**Nos. 25-2162 & 25-2357**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

MAHMOUD KHALIL,

Petitioner-Appellee,

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

Respondents-Appellants.

———————————

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

———————————

### APPENDIX: VOLUME I (1-389)

———————————

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

BENJAMIN HAYES
Special Counsel to the Assistant
Attorney General

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

JOHN F. STANTON
RACHEL L. BROWNING
Trial Attorneys

# TABLE OF CONTENTS

<u>Appendix – Volume I – Documents Required by Local Rule 32.2(c)</u>

Notice of Appeal, June 20, 2025 (for both June 11, 2025 and June 20, 2025 Orders)

    ECF No. 318 ...................................................................................................1

Notice of Appeal, July 18, 2025

    ECF No. 358 ...................................................................................................4

Amended Notice of Appeal (ECF 318), July 29, 2025

    ECF No. 368 ...................................................................................................6

Opinion and Order on Preliminary Injunction, June 11, 2025

    ECF No. 299 ...................................................................................................8

Order Granting Release, June 20, 2025

    ECF No. 316 .................................................................................................22

Opinion and Order, July 17, 2025

    ECF No. 355 .................................................................................................24

District of New Jersey Opinion and Order, April 1, 2025

    ECF No. 153 .................................................................................................34

District of New Jersey Opinion, April 29, 2025

    ECF No. 214 ...............................................................................................101

Opinion and Order on Preliminary Injunction, May 28, 2025

    ECF No. 272 ...............................................................................................209

Transcript of Motion Hearing for Release, June 20 Hearing - Judge Farbiarz

ECF No. 330 ............................................................................................................315

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel for Immigration Litigation
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Email: dhruman.y.sampat@usdoj.gov

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| MAHMOUD KHALIL,<br><br>*Petitioner,*<br><br>v.<br><br>WILLIAM P. JOYCE, *et al.*,<br><br>*Respondents.* | HON. MICHAEL E. FARBIARZ<br><br>*Civ. Act. No.* 25-cv-1963 (MEF) (MAH)<br><br>NOTICE OF APPEAL |

NOTICE is hereby given that Respondents[1] appeal to the United States Court of Appeals for the Third Circuit from the order entered on June 11, 2025, granting a preliminary injunction. *See* Dkt. No. 299. The order is an appealable interlocutory order of the district court under 28 U.S.C. § 1292(a)(1). The order incorporates previously issued opinions. *See* ECF Nos. 214, 272. Respondents appeal those opinions that are attendant to the granting of the preliminary injunction.

---

[1] Respondents are William P. Joyce, Acting Field Office Director of New York, United States Immigration and Customs Enforcement; Caleb Vitello, Acting Director of United States Immigration and Customs Enforcement; Kristi Noem, Secretary of the United States Department of Homeland Security; Pamel Bondi, Attorney General of the United States; Donald J. Trump, President of the United States; Marco Rubio, Secretary of the United States Department of State; and Yolanda Pittman, Warden of Elizabeth Contract Detention Facility.

<div align="center">

JA 1

</div>

NOTICE is hereby given that Respondents also appeal to the United States Court of Appeals for the Third Circuit from the order entered on June 20, 2025, granting Petitioner's motion for release on bail. *See* ECF No. 316. The order is an appealable interlocutory order of the district court under 28 U.S.C. § 1292(a)(1).

Dated: June 20, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel for Immigration Litigation

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov

**JA 2**

## CERTIFICATE OF SERVICE

I hereby certify that, on June 20, 2025, the foregoing Notice of Appeal was served upon counsel of record for Petitioner by notice of electronic filing with this Court's CM/ECF system.

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

*Petitioner,*

v.

WILLIAM P. JOYCE, *et al.,*

*Respondents.*

HON. MICHAEL E. FARBIARZ

*Civ. Act. No.* 25-cv-1963 (MEF) (MAH)

NOTICE OF APPEAL

NOTICE is hereby given that Respondents[1] appeal to the United States Court of Appeals for the Third Circuit from the order entered on July 17, 2025, ECF 355, modifying the preliminary injunction entered on June 11, 2025, ECF 299. The order is an appealable interlocutory order under 28 U.S.C. § 1292(a)(1). The order incorporates previously issued opinions. *See* ECF 214, 272, 299. Respondents appeal those opinions that are attendant to the preliminary injunction.

Respectfully submitted,

*/s/ Alanna T. Duong*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel for Immigration Litigation

DHRUMAN Y. SAMPAT
Senior Litigation Counsel

ALANNA T. DUONG
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
alanna.duong@usdoj.gov

July 18, 2025

Attorneys for Respondents

---

[1] Respondents are William P. Joyce, Acting Field Office Director of New York, United States Immigration and Customs Enforcement; Caleb Vitello, Acting Director of United States Immigration and Customs Enforcement; Kristi Noem, Secretary of the United States Department of Homeland Security; Pamel Bondi, Attorney General of the United States; Donald J. Trump, President of the United States; Marco Rubio, Secretary of the United States Department of State; and Yolanda Pittman, Warden of Elizabeth Contract Detention Facility.

JA 4

**CERTIFICATE OF SERVICE**

      I hereby certify that, on July 18, 2025, the foregoing Notice of Appeal was served upon counsel

of record for Petitioner by notice of electronic filing with this Court's CM/ECF system.

<div align="right">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

*Petitioner,*

v.

WILLIAM P. JOYCE, *et al.,*

*Respondents.*

HON. MICHAEL E. FARBIARZ

*Civ. Act. No.* 25-cv-1963 (MEF) (MAH)

AMENDED NOTICE OF APPEAL
(ECF 318)

NOTICE is hereby given that Respondents'[1] appeal to the United States Court of Appeals for the Third Circuit from the order entered on June 11, 2025, ECF 299, granting a preliminary injunction, is amended to incorporate the subsequently entered order on June 17, 2025, ECF 355, modifying the preliminary injunction. *See* ECF 318, 358; Dkt. No. 25-2162 (3d Cir.). The orders are appealable under 28 U.S.C. § 1292(a)(1), and incorporate previously issued opinions. *See* ECF 214, 272. Respondents appeal those opinions that are attendant to the preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel for Immigration Litigation

DHRUMAN Y. SAMPAT
Senior Litigation Counsel

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
alanna.duong@usdoj.gov

July 29, 2025

Attorneys for Respondents

---

[1] Respondents are William P. Joyce, Acting Field Office Director of New York, United States Immigration and Customs Enforcement; Caleb Vitello, Acting Director of United States Immigration and Customs Enforcement; Kristi Noem, Secretary of the United States Department of Homeland Security; Pamel Bondi, Attorney General of the United States; Donald J. Trump, President of the United States; Marco Rubio, Secretary of the United States Department of State; and Yolanda Pittman, Warden of Elizabeth Contract Detention Facility.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 29, 2025, the foregoing Notice of Appeal was served upon counsel

of record for Petitioner by notice of electronic filing with this Court's CM/ECF system.

<div align="right">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MAHMOUD KHALIL,

      *Petitioner*,

   v.

DONALD TRUMP et al.,

      *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

<u>**OPINION and ORDER**</u>

**Table of Contents**

I.    <u>**Background**</u>
    A.   <u>**The Facts**</u>
    B.   <u>**Procedural History**</u>
    C.   <u>**The Court's Approach**</u>
II.  <u>**Preliminary Injunction Requirements**</u>
    A.   <u>**Success**</u>
    B.   <u>**Harm**</u>
    C.   <u>**Equities**</u>
    D.   <u>**Public Interest**</u>
III. <u>**The Preliminary Injunction**</u>

\*    \*    \*

Federal officials detained a lawful permanent resident and seek to remove him from the United States for two reasons.

One reason is that the Secretary of State has determined that his activities and presence in the United States "compromise a compelling . . . foreign policy interest."

The lawful permanent resident filed a habeas corpus petition and has moved to preliminarily enjoin federal officials from

removing him from the United States based on the Secretary's determination.

The motion is granted.

\*     \*     \*

## I.   **Background**

### A.   **The Facts**

The relevant facts for now are as follows.

A lawful permanent resident[1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6.

He remains in immigration custody.  See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief (ECF 124) ("Motion for Preliminary Injunction") at 1-2.

The Department of Homeland Security is seeking to remove him from the United States on two grounds.

The first ground:

In 2024, the lawful permanent resident inaccurately completed his lawful-permanent-resident application.  See DHS Evidence, Tab 2 (Apr. 9, 2025) (Form I-485); see also Additional Charges of Inadmissibility (Mar. 17, 2025) (ECF 90-1) ("Additional Charges") at 1.

This can be a basis for removal.  See Additional Charges at 1; see also 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A).

The second ground for removal:

The Secretary of State determined that the lawful permanent resident's continued activities or presence in the United States would "compromise a compelling . . . foreign policy interest." Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security (ECF 198-1) ("Determination"), at 1.

Such a determination can also be a basis for removal.  See 8 U.S.C. § 1227(a)(4)(C).

---

[1]  Mahmoud Khalil.

B. **Procedural History**

The lawful permanent resident filed a habeas corpus petition in federal court.  <u>See</u> ECF 2.

From here, he is called "the Petitioner."  The various people he named in the petition are called "the Respondents."[2]

The Petitioner moved to preliminary enjoin his removal from the United States.  <u>See</u> ECF 66.[3]

The preliminary injunction motion became fully submitted on May 14, with the filing of the parties' last legal brief.  <u>See</u> ECF 256.

On May 28, the Court ruled on the motion.

As to the <u>first</u> ground of removal, related to the Petitioner's alleged failure to accurately complete the lawful-permanent-resident application, the Court denied the motion.

The Court held that the Petitioner had put forward no evidence, <u>see</u> <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1514713, at *54 (D.N.J. May 28, 2025), and also had not meaningfully developed legal arguments. <u>See</u> <u>id</u>. at *52–53.

As to the <u>second</u> ground of removal, related to the Secretary of State's determination, the Court held the Petitioner was likely to succeed on the merits of his claim, <u>see</u> <u>id</u>. at *52, but had not sufficiently addressed the <u>other</u> things a preliminary injunction applicant must show.  <u>See</u> <u>id</u>. at *55.

---

[2]  The Respondents are listed in the current habeas petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

[3]  For a fuller description of the relevant procedural history, see <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1514713, at *2–3 (D.N.J. May 28, 2025).

3

As to these matters, the Court indicated it would allow the record to be supplemented.  See id.; see also ECF 273.

The Petitioner said that he would need just under a week to do so.  See Petitioner's Letter (May 29, 2025) (ECF 274).  The Court set a briefing schedule accordingly, see ECF 275, and the final brief was filed yesterday.  See ECF 295.

### C.   **The Court's Approach**

To obtain a preliminary injunction, the Petitioner must show four things.  See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

He must establish that "he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id.  Of these, the "most critical" elements are the first and second.  See Nken v. Holder, 556 U.S. 418, 434 (2009).

The Court considers each of these four below, see Part II, and concludes that a preliminary injunction should issue as to the Secretary of State's determination.  The preliminary injunction's terms are set out in Part III.

## II.   **Preliminary Injunction Requirements**

### A.   **Success**

To obtain a preliminary injunction as to the Secretary's determination, the Petitioner must first show that he is likely to succeed on the merits of his claim.  See Winter, 555 U.S. at 20.

He has made this showing.  See Khalil, 2025 WL 1514713, at *56.

### B.   **Harm**

Next, the Petitioner must demonstrate that he is likely to suffer irreparable harm without preliminary relief.  See Winter, 555 U.S. at 20.

The Court concludes that he has done so.

\*     \*     \*

4

**JA 11**

<u>First</u>, the Petitioner states that the Secretary's determination has cost him a job, <u>see</u> Declaration of Mahmoud Khalil ("Khalil Declaration") (June 4, 2024) (ECF 281-1) ¶¶ 15-16, and damaged his career prospects through "career-ending" professional harm. <u>See id</u>. ¶¶ 15-17 (describing a hoped-for career in "diplomacy and international affairs," steps taken down that road, and the difficulty of sustaining such a career in light of the Secretary's determination). The Respondents do not contest this. <u>See</u> Respondents' Letter (June 9, 2025). And as a legal matter, serious long-term damage to career prospects can count as irreparable harm.[4] <u>See</u> <u>Kamdem-Ouaffo</u> v. <u>Task Mgmt. Inc.</u>, 792 F. App'x 218, 222 (3d Cir. 2019) (citing <u>Morton</u> v. <u>Beyer</u>, 822 F.2d 364, 372 n.13 (3d Cir. 1987)); <u>Acierno</u> v. <u>New Castle Cnty.</u>, 40 F.3d 645, 654 (3d Cir. 1994); <u>see also</u> <u>Carson</u> v. <u>Am. Brands, Inc.</u>, 450 U.S. 79, 89 & n.16 (1981); <u>Valley</u> v. <u>Rapides Parish Sch. Bd.</u>, 118 F.3d 1047, 1055-56 (5th Cir. 1997); <u>NAACP, Inc.</u> v. <u>Town of E. Haven</u>, 70 F.3d 219, 224 (2d Cir. 1995).

\*     \*     \*

<u>Second</u>, the Petitioner states that the Secretary's determination harms his reputation. <u>See</u> Khalil Declaration ¶¶ 3, 8-10, 16, 22. Again, the Respondents have opted not to contest this. <u>See</u> Respondents' Letter (June 9, 2025). And when it cannot be compensated through money damages, as cannot readily be done here, reputational injury can count as irreparable harm. <u>See</u>, <u>e.g.</u>, <u>Guardian Life Ins. Co. of Am.</u> v. <u>Est. of Cerniglia</u>, 446 F. App'x 453, 456 (3d Cir. 2011); <u>Kos Pharms., Inc.</u> v. <u>Andrx Corp.</u>, 369 F.3d 700, 726 (3d Cir. 2004); <u>Pappan Enters., Inc.</u> v. <u>Hardee's Food Sys., Inc.</u>, 143 F.3d 800, 805 (3d Cir. 1998); <u>accord</u>, <u>e.g.</u>, <u>Life Spine, Inc.</u> v. <u>Aegis Spine, Inc.</u>, 8 F.4th 531, 546 (7th Cir. 2021); <u>Register.com., Inc.</u> v. <u>Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004); <u>Rent-a-Center, Inc.</u> v. <u>Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991); <u>see also</u> 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (4th ed. 2025) ("Injury to reputation . . . is not easily measurable in monetary terms, and so often is viewed as irreparable."); <u>Bennington Foods LLC</u> v.

---

[4] Loss of employment, standing on its own, generally would not. <u>See</u> <u>Morton</u>, 822 F.2d at 372; <u>Moteles</u> v. <u>Univ. of Pa.</u>, 730 F.2d 913, 919 (3d Cir. 1984); 1 Moore's Manual --- Federal Practice and Procedure § 10A.22(2)(c) (2025).

St. Croix Renaissance, Grp., LLP, 528 F.3d 176, 178-79 (3d Cir. 2008).

<p style="text-align:center">*    *    *</p>

Third, the Petitioner states that the Secretary's determination deters him from engaging in speech-related activities.  In particular, the Petitioner states that he engaged in protest activities, see Khalil Declaration ¶ 12, and that "[a]s I remain detained because of the [Secretary of State's] [d]etermination, . . . I am unable to protest." Id. ¶ 13.[5]

Again, the Respondents have not contested this factually.  See Respondents' Letter (June 9, 2025).[6]

And per the Supreme Court, "chilling" of speech counts as irreparable harm.  See Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion); see also, e.g., Hartman v. Moore, 547 U.S. 250, 256 (2006); Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 794 (1988); Wooley v. Maynard, 430 U.S. 705, 714 (1977).[7]

---

[5]  The Petitioner's speech-related activities concern political speech.  See Petition ¶¶ 22-23, 26, 29; Khalil Declaration ¶¶ 12-14; Declaration of Noor Ramez Abdalla (Mar. 14, 2025) (ECF 55) ¶¶ 6-8; see also Khalil, 2025 WL 1232369, at *45-46. And political speech is entitled to special protection under the First Amendment.  See id. at *45.

[6]  There is ample record evidence that the Petitioner engaged in speech-related activities.  See Third Amended Petition (ECF 236) ("Petition") ¶¶ 22-29; Khalil Declaration ¶¶ 12-14; Declaration of Noor Ramez Abdalla (Mar. 14, 2025) (ECF 55) ¶¶ 6-8.  And also that he would return to these activities if detention did not prevent him from doing so.  See Khalil Declaration ¶¶ 13-14, 23; Petition ¶ 72; see also Khalil Declaration ¶¶ 9-12; Declaration of Veronica Salama, Exhibit B ("Abdalla June 4 Declaration") ¶ 26; Petition ¶ 22; cf. Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024).  (The Petition has been verified.  See Khalil Declaration ¶ 1.  Therefore, the Court treats it as evidence. See, e.g., K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972); see also Bascom Food Prods. Corp. v. Reese Finer Foods, Inc., 715 F. Supp. 616, 624 n.14 (D.N.J. 1989).)

[7]  Three things.  First, the underlying likely legal violation here relates to unconstitutional vagueness.  See Khalil, 2025 WL

<p style="text-align:center">6</p>

<p style="text-align:center">**JA 13**</p>

To be sure, it might be argued that the Petitioner would be detained anyway. After all, as noted above, the Department of Homeland Security is seeking to remove the Petitioner based not only on the Secretary of State's determination --- but also on a second basis, the Petitioner's alleged failure to accurately

---

1514713, at *52. But a chilling effect on speech can count as an irreparable harm even where the underlying legal violation is not itself a First Amendment violation. See, e.g., Reporters Comm. for Freedom of the Press v. Rokita, 751 F. Supp. 3d 931, 943-44, 947 (S.D. Ind. 2024) (so holding); Ctr. for Individual Freedom, Inc. v. Ireland, 2008 WL 1837324, at *5 (S.D. W. Va. Apr. 22, 2008) (same); Alexander v. Thornburgh, 713 F. Supp. 1278, 1287-88 (D. Minn. 1989) (same); cf. Walls v. Sanders, 733 F. Supp. 3d 721, 741 (E.D. Ark. 2024) (holding that a vague statute that assertedly chills teachers' classroom speech does not count as irreparable injury because "when . . . teachers speak in the course of carrying out . . . required employment obligations, they have no personal interest in the content of that speech") (cleaned up). To be sure, causation principles require a tight nexus between the underlying legal violation and the chilling impact on speech. Cf. Goldie's Bookstore v. Super. Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984). Here, the Court finds, there is plainly that sort of close link. Second, the Petitioner seems to suggest that his detention may itself count as irreparable harm. See Petitioner's Letter (June 4, 2025) (ECF 280) at 1 & n.1. But there are cases that tug in different directions on this. Compare, e.g., Arevalo v. Hennessy, 882 F.3d 763, 767 (9th Cir. 2018), and United States v. Bogle, 855 F.2d 707, 710-11 (11th Cir. 1988), with Watkins v. Muhammad, 2024 WL 4524525, at *3 (7th Cir. Oct. 18, 2024) ("[T]he ordinary hardships [such as pretrial detention] experienced by criminal defendants do not rise to the level of irreparable harm."); see also Respondents' Letter (June 9, 2025) (ECF 288) at 2 (discussing this point in the immigration context). The Petitioner's legal briefs do not meaningfully discuss this or cite cases in support of his position. Third, as part of his irreparable-harm filing, the Petitioner put forward evidence to suggest the Secretary's determination has chilled the speech of third parties. But the Petitioner makes no legal argument as to how that can count as irreparable harm here. See, e.g., Kansas v. United States, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the moving party, not . . . [a] third party.") (cleaned up).

complete his lawful-permanent-resident application.  <u>See</u>
Additional Charges at 1.

Maybe the Petitioner would be detained, in any event, on that
second basis.  And if so, it might be argued, there would not be
any incremental chilling effect from detaining the Petitioner
for an <u>additional</u> reason, the Secretary of State's
determination.

But that argument does not work.

The reason: the evidence is that lawful permanent residents are
virtually never detained pending removal for the sort of alleged
omissions in a lawful-permanent-resident application that the
Petitioner is charged with here.  And that strongly suggests
that it is the Secretary of State's determination that drives
the Petitioner's ongoing detention --- not the other charge
against him.

On this point, there are three relevant pieces of evidence.
(Again, none of this is contested by the Respondents.  <u>See</u>
Respondents' Letter (June 9, 2025).)

First, Kerry Doyle[8] states in a declaration that "[l]awful
permanent residents . . . are . . . certainly not detained,

---

[8] Doyle's relevant experience:

> I served as Principal Legal Advisor (PLA),
> for Immigration Customs Enforcement (ICE)
> from September 2021 through September 2024.
> In that role, I oversaw the more than 1,500
> attorneys and staff who work for the Office
> of the Principal Legal Advisor (OPLA) across
> the country.  As PLA, I was responsible for
> establishing the direction and priorities of
> our office in alignment with the Office of
> General Counsel (OGC), ICE, and DHS
> leadership.  During that time, I also served
> on detail as Acting Deputy General Counsel,
> Office of General Counsel (OGC), Department
> of Homeland Security (DHS) from February
> 2024 through May 2024 and as Deputy General
> Counsel from October 2024 through December
> 2024.  I was appointed as an Immigration

based solely on the types of allegedly missing information described [here][.]"  Declaration of Veronica Salama, Exhibit P (ECF 281-16) ¶ 18.

Second, per Stacy Tolchin: "it is incredibly rare to see a lawful permanent resident detained . . . for[, as in this case,] having failed to disclose a past membership or association on the application for adjustment of status."  Declaration of Veronica Salama, Exhibit L (ECF 281-12) ¶ 13 (emphasis added).

Tolchin, whose experience is extensive, see id. ¶¶ 1, 4-5, says this:

> I have represented at least ten permanent residents who have been placed into removal proceedings after they were denied naturalization.  The only ones who were detained were those who had criminal convictions that DHS believed made them removable, in addition to being ineligible for naturalization.

Id. ¶ 17.

And all the more so, per Tolchin, as to one of the questions that the Petitioner allegedly answered inaccurately, given the history of "many" federal immigration officials essentially ignoring this question, see id. ¶ 12; see also id. ¶ 8; the question's asserted vagueness, see id. ¶¶ 7-11; the case law that has developed under it, see id. ¶¶ 13-14; and the particular context here.  See id. ¶ 15.

> As relevant to [the Petitioner]'s case, it is incredibly rare to see a lawful permanent resident detained . . . for having failed to disclose a past membership or association on the application for adjustment of status.

---

Judge and served in that position from December 2024 through mid-February 2025.

In private practice, I have represented many hundreds of noncitizens in removal proceedings.

Declaration of Veronica Salama, Exhibit P (ECF 281-16) ¶¶ 3-4.

9

**JA 16**

Id. ¶ 16.

The third declaration is Ira J. Kurzban's.[9]

He states that, in general, lawful permanent residents are
typically not detained by the immigration judge unless detention
is mandatory.  See Kurzban Declaration ¶ 14.  "[I]t is extremely
unusual for a lawful permanent resident charged . . . [for]
making material misrepresentations to be detained pending
removal proceedings absent aggravating circumstances such as a
criminal record."  Id. ¶ 15; see also id. ¶ 16.  And all of that
generally tracks with this case.[10]

The Doyle, Tolchin, and Kurzban declarations are each based on
extensive professional experience.  They are written in a
careful way.  And they back each other up; they are mutually
reinforcing, one to the next.

Based on the declarations, the Court finds as a matter of fact
that it is overwhelmingly likely that the Petitioner would not
be detained based solely on the lawful-permanent-resident-
application charge.  Rather, the Court finds, the Petitioner's
detention almost surely flows from the charge that is based on
the Secretary of State's determination.[11]

---

[9]  Kurzban's relevant experience: a leading immigration-law
scholar, see Declaration of Veronica Salama, Exhibit K (ECF 281-
11) ("Kurzban Declaration") ¶ 4, and practitioner, see id. ¶¶ 2-
3, 5-7, who has been counsel of record on various landmark
Supreme Court cases.  See id. ¶ 6.

[10]  The Petitioner has no criminal record.  See Khalil
Declaration ¶ 5.  The Secretary of State's determination does
not say that he has been involved in criminal activity or
violence.  See Determination at 1-2.  And the Respondents have
not put forward any evidence as to involvement by the Petitioner
in violence, destruction of property, or any other sort of
criminal activity.

[11]  The Petitioner also states that even "[b]eyond [his]
immediate detention," Khalil Declaration at ¶ 14, the Secretary
of State's determination chills his speech.  The Court credits
this, and finds as a factual matter that even if the Petitioner
were not detained, or even if he were detained on another basis,
the Secretary's determination would deter him from speaking.

```
            *     *     *
```

To sum up:

The Respondents have not contested the evidence put forward by the Petitioner, and in light of that the Court finds as a matter of fact that the Petitioner's career and reputation are being damaged and his speech is being chilled --- and this adds up to irreparable harm.

### C.  Equities

So far, the Court has held that the Petitioner is likely to succeed on the merits and would suffer irreparable harm without an injunction.  See Part II.A and Part II.B.

Now the Court considers the third requirement for an injunction.[12]  Has the Petitioner shown "that the balance of equities tips in his favor"?  Winter, 555 U.S. at 20.

Yes.

The Respondents can have little or no interest in applying the relevant underlying statutes in what is likely an unconstitutional way.  See A.C.L.U. v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.").

And "[w]hen a plaintiff is claiming the loss of a First Amendment right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue."  11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2948.2 (3d ed. 2025) (citing Ramirez v. Collier, 595 U.S. 411, 433 (2022); Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020); Yang v. Kosinski, 960 F.3d 119, 136 (2d Cir. 2020); Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1059 (9th Cir. 2007)); accord

---

This is in part because of the vagueness associated with the determination's underlying approach.  That makes it hard to know what speech might potentially be covered, see Khalil, 2025 WL 1514713, at *37-42, and more likely that a person will curb his speech.  See id. at *41 n.63.

[12]  This third requirement is less important than the first two. See Nken, 556 U.S. at 434.

**JA 18**

Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 109 (3d Cir. 2022).

### D.   **Public Interest**

Finally, the Petitioner must show "that an injunction is in the public interest."  Winter, 555 U.S. at 20.[13]

"[T]he public has no interest in the enforcement of what is very likely an unconstitutional statute."  Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1290 (11th Cir. 2013); accord, e.g., Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 128–29 (3d Cir. 2023); Chamber of Com. of U.S. v. Edmondson, 594 F.3d 742, 771 (10th Cir. 2010).

And on the other side of the ledger, there is a chilling effect on speech.  See Amalgamated Transit Union Loc. 85, 39 F.4th at 109 ("There is a strong public interest in upholding the requirements of the First Amendment.  And, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.") (cleaned up).

## III. **The Preliminary Injunction**

All four preliminary injunction factors point in the same direction.  See Part II.  In light of that, the Court exercises its discretion, see Benisek v. Lamone, 585 U.S. 155, 158 (2018), and holds:

First, the Respondents are preliminarily enjoined from seeking to remove the Petitioner from the United States based on the Secretary of State's determination, as reflected in the Secretary's memorandum to the Secretary of Homeland Security.

Second, because the Court's preliminary injunction bars the Respondents from seeking to remove the Petitioner based on the Secretary's determination, the Respondents are also

---

[13]  This fourth requirement is less important than the first two. See Nken, 556 U.S. at 434.

preliminarily enjoined from detaining the Petitioner based on the Secretary of State's determination.[14]

The Court hereby stays its preliminary injunction for around 40 hours, until 9:30AM on June 13. This is to allow the Respondents to seek appellate review should they wish to.

In addition, the preliminary injunction shall not go into effect unless and until the Petitioner posts a nominal bond in the amount of $1, consistent with the requirement of Federal Rule of Civil Procedure 65(c).[15]

\*      \*      \*

---

[14]  The two holdings set out in the text have no impact on efforts to remove the Petitioner for reasons other than the Secretary of State's determination.

[15]  The Respondents have requested the posting of a bond. See Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction (ECF 156) at 35. But they have not specified any costs associated with complying with a preliminary injunction that they would seek to get back if the injunction were undone on appeal. See id.; see generally Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 804-05 (3d Cir. 1989) ("[T]he bond serves to inform the plaintiff of the price they can expect to pay if the injunction was wrongfully issued."); see also Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988). The Court is unaware of any such costs. See Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010); Siegel v. Platkin, 653 F. Supp. 3d 136, 161 (D.N.J. 2023); Koons v. Reynolds, 649 F. Supp. 3d 14, 45 (D.N.J. 2023); Beattie v. Line Mountain Sch. Dist., 992 F. Supp. 2d 384, 397 (M.D. Pa. 2014); Stilp v. Contino, 629 F. Supp. 2d 449, 468 (M.D. Pa. 2009), aff'd and remanded, 613 F.3d 405 (3d Cir. 2010). To be sure, if the Respondents opt to appeal, some of their attorneys' time would be occupied. But a Rule 65 bond does not typically aim to cover the costs associated with attorneys' fees. See Tullock v. Mulvane, 184 U.S. 497, 510-12 (1902) (quoting Oelrichs v. Spain, 82 U.S. (15 Wall.) 211, 230-31 (1872)); Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 560 (2d Cir. 2011); Fireman's Fund Ins. Co. v. S.E.K. Constr. Co., 436 F.2d 1345, 1351-52 (10th Cir. 1971); Sionix Corp. v. Moorehead, 299 F. Supp. 2d 1082, 1086 (S.D. Cal. 2003); Minn. Power & Light Co. v. Hockett, 105 F. Supp. 2d 939, 942 (S.D. Ind. 1999); 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2954 & n.1.

IT IS on this 11th day of June, 2025, so ORDERED.

_____

Michael E. Farbiarz, U.S.D.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

      *Petitioner*,

  v.

DONALD TRUMP et al.,

      *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**<u>ORDER</u>**

The Petitioner here is Mahmoud Khalil, currently detained by federal immigration authorities in Jena, Louisiana.

The Petitioner's motion at ECF 308 is granted to the extent the motion seeks release on bail from immigration custody.

The motion at ECF 308 is denied as moot to the extent it seeks transfer to New Jersey.

The ECF 308 motion is granted and denied for the reasons stated in court today.

After the Court issued its decision on the ECF 308 motion, the Respondents orally moved for a stay of the decision. The motion was denied for the reasons stated in court.

Pursuant to the Court's decision on the ECF 308 motion, the Petitioner shall be released from immigration custody today.

The release order shall become effective upon two conditions being met. First, the setting of bail conditions by the United States Magistrate Judge. And second, an order from the United States Magistrate Judge indicating that the bail conditions have been met.

The bail conditions here shall not include any obligation that electronic monitoring be put in place or that a bond be

immediately posted.  There is no basis for that in the
evidentiary record the parties have developed.

The bail conditions shall include other requirements that the
United States Magistrate Judge deems appropriate, including as
to those states to which and through which the Petitioner may
travel, and when the Petitioner must surrender his passport or
passports.

IT IS on this 20th day of June, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.

<center>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</center>

MAHMOUD KHALIL,

        *Petitioner*,

   v.

DONALD TRUMP et al.,

        *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION and ORDER**

<center>*   *   *</center>

For the purposes of this brief Opinion and Order, the Court assumes familiarity with the facts and procedural history of this case.

<center>*   *   *</center>

On June 11, the Court preliminarily enjoined the Respondents "from seeking to remove the Petitioner from the United States based on the Secretary of State's determination." Khalil v. Trump, 2025 WL 1649197, at *6 (D.N.J. June 11, 2025).

The Petitioner sought clarification as to how the June 11 preliminary injunction applies in certain particular circumstances. See Petitioner's Letter (July 1, 2025) (ECF 332).

As to that question, the parties filed letter briefs, see Petitioner's Letter (July 11, 2025) (ECF 347), Respondents' Letter (July 15, 2025) (ECF 349), the Court issued an Opinion and Order, see ECF 350, and the parties filed supplemental materials. See Petitioner's Brief (July 17, 2025) (ECF 352); Respondents' Brief (July 17, 2025) (ECF 353); Petitioner's Reply Brief (July 17, 2025) (ECF 354).

The Court writes briefly here to clarify in three ways the meaning of its June 11 preliminary injunction.

<center>**JA 24**</center>

*     *     *

<u>First</u>.

Under the June 11 preliminary injunction, the Respondents must
cause the immigration judge to promptly vacate or amend her June
20 decision to the extent it finds the Petitioner removable from
the United States on the 8 U.S.C. § 1227(a)(4)(C) charge, which
charge rests on the Secretary of State's determination.

The reason for this is straightforward.

In accord with the June 11 preliminary injunction, the June 20
decision simply should not have included any finding that the
Petitioner can be removed from the United States on the Section
1227 charge.

At bottom, the core purpose of such a finding is to advance the
process of removing the Petitioner from the United States on the
referenced charge.

And there is no meaningful real-world difference between that
and what the June 11 preliminary injunction explicitly forbade.
<u>See</u> <u>Khalil</u>, 2025 WL 1649197, at *6 ("Respondents are
preliminarily enjoined from seeking to remove the Petitioner
from the United States based on the Secretary of State's
determination.").

In short: issuance of the Section 1227 finding was directly
inconsistent with the June 11 preliminary injunction.[1]

_____

[1] In recent weeks, the Respondents have apparently contended
that the Court's June 11 preliminary injunction was forward-
looking only, and that it therefore does not require any
backward-looking undoing of actions already taken. <u>See</u>
Respondents' Letter (July 15, 2025) at 3. The Respondents do
not seem to make that argument now. <u>See</u> Respondents' Brief
(July 17, 2025). But one way or another, the argument misses
the mark. The June 20 immigration court finding came down <u>after</u>
this Court's June 11 preliminary injunction. It should not have
been made. The Court, today, needs to take a backward-looking
action --- to reach back and compel the June 20 decision to be
vacated or amended --- because the June 11 preliminary
injunction was not properly complied with. That has nothing to
do with whether the June 11 preliminary injunction did or did
not include a backward-looking aspect; as of June 11, the June

And the underlying equities here, see ECF 350 at 3-4, make clear that the June 11 preliminary injunction should be interpreted and applied as written.

The Petitioner has filed a declaration that sets out harms he continues to face because of the Secretary of State's determination and the Respondents' efforts to remove him on that basis --- even after this Court's June 11 preliminary injunction.  See Declaration of Mahmoud Khalil (July 16, 2025) (ECF 352-2) ¶¶ 3-9, 12.

The Respondents have not contested the Petitioner's declaration. And the immigration judge, before whom the Petitioner testified in person, described him as "credible."  In the Matter of Mahmoud Khalil (June 20, 2025) (ECF 333) at 17.

Against this backdrop, the Court generally credits the Petitioner's declaration and finds as a factual matter that the continued post-June 11 efforts to remove him from the United States on the Section 1227 charge are causing various types of harm.  Reputational harm.  See Declaration of Mahmoud Khalil ¶¶ 3, 7.  Professional harm.  See id.  And the chilling of speech.  See id. ¶¶ 5-6.

These can count as irreparable injury, see Khalil, 2025 WL 1649197, at *2-5, and the Court finds as a factual matter that they do here.

Moreover, the Petitioner persuasively argues that if the Section 1227 finding remains in the immigration judge's June 20 decision, the Board of Immigration Appeals would simply have no choice under existing case law but to affirm it.  See Khalil v. Joyce, 2025 WL 1232369, at *41-42 (D.N.J. Apr. 29, 2025); Petitioner's Brief (July 17, 2025) at 4 (citing declarations).

And once the Board decides the Petitioner's appeal, he will be subject to a final order of removal, losing his status as a lawful permanent resident and therefore his ability to work. See Petitioner's Brief (July 17, 2025) at 4 (citing declarations).  The Respondents have disputed none of this, and the Court credits it.

---

20 decision had of course not yet been issued.  Even if the June 11 preliminary injunction had only prospective effect, the June 20 decision should not have included the Section 1227 removal finding.

3

**JA 26**

Bottom line: the June 20 decision must be vacated or amended, to the extent stated above.

                    *     *     *

Second.

Under the June 11 preliminary injunction, the Respondents do not need to cause the immigration judge to revisit the determination she made in the June 20 decision as to the Petitioner's eligibility for asylum under 8 U.S.C. § 1158.

The immigration judge conducted an extensive and close written analysis of the asylum issue, spanning six single-spaced pages and based on live testimony.  See In the Matter of Mahmoud Khalil at 14-16, 21-26.

In light of this, the immigration judge concluded that the Petitioner is not eligible for asylum --- for reasons that she explicitly stated are not based on the Secretary of State's determination.  See id. at 21.

That conclusion is independent of the Secretary of State's determination.  Therefore, it is not at odds with the Court's June 11 preliminary injunction, which ordered relief only as to the determination.[2]

---

[2]  The Petitioner takes a different view.  He notes that asylum was also denied by the immigration judge on another ground, the Secretary's determination.  See Petitioner's Letter (July 11, 2025) at 1, 3 (citing In the Matter of Mahmoud Khalil at 20-21).  And the Petitioner argues that if that other ground is left in place, then the Board of Immigration Appeals might affirm the June 20 decision on that ground --- and ignore the immigration judge's independent, factual asylum analysis.  See Petitioner's Letter (July 11, 2025) at 3.  If the Board of Immigration Appeals opts to one day go down that road, the Petitioner can then seek relief from this Court.  But the Board of Immigration Appeals deserves this Court's respect.  And this Court will not proceed on the assumption that the Board will at some point take a step that would (a) be in some tension with this Court's June 11 preliminary injunction and (b) not engage with the extensive and independent asylum analysis undertaken by the immigration judge.  More generally, the Respondents are right to note that federal immigration law aims to preserve a wide swath of Executive Branch discretion and autonomy.  See Respondents'

\*       \*       \*

<u>Third</u>.

Under the June 11 preliminary injunction, the Respondents must cause the immigration judge to consider in an appropriately full and thorough manner, and then determine: (i) whether the Petitioner should be granted a waiver of removability, <u>see</u> 8 U.S.C. § 1227(a)(1)(H), in connection with the charge lodged against him as to his alleged failure to accurately complete his lawful permanent resident application ("LPR Charge"), and (ii) whether the Petitioner should be afforded an evidentiary hearing in connection with the immigration judge's assessment of his waiver-of-removability arguments.

The Respondents must ensure that, in doing the things set out in the preceding paragraph, the immigration judge gives no consideration to the Secretary of State's determination that the Petitioner is removable from the United States under 8 U.S.C. § 1227(a)(4)(C).

The basis for the above is again straightforward.

The June 11 preliminary injunction prohibited removal of the Petitioner from the United States "based on the Secretary of State's determination."

As the Court has noted, the June 11 preliminary injunction "is not qualified." ECF 350 at 2. "It covers all efforts," including "[t]hose that as a practical matter meaningfully rely on the Secretary's determination." <u>Id</u>.

The Court finds as a factual matter that the Respondents' efforts to remove the Petitioner from the United States on the LPR Charge "meaningfully rely on the Secretary's determination."

---

Brief (July 17, 2025) at 3. And the Respondents are also right to note that district courts such as this do not have appellate jurisdiction over the Executive's immigration tribunals. <u>See</u> Respondents' Letter (July 15, 2025) at 1-3. All of that weighs against this Court becoming more involved in the functioning of the immigration courts than is strictly necessary --- and against requiring that the asylum part of the June 20 decision now be undone, based on a speculation as to how the Board of Immigration Appeals might one day proceed.

5

**JA 28**

The Petitioner has filed multiple factual declarations on this point.[3]  Each is based on extensive experience,[4] and none has been contested by the Respondents.  The Court generally credits these declarations.

As a factual matter, the declarations establish the following:

- As to the LPR Charge, Section 1227(a)(1)(H) permits a waiver of removability for someone who "is the spouse [and] parent . . . of a citizen of the United States."  <u>See</u> Doyle Declaration ¶¶ 19-20; Tolchin Declaration ¶ 6; Kurzban Declaration ¶ 15.  The Petitioner fits into this category.  <u>See</u> Declaration of Mahmoud Khalil ¶ 7.

- A request for a Section 1227(a)(1)(H) waiver is typically made by requesting an evidentiary hearing before an immigration judge.  <u>See</u> Doyle Declaration ¶ 23; Tolchin Declaration ¶ 8; Kurzban Declaration ¶ 16.

- That request was repeatedly made here, <u>see</u> Declaration of Marc Van Der Hout (ECF 352-1) ¶¶ 6, 7-8, but it was denied, <u>see id</u>. ¶¶ 9-16, and the immigration judge issued her decision on the LPR Charge without assessing the Petitioner's eligibility for a Section 1227(a)(1)(H) waiver.  <u>See id</u>. ¶ 14; <u>see generally</u> In the Matter of Mahmoud Khalil.

- But evidentiary hearings are typically granted to those who, like the Petitioner, are statutorily eligible for a Section 1227(a)(1)(H) waiver.  <u>See</u> Tolchin Declaration ¶ 13 ("[U]nder normal circumstances, where a noncitizen . . . meet[s] the eligibility criteria [of Section 1227(a)(1)(H)], and has stated their intention to pursue a § 1227(a)(1)(H) waiver, an evidentiary hearing must be scheduled[.]"); Kurzban Declaration ¶ 20 ("An

---

[3]  The relevant ones are the declarations of Kerry E. Doyle, Stacy Tolchin, and Ira J. Kurzban.  <u>See</u> Declaration of Kerry E. Doyle ("Doyle Declaration") (ECF 352-3); Declaration of Stacy Tolchin ("Tolchin Declaration") (ECF 352-4); Declaration of Ira J. Kurzban ("Kurzban Declaration") (ECF 352-5).

[4]  <u>See</u> Doyle Declaration ¶¶ 2-4; Tolchin Declaration ¶ 1; Kurzban Declaration ¶¶ 1-6; <u>see generally</u> <u>Khalil</u>, 2025 WL 1649197, at *5 (describing these declarants as having "extensive professional experience").

**JA 29**

Immigration Judge's refusal to hold an evidentiary hearing on a waiver for an individual who is statutorily eligible for the waiver is highly unusual and is contrary to the normal conduct of immigration court procedure.").

- This strongly suggests that the Secretary of State's determination is operating as the hurdle that is preventing an evidentiary hearing, and therefore the possibility of a waiver.

- And that suggestion is buttressed by the way that the proceedings have unfolded before the immigration judge. See Declaration of Marc Van Der Hout ¶¶ 14–15.

- Not considering a Section 1227(a)(1)(H) waiver on the LPR Charge is no academic matter.  The Court finds as a factual matter that not considering a waiver increases by a meaningful margin the likelihood that the Petitioner will ultimately be removed from the United States on the LPR Charge.  The next three bullet points explain why.

- Per Kerry E. Doyle: "In the normal course, as the spouse of a U.S. Citizen, and the father of a U.S. citizen child, without any criminal history, or other history of immigration violations, [the Petitioner] would be an excellent candidate for the 1227(a)(1)(H) waiver."  Doyle Declaration ¶ 29.  And more generally, "most lawful permanent residents with a U.S. citizen spouse and/or child, who were not otherwise inadmissible at time of adjustment to lawful permanent resident status will be granted the waiver, particularly for such a minor type of alleged fraud."  Id.

- Per Stacey Tolchin: "[I]f the sole charge of removal against a noncitizen were under 8 U.S.C. § 1227(a)(1)(A), due to what is perceived as fraud and/or misrepresentation at the time that they adjusted their status, the likelihood of obtaining a waiver under § 1227(a)(1)(H) would be high where the noncitizen has close relationships to U.S. citizen and/or lawful permanent resident family members and they lack any criminal history."  Tolchin Declaration ¶ 15. In her judgment, the "Petitioner easily would have [been] granted that waiver given his relationship to his U.S.

citizen wife and minor U.S. citizen son, as well as his lack of criminal history."  <u>Id</u>. ¶ 16.

- Per Ira J. Kurzban: "[W]aivers pursuant [to] 8 U.S.C. § 1227(a)(1)(H) are regularly granted to LPRs who satisfy the statutory requirements for such relief."  Kurzban Declaration ¶ 22.

In short: the Court finds as a factual matter that the Secretary of State's determination is the likely reason that the Section 1227(a)(1)(H) waiver has not been ruled on --- and that not ruling on the waiver meaningfully raises the odds that the Petitioner will be removed from the United States.

This means that non-consideration of a Section 1227(a)(1)(H) waiver on the LPR Charge amounts to what the Court enjoined on June 11: "seek[ing] to remove the Petitioner from the United States based on the Secretary of State's determination."  <u>Khalil</u>, 2025 WL 1649197, at *6.

\*     \*     \*

A final point.

Complying with what is set out above may take some time.

And the Petitioner has persuasively established that he aims to appeal from the immigration judge's June 20 decision and must do so shortly --- and that when he does, the immigration judge will lose jurisdiction over the case and would, at that point, not be able to vacate or amend the June 20 decision or to work through the waiver-of-removability issue described above.  <u>See</u> Petitioner's Brief (July 17, 2025) at 4 (citing Tolchin Declaration ¶ 17); <u>Puc-Ruiz</u> v. <u>Holder</u>, 629 F.3d 771, 782 (8th Cir. 2010).

That would undermine the preliminary injunctive relief ordered by the Court on June 11, as clarified today.

The Court has power to ensure that its injunctive decrees are effective as a practical matter.  <u>See</u> <u>Nken</u> v. <u>Holder</u>, 556 U.S. 418, 428 (2009); <u>Swann</u> v. <u>Charlotte-Mecklenburg Bd. of Ed.</u>, 402 U.S. 1, 15-16 (1971); <u>McComb</u> v. <u>Jack. Paper Co.</u>, 336 U.S. 187, 193 (1949).

Therefore, the Court orders:

If it appears (as seems overwhelmingly likely) that each of the steps set out in this Opinion and Order cannot be appropriately and thoughtfully completed before the close of business on July 18, then the Respondents shall promptly cause the immigration judge to take all appropriate steps on July 18 that would be required to ensure that she would not be divested of her jurisdiction over this case if a notice of appeal from her June 20 decision were filed by the Petitioner on July 19, July 20, or July 21.

These "appropriate steps" might potentially include the immigration judge timely reopening the case and vacating her June 20 decision.[5]

---

[5]   In its filings of July 15 and July 17, the Respondents repeatedly suggest that the Court is "expand[ing]" its June 11 preliminary injunction.  See Respondents' Letter (July 15, 2025) at 2; Respondents' Brief (July 17, 2025) at 3.  This is not accurate.  As the Court's July 16 Opinion and Order made clear, the plain language of the June 11 preliminary injunction generally favors the Petitioner's positions.  See ECF 350 at 1-2.  For example, the language of the June 11 preliminary injunction clearly supports vacating or amending the June 20 decision to eliminate its Section 1227 finding --- because, in light of the language of the June 11 preliminary injunction, that finding simply should not have been made.  But injunctions should be interpreted and applied with an eye to the underlying equities, and not just to their text.  See ECF 350 at 2.  And Article III courts should avoid involvement in the important work of immigration tribunals unless doing so is strictly necessary.  Given this backdrop, the Court did not simply rest on the plain language of the June 11 preliminary injunction.  Rather, it sought factual evidence before landing on a final conclusion.  See ECF 350 at 5-6 & 6 n.7.  That evidence has now been submitted, and it includes uncontested evidence as to injuries to the Petitioner that flow from the June 20 finding as to Section 1227(a)(4)(C)(i).  See Declaration of Mahmoud Khalil ¶¶ 4-9.  That evidence does not serve as a basis for "expanding" the June 11 preliminary injunction.  It simply helps to show why the equities favor applying the June 11 preliminary injunction as it was written.  And doing that means that the June 20 decision must be vacated or amended.  As to the immigration judge's non-consideration of a Section 1227(a)(1)(H) waiver, the

*     *     *

IT IS on this 17th day of July, 2025, so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.

---

point is a bit different.  The uncontested factual evidence that
has now been put before the Court makes clear that, but for the
Secretary's determination, a waiver application on the LPR
Charge would normally have been taken up and resolved --- and
that if it was, that might well favor a person situated like the
Petitioner.  That uncontested factual evidence does not serve as
a basis for "expanding" the June 11 preliminary injunction.
Rather, it shows that the June 11 injunction, as it was written,
compels consideration of the waiver possibility.  After all,
given the facts here, there is no real-world difference between
(a) seeking to remove the Petitioner on the LPR Charge, with the
Secretary's determination operating as the impediment to a
possible waiver of removal and (b) what the June 11 preliminary
injunction explicitly forbids --- "seeking to remove the
Petitioner from the United States based on the Secretary of
State's determination."

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

        *Petitioner*,

   v.

WILLIAM P. JOYCE, et al.,

        *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION and ORDER**

**Table of Contents**

**I.**    **Background**
    **A.** **The Facts**
    **B.** **Procedural History**
    **C.** **The Motion**
    **D.** **The Court's Approach**
**II.**  **Legal Principles**
**III.** **Law of the Case**
    **A.** **General Principles**
    **B.** **"The Same Issue"**
    **C.** **Implicitly "The Same Issue"**
    **D.** **Discretion**
    **E.** **Conclusion**
**IV.**  **What Supplies Jurisdiction**
    **A.** **The Respondent's Argument**
    **B.** **Section 1631**
        **1.**  **The Court Can Look to Section 1631**
        **2.**  **Section 1631 Applies to Habeas Petitions**
        **3.**  **Section 1631 Applies Here**

**4.** **Section 1631 Covers Personal Jurisdiction**

**5.** **What Section 1631 Means Here**

    **a)** **Miller**

    **b)** **Martinez-Nieto**

    **c)** **Other Cases**

**V.** **Section 1631 and Two Further Issues**

**VI.** **The Endo Rule**

  **A.** **Background**

  **B.** **Consensus Understanding**

**VII.** **The Immediate Custodian Rule**

  **A.** **The Louisiana Warden**

  **B.** **The New Jersey Warden**

    **1.** **Facts**

    **2.** **The Unknown Custodian Exception**

    **3.** **Applying the Unknown Custodian Exception**

      **a)** **"If Known"**

      **b)** **The District of Confinement Rule**

      **c)** **Conclusion**

**VIII.** **Conclusion and Next Steps**

\*    \*    \*

A lawful permanent resident was detained, and filed a habeas corpus petition seeking his release.

The respondents, various federal officials, have moved to dismiss, arguing the Court does not have jurisdiction.

The motion is denied.

\*    \*    \*

## I.   Background

### A.   The Facts

The relevant facts for now are as follows.

A lawful permanent resident[1] was arrested by federal officials in Manhattan.  See Declaration of Amy E. Greer ("Greer Declaration") (ECF 11-1) ¶¶ 4-5; Second Supplemental Declaration of Acting Field Office Director William P. Joyce ("Joyce Declaration") (ECF 72) ¶¶ 6-7.

While in custody, he was handed various forms.  See Declaration of Mahmoud Khalil ("Khalil Declaration") (ECF 73-1) ¶¶ 4-6; Joyce Declaration ¶ 7.

These said two main things.  First, that federal officials were seeking to remove him from the United States.  See Joyce Declaration ¶ 7.  And second, that as part of that process, he would be required to appear before an immigration judge in Louisiana in about two weeks.  See Khalil Declaration ¶ 5.[2]

About seven hours after his arrest, see Greer Declaration ¶ 6, Joyce Declaration ¶ 7, the lawful permanent resident's lawyer electronically filed a habeas corpus petition on his behalf in federal court in Manhattan.[3]  See Greer Declaration ¶ 9.

\*     \*     \*

From here, the lawful permanent resident is called "the Petitioner," and his habeas petition (ECF 38, as amended) is "the Petition."  The Petition names various federal officials.[4]  From here, they are collectively called "the Respondents."

---

[1]  Mahmoud Khalil.  A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]"  8 U.S.C. § 1101(a)(20).

[2]  Removing a lawful permanent resident from the United States generally requires a removal hearing.  See 8 U.S.C. § 1229a.  Those typically go forward before an immigration judge.  See 8 U.S.C. § 1229a(a)(1); 8 C.F.R. § 1240.10(a).

[3]  Under the relevant part of the habeas corpus statute, of which more below, a federal judge may direct a person's custodian to release him from custody if he is being held in violation of federal law.  See Rumsfeld v. Padilla, 542 U.S. 426, 434-35 (2004); Coleman v. Tennessee, 97 U.S. 509, 534-35 (1878); 28 U.S.C. § 2241(c); see also 28 U.S.C. § 2243.

[4]  The Respondents are listed in the Petition as: President of the United States Donald Trump; Acting Field Office Director of

3

**JA 36**

\*     \*     \*

About one hour before the Petition was filed on his behalf, the Petitioner was moved to another detention facility.  See Khalil Declaration ¶ 8; Joyce Declaration ¶ 16.  As a result, when the filing was made, the Petitioner was no longer in New York.  See Khalil Declaration ¶ 7; Joyce Declaration ¶ 17.  He was in New Jersey.  See Khalil Declaration ¶¶ 8, 22; Joyce Declaration ¶ 17.

The Petitioner spent around eight hours in New Jersey.[5]  See Khalil Declaration ¶¶ 7-8, 22; Joyce Declaration ¶¶ 16, 18. From New Jersey, he was taken to Louisiana, where he remains today.[6]  See Greer Declaration ¶ 14; Khalil Declaration ¶¶ 24-26; Joyce Declaration ¶¶ 18-19.[7]

### B.  **Procedural History**

In the Manhattan federal court, where the Petition had been filed, the Respondents moved to dismiss the case.  See Respondents' Memorandum of Law in Support of their Motion to Dismiss or Transfer the Case (ECF 31) at 1.

They argued the New York court did not have jurisdiction to hear it.  The Respondents' core argument: habeas cases must generally

---

New York, Immigration and Customs Enforcement, William P. Joyce; Acting Director of Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

[5]  The timeline reflects that at 2:00am on March 9, the clocks moved forward to 3:00am for daylight saving time.

[6]  Recall: Louisiana was where the Petitioner was due to appear before an immigration judge.

[7]  As to more precise dates and times, the Petitioner was arrested in Manhattan at around 8:35pm on March 8, 2025.  See Greer Declaration ¶ 6; Joyce Declaration ¶ 7.  On March 9, he arrived in New Jersey at 3:20am, see Joyce Decl. ¶ 16; the habeas petition was filed on his behalf at 4:40am, see Greer Declaration ¶ 9; and he was taken from New Jersey sometime around 11:30am or noon, bound for Louisiana.  See Joyce Declaration ¶ 18; Khalil Declaration ¶ 22.

be filed only in the judicial district where the person in question is being held, see id. at 3-4 --- and the Petitioner was not in New York when the Petition was filed there. See id. at 3. At that point, he was in New Jersey. See id.

In light of this, the Respondents argued, the New York court should either: (a) dismiss the case without prejudice (which would allow the Petitioner to refile it in the right district) or (b) transfer the case to the federal court in the Western District of Louisiana, where the Petitioner was (and is) confined. See id. at 9-11.

The Petitioner made various counterarguments, see generally Plaintiff['s] Memorandum of Law in Opposition to Defendants' Motion to Dismiss or Transfer (ECF 50) ("New York Opposition Brief"), and the New York court issued two main rulings.

First, the court held that it did not have power to take up the case. That was "plainly" the correct outcome under the "normal" rules for habeas cases, the court determined --- because the Petitioner was no longer in Manhattan when his habeas corpus petition was filed there. Khalil v. Joyce, 2025 WL 849803, at *7 (S.D.N.Y. Mar. 19, 2025).

And second, the court turned to deciding between (a) dismissing the case and (b) transferring it. See id. at *11. The court chose transfer, in particular to New Jersey. See id.

Why New Jersey? Because certain statutes tell federal courts where to transfer cases that ae improperly before them. One of those statutes directs a federal court to transfer such a case to where it "could" have been filed. Id. at *12 (quoting 28 U.S.C. § 1406(a)).

And at the moment the Petition was filed, there was only one such place --- New Jersey, where the Petitioner was being held. See id. at *13.

### C.   **The Motion**

The Respondents have now moved to dismiss this case on the argument that this Court lacks jurisdiction over it. See Respondents' Brief in Support of Their Renewed Motion to Dismiss or to Transfer the Case (ECF 90) ("Motion to Dismiss").

The motion has been fully briefed, and oral argument on it was heard.

The motion is before the Court.

###    D.    **The Court's Approach**

After a brief discussion of relevant general principles, <u>see</u>
Part II, the Court takes up the Petitioner's first argument:
that the Respondents' motion must be denied in light of the New
York court's transfer of the case here.

This argument, the Court concludes, is not persuasive.  The New
York court decided that it did not have jurisdiction.  It did
not pass on whether <u>this</u> Court has jurisdiction.  The question
is therefore an open one.  See Part III.

The Court then directly considers whether it has jurisdiction.
The Court's conclusion: it does.

Under habeas law, jurisdiction in a particular district is
established when a petitioner is physically present in the
district at the same moment a petition is filed there on his
behalf.  <u>See</u> Part II.

That confluence happened here.  The Petitioner was in custody in
New Jersey as of March 9 at 4:40am.  And under a federal
statute, the Petition, though filed in New York, must be treated
as having been filed in New Jersey on March 9 at 4:40am.
Therefore, this Court has jurisdiction.  See Part IV.

The Court then asks whether the jurisdiction it obtained on
March 9 is now lost, because the Petitioner was moved to
Louisiana.

The Court's jurisdiction, it concludes, has not been lost.  The
Supreme Court has all but so held.  <u>See</u> Part VI.

Finally, the Court asks whether the jurisdiction it obtained on
March 9 is undone because the Petition did not name a Louisiana
warden (in whose custody the Petitioner now is) or a New Jersey
warden (in whose custody the Petitioner was before being moved
to Louisiana).

These omissions do not defeat jurisdiction, the Court holds.  As
to the Louisiana warden, this is because of the effect of an on-
point Supreme Court case.  <u>See</u> Part VII.A.  And as to the New
Jersey warden, this is because there was no way for the
Petitioner's lawyer to know he was in New Jersey when she filed
the Petition on his behalf.  <u>See</u> Part VII.B.

## II.  **Legal Principles**

This Opinion and Order generally lays out the law on a given topic as it becomes relevant.

But two legal principles come up frequently, so they are briefly sketched out here, along with some of their connections to the case.

The <u>first</u>: a habeas corpus petition must generally be filed in the judicial district where the habeas petitioner is physically in custody.  <u>See</u> <u>Rumsfeld</u> v. <u>Padilla</u>, 542 U.S. 426, 435 (2004); <u>United States</u> v. <u>Hayman</u>, 342 U.S. 205, 213 (1952); <u>Ahrens</u> v. <u>Clark</u>, 335 U.S. 188, 190 (1948).[8]

Recall that the Petitioner was in custody in New Jersey at the moment when his Petition was filed, and he is now in custody in Louisiana.  <u>See</u> Part I.A.

The <u>second</u> legal principle: a habeas corpus petition, like this one, that challenges custody imposed by Immigration and Customs Enforcement --- a federal agency referred to from here as "ICE" --- must generally name as the respondent the warden of the detention facility where the person is held.  <u>See</u> <u>Anariba</u> v. <u>Dir. Hudson Cnty. Corr. Ctr.</u>, 17 F.4th 434, 444 (3d Cir. 2021).

The Petitioner here did not name the warden of the New Jersey facility, though he now seeks permission to do so.  <u>See</u> Petitioner's Memorandum of Law in Opposition to Respondents' Renewed Motion to Dismiss or Transfer & in Support of His Cross-Motion for Re-Transfer (ECF 107) ("Opposition Brief") at n.1; <u>see also</u> Petitioner's Supplemental Memorandum of Law in Further Support of His Motion to Compel Respondents to Return Him to

---

[8]  There are exceptions to this rule.  For example, the rule does not apply to a challenge to something other than here-and-now physical custody --- as when a person challenges a "detainer," on the argument it will lead to his or her future confinement.  <u>See</u> <u>Padilla</u>, 542 U.S. at 438 (citing <u>Braden</u> v. <u>30th Jud. Cir. Ct. of Ky.</u>, 410 U.S. 484 (1973)).  And things work differently when a person is detained outside the United States.  <u>See</u>, <u>e.g.</u>, <u>Ex parte Hayes</u>, 414 U.S. 1327, 1328-29 (1973) (Douglas, J., in chambers).  The exceptions alluded to in this footnote are irrelevant here.  This is because habeas challenges to "present physical confinement" within the United States, as in this case, must be brought in the judicial district where the person in question is confined.  <u>See</u> <u>Padilla</u>, 542 U.S. at 435.

**JA 40**

This District (ECF 96) at n.1.  And the Petitioner here did not name the warden of the Louisiana facility, but he has not asked to do that.

With the key legal principles in mind, move on now to consider this case.

### III. __Law of the Case__

The Petitioner's first argument is that the Respondents' motion to dismiss must be denied without considering whether it is persuasive.  See Opposition Brief at 7-8.

The New York court, the argument goes, has already ruled on the relevant issue --- and this Court must stick with that ruling under the "law of the case" doctrine.  See id. at 7-12.

But this argument does not work.

First, its premise is inaccurate.  The New York court did not rule on the issue that this Court now needs to take on.  See Part III.B and Part III.C.  Therefore, the law-of-the-case doctrine is not on the table.

And second, even if the doctrine might have a role, the Court would not opt to apply it here.  See Part III.D.

Take these points up in a moment, after a quick look at some general legal principles.  See Part III.A.

### A.   __General Principles__

The starting point here is one of the law's recurring questions: how should one court weigh an earlier judicial decision?

Different bodies of legal rules, each tailored to a different circumstance, supply answers.  Stare decisis is an example; res judicata is another.[9]

---

[9]  Stare decisis is "[t]he doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation."  Stare Decisis, Black's Law Dictionary (12th ed. 2024).  Res judicata is "[a]n affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have

One of these bodies of rules is the "law of the case" doctrine.[10]

Under the doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983).

The law-of-the-case doctrine may apply when, as here, a litigant asks a federal court in one district to defer in some way to a ruling a federal court in another district already made in the case. See, e.g., Hayman Cash Reg. Co. v. Sarokin, 669 F.2d 162, 168-69 (3d Cir. 1982); see generally Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816-17 (1988) (discussing law-of-the-case doctrine as between "coordinate courts").

But the doctrine kicks in only when the two courts have resolved "the same issue." Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994); accord, e.g., Arizona, 460 U.S. at 618; Musacchio v. United States, 577 U.S. 237, 244-45 (2016); Pepper v. United States, 562 U.S. 476, 506 (2011); 18 James Wm. Moore et al., Moore's Federal Practice § 134.20 (2025).

This means that "the doctrine does not apply when the first judge never decided the precise issue before the second judge." Chi. Joe's Tea Room, LLC v. Vill. of Broadview, 894 F.3d 807, 818 (7th Cir. 2018).

When the doctrine is in play, it is discretionary. See United States v. U.S. Smelting Refin. & Mining Co., 339 U.S. 186, 199 (1950); see generally In re Celgene Corp., Inc. Sec. Litig., 747 F. Supp. 3d 748, 761 (D.N.J. 2024) (laying out some of the history of this approach).

This means that a court generally has a choice. Cf. Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 n.6 (2d Cir. 2001). It can opt to go with the earlier decision. Or it can reflect on the previous decision, and, if necessary, take things in a

---

been --- but was not --- raised in the first suit." Res Judicata, sense 2, Black's Law Dictionary (12th ed. 2024).

[10]  For the relationship of law of the case to stare decisis, see, for example, Loumar, Inc. v. Smith, 698 F.2d 759, 762 (5th Cir. 1983). And for the link between law of the case and res judicata, see, for example, Southern Railway Co. v. Clift, 260 U.S. 316, 319 (1922).

9

different direction --- informed by the prior decision, but not entirely hemmed in by it.

### B. "The Same Issue"

Come back now to this case.

The Petitioner's argument is that under the law-of-the-case doctrine, the New York court's decision requires this Court to deny the Respondents' current motion to dismiss for lack of jurisdiction. See Opposition Brief at 12.

But this argument is not persuasive.

The reason why: the issue that was resolved by the New York court is not "the same," Fagan, 22 F.3d at 1290, as the issue on the now-pending motion to dismiss --- and so the law-of-the-case doctrine is not part of the mix.

\*　　\*　　\*

To see the point, start by zeroing in on what the New York court did, and then look to the question now before this Court.

At its core, the New York court held that it did not have jurisdiction over this case, see Khalil, 2025 WL 849803, at \*2, and that it would transfer the matter to New Jersey. See id.

Why New Jersey? The New York court looked mainly to a 1948 law that covers court-to-court transfers, 28 U.S.C. § 1406(a). See id. at \*12-14. Under Section 1406(a), a federal court with a case that has been filed in the wrong place has two choices. It can dismiss the case (which the New York court decided against, see id. at \*12) or transfer it "to any district . . . in which [the case] could have been brought" (which the New York court decided to do, see id. at \*11 (quoting 28 U.S.C. § 1406(a)).

Per the New York court, Section 1406(a) pointed to New Jersey. At the moment his habeas petition was filed, the Petitioner was in custody here. Id. at \*12. And as noted, a habeas petition can be filed only in the district where a person is detained. See id. at \*1 (citing Padilla, 542 U.S. at 449).

Therefore, the New York court concluded, the case "could have been brought" in New Jersey and would be transferred here. See id. at \*12 (quoting 28 U.S.C. § 1406(a)) (emphasis added).

Now compare all of that to "the . . . issue," Fagan, 22 F.3d at 1290, before the Court now.

10

**JA 43**

That issue is the one put by the Respondents in their motion to dismiss: does <u>this</u> Court, in New Jersey, have jurisdiction over this case?  <u>See</u> Motion to Dismiss at 1.[11]

Did the New York court make that determination, about this Court's jurisdiction?

The Petitioner seems to say yes.  For example, the Petitioner takes the Respondents to task for arguing that "this Court . . . must re-evaluate its own jurisdiction . . . because [the New York court] got that question wrong."  Opposition Brief at 10 (cleaned up).

But "wrong" or right --- the premise of this argument is that the New York court assessed this Court's jurisdiction.

---

[11]  Note that working through the Respondents' motion does not threaten what the Petitioner invokes --- "a perpetual game of jurisdictional ping-pong until one of the parties surrenders to futility."  Opposition Brief at 12 (cleaned up).  Look to the cases the Petitioner cites as the basis for his concern.  In <u>Hayman Cash Register Co.</u> v. <u>Sarokin</u>, 669 F.2d 162 (3d Cir. 1982), a Washington, DC, federal court transferred a case to New Jersey --- only to have the case transferred back to DC by the New Jersey court.  <u>See</u> <u>id.</u> at 163-64.  That back-and-forth took two years, <u>see</u> <u>id.</u>, and the court of appeals put an end to it.  The other main case cited by the Petitioner is <u>Christianson</u> v. <u>Colt Industries Operating Corp.</u>, 486 U.S. 800 (1988).  There, the Federal Circuit transferred a case to the Seventh Circuit, which then transferred it back.  <u>See</u> <u>id</u>. at 806-07.  This, too, took two years, <u>see</u> <u>id</u>. at 804, and the Supreme Court cut things off based, in part, on law-of-the-case grounds.  But <u>Hayman</u> and <u>Christianson</u> are a long way off from this case.  There is no danger here of "perpetual . . . ping-pong," <u>Christianson</u>, 486 U.S. at 818, played until someone folds.  The New York court transferred this case to New Jersey.  But no one wants the case to now be sent back to New York.  (In purely nominal fashion, solely to preserve the issue for appeal, the Petitioner asks for a return to New York.  <u>See</u> Opposition Brief at 30-31.  But put that aside as irrelevant for now.  There is no real ask from either party to go back to New York.)

11

**JA 44**

But subject to an exception taken up below in footnote 14, there is nothing explicit along those lines in the New York court's decision.[12]

For example, the critical argument from the Respondents in New York was that habeas jurisdiction never vested in New Jersey, because the Petitioner did not file a Petition here.  See Respondents' Memorandum of Law in Support of Their Motion to Dismiss or to Transfer the Case (ECF 31) at 10.  And, the Respondents argued, the federal transfer statutes cannot fill the gap because they "do not independently vest courts with jurisdiction."  See Respondents' Reply Memorandum of Law in Further Support of Their Motion to Dismiss or to Transfer the Case (ECF 71) at 14.

But these questions were not addressed in the New York court's opinion.  There was no discussion, for example, as to whether one court can potentially take habeas jurisdiction on a derivative basis --- based on an earlier filing in another court.  And there was no discussion as to whether there is a federal statute that vests the jurisdiction the Respondents said was missing.

These are not gaps in the New York court's analysis.  They are, rather, indications of what the analysis was about.  The New York court opined as to its own jurisdiction.  See Khalil, 2025 WL 849803, at *5-*11.  But it did not purport to rule as to this Court's jurisdiction --- which raises substantial (and distinct) issues of its own, covered here.  See Part IV to Part VII.

*     *     *

Moreover, there are strong affirmative indications that the New York court did not see itself as resolving this Court's jurisdiction.

---

[12]  To be sure, the Petitioner notes that the New York court ruled that it had subject-matter jurisdiction over this case and that this Court does, too.  See id.  But such a ruling is beside the point.  No one doubts that federal district courts have jurisdiction over the subject matter, habeas cases under 28 U.S.C. § 2241.  Rather, the question is whether this Court has power over this habeas petition.  A ruling as to federal courts' subject-matter jurisdiction over habeas cases generally does not answer that.

12

**JA 45**

Look to one in particular.

To see it, start by noting that in the Supreme Court's <u>Padilla</u> decision, Justice Kennedy suggested in a concurrence that certain sorts of wrongful behavior from the United States, like hiding a detainee's location, might confer habeas jurisdiction on a particular court, even one that might not otherwise have power over the case.  <u>See</u> 542 U.S. at 454 (Kennedy, J., concurring).

The New York court did not decide whether to adopt for itself this concurrence.  <u>See</u> <u>Khalil</u>, 2025 WL 849803, at *8.  But it determined that even if the concurrence might be on the table as a general matter, the actions of federal officials in this particular case would not trigger it.  <u>See</u> <u>id</u>. at *8–11.

In reaching this conclusion, the New York court put aside any questions as to federal officials' conduct related to the Petitioner's later New Jersey-to-Louisiana transfer.  <u>See</u> <u>id</u>. at *8.  Those questions, the New York court said, were not "jurisdictionally relevant."  <u>Id</u>. at *9.

And that makes sense.  Any possible downstream misconduct by federal officials in sending the Petitioner from New Jersey to Louisiana could not impact whether there was or was not jurisdiction at an earlier point, in New York.

Such an inquiry might, of course, shed light on whether there was jurisdiction in New Jersey.

But no analysis like that was conducted.  The New York court suggested such an analysis would be "jurisdictionally [ir]relevant."  <u>Id</u>. at *9.  And with good reason.  It was, indeed, irrelevant to <u>its</u> question (is there jurisdiction in New York?) --- even as it might well have been relevant to a question it was <u>not</u> addressing (is there jurisdiction in New Jersey?).

<center>*    *    *</center>

Nor is it surprising in any way that the New York court transferred the case here without first deciding that this Court has jurisdiction.

Courts routinely transfer cases on the understanding that the transferee court will itself determine in the first instance, when the case arrives, whether it has jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>Abira Med. Lab'ys, LLC</u> v. <u>Cigna Health & Life Ins. Co.</u>, 2023 WL

<center>13</center>

<center>**JA 46**</center>

4074081, at *2 n.4 (D.N.J. June 16, 2023); <u>Ike</u> v. <u>U.S.</u>
<u>Citizenship & Immigr. Servs.</u>, 2020 WL 7360214, at *2 (D.D.C.
Dec. 15, 2020); <u>Kneizys</u> v. <u>Fed. Deposit Ins. Co.</u>, 2020 WL
5632954, at *4 (D. Nev. Sept. 21, 2020); <u>Moore</u> v. <u>Baker</u>, 2018 WL
3421601, at *1 (M.D. Ala. June 18, 2018), <u>report and</u>
<u>recommendation adopted by</u> 2018 WL 3420802 (M.D. Ala. July 13,
2018); <u>Morrison</u> v. <u>Rochlin</u>, 2017 WL 1162938, at *3 n.3 (M.D. Pa.
Mar. 29, 2017); <u>Hara</u> v. <u>Hardcore Choppers, LLC</u>, 904 F. Supp. 2d
22, 28 (D.D.C. 2012); <u>Benninghoff</u> v. <u>Ortho-McNeil Pharma., Inc.</u>,
2011 WL 13218034, at *2 (C.D. Cal. Apr. 6, 2011); <u>Miller</u> v.
<u>Toyota Motor Corp.</u>, 2008 WL 11451547, at *3 (N.D. Ohio Sept. 30,
2008); <u>De Pedrero</u> v. <u>Schweizer Aircraft Corp.</u>, 2008 WL 11503874,
at *1 (S.D. Tex. Feb. 4, 2008); <u>Int'l Flavors & Fragrances Inc.</u>
v. <u>Van Eeghen Int'l. B.V.</u>, 2006 WL 1876671, at *8 (S.D.N.Y. July
6, 2006); <u>Alta. Telecomms. Rsch. Ctr.</u> v. <u>Rambus, Inc.</u>, 2006
WL 1049083, at *3 n.2 (E.D. Va. Apr. 12, 2006); <u>Apollo Prods.,</u>
<u>Inc.</u> v. <u>Marino</u>, 2006 WL 1798250, at *5 (W.D. Mo. June 28, 2006);
<u>Weber</u> v. <u>Jolly Hotels</u>, 977 F. Supp. 327, 334 (D.N.J. 1997);
<u>Downs</u> v. <u>Red River Shipping Corp.</u>, 1994 WL 554174, at *3 n.4
(E.D. La. Oct. 6, 1994); <u>United States</u> v. <u>Am. River Transp.,</u>
<u>Inc.</u>, 150 F.R.D. 587, 592 (C.D. Ill. 1993); <u>Trask</u> v. <u>Serv.</u>
<u>Merch. Co.</u>, 135 F.R.D. 17, 21 n.3 (D. Mass. 1991); <u>Miller</u> v.
<u>Campbell</u>, 1991 WL 311899, at *1 (E.D. Mich. Feb. 7, 1991);
<u>Jennings</u> v. <u>Entre Comput. Ctrs., Inc.</u>, 660 F. Supp. 712, 716 (D.
Me. 1987); <u>Booth</u> v. <u>Alvin Petroleum, Inc.</u>, 1987 WL 6748, at *4
(E.D. Pa. Feb. 13, 1987); <u>cf</u>. <u>Federal Practice and Procedure</u>
§ 3842.

And there may well have been special reason to proceed that way
here.

To decide there was no wrongful conduct in New York, which may
have been relevant to jurisdiction, the New York court leaned on
its understanding of how ICE handles everyday cases in New York.
<u>See</u> <u>Khalil</u>, 2025 WL 849803, at *8-10.  That understanding was
based to an extent on the New York judge's own direct experience
with New York ICE practices.  <u>See</u> <u>id</u>. at *8.

How does New Jersey ICE operate?  The New York court may well
have thought that the question was best considered in the first
instance by a New Jersey judge --- himself or herself personally
familiar with local ICE practices.  <u>Cf</u>. <u>Padilla</u>, 542 U.S. at 449
n.17 (dismissing Justice Kennedy's proposed exception to habeas
rules given that its factual premise was never suggested by the

14

**JA 47**

district court, "which was much closer to the facts of the case than we are").

More generally, the New York court might have thought that determining what happened to the Petitioner in New Jersey could bear on New Jersey jurisdiction, <u>see</u> <u>Khalil</u>, 2025 WL 849803, at *8 (citing <u>Padilla</u>, 542 U.S. at 454 (Kennedy, J., concurring)) --- but that any necessary fact-gathering on that point should go forward closer to where things happened, in New Jersey.

<p align="center">*     *     *</p>

And one last point.

The Third Circuit has repeatedly made clear in the law-of-the-case context that the question of what one court decided is assessed, in part, with reference to the issues that were teed up for it by the parties.

In <u>United States</u> v. <u>Curtis</u>, 683 F.2d 769 (3d Cir. 1982), for example, the court of appeals "decline[d] to infer [the first court's] rejection," <u>id.</u> at 772, of an argument that the parties had not meaningfully raised to the court "in the absence of some judicial statement that the contention has been considered and rejected." <u>Id</u>.

And look, too, to <u>Fagan</u> v. <u>City of Vineland</u>, 22 F.3d 1283 (3d Cir. 1994).  There, the Third Circuit held that the first judge had not considered a particular issue --- in large part because the motion papers before him did not themselves dive into it. <u>See</u> <u>id</u>. at 1290-91.

Against this backdrop, it would make little sense to conclude that the New York court held that this Court has jurisdiction --- even as the Petitioner himself did not substantially make that argument in New York.

The Petitioner's initial opposition brief mentioned going forward in New Jersey --- but only as a fourth fallback.  <u>See</u> New York Opposition Brief at 20.  The Petitioner argued to keep the case in New York; or if not, to allow jurisdictional discovery; or if not that, to allow an amendment to the Petition.  <u>See</u> <u>id</u>.  And if all that failed, the Petitioner argued, the case should be moved to New Jersey instead of Louisiana.  <u>See</u> <u>id</u>.

None of this teed up a serious reckoning with the distinct legal complexities associated with this Court's jurisdiction, and none

<p align="center">15</p>

<p align="center">**JA 48**</p>

of those complexities were discussed in the Petitioner's opening
brief --- which cited none of the key authorities that are
relevant to New Jersey jurisdiction.  There was, for example, no
discussion from the Petitioner of 28 U.S.C. § 1631, see
Part IV.B below, or Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir.
1986), see Part VII below.

And when the New York court followed up with a directive for
further briefing as to the import of three particular statutes,
see Order (ECF 63), there was more of the same --- New Jersey
jurisdiction was not substantially put forward as an issue by
the Petitioner.

The Petitioner suggested that "venue" was proper in New Jersey.
See New York Opposition Brief at 20; Plaintiff['s] Supplemental
Memorandum of Law in Opposition to Respondents' Motion to
Dismiss or Transfer (ECF 70) ("New York Supplemental Opposition
Brief") at 1-2, 5.  And it did so largely by leaning on
arguments from the location of witnesses, lawyers, and parties,
see New York Supplemental Opposition Brief at 2-3, arguments
that the New York court mainly agreed with.  See Khalil, 2025
WL 849803, at *12.

But this argument from the Petitioner simply invited the New
York court to do what it did --- to transfer the case on
convenience-type grounds, see id., and to allow the transferee
court (this Court) to decide in the first instance on its own
jurisdiction.

And this, as the cases cited above show, is an everyday approach
in transfer cases.

*     *     *

A final, related piece of the Petitioner's papers helps to make
clear that the question of New Jersey jurisdiction was far
removed from how this case was litigated in New York.

The New York court, as noted, sought analysis as to three
statutes.  See Order (ECF 63).  In response, the Petitioner said
that these statutes "use almost identical language."  New York
Supplemental Opposition Brief at 5.  But they do not.  Two of
the statutes (28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a)) use
virtually "identical language," and they touch in various ways
on transfer and convenience.  See 28 U.S.C. §§ 1404(a), 1406(a).

But the third statute uses quite different language than the other two.  And that difference is perhaps the single most important piece of the New Jersey jurisdiction analysis to come.  See Part IV.B.  But the Petitioner did not note that language for the New York court, apparently because it did not matter for the argument he was making --- an argument as to transfer and convenience, not as to New Jersey jurisdiction.

<div align="center">*     *     *</div>

Bottom line: the New York court decided that it did not have jurisdiction, but not that this Court does.

### C.  <u>Implicitly "The Same Issue"</u>

To finish out the analysis, go one step further.

Was the issue of New Jersey's jurisdiction somehow taken up <u>implicitly</u> by the New York court?  <u>See</u> <u>Moore's Federal Practice</u> § 134.20 ("The law of the case doctrine applies to an issue or issues that have actually been decided explicitly or by necessary implication."); <u>cf</u>. <u>Christianson</u>, 486 U.S. at 817.

At one or two points, the Petitioner appears to argue the New York court's transfer decision necessarily implied that this Court has jurisdiction over the case.  <u>See</u> Opposition Brief at 9, 12.

This argument, if it is being made, seems to start from the New York court's ruling that this case "<u>could</u> have been brought," 28 U.S.C. § 1406(a) (emphasis added), in New Jersey because the Petitioner was in this state at the moment of filing.

And that is certainly true to what the New York court held.

From that starting point, the Petitioner's argument seems to be this.  Because (a) this case "<u>could</u> have been brought" in New Jersey (as the New York court ruled, citing the Section 1406(a) transfer statute), it follows that (b) this case should be treated as if it <u>was</u> brought in New Jersey at the moment it was filed in New York --- and because of that (c) this Court now has jurisdiction over the case.

Much of this argument might well be persuasive in the end.  Indeed, Part IV of this Court's Opinion explains why (b) is sound.  And Part VI of this Court's Opinion explain why the progression from (b) to (c) also makes sense.  But these issues are not addressed in the New York court's opinion.

<div align="center">17</div>

<div align="center">**JA 50**</div>

Maybe, though, the conclusions reached in this Opinion were logically necessary to, and thus implicitly baked into, the New York court's transfer decision.[13]

But this works only if the New York court's decision --- (a), in the above --- necessarily leads to (b), and then (b) necessarily leads to (c).

But it does not go that way.

The first step in the (a)/(b)/(c) progression is the move from (a) (saying that the case <u>could</u> have been brought in New Jersey, as the New York court held) to (b) (concluding that, therefore, the case should be treated as if it <u>was</u> brought in New Jersey).

But that (a)-to-(b) move is not a necessary one --- not in logic and not in the law.

                    *    *    *

To see the point, start by imagining a student who turns in a math assignment late. She <u>could</u> have done her homework on time. But that does not mean that her late work must be received by the teacher as if it <u>was</u> handed in on time. What could have been done (on-time work) sets the table for another question (whether to accept the late work). But it does not answer it.

Or think of a train passenger asking the conductor not to charge him the extra $5 penalty fare, the step-up fine imposed for buying the ticket on board the train instead of back in the station. The passenger will not argue to the conductor that he could have bought the ticket in the station. That is not a winning argument. Why? Because the fact that the passenger <u>could</u> have bought the ticket earlier does not compel the conductor to give the passenger a break, to treat him as if he <u>did</u> buy the ticket earlier.

In short, there is typically real daylight between what could have been done and what was done. Sometimes that daylight can be closed up. The late homework might be accepted as if it had been submitted on time. The conductor might say "no problem" and not charge the $5 penalty.

---

[13]  Recall: "[t]he law of the case doctrine applies to an issue or issues that have actually been decided explicitly or by necessary implication." <u>Moore's Federal Practice</u> § 134.20.

But none of that changes the basic point: saying that a thing
could have been done (which is what the New York court said
about filing this case in New Jersey) does not inevitably lead
to the conclusion that the thing should be treated as if it was
done.

*   *   *

And what is true as a matter of common sense is true as a matter
of habeas corpus law, too.

In the Supreme Court's Padilla case, for example, a person was
held in New York and then transferred to South Carolina.  Only
after the transfer was a habeas petition filed on his behalf in
New York.  See 542 U.S. at 431-32.  Could the petition have been
filed for the person while he was in New York?  Yes, and if so,
there would have been jurisdiction there.  See id. at 441.

But that possibility (what could have happened) did not answer
whether the New York court had jurisdiction over the case.
Indeed, the Padilla Court discussed that point at some length,
see id. at 448-49 & n.17, and then held the New York court did
not have jurisdiction.  See id. at 451.

In short, where the case could have gone forward (New York) did
not determine which court (New York or South Carolina) had power
over the case when it mattered.

Take another example.

In al-Marri v. Rumsfeld, 360 F.3d 707 (7th Cir. 2004), a person
detained in Illinois, believing he was to be moved to military
custody, asked to stay his transfer to have time to petition for
habeas.  See id. at 712.  But he was transferred before he could
file his petition.  Per the Seventh Circuit, the question of
where the petition could have been filed (in Illinois, before
the transfer) did not answer whether jurisdiction was vested in
the Illinois court (as if the filing had in fact been made):

> After the United States filed a motion to
> dismiss al-Marri's indictment in the Central
> District of Illinois, his lawyer orally
> opposed "any movement of Mr. Al-Marri until
> we have an opportunity to file --- it will
> be a habeas corpus action I suspect . . . .
> We would ask that the Court stay his removal
> from the Peoria County jail for at least

19

**JA 52**

until some time tomorrow so we would have an opportunity to file an appropriate petition with the Court in regard to the transfer to military custody." The district judge denied this motion . . . .

According to al-Marri, asking the district court for an injunction against transfer was equivalent to filing a petition under § 2241; and if such a petition had been filed while al-Marri was still in the Central District of Illinois, that would have [allowed the Illinois court to exercise jurisdiction over such a petition] . . . . But what actually happened, rather than what could have happened, governs. Someone who files a notice of appeal one day after the time expired loses, even if the notice could have been filed on time. Likewise with a complaint filed one day after the statute of limitations, or a summons attempted to be served in hand one day after the potential defendant left the jurisdiction. What did happen is that, after arriving [in South Carolina], al-Marri filed a petition in Peoria, Illinois.

Id. at 712 (emphasis in original) (cleaned up).

Accordingly, the Seventh Circuit held, the habeas corpus case could not go forward in Illinois.

                         *     *     *

In a nutshell, the New York court's opinion might be understood as implicitly holding that this Court has jurisdiction over this case only if the New York holding (that this case "could have been" brought in New Jersey) necessarily requires the conclusion that New Jersey has jurisdiction. It does not. Padilla and al-Marri show that. Where a case "could have been" filed does not answer the question of whether it should be treated as having been filed there.

                         *     *     *

Where things stand:

The issue raised here by the Respondents' motion is whether this Court has jurisdiction over this case.

That issue was not resolved by the New York court.  See Part III.B.

And it does not work to argue that the New York court somehow implicitly held that this Court has jurisdiction.  That runs aground on Padilla and al-Marri.  See Part III.C.

All of this means that the law-of-the-case doctrine does not come online here --- because "[t]he law of the case operates only to limit reconsideration of the same issue."  Fagan, 22 F.3d at 1290.

### D.   **Discretion**

As noted, the law-of-the-case doctrine is discretionary.  See Part III.A.

And even assuming arguendo that the doctrine could be taken to apply here, based on some aspect of the language or implicit logic of the New York opinion, the Court would use its discretion not to invoke the doctrine in this case.[14]

---

[14]   In its next-to-last paragraph, the New York court's opinion said: "It will be up to the transferee court in New Jersey to consider not only [the] Petition, over which it alone has jurisdiction, but also the various motions that [the Petitioner] has filed to date in connection with his Petition[.]"  Id. at *14 (emphasis added).  But it is not clear these words were necessary to the New York court's transfer decision.  And while the words are in the opinion's "in sum" conclusion, the body of the opinion being summarized does not directly consider this Court's jurisdiction, for the reasons noted in Parts III.B and III.C above.  Moreover, especially because the Petitioner did not himself meaningfully argue in New York as to New Jersey jurisdiction, see Part III.B, this Court does not take the underscored words as resolving the question.  See Fagan, 22 F.3d at 1289-91 (opinion and case citation by the first judge "might imply" a holding on an issue taken up by the second --- but did not count as resolving "the same issue" because the holding was "ambiguous" as to whether it did, and "[t]he record [wa]s unclear" given that the parties had not directly briefed the issue); see also Curtis, 683 F.2d at 772 (law-of-the-case

**JA 54**

This Part III.D explains why.

*     *     *

"[O]ne of the bases of the law of the case doctrine is to promote the finality and efficiency of the judicial process by protecting against the agitation of settled issues."  In re Celgene, 747 F. Supp. 3d at 761 (cleaned up).

When "[t]ime was invested, attention was focused, and a decision was made," id., the ball should stop bouncing.  An issue that "has been reached and resolved, and is in the rear-view mirror," id., should be left there.

But none of that is this case.

The relevant question --- does this Court now have jurisdiction? --- was not substantially addressed by the New York court.  This does not clear the "a decision was made" bar.  Id.  Moreover, the question of this Court's current jurisdiction can hardly be chalked up as being in the "rear-view mirror."  Id.  The Respondents made that clear in New York, saying that if the New York court opted to transfer this case to New Jersey, they would raise, here, the question of whether this Court has jurisdiction.  See Respondents' Memorandum of Law in Support of Their Motion to Dismiss or to Transfer the Case (ECF 31) at 10-11.

In short: if the Court were to assume arguendo that the law-of-the-case doctrine applies here because the New York court focused on "the same issue," Fagan, 22 F.3d at 1290, this Court would exercise its discretion to not apply the doctrine, because of the "unusual circumstances," see Hayman Cash Reg., 669 F.2d at 165, 169, 170, set out above, plus three more discussed just below.

---

doctrine not triggered, in spite of language in the first opinion that might "reflect[] full awareness" of a certain question, because the parties had not meaningfully briefed that issue).  On balance, the better understanding is that the New York court did what courts routinely do.  See Part III.B (collecting cases).  It transferred this case here on convenience-focused grounds, see Khalil, 2025 WL 849803, at *13-14, and left it for this Court in the first instance to rule on its jurisdiction.

22

**JA 55**

*First*, the law-of-the-case doctrine aims to nip delay in the bud by preventing an issue that was considered before from being litigated again.  *See id*. at 167.

And more pointedly: "the place of trial [should not] remain unsettled for an unnecessarily long time to accommodate double judicial consideration."  Hoffman v. Blaski, 363 U.S. 335, 349 (1960) (Frankfurter, J., dissenting).  Cases need to get off the ground.

But these concerns do not loom large.  A "double" look is not happening here --- the New York court ruled on *its* jurisdiction, and this Court today rules on its own.  And there has been no "unnecessar[y]" delay.  The New York court ruled ten days after the habeas petition was filed.  This Court rules today on the second business day after oral argument.  (Oral argument itself went forward around 36 hours after the last brief as to jurisdiction was filed.)

*Second*, the law-of-the-case doctrine rests on the idea that it is for "the judicial department to say what the law is."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).  This "duty," *id*., falls to the judiciary as a whole ("the judicial department"), and there is no reason to think that one judge is somehow better at it than another.  The law-of-the-case doctrine reflects that idea --- by telling the second judge to respect the first, who has "sa[id] what the law is" for the case, and whose determination should generally stand.

But again, none of this is at stake here.  On the point of New Jersey's jurisdiction, there has not yet been a sustained statement of "what the law is."[15]

*Third* and finally, courts routinely hold that "judges are significantly less constrained by the law of the case doctrine with respect to jurisdictional questions."  Gilbert v. Ill. State Bd. of Educ., 591 F.3d 896, 903 (7th Cir. 2010) (cleaned up); accord, *e.g.*, Phelps v. Alameda, 366 F.3d 722, 728 n.6 (9th Cir. 2004); *cf*. Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 118-19 (3d Cir. 1997).  And that

---

[15]  *Cf*. Pennsylvania v. Brown, 373 F.2d 771, 784 (3d Cir. 1967) ("It is universally recognized that questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (cleaned up).

principle applies with special force here.  Especially on a potentially complex question, it does not make sense to allow either a very short statement or an implicit ruling to take the place of a direct and detailed analysis.

Jurisdiction is the "first and fundamental question," Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900), and it should be taken head-on and fully before it is determined whether this Court can assume power over this case.

### E.    **Conclusion**

The law-of-the-case doctrine does not apply.  This is because the issue here is whether this Court has jurisdiction, and that "same issue" was not taken up by the New York court, see Part III.B, not even implicitly.  See Part III.C.

In addition, even assuming arguendo there is some way in which that "same issue" was reached and resolved in New York, law of the case is a discretionary doctrine, see Part III.A. --- and the Court chooses not to apply it here.  See Part III.D.

## IV.   **What Supplies Jurisdiction**

The Petitioner's law-of-the-case argument aimed to cut things off at the pass, but it was not persuasive.  See Part III.

Come now then to the substance of the Respondents' motion to dismiss for lack of jurisdiction.

The argument the motion rests on is unpacked just below in Part IV.A, and in Part IV.B the Court explains why it does not work.

### A.    **The Respondents' Argument**

The Respondents' argument can be put this way:

A habeas court has jurisdiction over a case when it has two things at once.  First, it must have the habeas petition.  And second, it must have, in its district, the habeas petitioner. See Motion to Dismiss at 1; cf. Padilla, 542 U.S. at 435, 437.

The New York court sent the Petition to New Jersey on March 19. See Khalil, 2025 WL 849803, at *14.  But by the time the Petition arrived in New Jersey, the Petitioner was gone.  He was in Louisiana.

At no moment, then, were the Petition and the Petitioner together in the same place.  When the Petitioner was here, the Court lacked the Petition; and now that the Court has the Petition, the Petitioner is elsewhere.  The Petition and the Petitioner missed each other; and so, the argument goes, there has never been jurisdiction in this Court.

Therefore, it makes no difference that the New York court moved the case here on March 19 under Section 1406(a) and Section 1404(a), because the case "could have been" or "might have been" brought here back on March 9, when the case was first filed and the Petitioner was physically in New Jersey.

Why does the transfer make no difference?

Jurisdiction is missing because the Petition and the Petitioner were never here together, as the Supreme Court in Padilla required.  And the transfer statutes do not purport to provide the missing jurisdiction.  See Motion to Dismiss at 1, 5, 9-10.

On the Respondents' argument, the transfer statutes are like conveyor belts, smoothing the way for cases to move from one district to another.

But they are not like time machines.  They do not allow a Petition that arrived in New Jersey on March 19 to be treated as if it had arrived in New Jersey on March 9 at 4:40am --- the moment it was filed in New York, and also a moment when the Petitioner was here in New Jersey.  And unless the Petition can be somehow backdated and thought of as having been in New Jersey on March 9 when the Petitioner was last here, there is no moment when both the Petition and the Petitioner were here together in New Jersey.  Therefore, there would be no habeas jurisdiction in the state.

**B.   Section 1631**

The problem with the Respondents' argument as set out above is this: it does not reckon with 28 U.S.C. § 1631.

That statute dates from 1982, and it is titled "Transfer to cure want of jurisdiction."  Per Section 1631:

> Whenever a civil action is filed in a court
> . . . and that court finds that there is a
> want of jurisdiction, the court shall, if it
> is in the interest of justice, transfer such

> action . . . to any other such court . . .
> in which the action . . . could have been
> brought at the time it was filed or noticed,
> and the action . . . <u>shall</u> <u>proceed</u> <u>as</u> <u>if</u> it
> had been filed in . . . the court to which
> it is transferred on the date upon which it
> was actually filed in . . . the court from
> which it is transferred.

28 U.S.C. § 1631 (emphasis added).

The statute is a command from Congress to the courts.  Its
language is clear.  <u>See</u> <u>Jimenez</u> v. <u>Quarterman</u>, 555 U.S. 113, 118
(2009) ("[W]hen the statutory language is plain, we must enforce
it according to its terms."); <u>accord</u> <u>King</u> v. <u>Burwell</u>, 576 U.S.
473, 474 (2015); <u>Dodd</u> v. <u>United States</u>, 545 U.S. 353, 359
(2005).

It tells a court that receives a transferred case (as this Court
did) that it must treat the case ("<u>shall</u> proceed") "as if it had
been filed in . . . the court to which it is transferred" (New
Jersey) at the time it was first filed in the transferor court
(New York).

In other words, when Section 1631 is in play, it does indeed
work as a kind of time machine, in a way that Section 1404(a)
and Section 1406(a) do not purport to.

If Section 1631 applies, its import for this case is unmissable:

The Petition arrived in New Jersey on March 19.  But this Court,
per Section 1631, "shall proceed" as if the Petition got here
when it was filed in New York --- March 9 at 4:40am.  At that
moment, the Petitioner was in New Jersey --- so there is no
missing piece of the jurisdictional puzzle.  Under Section 1631,
the Petition counts as having been in New Jersey at the same
moment the Petitioner was here.

The key questions, then, are these: does Section 1631 apply to
this case, and does it have the effect sketched out above?  Yes
and yes, the Court concludes.  The sections that follow explain
why.

### 1.   __The Court Can Look to Section 1631__

In transferring this case, the New York court relied on Section 1404(a) and Section 1406(a), not Section 1631.  See Khalil, 2025 WL 849803, at *12-13.

Does this mean this Court should not rely on Section 1631?

No.  In Xu v. DHS/ICE Office of Chief Counsel, 2024 WL 2185060 (3d Cir. May 15, 2024), for example, the Third Circuit preserved the timeliness of a lawsuit by "deem[ing]" it transferred under Section 1631 --- even though the district court had not used that statute, but rather had dismissed the case.  See id. at *1.

And before that, on another occasion, the Third Circuit had come to essentially the same conclusion --- that a transferee court can invoke Section 1631 even though the transferor court did not.  See Martinez-Nieto v. Att'y Gen. of U.S., 805 F. App'x 131, 135 (3d Cir. 2020).

And every circuit court to have decided the issue has landed on that same spot, too.  See Franco v. Mabe Trucking Co., Inc., 3 F.4th 788, 796 (5th Cir. 2021); Kolek v. Engen, 869 F.2d 1281, 1284 (9th Cir. 1989);[16] Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1526-27 (10th Cir. 1987); In re Teles AG Informationstechnologien, 747 F.3d 1357, 1361 (Fed. Cir. 2014); see also Ctr. for Nuclear Resp., Inc. v. U.S. Nuclear Regul. Comm'n, 781 F.2d 935, 944-45 (D.C. Cir. 1986) (R.B. Ginsburg, J., dissenting).

In short: the Court can, and does,[17] look to Section 1631 here; the fact the New York court did not invoke it as a basis for

---

[16]   Accord Rodriguez-Roman v. INS, 98 F.3d 416, 423-24 (9th Cir. 1996); In re McCauley, 814 F.2d 1350, 1352 (9th Cir. 1987).

[17]   The Fifth Circuit has explained that Section 1631 --- which says a court "shall" transfer if certain requirements are met --- is sometimes mandatory.  See Franco, 3 F.4th at 796.  And the statute includes a similarly mandatory directive from Congress to the transferee court.  That court "shall proceed as if [the case] had been filed in . . . the court to which it is transferred[.]"  28 U.S.C. § 1631 (emphasis added).

27

**JA 60**

transferring this case does not matter, as every circuit to
consider the question has suggested.[18]

### 2.  Section 1631 Applies to Habeas Petitions

Per the section just above, the Court can look to Section 1631 -
-- but does it apply in habeas cases like this one?

Yes.  Section 1631 applies to any "civil action" filed in a
district court, see 28 U.S.C. § 1631, and a habeas proceeding is
a civil action.  See, e.g., Mayle v. Felix, 545 U.S. 644, 654
n.4 (2005).

In accord with this, the Third Circuit has repeatedly recognized
that Section 1631 applies to habeas petitions.  See, e.g.,
Robinson v. Johnson, 313 F.3d 128, 139 (3d Cir. 2002) (stating
that a district court may transfer a habeas petition under
§ 1631); United States v. Vidal, 647 F. App'x 59, 60 (3d Cir.
2016) (same); Foy v. Super-Rich Members of Illuminati, 622 F.
App'x 102, 103 (3d Cir. 2015) (same); Harvey v. Maiorana, 518 F.
App'x 82, 83 (3d Cir. 2013) (same).

And so have other courts of appeals across the Nation.  See,
e.g., Chappell v. Colorado, 2024 WL 2973701, at *2 n.5 (10th
Cir. June 13, 2024); Gallo-Alvarez v. Ashcroft, 266 F.3d 1123,

---

[18]  The Court decides the issue with the benefit of the parties'
views, though to a very limited extent.  The New York court
ordered briefing on various statutes, including Section 1631,
see ECF 63, and the parties provided it.  See ECF 70-71.  And in
his brief to this Court, the Petitioner notes (lightly) that
transfer under Section 1631 could have been appropriate.  See
Opposition Brief at 11 n.9.  Note that had the Petitioner not
invoked Section 1631 in any way at all, this Court could have
considered it sua sponte.  See Danziger & De Llano, LLP v.
Morgan Verkamp LLC, 948 F.3d 124, 132 (3d Cir. 2020) (a district
court "may transfer a case at the parties' request or sua
sponte" under Section 1631).  What position to take is for the
litigants under the party-presentation principle; but saying
what the law is --- that is for the Court, and can therefore be
raised sua sponte.  See In re Celgene Corp., 747 F. Supp. 3d at
760 n.17.  Indeed, not bringing to bear Section 1631 would
ignore Congress' mandatory directive to transferee courts, see
footnote 17, as to how they "shall proceed."  This Court must
hew to Congress' directive.  Cf. Amy Coney Barrett, Substantive
Canons and Faithful Agency, 90 B.U. L. Rev. 109, 112 (2010).

28

**JA 61**

1127-28 (9th Cir. 2001); <u>Phillips</u> v. <u>Seiter</u>, 173 F.3d 609, 610 (7th Cir. 1999).

### 3. **Section 1631 Applies Here**

Section 1631 applies to habeas cases in general, <u>see</u> Part IV.B.2 --- but does it apply to <u>this</u> habeas case in particular?

It does.  The statute's effect on a transferee court is mandatory, <u>see</u> footnote 17, but only in two circumstances. <u>See</u> <u>Franco</u>, 3 F.4th at 796.  First, when the transferor court "finds that there is a want of jurisdiction." 28 U.S.C. § 1631.  And second, when transfer to another court is "in the interest of justice." <u>Id</u>.

Here, each box was checked.  The New York court (the transferor court) determined that there was "a want of jurisdiction." <u>See</u> <u>Khalil</u>, 2025 WL 849803, at *14.  And it held that transfer was in the interest of justice. <u>See id</u>.[19]

### 4. **Section 1631 Covers Personal Jurisdiction**

To this point, the Court has established that it can look to Section 1631, even though the New York court did not invoke it as a basis for transfer, <u>see</u> Part IV.B.1 --- and that Section 1631 applies to habeas petitions in general, <u>see</u> Part IV.B.2, and to this one in particular. <u>See</u> Part IV.B.3.

Section 1631 is in play.  What then does it do?

The words of the statute make clear that it cures jurisdictional defects.  It tells the transferee court that it "shall" treat the case as having been brought there, in the transferee court, at the moment it was first initiated in the transferor court.

---

[19]  Had the New York court not made its own "interest of justice" determination, it is possible that this Court might have been called on to assess the question, as part of determining whether Section 1631 applies.  <u>Cf</u>. <u>Xu</u>, 2024 WL 2185060, at *1 & n.1 (determining that a Section 1631 transfer would be "in the interest of justice" where the district court had dismissed the complaint altogether); <u>Martinez-Nieto</u>, 805 F. App'x at 135 (similar).  But this is irrelevant for now, because the New York court issued its own interest-of-justice ruling.

But what <u>kinds</u> of jurisdictional defects can be cured by Section 1631?

Subject-matter defects are irrelevant here.  <u>See</u> footnote 12.

Does the statute cure the sort of personal jurisdiction issues that are on the table here?

A leading treatise has suggested that Section 1631 focuses <u>only</u> on subject-matter jurisdiction cures.  <u>See</u> <u>Federal Practice and Procedure</u> ¶ 3842.

But this is not the better view.

To see why, start with the text --- and end with it.

"If the text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible."  <u>Martin</u> v. <u>Hunter's Lessee</u>, 14 U.S. 304, 338-39 (1816); <u>see</u> <u>Conn. Nat'l Bank</u> v. <u>Germain</u>, 503 U.S. 249, 253-54 (1992) (collecting cases).

Section 1631 says it can cure "a want of jurisdiction."  Had Congress wished, it could have said, for instance, that the statute will cure "a want of subject-matter jurisdiction."  But it did not, and the Court interprets the words as they are.  The Court may not add a "restriction," <u>Martin</u>, 14 U.S. at 339, and reading in "subject-matter" as a limit on "jurisdiction" would do just that.

The Fifth Circuit has recently made this point, noting that Congress' choice of an open-ended umbrella term in Section 1631 (jurisdiction) means that the term cannot be pared back to remove some of what it ordinarily encompasses (like personal jurisdiction).  <u>See</u> <u>Franco</u>, 3 F.4th at 793.

This makes sense.  "Jurisdiction" may be "a verbal coat of too many colors."  <u>United States</u> v. <u>L. A. Tucker Truck Lines, Inc.</u>, 344 U.S. 33, 39 (1952) (Frankfurter, J., dissenting).  But that is the term Congress chose.  And it will not do for a court to see itself as tidying up Congress' work after the fact, by removing some here and a bit there, on the thought that doing so provides more coherence.

Moreover, the Fifth Circuit confirmed its reading by looking to a present-day dictionary, which defines "jurisdiction" as referencing <u>both</u> the personal and subject-matter sorts.  <u>See</u> <u>Franco</u>, 3 F.4th at 792; <u>cf</u>. <u>Kontrick</u> v. <u>Ryan</u>, 540 U.S. 443, 455

(2004) (suggesting that "the label 'jurisdictional' . . . delineat[es] the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority").

To be sure, the Supreme Court routinely directs courts to look to the contemporary meaning of statutory text, and that often involves a look to time-of-enactment dictionaries.  See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227–28 (2014).

But "jurisdiction" meant roughly the same thing in 1982, when Section 1631 became law.  Shortly before the statute's enactment, a leading legal dictionary defined "jurisdiction" as "a term of large and comprehensive import," generally sweeping in "the authority by which courts and judicial officers take cognizance of and decide cases."  Jurisdiction, Black's Law Dictionary (5th ed. 1979).  The same dictionary defined "want of jurisdiction," the fuller phrase in Section 1631, as a "[l]ack of jurisdiction over person or subject matter."  Want of Jurisdiction, Black's Law Dictionary (5th ed. 1979) (emphasis added).

Given the clear meaning of "jurisdiction," there is no textual reason to think Congress wanted Section 1631 to reach only one sort of jurisdiction.

Congress' choice not to use the words "subject-matter jurisdiction" in Section 1631 is especially telling given that it has repeatedly used that language elsewhere in Title 28.  See Franco, 3 F.4th at 792-93 (citing, for example, 28 U.S.C. § 1390(a)) ("The term 'venue' refers to the geographic specification of the proper court or courts for the litigation of a civil action that is within the subject-matter jurisdiction of the district courts in general.") (emphasis added).

And when legislators could have, but did not, adopt "obvious alternative" language, "the natural implication is that they did not intend" the alternative, and the Court cannot revisit that choice.  Lozano v. Montoya Alvarez, 572 U.S. 1, 16 (2014).

In short: the text of Section 1631 is clear, and underscores that the statute works to cure all sorts of jurisdictional defects --- the kind at issue here (related to personal

jurisdiction) and also those that have no bearing here (related to subject-matter jurisdiction).[20]

*     *     *

This conclusion reflects the clear judicial consensus.

As alluded to above, the Fifth Circuit has held "that the term 'jurisdiction' in Section 1631 encompasses both personal and subject-matter jurisdiction." Franco, 3 F.4th at 794.

The First, Sixth, and Seventh Circuits have said the same. See Fed. Home Loan Bank of Bos. v. Moody's Corp., 821 F.3d 102, 114 (1st Cir. 2016), abrogated on other grounds by Lightfoot v. Cendant Mortg. Corp., 580 U.S. 82 (2017); Roman v. Ashcroft, 340 F.3d 314, 328 (6th Cir. 2003); North v. Ubiquity, Inc., 72 F.4th 221, 227 (7th Cir. 2023).

And "[t]he Ninth, Tenth, and Eleventh Circuits have implicitly reached the same conclusion by either applying § 1631 to a transfer to cure a defect in personal jurisdiction, directing a district court to consider utilizing the provision to rectify a lack of personal jurisdiction, or approving such a transfer after it occurred." Franco, 3 F.4th at 794 (citing Gray & Co. v. Firstenberg Mach. Co., 913 F.2d 758, 761–62 (9th Cir. 1990); Ross, 822 F.2d at 1527–28)); see United States v. Kinsey, 393 F. App'x 663, 665 (11th Cir. 2010); accord Okongwu v. Reno, 229 F.3d 1327, 1331 & n.3 (11th Cir. 2000).

And though the Third and Eighth Circuits have not answered this question directly, they have said in dicta that a transfer under Section 1631 can cure a lack of personal jurisdiction. See Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 218 n.9 (3d Cir. 2002); Johnson v. Woodcock, 444 F.3d 953, 954 n.2 (8th Cir. 2006); accord Chavez v. Dole Food Co., Inc., 836 F.3d 205, 224 (3d Cir. 2016) (noting that the proper transfer statute was "arguably" Section 1631 in a case where personal jurisdiction

---

[20]  The Second Circuit has said that "the legislative history of section 1631 provides some reason to believe that this section authorizes transfers only to cure lack of subject matter jurisdiction." SongByrd, Inc. v. Est. of Grossman, 206 F.3d 172, 179 n.9 (2d Cir. 2000). But because the text is clear, the legislative history is out of bounds. See, e.g., Bostock v. Clayton Cnty., 590 U.S. 644, 674 (2020) ("[L]egislative history can never defeat unambiguous statutory text[.]"); accord Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 132 n.9 (2018).

was lacking); <u>Tripati</u> v. <u>Wexford Health Sources Inc.</u>, 2022 WL 17690156, at *2 n.4 (3d Cir. Dec. 15, 2022) (similar); <u>Danziger</u>, 948 F.3d at 132 (calling Section 1631 the "relevant statute" regarding transfer where district court lacked personal jurisdiction); <u>D'Jamoos ex rel. Est. of Weingeroff</u> v. <u>Pilatus Aircraft Ltd.</u>, 566 F.3d 94, 109-11 (3d Cir. 2009) (remanding to the district court to consider whether transfer was appropriate under Section 1631 when it lacked personal jurisdiction over defendant).[21]

\*     \*     \*

The Court holds: Section 1631 can cure a personal-jurisdiction defect of the kind at issue here, and not just subject-matter jurisdiction defects.

### 5.  <u>What Section 1631 Means Here</u>

The previous sections, <u>see</u> Parts IV.B.1 to IV.B.4, established that the Court can look to Section 1631 in this case and use it to cure difficulties as to personal jurisdiction.

How would that work here?  To see the answer, start by looking again at the statutory language, and filling in some of the facts of this case.

> Whenever a civil action [here, this habeas case] is filed in a court [the New York court] . . . and that court finds that there is a want of jurisdiction [as it did here], the court shall, if it is in the interest of justice [as it found], transfer such action . . . to any other such court [this Court] . . . in which the action . . . could have been brought . . . , and the action . . . <u>shall proceed as if</u> it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred [that is, March 9, 2025, at 4:40am].

---

[21]  The Fourth Circuit has not decided the issue.  <u>See</u> <u>In re Carefirst of Md., Inc.</u>, 305 F.3d 253, 257 n.2 (4th Cir. 2002).

28 U.S.C. § 1631.

Bottom line: Section 1631 means that the Petition here is treated as if it was backdated --- and in particular, as if it was filed on March 9.

Various Third Circuit cases back up this reading.  Consider some below.

### a)  **Miller**

In <u>Miller</u> v. <u>United States</u>, 753 F.2d 270 (3d Cir. 1985), the petitioner challenged his discharge from the Army before the Third Circuit and the Federal Circuit.  Later, he petitioned the Third Circuit for fees incurred at the Federal Circuit.  <u>See</u> <u>id</u>. at 272.

The Third Circuit held that it lacked jurisdiction over the claim for Federal Circuit fees.  But by then, the deadline to file for fees in the proper court (the Federal Circuit) had passed.  <u>See</u> <u>id</u>. at 273, 276.

But the Third Circuit recognized that the Federal Circuit <u>would</u> have had jurisdiction over the fee petition "had it been filed as an original petition with that court."  <u>Id</u>. at 276.  Backdating jurisdiction to the time of the original filing, the Third Circuit sent the petition to the Federal Circuit "in the interest of justice."  <u>Id</u>.

### b)  **Martinez-Nieto**

A newer Third Circuit case shares the same holding.  In <u>Martinez-Nieto</u> v. <u>Attorney General of United States</u>, 805 F. App'x 131 (3d Cir. 2020), a person petitioned the Third Circuit to review a decision of the Board of Immigration Appeals.  <u>See</u> <u>id</u>. at 133–34.  He filed his petition on the last possible day --- and, mistakenly, in the district court instead of the court of appeals.  <u>See</u> <u>id</u>. at 135.

The Third Circuit explained that the two criteria of Section 1631 were met: the district court lacked jurisdiction, and a transfer would serve the interest of justice.  <u>See</u> <u>id</u>. at 135.  It therefore assumed jurisdiction over the otherwise time-barred petition, since it "would have been able to exercise jurisdiction on the date that the petition was filed in the District Court."  <u>Id</u>.

Like Miller, Martinez-Nieto parallels the facts here. A petitioner filed his action in a court that lacked jurisdiction. By the time he sought to fix his error, the right court could no longer exercise jurisdiction because of a procedural hurdle. A transfer "in the interest of justice" cured this problem by backdating jurisdiction in the receiving court to the time at which the petition was originally filed.

### c)  Other Cases

Miller and Martinez-Nieto are no outliers.

Before, after, in between them, Third Circuit cases have pointed in the same direction: Section 1631 vests a court with precisely the jurisdiction it would have had at the time of the original case's filing. See Xu, 2024 WL 2185060, at *1; Forkpa-bio v. Att'y Gen. of U.S., 296 F. App'x 239, 243 n.4 (3d Cir. 2008); Mejia-Juarez v. Att'y Gen. of U.S., 287 F. App'x 204, 205 n.1 (3d Cir. 2008); Keller v. Petsock, 849 F.2d 839, 843 (3d Cir. 1988); cf. Monteiro v. Att'y Gen. of U.S., 261 F. App'x 368, 369 (3d Cir. 2008); Lawal v. Ashcroft, 89 F. App'x 774, 776 (3d Cir. 2004); Campbell v. Off. of Pers. Mgmt., 694 F.2d 305, 309 n.6 (3d Cir. 1982).

## V.  Section 1631 and Two Further Issues

The analysis set out in Part IV establishes that this case, filed in New York on March 9 at 4:40am, must be treated as if it had been filed in New Jersey on March 9 at 4:40am --- under the authority of Section 1631.

This establishes that this Court has jurisdiction.

After all, the Petitioner was in custody in New Jersey on March 9. The Petition must be treated as if it was filed here in New Jersey at that same moment. And per the Supreme Court in Padilla: that adds up to jurisdiction. See Padilla, 542 U.S. at 447 (so holding); see generally Part II.

But there are two complexities.

The first: what of the fact that the Petitioner, here in New Jersey when the Petition was filed, is now in Louisiana? Jurisdiction may well have been proper in New Jersey on March 9. But is jurisdiction still proper today, now that the Petitioner is no longer in New Jersey?

The Court's conclusion: yes, for the reasons set out in Part VI.

The second issue: what of the fact that the Petitioner has not named as a respondent either the warden of the Louisiana facility (where he is now in custody) or the warden of the facility in New Jersey (where he was in custody while here)? That is generally required.  See Anariba, 17 F.4th at 444 (holding that a habeas petition that challenges ICE custody must generally name as the respondent the warden of the facility where the person is held).

Jurisdiction might well have been proper in New Jersey on March 9.  But is jurisdiction still proper given that he has not sued the relevant warden?

The Court's conclusion: again, yes, for the reasons laid out in Part VII.

Take all this up now, in the next two Parts.

## VI.  __The Endo Rule__

As noted just above, see Part V, this Court's jurisdiction is not undone because the Petitioner is no longer in New Jersey, having been moved to Louisiana after the Petition was filed.

The basis for this conclusion is a rule --- call it "the Endo Rule" --- that a habeas court that otherwise has jurisdiction over a case does not lose that jurisdiction just because the habeas petitioner has been moved out of the district.

Is that rule good law?  This Part shows that it is.

The Court moves through the background quickly --- describing the key Supreme Court decision in this area and the two competing understandings of it, only one of which supports the referenced Endo Rule.  See Part VI.A.

From there, the Court explains that any debate that there once may have been is now over.  The Endo Rule is now the law.  See Part VI.B.

And under the Endo Rule, this Court --- which otherwise has jurisdiction, see Part IV --- does not lose that jurisdiction because the Petitioner was transferred from New Jersey to Louisiana.

A. **Background**

Start with the key Supreme Circuit case, Ex parte Endo, 323 U.S. 283 (1944).

Mitsuye Endo, an American citizen, was removed from her home and detained in a California "relocation center," along with thousands of other Japanese-Americans.  See id. at 284-85, 288.

While confined at the "center," she filed a habeas petition in a California federal court.  See id. at 285.

The petition was denied, Endo appealed, and while the appeal was pending she was moved out of California and to a different facility, this one in Utah.  See id.

The case went to the Supreme Court, which held Endo should be released.  See id. at 304.  But how?  Could the California court issue a habeas corpus writ releasing Endo --- even though she had been moved out of California?

Yes, the Supreme Court held.  See id. at 307.

\*     \*     \*

How to understand the Supreme Court's Endo decision?

On some accounts, the decision was not about the California court's power after Endo was moved to Utah.  Rather, the decision was about whether the case had become moot because the people who were originally named as respondents in the habeas petition were no longer Endo's immediate custodians.

On this reading, the Supreme Court in Endo held no more and no less than this: the case before it was not moot.  See id. at 305.

On that interpretation, Endo defeats any argument that a case in which a habeas petitioner has been moved is not ripe for decision --- but it does not affirmatively supply a basis for the first court (the California court) to continue to exercise jurisdiction.

There is some language in Endo that supports a mootness-flavored reading.  See id.  And over the years, some courts have foregrounded the mootness/ripeness aspects of the decision.[22]

\*     \*     \*

But there is another interpretation of Endo --- one focused squarely on the idea that a court keeps power over a habeas case, even after the petitioner-detainee may have been transferred out of the court's territory.

That reading is true to the Endo Court's language.  See id. at 306-07 (stating that the California federal court "acquired jurisdiction" when Endo filed her habeas petition, and kept the case because the objective of the habeas corpus statute "may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court," and the habeas "decree of the court [can be] made effective if a respondent who has custody of the prisoner is within reach of the court's process even though the prisoner has been removed from the district since the suit was begun").

And that reading is in keeping with broader jurisdictional principles.

Diversity jurisdiction, for example, locks in at the time a case is filed --- and survives changing circumstances down the line.

That is true as to changes in the parties' citizenship.  See Louisville, N.A. & C.R. v. Louisville Tr. Co., 174 U.S. 552, 566 (1899) (so holding); McCracken v. ConocoPhillips Co., 335 F. App'x 161, 162 (3d Cir. 2009) (same).

And it is also true as to changes in the amount in controversy. See St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283,

---

[22]  See, e.g., Copley v. Keohane, 150 F.3d 827, 829-30 (8th Cir. 1998); Sharp v. Ciccone, 360 F.2d 605, 606 (8th Cir. 1966); Factor v. Fox, 175 F.2d 626, 628-29 (6th Cir. 1949); White v. Gilley, 2023 WL 5987206, at \*2-3 (E.D. Ky. Sept. 13, 2023); Dailey v. Pullen, 2023 WL 3456696, at \*3 (D. Conn. May 15, 2023); Parker v. Hazelwood, 2019 WL 4261832, at \*6 (D.N.H. Sept. 9, 2019); Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 44-45 (D. Mass. 2016); Bowen v. Harris, 224 F. Supp. 976, 977-78 (W.D. Mo. 1964).

289-90 (1938) (so holding); <u>Auto-Owners Ins. Co.</u> v. <u>Stevens & Ricci Inc.</u>, 835 F.3d 388, 395-96 (3d Cir. 2016) (same).

Or take this example: jurisdiction over <u>in rem</u> civil forfeiture and admiralty proceedings is generally determined by the physical location of the "res," the thing, at the moment when a case is initially filed and the res is seized. <u>See Republic Nat'l Bank of Mia.</u> v. <u>United States</u>, 506 U.S. 80, 84-85 (1992).

The res might later wind up leaving the physical jurisdiction of a district court. Maybe it is moved. Or maybe it is sold off, and the cash goes somewhere else.

What then for the court's jurisdiction? The answer: the court that initially had jurisdiction generally keeps it. <u>See Republic Nat'l Bank</u>, 506 U.S. at 84; <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Real Props. & Premises</u>, 521 F. App'x 379, 383 (6th Cir. 2013) (applying <u>Republic Nat'l Bank</u> to retain jurisdiction); <u>Vitol, S.A.</u> v. <u>Primerose Shipping Co. Ltd.</u>, 708 F.3d 527, 540-41 (4th Cir. 2013) (same, as to <u>quasi in rem</u> proceedings); <u>Ventura Packers, Inc.</u> v. <u>F/V Jeanine Kathleen</u>, 424 F.3d 852, 860-61 (9th Cir. 2005) (<u>in rem</u>).[23]

---

[23] This has essentially been the rule since the early days of this Republic. <u>See</u>, <u>e.g.</u>, <u>The Little Charles</u>, 26 F. Cas. 979, 982 (C.C.D. Va. 1818) (No. 15,612) (Marshall, C.J.) (in a case regarding the seizure of a vessel, "[t]here must be seizure to vest the jurisdiction. But it is not believed that the continuance of possession, is necessary to continue the jurisdiction. It is a general principle, that jurisdiction, once vested, is not divested, although a state of things should arrive in which original jurisdiction could not be exercised."); <u>The Rio Grande</u>, 90 U.S. (23 Wall.) 458, 463 (1875) (similar). Note that there are exceptions to the rule. Jurisdiction, for example, can be lost if a change in circumstances renders any judgment "useless," because there is nothing left within the court's jurisdiction to collect against. <u>See Republic Nat'l Bank</u>, 506 U.S. at 85-87; <u>see also Cmty. Bank of Lafourche</u> v. <u>Lori Ann Vizier, Inc.</u>, 541 F. App'x 506, 513 (5th Cir. 2013); <u>Eurasia Int'l, Ltd.</u> v. <u>Holman Shipping, Inc.</u>, 411 F.3d 578, 583-84 (5th Cir. 2005); <u>Woodlands Ltd.</u> v. <u>Nationsbank, N.A.</u>, 164 F.3d 628, *5-6 (4th Cir. 1998); <u>United States</u> v. <u>One Parcel of Real Estate at 3262 SW 141 Ave., Mia.</u>, 33 F.3d 1299, 1303-04 (11th Cir. 1994); <u>Newpark Shipbuilding & Repair, Inc.</u> v. <u>M/V Trinton Brute</u>, 2 F.3d 572, 573 (5th Cir. 1993).

B.    **Consensus Understanding**

As alluded to just above, see Part VI.A, there has been a debate over the years as to how to most faithfully read Endo.

But that back and forth is now over.  The Supreme Court has made clear that Endo is not a mootness case but a jurisdictional one. Per the Court in Padilla:

> Endo stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release.

Padilla, 542 U.S. at 441 (emphasis added).

That might have been dicta, but other cases' holdings point the same way.

Take, for example, Anariba v. Director Hudson County Correctional Center, 17 F.4th 434 (3d Cir. 2021).

There, a person detained in New Jersey filed a habeas petition. See id. at 436.  The petition was denied.  Transferred to a detention facility outside New Jersey, he made a new filing, which the Third Circuit took as a motion to reconsider the habeas ruling.  See id. at 439, 444.

Could the motion be taken up, even though the habeas petitioner was no longer in New Jersey?  Yes, the Third Circuit answered, see id. at 445-46 --- because like Padilla, it took Endo as supporting continued jurisdiction in a habeas court, even after the habeas petitioner was moved out of the relevant district. The Third Circuit cited Endo and Padilla.  See id.

And it noted:

> Our precedent likewise reflects an adherence to the general rule articulated in Endo, that the government's post-filing transfer of a § 2241 petitioner out of the court's territorial jurisdiction does not strip the court of jurisdiction over the petition.

Id. (citing Ex parte Catanzaro, 138 F.2d 100, 101 (3d Cir. 1943)).[24]

And from Catanzaro:

> [W]e do not believe that passing about of the body of a prisoner from one custodian to another after a writ of habeas corpus has been applied for can defeat the jurisdiction of the Court to grant or refuse the writ on the merits of the application.

138 F.2d at 101.

All of this is consistent with other Third Circuit cases. See, e.g., Hoffman v. Warden Phila. FDC, 2022 WL 1564177, at *2 (3d Cir. May 18, 2022); McGee v. Martinez, 490 F. App'x 505, 506 (3d Cir. 2012); Brown v. Yates, 154 F. App'x 319, 320 (3d Cir. 2005).[25]

And the district courts of this Circuit have treated the matter as done and settled: a habeas court with jurisdiction does not lose it because the detainee has been moved out of the district. See, e.g., Summers v. FCI Loretto Warden, 2025 WL 72797, at *1 (W.D. Pa. Jan. 10, 2025); Saillant v. Hoover, 2020 WL 4924567, at *2 (M.D. Pa. Aug. 21, 2020); Guerrero Sanchez v. Sabol, 2019 WL 1977922, at *5 n.14 (M.D. Pa. May 3, 2019); Almahdi v. Rabsatt, 2015 WL 5567312, at *2 (D.N.J. Sept. 22, 2015); McGee

---

[24] See also Anariba, 17 F.4th at 448 ("Allowing a district court to retain jurisdiction for all post-filing proceedings . . . despite a detainee's transfer out of the territorial jurisdiction of the district court in which the § 2241 petition was filed, would minimize incentives for Government abuse of the already turbulent ICE transfer process.").

[25] Other circuit courts take the same approach. See Roberts v. LeJeune, 43 F.4th 695, 698 (7th Cir. 2022); Lennear v. Wilson, 937 F.3d 257, 263 n.1 (4th Cir. 2019); Pinson v. Bekebile, 604 F. App'x 649, 652-53 (10th Cir. 2015); White v. Lamanna, 42 F. App'x 670, 671 (6th Cir. 2002); Vasquez v. Reno, 233 F.3d 688, 695 (1st Cir. 2000); Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990); Harris v. Ciccone, 417 F.2d 479, 480 n.1 (8th Cir. 1969); see also Stokes v. U.S. Parole Comm'n, 374 F.3d 1235, 1237-39 (D.C. Cir. 2004); Henderson v. INS, 157 F.3d 106, 125 (2nd Cir. 1998).

41

**JA 74**

v. <u>Martinez</u>, 2011 WL 5599338, at *2 (M.D. Pa. Nov. 17, 2011); <u>Dandridge</u> v. <u>Schultz</u>, 2007 WL 4300846, at *8 n.3 (E.D. Pa. Dec. 6, 2007); <u>Qiang</u> v. <u>Dist. Dir. for Immigr. Customs Enf't</u>, 2006 WL 3762029, at *2 (M.D. Pa. Dec. 20, 2006); <u>Parra</u> v. <u>U.S. Parole Comm'n</u>, 2005 WL 8164431, at *2 n.3 (W.D. Pa. Dec. 13, 2005); <u>Bah</u> v. <u>Wagner</u>, 2005 WL 83259, at *1 (E.D. Pa. Jan. 13, 2005); <u>Miller</u> v. <u>United States</u>, 2004 WL 887420, at *1 (E.D. Pa. Apr. 23, 2004); <u>Chavez-Rivas</u> v. <u>Olsen</u>, 194 F. Supp. 2d 368, 371 (D.N.J. 2002); <u>Caballero</u> v. <u>United States</u>, 145 F. Supp. 2d 550, 558 (D.N.J. 2001); see also <u>White</u> v. <u>Grace</u>, 2005 WL 1309044, at *4 (M.D. Pa. June 1, 2005).

<p style="text-align:center">*     *     *</p>

Bottom line: the <u>Endo</u> Rule is the law --- and under that rule this Court retains the jurisdiction it had over this case, <u>see</u> Part IV, even though the Petitioner is now in Louisiana.

## VII. <u>The Immediate Custodian Rule</u>

To this point, the Court has determined that it properly acquired jurisdiction over this case because, under 28 U.S.C. § 1631, the Petition counts as if it was filed here at around 4:40am on March 9 --- when the Petitioner was in New Jersey. <u>See</u> Part IV.

And as set out just above, <u>see</u> Part VI, jurisdiction has <u>stayed</u> with the Court since March 9 --- even though later on March 9 the Petitioner was moved to Louisiana and remains there.

There is, though, one remaining issue.

As noted, <u>see</u> Part II and Part V, habeas petitions must name as a respondent the detainee's "immediate custodian." <u>See generally</u> <u>Padilla</u>, 542 U.S. at 435. For a person being detained in connection with an immigration matter, the immediate custodian is the warden of the detention center. <u>See</u> <u>Anariba</u>, 17 F.4th at 444.

The Petitioner did not name any warden.

That was no surprise --- at the time she put together a filing on his behalf, the Petitioner's lawyer thought he was in New

York.  It would not have made sense for her to name the warden of a New Jersey facility.[26]

Is this an issue?  As a practical matter, not always.

When a habeas case is filed in the wrong district and then sent to another, the petitioner often simply adds a proper respondent-warden in the new district --- and things are wrapped up that way.[27]

But that is not required.

A court does not have jurisdiction unless the proper immediate custodian is named as a respondent on the petition.  See Padilla, 542 U.S. at 441.  A respondent-custodian can choose to waive objections to personal jurisdiction.  See Dufur v. U.S. Parole Comm'n, 34 F.4th 1090, 1096–97 (D.C. Cir. 2022); Flynn v. Kansas, 299 F. App'x 809, 810 n.3 (10th Cir. 2008); Smith v. Idaho, 392 F.3d 350, 355-56 (9th Cir. 2004).  But he or she does not need to.

---

[26]  Naming a New Jersey warden while confident that her client was in New York might have been in some tension with the lawyer's professional obligations.  See Fed. R. Civ. P. 11(b); cf. Moore's Federal Practice § 11.11.  And note that the law has long expected lawyers working on behalf of detainees to do the legwork needed to name the right custodian, even when doing so is very difficult.  See, e.g., Paul D. Halliday, Habeas Corpus: From England to Empire 43 (2010) (describing 17th- and 18th-century practice).

[27]  For cases in which courts have gone down that route or a similar one, see, for example: Jackson v. Chapman, 589 F. App'x 490, 491 n.1 (11th Cir. 2014); Kordelski v. Jordan, 111 F. App'x 557, 558 n.* (10th Cir. 2004); Stanley v. Calif. Sup. Ct., 21 F.3d 359, 360 (9th Cir. 1994); West v. Louisiana, 478 F.2d 1026, 1029 (5th Cir. 1973); Medina v. People, 2020 WL 5217150, at *6 (C.D. Cal. July 28, 2020); Bradley v. U.S. Parole Comm'n, 2017 WL 2604267, at *1 n.2 (M.D. Pa. May 23, 2017); report and recommendation adopted by 2017 WL 2592403 (M.D. Pa. June 15, 2017); Forney v. Recktenwald, 2014 WL 4437552, at *1 (M.D. Pa. Sept. 9, 2014); Burns v. Weber, 2010 WL 276229, at *5 (D.N.J. Jan. 19, 2010); see also Bridges v. Chambers, 425 F.3d 1048, 1049 (7th Cir. 2005); Smith v. Idaho, 392 F.3d 350, 353 n.3 (9th Cir. 2004); Cruz-Aguilera v. INS, 245 F.3d 1070, 1073 n.2 (9th Cir. 2001).

43

**JA 76**

That is in essence the tack the Respondents take here.

First, they argue that this Court lacks jurisdiction because the Petitioner's current immediate custodian (the warden of the Louisiana facility where he is held) is not named as a respondent. See Motion to Dismiss at 6 (implying this argument); Transcript at 17:14-19, Khalil v. Joyce, No. 25-01963 (D.N.J. Mar. 28, 2025) ("March 28 Transcript").

And this might be a practical problem.

There are hard territorial limits on a habeas court's jurisdiction. This Court's habeas power ends at the state line. Out-of-state "long arm" jurisdiction is available in most other civil cases, but not in this one. See Padilla, 542 U.S. at 444-45; see also Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 44 (D. Mass. 2016) (interpreting Padilla); Qiang, 2006 WL 3762029, at *2 (same); see generally Brian R. Means, Postconviction Remedies § 12:5 (2024) (describing Padilla).

So if the Louisiana warden must be named, the Court might not be able to reach him or her.

And second, the Respondents argue that even if the Petition were treated as having been filed on March 9, there is no jurisdiction here because a New Jersey warden was never named. See Motion to Dismiss Brief at 8 ("Because [the Petitioner's] original petition was improper, no court has yet had proper habeas jurisdiction over this matter."); March 28 Transcript at 8:25 to 9:12.

*     *     *

Neither of these arguments works.

The first argument, as to the Louisiana warden, runs aground on the Supreme Court's Endo Rule, see Part VI, for reasons explained below in Part VII.A.

The second argument, as to the New Jersey warden, makes for a closer question. But it, too, does not work --- in light of the "unknown custodian" exception most commonly associated with Judge Bork's decision in Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986). This is explained in Part VII.B.

44

JA 77

A. **The Louisiana Warden**

Recall that under the Endo Rule a court retains jurisdiction over a habeas petitioner even after the petitioner is moved out of the court's territory.  See Part VI.

But how can this work?

Assume that the court decides that the petitioner must be released.  The court then would be expected in the ordinary case to issue a writ to the petitioner's immediate custodian.  But the court does not have obvious direct power over the custodian. After all, in the Endo situation the immediate custodian is by definition physically outside the court's jurisdiction.[28]

Something needs to give.  Either the Endo idea that the court keeps jurisdiction as the petitioner is moved about.  Or the idea that habeas writs can run only to the immediate custodian.

The Supreme Court's choice: to relax the immediate custodian rule.[29]  Per the Padilla Court:

> Endo stands for the . . . proposition that
> when the Government moves a habeas
> petitioner after she properly files a
> petition naming her immediate custodian, the
> District Court retains jurisdiction and may
> direct the writ to any respondent within its
> jurisdiction who has legal authority to
> effectuate the prisoner's release.

542 U.S. at 441.

---

[28]  "By definition" because Endo is about detainees who are moved outside a court's territory.  And immediate custodians are always physically with detainees.  See Padilla, 542 U.S. at 444 ("By definition, the immediate custodian and the prisoner reside in the same district.").  That is what makes them "immediate" custodians.  See Yi v. Maugans, 24 F.3d 500, 508 (3d Cir. 1994) ("[I]t is the warden that has day-to-day control over the prisoner and who can produce the actual body.").

[29]  In a somewhat analogous non-habeas context, courts have seen things differently --- and held that it is the retain-jurisdiction principle that might not be sustainable.  See footnote 23 (discussing the "useless judgment" rule).

Who has "legal authority"?  A senior supervisor of the immediate custodian.

For example, in the <u>Endo</u> case itself, the California court did not have power over Endo's Utah-based immediate custodian.  <u>See</u> 323 U.S. at 285.  But that did not matter, the Supreme Court explained.  The California court had jurisdiction over an up-the-chain supervisor of the immediate custodian, and the supervisor could tell the immediate custodian to release Endo. <u>See</u> <u>id</u>. at 304-05.

<p style="text-align:center">*     *     *</p>

Come back now to this case.

Here, there was no need for the Petitioner to have named the Louisiana warden as a respondent.  This is because one of the warden's senior supervisors is named --- and that is what is needed under the Supreme Court's decisions in <u>Padilla</u> and <u>Endo</u>.

The senior supervisor-respondent is the Secretary of Homeland Security.  <u>See</u> footnote 4.  Her cabinet department includes ICE. <u>See</u> <u>Clark</u> v. <u>Martinez</u>, 543 U.S. 371, 375 (2005).  And ICE runs the facility where the Petition is currently detained.  <u>See</u> Joyce Declaration ¶¶ 18-19.

Moreover, as the Respondents concede, the Secretary "is within the Court's jurisdiction."  <u>See</u> Respondents' Letter (Mar. 28, 2025) (ECF 140).  Therefore, if it came to it, this Court could order the Secretary to direct the immediate custodian to release the Petitioner.

## B.  <u>The New Jersey Warden</u>

Come now to a final immediate custodian issue.

The Petition, as discussed above, was filed in New York on March 9, and must be treated as if it was filed in New Jersey at that moment.  <u>See</u> Part IV.B.  But the Petition said nothing about the Petitioner's then-custodian --- the warden of the New Jersey facility where he was then held.

That seems at first glance to run afoul of the immediate custodian rule.  After all, jurisdiction requires not only that the petitioner be in the district --- but also that his immediate custodian be named as a respondent on the petition.

See Padilla, 542 U.S. at 435, 442.  And here no New Jersey warden was named.[30]

The Court's concludes that, on the facts here, this is no bar to jurisdiction.

To explain why, the Court first sets out some relevant (and uncontested) facts, see Part VII.B.1, and then describes the unknown custodian exception to the immediate custodian rule. See Part VII.B.2.  The Court then determines, see Part VII.B.3, that the exception applies to this case --- and excuses the Petitioner's failure to name a New Jersey warden.  See Part VII.B.3.

### 1.   Facts

Move now through some of the relevant facts.

The Petitioner, as previously noted, was arrested at around 8:30pm on March 8.  See Greer Declaration ¶ 4; Joyce Declaration ¶ 7.  The arrest took place in Manhattan.  See Joyce Declaration ¶ 7.

One of the arresting agents said to the Petitioner's wife that he was being taken to a particular and prominent local building. See Declaration of Noor Ramez Abdalla (ECF 55) ("Abdalla Declaration") ¶ 14; see also Greer Declaration ¶ 7.  The building is in Manhattan.

A lawyer for the Petitioner then "worked all night to draft a habeas petition."  Greer Declaration ¶ 9.  It was electronically filed at 4:40am, see id., in the federal court in Manhattan.

Why there?  Per the lawyer:

> At the time of filing the petition, we had
> every reason to believe that Mahmoud [the

---

[30]  The Endo Rule, as discussed just above in Part VI, is not relevant.  It is about a transfer (in this case, to Louisiana) after jurisdiction has attached --- not about whether jurisdiction properly attached in the first place.  It allows for loosening of the immediate custodian rule at Time 2, after a person has been moved.  See Part VI.A.  But it does not purport to say anything as to the immediate custodian rule for the earlier period, at Time 1.

> Petitioner] was detained in New York because
> of what the DHS agent told his wife and the
> ICE Online Detainee Locator System.
>
> I originally checked the ICE locator around
> 10 PM on Saturday, March 8th and Mahmoud was
> not in the system.  I checked again at 1:35
> AM on Sunday, March 9th and it said he was
> in custody in New York and to call the field
> office. I checked again at 4:29 AM on
> Sunday, March 9th and it said the same
> thing.  I checked again at 8:30 AM on
> Sunday, March 9th and Mahmoud was still
> listed as being detained in New York.

Id. ¶¶ 9-10.

In a nutshell: the Petitioner filed in Manhattan because affirmatively-supplied information said he was there.  The arresting agent pointed to Manhattan, and so did the online "detainee locator" --- it "located" the Petitioner in New York, both before and after the filing was made there.

But as has been discussed, the Petitioner was moved from Manhattan to New Jersey during the early hours of March 9, about 80 minutes before the Manhattan petition was filed.  Compare Joyce Declaration ¶ 14, with Greer Declaration ¶ 9.

Could the Petitioner have told his lawyer or someone else that he had been moved to New Jersey?  The evidence on this point is from the Petitioner, and has not been disputed:

> The moment I arrived [in New Jersey], I told
> the officers that I needed to call my
> attorney.  They told me to ask another guy
> at the facility.  I asked that guy, and he
> said I needed to wait until I was processed.

Khalil Declaration ¶ 9.

> Later, in the morning, I asked a female
> officer to allow me to call my attorney, and
> she told me, like the first guy, to wait
> until I was processed.

Id. ¶ 12.

Could someone have determined in real time that the Petitioner had been moved to New Jersey, such that the Petition, then being prepared, might have listed a New Jersey warden as a respondent?

Nothing in the record suggests that. And there is no suggestion that anyone connected with the Petitioner was sitting on their hands. The lawyer worked through the night on a habeas petition, and re-checked the "detainee locator" ten or so minutes before filing. See Greer Declaration ¶¶ 9–10.

Per the Petitioner's wife's declaration:

> I was unable to sleep that night, first working with Amy [the lawyer] to secure immigration counsel for Mahmoud and then trying to find a way to make contact with him. The lawyers relayed to me that he seemed to be in Manhattan throughout the night, according to an ICE locator. By the early morning, they had filed a lawsuit in federal court, with my consent.
>
> Within a few hours and still in the early morning on Sunday, the locator showed Mahmoud as being held at an immigration detention facility in Elizabeth, New Jersey. I immediately went there, desperate to see my husband. I attempted to see him twice and was told by employees at the facility that he was not there, and that I would not be able to see him. I waited outside of the facility for approximately two hours and was never able to see or be in contact with Mahmoud.

Abdalla Declaration ¶¶ 15–16.

Based on the undisputed evidence here, the Court finds that, as of the time she filed the petition on March 9, the Petitioner's lawyer had been affirmatively and persistently led to believe he was in Manhattan;[31] that she relied on that information; and that

---

[31]  The record here does not provide any obvious reason to conclude that the information supplied by the arresting agent, or posted on the website, was provided in bad faith or with an intent to deceive. But no definitive findings are necessary on this point. This is because the application of the unknown

in spite of her best efforts there was no realistic way for her to know that the Petitioner was, in fact, in New Jersey when she filed the Petition.

All of this leads, all but necessarily, to another finding: as of the time she filed the Petition, there was no real way for the Petitioner's lawyer to know that, at that moment, the Petitioner's immediate custodian was a New Jersey warden.  After all, there was no way for her to know he <u>was</u> in New Jersey.

### 2.   <u>The Unknown Custodian Exception</u>

Situations like the above are rare.  A lawyer for a person in custody can almost always name the detainee's immediate custodian.  But not always, and that is when the unknown custodian exception to the immediate custodian rule kicks in.

Take it up here.

\*     \*     \*

The unknown custodian exception is often associated with Judge Bork, who issued a relevant in-chambers opinion in <u>Demjanjuk</u> v. <u>Meese</u>, 784 F.2d 1114 (D.C. Cir. 1986).

In federal custody and soon to be extradited, the <u>Demjanjuk</u> petitioner applied for a habeas writ, but the United States declined to say where he was.  <u>See id</u>. at 1115-16.  What to do? How to satisfy the immediate custodian rule when there is no sense of where the detainee is (and therefore who his immediate custodian is)?

In these circumstances, Judge Bork held that the habeas petition before him could be assessed on the merits.  <u>See id</u>. at 1116. It was the more "[]practica[l]" solution, Judge Bork ruled.  <u>Id</u>. This even though it was at odds with the district of confinement rule, of which more soon, because it was anyone's guess whether the petitioner was in DC, where Judge Bork sat.  And this even though it was at odds with the immediate custodian rule, for the same reason.

Given that the immediate custodian was unknown, Judge Bork relaxed the immediate custodian rule --- and allowed the Attorney General to be named as the respondent on the habeas

---

custodian exception, as discussed below, does not turn on the presence of such factors.

petition, on the theory that the Attorney General was the ultimate supervisor of the immediate custodian --- whoever that custodian might turn out to be.  See id.

That, in a nutshell, is what the unknown custodian exception does.  It opens up an exception to the otherwise-applicable immediate custodian rule when, on the facts of a given case, the immediate custodian simply cannot be known.

\*     \*     \*

Is this rule the law of the land?  The Supreme Court's Padilla opinion suggests the answer is yes.

In Padilla, Chief Justice Rehnquist wrote for five Justices. Two of those Justices, in a concurrence, proposed an exception to the immediate custodian rule.  See 542 U.S. at 454 (Kennedy, J., concurring).  The Chief Justice rejected this exception. "No exceptions to this rule, either recognized or proposed, apply here."  Id. at 435-36.  The "proposed" exception was clearly the one offered up by the two concurring Justices --- the Chief Justice had cited it.  See id. at 436.

But what were the "recognized" exceptions?  The Chief Justice's opinion suggests two, and each laid out in footnote 18 of the Padilla opinion.  That footnote reads in part:

> Demjanjuk v. Meese, 784 F.2d 1114
> (C.A.D.C.1986), on which the dissent relies,
> is similarly unhelpful:  When, as in that
> case, a prisoner is held in an undisclosed
> location by an unknown custodian, it is
> impossible to apply the immediate custodian
> and district of confinement rules.  That is
> not the case here, where the identity of the
> immediate custodian and the location of the
> appropriate district court are clear.

542 U.S. at 450 n.18 (cleaned up).

And at another point in the opinion, the Chief Justice explained that, on the facts of the Padilla case itself, "the identity of the immediate custodian" was not "shrouded . . . in secrecy." Id. at 449 n.17.

All of this suggests that the Padilla majority took Judge Bork's unknown custodian exception as part of our law.

After all, as far as "proposed" and "recognized" exceptions went, the unknown custodian exception was on the "recognized" side of the line. And the <u>Padilla</u> Court took the exception as a given, with the facts of the case to be measured against it (was the immediate custodian "shrouded . . . in secrecy"?).

<div align="center">*   *   *</div>

The United States has generally taken the same basic approach. Where the issue has come up around the country, it has argued that the unknown custodian exception does not match the facts of a particular case. <u>See</u> Appellee's Brief at 25, <u>Remy</u> v. <u>Chadbourne</u>, 184 F. App'x 79 (2d Cir. 2006) (No. 05-0602), 2006 WL 6263982; Brief for John Ashcroft Attorney General of the United States at 33, <u>Filsaime</u> v. <u>Ashcroft</u>, 393 F.3d 315 (2d Cir. 2004) (No. 03-2221), 2004 WL 3525390, at *33; Respondents' Reply Memorandum in Support of Motion to Dismiss Improper Respondents at 6 n.3, <u>Ali</u> v. <u>Obama</u>, 741 F. Supp. 2d 18 (D.D.C. 2010) (No. 10-1020), 2008 WL 8202651; Memorandum in Support of Motion to Dismiss, at 10, <u>Baez</u> v. <u>INS</u>, 2005 WL 3541030 (E.D. La. Oct. 25, 2005) (No. 03-1568), 2003 WL 25713262.

But it does not appear to have contended that the unknown custodian exception is in some sense itself incorrect as a matter of law.

<div align="center">*   *   *</div>

Lower court opinions have also treated the unknown custodian rule as a basic part of our law.

In <u>United States</u> v. <u>Moussaoui</u>, 382 F.3d 453 (4th Cir. 2004), for example, a defendant sought access to a trial witness held in military custody via a writ of habeas corpus <u>ad testificandum</u>, but the immediate custodian was unknown. <u>See id.</u> at 465.

No matter, the Fourth Circuit held. "[T]he immediate custodian [was] unknown. Under such circumstances, the writ is properly served on the prisoner's ultimate custodian." <u>Id.</u> (citing Demjanjuk, 784 F.2d at 1116).

The "ultimate custodian" in Judge Bork's case was the Attorney General who supervised all the federal prisons in which the habeas petitioner might have been held. <u>See</u> Demjanjuk, 784 F.2d at 1116. In <u>Moussaoui</u>, the "ultimate custodian" was the Secretary of Defense, who supervised all the Nation's troops,

some of whom were said to be holding the witness.  382 F.3d at 465.

Moussaoui does not stand alone.

In United States v. Paracha, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), aff'd, 313 F. App'x 347 (2d Cir. 2008), the court came to the same conclusion on virtually the same facts.  Witnesses were said to be in the custody of the United States "in undisclosed locations abroad."  Id. at *5.  Could a habeas writ issue for their testimony?  Yes, the Court held, citing the unknown custodian exception: because "the immediate custodian is unknown, a writ may properly be served on the prisoner's ultimate custodian."  Id. at *6 (citing Demjanjuk and Moussaoui).  And so the writ went to the Secretary of Defense.  See id.

Another example.  In Ali v. Ashcroft, 2002 WL 35650202 (W.D. Wash. Dec. 10, 2002), a habeas class action named the Attorney General as respondent.  See id. at 3.  What about the immediate custodian rule?  Per the district court, this did not matter: "[a] nationwide habeas class with the Attorney General as respondent is appropriate when the location of the putative class members is unclear."  Id.

In dicta, the lower federal courts have consistently embraced the unknown custodian exception to the immediate custodian rule.  See, e.g., Vasquez, 233 F.3d at 696; Roman, 340 F.3d at 325; Aransevia v. McKelvy, 77 F. App'x 531 (D.C. Cir. 2003); Guerra v. Meese, 786 F.2d 414, 416 n.1 (D.C. Cir. 1986); Hamama v. Adducci, 2017 WL 2806144, at *2 (E.D. Mich. June 26, 2017); Heras-Quezada v. Terry, 2012 WL 13076586, at *2 (D.N.M. July 17, 2012), report and recommendation adopted by 2012 WL 13076297 (D.N.M. Sept. 10, 2012); Bailes v. Quinlan, 1988 WL 58914, at *1 n.3 (D.D.C. May 20, 1988); cf. Blackmon v. England, 323 F. Supp. 2d 1, 4 (D.D.C. 2004).

And a standard treatise has put it this way: "The 'immediate custodian' rule . . . is inapplicable . . . where the prisoner's current whereabouts are unknown."  Randy Hertz & James S. Liebman, 1 Federal Habeas Corpus Practice & Procedure § 10.1 (7th ed. 2015); accord Brian R. Means, Federal Habeas Manual § 1:93 (2024) ("[W]here the immediate custodian is unknown, the writ may be served on the prisoner's ultimate custodian.").

### 3.   <u>Applying the Unknown Custodian Exception</u>

The unknown custodian exception is an established part of federal law, <u>see</u> Part VII.B.2, and under it the immediate custodian rule can be set aside in "limited and special circumstances." <u>Demjanjuk</u>, 784 F.2d at 1116.

Which ones?  When the identity of the immediate custodian is virtually unknowable.

That was the case here.

The Petitioner's lawyer, the Court has found, was affirmatively led to believe that he was in New York --- and because no phone calls were allowed, the Petitioner could not undo the impression.  <u>See</u> Part VII.B.1.

What happens when the unknown custodian exception applies?  The Petitioner is permitted to name not his immediate custodian, as is normally required, but his "ultimate" custodian.  <u>See</u> <u>Demjanjuk</u>, 784 F.2d at 1116; <u>Moussaoui</u>, 382 F.3d at 465; <u>Paracha</u>, 2006 WL 12768, at *6.

And that is what the Petitioner did here.  His Petition, filed on March 9, named as a respondent the Secretary of the Department of Homeland Security.  She is the ultimate supervisor of any possible warden of a New Jersey detention facility.

All of this adds up the conclusion that the Respondents' New Jersey-focused immediate custodian argument is not persuasive. The Petitioner did not name as a respondent his immediate New Jersey custodian.  But he did not need to.  That custodian was not only unknown to the Petitioner's lawyer, but virtually unknowable to her.  And so the Petition could clear the bar by doing what it did --- naming the Petitioner's ultimate custodian, the Secretary of Homeland Security.

*     *     *

Take now three points related to the above conclusion, each rooted in a comparison of this case to <u>Demjanjuk</u>.

### a)   <u>"If Known"</u>

The first point: in some ways, this is an easier case for application of the unknown custodian exception than <u>Demjanjuk</u> --- given where this case is procedurally and where that one was.

54

**JA 87**

To see the point, note that a federal habeas court exercises a package of powers. The "power to entertain a prisoner's request that the court direct a habeas writ to a custodian" is one of these powers. Lee Kovarsky, <u>A Constitutional Theory of Habeas Power</u>, 99 Va. L. Rev. 753, 757 (2013). Another power typically comes into play later, the "power to issue a habeas writ instructing a custodian to produce the body and justify detention." <u>Id</u>.; <u>see also id</u>. at 763-65 (describing habeas procedure at common law); Halliday, <u>Habeas Corpus: From England to Empire</u> at 39-63 (setting out, historically, the set of procedures that were bundled together in order "to produce the body").

Judge Bork used the unknown custodian rule through to the end of the case --- at the merits stage.

But this case is at a much earlier point. All that is in play for now is the table-setting question, the Court's "power to entertain a prisoner's request that the court direct a habeas writ to a custodian." Kovarsky, <u>A Constitutional Theory of Habeas Power</u>, 99 Va. L. Rev. at 757.

And at this earlier point in the litigation, there is more flexibility in terms of a petitioner naming the correct custodian.

The habeas statute, for example, is cleaved in two. Section 2243 covers the later stages of a habeas case, on merits/remedy. <u>See</u> 28 U.S.C. § 2243. Section 2242 covers the earliest stage --- what is essentially the pleading stage, where this case is now.

In turn, Section 2242 is more forgiving when it comes to naming precisely the right custodian. <u>See</u> 28 U.S.C. § 2242 (indicating that a habeas petition "shall allege . . . the name of the person who has custody over [the petitioner] . . . <u>if known</u>") (emphasis added); <u>see also</u> <u>Nguyen</u> v. <u>Kissinger</u>, 528 F.2d 1194, 1204 n.17 (9th Cir. 1975) (the section "requires the naming of the custodian 'if known,' seemingly contemplating the power of the district court to develop the fact if unknown"). Section 2243, which kicks in later, has no "if known" carve-out.

Judge Bork, as noted, applied the unknown custodian exception through to what was the last stage of the habeas proceeding. He ruled on the merits of the habeas petition before him, <u>see</u>

55

**JA 88**

_Demjanjuk_, 784 F.2d at 1116–18, but even at that point no immediate custodian had been named.

It is a lighter lift than that to apply the unknown custodian exception to this case now --- at the <u>beginning</u> of the habeas process, when Congress has suggested (through the "if known" language) something of a different approach to unknown custodian issues. <u>Cf.</u> <u>Armentero</u> v. <u>INS</u>, 340 F.3d 1058, 1068 (9th Cir. 2003), <u>reh'g granted, opinion withdrawn</u>, 382 F.3d 1153 (9th Cir. 2004), <u>opinion after grant of reh'g</u>, 412 F.3d 1088 (9th Cir. 2005) ("[W]hile a petitioner's immediate physical custodian is typically a proper respondent . . . the statutory custodian requirement of 28 U.S.C. § 2241 is sufficiently flexible to permit the naming of respondents who are not immediate physical custodians if practicality, efficiency, and the interests of justice so demand.").[32]

### b)  <u>The District of Confinement Rule</u>

Turn now to another reason why it is more straightforward to apply the unknown custodian exception in this case than in <u>Demjanjuk</u>.

To see the point, first take a step back.

$$*\qquad*\qquad*$$

The law often channels cases to particular courts based on fixed-in-advance criteria, like where an event took place or where a defendant lives.  <u>See</u> <u>Daimler AG</u> v. <u>Bauman</u>, 571 U.S. 117, 128 (2014); <u>Atl. Marine Constr. Co.</u> v. <u>U.S. Dist. Ct. for the W. Dist. of Tex.</u>, 571 U.S. 49, 55-56 (2013).  Applying pre-baked rules of this sort has a number of effects, including paring back possible forum-shopping.

---

[32]  At a later stage in the proceedings here, would the unknown custodian exception continue to excuse not naming the New Jersey warden who apparently held the Petitioner as of March 9?  That question is for later.  But it also may never come up.  The Petitioner has sought permission to amend the Petition, <u>see</u> Opposition Brief at n.1, to add appropriate respondents now that the dust has settled, and it is clear where the Petitioner was on March 9 at 4:40am.  That request is hereby granted, and the Petition may be amended to add additional respondents, provided the amended petition is filed before 5:00pm on April 3.

Habeas law is no exception.  It too has rules that send certain cases to certain courts.  And limiting forum-shopping is also a key purpose of those rules.

The rules are reflected in Congress' 1867 amendments to the habeas statute, under which the district courts have power to grant habeas writs --- but only "within their respective jurisdictions."  28 U.S.C. § 2241(a).

Congress, per the Supreme Court, "thought [it] inconvenient, potentially embarrassing, certainly expensive and on the whole quite unnecessary to provide every judge anywhere with authority to issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat."  Carbo v. United States, 364 U.S. 611, 617 (1961).

Judicial practice reflects this same concern, and courts have long held that a habeas writ cannot typically issue as to a person in custody outside the borders of the district in which the habeas court sits.  See, e.g., United States ex rel. Harrington v. Schlotfeldt, 136 F.2d 935, 940 (7th Cir. 1943); United States ex rel. Belardi v. Day, 50 F.2d 816, 817 (3d Cir. 1931); In re Boles, 48 F. 75, 75–76 (8th Cir. 1891); Ex parte Yee Hick Ho, 33 F.2d 360, 361 (N.D. Cal. 1929); Ex parte Gouyet, 175 F. 230, 233 (D. Mont. 1909); see also Carbo, 364 U.S. at 616 (describing an unreported decision in which Chief Justice Chase, riding circuit, "reject[ed] an application for the Great Writ from a prisoner on the ground that he was incarcerated outside his circuit").[33]

---

[33]  This may sometimes have been the approach in pre-1867 cases, too.  See, e.g., In re Bickley, 3 F. Cas. 332, 333 (S.D.N.Y. 1865) (No. 1,387) (discussing "actual confinement" of the prisoner in the court's district).  As to a possible reason why, note that the 1867 amendments' reference to habeas courts' "respective jurisdiction" is often taken to mean the district courts' territorial jurisdiction.  See Padilla, 542 U.S. at 442-44; see also, e.g., Ex parte Kenyon, 14 F. Cas. 353, 354 (C.C.W.D. Ark. 1878) (No. 7,720).  But that may not have added quite so much.  Especially in the pre-"long arm" era, territorial limits on the jurisdiction of the federal courts were often thought to already exist, flowing from the fact that Congress in 1789 had opted to divide the Nation into distinct territorial districts.  (For an example of this approach, see Justice Washington's opinion in Ex parte Graham, 10 F. Cas. 911 (C.C.E.D. Pa. 1818) (No. 5,657).)  On this understanding,

In the mid-20th century, the Supreme Court began to refer to this approach in shorthand --- as the "district of confinement rule."  See Ahrens, 335 U.S. at 210 (Rutledge, J., dissenting) (using the term "district of confinement"); Carbo, 364 U.S. at 618 (same); Braden, 410 U.S. at 499 n.15 (same); see generally Padilla, 542 U.S. at 442 ("[T]he traditional rule has always been that the Great Writ is issuable only in the district of confinement.") (cleaned up).

The district of confinement rule is this: "for . . . habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." Padilla, 542 U.S. at 443 (emphasis added).

But this line can be hard to hold.

Habeas is a remedy that runs to a detainee's custodian, on the theory that it is the custodian who can release the detainee if ordered to do so by a court.  See, e.g., id. at 435; Braden, 410 U.S. at 494-95; Wales v. Whitney, 114 U.S. 564, 574 (1885); see also 28 U.S.C. § 2243.

And that can fold complexity into the mix.

Sometimes, for example, a person might be detained in district A while his custodian is in both district A and district B.  This may be the case when the custodian is physically in district A but exercises power in both district A and district B.  Does this mean that the case can go forward in both the district of confinement (A) and also in one of the districts where the custodian is located (B)?  Does the background district of confinement rule get overridden or softened?[34]

Or take another example.

Think of a federal criminal prisoner, held in a prison in district A under the authority of the Attorney General, as in some sense all or virtually all federal criminal prisoners are. Can her habeas case go forward only in district A (because that

territorial limits on jurisdiction in habeas cases may have been taken as the background assumption --- confirmed and made more explicit in the 1867 statutory amendment, but not newly established by it.

[34]  The Third Circuit has suggested that the answer is no, the action goes forward only in A.  See Day, 50 F.2d at 817-18.

58

**JA 91**

is her "district of confinement"), or can it go forward in any of the country's 94 judicial districts that she picks? (The theory for going forward in any of the 94 districts would be that the Attorney General is legally present in each district, cf. Fed. R. Civ. P. 4(i)(2), and that, if ordered to do so by any district court, the Attorney General can as a practical matter direct the release of a person confined in district A.[35])

*     *     *

All of this points to habeas law's core challenge in this area: to prevent the district of confinement rule (habeas cases generally go forward only in the district where the petitioner is held) from being undermined by the fact that habeas cases must always run against a custodian (who may well be somewhere else, outside the district of confinement).

A critical part of the Supreme Court's approach to this issue has been to adopt the immediate custodian rule.

That rule tells habeas petitioners to name nearby officials (like the warden of a detention facility, see Padilla, 542 U.S. at 435, Yi v. Maugans, 24 F.3d 500, 507 (3d Cir. 1994)), and not far-off supervisors (like the warden's boss in another state or back in Washington).

> In habeas challenges to present physical
> confinement, . . . the district of
> confinement is synonymous with the district

---

[35]  If a habeas case can go forward anywhere a petitioner chooses, the forum-shopping would become severe. Per Judge Easterbrook:

> National venue would mean that one
> idiosyncratic district or appellate court
> anywhere in the nation could insist that the
> entire federal government dance to its tune.
> Requiring prisoners to litigate where they
> are confined . . . not only distributes
> business among the district courts and
> circuits but also allows important issues to
> percolate through multiple circuits before
> the Supreme Court must review a disputed
> question.

al-Marri, 360 F.3d at 710.

> court that has territorial jurisdiction over
> the proper respondent. This is because
> . . . the immediate custodian rule
> applies . . . . By definition, the
> immediate custodian and the prisoner reside
> in the same district.

Padilla, 542 U.S. at 444 (cleaned up).

> Whenever a § 2241 habeas petitioner seeks to
> challenge his present physical custody
> within the United States, he should name his
> warden as respondent and file the petition
> in the district of confinement.
>
> This rule, derived from the terms of the
> habeas statute, serves the important purpose
> of preventing forum shopping by habeas
> petitioners. Without it, a prisoner could
> name a high-level supervisory official as
> respondent and then sue that person wherever
> he is amenable to long-arm jurisdiction.
> The result would be rampant forum shopping,
> district courts with overlapping
> jurisdiction, and the very inconvenience,
> expense, and embarrassment Congress sought
> to avoid when it added the jurisdictional
> limitation 137 years ago.

Id. at 447 (cleaned up).

The immediate custodian rule, in short, checks all the boxes.

It tells habeas petitioners who to sue: the immediate custodian.
And zeroing in on the immediate custodian prevents any possible
end-run around the district of confinement rule --- because an
immediate custodian is always in the same district where the
petitioner is confined.

Put differently, the immediate custodian rule eases the possible
tension between (1) the overarching district of confinement rule
and (2) the idea that all habeas petitions must name a
custodian.

The reason is that, under the immediate custodian rule, these
two always point in the same direction. Why? Because the
district of confinement rule focuses on where a habeas

petitioner is.  And the immediate custodian rule focuses on a custodian who is always with the petitioner.  A person in custody and his immediate custodian are, "[b]y definition," id. at 444, always in the same place.

\*     \*     \*

Against the backdrop set out above, come back to Demjanjuk and then to this case.

In Demjanjuk, Judge Bork relaxed the immediate custodian rule because the custodian was unknown.  See Part VII.B.2.

But doing so in that case was an especially large leap.  This was because in Demjanjuk, relaxing the immediate custodian rule (via the unknown custodian exception) potentially threatened to undermine one of the key reasons the immediate custodian rule is there in the first place --- to prevent habeas petitions from going forward in a place that is not the district of confinement.

After all, the Demjanjuk petition was filed before Judge Bork in Washington, DC.  But the Demjanjuk petitioner may not have been confined there.  Where he was being held was unknown to the court.  See Demjanjuk, 784 F.2d at 1115-16.  He could just as easily have been in custody in Texas or Michigan or Maine.  Any federal judge in America might have been asked to use the unknown custodian exception and get to the merits, just as Judge Bork was asked to (and did).  Cf. id. at 1116 ("[i]t is impracticable to require the attorneys to file in every jurisdiction").

\*     \*     \*

But this case poses none of these issues.

This case, as filed on March 9 at 4:40am, can go forward in New Jersey because that is where the Petitioner was confined at that moment.  See Part VII.B.1.  And because New Jersey was the district of confinement then, this case can go forward only in New Jersey, unless it is now dismissed and re-filed elsewhere.  See Padilla, 542 U.S. at 443 ("[F]or . . . habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.") (emphasis added).

This means that relaxing the immediate custodian rule here --- because as of the time of filing on March 9 the Petitioner's

lawyer could not know that the Petitioner was in New Jersey --- does not open the door to forum-shopping.  The case as filed can go forward only here.  The other 93 districts, where the Petitioner was nowhere to be found, are out of the question.

Indeed, relaxing the immediate custodian rule here has precisely the opposite effect of forum-shopping.

It opens the way to this case continuing in the district that was the single district of confinement at the moment the Petition was filed.  The unknown custodian exception does this by removing an impediment to this case going forward in New Jersey, the district of confinement (the impediment being the contention that the immediate custodian rule was violated because no New Jersey custodian was timely named as a respondent).

\*      \*      \*

To put the point in a different way:

Per the Supreme Court, the immediate custodian rule exists in part to protect the district of confinement rule.

If the unknown custodian exception to the immediate custodian rule makes sense even where (as in Demjanjuk) it seems to undermine the district of confinement rule, then there is an all-the-stronger case for applying the unknown custodian exception here.

Why?  Because applying the unknown custodian exception in this case actively advances the district of confinement rule. Applying the exception here helps ensure that this case goes forward in the district of confinement, New Jersey, where the Petitioner was held when the Petition was filed.

If the unknown custodian exception can apply (as in Demjanjuk) even in the teeth of the district of confinement rule --- why not apply it where, as here, it is the way to make that rule stick?

### c)    Conclusion

The unknown custodian exception applies here.  See Part VII.B.3. And in two important ways it makes more sense to apply the exception in this case than it did in Demjanjuk.  See Parts VII.B.3.a–b.

In another sense, though, Demjanjuk was a stronger and easier case for application of the unknown custodian exception.

That is the subject of this section.

*   *   *

Per the Supreme Court, courts must apply the habeas statute with an eye to the underlying equitable nature of the writ.  See Brown v. Davenport, 596 U.S. 118, 132 (2022); Holland v. Florida, 560 U.S. 631, 646 (2010); Boumediene v. Bush, 553 U.S. 723, 780 (2008); Munaf v. Green, 553 U.S. 674, 693 (2008); Schlup v. Delo, 513 U.S. 298, 319 (1995).

And it appeared in Demjanjuk that, if the unknown custodian exception were not brought to bear, no habeas petition could have been heard anywhere in the United States (save, perhaps, by a Supreme Court Justice).  After all, the location of the petitioner was being kept confidential.  See Part VII.B.3.  No proper custodian could be named anywhere because no custodian could be named --- and this would have been as much a problem for a habeas petition filed in DC, where the case was brought, as it would have been anywhere else.

From an equitable perspective, this suggests that Demjanjuk was a more persuasive case for application of the unknown custodian exception.  Without that exception, the Demjanjuk case could not go forward anywhere.  But this case, without the exception, can simply be dismissed and refiled in Louisiana.[36]

---

[36]  The equities, as referenced here, have nothing to do with the merits.  Not in this case --- the Court expresses no view on the case's merits.  And not in Demjanjuk --- where Judge Bork was convinced that the petition before him was plainly not persuasive on the merits.  See 784 F.2d at 1116-17.  (To be sure, there may be a way in which habeas law and Judge Bork's view of the merits came together in Demjanjuk.  The habeas petition came to Judge Bork in the first instance, and he was a circuit judge.  He decided that it was not worth the time to remand the case to a district court, see id. at 1115, as would typically be done under Federal Rule of Appellate Procedure 22(a), because the case was plainly doomed on the merits.  See id.  The case being in a circuit court, and not a district court, meant no real possibility of fact-finding, whereas a district judge could presumably have considered

63

**JA 96**

\*   \*   \*

To unpack the point a bit more, in <u>Demjanjuk</u> the unknown
custodian exception was the last resort.  It was applied, and
the case was considered.  But if the exception was not applied,
there would have been no way for the petitioner to seek habeas
relief --- not in Washington, DC, (where no custodian was named)
and not anywhere else (where there would have been the same
problem).  Without leaning on the unknown custodian exception,
there could have been no habeas remedy anywhere.[37]

Here, things are different.  If the unknown custodian rule is
not applied here, this case might arguably need to be dismissed.
But if so, a habeas petition can still be presented.  The
Petitioner is now detained in Louisiana, and he can presumably
refile a habeas petition there.

In that sense --- and it is plainly an important one --- this
case is a less compelling one for application of the unknown
custodian exception than <u>Demjanjuk</u> was.

\*   \*   \*

That point moves the needle, but not far enough.  And on balance
the Court's judgment remains the same: that the unknown
custodian exception applies here.

<u>First</u>, the exception applies on its face, <u>see</u> Part VII.B.3, and,
while it is associated with <u>Demjanjuk</u>, the exception is bigger
than just that case.  <u>See</u> VII.B.2.  <u>Second</u>, applying the
exception here is generally consistent with the habeas statute.

---

allowing for some tightly-limited discovery to identify a
custodian.  <u>See</u>, <u>e.g.</u>, <u>Maqaleh</u> v. <u>Hagel</u>, 738 F.3d 312, 325-26
(D.C. Cir. 2013), <u>vacated in part on unrelated grounds sub nom.</u>
<u>al-Najar</u> v. <u>Carter</u>, 575 U.S. 908 (2015) (describing
jurisdictional discovery in the habeas context).  The lack of a
named custodian --- an issue addressed in <u>Demjanjuk</u> through the
unknown custodian exception --- might conceivably have been
handled in a narrower way, and in a factual way rather than a
legal way, if Judge Bork had viewed the petition as even
potentially having merit, such that a remand to the district
court could have made sense.)

[37]  And in such a circumstance, there might be an argument that
applying the unknown custodian exception is constitutionally
required, by the Suspension Clause.  <u>Cf</u>. <u>Roman</u>, 340 F.3d at 325.

See Part VII.B.3.a.  And third, on the facts of this particular
case, the unknown custodian exception vindicates the district of
confinement rule, and in that sense protects against forum-
shopping.  See Part VII.B.3.b.

All that weighs heavily.

Moreover, applying the unknown custodian exception in this case
is in the interest of the equitable concerns that the Supreme
Court has long invoked in habeas law.

If the unknown custodian exception does not apply here, and this
case is therefore dismissed, it is true that the Petition can be
refiled in another federal court.

But it is also true that if the exception does not apply, and
the case is dismissed on that basis, then the implication would
be that there can be a period of time during which a person can
be arrested in the United States and then moved by federal
officials, during which period no habeas court would have the
power to hear him out --- even though, as here, his lawyers and
family cannot determine where he is only because they have been
given inaccurate information about his whereabouts, and because
he has not been allowed to correct that information by making a
phone call.

A detainee in that situation would not be able to file a habeas
petition in his original place of confinement, because he is no
longer there.  See Khalil, 2025 WL 849803, at *14 (so holding).

And without the benefit of the unknown custodian exception, he
might well not be able to file a habeas petition in the place
where he was moved --- because when he filed in the first
location he did not name his second custodian (who was then
unknown).

Looking back from the perspective of today, April 1, that may
not seem like very much.  The Petitioner is now in Louisiana.
He can file a habeas petition from there.

But that is not the only perspective.

The implication of not applying the unknown custodian exception
here is that, as of March 9, the Petitioner, detained in the
United States, would not have been able to call on any habeas
court.  Not in Louisiana, New York, or New Jersey.  And not
anywhere else, either.

That is too far.  Our tradition is that there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it.  See, e.g., 3 William Blackstone, Commentaries *131 ("[T]he sovereign is at all times entitled to have an account, why the liberty of any of her subjects is restrained, wherever that restraint may be inflicted."); accord, e.g., Boumediene, 553 U.S. at 741; 2 Joseph Story, Commentaries on the Constitution of the United States § 1341, p. 237 (3d ed. 1858).

## VIII.    Conclusion and Next Steps

The Court's conclusion: it has jurisdiction over this case and the Respondents' motion to dismiss must therefore be denied.

\*       \*       \*

Recall for a moment the basis for this conclusion.

A habeas court generally has jurisdiction (1) where the habeas petitioner is physically in the court's district when (2) he files his habeas petition.  See Part II.

Here, each box is checked.  The Petitioner was in New Jersey on March 9 at 4:40am.  And Congress has required that the Petition must be taken as having been filed in New Jersey at that same moment.  See Part IV.

That vested this Court with jurisdiction.

The Court's jurisdiction is not defeated by the Petitioner having been moved to Louisiana.  See Part VI.

And the Court's jurisdiction is not undone, either, by the Petition not having named either a Louisiana or New Jersey warden.  See Part VII.

\*       \*       \*

Before concluding, note that this case is postured in an unusual way.  But in rare circumstances, other courts have dealt with a case that, in some ways, has similar facts to this one.

In such cases, a habeas petition is filed in Place 1 while the petitioner is actually in Place 2; and by the time a court sends the case to a court in Place 2, the petitioner has been moved to Place 3.

**JA 99**

These cases have all landed on the same conclusion as this Court: jurisdiction is proper in Place 2. See Golding v. Sessions, 2018 WL 6444400 (S.D.N.Y. Dec. 6, 2018); Simpson v. Ashcroft, 321 F. Supp. 2d 13 (D.D.C. 2004); Belvett v. Ashcroft, 2002 WL 287839 (S.D.N.Y. Feb. 27, 2002). Here, that place is New Jersey.

\*       \*       \*

In the ordinary course, the Court's decision today would likely be unappealable. But there may be reasons for allowing an interlocutory appeal here under 28 U.S.C. § 1292(b). The Court will solicit the parties' views on this question.

But discussion about an interlocutory appeal may turn out to be unnecessary. The Respondents, for example, may opt to waive their right to further challenge this Court's jurisdiction (and venue) over the Petition. As to that point, the Court will solicit the Respondents' views pursuant to an Order. It will issue shortly.

\*       \*       \*

For the reasons set forth above, the Respondents' motion to dismiss is denied.

It is on this 1st day of April, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

      *Petitioner*,

    v.

WILLIAM P. JOYCE et al.,

      *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION**

## Table of Contents

I.    **Background**
    A. **The Facts**
    B. **Procedural History**
    C. **The Motion**
    D. **The Response**
II.   **The Question**
III.  **The Court's Approach**
IV.  **Section 1252(b)(9) Does Not Apply Here**
    A. **Section 1252(b)(9)**
       1.   **The Statute**
       2.   **The Question**
       3.   **The Answer**
          a)  **"Action"**
          b)  **"To Remove"**
          c)  **"Under This Subchapter"**
          d)  **"Arising From"**
    B. **The Text**
    C. **Chehazeh**

V.   **If Section 1252(b)(9) Applies Here**

   A.   **EOHC**

   B.   **Administrative Law**

     1.   **Structure**

     2.   **Thunder Basin**

   C.   **EOHC In Context**

   D.   **Massieu**

   E.   **Conclusion**

VI.   **Meaningful Review**

   A.   **Legal Remedies**

   B.   **Factual Development**

   C.   **Expertise**

   D.   **Conclusion**

     1.   **Public Concern**

     2.   **First Amendment Speed**

       a)   **Administrative Proceedings**

       b)   **State Prosecutions**

       c)   **The Supreme Court**

       d)   **Prior Restraints**

       e)   **Implications**

     3.   **AADC**

     4.   **Axon**

VII.   **Section 1252(g)**

VIII.   **The Policy**

IX.   **Conclusion**

\*     \*     \*

A lawful permanent resident is held in immigration custody, and federal officials have begun proceedings before an immigration judge to remove him from the United States.

The lawful permanent resident has moved for a preliminary injunction, claiming that one of the charges against him is unconstitutional and that this Court should therefore order him released.

**JA 102**

In response, federal officials argue that the motion should be denied, in part because this Court cannot hear the case. Certain statutes, they say, strip the Court of jurisdiction.

The jurisdictional argument is not persuasive. This Opinion explains why.

I.   **Background**

   A.   **The Facts**

A lawful permanent resident[1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6; Second Supplemental Declaration of Acting Field Office Director William P. Joyce ("Joyce Declaration") (ECF 72) ¶¶ 6-7.

While in custody, he was handed various forms. See Declaration of Mahmoud Khalil ("Khalil Declaration") (ECF 73-1) ¶¶ 4-6; Joyce Declaration ¶ 7.

These said two main things.

First, that federal officials were seeking to remove him from the United States based on 8 U.S.C. § 1227(a)(4)(C)(i), of which more in a moment. See Joyce Declaration ¶ 7.

And second, that as part of that process he had to appear before an immigration judge.[2] See Khalil Declaration ¶ 5.

The proceedings before the immigration judge are now underway.

\*     \*     \*

---

[1]  Mahmoud Khalil. A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20).

[2]  Removing a lawful permanent resident from the United States generally requires a hearing. See 8 U.S.C. § 1229a. Those typically go forward before an immigration judge. See id. § 1229a(a)(1); 8 C.F.R. § 1240.10(a). An immigration judge is an "attorney[] whom the Attorney General appoints as [an] administrative judge[] . . . to conduct specified classes of proceedings, including [removal] hearings under section 240 of the [Immigration and Nationality Act]." 8 C.F.R. § 1003.10(a).

3

At an immigration court hearing earlier this month, the immigration judge assessed federal officials' argument that the lawful permanent resident should be removed from the United States under 8 U.S.C. § 1227(a)(4)(C)(i).

Under that statute, "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."

The immigration judge referred to a memorandum from the Secretary of State to the Secretary of the Department of Homeland Security. See Audio Recording of Hearing (April 11, 2025) ("April 11 Audio Recording") at 1:34:40 to 1:34:48.

In the memo, the Secretary of State wrote that he had "determined" that the Petitioner was "deportable" under Section 1227(a)(4)(C)(i). See Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Determination") (ECF 198-1) at 1.

Based on the memo, the immigration judge ruled that the requirements of Section 1227(a)(4)(C)(i) had been met and that the lawful permanent resident could therefore be removed from the United States. See April 11 Audio Recording at 1:37:46 to 1:38:25.

\*     \*     \*

There are further immigration court proceedings to come.

For example, an appeal of the immigration judge's decision might be taken to the Board of Immigration Appeals.[3]

---

[3] The Board of Immigration Appeals "function[s] as an appellate body charged with the review of . . . administrative adjudications under the [Immigration and Nationality Act]." 8 C.F.R. § 1003.1(d)(1). It can hear appeals from a variety of decisions made by immigration judges. See id. § 1003.1(b). The Attorney General can review the decisions of the Board of Immigration Appeals. See id. § 1003.1(d)(7)(i), (h). Sometimes, the Attorney General opts to do so. See, e.g., Matter of Coronado Acevedo, 28 I. & N. Dec. 648 (A.G. 2022); Matter of B-Z-R-, 28 I. & N. Dec. 563 (A.G. 2022); Matter of A-C-A-A-, 28 I. & N. Dec. 84 (A.G. 2020); Matter of O-F-A-S-, 28 I. & N. Dec. 35 (A.G. 2020).

4

**JA 104**

And more proceedings have been scheduled before the immigration judge.[4]

**B.   Procedural History**

The lawful permanent resident filed a habeas corpus petition in a federal district court.

From here, he is called "the Petitioner."  The various people he named in his habeas petition are referred to, collectively, as "the Respondents."[5]

\*     \*     \*

The Petitioner filed his case in New York, but it was transferred to New Jersey.  See Khalil v. Joyce, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

In New Jersey, the Respondents moved to dismiss the case, arguing it should go forward in Louisiana, where the Petitioner is in custody.  The motion was denied.  The Court held that

---

[4]  In addition to the Section 1227(a)(4)(C)(i) charge, federal officials have also pressed a second charge in immigration court against the lawful permanent resident, for allegedly not disclosing certain information when he applied for lawful permanent resident status.  See Additional Charges of Inadmissibility/Deportability at 1.  Federal officials are also seeking to remove the lawful permanent resident from the United States based on the failure-to-disclose charge.  See id.  The immigration judge has scheduled a proceeding for next month on that charge.

[5]  The Respondents are listed in the Petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

5

**JA 105**

habeas jurisdiction is proper in New Jersey. See Khalil v. Joyce, 2025 WL 972959 (D.N.J. Apr. 1, 2025).[6]

But as the Court noted: there are "other jurisdictional hurdles." Khalil v. Joyce, 2025 WL 1019658, at *1 n.2 (D.N.J. Apr. 4, 2025).

This Opinion considers them.

### C.  **The Motion**

The Petitioner has moved for a preliminary injunction. See ECF 66.

Through this motion, he asks the Court to order three things. See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief ("Motion for Preliminary Injunction") (ECF 124) at 9-10.

*     *     *

First, and as noted above, the Secretary of State has determined that the Petitioner's presence and activities in the United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest."  Determination at 1.  And based on the Secretary's determination, the immigration judge has ruled that the Petitioner can be removed from the United States.  See April 11 Audio Recording at 1:37:46 to 1:38:25.

The Petitioner asks the Court to order that the Secretary's determination be set aside, vacated.  See Motion for Preliminary Injunction at 9.

The determination, the Petitioner argues, was made in retaliation for statements the Petitioner made on political

---

[6]  The Respondents asked the Court of Appeals to review this decision, and the Petitioner has opposed that request.  See Petition for Permission to Appeal an Interlocutory Order of the United States District Court for the District of New Jersey Pursuant to 28 U.S.C. § 1292(b) at 1-2, Khalil v. President U.S. (No. 25-08019); Opposition to Petition for Permission to Appeal an Interlocutory Order of the U.S. District Court for the District of New Jersey Pursuant to 28 U.S.C. § 1292(b) at 1-3, Khalil v. President U.S. (No. 25-08019).

issues, and this retaliation violates the First Amendment.  See id. at 10-18.[7]

                    \*     \*     \*

Second, the Petitioner alleges that the Respondents are pursuing a policy to "to arrest, detain, and seek to remove noncitizens who engage in expressive activities . . . supporting Palestinian rights," id. at 4, --- and that it is because of this policy that federal official are seeking to remove him from the United States.  See id.

The Petitioner asks the Court to order that the policy be stopped.  See id. at 9-10.

The policy violates the First Amendment, the Petitioner says, because it is premised on "viewpoint discrimination," id. at 19 --- it operates against people who take one view in certain public debates, but not those who take other views.

And the policy also violates the Fifth Amendment, the Petitioner says, because it is too vague --- and due process requires

---

[7]  Two things.  First, the Petitioner also argues that the Secretary's determination is unconstitutionally vague.  See Motion for Preliminary Injunction at 23-24.  (But note that the Petitioner does not argue in his petition that Section 1227(a)(4)(C)(i) is itself unconstitutionally vague.)  Second, in a footnote in one of his legal briefs, the Petitioner references the second charge against him, the one based on his alleged failure to make certain disclosures in his lawful-permanent-resident application.  See Petitioner's Reply in Support of Motion for Preliminary Injunctive Relief ("Reply Brief") (ECF 175) at 16 n.11.  But there is no reference to this in the habeas petition.  See Salas v. Warren, 2019 WL 3423534, at \*1 n.1 (D.N.J. July 30, 2019) (declining to consider claims that the petitioner raised in his traverse, rather than his petition); Quang Van Nguyen v. Wenerowicz, 2013 WL 6473264, at \*6 (E.D. Pa. Dec. 10, 2013) (similar, as to claims first raised in a reply brief); accord, e.g., Carrascosa v. McGuire, 520 F.3d 249, 264 (3d Cir. 2008); St. John v. Ashcroft, 43 F. App'x 281, 282 (10th Cir. 2002); Bracken v. Dormire, 247 F.3d 699, 702 (8th Cir. 2001).  Nor does the legal brief purport to seek relief from the Court based on the second charge.  No challenge to the second charge is before the Court.

precision, so that people can know in advance what the government might seek to do. See id. at 16.

                        *     *     *

Third and finally, the Petitioner says he is being detained by immigration authorities in retaliation for the public statements he has made, see id. at 33, and also to "chill" him from making other statements. See id. This, the argument goes, violates the Petitioner's First Amendment rights --- and the Court should therefore order the Petitioner released from custody. See id. at 9.

### D.    **The Response**

The Petitioner, as noted, has sought a preliminary injunction as to each of the three things set out above.

In doing so, the Petitioner is asking for a remedy at an early stage of this case, before it runs its typical and full course.[8]

To win a preliminary injunction, a litigant must show a number of things.

One of them: that he is "likely" to be the ultimate winner --- when the case is over and done, and reaches its normal finish line. See, e.g., Starbucks Corp. v. McKinney, 602 U.S. 339, 345 (2024).

The Respondents argue that the Petitioner has not met this standard. See Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction ("Opposition Brief") (ECF 156) at 8-32.

As to why, some of the Respondents' arguments focus on the merits of the case. See id. at 23-32.

Others zero in on the Court's power over the case --- in particular, on a set of statutes that the Respondents say take away this Court's jurisdiction. See id. at 8-21.

## II.   **The Question**

"Jurisdiction is, as always, the 'first and fundamental question.'"  Baymont Franchise Sys., Inc. v. Narnarayandev, LLC,

---

[8]  For example, there has been no discovery to this point, or testimony.

8

**JA 108**

348 F.R.D. 220, 227 (D.N.J. 2024) (quoting <u>Great S. Fire Proof Hotel Co.</u> v. <u>Jones</u>, 177 U.S. 449, 453 (1900)).

This is because a court that does not have jurisdiction does not have power over a case. It cannot decide the merits, <u>see</u> <u>Steel Co.</u> v. <u>Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998), and so it should not speak to them.

Against this backdrop, the Court will consider in this Opinion solely whether it has jurisdiction. Merits issues (and other issues, like venue) will be taken up later.

\* \* \*

Begin the jurisdictional analysis by getting a fuller sense of the main issue that is on the table.

The Court starts off with jurisdiction here.

The habeas corpus statute gives federal district courts jurisdiction over habeas cases, <u>see</u> 28 U.S.C. § 2241(a), and this is a habeas case. <u>See</u> Second Amended Petition ("Petition") (ECF 162) ¶ 20.

Moreover, the Court has previously ruled that it has habeas jurisdiction over this case in particular. <u>See</u> <u>Khalil</u>, 2025 WL 972959.

The question, then, is this: does anything take away the Court's jurisdiction?

The Respondents say yes, and they point to two "jurisdiction-stripping" statutes. <u>See</u> Opposition Brief at 9–20, 23.

The statutes are in Title 8 of the United States Code, at Section 1252(g) and Section 1252(b)(9). Their current versions became law in 2005.[9]

If these statutes do <u>not</u> strip away this Court's habeas jurisdiction, then things stay as they were and this Court resolves the case.

If these statutes <u>do</u> strip away this Court's habeas jurisdiction, then the way forward is different. The front-line review will be done by the immigration courts.

---

[9] Another statute is invoked, too. <u>See</u> Opposition Brief at 20–21. But it is mostly irrelevant here, and is therefore taken up only later, in Part VIII.

9

**JA 109**

Either way, though, the <u>next</u> rung up on the ladder is the same.
Whoever does the first-cut look, this Court or the immigration
courts, what follows is review in a federal court of appeals
(and after that, review would be possible in the Supreme
Court).[10]

## III.  **The Court's Approach**

The Court first takes up the Respondents' argument that Section
1252(b)(9) strips jurisdiction.

Section 1252(b)(9), it is said, prevents this Court from
considering the Petitioner's claim that the Secretary of State's
determination under Section 1227(a)(4)(C)(i) was
unconstitutional.

Out of the gate, this Section 1252(b)(9) argument looks strong.
<u>See</u> Part IV.A.

But ultimately, it is not persuasive.

This is because Section 1252(b)(9) applies only <u>after</u> a final
order of removal has been entered by the immigration courts.
The words of the statute say so.  <u>See</u> Part IV.B.  And so has the
Third Circuit.[11]  <u>See</u> Part IV.C.

But no final order of removal has been entered in this case.
Therefore, Section 1252(b)(9) does not apply.

---

[10]  The text refers to immigration <u>courts</u> because, as noted in
footnote 3, certain rulings from immigration judges can be
appealed to the Board of Immigration Appeals.  Review by a
federal court of appeals generally takes place only <u>after</u> the
Board of Immigration Appeals has ruled.  <u>See</u>, <u>e.g.</u>, <u>Dia</u> v.
<u>Ashcroft</u>, 353 F.3d 228, 234 (3d Cir. 2003).  If this Court has
jurisdiction and is responsible for initially handling the case,
any appeal would be to the federal court of appeals for the
Third Circuit.  <u>See</u> 28 U.S.C. § 1291.  If this Court does not
have jurisdiction and the immigration courts therefore do the
ground-floor review, then any appeal would be to the federal
court of appeals for the circuit that covers Louisiana, where
the Petitioner is held; that is the Fifth Circuit.  <u>See</u> 8 U.S.C.
§ 1252(b)(2).

[11]  In a case called <u>Chehazeh</u> v. <u>Attorney General of the United
States</u>, 666 F.3d 118 (3d Cir. 2012).

**JA 110**

&ast;   &ast;   &ast;

There is, though, a wrinkle.

In another case,[12] the Third Circuit has suggested that Section 1252(b)(9) can apply, as here, <u>before</u> a final order of removal has been entered by the immigration courts.

But even on the assumption that the second case is controlling, Section 1252(b)(9) does not remove jurisdiction from this Court as to the Secretary of State's determination.

Under the second case, Section 1252(b)(9) strips jurisdiction from a federal district court over a claim only when that claim could still get "meaningful" federal court review later --- after the immigration courts have wrapped up their work, and the claim then goes to a federal court for the first time, a federal court of appeals.  See Part V.

But in this case, that sort of <u>delayed</u> federal court review would not be "<u>meaningful</u>" federal court review.

This is for two reasons.

First, because there would be little to show for any such delay. Usually, the immigration courts can tee things up for the federal court of appeals, by providing a remedy for any illegal conduct, by finding the facts, and by applying their distinctive expertise.  But the immigration courts cannot do any of that as to the Secretary of State's determination.  See Part VI.A to Part VI.C.

And second, the law requires sped-up judicial review of First Amendment claims of the kind the Petitioner raises here.  That is not consistent with delaying federal court review until after the immigration courts have finished their work and the case then moves to a federal court of appeals.  See Part VI.D.

&ast;   &ast;   &ast;

Next, the Court considers the Respondents' argument that Section 1252(g) cuts off review here of the Secretary of State's determination.

---

[12]   <u>EOHC</u> v. <u>Secretary United States Department of Homeland Security</u>, 950 F.3d 177 (3d Cir. 2020).

But the Section 1252(g) argument does not work.  It runs aground on the plain words of the statute and the Supreme Court's main decision in this area.[13]  See Part VII.

<p style="text-align:center">*     *     *</p>

Finally, the Court considers the alleged policy that the Petitioner has challenged --- and assesses whether Section 1252(b)(9) or Section 1252(g) take away jurisdiction from this Court to consider it.

As to the policy, the jurisdiction-stripping argument is not persuasive for most of the same reasons it was not persuasive as to the Secretary's determination, plus a few more.  See Part VIII.[14]

## IV.   <u>Section 1252(b)(9) Does Not Apply Here</u>

Get underway now with the jurisdictional analysis.

The Respondents' first argument is that Section 1252(b)(9) removes this Court's jurisdiction to consider the Petitioner's request for an injunction vacating the Secretary of State's determination.  <u>See</u> Opposition Brief at 9-14.

At first, this argument looks strong.  <u>See</u> Part IV.A.

But in the end, it does not work.  Section 1252(b)(9) does not apply in cases like this one, in which a final order of removal has not been entered by the immigration courts.  <u>See</u> Part IV.B. And the Third Circuit has confirmed as much.  <u>See</u> Part IV.C.

Bottom line: Section 1252(b)(9) is irrelevant here.  It applies to <u>post</u>-order-of-removal cases, and this is a <u>pre</u>-order-of-removal case.

### A.    <u>Section 1252(b)(9)</u>

To start off, bracket for a few moments the question of whether Section 1252(b)(9) does or does not apply to pre-order-of-removal cases like this one.  Assume, instead --- and throughout

---

[13]  The decision is <u>Reno</u> v. <u>American-Arab Anti-Discrimination Committee</u>, 525 U.S. 471 (1999).

[14]  There is also a third statute. Its impact is marginal, and it is considered briefly in Part VIII.

this Part IV.A --- that Section 1252(b)(9) applies to such cases.

Under the statute, there is a four-part test for deciding whether Section 1252(b)(9) removes jurisdiction over a given claim. See Part IV.A.2.

Applying that test, the Court concludes that Section 1252(b)(9), assuming that it applies, would strip away this Court's jurisdiction over the Petitioner's claim that the Secretary of State's determination is unconstitutional. See Part IV.A.3.

That sets the stage for the question taken up in Part IV.B and in Part IV.C: does Section 1252(b)(9) apply in pre-order-of-removal cases like this one?

### 1. **The Statute**

Begin, as always, with the words Congress used in the law it passed. See Lawson v. FMR LLC, 571 U.S. 429, 440 (2014); United States v. Turkette, 452 U.S. 576, 580 (1981).

Here, those words are "clear and distinct," Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 339 (1816), so they must be enforced as written. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (collecting cases).

And their effect here is unmissable. If Section 1252(b)(9) applies, there is no jurisdiction in this Court over the Petitioner's challenge to the Secretary of State's determination.

* * *

In relevant part, Section 1252(b)(9) says:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9).

* * *

This part of Section 1252(b)(9) does not itself say when and where the "judicial review" it mentions is to take place.

But other parts of Section 1252 do. They make clear that the "judicial review" alluded to in Section 1252(b)(9) is conducted <u>only</u> by federal courts of appeals, with federal district courts having no role. And the court of appeals' review kicks in after the immigration courts are done with their work --- after the Board of Immigration Appeals has affirmed the immigration judge's order or after the time for appealing to the Board has run out.[15]

### 2.   <u>The Question</u>

As set out just above, if "judicial review" is covered by Section 1252(b)(9), then that review must happen <u>only</u> later (after the immigration courts have finished their work) and <u>only</u> elsewhere (in the federal court of appeals, not here).

_____

[15]  The sources for the statements in the text are laid out here. As to <u>when</u> the "judicial review" alluded to in Section 1252(b)(9) takes place: that review is of "an order of removal under subsection (a)(1)," <u>id.</u> § 1252(b); subsection (a)(1) clarifies that an "order of removal" is "a <u>final</u> order of removal," <u>id.</u> § 1252(a)(1) (emphasis added); and an order of removal becomes "final" on the earlier of "a determination by the Board of Immigration Appeals affirming such order" or "the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." <u>Id.</u> § 1101(a)(47)(B); <u>Yusupov</u> v. <u>Att'y Gen. of U.S.</u>, 518 F.3d 185, 195 (3d Cir. 2008), <u>as amended</u> (Mar. 27, 2008). As to <u>where</u> "judicial review" will go forward: in a federal court of appeals, <u>see</u> 8 U.S.C. § 1252(a)(5), and in particular in the court of appeals that sits in "the judicial circuit in which the immigration judge completed the proceedings." <u>Id.</u> § 1252(b)(2); <u>see</u> <u>Castillo</u> v. <u>Att'y Gen. of U.S.</u>, 109 F.4th 127, 129 (3d Cir. 2024). And critically: court of appeals review will be the "[e]xclusive means of review." 8 U.S.C. § 1252(a)(5). Exclusive means exclusive. The federal "judicial review" described in Section 1252(b)(9) will happen <u>only</u> in a court of appeals. That rules out a place in the process for the district court.

14

**JA 114**

The question, then, is this: is the judicial review the Petitioner seeks here, of the Secretary of State's determination, covered by Section 1252(b)(9)?

If it is not covered, then Section 1252(b)(9) is no hurdle to this Court keeping jurisdiction.

If it is covered, Section 1252(b)(9) strips jurisdiction --- and review by this Court would be out of bounds.

\*     \*     \*

To answer the question, look to the front end of Section 1252(b)(9), the part <u>before</u> the word "shall."

Again, Section 1252(b)(9):

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter <u>shall</u> be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9) (emphasis added).

What judicial review is covered by the first half of the sentence?

"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter[.]" <u>Id.</u>

In other words, Section 1252(b)(9) kicks in when four conditions are met:

> 1. There is "any action . . . or proceeding,"
> 2. "to remove an alien from the United States,"
> 3. "under this subchapter," and
> 4. judicial review is sought as to "a[] question[] of law and fact" that "aris[es] from" such "action" or "proceeding."

Below, the Court ticks through these --- and concludes that each of the four boxes is checked.

15

**JA 115**

What this means: Section 1252(b)(9) covers judicial review of the Secretary of State's determination --- and so, if Section 1252(b)(9) applies in the first place,[16] that Section prevents this Court from assessing the Secretary's determination.

### 3.   **The Answer**

Section 1252(b)(9), as noted, spins off a four-part test for deciding whether judicial review of a claim is covered by the statute.  See Part IV.A.2.

As shown below, each part of the test is satisfied.[17]

#### a)   **"Action"**

Is the Secretary's determination an "action" or "proceeding" within the meaning of Section 1252(b)(9)?

The Court's conclusion: it is an "action."

At around the time of Section 1252(b)(9)'s initial enactment in 1996, authoritative sources understood "action" broadly.[18]

The Oxford English Dictionary defined "action" as "a thing done, a deed."  Action, n., sense 3.a, Oxford English Dictionary (2d

---

[16]  Recall: that is assessed below, in Part IV.B and Part IV.C.

[17]  Section 1252(b)(9)'s key terms are not defined by the statute.  See 8 U.S.C. § 1101(a) (defining other terms in the statute).  Therefore, the Court looks to the ordinary and contemporary meanings of the words Congress used in the Section. See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014). This includes referring to time-of-enactment dictionaries, both general and legal.  See, e.g., Sandifer, 571 U.S. at 227; Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566-67 (2012); see also Khalil, 2025 WL 972959, at *17.

[18]  Section 1252(b)(9) was first passed in 1996, and its current version dates to 2005.  Why the focus on 1996?  Because that is when the relevant sentence of Section 1252(b)(9) was passed. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009.  In 2005, more words were added to Section 1252(b)(9) to specify that it reached habeas jurisdiction.  See REAL ID Act of 2005, Pub. L. No. 109-13, 199 Stat. 305.  But none of those words is at issue in this Opinion.

ed. 1989). And a leading legal dictionary went roughly the same
way. See Action, Black's Law Dictionary (6th ed. 1990)
("something done.").

In making his determination, formalized through a memorandum,
the Secretary of State took an action. Writing or approving a
memo is not something that just happens; it takes doing --- the
"do[ing]" of "something."

The inquiry could end there.

And it would, except that something else reinforces the
conclusion that the Secretary's determination is an "action."
Namely, Congress put the word "any" before the word "action";
the statute says "any action." 8 U.S.C. § 1252(b)(9) (emphasis
added).

And putting "any" before a word confirms it must be understood
in an inclusive way, to reach the outer edge of its possible
orbit.

A year after Section 1252(b)(9) first became law, for example,
the Supreme Court said: "Read naturally, the word 'any' has an
expansive meaning, that is, 'one or some indiscriminately of
whatever kind.'" United States v. Gonzales, 520 U.S. 1, 5
(1997) (quoting Webster's Third New International Dictionary 97
(1976)).

This wide-angle view of "any" matches up with a long line of
Supreme Court cases.

In Collector of Internal Revenue v. Hubbard, 79 U.S. 1, 15
(1870), for example, the Supreme Court interpreted a statute
that said certain tax suits shall not "be maintained in any
court." 79 U.S. at 3. It was "quite clear" that "any court"
meant any court, federal or state. Id. at 15.

More recently, the Court reaffirmed that "any" "ordinarily
'refers to a member of a particular group or class without
distinction or limitation' and in this way 'implies every member
of the class or group.'" SAS Inst., Inc. v. Iancu, 584 U.S.
357, 362 (2018) (cleaned up) (quoting Any, Oxford English
Dictionary (3d ed. 2016)); see also United States v. Alvarez-
Sanchez, 511 U.S. 350, 358 (1994).

*     *     *

Bottom line:

The Secretary of State's determination was a decision made as to the Petitioner, and it culminated in a physical thing in the world -- the memorandum that reflects the determination. The determination was "something done," and that is what "action" means.

And whatever possible doubt there might be is dissipated by Congress' use of "any action." Per that phrase, Section 1252(b)(9) covers <u>all</u> actions --- without qualification, nothing carved out.

This conclusion, that the Secretary's determination is an "action," is linguistically obvious.

So much so that the Petitioner seems to see things in the same way. In making his determination, the Petitioner writes in his legal brief, the Secretary "had taken [an] <u>action</u>." Motion for Preliminary Injunction at 17 (emphasis added); <u>see also id</u>. at 1, 7, 13 (describing the challenged conduct as an "action").

\*    \*    \*

The first of the four Section 1252(b)(9) boxes is checked. The Secretary's determination counts as an "action."

\*    \*    \*

Before moving on, note a possible counterargument.

Namely, it might be argued that Section 1252(b)(9) refers only to an "action" of the legal sort --- as in, say, a civil action, or some other kind of lawsuit. After all, one of the basic definitions of "action" is "[a] legal process or suit." <u>Action</u>, n., sense 8, <u>Oxford English Dictionary</u> (2d ed. 1989).

If this were the right understanding of Section 1252(b)(9), the Secretary's determination could not be chalked up as an "action." The determination is "a thing done." <u>Action</u>, n., sense 3, <u>Oxford English Dictionary</u> (2d ed. 1989). But it is not a lawsuit.

This sort of reading, though, does not make sense.

For starters, Section 1252(b)(9) does not speak of "bringing" an action, but of "tak[ing]" one.

In everyday English, people "take action" all the time. But people do not "take a civil action" --- they <u>bring</u> one.

18

**JA 118**

That is how the words have been used for centuries. See, e.g., id. (quoting 1 Tomlins, Law Dictionary (1809)) ("A man attainted of treason . . . cannot bring an action.").

And to see the proof: across 200 years, the U.S. Reports contain 136 mentions of a "civil action brought" --- but none of a civil action "taken." Cf. Delligatti v. United States, 145 S. Ct. 797, 813 (2025) (Gorsuch, J., dissenting) ("[A]nalyzing 'how particular combinations of words are used in a vast database of English prose' can shed light on how ordinary people understand statutory terms.") (quoting Facebook, Inc. v. Duguid, 592 U.S. 395, 412 (2021) (Alito, J., dissenting)).

Moreover, to read "action" in its legal sense would make redundant another term in Section 1252(b)(9) --- "proceeding."

"Proceeding" covers a part of the legal process. See Proceeding, Black's Law Dictionary (6th ed. 1990) ("[T]he form and manner of conducting juridical business before a court or judicial officer."); Proceeding, vbl. n., sense 3, Oxford English Dictionary (2d ed. 1989) ("The instituting or carrying on of an action at law[.]"); see also Waetzig v. Halliburton Energy Servs., Inc., 145 S. Ct. 690, 698–99 (2025) (surveying definitions of "proceeding").

As the Supreme Court confirmed this Term: "'proceeding' encompasses all steps in an action." Waetzig, 145 S. Ct. at 699.

If "proceeding" sweeps in the full arc of "an action," as the Supreme Court's recent opinion suggests, then "action" --- if it is understood in its legal sense --- would be fully encompassed within "proceeding."

The two words would cover the same thing. They would become redundant. One or the other would be reduced to surplus, an unnecessary bit of add-on. And reading statutes to create redundancies and surplus --- that is not how things are supposed to go. See Bufkin v. Collins, 145 S. Ct. 728, 741 (2025); Waetzig, 145 S. Ct. at 699; Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803).

And note a final point.

On the few occasions it has discussed Section 1252(b)(9), the Supreme Court has used "action" in its general sense --- not in any legal sense. See, e.g., Jennings v. Rodriguez, 583 U.S.

19

281, 293 (2018) (suggesting that placing someone in detention is an "action"); Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999) ("AADC") (similar).

In a nutshell: the possible counterargument sketched out here does not work. As used in Section 1252(b)(9), "action" means what it usually does. It does not mean a lawsuit.[19]

### b) "To Remove"

The first of the four Section 1252(b)(9) boxes is checked. See Part IV.A.3(a). The Secretary of State's determination was an "action taken."

The next question: was the "action taken to remove an alien from the United States"? 8 U.S.C. § 1252(b)(9) (emphasis added).

It was.

The key word in the quoted phrase is "to."

As used with the verb "remove," "to" signals "purpose or intention." To, sense B.I, Oxford English Dictionary (2d ed. 1989).

And the cases confirm what the dictionaries say. See, e.g., Loughrin v. United States, 573 U.S. 351, 354-55 (2014)

---

[19] To be sure, courts sometimes analyze a word with reference to its neighbor. See Jones v. United States, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (cleaned up); see also Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961); Amy Coney Barrett, Congressional Insiders and Outsiders, 84 U. Chi. L. Rev. 2193, 2197 n.11 (2017). And so it might be argued here that "proceeding" (which undoubtedly has a legal meaning) should be taken to overspill itself, and to color the meaning of the neighboring "action" --- leaving "action" with some legalistic hues (a civil action, a lawsuit). But that does not work. If "action" and "proceeding" are each assigned a legal-shaded meaning, the words become redundant. Courts often look to contextual clues to avoid superfluous readings. See, e.g., United States v. Kaluza, 780 F.3d 647, 659 (5th Cir. 2015). But they have rejected contextual arguments that create redundancy. See, e.g., Waetzig, 145 S. Ct. at 699; Arcadia v. Ohio Power Co., 498 U.S. 73, 78 (1990).

20

**JA 120**

(concluding that "to obtain" in 18 U.S.C. § 1344 signals
"inten[t]"); Allison Engine Co. v. U.S. ex rel. Sanders, 553
U.S. 662, 668 (2008) (concluding that "to get" in the relevant
statute "denotes purpose").

<div align="center">*     *     *</div>

Given the above, the question is this: was the Secretary of
State's determination (an "action") done ("taken") with the
purpose or intention ("to") of removing an alien from the United
States"?

Yes, clearly.

When a Secretary of State says he has "reasonable ground[s] to
believe" that a person's "presence or activities in the United
States . . . would have potentially serious adverse foreign
policy consequences for the United States"[20] --- that statement
has only one known function in our law.

And that function is to seek the person's removal from the
United States. See 8 U.S.C. § 1227(a)(4)(C)(i) ("[a]n alien"
who meets the criteria quoted just above "is deportable.").

The memo that formalizes the Secretary's determination confirms
this.

Its "subject" line says that it concerns "[r]emovability
[d]eterminations" under the immigration laws. See Determination
at 1.

The first paragraph of the memo explains that the Secretary has
deemed the Petitioner to be a "deportable alien[]" under the
removal statute. See id. The second paragraph lays out the
Secretary's understanding of the relevant statute. See id. And
the last paragraph asserts that the Petitioner's "presence" in
the United State would harm American foreign policy. See id. at
1-2.

In short: under Section 1252(b)(9), "to remove an alien from the
United States" means to act with the intent or purpose to remove
someone. And that was the purpose of the Secretary's
determination.

---

[20]  That is in essence what the Secretary's determination says
here. See Determination at 1-2.

<div align="center">21</div>

<div align="center">**JA 121**</div>

### c) <u>"Under This Subchapter"</u>

Next: Section 1252(b)(9) applies when the claim in question
"aris[es] from any action taken . . . under this subchapter."

The subchapter in question is Subchapter II of Chapter 12 of
Title 8 --- the part of the Immigration and Nationality Act that
spans Section 1151 to Section 1382.

And the Secretary made his determination under 8 U.S.C.
§ 1227(a)(4)(C), which is part of Subchapter II.

So the Petitioner's claim, which challenges the Secretary's
determination, "aris[es] from an[] action taken . . . under this
subchapter."

### d) <u>"Arising From"</u>

To this point, the Court has concluded that the Secretary's
determination was (a) an action taken (b) to remove an alien
from the United States (c) under the relevant subchapter.

That leaves a fourth and final question.

Judicial review is sought here to enjoin the Petitioner's
detention as a violation of the First Amendment. <u>See</u> Petition
¶¶ 89-90.

Does assessment of that "question[]. . . aris[e] from an[]
action taken [the Secretary's determination] to remove an alien
[the Petitioner] from the United States"?

Yes.

The Supreme Court has recently debated what "arising from" means
in Section 1252(b)(9). <u>See</u> <u>Jennings</u>, 583 U.S. 281. How tight
must the nexus be between A and B to say that B arises from A?

Whatever the answer to that question might be in the abstract,
there can be no doubt that review of the legality of the
Petitioner's detention "aris[es] from" the Secretary's
determination.

The two are tightly yoked together. The Secretary of State's
determination is not tangential to the detention of the
Petitioner or his removal under Section 1227(a)(4)(C)(i). Quite
the opposite. The determination is what allows removal to go
forward in the first place --- indeed, it has <u>only</u> that purpose
under the law, and it is the <u>only</u> piece of evidence put forward

22

**JA 122**

before the immigration courts in support of a Section
1227(a)(4)(C)(i) removal.

                    *    *    *

To sum up:

Built into Section 1252(b)(9) is a four-part test for deciding
whether judicial review is or is not covered.

Here, that test is satisfied, for the reasons set out above.[21]

---

[21] And also: this conclusion gets support from two statements
about Section 1252(b)(9) in AADC.  There, the Supreme Court said
that Section 1252(b)(9) "channels judicial review of all"
relevant "decisions and actions, 525 U.S. at 483 (emphasis in
original), to the immigration courts and the court of appeals.
And Section 1252(b)(9) is a "zipper" clause, that "says 'no
judicial review in deportation cases unless this section
provides judicial review.'"  Id. at 482.  These statements
strengthen the conclusion that the Secretary's determination is
covered by Section 1252(b)(9).  But they should not be treated
as definitively fixing the meaning of Section 1252(b)(9).
First, subsequent cases have limited these statements.  Justice
Alito's Jennings plurality opinion, for example, construed
Section 1252(b)(9) as allowing for judicial review of prolonged
immigration detention in a federal district court, see 583 U.S.
at 294-95 --- and that would seem to be at odds with the quotes
from AADC.  Second, the AADC statements about Section 1252(b)(9)
were dicta; the holding in AADC was about the meaning of a
different immigration-related provision, 8 U.S.C. § 1252(g).
See 525 U.S. at 473.  And third, when the AADC Court said that
Section 1252(b)(9) covers "all" actions and decisions, see id.
at 483, it was rejecting an argument that Section 1252(g) covers
all actions from the beginning ("commence[ment]") to the end
("execut[ion]" of removal orders).  See AADC, 525 U.S. at 482-
83.  Section 1252(g) could not mean that, the Court reasoned,
because Section 1252(b)(9) already does.  See id. at 483.  But
even if 1252(b)(9) covers all actions between commencement and
execution, it might arguably have nothing to say about the
Secretary of State's determination --- because that is a pre-
commencement step.  All of this said, though, the AADC
statements tip the scales, at least to an extent, toward the
conclusion that the Secretary's determination is covered by
Section 1252(b)(9).  After all, Supreme Court dicta carry
special weight.  See, e.g., Singh v. Uber Techs. Inc., 939 F.3d
210, 223 (3d Cir. 2019).  And the AADC Section 1252(b)(9)

23

**JA 123**

What this means: <u>assuming</u> that Section 1252(b)(9) applies here in the first place, this Court has no jurisdiction to consider the Petitioner's claim as to the Secretary's determination.

Is this assumption right?  Take that up now.

> **B.    The Text**

The words of Section 1252(b)(9) seem to cover the Petitioner's challenge to the Secretary's determination.  <u>See</u> Part IV.A.

But the analysis that supports this conclusion, <u>see id</u>., is zoomed in to a fault.  Pan out to see the rest of the statute, and what becomes clear is this: Section 1252(b)(9) does not apply here as a categorical matter.  It does not reach cases like this one, in which a final order of removal has not been entered.

<p style="text-align:center">*    *    *</p>

Section 1252(b)(9) is part of Section 1252(b), and Section 1252(b) starts with a lead-in.

> With respect to review of an order of removal . . . , the following requirements apply:

From there, Section 1252(b) runs through a set of numbered "requirements," 1252(b)(1), (b)(2), and so on --- out to (b)(9).

With that structure in mind, look to some relevant parts of Section 1252(b):

> **(b) Requirements for review of orders of removal**
>
> With respect to review of an order of removal . . . , the following requirements apply:

---

statements are not <u>pure</u> dicta; they take some steps down the road in the "holding" direction.  This is because the <u>AADC</u> Court's broad reading of Section 1252(b)(9) may have been a necessary element of the Court's actual holding, as to the scope of Section 1252(g).  <u>See</u> 525 U.S. at 483.  And logically necessary and explicitly invoked steps along the way to a holding can be binding.  <u>See</u>, <u>e.g.</u>, <u>Seminole Tribe of Fla.</u> v. <u>Florida</u>, 517 U.S. 44, 67 (1996).

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings . . . .

**(3) Service**

  **(A) In general**

  . . . The petition shall be served on the Attorney General and on the officer or employee of the [federal immigration agency] in charge of the . . . district in which the final order of removal . . . was entered. . . .

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)--

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based, . . . .

[ . . . ]

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas

**JA 125**

> corpus . . . , or by any other provision
> of law (statutory or nonstatutory), to
> review such an order or such questions of
> law or fact.

Looking to the full statute is required, and always has been.[22]

Doing so here makes clear that Section 1252(b)(9) has no bearing on this case.

Section 1252(b)(9) speaks to cases in which judicial review goes forward <u>after</u> the immigration courts enter a final order of removal.

But Section 1252(b)(9) does not purport to say anything about what happens when --- as here --- judicial review takes place <u>before</u> an order of removal is entered.

*      *      *

The point is clear from the get-go.

The title of Section 1252(b) says that the Section, which includes Section 1252(b)(9), is about "Requirements for review of orders of removal."

These words assume that an order of removal has <u>already</u> been entered.  After all, "review" means to "look at a thing again." <u>Review</u>, v., sense 1, <u>Merriam-Webster</u>, https://www.merriam-webster.com/dictionary/review (accessed Apr. 17, 2025); <u>accord</u>, <u>e.g.</u>, <u>Review</u>, v., sense 2, <u>Oxford English Dictionary</u> (2d ed. 1989) ("view, inspect, or examine a second time or again").

---

[22] <u>See</u> <u>The Mary Ann</u>, 21 U.S. 380, 387 (1823) ("[T]hose rules for construing statutes, which are dictated by good sense, and sanctioned by immemorial usage, . . . require that the intent of the Legislature shall have effect, which intent is to be collected from the context[.]"); <u>United States</u> v. <u>Fisher</u>, 6 U.S. (2 Cranch) 358, 386 (1805) ("It is undoubtedly a well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole."); <u>accord</u> <u>Gundy</u> v. <u>United States</u>, 588 U.S. 128, 141 (2019); <u>Nat'l Broad. Co.</u> v. <u>United States</u>, 319 U.S. 190, 214-16 (1943); <u>Durousseau</u> v. <u>United States</u>, 10 U.S. (6 Cranch) 307, 314 (1810); <u>Oneale</u> v. <u>Thornton</u>, 10 U.S. (6 Cranch) 53, 68 (1810); <u>see also</u> 1 William Blackstone, <u>Commentaries</u> *59.

And there can be no looking "again" at a thing (here, an order of removal) that does not already exist.  If a movie is not out until next year, a newspaper might run a preview.  But the review comes after the fact --- after the filming and editing are wrapped up and someone can sit and watch the final product.

Bottom line: Section 1252(b)'s heading ("Requirements for review of orders of removal") shows that Section 1252(b)(9) kicks in after a final order has been entered, not before.[23]

                    *     *     *

Other parts of Section 1252(b) point in the same direction.

Start from the top, with the Section 1252(b) lead-in.

It says that "[w]ith respect to review of an order of removal . . . , the following requirements apply."  8 U.S.C. § 1252(b) (emphasis added).  And as noted, one of those "requirements" listed under that Section is 1252(b)(9).

The clear implication:  Section 1252(b)(9) is about "review of an order of a removal," not about a situation in which review might take place before such an order exists.

Move now to the first substantive part of Section 1252(b), Section 1252(b)(1).

Section 1252(b)(1) lays down a deadline for when a person must act if he or she wants to seek out the judicial review that is the subject of Section 1252(b): "The petition for review [in the

---

[23]  And note: in the context of Section 1252(b), courts routinely reason from the language Congress used in the various statutory headings.  See EOHC v. Sec'y U.S. Dep't of Homeland Sec., 950 F.3d 177, 186 (3d Cir. 2020) ("That is also why the provision is captioned 'Consolidation of Questions for Judicial Review.'") (cleaned up); see also Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 810 (9th Cir. 2020); Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 9 (1st Cir. 2007); Singh v. Gonzales, 499 F.3d 969, 977 (9th Cir. 2007); Saint Fort v. Ashcroft, 329 F.3d 191, 198 (1st Cir. 2003); Mahadeo v. Reno, 226 F.3d 3, 12 (1st Cir. 2000); Flores-Miramontes v. INS, 212 F.3d 1133, 1139 (9th Cir. 2000); Cath. Soc. Servs., Inc. v. INS, 182 F.3d 1053, 1060 (9th Cir. 1999), on reh'g en banc, 232 F.3d 1139 (9th Cir. 2000); cf. Cunningham v. Cornell Univ., 2025 WL 1128943, at *6 (U.S. Apr. 17, 2025) (in a different context, looking to statutory headings to resolve possible doubt about statutory construction).

court of appeals] must be filed not later than 30 days after the date of the final order of removal."

This timeline assumes that a final order of removal has been entered. It happened. It was done on a certain "date," and the 30-day countdown goes from there.

And note: Section 1252(b) provides no deadline for a court challenge that might be brought before the entry of a final order of removal. Why not? Because Section 1252(b) does not cover those sorts of challenges.

Walk through the statute and see more of the same.

Under Section 1252(b), the court challenge is to go forward in "the judicial circuit in which the immigration judge completed the proceedings." Id. § 1252(b). That makes sense if Section 1252(b) covers situations in which an order of removal has been entered. But not if it also speaks to the period before an order has been entered. At that point, the "proceedings" before the immigration judge are not "completed." They are underway.

And along the same lines:

Why would Congress require service where "the final order of removal . . . was entered," id. § 1252(b)(3), if it meant for Section 1252(b) to cover situations in which there was not yet a final order of review that had been "entered"?

Why would Congress limit review "only" to "the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), if the review takes place before an order of removal, "based" on the record, has been entered?

In sum, a broader look shows that Section 1252(b)(9) comes online after an order of removal has been entered by the immigration courts.

Therefore, Section 1252(b)(9) does not purport to say anything about what might happen in cases like this one, cases that are brought before a final order of removal is entered.

The upshot: Section 1252(b)(9) has no role to play here, and so it cannot strip this Court of jurisdiction.

\*     \*     \*

A final note.

On the understanding sketched out just above, Section 1252(b)(9) has an important role to play.

It tells federal district courts that, _after_ an order of removal is finalized, they are not part of the mix. The immigration courts will do the front-line work. And the work of Article III judicial review belongs to the court of appeals, and fully. An issue here or there --- those cannot be plucked out by a district court for its own review.

By conveying this message, Section 1252(b)(9) "streamlines" review, as courts have observed that it aims to. See _Nken_ v. _Holder_, 556 U.S. 418, 424 (2009); _F.J.A.P._ v. _Garland_, 94 F.4th 620, 628 (7th Cir. 2024); _Patel_ v. _U.S. Att'y Gen._, 971 F.3d 1258, 1269 (11th Cir. 2020), _aff'd sub nom. Patel_ v. _Garland_, 596 U.S. 328 (2022); _Cooper Butt ex rel Q.T.R._ v. _Barr_, 954 F.3d 901, 906 (6th Cir. 2020).

And it also cuts off "piecemeal" litigation, another of its core purposes. See _Gicharu_ v. _Carr_, 983 F.3d 13, 18 (1st Cir. 2020); _Jama_ v. _Dep't of Homeland Sec._, 760 F.3d 490, 496 (6th Cir. 2014); _Chehazeh_ v. _Att'y Gen. of U.S._, 666 F.3d 118, 131 (3d Cir. 2012); _Aguilar_ v. _U.S. Immigr. & Customs Enf't_, 510 F.3d 1, 9 (1st Cir. 2007).

But Section 1252(b)(9) does those things only where it applies --- and that is _after_ orders of removal have been entered, not, as here, _before_.[24]

---

[24] But it might be argued: this cannot be all. Even _without_ Section 1252(b)(9), few district judges would have imagined that they could review an issue that is brought to them while a court of appeals is already handling the overall case. But this ignores the state of the law before Section 1252(b)(9) was passed in 1996. See, _e.g._, _Delligatti_, 145 S. Ct. at 806-07 (looking to a "[legal] principle [that] was well established" when a statute was enacted to inform interpretation of the statute). In 1983, the Supreme Court held that "final orders" of removal "include[] all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." _INS_ v. _Chadha_, 462 U.S. 919, 938 (1983) (cleaned up). This leaves behind a good many issues. It might have been taken to imply that the court of appeals, when it reviews a final order of removal, takes up only a subset of

*     *     *

Here, the Petitioner does not seek judicial review of an order
of removal.  None has been finalized.  And therefore, Section
1252(b)(9) does not prevent this Court from considering the
Petitioner's claim that the Secretary's determination must be
set aside as unconstitutional.

"Jurisdictional rules . . . should be 'clear and easy to
apply.'"  Axon Enter., Inc. v. FTC, 598 U.S. 175, 212 (2023)
(Gorsuch, J., concurring) (quoting Hamer v. Neighborhood Housing
Servs. of Chi., 583 U.S. 17, 25 (2017)).  This one is.

### C.   **Chehazeh**

Do cases support the reading of Section 1252(b)(9) laid out just
above?

At the Supreme Court, there is no binding authority.  A majority
of Justices has not directly passed on the question one way or
another.[25]

---

questions ("all matters on which the validity of the final order
is contingent") --- with room left for a district court to look
into other issues related to a case that is brought before it.
See Nasrallah v. Barr, 590 U.S. 573, 582 (2020) (making a
closely similar point in another immigration-law context).
Section 1252(b)(9), where it applies, shuts the door on that
sort of thinking --- because it says that review in the court of
appeals occupies virtually the whole playing field of possible
issues, well beyond those that the order of removal was
"contingent" on.  Court of appeals review covers "[j]udicial
review of all questions of law and fact, including
interpretation and application of constitutional and statutory
provisions, arising from any action taken or proceeding brought
to remove an alien."  8 U.S.C. § 1252(b)(9).

[25]  In short passages here and there, various Justices have
weighed in.  A dissent from Justice Breyer, joined by Justices
Ginsburg and Sotomayor, suggests that Section 1252(b)(9) applies
only to review of orders of removal that have already been
entered.  "Jurisdiction . . . is unaffected by 8 U.S.C.
§ 1252(b)(9), which by its terms applies only 'with respect to
review of an order of removal under § 1252(a)(1).'  The

But the Supreme Court addressed Section 1252(b)(9) in passing in
an earlier case.

And based on that Supreme Court case, and based on an earlier
decision of its own, the Third Circuit has held that Section
1252(b)(9) applies only <u>after</u> a final order of removal has been
entered --- and such an order, as noted, has not been entered
here as to the Petitioner.

The Third Circuit's analysis and holding as to Section
1252(b)(9) is quoted here in full:

> [T]he Supreme Court has noted that
> § 1252(b)(9) is subject to the limitations
> of § 1252(b), and, therefore, "applies only
> 'with respect to review of an order of
> removal under subsection (a)(1).'" <u>INS</u> v.
> <u>St. Cyr</u>, 533 U.S. 289, 313, (2001) (quoting
> 8 U.S.C. § 1252(b)). Section 1252(b)(9),
> "by its own terms," does not bar review of
> an order "not subject to judicial review
> under § 1252(a)(1)," <u>St. Cyr</u>, 533 U.S. at
> 313, and § 1252(a)(1) describes only "review
> of a final order of removal." <u>See</u> 8 U.S.C.
> § 1252(a)(1) ("Judicial review of a final
> order of removal . . . is governed only by
> chapter 158 of title 28, except as provided
> in sub[s]ection (b) of this
> section . . . ."). Section 1252(b)(9),
> therefore, requires only that, when there is

respondents challenge their detention without bail, not an order
of removal." <u>Jennings</u>, 583 U.S. at 355 (Breyer, J., dissenting)
(cleaned up). On the other hand, a dissent from Justice Thomas,
joined by Justice Alito, seems to suggest the opposite view,
that Section 1252(b)(9) limits district-court review even before
an order of removal has been entered. "[Section] 1252(b)(9)
covers all 'questions of law and fact' that an immigration judge
must decide as a result of the Government's decision to initiate
removal proceedings against an alien." <u>Nasrallah</u>, 590 U.S. at
590 (Thomas, J., dissenting). And note that a concurrence from
Justice Thomas, joined by Justice Gorsuch, necessarily rests on
the idea that Section 1252(b)(9) applies even before orders of
removal are entered. <u>See</u> <u>Jennings</u>, 583 U.S. at 319-21 (Thomas,
J., concurring). For more on <u>Jennings</u>, see Part IV.A.3(d).

31

**JA 131**

an order of removal under subsection (a)(1),
review of any issues related to that order
must be consolidated into a single petition
for review and cannot be brought piecemeal.
One may not, for instance, follow a petition
for review with a habeas petition or a
petition for a writ of mandamus.

Although St. Cyr issued prior to the REAL ID
Act, the REAL ID Act did not modify
§ 1252(b) or the instruction that
§ 1252(b)(9) "applies only 'with respect to
review of an order of removal under
subsection (a)(1).'" St. Cyr, 533 U.S. at
313 (quoting 8 U.S.C. § 1252(b)). Since
that time, both the Ninth and Eleventh
Circuits have held that, when a person is
not seeking review of "an order of removal
under subsection (a)(1)," the limitations of
§ 1252(b)(9) do not apply. See Singh v.
Gonzales, 499 F.3d 969, 978 (9th Cir. 2007)
("By virtue of its explicit language . . .
1252(b)(9) applies only to those claims
seeking judicial review of orders of
removal."); Madu v. Att'y Gen., 470 F.3d
1362, 1367 (11th Cir. 2006) (explaining that
"section 1252(b)(9) applies only with
respect to review of an order of removal"
and that the REAL ID Act "did not expand the
scope of § 1252(b)(9) by making it
applicable to cases other than those
involving 'review of an order of removal'"
(internal quotation marks omitted)); cf.
House Conference Report on the REAL ID Act,
H.R. Rep. No. 109-72, at 175, 2005
U.S.C.C.A.N. 240, 300 ("Section 106 would
not preclude habeas review over challenges
to detention that are independent of
challenges to removal orders. Instead, the
bill would eliminate habeas review only over
challenges to removal orders.").

While we have not written precedentially on
the scope of § 1252(b)(9) after the REAL ID
Act, we have addressed the effect of nearly

identical language in § 1252(a)(5). In
Kumarasamy v. Attorney General, we
considered whether a habeas petition that
was before us on appeal when the REAL ID Act
came into effect should be converted into a
petition for review pursuant to 8 U.S.C.
§ 1252(a)(5). 453 F.3d 169, 172 (3d Cir.
2006). That subsection states that a
"petition for review filed with an
appropriate court of appeals . . . shall be
the sole and exclusive means for judicial
review of an order of removal." 8 U.S.C.
§ 1252(a)(5). The petitioner in Kumarasamy
had not been seeking review of an order of
removal but was seeking habeas relief,
claiming that his deportation was illegal
"because there was no order of removal."
453 F.3d at 172 (emphasis in original). We
held that § 1252(a)(5) did not apply,
because that provision pertained only to
"judicial review of an order of removal."
Id. (emphasis in original). Our holding in
Kumarasamy supports the conclusion that,
because § 1252(b) refers only to "review of
an order of removal under subsection
(a)(1)," it, and its subsections, are
inapplicable when there is no such order.

Not all courts agree with the conclusion
reached by the Ninth and Eleventh Circuits
and suggested by us in Kumarasamy. The
First Circuit held in Aguilar v. United
States Immigration & Customs Enforcement
that "the reach of section 1252(b)(9) is not
limited to challenges to singular orders of
removal." 510 F.3d 1, 9 (1st Cir. 2007).
The reasoning of Aguilar, however, appears
to conflict with the Supreme Court's
explicit instruction in St. Cyr, 533 U.S. at
313 ("Section 1252(b)(9) applies only 'with
respect to review of an order of removal
under subsection (a)(1).'"), and with the
language of § 1252(b) ("With respect to
review of an order of removal under

33

**JA 133**

> subsection (a)(1) of this section, the
> following requirements apply . . . .").  We
> therefore join with the Ninth and Eleventh
> Circuits and hold that § 1252(b)(9) applies
> only "with respect to review of an order of
> removal under subsection (a)(1)."  8 U.S.C.
> § 1252(b).  Because Chehazeh is not seeking
> review of any order of removal --- as there
> has been no such order with respect to him -
> -- § 1252(b)(9) does not preclude judicial
> review.

Chehazeh, 666 F.3d at 131–33 (cleaned up).

This is all but dispositive.

There is no order of removal in this case.  And so Section
1252(b)(9) does not apply under Chehazeh.  "Because [the
Petitioner] is not seeking review of any order of removal --- as
there has been no such order with respect to him ---
§ 1252(b)(9) does not preclude judicial review."  Id.

                    *      *      *

Might Chehazeh be distinguished from this case on factual
grounds?

Chehazeh, after all, was an "unusual" case, id. at 121, focused
on the Board of Immigration Appeals' decision to sua sponte
reopen a decision.  See id.

Perhaps, it might be argued, Chehazeh does not apply to the more
typical case, where a person in a removal proceeding seeks
federal district court review before the immigration court
proceedings have run their course.

But that sort of distinction seems to have been considered and
rejected by the Third Circuit in EOHC v. Secretary United States
Department of Homeland Security, 950 F.3d 177 (3d Cir. 2020).

There, people in removal proceedings went to the district court.
See id. at 180.  Up against Chehazeh, the federal-government
appellees argued that that case should be limited to its facts.
See Brief for Appellees at 37, EOHC, 950 F.3d 177 (No. 19-2927).
But the Third Circuit did not seem to accept this position.
This was the EOHC court's only mention of Chehazeh:

> [Section 1252(b)(9)] does not reach "claims
> that are independent of, or wholly
> collateral to, the removal process," like
> "claims that cannot effectively be handled
> through the available administrative
> process." Aguilar, 510 F.3d at 11; accord
> J.E.F.M. v. Lynch, 837 F.3d 1026, 1032 (9th
> Cir. 2016) (collecting cases); Reply Br. 16
> (interpreting Chehazeh v. Att'y Gen. of the
> U.S., 666 F.3d 118 (3d Cir. 2012)); Oral
> Arg. Tr. 20–21.

EOHC, 950 F.3d at 186.

Now look to the page of the Reply Brief that was cited as
"interpreting" Chehazeh. It reads, in part: "the government's
argument that this Court should 'limit Chehazeh to its facts'
. . . is misplaced. Instead, . . . the applicability of section
1252(b)(9) depends on the nature of the claim being considered."
Reply Brief for Appellants at 16, EOHC, 950 F.3d 177 (No. 19-
2927).

It appears that the EOHC court, by citing this page of the
brief, meant to signal that it rejected any cabining of Chehazeh
to its facts.

                    *    *    *

Might it be argued that Chehazeh has been implicitly overruled
by the Supreme Court's decision in Jennings?

This seems unlikely.

The Third Circuit in EOHC referenced Chehazeh, as noted.  See
EOHC, 950 F.3d at 186.  And it also discussed Jennings at
length.  See id. at 185–86.  If Jennings overruled Chehazeh,
would EOHC not have said so?

And more directly: there is no reason to think Jennings pushed
aside Chehazeh.

To see why, look first to the facts of Jennings.

Noncitizens in immigration custody had been detained for more
than six months without bond hearings, and they argued this was
illegal under various statutes.  See id. at 290.  Those statutes

35

**JA 135**

applied to certain noncitizens --- those who had not received a final order of removal.  See id. at 291, 299, 303.[26]

Jennings, then, was like Chehazeh --- a pre-order-of-final-removal case.

As to jurisdiction, what did the Supreme Court rule in Jennings? Did Section 1252(b)(9) strip jurisdiction or not?

The answer is not straightforward, because the Jennings Court fragmented on the jurisdictional question.  See id. at 284. Eight justices took part and there were three opinions; none commanded a majority.  See id. at 284, 292.

How to decide what to take away from this?  When "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  Marks v. United States, 430 U.S. 188, 193 (1977) (cleaned up); see generally Richard M. Re, Beyond the Marks Rule, 132 Harv. L. Rev. 1942 (2019).

But this "Marks rule" is not clarifying here.[27]

---

[26]  In the district court, one of the noncitizens sought certification of a subclass under 8 U.S.C. § 1231(a), which governs the "[d]etention . . . of aliens ordered removed."  See Jennings, 583 U.S. at 291.  But the court of appeals held that this subclass could not be certified, see id., and the Supreme Court did not revisit that decision.  See id. at 291–92.  So the case before the Court concerned only detention of people who had not been ordered finally removed.

[27]  As a general matter, the Marks rule can apply to jurisdictional holdings.  See, e.g., United States v. Donovan, 661 F.3d 174 (3d Cir. 2011); United States v. Johnson, 467 F.3d 56 (1st Cir. 2006); United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006).  It just does not shed light here, as will be seen in a moment. (Note that the Marks rule may be especially hard to apply to a jurisdiction-stripping statute, because it is not obvious what the right baseline is.  Are the "narrower grounds" those that narrow the reach of the statute (and therefore expand federal court jurisdiction)?  Or are the "narrower grounds" those that expand the reach of the statute (and therefore narrow federal court jurisdiction)?  Cf. Johnson, 467 F.3d at 63–64.)

<u>Chehazeh</u> held that, as a categorical matter, Section 1252(b)(9) does not apply before entry of an order of removal.  <u>See</u> 666 F.3d at 133.

But on that question, there is no <u>Jennings</u> majority to cobble together using <u>Marks</u>.

As noted, eight Justices took part in <u>Jennings</u>.  <u>See</u> 583 U.S. at 284.

Two Justices, with Justice Thomas writing, held that Section 1252(b)(9) <u>can</u> apply before a final order of removal exists. <u>See</u> <u>id</u>. at 317–18 (Thomas, J., concurring).

Three Justices, with Justice Breyer writing, suggested that it <u>cannot</u> apply before a final order of removal exists.  <u>See</u> <u>id</u>. at 355 (Breyer, J., dissenting).

And three Justices, with Justice Alito writing, took no explicit stance on the question.

Rather, Justice Alito's opinion held that Section 1252(b)(9) did not control the particular case before the Court --- because detention without a bail hearing did not "aris[e] from" actions to remove the noncitizens, as Section 1252(b)(9) requires.  <u>See</u> <u>id</u>. at 292–95.

But nothing can be read into Justice Alito's opinion as to whether Section 1252(b)(9) might <u>otherwise</u> apply before an order of removal; therefore, no holding of his can join that of another opinion, via the <u>Marks</u> rule, to make a majority.

This is for two reasons.

<u>First</u>, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  <u>Cooper Indus., Inc.</u> v. <u>Aviall Servs., Inc.</u>, 543 U.S. 157, 170 (2004); <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>More</u>, 7 U.S. (3 Cranch) 159, 172 (1805) (Chief Justice Marshall making this point at oral argument as to jurisdiction).

Justice Alito took no "position," <u>Marks</u>, 430 U.S. at 193, on whether Section 1252(b)(9) could or could not categorically have applied if the statute's "arising from" language had fit the case before the Court.

So why impute a position to him?

37

And all the more so because Justice Alito's opinion noted that the parties had not briefed "the scope" of Section 1252(b)(9), see Jennings, 583 U.S. at 294, and so, as Justice Alito put it, his opinion declined "to provide a comprehensive interpretation" of Section 1252(b)(9), ruling only that the statute did not apply given the facts at hand.  See id. at 294.

To see the second point, start by noting that when an explicit ruling (call it "CD") necessarily rests on an implicit logical proposition (call it "AB") --- then both CD and AB can count as rulings.  See footnote 21 (discussing this).

If Justice Alito's explicit ruling (CD) was that jurisdiction was stripped in Jennings because of Section 1252(b)(9)'s language, then that would logically rest on the implicit idea (AB) that Section 1252(b)(9) applied in the first place.

But that is not where Justice Alito's opinion came down.

It held that, because of Section 1252(b)(9)'s language, jurisdiction was not stripped --- and that ruling does not rest on a logically necessary sense that Section 1252(b)(9) applied. After all, Justice Alito could have reached the same result (no jurisdiction strip) regardless of his answer to the question of whether Section 1252(b)(9) does or does not categorically apply to pre-order-of-removal cases.[28]

---

[28]  The second point in the text is abstract.  Unpack it a bit more here.  The complexity is this: AB may typically get analyzed before conclusion CD is reached; but whether AB is necessary to conclusion CD --- that depends.  To see why, imagine this statute: "if a person is an employee, she cannot be discriminated against --- and if she is discriminated against, the employer is liable and must pay."  Under the statute, whether a person is an employee will usually be analyzed before deciding whether she has been discriminated against.  But is a holding as to whether she is an employee logically implicit in a holding as to whether the employer must pay?  Sometimes yes, sometimes no.  If the court holds she was discriminated against and that the employer must pay, then that must logically rest on a particular resolution of the prior question, as to whether person was an employee.  After all, if she was not an employee, how could the employer have broken the statute and now be expected to pay?  But if the court holds she was not discriminated against, and the employer need not pay, that does

<p style="text-align:center">*   *   *</p>

In sum: even after deploying the <u>Marks</u> rule, it cannot be said that a <u>Jennings</u> majority spoke to the <u>Chehazeh</u> question --- let alone implicitly overruled the Third Circuit's <u>Chehazeh</u> opinion.

## V.    **If Section 1252(b)(9) Applies Here**

Where things stand:

The Respondents argue that Section 1252(b)(9) pulls away jurisdiction, such that this Court cannot consider the Petitioner's motion to enjoin the Secretary's determination.

That argument looks solid at first.  <u>See</u> Part IV.A.  But look to all of Section 1252(b), and the argument melts away. Section 1252(b)(9) is in play only when an order of removal has been entered.  That is what the statute says.  <u>See</u> Part IV.B. And that is what the Third Circuit has held.  <u>See</u> Part IV.C.

Therefore, Section 1252(b)(9) does not apply here --- there is no order of removal.

But there is an important difficulty.

To see it, compare (a) <u>Chehazeh</u> and (b) <u>EOHC</u>, two Third Circuit cases that have been mentioned at various points above.

<p style="text-align:center">*   *   *</p>

---

not logically need to have been based on any particular decision on the question of whether the person was an employee.  Why not? Because the ruling (no pay) would come out the same way regardless of how the employee question was answered.  Another way to see this is to think about arguments made <u>arguendo</u>. Justice Alito in <u>Jennings</u> could have said "assuming <u>arguendo</u> that Section 1252(b)(9) can generally apply to pre-order-of-removal cases, the statute's language does not apply to this case --- and so there is no jurisdiction strip here."  But for his part, Justice Thomas in <u>Jennings</u> could not have said "assuming <u>arguendo</u> that Section 1252(b)(9) can generally apply to pre-order-of-removal cases, its language applies to this case --- and so there is a jurisdiction strip here."  For Justice Alito's bottom-line conclusion, the categorical question of whether Section 1252(b)(9) applies is not logically necessary and therefore can be assumed away <u>arguendo</u>; for Justice Thomas' bottom-line conclusion, the categorical question is logically necessary --- and therefore cannot be bracketed for later.

<p style="text-align:center">39</p>

<p style="text-align:center">**JA 139**</p>

_Chehazeh_ holds that Section 1252(b)(9) applies only when an order of removal has been entered.  The long excerpt above, see Part IV.C, shows that.

Move now to EOHC.

It, too, was an immigration case.  And it held that Section 1252(b)(9) precluded the district court from hearing a particular claim --- even though no order of removal had been entered.  See EOHC, 950 F.3d at 180.

_Chehazeh_ and EOHC appear to pull in opposite directions.

Does Section 1252(b)(9) apply when there is, as here, no order of removal?

_Chehazeh_ seems to say no.  EOHC seems to say yes.

If _Chehazeh_ controls, then Section 1252(b)(9) is not on the table in this case.  It is categorically irrelevant. Jurisdiction is not affected by it.  See Part IV.B and IV.C.

But if EOHC controls, Section 1252(b)(9) potentially does apply here --- and if it does, there is a solid textual case, see Part IV.A, that it strips this Court of jurisdiction.

*       *       *

How to proceed?

The Court closely reviews EOHC, and concludes that it stands for this principle: the question of whether Section 1252(b)(9) allows a federal district court to hear a claim that has been brought to it depends on whether the claim could get "meaningful review" if federal court review is delayed out into the future --- as will happen if the federal district court is divested of jurisdiction by Section 1252(b)(9), and the case is then sent the immigration courts route.  See Part V.A.[29]

In other words:

Under EOHC, Section 1252(b)(9) strips jurisdiction if later review in the federal court of appeals, after the immigration courts are done, would be meaningful.  But Section 1252(b)(9)

---

[29]  Recall: if a claim must first go to the immigration courts, federal court review of the claim will happen only later, in a federal court of appeals, after the immigration courts have done their work.

does not strip jurisdiction if post-immigration-courts review would not be meaningful.

On this reading, EOHC essentially applies the Supreme Court's general administrative law jurisprudence in the particular context of immigration law --- and that makes sense, given that immigration law, in this area, is a part of the administrative law family.  See Part V.B.

And on this reading, EOHC is fully consistent with one of the Third Circuit's key relevant precedents --- the opinion authored by then-Judge Alito in Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996).  Massieu applied the same body of general administrative law jurisprudence that EOHC does.  See Part V.C.

*     *     *

The question of how the referenced "meaningful review" issue plays out in this case is taken up in Part VI.

For now, though, start with EOHC, and move on to administrative law more generally and then to Massieu.

### A.   EOHC

This is what the EOHC case was about:

A father and his minor daughter came to the United States from Guatemala.  See EOHC, 950 F.3d at 181.

Federal officials began removal proceedings.  See id.  The Board of Immigration Appeals eventually entered a stay of removal, see id., but the father and his daughter became concerned that they would be moved to Mexico, see id., to wait things out there while American immigration courts assessed whether they should be removed back to Guatemala.[30]  See id.

The father and his daughter filed a habeas petition in Pennsylvania.  See id.  They pressed a set of claims, and as to each one the Third Circuit asked the same question: can this claim go forward in the federal district court?  Or do jurisdiction-stripping statutes take away that possibility,

---

[30]  This was during the period when the federal government applied a protocol to send noncitizens to Mexico while they waited for removal proceedings.  See EOHC, 950 F.3d at 181.

41

**JA 141**

requiring the claim to run down the immigration-court track? See id. at 184.

To answer these questions, EOHC relied on this principle: that Section 1252(b)(9) allows claims to be brought in a federal district court now if there could not be "meaningful" judicial review of those claims later --- after the immigration courts have finished their work and a federal court (the court of appeals) then gets involved. See id. at 180 ("When a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court."); see also id. at 186–87 (invoking meaningful review as to Section 1252(b)(9); cf. id. at 189-90 (invoking meaningful review as to other jurisdiction-stripping provisions).

In immigration law, involvement by an Article III federal court is typically a late-in-the-process thing. See id. at 180. Immigration courts handle the case at Time 1, and a federal court (a court of appeals) gets involved for the first time only at Time 2. See id.

But, EOHC holds, if waiting until Time 2 would undermine "meaningful" federal court review --- then that review can be hurried up, and a "detained alien" can first go to a federal court, a federal district court, at Time 1, rather than have the immigration courts take the initial look, with federal court review to take place only afterwards (in a federal court of appeals).

In that circumstance, Article III judicial review --- usually pushed out into the future as a job for a federal court of appeals --- is pulled back into the present, and is undertaken by a federal district court (whose work is later reviewed by a federal court of appeals).

*     *     *

How does this principle work in practice?

The EOHC father and daughter claimed that they would be temporarily moved to Mexico, to wait there for the immigration courts' decision in their removal proceedings. See id. at 181. Such a claim, EOHC held, can be taken up right away by a federal district court, consistent with Section 1252(b)(9). See id. at 187.

42

**JA 142**

Why?

Because, per EOHC, there can be no "meaningful" consideration later of such a claim by a court of appeals, after the immigration courts have wrapped up their work. By then, the father and daughter could already have been in Mexico for years, and those years would have been lost. See id. at 186-87. "Now-or-never" claims, id. at 186, as that one was, can go forward now in a federal district court because they fit into a broader umbrella category --- claims that cannot later be "meaningful[ly]" reviewed when they would ordinarily make their way to a federal court of appeals.

And take a second example, to see the flip side of the coin.

The EOHC father and daughter also claimed that being moved to Mexico would fray their relationship with their lawyer, which would violate their statutory right to counsel at an eventual removal hearing. See id. at 187-88.

EOHC, citing Section 1252(b)(9), held that this claim could not be brought right away in federal district court.[31]

Why not?

Because the claim could get "meaningful" review later --- as the court of appeals looked back on what happened at the removal hearing, with an eye on any damage that may have been done to the attorney-client relationship. See id. at 188 ("[T]he court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed.").

### B.   <u>Administrative Law</u>

In a nutshell, EOHC held that Section 1252(b)(9) does not take jurisdiction away from federal district courts when the alternative --- going the standard route, to the immigration courts and then to a federal court of appeals --- would undermine "meaningful" judicial review.

EOHC indicated that its approach flowed from a broad range of sources --- statutory text, a recent Supreme Court decision, and a set of presumptions. See id. at 184-86.

---

[31]   This was a pre-order-of-removal claim.

43

**JA 143**

And that approach is also closely consistent with broader principles of administrative law --- the legal family that, in this context, immigration law is part of.

### 1.  Structure

To begin seeing this, start with the classic picture of adjudication in the federal system.

On the ground floor is a federal district court.  Then the next level up is a federal court of appeals.  And finally the Supreme Court sits atop the pyramid.

But the classic picture is not everywhere the current one.

In administrative law, for example, the federal district court is often swapped out, its place taken by an administrative court.

In cases related to the SEC, the FTC, the EPA, the FDA, and the FCC, the rungs on the ladder often look like this: an agency administrative judge (or an administrative law judge, or some other non-Article III official), does the front-line dispute resolution.  And after that is done, the case plugs back into the standard system --- with the administrative judge's decision then reviewed by an Article III court, the federal court of appeals.  See Federal Appeals Jurisdiction and Practice § 15:1 (2025 ed.); 2 Charles H. Koch & Richard Murphy, Admin. L. & Prac. § 5:10 (3d ed. 2024).

*     *     *

There was a time when immigration detention was commonly reviewed using the classic tools of American adjudication.

A person in custody typically (though not always) started off in the federal district court, seeking a habeas corpus writ.  See Carlson v. Landon, 342 U.S. 524, 531-32 (1952); Fong Haw Tan v. Phelan, 333 U.S. 6, 8 (1948); U.S. ex rel. Tisi v. Tod, 264 U.S. 131, 132-33 (1924) Chin Yow v. United States, 208 U.S. 8, 13 (1908); Yamataya v. Fisher, 189 U.S. 86, 87 (1903).

But the plates began to shift during the mid-20th century.

New jurisdictional statutes became law.[32]

And now, immigration law looks in some basic ways like a branch of administrative law.

Cases generally go in the first instance to immigration judges, see 8 C.F.R. § 1003.10, and immigration judges are roughly akin to other administrative judges. See footnote 2; 2 Fed. Proc., L. Ed. § 2:159. And as with administrative judges, immigration judges' decisions are ultimately funneled out of the agency --- for relatively late-in-the-process review by a federal court, a courts of appeals. See 8 U.S.C. § 1252(a)(5).

Bottom line: immigration disputes are resolved using many of the same basic structures as bread-and-butter administrative disputes, like those involving the SEC, FTC, or FDA.

The next section begins to explain why this similarity matters.

### 2.  __Thunder Basin__

The key question covered by this Opinion is this: under Section 1252(b)(9), must the Petitioner's constitutional challenge to the Secretary of State's determination go forward in the first instance before this Court or before the immigration courts?

At its core, this question is a variant on an everyday set of administrative law questions --- questions that are spun off by administrative-agency adjudication that, as the prior section shows, makes use of the same basic structure (agency adjudication, followed by federal court of appeals review) as modern immigration law.

Look here at how administrative law generally handles issues of this sort, and then return, later, to immigration law and to EOHC.

---

[32]  After the passage of the Immigration and Nationality Act of 1952, there was some back and forth over where deportation orders might be reviewed. See Brownell v. We Shung, 352 U.S. 180, 186 (1956); Shaughnessy v. Pedreiro, 349 U.S. 48, 51 (1955); Heikkila v. Barber, 345 U.S. 229, 235-36 (1953). But this was mostly smoothed out by the passage of the 1961 amendments to the INA, which made review in the federal courts of appeals the "sole and exclusive procedure" for judicial review of final orders of deportation. See Act of Sept. 26, 1961, Pub. L. No. 87-301, 75 Stat. 650, 651.

                                *     *     *

As a matter of administrative law:

What to do if a litigant tries to sue in federal district court, but a separate system of administrative-agency courts has been set up?  Does she get to stay in the federal district court, or must she move over to the agency's courts, and await federal court review in the court of appeals?

The Supreme Court has answered these questions in a string of cases involving the Mine Safety and Health Administration, the Public Company Accounting Oversight Board, the Merit Systems Protection Board, and the Federal Trade Commission.

The anchor case in the chain is <u>Thunder Basin Coal Co.</u> v. <u>Reich</u>, 510 U.S. 200 (1994), and so the law in this area often goes by the shorthand of "<u>Thunder Basin</u>."

<u>Thunder Basin</u> law in a nutshell:

If Congress has explicitly pulled jurisdiction away from the federal district courts, the case goes to the agency for first-cut adjudication there.  <u>See</u> <u>Axon</u>, 598 U.S. at 185; <u>Adorers of the Blood of Christ</u> v. <u>FERC</u>, 897 F.3d 187, 195 (3d Cir. 2018); <u>accord</u>, <u>e.g.</u>, <u>Jarkesy</u> v. <u>SEC</u>, 803 F.3d 9, 15 (D.C. Cir. 2015); <u>Cochran</u> v. <u>SEC</u>, 20 F.4th 194, 205 (5th Cir. 2021); <u>Bank of La.</u> v. <u>FDIC</u>, 919 F.3d 916, 923 (5th Cir. 2019); <u>Jones Brothers, Inc.</u> v. <u>Sec'y of Lab.</u>, 898 F.3d 669, 675 (6th Cir. 2018); <u>E. Bridge, LLC</u> v. <u>Chao</u>, 320 F.3d 84, 88 (1st Cir. 2003).

But if Congress has <u>not</u> explicitly pulled jurisdiction away from the federal district courts, ask: is it "fairly discernible" that Congress intended for claims to go to administrative courts as opposed to federal district courts?  <u>See</u> <u>Elgin</u> v. <u>Dep't of Treasury</u>, 567 U.S. 1, 10 (2012); <u>Free Enter. Fund</u> v. <u>Pub. Co. Acct. Oversight Bd.</u>, 561 U.S. 477, 489 (2010); <u>see also</u> <u>Axon</u>, 598 U.S. at 185.[33]

_____

[33]  This question is mainly answered as matter of statutory interpretation --- with an eye, for example, on text and purpose.  <u>See</u> <u>Elgin</u>, 567 U.S. at 10; <u>Free Enter. Fund</u>, 561 U.S. at 489; <u>Thunder Basin</u>, 510 U.S. at 207; <u>Adorers</u>, 897 F.3d at 195; <u>accord</u>, <u>e.g.</u>, <u>Cochran</u>, 20 F.4th at 199–205; <u>Bank of La.</u>, 919 F.3d at 923; <u>Hill</u> v. <u>SEC</u>, 825 F.3d 1236, 1242 (11th Cir. 2016); <u>Tilton</u> v. <u>SEC</u>, 824 F.3d 276, 281 (2d Cir. 2016); <u>Bennett</u>

If the answer to the step-one "fairly discernible" question is "no," then the case stays in federal district court.

If the answer to the "fairly discernible" question is "yes," then the focus narrows, to the particular "type" of claim that is in play --- and whether (now, step-two) Congress wanted that type of claim to make its first stop in a federal court or before an administrative adjudicator. See Axon, 598 U.S. at 186; Elgin, 567 U.S. at 22; Free Enter. Fund, 561 U.S. at 489; Thunder Basin, 510 U.S. at 208; Adorers, 897 F.3d at 195; Kreschollek v. S. Stevedoring Co., 78 F.3d 868, 873 (3d Cir. 1996); accord, e.g., Cochran, 20 F.4th at 206; Tilton v. SEC, 824 F.3d 276, 281 (2d Cir. 2016); Bennett v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015); Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 40 (1st Cir. 1995).

To answer this "type" question, courts are to look to whether agency-first adjudication would: (1) supply "meaningful review"; (2) draw on agency expertise; and (3) run through issues that are core, rather than collateral. See Axon, 598 U.S. at 184-85; Elgin, 567 U.S. at 15; Free Enter. Fund, 561 U.S. at 489; Thunder Basin, 510 U.S. at 212-13; accord, e.g., Bank of La., 919 F.3d at 923; Hill v. SEC, 825 F.3d 1236, 1241 (11th Cir. 2016); Tilton, 824 F.3d at 281; Bennett, 844 F.3d at 181; Jarkesy, 803 F.3d at 17; Bebo, 799 F.3d at 769.

Of these three, "meaningful review" is by far the most important. See Bennett, 844 F.3d at 183 n.7; Hill, 825 F.3d at 1245; Tilton, 824 F.3d at 282; Bebo, 799 F.3d at 774.

Can there be "meaningful review" if Article III review is deferred until after the administrative court finishes its work and hands things over to the federal court of appeals?

Or does "meaningful review" require that the claim be heard, now, in the federal district court?[34]

---

v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015).

[34] Saying yes to this question would bypass Congress' broader choice to send claims to the agency's courts. But it would do so on the theory that Congress would have wanted a particular "type" of claim to go forward first in the federal district

C. **EOHC In Context**

Come back now to the EOHC case, and see it in light of the broader administrative law principles laid out just above.

EOHC was an immigration-adjudication case.

And as discussed, the basic structure of immigration adjudication is closely similar to the structure of administrative adjudication more generally. See Part V.B.1.

No surprise, then, that in those closely related contexts, similar questions are answered in roughly the same way.

The questions:

Do the relevant statutes mean that a case stays in federal district court? Or do they mean that a case is channeled in the first instance to agency tribunals, like SEC, FTC, or immigration courts --- and only after they are done with their work does the case potentially go to federal court, a federal court of appeals?

The answer:

Under Thunder Basin (for administrative law in general) and under EOHC (for immigration law in particular) the answer is largely the same: it depends on whether delayed federal court review is consistent with the imperative of "meaningful review."

The key point: EOHC was, in essence, applying general administrative law rules (the Thunder Basin rules) to closely related immigration law questions.

And EOHC applied Thunder Basin systematically.

EOHC precisely invoked Thunder Basin's step-one test. Compare Thunder Basin, 510 U.S. at 207 ("In cases involving delayed judicial review . . . , we shall find that Congress has allocated initial review to an administrative body where such intent is fairly discernible.") (emphasis added) (cleaned up), with EOHC, 950 F.3d at 188 ("We look to whether the congressional intent to preclude judicial review is fairly discernible in the statutory scheme.") (emphasis added) (cleaned up).

---

court if that is the way to get "meaningful review." See Thunder Basin, 510 U.S. at 212—13.

EOHC undertook the basic step-one analysis prescribed in Thunder
Basin.  Compare Thunder Basin, 510 U.S. at 207 (to get at the
question of Congressional intent, looking to a "statute's
language, structure, and purpose"), with EOHC, 950 F.3d at 188
("In discerning that intent, we look at the statute's 'text,
structure, and purpose.'") (quoting Elgin, 567 U.S. at 10).

And, as has been noted, EOHC focused on the main Thunder Basin
step-two concern --- "meaningful" judicial review.  Compare
Thunder Basin, 510 U.S. at 207 ("Whether a statute is intended
to preclude initial judicial review is determined from . . .
whether the claims can be afforded meaningful review."), with
EOHC, 950 F.3d at 180, 186, 189-90.[35]

*    *    *

In applying the Thunder Basin rules,[36] why did EOHC land on the
"meaningful review" rule?

Per the Thunder Basin line of cases, that is the standard to use
when Congress has not said in an "explicit" way that certain

---

[35]  EOHC also cited a source that mentioned one of the other two
Thunder Basin factors.  Compare Thunder Basin, 510 U.S. at 212
("[t]his Court previously has upheld district court jurisdiction
over claims considered wholly collateral to a statute's review
provisions"), with EOHC, 950 F.3d at 186 (citing the appellants'
reply brief at 16 --- which noted that "claims independent of or
collateral to the removal process are excluded").

[36]  Too much should not be made of the fact that EOHC did not
cite Thunder Basin or explicitly invoke its two-step analysis.
EOHC cited Elgin, see EOHC, 950 F.3d at 188, and that is a key
case in the Thunder Basin line.  More fundamentally, the
question of whether review will be "meaningful" --- and
therefore whether federal court review should be deferred in
favor of agency review --- has long been a part of
administrative law's DNA.  See Axon, 598 U.S. at 192; McNary v.
Haitian Refugee Ctr., 498 U.S. 479, 496 (1991); Mathews v.
Eldridge, 424 U.S. 319, 341 (1976); Goldberg v. Kelly, 397 U.S.
254, 262-63 (1970).  It long predates Thunder Basin and was
clearly part of the EOHC court's thinking.  Compare EOHC, 950
F.3d at 186 (citing McNary for the proposition that there was no
jurisdiction-stripping over certain claims when "meaningful
judicial review . . . would [otherwise] be foreclosed"), with
Thunder Basin, 510 U.S. at 213-14 (reasoning from McNary).

49

**JA 149**

types of cases must go to an administrative court.  <u>See</u> Part
V.B.1.

Presumably, the <u>EOHC</u> court did not view Congress as having
provided sufficiently "explicit" direction as to whether certain
cases must first go to immigration courts.[37]

<div align="center">*   *   *</div>

In a nutshell: to determine whether to apply Section 1252(b)(9)
to a given claim, <u>EOHC</u> applied <u>Thunder Basin</u>, and in particular
its "meaningful review" test.

### D.  **Massieu**

<u>EOHC</u> sits atop <u>Thunder Basin</u> --- and foregrounding this only
emphasizes the close continuity between <u>EOHC</u> and one of the
Third Circuit's key precedents in this area, <u>Massieu</u>.

To see the point, look now to <u>Massieu</u>.

During the mid-1990s, the federal government sought to remove a
Mexican national, Mario Ruiz Massieu, from the United States.
<u>See</u> <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416, 417-19 (3d Cir. 1996).

This was to be done based on a determination made by Secretary
of State Warren Christopher, using the same law invoked in this
case to seek the removal of the Petitioner.  <u>See</u> <u>id.</u> at 418.

Massieu sued, and Judge Barry, then of this Court, ruled that
she had jurisdiction over the case.  <u>See</u> <u>Massieu</u> v. <u>Reno</u>, 915 F.

---

[37]  And such a conclusion is not surprising.  After all, the
argument that there is an "explicit" congressional directive as
to where cases should go rests largely on Section 1252(b)(9).
But <u>Chehazeh</u> held that in <u>this</u> "type" of case, a pre-order-of-
removal case, Section 1252(b)(9) is inapplicable.  And in any
event, the Justices have suggested a range of different views as
to whether Section 1252(b)(9) applies before entry of an order
of removal.  <u>See</u> footnote 25.  That suggests that the
explicitness test is not met, especially against the backdrop of
the various presumptions against jurisdiction-stripping that
<u>EOHC</u> leaned on.  <u>See</u> 950 F.3d at 184.

**JA 150**

Supp. 681, 697 (D.N.J. 1996), <u>rev'd</u>, 91 F.3d 416 (3d Cir.
1996).[38]

The Third Circuit, per then-Judge Alito, reversed.  <u>See</u> <u>Massieu</u>,
91 F.3d at 425.  It held that the case needed to first go to the
immigration courts.  <u>See</u> <u>id</u>.

The Third Circuit in <u>Massieu</u> came to that conclusion by
analyzing the case using the two-step <u>Thunder Basin</u> doctrine
described above in Part IV.B.

First, Judge Alito looked to text, purpose, and other sources to
decide if Congress had expressed a "fairly discernible" intent
to send the case to an immigration judge in the first instance,
and not to a federal district judge.  <u>See</u> <u>id</u>. at 420.

And the <u>Massieu</u> court then went to the second step, moving
through each of the required <u>Thunder Basin</u> factors --- the
critical "meaningful review" factor, plus the "collateral" and
"expertise" factors.  <u>See</u> <u>id</u>. at 422.

                    *    *    *

<u>Massieu</u> is relevant here in three main ways.

                    *    *    *

<u>First</u>, <u>Massieu</u> is very similar to this case.

The Respondents go so far as to say it is "on all fours."  <u>See</u>
Opposition Brief at 12.  And there is a lot to that.  <u>Massieu</u>
involved the same statute as this case (what is now 8 U.S.C.
§ 1227(a)(4)(C)(i)) and the same question as this case (in what
court should the claim start?).

Whether <u>Massieu</u> controls the outcome here is taken up in the
next Part.

                    *    *    *

<u>Second</u>, <u>Massieu</u>, as noted, is closely consistent with <u>EOHC</u>.

<u>EOHC</u> and <u>Massieu</u> land in the same place --- on a concern for
"meaningful review" as a key touchstone for deciding whether a

---

[38]  On the merits, Judge Barry held that 8 U.S.C.
§ 1251(a)(4)(C)(i) (now 8 U.S.C. § 1227(a)(4)(C)(i)) is
unconstitutionally vague.  <u>See</u> <u>Massieu</u>, 915 F. Supp. at 703.
The Petitioner here has not made that argument.  <u>See</u> footnote 7.

**JA 151**

case must go to the immigration courts before a federal district court.

EOHC and Massieu thus point in the same direction.

Each suggests that, on the assumption that Section 1252(b)(9) applies here,[39] this Court must conduct a Thunder Basin-type analysis, and with an emphasis on Thunder Basin's most important factor --- "meaningful" judicial review.[40]

                    *    *    *

Third and finally, Massieu undermines any argument that the immigration laws in some "explicit" way require that this case be sent now to the immigration courts.

After all, if the immigration laws were explicit on that point, then Judge Alito's opinion would not have done what it did. It would not have conducted a Thunder Basin analysis --- because that is called for only when the relevant laws are not explicit.[41]

---

[39] See Part IV.B and Part IV.C.

[40] EOHC and Massieu are no outliers. Federal courts often rely on Thunder Basin to decide whether a claim should be heard in immigration courts or in the federal district court. See, e.g., Miriyeva v. U.S. Citizenship & Immigr. Servs., 9 F.4th 935, 939 (D.C. Cir. 2021); Adi v. Mayorkas, 2022 WL 267989, at *7 (N.D. Ill. Jan. 28, 2022); O.A. v. Trump, 404 F. Supp. 3d 109, 136 (D.D.C. 2019); Ramirez v. U.S. Immigr. & Customs Enf't, 338 F. Supp. 3d 1, 37 (D.D.C. 2018); Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 30-31 (D.D.C. 2018); Jafarzadeh v. Duke, 270 F. Supp. 3d 296, 308 (D.D.C. 2017); see also J.E.F.M. v. Lynch, 837 F.3d 1026, 1035-36 (9th Cir. 2016); Aguilar, 510 F.3d at 11; cf. Duron v. Johnson, 898 F.3d 644, 647 (5th Cir. 2018).

[41] And the point can be seen more directly, too. For the key proposition, Massieu cited a federal-common-law rule and a treatise, not an explicit statutory provision.

> Even where an alien is attempting to prevent
> an exclusion or deportation proceeding from
> taking place in the first instance and is
> thus not, strictly speaking, attacking a
> final order of deportation or exclusion, it

To be sure, the immigration laws have changed a good deal since Massieu was handed down in 1996.

But the three main statutes that Judge Alito reasoned from remain on the books, and in substantively similar form.

The main one was 8 U.S.C. § 1105a(c) (1996) ("[A]n order of deportation . . . shall not be reviewed by any court if the alien has not exhausted the administrative remedies[.]").

It has since been revised, with the current version at 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies.").

But the two statutes "state[] the same requirements in essentially the same language." Duvall v. Elwood, 336 F.3d 228, 231 (3d Cir. 2003). Indeed, the Third Circuit has held that Massieu's analysis still governs Section 1252(d)(1). See id. at 232.

And the two other statutes that Massieu relied on also remain on the books, tweaked here and there but substantively the same. Compare 8 U.S.C. § 1105a(a) (1996) ("the sole and exclusive procedure for . . . the judicial review of all final orders of deportation" is through a petition for review), and 8 U.S.C.

---

is well settled that "judicial review is precluded if the alien has failed to avail himself of all administrative remedies," one of which is the deportation or exclusion hearing itself. See, e.g., Xiao v. Barr, 979 F.2d 151, 153 (9th Cir. 1992); see also 3 Charles Gordon & Stanley Mailman, Immigration Law and Procedure § 81.02[2], at 81-26-28 (1996) ("A person against whom a deportation proceeding is brought may feel that the proceeding is unjustified and illegal but generally has no right to go to court immediately to stop the proceeding. Congress has provided an administrative device for passing upon an alien's deportability, and generally there must be a final administrative ruling before judicial review can be initiated.").

Massieu, 91 F.3d at 421.

§ 1252(b) (1996) ("[T]he [administrative] procedure so
prescribed shall be the sole and exclusive procedure for
determining the deportability of an alien under this section."),
with 8 U.S.C. § 1252(a)(5) ("[A] petition for review filed with
an appropriate court of appeals . . . shall be the sole and
exclusive means for judicial review[.]"), and 8 U.S.C.
§ 1229a(a)(3) ("[A] proceeding under this section shall be the
sole and exclusive procedure for determining whether an alien
may be . . . removed from the United States.").

And the most relevant new, post-Massieu statute ---
Section 1252(b)(9) --- either does not apply to this case, per
Chehazeh, or does not provide explicit enough direction. See
footnote 37.

###　E.　Conclusion

Pause now briefly to see where things stand:

The Third Circuit in Chehazeh held that Section 1252(b)(9) does
not apply to cases like this one, in which no order of removal
has been entered. Therefore, Section 1252(b)(9) is irrelevant
here, and does not strip this Court of jurisdiction. See
Part IV.

But even if Section 1252(b)(9) were understood to apply here, as
EOHC might suggest, see Part V.A, that Section would apply only
when sending a case to the immigration courts is consistent with
the Thunder Basin requirement of "meaningful review."

That was the approach the Third Circuit took in EOHC, see Part
V.B and Part V.C, and that is consistent with the Third
Circuit's approach in Massieu. See Part V.D.

So assuming arguendo that Section 1252(b)(9) applies here, the
question is this: would this case get the required "meaningful
review" if it starts out in immigration court, as opposed to
here?

Take that up in the next Part.

## VI.　Meaningful Review

Immigration courts are tasked with doing important work on
behalf of our country. According to recent statistics, for
example, there are almost four million pending immigration cases
spread out across 700 or so immigration judges. See Pending

**JA 154**

Cases, New Cases, and Total Completions, Exec. Off. for Immigr. Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025); Office of the Chief Immigration Judge, Exec. Off. for Immigr. Rev., https://perma.cc/8H5S-EPW6 (accessed on Apr. 29, 2025).

But different institutions are built for different tasks and given different tools.

Immigration courts are not legally permitted to provide the relief (striking down the Secretary of State's determination) that the Petitioner seeks here. See Part VI.A.

And immigration courts cannot be expected to undertake the fact-finding that may potentially be required to evaluate the Petitioner's claim that the Secretary's determination is unconstitutional. See Part VI.B.

To be sure, immigration courts routinely tee up constitutional issues for eventual review by federal courts of appeals --- even when the immigration courts themselves lack the power to remedy the alleged violation.

But the immigration courts cannot do that here --- in part because of a prior Board of Immigration Appeals decision. See Part VI.C.

What this adds up to: the immigration courts could not meaningfully develop this case, legally or factually. Therefore, the period that might be spent before those courts will not advance the ball.

In some circumstances, that may be just how it has to be. Cases can take a while to resolve. And sending cases to the immigration courts is typically required even when doing so will accomplish only a modest amount.

But in this case, what can be accomplished is much less than that.

And a period of delay while this case is pending before the immigration courts, knowing that there will be little or nothing to show for it --- that does not work.

The reason is this: the Petitioner's core argument is that his free speech rights are being violated, now. See Part VI.D.

And the Supreme Court has held over and over again, in numerous contexts, that meaningful review of First Amendment claims generally means rapid, prioritized review. See id.

That is not consistent with postponing federal court consideration of the Petitioner's First Amendment claims.

Begin seeing all of this just below.

### A.  <u>Legal Remedies</u>

As has been discussed, the Petitioner claims that the Secretary of State's determination is a product of First Amendment retaliation, and that this Court should therefore enter an order to vacate it.  <u>See</u> Motion for Preliminary Injunction at 9-10; <u>see also</u> Petition ¶¶ 88-90.

Can the immigration courts do this?

The Respondents say the answer is no.[42]

Under the heading "The IJ Cannot Vacate the Secretary of State's Determination or Issue the Requested Injunction," they say:

> The authority of immigration judges comes from the INA and regulations.  The INA provides that an immigration judge "shall conduct proceedings for deciding the inadmissibility or deportability of an alien."  The immigration judge has the authority to determine removability and to adjudicate requests for certain forms of relief from removal.  The INA and implementing regulations do not provide the immigration judge with general injunctive or equitable authority.  Thus, an immigration judge cannot order the Secretary of State to

---

[42]  Were the Petitioner seeking to invalidate Section 1227(a)(4)(C)(i) on constitutional grounds, which he is not, <u>see</u> footnotes 7 and 38, the immigration courts would lack the power to do that, too.  <u>See</u> <u>In re Salazar-Regino</u>, 23 I. & N. Dec. 223, 231 (BIA 2002) ("We have long declared that we lack authority to rule on the constitutionality of the statutes we administer."); <u>see also</u> <u>Johnson</u> v. <u>Robison</u>, 415 U.S. 361, 368 (1974) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."); <u>accord</u>, <u>e.g.</u>, <u>Breinza-Schettino</u> v. <u>Att'y Gen. of U.S.</u>, 221 F. App'x 140, 144-45 (3d Cir. 2007); <u>Nehme</u> v. <u>INS</u>, 252 F.3d 415, 421 (5th Cir. 2001); <u>Liu</u> v. <u>Waters</u>, 55 F.3d 421, 426 (9th Cir. 1995).

>           take or not take any action regarding the
>           type of foreign policy determination at
>           issue here.

Respondents' Letter (Apr. 11, 2025) (ECF 190) at 2 (cleaned up).

                        *     *     *

But this way of thinking is too formalistic.

When a court is asked to put a stop to allegedly illegal
behavior that is happening out in the world, the request is
usually framed as an ask for an injunction.

But things are different when a judge is asked to issue an order
as to a matter happening right before her, in her own courtroom.

Imagine a judge overseeing a criminal prosecution.  Drugs were
seized (but there was no warrant), and a confession was made
(but there were no <u>Miranda</u> warnings).

The defendant might want an order from the court suppressing the
evidence, so that the jury cannot learn of it.  Order that the
drugs be excluded as the fruit of a Fourth Amendment violation,
the defendant will say.  And order that the confession be put
aside, as the product of a Fifth Amendment breach.

But the defendant, seeking an order, will not describe this as a
request for an injunction (which is, after all, a kind of
order).[43]

---

[43]  One reason is this: an injunction generally issues only based
on a sense, among other things, that the public interest demands
it.  <u>See</u>, <u>e.g.</u>, <u>Monsanto Co.</u> v. <u>Geertson Seed Farms</u>, 561 U.S.
139, 156–57 (2010); <u>Winter</u> v. <u>Nat'l Res. Def. Council, Inc.</u>, 555
U.S. 7, 20 (2008); <u>eBay, Inc.</u> v. <u>MercExchange, LLC</u>, 547 U.S.
388, 391 (2006); <u>see also</u> Samuel L. Bray, <u>The System of
Equitable Remedies</u>, 63 UCLA L. Rev. 530, 585–86 (2016).  A
defendant wants to argue that drugs should be suppressed because
the search was illegal.  He does not want to <u>also</u> have to argue
that suppressing the drugs is a good from the perspective of the
public interest.  (And equitable claims are especially difficult
to make out in any number of other ways, too.  For example, at
least some suppression orders likely could not issue as
injunctions because the defendant, seeking to suppress what is
his own contraband, <u>see</u> <u>Rakas</u> v. <u>Illinois</u>, 439 U.S. 128, 133–34

All of this implies that the right question here is not whether the immigration courts can <u>enjoin</u> the Secretary's determination as being the result of a violation of the First Amendment --- but rather whether the immigration courts can <u>suppress</u> the Secretary's determination as a violation of the First Amendment.

And a suppression framing makes sense on the facts of this case.

After all, the Secretary of State's determination is evidence (indeed, the only evidence) put forward in support of the Department of Homeland Security's effort to remove the Petitioner under Section 1227(a)(4)(C)(i).

And evidence obtained at Time 2 is sometimes ordered suppressed at Time 3 because it was gathered at Time 1 in violation of the Fourth Amendment or the Fifth. So why not the First?

The immigration courts, as noted, do not have power to <u>enjoin</u> the Secretary of State's determination on the grounds that it violates the First Amendment.

But do they have the power to <u>suppress</u> the Secretary's determination on those same grounds?

                    \*     \*     \*

Shifting the framing clarifies the question to ask. But it does not change the answer.

The reason: with a caveat taken up below in footnote 46, the Supreme Court has held that in removal proceedings the Fourth Amendment exclusionary rule is not available; evidence obtained in violation of the Fourth Amendment can come in. <u>See</u> <u>INS</u> v. <u>Lopez-Mendoza</u>, 468 U.S. 1032, 1034 (1984).

Part of the explanation is that the immigration courts, per the Supreme Court in <u>Lopez-Mendoza</u>, were built to quickly determine whether someone is removable --- not to ask and answer broader questions, such as whether someone else violated the Constitution. <u>Lopez-Mendoza</u>:

---

(1978), could not make the "clean hands" showing that equity typically requires. <u>See</u> <u>Precision Instrument Mfg. Co.</u> v. <u>Auto. Maint. Mach. Co.</u>, 324 U.S. 806, 814 (1945); <u>Johnson</u> v. <u>Yellow Cab Transit Co.</u>, 321 U.S. 383, 387 (1944); <u>see</u> <u>also</u> Bray at 581.)

The INS currently operates a deliberately
simple deportation hearing system,
streamlined to permit the quick resolution
of very large numbers of deportation
actions, and it is against this backdrop
that the costs of the exclusionary rule must
be assessed.  The costs of applying the
exclusionary rule, like the benefits, must
be measured at the margin.

[In 1984] [t]he average immigration judge
handles about six deportation hearings per
day.  Neither the hearing officers nor the
attorneys participating in those hearings
are likely to be well versed in the
intricacies of Fourth Amendment law.  The
prospect of even occasional invocation of
the exclusionary rule might significantly
change and complicate the character of these
proceedings.

Id. at 1048.

In support of its approach, the Lopez-Mendoza Court quoted the
Board of Immigration Appeals, which was also opposed to Fourth
Amendment exclusion remedies in immigration courts.  The Board,
as quoted by the Supreme Court:

Absent the applicability of the exclusionary
rule, questions relating to deportability
routinely involve simple factual allegations
and matters of proof.  When Fourth Amendment
issues are raised at deportation hearings,
the result is a diversion of attention from
the main issues which those proceedings were
created to resolve, both in terms of the
expertise of the administrative decision
makers and of the structure of the forum to
accommodate inquiries into search and
seizure questions.  The result frequently
seems to be a long, confused record in which
the issues are not clearly defined and in
which there is voluminous testimony. . . .
The ensuing delays and inordinate amount of
time spent on such cases at all levels has
an adverse impact on the effective

> administration of the immigration
> laws. . . .  This is particularly true in a
> proceeding where delay may be the only
> "defense" available and where problems
> already exist with the use of dilatory
> tactics.

Id. at 1048–49 (quoting Matter of Sandoval, 17 I. & N.
Dec. 70, 80 (BIA 1979)).

Building the record for a Fourth Amendment suppression challenge
would not always very dramatically "change and complicate"
removal hearings.  See id. at 1048.

After all, in many cases the Fourth Amendment suppression
evidence would come in wholly through the immigration agents who
made the relevant arrest in the first place.  See id. at 1043
("[T]he agency officials who effect the unlawful arrest are the
same officials who subsequently bring the deportation action.").

But even given that, the Supreme Court determined in Lopez-
Mendoza that the "diversion of attention" implicit in Fourth
Amendment suppression hearings weighed against allowing Fourth
Amendment suppression motions to be made in immigration
proceedings.  See id. at 1048–49.

But if Fourth Amendment suppression motions cannot generally be
made --- then surely First Amendment suppression motions have no
place, either.

If a Fourth Amendment suppression hearing (typically involving
testimony from arresting immigration agents) is a bridge too
far, then a First Amendment suppression hearing (which in this
case could conceivably seek testimony from our country's top
officials) is also a bridge too far --- and then some.

                         *     *     *

The conclusion set out just above is buttressed from two sides.

First, look to the one on-point case in this area.  The Second
Circuit was asked whether immigration courts can consider a
First Amendment suppression argument.  Its answer was no.  See
Montero v. INS, 124 F.3d 381 (2d Cir. 1997) ("We decline [the]
invitation to fashion an exclusionary rule for evidence obtained
in violation of an individual's First Amendment rights.")
(citing Lopez-Mendoza).

And second, look to what the immigration judge in this case said about the scope of her powers.[44]

Before the immigration judge, the Petitioner made various motions to compel discovery.  For example, he moved to issue a subpoena to the Secretary of State, as well as to compel the production of certain documents.[45]

But the immigration judge denied those motions.

She said the authority of immigration judges "is very limited to two things.  Is [the Petitioner] removable from the United States, and does he have relief available to him from removal if he is found removable."  Audio Recording of Hearing (April 8,

---

[44]  In deciding whether "meaningful review" can be conducted before an administrative court, federal courts routinely look to what the administrative court has in fact actually done.  Take Jarkesy v. SEC, 803 F.3d 9 (D.C. Cir. 2015).  There, an investment advisor filed suit in a federal district court, pressing constitutional claims.  Could an SEC administrative law judge provide meaningful review?  Yes, the D.C. Circuit answered.  See id. at 28.  How to know?  Because the D.C. Circuit had read the administrative law judge's decisions and observed that she had "considered and rejected" the plaintiff's arguments.  Id.  Another example: in Aguilar v. U.S. Immigration and Customs Enforcement Division, 510 F.3d 1 (1st Cir. 2007), the First Circuit asked whether the petitioners could have gotten "effective relief" for their right-to-counsel claims through the immigration courts.  Yes, the First Circuit held.  Id. at 14.  "The proof" was that during the removal proceedings "each petitioner who requested a continuance for the purpose of retaining counsel received one."  Id.  And a final example.  The Fifth Circuit considered whether the Federal Deposit Insurance Corporation's administrative proceedings could adequately assess claims that the "enforcement proceedings were tainted by constitutional violations."  See Bank of La., 919 F.3d at 926.  Yes.  Part of why: the administrative law judge, per the Fifth Circuit, had written a "lengthy, detailed, and well-reasoned opinion" on the claims, such that it was clear that the proceedings qualified as "meaningful judicial review."  Id.

[45]  It appears that this was likely understood as connected to a First Amendment issue.  See April 11 Audio Recording at 23:50 to 25:24.

2025) ("April 8 Audio Recording") at 21:12 to 21:24; <u>see</u> Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

And the immigration judge suggested that to the extent any constitutional issues were being raised, she could not take them on.  <u>See</u> April 11 Audio Recording at 1:35:35 to 1:36:00 ("I understand . . . that you would like to challenge the authority of the Secretary of State . . . , but you will need to take that up with Congress.  This court is without jurisdiction to entertain challenges to the validity of such laws under the Constitution."); <u>see also</u> April 8 Audio Recording at 21:12 to 21:24; Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

Finally, as to seeking a subpoena for the Secretary of State, the immigration judge said of the Petitioner that he was "in the wrong court for that."  April 8 Audio Recording at 20:55-58; <u>see</u> Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

\*     \*     \*

In a nutshell:

The Petitioner seeks here an injunction vacating the Secretary of State's determination.  But the immigration courts cannot issue injunctions.  And they cannot suppress evidence (like the Secretary's determination) on First Amendment grounds.  That conclusion is based on an analogy to Fourth Amendment suppression, an on-point Second Circuit decision, and the immigration judge's approach here.[46]

---

[46]  A final note.  In <u>Lopez-Mendoza</u>, a plurality of the Court, not a majority, said this: "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."  468 U.S. at 1050-51. This left the door open, and a number of circuits have held that suppression is indeed available in immigration courts when the Fourth Amendment is violated in sufficiently "egregious" or "widespread" ways.  <u>See</u>, <u>e.g.</u>, <u>Corado-Arriaza</u> v. <u>Lynch</u>, 844 F.3d 74, 77 (1st Cir. 2016); <u>Almeida-Amaral</u> v. <u>Gonzales</u>, 461 F.3d 231, 235 (2d Cir. 2006); <u>Yoc-Us</u> v. <u>Att'y Gen. U.S.</u>, 932 F.3d 98, 111 (3d Cir. 2019); <u>Yanez-Marquez</u> v. <u>Lynch</u>, 789 F.3d 434, 450 (4th Cir. 2015); <u>Puc-Ruiz</u> v. <u>Holder</u>, 629 F.3d 771, 778 (8th Cir. 2010); <u>Martinez-Medina</u> v. <u>Holder</u>, 673 F.3d 1029, 1033-34 (9th Cir. 2011).  Other circuits have suggested openness to such an

**B.    Factual Development**

As noted just above, the immigration courts cannot give the Petitioner the legal relief he seeks as to the Secretary of State's allegedly unconstitutional determination.  Whether through injunction or suppression --- the immigration courts cannot push aside the Secretary's determination.

But in some cases, a person is suing to get a statute invalidated as it applies to him.

And most of the time (if not all of the time) that is not something that an agency court is legally empowered to do.

---

exception.  See, e.g., United States v. Navarro-Diaz, 420 F.3d 581, 587 (6th Cir. 2005).  Maybe it could be argued that the "egregious" exception leaves room for First Amendment suppression in this case?  The argument would presumably run like this: (a) the Lopez-Mendoza plurality allowed for the possibility of an "egregious" Fourth Amendment suppression exception, (b) the exception does in fact exist, (c) it should be extended to the First Amendment suppression context in general, and (d) to this "egregious" case in particular.  If this argument is persuasive, then maybe the immigration courts could provide a First Amendment suppression remedy here.  But the argument does not work.  The reason: link (b) in the chain cannot hold up.  The immigration judge here is in Louisiana, so any review will be to the Fifth Circuit, see 8 U.S.C. § 1252(b)(2), whose precedent will control.  See Ballesteros v. Ashcroft, 452 F.3d 1153, 1157 (10th Cir. 2006).  And the Fifth Circuit has flatly held that "[i]t is well established that the fourth amendment exclusionary rule is not to be applied in deportation proceedings."  Mendoza-Solis v. INS, 36 F.3d 12, 14 (5th Cir. 1994).  (Some other Fifth Circuit cases seem to go the other way, and to treat an "egregious" Fourth Amendment suppression exception as a part of the law.  But one is dicta in a Bivens case.  See De La Paz v. Coy, 786 F.3d 367, 376 (5th Cir. 2015).  And the rest are cases not selected for publication.  See Escobar v. Holder, 398 F. App'x 50, 53 (5th Cir. 2010); Gonzalez-Reyes v. Holder, 313 F. App'x 690, 695 (5th Cir. 2009); Verduzco-Contreras v. Gonzalez, 160 F. App'x 406, 408 (5th Cir. 2005).  Under the Fifth Circuit's rules, see 5th Cir. R. 47.5, unpublished cases are out of bounds.)

63

**JA 163**

But even in those sorts of circumstances, federal courts often require that the case be sent first to an administrative court. See Elgin, 567 U.S. at 17; Thunder Basin, 510 U.S. at 215; Massieu, 91 F.3d at 426; accord, e.g., Hill, 825 F.3d at 1245; Tilton, 824 F.3d at 279, 290; Bennett, 844 F.3d at 176, 184; Bebo, 799 F.3d at 767, 771; Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 376 F.3d 239, 243–44 (4th Cir. 2004).

There are a number of reasons why.

One of them: even if the agency's courts cannot themselves deliver the requested remedy, they can prepare the field --- by finding the facts, so that a federal court of appeals will have a solid record to work from when it gets the case. See Elgin, 567 U.S. at 19–20; accord, e.g., Bank of La., 919 F.3d at 927; Chau v. SEC, 665 F. App'x 67, 71 (2d Cir. 2016); Hill, 825 F.3d at 1249; Jarkesy, 803 F.3d at 21–22; Bebo, 799 F.3d at 773.

But in this case, the immigration courts would not be able to do the fact-finding that a federal court of appeals would need down the road.

The Court explains why here.

                    *     *     *

To see the limits of the immigration courts' fact-finding, try to peer around the corner --- to predict the sorts of factual issues that may possibly come up as the case unfolds.[47]

One of those issues is suggested by the Respondents, and it provides a helpful example of the fact-finding difficulties that the immigration courts would encounter in this case.

The Petitioner claims that his detention is the product of First Amendment retaliation. See Motion for Preliminary Injunction at 3; see also Petition ¶¶ 88–90. But the Respondents say that this argument "is likely to fail." Opposition Brief at 28.

The reason why: to make out a retaliatory-detention claim under the First Amendment, the Respondents say, the Petitioner must show that there was no probable cause for his arrest. See

---

[47] The discussion in this section assumes that fact-finding is necessary. But the Court has not developed views on whether this case can be resolved on the papers, or will require evidentiary development.

64

**JA 164**

Nieves v. Bartlett, 587 U.S. 391, 402 (2019) (cited by the
Opposition Brief at 28).

But, the Respondents argue, the Petitioner cannot make that
showing. See Opposition Brief at 28. The Secretary of State's
determination and the Petitioner's alleged failure-to-disclose
on his lawful permanent resident application are said to be
"facially valid reasons" to remove him from the country. Id. at
28.

Therefore, the Respondents' argument goes, federal officials had
probable cause to detain the Petitioner --- and under Nieves,
cited just above, his First Amendment argument hits a quick dead
end. See id.

Moreover, the Respondents argue, the Petitioner has not tried to
use the exception to all this that the Supreme Court suggested
in Nieves. See id. at 28-29.

Under that exception, the Petitioner may not actually need to
establish an absence of probable cause. Per the Nieves Court:
"The no-probable-cause requirement should not apply when [the
Petitioner] presents objective evidence that he was arrested
when otherwise similarly situated individuals not engaged in the
same sort of protected speech had not been." 587 U.S. at 407.

Look just a bit over the horizon, and it seems possible that the
Petitioner could try to press a selective-enforcement defense --
- contending, presumably, that other "similarly situated
individuals" have not been the subject of a
Section 1227(a)(4)(C)(i) determination by the Secretary of
State.

To make out this defense, the Petitioner would potentially seek
some discovery --- as to others, for example, against whom
enforcement actions may not have been taken, and perhaps as to
the decision-making process of senior federal officials.

Can the immigration courts provide "meaningful" factual
development as to those issues?

It is hard to see how they could.

The Supreme Court, after all, has suggested that even narrow-
gauge Fourth Amendment suppression hearings are not a good fit
for the tight focus of the immigration courts. See Lopez-
Mendoza, 468 U.S. at 1046-50.

And as noted above, the immigration judge in this case herself declined to permit any discovery. See April 8 Audio Recording at 20:55-58 (stating the Petitioner was "in the wrong court" for obtaining a subpoena of the Secretary).[48]

\*     \*     \*

Given the limits of fact-finding in the immigration courts, federal courts have sometimes taken up immigration claims, rather than require them to wind their way through agency courts.

---

[48]  Selective enforcement can be raised as a kind of defense to a defense, as in Nieves: does selective enforcement undermine the probable cause defense to a First Amendment retaliation claim? But selective enforcement can also be raised in more garden-variety affirmative contexts: was a person targeted for immigration enforcement in the first place based on selective enforcement?  See Ragbir v. Homan, 923 F.3d 53, 62, 67 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227 (2020); AADC, 70 F.3d at 1052; Massieu, 91 F.3d at 418.  Can the immigration courts draw on their experience when it comes to building out the second sort of selective-enforcement case to develop a factual record as to selective enforcement that is raised in the first context?  Not really. The reason is that affirmative selective-enforcement claims are very rarely handled by the immigration courts.  For nearly 30 years, such claims have largely been unavailable to noncitizens without lawful status in the United States.  See AADC, 525 U.S. at 488 ("[A]n alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation").  And even before AADC foreclosed many selective-enforcement claims, immigration courts generally steered clear of them --- largely to avoid trenching on federal immigration officials' discretion.  See Matter of Merced, 14 I. & N. Dec. 644, 645 (BIA 1974); Matter of Lennon, 15 I. & N. Dec. 9, 12 (BIA 1974), overruled on other grounds by Matter of Esqueda, 20 I. & N. Dec. 850 (BIA 1994); Matter of Geronimo, 13 I. & N. Dec. 680, 681 (BIA 1971); see also Corredor v. Holder, 481 F. App'x 442, 444 (10th Cir. 2012); Cortez-Felipe v. INS, 245 F.3d 1054, 1057 (9th Cir. 2001); AADC, 70 F.3d at 1055; Johns v. Dep't of Just., 653 F.2d 884, 889 (5th Cir. 1981); Lopez-Telles v. INS, 564 F.2d 1302, 1304 (9th Cir. 1977) ("The immigration judge is not empowered to review the wisdom of the INS in instituting the proceedings.  His powers are sharply limited[.]").

For example, in McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), the respondents challenged certain INS amnesty procedures in a federal district court.  See 498 U.S. at 487–88. But did they have to go through the immigration courts first?

No, the Supreme Court held.

The case was a "pattern and practice case," because it challenged "[a] pattern of . . . unconstitutional practices." Id. at 497 (cleaned up).

Pattern-and-practice cases require a "substantial amount of evidence," and an immigration judge adjudicating one particular case would not have been able to gather it.  Id.  This would leave the federal court of appeals in a bad spot; it "would be in [no] position to provide meaningful review of the type of claims raised."  Id.

So the Supreme Court's decision: no need for the case to go to the immigration courts --- keep it in the federal district court.  See id. at 494.

McNary is not directly on-point.

But it speaks to the idea that when it comes to "meaningful" development of the factual record --- and the knock-on question of whether adjudication in the immigration courts is required --- federal courts do not need to turn a blind eye to a common-sense reality.[49]

And that is this: immigration courts are mainly built for close-to-the-ground fact-finding.  Not for fleshing out the record as to potentially sweeping claims --- related to "pattern and practice" issues, McNary, 498 U.S. at 497, for example, or selective enforcement.

And sweeping claims are plainly what the Petitioner is pressing here.[50]

---

[49]  See generally Tennessee v. Dep't of Educ., 104 F.4th 577, 606 (6th Cir. 2024) (suggesting that "practical realities" influence whether there is "meaningful review" under Thunder Basin).

[50]  As briefly alluded to above, immigration courts are high-volume affairs.  As of March 2025, there were around 3.9 million cases in the backlog.  See Pending Cases, New Cases, and Total

<center>*    *    *</center>

As to the fact-finding difficulties here for the immigration courts, consider briefly a final added point.

One of the Petitioner's core arguments is that he is being retaliated against under a policy formulated by the most senior officials in the federal government.  See Motion for Preliminary Injunction at 3; see also Petition ¶¶ 29-36.

More on that allegation later, in Part VIII.

For now, note that there is at least a potential argument under the Supreme Court's decision in Lozman v. Riviera Beach, 585 U.S. 87, 100-01 (2018), that the existence of such a policy could undo the argument the Respondents have made here --- namely, the argument that probable cause is a full defense to an arrest made in retaliation for First Amendment activity.  See Opposition Brief at 28.

This means that the salience of the Nieves question (was there probable cause such that First Amendment retaliation may not matter?) could potentially turn under Lozman on the answer to an earlier and broader question (was there an official policy of retaliation?).

---

Completions, Exec. Off. for Immigr. Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025).  Roughly 360,000 of those cases were added in 2025.  See id.  This has an everyday impact. Per a 2022 congressional report, some immigration judges reported having nearly 5,000 pending cases; others reported they heard 80 cases each day.  Holly Straut-Eppsteiner, Cong. Rsch. Serv., R47077, U.S. Immigration Courts & the Pending Cases Backlog 22 (2022); cf. Malets v. Garland, 66 F.4th 49, 59 (2nd Cir. 2023) ("We have repeatedly recognized the extraordinary caseload burdens faced by IJs."); Abulashvili v. Att'y Gen. of U.S., 663 F.3d 197, 208 (3d Cir. 2011) ("We readily acknowledge that an IJ's position is an impossibly demanding and challenging one.").  The typical fact-finding in these cases does not appear extensive.  When a person is detained, the first hearing seems to typically be the only one.  See Ingrid Eagly & Steven Shafer, Detained Immigration Courts, 110 Va. L. Rev. 691, 756 (2024). (Part of why: while discovery tools exist, see 8 C.F.R. §§ 1003.10(b), 1003.35, they are rarely used in practice.  See Geoffrey Heeran, Shattering the One-Way Mirror: Discovery in Immigration Court, 79 Brook. L. Rev. 1569, 1582-84 (2014).)

<center>68</center>

<center>**JA 168**</center>

If fact-finding is one day required as to such a policy --- whether it exists, what its scope might be, whether it led to the Petitioner's detention --- it cannot be done in a "meaningful" way by the immigration courts, for reasons that have already been discussed (and that were the focus of the Supreme Court's "pattern and practice" decision in McNary).

But that is only the tip of the iceberg.

Deciding, for example, whether Lozman applies to a case like this one, involving only federal officials, may require some complex legal judgments about constitutional questions that have not yet been resolved in all federal circuits. See, e.g., Novak v. City of Parma, 932 F.3d 421, 429 (6th Cir. 2019) (suggesting that Lozman is only relevant as to claims against municipalities).

And that question may need to be answered at the threshold of any fact-finding, to determine the scope of discovery.

If Lozman applies, the Petitioner may try to prove up a policy --- and to seek out evidence accordingly.

And if Lozman does not apply, then maybe what matters is only proof as to probable cause and selective enforcement --- which may imply a different (though still potentially wide) scope for discovery.

\* \* \*

Bottom line: the immigration courts cannot be expected to supply sufficiently substantial fact-finding as to the allegations in this case.

And the threshold questions that may determine the scope of any possible discovery seem to themselves require knowledge as to complex areas of constitutional law, areas that are removed from the legal issues the immigration courts typically consider.[51]

---

[51] The "meaningful review" test is designed to get a handle on what Congress' intent for a certain "type" of case might have been. See Thunder Basin, 510 U.S. at 212. In terms of how factual development might go forward --- would Congress have wanted a case like this one to be handled by the immigration courts? The first proposed subpoena here was to a cabinet official, and the allegations in this case quote statements made

69

**JA 169**

## C. __Expertise__

The focus to this point has been on what the immigration courts could accomplish in this case.

Could they grant the Petitioner the legal relief he seeks? Could they substantially develop the factual record?

The Court's answer has been no to each question.  See Part VI.A and Part VI.B.

The implications of this are taken up in Part VI.D, which considers whether the Petitioner could get the required "meaningful review" of his claim if it first goes to the immigration courts.

Before getting there, though, take a quick detour --- to see the impact here of a decision of the Board of Immigration Appeals.

*      *      *

"Meaningful review" is the most important of the __Thunder Basin__ factors.  See Part V.B.2.

But there are two others.

---

about the Petitioner by the President.  See Petition ¶¶ 73, 74. It is unclear at this point whether discovery might be needed here.  See footnote 47.  But if it is, note that the federal courts have evolved any number of potentially relevant doctrines in this area.  See, e.g., United States v. Morgan, 313 U.S. 409, 422 (1941) (as to an agency action, a cabinet secretary "should never have been subjected to" a deposition); In re U.S. Dep't of Educ., 25 F.4th 692, 700 & n.1 (9th Cir. 2022) (suggesting that "[t]he rules for when a court may allow the questioning of a cabinet secretary" "rest on a constitutional foundation") (cleaned up); see also In re United States, 985 F.2d 510, 512 (11th Cir. 1993); Simplex Time Recorder Co. v. Sec'y of Lab., 766 F.2d 575, 586 (D.C. Cir. 1985); Kyle Eng'g Co. v. Kleppe, 600 F.2d 226, 231 (9th Cir. 1979).  These aim to strike a fine balance between the legitimate needs of parties seeking evidence and the legitimate needs of senior federal officials --- whose time is pressed and whose work files are likely to be especially sensitive, such that they will require special judicial protection as to any discovery.  It seems unlikely that Congress would have thought that a case of this "type," raising these sorts of evidentiary issues, should go before the immigration courts, which lack experience with them.

\*    \*    \*

The first is whether the claims in question are "wholly collateral to the statute's review provisions." Axon, 598 U.S. at 186 (cleaned up).

The claim as to the Secretary's determination is not collateral. It is "the vehicle by which [the Petitioner] seek[s] to" challenge his removal proceedings, Elgin, 567 U.S. at 22 --- and per the statutory "review provisions," those are the "challenge[s]" that are generally supposed to go before the immigration courts.

\*    \*    \*

The second Thunder Basin factor relates to whether the agency's expertise can be brought to bear if a certain claim goes to it first. See Axon, 598 U.S. at 194; Elgin, 567 U.S. at 22; Free Enter. Fund, 561 U.S. at 491.

If agency expertise can be brought to bear, that is a reason to think Congress wanted claims of the relevant "type" to go to the agency's courts (here, the immigration courts).

But in this case, "agency expertise" would have virtually no role to play as to any immigration court assessment of the Secretary of State's determination.

This Part VI.C explains why.

\*    \*    \*

Agency adjudicatory bodies are experts in the laws they routinely use, plus nearby bodies of law.

SEC adjudicators, for example, can be expected to be fluent in the Securities Act of 1933 and the Securities Exchange Act of 1934. And they are almost surely experts on related subjects, too. Common-law fraud, for example.

Immigration courts plainly have deep expertise in immigration law.

But the Petitioner claims that the Secretary of State's determination is the product of First Amendment retaliation. See Petition ¶¶ 8, 89; Motion for Preliminary Injunction at 10-18.

And First Amendment issues have little or no place on an immigration judge's docket. See Part VI.A. It follows that

71

there is no reason to think immigration courts have special expertise in First Amendment law.  See Axon, 598 U.S. at 194 (describing constitutional claims as outside the administrative agency's area of expertise); Free Enter. Fund, 561 U.S. at 491 (similar).

But agency expertise can still potentially be brought to bear.

Indeed, the Thunder Basin "agency expertise" factor can weigh in favor of upfront adjudication in the agency's courts --- even when the legal theory that undergirds the claim is not one as to which an agency adjudicator has any expertise.  See Elgin, 567 U.S. at 22-23; Rydie v. Biden, 2022 WL 1153249, at *8 (4th Cir. Apr. 19, 2022).

But while that is true in general, in this particular case the "agency expertise" factor does not point to the immigration courts.

\*     \*     \*

To see why, start with the idea that an agency adjudicator's decision, informed by special expertise, can helpfully move the case along by eliminating the need for later federal court intervention.

Take as an example Elgin v. Department of Treasury, 567 U.S. 1 (2012).

There, federal employees were fired because they did not register for the draft, and they sued.  See id. at 6-7.  Their argument: their termination for failure to register was unconstitutional because, among other things, the draft discriminated against men based on sex.  See id. at 7.

Analyzing the Thunder Basin factors, the Supreme Court ruled that the case needed to first be adjudicated by the relevant agency, the Merit Systems Protection Board.[52]  See id. at 8.

---

[52]  "The Merit Protection Board . . . is a[n] . . . agency in the executive branch charged with protecting federal employees against improper employment-related actions," including "favoritism, or engaging in reprisals against whistleblowers."  Jon O. Shimabukuro & Jennifer A. Staman, Cong. Rsch. Serv., R45630, Merit Systems Protection Board (MSPB): A Legal Overview (2019) (summary page).

The Board did not have expertise on the underlying constitutional issue.  See id. at 22.  But the Court noted that the Board might be able to wrap up the case by applying its expertise to "threshold" issues, without the need for a court to later take up the constitutional question.  See id.

For example, one of the fired employees had not been formally fired --- instead, he argued that he had been "constructive[ly] discharge[d]."[53]  Id. at 23.

If this employee was not in fact constructively discharged, the constitutional challenge to his firing would no longer exist --- because it could no longer be said that he was fired.  See id.

And that, per the Supreme Court, was a reason to let the case run down the agency-adjudication track.  See id.  After all, the question of whether a person is or is not constructively discharged is "unique to the employment context" and therefore "falls squarely within the [Board's] expertise."  Id. at 22-23.[54]

*       *       *

With this background in mind, turn back now to this case.

Are there "threshold" issues here, id. at 22, that the immigration courts could resolve, and that might put an end to the Petitioner's First Amendment challenge?

Yes, it would seem.

After all, the Secretary of State determined that there were "reasonable ground[s] to believe [the Petitioner's presence or

---

[53]  Constructive discharge refers to "[a]n employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign."  Discharge, sense 7, Black's Law Dictionary (12th ed. 2024) (defining "constructive discharge").

[54]  For other cases making this same point, see, for example, Bank of La. v. FDIC, 919 F.3d 916, 929 (5th Cir. 2019) ("[T]he [agency] could have mooted the [plaintiff's] constitutional claims by finding the [plaintiff] innocent of the statutory violations it was accused of committing."), and Jarkesy v. SEC, 803 F.3d 9, 29 (D.C. Cir. 2015) ("[T]he agency could moot the need to resolve [the constitutional question] by finding that he did not commit the securities-law violations of which [the plaintiff] stands accused.").

activities in the United States] would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i).

Maybe the immigration courts could hold that there were in fact not "reasonable grounds" --- and if so, the Petitioner's claim would be resolved on that basis, without the need for a federal court to decide whether the Secretary's determination amounted to First Amendment retaliation.

And indeed, after the Third Circuit sent Massieu's case to the immigration courts, that is precisely what happened.

The immigration judge looked behind the curtain of the Secretary of State's "reasonable grounds" determination --- and said the evidence was not there.  See In re Ruiz-Massieu, 22 I. & N. Dec. 833, 835-36 (BIA 1999).

But that was not the end of the road.

The Board of Immigration Appeals took it from there, and held that what the immigration judge had done was not allowed.  Per the Board, the Secretary's determination under 8 U.S.C. § 1227(a)(4)(C)(i) is like a prior criminal conviction --- it must be treated as a given if it seems solid-enough on its face, with no possibility of getting under the hood and examining its underlying factual basis.

> In the scheme adopted by Congress, the Secretary of State's determination as outlined in section 241(a)(4)(C)(i) [8 U.S.C. § 1227(a)(4)(C)(i)] of the Act is equivalent to a duly certified record of criminal conviction by a state or federal court. . . .

> [The alternative] would necessarily require the Immigration Judge and this Board to intrude into the realm of foreign policy. . . .

> For an example, we need only look to the opinion in the present case.  The Immigration Judge held that the [Immigration and Naturalization] Service must produce more than clear, unequivocal, and convincing evidence that the Secretary of State held a

74

**JA 174**

facially reasonable opinion that the alien's
presence would have adverse foreign policy
consequences.  She required the Service to
convince her by clear, unequivocal, and
convincing evidence that the Secretary's
opinion is reasonable.  The Immigration
Judge found that the Service had not shown
that the opinion of the Secretary of State
is reasonable.  Consequently, in the absence
of further evidence, she substituted her
judgment for that of the Secretary of State.
This standard of inquiry would entangle the
Immigration Court in matters of foreign
policy and involve that court in weighing
the importance of various factors in an area
in which it has no special expertise.  Such
an in-depth examination could well require
the Service to proffer secret or
confidential information and expert
witnesses, or involve a deposition of the
Secretary of State.  There is no indication
that Congress contemplated an Immigration
Judge, or even the Attorney General,
overruling the Secretary of State on a
question of foreign policy.

Id. at 844-45.[55]

In short: "it is . . . the opinion of the Secretary [of State]
that decides the issue," id. at 845 n.13 --- and because of the
above-quoted ruling from the Board of Immigration Appeals in
Ruiz-Massieu, there would be next to nothing for an immigration
court to do in this case.  The reasonableness of the Secretary's
determination might have been a "threshold" matter for the

---

[55]  Ruiz-Massieu is binding on immigration judges, see 8 C.F.R.
§ 1003.1(g)(1), and serves as precedent for future Board of
Immigration Appeals proceedings regarding the same issue.  See
id. § 1003.1(g)(2); see also April 11 Audio Recording at 1:34:30
to 1:36:00 (holding that Ruiz-Massieu bound the immigration
court).

immigration courts. <u>Elgin</u>, 567 U.S. at 22. But after the <u>Ruiz-Massieu</u> decision, no longer.[56]

*     *     *

Are there other reasons why agency expertise might matter?

Yes. Take up here the main added possible reason, and then consider a second one below in footnote 57.

An agency's narrowing construction of a statute might potentially obviate the need for a federal court to later reach the relevant constitutional issues. <u>See</u> <u>id.</u> at 23 (a "challenged statute may be one that the [agency] regularly construes, and its statutory interpretation could alleviate constitutional concerns"); <u>see also</u> <u>Jarkesy</u>, 803 F.3d at 29 ("[T]he [agency] could offer an interpretation of the securities laws in the course of the proceeding that might answer or shed light on [the plaintiff's] [constitutional] challenge. As our court has previously observed, there are precious few cases involving interpretation of statutes authorizing agency action in which our review is not aided by the agency's statutory construction.") (cleaned up); <u>Am. Fed'n of Gov. Emps., AFL-CIO</u> v. <u>Trump</u>, 929 F.3d 748, 761 (D.C. Cir. 2019) (similar).

Imagine, for example, if the immigration courts took first crack at this case --- and construed 8 U.S.C. § 1227(a)(4)(C)(i) as providing a basis for removal only if the Secretary of State's

---

[56] There might <u>sometimes</u> be fact-finding work for the immigration courts to do in cases like this one. For example, there may be a dispute as to whether the Secretary personally made the relevant determination. That could take fact-finding, and the immigration courts could do it. <u>Cf.</u> <u>In re Ruiz-Massieu</u>, 22 I. & N. Dec. at 845 n.13. And that possibility was part of why Judge Alito thought the <u>Massieu</u> case should be sent to the immigration courts. <u>See</u> <u>Massieu</u>, 91 F.3d at 426. But no one seems to be disputing the Secretary of State's personal involvement here. Indeed, the Petitioner goes the other way --- and affirmatively alleges that there was a good deal of personal involvement from the Secretary in this case. <u>See</u> Petition ¶¶ 2-3, 33, 75, 80, 83. (Note that the Secretary does not <u>always</u> need to be personally involved in passing on a determination. Only when his determination is based on speech that would be First Amendment-protected. <u>See</u> 8 U.S.C. §§ 1227(a)(4)(C)(ii), 1182(a)(3)(C)(iii). But the immigration courts have no special expertise on that First Amendment gating question.)

determination was not based on any sort of retaliation whatsoever.

That could switch things up, transforming a constitutional question into an immigration law question. The constitutional question (was the Secretary's determination the product of First Amendment retaliation?) would become one of immigration law (was the Secretary's determination the product of "any sort of retaliation," as defined by the immigration courts?).

And if so, it might make sense to allow the immigration courts to assess the case first --- under what will, by hypothesis, be their own standard.

But the Board of Immigration Appeals has already construed Section 1227(a)(4)(C)(i), and it has not opted to give it a limiting construction of any kind.

And in any event, a limiting agency construction would carry less weight now that the Board of Immigration Appeals decisions no longer get strong deference. Compare Bautista v. Att'y Gen. of U.S., 744 F.3d 54, 58 (3d Cir. 2014), abrogated on other grounds by Torres v. Lynch, 578 U.S. 452 (2016) (Board of Immigration Appeals decisions get Chevron deference), and Rodriguez-Avalos v. Holder, 788 F.3d 444, 448-49 (5th Cir. 2015) (same), with Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024) ("Chevron is overruled.").

                    *    *    *

Bottom line: the immigration courts would be unable to apply their expertise here to resolve any substantial threshold matter --- and they would be unable to interpret the immigration laws in a way that would later receive strong deference from a federal court.

In light of this, the Thunder Basin "agency expertise" factor tilts the scales toward the conclusion that Congress did not intend for immigration courts to handle this "type" of case in the first instance.[57]

---

[57] Per the Supreme Court in Axon, the expertise factor "reflect[s] . . . the point of special review provisions --- to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." 598 U.S. at 186. But "the point" of the structure created by Congress for

D.    **Conclusion**

As to the Secretary of State's determination, the immigration courts cannot provide the Petitioner with the legal relief he seeks.  See Part VI.A.  They cannot be expected to knock out any fact-finding that might potentially be necessary.  See Part VI.B.  And they cannot bring their special expertise to bear in a substantial way.  See Part VI.C.

Does this mean that if this case starts off in the immigration courts, the Petitioner cannot get "meaningful review" --- and that, under Section 1252(b)(9), this Court should therefore retain jurisdiction?[58]

To answer, go back for a moment to the key cases.

*      *      *

Recall that, in Elgin, employees were fired for not signing up for the draft.  See 568 U.S. at 6–7.  The Supreme Court held that the employees could not sue first in the federal district court.  They would have to go down the administrative track, per a statute --- even though they could not get constitutional relief there.  See id. at 13–14.

Or look back to Massieu.

The underlying statute, essentially the same one that is at issue here, was challenged as unconstitutional.

---

immigration claims was not just to build up and lean on expertise --- but also to keep the tide of immigration cases from swamping the federal courts and displacing a good deal of their work on other cases.  See Robbie Clarke, Reaffirming the Role of the Federal Courts, 17 Wash. & Lee J. Civ. Rts. & Soc. Just. 463, 474–75 & n.65 (2011).  But any precedent that might be set by this case does not implicate such concerns.  It is much too unusual for that.  Because of the Board of Immigration Appeals' Ruiz-Massieu decision, for example, there is virtually nothing for the immigration courts to do here.  And the sensitive and sprawling nature of the discovery that might potentially be required makes this case an especially serious misfit for immigration courts fact-finding.

[58]  Recall: the Court here is proceeding on the assumption that Section 1252(b)(9) applies in the first place.  See Part IV.

But the immigration judge's hands were tied.  She was "not authorized to consider the constitutionality of the statute." 91 F.3d at 424.

The result?   Same as in Elgin.  The Third Circuit held that the noncitizen would have to go to the immigration courts and then over to the court of appeals, rather than seek immediate relief in the district court.  See id. at 422.

*   *   *

These precedents loom large.  They suggest that going to the administrative courts is necessary --- even when they cannot be the litigation's main event.

But in the end, the Court's conclusion is this: neither the Supreme Court's Elgin decision nor the Third Circuit's Massieu decision dictates the outcome here.

Those cases are different than this one.

*   *   *

The first difference has already been discussed.

In Elgin and Massieu, the administrative courts could realistically be expected to push things forward.

They could gather facts.  They could bring to bear their distinctive expertise.

The cases would take longer to make it to federal court --- a first trip there, to the federal court of appeals, could go forward only after the administrative adjudication was done.

But the time in Elgin and Massieu would have been well spent. The administrative courts' work (fact-finding, using their expertise) would have set the table for the federal court of appeals to make its constitutional decision.

But in this case, the time in the immigration courts cannot be expected to advance the ball.

If there needs to be fact-finding here, it may potentially be sprawling, and it may potentially involve sensitive evidence, or (renewed) requests to depose senior officials.  See Part VI.B.

And the scope of discovery may depend not on questions of immigration law, but on questions of constitutional law, both procedural (for example: what are the limits on subpoenaing a

79

**JA 179**

cabinet official?) and substantive (for example: is there a "policy" exception under <u>Lozman</u> to the <u>Nieves</u> First Amendment-retaliation framework?).  <u>See</u> <u>id</u>.

This is not the kind of fact-finding work the immigration courts have been built for.  <u>See</u> <u>id</u>.

And in this case, the immigration courts would also have no real chance to deploy their special expertise.  The Board of Immigration Appeals has already held that the Secretary of State's determination is conclusive.  This binds the immigration courts.  And it means that, for those courts at least, there is no room to examine the underlying basis of the Secretary's determination.  <u>See</u> Part VI.C.

There is, in short, little that the immigration courts can be expected to accomplish in this case.

The requirement of "meaningful review" under <u>Thunder Basin</u>, <u>Elgin</u>, and <u>Massieu</u> can accommodate a slower road to federal court.  But those cases envision that along the way things will get done.  Facts will be found, law will be interpreted, expertise will be used.  <u>See</u> <u>Thunder Basin</u>, 510 U.S. at 214–15; <u>Elgin</u>, 567 U.S. at 22–23; <u>Massieu</u>, 91 F.3d at 426.

The work in the administrative court may end the case.  And if not, then the time will have been <u>used</u>.  The journey (in the administrative courts) will shape the final destination (review in federal court).

But <u>Elgin</u> and <u>Massieu</u> do not purport to speak to a case like this one.  In those cases, the administrative court route meant that extra time would pass --- but for a purpose.

Here, the situation would be different.  Time would pass, yes, and perhaps a great deal.  But there would be little to show for it.

*     *     *

Take now a second way in which this case is different from <u>Elgin</u> or <u>Massieu</u>.

Start with the basic distinguishing point, <u>see</u> Part VI.D.1, and then look to its implications from three related perspectives. <u>See</u> Part VI.D.2 to Part VI.D.4.

### 1.   **Public Concern**

The Petitioner alleges that the Secretary of State's determination amounts to retaliation for his First Amendment-protected statements.

There was nothing like that in <u>Elgin</u>.  The petitioners there were federal employees who had not registered for the draft.  <u>See</u> 567 U.S. at 6–7.

And there was nothing like that in <u>Massieu</u>, where the plaintiff was a former senior Mexican official whose presence had become a thorn in the side of U.S.-Mexico relations.  <u>See</u> <u>Massieu</u>, 915 F. Supp. at 712 (quoting Letter from Warren Christopher, Sec'y of State, to Janet Reno, Att'y Gen.) (Oct. 2, 1995) (failure to return the plaintiff "to Mexico . . . would be a major setback for . . . our combined efforts to chart a new and effective course of U.S.-Mexican relations").[59]

Before getting to why this difference matters, note briefly the Petitioner's speech-related allegations.

That he had spoken at press conferences and on TV.  <u>See</u> Petition ¶ 26.  That he had helped lead two university student groups, at least one of which puts on public lectures.  <u>See</u> <u>id</u>. ¶ 23.  And that the subject of all this was the current violence in the Middle East and the Petitioner's views on it --- Israel has committed a "genocide," the Petitioner has said, <u>id</u>. ¶ 22; Columbia University, where he was a student, is "financing and in other ways facilitating it," he has said, <u>id</u>.; and the United States is on the wrong side of the line.  <u>See</u> <u>id</u>. ¶ 29.

---

[59]   The <u>Massieu</u> complaint alleged that "the deportation proceeding evidence[d] selective enforcement in retaliation for Mr. Ruiz Massieu's exercise of his First Amendment right to criticize the Mexican political system."  <u>Massieu</u>, 915 F. Supp. at 689.  But that was the first and last appearance of the First Amendment in <u>Massieu</u>.  It was not invoked in the opinion of the district court, in the appellants' or appellee's briefs on appeal, or in the opinion of the court of appeals.  <u>See</u> <u>generally</u> <u>Massieu</u>, 915 F. Supp. 681; <u>Massieu</u>, 91 F.3d 416; Appellants' Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414627; Appellee's Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414626; Appellants' Reply Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414628.

Per the Supreme Court, speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Snyder v. Phelps, 562 U.S. 443, 452 (2011).

Was the Petitioner's alleged speech about a "public concern"?

Speech "deals with matters of public concern when it can be fairly considered as relating to any matter of political . . . concern to the community." Id.

The Petitioner's public statements about the Middle East conflict meet that test. See, e.g., id. at 454 (holding that protest signs as to United States military policy were "political" and "of public import"); see also Rankin v. McPherson, 483 U.S. 378, 386 (1987); Navab-Safavi v. Glassman, 637 F.3d 311, 313, 316 (D.C. Cir. 2011); Dunn v. Carroll, 40 F.3d 287, 291-92 (8th Cir. 1994).

And speech can be a matter of public concern when it is "a subject of legitimate news interest," Snyder, 562 U.S. at 452, including as to "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." Time, Inc. v. Hill, 385 U.S. 374, 388 (1967); accord, e.g., Lane v. Franks, 573 U.S. 228, 241 (2014); Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 103-04 (3d Cir. 2022); O'Laughlin v. Palm Beach Cnty., 30 F.4th 1045, 1051-52 (11th Cir. 2022).

The Petitioner's public statements meet that test, too

In short: the Petitioner's speech was on a subject of "public concern" --- and that sort of speech gets "special protection." Snyder, 562 U.S. at 452.

\*      \*      \*

Moreover, the Petitioner alleges not only that he was detained by immigration officials because of his speech --- but also that this detention is having an effect now, in the present.

A direct effect --- because detention prevents the Petitioner from speaking publicly. See Petition ¶¶ 89, 99.[60]

---

[60] See generally Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024) ("There is no dispute that an arrest constitutes conduct sufficient to deter a person of ordinary firmness from

And an indirect effect --- because detention deters the Petitioner (and others) from speaking.  See id. ¶ 89.[61]

This sort of here-and-now impact on speech weighs heavily.

That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion); see Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys., 938 F.3d 424, 442 (3d Cir. 2019); B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 323 (3d Cir. 2013); see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2025); cf. Tandon v. Newsom, 593 U.S. 61, 64 (2021); Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020); Dombrowski v. Pfister, 380 U.S. 479, 485–86 (1965); Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 178 (3d Cir. 2002).

And this is because "[t]he timeliness of political speech" --- the type of speech at issue here --- "is particularly important." Elrod, 427 U.S. at 374 n.29 (citing Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 182 (1968); Wood v. Georgia, 370 U.S. 375, 391 (1962)).

Our law's response to a here-and-now impact on political speech has been the same across the board: no unnecessary delay.

Deal thoughtfully and thoroughly with the speech issue.  But deal with it on a faster-than-usual timeline.

Begin seeing this below, and its import for this case.

---

exercising her constitutional rights.") (cleaned up), cert. denied sub nom. Murray-Nolan v. Rubin, 144 S. Ct. 2560 (2024); cf. Speech First, Inc. v. Whitten, 145 S. Ct. 701, 703 (2025) (Thomas, J., dissenting from the denial of certiorari) (discussing various things that "may cause students to self-censor") (cleaned up).

[61] Since the 1960s, the law has called this sort of First Amendment deterrence a "chilling effect." See Dombrowski v. Pfister, 380 U.S. 479, 487 (1965); see also, e.g., Counterman v. Colorado, 600 U.S. 66, 75 (2023) (describing that certain rules may "chill, or deter, speech outside their boundaries").

## 2. First Amendment Speed

Move here through four separate legal contexts, each distinct from the next, in which the unifying thread was only this: here-and-now speech impacts cannot be left out there, waiting too long for judicial review.

### a) Administrative Proceedings

Look first to <u>Oestereich</u> v. <u>Selective Service System Local Board No. 11, Cheyenne</u>, 393 U.S. 233 (1968).

There, a student protested against the Vietnam War. <u>See id</u>. at 234. Soon afterwards, the draft board withdrew an exception he was entitled to and called him up for induction into the military. <u>See id</u>. at 234-35.

The student sued to stop his enlistment; the district court dismissed his complaint, and the court of appeals affirmed. <u>See id</u>. at 235. The reason: judicial review would be available, if only later on. <u>See</u> <u>Oestereich</u> v. <u>Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne</u>, 390 F.2d 100, 100 (10th Cir.).

The Supreme Court reversed. <u>See</u> <u>Oestereich</u>, 393 U.S. at 239.

A statute barred judicial review of the draftee's classification before he was inducted. That was "unambiguous," the Supreme Court said. <u>Id</u>. at 235.

And there was no doubt that judicial review would <u>someday</u> be available, as the court of appeals had said --- either as "a defense in a criminal prosecution" brought against the student for not registering, or on a "habeas corpus [petition] after induction." <u>Id</u>.

But the Supreme Court held that a literal reading of the law might be "out of harmony . . . with constitutional requirements." <u>Id</u>. at 238. The draft board's actions, the Court explained, were no different in this sense "from a case where induction of a[] . . . clearly exempt person is ordered . . . to retaliate against the person because of his political views." <u>Id</u>. at 237.

And given this concern about "retaliat[ion]" for "political views," the Supreme Court did not make the student wait for his day in court, either as a habeas petitioner after his enlistment or as a criminal defendant after his refusal to enlist. <u>See id</u>.

at 238.  Rather, per the Court, he could go to court right away.
See id.

### b)   State Prosecutions

The next example starts with this: a long-standing statute that
tells federal courts that they cannot generally enjoin a state
court proceeding.  See 28 U.S.C. § 2283.

But sometimes, very rarely, to ward off a First Amendment chill
--- they can.

In Dombrowski v. Pfister, 380 U.S. 479 (1965), civil rights
activists faced criminal prosecution.  See id. at 482.  State
prosecutors accused them of belonging to a Communist front ---
allegations that allegedly "frightened off potential members and
contributors."  Id. at 488.

In federal district court, the activists sought an injunction
against the officials.  See id. at 482.  The court dismissed
their complaint, see id., but the Supreme Court reversed.  See
id. at 483.

There was good reason not to intervene in the prosecution.
Federalism concerns, always important, were top of mind.  See
id. at 484.  So too were less-intrusive ways of resolving the
case.  State courts and prosecutors, after all, are sworn to
honor the Constitution, just as federal officials are, see id.,
and any miscarriage of justice could be promptly appealed,
perhaps up to the Supreme Court.  See id. at 485.  In the
meantime, a state court might moot the matter by acquitting the
defendants.  See id.

But all of that would come too late, the Supreme Court said.  By
then, the First Amendment harm would have been done.

"The chilling effect upon the exercise of First Amendment rights
may derive from the fact of the prosecution, unaffected by the
prospects of its success or failure."  Id. at 487. "Even the
prospect of ultimate failure of such prosecutions by no means
dispels their chilling effect on protected expression."  Id. at
494.  The Supreme Court ordered the district court to enjoin
prosecution.  See id. at 497.

To be sure, Dombrowski has been whittled a long way back.

Under Younger v. Harris, 401 U.S. 37 (1971), Dombrowski no
longer means that a chilling effect can "by itself justify

federal intervention." Id. at 50. Nonetheless, Younger reiterated that intervention may be proper when there is bad faith or harassment on the part of a state.[62] See id. at 53. And even without that, "[t]here may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown." Id.

But Dombrowski and Younger remain relevant.

In those cases, as in Oestereich, the need in the First Amendment context for speed was a powerful counterweight --- heavy enough, at least sometimes, to overcome important countervailing concerns, including the need for federal courts to wait, out of respect for the judgment of state officials and judges (in Dombrowski); of federal draft boards (in Oestereich); and, in both cases, the judgment of Congress, which had passed on-point statutes that told the courts to hold back.

### c)   **The Supreme Court**

Turn now to the Supreme Court, and one of the statutes passed by Congress that shapes its jurisdiction, 28 U.S.C. § 1257.

Section 1257 allows the Supreme Court to hear "[f]inal judgments . . . rendered by the highest court of a State." Id. (emphasis added).

But when a First Amendment "chill" may be in the air, the Supreme Court has read Section 1257 as allowing review of a non-final judgment. See, e.g., Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 55-57 (1989); Nat'l Socialist Party of Am. v. Vill. of Skokie, 432 U.S. 43, 44 (1977); Neb. Press Ass'n v. Stuart, 423 U.S. 1327, 1329 (1975) (Blackmun, J., in chambers); Mia. Herald Pub. Co. v. Tornillo, 418 U.S. 241, 246-47 & n.6 (1974); Mills v. Alabama, 384 U.S. 214, 221-22 (1966) (Douglas, J., concurring).

For an example, look to Fort Wayne Books.

There, two bookshops sold graphic magazines. See State v. Sappenfield, 505 N.E.2d 504, 504 (Ind. Ct. App. 1987), aff'd and

---

[62]  The Dombrowski Court did not define "bad faith" but suggested it includes "discriminatory enforcement or the use of impermissible criteria for prosecution, such as a defendant's . . . political beliefs."  Owen M. Fiss, Dombrowski, 86 Yale L.J. 1103, 1115 (1977) (citing Dombrowski, 380 U.S. at 490).

remanded sub nom. <u>Fort Wayne Books, Inc.</u> v. <u>Indiana</u>, 489 U.S. 46 (1989).  State prosecutors charged the shops' owner with distributing obscene material.  And that provided a basis for state-law RICO charges.  See <u>Fort Wayne Books, Inc.</u>, 489 U.S. at 53.

The trial court threw out the racketeering counts for being unconstitutionally vague.  See <u>id</u>.  The Indiana Court of Appeals reversed --- and the Indiana Supreme Court decided not to take up the case.  See <u>id</u>.

The federal Supreme Court granted certiorari and then paused to take stock of its jurisdiction.  See <u>id</u>. at 54.

The jurisdictional question was a hard one.  In criminal law, the rule of finality generally requires a conviction and a sentence before an appeal can be taken.  See <u>id</u>.  But neither box was checked.  See <u>id</u>.  Normally, then: no Supreme Court jurisdiction under the statute.  See <u>id</u>.

But the Supreme Court determined that the First Amendment required "immediate review," meriting an exception to the general rule.  See <u>id</u>. at 55.

A too-long wait, the Court explained, could chill speech. "Whichever way we were to decide on the merits, it would be intolerable to leave unanswered, under these circumstances, an important question of freedom of the press under the First Amendment."  <u>Id</u>. at 56.  Leaving the question unsettled "could only further harm the operation of a free press."  <u>Id</u>.

### d)  Prior Restraints

One more example.

A prior restraint is government censorship that cuts off speech before it makes it to the public.  It is a restraint (of speech) that is prior (to publication).

Prior restraints are "immediate and irreversible," <u>Neb. Press Ass'n</u> v. <u>Stuart</u>, 427 U.S. 539, 559 (1976), and presumptively unconstitutional.  See <u>Se. Promotions, Ltd.</u> v. <u>Conrad</u>, 420 U.S. 546, 558 (1975).

Nonetheless, the First Amendment allows for some prior restraints --- but only when judicial review is almost immediately available.  See <u>Vance</u> v. <u>Universal Amusement Co.</u>, 445 U.S. 308, 309 (1980); <u>Se. Promotions, Ltd.</u>, 420 U.S. at 560;

Freedman v. Maryland, 380 U.S. 51, 58–59 (1965); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).

Why?  To quickly dissipate any freedom-of-speech chill.

Take as the example the Freedman case.

A few years before, the Court had decided that the First Amendment allowed some prior restraints on movies.  See Freedman, 380 U.S. at 54 (citing Times Film Corp. v. City of Chi., 365 U.S. 43 (1961)).

Now, in Freedman, the Court considered the constitutionality of a Maryland law that prohibited screening a disapproved movie "unless and until," in the Court's words, "the exhibitor undertakes a time-consuming appeal to the Maryland courts and succeeds in having the Board's decision reversed."  Id. at 54–55.

That did not clear the bar.

The Court held that a movie-censorship scheme could survive constitutional scrutiny only under various conditions.  One: fast recourse to a court.  See id. at 58–59.

But the Maryland law "provide[d] no assurance of prompt judicial determination," id. at 60, and the only reported appeal of a movie-censorship decision at that point showed that it took six months --- longer than the two days the Court suggested was appropriate in another state's scheme.  See id. at 55, 60.  Fear of a "chilling effect" drove the Court's thinking.  See id. at 59–61.  And the Maryland statute was struck down as unconstitutional.

### e)    Implications

These cases are, intentionally, pulled from all over the map. They show something that suffuses our law, in many of its different corners --- that when it comes to here-and-now First Amendment injuries, the law requires a faster pace.

And note this: in many ways, the questions taken up by the Supreme Court in the cases set out above were harder than the issue before the Court today.

To accommodate the First Amendment's need for faster-than-usual judicial review, must a state law be struck down as

88

**JA 188**

unconstitutional, as in the case of the Maryland licensing scheme?

Must an exception be carved into a federal law, like the "unambiguous" statute that determined whether a federal court could take the draft-registration case?  Or the Supreme Court's jurisdictional statute?  Or the statute that tells federal courts not to enjoin state court proceedings?

These are big lifts.

Declaring a statute unconstitutional is always a fateful act, the very last resort.  See, e.g., Mistretta v. United States, 488 U.S. 361, 384 (1989).  And statutes are generally to be read as they were written, not with judge-made exceptions bored into them.

But as in the cases sketched out above, the Supreme Court time and again has done those very things, to accommodate the First Amendment's need for a quicker pace.

For the questions addressed in this Opinion, much less is at stake.

No one says here that too much delay means that a statute must be struck down as violating the First Amendment.  And no one says that a law on the books must be re-read, so as to match up with constitutional values.

Rather, delay matters here only as a reason to do something much less intrusive than all that --- as a way of understanding how to apply the law that we already have.

That law requires consideration of whether later federal court review would still be "meaningful" enough.  See Part V.

Here, it would not be.

Come back again to what the Supreme Court has said: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373.  And: "[t]he timeliness of political speech" --- which is in play here --- "is particularly important." Id. at 374 n.29.

For judicial review to be "meaningful," it must hew to these principles.

**JA 189**

But judicial review that tells the Petitioner to wait until the
immigration courts are done does not do that.

Not because First Amendment concerns always compel this result.
But because they do here, in this case.

One core reason why: for reasons that are particular to this
case, see Part VI.A to Part VI.C, the time spent in the
immigration courts would accomplish next to nothing.

The Petitioner would not be able to seek the legal relief he
asks for.  See Part VI.A.  The factual record could not be
substantially developed.  See Part VI.B.  The immigration
courts' special expertise could not be brought to bear.  See
Part VI.C.[63]

Delay to ensure thoughtful consideration of hard issues is
permissible.  Necessary, even.[64]

---

[63]  A caveat.  There is some relief that may be available to the
Petitioner --- applying for asylum, for example, or the
withholding of removal.  If an immigration judge grants any of
this relief, that could be "potentially dispositive," as Massieu
suggested.  91 F.3d at 425.  It is unclear how any such requests
for relief might play out, or whether they would become
unavailable if this Court retains jurisdiction.  But one way or
another, the possibility of asylum or withholding moves the
needle, but not far enough to alter the conclusion here.

[64]  See N.Y. Times Co. v. United States, 403 U.S. 713, 753 (1971)
(Harlan, J., dissenting) (arguing that "difficult" First
Amendment questions "should have led the Court to shun such a
precipitate timetable"); id. at 752 (Burger, C.J., dissenting)
("We all crave speedier judicial processes but when judges are
pressured as in these cases the result is a parody of the
judicial function."); Tunick v. Safir, 209 F.3d 67, 88 (2d Cir.
2000) (certifying case to state court while acknowledging that
"in many First Amendment cases . . . the constitutional rights
involved are significantly damaged, if not altogether lost, by
the delay entailed in certification"); cf. United States v.
Coburn, 2025 WL 729969 (D.N.J. Mar. 6, 2025).

**JA 190**

But not delay that may be long.  That will serve little real
practical purpose.  And that we can see, now, will come and go
with little to show for the wait.[65]

### 3.  **AADC**

To see the "meaningful review" issue here from another angle,
look to a case, AADC, that bubbled up through the federal courts
during the 1980s and 1990s.

---

[65]  It is hard to say how long the immigration courts would take.
See footnote 50.  And averages would almost surely fail to tell
the story, in part because courts tend to prioritize important
constitutional cases.  See, e.g., Care One, LLC v. NLRB, 680 F.
Supp. 3d 540, 549 (D.N.J. 2023).  But this much is clear: if
this case does not go to the immigration courts, federal court
review will continue now.  If it goes to the immigration courts
first, the process has more steps to it --- immigration judge,
then Board of Immigration Appeals, and only then a federal
court, a court of appeals.  And in the end, the immigration
courts route may be longer than that.  The Respondents have
suggested that one way to do any needed fact-finding here might
be for the federal court of appeals, when it gets the case, to
remand it to a federal district court --- which would then
presumably send it back up to the court of appeals for a
decision.  See Respondents' Letter (Apr. 10, 2025) (ECF 185) at
3.  It is not clear why the Respondents mention this
possibility.  Maybe because of a felt sense that, if this case
requires fact-finding, the immigration courts may not be the
right forum.  See Part VI.B.  But one way or another, a fact-
finding remand only folds in another round of back and forth ---
and therefore an extra dollop of delay.  (And note another
potential issue.  When the factual record is not well developed
coming out of the immigration courts, federal courts of appeals
sometimes bounce the case back down for fact-finding by an
immigration court or a federal district court.  But the Supreme
Court has suggested this may not be allowed in cases like this
one --- and the problem may be jurisdictional.  See AADC, 525
U.S. at 488 n.10.  This might imply a serious, down-the-road
issue with going the immigration courts route --- a lack of
solid factual development by the time the case hits the federal
court of appeals (because the immigration courts are not built
for fact-finding in a case like this) but with no ready way to
fix the problem (because a remand may encounter a non-waivable
legal hurdle).)

Federal officials sought to deport eight noncitizens, at first
on grounds related to their speech. <u>See</u> <u>AADC</u>, 525 U.S. at 473.
But the speech-related charges were dropped. <u>See</u> <u>id</u>. And what
was left behind included removal charges based on two of the
noncitizens' membership in an alleged terror organization, plus
six of the noncitizens' status violations, for issues like
overstaying a visa and failing to maintain student status. <u>See</u>
<u>id</u>. at 473. (There was evidence that all eight noncitizens were
involved in helping to finance the terror group. <u>See</u> <u>id</u>. at
475.)

As here, various statutes seemed to require going to the
immigration courts before a federal court could get involved.

But the noncitizens argued to the Supreme Court that federal
court review "would come too late to prevent the 'chilling
effect' upon . . . First Amendment rights" --- and so the
statutes that funneled cases to the immigration courts should be
read in light of the "doctrine of constitutional doubt,"[66] and
"interpret[ed] . . . in such fashion as to permit immediate
review of the[] [First Amendment] claims." <u>Id</u>. at 488.

But the Supreme Court, per Justice Scalia, rejected this
argument.

How? By breaking new ground and resolving a consequential legal
question --- holding that the eight noncitizens had no
underlying First Amendment selective-enforcement claim because
they had no legal status in the United States. <u>See</u> <u>id</u>. at 489.[67]

With that holding made, the doctrine of constitutional doubt
could no longer impact how jurisdiction-channeling statutes
might be interpreted --- because there was no longer any
possibility of a constitutional violation.

Why did the Court choose to resolve the First Amendment
selective-enforcement claim?

---

[66] This doctrine "counsel[s] that ambiguous statutory language
be construed to avoid serious constitutional doubts." <u>FCC</u> v.
<u>Fox Television Stations, Inc.</u>, 556 U.S. 502, 516 (2009).

[67] The selective-enforcement question was so new that no on-
point precedents existed to guide the Court.

The answer is not crystal clear.  But it seems likely to have been this: because the Court viewed the alternative on the table as presenting an even closer question of constitutional law.

And that brings things back to this case.

The alternative before the AADC Court was to hold that a federal court could not hear the noncitizens' here-and-now First Amendment claim until the immigration courts got first crack. Justice Ginsburg argued for this position in her concurrence, see id. at 492 (Ginsburg, J., concurring), based on a narrowed-down reading of some of the cases discussed above in Part VI.D --- narrowed readings that evidently did not convince the Court. Per the majority:

> Instead of resolving this constitutional question [about First Amendment selective enforcement], Justice Ginsburg chooses to resolve the constitutional question whether Congress can exclude the courts from remedying an alleged First Amendment violation with immediate effects, pending the completion of administrative proceedings.  It is not clear to us that this is easier to answer than the question we address --- as is evident from the fact that in resolving it Justice Ginsburg relies almost exclusively on cases dealing with the quite different question of federal-court intervention in state proceedings.  (Even in that area, most of the cases she cites where we did not intervene involved no claim of present injury from the state action --- and none involved what we have here: an admission by the Government that the alleged First Amendment activity was the basis for selecting the individuals for adverse action.  Cf. Dombrowski v. Pfister, 380 U.S. 479, 487-488, n. 4 (1965).)  The one case not involving federal-state relations in fact overrode a congressional requirement for completion of administrative proceedings --- even though, unlike here, no immediate harm was apparent.  See Oestereich v. Selective Serv. System Local Bd. No. 11, 393

U.S. 233 (1968). Justice Ginsburg counts the
case as one for her side on the basis of
nothing more substantial than the Court's
characterization of the agency action at
issue as "blatantly lawless," id., at 238.
See post, at 948 (opinion concurring in part
and concurring in judgment).

Nor is it clear that the constitutional
question Justice Ginsburg addresses has
narrower application and effect than the one
we resolve.  Our holding generally deprives
deportable aliens of the defense of
selective prosecution.  Hers allows all
citizens and resident aliens to be deprived
of constitutional rights (at least where the
deprivation is not "blatantly lawless")
pending the completion of agency
proceedings.

Id. at 488 n.10 (cleaned up).

Justice Scalia's majority opinion, as quoted at length above,
plainly rested on the idea that there was a real possibility
that it is unconstitutional to divert people with here-and-now
First Amendment claims into the immigration courts, at the cost
of pushing off into the future their day in federal court.

And the question seemed vexed enough that the Supreme Court,
rather than wade in, worked to skirt the issue, by resolving
another novel constitutional claim --- whether noncitizens
without lawful status can press a First Amendment selective-
enforcement claim.

If, per the Supreme Court, delayed consideration in federal
court of a First Amendment claim might be unconstitutional ---
then that is a strong argument for taking what is a much smaller
step, for opting not to delay federal court consideration of a
First Amendment claim in the first place.

And all the more so in this case.

Not just because of how little can realistically be accomplished
here in the immigration courts.  See Part VI.A to Part IV.C.

But also because of how this case lines up against AADC.

94

**JA 194**

In _AADC_, there were allegations of membership in a terror group and evidence of financial support to it. _See_ 525 U.S. at 474-75. Here, no such information has been put before the Court.

And in _AADC_, the noncitizens did not have lawful status. _See id._ at 488, 491-92. Here, the Petitioner does, _see_ Petition ¶¶ 1, 9, 21 --- and that could make a meaningful First Amendment difference, as the Court held in _AADC_. _See_ 525 U.S. at 488, 491-92.

In short: if delayed federal court uptake of a First Amendment claim raised a serious constitutional issue in _AADC_, is that not a powerful reason to steer away from such delay here?

### 4. _Axon_

Finally, look to the Supreme Court's recent decision in _Axon Enterprise, Inc._ v. _Federal Trade Commission_, 598 U.S. 175 (2023).

_Axon_ was a case like this one. It involved a set of statutes that seemed to require that the case be sent to the administrative courts, before any federal court involvement. _See id._ at 181.

To decide where the case should start off, the Supreme Court asked "whether preclusion of district court jurisdiction 'could foreclose all meaningful judicial review.'" _Id._ at 190 (quoting _Thunder Basin_, 510 U.S. at 212-13).

The _Axon_ Court's answer: it depends.

Typically, a party can get meaningful judicial review even if a district court never becomes involved in the case. Review of agency action by a court of appeals, following an administrative proceeding --- that is generally enough. _See id._ at 190.

But not always.

Not, per the Supreme Court, when there is a "here-and-now" injury --- one that will be "impossible to remedy once the proceeding is over, which is when appellate review kicks in." _Id._ at 191.

In _Axon_, the plaintiffs argued that they were "being subjected to unconstitutional agency authority --- a proceeding by an unaccountable [FTC] ALJ." _Id._ (cleaned up). That was a here-and-now constitutional injury, the Supreme Court held. _See id._

A court of appeals could later vacate any FTC order that might issue, but it could never unwind the clock and undo the harm of being subjected to the FTC proceeding in the first place. "Judicial review . . . would come too late to be meaningful." Id.

But is that not also true of having speech allegedly frozen (through detention) and chilled (because of the fear that detention causes)?

Yes.

If being subjected to proceedings before an allegedly unconstitutional decision-maker is a here-and-now injury, as Axon held --- then so too is it a here-and-now injury to allegedly lose out on core First Amendment rights.

<p align="center">*     *     *</p>

To see the point in sharper relief, move away for a moment from First Amendment issues.

Administrative law has sometimes allowed claimants to bypass agency adjudicators and try to remedy harms now --- if those claims could not realistically be addressed later, at the moment when the federal court would ordinarily step in.

In Mathews v. Eldridge, 424 U.S. 319 (1976), for example, the Supreme Court allowed the respondent to bring a due-process challenge to the lack of a pre-termination hearing for disability benefits --- despite the Social Security Act requiring the exhaustion of administrative remedies.  See id. at 327–28.  In light of the respondent's physical state and need for benefits, the Court observed that "an erroneous termination would damage him in a way not recompensable through retroactive payments."  Id. at 331.

And in Kreschollek v. Southern Stevedoring Co., 78 F.3d 868 (3d Cir. 1996), a longshoreman got hurt on the job and was cut off from his disability payments.  Id. at 870.  The Third Circuit allowed him to challenge the constitutionality of part of a federal statute in the district court, rather than wait to be heard in a court of appeals after the administrative process. See id.  Making him wait would be like having no "effective judicial review" at all, since the longshoreman would be without any income in the meantime.  Id. at 874–75.

<p align="center">**JA 196**</p>

These harms, which seem (and are) irreparable, opened the doors to federal courthouses, even though that meant skipping over agency adjudication.

What do harms of this sort have in common?

The underlying principles can be boiled down in a number of different ways.

But the First Circuit has captured part of the doctrine well. It noted that under Thunder Basin, "effective" judicial review becomes unavailable --- such that immediate judicial review makes sense --- "where the compliance costs are so onerous that complying with the regulation [while the administrative proceeding continues] will cause irreparable harm." E. Bridge, LLC, 320 F.3d at 90 (collecting cases).

If this is right, is not alleged suppression of political speech the archetypal "irreparable harm"? And if so, is that not an argument for allowing those sorts of claims to go straight to federal court?

                    *    *    *

The basic remedy for unconstitutional curbs on political speech is an injunction, and often an early one.  The harm is irreparable.  It needs to stop now.  Letting the speech suppression go on, with only the promise of a delayed and after-the-fact damages remedy --- that does not cut it.

Cases routinely hold this.  See N.Y. Times Co. v. United States, 403 U.S. 713, 714 (1971); Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 128 (3d Cir. 2023); Amalgamated Transit Union Loc. 85, 39 F.4th at 108; Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth., 975 F.3d 300, 317 (3d Cir. 2020); Ne. Pa. Freethought Soc'y, 938 F.3d at 442; Hawk, 725 F.3d at 323; K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 113 (3d Cir. 2013); Stilp v. Contino, 613 F.3d 405, 409 & n.4 (3d Cir. 2010); Swartzwelder v. McNeilly, 297 F.3d 228, 231, 242 (3d Cir. 2002); Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998); In re Asbestos Sch. Litig., 46 F.3d 1284, 1294-95 (3d Cir. 1994); GJJM Enters., LLC v. City of Atl. City, 293 F. Supp. 3d 509, 520 (D.N.J. 2017); Am. Broad. Cos., Inc. v. Wells, 669 F. Supp. 2d 483, 489 (D.N.J. 2009); Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist., 233 F. Supp. 2d 647, 666 (D.N.J. 2002), aff'd, 386 F.3d 514 (3d Cir. 2004); LCN Enters., Inc. v. City of Asbury Park, 197 F. Supp. 2d 141, 153

(D.N.J. 2002), as amended (Apr. 5, 2002); Lysaght v. State of N.J., 837 F. Supp. 646, 653–54 (D.N.J. 1993); Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs, 802 F. Supp. 1223, 1237–38 (D.N.J. 1992); Telco Commc'ns, Inc. v. Barry, 731 F. Supp. 670, 684 (D.N.J. 1990); Gannett Satellite Info. Network, Inc. v. Twp. of Pennsauken, 709 F. Supp. 530, 535 (D.N.J. 1989); E-Bru, Inc. v. Graves, 566 F. Supp. 1476, 1480 (D.N.J. 1983).

And this is a core commitment of our law, at work in any number of other ways.[68]

---

[68] Two examples. First, another part of the First Amendment, the Free Exercise Clause, works in much the same way. In Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14 (2020), for instance, the Supreme Court considered some of New York's Covid-era restrictions on First Amendment-protected religious activity. The Court explained that the harm was "unquestionably . . . irreparable." Id. at 18 (quoting Elrod, 427 U.S. at 373). So long as the state's rules were in place, religious obligations could not be properly fulfilled. See id. at 19. The plaintiffs might have later won on the merits; but their eventual win would have come too late to undo the harm suffered to their religious life while time passed. So the Court moved to preliminarily enjoin New York's restrictions on religious services, reaffirming along the way that First Amendment injuries are here-and-now injuries. See id. at 69. And a second example: in opinions on applications for emergency stays, Justices have routinely reiterated the urgency of First Amendment relief. See CBS, Inc. v. Davis, 510 U.S. 1315, 1318 (1994) (Blackmun, J., in chambers); Neb. Press Ass'n, 423 U.S. at 1329; Neb. Press Ass'n v. Stuart, 423 U.S. 1319, 1323 (1975) (Blackmun, J., in chambers); Times-Picayune Pub. Corp. v. Schulingkamp, 419 U.S. 1301, 1309 (1974) (Powell, J., in chambers). In CBS, Inc., for instance, a state court enjoined a news outlet from airing footage of a meat-packing plant, reasoning that it was wrongfully obtained and could lead to the plant's closure. See 510 U.S. at 1315–16. The news outlet then applied to the Supreme Court for an emergency stay, hoping to air the tape that evening. See id. at 1315. Sitting as a Circuit Justice, Justice Blackmun granted the stay. "[I]ndefinite delay of the broadcast will cause irreparable harm

Many of the cited cases are in the end simply about timing.

Over and over again in First Amendment cases, courts issue injunctions --- because a person whose speech is suppressed cannot be asked to wait until the far end of the road for a remedy.  The harm along the way is irreparable.  It cannot be fixed later.

But if it is too much to wait from the beginning of a case (when, say, a preliminary injunction might be entered) until its end (when there might be a damages payout or permanent relief) --- then what of waiting months or even years for the case to get off the ground in the first place, while it winds its way through the immigration courts?

                            *     *     *

Per the Supreme Court in Axon, bypassing administrative courts can be allowed when there is a "here-and-now" injury that will be "impossible to remedy" "once the [administrative] proceeding is over."  598 U.S. at 191.

That implies that this case should be heard, now, in federal court.

First Amendment harms, as alleged here, are routinely said to cause "irreparable injury."  In Axon's phrase, they cause injuries that are "impossible to remedy."

First Amendment harms, as alleged here, are often said to warrant preliminary and early relief.  Because in Axon's words, later, "once the proceeding is over," will be too late.

And First Amendment harms, as alleged here, are classic in-the-moment injuries.  Axon speaks of "here-and-now" injuries.  See id. at 191.  And that is what First Amendment injuries are, and have always been understood to be.

In Axon, the Supreme Court concluded, the claimants "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over."  Id. at 192.

So too here.

---

to the news media that is intolerable under the First Amendment," he wrote.  Id. at 1318.

The Petitioner says his First Amendment rights are now being violated. He will lose them and he will keep losing them if he must wait for federal court review. In the Court's judgment: he does not have to. The Petitioner's claims may or may not be meritorious. But our law allows them to be heard, now, in federal court.

\*    \*    \*

Section 1252(b)(9) does not bar jurisdiction because it does not apply to pre-order-of-removal cases like this one. See Part IV.

But if Section 1252(b)(9) does apply to cases like this one, it divests jurisdiction only when later federal court review would be "meaningful." Here, it would not be. Therefore, Section 1252(b)(9) does not strip this Court of jurisdiction to review the Petitioner's challenge to the Secretary of State's determination. See Part V and Part VI.

## VII. Section 1252(g)

Move on now to another statute.

The Respondents say that Section 1252(g) prevents consideration of the Petitioner's First Amendment claim as to the Secretary's determination. See Opposition Brief at 14.

Section 1252(g) reads:

> [N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The Supreme Court construed this provision in AADC --- and narrowly.

The Supreme Court rejected the parties' understanding of Section 1252(g) "as covering all or nearly all deportation claims." AADC, 525 U.S. at 478. Unlike Section 1252(b)(9), Section 1252(g) was not an expansive "zipper clause." Id. at 482.

> In fact, what § 1252(g) says is much narrower. The provision applies only to

100

**JA 200**

> three discrete actions that the Attorney
> General[69] may take: her decision or action to
> <u>commence</u> proceedings, <u>adjudicate</u> cases, or
> <u>execute</u> removal orders.

<u>Id</u>. at 482 (emphasis in original) (cleaned up).

<u>AADC</u>'s view of Section 1252(g) as a tightly drawn provision has
been reaffirmed by a Supreme Court plurality. <u>See</u> <u>Jennings</u>, 583
U.S. at 841 (<u>AADC</u> "did not interpret [Section 1252(g)'s]
language to sweep in any claim that can technically be said to
'arise from' the three listed actions of the Attorney General.
Instead, we read the language to refer to just those three
specific actions themselves.").

And the Third Circuit has landed on the same approach,
emphasizing just how narrow-gauged Section 1252(g) is. <u>See</u> <u>Tazu</u>
v. <u>Att'y Gen. U.S.</u>, 975 F.3d 292, 296 (3d Cir. 2020) ("Section
1252(g) does not sweep broadly. It reaches only these three
specific actions, not everything that arises out of them."); <u>see</u>
<u>also</u>, <u>e.g.</u>, <u>Chehazeh</u>, 666 F.3d at 133-35; <u>Garcia</u> v. <u>Att'y Gen.</u>
<u>of U.S.,</u> 553 F.3d 724, 728-29 (3d Cir. 2009).

\*     \*     \*

Section 1252(g) does not bar consideration here of the Secretary
of State's determination.

The reason is this: the determination is not one of the "three
specific actions," <u>Tazu</u>, 975 F.3d at 296, covered by the
statute, and it is not an exercise of "prosecutorial
discretion." <u>AADC</u>, 525 U.S. at 489.

\*     \*     \*

Cross the last two "specific actions" off the list.

The Secretary of State's determination is not "a decision or
action" to "execute," 8 U.S.C. § 1252(g), a removal order.
Indeed, no such order has been entered.

---

[69] The reference to "Attorney General" should now be read as
"Secretary of Homeland Security," given the post-Section 1252(g)
creation of the Department of Homeland Security. <u>See</u> <u>Johnson</u> v.
<u>Guzman Chavez</u>, 594 U.S. 523, 527 n.1 (2021); <u>La. Forestry Ass'n</u>
<u>Inc.</u> v. <u>Sec. U.S. Dep't of Lab.</u>, 745 F.3d 653, 660 n.3 (3d Cir.
2014); 6 U.S.C. § 557.

And the Secretary's determination is not "a decision or action" to "adjudicate" a case.  Id.  The Secretary is not a judicial officer, and the relevant statutes do not suggest he has the power to control immigration judges.

                              *     *     *

Come now to the last of the three "specific actions."

Is the Secretary of State's determination a "decision or action by the [the Secretary of Homeland Security] to commence proceedings"?

To ask this question is to answer it.

The determination is an "action."  See Part IV.A.3(a).  But it is an action by the Secretary of State, not what Section 1252(g) requires: an "action by the [Secretary of Homeland Security]."

There is no way to whistle past this textual problem.  See Est. of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992) (referencing the "basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written").

The textual problem cinches things --- and it is also a surface indication of a deeper issue.

Per the Supreme Court, Section 1252(g)'s aim was to give the Secretary of Homeland Security the space she needs to make the choices she must --- about enforcement priorities, for example, or allocation of finite resources.  These are classic questions of prosecutorial discretion, and they are generally for prosecutors to work through for themselves.

Per the Supreme Court: "Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  AADC, 525 U.S. at 485 n.9.[70]

But the Secretary of State does not exercise prosecutorial discretion here.  He takes his step --- he makes his determination --- and then it is over to the Secretary of Homeland Security, for her to make her choice.

_____

[70] See generally United States v. Texas, 599 U.S. 670, 679 (2023) (noting that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context," and describing the "problems raised by judicial review of the Executive Branch's arrest and prosecution policies").

There were, in short, two distinct moving pieces here --- (a) the Secretary of State's determination as to the Petitioner, and then (b) the act of "prosecutorial discretion" that followed. Section 1252(g), by its terms, covers only (b). But what the Petitioner is challenging is (a).

The two distinct steps are there on the face of the Secretary's memo, which marks the handover from the Secretary of State's area of responsibility to the Secretary of Homeland Security's.

The memo is addressed from him to her. See Determination at 1.

It reports the Secretary of State's conclusion. See id. ("I have determined that . . . [the Petitioner] . . . [is a] deportable alien[.]").

And it then looks to the next steps --- which are the Secretary of Homeland Security's to undertake. See id. ("I understand that [a Homeland Security component] now intends to initiate removal charges[.]").

And all of this makes sense under the various relevant statutes.

A Section 1227(a)(4)(C)(i) determination from the Secretary of State makes a noncitizen "deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

"Deportable" means can be deported, "[]able" to be deported.

Who then decides whether someone who can be deported will be removed? The Secretary of Homeland Security.

> Any alien . . . in and admitted to the United States shall, upon the order of the [Secretary of Homeland Security], be removed if the alien is within one of more of the following classes of deportable aliens.

8 U.S.C. § 1227(a) (emphasis added).[71]

---

[71] In exercising her power, the Secretary of Homeland Security generally has wide discretion. See, e.g., Arizona v. United States, 567 U.S. 387, 396 (2012); AADC, 525 U.S. at 483-84; Texas v. United States, 809 F.3d 134, 165-66 (5th Cir. 2015); Martinez-Garcia v. Ashcroft, 366 F.3d 732, 735 (9th Cir. 2004); Costa v. INS, 233 F.3d 31, 37 (1st Cir. 2000).

In a nutshell: the Secretary of State's determination was its own step; it was taken separate from, and before, the Secretary of Homeland Security's "decision or action to commence proceedings." AADC, 525 U.S. at 482 (cleaned up).

But jurisdiction is stripped by Section 1252(g) only as to the decision made by the Secretary of Homeland Security, see id. --- and the Petitioner's challenge here is not to that. Rather, it is to the earlier decision, made by the Secretary of State.

Jurisdiction is not stripped. See, e.g., N. Am. Butterfly Assoc. v. Wolf, 977 F.3d 1244, 1260 (D.C. Cir. 2020); Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 29 (D.D.C. 2018); Young Sun Shin v. Mukasey, 547 F.3d 1019, 1024 (9th Cir. 2008); Wong v. United States, 373 F.3d 952, 965 (9th Cir. 2004), abrogated on other grounds by Wilkie v. Robbins, 551 U.S. 537 (2007); Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 944 (5th Cir. 1999); Castellar v. Nielsen, 2018 WL 786742, at *10 (S.D. Cal. Feb. 8, 2018); Abdur-Rahman v. Napolitano, 814 F. Supp. 2d 1087, 1096 (W.D. Wa. 2010); Hafeez v. Dorochoff, 2007 WL 4300582, at *2 (N.D. Ill. Nov. 30, 2007); cf. Tazu, 975 F.3d at 298.

## VIII.  **The Policy**

The Court has considered and rejected the Respondents' argument that, under Section 1252(b)(9) and Section 1252(g), it lacks jurisdiction over the Petitioner's challenge to the Secretary of State's determination. See Part IV to Part VII.

Citing the same statutes, the Respondents also say there is no jurisdiction over the Petitioner's request for an injunction to stop a certain alleged policy. See Opposition Brief at 1, 8, 14.

This argument does not work. To see why, start with the background.

*     *     *

The Petitioner alleges that the Respondents have "adopted a policy . . . to retaliate against and punish noncitizens like [the Petitioner] for their participation in protests concerning Israel's military campaign in Gaza." Petition ¶ 2.

In particular:

> On or before March 8, 2025, Respondents
> adopted the Policy by which they would

104

**JA 204**

> retaliate against and punish noncitizens
> like [the Petitioner] for their
> participation in protests concerning
> Israel's military campaign in Gaza.  Under
> the Policy, Respondent Rubio, the Secretary
> of State, would make determinations that the
> protestors' presence or activities in the
> United States would have potentially serious
> foreign policy consequences for the United
> States and would compromise a compelling
> United States foreign policy interest.
> These determinations would then permit the
> Department of Homeland Security to seek to
> detain and deport the protestor.

Id. ¶ 44.

Per the Petitioner, he was detained by federal officials "as a
first implementation of the policy and a 'blueprint' for future
investigations and deportations of prominent student activists."
Id. at 13 (cleaned up).

The alleged policy, in short, is broader than the Secretary's
determination as to the Petitioner, since it is said to include
determinations as to others.  It is also broader than the
Petitioner's detention, since it is said to envision detention
of others.

* * *

The argument that Section 1252(b)(9) and Section 1252(g) strip
jurisdiction as to the alleged policy is not persuasive.

This is for the reasons explained above as to the Secretary's
determination, see Part IV to Part VII, plus some others.

These do not need to be belabored, but tick through them quickly
here.

First, while the Secretary's determination amounts to a Section
1252(b)(9) "action," see Part IV.A.3(a), it is a good deal
harder to say that a policy is an "action" --- especially a
policy that, as alleged, does not have sharply marked edges.
Cf. Opposition Brief at 8 (describing the alleged policy as "an
ill-defined initiative").

Second, if Section 1252(b)(9) applies here, meaningful fact-
finding as to the policy will be harder yet in the immigration

**JA 205**

courts.  <u>See</u> Part VI.B.  The policy, for example, is broader
than the Secretary's determination, and therefore could require
discovery as to a broader range of subjects.[72]

<u>Third</u> and finally, Section 1252(g) focuses on exercises of
"prosecutorial discretion."  <u>See</u> Part VII.  But the alleged
policy is an extra step removed from the decision of the
Department of Homeland Security to initiate removal proceedings
here.  The Secretary of State's determination came before the
Department of Homeland Security's removal-proceedings decision.
And the policy is alleged to predate the determination.

                    *    *    *

In short, there is no jurisdictional bar to the Court taking up
here the Petitioner's request for an injunction to stop the
alleged policy.[73]

---

[72]  Fact-finding complexities may be part of why courts routinely
hold that claims about a broad government policy --- like the
one alleged here --- are not barred by Section 1252(b)(9), and
therefore should go forward in federal court from the start.
<u>See</u> <u>Dep't of Homeland Sec.</u> v. <u>Regents of the Univ. of Cal.</u>, 591
U.S. 1, 19 (2020); <u>Texas</u> v. <u>United States</u>, 126 F.4th 392, 417
(5th Cir. 2025); <u>Casa de Md.</u> v. <u>U.S. Dep't of Homeland Sec.</u> 924
F.3d 684, 697 (4th Cir. 2019); <u>Nava</u> v. <u>Dep't of Homeland Sec.</u>,
435 F. Supp. 3d 880, 885-86, 895 (N.D. Ill. 2020); <u>O.A.</u>, 404 F.
Supp. 3d at 135-38; <u>cf.</u> <u>Daud</u> v. <u>Gonzales</u>, 207 F. App'x 194, 200
(3d Cir. 2006).

[73]  The Respondents also invoke another jurisdictional bar, 8
U.S.C. § 1226(e), but only as to the Petitioner's request for an
injunction to release him from detention.   <u>See</u> Opposition Brief
at 20-21.  This has no bearing here now.  Section 1226(e) bars
judicial review as to detention "under this section," a section
that covers detention "<u>pending</u> a decision on whether the alien
is to be removed from the United States."  8 U.S.C. § 1226(e)
(emphasis added); <u>see</u> <u>generally</u> <u>e.g.</u>, <u>Jennings</u>, 583 U.S. at 306;
<u>Velasco Lopez</u> v. <u>Decker</u>, 978 F.3d 842, 848 (2d Cir. 2020);
<u>Quinteros</u> v. <u>Warden Pike Cnty. Corr. Facility</u>, 784 F. App'x 75,
76-77 (3d Cir. 2019); <u>Hernandez</u> v. <u>Sessions</u>, 872 F.3d 976, 981-
82 (9th Cir. 2017); <u>Padilla-Ramirez</u> v. <u>Bible</u>, 882 F.3d 826, 829-
30 (9th Cir. 2017); <u>Sylvain</u> v. <u>Att'y Gen. of U.S.</u>, 714 F.3d 150,
154 (3d Cir. 2013); <u>Castellano</u> v. <u>Holder</u>, 337 F. App'x 263, 268
n.3 (3d Cir. 2009); <u>Gayle</u> v. <u>Napolitano</u>, 2013 WL 1090993, at *2

## IX.  **Conclusion**

In circumstances like this one, federal courts have recently split as to whether jurisdiction is stripped.  Compare Taal v. Trump, 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025) (yes), with Ozturk v. Trump, 2025 WL 1145250, at *15 (D. Vt. Apr. 18, 2025) (no).

This Court concludes that jurisdiction is not stripped over the Petitioner's claims that the Secretary of State's determination and the alleged policy are unconstitutional.

Section 1252(b)(9) is irrelevant.  It takes away federal district court jurisdiction only after an order of removal has been entered.  But none has been entered here.  See Part IV.

And even if Section 1252(b)(9) might apply when, as here, no order has been entered, that provision strips jurisdiction only when delayed review would amount to "meaningful review."  See Part V.  Here, it would not.  See Part VI.

As to Section 1252(g), that pulls away jurisdiction over "specific actions" by the Secretary of Homeland Security --- not over actions by the Secretary of State, like his determination here, and not over across-the-board policies, like the one alleged here.  See Part VII and Part VIII.

This Court has habeas jurisdiction over this case.  See Khalil, 2025 WL 1019658.  And as set out in this Opinion, that jurisdiction is intact.  It has not been removed.

---

(D.N.J. Mar. 15, 2013); Baguidy v. Elwood, 2012 WL 5406193, at *4 (D.N.J. Nov. 5, 2012).  If the Court holds that the Constitution forbids removal of the Petitioner based on a particular charge, then, apart from an appeal from that holding, there will no longer be a "pending . . . decision on whether the alien is to be removed from the United States" --- because the "decision" would have been made by this Court's determination that it would be unconstitutional to remove him.  Therefore, at that point, there will be no available argument that Section 1226(e) bars release.  To be sure, Section 1226(e) might be relevant if the Court were to consider ordering the release of the Petitioner without first finding that a charge against him is unconstitutional.  But that circumstance can be addressed when and if it comes up.

Orders as to next steps in this case will follow shortly.


DATE: April 29, 2025

 

_____
Michael E. Farbiarz, U.S.D.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

       *Petitioner*,

   v.

DONALD TRUMP et al.,

       *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION and ORDER**

### Table of Contents

I.    **Background**
    A.   **The Facts**
    B.   **Procedural History**
        1.   **Immigration Court**
        2.   **Federal Court**
    C.   **The Motion**
II.  **The Court's Approach**
III. **Vagueness: Legal Principles**
IV.  **The Secretary of State's Determination**
V.   **Vagueness**
    A.   **Section 1227**
        1.   **The Relevant Part**
        2.   **Sources**
        3.   **Meaning**
    B.   **Other Countries**
        1.   **"Want of Proper Words"**
        2.   **Domestic Impact**

C.   In Comparison

  1.   Precedent

    a)  Kolender

    b)  Akron

    c)  Cramp

  2.   The Counterargument

  3.   Implications

D.   History

  1.   Legislative History

    a)  Its Role

    b)  The Conference Report

    c)  The Prior Statute

  2.   Enforcement History

E.   Difficulty

F.   The First Amendment

G.   Another Approach

H.   Conclusion

VI.  Failure to Disclose

VII. Remedy

VIII. Conclusion

*     *     *

Federal officials detained a lawful permanent resident and seek to remove him from the United States for two reasons.

First, because his application for lawful permanent residence was allegedly inaccurate.

And second, because the Secretary of State has determined that his presence in the United States "compromise[s] a compelling . . . foreign policy interest."

The lawful permanent resident filed a habeas corpus petition, and has moved to preliminarily enjoin various federal officials --- arguing that the Constitution forbids them from removing him from the United States for either of the two cited reasons.

As to the first reason, the lawful permanent resident has not established a likelihood of success on the merits of his claim.

2

**JA 210**

Therefore, his motion for a preliminary injunction is denied.

As to the second reason, the lawful permanent resident has
established a likelihood of success on the merits.

But he has not put forward evidence as to the other things he
must show to secure a preliminary injunction.  The Court will
now afford him a chance to do so.

\*     \*     \*

I.    **Background**

A.    **The Facts**

The relevant facts for now are as follows.

A lawful permanent resident[1] was arrested by federal officials.
See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6; Second
Supplemental Declaration of Acting Field Office Director William
P. Joyce (ECF 72) ¶¶ 6-7.

He remains in immigration custody.  See Petitioner's Amended
Memorandum of Law in Support of Motion for Preliminary
Injunctive Relief (ECF 124) ("Motion for Preliminary
Injunction") at 1-2.

The Department of Homeland Security is seeking to remove him
from the United States on two grounds.

The first ground:

To become a lawful permanent resident, a person must submit an
application to federal officials.  See 8 C.F.R. § 245.2(a)(3).
The application has to be filled out "fully and accurately."
U.S. Citizenship & Immigr. Servs., Instructions for Application
to Register Permanent Residence or Adjust Status,
https://perma.cc/RZ5K-N47Z (accessed on May 28, 2025) (page 5 of
42).

In 2024, the lawful permanent resident completed his lawful-
permanent-resident application.  See DHS Evidence, Tab 2 (Apr.

---

[1]  Mahmoud Khalil.  A lawful permanent resident is a person who
has "been lawfully accorded the privilege of residing
permanently in the United States as an immigrant in accordance
with the immigration laws[.]"  8 U.S.C. § 1101(a)(20).

9, 2025) (Form I-485); <u>see</u> <u>also</u> Third Amended Petition ("Petition") ¶ 21.

But per federal officials, he did not accurately answer certain questions.  <u>See</u> Additional Charges (Mar. 17, 2025).

This can be a basis for removal from the United States.  <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A).

The <u>second</u> ground for removal:

The Secretary of State determined that the lawful permanent resident's continued presence or activities in the United States would "compromise a compelling foreign policy interest."  <u>See</u> Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Determination") (ECF 198-1), at 1.[2]

Such a determination can also be a basis for removal.  <u>See</u> 8 U.S.C. § 1227(a)(4)(C).

B.  **Procedural History**

There are two branches to this case.

Federal officials have brought removal proceedings in immigration court.  And the lawful permanent resident has brought a habeas corpus case in federal court.

1.  **Immigration Court**

Removing a lawful permanent resident from the United States generally requires a hearing.  <u>See</u> 8 U.S.C. § 1229a.  Those typically go forward before an immigration judge.  <u>See</u> <u>id</u>. § 1229a(a)(1); 8 C.F.R. § 1240.10(a).

Federal officials have begun removal proceedings against the Petitioner before an immigration judge.

The immigration judge has not ruled on the first ground, as to whether the lawful permanent resident can be removed based on the way he filled out the above-referenced application.

But she has ruled on the second ground, holding that the Petitioner can be removed from the United States based on the

---

[2]  The substance of the Secretary's determination is described in Part IV.

Secretary of State's determination.  See Audio Recording of
Hearing (April 11, 2025) at 1:34:40 to 1:38:26.

### 2.  **Federal Court**

Separate from the above, the lawful permanent resident initiated
his own proceedings.

He filed a habeas corpus petition in federal district court.

From here, he is called "the Petitioner."  The various people he
named in his habeas petition are referred to, collectively, as
"the Respondents."[3]

*     *     *

The Petitioner filed his suit in New York, but the case was
transferred to New Jersey.  See Khalil v. Joyce, 2025 WL 849803
(S.D.N.Y. Mar. 19, 2025).

Here, the Respondents moved to dismiss the case, arguing that it
should go forward only where the Petitioner has been in
immigration custody --- Louisiana.  The motion was denied.  The
Court held that habeas jurisdiction is proper in New Jersey.
See Khalil v. Joyce, 2025 WL 972959 (D.N.J. Apr. 1, 2025).[4]

The Respondents also argued that jurisdiction was stripped from
this Court under the Immigration and Nationality Act.  See
Respondents' Opposition to Petitioner's Motion for a Preliminary
Injunction ("Opposition Brief") (ECF 156) at 8-21.  The Court
rejected this argument, holding that its habeas jurisdiction

---

[3]  The Respondents are listed in the current habeas petition as:
President of the United States Donald Trump; Acting Field Office
Director of New York, United States Immigration and Customs
Enforcement, William P. Joyce; Warden of Elizabeth Contract
Detention Facility Yolanda Pittman; Acting Director of United
States Immigration and Customs Enforcement Caleb Vitello;
Secretary of the United States Department of Homeland Security
Kristi Noem; Secretary of the United States Department of State
Marco Rubio; and Attorney General of the United States Pamela
Bondi.

[4]  The Court certified its April 1 opinion and order under 28
U.S.C. § 1292(b), by an opinion dated April 4.  See Khalil v.
Joyce, 2025 WL 1019658, at *2 (D.N.J. Apr. 4, 2025).  On May 6,
the Third Circuit denied the petition to appeal.  See Khalil v.
President U.S., No. 25-08019 (3d Cir. May 6, 2025).

5

**JA 213**

remains intact.  See Khalil v. Joyce, 2025 WL 1232369 (D.N.J. Apr. 29, 2025).[5]

Finally, the Respondents moved to dismiss or transfer this case for lack of venue.  The briefing was completed as of May 5, and the motion was denied that day.  See ECF 248.

### C.  **The Motion**

As noted, the Petitioner has moved for a preliminary injunction. See ECF 66.

The motion became fully submitted on May 14, with the filing of the parties' final legal brief.  See ECF 255.

The Petitioner's motion is based on two arguments.

First, the Petitioner claims that the efforts to remove him are retaliation for his exercise of First Amendment-protected speech.  See Motion for Preliminary Injunction at 10-18.

And second, he argues that the efforts to remove him violate the Due Process Clause, because they are rife with unconstitutional "vagueness."  See id. at 23-31.

The Petitioner's motion is before the Court.

## II.  **The Court's Approach**

Federal officials, as noted, are seeking to remove the Petitioner from the United States on two grounds, see Part I.A., and the Petitioner's motion aims to enjoin them from doing so. See Part I.C.

\*     \*     \*

The Court first considers whether the underlying federal statutes are unconstitutionally vague as they are being applied to the Petitioner by means of the Secretary of State's determination.  See Motion for Preliminary Injunction at 23-31.

---

[5]  On April 30, the Respondents moved to certify the April 29 opinion under 28 U.S.C. § 1292(b).  See ECF 218.  The Petitioner opposed the motion.  See ECF 221.  On May 1, the Court issued an opinion denying certification.  See Khalil v. Joyce, 2025 WL 1262349, at *2 (D.N.J. May 1, 2025).

As to this argument, the Court lays out the governing legal
principles, see Part III, and then describes the Secretary's
determination.  See Part IV.

From there, the Court provides its conclusion: the Petitioner is
likely to succeed[6] on the merits of this unconstitutional
vagueness argument.  See Part V.

But this does not entitle him to a preliminary injunction.  He
has not put before the Court evidence as to the various other
things he must prove, see footnote 6, before an injunction might
issue.  See Part VII.  The Court will give the Petitioner a
chance to quickly fill out the record, and for the Respondents
to then weigh in.  See id.

\*     \*     \*

The Court also considers what it understands to be[7] the
Petitioner's second argument: that he cannot be removed from the
United States based on his alleged failure to accurately fill
out his lawful-permanent-resident application --- because the
effort to remove him flows from an allegedly unconstitutional
policy established by the President and his senior advisors.

The Court's conclusion: this argument is not meaningfully
developed, and the Petitioner therefore has not carried his
burden of showing that he is likely to succeed on the merits.
Accordingly, an injunction may not issue.  See Part VI.

\*     \*     \*

Start off, just below, with the legal principles that govern the
Petitioner's void-for-vagueness challenge to the Secretary of
State's determination that he should be removed from the United
States.

---

[6]  The focus throughout is on likely success, not success.  This
is because to win on his preliminary injunction motion, the
Petitioner must show "he is [1] likely to succeed on the merits,
[2] that he is likely to suffer irreparable harm in the absence
of preliminary relief, [3] that the balance of equities tips in
his favor, and [4] that an injunction is in the public
interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7,
20 (2008) (emphasis added).  The first two factors are "the most
critical."  Nken v. Holder, 434 U.S. 418, 434 (2009).

[7]  "Understands to be" because, as noted in Part VI, the argument
on this point is not crystal clear.

## III. **Vagueness: Legal Principles**

Our laws are required to strike a balance.

A law cannot be so narrow that it punishes pre-selected people. Think, for example, of the Constitution's limit on bills of attainder. <u>See</u> U.S. Const., art. I, § 9, cl. 3; <u>Cummings</u> v. <u>Missouri</u>, 71 U.S. 277 (1866).

And at the same time, a law cannot be so broad that it covers just about anyone. <u>See</u> <u>United States</u> v. <u>Reese</u>, 92 U.S. 214, 221 (1875).

A given law needs clarity, too.

The rule of lenity,[8] for example, helps to ensure that our criminal laws are exacting. <u>See</u>, <u>e.g.</u>, <u>Liparota</u> v. <u>United States</u>, 471 U.S. 419, 427 (1985).

Constitutional vagueness doctrine is animated by each of these concerns.

The scope of a law matters for vagueness doctrine. And so does how clear it is.

Take clarity <u>first</u>.

Vagueness doctrine requires that a law be clear enough to provide real notice --- understandable guidance as to the conduct a person should steer himself away from, to avoid the negative consequence the law lays out.

This sort of guidance "guarantees that ordinary people have fair notice of the conduct a statute proscribes." <u>Sessions</u> v. <u>Dimaya</u>, 584 U.S. 148, 155-56 (2018) (cleaned up).

And this "guarantee" is a matter of constitutional law. Why? Because "[v]ague laws contravene the first essential of due process of law that statutes must give people of common

---

[8] "The judicial doctrine holding that a court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment." <u>Rule of Lenity</u>, <u>Black's Law Dictionary</u> (12th ed. 2024).

8

**JA 216**

intelligence fair notice of what the law demands of them."
<u>United States</u> v. <u>Davis</u>, 588 U.S. 445, 451 (2019) (cleaned up).[9]

Vagueness doctrine zeros in on a <u>second</u> concern, too.

It aims to cut off laws that are so broad, or so fuzzy, that
they end up warping the separation of powers --- by handing over
de facto responsibility for deciding what the law forbids from
legislators (who are supposed to be the ones making the law) to
executive officials like police or prosecutors (who are only
supposed to be enforcing it).[10]

---

[9]  <u>See</u> <u>also</u>, <u>e.g.</u>, <u>City of Chi.</u> v. <u>Morales</u>, 527 U.S. 41, 58
(1999) ("[T]he purpose of the fair notice requirement is to
enable the ordinary citizen to conform his or her conduct to the
law."); <u>Gentile</u> v. <u>State Bar of Nev.</u>, 501 U.S. 1030, 1077-78
(1991) ("The void-for-vagueness doctrine is concerned with a
defendant's right to fair notice and adequate warning that his
conduct runs afoul of the law."); <u>Grayned</u> v. <u>City of Rockford</u>,
408 U.S. 104, 108 (1972) ("[W]e insist that laws give the person
of ordinary intelligence a reasonable opportunity to know what
is prohibited, so that he may act accordingly."); <u>Rabe</u> v.
<u>Washington</u>, 405 U.S. 313, 315 (1972) ("To avoid the
constitutional vice of vagueness, it is necessary, at a minimum,
that a statute give fair notice that certain conduct is
proscribed."); <u>Papachristou</u> v. <u>City of Jacksonville</u>, 405 U.S.
156, 162 (1972) ("[A vague law] fails to give a person of
ordinary intelligence fair notice that his contemplated conduct
is forbidden by the statute.") (cleaned up); <u>Jordan</u> v. <u>De
George</u>, 341 U.S. 223, 230 (1951) ("The essential purpose [of
vagueness doctrine] . . . is to warn individuals of the . . .
consequences of their conduct."); <u>Connally</u> v. <u>Gen. Constr. Co.</u>,
269 U.S. 385, 391 (1926) ("[A] statute which either forbids or
requires the doing of an act in terms so vague that men of
common intelligence must necessarily guess at its meaning and
differ as to its application violates the first essential of due
process of law.").

[10]  <u>See</u>, <u>e.g.</u>, <u>Davis</u>, 588 U.S. at 451 ("Vague statutes threaten
to hand responsibility for defining crimes to relatively
unaccountable police, prosecutors, and judges, eroding the
people's ability to oversee the creation of the laws they are
expected to abide."); <u>Kolender</u> v. <u>Lawson</u>, 461 U.S. 352, 358
(1983) ("Where the legislature fails to provide . . . minimal
guidelines, a criminal statute may permit a standardless sweep
that allows policemen, prosecutors, and juries to pursue their

This blurring of law-making power with law-enforcing power can be an "invit[ation] [to] arbitrary enforcement," because it can leave executive officials "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case[.]" <u>Beckles</u> v. <u>United States</u>, 580 U.S. 256, 266 (2017) (cleaned up).[11]

In a nutshell: a concern for notice to "ordinary people," and a concern for subjecting government power to crisply drawn and "fixed" standards --- these are the two main engines of constitutional vagueness doctrine.

*     *     *

Take up the details of vagueness doctrine as they come up.

For now, two last things.

*     *     *

First, how vague a law can be depends on the kind of law it is.

Civil laws that deal mainly with economic matters take the lowest rung on the ladder.

---

personal predilections.") (cleaned up); <u>cf</u>. <u>Reese</u>, 92 U.S. at 221 ("[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained," and "[t]his would . . . substitute the judicial for the legislative department of the government"). Vague laws can also sometimes transfer lawmaking power to other actors, too. Juries and judges, for example. <u>See</u>, <u>e.g.</u>, <u>Beckles</u> v. <u>United States</u>, 580 U.S. 256, 266 (2017); <u>Johnson</u> v. <u>United States</u>, 576 U.S. 591 (2015); <u>see also</u> <u>Louisville & N. R. Co.</u> v. <u>R.R. Comm'n of Tenn.</u>, 19 F. 679, 691 (C.C.M.D. Tenn. 1884); <u>Ex Parte Jackson</u>, 45 Ark. 158, 164 (1885).

[11] <u>See</u>, <u>e.g.</u>, <u>Johnson</u>, 576 U.S. at 595 (due process is violated when a law is "so standardless that it invites arbitrary enforcement"); <u>Vill. of Hoffman Ests.</u> v. <u>Flipside, Hoffman Ests., Inc.</u>, 455 U.S. 489, 498 (1982) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.") (cleaned up); <u>Smith</u> v. <u>Goguen</u>, 415 U.S. 566, 572-73 (1974) (vagueness doctrine "requires legislatures to set reasonably clear guidelines for law enforcement and triers of fact in order to prevent arbitrary and discriminatory enforcement") (cleaned up).

As to these sorts of laws, vagueness doctrine is not especially demanding.  See, e.g., Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982); Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 48-49 (1966); United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 34-35 (1963).

The next level up: criminal laws.

These get a much harder look from a vagueness perspective.  See, e.g., City of Chi. v. Morales, 527 U.S. 41, 56 (1999); Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 525 (1994); Kolender v. Lawson, 461 U.S. 352, 357 (1983); Papachristou v. City of Jacksonville, 405 U.S. 156, 165-66 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

And critically: this is also the category for immigration laws that can trigger removal from the United States, laws like the ones the Secretary of State's determination is based on.  See Dimaya, 584 U.S. at 156-57 (citing Jordan v. De George, 341 U.S. 223, 229, 231 (1951)).

Up at the top --- arguably vague laws that touch on First Amendment-protected rights.

These must meet the most exacting vagueness standards.  See, e.g., FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253-54 (2012); Smith v. Goguen, 415 U.S. 566, 573 (1974); Baggett v. Bullitt, 377 U.S. 360, 372 (1964); Cramp v. Bd. of Pub. Instruction of Orange Cnty., 368 U.S. 278, 287 (1961); Winters v. New York, 333 U.S. 507, 518 (1948).

                    *     *     *

A second point, the final one for now.

Vagueness challenges to a law run down one of two tracks.  There are facial challenges, and there are "as applied" challenges. See generally 32 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8141 (2d ed. 2025).

A facial challenge is about the law as it might be applied to everyone (or nearly everyone).

An as-applied challenge is about the law as it actually applies to the person who brings the challenge.

To win on a facial challenge, a person must show that a law is vague in all of its applications (or at least in a great many of

them).  See id.; Johnson v. United States, 576 U.S. 591, 595–96, 602–03 (2015); Hoffman Ests., 455 U.S. at 495.

To win on an as-applied challenge, a person must show that a law is vague in the way that it is being applied to him.  See Fed. Prac. & Proc. Judicial Review § 8141 n.13 (collecting cases).

\*    \*    \*

More on the law as it comes.

Turn now to a description of the Secretary of State's determination.

## IV.   **The Secretary of State's Determination**

As noted, under 8 U.S.C. § 1227(a)(4)(C), a foreign national may be removed from the United States based on a determination from the Secretary of State.

Such determinations must meet higher standards when they are based on a foreign national's "otherwise lawful" "beliefs, statements, or associations."  See 8 U.S.C. § 1182(a)(3)(C)(iii).

Those higher standards have a procedural aspect and a substantive aspect.

As to procedure, the Secretary's determination must be (a) made by him personally and (b) reported to certain congressional leaders.  See id. §§ 1182(a)(3)(C)(iii), 1182(a)(3)(C)(iv).

As to substance, the Secretary must determine that the foreign national's "presence or activities" in the United States "would compromise a compelling United States foreign policy interest." Id. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii).

\*    \*    \*

Here, the Secretary of State's determination came in the form of a memorandum.  See Determination at 1.

In it, the Secretary referenced the higher standard.  See Determination at 1 ("Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.").

12

**JA 220**

And in the memo, the Secretary seemed to apply the higher standard.  See id. ("I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.").

In short: the higher standard is the one that is invoked here.[12]

<p style="text-align:center">*    *    *</p>

The Secretary determined that the Petitioner undertook activities within the United States.[13]

The effects of these activities, the Secretary determined, were felt inside the United States.[14]

---

[12]  Two things.  First, 8 U.S.C. § 1227(a)(4)(C) became law in 1990.  Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat 4978.  But until 1996, it was in a different place in Title 8 of the United States Code --- not in Section 1227, as it is now, but in Section 1251.  See 8 U.S.C. § 1251(a)(4)(C)(i) (1995); see also Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat 3009 (moving the provisions).  And second, the higher standard that is relevant here is in its own corner of Title 8.  It is at Section 1182.  For ease of reference, throughout this Opinion and Order the Court refers collectively to (a) Section 1227(a)(4)(C), (b) the former Section 1251, and (c) the relevant subsections of Section 1182 --- as "Section 1227."

[13]  The Secretary's determination described the Petitioner's "participation and role[] . . . in antisemitic protests and disruptive activities," and the Petitioner's "public actions . . . in the United States."  Determination at 2.

[14]  Per the determination, the Petitioner's activities "fostered a hostile environment for Jewish students in the United States," and the Petitioner's "continued presence . . . in the United States undermine[s] U.S. policy to combat anti-Semitism . . . in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." Id.

<p style="text-align:center">13</p>

<p style="text-align:center">**JA 221**</p>

The Secretary determined that these activities also had an impact outside of the United States.[15]  See id.

The full determination is at Appendix A.  The substantive part is this:

> I have determined that the activities and presence of [the Petitioner] in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  Th[is] determination[] [is] based on information provided by the DHS/ICE/HIS regarding the participation and role[] of . . . [the Petitioner] in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. . . .  The public actions and continued presence of . . . [the Petitioner] in the United States undermine[s] U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States.  Consistent with E.O. 14150,[16] America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

Id. at 1-2.

---

[15]  The Secretary determined that "[t]he public actions and continued presence" of the Petitioner "undermine[s] U.S. policy to combat anti-Semitism around the world."  Id.

[16]  This is a reference to Executive Order 14,150, issued by the President on January 20, 2025.  It is attached as Appendix B.

14

**JA 222**

V.    <u>**Vagueness**</u>

Is the Petitioner likely to succeed on the merits of his claim that Section 1227,[17] applied to him through the Secretary's determination, is unconstitutionally vague?

The Court's conclusion: yes.

This Part explains why.

A.    <u>**Section 1227**</u>

1.    <u>**The Relevant Part**</u>

At the core of any constitutional vagueness claim is the argument that a law is doubly flawed.

It does not put the ordinary person on notice as to what is allowed and what is not.  <u>See</u> Part III.

And it does not delineate the power of the government sharply enough.  <u>See</u> <u>id</u>.

Here, Section 1227 is the statute that is claimed to be vague. <u>See</u> Petitioner's Supplemental Vagueness Brief (ECF 233) ("Petitioner's Supplemental Brief") at 15.

But not all parts of Section 1227 matter for a vagueness analysis.

Some parts speak to <u>how</u> a removal might go forward --- removal happens, in cases like this one, via a "personal" determination by the Secretary of State.  <u>See</u> Part IV.

Other parts of the statute speak to <u>what</u> a person might do to potentially get himself removed --- "compromise a compelling United States foreign policy interest."  <u>See</u> <u>id</u>.

Only the latter piece of Section 1227 is relevant to the vagueness analysis.

Why?

Because only "compromise a compelling . . . foreign policy interest" purports to give a foreign national the notice that vagueness law requires.

_____

[17]  Recall that this is shorthand for a set of laws.  <u>See</u> footnote 12.

And because only "compromise a compelling . . . foreign policy interest" purports to bolt on substantive guardrails --- outer-edge limits on the space in which an official (here, the Secretary) is free to act.

What notice does "compromise a compelling . . . foreign policy interest" supply to the ordinary person?  What limits do the quoted words put on who the Secretary can remove?[18]

Move through a set of sources, to see where the answer to these questions might come from.

###    2.  **Sources**

Section 1227 is a statute, and to know what a statute conveys, the first stop is always the same: a look to its words.  See, e.g., Sw. Airlines Co. v. Saxon, 596 U.S. 450, 457 (2022) ("As always, we begin with the text."); accord, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979).

Vagueness law is no exception.

To understand both the heads-up that a law gives to a "person of ordinary intelligence," Papachristou, 405 U.S. at 162, and the extent to which a law crisply hems in the power of government officials, the words of the statute are the place to start.  See Dimaya, 584 U.S. at 164; Holder v. Humanitarian L. Project, 561

---

[18]  The notice question and the enforcement-power question often run together.  If an ordinary person needs to guess at what a law means, government enforcers may need to guess, too.  Cf. Winters, 333 U.S. at 519 (it would be "utter[ly] impossib[le] [for] the actor or the trier to know where this . . . standard of guilt would draw the line") (emphasis added).  And more notice often means tighter limits on what the government can do.  To see the point, imagine if Section 1227 were tweaked --- if it said a person could be removed only for "compromising a compelling foreign policy interest related to nuclear weapons."  The hypothesized change adds specificity, which improves notice.  And the change also tightens the range of who can be removed, which trims back executive discretion.  Removal "related to nuclear weapons" rings a clearer warning bell.  And it also limits the Secretary to nuclear-related removals.  In a nutshell: notice and limits on government power are often yoked together, pulling in the same direction.  (Not always, though.  See, e.g., footnote 20.)

U.S. 1, 20-21 (2010); <u>Morales</u>, 527 U.S. at 56-59; <u>Posters 'N'
Things</u>, 511 U.S. at 525-26.

But they are not usually the place to finish.

This is because, for the purposes of vagueness law, sources
outside the statutory text are also relevant.

But walk through the usual outside-the-text sources here, and it
becomes clear that they have no role to play in this case, with
one exception.

\*     \*     \*

<u>First</u>, courts look to prior judicial decisions that interpret
the statute.  Precedents might have clarified the statute, or
whittled it back.  <u>See</u>, <u>e.g.</u>, <u>Johnson</u>, 576 U.S. at 601; <u>Skilling</u>
v. <u>United States</u>, 561 U.S. 358, 407-08 (2010); <u>Grayned</u> v. <u>City
of Rockford</u>, 408 U.S. 104, 111-12 (1972); <u>United States</u> v. <u>Loy</u>,
237 F.3d 251, 263 (3d Cir. 2001).

But that is irrelevant here.

Section 1227 has been meaningfully analyzed by a federal court
only once --- by Judge Barry, when she sat on this Court.  <u>See</u>
<u>Massieu</u> v. <u>Reno</u>, 915 F. Supp. 681, 699-703 (D.N.J. 1996), <u>rev'd
on other grounds</u>, 91 F.3d 416 (3d Cir. 1996).

Judge Barry did not impose any interpretation on Section 1227.
<u>See</u> <u>id</u>. at 703.

Rather, she simply struck it down as unconstitutionally vague --
- across the board, on its face.  <u>See</u> <u>id</u>.[19]

\*     \*     \*

<u>Second</u>, courts look to the ways in which prior interpretations
by administrative tribunals have molded a statute's meaning.
<u>See</u>, <u>e.g.</u>, <u>Fox Television Stations</u>, 567 U.S. at 254-55; <u>U.S.
Civ. Serv. Comm'n</u> v. <u>Nat'l Ass'n of Letter Carriers, AFL-CIO</u>,
413 U.S. 548, 572 (1973); <u>see also</u> <u>Alphonsus</u> v. <u>Holder</u>, 705 F.3d
1031, 1043 (9th Cir. 2013), <u>abrogated on other grounds by</u>
<u>Guerrero</u> v. <u>Whitaker</u>, 908 F.3d 541 (9th Cir. 2018); <u>Miranda</u> v.
<u>U.S. Att'y Gen.</u>, 632 F. App'x 997, 999 (11th Cir. 2015); <u>Hess</u> v.

---

[19]  The Petitioner has specifically stated that he is not
pursuing a facial vagueness challenge.  <u>See</u> Motion for
Preliminary Injunction at 29 n.27.  Rather, his is an as-applied
challenge only.  <u>See</u> <u>id</u>. at 23-24; <u>see</u> <u>generally</u> Part III.

Bd. of Parole & Post-Prison Supervision, 514 F.3d 909, 914 (9th
Cir. 2008).

But there is no real administrative case law to lean on here.

In 1999, the Board of Immigration Appeals, the top
administrative court in this area, held that a Secretary of
State's Section 1227 determination is conclusive. See In re
Ruiz-Massieu, 22 I. & N. Dec. 833, 842 (BIA 1999). An
immigration judge must take the determination at face value,
without further analysis. See id.

That nipped in the bud the development of any potentially
clarifying administrative case law.

                    *    *    *

Third, courts thinking through vagueness challenges look to
administrative regulations that might clarify a statute's
meaning and limit the sorts of actions the government can take.
See, e.g., Northstar Wireless, LLC v. FCC, 38 F.4th 190, 216
(D.C. Cir. 2022); United States v. Blaszczak, 947 F.3d 19, 40
(2d Cir. 2019), cert. granted, judgment vacated sub nom. Olan v.
United States, 141 S. Ct. 1040 (2021); Wis. Res. Prot. Council
v. Flambeau Mining Co., 727 F.3d 700, 708 (7th Cir. 2013);
United States v. McAusland, 979 F.2d 970, 975 (4th Cir. 1992).

But again: nothing like that on the table.

No regulation, for example, lists the broad categories of
"foreign policy interests" that could trigger a Section 1227
removal, or spells out criteria for what might count as
"compelling."

                    *    *    *

Fourth, courts in vagueness cases sometimes look to guidance
materials --- a manual posted online, for example, can provide a
heads-up as to how the government might be looking to enforce a
particular statute. See, e.g., FTC v. Wyndham Worldwide Corp.,
799 F.3d 236, 257-58 & nn.22-24 (3rd Cir. 2015); accord, e.g.,
Carman v. Yellen, 112 F.4th 386, 404 (6th Cir. 2024); Cal. Pac.
Bank v. FDIC, 885 F.3d 560, 571-72 (9th Cir. 2018) (as to

interpretative materials, such as policy statements, agency manuals, etc.).[20]

But there is no public manual, or anything else of the kind, that sheds light on when the Secretary of State might opt to use his Section 1227 power.

\*     \*     \*

Fifth, courts ask if the statute uses technical words. See, e.g., Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502 (1925); Omaechevarria v. Idaho, 246 U.S. 343, 348 (1918). Or well-understood legal terms, like phrases pulled in from the common law. See, e.g., Cameron v. Johnson, 390 U.S. 611, 616 n.7 (1968); Winters, 333 U.S. at 519; Mahler v. Eby, 264 U.S. 32, 40 (1924); accord, e.g., United States v. Nason, 269 F.3d 10, 22 (1st Cir. 2001); Jellum v. Cupp, 475 F.2d 829, 831 (9th Cir. 1973).

"Public interest," for example, might sound impossibly open-ended. See FCC v. RCA Commc'ns, 346 U.S. 86, 90-91 (1953) (discussing the term). But decades of judicial precedent have defined it, see id. --- and so in some cases, with the common law meaning read into the statute, "public interest" can pass a vagueness test. See, e.g., N.Y. Cent. Sec. Corp. v. United States, 287 U.S. 12, 25 (1932) (taking this approach).

But none of this is in the mix here.

"Foreign policy interest" is not a legal term of art. Neither is "compromise."

"Compelling" often comes up in constitutional law. See, e.g., Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 532 (2022); Fisher v. Univ. of Tex. at Austin, 570 U.S. 297, 314-15 (2013).

---

[20] Guidance materials provide potential notice --- they help "ordinary people," Morales, 527 U.S. at 64, see what the government might do. But they do not generally purport to constrain government power by limiting what it can do. So when it comes to guidance materials, notice and power do not travel together. Guidance supplies notice. But it does not provide an equal measure of constraint on the scope of government power. Cf. footnote 18.

19

**JA 227**

But Section 1227 does not import the constitutional law meaning of "compelling."[21]

\*    \*    \*

Sixth, federal courts routinely look to legislative history to decide whether a particular statute is too vague.[22]

And in this case, both the Petitioner and the Respondents direct the Court to Section 1227's legislative history.  See

---

[21] In constitutional law, "compelling" indicates which interests (ends) the government must be pursuing for an action to have a chance to make it past the means-ends gauntlet ("narrowly tailored") required by the doctrine of strict scrutiny.  See, e.g., Kennedy, 597 U.S. at 532; Fisher, 570 U.S. at 314-15.  A campaign-finance law that triggers strict scrutiny might clear the hurdle if it aims to achieve the compelling interest of battling overt corruption.  But not if its goal is a non-compelling interest, like evening out resources between candidates.  "Compelling," in short, matters in constitutional law because it defines the subset of government interests that can be invoked to try to justify certain government actions.  But here, there is no need to pick an interest.  Congress has done that.  Section 1227 says it: a "foreign policy interest."  In Section 1227, therefore, "compelling" is not shorthand for those interests that, as in constitutional law, might be important enough to allow for certain government actions.  Rather, "compelling" in Section 1227 is simply an adjective that modifies an already selected interest, a "foreign policy interest."

[22] See Davis, 588 U.S. at 459-60; Nat'l Dairy Prods. Corp., 372 U.S. at 32-34; United States v. Harriss, 347 U.S. 612, 620-21 (1954); Boyce Motor Lines v. United States, 342 U.S. 337, 341-42 (1952); see also Gougen, 415 U.S. at 582 n.30; Kahn v. United States, 753 F.2d 1208, 1222 n.8 (3d Cir. 1985); accord, e.g., CPR for Skid Row v. City of L.A., 779 F.3d 1098, 1108 (9th Cir. 2015); United States v. Rybicki, 354 F.3d 124, 132-37 (2d Cir. 2003); United States v. Colon-Ortiz, 866 F.2d 6, 11 (1st Cir. 1989); United States v. Ocegueda, 564 F.2d 1363, 1365 (9th Cir. 1977); cf. Skilling, 561 U.S. at 404-05; United States v. Powell, 423 U.S. 87, 91 (1975); Nat'l Ass'n of Letter Carriers, 413 U.S. at 571-72; but see United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83-84 (1932); Fleuti v. Rosenberg, 302 F.2d 652, 657 (9th Cir. 1962).

Petitioner's Supplemental Brief at 18–19; Respondents'
Supplemental Vagueness Brief (ECF 256) ("Respondents'
Supplemental Brief") at 5–7.

Here, the legislative history sheds light on how an ordinary
person might understand Section 1227.  That is taken up below,
in Part V.D.1.

*    *    *

In sum:

Courts can often draw on outside-the-text sources as part of a
vagueness analysis.

These sources can provide notice.  And they can limit government
enforcement discretion.

But with the exception of legislative history, none of this is
in play here.  As to Section 1227, there are no relevant
judicial or administrative decisions, regulations, guidance
materials, or borrowed technical or legal terms.

Therefore, the statute mostly stands alone.

Move now to an analysis of its meaning.

### 3.  <u>Meaning</u>

A statute's words are generally given their "ordinary meaning."
<u>See</u> <u>New Prime Inc.</u> v. <u>Oliveira</u>, 586 U.S. 105, 113 (2019);
<u>Walters</u> v. <u>Metro. Educ. Enters., Inc.</u>, 519 U.S. 202, 207 (1997);
<u>Perrin</u> v. <u>United States</u>, 444 U.S. 37, 42 (1979); <u>Caminetti</u> v.
<u>United States</u>, 242 U.S. 470, 485-86 (1917).

And for an objective, down-the-middle understanding of ordinary
meaning, courts typically do what everyone else does --- they
reach for the dictionary.  <u>See</u>, <u>e.g.</u>, <u>Wis. Bell, Inc.</u> v. <u>United
States ex rel. Heath</u>, 145 S. Ct. 498, 505 (2025);  <u>Taniguchi</u> v.
<u>Kan Pac. Saipan, Ltd.</u>, 566 U.S. 560, 567-69 (2012); <u>Reiter</u> v.
<u>Sonotone Corp.</u>, 442 U.S. 330, 338 (1979); <u>Eisner</u> v. <u>Macomber</u>,
252 U.S. 189, 207 (1920); <u>Osborne</u> v. <u>S.D. Land & Town Co.</u>, 178
U.S. 22, 38 (1900); <u>Fanning</u> v. <u>Gregoire</u>, 57 U.S. 524, 525
(1853); <u>United States</u> v. <u>Tenbroek</u>, 15 U.S. (2 Wheat.) 248, 251-
52 (1817).

Vagueness doctrine works the same way.

Courts thinking through vagueness questions start with the words
of the statute.  <u>See</u> <u>Dimaya</u>, 584 U.S. at 160-61; <u>Johnson</u>, 576

U.S. at 597; Holder, 561 U.S. at 20-21; United States v.
Williams, 553 U.S. 285, 306 (2008); Morales, 527 U.S. at 56-59;
Posters 'N' Things, 511 U.S. at 525-26; Hoffman Ests., 455 U.S.
at 500; Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971).

And they rely on dictionaries to find the "ordinary meaning" of
the statute's words, Oliveira, 586 U.S. at 113, so as to land on
a sense of what "ordinary people," Johnson, 576 U.S. at 595,
would take from them.[23]

The Supreme Court has taken this approach.  See, e.g., Holder,
561 U.S. at 23-24 (reasoning from a statute's dictionary
definition in a vagueness case); Hoffman Ests., 455 U.S. at 501-
02 (same).  And so has the Third Circuit.  See CMR D.N. Corp. v.
City of Phila., 703 F.3d 612, 632 (3d Cir. 2013) (same); United
States v. Maurer, 639 F.3d 72, 78 (3d Cir. 2011) (same).

                    *     *     *

Against this backdrop, recall that the relevant part of
Section 1227 is the piece that says a foreign national can be
removed if he has "compromise[d] a compelling United States
foreign policy interest."  See Part V.A.1.

Zoom in on two of these words: "foreign policy."

One current[24] definition of "foreign policy": "the underlying
basic direction of the activity and relationships of a sovereign

---

[23]  When a statute defines a word, the statute's definition is
plugged in, not a dictionary's.  See, e.g., Holder, 561 U.S. at
20-21.  Section 1227's key words for vagueness purposes are
"compromise," "compelling," and "foreign policy interests."  See
Part V.A.1.  But the statute does not define them.

[24]  The law generally asks about a statute's meaning at the time
it was enacted.  See Niz-Chavez v. Garland, 593 U.S. 155, 160
(2021); Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020);
Tanzin v. Tanvir, 592 U.S. 43, 48 (2020); Oliveira, 586 U.S. at
113.  Time-of-enactment dictionaries help with that work.  See
Delaware v. Pennsylvania, 598 U.S. 115, 128 (2023); Wis. Cent.
Ltd. v. United States, 585 U.S. 274, 277-78 (2018); see also
Khalil, 2025 WL 1232369, at *8-9; Khalil, 2025 WL 972959, at
*17.  But here, things may be more complicated.  Recall
vagueness doctrine's two underlying concerns.  One is ensuring
that the government's enforcement discretion under a statute is
appropriately delineated.  See Kolender, 461 U.S. at 358;

state in its interaction with other sovereign states typically
manifested in peace, war, neutrality, and alliance or various
combinations of or approaches to these."  Foreign Policy, n.,
Merriam-Webster's Unabridged Dictionary (2025).

Another current definition: "the policies of a government
regarding relations with other countries."  Foreign Policy, n.,
Collins English Dictionary (2025).

And some others.

"The diplomatic policy of a nation in its interactions with
other nations."  Foreign Policy, n., New American Heritage
Dictionary of the English Language (5th ed. 2022).

"[A] government's strategy in dealing with other nations."
Foreign Policy, n., New Oxford American Dictionary (3d ed.
2015).[25]

---

Papachristou, 405 U.S. at 162.  That starts off with this
question: what is the government's enforcement discretion under
the statute?  That is mainly a statutory interpretation
question.  And for Section 1227, that question turns to an
extent on the meaning of the statute when it was passed, in
1990.  But vagueness doctrine also focuses on notice to ordinary
people.  And that could conceivably require a different focus.
Not on the meaning of the law when it was passed.  But rather on
what the law was taken to mean when the Petitioner allegedly
acted --- here, seemingly in 2023 to 2025.  All of this may
suggest that the Court should look to two sets of dictionaries.
To circa-1990 dictionaries, to get a handle on the precise scope
of the power Section 1227 gave to the government when the law
was passed.  And to present-day dictionaries, from around 2023
to 2025, to understand the notice the Petitioner would have
taken from Section 1227.  But there is no need to wade into this
issue here.  The reason why: there is no meaningful difference
between "foreign policy" as it is understood today and as it was
understood around 1990.  See footnotes 25, 26, and 27.

[25]  Dictionaries from around 1990 turn up the same basic meaning.
Foreign Policy, n., Webster's Third New International Dictionary
of the English Language, Unabridged 889 (1993) ("the underlying
basic direction of the activity and relationships of a sovereign
state in its interaction with other sovereign states typically
manifested in peace, war, neutrality, alliance or various
combinations or approaches to these"); Foreign Policy, n.,

What all of this adds up to: in everyday English, what we mean by a country's "foreign policy" is its approach to <u>other countries</u>.

\*      \*      \*

Now kick the tires on this reading by breaking up "foreign policy" into its component parts.

Start from the back end. "Policy" means "[a] principle or course of action adopted or proposed as desirable, advantageous, or expedient; esp. one formally advocated by a government, political party, etc." <u>Policy</u>, n., sense I.4, <u>Oxford English Dictionary</u> (2025); <u>accord</u>, <u>e.g.</u>, <u>Policy</u>, n., sense 5.a, <u>Merriam-Webster's Unabridged Dictionary</u> (2025); <u>Policy</u>, n., <u>New Oxford American Dictionary</u> (3d ed. 2015).[26]

As to "foreign," that means "[d]ealing with matters concerning other countries[.]" <u>Foreign</u>, adj., sense II.9.a, <u>Oxford English Dictionary</u> (2022); <u>accord</u>, <u>e.g.</u>, <u>Foreign</u>, adj., sense 5, <u>Merriam-Webster's Unabridged Dictionary</u> (2025) ("related to or dealing with other nations"); <u>Foreign</u>, adj., sense 3, <u>Brittanica Dictionary</u> (2025) ("relating to or dealing with other nations"); <u>Foreign</u>, adj., sense 1, <u>New Oxford American Dictionary</u> (3d ed. 2015) ("dealing with or relating to other countries").[27]

---

<u>Merriam-Webster's Collegiate Dictionary</u> 456 (10th ed. 1993) ("the policy of a sovereign state in its interaction with other sovereign states"); <u>Foreign Policy</u>, n., <u>American Heritage Dictionary of the English Language</u> (3d ed. 1992) ("The diplomatic policy of a nation in its interactions with other nations.").

[26] Somewhat older definitions, <u>see</u> footnote 24, run along the same lines. <u>See</u> <u>Policy</u>, n., sense 5, <u>Oxford English Dictionary</u> (1989); <u>Policy</u>, n., sense 2, <u>Webster's Encyclopedic Unabridged Dictionary of the English Language</u> 1113 (1989).

[27] Again, definitions from around 1990 point in the same direction. <u>See</u>, <u>e.g.</u>, <u>Foreign</u>, adj., sense 4, <u>New Merriam-Webster Dictionary for Large Print Users</u> 352 (1989) ("related to or dealing with other nations"); <u>Foreign</u>, sense 10, VI <u>Oxford English Dictionary</u> 52 (1989) ("Dealing with matters concerning other countries."); <u>Foreign</u>, adj., sense 5, <u>New Penguin English Dictionary</u> 364 (1986) ("of, concerned with, or dealing with other nations").

24

**JA 232**

\*　　\*　　\*

Bottom line: a country's "foreign policy" is the course of action it takes as to other countries.

That is true to how the words land on people's ears today, and also to how they were understood when Section 1227 was passed in 1990.

And the above definition makes sense whether "foreign policy" is scrutinized as a whole, or if it is understood based on the meaning of its parts, "foreign" and "policy."

### B.    Other Countries

Section 1227 can come into play only when a person has a severe negative impact ("compromise[s]") on an especially important ("compelling") American "foreign policy interest" --- and that last phrase concerns the United States' relations with other countries.  See Part V.A.3.

With this understanding in mind, is the Petitioner likely to win on the merits of his argument that Section 1227 is unconstitutionally vague as applied to the effort to remove him under the statute?

The Court's conclusion: yes.

To see why, compare two things.

First, what Section 1227 tells an "ordinary person" that he might be removed from the United States for.

And second, what, per the Secretary of State's determination, the Petitioner is to be removed for.[28]

---

[28]  This Opinion and Order is solely concerned with what the Secretary of State determined.  To get at why, note that when it comes to vagueness doctrine the Supreme Court has analogized removal cases like this one to criminal cases.  See Dimaya, 584 U.S. at 156-57 (citing Jordan, 341 U.S. at 229, 231).  The Secretary's determination is like a criminal indictment --- a formal instrument that tells someone what he allegedly did, and kicks off a legal process against him.  In criminal cases in which there is a vagueness challenge, courts routinely anchor the analysis in the allegations of the indictment, at least early in the litigation, as here.  See United States v.

<center>*   *   *</center>

Congress empowered the Secretary of State to seek removal of foreign nationals if they compromise American "foreign policy" interests --- which here means a compromise to the United States' relations with another country or countries.

But the Secretary did not affirmatively determine that the Petitioner's alleged conduct has impacted U.S. relations with other countries.

Indeed, the Secretary's determination[29] says nothing about any country other than America.

It also does not mention a region of the world that encompasses particular countries.

And while it cites an executive order,[30] the order does not mention any country other than America or any global region.

<center>*   *   *</center>

---

Birbragher, 603 F.3d 478, 480-81 (8th Cir. 2010); United States v. Woznichak, 2023 WL 7324442, at *2 (W.D. Pa. Nov. 7, 2023); United States v. Auernheimer, 2012 WL 5389142, at *3 (D.N.J. Oct. 26, 2012), rev'd, 748 F.3d 525 (3d Cir. 2014); United States v. Gigante, 737 F. Supp. 292, 295 (D.N.J. 1990); see also Nat'l Dairy Prods. Corp., 372 U.S. at 32-33, 37; United States v. Stock, 728 F.3d 287, 299 (3d Cir. 2013). But cf. Peoples Rts. Org., Inc. v. City of Columbus, 152 F.3d 522, 530 (6th Cir. 1998). Moreover, Congress specifically directed that in cases like this one, see Part IV, the Secretary would be required to make a personal determination. At this stage, looking to other information would be to skirt Congress' choice. And it would also be to diminish the seriousness of the step the Secretary of State has himself taken and the respect it deserves; the Secretary of State has determined certain things but not others. All of this is consistent with where the Respondents are. They do not meaningfully argue against vagueness-as-applied based on information outside the Secretary's determination. They do not provide such information. Quite the opposite. They are opposed to "peer[ing] behind," Respondents' Supplemental Brief at 14, the determination, and the Court does not do so here.

[29]   Recall: it is at Appendix A, reproduced there in full.

[30]   At Appendix B.

Would an ordinary person have a sense that he could be removed from the United States because he "compromise[d]" American "foreign policy interests" --- that is, because he compromised U.S. relations with other countries --- when the Secretary has not determined that his actions impacted U.S. relations with a foreign country?

Probably not.

                              *      *      *

And if Section 1227 "foreign policy" is read to allow removals for conduct not affirmatively determined by the Secretary to have impacted any foreign country, can the statute be said to "provide [an] explicit standard[]" that could prevent "arbitrary . . . enforcement"?  Grayned, 408 U.S. at 108.

Again, probably not.

The reason is this: if a person can be removed without the Secretary determining that there is a "foreign policy" impact, an impact on U.S. relations with a foreign country --- then there is no "explicit standard," id., left behind in Section 1227.

To see why, recall that Section 1227's relevant provision is this: "compromise[s] a compelling . . . foreign policy interest."  See Part V.A.1.

Each of these words limits the government's enforcement power.

"Compromise[s]" implies a serious impairment to "foreign policy," not a slight one.  "Compelling" points to an especially important "foreign policy interest," not a minor one or a mid-sized one.

These words constrain the Secretary's Section 1227 power.

But they do no independent work.  They are bundled together with "foreign policy."

What under the statute must be "compromise[d]"?  Foreign policy.

What does "compelling" do?  It trims back on the kind of foreign policy that can count.

What this adds up to: because the Secretary has not affirmatively determined here that there is a foreign policy impact, there is nothing left of the other constraints that Congress laid down in Section 1227.

27

**JA 235**

Congress required an especially strong impact ("compromise[s]") on foreign policy. But that does not matter if what has been put on the table is not foreign policy.

And Congress required that the foreign policy be an especially important one --- "compelling." But that does not matter if the Secretary is not acting in relation to "foreign policy" in the first place.

In short: a Section 1227 removal effort that is not based on a determination from the Secretary that there is a foreign policy impact is left <u>fully</u> standardless --- because without a "foreign policy" link there is nothing left of the standard ("compromise[s] a compelling . . . foreign policy interest") that Congress laid down when it passed Section 1227. <u>See Johnson</u>, 576 U.S. at 595 (a law is vague when, among other things, it is "standardless"); <u>Kolender</u>, 461 U.S. at 358 (similar); <u>Goguen</u>, 415 U.S. at 578 (a statute is vague when it "simply has no core"); <u>Coates</u>, 402 U.S. at 614 (a statute is vague when "no standard of conduct is supplied at all"); <u>Giaccio v. Pennsylvania</u>, 382 U.S. 399, 402 (1966) (similar).

\*     \*     \*

Lack of notice and "standardless" enforcement --- these tilt the scale in favor of the conclusion that the Petitioner is likely to succeed on the merits of his claim that Section 1227 is vague as applied to efforts to remove him via the Secretary of State's determination.[31]

To see the point from a different perspective, step back for a moment, starting just below.

### 1.     <u>"Want of Proper Words"</u>

It has long been the "the law of the land" that "no one [can] be taken by surprise" by having to "answer in court for what [he]

---

[31]  Does this, on its own, move things all the way to the conclusion that the Petitioner is likely to succeed on the merits? There is no need to answer. There are <u>other</u> important things that weigh in the Petitioner's direction. <u>See</u> Part V.C to Part V.F. How this case might look without those --- that is a separate question.

has not been warned to answer." <u>Goldington</u> v. <u>Bassingburn</u>, Y.B. Trin. 3 Edw. II, f. 27b, 196 (1310).[32]

But "surprise" can come from different directions.

It can be a matter of "Uncertainty." And it can also flow from "the Want of proper legal words." 2 W. Hawkins, <u>Pleas of the Crown</u>, ch. 25, § 100, p. 245 (2d ed. 1724) ("[I]t seems to have been anciently the common Practice, where an Indictment appeared to be insufficient, either for its Uncertainty or the Want of proper legal words, not to put the defendant to answer it[.]").

The source of "surprise" just discussed is not mainly "Uncertainty." Rather, it is "the Want of proper legal words."

This is explained just below.

    *  *  *

Surprise of the "Uncertainty" sort generally concerns the <u>ambiguity</u> of a key statutory term.[33]

This is bread-and-butter vagueness doctrine, and the classic example comes from English legal history.

A statute made it a crime to steal "cattle." And "cattle" used to include a broader group of animals than it does today. <u>See</u> <u>Dimaya</u>, 584 U.S. at 178 (Gorsuch, J., concurring). Did the word also cover snatching an ox or a lamb? <u>See</u> 1 William Blackstone, <u>Commentaries</u> *88 (discussing this example). It was unclear, "so the court treated the term 'cattle' as a nullity." <u>Dimaya</u>, 584 U.S. at 178 (Gorsuch, J., concurring) (describing this statute).

Along these lines, think of a case like <u>Connally</u> v. <u>General Construction Co.</u>, 269 U.S. 385 (1926).

---

[32] <u>Goldington</u>'s "law of the land," invokes the Magna Carta, and the Supreme Court has said that "[t]he words, 'due process of law' [in the Constitution] were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Charta." <u>Den ex dem. Murray</u> v. <u>Hoboken Land & Improvement Co.</u>, 59 U.S. 272, 276 (1855). In turn, the Constitution's Due Process Clause is the source of contemporary vagueness doctrine. <u>See</u> <u>Beckles</u>, 580 U.S. at 262; <u>Johnson</u>, 576 U.S. at 598; <u>Williams</u>, 553 U.S. at 304.

[33] "Generally," but not always. Another kind of "surprise" is the subject of Part V.E.

There, the Supreme Court held there was too much vagueness in a law that required employers to pay the wage that prevailed "in the locality where the work is performed."  See id. at 388.  The law was ambiguous.  It was not clear which places might make up "the locality."

> Who can say, with any degree of accuracy, what areas constitute the locality where a given piece of work is being done?  Two men, moving in any direction from the place of operations, would not be at all likely to agree upon the point where they had passed the boundary which separated the locality of that work from the next locality.

Id. at 394.

\* \* \*

The kind of surprise that is relevant for now is not "Uncertainty."  It is a "Want of proper legal words."

"Want of proper legal words" happens when the problem is not ambiguity.

The language in a statute might provide sufficient and clear notice.  And it might appropriately constrain government action.

But when the statute has virtually nothing to do with the case at hand, its language cannot do its work.

An ox may or may not count as cattle.  That is an "[u]ncertainty" case.

But everyone knows that a teapot is not cattle.  When a teapot is stolen, the statute simply cannot apply, and not by a long shot.

The statute does not provide notice to those who might steal teapots.  And because the statute does not give the government power to take on teapot cases, it does not supply a standard to apply in such cases, either.

That is a "Want of proper legal words"-type situation.

As to this category, think of a case like Rabe v. Washington, 405 U.S. 313 (1972).

There, the Supreme Court struck down on vagueness grounds a conviction for screening an obscene movie.  Why?  Because the

30

conclusion that the movie was obscene was based on its "context" --- and that idea was nowhere to be found in the statute.

> To avoid the constitutional vice of vagueness, it is necessary, at a minimum, that a statute give fair notice that certain conduct is proscribed.  The [Washington] statute under which petitioner was prosecuted, however, made no mention that the 'context' or location of the exhibition was an element of the offense . . . . Petitioner's conviction was thus affirmed under a statute with a meaning quite different from the one he was charged with violating.

> It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

Id. at 315 (cleaned up); see also, e.g., Bouie v. City of Columbia, 378 U.S. 347, 351-56 (1964).

*     *     *

Come back now to Section 1227, and to this case.

Section 1227 allows for removal of a person who the Secretary of State determines is negatively impacting American foreign policy --- that is, the United States' relations with other countries.

But the Secretary of State has not made that determination here. His determination says nothing about foreign countries.  Not explicitly.  And not implicitly, either.  There is no suggestion in the Secretary's determination that U.S. relations with other countries have been impacted by the Petitioner's conduct.

This is a dramatic misfit, a "Want of proper legal words." Hawkins, Pleas of the Crown p. 245.

As to the law's concern with notice: how could an "ordinary person" have known that Section 1227 might be used in this circumstance?

And as to the law's concern with enforcement discretion: how could the Secretary, who needed under Section 1227 to determine that U.S. relations with other countries were being impacted,

31

**JA 239**

use Section 1227 without making that determination?  And once he did, what legislative standard was left behind to guide his discretion?

    2.  **Domestic Impact**

Before moving on, consider a narrow point.

The Secretary of State's determination says that some of the Petitioner's activities had a domestic impact.  <u>See</u> Determination at 2.

To the extent inside-the-United-States conduct by the Petitioner was determined by the Secretary to have had <u>only</u> inside-the-United-States consequences, there is an added reason, beyond what has been discussed above, to think Section 1227 is vague as applied to that particular subset of the Petitioner's activities.

Take the point up here.

          *    *    *

Recall that the Secretary's determination described only activities undertaken by the Petitioner in the United States. <u>See id</u>. at 2 (describing "participation and role[] . . . in antisemitic protests and disruptive activities," and the Petitioner's "public actions . . . in the United States").

And recall that some of the effects of these activities, per the Secretary, were felt in the United States.  <u>See id</u>. (the Petitioner's activities "foster[] a hostile environment for Jewish students in the United States"); <u>id</u>. (the Petitioner's "continued presence . . . in the United States undermine[s] U.S. policy to combat anti-Semitism . . . in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States").

But protecting students "in the United States" is a domestic concern, not a "foreign policy" concern.

And foreign and domestic are understood to be distinct.

Therefore, to an ordinary person, giving the Secretary power over a "foreign policy" impact is not the same as <u>also</u> giving the Secretary power over domestic conduct to the extent it had only a domestic impact.

          *    *    *

To see the point, start with the words.

"Foreign" is often marked down as the opposite of "domestic." See Foreign, adj., sense 1, Merriam-Webster.com Thesaurus (2025); Foreign, adj., sense 1, Merriam-Webster's Collegiate Thesaurus (2025); Foreign, adj., sense 1, Collins English Thesaurus (2025); Foreign, adj., sense 1, Pocket Oxford American Thesaurus (2012); cf. Domestic, adj., Cambridge English Thesaurus (2025) (listing "foreign" as an antonym).

And "domestic" is usually taken to mean "[e]xisting, occurring, or produced inside a particular region or country; not foreign or international." Domestic, adj., sense 4, Oxford English Dictionary (2023) (emphasis added); see also, e.g., Domestic, adj., sense 3, Merriam-Webster Unabridged Dictionary (2025) ("relating and limited to one's own country or the country under consideration or its internal affairs and interests"); Domestic, adj., Cambridge English Dictionary (2025) ("relating to a person's own country"); Domestic, adj., sense 1, Collins English Dictionary (2025) ("political activities, events, and situations [that] happen or exist within one particular country"); Domestic, adj., sense 4, American Heritage Dictionary of the English Language (5th ed. 2022) ("[o]f or relating to a country's internal affairs").[34]

In keeping with these understandings, Supreme Court opinions have often assumed that foreign concerns and domestic concerns are distinct.[35]

---

[34]  Older dictionaries, see footnote 24, dredge up the same basic meanings.  See, e.g., Foreign, Collins English Dictionary & Thesaurus 443 (1993) (listing "domestic" as an antonym); Domestic, adj., sense 3.a, Oxford English Dictionary (1989) ("Of or pertaining to one's own country or nation; not foreign, internal, inland, 'home'."); Domestic, adj., sense 4, Webster's Encyclopedic Unabridged Dictionary of the English Language 424 (1989) ("of or pertaining to one's own or a particular country as apart from other countries").

[35]  See, e.g., Fleming v. Page, 50 U.S. 603, 606 (1850) ("A foreign country is one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States.  This is the well-settled meaning of the word 'foreign,' in acts of Congress."); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 16 (1831) (Marshall, C.J.) ("In the general, nations

And this is no artifact of legal culture, a way of thinking that is particular to lawyers or judges.  Not at all.  Virtually everyone treats foreign and domestic as contrast points (if not opposites).

One way to see this: by looking to newspaper articles[36] for the two or three months before the Petitioner's arrest.  These overwhelmingly show that foreign and domestic are generally taken as separate (and indeed as contrasts).[37]

---

not owing a common allegiance are foreign to each other."); see also, e.g., Haaland v. Brackeen, 599 U.S. 255, 274 (2023); Medellin v. Texas, 552 U.S. 491, 564 (2008) (Breyer, J., dissenting); United States v. Lara, 541 U.S. 193, 201 (2004); Kent v. Dulles, 357 U.S. 116, 127 (1958); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 176 (1951) (Douglas, J., concurring); United States v. Pink, 315 U.S. 203, 233 (1942) ("No State can rewrite our foreign policy to conform to its own domestic policies."); see also William Blackstone, Commentaries *66 (contrasting "foreign emergencies" with "domestic discontents"); The Federalist No. 3 (John Jay) (differentiating between "dangers from foreign arms and influence . . . [and] dangers of the like kind arising from domestic causes") (cleaned up).

[36]  Notice to an ordinary person can be supplied by a look to "common usage."  United States v. Tykarsky, 446 F.3d 458, 473 (3d Cir. 2006); accord, e.g., Kovacs v. Cooper, 336 U.S. 77 (1959) (considering the "daily use" of certain words); Sproles v. Binford, 286 U.S. 374, 393 (1932) (invoking "common usage and understanding"); Mahler, 264 U.S. at 40 (citing "common understanding" that gives words "the quality of a recognized standard").  In keeping with this, the Third Circuit has scrutinized newspaper articles in the vagueness context to get a sense of the notice that a statute might provide to an "ordinary person."  See United States v. Blake, 288 F. App'x 791, 794-95 (3d Cir. 2008).  Moreover, "analyzing 'how particular combinations of words are used in a vast database of English prose' can shed light on how ordinary people understand statutory terms."  Delligatti v. United States, 145 S. Ct. 797, 813 (2025) (Gorsuch, J., dissenting) (emphasis added) (quoting Facebook, Inc. v. Duguid, 592 U.S. 395, 412 (2021) (Alito, J., concurring in judgment)).  Newspapers can provide that database.

[37]  See, e.g., Tom O'Connor, Trump Takes on Xi and Putin at their Own Great Power Game, Newsweek, Mar. 7, 2025 (contrasting

34

And it is presumably because the statute's reference to foreign policy is indeed about foreign affairs, not domestic ones, that it is the Secretary of State who has an important role to play in Section 1227 removals.

After all, the State Department's business is not domestic matters, but foreign ones. The State Department "exists to assist the President . . . in formulating and executing [] foreign policy." 1 Foreign Affairs Manual 011.2; accord, e.g., Kumar v. Republic of Sudan, 880 F.3d 144, 157 (4th Cir. 2018); Thomas v. Baker, 925 F.2d 1523, 1524 (D.C. Cir. 1991); United States v. Green, 671 F.2d 46, 51 n.7 (1st Cir. 1982); see also 22 U.S.C. § 2656 ("The Secretary of State shall perform such duties as shall from time to time be . . . intrusted to him by the President relative . . . to such . . . matters respecting

---

foreign and domestic); Ross Douthat, Trump and Vance are Stripping Away Foreign Policy Illusions, N.Y. Times, Mar. 1, 2025 (same); Daniel Bush, Donald Trump Has Promised a "Golden Age" for the US. Can He Deliver?, Newsweek, Feb. 7, 2025 (same); Shane Brennan, Biden's Long, Unique Legacy, News Journal, Jan. 19, 2025, at A.9 (same); Francesca Chambers, Biden Argues US Stronger on World Stage: President Uses Farewell Speeches to Define Legacy, USA Today, Jan. 14, 2025 (same); Stuart E. Eizenstat, Jimmy Carter's Underrated Legacy: A Strong, Ethical America and a More Peaceful World, USA Today, Dec. 29, 2024 (same). For articles that take the same approach from when Section 1227 became law through to the present, see, for example: George F. Will, The 'Better Off' Diversion: A Kerry Win Might Not Mean Marked Changes in Either Domestic or Foreign Policy, Pitt. Post-Gazette, July 12, 2004, at A.13; Patrick Healy & Susan Milligan, Kerry Calls Bush's Domestic, Foreign Policies 'Extreme', Bos. Globe, Feb. 8, 2004, at A.20; David M. Shribman, Democrats Turn to Foreign Policy, Bos. Globe, Aug. 14, 2001, at A.3; David S. Broder, Needed: A Voice for Foreign Policy, Record, Nov. 25, 1996, at A12; Michael Remez, Foreign Policy Takes Back Seat in Presidential Campaign, Hartford Courant, Oct. 28, 1996 at A.1; John F. Harris, Clinton Learning Foreign Policy Can Be Fun Shifts His Focus from Domestic Issues, Record, Dec. 15, 1995, at A18; Richard Benedetto, Bush Goes to China; Criticizes Clinton's Domestic, Foreign Policies, USA Today, Jan. 12, 1994, at 08A; Johanna Neuman, Economy Takes Front Seat to Foreign Policy, USA Today, Nov. 6, 1992, at 03A; Jonathan Schell, Foreign Policy --- Who Needs It?, Newsday, Sept. 26, 1991, at 117.

foreign affairs as the President of the United States shall assign to the [State] Department[.]").[38]

* * *

_____

[38] Immigration law straddles the foreign-domestic line. But that does not blur away the normal foreign-versus-domestic distinction. Take the Administrative Procedure Act. Under it, proposed rules must usually wait out a notice-and-comment period. See 5 U.S.C. § 553. But not rules that involve a "foreign affairs function of the United States." Id. § 553(a)(1). Do all immigration-related rules involve a "foreign affairs function"? No. "For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences." Yassini v. Crosland, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (citing S. Rep. No. 752, 79th Cong., 1st Sess. 13 (1945)); accord City of N.Y. v. Permanent Mission of India to U.N., 618 F.3d 172, 202 (2d Cir. 2010); Hou Ching Chow v. Att'y Gen., 362 F. Supp. 1288, 1290 (D.D.C. 1973). And look to 8 U.S.C. § 1182(f) --- which lets the President limit the entry of foreign nationals when he finds their arrival "would be detrimental to the interests of the United States." What "interests"? In Trump v. Hawaii, 585 U.S. 667 (2018), the President invoked Section 1182(f), see id. at 675, and the Supreme Court noted that his "stated objective" was "to protect the country and improve vetting processes." Id. at 704-05. And this was not the first time, the Court noted, that a President had suspended entry "to retaliate for conduct by [foreigners'] governments that conflicted with U.S. foreign policy interests." Id. at 693. In light of the international interests invoked, the Court ruled that the President's invocation of Section 1182(f) passed muster. See id. at 711. Contrast that with Doe #1 v. Trump, 957 F.3d 1050 (9th Cir. 2020). There, the President invoked Section 1182(f) to restrict particular foreign nationals from entering the country without certain health insurance. See id. at 1056, 1065. Foreign policy interests were not on the table. See id. at 1067. Rather, the focus was healthcare costs, "a purely domestic economic issue." Id. at 1067. This interest, per the court of appeals, was likely outside the "traditional spheres authorized by § 1182(f)" --- "international affairs and national security." Id. at 1067. Therefore, the President was unlikely to "succeed in [hi]s broad reliance on § 1182(f)." Id. at 1067. In sum: immigration law holds the line between foreign and domestic; courts have refused to conflate the two, under both the APA and Section 1182(f).

36

**JA 244**

Bottom line as to the narrow point covered in this section:

To the extent the Secretary determined that any domestic conduct had only a domestic impact, there is an additional reason to think Section 1227 is vague as applied to that particular conduct.

A statute that empowers the Secretary only when it comes to impacts on foreign policy does not also empower him as to impacts on purely domestic matters.[39]

Using Section 1227 in that circumstance undermines notice.  And it makes it impossible to say the Secretary is acting in accord with an "explicit standard," Grayned, 408 U.S. at 108, laid down by Congress.

### C.    In Comparison

Where things stand.

Under Section 1227, a person can be removed if the Secretary of State determines he is negatively impacting U.S. relations with a foreign country or countries.  See Part V.A.3.

But the Secretary did not make that determination here.

His determination does not say whether the Petitioner's conduct affected U.S. relations with any other country.  See id.

An ordinary person would have had no real inkling that a Section 1227 removal could go forward in this way --- without the Secretary first determining that there has been an impact on American relations with another country.  See Part V.B.

And using Section 1227 like this is to use it without reference to the only "explicit standard," Grayned, 408 U.S. at 108, laid

---

[39]  See Amy Coney Barrett, Congressional Insiders & Outsiders, 84 U. Chi. L. Rev. 2193, 2197 n.12 (2017) (noting that under the canon of expressio unius, "the inclusion of specific terms signifies the exclusion of others"); see, e.g., Tucker v. Alexandroff, 183 U.S. 424, 436 (1902) (applying that canon; see also Bittner v. United States, 598 U.S. 85, 94 (2023) (same). And the point is stronger yet given the gulf that is generally taken to exist between "foreign" and "domestic," as described above.

**JA 245**

down by Congress --- the linchpin of which is a link to foreign policy. See id.

\*     \*     \*

There is another vagueness problem here, too.

Namely, Section 1227 is markedly vaguer than a number of statutes the Supreme Court has struck down over the years on vagueness grounds, see Part V.C.1 --- and the Respondents' counterargument on this point is not persuasive. See Part V.C.2.

Move through these points now, and then in Part V.C.3 consider their implications for this case.

### 1.   Precedent

As discussed, see Part V.A.1, Section 1227's key operative term is "foreign policy."

The statute's reliance on that term makes Section 1227 more vague than other statutes the Supreme Court has struck down.

Apples-to-apples comparisons do not work smoothly in this area. This is because each statute covers a different subject area. And each uses different words.

But the pattern is clear. A few examples make the point.[40]

### a)   Kolender

The stepping-off point: Kolender v. Lawson, 461 U.S. 352 (1983).

The statute there required anyone loitering in certain circumstances to hand over identification. See id. at 353. The statute was attacked as facially unconstitutional. See id. at

---

[40]  Recall here that how vague a law can be depends on the kind of law it is. See generally Part III. Civil laws that deal mainly with economic matters do not get especially rigorous scrutiny. Criminal laws, though, come in for a much harder look. (And a key point: immigration laws like Section 1227 get the same treatment as criminal laws. See Dimaya, 584 U.S. at 156–57 (citing Jordan, 341 U.S. at 229, 231).) There is also another level up. As to statutes that touch on First Amendment-protected rights, vagueness review is at its most exacting. First Amendment issues are taken up in Part V.F.

38

**JA 246**

355.  Why?  Because it required the ID to be "credible and reliable," and, per the Supreme Court, that was vague.  See id. at 353–54.

Standing alone, "credible and reliable" is about as vague as "compelling foreign policy interest."

Can an out-of-town water bill count?  What about a new credit card?  How about both together?

Does America have a compelling foreign policy interest in working with Colombia to prevent narcotics trafficking or in working with Syria to eliminate chemical weapons stockpiles?  What about in helping Egypt to preserve antiquities?  Preventing poaching in Kenya?  What about disincentivizing poor working conditions at garment factories in Bangladesh?  What about preserving security there?

In Kolender, the face of the statute was not the end of the story.

A previous judicial decision had narrowed down the law.  Per a state appeals court, "credible and reliable" "meant identification 'carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself.'"  Id. at 357 (quoting People v. Solomon, 33 Cal. App. 3d 429, 438 (Cal. Ct. App. 1973)).

That interpretation arguably seemed to provide the harder-edged standard that was missing from the statute's text.  See id. at 373 (White, J., dissenting).

But no matter, the Supreme Court held.

Even as interpreted, the Court explained, "the statute vests virtually complete discretion in the hands of the police."  Id. at 358.

And this even though there was another constraint built into the law: police officers were allowed to ask for identification only in "circumstances that would justify a stop under the standards of Terry v. Ohio, 392 U.S. 1 (1968)."  Id. at 353.

Nonetheless, the statute was struck down by the Supreme Court as unconstitutionally vague, invalid on its face.  See id. at 361.

In short: the statute in Kolender was roughly as vague as Section 1227.  But it did not clear the bar.  Even though it had

been interpreted and pared back by a prior court decision --- but there is none here. And even though government discretion was tied down to the dense body of rules developed under <u>Terry</u>. Again, nothing like that here.

### b) <u>Akron</u>

Move to <u>City of Akron</u> v. <u>Akron Center for Reproductive Health, Inc.</u>, 462 U.S. 416 (1983).

Per an Akron ordinance, doctors performing abortions had to "[e]nsure that the remains of the unborn child are disposed of in a humane and sanitary manner." <u>Id</u>. at 451.

The doctors challenged "humane" as unconstitutionally vague, <u>see id</u>. at 451-52, and the Court agreed --- striking down the statute.

This was not surprising. "Humane" is open-ended.

But some years before, a different federal court had upheld a "humane disposition" law against a vagueness attack in light of the state's representation that the law aimed "to preclude the mindless dumping of aborted fetuses on garbage piles." <u>See id</u>. at 451 (citing <u>Planned Parenthood Ass'n</u> v. <u>Fitzpatrick</u>, 401 F. Supp. 554, 573 (E.D. Pa. 1975), <u>aff'd sub nom. Franklin</u> v. <u>Fitzpatrick</u>, 428 U.S. 901 (1976)); <u>see also id</u>. at 475 (O'Connor, J., dissenting).

At the Supreme Court, Akron tried to lean on this same representation. <u>See id</u>. at 474-75 (O'Connor, J., dissenting).

But that did not do the trick, and the Supreme Court struck down the law as too vague. <u>See id</u>. at 452 (majority opinion).

### c) <u>Cramp</u>

Take a final case, <u>Cramp</u> v. <u>Board of Public Instruction of Orange County</u>, 368 U.S. 278 (1961).

A Florida law required every state employee to swear "he has never lent his 'aid, support, advice, counsel or influence to the Communist Party.'" <u>Id</u>. at 279.

A teacher sued, claiming the state law was void for vagueness. <u>See id</u>. at 280, 283.

The law left plenty of room for guesswork.

The Supreme Court asked: "[c]ould a lawyer who had ever represented the Communist Party or its members swear with either confidence or honesty that he had never knowingly lent his 'counsel' to the Party?"  Id. at 286.

The statute did not say, and the Court held the law unconstitutionally vague.  See id. at 280, 288.

But the Florida law was less vague than Section 1227.

Pushing back on communism was an unmissable American foreign policy interest when the Supreme Court reached its decision. See, e.g., 22 U.S.C. § 2370(h) (banning "aid" to communist countries when against "the best interests of the United States"); Communist Party of U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 93-96 (1961).

And the Florida law honed in on that interest, and just that interest, in a single, clear way --- by requiring an oath.

Now see the contrast.

Section 1227 catches within its net not just one U.S. foreign policy interest, but large numbers of them.  Anything that can be chalked up as "compelling."

And it protects those interests not by forbidding a specific and knowable action, like refusing to take an oath.

Rather, it does so in an opaque and catch-all way --- by reaching anything that "compromise[s]" those interests, however a "compromise" might happen.

Moreover, the law is much more forgiving of vagueness in a statute that includes a mens rea requirement.  The thinking is that if a statute requires a person to know she is acting intentionally, then it may matter less that the law is somewhat unclear.  See, e.g., Loy, 237 F.3d at 265 (collecting cases).

The Florida law, as construed by the Florida Supreme Court, had a mens rea requirement.  See id. at 285 (citing Cramp v. Bd. of Pub. Instruction of Orange Cnty., 125 So. 2d 554, 557 (Fla. 1960)).

But Section 1227 does not have one.  A person can be removed from the United States for compromising a compelling foreign policy interest.  Even if he does not aim to.  And even if he does not know that he has done so.

41

**JA 249**

To be sure, it might be said, the Florida law implicated First Amendment issues.

It required state employees to swear an oath. Compelled speech is a classic First Amendment concern. See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. 878, 892 (2018); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). And for purposes of vagueness law, statutes that put pressure on free speech are held to a higher standard. See Part III.

But that is no distinction from this case.

Here, the Petitioner protested, see Determination at 2 --- and the Secretary's determination relied on the part of Section 1227 that kicks in only when removal is sought based on "beliefs, statements, or associations" that are "lawful." See id. at 1–2 (tracking the text of Section 1182(a)(3)(C)).

*    *    *

In short:

The Secretary's determination does not say what Section 1227 requires. The Secretary did not affirmatively determine that the Petitioner's conduct has affected U.S. relations with other countries.

This undermines notice. It leaves enforcement standardless. And it weighs in favor of the conclusion that Section 1227 is unconstitutionally vague as applied here. See Part V.B.

That conclusion is strengthened by comparing Section 1227 to the laws struck down by the Supreme Court in Kolender, Akron, and Cramp --- which suggest that Section 1227 already starts off on its back foot, hovering close to the line that separates what is constitutional from what is not.

## 2.    **The Counterargument**

The Respondents see things differently.

Section 1227, they contend, "is plainly more definite than other provisions that the Supreme Court has upheld against vagueness challenges." See Respondents' Supplemental Brief at 7–8 (emphasis in original).

But they do not take on any of the cases discussed above.

And in any event, the Respondents' argument does not work.  To see why, tick through the cases they cite.

<p style="text-align:center">*     *     *</p>

<u>First</u>, <u>Jordan</u> v. <u>De George</u>, 341 U.S. 223 (1951).

There, the Supreme Court rejected a vagueness challenge to a provision allowing the deportation of someone who had committed more than one "crime involving moral turpitude."  <u>See</u> <u>id</u>. at 225, 229-32.

That sounds vague.

But its meaning was no mystery.  "Moral turpitude" had been part of our immigration laws since 1891, during which time it had been construed by the Supreme Court.  <u>See</u> <u>id</u>. at 229-30 & n.14.  And other statutes used the same phrase.  Those, too, had received judicial interpretation.  <u>See</u> <u>id</u>. at 230.  And no court in any context had held the phrase was too vague.  <u>See</u> <u>id</u>.

Moreover, as to the statute in the <u>Jordan</u> case, underlying due process concerns[41] were plainly satisfied --- the "moral turpitude" provision was triggered only "after conviction and sentence of the requisite two crimes."  <u>Id</u>.  "[T]he statute [as to moral turpitude] provided adequate notice, at least to the extent that if an alien behaved him or herself and did not violate the traditionally well-defined penal laws, the alien could rest assured that he or she would not be deported, at least under that statute."  <u>Massieu</u>, 915 F. Supp. at 700.

This case is not like <u>Jordan</u>.

No court, much less the Supreme Court, has construed Section 1227.

No court seems to have interpreted the Section 1227 language as it may appear in another obviously relevant statute.

And the Petitioner has not been convicted of multiple crimes (or any crime) as a prerequisite for removal.

Indeed, the Secretary is going forward under a determination that alludes to alleged criminal conduct by <u>another</u> person, but not the Petitioner.  <u>See</u> Determination at 2.  And moreover, the Secretary affirmatively suggests that the Petitioner's

---

[41]  Recall that the void-for-vagueness doctrine is rooted in the Due Process Clause.  <u>See</u> footnote 32.

underlying "beliefs, statements, or associations" are "lawful." Id. at 1 (citing Section 1227).

\* \* \*

Second, the Respondents point to Mahler v. Eby, 264 U.S. 32 (1924).

That was a vagueness challenge to a law that provided for the deportation of noncitizens that the Secretary of Labor found to be "undesirable residents of the United States." Id. at 36 (cleaned up).

The Supreme Court rejected the challenge.

The Respondents take from Mahler that "the expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress." Respondents' Supplemental Brief at 7 (quoting Mahler, 264 U.S. at 40) (cleaned up).

The argument seems to run like this: if the Secretary of Labor can determine that someone is "undesirable" and secure their removal on that basis, then the Secretary of State should be able to determine that someone is compromising "compelling foreign policy interests" and have them removed for that.

This argument sounds strong.

But a look at the fuller Supreme Court excerpt shows that the "undesirable" standard did not stand alone, and in fact had been dramatically narrowed down and specified.

The Respondents paste into their legal brief the part of Mahler the Court has underlined below. But they leave on the cutting-room floor everything else --- and those are the critical passages:

> [Congress] has established classes of persons who in its judgment constitute an eligible list for deportation, of whom the Secretary is directed to deport those he finds to be undesirable residents of this country. With the background of a declared policy of Congress to exclude aliens classified in great detail by their undesirable qualities in the Immigration Act of 1917, and in previous legislation of a similar character, we think the expression

44

**JA 252**

> 'undesirable residents of the United States'
> is sufficiently definite to make the
> delegation quite within the power of
> Congress.

Mahler, 264 U.S. at 40 (emphasis added).

What were the undesirable qualities that had been "classified"?

> The classes include all aliens interned as
> enemies by the President's proclamation
> under R. S. § 4067 (Comp. St. § 7615) and
> alien convicts under the Espionage Act, the
> Explosives Act, the act restricting foreign
> travel, the Sabotage Act, the Selective
> Draft Act, the act punishing threats against
> the President, the Trading with the Enemy
> Act, and certain sections of the Penal Code.

Id. at 36–37.

These are hard-edged, public standards --- and "great[ly]
detail[ed]" ones, id. at 40, as the Supreme Court put it.  They
dramatically reduced any vagueness otherwise inherent in the
term "undesirable residents."

There is no persuasive way to analogize Mahler to this case.

Section 1227, like the law in Mahler, starts off with broad
language.  But then in Mahler, a list of "great detail," id.,
came in to flesh things out.  There is nothing like that list
associated with Section 1227.  No regulations, for example.

To ignore the list, as the Respondents do, is to miss why the
statute in Mahler passed muster --- and to miss, too, why
Section 1227 is much vaguer than the law that was at issue in
that case.

And another point.

One of the terms in Mahler, "undesirable residents," had been
used in American immigration law as far back as 1802.  And so,
per the Supreme Court in Mahler, "[o]ur history has created a
common understanding of the words 'undesirable residents' which
gives them the quality of a recognized standard."  Id.

But again, that is not this case.

No word in Section 1227 hauls along with it the built-up clarity
of our common law.  See Part V.A.2.

Mahler is, simply, a long way off.  The analogy does not work.

\*      \*      \*

The Respondents' third and final case is Boutilier v. Immigration & Naturalization Service, 387 U.S. 118 (1967).  See Respondents' Supplemental Brief at 8.

The Boutilier petitioner had been ordered deported under a law that made excludable those foreign nationals who had a "psychopathic personality," which federal officials read to include gay men.  See 387 U.S. at 118.  The petitioner argued that this reading of the law was void for vagueness, see id. at 119, but the Supreme Court disagreed.

The Court explained why: "[t]he legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals such as petitioner."  Id. at 120.

The Court went on to describe that clarifying history.  See id. at 121–22.  One example: a Senate report defined "'psychopathic personality' . . . to include homosexuals."  Id. at 121.

Another data point: a report of the Public Health Service that buttressed the legislative history defined "psychopathic personality" to include homosexuality.  See id. at 120.

The legislative history of Section 1227 is a world away from all this.

Far from specifying "beyond a shadow of a doubt" what might be meant by a "compelling . . . foreign policy interest," Congress took the exact opposite tack --- indicating that it wanted to leave things open-textured and flexible, undefined.

Per the State Department's Legal Adviser in the run-up to the passage of Section 1227: "[w]e recognize that the revised standard leaves considerable discretion in the Executive branch. But we believe it is . . . inadvisable to be more precise[.]" Exclusion and Deportation of Aliens: Hearing Before the Subcomm. on Immigr., Refugees, and Int'l L. of the Comm. of the H. Comm. on the Judiciary, 100th Cong. 40 (1987) ("1987 Hearing") (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't).

And to the extent that legislative history is relevant here, it suggests, if anything, that the Secretary's determination as to

46

**JA 254**

the Petitioner is out of step with the statute.  That is the subject of Part V.D.

### 3.    **Implications**

Where things stand.

Section 1227, as applied here, appears to be a good deal vaguer than other statutes the Supreme Court has struck down for vagueness.  See Part V.C.1.

And the problem is not solved by the Respondents' cited cases.  See Part V.C.2.

Is this the end of the road?  Does the above require the conclusion that Section 1227, as applied, must simply be struck down?

After all, the Supreme Court cases cited above, see Part V.C.1, were facial challenges, and this one is an as-applied challenge.

A facial challenge traditionally attacks a statute as "impermissibly vague in all of its applications."  Hoffman Ests., 455 U.S. at 495 (emphasis added).

And "[i]f a statute is vague in all its applications then it will necessarily be vague 'as applied' in every case."  United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988) (emphasis added).

If less vague statutes did not survive facial challenges in Kolender, Akron, and Cramp, can the vaguer Section 1227 survive the current as-applied challenge?

The Court's judgment: yes, it can.

Take two reasons why.

*        *        *

First, the quote from the Supreme Court in Hoffman, just above, may no longer be good law.

In Johnson, for example, the Court looked back on L. Cohen Grocery, a case in which a statute that barred "unjust and unreasonable" prices was voided as vague on its face.

The Johnson Court asked: was the pricing statute really vague in all its applications?  See 576 U.S. at 602.  After all, "charging someone a thousand dollars for a pound of sugar would

surely be unjust and unreasonable." Id. (interpreting L. Cohen Grocery) (emphasis added).

But, the Johnson Court noted, that did not stop the Supreme Court in L. Cohen Grocery from striking down the pricing law on its face, as void for vagueness across the board. See id.

Why not? Because per the Supreme Court in Johnson, a holding of facial vagueness need not mean that literally every application of a law is vague. See id. at 602-03.

On this understanding, the fact that "a statute is vague in all its applications" does not "necessarily" suggest the statute will "be vague 'as applied' in every case." Gaudreau, 860 F.2d at 361.

And this means that the Supreme Court cases cited above --- Kolender, Akron, and Cramp --- do not require the conclusion that Section 1227 is vague as applied here, even as they push things a long way down the road in that direction.

*    *    *

A second reason why Kolender, Akron, and Cramp do not strictly compel any conclusion here: those cases may be distinguishable, at least to an extent.

Take two ways.

When assessing a vagueness challenge, the Supreme Court has aimed to account for the sheer difficulty of crafting an appropriately tight law. Think of a disorderly conduct ordinance, for example.

> There are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision. Control of the broad range of disorderly conduct that may inhibit a policeman in the performance of his official duties may be one such area, requiring as it does an on-the-spot assessment of the need to keep order.

Goguen, 415 U.S. at 581; accord, e.g., Kolender, 461 U.S. at 360-61; United States v. Petrillo, 322 U.S. 1, 7 (1947).

Section 1227 looks like a backstop statute --- to be deployed rarely,[42] and in situations where there is a gap between the formidable range of on-the-books immigration-law powers[43] and the felt needs of an unforeseen case.

Drafting a statute to cover these sorts of situations is intrinsically hard. See 1987 Hearing at 40-41 ("it is difficult . . . to be more precise") (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't).

And the drafting task was likely harder than anything that needed writing up in Kolender, Akron, or Cramp.

Take now another possible distinction.

Vagueness law's concern with sharp delineation of government power is said to rest on the need to limit the possibility of arbitrary enforcement.

That can result when a too-broad law gives de facto lawmaking power to many lower-level enforcement officials. See, e.g., Davis, 588 U.S. at 451 ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide."); accord, e.g., Johnson, 576 U.S. at 595 (similar); Kolender, 461 U.S. at 358 (similar).[44]

---

[42] See 1987 Hearing at 40-41 (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't) (suggesting this).

[43] See, e.g., 8 U.S.C. § 1227(a)(4)(B) (authorizing removal in cases involving terrorism); id. § 1227(a)(4)(E) (same, religious persecution); id. § 1227(a)(2)(A)(iii) (same, commission of aggravated felony); id. § 1227(a)(6)(B) (same, unlawful voting); id. § 1227(a)(6)(B) (same, public charge).

[44] The concern in this situation dovetails with the double difficulties associated with (a) a broadly written injunction that then (b) gives many different people a hand in enforcing it. See, e.g., Merch Traffic, LLC v. Does 1-100, 686 F. Supp. 3d 380, 386 (D.N.J. 2023) ("Where . . . the injunction's starting point is loose language, many interpreters . . . means many different interpretations. And many different interpretations multiplies the chances for uncertainty and confusion, along with the risk that the injunction will be

But the Supreme Court has indicated there are <u>also</u> possible vagueness problems when a single senior official or a single official body is expected to make enforcement decisions without the benefit of a crisp legal standard from the legislature.  <u>See Bantam Books, Inc.</u> v. <u>Sullivan</u>, 372 U.S. 58, 71 (1963) (statewide commission); <u>Mahler</u>, 264 U.S. at 40 (Secretary of Labor); <u>cf</u>. <u>Aptheker</u> v. <u>Sec'y of State</u>, 378 U.S. 500 (1964) (Secretary of State).

Is <u>all</u> relatively standardless enforcement to be treated in the same way?  Is decentralized enforcement under a loose standard (as in <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u>) to be directly analogized, without doctrinal adjustment, to centralized enforcement under a loose standard (as in <u>Bantam</u> and <u>Mahler</u> --- and also as envisioned for the Secretary of State in Section 1227)?[45]

These are complex questions, and they suggest that it would be too hasty to simply treat <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u> as compelling the outcome in this case.

---

misunderstood in ways that sweep in people it should not.") (cleaned up).

[45]  Thinking this through might require wrestling with another set of questions.  Namely, in its cabining-government-power prong, is vagueness doctrine concerned only with arbitrary enforcement, or is it also concerned with democratic accountability?  And if vagueness doctrine is concerned with accountability (as some cases suggest, <u>see</u>, <u>e.g.</u>, <u>Davis</u>, 588 U.S. at 451), does that imply that it should be more forgiving of relatively looser standards when they are visibly administered only by a single, senior official?  <u>See</u> Alexander Bickel, <u>The Least Dangerous Branch: The Supreme Court at the Bar of Politics</u> 151 (1962) ("A vague statute delegates to administrators, prosecutors, juries, and judges the authority of ad hoc decision, which is in its nature difficult if not impossible to hold to account, because of its narrow impact."); <u>cf</u>. <u>Dimaya</u>, 584 U.S. at 182-83 (Gorsuch J., concurring); Memorandum from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, to Eric Holder, U.S. Att'y Gen., <u>Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi</u> 38-41 (July 16, 2010) (in a context that is far afield, implicitly suggesting that due process concerns may be lessened when "high-level" officials are the key decision-makers).

*     *     *

In sum:

Section 1227 as applied here is more vague than other statutes the Supreme Court has struck down, see Part V.C.1, but this does not end things.  It weighs in favor of the conclusion that Section 1227 is vague as applied.  But it does not <u>require</u> that conclusion.

D.   **History**

When it comes to vagueness, the Supreme Court and other federal courts have often looked to legislative history.  See Part V.A.2.

And in this case, the parties have affirmatively brought Section 1227's legislative history to the Court's attention.  <u>See</u> Petitioner's Supplemental Brief at 18–19; Respondents' Supplemental Brief at 5–7.[46]

Take up here Section 1227's legislative history, <u>see</u> Part V.D.1, and then its enforcement history.  <u>See</u> Part V.D.2.

A quick preview of what they show:

The legislative history generally suggests that Section 1227 removal was intended for cases in which (a) the underlying conduct happened abroad or almost exclusively abroad, and (b) it was determined by the Secretary of State that the underlying conduct would have impacted U.S. relations with other countries.

And the enforcement history shows Section 1227 has generally been used over the years in keeping with the legislative-history blueprint --- for removals based on conduct that took place entirely (or almost entirely) abroad, and that, per the Secretary, affected America's relations with other countries.

This case does not fit into those categories.

---

[46]  And the Respondents have focused the Court on <u>Boutilier</u> v. <u>INS</u>, 387 U.S. 118 (1967), discussed above, in which the Supreme Court squinted hard at legislative history to resolve a vagueness challenge.  <u>See</u> <u>id.</u> at 121–22 (citing S. Rep. No. 82-1137, at 9 (1952)).

As determined by the Secretary of State, all of the Petitioner's conduct took place in the United States.  See Determination at 2.  And the Secretary has not affirmatively determined that the Petitioner's conduct impacted U.S. relations with any foreign country.  See id.

The takeaway: a further reduction in the likelihood that an "ordinary person" in the Petitioner's position would have had a sense that Section 1227 might be used to seek to remove him.

### 1.   Legislative History

#### a)   Its Role

Ensuring that there are clear limits on the scope of government power is one of the bases for the vagueness doctrine.  See Part III.

And this is largely a matter of two things.

First, understanding what the statute does and does not empower the government to do.  And then second, asking the vagueness question --- how crisp is Congress' command, and what sort of space does it leave behind for potentially arbitrary enforcement?

The first part of the inquiry is mainly a matter of statutory interpretation.  And as to that, legislative history can have a role to play only when the underlying statute is ambiguous. See, e.g., Bostock v. Clayton Cnty., 590 U.S. 644, 674 (2020).

Here, the linchpin words in Section 1227 are "foreign policy." The dictionary definitions of those words are essentially uniform.  See Part V.A.3.  The words are not ambiguous.

Therefore, as to delineating the power that Section 1227 gives the Secretary, legislative history has no role.[47]

But that is not the end of the matter.

In addition to zeroing in on the limits to government power, vagueness doctrine also takes up notice questions.  What would

---

[47]  No role for now.  See footnote 68.

**JA 260**

an ordinary person take away from the law?  What would he or she be warned about as a practical matter?

This sort of notice is a matter of what things mean in "the common mind."  McBoyle v. United States, 283 U.S. 25, 27 (1931); Mahler, 264 U.S. at 40 ("common understanding"); Kovacs v. Cooper, 336 U.S. 77 (1959) ("daily use"); Sproles v. Binford, 286 U.S. 374, 393 (1932) ("common usage and understanding").

Getting at that often requires panning out, to consider the broader range of information that might inform the understanding of ordinary people.  This can mean a look to newspaper articles, for example, see Blake, 288 F. App'x at 794-95, and to enforcement history.  See Wyndham, 799 F.3d at 257-58 & nn.22-24.  And it is hard to know why it should not also mean a look to legislative history.

What this adds up to: the parties have each pointed the Court to Section 1227's legislative history, and the Court refers to it here to shed light on the notice an ordinary person in the Petitioner's position would have had.

Now look to two parts of the legislative history.

### b) **The Conference Report**

Start with the 1990 House Conference Report.[48]  See Petitioner's Supplemental Brief at 18-19 (citing the Report); Respondents' Supplemental Brief at 7 (same).

The Report was issued in the run-up to the passage of Section 1227.  See H.R. Rep. No. 101-955 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 6784, 6794.

---

[48]  A conference report "presents the formal legislative language on which the conference committee has agreed."  Christopher M. Davis, Cong. Rsch. Serv., R98-382, Conference Reports & Joint Explanatory Statements 1 (2015).  Such reports are sometimes regarded as relatively more reliable sources of legislative history.  See, e.g., Ry. Lab. Execs. Ass'n v. Interstate Com. Comm'n, 735 F.2d 691, 701 (2d Cir. 1984); Demby v. Schweiker, 671 F.2d 507, 510 (D.C. Cir. 1981).

When, per the Report, might Section 1227 be invoked?[49]

The Report gave two examples.

The first: Section 1227 might be brought to bear when there could be "imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran)." Id. at 6795.

The reference to the Shah is apparently this: on October 29, 1979, the Shah of Iran was admitted to the United States for medical treatment, and six days later scores of Americans were taken hostage in the storming of the United States Embassy in Tehran.  See Mark Bowden, Guests of the Ayatollah (2006) at 5-6, 19-20.

By then, the Shah had ruled Iran for more than 35 years.  He was not someone who undertook meaningful activities in the United States.  He moved around in the last year of his life to a succession of countries for treatment, including Egypt, Morocco, the Bahamas, and Mexico.  One of those countries was the United States.

And the concern as to the Shah's treatment was that it could have impacted "lives or property of United States persons abroad," or "property of the United States government abroad." See H.R. Rep. No. 101-955 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 6784, 6795 (emphasis added).

Bottom line: per the Report's first example, Section 1227 was to focus on conduct outside of the United States that involved a direct impact on U.S. relations with a foreign country, Iran.

The Report's second example: Section 1227 might be used when there "would [be a] viol[ation] [of] a treaty or international agreement to which the United States is a party."  Id.

---

[49]  The Report discussed Section 1227 in the context of the decision to exclude a person from entering the United States, see H.R. Rep. No. 101-955, 1990 U.S.C.C.A.N. at 6794-95 --- not, as here, in the context of an effort to remove a person from the United States.  No matter.  Section 1227 makes clear that these are interchangeable.  They are governed by the same standard. Compare 8 U.S.C. § 1227(a)(4)(C)(ii), with id. § 1182(a)(3)(C)(iii).

As a general matter, treaties are externally focused, concerned with foreign matters, not domestic ones.[50] See Medellin v. Texas, 552 U.S. 491, 505 (2008) ("A treaty is . . . primarily a compact between independent nations.") (cleaned up); see also 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliott ed., 1836) at 514 (statement of James Madison: "The object of treaties is the regulation of intercourse with foreign nations, and is external."); Treaties and Executive Agreements: Hearings on S.J. Res. 1 before a Subcomm. of the Sen. Comm. on the Judiciary, 84th Cong. 183 (1955) (Secretary of State Dulles) (stating that treaties cannot regulate matters "which do not essentially affect the actions of nations in relation to international affairs, but are purely internal").

Treaties are overwhelmingly entered between the United States and other counties. See Medellin, 552 U.S. at 505; Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979); Restatement (Fourth) of the Foreign Relations Law of the United States § 301 (2018); Phillip R. Trimble, International Law: United States Foreign Relations Law 129 (1st ed. 2002).

And "viol[ating]" a treaty --- the Report's stated concern --- would plainly impact U.S. relations with the country that was America's treaty partner.[51]

---

[50] "As a general matter" because of some arguable drift during recent decades. Compare Restatement (Second) of the Foreign Relations Law of the United States § 117(1)(a) (1965) (stating that the Constitution's treaty power can be put in play only if the subject matter of the treaty "is of international concern"), with Restatement (Third) of the Foreign Relations Law of the United States § 302, cmt. c (1987) ("Contrary to what was once suggested, the Constitution does not require that an international agreement deal only with 'matters of international concern.'").

[51] It is not crystal clear how a Section 1227 removal might prevent a treaty breach. But maybe the idea is that a country whose extradition request is not fulfilled by the United States would think of its extradition treaty as having been breached. On this understanding, Section 1227 might have been envisioned as working, in part, as a kind of back-up extradition-type mechanism, as when, for example, there is a failure of proof

55

In short, the Report's examples point in the same direction:
Section 1227 was expected to be used in contexts in which the
underlying conduct (a) took place mainly abroad, not inside the
United States, and (b) was determined by the Secretary to impact
U.S. relations with another country.

### c)    __The Prior Statute__

Look now to another piece of legislative history.

Section 1227 became law in 1990, and the Respondents direct the
Court to Section 1227's pre-enactment history.  See Respondents'
Supplemental Brief at 6.

That history is laid out here over the next page or two.

*     *     *

A 1952 statute empowered the Secretary of State to order the
removal of certain foreign nationals from the United States.
See Immigration & Nationality Act of 1952, Pub. L. No. 82-
414 § 241(a)(7), 66 Stat. 163, 206 (codified at 8 U.S.C.
§ 1251(a)(7)).

This statute had "for years" been understood to reach foreign
nationals who might generate "adverse foreign policy
consequences" for the United States.  See 1987 Hearing at 47
(letter of Assistant Att'y Gen. John Bolton).

The 1952 statute did not mention the words "foreign policy."
See Immigration & Nationality Act of 1952 §§ 212(a)(27)
(exclusion), 241(a)(7) (deportation).

Rather, per the 1952 statute, a foreign national could be
removed if he "engage[d] in activities which would be
prejudicial to the public interest . . . of the United States."
See id. §§ 212(a)(27) (exclusion), 241(a)(7) (deportation).

---

before the American extradition court, and an extradition
therefore does not go forward.  That is how Section 1227 was
used in Massieu v. Reno, 91 F.3d 416, 418-19 (3d Cir. 1996).
(In terms of the location-of-the-underlying-conduct point, note
that when the United States extradites a person to country X, it
is virtually always for conduct that occurred in country X, not
for conduct that took place in the United States.  See, e.g.,
Extradition Treaty, Mex.-U.S., art. 1(1), May 4, 1978, 31 U.S.T.
5059.)

56

**JA 264**

That worked because "public interest" could be read to cover foreign policy concerns.  See 1987 Hearing at 47 (letter of Assistant Att'y Gen. John Bolton) (describing the Department of Justice's long-standing interpretation of the 1952 statue).

But it did so by casting a wide net --- one so broad that it allowed the Secretary of State to act on foreign policy concerns and also based on purely domestic concerns.

During the late 1980s, Attorney General Meese and Secretary of State Schultz gave a set of major speeches focused on changing immigration laws to pry open more space for free expression. See id. at 33 (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't) (describing the speeches).

Citing these speeches, former Judge Sofaer, then the State Department Legal Adviser, testified for the Reagan administration that the foreign-and-domestic 1952 statute could be eliminated, provided that a replacement statute gave back to the Secretary of State the foreign policy-focused powers that he needed.

Judge Sofaer's testimony:

> We recognize . . . that the "public interest" standard is broad, and we are prepared to support replacing it with language that limits the grounds of exclusion to potentially serious foreign policy consequences.  (The public interest standard also encompasses internal security cases, but we feel these are adequately handled under other sections of the law.)  This narrowing of our authority is significant. . . .  We recognize that the revised standard leaves considerable discretion in the Executive branch.  But we believe it is difficult and inadvisable to be more precise in defining what cons[t]itutes a serious adverse foreign policy consequence.  New crises and difficulties arise every day in our international relations, and we need some flexibility to deal with them.

Id. at 40–41.

**JA 265**

The gist of Judge Sofaer's testimony: the 1952 statute swept
broadly and included powers to address both domestic
("internal") concerns and also foreign policy concerns.  <u>Cf</u>.,
<u>e.g.</u>, <u>id</u>. at 57-58 (testimony of then-INS Commissioner Alan
Nelson).  The 1952 statute, he argued, could be struck from the
books, so long as its kernel of foreign policy power was kept.

And that is where things went.

In 1990, Congress repealed the relevant part of the 1952 statute
and replaced it with the current Section 1227.  <u>See</u> Immigration
Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (1990).

By eliminating the broad 1952 "public interest" standard and
allowing for removal only on grounds related to "foreign policy
interests," Section 1227 provided what the Reagan administration
had wanted: a narrower statute, focused solely on the
Secretary's power as to foreign policy concerns, without any of
the power of the old "public interest" standard as to matters of
"internal" concern.

In a nutshell: Section 1227 was meant to focus on foreign
concerns, not domestic ones.  And that view undergirded the
Reagan administration's position --- which was to walk away from
removal powers triggered by "internal" conduct, so long as
foreign-focused removal powers stayed on the books.

### 2.   **Enforcement History**

The Court can also look to Section 1227's enforcement history.

In its <u>Wyndham</u> decision, the Third Circuit assessed enforcement
history to help resolve a vagueness question.  It scrutinized
the complaints filed by an enforcement agency, the FTC, to get a
handle on the notice that might have been provided to an entity
that was later sued by the agency.  <u>See</u> <u>Wyndham</u>, 799 F.3d at
257-58 & nn.22-24.[52]

---

[52]   Three points here.  <u>First</u>, in <u>Wyndham</u> the Third Circuit
pointed to enforcement history to show that a company was not in
the dark and therefore could not successfully make a lack-of-
notice argument.  <u>See</u> 799 F.3d at 258.  But it makes little
sense to think that enforcement history might be used to help
<u>defeat</u> a lack-of-notice argument (as in <u>Wyndham</u>) but not to help
<u>bolster</u> one (as here).  <u>Second</u>, there are, in general, solid

58

**JA 266**

Take up Section 1227's enforcement history now.[53]

_____

reasons to look to enforcement history.  For example, it comes closer in time to a person's alleged conduct than legislative history, and the example of a concrete case looms larger for an ordinary person than a given congressional report.  Moreover, in terms of notice, what is actually being done (what the enforcement history shows) is likely more telling that what was first planned (which is what the legislative history shows).  In addition, if the government always enforces a statute in one way but then spins it around and uses it in a wholly different way, that may lead to the sort of arbitrary enforcement that vagueness doctrine is specifically intended to guard against. Why ignore it?  A third point.  Enforcement history can count only if it provides public notice.  Wyndham makes that clear, see 799 F.3d at 257, and public examples are the Court's sole focus here.  A seemingly non-public case put forward by the Respondents, see Respondents' Letter (May 9, 2025) (ECF 241) at 1, has been put aside.  (Note that the State Department has published three examples from Section 1227's enforcement history on the internet, in its widely used compendium, the Digest of United States Practice in International Law 1991-1999.)

[53]  A note on enforcement history in this case.  This month, the Court convened a conference in lieu of oral argument and set a schedule for supplemental briefing.  See ECF 224, 228.  At the conference, the Court indicated it would be looking to enforcement history.  See Transcript of May 2, 2025 Teleconference (ECF 229) at 7:14-19, 8:6-10.  No one objected. Five days later the Court ordered the Respondents to provide enforcement-history information.  See ECF 231.  The Respondents apparently agreed that such materials were relevant.  They said they were "in the process" of gathering those materials themselves and "already intended to provide some of this information to the Court in [their then-upcoming] supplemental [legal brief]."  ECF 232.  But the Respondents asked for more time to provide the information.  See id.  More time was afforded, see ECF 234; the Respondents produced enforcement history materials, see ECF 241, 246 --- and then, only after that, objected for the first time to the production of further information, and seemingly to the use of such materials, too. See Respondents' Letter (May 9, 2025) (ECF 247).  The Court did not press the matter.  But one way or another, the Respondents' objection came too late.

\*   \*   \*

The enforcement history of Section 1227 lines up with its legislative history.

They point in the same direction: the statute was _meant_ to be used, and generally _was_ used (until the Petitioner's case) as to people whose relevant conduct took place entirely abroad, or all but entirely abroad, and which was determined by the Secretary to impact U.S. relations with a foreign country.

Walk through the enforcement history now.

\*   \*   \*

In 1995, the Secretary of State issued a Section 1227 determination as to a Jordanian national. The underlying facts:

> [T]he respondent was indicted in Jordan of conspiracy with the intention of committing terrorist acts. The indictment describes a deliberately unnamed organization in Jordan established for the purpose of fighting tyrant Arab rulers, resisting the "peace process," combating vice, and fighting Jews and Americans. This documentation alleges that the organization collected arms and explosives and attempted a number of bombings in cinemas in Jordan, and also a supermarket there, in January 1994. The respondent's alleged role was training one of the organization's founders at a training camp in the Philippines and agreeing to finance the organization after a visit to Jordan to assess the organization's capabilities in early 1994. As a result of the legal proceeding in Jordan, the respondent was evidently sentenced to death in absentia for his role in the terrorist attacks.

In Re Mohammad J.A. Khalifa, 21 I. & N. Dec. 107, 108-09 (BIA 1995).

The Secretary of State's determination indicated that Jordan had requested the removal, see ECF 252 at 5-6, and that saying no would "damage U.S. relations with Jordan." Id. at 6.

60

**JA 268**

*　　　*　　　*

Later in 1995, the Secretary of State determined that the leader of a Haitian paramilitary force should be removed from the United States.

More of the same.  Conduct that took place wholly abroad, and a determination by the Secretary that zeroed in on harm to U.S. relations with a foreign country.

Secretary of State Christopher's determination:

> [T]he Revolutionary Front for the Advancement and Progress of Haiti ("FRAPH") . . . claims to be a political party, [but] it has never in fact participated in the national political process.  It is officially regarded by the Department of State as an illegitimate paramilitary organization whose members were responsible for numerous rights violations in Haiti in 1993 and 1994.  Opposition to FRAPH is a key element of our Haitian foreign policy, and we have said so publicly. . . .

> [The foreign national whose removal is sought] is one of the co-founders and current President of FRAPH.  He was instrumental in sustaining the repression that prevailed in Haiti under the illegal military-led regime until it was displaced last September by the multinational force led by the United States.  On February 3, 1995, Mr. Constant sent a letter on behalf of FRAPH to the Special Representative of the Secretary General of the United Nations for Haiti using a Washington, D.C., return address and telephone number.  In addition, since his arrival in the United States, FRAPH elements in Haiti have broadcast on Haitian radio tape recordings of Mr. Constant speaking on behalf of FRAPH to the Haitian people.

> These activities create the impression in Haiti that the United States is permitting

61

**JA 269**

Mr. Constant to use the United States as a
base of operations for FRAPH.  They fuel
false but widespread perceptions in Haiti
that Mr. Constant was deliberately allowed
to enter the United States in December and
that the United States Government is
secretly supporting him; that the United
States endorses both him and his positions;
and that we approve of FRAPH.  These
misperceptions persist notwithstanding that
we have consistently denounced FRAPH and
made statements distancing the United States
from it and Mr. Constant.

My concern about Mr. Constant's presence and
activities in the United States is
heightened by the fact that elections for a
new Haitian Parliament and for over 2,000
local government positions are scheduled for
June 4, 1995.  The United States has a huge
stake in making sure that these elections --
- the best manifestation of democracy ---
are held successfully.  Because Mr. Constant
for many Haitians symbolizes the antithesis
of democracy, permitting him to remain at
large in the United States could undermine
this important foreign policy
objective. . . .

The Haitian Government shares our belief
that Mr. Constant is in the United States
and has requested his extradition so that he
may face criminal charges in Haiti.  We have
returned the request, which was technically
deficient, to the Haitian Government, to
which we have offered assistance in
perfecting the documents.  Given the
compelling foreign policy interests at
stake, it is essential that we seek Mr.
Constant's deportation independent of any
extradition efforts.

Letter from Warren Christopher, Sec'y of State, to Janet Reno,
Att'y Gen. (Mar. 29, 1995), U.S. Dep't of State,
https://perma.cc/24DS-V4DR (accessed on May 28, 2025) (retrieved

62

**JA 270**

through the <u>Digest of United States Practice in International Law 1991-1999</u>).[54]

<center>*   *   *</center>

Fast-forward two years, to a 1997 determination from Secretary of State Albright and another example of the same pattern.

A foreign national's removal was sought based on purely foreign conduct, and also based on an impact on U.S. relations with other countries.  Among other things, a refusal might have harmed a U.S.-led peace process, and might have made other countries less likely to help America deny safe havens to terrorists.

> I have determined that the entry, continued presence, or activities in the United States of Mousa Mohammed Abu Marzook . . . would have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest.  My determination is based on the following considerations. . . .

> Mr. Marzook, who acknowledges that he is a top official of Hamas, has been declared a "Specially Designated Terrorist" under the authority of [a Presidential] executive order by virtue of his actions on behalf of Hamas.  All assets of both Hamas and Mr. Marzook in the United States are blocked, and financial transactions with each are prohibited unless authorized by the Department of the Treasury's Office of Foreign Assets Control.

> Additionally, during the course of recent extradition proceedings against Mr. Marzook

---

[54] See <u>also</u>, <u>e.g.</u>, Matthew Purdy, <u>Hiding in Plain Sight: Search for Haitian Exile</u>, N.Y. Times, May 24, 1995, at B.1 (newspaper article describing Constant's removal from the United States); <u>INS Agents Arrest Emmanuel Constant</u>, United Press Int'l (May 11, 1995), https://perma.cc/8UMS-MFSR  (accessed on May 28, 2025) (same).

<center>63</center>

<center>**JA 271**</center>

initiated at the request of the Government
of Israel, two U.S. courts found probable
cause that he was criminally responsible for
ten specific, grave incidents of terrorism
in and around Israel before his arrival in
the United States.  Judge Duffy stated:

> "I find that there is probable
> cause to believe Abu Marzook
> engaged in and intended to further
> aims of the conspiracy by his
> membership in and support of the
> Hamas organization.  I also find
> that probable cause exists that
> Abu Marzook knew of Hamas's plan
> to carry out violent, murderous
> attacks, that he selected the
> leadership and supplied the money
> to enable the attacks to take
> place and that such attacks were,
> therefore, a foreseeable
> consequence of the conspiracy."

Judge Wood, in her ruling, found that "the
evidence [Judge Duffy] relied upon is more
than sufficient to sustain his ruling,"
noting as an example Mr. Marzook's public
acceptance of responsibility on behalf of
Hamas for an October 9, 1994, attack in a
pedestrian mall in downtown Jerusalem. . . .

The credibility of United States policies
would be jeopardized if a prominent leader
of a designated terrorist organization were
allowed to reside in the United States.
This in turn would undermine our ability to
seek cooperation from others in denying
terrorists [safe haven].  Moreover, this is
a particularly crucial moment in the Middle
East peace process, when senior United
States officials are making a maximum effort
to secure cooperation in the fight against
Hamas terrorism and to resume the
negotiating process.

64

Letter from Madeleine Albright, Sec'y of State, to Janet Reno, Att'y Gen. (Apr. 4, 1997) (quoting Marzook v. Christopher, 1996 WL 583378 (S.D.N.Y. Oct. 10, 1996)), https://perma.cc/Q87M-UD99 (retrieved through the Digest of United States Practice in International Law 1991-1999) (accessed on May 28, 2025) (cleaned up).

*    *    *

Finally: Matter of Ruiz-Massieu, 22 I. & N. Dec. 833 (BIA 1999).

There, federal officials sought to remove Mario Ruiz-Massieu. See Massieu, 91 F.3d at 417-19. He was "the second ranking law enforcement authority in Mexico" and was facing "serious" and "unprecedented" criminal charges there. Massieu, 915 F. Supp. at 711.

Ruiz-Massieu was alleged to have violated Mexican criminal law while serving in Mexico as a Mexican government official. See id. The Secretary's determination focused entirely on his alleged activities abroad. And it zeroed in on damage in the absence of removal to "U.S.-Mexican relations."

> The U.S. Government has consistently urged
> Mexico to take the steps towards reform in
> its justice system that President Zedillo is
> so forcefully pursuing. The ability to
> prosecute Mr. Ruiz Massieu and other
> powerful individuals in Mexico for the
> crimes of which they are accused is key to
> the success of Zedillo's pledge to transform
> totally the judicial and law enforcement
> system and to rid Mexico of corruption and
> abuse of power. Should the U.S. Government
> not return Mr. Ruiz Massieu to Mexico, our
> support of such reforms would be seen as
> hollow and self-serving and would be a major
> setback for President Zedillo and our
> combined efforts to chart a new and
> effective course of U.S.-Mexican relations.

Id. at 712.[55]

---

[55]  See generally Ronald Smothers, Former Mexican Deputy Attorney General Indicted for Drug Trafficking, N.Y. Times (Aug. 28,

\*     \*     \*

The legislative history and the enforcement history of
Section 1227 sit on the same side of the scale.

Section 1227 was generally meant to be used, and has been used,
for conduct (a) that entirely or all but entirely took place
outside the United States and (b) that, as determined by the
Secretary, would impact U.S. relations with a foreign country.

But here, per the Secretary's determination, the Petitioner
acted solely within the United States.  See Determination at 2.
And the Secretary did not affirmatively determine that the
Petitioner's conduct had any impact on U.S. relations with
another country.

The legislative and enforcement history do not suggest in "the
common mind," McBoyle, 283 U.S. at 27, that removal might be
sought in these circumstances.[56]

Rather, they underscore that a Section 1227 removal of the kind
at issue here is unprecedented --- not within the realm of
conduct that the statute normally covers, of which an ordinary
person would have notice.

### E.    Difficulty

To see the next point, start with this legal principle: a law
can be unconstitutionally vague when it conditions liability or
punishment (or here, removal) on a standard that requires
analysis that is simply too hard for an ordinary person to
realistically pull off.

---

1999), https://perma.cc/3DZZ-EBG8 (accessed on May 28, 2025);
Ex-Official of Mexico Indicted, Wash. Post. (Aug. 27, 1999),
https://www.washingtonpost.com/archive/politics/1999/08/28/ex-
official-of-mexico-indicted/8633fe6d-5e2b-476a-8496-cc72cbca6a5d
(accessed on May 28, 2025).

[56]  If anything, the relevant "history and practice," Beauharnais
v. Illinois, 343 U.S. 250, 253 (1952), might have led an
ordinary person to affirmatively believe that domestic conduct
which the Secretary has not determined affects U.S. relations
with another country is beyond the reach of Section 1227.

66

**JA 274**

The Supreme Court has made that clear, as discussed below.  And it is not hard to see its reasoning.

A standard that is too hard to use undermines notice.  As a practical matter, it leaves people guessing as to whether they are violating the law.

And such a standard also ups the odds of arbitrary enforcement, because it leaves enforcers to guess, too.

Take this up now, along with its implications for this case.

*     *     *

Legal standards often require some analysis, and that is not generally a vagueness problem.

Take an ordinance that says a person picketing outside a school commits a crime if she makes noise that disturbs a class.

The ordinance requires the demonstrator to think through the possible relationship between a cause (her protest) and a possible effect (disruption of the students and teachers working away inside).

If she gets the analysis wrong --- or at least analyzes things differently than a police officer might --- the demonstrator can be arrested.

This is no vagueness issue.

The ordinance requires an analysis that is not especially complicated or obscure.  People can figure out whether "normal . . . activity . . . is about to be disrupted."  Grayned, 408 U.S. at 112.

No surprise, then, that anti-noise ordinances along the lines of the above have routinely survived vagueness challenges.  See, e.g., id.; Cameron, 390 U.S. at 615–17 (rejecting vagueness challenge to an ordinance that prohibited demonstrations that disturbed activity inside a courthouse); see generally Nash v. United States, 229 U.S. 373, 377 (1913) ("[T]he law is full of instances where a man's fate depends on his estimating rightly.").

Consider another law.

This one told truck drivers hauling explosives to avoid "driving into or through congested thoroughfares, places where crowds are

assembled" --- "so far as practicable, and, where feasible."
Boyce Motor Lines, 342 U.S. at 339.

This can be tricky to figure out in big cities, and a truck
company hauling loads from New Jersey to New York was charged
with breaking the referenced law.  See id.

It argued the law was unconstitutionally vague.  See id. at 339–
40.  But the Supreme Court disagreed.  See id. at 343.

Trucking-industry groups had been involved in formulating the
law, see id. at 341–42, and truckers could realistically be
expected to thread the needle by mapping out routes that dodged
"congested" streets and "crowd[ed]" places.  See id. at 342–43;
accord, e.g., Sproles, 286 U.S. at 393 (rejecting vagueness
challenge to a law that required truckers to use the "shortest
practicable route to [their] destination").

In the noise-ordinance cases and in the trucking cases, the
operative legal standards required some analysis.  But not too
much, and so the Supreme Court held there was no vagueness
problem.

There are cases, though, that go the other way --- cases in
which the analysis required by a statute's operative standard
was too difficult as a practical matter, and so the Supreme
Court struck down the statute.

Walk through the cases now.

                    *     *     *

First, International Harvester Co. of America v. Kentucky, 234
U.S. 216 (1914).

A Kentucky law allowed certain businesses to come together to
sell their goods --- but only if that would not raise prices.
See id. at 221.

How to confirm that prices did not jump?

Per the Kentucky law, that was a matter of determining whether
current prices were no more than what "the market value under
fair competition" would have been --- that is, the prices "under
normal market conditions," id., had the businesses not decided
to join together in the first place.

A company, International Harvester, was convicted under this law. See id. at 219. But the Supreme Court, per Justice Holmes, struck down the law as unconstitutionally vague.

Why? Not because the Kentucky law required wading through some shades of gray. Many laws require that.

Negligence law, per the Supreme Court, was one such example: "between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach, and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust." Id. at 223. Laws against negligence leave room for judgment, but they are not vague. They involve well-known concepts, which makes it "comparatively easy for common sense to keep to what is safe." Id.

But the Kentucky law was vague because "common sense" could be no help. Only "complex[]," id., counterfactual economic analysis could indicate what prices might have been had the businesses not come together --- and without doing that analysis, International Harvester could not stay on the right side of the law.

But why not just require International Harvester to loose accountants and economists on the pricing question?

The Supreme Court's answer: the required analysis was simply too hard.

Working through it would vex "the acutest commercial mind." Id. The facts --- necessary grist for any financial analysis --- were "uncertain both in nature and degree." Id. They were "only partially determinate." Id. The end result would be "[t]o compel [businesses] to guess," "to divine prophetically." Id.

All of this, per the Supreme Court, was too much, and so it struck down the law as vague. See id. at 222-24; accord, e.g., Am. Seeding Mach. Co. v. Kentucky, 236 U.S. 660, 662 (1915); Collins v. Kentucky, 234 U.S. 634, 638 (1914).

Ordinary people need to have a real shot at understanding what the law requires. That is impossible when a law's requirements are articulated through an analysis that must be done --- but which is so challenging that it ultimately calls for a great deal of guesswork. See Harriss, 347 U.S. at 617 ("The

69

**JA 277**

underlying principle [of vagueness law] is that no man shall be held criminally responsible,[57] for conduct which he could not reasonably understand to be proscribed.").[58]

Now take another case, United States v. L. Cohen Grocery Co., 255 U.S. 81 (1921).

The defendant, a grocer, was charged with violating a law that barred sales of certain goods at an "unjust or unreasonable rate." Id. at 89 (cleaned up).

District judges had taken numerous approaches to determining a "[]reasonable" rate. See id. at 90 n.2. They came up with various formulas; these accounted for the price the defendant paid, handling costs, and typical industry profits. See id.

The Supreme Court might have gone with any one of those --- especially because the statute in question had a mens rea requirement, see id. at 86, something that has long been understood as stiff medicine for curing a vagueness problem. See, e.g., Screws v. United States, 325 U.S. 91, 101–103 (1945);

---

[57] As noted in Part III, the vagueness doctrine that applies to criminal cases applies in removal cases. See Dimaya, 584 U.S. at 156–57 (citing Jordan, 341 U.S. at 229, 231).

[58] A passage in International Harvester suggests that the analysis the statute required was not just difficult, but impossible --- requiring "gifts that mankind does not possess." 234 U.S. at 224. But an impossibility reading of the case would be too strong. Judges routinely deal with counterfactual questions. What would a person have earned if she had not been injured? And counterfactual questions can be sprawling. Think of an antitrust class action. Or some of the lost-profits issues in major commercial disputes. Or the price effects of foreign goods dumped in the domestic market. See, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015). The counterfactual economics question in International Harvester question would have been very hard. That was the Supreme Court's point. But it would not likely have seemed literally impossible to Justice Holmes and his colleagues. (Indeed, economists often resolve tough questions by seeking out "natural experiments." And one could have been at hand in International Harvester. To ask how the market would have worked without the combinations Kentucky allowed, it might have been possible to simply look to the prices being charged in similar markets that did not have a combinations law like Kentucky's.)

United States v. Ragen, 314 U.S. 513, 524 (1942); Gorin v. United States, 312 U.S. 19, 27—28 (1941); Omaechevarria, 246 U.S. at 348.

But the Court struck down the statute as vague.  See L. Cohen Grocery, 255 U.S. at 92–93.  The range of facts that might relate to whether a price is "unreasonable" was simply too broad to get a solid handle on.

> [The statute] confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides.  It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.

Id. at 89.

The statute, in short, envisioned a standard ("[]reasonable" and "[]just") for allowable prices.  See id. at 86.

That standard, on its own, may not have been too hard to administer.  See Cameron, 390 U.S. at 616 & n.7 (holding that "unreasonable" is not vague --- and noting that the Constitution itself uses that term).

But applying the standard, figuring out how it might actually work as to the price of a pound of sugar --- that was too much. The equation was too difficult to work through, because its factual inputs could be anything and everything --- "the widest conceivable inquiry."

A third case is Johnson v. United States, 576 U.S. 591 (2015).

There, the Supreme Court considered a provision of federal law that lengthened a defendant's prison term if she had three or more prior convictions for a "violent felony."  See id. at 593 (cleaned up).  The law, as interpreted by the Supreme Court, defined "violent felony" in light of whether the underlying crime's "ordinary case" posed a serious risk of physical injury. See id. at 596 (cleaned up).

This was too vague an approach under the Constitution, the Supreme Court held.  One of the main reasons why:

> How does one go about deciding what kind of
> conduct the 'ordinary case' of a crime
> involves? A statistical analysis of the
> state reporter? A survey? Expert evidence?
> Google? Gut instinct? To take an example,
> does the ordinary instance of witness
> tampering involve offering a witness a
> bribe? Or threatening a witness with
> violence? . . . Explaining why attempted
> burglary poses a serious potential risk of
> physical injury, the Court said: "An armed
> would-be burglar may be spotted by a police
> officer, a private security guard, or a
> participant in a neighborhood watch program.
> Or a homeowner . . . may give chase, and a
> violent encounter may ensue." The dissent,
> by contrast, asserted that any confrontation
> that occurs during an attempted burglary "is
> likely to consist of nothing more than the
> occupant's yelling 'Who's there?' from his
> window, and the burglar's running away."
> The [statute] offers no reliable way to
> choose between these competing accounts of
> what 'ordinary' attempted burglary involves.

Id. at 597 (cleaned up).

The questions posed by the Supreme Court, through Justice
Scalia, were sharp and telling. But they were clearly
rhetorical.

It is possible to work out, at least roughly, what the
"ordinary" case of a crime is. For example, a "statistical
analysis" of reported cases would likely shed light on that,[59]
and an expert deep dive might, too. Indeed, the Sentencing

---

[59]  There are, for example, around two to three dozen people
charged each year in the federal system under the statute that
forbids witness tampering. See Federal Criminal Case Processing
Statistics Data Tool, Bureau of Just. Stats.,
https://fccps.bjs.ojp.gov/home.html?dashboard=FJSP-
CriminalCodeStats&tab=CriminalCodeStatistics&ccm=4 (accessed on
May 28, 2025) (Select "Number of persons in cases filed" and
"18:1512 B"). The indictments for these can help show what is
typical.

Guidelines are in part premised on typicality.  See Koon v. United States, 518 U.S. 81, 94 (1996) (noting that the United States Sentencing Commission bases its Guidelines on "a heartland of typical cases"); U.S. Sent'g Guidelines Manual at 7 (U.S. Sent'g Comm'n 2024) ("When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.").

The point is only this: Johnson does not rest on the idea that it is literally impossible to determine what the "ordinary" case of a crime is --- only that the analysis is enormously difficult and consuming.

And when the law requires an analysis like that, vagueness red flags go up, as they did in International Harvester and L. Cohen Grocery, too.

This point looms especially large in First Amendment-related cases.[60]

To see how, look to a final case, Herndon v. Lowry, 301 U.S. 242 (1937).

There, the Supreme Court reviewed a state criminal conviction. The underlying statute had been construed as requiring an element of violence, see id. at 262-63, but the defendant had done little more than recruit Communist Party members and possess certain literature.  See id. at 253.

On what basis, then, could he have been convicted?  How could the violence aspect of the conviction be sustained?

The state courts' answer: based on the potential actions of others --- on the defendant's "influence . . . in causing such action by those whom he sought to induce."  Id. at 262.

Quoting L. Cohen Grocery at length, see id. at 263, and citing a set of other vagueness cases, see id. at 263 n.14, the Supreme Court reversed the conviction.

The state's criminal law, the Supreme Court held, improperly allowed for conviction based on a "forecast," id. at 262, the

---

[60]  The Petitioner's case is a First Amendment case.  See Part V.F.

"result of a chain of causation," <u>id</u>., as to how others might in the future respond to the defendant's past actions.

> The question thus proposed to a jury involves pure speculation as to future trends of thought and action. Within what time might one reasonably expect that an attempted organization of the Communist Party in the United States would result in violent action by that party? If a jury returned a special verdict saying twenty years or even fifty years, the verdict could not be shown to be wrong. The law, as thus construed, licenses the jury to create its own standard in each case.

<u>Id</u>. at 263.

The theory that the defendant "ought to have foreseen his words would have some effect in the future conduct of others," <u>id</u>. at 263-64, was, per the Supreme Court, too "vague." <u>See</u> <u>id</u>. at 264.

\*     \*     \*

Come back now to this case.

Section 1227, the subject of the Petitioner's as-applied challenge, triggers the same difficulties as the just-cited cases.

The Secretary of State's determination rests, as relevant here, on the idea that the Petitioner's conduct in the United States impacted the global fight against anti-Semitism. <u>See</u> Determination at 2.[61]

But there is no suggestion as to how.

The Secretary's determination does not say that the Petitioner contacted anyone outside the United States. And the Secretary's determination does not suggest that people abroad paid any attention to the Petitioner --- let alone that he influenced them in the direction of prejudice (or in any other direction for that matter).

---

[61] Put aside for now that the Secretary of State did not affirmatively determine whether this had the required impact on U.S. relations with other countries.

**JA 282**

The implied understanding of Section 1227 at work in the Secretary's determination would seem to be this: while the statute covers only impacts on "foreign policy," those impacts can be the product of domestic action that is not said to be directed to the outside world.

Impacts of that sort can plainly happen.  Ideas and words can spread.  An act here can cause bias there.  One person's example can "influence" another person --- "as a result of a chain of causation."  Herndon, 301 U.S. at 262.

But if that is the idea, how is an ordinary person to have notice that his conduct in America may have the impact that Section 1227 requires?  How will he know whether people are hearing his words?  That they are being influenced by them?  That he is being seen by others as a kind of role model?  What facts will he need to look to in order to answer these questions?  Is he to read foreign newspapers to see whether he is being covered and how?  In what languages?  Newspapers from what places?  Should he look to YouTube?  TikTok?  How thoroughly must he search for himself online?  And critically: how much influence abroad is enough?  When will he have a sense that his influence has risen to the high level of "compromis[ing]" --- "undermin[ing]," Compromise, v., sense 2, Oxford American Writer's Thesaurus (2024) (emphasis added) --- a compelling American foreign policy interest?[62]

If a person wishes to steer clear of the possibility of being removed from the United States under Section 1227, he will have to go quiet, or he will have to figure these things out.

But having people go quiet because they cannot readily determine how to stay on the right side of the law --- that is one of the things vagueness doctrine exists to guard against.[63]

---

[62]  Cf. Johnson, 576 U.S. at 597 ("How does one go about deciding what kind of conduct the 'ordinary case' of a crime involves?  A statistical analysis of the state reporter?  A survey?  Expert evidence?  Google?  Gut instinct?").

[63]  See Grayned, 408 U.S. at 109 ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the

And as to figuring things out, the task is, simply, very hard.

Answering the questions listed out above depends on an extraordinarily broad range of information.

And the questions are, in any event, difficult --- around as hard as the questions in International Harvester, L. Cohen Grocery, and Johnson, cases in which the legal standards were too hard to realistically apply, to the point that they did not allow for real notice to potential violators and the underlying statutes were struck down by the Supreme Court as unconstitutionally vague.

And more pointedly: a standard that turned on a "forecast" as to how others might be "influenced" by one's conduct was stuck down as vague by the Supreme Court in Herndon.

But that is what Section 1227 asks of the Petitioner here.

### F.   **The First Amendment**

A final point.

When it comes to First Amendment-protected speech, the Supreme Court has repeatedly said that vagueness doctrine is especially demanding.[64]

The Secretary's determination here falls into First Amendment category.

---

unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).

[64]   See Fox Television Stations, 567 U.S. at 253–54; Reno v. Am. C.L. Union, 521 U.S. 844, 871–72 (1997); Marks v. United States, 430 U.S. 188, 196 (1977); Buckley v. Valeo, 424 U.S. 1, 41 (1976); Parker v. Levy, 417 U.S. 733, 756 (1974); Goguen, 415 U.S. at 573; Grayned, 408 U.S. at 109; Ashton v. Kentucky, 384 U.S. 195, 200 (1966); Baggett, 377 U.S. at 372–73 & n.10; Cramp, 368 U.S. at 287–88; Smith v. California, 361 U.S. 147, 151 (1959); Cantwell v. Connecticut, 310 U.S. 296, 308 (1940); see also Ashcroft v. Free Speech Coal., 535 U.S. 234, 258 (2002); Interstate Cir., Inc. v. City of Dall., 390 U.S. 676, 684–90 (1968); Cox v. Louisiana, 379 U.S. 536, 551–52 (1965); Edwards v. South Carolina, 372 U.S. 229, 237 (1963); Winters, 333 U.S. at 509–10; Stromberg v. California, 283 U.S. 359, 369 (1931).

The Secretary's determination suggests it was based on the Petitioner's "lawful" "beliefs, statements, or associations." Determination at 1.

And "beliefs," "statements," and "associations" are generally protected by the First Amendment.  See, e.g., Elfbrandt v. Russell, 384 U.S. 11, 18 (1966); Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y., 360 U.S. 684, 688 (1959).[65]

\* \* \*

When the First Amendment is implicated, as here, vagueness doctrine becomes especially unforgiving.

To see the point, look first to Buckley v. Valeo, 424 U.S. 1 (1976).

There, the Supreme Court considered a vagueness challenge to a campaign-finance statute.

The challenged provision read: "No person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."  Id. at 193.

This is much more specific and sharply drawn than Section 1227's "compromise[s] a compelling . . . foreign policy interest."

And on first glance, it looks like it easily clears the vagueness bar.

After all, the statute's words limit the giving of one person ("no person") towards another ("a clearly identified candidate") during a clearly defined time ("a calendar year") to a fixed amount of money ("$1,000").  On top of that, the act included

---

[65]  Sometimes, though, they are not.  Think, for example, of "fighting" words or "true threats."  See Counterman v. Colorado, 600 U.S. 66, 72 (2023); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942).  But those carveouts are not in play.  The Secretary has proceeded on the basis that the Petitioner's "beliefs, statements, or associations" were "otherwise lawful" --- lawful, that is, but for their being a predicate for a Section 1227 removal.

its own definitions for "expenditure," "clearly identified," and "candidate." See id. at 41.

But there was a problem, the Supreme Court said.

One statutory term, "relative to," was left undefined. See id. at 41. And that suggested possible vagueness. See id.

To salvage the statute, the Court looked to context and legislative history. Context permitted (and maybe required) "'relative to' a candidate to be read to mean 'advocating the election or defeat of' a candidate." Id. at 42. And this definition also found support in the Senate Report, House Report, Conference Report, and the opinion of the court of appeals. See id. at 42 n.49.

But even that did not close the door on the vagueness problem. See id. at 42. It just opened the way to new questions. What did it mean to advocate "the election or defeat of" a candidate? The line between such advocacy, which the statute limited, and "discussion of issues or candidates," which it did not, was too hazy, the Court said. See id. at 42-43.

"Such a distinction offers no security for free discussion." Id. at 43 (cleaned up). "In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." Id. (cleaned up).

So the Supreme Court further narrowed the statute.

As newly construed, the provision would extend "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Id. at 44.

And the Court listed specific phrases ---- "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject'" --- to show exactly where the line was. Id. at 44 n.52.

Only with that extraordinary amount of specificity now baked in did the Court hold that the provision could survive a vagueness challenge under the heightened First Amendment standard afforded to political speech. See id. at 44; see also id. at 41 (noting that the Buckley Court was wrestling with an area "permeated by First Amendment interests").

And there can be no doubt that the statute in <u>Buckley</u>, which barely squeaked by, was much less vague than Section 1227.

<p style="text-align:center">*   *   *</p>

<u>Buckley</u> is not alone.

Look to a final case, <u>United States</u> v. <u>Loy</u>, 237 F.3d 251 (3d Cir. 2001).

The defendant there, convicted for possessing child pornography, challenged a supervised-release condition as vague.  The condition barred him "from possessing all forms of pornography, including legal adult pornography."  <u>Id</u>. at 261. (cleaned up).[66]

Was this too vague?  Yes, the Third Circuit held.

The court was not writing on a completely blank slate in defining "pornography."  The Supreme Court had at least pointed to a definition of the word, though that was dicta of the most glancing kind.  <u>See id</u>. at 263 (citing <u>Miller</u> v. <u>California</u>, 413 U.S. 15, 19 n.2 (1973)).

That definition and others in dictionaries left room for debate. <u>See id</u>. at 263–64.  And even with their help, the Third Circuit could not say whether pornography encompassed only visual materials or included pure text and sound recordings, or whether it would sweep in medical textbooks and classic novels.  <u>See id</u>. at 264, 266.

And while a federal statute defined a related term, "child pornography," that definition did not fit with the release condition.  <u>See id</u>. at 263 n.4 (citing 18 U.S.C. § 2256).  The court declined to adopt it (though it noted that the district court might borrow from it on remand).  <u>See id</u>. at 267.

The court also declined to salvage the condition by reading it to include a mental-state requirement.  <u>Mens rea</u> "cannot eliminate vagueness if it is satisfied by an 'intent' to do something that is in itself ambiguous," the court said.  <u>Id</u>. at 265 (cleaned up).

The no-pornography condition went too far, and the First Amendment was part of why.  "[W]ith no guidepost for [the defendant], the pornography prohibition as currently written

---

[66]  The court of appeals noted that pornography receives First Amendment protection.  <u>See id</u>. at 261–63.

<p style="text-align:center"><b>JA 287</b></p>

violates due process by failing to provide [the defendant] with adequate notice of what he may and may not do, chilling his First Amendment rights." Id. at 267. The court of appeals vacated the condition. See id. at 270.

<center>*     *     *</center>

The Supreme Court has repeatedly held that when it comes to First Amendment vagueness, the kind at issue here, the bar is raised to its highest level. See Part III.

But the Court does not seem to have set down a doctrinal test that reflects the special rigor demanded in this area.

No matter, though.

Buckley and Loy make clear what it means.

Think of the Supreme Court in Buckley, which upheld the campaign-finance statute, but only after working at length to pin it down.

And think of the Third Circuit in Loy, which looked to dictionaries, another statute, and a mens rea requirement --- but still struck down the supervised-release condition as vague.

As the Court has shown, the Secretary's determination has many vagueness-as-applied strikes against it.

Section 1227 is vaguer than other statutes that have been struck down. See Part V.C.

Section 1227 has been applied here in a surprising way --- one that lessens the notice that an "ordinary person" receives and leaves enforcement fully "standardless."

The Secretary has not determined that the Petitioner's conduct has impacted U.S. relations with another country. But that is what Section 1227 requires. See Part V.B.

And the statute's legislative and enforcement history do not foreshadow the Secretary's determination. See Part V.D.

Moreover, Section 1227, as applied here, requires hard thinking to even know whether it is being triggered. See Part V.E.

Take all of those headwinds, and add to them the First Amendment's.

The result is that the Petitioner is likely to succeed on the merits of his claim that Section 1227 is unconstitutionally

<center>80</center>

vague as applied to him through the Secretary of State's determination.

###### G.   <u>Another Approach</u>

The premise of the analysis set out above in Part V.B to Part V.F is that (a) dictionaries say that "foreign policy" concerns state-to-state relations, <u>see</u> Part V.A.3, and (b) vagueness doctrine instructs that statutes like Section 1227 must be interpreted in light of such dictionary definitions.  <u>See</u> <u>id</u>.

All of this is sound.

But nonetheless, consider now an alternative approach to the vagueness question that appears to implicitly drive part of the Respondents' argument.

Namely, what if Section 1227's "foreign policy" has a broader meaning?  What if it means not just America's relations with other <u>countries</u>, as the dictionaries say, but also encompasses a wider concern --- the United States' relations with the external world as a whole?[67]

If that were the shape of the umbrella, fighting the social and religious scourge of global anti-Semitism could well fit under it.

And if so, it would be beside the point that the Secretary has not determined that the Petitioner's conduct impacts U.S.

---

[67]  The United States has a foreign policy interest in other countries.  But it may also have a general interest, wholly separate from its relation to any countries, in securing access from abroad to certain minerals.  <u>See</u> Exec. Order 14,241, 90 Fed. Reg. 13673 (Mar. 20, 2025); Exec. Order 14,017, 86 Fed. Reg. 11849 (Feb. 24, 2021).  Or in limiting global emissions of certain chemicals.  <u>See</u> Exec. Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021); Montreal Protocol on Substances that Deplete the Ozone Layer, Preamble, Sept. 16, 1987, S. Treaty Doc. 100-10.  Or in curbing piracy on the high seas.  <u>See</u> <u>U.S. Counter Piracy & Maritime Security Action Plan</u>, U.S. Dep't of State, Bureau of Pol.-Mil. Affs. (June 2, 2014).  An occasional dictionary maps out this understanding, of "foreign policy" as concerned with "[t]he political and security policies adopted by a state in relation to the outside world."  <u>Foreign Policy</u>, sense 1, <u>A Dictionary of Diplomacy</u> 107 (2d ed. 2003).

relations with any country or countries, because foreign policy could be taken as including things (like fighting global anti-Semitism) separate from any impact on relations with particular countries.

On this broader understanding --- call it an "external affairs" understanding --- is Section 1227 still vague as applied in this case?

The Court's conclusion: yes.

                    *    *    *

To see why, begin by noting that an external affairs reading of "foreign policy" scrambles the picture --- but only to a point.

It does not alter the fact that Section 1227 is vaguer than a number of statutes that the Supreme Court has struck down.  See Part V.C.  It does not undo the legislative- and enforcement-history points.[68]  See Part V.D.  And it does not cast doubt on the parts of the analysis that turn on the difficulty of knowing whether one has violated the law, see Part V.E, or on the relevance of the First Amendment.  See Part V.F.

                    *    *    *

This said, the external affairs understanding of foreign policy would seem to improve notice.

Because, on that interpretation, the statute's words ("foreign policy") would now better fit the Secretary's determination.[69]

---

[68]  The Court has looked to legislative history here only as to notice.  See Part V.D.1(a).  But if there are competing understandings of "foreign policy," each pulling hard in a different direction, then Section 1227 is ambiguous.  If so, the Court can consult the statute's legislative history not just as to notice but also as to the delineation of government powers. See Delaware, 598 U.S. at 138-39; McDaniel v. Sanchez, 452 U.S. 130, 146-47 (1981); Dir., Off. of Workers' Comp. Programs v. Sun Ship, Inc., 150 F.3d 288, 291 (3d Cir. 1998); cf. Pringle v. Ct. of Common Pleas, 778 F.2d 998, 1003 n.5 (3d Cir. 1985).  And the legislative history generally supports the narrower, "other countries" reading of foreign policy.  See Part V.D.

[69]  Notice seems improved.  But maybe not really.  After all, the Secretary's effort to remove the Petitioner can be squeezed into

And moreover, using the broader external affairs understanding would mean that the Secretary is operating <u>within</u> a legislated standard.

After all, "foreign policy," on the external affairs understanding, can apply to efforts to take on a social or religious issue, like combatting global anti-Semitism.

                    *    *    *

But all of this is on first glance only.

Look harder at what it would mean to read "foreign policy" broadly, and Section 1227 only becomes vaguer, supplying on balance both less notice and fewer curbs on enforcement discretion.

This Part explains the point.

                    *    *    *

_____

the words of Section 1227 only by ignoring the leading dictionary definitions of "foreign policy."  But why should an ordinary person be expected to whistle past those?  Maybe, it might be said, this issue can be addressed by treating the "other countries" understanding as the <u>primary</u> dictionary definition of foreign policy --- and the broader "external affairs" understanding as a kind of <u>secondary</u> dictionary definition.  But there is little warrant for doing this in the dictionaries themselves.  And in any event, that renames the problem.  It does not solve it.  <u>See</u> <u>Lanzetta</u>, 306 U.S. at 454 (holding law unconstitutionally vague because, in part, dictionary definitions were "numerous and varied"); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Sharp</u>, 27 F. Cas. 1041, 1043 (C.C.D. Pa. 1815) (noting that Justice Washington, riding circuit, declined to recommend a guilty verdict to the jury because when it came to the key term, revolt, "[i]f we resort to definitions given by philologists, they are so multifarious, and so different, that I cannot avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men"); <u>McJunkins</u> v. <u>State</u>, 10 Ind. 140, 144-45 (1858) (determining that a law is "vague" after consulting multiple dictionaries and finding different definitions for the same term); <u>cf</u>. <u>Lifchez</u> v. <u>Hartigan</u>, 735 F. Supp. 1361, 1365 (N.D. Ill. 1990) ("wildly different definitions" of a key term "offer[] little help to persons of common intelligence who want to know what the state forbids").

Here is a list of some things that have been described as American "foreign policy interests" that do not seem to be linked to the United States' relations with any particular country:

(1) ensuring the global economic competitiveness of American companies, (2) ensuring resiliency in global supply chains, (3) defending democracy around the world, (4) regulating unmanned-aerial-systems exports, (5) containing the spread of "radical Islam," (6) ensuring American armed forces maintain a technological edge over potential foes, (7) promoting gender equality, (8) preventing the violation of United States export laws, (9) promoting human rights globally, (10) promoting certain international broadcasting, (11) preserving the trade of ethically sourced diamonds, (12) promoting trade, (13) combatting terrorism, (14) increasing transparency in governance, (15) maintaining the aerospace industry's competitiveness globally, (16) achieving a Comprehensive Test Ban, (17) furthering economic growth, (18) promoting human rights in the Western Hemisphere, (19) supporting free markets, (20) enlarging the number of democracies, (21) pursuing world freedom, (22) improving international relations, (23) building a more peaceful world, (24) promoting science and technology in America's relations with other nations, (25) preventing nuclear proliferation, (26) fostering world economic stability, (27) increasing individuals' capacity to meet their basic human needs, (28) adequately funding foreign aid, (29) ensuring equitable economic intercourse among nations, (30) reducing direct military involvement abroad, (31) fostering good will towards the United States, (32) reducing unnecessary barriers to trade, and (33) assisting the economic growth of less-developed countries.[70]

---

[70] The source for (1) is Exec. Order 14,209, 90 Fed. Reg. 9587 (Feb. 10, 2025).  For (2), President Joseph Biden, National Security Memorandum on United States Conventional Arms Transfer Policy (Feb. 23, 2023).  For (3), President Joseph Biden, Memorandum on Deferred Enforced Departure for Certain Hong Kong Residents (Aug. 5, 2021).  For (4), Kayleigh McEnany, Statement by the Press Secretary on Unmanned Aerial Systems Exports (July 24, 2020).  For (5), President Donald Trump, Remarks on Foreign Policy (Apr. 27, 2016).  For (6), Presidential Policy Directive 27, Directive on United States Conventional Arms Transfer Policy (President Obama) (Jan. 15, 2014).  For (7), President Barack

---

Obama, Memorandum on Coordination of Policies and Programs to Promote Gender Equality and Empower Women and Girls Globally (Jan. 30, 2013).  For (8), Exec. Order 13,558, 75 Fed. Reg. 69573 (Nov. 9, 2010).  For (9), Robert Gibbs, Press Sec., Press Briefing (Aug. 18, 2009).  For (10), President George W. Bush, Statement of Administration Policy: H.R. 2764 (June 19, 2007).  For (11), President George W. Bush, Statement on Signing the Clean Diamond Trade Act (Apr. 25, 2003).  For (12), Ari Fleischer, Press Sec., Press Briefing (Oct. 10, 2001).  For (13), Letter from President George W. Bush to Vice President Dick Cheney and J. Dennis Hastert, Speaker of the House of Representatives (Aug. 17, 2001).  For (14), President George W. Bush, Statement on the Global Forum on Fighting Corruption and Safeguarding Integrity II (May 28, 2001).  For (15), Mike McCurry, Press Sec., Press Briefing (July 3, 1997).  For (16), Mike McCurry, Press Sec., Press Briefing (Sept. 9, 1996).  For (17), Letter from President Bill Clinton to Thomas S. Foley, Speaker of the House of Representatives, Claiborne Pell, Chairman of the S. Comm. on Foreign Rels., and John Glenn, Chairman of the S. Comm. on Gov't Affs. (Mar. 20, 1996).  For (18), Dee Dee Myers, Press Sec., Press Briefing (Sept. 8, 1994).  For (19), President Bill Clinton, News Conference with President Boris Yeltsin of Russia (July 10, 1994).  For (20), Dee Dee Myers, Press Sec., Press Briefing (Oct. 20, 1993).  For (21), President Ronald Reagan, Address to the Nation on the Soviet-United States Summit Meeting (Dec. 10, 1987).  For (22), President Ronald Reagan, Message to the Congress Transmitting the Annual Report on International Activities in Science and Technology (June 17, 1987).  For (23), President Ronald Reagan, Remarks to Participants in the National YMCA Youth Governors' Conference (June 21, 1984).  For (24), President Ronald Reagan, Message to the Congress Transmitting the Annual Report on U.S. International Activities in Science and Technology (July 11, 1983).  For (25), President Ronald Reagan, Statement on United States Nuclear Nonproliferation Policy (July 16, 1981).  For (26), President Jimmy Carter, State of the Union Address (Jan. 19, 1979).  For (27), President Jimmy Carter, International Health Program Statement Announcing a Program to Strengthen U.S. Participation (May 2, 1978).  For (28), President Richard Nixon, Special Message to the Congress Proposing Reform of the Foreign Assistance Program (Apr. 21, 1971).  For (29), President Richard Nixon, Second Annual Report to the Congress on United States Foreign Policy (Feb. 25, 1971).  For (30), President Richard Nixon, Special Message to the Congress Proposing Supplemental Foreign Assistance Appropriations (Nov. 18, 1970).  For (31),

*   *   *

Note four things about this list.

*   *   *

First, it could run on and on.  Added pages could easily have
been laid down.

What notice is provided if "foreign policy interest" can mean
relations with other countries --- plus the 33 things noted
above, plus the many multiples of the 33 that might have been
put down here?  Not very much.

What sort of limits on enforcement discretion does this list
imply?  Only light ones.

If "foreign policy" means what the dictionaries say --- U.S.
relations with other countries --- then the denominator is big.
But it is knowable.  The United States recognizes 197 countries.
See Independent States in the World, U.S. Department of State
(Mar. 12, 2025), https://perma.cc/9JMZ-UBAE (accessed on May 28,
2025).  Not 196 or 198, and not 296 or 298.

But how many extra "foreign policy interests" get added in when
the external affairs interpretation is put on the table?  The
number is very large --- and that diminishes both notice and the
possibility of genuine limits on enforcement discretion.[71]

*   *   *

---

President Lyndon B. Johnson, Statement by the President Upon
Signing Bill Extending the Agricultural Trade and Assistance Act
(Oct. 8, 1964).  For (32), President Dwight Eisenhower,
Memorandum of Disapproval of Bill Concerning the Marking of
Imported Articles and Containers (Sept. 7, 1960).  For (33),
President Dwight Eisenhower, Annual Budget Message to the
Congress (Jan. 18, 1960).

[71] The breadth of a statute plainly affects an as-applied
vagueness challenge.  See Holder, 561 U.S. at 21 (holding, in
as-applied case, that the statute was not impermissibly vague in
light of a statutory definition that narrowed the key
provision).  This is common sense.  For a given ordinary person,
the signal he is seeking (I want to do X, is that allowed?) can
get buried in what is to him noise (everything else the too-
broad statute might cover).

Second, there is no one-stop shop, no single place to see all of America's foreign policy interests put down on paper.

Look through the sources cited in footnote 70.

They are all over the map, from executive orders to speeches to statements during press briefings.  See, e.g., Exec. Order 14,209, 90 Fed. Reg. 9587 (Feb. 10, 2025) (an executive order); President Jimmy Carter, State of the Union Address (Jan. 19, 1979) (speech); Dee Dee Myers, Press Sec., Press Briefing (Sept. 8, 1994) (press briefing).

An external affairs understanding generates not only a large number of "foreign policy interests," but also a number that is unknowable as a practical matter.[72]

Where would an "ordinary person" look to get the answer to what counts as a foreign policy interest?

America, for example, has an announced interest in promoting trade in ethically sourced diamonds.  See President George W. Bush, Statement on Signing the Clean Diamond Trade Act (Apr. 25, 2003).

Is that still an interest?  How to know?  What about trade in gold or cobalt?  Can someone be removed from the United States for compromising our interest in lithium imports?  Who to ask?  Where to check?  See Johnson, 576 U.S. at 597 ("We are convinced that the indeterminacy of the wide-ranging inquiry required . . . denies fair notice to defendants[.]"); Morales, 527 U.S. at 56 (a law may be unconstitutionally vague if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits"); Giaccio, 382 U.S. at 402 ("a law fails to meet the requirements of the Due Process Clause if it . . . leaves the public uncertain as to the conduct it prohibits").

*    *    *

Third, plugging in the adjective "compelling" does not meaningfully clear things up.

---

[72]  Also: the United States presumably has secret foreign policy interests.  What to do about those?  See Massieu, 915 F. Supp. at 700 (alluding to this issue).

Of the interests set out above, around a third are characterized in the underlying foreign-policy documents as being especially important.

And on the Petitioner's challenge to Section 1227 as it is being applied to him, there is an additional issue.

As the Respondents argue, <u>see</u> Opposition Brief at 23-25, the Secretary of State deserves deference in terms of American foreign policy interests and their hierarchy.

But here it may not ultimately be crystal clear that the Secretary determined that the Petitioner's conduct has affected a "<u>compelling</u> foreign policy interest."

At the end of the analysis portion of his determination, the Secretary said that the Petitioner's conduct impacted a "<u>significant</u> foreign policy objective," Determination at 2, not a "compelling" one.

And "significant" implies a bar set lower than "compelling." <u>Compare</u> <u>Significant</u>, adj., sense 1, <u>New Oxford American Dictionary</u> (2024) ("sufficiently great or important to be worthy of attention; noteworthy"), <u>and</u> <u>Significant</u>, adj., sense 3.a, <u>Merriam-Webster's Unabridged Dictionary</u> (2025) ("having or likely to have influence or effect: deserving to be considered"), <u>with</u> <u>Compelling</u>, adj., <u>New Oxford American Dictionary</u> (2024) ("not able to be resisted; overwhelming"), <u>and</u> <u>Compelling</u>, adj., sense 1, <u>Merriam-Webster's Unabridged Dictionary</u> (2025) ("forcing, impelling, driving").

<div align="center">*     *     *</div>

<u>Fourth</u>, many of the interests listed out above are both enormously broad and fuzzy at their edges.

If foreign policy means relations with Canada or South Korea, that is concrete. On a relations-with-countries understanding, "foreign policy" is broad and highly flexible. It can, for example, be used to remove terrorists from the United States. <u>See</u> Part V.D (providing examples of this).

But on that understanding, Section 1227 nonetheless has an outer-edge limit, and a crisp, objective one at that --- the need for a link to America's relations with other countries.

What if "foreign policy" under Section 1227 is taken to include interests in fostering world economic stability or in creating good will towards the United States, to take two examples from

<div align="center">88</div>

<div align="center">**JA 296**</div>

the list above?  How to know where these begin and end?  See City of Akron, 462 U.S. at 451 (finding law unconstitutional when a word was "impermissibly vague as a definition").

And this is no abstract concern.

What "foreign policy interest" was the Secretary invoking here?

Maybe the answer is "combat[ting] anti-Semitism around the world."  Determination at 2.

But one possible reading of the Secretary's determination is that "the foreign policy of the United States champions . . . American citizens" --- and that is the "foreign policy objective" in play.  Id.

But if that is so: what are the limits on this sort of interest?  On this understanding, what would not be a basis for a Section 1227 removal?  See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 290 n.12 (1982) ("[V]ague laws do not limit the exercise of discretion by law enforcement officials; thus they engender the possibility of arbitrary and discriminatory enforcement."); Grayned, 408 U.S. at 108–09 ("[a] vague law impermissibly delegates basic policy matters" and in doing so opens the way to enforcement on "an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application").

\*     \*     \*

To sum up:

If "foreign policy interests" are understood as based on U.S. relations with other countries, the term drops a solid anchor, though a large one.  The statutory words point to something concrete that exists out in the real world --- the 197 countries recognized by the United States.

But if "foreign policy interests" reach more broadly, to cover U.S. relations with other countries, and also the full range of America's external affairs --- then the term loses much of its real-world mooring.  It becomes hard to even begin to pin down.

When it comes to making foreign policy, great flexibility may be more virtue than vice.

But when it comes to the notice to ordinary people that the Constitution requires, there is a deep difficulty with a statute

that, on the "external affairs" interpretation, hangs its hat on
a term whose meaning can move around all but freely.[73]

And there is a similar difficulty for the goal of cabining
government enforcement discretion.  See, e.g., Nat'l Ass'n for
Advancement of Colored People v. Button, 371 U.S. 415, 466
(1963) (Harlan, J., dissenting) ("Laws that have failed to meet
[the vagueness] standard are, almost without exception, those
which turn on language calling for the exercise of subjective
judgment, unaided by objective norms."); Coates, 402 U.S. at 616
(noting that an ordinance against "annoying" conduct "contains
an obvious invitation to discriminatory enforcement"); see also
Papachristou, 405 U.S. at 170 ("Where . . . there are no
standards governing the exercise of the discretion granted by
the ordinance, the scheme permits and encourages an arbitrary
and discriminatory enforcement of the law."); Daniels v. Allen,
344 U.S. 443, 496 (1953) ("Discretion without a criterion for
its exercise is authorization of arbitrariness."), overruled by
Townsend v. Sain, 372 U.S. 293 (1963).[74]

---

[73]  See, e.g., Beckles, 580 U.S. at 266 (focusing on the need for
"legally fixed standards"); accord The Federalist No. 62 (James
Madison) (discussing the difficulties associated with "a mutable
policy," with laws that are not "fixed" and can "undergo . . .
incessant changes").

[74]  And note here the main flaw in the Respondents' argument that
the Petitioner's challenge to the Secretary's determination
raises a non-justiciable "political question."  See Opposition
Brief at 23–25.  Courts cannot usurp the Secretary's role by
purporting to determine how the Nation should conduct its
foreign policy.  See id. at 25.  Of course not.  But the Court
here has asked only whether Section 1227, as applied through the
Secretary's determination, provides enough notice and properly
cabins government authority.  These are questions only about
whether the Constitution's due process guarantee has been
satisfied.  Not, for example, about the Secretary's underlying
judgment as to the Petitioner.  (Indeed, the Court has taken the
Secretary of State's determination entirely as a given.  See
footnote 28.  It has not at this stage questioned it;
questioning the determination might well raise different sorts
of issues.)  There is no political question bar here.  See,
e.g., Shachtman v. Dulles, 225 F.2d 938, 944 (D.C. Cir. 1955)
(holding that challenge to Secretary of State's determination to

Bottom line: the Court concludes that the Petitioner is likely to succeed on the merits of his Section 1227 vagueness argument --- under the dictionary definition of "foreign policy," and also on the broader, external affairs reading discussed in this section.[75]

### H.  Conclusion

The Secretary of State determined that the Petitioner engaged in anti-Semitic conduct that helped to create a hostile environment for Jewish students.  See Determination at 2.  And there is at least some suggestion in the determination that this may have opened the door to the threat of violence.  See id.

If this is accurate, it offends some of our deepest values.

One of our country's proudest claims has been that ancient prejudices have had a smaller footprint in America.[76]  And one necessary thread of that fabric is this: Jews, like others, will not be targeted or hounded, "harass[ed]," id., as they take part in public life.

---

deny passport in "the best interests of the United States" was "within the scope of the due process clause").

[75] Indeed, on the external affairs understanding this is, if anything, an easier case.  For example, on the dictionary definition of foreign policy, Section 1227 is already vaguer than other statutes the Supreme Court has struck down on vagueness grounds.  See Part V.C.  But the external affairs reading of Section 1227 would make the statute even vaguer.

[76]  See, e.g., Of the Study of the Law in the United States (1790–91) in 1 Collected Works of James Wilson 433-35 & n.(b) (Kermit L. Hall & Mark David Hall eds., 2007) (a lecture on law by Justice James Wilson, with President Washington present, at which Justice Wilson said that it was Lord Baltimore who was "truly the father of his country," because "before the doctrine of toleration was published in Europe, the practice of it was established in America," by a "law in favour of religious freedom [that] was passed in Maryland, as early as the year one thousand six hundred and forty nine" --- the Maryland Toleration Act (Sept. 21, 1649) that had been championed by Lord Baltimore).

But the Petitioner, in response to the Secretary of State's determination, is emphatic: the Secretary has it wrong.  See Petition ¶¶ 22-28.  He says that he is not a bigot, see id. ¶ 25, and claims that he is being persecuted from the highest level of our government for nothing more than speaking out on behalf of a cause he cherishes.  See id. ¶¶ 29-33.

But this case, at least for now, is not about choosing between competing accounts of what happened at Columbia between 2023 and 2025.  Or about whether the Petitioner's First Amendment rights are being violated.[77]

Rather, the issue now before the Court has been this: does the Constitution allow the Secretary of State to use Section 1227, as applied through the determination, to try to remove the Petitioner from the United States?

The Court's answer: likely not.

Our law asks about an "ordinary person."  Would he know that Section 1227 could be used against him based on his speech inside the United States, however odious it might allegedly have been --- speech that has not been affirmatively determined by the Secretary to have an impact on U.S. relations with other countries?

The Court's answer is no.

And our law asks about government power.  Would the loose interpretation of Section 1227 that the Secretary's determination rests on open the door to arbitrary enforcement?

The decided cases are mainly about close-to-the-ground officials --- police officers, prosecutors, judges.  See, e.g., Davis, 588 U.S. at 451; Kolender, 461 U.S. at 358.  Our law needs to be steady.  And to be steady, it cannot be written so broadly that it can mean different things to each different police officer or prosecutor who has a hand in enforcing it.

Here, there is only one possible enforcer of the law.

This is because when it comes to cases like this one, where the underlying conduct is "otherwise lawful" speech, Congress has

---

[77] Because the Court holds the Secretary's determination is likely unconstitutionally vague, the First Amendment issue does not need to be reached.

entrusted the Section 1227 removal power to one person --- the
Secretary of State.  Under the statute, he must exercise his
power personally, and here he has.  The Secretary of State's
determination deserves, and gets, the highest respect.

But arbitrary enforcement is not just a danger when many people
enforce the law.  It can also be a danger when one person is
given the job,[78] if his determination veers too far away from the
standard set down by Congress.  Here, the Secretary's did.[79]

<p style="text-align:center">*     *     *</p>

Vagueness doctrine has sometimes been criticized.

"It is not likely," Justice Holmes said, "that a criminal will
carefully consider the text of the law before he murders or
steals."  McBoyle, 283 U.S. at 27.

That may very well be true.

But it is also true that "[t]he general outlines of the law ---
or its lack of sufficiently definite shape, and hence its
brooding, overreaching threat --- tend to be noticed by those
who may be specially affected[.]"  Alexander Bickel, The Least

---

[78]  See Bantam Books, 372 U.S. at 71; Mahler, 264 U.S. at 40; cf.
Aptheker, 378 U.S. at 501-02.

[79]  Void-for-vagueness doctrine is analogous in some ways to the
non-delegation doctrine.  In a non-delegation case, Justice
Gorsuch has said this:

> The Constitution promises that only the
> people's elected representatives may adopt
> new federal laws restricting liberty.  Yet
> the statute before us . . . endow[s] the
> nation's chief prosecutor [the Attorney
> General] with the power to write his own
> criminal code . . . .  Yes, those affected
> are some of the least popular among us.  But
> if a single executive branch official can
> write laws restricting the liberty of this
> group of persons, what does that mean for
> the next?

Gundy v. United States, 588 U.S. 128, 149 (2019) (Gorsuch, J.,
dissenting).

<p style="text-align:center">93</p>

<p style="text-align:center">**JA 301**</p>

Dangerous Branch: The Supreme Court at the Bar of Politics 150-51 (1962).

Who will be "specially affected" here?

The Petitioner, to be sure.

And behind him a range of foreign nationals, of whom there are large numbers living ordinary lives in our country, who might feel the "threat" of Section 1227 being used without a "sufficiently definite shape." Id.

But to see the full, end-of-line answer to the question of who might be "affected," look more broadly.

The Supreme Court has repeatedly held that the vagueness law that applies in removal cases like this one is to be the same vagueness law that applies in criminal cases. See Dimaya, 584 U.S. at 156-57; Jordan, 341 U.S. at 229-31.

And there is every reason to think the street runs two ways.

If Section 1227 can apply, here, to the Petitioner, then other, similar statutes can also one day be made to apply.

Not just in the removal context, as to foreign nationals. But also in the criminal context, as to everyone.

This point was alluded to in 1996, the first and only time before today that a federal court has written substantively on Section 1227.

> Imagine, for a moment, how quickly our
> constitutional hackles would rise if a local
> police chief were granted the power to
> arrest any person whose mere presence would
> cause potentially serious adverse
> consequences for the public peace. . . . If
> the hypothetical police chief statute would
> be void for vagueness (as it obviously
> would), then so, too, must be Section 1227.

Massieu, 915 F. Supp. at 701 n.19.

* * *

The Court holds: the Petitioner is likely to succeed on the merits of his claim that Section 1227, as applied to him here

through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution.[80]

## VI. **Failure to Disclose**

Recall that in addition to the Secretary of State's determination, federal officials have sought to remove the Petitioner from the United States on <u>another</u> ground.  <u>See</u> Part I.A.

The Petitioner obtained his permanent residence, it is alleged, "by fraud or by willfully misrepresenting a material fact." Additional Charges of Inadmissibility at 1 (ECF 90-1) (citing 8 U.S.C. § 1182(a)(6)(C)(i)).[81]

Per the Respondents, these alleged failures to disclose add up to "an independent basis to justify removal."  Opposition Brief at 30.

Last month, the Court noted that the Petitioner had not lodged any "challenge to the second charge."  <u>Khalil</u>, 2025 WL 1232369, at *3 n.7.  "[T]here is no reference to [such a claim] in the habeas petition."  <u>Id</u>.

After that, the Petitioner amended his habeas petition to include two paragraphs on the failure-to-disclose charge, and these new paragraphs allude to the First Amendment.  <u>See</u> Redline Petition Comparison ¶¶ 88–89 (May 1, 2025) (ECF 223-2).[82]

---

[80]  The citation to <u>Massieu</u> should not be misunderstood.  The Court does not suggest any view as to whether Section 1227 is facially vague.  That question has not been posed here.  <u>See</u> footnote 19.

[81]  In particular, federal officials contend that when the Petitioner applied for lawful permanent residence in 2024, he did not disclose that he was "a member" of the United Nations Relief and Works Agency for Palestinian Refugees ("UNRWA"), that he worked at the British Embassy in Beirut, or that he was in a group called Columbia University Apartheid Divest.  <u>See</u> Additional Charges of Inadmissibility at 1.

[82]  Does this Court have jurisdiction over a First Amendment-related challenge to the failure-to-disclose charge?  Plainly yes, if Section 1252(b)(9) of Title 8 does not apply to pre-final-order-of-removal cases like this.  <u>See</u> <u>Khalil</u>, 2025 WL

95

But even so, the amended portions of the Petition are unclear.

They say that the 2025 efforts to remove the Petitioner from the United States for his alleged 2024 failure to disclose are "evidence of the government's unlawful Policy of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel." Petition ¶ 89 (emphasis added).

Do they also imply a claim that if the alleged "Policy" is struck down on First Amendment grounds (as the Petitioner seeks, see id. at 28), then the Respondents must be enjoined from pursuing the failure-to-disclose grounds for removal?

Maybe, maybe not.

But assume for present purposes the answer is yes.

The Court's prior opinion emphasized that the Petitioner's legal briefs did not do meaningful work as to a challenge to the

---

1232369, at *16-21. If it does, the questions are closer than those the Court resolved in its prior Opinion. That is because an immigration court may be able to deploy its expertise to resolve the failure-to-disclose charge. Cf. id. at *39-43. For example, an immigration court could indicate whether immigration law indeed required certain disclosures, and it could resolve any possible factual disputes as to why forms may not have been filled out in a certain way. Cf. id. at *40. And if an immigration court holds that the Petitioner did not have to disclose the allegedly omitted information, that could fully dispose of the underlying ground for removal, without any need for a federal court to reach a potentially complex First Amendment question. Cf. Elgin v. Dep't of Treasury, 567 U.S. 1, 23 (2012). All this weighs against this Court's jurisdiction, but not heavily enough. This is because the Petitioner seems to suggest the failure-to-disclose charge (as part of an allegedly retaliatory policy) violates the First Amendment. First Amendment claims call for speed, and they raise issues an immigration court cannot remedy. See Khalil, 2025 WL 1232369, at *30-34. (As to the vagueness claim discussed in prior parts of this Opinion and Order, there is plainly jurisdiction. There is no final order of removal. Immigration courts cannot remedy constitutional challenges of the sort claimed. There is no fact-finding to be done for now. Immigration-law expertise has no place. And the vagueness challenge as to the Secretary's determination is tightly bound up with First Amendment issues.)

failure-to-disclose claim.  See Khalil, 2025 WL 1232369, at *3
n.7 ("Nor does the legal brief purport to seek relief from the
Court based on the second [failure-to-disclose] charge.").

But this has not changed.

The Petitioner's legal briefs still make no substantial argument
as to the failure-to-disclose claim --- even as lengthy
supplemental briefs have been filed.

To prevail on a First Amendment-retaliation claim, the
Petitioner would presumably need to show that the effort to
remove him based on his alleged failure to disclose was caused
by his First Amendment-protected activity.  See Nieves v.
Bartlett, 587 U.S. 391, 398 (2019).

But the burden is his, see Mt. Healthy City Sch. Dist. Bd. of
Educ. v. Doyle, 429 U.S. 274, 287 (1977), and he has made no
real effort to carry it.  He has not developed any arguments in
his legal briefs or cited anything[83] from a large body of
potentially relevant case law.[84]

Recall that to obtain a preliminary injunction, a party must
show that he is likely to succeed on the merits of his claim.
See Lackey v. Stinnie, 145 S. Ct. 659, 667 (2025); Starbucks
Corp. v. McKinney, 602 U.S. 339, 345 (2024); Winter v. Nat. Res.
Def. Council, Inc., 555 U.S. 7, 20 (2008); Munaf v. Geren, 553
U.S. 674, 690 (2008); Veterans Guardian VA Claim Consulting LLC
v. Platkin, 133 F.4th 213, 218 (3d Cir. 2025); Ayers v. Phila.
Hous. Auth., 908 F.2d 1184, 1195 & n.23 (3d Cir. 1990); In re

---

[83]  On, for example, the inferences that can and cannot be drawn
as to causation from temporal proximity.  See Watson v. Rozum,
834 F.3d 417, 424 (3d Cir. 2016).

[84]  And presumably because the Petitioner says nothing
substantial, there is hardly anything in response from the
Respondents, beyond noting the Petitioner allegedly did not
disclose on his lawful-permanent-resident application that he
was a "member" of UNRWA, even as his LinkedIn account allegedly
says he was employed there.  See Respondents' Supplemental Brief
at 9 n.3.  (This might mean to suggest that a kind of
inevitable-discovery rule is implicated --- applicable to a
First Amendment-retaliation claim, as it might be to, say, a
Fourth Amendment claim.)

Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982); see also 42 Am. Jur. 2d Injunctions § 18 (2025).

The Petitioner has not meaningfully tried to do so.

And there is another problem, too.

The Third Circuit has held that a "preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties." Adams v. Freedom Forge Corp., 204 F.3d 475, 487 (3d Cir. 2000) (cleaned up); see Bradley v. Pitt. Bd. of Educ., 910 F.2d 1172, 1178 (3d Cir. 1990); see also Baker v. Fishman, 2018 WL 6727536, at *5 (D.N.J. Dec. 21, 2018), aff'd sub nom. Baker v. Ahsan, 785 F. App'x 904 (3d Cir. 2019); Herley Indus., Inc. v. R Cubed Eng'g, LLC, 2020 WL 6504588, at *4 (E.D. Pa. Nov. 5, 2020) (collecting district court cases); Bascom Food Prods. Corp. v. Reese Finer Foods, Inc., 715 F. Supp. 616, 624 n.14 (D.N.J. 1989).

Here, the Petitioner has not put forward relevant "affidavits, deposition testimony, or other documents."

To be sure, a verified[85] pleading can sometimes[86] close the gap. See, e.g., K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972); see also Bascom Food Prods. Corp., 715 F. Supp. at 624 n.14 (D.N.J. 1989); cf. 28 U.S.C. § 2242 (requiring habeas petitions to be verified).

And a declaration filed in this case suggests that the Petitioner has "verif[ied]" his pleading.  See ECF 50-1.

But the verification was made as to the First Amended Petition for habeas relief (ECF 38), not the current one.  And the First Amended Petition said nothing about the failure-to-disclose basis for removal.  Indeed, the First Amended Petition was filed

---

[85]  A verified pleading "contains a sworn statement indicating its contents are true and may be treated as an affidavit." Germain v. Shearin, 725 F. App'x 225, 226 (4th Cir. 2018).

[86]  "Sometimes" because a verified pleading rarely supplies the sort of highly detailed and specific information, based on the personal knowledge of the affiant, that is especially telling.

98

**JA 306**

before the failure-to-disclose charge was even <u>made</u> by federal
officials.

The Petitioner, in short, has not put <u>evidence</u> in the record
that relates to the failure-to-disclose charge.

The law is clear: preliminary injunctions cannot issue in such
circumstances.  <u>See</u> <u>Adams</u>, 204 F.3d at 487; <u>Bradley</u>, 910 F.2d at
1178.

To sum up: to the extent the Petitioner is moving to
preliminarily enjoin the failure-to-disclose ground for removal,
that motion must be denied.  He has not carried his burden of
showing a likelihood of success on the merits.

**VII.  <u>Remedy</u>**

As to the merits, the Court has held two things.

First, that the Petitioner is likely to succeed on his vagueness
challenge related to the Secretary of State's determination.
<u>See</u> Part V.

And second, that he is not likely to succeed on his challenge as
to the efforts to remove him for allegedly failing to make
certain disclosures on his lawful-permanent-resident
application.  <u>See</u> Part VI.

As to remedy, the Petitioner seeks a preliminary injunction, <u>see</u>
Motion for Preliminary Injunction at 40, and to get one he must
show "that he is likely to suffer irreparable harm in the
absence of preliminary relief."  <u>Winter</u>, 555 U.S. at 20.

To do that, a litigant generally needs to put forward evidence
of "irreparable harm."  <u>See</u> footnote 6.[87]

---

[87]   A likely violation of a First Amendment right can excuse the
need to show irreparable injury.  <u>See</u> <u>Del. State Sportsmen's
Ass'n, Inc.</u> v. <u>Del. Dep't of Safety & Homeland Sec.</u>, 108 F.4th
194, 204 (3d Cir. 2024) (citing <u>Roman Cath. Diocese of Brooklyn</u>
v. <u>Cuomo</u>, 592 U.S. 14, 19 (2020) (per curiam)); <u>see also</u> <u>K.A. ex
rel. Ayers</u> v. <u>Pocono Mountain Sch. Dist.</u>, 710 F.3d 99, 113 (3d
Cir. 2013).  The Petitioner seems to be invoking this
presumption.  <u>See</u> Motion for Preliminary Injunction at 35.  But
does this exception get traction here?  The Court has not

**JA 307**

As noted, see Part VI, the only relevant evidence comes from the Petitioner's verified First Amended Petition.

But the crux of the First Amended Petition's irreparable-injury contention is that the Secretary of State's determination "prevent[s] him from speaking now (through detention)[.]" First Amended Petition ¶ 89 (emphasis added).

But preliminarily enjoining the Secretary's determination would not seem to end the Petitioner's "detention" to the extent he remains detained on another basis, for his alleged 2024 failure to make certain disclosures in his lawful-permanent-resident application.

There may be other bases for showing irreparable harm --- the Secretary's determination, for example, might add another meaningful layer of free speech chill, and there is some flavor of this contention in the First Amended Petition. See id. (the determination is an "attempt to chill (through past punishment and ongoing threat) . . . his future speech in the United States") (emphasis added); see also id. ¶ 8 (among other things, the Secretary's determination is "plainly intended . . . to silence, or at the very least restrict and chill, his speech now and in the future") (emphasis added).

But nothing along these lines, or others, is developed --- maybe because the First Amended Petition's irreparable-injury sections were filed before federal officials brought the failure-to-disclose charge.

At that point in time, it looked like any irreparable injury as to the Secretary's determination was the "detention" it caused. But now the detention seems to have another, arguably independent cause --- the failure-to-disclose charge.

The Court will issue an Order shortly to permit the Petitioner to quickly address these issues, and for the Respondents to respond.[88]

---

resolved the Petitioner's First Amendment claim, but rather his vagueness claim.

[88] The Petitioner will be permitted to add affidavits or other factual evidence to the record, to explain why they are not necessary, see footnote 87, or both. The Respondents have expressed dissatisfaction with the fast pace that a large number

**VIII.    <u>Conclusion</u>**

The Petitioner is likely to succeed on the merits of his claim
that Section 1227 is unconstitutional as applied to him.

As to that claim, an Order as to next steps will issue today.

The Petitioner is not likely to succeed on the merits of his
claim related to his alleged failure to accurately complete his
lawful-permanent-resident application.

As to that claim, his preliminary injunction motion is denied.

IT IS on this 28th day of May, 2025, so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.

---

of the Court's orders in this case have required.  <u>See</u>
Respondents' Letter (May 9, 2025) (ECF 247).  But both parties
have rightly asked for this case to proceed at a quick clip, and
the Respondents will be expected to promptly respond to any
irreparable-injury filing made by the Petitioner.  (The Court
provides this information so that the Respondents' lawyers, who
have plainly been working hard, can thoughtfully allocate their
time in advance.)

**JA 309**

# APPENDIX A

Uploaded Case 1:25-cv-01963-MEH Document 31-9 Filed 08/20/2025 Page 314 of 392
Case 1:25-cv-01963-MEH Document 31-9 Filed 08/20/2025 Page 31 of 106
PageID: 2815

**THE SECRETARY OF STATE**
**WASHINGTON**

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:     Marco Rubio

SUBJECT:     (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that ███████████████████
███████████████ and Mahmoud Khalil (DOB: ███████████; POB: Algeria), both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by: Secretary of State Marco Rubio
E.O. 13526, Reason(s): 1.4 (justification sections)
Declassify on: Month DD, YYYY

**JA 311**

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
-2-

information provided by the DHS/ICE/HSI regarding the participation and roles of ███ and Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for ███ is also based on ███ citations for unlawful activity during these protests. The public actions and continued presence of ███ and Khalil in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**
Tab 1 – DHS Letter on ███
Tab 2 – HSI Subject Profile of ███
Tab 3 – DHS Letter on Mahmoud Khalil
Tab 5 – HSI Subject Profile of Mahmoud Khalil
Tab 5 – 8 USC 1227(a)(4)(C)

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# APPENDIX B

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents   8337

# Presidential Documents

Executive Order 14150 of January 20, 2025

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2.** *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

<pre>
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2

 3   _____

 4   MAHMOUD KHALIL,

 5        Plaintiff,              CIVIL ACTION NUMBER:

 6            vs.                 2:25-cv-1963-MEF

 7   Deputy Director William P.   Oral Argument
     Joyce, in his official
 8   capacity as Acting Field
     Office Director of New York,
 9   Immigration and Customs
     Enforcement, et al.,
10
         Defendants.
11   _____

12        Frank R. Lautenberg Post Office and Courthouse
          Two Federal Square
13        Newark, New Jersey  07102
          June 20, 2025

14   B E F O R E:            THE HONORABLE MICHAEL E. FARBIARZ,
                             UNITED STATES DISTRICT COURT JUDGE
15
     A P P E A R A N C E S:
16
          IMMIGRATION RIGHTS CLINIC, BY:
17        ALINA DAS, ESQ.
          NYU School of Law
18        245 Sullivan Street
          5th Floor
19        New York, New York  10012

20           appeared on behalf of Petitioner;

21            Lisa Larsen, RPR, RMR, CRR, FCRR
                 Official Court Reporter
22            Lisa_Larsen@njd.uscourts.gov
                    (973)776-7741
23

24
            Proceedings recorded by mechanical stenography.
25      Transcript produced by computer-aided transcription.
</pre>

```
 1   A P P E A R A N C E S:  (Cont'd.)

 2        UNITED STATES DEPARTMENT OF JUSTICE, BY:
          BY:  DHRUMAN Y. SAMPAT, SENIOR LITIGATION COUNSEL
 3             SARAH S. WILSON, ASST. DIRECTOR
               P.O. Box 878
 4             Ben Franklin Station
               Washington, D.C.  20044
 5
               appeared on behalf of Respondents; and
 6
     A L S O    P R E S E N T:
 7
          Amy Greer
 8        Amy Belsher
          Veronica Salama
 9        Robert Hodgson
          Omar Jadwat
10        Esha Bhandari
          Noor Zafar
11        Brian Hauss
          Brett Kaufman
12        Baher Azmy
          Samah Sisay
13        Naz Ahmad
          Ramzi Kassem
14        Mudassar Toppa
          Diala Shamas
15        Marc Van Der Hout
          Johhny Sinodis
16        Oona Cahill
          Jeanne LoCicero
17        Liza Weisberg

18

19

20

21

22

23

24

25
```

1          (PROCEEDINGS held via Teams before the

2           HONORABLE MICHAEL E. FARBIARZ, United States

3           District Court Judge, on June 20, 2025.)

4          THE COURT:  Good afternoon.  This is Judge Farbiarz.

5          I'll ask will the courtroom deputy please confirm that

6     the court reporter is on the line.

7          THE DEPUTY CLERK:  Good afternoon, Judge.  Yes, Lisa

8     Larsen is on the Teams conference.

9          THE COURT:  Thanks very much.

10         We are here for *Khalil v. Trump, et al.*

11         I want to go around the horn and get appearances but,

12    given the number of lawyers I know who have appeared on this

13    case, I'm gonna do what I did last time, which is I'm simply

14    going to ask the lawyer or lawyers who expect to speak to the

15    pending motion to introduce just themselves and we'll take it

16    from there.

17         First, the lawyer or lawyers who will be appearing --

18    rather, speaking today, for the petitioner.

19         MS. DAS:  Good afternoon, Your Honor.  This is Alina

20    Das from the NYU Immigrant Rights Clinic, Washington Square

21    Legal Services.  I'll be arguing on behalf of the petitioner

22    today.

23         THE COURT:  Ms. Das, good afternoon to you.

24         And for the respondents.

25         MR. SAMPAT:  Good afternoon, Your Honor.  Dhruman

1    Sampat and I'll be arguing on behalf of the respondents today.

2         THE COURT:  Good afternoon to you.

3         What I'll ask you to do, the lawyer for the petitioner

4    and also the lawyer for the respondent, just so the record is

5    complete, could I ask you to please at the end of today's

6    proceeding file a very simple one-sentence letter that

7    indicates all of your colleagues who are on the phone so we

8    have a full and complete record of everybody who has appeared.

9         Can I ask you to do that, please.

10        MS. DAS:  Yes, Your Honor.

11        MR. SAMPAT:  Of course, Your Honor.

12        THE COURT:  Thanks a lot.  I appreciate it.

13        I want to start out -- let's just start out for half a

14   moment as to where we are.  Motion for -- a letter with

15   respect to bail and release was filed on Monday from

16   petitioner, including a short letter brief, the respondents

17   responded on Tuesday, the petitioner filed his response on

18   Wednesday, yesterday was of course a court holiday, and today,

19   Friday noon, we are here for oral argument with respect to the

20   motion for bail or for release.  That's where we are.

21        In the interest of saving us some time, I want to

22   address at the outset an argument that was made by the

23   respondents that I don't find persuasive.  I want to just

24   explain my reasons so that we not invest our time on it.

25        The respondents essentially argue, among other things,

1  that the petitioners have simply made what functions as a

2  motion for reconsideration of my Friday decision, which is to

3  say my decision of seven days ago.

4      I think that's simply not right.  What happened a week

5  ago, a week ago today, is that as of 9:30 in the morning I

6  preliminarily enjoined certain things, detention as to and

7  efforts to remove as to the Secretary of State's determination

8  as to the petitioner here.

9      An hour or so later the petitioner filed a letter

10  saying, given the Court's decision as to the Secretary of

11  State's determination, the petitioner needed to be released on

12  the other ground he was held.

13      That is simply not persuasive, and it's not persuasive

14  because the fact that a person cannot be held or removed on

15  one charge simply does not logically imply that he or she

16  cannot be held or removed on another charge.

17      If this were a criminal case, which it's of course not,

18  the court held that a person -- a charge of theft could not go

19  forward.  That would not imply that the other charge in the

20  case, pretend it's robbery, could not go forward.  That

21  doesn't follow logically.

22      As of Friday, that was the only argument that the

23  petitioner had made, as I understood it, and as I do

24  understand it now.

25      Over the weekend the petitioner apparently developed

1   and on Monday filed a different argument.  That argument is

2   not that the preliminarily enjoining of the Secretary of

3   State's determination charge, that that preliminary enjoining

4   implied logically that another charge could not go forward;

5   rather, it's a different argument.

6        The Monday argument is that the remaining charge is one

7   as to which the petitioner is entitled to either release or

8   removal -- excuse me, release or -- not "removal," forgive me,

9   release or transfer to this district.

10       So they're just simply different things.  The Friday

11  argument was that there is a logical reason why enjoining

12  Charge A requires not going forward on Charge B.  That's not

13  logical.

14       The argument made Monday and the one we are here

15  principally to discuss, the argument as to bail, is an

16  argument simply that as to Charge B there is a request for

17  bail the petitioner.

18       I do not understand the petitioner to be making a

19  motion for reconsideration.  I think that's a misunderstanding

20  of the argument that was pressed by the petitioner last week

21  and a misunderstanding of the decision I made on Friday.

22       So I wanted to say all that at the outset, Mr. Sampat,

23  so we don't spend any time on it because I don't view it as a

24  meaningful -- not that it's not meaningful but it's just an

25  argument that I don't think is persuasive.  So I wanted to say

 1    that from the outset.

 2         I'll ask Ms. Das if I could just get an update from you

 3    as to where things stand in terms of the process of seeking

 4    bail in front of the immigration judge.

 5         MS. DAS:  Yes, Your Honor, and thank you.

 6         So on Friday, as you know, immigration counsel sought

 7    release directly from the DHS.  That was denied on Monday.  On

 8    Tuesday immigration counsel filed a motion for a bond hearing

 9    with the immigration judge.

10         As of this morning or just before this hearing, we have

11    not heard back as to whether that bond hearing has been

12    scheduled.  In addition, Mr. Van Der Hout had also asked DHS

13    on Friday if it would direct the immigration judge to this

14    Court's opinion and indicate that it would be withdrawing or

15    dismissing that charge so that the case could move forward.

16         As far as we know, there has not been a filing from DHS

17    to the immigration judge about that matter, either.

18         THE COURT:  Can you explain a little bit -- I

19    understood from Exhibit C to your Wednesday filing, Ms. Das,

20    that Mr. Van Der Hout, who I believe is the immigration

21    counsel you alluded to, that Mr. Van Der Hout was seeking an

22    immigration judge proceeding as soon as this coming Monday.

23         So, first, I hear you to be saying that that has not

24    yet been scheduled.

25         Do I have that right?

1       MS. DAS:  That's right, Your Honor.

2       THE COURT:  What was the second point, if you could

3  just slow it down a bit and explain that a little more fully.

4       MS. DAS:  Absolutely, Your Honor.

5       In the same letter to -- the e-mail to the Department

6  of Homeland Security where Mr. Van Der Hout attached the

7  request for release directly to DHS, there was also a request

8  to DHS that they indicate to the immigration court that they

9  will be dismissing or withdrawing the foreign policy ground or

10  otherwise not relying on it, given this Court's order.

11      In our view, that would facilitate the bond hearing for

12  the Government to actually be conveying to the immigration

13  judge that it can go forward on the bond hearing.  Of course

14  Mr. Van Der Hout has also given the court ruling to the

15  immigration court and has sought reconsideration of her prior

16  determination directly, just to cover all bases; but I just

17  wanted to indicate that as far as we know we're not aware of

18  DHS submitting any filings with respect to our request for

19  bond to the immigration judge or any filings related to the

20  foreign policy ground.

21      THE COURT:  Right.  But what I'm just not fully

22  understanding is why it matters.  It sounds like the

23  petitioner has himself conveyed to the immigration judge that

24  the charge that rests on the Secretary of State's

25  determination has been preliminarily enjoined.

1       What difference does it make if DHS also says something

2   about that to the immigration judge?

3       MS. DAS:  Your Honor, it may not make a difference.

4   It's certainly our position that the immigration judge should

5   grant a motion for a bond hearing and hold that bond hearing

6   as quickly as possible; but in our experience in litigating

7   these issues, the immigration judge generally

8   does like to hear from both sides, and so that's why we

9   suggested it.

10      THE COURT:  That makes sense.  I wondered if there was

11  something else I was missing, but I do appreciate how that

12  makes sense.

13      One other -- Mr. Sampat, is there anything about what

14  Ms. Das just said that is inaccurate, from your perspective?

15      Mr. Sampat, we don't hear you, if you're speaking.

16      MR. SAMPAT:  Sorry, Your Honor.  I was muted and I lost

17  Your Honor's questions when I was trying to un-mute.  I

18  apologize.

19      THE COURT:  Not at all.  No worries.

20      Is there anything in what Ms. Das said that is

21  inaccurate, from your perspective?

22      MR. SAMPAT:  Not that I know of.  I will say that from

23  my understanding the bond hearing -- I agree with Ms. Das that

24  the bond hearing has not yet been scheduled in front of the

25  immigration judge, but I can represent that they are usually

 1    scheduled pretty quickly.  So if it's not scheduled for this

 2    upcoming Monday, as per Mr. Khalil's request, we anticipate it

 3    should be scheduled pretty soon.

 4         THE COURT:  Okay.  All right.  I appreciate that.

 5         Ms. Das, I'm going to come back to you for half a

 6    moment.

 7         Do you have an understanding as to what your

 8    expectation is as to how an immigration judge detention

 9    hearing would go, which is to say, live witnesses, a decision

10    in one day?

11         What is your expectation based on experience with this

12    particular judge in general, et cetera?

13         MS. DAS:  Yes, Your Honor.

14         So it can go in different ways, so it's not precisely

15    clear.  But as a general matter, when an immigration judge

16    receives a request to schedule a bond hearing, the immigration

17    judge will typically set a date for that hearing.

18         The parties are generally given the opportunity to

19    submit bond submissions.  In a bond hearing the immigration

20    judge would put the burden on the non-citizen respondent to

21    demonstrate lack of flight risk and danger, and in addition to

22    written submissions to that effect the immigration judge would

23    typically take testimony at a bond hearing, although there are

24    occasions where they will simply rely on argumentation from

25    both sides.

1       In the typical case, an immigration judge would rule on

2   bond on that day, but there are instances where a judge will

3   reserve decision and take some time to issue a decision on

4   bond.

5       As we noted in our papers, what we have seen most

6   recently with respect to students in particular engaged in

7   political speech is that the Government has been filing an

8   automatic stay.  If they file an appeal of the bond decision

9   within one day of the decision, they receive an automatic stay

10  where the bond decision would not be implemented while the

11  Department of Homeland Security pursued an appeal to the Board

12  of Immigration appeals which is a process that typically takes

13  months to resolve.

14      THE COURT:  Mr. Sampat, do the respondents have a

15  position as to what they would do with respect to the

16  referenced automatic stay if an immigration judge granted

17  release here?

18      MR. SAMPAT:  No, Your Honor, we don't have a position

19  because we think it's speculative at this moment.  We still

20  don't know what the immigration judge is gonna do.

21      THE COURT:  All right.  I got it.

22      Mr. Sampat, just to round it out, anything that

23  Ms. Das said that strikes you as inaccurate in terms of

24  characterization of the process?

25      MR. SAMPAT:  No.  The only note that I had was noting

 1   that sometimes bond decisions can be reserved, but Ms. Das

 2   said that so I think we're good on our end.

 3        THE COURT:  Thanks very much.

 4        This is the petitioner's motion, so ordinarily I'd have

 5   the petitioner go first in terms of argument, but the

 6   respondents here have a number of threshold issues that they

 7   press.

 8        The first and most important is, as always,

 9   jurisdiction, not most important but necessarily first, which

10   is to say an argument under 1226(e).  There's also an argument

11   about exhaustion.

12        Mr. Sampat, I wanted to hear you out on one or both of

13   those arguments at the outset.  Why don't you just give me a

14   few moments on your position now.

15        MR. SAMPAT:  Of course, Your Honor.

16        Understanding that we're not gonna talk about the

17   motion for reconsideration, so on the 1226(e), Your Honor --

18        THE COURT:  Mr. Sampat, let me stop you for a second.

19   There is no motion for reconsideration.  My point was that

20   I do not view what was filed by the petitioner on Monday as a

21   motion to reconsider my Friday decision.  I view it as just

22   simply a separate motion that progresses a different theory.

23        The Friday theory was, in my judgment, not persuasive

24   because, as I said, analogically, not being able to go forward

25   on theft does not mean that somebody cannot go forward on

1    robbery.  Those are simply separate.

2         This is a different argument, so I just want to be

3    crystal clear, Mr. Sampat, my point is that I do not view the

4    Monday motion by the petitioner as a motion for

5    reconsideration.

6         With that, back to you.

7         MR. SAMPAT:  I appreciate that, Your Honor.  I was only

8    characterizing what our position was in our papers.

9    Understood.

10        On 1226(e), Your Honor, we think the text is pretty

11   clear.  It sets forth that the Attorney General's

12   discretionary judgment regarding the application of this

13   section shall not be subject to review and that no court may

14   set aside an action or decision under this section regarding

15   the detention of any alien.

16        Mr. Khalil is currently detained pursuant to 1226(a) in

17   light of the fraud and willful misrepresentation charge.

18   Congress has authorized the executive to detain aliens if

19   they're deemed removable or inadmissible.  That decision is

20   not subject for review and a court order requiring release

21   would offend 1226(e).

22        We think that the Third Circuit's decision in *Borbot v.*

23   *The Warden* at 906 F.3d 274 says exactly that.  So we think the

24   release request is actually foreclosed by Third Circuit law,

25   as well.

1       THE COURT:  Here is the thing I don't get about that:

2       You briefed that argument without saying anything about

3  the Supreme Court's decision in *St. Cyr* in 2001 or the Supreme

4  Court's decision in *Demore* in 2003.

5       As you know, those decisions stand for the

6  proposition -- well, step back.  As we know from *Colorado*

7  *River* and many other cases, federal courts have a, quote,

8  unquote, virtually unflagging obligation to exercise their

9  jurisdiction.

10      United States Congress has given the court habeas

11  jurisdiction.  The Supreme Court in *St. Cyr* said that

12  jurisdiction stripping or habeas jurisdiction stripping in the

13  immigration context has to be extraordinarily clear.

14      The Supreme Court said in *St. Cyr* that jurisdiction was

15  not stripped as to a passage that was headed "elimination of

16  custody review by habeas corpus."  That's what Congress had

17  written, and the Supreme Court said it wasn't clear enough.

18      Then in 2003 in *Demore,* Chief Justice Rehnquist says

19  that as to 1226(e), which is the portion of the statute that

20  you're invoking, that it, quote, contains no explicit

21  provision barring habeas review.

22      So what I don't fundamentally understand is how it can

23  be that the Supreme Court has said in general as to the

24  immigration statute and in particular as to this portion of

25  the immigration statute that it's not clear enough to vitiate

1   habeas and -- to eliminate habeas jurisdiction and yet you're

2   arguing here today that 1226(e) does strip away habeas

3   jurisdiction.

4        How do those live together?

5        MR. SAMPAT:  So, Your Honor, to take Your Honor's

6   points in turn, *St. Cyr* pre-dated the REAL ID Act which

7   obviously curtails federal court's habeas jurisdiction moving

8   forward where removal orders were now channeled through the

9   petition for review process.

10       *Demore* talks about 1226(e), but I think it's important

11  to note that *Borbot* post-dates all of those decisions.  And

12  the Third Circuit was clear on -- that a challenge to a

13  particular action or decision to detain would be barred under

14  1226(a).

15       THE COURT:  I don't think any of that is right.  I

16  think the problem you have is that there is a longstanding

17  idea -- well, let's step back for half a moment.

18       The fact that *St. Cyr* pre-dates the REAL ID I think

19  cuts strongly against your position because what it suggests

20  is that Congress was well aware of the requisite level of

21  specificity that it required if it was gonna strip habeas

22  jurisdiction and 1226(e) is not particularly specific.

23       There are circuit courts all over the country --

24  Second, Ninth, the Fifth, the Seventh -- all of whom have held

25  that 1226(e) does not bar the exercise of habeas jurisdiction.

1          I'll just say the names of those cases so we have them.

2    The Second Circuit is *Ozturk*, O-Z-T-U-R-K.  The Ninth Circuit

3    is *Martinez*, citing the *Singh* case, S-I-N-G-H.  The Fifth

4    Circuit is *Najera*, N-A-J-E-R-A, and the Seventh Circuit is

5    *Al-Siddiqui*, which I think is an especially helpful case,

6    A-L, dash, S-I-D-D-I-Q-U-I, all of which emphasizes that

7    *Demore* has a clear -- that *St. Cyr* requires a clear statement.

8    *Demore* makes it clear that there's no clear statement in

9    1226(e) so there's no stripping of habeas jurisdiction.

10         And to close it out, federal courts have held for --

11   since the 19th century that one of the incidents of habeas

12   jurisdiction is the ability to grant or not grant bail pending

13   resolution of a habeas case.

14         You cited in your March filing the Third Circuit's

15   *Johnston* decision on that from the '50s.  The Second Circuit's

16   *Mapp v. Reno* case collects decisions way back to the

17   19th century.

18         I have Judge Posner -- I scribbled a note to myself --

19   from 2007 for the Second Circuit talking about the possibility

20   of bail in the habeas context being a, quote, natural

21   incident, end quote, of habeas jurisdiction.

22         So I think the problem you have fundamentally,

23   Mr. Sampat, is that over and over again the circuit courts of

24   the United States have held that there's insufficient clarity

25   in 1226(e) under *St. Cyr* to strip habeas jurisdiction, and a

1    core aspect of habeas jurisdiction -- in the Third Circuit,

2    *Lucas*, *Landano*, *Johnston* -- throughout the United States a

3    core incident of habeas jurisdiction is the possibility of

4    admitting somebody into bail.

5        So I don't see 1226(e) as being clear enough under

6    *Demore* to strip habeas jurisdiction; and if it does not strip

7    habeas jurisdiction, 1226(e) does not strip one of the basic

8    incidents of habeas jurisdiction, which is the ability of a

9    federal court to grant someone bail in advance of a final

10   decision as to the habeas claim.

11       Anything else you want to add on this, Mr. Sampat?

12       MR. SAMPAT:  Yeah, Your Honor.  Yes, Your Honor.  Just

13   on the *Demore* point.

14       THE COURT:  Sure.

15       MR. SAMPAT:  I very quickly pulled it up, and it seems

16   like the Court's reasoning on 1226(e) was that because Mr. Kim

17   there was not challenging the individual judgment or decision

18   to detain, that it was rather challenging the statutory

19   framework --

20       THE COURT:  Mr. Sampat, Mr. Sampat, this is what

21   happens when you pull things up during oral argument.

22       There's a reason I cited you to *Al-Siddiqui* out of the

23   Seventh Circuit in particular.  It makes it crystal clear that

24   there are -- it is true that in *Demore* itself that was the

25   issue, but, number one, Chief Justice Rehnquist said -- this

1 is why I quoted this particular line that, quote,

2 Section 1226(e) contains no explicit provision barring habeas

3 review.

4 Under *St. Cyr* that is dispositive, whether the case is

5 one that challenges a regulation or challenges something as

6 applied.

7 That's number one.

8 Number two, that's why the *Al-Siddiqui* case out of the

9 Seventh Circuit matters. It collects a number of cases that

10 emphasize that *Demore's* holding is controlling regardless of

11 the nature of the challenge.

12 Now, there are gonna be some outer limits aspects to

13 that, but the problem is Congress needs to speak clearly. And

14 having not spoken clearly, that is, under the cases I have

15 cited, even under Chief Justice Rehnquist's quote that I read

16 to you from the Supreme Court, that's in my judgment the end

17 of the matter.

18 Anything else, Mr. Sampat?

19 MR. SAMPAT: Not on that, Your Honor. I think we have

20 exhausted our arguments on 1226.

21 THE COURT: Fair enough.

22 I do not view 1226(e) as a jurisdictional bar here to

23 admitting or not admitting the petition to bail.

24 What's the exhaustion argument? Is that an argument

25 you're making, Mr. Sampat, that there's administrative

1    exhaustion?  What's your position on that?

2         MR. SAMPAT:  So, Your Honor, our position is that as a

3    prudential matter it makes for sense for Mr. Khalil to avail

4    himself at the administrative process and to avoid conflicting

5    decisions between this Court and the immigration judge.

6         He's currently -- as we know, he has filed for a motion

7    of custody re-determination before the immigration Judge.

8    He's availing himself to those processes.  It makes more sense

9    for him to go through that process right now than it is for

10   Your Honor to weigh in.

11        THE COURT:  Okay.  What is the -- that argument proves

12   very little in the sense that it says nothing about why I

13   should wait for the immigration judge versus why the

14   immigration judge should wait for me.

15        What is the argument for why I should wait for the

16   immigration judge?

17        MR. SAMPAT:  Well, Your Honor, it goes back to some of

18   the cases that we have cited in our briefs where judges within

19   the district have said that they won't exercise habeas

20   jurisdiction or won't review claims absent a petitioner

21   exhausting administrative remedy.

22        I'll also point Your Honor to a decision that just came

23   out a few days ago out of the Southern District of New York.

24   The name of the case is *Guzman vs. Joyce*, which can be found

25   at 2025 Westlaw 1696891.

1          That case, Your Honor, discusses and supports the fact

2    that exhaustion is an important part of this process before a

3    party was to run into federal court because if the issue can

4    be resolved administratively it is better for -- it's a better

5    course of action than expending judicial resources here.

6          THE COURT:  I hear that, but I think it's a -- look,

7    you invoke in your papers and you invoked at the outset of

8    what you just said two District of New Jersey cases.  There's

9    the opinion from Judge McNulty and there's the opinion from

10   Judge Wigenton.

11         I think the problem you have is that both of those

12   cases rely on *DeValle* and *Yi*, which are Third Circuit cases

13   that say that administrative exhaustion is jurisdiction.  But

14   of course -- and I'm honestly surprised that nobody brings

15   these cases to my attention in these papers, but such is life.

16   It's the same issue I have with *Demore*.  Again, nobody brings

17   this up.

18         In 2023 the Supreme Court held, as we all know, that

19   the exhaustion provisions such as they are of 8 U.S.C.

20   1252(d)(1), that those exhaustion provisions are not

21   jurisdiction.

22         And so the cases, Mr. Sampat, you're citing are -- they

23   just look a whole lot different.  They are based on a

24   Third Circuit conception that administrative exhaustion is

25   jurisdiction; but after those district court decisions came

1    down, the United States Supreme Court explicitly held in 2023

2    that 1252(d)(1) is not jurisdiction.

3         Instead, the conclusion from the Supreme Court is that

4    there is, if anything, some kind of common law exhaustion

5    required.  I don't know if that common law exhaustion is in

6    play here or not.

7         The Third Circuit in *DeValle* suggested that 1252(d)(1)

8    requires exhaustion, even in the context of something that

9    long pre-dates review of a final order.  One can look at that

10   in many different ways, and one can look at that as surviving

11   or not surviving the Supreme Court's decision in

12   *Santos-Zacaria* of 2023.

13        But assuming arguendo Santos-Zacaria applies here, then

14   exhaustion is only a prudential issue, which is how you

15   started off, Mr. Sampat.

16        First, let me just say I'm not sure under *DeValle* that

17   there is a need for prudential exhaustion before the entry --

18   before the entry of an order of final removal.  I don't know

19   the answer to that.

20        But even assuming arguendo that there is some need

21   for that kind of exhaustion, all of the factors that

22   Justice Jackson for the Supreme Court in *Santos-Zacaria*

23   pointed out, all of those factors weigh heavily in the

24   direction of me taking this issue on.

25        Supreme Court Justice Jackson speaks about the, quote,

1   unquote, orderly progression of the litigation.  Here there

2   are bail arguments that have been made in front of me.  There

3   has not even been a scheduled bail hearing in front of the

4   immigration judge so it's hard to know why orderly progression

5   does not cut in favor of me simply resolving the issue.

6        The Supreme Court in *Santos-Zacaria* invokes efficiency,

7   it invokes, quote, unquote, waste of work.  That would seem to

8   cut in favor of me resolving the issue here as well.

9        There's been many, many, many pieces of evidence filed.

10  There has been a great deal of litigation on this particular

11  issue.

12       Hard to know why at this stage it's more efficient in

13  terms of the judicial resources you alluded to, Mr. Sampat,

14  for me not to just take the case and resolve it myself.

15       Finally, there is something of a futility reason to

16  avoid exhaustion.  I have to say that with respect to that

17  there is a very strong and uncontested record here as to lack

18  of flight risk and lack of dangerousness.

19       Given that strong and uncontested record, it becomes

20  hard to know what the reason, other than waste of time, is to

21  send this to an immigration judge who will look at those same

22  two factors under C.F.R. 1003.19(h)(3) and will come to what I

23  imagine is a pretty obvious solution.

24       I think the New Jersey cases you cite rest on Third

25  Circuit decisions that themselves treat exhaustion as

```
 1   jurisdiction.  The Supreme Court in 2023 made crystal clear
 2   that exhaustion is not jurisdictional.
 3        To the extent that exhaustion is required, in contexts
 4   like this one it is required as a prudential matter; and if
 5   it is required, if it is required as a prudential matter, for
 6   all the reasons I have just mentioned, I don't understand why
 7   it would be required here under the factors set out in
 8   Santos-Zacaria in 2023.
 9        So it's a prudential matter, it's a discretionary
10   matter, and I will not exercise my discretion to avoid this
11   decision, given where things are postured.
12        Mr. Sampat, anything else you want to add on
13   exhaustion?
14        MR. SAMPAT:  Nothing else, Your Honor.
15        THE COURT:  Mr. Sampat, I'm going to keep sticking with
16   you because a lot of the preliminary things run through
17   arguments the respondents have made.
18        The standard here with respect to bail, I want to
19   understand where you're coming from on this.
20        MR. SAMPAT:  On the extraordinary circumstances
21   standard, Your Honor?
22        THE COURT:  Yeah, what the key case is and what the
23   substantive standard that that case or cases stands for.
24        MR. SAMPAT:  Yes, Your Honor.
25        So Landano sets forth the extraordinary circumstances
```

 1  standard, and we think that means, you know, it is something

 2  in the form of severe health complication or something that

 3  would be irreparable in a case where an individual would

 4  not -- further delay would severely prejudice a petitioner.

 5       We don't have that here.  Mr. Khalil, again, is before

 6  an immigration judge, is receiving his due process.  If he's

 7  released, his case would be transferred to the non-detained

 8  docket, so those proceedings would remain ongoing.

 9       It's a pretty high burden, and we don't think

10  Mr. Khalil has made it.  We think a lot of that is rooted in

11  our March 23rd filing on the opposition for his motion for

12  release.

13       THE COURT:  Why do you think *Landano* provides the

14  standard?  Let me step back even further.

15       What is the standard that you view as the one that

16  you've made?

17       MR. SAMPAT:  I'm sorry, Your Honor.  Give me one

18  moment.

19       THE COURT:  Let me explain to you why I'm asking the

20  question.

21       In your March 23rd filing you just alluded to, at

22  page 17 you indicate that the standard that needs meeting here

23  is what you described as the *Landano* standard, and you say

24  that it is, quote, unquote, conjunctive, that there needs to

25  be a showing of both high probability of success on

1  substantial claims and extraordinary circumstances.

2        I'm not sure -- is that your position today, or do you

3  have a different position?

4        MR. SAMPAT:  No, that is our position today.  That is

5  a -- it is a conjunctive standard, Your Honor.

6        THE COURT:  So in other words, your judgment is that

7  there needs to be a showing of extraordinary circumstances,

8  whatever that means, plus there needs to be a high

9  probability -- let's pretend that's 51 percent -- of winning

10 on a substantial claim.  Is that --

11       MR. SAMPAT:  Yes.

12       THE COURT:  I'm not sure I understand how you get that

13 out of the case.  I think the problem you have with that is to

14 make that argument you pin cite to a particular page in

15 *Landano* but that particular page in *Landano* is simply reciting

16 the standard set out by the Fifth Circuit circuit.

17       And a couple paragraphs later the circuit says, well,

18 gee, we, the Third Circuit, have set out a standard in *Lucas*

19 previously.  And the *Lucas* standard is not conjunctive.  The

20 *Lucas* standard does not say something about high probability

21 and also extraordinary circumstances.  The *Lucas* standard

22 simply says extraordinary circumstances.

23       So I'm not sure why the *Landano* court's simple

24 citation -- the *Landano* court literally says this is how other

25 courts have done it and then cites the Fifth Circuit's

conjunctive standard but then two paragraphs later has what I take to be a contrast with its own pre-*Landano* statement in *Lucas* which is simply about extraordinary circumstances, not about the merits.

I'm not sure why I read *Landano* as displacing by mere citation to the Fifth Circuit the Third Circuit's *Lucas* position.

MR. SAMPAT:  Your Honor, so we cited -- there are a couple cases that we cited in our March 23rd filing where courts within the circuit have used it as a conjunctive standard.  That's in *Ingram* where the court denied bail after a state prisoner failed to establish both prongs.

There's also the *Hudler* case out of the Middle District of Pennsylvania where it was denied.  I'm sorry, Your Honor. I don't mean to --

THE COURT:  No, no, no, go on.

MR. SAMPAT:  Sure.

So *Hudler* was denied on the basis that petitioner had failed to establish a substantial constitutional claim.  I will also note that when we briefed the release motion back in March, the fraud and willful misrepresentation charge wasn't before the Court or had not been briefed in the PI or in the operative pleadings that were tethered to the motion, so we haven't had a chance to actually brief it.

We don't think it's necessary because at the end of the

1    day we think this is a discretionary decision obviously, but

2    this is just a separate independent charge that continues to

3    justify Mr. Khalil's detention today.

4           THE COURT:  What I would say that -- I read all the

5    district court opinions you cited and they're thoughtful, of

6    course.  They're my colleagues throughout the circuit thinking

7    this through very carefully, no doubt about it.

8           It's just that when I read *Landano*, I do not see a

9    Third Circuit adapting the Fifth Circuit's conjunctive

10   two-part test.  In fact, I see it as very explicitly drawing a

11   contrast with the Third Circuit's own *Lucas* test, which is

12   simply focused on extraordinary circumstances.

13          I think that -- so I think that my own judgment is that

14   what governs here is the *Lucas* standard, not the *Landano*

15   standard.  The thing that's a little complicated is what

16   extraordinary circumstances mean.  And I appreciate that the

17   Second Circuit in *Mapp v. Reno* has said that extraordinary

18   circumstances means something like circumstances so

19   extraordinary that the habeas writ would be ineffective if

20   bail were not granted.

21          But I don't see that in the Third Circuit's binding

22   *Lucas* decision.  I don't see the extraordinary circumstances

23   are limited to that qualification.

24          I'll go even further.  The *Mapp v. Reno* decision is

25   itself based on an older Second Circuit decision, two of them.

1    One of them is *Iuteri*, I-U-T-E-R-I.  And that seems like one

2    of the cases that *Lucas* explicitly walked away from.

3            So I'm left with two complexities in terms of the

4    standard here.  First, I think *Lucas* controls and not *Landano*.

5    I appreciate that many colleagues or some colleagues in the

6    Third Circuit, other district judges, have seen it perhaps

7    differently; but I think the most faithful read of the

8    circuit's precedence is that *Lucas* controls.

9            I am left with two issues.  The first is extraordinary

10   circumstances as to what?  *Mapp v. Reno* or the Second Circuit

11   based on *Iuteri* says that it's extraordinary circumstances

12   that are specifically tied to the efficacy of a later habeas

13   remedy, but the Third Circuit did not say that in *Lucas* and

14   has not said that in its case law, so far as I have been able

15   to see it.

16           In addition, and I think this is quite important, *Mapp

17   v. Reno* requires some showing of meatiness to the underlying

18   claim.  It doesn't seem like *Lucas* requires that.

19           Now, if *Landano* was the law in the Third Circuit, there

20   would need to be some kind of, quote, unquote, high

21   probability showing, but I don't think *Landano* is the law.  I

22   think *Lucas* is the law.

23           Under *Lucas*, what I take away is the extraordinary

24   circumstances do not need to be focused on the preservation of

25   the habeas remedy.  The Third Circuit in *Lucas* left open a

1 broader remit for federal judges considering bail to simply

2 assess extraordinary circumstances and all of the possible

3 permutations that might arise, and the *Lucas* court did not

4 seem to take the step that the Second Circuit did.  That is to

5 say the *Lucas* court did not seem to require that there be some

6 showing of likelihood of success on the merits or some showing

7 of even a substantial claim on the merits.

8      So my judgment is *Lucas* controls here and that *Lucas*

9 has a very broad idea of extraordinary circumstances, not one

10 tethered, as in *Mapp v. Reno*, to the efficacy or non-efficacy

11 of the habeas remedy.  And at least within its four corners

12 *Lucas* does not seem to require any sort of showing that there

13 is a kind of level of strength in the underlying claims.

14      I'll note two other things about *Lucas*.  First of all,

15 it seems to me that the Third Circuit almost surely takes the

16 view -- would take the view, excuse me, that the standard set

17 out for bail in habeas criminal cases is higher than the

18 standard that would apply here, and that's in part based on a

19 simple a fortiori assessment, which is that in a criminal

20 context somebody has, by hypothesis, been convicted with all

21 the guarantees that the Constitution implies.  And there are

22 in the state criminal context imported federalism issues.

23      None of that is present of course in the immigration

24 context.  There are not criminal protections, there is not a

25 criminal judgment, and there are not federalism issues.

1       The a fortiori, by that I mean whatever the standard

2   for release is, in criminal habeas is higher than the standard

3   for release in immigration habeas.

4       The buttress for that a fortiori argument is what the

5   Third Circuit in *Landano* cites, which is Justice Douglas's

6   opinion *in Aronson*, his in-Chambers opinion in 1964.

7       I'll also note that *Landano* and *Lucas* seem hesitant

8   about the idea of tying the standard of -- for granting bail

9   in the habeas context.  They seem hesitant about tying it to

10  the substantive likelihood of success.

11      One of the things that is said in one of those cases is

12  exhaustion doesn't generally turn on whether you have a good

13  claim or not, which is really what we're talking about here.

14      So, bottom line, I think the *Lucas* standard controls,

15  not *Landano*.  I think the *Lucas* standard under the reasoning

16  of Justice Douglas as cited in *Landano* is almost surely higher

17  than the standard that is in play here.

18      The *Lucas* standard is about extraordinary

19  circumstances.  Period.  Full stop.  The *Lucas* standard is not

20  about extraordinary circumstances related to ultimate efficacy

21  of a habeas decision.  That's the Second Circuit's perspective

22  but it's not what *Lucas* says.

23      Finally, *Lucas* is not about the strength of the

24  underlying claim.  That is *Iuteri* out of the Second Circuit,

25  that is *Mapp* out of the Second Circuit, but that is not what

     1    the Third Circuit said in *Lucas*.  And of course it's my job to

     2    faithfully apply the standard set out by the circuit and not

     3    to subtract from them and not to add to them.  That's where I

     4    stand on the standard.

     5         Mr. Sampat, do you have anything you want to add on any

     6    of this?

     7         MR. SAMPAT:  Yes, Your Honor, if I may, understanding

     8    Your Honor's point that you believe that *Lucas* is the standard

     9    and not *Landano*.

    10         THE COURT:  Right, right.

    11         MR. SAMPAT:  I think it's important to note that if

    12    *Lucas* is the standard, anyone would be able to just file a

    13    habeas petition and just say their case is different, it's

    14    special enough, there's extraordinary circumstances, and that

    15    standard is met.

    16         I think *Landano* was meant to say that it needs to be

    17    tethered to the underlying claims that's raised in the

    18    petition itself.  It makes logical sense for -- we think that

    19    it makes logical sense to read *Landano* that way because at the

    20    end of the day release pending habeas review is, in effect,

    21    sort of an injunctive relief.

    22         There needs to be some sort of showing that there's a

    23    likelihood of success on the merits before we go forward and

    24    before release actually results.  What the Third Circuit has

    25    said repeatedly is an exceptional form of relief of release on

1  bail pending habeas.

2       THE COURT:  I hear all that, but my responses are

3  twofold.  First, maybe the Third Circuit should have

4  articulated a different standard, but that's ultimately not my

5  job.  My job is to faithfully follow the circuit's standard as

6  I understand it.

7       The second point I would make is extraordinary

8  circumstances is a pretty high standard.  It is certainly the

9  case that litigants all over the country can make any claim

10 they want, but the fact that claims are makeable doesn't mean

11 that claims win, and extraordinary circumstances sets a pretty

12 high bar.

13      The third problem with what you've said about the idea

14 that bail pending a determination is analogous to an

15 injunctive remedy and therefore a likelihood of success is

16 necessary, there are a bunch of problems with that.  I'll take

17 two.

18      Problem one is that the Third Circuit -- forgive me for

19 not recalling if it's in *Landano* or *Lucas*, I think it's in

20 *Landano* -- has explicitly said no to that, has explicitly said

21 we don't think of likelihood of success on the merits as the

22 key issue.

23      The second thing is, the only circuit court that has

24 specifically addressed the question of bail in the habeas

25 context, which is to say the Second Circuit in *Mapp v. Reno*,

1  the only modern circuit that's done it, they too have not

2  followed what you suggested.

3       They haven't required a likelihood of success on the

4  merits.  They have required something quite a bit lower.  They

5  have required something like a substantial claim.  I'm

6  quoting, I think, there.

7       So, maybe, but that's just not the state of the law,

8  and it's the state of the law as it stands today that I'm

9  bound to apply here.

10      The other problem I think you have to deal with is the

11 a fortiori point that I alluded to earlier and that is central

12 to *Landano*'s citation of Justice Douglas, which is that if the

13 standard doesn't include -- and it doesn't, the *Lucas* standard

14 does not include likelihood of success on the merits in a

15 criminal case, why would we imagine a higher standard in an

16 immigration case?

17      Indeed the logic -- not the implicit logic but the

18 explicit logic of *Landano* would seem to be that immigration is

19 a lower standard because, by hypothesis, nobody has received

20 the very strict protections associated with a criminal

21 conviction, including the full range of constitutional rights

22 that are triggered there.

23      So, ultimately, I'm not persuaded by what you're saying

24 on that point, Mr. Sampat, but I appreciate it.

25      Anything else you want to add?

```
 1          MR. SAMPAT:  No, Your Honor.  Thank you.

 2          THE COURT:  Thank you.

 3          So those were a whole bunch of preliminary issues, and

 4   they are complicated in this case in part for a reason that

 5   Mr. Sampat alluded to.  These are -- extraordinary

 6   circumstances a high standard, it's hard to meet, and there

 7   are simply not a lot of cases in this area, in part because

 8   it's hard to meet and in part because generally this sort of

 9   litigation goes forward not in a federal district court but in

10   front of an immigration judge.

11          Ms. Das, I haven't heard from you.  We're now at the

12   merits of your argument with respect to release.  I won't ask

13   you to repeat everything you've said in your papers, but I'd

14   like to hear from you on the extraordinary circumstances

15   argument, anything else you want to say, and then I'll ask

16   Mr. Sampat to be heard as well at that point.

17          MS. DAS:  Thank you, Your Honor.

18          Yes, we certainly are able to address the extraordinary

19   circumstances, which we would essentially put into

20   three buckets at this point.

21          One is certainly the fact that this is a First

22   Amendment case, and the Government's most recent actions

23   underscore our First Amendment concerns, which I will address

24   in a moment.  The other, as you've already noted, is that this

25   is a case where there is extensive evidence in the record,
```

1    much of which goes to flight risk and danger, and that's

2    evidence that the Government has not controverted.

3         Finally, there's a whole set of harms related to what

4    this has meant to Mr. Khalil and his family and the prejudice

5    that further delay would cause him.

6         Taking the first point on the First Amendment issues

7    first, certainly for more than three months the Government has

8    relied on a rarely used and unconstitutionally vague foreign

9    policy ground to justify its detention of Mr. Khalil.

10        When this Court enjoined that detention and removal on

11   that ground, ICE made the extraordinary decision this past

12   Friday not to release Mr. Khalil as it would in an ordinary

13   case but now to detain him on the basis of the separate

14   immigration application charge, a charge that the evidence we

15   presented already shows is rarely, if ever, used as a basis to

16   detain lawful permanent residents like Mr. Khalil.

17        So the Government's latest actions confirm what we have

18   alleged in this petition all along that retaliatory detention

19   is the Government's goal, that the purpose of every step that

20   the Government has taken in this case has been to ensure that

21   Mr. Khalil remains locked away until he is deported as

22   retaliation and punishment for his speech and viewpoint.

23        So at this stage of the case the Court does have the

24   power and the sufficient evidentiary record to grant bail in

25   light of that extraordinary circumstance.  His petition has

1  been verified.  He submitted extensive evidence of the

2  Government's own statements about his protected political

3  speech, the timing and baselessness of these

4  characterizations, and the extraordinary irregularity of the

5  Government's latest justification for his detention.

6      It's clear that this case is core about detention.

7  It is a rare case where there's actually direct evidence of

8  First Amendment retaliation from day one.  The Government's

9  own statements and their supplemental charging document make

10 explicit that they have been targeting Mr. Khalil from the

11 start based on his speech and viewpoint.

12     This Court has made findings with respect to the fact

13 that Mr. Khalil has engaged in protected speech and the fact

14 that the Government has now swapped in what we would argue to

15 be an even weaker justification for his continuing detention,

16 because this Court's injunction has forced them to do so,

17 doesn't break that causal chain.  If anything, it

18 strengthens it.

19     THE COURT:  May I ask you something on that for the

20 moment?

21     MS. DAS:  Yes.

22     THE COURT:  There are two charges here and one of them

23 has been enjoined.  The second charge was not filed last

24 Friday.  It was filed many months ago.  So I'm a little bit

25 not exactly sure what you mean by swapping out a

1    justification.

2         I would imagine -- the Department of Homeland Security,

3    I imagine, saw itself as justified in proceeding on both

4    charges and there's just -- one is now preliminary enjoined

5    and the other one wasn't invented on Friday.  It's been on the

6    books for months.

7         MS. DAS:  Yes, Your Honor.  Absolutely.

8         To be sure -- and this Court has made clear that First

9    Amendment issues regarding the charge itself will require

10   further development, and we, you know, intend to file those

11   submissions promptly.

12        But with respect to detention itself, the Government

13   has only relied on the foreign policy ground for detention and

14   we know that because when in our bail briefing we argued,

15   well, he's not a flight risk and danger and the Government has

16   not contested that in these proceedings, the Government's

17   response was that it was relying on the foreign policy ground,

18   that this was somehow in the category of security cases where

19   flight risk and dangerousness was unnecessary to detention.

20        We also know that based on the Government's letter on

21   Friday that they are taking the position that they are now

22   relying on the immigration application charge as the basis of

23   his detention.  So it's really the Government's actions that

24   are bringing the detention part of this case based on the

25   willful misrepresentation charge to the forefront.

1        But even if this issue has been in the case all

2    along -- and certainly we have argued that retaliation is the

3    goal and that it really doesn't matter which charge the

4    Government is relying on, regardless of whether charges

5    themselves are valid and give the Government discretion to

6    detain an individual in removal proceedings, the First

7    Amendment itself forbids the Government from exercising that

8    discretion in retaliation for someone's speech and the Fifth

9    Amendment forbids the Government from exercising that

10   discretion to punish someone.

11       And given the fact that these issues have been

12   developed in the evidence, that both sides have submitted

13   evidence, including all the immigration filings, this issue

14   has been teed up, and the fact that there is a strong First

15   Amendment issue that will be litigated over the course of this

16   case is an extraordinary circumstance such that Mr. Khalil

17   should not be remaining in detention, having his First

18   Amendment rights be impaired as these issues are further

19   litigated.

20       THE COURT:  What do you do with the argument that

21   Mr. Sampat has made that is essentially the consequences for

22   this petitioner of being detained are, while difficult for him

23   undoubtedly, quite a bit like the consequences for many, many,

24   many detainees?

25       And in terms of showing that they are, quote, unquote,

1  extraordinary as the law requires, why is this petitioner's

2  situation any different or worse than that of many, many, many

3  other people who are in detention who have their own

4  collateral consequences, who have their own life disruptions?

5       MS. DAS:  Well, Mr. Khalil's case is unique because

6  this is a First Amendment case.

7       THE COURT:  I've got you on that.  Bracket that for

8  half a moment if you could, but I took Mr. Sampat to be saying

9  in the brief he filed in March on this subject that the normal

10  extraordinary circumstance is something like a person who is

11  very ill and at the end of their life and they can't wait for

12  a habeas remedy because they will otherwise not make it, they

13  need to go to a hospital or something like that, and that

14  there's nothing like that that you all have put forward with

15  respect to the petitioner here.

16       What do you do with that argument, Ms. Das?

17       MS. DAS:  Our position in this case has been all along

18  that both the retaliation and the punishment are the two

19  impermissible motivations and goals behind what the Government

20  is doing.  And if he has to remain in detention only to get a

21  victory on those claims, you know, several months from now,

22  then the Government wins.

23       If the argument is, no, he should have never been

24  detained, that they are doing this to punish him for speaking

25  out about issues that he cares about, matters of pressing

public concern, the fact that he will have to remain in

detention for those punitive or retaliatory reasons, that is

the extraordinary circumstance and that his ability to live

his life freely is the controversy that preceded all of this.

That is the status quo to which he should be restored.

I think in this case that is not true for every

non-citizen who faces detention and there are processes that

are available to them in the ordinary course, but for

Mr. Khalil this has never been an ordinary immigration case.

Our entire theory is that the Government is abusing the

ordinary processes of immigration court of putting someone in

removal proceedings, of detaining them for a constitutionally

improper purpose.

And of course in Mr. Khalil's case we have alleged that

there are the kinds of concerns that are extraordinary, that

the loss that he's already suffered in terms of his ability to

be there for the birth of his first child, to attend his

graduation.  These are the punitive experiences he's

experienced, again, not just in the way that every person who

is detained experiences them but because that is part of the

punishment.

That's what makes this case extraordinary.  I am aware,

you know, in my 20 years of representing immigrants of no

other case where the Government announced the day that it

detains someone that they were detaining them in order to send

1   a message that their arrest would be the first of many, that

2   they were going after student protestors.

3        That chilling effect has made this case an

4   extraordinary case, and it's something that's been recognized

5   in the small handful of cases that have emerged over the last

6   several months that have dealt with similar issues, in the

7   *Ozturk* case, *Concerti*, *Mahdawi*, *Aditya*, *Muhammad*, these are

8   all cases where the First Amendment concerns, the chilling

9   effect, the punitive effect it's having on the individuals

10  have demonstrated extraordinary circumstances.

11       I certainly agree that in the Third Circuit the

12  standard here is a very capacious one and that goes back not

13  just to *Lucas* but to *Johnston v. Marsh*, really talking about

14  the inherent power to grant petitioner's bail in the exercise

15  of the judge's discretion.

16       I think in some of the other cases some of the

17  extraordinary circumstances have been really discussed more as

18  a kind of interest of justice model.  Here we can see, given

19  the extensive record, including the record on lack of a flight

20  risk or dangerousness, of the Government never coming forward

21  with a valid justification for why Mr. Khalil must remain

22  detained while we litigate these very weighty issues.  Those

23  are all extraordinary circumstances that set this case apart.

24       I think one very illustrative case is the *Ozturk* case

25  in many ways.  It's very similar to what we are seeing here.

1    In her case, Ms. *Ozturk*, like Mr. Khalil, she was originally

2    detained based on these foreign policy allegations; but in her

3    case her student visa was revoked and ICE ultimately decided

4    to pursue removal proceedings on the basis of the revoked visa

5    charge alone and not the foreign policy ground.

6        She raised her First Amendment and due process

7    challenges to detention.  Initially the district court in

8    Ms. Ozturk's case concluded it was too soon to consider bail,

9    given the foreign policy allegations and the limited factual

10   record; but after the Government declined to present any

11   evidence to controvert Ms. Ozturk's allegations and

12   submissions, the court granted bail and did so even when the

13   immigration judge had denied bail.

14       It held that Ms. Ozturk had raised substantial claims

15   that her detention violated First Amendment and due process

16   and that there were several extraordinary circumstances,

17   including the chilling effect that her detention had on her

18   speech.

19       So this is a case in which those extraordinary

20   circumstances are clear from every method that the Government

21   has used and every decision they have made in this case to

22   pursue Mr. Khalil's detention and their plan to remove him.

23       THE COURT:  Ms. Das, anything else you want to add?

24       MS. DAS:  I wanted to address the idea about waiting

25   for immigration court bond proceedings.

1        I think, as the Court has already noted, there is no

2   statutory exhaustion requirement in this case.  I would also

3   note that the 1252(d) exhaustion requirements do not apply to

4   detention matters because there's no avenue in which detention

5   issues ever get to a court of appeals on a petition for review

6   because it's not --

7        THE COURT:  Ms. Das, let me pause you there.  I see the

8   argument you're making, and on a blank slate it's not clear

9   how to think about it.  The complexity is that in *DeValle* the

10  Third Circuit suggested that decisions on the way to a final

11  order of removal may require a kind of common law exhaustion.

12       How *DeValle* might or might not play in a detention

13  context and how *DeValle* might or might not work as to that

14  point, as to that point, after the Supreme Court's decision in

15  *Santos-Zacaria*, I don't know the answer to that.  But that's

16  why I presumed arguendo that prudential exhaustion is required

17  in the circumstances; but, as you've heard, I've determined

18  that on the facts of this case, given when the record was

19  built, how thickly the record has been developed, how much

20  time has been put into it, and what the record shows about

21  flight and dangerousness, which are those same two things the

22  immigration judge would need to look to, given all of that, I

23  have concluded that -- even assuming arguendo that there is an

24  exhaustion obligation under *DeValle* there is no need for

25  exhaustion here under the factors laid out by the

1    United States Supreme Court in *Santos-Zacaria* in 2023.

2         So that's where we are on that.  I mention all that at

3    this moment, Ms. Das, because I think that if you want to tell

4    me that there's no exhaustion in the detention -- excuse me,

5    in the habeas bail context, you're gonna have to explain to me

6    why *DeValle* doesn't work.  I don't know if you want to do that

7    or not, but that's the key data point here.

8         MS. DAS:  No, Your Honor.  I simply -- to the extent

9    that there is a prudential exhaustion requirement in the

10   detention context, our position would be that it doesn't stem

11   from 1252.  It's a prudential exhaustion requirement that may

12   stem from general principles, and we would agree that

13   exceptions -- normal exceptions would certainly apply here on

14   this record, so I don't need to belabor that particular point.

15        We are concerned that the ordinary immigration court

16   processes will not provide Mr. Khalil with the opportunity to

17   protect his rights, and certainly this is a case -- and this

18   is something that was also considered in the *Ozturk*

19   decision -- where it's not fair that an immigration court

20   proceeding could ever be a substitute for this Court's

21   consideration of release since an executive branch employee

22   would not be able to address First and Fifth Amendment issues,

23   powerless to consider constitutional claims, and certainly it

24   would be unusual for them to be considering evidence of the

25   executive branch as retaliatory or punitive motives.

 1          So it just isn't a substitute for the power that this

 2     Court has and the issues that this Court would be considering.

 3          Fundamentally, you know, we would just ask that this

 4     Court grant Mr. Khalil bail, and, you know, we certainly

 5     believe that ordering Mr. Khalil's return to this jurisdiction

 6     in the alternative would be appropriate if the Court were not

 7     to grant bail.  And I'd be happy to address any concerns the

 8     Court has about that.

 9          But release at this stage, given the development of the

10     record and the opportunity that both sides have had to explain

11     why Mr. Khalil is being detained and given all of the harms

12     that he suffered over the 104 days that he's been in

13     detention, we hope that this Court will grant his immediate

14     release on bail.

15          THE COURT:  Ms. Das, thank you very much.

16          Mr. Sampat, over to you.

17          MR. SAMPAT:  Thank you, Your Honor.

18          If I may just make a quick point on factual -- a

19     factual point that my friend made on the other side regarding

20     the *Ozturk* case.

21          THE COURT:  Sure.

22          MR. SAMPAT:  If I remember that case correctly, I don't

23     believe Ms. Ozturk was held on the foreign policy ground.  I

24     think there was some debate as to whether she was or was not

25     being held on that ground; but I think at the end of the day

1    when the Government submitted its briefing, it was the fact

2    that she was out of status after her student visa was

3    terminated.  That was the reason that she was detained and

4    placed into proceedings.

5         I wanted to make that point very quickly.

6         As to the extraordinary circumstances, Your Honor, I

7    think it's important to note, at least on the Fifth Amendment

8    issue, that the detention -- detention of aliens has been

9    upheld by the Supreme Court as being constitutional.  It's

10   part of the process.

11        It's integral to determine whether somebody is --

12   should be found removable, is removable, and then is

13   ultimately ordered removed.  I think that's an important point

14   to note as the Court is considering the Fifth Amendment

15   issues.

16        On the First Amendment issues, I'll just note that the

17   Court hasn't ruled on the First Amendment issues yet.

18   Obviously my concern -- you know, the Government's concern

19   with the argument that Mr. Khalil -- that the petitioner is

20   posing here is that it kind of invites a magic word test where

21   petitioners could raise First Amendment claims in habeas and

22   then that by itself would be deemed extraordinary

23   circumstances.

24        I don't think that's what the Third Circuit had in mind

25   when it kept saying that the extraordinary circumstances

     1   standard is a very high bar, that that high bar could be

     2   circumvented by some sort of artful pleading or coloring their

     3   claims in constitutional guard that way.

     4        THE COURT:  The problem with that -- look, I think that

     5   is potentially your real issue.  And Ms. Das left out one of

     6   the key First Amendment cases in this area which is the case I

     7   believe she litigated, the *Ragbir* case, in front of the Second

     8   Circuit.

     9        It is the case that treating First Amendment chilling

    10   as potentially a basis for extraordinary circumstances could

    11   open the door to more people seeking extraordinary

    12   circumstances, but there are two answers to that.

    13        The first is, it is then on district judges to not

    14   simply accept magic words and be done with it.

    15        As you know, Mr. Sampat, I previously found that the

    16   petitioner here -- I found as a matter of fact that the

    17   petitioner here engaged in, quote, unquote, political speech

    18   within the meaning of the Supreme Court's jurisprudence; and I

    19   found as a matter of fact that he wishes to and would return

    20   to such speech.  So it's not simply a question of magic words.

    21        But the other point is that the mere -- we had this

    22   back-and-forth, you and I, in our first interaction with

    23   Mr. Flentje, but the mere fact that a claim might be made

    24   under a standard is not an argument against that standard.

    25   It's just a fact of the standard, number one.

 1    Number two, I'm not in the standard-making business.

 2  I'm in the standard-applying business.  So Ms. Das's argument

 3  that First Amendment chilling is an extraordinary

 4  circumstances, that argument may work or may not, but the fact

 5  that it might doesn't tell me whether it should or should not.

 6  It's simply a restatement of the question.

 7    Her argument is that First Amendment chilling might

 8  count as an extraordinary circumstances, and what you're

 9  saying back is, well, if it does, that would allow those

10  claims to go forward.  True, but that doesn't tell me

11  anything.  That just restates the issue.

12    If what it means to tell me is that people could use

13  magic words, well, then, A, it's over to district judges to

14  not simply accept magic words, and, B, you know the factual

15  findings I've made here as to First Amendment speech.

16    I'm not sure I'm fully persuaded by the argument, at

17  least as you've made it until now, on that particular piece.

18    MR. SAMPAT:  I absolutely hear you, Your Honor.  I

19  would just say that, you know, if we're gonna get to the First

20  Amendment issue, we are getting to the merits of his First

21  Amendment claim which then goes back to our point of, like,

22  why just extraordinary circumstances by itself can't be the

23  standard for bail pending -- in a habeas case that needs to be

24  likelihood of success on the merits, as well.  This is how it

25  all -- we think that it all sort of ties together.

 1          THE COURT:  I want to just say, Mr. Sampat, that's why

 2    we spent so much time discussing the standard.  I appreciate

 3    that point, which is to say I have held that the petitioner

 4    has failed to develop any likely to succeed argument on

 5    anything other than the vagueness ground as to the Secretary

 6    of State's determination.  And Ms. Das, 15 minutes ago, noted

 7    the petition has been verified.

 8          But as we all understand, the petition was very

 9    belatedly verified.  It was -- in Mr. Khalil's latest

10    declaration, there was a reference in sentence two or three

11    to:  And, yes, I have gone back and verified the petition.

12          But the point is, in terms of the materials I've had

13    before me in a merits-type context, I have indeed found that

14    there is no factual evidence because at the relevant point no

15    one had put any evidence in front of me, including no verified

16    petition, and no meaningful legal arguments had been made.

17          So I have already held that there is no likelihood of

18    success as developed by the petitioner on those things.

19          So I agree with you, Mr. Sampat, that the standard here

20    matters a great deal, because if the standard requires

21    likelihood of success on an underlying claim, as I've already

22    held, that has simply not been shown by the petitioner to this

23    point.

24          So I think you're right to say it all flows together,

25    but that's of course why it was so important to spend time and

1   explain, in my judgment, why *Lucas* does not involve likelihood

2   of success on the merits and indeed even *Mapp* doesn't.  That's

3   part of how I'm thinking about the situation that the case is

4   currently in.

5           Mr. Sampat, back to you.

6           MR. SAMPAT:  Thank you, Your Honor.  If I may have just

7   a quick moment to just consult my notes.

8           THE COURT:  Of course, of course.  Take your time.

9           MR. SAMPAT:  Thank you.

10          MS. DAS:  Your Honor, I don't want to interrupt

11  Mr. Sampat, but there is a development in the immigration case

12  that's relative.

13          THE COURT:  Hang on for just one second.  Let

14  Mr. Sampat do his thinking and we'll get to it in a half a

15  moment.

16          MS. DAS:  Yes, Your Honor.

17          THE COURT:  Thanks.

18             (Brief pause.)

19          MR. SAMPAT:  Thank you, Your Honor.

20          I don't think we have anything else to add on the

21  extraordinary circumstances point, other than what's in our

22  briefing; but if Your Honor has questions, we're of course --

23  I'm ready to answer them.

24          THE COURT:  Okay.  No.  I appreciate that.

25          Mr. Sampat, while you're looking at your notes, Ms. Das

 1  had something that she wanted to bring to all of our

 2  attention.

 3         Ms. Das, over to you.

 4         MS. DAS:  Mr. Khalil's immigration counsel just

 5  informed me that the immigration judge has just denied a bond

 6  hearing, relying on the foreign policy ground.

 7         THE COURT:  Okay.

 8         MS. DAS:  So I think that alone is an extraordinary

 9  circumstances that would be relevant both to, even if there

10  were at the highest level, the *Landano* substantial

11  constitutional claim that Your Honor has already found.  And

12  it goes to demonstrate that there's no administrative

13  proceeding that will otherwise resolve this being an

14  extraordinary circumstance.

15         It also appears that she's found him removable on the

16  remaining charge and denied asylum, but we can certainly --

17  obviously this is coming in now.  We can send a letter to the

18  Court immediately with these developments.

19         THE COURT:  Right.  I appreciate that.

20         Mr. Sampat, do you know anything about any of that?

21         MR. SAMPAT:  No, Your Honor.  I'm hearing it for the

22  first time right now.

23         THE COURT:  I get it.  If we were in court physically

24  with nobody checking their phones, we wouldn't have known

25  this, but here we are remotely, and at least Ms. Das had some

```
 1   information.  Okay.

 2        Ms. Das, we've heard from yourself, we've heard from

 3   Mr. Sampat.

 4        Anything else that you feel compelled to add at this

 5   point?

 6        MS. DAS:  Just briefly, Your Honor.

 7        I would note that in addition to the verified petition

 8   much of the evidence that we referred to in our latest letter

 9   also comes from the submissions that were attached to the

10   declaration, I believe at ECF-284, which go to the

11   irregularities around the foreign policy ground, around the

12   misrepresentation charge.

13        And certainly the fact now that it appears that the

14   Government or at least the immigration court is not complying

15   with this Court's injunction is another extraordinary

16   circumstances, so we do believe that the factual record at

17   this stage has been sufficiently developed under any standard

18   that's applicable to bail.

19        THE COURT:  I appreciate all that.

20        I want to learn more before suggesting even for a

21   moment that anyone has not complied with the judgment order,

22   but we'll learn more.

23        Ms. Das, you indicated you would file a letter, and I'm

24   sure you and Mr. Sampat can huddle after today's proceeding

25   just so we have a fuller understanding of what's going on with
```

1  the immigration judge and what advice is being provided to the

2  immigration judge about the meaning of the Court's preliminary

3  injunction.

4       Let me take you through my thinking as to the

5  compliance with the relevant standards here, which is to say

6  the standards set out in *Lucas* and subject to the full

7  discussion we had earlier about *Landano* and about *Mapp v. Reno*

8  and *Iuteri* and all the rest of it.

9       The first thing that I just want to indicate here is

10 that there is -- you know, here is some of the evidence in the

11 record:

12      That the petitioner is married to a United States

13 citizen, that he is the parent of a child in the United States

14 who is -- the child is itself a United States citizen, the

15 petitioner's wife is employed in the United States, the

16 petitioner has pursued education in the United States, has had

17 United States career plans which may be displaced at this

18 point.  In fact, some of them were displaced, which I

19 previously found.

20      In addition, the petitioner has made himself into a

21 highly public figure from the very get-go of the case.  In the

22 first and timely verified petition, there are references to

23 his speaking to the media, et cetera.

24      All of that suggests very low flight risk, connections

25 to the United States and publicness in terms of his person.

1   There are any number of sources for what I have laid out.

2   They are in the petition itself, they're in the petitioner's

3   various declarations, they're in the petitioner's wife's, one

4   of her declarations, one of them doesn't speak to it.  It's at

5   ECF 56-6.  The first letter speaks to some of these

6   connections to the community, but that's just a portion of it.

7          There is strong evidence of lack of flight risk.  All

8   of this is drawn from sworn affidavits that were put forward

9   March 15, March 20, May 8th, June 4th by petitioner; and as to

10  all of that, the respondents have opted not to controvert any

11  of the evidence.

12         And so I find as a matter of fact that the petitioner

13  here, based on the evidence that has been put in front of me,

14  is not a flight risk.  The respondents have opted not to

15  controvert the evidence, as Ms. Das noted, and the

16  uncontroverted evidence points in only one direction.

17         The second issue here that is relevant -- and I'll

18  come in a moment as to how all of this is relevant -- is

19  danger to the public, danger to the community.

20         Again we're in a place where the petitioner has put in

21  sworn evidence March 15, March 20, May 8th, June 4th, and the

22  respondents have simply opted not to take on any of this

23  evidence.  They haven't argued through affidavits, through

24  declarations, through any other evidentiary means that the

25  evidence put forward by the petitioner is wrong, is

1   unreliable.

2        They haven't attempted to put in their own evidence.

3   They have done nothing of the kind.  And so we're left with

4   what the evidence that has been put forward by the petitioner

5   that is uncontroverted shows.

6        That evidence shows that the petitioner has no criminal

7   record.  And there is some evidence in the record from

8   which -- well, let me just emphasize what it is.

9        Exhibits 93 -- excuse me.  Forgive me.  ECF 93-1, that

10  is ECF 93-1, the first letter and the third letter; ECF 56-1,

11  ECF 56-1, letter 4, letter 7, letter 9.  All of these shed

12  evidentiary light on the petitioner's actions in what everyone

13  assumes is the relevant context.

14       And the evidence that all of those -- excuse me.  What

15  all of that evidence adds up to is a lack of violence, a lack

16  of property destruction, a lack of anything that might be

17  characterized as incitement to violence.

18       All of that is simply uncontroverted here by the

19  respondents.  That evidence has been put before the Court in

20  affidavits, in declarations, in letters that are sworn to, and

21  the respondents have opted to say nothing in response of an

22  evidentiary nature.  And so where we are is similar to where

23  we are, risk of flight.

24       All of the evidence in the record points to lack of

25  danger to the community; that is, all evidence that has been

1   put on by the petitioner.  It might have been challenged as

2   unreliable, it might have been challenged as an incomplete

3   picture, but no such challenge has been made, even as there

4   have been many opportunities for the respondents to do that.

5        So what I find as a matter of fact, given the evidence

6   before me as it's been developed by the petitioner and as the

7   respondents have simply opted not to develop anything on the

8   flipside, is that the evidence, I find, is that the petitioner

9   is not a flight risk, and the evidence that has been presented

10  to me, at least, is that he is not a danger to the community.

11  Period.  Full stop.

12       So, given those findings of fact, that is highly,

13  highly unusual that in those settings the respondents and in

14  particular the Secretary of the Department of Homeland

15  Security would continue to seek the detention of a person in

16  that setting.

17       It is of course the case that in the beginning of a

18  proceeding there is ample room -- and the United States

19  Supreme Court has made this clear in a set of recent opinions.

20  There is ample room for a presumption of flight risk or a

21  presumption of danger to justify short-term detention.

22       And in the first days or weeks or even beyond, the

23  Supreme Court has made clear that that's consistent with the

24  law.  But at this point what we have is a thick record that

25  has not been objected to by the respondents, that has not been

 1   supplemented by the respondents, and where we are is that it's
 2   not the first day or week or month.  There's been ample time
 3   to make a contrary submission if that was wanted.
 4        So given the fact that, in my judgment, the standards
 5   for detention would clearly not be met in front of an
 6   immigration judge, it is highly, highly, highly unusual to be
 7   seeking the detention of the petitioner, given the factual
 8   record as of today.
 9        That unusualness is amplified by the findings of fact
10   that I made during the middle of last week, and those findings
11   of fact were based on three declarations by seasoned, expert
12   practitioners.
13        Those declarations were simply not objected to
14   factually, they were not controverted in any way factually by
15   the respondents, and those added up to the idea that it's
16   overwhelming unlikely, I found, that a lawful permanent
17   resident would be detained on the remaining available charge
18   here -- not "available," the remaining charge here, which is
19   to say a charge of failing to fill out accurately and honestly
20   certain particular pieces of the LPR application, certain
21   particular pieces of the LPR application as to things like
22   groups, et cetera.
23        So where we are is that, given the evidence it is, as I
24   said, highly unusual that there would be detention, which is
25   to say the evidence that I have found as to flight risk and

1   danger.  And layered on top of that is the highly unusual

2   aspect of seeking detention and of keeping someone detained,

3   given the background charges here and in particular the pieces

4   of the LPL application that this lawful permanent resident did

5   not allegedly fill out properly.

6        That's another factor that leans in the direction of a

7   finding of extraordinary circumstances: evidence of no flight

8   risk, evidence of no danger, and evidence that I have already

9   found is that it's overwhelming unlikely that a person would

10  be detained on the charge that is not currently enjoined.

11       There are a couple of other things here.  One of them

12  is that there is an extraordinary circumstance that flows in

13  part from a chilling effect.  I have found previously that

14  this petitioner, as I alluded to with Mr. Sampat a few moments

15  ago, that this petitioner engaged in what counts as political

16  speech under the Supreme Court's jurisprudence and would seek

17  to return to it in a form that is inconsistent with detention,

18  which is to say the petitioner has engaged in protests, and

19  that is something that is not doable from inside of custody.

20       So it's a kind of chilling that is not obviated, for

21  example, by giving an interview from a detention facility or

22  sending a communication from a detention facility.

23       So another part of the extraordinary circumstances

24  calculus here is a finding of fact that I make and that I

25  previously made that the petitioner is being prevented from

engaging in his speech and that that chilling effect is
another part of the extraordinary circumstance that is here.

I also agree that another piece of the extraordinary
circumstance is that part of the theory here for release would
require assessment by the immigration judge of issues that the
immigration judge is almost surely not legally permitted to
consider, which is whether or not detention continues to be
appropriate or if release is more appropriate when those kinds
of questions are bottomed on alleged constitutional
violations.

It's an extraordinary circumstance if the argument that
might be made is one -- if the argument for release that might
be made is one that the immigration judge literally cannot
address.  That is both an additional argument for
non-exhausting remedies but it's also part of what makes this
circumstance unusual.

The final thing I want to note is that while it seems
to me that *Lucas* does not require any showing of some kind of
substantialness to the underlying legal claim, I see of course
that the law is not thickly developed in this area and that it
might be that *Mapp v. Reno* at least in part is relevant; and
*Mapp v. Reno* suggests there needs to be some kind of showing
as to the underlying merits of the claim.

There needs to be some kind of showing that there's
something to them, that they're not trivial, that they're

1    serious, et cetera.

2         I don't take *Mapp v. Reno* as suggesting they need to be

3    likely to succeed on the merits, not at all.  If I took *Mapp*

4    *v. Reno* as governing, point one, and if I took *Mapp v. Reno* as

5    requiring likelihood on the merits, point two, well, then,

6    there could be no release here for the petitioner because, as

7    I've already held, there has been no showing by the petitioner

8    of likelihood of success on the merits as to the lawful

9    permitting application charge, but that's not -- *Mapp v. Reno*

10   is not obviously governing and that's not what *Mapp v. Reno*

11   says.  It requires some kind of substantialness but not all

12   the way to likelihood of success on the merits.

13        What I would say as to the claims here, Ms. Das today

14   invokes a First Amendment claim and a due process punishment

15   claim.  The due process punishment claim is based, as we know,

16   on the idea -- and it's in the petition, of course.  It's at

17   pages 25 or 26 of the petition.

18        But the due process punishment idea is that, as the

19   Supreme Court held in the 19th century in the *Wong* case, as

20   it's held more recently in the *Zadvydas* case, the criminal law

21   is for punishment, the criminal law with all of its

22   protections.

23        The civil law, including immigration law -- and that's

24   what those Supreme Court cases hold -- are not a place for

25   punishment.  They're a place for effectuating other government

1    interests.

2         One of the arguments the petitioner has made here is

3    that he is being punished, that there is a disapproval of

4    certain things he has said and done in the past, and that the

5    immigration process is being used not to vindicate the

6    immigration laws but to punish the petitioner for those

7    things.

8         The petition has -- the verified petition has facts

9    along those lines at paragraphs 33 and 73 and 82 and 83 and

10   84.  And when you combine those facts with the current fact,

11   which is that the petitioner -- the respondent, one of them,

12   the Department of Homeland Security Secretary, is detaining

13   and seeking to keep detained the petitioner in the absence --

14   not "in the absence," in the face of thick evidence that has

15   not been controverted as to flight, as to dangerousness, and

16   is keeping and seeking to keep the petitioner detained in

17   light of strong evidence that I have found, that this is

18   overwhelming unlikely to be the ordinary course.

19        All of that, the evidence that strongly suggests that

20   there is no basis for detention here, combined with the

21   paragraphs I've mentioned in the petition at 33 and 73 and 82

22   and 83 and 84, when you put all those together, they suggest

23   that there is at least something to the underlying claim that

24   there is an effort to use the immigration charge here to

25   punish the petitioner, and of course that would be

1    unconstitutional.

2         There is at least enough to that claim that even if

3    *Mapp v. Reno* were to apply here and even if there is some need

4    to show a meaningful move in the direction of meritoriousness

5    in the substantial claim, that part of the *Mapp v. Reno* test

6    would be satisfied.

7         I do not hold that there is a likelihood of success on

8    the merits based on what I have just said.  It's a question

9    that I don't need to reach in light of what I've said about

10   the standard; and it's indeed a question that, as I have made

11   clear in a prior decision, at least in the absence of all the

12   extra things we now have would not have been made out by the

13   petitioner.

14        So my finding is that there are extraordinary

15   circumstances here.  They relate to my findings on risk of

16   flight, my finding on dangerousness to the community, my

17   finding on the overwhelming unlikeliness the detention would

18   be sought in a case of this sort in a context like this one,

19   my finding as to chilling effect, my finding as to the

20   inability of an immigration judge to take on these issues,

21   and, finally, my finding that while it does not rise to the

22   likelihood of success level, the claim that there is a due

23   process violative effort to punish the petitioner is

24   substantial enough that even if *Mapp v. Reno* is in play here,

25   there would be enough as to that claim to justify release.

1        So given all of those factual findings, I'm gonna

2   exercise the discretion that I have to order the release of

3   the petitioner in this case.

4        I don't plan to write an opinion on this.  I will

5   simply issue a very brief release order, and I'll do it

6   shortly, and refer the Court of Appeals, should there be an

7   effort to take an appeal, back to today's transcript.

8        I haven't been reading from an opinion, as I'm sure

9   you've all perceived, so things will be -- I'm sure the

10  transcript will reflect that.  But I'm hopeful that should

11  there be an effort to seek review from the Third Circuit, this

12  will give the Third Circuit a strong sense of my own factual

13  findings and the basis for my exercise of discretion here as

14  well as my decisions as to jurisdiction and exhaustion and the

15  relevant standard.

16       So that's my decision, that the petitioner's motion for

17  release will be granted and that obviates the need for

18  consideration of the petitioner's motion to transfer.

19       Mr. Sampat, let me go to you for half a moment.  Are

20  there any conditions that the respondents would seek be

21  imposed after the entry of the release order?

22       MR. SAMPAT:  Your Honor, I think we would need time to

23  consult with our clients on that to see what conditions would

24  be appropriate, but what we would also ask is, understanding

25  Your Honor's order granting the motion, we would ask that the

1  Court stay the effect of that order for seven days so that the

2  respondents could seek emergency appeal and stay if so

3  necessary.

4         THE COURT:  Let's stick with the first one, though,

5  Mr. Sampat.

6         MR. SAMPAT:  Sure.

7         THE COURT:  I would -- the question of the conditions

8  that are imposed upon a release, they're not usually very

9  complicated.  I deal with criminal cases every single day.

10        They're usually about things like limits on where

11 someone might travel to and they're usually about things like

12 surrendering of a passport and they're usually about things

13 like no applications for further travel documents, and that's

14 usually the end of it.

15        I will also say that in my experience those things are

16 usually pretty quickly consented to between the parties.

17 You'll take whatever position you want, of course.  I respect

18 that entirely.  But what I would just suggest is this probably

19 doesn't take a whole lot of consultation with your client.

20        How long do you think you need to figure those things

21 out?

22        MR. SAMPAT:  Your Honor, I think it's a little

23 difficult to say how much time we need.  I'd say probably at

24 least the rest of the day.  Understanding Your Honor's point

25 on the criminal context in criminal proceedings, the

 1  conditions are pretty quick.

 2       I will just note that immigration detention -- when

 3  individuals are released, there's report requirements and

 4  things like that that we would have to consult with our

 5  clients about what would be appropriate, especially in light

 6  of the fact --

 7       THE COURT:  But my point, Mr. Sampat, is not that it's

 8  easy or hard, and I hope I wasn't misunderstood that way, and

 9  if I was, my apologies.

10       My point is, these are high-volume affairs and they're

11  pretty standard approaches in our country to release

12  conditions, and so I would urge you to consult very quickly

13  with respect to that because this is not the first time anyone

14  has thought through these issues of what to do with a person

15  who is released.

16       You know, for example, the reporting requirements you

17  alluded to, these are pretty standard operating procedure

18  things.  So let's just -- let's pause for a moment on that.

19       Ms. Das, I'm imagining that you will not have any

20  issues with -- and you'll correct me if I'm wrong.  Just as

21  with the respondents, the position is for you to formulate.

22       But I'm presuming you would not have issues with some

23  reasonable geographic limitations on where the petitioner

24  might go and the need for him to surrender his passport and to

25  not apply for any new travel documents.

1     Would there be any disagreement with those things?

2     MS. DAS:  Your Honor, we would agree to reasonable

3 conditions in terms of travel and the issues related to the

4 passport.  I think in addition to that, we would hope that the

5 order would specify that he should be released on his own

6 recognizance, that there would be no electronic monitoring,

7 and that there would be a 72-hour notice prior to

8 re-detention.

9     Those are some of the grounds that were issued in other

10 cases such as *Chung*, *Concerti*, *Mahdawi*.  They had different

11 formulations of that, but essentially to ensure that the

12 individual could travel and would be released on recognizance

13 without GPS monitoring were particularly important.

14     THE COURT:  Right.  So what I would say is that there

15 has been a thick record developed here with respect to the

16 relevant bail considerations.  There is simply nothing that

17 even begins to suggest that an electronic bracelet is

18 appropriate or necessary.

19     With respect to the 72 hours before re-detention, I

20 don't understand the basis for something like that.  There may

21 be any number of reasons why a person is detained, and I'm not

22 gonna presume that other bases that might be put forward are

23 somehow infirm.

24     The idea of enjoining the United States, slowing it

25 down from doing something it might do when I don't know what

 1   that thing it might do is strikes me as not grounded in the

 2   record and something that would cause real problems in terms

 3   of this Court's ability, for example, under *Lyons* and under

 4   the limits of its own injunctive power as to prospective

 5   things.

 6        So I'm not gonna go that way, Ms. Das.  I will not tell

 7   the United States that it can't proceed in certain ways.  If

 8   the United States proceeds in certain ways that are illegal,

 9   we will take it from there, Ms. Das.

10        MS. DAS:  Thank you, Your Honor.  That's understood.

11   Two quick issues.

12        THE COURT:  Sure.

13        MS. DAS:  With respect to the passport, in our recent

14   experience, he may need that passport to travel back to his

15   home in New York.  So if there could be a period of time by

16   which that has to be surrendered, that would be helpful.

17        THE COURT:  That's exactly why I'm a little bit

18   surprised that this seems complicated.  The normal thing one

19   would have expected would be something like limits on travel

20   from Louisiana back to New York and surrender of passport

21   immediately upon return to New York, something like that.

22        But these are the kinds of things that parties just

23   work out between themselves.  This is not the kind of thing

24   that a judge generally gets involved in.  Because while

25   Mr. Sampat -- and I respect his position -- doesn't agree with

1    where I've ruled, it's not usually very tricky to fix these

2    things between thoughtful lawyers such as yourself, Ms. Das,

3    and such as Mr. Sampat.  I'm confident you all can figure that

4    out.

5         MS. DAS:  Yes, Your Honor.  I think that's what we've

6    done in the normal course.  If Your Honor were willing, we

7    would ask that there be an order of his release immediately

8    and then that release can start getting processed right away,

9    and during that processing time we could work out with the

10   Government if there are -- what those reasonable terms

11   would be.

12        THE COURT:  Mr. Sampat, what is the argument for a

13   seven-day stay?  What is that about?

14        MR. SAMPAT:  Your Honor, that's to give us enough time

15   to process Your Honor's order and go through the necessary

16   channels that we need to to get authorization -- to seek

17   whether or not an appeal is warranted; and if so, then to go

18   through the necessary channels to get authorization to pursue

19   that appeal, Your Honor, and then potentially seek a stay of

20   Your Honor's order at the Third Circuit, as well.

21        THE COURT:  Ms. Das, your view?

22        MS. DAS:  Your Honor, we don't think a stay is

23   warranted for the reasons that Your Honor has already made

24   with respect to the findings.  There's no risk of flight or

25   dangerousness.

1    Ultimately, if the Government prevails on some sort of

2    appeal, it has the ability to re-detain the petitioner, so

3    there's no reason for this Court to stay its order based on

4    the substantial findings it's already made.

5    THE COURT:  Mr. Sampat, what is -- the standard kind of

6    argument for a district judge to stay its own order generally

7    runs through, among other things, the applicant for the stay,

8    this would be you here, being irreparably injured by the

9    non-entry of a stay.

10   What would be the irreparable injury here?

11   MR. SAMPAT:  It is the release, Your Honor.  Obviously

12   we're also seeking -- we're contemplating the appeal of

13   Your Honor's PI order, as well.

14   THE COURT:  Sure.

15   MR. SAMPAT:  So it's whether or not -- that irreparable

16   injury would be the potential that Mr. Khalil would be

17   released and we wouldn't be able to re-detain him.

18   THE COURT:  But the problem with that argument is that,

19   as Ms. Das has pointed out, the factual record here doesn't

20   suggest any risk of flight.  To the extent the United States

21   had that kind of concern, well, the time for putting in

22   evidence on that was not -- it's not today or tomorrow.  It's

23   over the course of these last days and weeks.

24   So if the irreparable injury is the concern that the

25   Third Circuit will undo what I have done and you will not be

1    able to find and re-detain the petitioner, there's just no

2    evidence of that.  And there was ample opportunity for the

3    respondents to build an evidentiary record that might have

4    suggested that.

5         Any other irreparable injury here?

6         MR. SAMPAT:  Nothing that I can find, Your Honor, but

7    I'm consulting my notes, just making sure that I haven't

8    missed anything.

9         THE COURT:  Take your time.  I don't mean to rush you.

10            (Brief pause.)

11        MR. SAMPAT:  Your Honor, just a couple points on

12   irreparable injury.  There's also irreparable injury when

13   courts do enjoin the effectuating of statutes enacted by

14   Congress.  That's *Maryland v. King* at 567 --

15        THE COURT:  But the problem with that, Mr. Sampat, as

16   you know, is that the Second Circuit in *Ozturk* made pretty

17   quick work of that.  I'm not enjoining any statute, far from

18   it.  I'm not saying a statute is unconstitutional, I'm not

19   enjoining a statute, not in the slightest.  I'm simply

20   ordering that a person be granted bail.

21        If it were the case that every time a federal litigant

22   loses a granular decision like a bail decision they could say

23   there's irreparable injury, there would be nothing left to the

24   irreparable injury standard.  It would simply mean that there

25   is a stay of a judicial decision every time a federal litigant

1    loses.  That's not the law.

2        MR. SAMPAT:  Nothing else to add, Your Honor.  Thank

3    you.

4        THE COURT:  All right.  So I'm going to issue a release

5    order.

6        Mr. Sampat, I don't want to put you in a difficult spot

7    in terms of consultation, but what I'm gonna do is there's a

8    United States magistrate judge on this case who you all have

9    dealt with a little bit, Judge Hammer, who has been working on

10   the case and who is, like all United States magistrate judges,

11   enormously experienced with respect to issues of where a

12   passport will go, what travel restrictions make sense.

13       I'm really hopeful the parties can simply agree to

14   reasonable restrictions here, but if need be, there will be an

15   order releasing the petitioner by a time certain today subject

16   to conditions that Judge Hammer can impose if the parties are

17   not themselves able to agree to, you know, reasonable

18   conditions together.

19       I think that will allow everybody to have a little bit

20   of time for consultation, but, candidly, these are just not

21   issues that are so terribly complex that they require a great

22   deal more than that.

23       Mr. Sampat, anything that you want to add before we

24   wrap up?

25       MR. SAMPAT:  Not from the Government, Your Honor.

1   Thank you for your time this afternoon.

2         THE COURT:  Mr. Sampat, thank you, as always.

3         Ms. Das, from your perspective, anything that you want

4   to add before we wrap up?

5         MS. DAS:  No, Your Honor.  But just to clarify, I

6   understand that some of the conditions we may need to hash out

7   as part of the release order, but our understanding is that

8   Your Honor would be issuing an order that he be released by a

9   time certain today.  And we're hoping that that order would

10  specify that he would not be subject to electronic monitoring

11  and would be allowed to travel to New York with his passport,

12  and then any other conditions that we need to negotiate we

13  could speak to the magistrate judge about.  I just wanted to

14  clarify that point.

15        THE COURT:  Two things:  First, I'm going to write the

16  order.  It will take a few moments to write.  I haven't

17  pre-written it or anything like that.

18        It will direct that the petitioner be released today,

19  subject to the conditions that are set today by the

20  United States magistrate judge.

21        It just seems, to me, pretty straightforward that you

22  all, Ms. Das, and you, Mr. Sampat, should rapidly consult as

23  to these issues so that the United States magistrate judge has

24  the benefit of your thoughts on these subjects and hopefully

25  your agreement.

1      I don't want to micromanage the process.  There are

2  things I don't know.  For instance, I don't know if the

3  petitioner's passport is in his pocket or is somewhere in

4  New York.  There are just things I don't know.

5      Those are not the kind of things that judges should

6  take the first cut at.  Those are things that you all should

7  work together on, but the release order will be drafted

8  shortly by me and it will hit the docket and you'll see it,

9  Ms. Das, and Mr. Sampat, as well.

10      MR. SAMPAT:  Thank you, Your Honor.

11      THE COURT:  As to the stay application, it's simply

12  denied.  The stay factors are ones I understand.  There's no

13  need, I don't think, to cite them here.  One of the two key

14  stay factors -- I'm thinking, for example, of the *Hilton* case,

15  which is the Supreme Court's case from 1987 that relates to

16  this, and *United States v. Smith*, which is the Third Circuit's

17  1987 decision.  The stay applicants here are the respondents

18  and their arguments as to irreparable injury, given the

19  factual record that's been built here, that they haven't

20  contested, there's just not an argument to move for a stay.

21      I appreciate that that means that the respondents will

22  have to work quickly to seek an appeal, should they wish to,

23  but that is a little bit the wages of having not contested

24  over the course of this period the record and having the

25  record lean in one direction with respect to the relative ease

```
  1    of the re-detaining issue should the Third Circuit indicate

  2    that its decision will order him detained.

  3         I also don't think that there's been the requisite

  4    showing by the respondents as to the likelihood of success as

  5    to jurisdiction, as to exhaustion, as to the standard, as to

  6    my factual findings, and as to exercise of discretion as to

  7    detention.

  8         So the application for a stay is denied, as we just

  9    discussed, and an order will follow shortly with respect

 10    to the granting of a motion for release.

 11         Having said that all, Ms. Das, any final things you

 12    wanted to convey, Ms. Das?

 13         MR. SAMPAT:  No.  Thank you so much, Judge.

 14         THE COURT:  Mr. Sampat, any final things that you

 15    wanted?

 16         MR. SAMPAT:  Nothing from the Government, Your Honor.

 17    Thank you.

 18         THE COURT:  Thank you all very much.  And I will

 19    prepare the order in a short while.  Thank you all very much.

 20    Appreciate it.

 21              (Which were all the proceedings held in the

 22               above-entitled matter on said date.)

 23

 24

 25
```

1        **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3        I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4   Reporter of the United States District Court for the District

5   of New Jersey, do hereby certify that the foregoing

6   proceedings are a true and accurate transcript from the

7   record of proceedings in the above-entitled matter.

8

9

10          */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11          Official U.S. District Court Reporter ~

12          District of New Jersey

13

14          DATED this June 21, 2025

15

16

17              *   *   *   *   *

18

19

20

21

22

23

24

25