**Nos. 25-2162 & 25-2357**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

MAHMOUD KHALIL,

Petitioner-Appellee,

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

Respondents-Appellants.

———————————

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

———————————

### APPENDIX: VOLUME II (390-678)

———————————

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

BENJAMIN HAYES
Special Counsel to the Assistant
Attorney General

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

JOHN F. STANTON
RACHEL L. BROWNING
Trial Attorneys

# TABLE OF CONTENTS

<u>Appendix – Volume II</u>

Petition for Writ of Habeas Corpus, March 9, 2025

    ECF No. 2 ...................................................................................................390

Declaration of Amy E. Greer, March 10, 2025

    ECF No. 11-1 ..............................................................................................401

Respondent's Memorandum of Law in Support of Their Motion to Dismiss or

Transfer the Case, June 12, 2025

    ECF No. 31 ..................................................................................................405

Declaration of William P. Joyce, March 12, 2025

    ECF No. 32 ..................................................................................................420

Amended Petition for Writ of Habeas Corpus and Complaint, March 13, 2025

    ECF No. 38 ..................................................................................................423

Declaration of Veronica Salama, March 14, 2025

    ECF No. 50-1 ..............................................................................................456

Declaration of Noor Ramez Abdallah (dated March 14, 2025), March 15, 2025

    ECF No. 55 ..................................................................................................458

Declaration of Samah Sisay in Support of Motion for Release Under *Mapp v. Reno*,

March 15, 2025

    ECF No. 56 ..................................................................................................466

Exhibit B: MPA Confirmation for Mahmoud Khalil (dated March 13, 2025), March 15, 2025

    ECF No. 56-1 ................................................................................................469

Exhibit C: Identity Documents for Mahmoud Khalil, March 15, 2025

    ECF No. 56-2 ................................................................................................471

Exhibit D: Notice to Appear for Mahmoud Khalil (dated March 9, 2025), March 15, 2025

    ECF No. 56-3 ................................................................................................473

Exhibit E: Certificate of Marriage for Mahmoud Khalil & Noor Abdalla (dated November 16, 2023), March 15, 2025

    ECF No. 56-4 ................................................................................................477

Exhibit F: Medical Letters for Noor Abdalla (dated March 13-14, 2025), March 15, 2025

    ECF No. 56-5 ................................................................................................479

Exhibit G: Letters of Support for Mahmoud Khalil (dated March 13-14, 2025), March 15, 2025)

    ECF No. 56-6 ................................................................................................483

Declaration of Veronica Salama with Exhibits A–D, March 17, 2025

    ECF No. 68, 68-1, 68-2, 68-3, 68-4 .....................................................500

Second Supplemental Declaration of William P. Joyce, March 17, 2025

    ECF No. 72 ...................................................................................................526

Southern District of New York Opinion and Order, March 19, 2025

    ECF No. 78 ................................................................................535

Order, March 19, 2025

    ECF No. 81 ................................................................................568

Respondent's Brief in Support of Their Renewed Motion to Dismiss or Transfer the Case, March 20, 2025

    ECF No. 90 ................................................................................569

Exhibit A: Notice to Appear and Additional Charges of Removability (dated March 9, 2025), March 20, 2025

    ECF No. 90-1..............................................................................588

Exhibit I: Supplemental Letters of Support, March 20, 2025

    ECF No. 93-1..............................................................................594

Petitioner's Memorandum of Law in Opposition to Respondents' Renewed Motion to Dismiss or Transfer & In Support of His Cross-Motion for Re-Transfer, March 24, 2025

    ECF No. 107 ..............................................................................610

Second Amended Petition for Writ of Habeas Corpus and Complaint, April 3, 2025

    ECF No. 162 ..............................................................................650

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

M.K.,

        *Petitioner*,

v.

William P. JOYCE, in his official capacity as
Acting Field Office Director of New York,
Immigration and Customs Enforcement; Caleb
VITELLO, Acting Director, U.S. Immigration and
Customs Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; and Pamela
BONDI, Attorney General, U.S. Department of
Justice,
.

        *Respondents*.

Case No.

**PETITION FOR
WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner, M.K., is a lawful permanent resident and student at Columbia University.

M.K. is married to a U.S. citizen, who is pregnant with their first child and due to give birth next

month. On March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested

M.K. with no prior notice.

When agents[1] arrested M.K. at his Columbia University student housing, the agents

stated that they were detaining him because his student visa had been revoked by the U.S.

Department of State. When M.K. showed the officers his immigration documents demonstrating

that he is a lawful permanent resident—not a student visa holder—they arrested him anyway,

---

[1] On information and belief, agents from Immigration and Customs Enforcement ("ICE"), a subset of DHS, arrest and detain noncitizens in the community.

1

saying that his green card had also been revoked, but providing no basis for the revocation.

ICE's arrest and detention of M.K. follow the U.S. government's open repression of student activism and political speech, specifically targeting students at Columbia University for criticism of Israel's assault on Gaza. The U.S. government has made clear that they will use immigration enforcement as a tool to suppress that speech.

M.K. has been an outspoken activist regarding these issues. Given that there is no other basis for M.K.'s arrest and detention, it is clear that Respondents are engaging in blatant efforts to target and chill M.K.'s speech and to discriminate against particular viewpoints in contravention to the First Amendment and M.K.'s Due Process Rights. By detaining M.K. without providing a reason and perhaps based on the misunderstanding that he is a student visa holder rather than a lawful permanent resident, ICE's actions violate M.K.'s rights under the First and Fifth Amendments of the U.S. Constitution, the INA, the Administrative Procedures Act, and its own federal regulations. Accordingly, this Court should declare ICE's actions unlawful, enjoin his transfer outside of this District and order his immediate release.

## **PARTIES**

1.      Petitioner M.K. is a student at Columbia University who is married to a U.S. citizen who is 8 months pregnant. On March 8, 2025, Officers from the Department of Homeland Security arrested M.K. in front of his Columbia University housing.

2.      Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office Director, 26 Federal

Plaza, New York, New York 10278.

3.      Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official

Performing the Duties of the Director of ICE, he is responsible for the administration and

enforcement of the immigration laws of the United States; routinely transacts business in the

Southern District of New York; is legally responsible for pursuing any effort to remove the

Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the

Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

4.      Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland

Security in the United States Department of Homeland Security. In this capacity, she is

responsible for the administration of the immigration laws pursuant to Section 103(a) of the

INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New

York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as

such is a custodian of the Petitioner. Respondent Mayorkas's address is U.S. Department of

Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE,

Washington, DC 20528-0485.

5.      Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she

routinely transacts business in the Southern District of New York; is responsible for the

administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g)

(2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S.

Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

6.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §

2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the

Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory

Judgment).

7.      An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

8.      Venue is proper in the Southern District of New York Under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. At the time this proceeding was initiated, M.K. was detained at 26 Federal Plaza in New York, New York. The petitioner has been and is presently detained at the direction of Mr. Joyce, and a substantial part of the events giving rise to the claims and relevant facts occurred within this district.

## FACTS

*Background*

9.      M.K. is Palestinian, but he grew up in Syria because his grandparents were forcibly removed from their ancestral home in Tiberius, Palestine. Since the war in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

10.      M.K. entered the United States on a student visa in or around December 2022 in order to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). M.K. completed his program in December 2024, and has an anticipated graduation date of May 2025.

11.      M.K. married his U.S. citizen wife on November 16, 2023.  He became a lawful permanent resident in 2024. M.Z. and his wife are expecting their first child together next month, April 2025.

### *M.K.'s Student Activism and Speech on Matters of Public Concern*

12.      As a Palestinian, M.K. has felt compelled to be an outspoken advocate for Palestinian human rights and more recently, to speak out against Israel's genocide in Gaza and the role of Columbia University in financing and in other ways facilitating the genocide.  M.K. is

committed to being a voice for his People, and calling on the rest of the world to stop providing weapons and support to enable the genocide in contravention with international law.

13. Additionally, M.K. has been a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, M.K. has advocated on behalf of his peers to be treated humanely and fairly by the University.  This role has placed M.K. in the public eye, particularly through numerous interviews with national media outlets.

14. Speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters are all topics of public concern clearly protected by the First Amendment.

### M.K.'s Arrest by the Department of Homeland Security

15. On the evening of March 8, 2025, at approximately 8:30 p.m., M.K. and his wife were returning to their Columbia University-owned apartment from a friend's home. When they arrived at their apartment building, M.K. and his wife were approached by approximately four people who were dressed in plain clothes.  All of them entered the lobby of the apartment building.

16. When the people approached M.K. and his wife, they asked, "Are you M.K.?"  When M.K. answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and that they have to take M.K. into custody.  The agents told M.K.'s wife to go up to her apartment, and that if she would not leave M.K., they threatened to arrest her, too.

17. M.K.'s wife retrieved M.K.'s immigration documents to show the agent that M.K. is a lawful permanent resident.   She handed the documents to the agent, who was talking to someone on the phone. The agent looked confused when he saw the documents and said, "He has a green card." M.K.'s wife heard the agent repeat that they were being ordered to bring M.K. in anyways.

18. While M.K.'s wife went to their apartment, M.K. was able to place a call to his attorney, Amy

Greer.  Attorney Greer advised M.K. to ask if the ICE agent had a warrant, and they advised that

they did.  Attorney Greer then heard a voice tell M.K. to hand him the phone. Attorney Greer

identified herself as M.K.'s attorney and asked who she was speaking with.  The agent identified

himself as Special Agent Elvin Hernandez of Homeland Security.  Attorney Greer asked if Agent

Hernandez had a warrant, and he answered in the affirmative, stating that M.K.'s student visa had

been revoked by the U.S. Department of State and therefore they were detaining him.  Attorney

Greer advised Agent Hernandez that M.K. is a lawful permanent resident and has the right to due

process.  Agent Hernandez responded that the Department of State had revoked M.K.'s green

card, too, and that he would be brought in front of an immigration judge.  The agent stated that he

would be taking M.K. to 26 Federal Plaza.

19. The agents then handcuffed M.K. and brought him outside where there were multiple vehicles

waiting.  M.K.'s wife asked for the names of the agents, their contact information, and how to

reach them to follow up on her husband's detention, but they only advised her that M.K. would be

taken to 26 Federal Plaza, and otherwise refused to speak with her.  They left her no business card

or any information at all as to how to find out where her husband will be taken, on what grounds,

or who she can contact.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## RETALIATION, DISCRIMINATION, AND PRIOR RESTRAINT IN VIOLATION OF THE FIRST AND FIFTH AMENDMENTS AND FEDERAL REGULATIONS

20. Petitioner incorporates the preceding paragraphs as if fully set forth herein.

21. The First Amendment to the United States Constitution provides in part that "Congress

shall make no law . . . abridging the freedom of speech  . . . or the right of the people . . . to

petition the Government for a redress of grievances." U.S. Const. Amend. I.

22.     The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, No. 06 Civ. 1007(SHS), 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). The First Amendment applies to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted*), cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

23.     Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 137 S. Ct. 1744 (2017).

24.     "To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the 's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted*), cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

25.     In addition, "the Constitution prevents governmental actors from forbidding, or

penalizing, speech that is protected under the first amendment........Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley*, 578 F.3d at 525. To establish a claim of an unconstitutional "prior restraint" on future testimony, a plaintiff must show (1) that defendants presented "threats of punishment that are designed to discourage" the future testimony, (2) "that [plaintiff's] potential testimony . . . caused the threats," and (3) that the defendants actions caused some injury. *Id.*

26.     M.K.'s past speech pertains to matters of prominent public concern—Israel's war on Gaza and criticism of U.S. institutions that support Israel. These issues have garnered national attention, particularly since the Trump administration has vowed to crack down on student activists.

27.     Respondents have taken adverse actions against M.K. that are motivated by his past and future exercise of First Amendment-protected speech, and have taken action to discourage him from speaking out in the future. By detaining M.K. and holding him in isolation, possibly for removal proceedings, Respondents threaten M.K. with the ultimate punishment for speaking out and discourage M.K. from speaking out in the future.  If ICE eventually deports M.K., Respondents will effectively prevent him speaking at all.

28.     There is a substantial causal connection between M.K.'s protected speech and Respondents' adverse actions and threats. M.K. has been outspoken in his campus activism. There is no other basis that ICE could possibly arrest and detain him other than as retaliation against his protected speech.

29.     M.K. suffers severe and ongoing harm as a result of Respondents' actions, including the unjustified isolation and silencing of his protected speech. He is not able to speak publicly about Israel's continued assault on Gaza, divestment from Israel, Columbia's treatment of student activists, or even how his current unlawful arrest and detention by ICE, which is a current First

Amendment injury. Moreover, even the threat of detention and deportation has a chilling effect on speech. Left undisturbed, Respondents' action in this case would have a devastating effect on vital political speech, allowing a government agency to abuse noncitizens and then detain and maybe even deport the victims of its illegal actions.

30.     Respondents' actions against M.K. on the basis of his protected speech does not serve a compelling state interest, and is not narrowly tailored to any legitimate government interest. Respondents' actions operate as a prior restraint that will prevent him from speaking out about government repression of political speech and student activism. Furthermore, he has been deprived of his liberty with no notice and opportunity to be heard on his First Amendment claim prior to his arrest and detention.

31.     As a result, this Court should declare that Respondents' retaliatory and discriminatory actions, including the arrest and detention of M.K., violate the First Amendment and the Due Process Clause of the Fifth Amendment; order the release of M.K. under reasonable conditions of supervision; and enter an injunction restraining Respondents from transferring M.K. outside of this Court's jurisdiction,  unless Respondents demonstrate that such action is untainted by unlawful First Amendment retaliation and discrimination.

## **FIRST CLAIM FOR RELIEF**

### **RELEASE PENDING ADJUDICATION**
### **PURSUANT TO *MAPP v. RENO***

32.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

33.     This Court has the "inherent authority" to grant bail to habeas petitioners like M.K. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised

substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective").

34.     Numerous courts within the Second Circuit have ordered the release of petitioners like M.K. in light of their extraordinary circumstances. *See, e.g.*, *S.N.C. v. Sessions*, No. 18 Civ. 7680 (LGS), 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application); *Kiaddii v. Sessions*, No. 18 Civ. 1584, at *3 (S.D.N.Y. Mar. 2, 2018) (ECF No. 9) (ordering immediate release when the petitioner presented evidence she may be a U.S. citizen.

35.     Here, ICE officers informed M.K. that they were arresting him because his student visa was revoked. Based on this statement, it very well could be that ICE made an error and arrested, detained, and are currently holding M.K. in ICE detention based on a mistake. Release is necessary to make the remedies this civil action and petition seeks effective, in particular because as long as M.K. remains in ICE custody, his ability to speak freely and openly will be chilled. In custody, his speech is severely curtailed and controlled by ICE. He should not remain in ICE custody while pursuing his claims against the agency.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Declare that Respondents' actions to detain M.K. violate the First Amendment and the Due Process Clause of the Fifth Amendment;

3)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

4)      Order the release of Petitioner under reasonable conditions of supervision;

5)      Award Petitioners their costs and reasonable attorneys' fees in this action as provided for

by the Equal Access to Justice Act, 28 U.S.C. § 2412, FTCA, or other statute; and

6)      Grant such further relief as the Court deems just and proper.


Dated: March 9, 2025                                    /s/ Amy E. Greer
New York, NY                                            Amy E. Greer, Esq.
                                                        NY Bar ID: 5910179
                                                        Dratel & Lewis
                                                        29 Broadway, Suite 1412
                                                        New York, NY 10006
                                                        Phone:(212)732-8805
                                                        Fax: (212) 571-3792
                                                        Email: agreer@dratellewis.com

                                                        *Counsel for Petitioner*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud Khalil,

*Petitioner*,

v.

William P. JOYCE, in his official capacity as
Acting Field Office Director, New York City
Field Office, U.S. Immigration & Customs
Enforcement, *et al*.,

*Respondents.*

Civil Action No. 25-cv-1935

## DECLARATION OF AMY E. GREER

I, Amy E. Greer, under penalty of perjury, declare as follows:

1.      I am an attorney with Dratel & Lewis, a law firm that specializes in criminal defense in New York. I have been representing Mahmoud Khalil in his disciplinary cases at Columbia University since November 2024.

2.      Mahmoud has been experiencing a profound doxing[1] campaign for over two months related to his First Amendment protected activities in support of Palestinian human rights. The harassment was so pervasive that Mahmoud emailed the Columbia University administration repeatedly asking for support.

3.      At 6:46 AM on Friday, March 7, 2025, Mahmoud wrote to Interim President Katrina Armstrong at Columbia University describing the vicious and dehumanizing doxing campaign against him – including people falsely labeling him a terrorist threat and calling for his

---

[1] Doxing includes instances of individuals' addresses, pictures, and other personal information being shared online for the purpose of harassment by those who disagree with their opinions.

1

deportation. He closed the email by saying he was not able to sleep fearing U.S. Immigration and Customs Enforcement ("ICE"), or other dangerous individuals would target him and his family and urging Interim President Armstrong to provide legal support and other protections.

4.      At 8:26 PM on Saturday, March 8, 2025, Mahmoud called me and said he was surrounded by people claiming to be from the U.S. Department of Homeland Security ("DHS") at his Columbia-owned apartment and that they were going to arrest him. An agent told Mahmoud to give him the phone and identified himself to me as special agent Elvin Hernandez. Agent Hernandez told me he was an agent with DHS, but I do not recall whether he specified what branch. I asked why DHS was detaining Mahmoud and whether they had a warrant. Agent Hernandez said they had an administrative warrant. I asked the basis of the warrant, and he said the U.S. Department of State revoked Mahmoud's student visa.

5.      When I told Agent Hernandez that Mahmoud does not have a student visa because he is a green card holder and permanent resident in the U.S., he said DHS revoked the green card, too. I explained to Agent Hernandez that Mahmoud is entitled to due process as a green card holder before his green card can be revoked and he responded that Mahmoud would have the chance to go before an immigration judge. When I began to ask more questions about what grounds they would have to put Mahmoud in immigration proceedings, Agent Hernandez started to grumble at me. I asked him to show me, Mahmoud, or his wife the warrant and he hung up on me.

6.      A couple of minutes passed and around 8:34 PM Mahmoud's wife called using Mahmoud's phone. I was talking to a partner at my firm so we both joined the call. We could hear everything happening. Mahmoud's wife was also narrating everything. DHS agents handcuffed Mahmoud. His wife asked do you have a warrant, but the DHS agents did not respond. Mahmoud's wife asked the agents where they were taking him and again, they did not answer

2

**JA 402**

her. She continued to follow them and narrate what was happening and explained to me that there were more agents and cars outside, but nobody would tell her what was happening.

7.    DHS agents put Mahmoud in an unmarked vehicle. Finally, one agent told his wife that they were taking him to 26 Federal Plaza. The agent did not take my information as Mahmoud's lawyer or leave any information about who we should contact about his case.

8.    I called an immigration attorney to figure out next steps and the partner at my firm helped me draft a letter that I emailed to a generic ICE email stating that Mahmoud is represented by council and invoking his right to remain silent.

9.    I worked all night to draft a habeas petition for Mahmoud. The petition was filed at 4:40 AM on March 9, 2025, in the Southern District of New York. At the time of filing the petition, we had every reason to believe that Mahmoud was detained in New York because of what the DHS agent told his wife and the ICE Online Detainee Locator System[2].

10.    I originally checked the ICE locator around 10 PM on Saturday, March 8th and Mahmoud was not in the system. I checked again at 1:35 AM on Sunday, March 9th and it said he was in custody in New York and to call the field office. I checked again at 4:29 AM on Sunday, March 9th and it said the same thing. I checked again at 8:30 AM on Sunday, March 9th and Mahmoud was still listed as being detained in New York.

11.    Sometime after 9 AM on Sunday, the ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey. Around 11:20 AM, Mahmoud's wife notified my colleague that she went to the Elizabeth Detention Center and was told that Mahmoud was not showing up in the system. The person she spoke to at the facility said even if he was brought in, they would not be able to see him in the system for 24 hours.

---

[2] https://locator.ice.gov/odls/#/search.

**JA 403**

12.     An immigration attorney contacted ICE on Sunday, March 9th after filing the habeas. At 1:47 PM, ICE stated in an email that Mahmoud was en route to being transferred to a different facility. They said he would arrive late Sunday evening and his case will fall under the New Orleans ERO Field Office.

13.     Around 3:10 PM the same attorney sent an email to the Assistant United States Attorneys ("AUSA") assigned to Mahmoud's habeas case. An AUSA wrote back quickly saying they would reach out to ICE contacts and asked for a copy of Mahmoud's green card which we sent. Around 4:22 PM we received an email from an AUSA saying ICE knows Mahmoud is a lawful permanent resident and that he was already en route to Louisiana. The same AUSA responded around 5:18 PM saying that based on information and belief Mahmoud is deportable. The AUSA then dropped off the email chain and told us he was conflicted out of the case.

14.     I received press outreach around 8 PM on Sunday saying that Mahmoud was in Louisiana. I confirmed this morning around 7:30 AM on the ICE online locator and Mahmoud was listed as being detained at the Central Louisiana ICE Processing Center ("CLIPC") in Jena, Louisiana.

15.     Mahmoud's wife called me at 9:36 AM and informed me that he had called her, and they were able to talk for the first time since Mahmoud was taken into custody. Mahmoud then called me at 10:17 AM and confirmed he is in Jena, Louisiana before our call got cut off.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 10th day of March, 2025 in Baltimore, MD.

AMY GREER

4

**JA 404**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAHMOUD KHALIL,

                                        Petitioner,

                    - against -

WILLIAM P. JOYCE, *et al.*,

                                        Respondents.

No. 25 Civ. 1935 (JMF)

---

**RESPONDENTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS OR TO TRANSFER THE CASE**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
Attorney for Respondents
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2695/2743

JEFFREY OESTERICHER
BRANDON M. WATERMAN
Assistant United States Attorneys
    – Of Counsel –

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ......................................................................................2

    A.    Khalil's immigration detention ...........................................2

    B.    Khalil's habeas petition....................................................3

ARGUMENT

    THE COURT SHOULD DISMISS THIS ACTION OR
    ALTERNATIVELY  TRANSFER THIS ACTION ...........................3

    A.    Venue is Improper in this Court........................................3

    B.    The Court Should Either Dismiss or Transfer this Action.......9

CONCLUSION.......................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**:

*Adikov v. Mechkowski*,
    No. 16 Civ. 3797 (JPO), 2016 WL 3926469 (S.D.N.Y. July 18, 2016) ................................. 7

*Ali v. Dep't of Justice*,
    No. 19 Civ. 8645 (LGS), 2020 WL 3057383 (S.D.N.Y. June 9, 2020) ............................. 10

*Alvarado v. Gillis*,
    No. 22 Civ. 10082 (JLR) (KHP), 2023 WL 5417157 (S.D.N.Y. Aug. 3, 2023) ................................. 10

*Andoh v. Barr*,
    No. 19 Civ. 8016 (PAE), 2019 WL 4511623 (S.D.N.Y. Sept. 18, 2019) ............................. 5

*Azize v. Bureau of Immigration and Naturalization Service*,
    No. 04 Civ. 9684 (SHS) (JCF), 2005 WL 3488333 (S.D.N.Y. Oct. 7, 2005) ................................. 9, 10

*Bacuku v. Shanahan*,
    No. 16 Civ. 0305 (LGS), 2016 WL 1162330 (S.D.N.Y. Mar. 1, 2016) ............................. 7

*Benitez v. An Unknown Immigration Officer*,
    No. 19 Civ. 3153 (GHW), 2019 WL 3450743 (S.D.N.Y. July 22, 2019) ............................. 7

*Cesar v. Shanahan*,
    No. 17 Civ. 7974 (ER), 2018 WL 1747989 (S.D.N.Y. Feb. 5, 2018) ................................. 7

*Chan Lo v. Sessions*,
    No. 17 Civ. 6746 (GHW), 2017 WL 8786850 (S.D.N.Y. Sept. 15, 2017) ............................. 7

*Concepcion v. Aviles*,
    No. 14 Civ. 8770 (AT), 2015 WL 7766228 (S.D.N.Y. Mar. 12, 2015) ................................. 7

*Drakoulis v. Ashcroft*,
    356 F. Supp. 2d 367 (S.D.N.Y. 2005) ................................. 8

*Excellent v. Gonzales*,
    No. 04 Civ. 9748 (VM), 2006 WL 238986 (S.D.N.Y. Jan. 31, 2006) ................................. 8

*Farez-Espinoza v. Chertoff*,
    600 F. Supp. 2d 488 (S.D.N.Y. 2009) ................................. 5, 6

*Fortune v. Lynch*,
    No. 15 Civ. 8134 (KPF), 2016 WL 1162332 (S.D.N.Y. Mar. 22, 2016) ............................. 7

*Freire v. Terry*,
    756 F. Supp. 2d 585 (S.D.N.Y. 2010) ................................. 8

*German v. Green*,
    No. 15 Civ. 4691 (WHP), 2015 WL 7184992 (S.D.N.Y. Oct. 30, 2015) ............................. 8

*Guo v. Napolitano*,
No. 09 Civ. 3023 (PGG), 2009 WL 2840400 (S.D.N.Y. Sept. 2, 2009) ...................................... 5, 6, 7

*Henderson v. I.N.S.*,
157 F.3d 106 (2d Cir. 1998) ................................................................................................... 6

*Kolev v. Sessions*,
No. 17 Civ. 9477 (RA), 2019 WL 1748436 (S.D.N.Y. Apr. 16, 2019) .................................. 7

*Medina-Valdez v. Holder*,
No. 12 Civ. 6002 (RA), 2012 WL 4714758 (S.D.N.Y. Oct. 1, 2012) ................................... 7

*Phrance v. Johnson*,
No. 14 Civ. 3569 (TPG), 2014 WL 6807590 (S.D.N.Y. Dec. 3, 2014) ................................. 7

*Rone v. Holder*,
No. 15 Civ. 2815 (ER), 2015 WL 13722402 (S.D.N.Y. June 5, 2015) ................................. 7

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004) ...................................................................................... 1, 4, 5, 6, 8, 9

*S.N.C. v. Sessions*,
325 F. Supp. 3d 401 (S.D.N.Y. 2018) ................................................................................. 7

*Shehnaz v. Ashcroft*,
No. 04 Civ. 2578 (DLC), 2004 WL 2378371 (S.D.N.Y. Oct. 25, 2004) ......................... 8, 9

*Sikivou v. Dep't of Homeland Security*,
No. 06 Civ. 5530 (PKC), 2007 WL 2141564 (S.D.N.Y. July 25, 2007) ............................. 7

*Singh v. Holder*,
No. 12 Civ. 4731 (JMF), 2012 WL 5878677 (S.D.N.Y. Nov. 21, 2012) ...................... 1, 5, 6

*Washington v. District Director, INS*,
No. 04 Civ. 3492 (RMB) (MHD), 2005 WL 2778747 (S.D.N.Y. Oct. 19, 2005) .............. 8

**Statutes**:

8 U.S.C. § 1226 .................................................................................................................... 2
8 U.S.C. § 1227 .................................................................................................................... 2
28 U.S.C. § 2241 ........................................................................................................... 1, 3, 4

## Preliminary Statement

The petitioner brings this habeas action under 28 U.S.C. § 2241 to challenge his detention by U.S. Immigration and Customs Enforcement ("ICE") during the pendency of his removal proceedings. But this Court is not the proper forum for this habeas action. Federal district courts possess limited authority to grant writs of habeas corpus within their respective jurisdictions. As the Supreme Court has explained, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). And for challenges to detention, "jurisdiction lies in only one district: the district of confinement." *Id.* at 443.

At the time that this action was filed, the petitioner was physically present and detained at the Elizabeth Detention Facility in Newark, New Jersey. He was not in the Southern District of New York. Thus, this Court did not acquire habeas jurisdiction over this matter, and venue is improper in this district. This Court has already decided the precise legal issue underlying the government's motion in at least five cases. *See Thomas v. Decker*, No. 19 Civ. 8690 (JMF), ECF No. 26 (S.D.N.Y. Oct. 16, 2019); *Tazu v. Barr*, No. 19 Civ. 1716 (JMF), ECF No. 16 (S.D.N.Y. Mar. 1, 2019); *Traore v. Decker*, No. 18 Civ. 7909 (JMF), ECF No. 9 (S.D.N.Y. Sept. 13, 2018); *Suraiya v. Cioppa*, No. 18 Civ. 6628 (JMF), ECF Nos. 17 (Order), 18 (Transcript) (S.D.N.Y. July 31, 2018); *Singh v. Holder*, No. 12 Civ. 4731 (JMF), 2012 WL 5878677, at *2 (S.D.N.Y. Nov. 21, 2012). There has been no intervening change in controlling law, and thus this Court should adhere to its prior decisions and conclude that this action cannot proceed in this Court.

Accordingly, this Court should dismiss this action without prejudice for lack of jurisdiction/venue, or alternatively transfer it. If the Court decides to transfer the case, to minimize any delay, the government respectfully requests that the Court waive the seven-day waiting period contained in Local Civil Rule 83.1.

# BACKGROUND

**A.      Khalil's immigration detention**

Mahmoud Khalil ("Khalil"), a native of Syria and citizen of Algeria, entered the United States on a student visa in December 2022.  *See* Declaration of Acting Field Office Director William Joyce ("Joyce Decl.") ¶ 5.  He adjusted to lawful permanent resident status in November 2024.  *Id.* ¶ 6.  On March 8, 2025, Special Agents from the U.S. Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility arrested Khalil at 8:35 p.m. in front of 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  *Id.* ¶ 7.  HSI transported him to 26 Federal Plaza at 8:44 p.m. for processing.  *Id.* While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), the charging document used to commence removal proceedings, which charged him as being removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  *Id.*  ICE also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).  *Id.*

Upon completion of processing, ICE transported Khalil from 26 Federal Plaza to Elizabeth Detention Facility in Newark, New Jersey,[1] where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on

---

[1] Elizabeth Detention Facility has comprehensive overnight accommodations for detainees, such as bends and 24-hour medical staff, whereas 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of a facility, and it does not have beds or overnight medical staff.  Joyce Decl. ¶ 10.

2

**JA 410**

March 9, 2025.  *Id.* ¶ 8.  Shortly before noon on March 9, Khalil departed Elizabeth Detention Facility and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.  *Id.* ¶ 10.  Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m. on March 10, 2025, and he remains detained at that facility.  *Id.* ¶ 11.

**B.    Khalil's habeas petition**

At 4:41 a.m. on March 9, 2025, Khalil's attorney filed the instant habeas petition under 28 U.S.C. § 2241, while Khalil was physically present and detained in New Jersey.  Joyce Decl. ¶¶ 8-9; *see also* ECF No. 11 at 6 ("Counsel filed the instant habeas corpus petition on Mr. Khalil's behalf on March 9, 2025, at 4:41 a.m.").  By her account, Khalil's attorney filed the instant habeas petition in this District, because (i) DHS agents had previously told Khalil's wife that he was being sent to 26 Federal Plaza (as he was), and (ii) the public "ICE Online Detainee Locator System" had not yet been updated at that hour to show he had been transferred to New Jersey.  Greer Decl. (ECF 11-1) ¶¶ 7, 9.  Khalil's petition challenges his current immigration detention as unlawful, and he seeks an order from this Court requiring ICE to immediately release him.  Pet. (ECF No. 2).

**ARGUMENT**

**THE COURT SHOULD DISMISS THIS ACTION OR ALTERNATIVELY
TRANSFER THIS ACTION**

**A.    Venue is Improper in this Court**

A habeas petition brought under 28 U.S.C. § 2241 challenging detention must be brought against the immediate custodian and filed in the district in which the petitioner is detained.  Venue is improper in the Southern District of New York because Khalil was not detained in this district at the time he filed his habeas petition.  Joyce Decl. ¶ 9.  Rather, the petitioner's attorney filed the habeas petition in this Court while Khalil was physically present in and confined at the Elizabeth Detention Facility in Newark, New Jersey.  *Id.* ¶ 8; ECF No. 11 at 6.  Thus, the Court lacks

jurisdiction over the habeas petition and the Southern District of New York is not the proper venue for this habeas action.  Consequently, the Court should either dismiss this action or transfer it.

The Supreme Court has made clear that in "core" habeas petitions—*i.e.*, petitions like the instant one that challenges the petitioner's present physical confinement—the petitioner must file the petition in the district in which he is confined (*i.e.*, the district of confinement) and name his warden as the respondent.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004).  In *Padilla*, the Supreme Court described habeas petitions challenging a petitioner's present physical confinement (*i.e.*, detention) as "core" habeas petitions.  *Id.* at 445.  For review of such "core" petitions, "jurisdiction lies in only one district: the district of confinement."  *Id.* at 443.  Accordingly, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."[2]  *Id.* at 447; *see also id.* at 443 (explaining that "[t]he plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement").

In embracing the "immediate custodian" rule, the Supreme Court explained that limiting a district court's jurisdiction to issue a writ to custodians within their jurisdiction "serves the important purpose of preventing forum shopping by habeas petitioners."  *Padilla*, 542 U.S. at 447 (observing that the result of disregarding the immediate custodian rule "would be rampant forum shopping, district courts with overlapping jurisdiction, and the very inconvenience, expense, and embarrassment Congress sought to avoid when it added the jurisdictional limitation [in 1867]").

---

[2] In adopting the "immediate custodian" rule, the Supreme Court rejected the "legal reality of control" standard and held that legal control does not determine the proper respondent in a habeas petition that challenges present physical confinement.  *See Padilla*, 542 U.S. at 437-39; *see also id.* at 439 ("In challenges to present physical confinement, we reaffirm that the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent.").

4

JA 412

Although *Padilla* addressed a habeas petition outside of the immigration context, based on *Padilla*'s holding and logic, a "clear majority of district courts" within the Second Circuit have applied "the immediate custodian rule to habeas petitions filed by incarcerated aliens challenging their physical detention prior to deportation." *Guo v. Napolitano*, No. 09 Civ. 3023 (PGG), 2009 WL 2840400, at *3 (S.D.N.Y. Sept. 2, 2009) (collecting cases). "The substantial majority of judges in this District to consider this question have reached the same conclusion, holding that a [petitioner] detained in New Jersey who seeks to challenge his detention, even if under the supervision of ICE personnel in this District, must bring a habeas action in the District of New Jersey." *Andoh v. Barr*, No. 19 Civ. 8016 (PAE), 2019 WL 4511623, at *2 (S.D.N.Y. Sept. 18, 2019).

This Court has addressed this exact issue in at least five cases: *Thomas v. Decker*, No. 19 Civ. 8690 (JMF), ECF No. 26 (S.D.N.Y. Oct. 16, 2019); *Tazu v. Barr*, No. 19 Civ. 1716 (JMF), ECF No. 16 (S.D.N.Y. Mar. 1, 2019); *Traore v. Decker*, No. 18 Civ. 7909 (JMF), ECF No. 9 (S.D.N.Y. Sept. 13, 2018); *Suraiya v. Cioppa*, No. 18 Civ. 6628 (JMF), ECF Nos. 17 (Order), 18 (Transcript) (S.D.N.Y. July 31, 2018); *Singh v. Holder*, No. 12 Civ. 4731 (JMF), 2012 WL 5878677, at *2 (S.D.N.Y. Nov. 21, 2012).   In *Singh*, this Court held that the proper forum for a habeas petition brought by an alien challenging his continued physical detention—*i.e.*, "core" habeas claims—was "the district of confinement."   2012 WL 5878677, at *2; *see also id.* ("Applying the 'immediate custodian' rule, the Court therefore holds that jurisdiction lies only in the Northern District of Alabama, where Petitioner is detained, and that the only proper respondent is Petitioner's immediate custodian, Warden Scott Hassel."). In reaching this conclusion, the Court noted that it was unpersuaded by the analysis in *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488 (S.D.N.Y. 2009), where Judge Baer had reasoned that the Attorney General and Secretary of the

**JA 413**

Department of Homeland Security were proper respondents in an immigration habeas action, and, despite the petitioner's detention in New Jersey on the day the petition was filed, held that the Southern District of New York was the proper venue based on a finding that the "traditional principles of venue" governed immigration habeas cases. *See id.* at 495-97. This Court found the analysis in *Farez-Espinoza* to be flawed because that decision relied on cases that pre-dated *Padilla* and that were otherwise inapplicable to venue consideration in immigration detention challenges. *See Singh*, 2012 WL 5878677, at *2; *see also Guo*, 2009 WL 2840400, at *4-5 (finding *Farez-Espinoza* unpersuasive for the additional reason that it relied on *Henderson v. I.N.S.*, 157 F.3d 106 (2d Cir. 1998), which was issued six years prior to *Padilla*, and which relied on the "legal control" argument that *Padilla* subsequently rejected).

Similarly, in *Suraiya*, this Court held a conference eight days after the petition was filed at which the Court acknowledged its application of *Padilla* in its prior ruling in *Singh*, "a case bringing pretty much the same exact nature of claim," and then explained "that the immediate custodian rule applies to challenges of this nature and that jurisdiction is proper only in the district where the immigrant is detained." Transcript (attached), *Suraiya v. Cioppa*, No. 18 Civ. 6628 (JMF) (S.D.N.Y. July 31, 2018) (ECF No. 18) at 2:21-3:4. This Court proceeded similarly in *Traore* and *Tazu*. *See* Transcript of Proceedings (Sept. 6, 2018), *Traore v. Decker*, No. 18 Civ. 7909 (JMF) (S.D.N.Y. Sept. 21, 2018) (ECF No. 10) at 2:14-23; Transfer Order, *Traore v. Decker*, No. 18 Civ. 7909 (JMF) (S.D.N.Y. Sept. 13, 2018) (ECF No. 9); Transcript of Proceedings (Mar. 1, 2019), *Tazu v. Decker*, No. 19 Civ. 1716 (JMF) (S.D.N.Y. Mar. 19, 2018) (ECF No. 16) at 2:25-3:10; Transfer Order, *Tazu v. Decker*, No. 19 Civ. 1716 (JMF) (S.D.N.Y. Mar. 1, 2019) (ECF No. 14). Lastly, in *Thomas*, this Court received full briefing and was ultimately unpersuaded to change its position. *Thomas v. Decker*, No. 19 Civ. 8690 (JMF) (ECF No. 26) (S.D.N.Y. Oct. 16, 2019).

Moreover, in cases similar to this matter—where immigration habeas petitioners detained outside of the Southern District of New York nonetheless brought actions in this District challenging their present physical confinement—courts have routinely held that venue in this district is improper.  These cases include challenges to immigration detention where aliens are currently in removal proceedings, as well as cases where aliens are subject to a final order of removal and awaiting removal.  *See, e.g.*, *Benitez v. An Unknown Immigration Officer*, No. 19 Civ. 3153 (GHW), 2019 WL 3450743, at *1 (S.D.N.Y. July 22, 2019) ("The majority of courts in this district that have considered the issue have held that habeas petitions which challenge an alien's detention pending removal are subject to the immediate custodian rule, and thus jurisdiction over such a claim lies only in the district where Petitioner is physically confined."); *Kolev v. Sessions*, No. 17 Civ. 9477 (RA), 2019 WL 1748436, at *1 (S.D.N.Y. Apr. 16, 2019); *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 410 (S.D.N.Y. 2018) (same); *Cesar v. Shanahan*, No. 17 Civ. 7974 (ER), 2018 WL 1747989, at *1 (S.D.N.Y. Feb. 5, 2018) (same); *Chan Lo v. Sessions*, No. 17 Civ. 6746 (GHW), 2017 WL 8786850, at *1 (S.D.N.Y. Sept. 15, 2017) (same); *Adikov v. Mechkowski*, No. 16 Civ. 3797 (JPO), 2016 WL 3926469, at *1 (S.D.N.Y. July 18, 2016) (same); *Fortune v. Lynch*, No. 15 Civ. 8134 (KPF), 2016 WL 1162332, at *2 (S.D.N.Y. Mar. 22, 2016) (same); *Bacuku v. Shanahan*, No. 16 Civ. 0305 (LGS), 2016 WL 1162330, at *1 (S.D.N.Y. Mar. 1, 2016) (same); *Rone v. Holder*, No. 15 Civ. 2815 (ER), 2015 WL 13722402, at *1 (S.D.N.Y. June 5, 2015) (same); *Concepcion v. Aviles*, No. 14 Civ. 8770 (AT), 2015 WL 7766228, at *1 (S.D.N.Y. Mar. 12, 2015) (same); *Phrance v. Johnson*, No. 14 Civ. 3569 (TPG), 2014 WL 6807590, at *2 (S.D.N.Y. Dec. 3, 2014) (same); *Medina-Valdez v. Holder*, No. 12 Civ. 6002 (RA), 2012 WL 4714758, at *1-2 (S.D.N.Y. Oct. 1, 2012) (same); *Guo*, 2009 WL 2840400, at *5 (same); *Sikivou v. Dep't of Homeland Security*, No. 06 Civ. 5530 (PKC), 2007 WL 2141564, at *3 (S.D.N.Y. July 25, 2007)

(same); *Excellent v. Gonzales*, No. 04 Civ. 9748 (VM), 2006 WL 238986, at *1 (S.D.N.Y. Jan. 31, 2006) (same); *Washington v. District Director, INS*, No. 04 Civ. 3492 (RMB) (MHD), 2005 WL 2778747, at *2 (S.D.N.Y. Oct. 19, 2005) (same); *Drakoulis v. Ashcroft*, 356 F. Supp. 2d 367, 370-71 (S.D.N.Y. 2005) (same); *Shehnaz v. Ashcroft*, No. 04 Civ. 2578 (DLC), 2004 WL 2378371, at *4 (S.D.N.Y. Oct. 25, 2004) (same); *cf. German v. Green*, No. 15 Civ. 4691 (WHP), 2015 WL 7184992, at *2 (S.D.N.Y. Oct. 30, 2015) ("Since [petitioner] mailed his petition to this Court while physically detained in New Jersey . . . this Court has no jurisdiction over this case."); *Freire v. Terry*, 756 F. Supp. 2d 585 (S.D.N.Y. 2010) (dismissing habeas petition for lack of jurisdiction, without prejudice to refiling in the district of confinement)

There is no basis for this Court to depart from this practice in this case. During the March 12 conference, the Court raised Justice Kennedy's concurrence in *Padilla*—and how it contemplated an exception to the district-of-confinement rule in the face of certain governmental misconduct. But this "proposed" exception—from a concurring opinion where the Justices joined the majority opinion in full—is not the law. *Padilla*, 542 U.S. at 436.

And in all events, nothing here would implicate the concerns behind Justice Kennedy's concurrence. As the above makes clear, Khalil was transferred from a processing facility in New York City to a detention facility in New Jersey. And, as explained too, the reasons that the petition was filed in this District were that (i) Khalil's wife was told by DHS officials that he was being taken to 26 Federal Plaza (a completely accurate statement), and (ii) the ICE website had not updated with accurate information at that hour (around 4am on a weekend). In stark contrast to this, Justice Kennedy's concurrence raises the prospect of a narrow exception "in an exceptional case" for prolonged, wrongful conduct—*i.e.*, a sustained governmental effort to evade habeas jurisdiction. *Id.* at 454 (Kennedy, J.). That is not this case here: Over the span of a day, Khalil

was processed and transferred, after an overnight stay, to a detention facility where he will be held for the foreseeable future; and where he can file a proper petition in that District (as discussed next). His detention is not unique in any way that would provide a basis for departure from the district-of-confinement/immediate custodian rule. *Id.* at 454; *see also id.* at 442.

This case thus provides no basis for deviating from the "the default rule . . . that the proper respondent is the warden of the facility where the prisoner is being held." *Id.* at 435 (opinion of the Court); *see also id.* at 447 ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."). Because the petitioner was detained in New Jersey at the time he filed this habeas petition, the Court lacks habeas jurisdiction over this matter and venue is not proper in the Southern District of New York.

**B.    The Court Should Either Dismiss or Transfer this Action**

Because this Court lacks jurisdiction and is not the proper forum for this habeas action, the Court should either dismiss this action without prejudice or transfer the petition forthwith.[3]  *See Shehnaz*, 2004 WL 2378371, at *4.

Should the Court consider transferring the petition, the proper venue is the Western District of Louisiana. *See Azize v. Bureau of Immigration and Naturalization Service*, No. 04 Civ. 9684 (SHS) (JCF), 2005 WL 3488333, at *1 (S.D.N.Y. Oct. 7, 2005) (noting that "*Padilla* controls," and transferring detention challenge to the Western District of Louisiana, which was the place of petitioner's "present physical custody"). In *Padilla*, the Supreme Court recognized a "limited" exception to the district-of-confinement rule, only "when the Government moves a habeas

---

[3] Should the Court transfer the case, to minimize any delay in having the case heard in the proper forum, the government respectfully requests that the Court waive the seven-day waiting period contained in Local Civil Rule 83.1.

9

petitioner after she *properly files* a petition naming her immediate custodian." *Id.* at 441 (emphasis added) (discussing *Ex Parte Endo*, 323 U.S. 283 (1944)). In that event, the court where jurisdiction originally vested can retain the case.

Here, the petitioner did not properly file a petition naming his immediate custodian because the habeas petition was filed in this District when Khalil was being detained in New Jersey. Accordingly, jurisdiction did not vest in the District of New Jersey because he did not file his petition in that court. Consequently, the District of New Jersey cannot "retain[]" habeas jurisdiction, as it never acquired it to begin with. *Id.*

A proper course is thus to transfer this case to the Western District of Louisiana—*i.e.*, the only district where Khalil could refile a petition today, if this Court were to dismiss his improper one. Put simply, "jurisdiction lies in only one district: the district of confinement." *Id.* at 443.

The District of New Jersey has been raised as a potential proper forum. Given that the District of New Jersey never acquired jurisdiction over this case, and does not have jurisdiction over Khalil's present custodian, it is difficult to see how that court could adjudicate this dispute, simply because Khalil was present there at the time of his original (improper) filing.[4]

Nevertheless, in the event the Court harbors doubt about whether New Jersey or Louisiana is the proper forum, what should be plain is that venue does not lie in this Court. And if this Court

---

[4] It is true that in at least two cases in this District, judges concluded that, notwithstanding (i) an improperly filed petition in this District because the petitioner was detained elsewhere, and (ii) a subsequent transfer of the petitioner after the habeas petition was filed to a different facility in another District, the case should be transferred to the District where the petitioner was detained at the moment the original habeas petition was filed. *See, e.g.*, *Alvarado v. Gillis*, No. 22 Civ. 10082 (JLR) (KHP), 2023 WL 5417157 (S.D.N.Y. Aug. 3, 2023), *rep. and rec. adopted* at ECF 16 (S.D.N.Y. Aug. 22, 2023); *Ali v. Dep't of Justice*, No. 19 Civ. 8645 (LGS), 2020 WL 3057383, at *2 (S.D.N.Y. June 9, 2020). In these cases, however, the government did not seek transfer to the district of confinement and therefore the court did not address the issue presented here.

is inclined to transfer this case to the District of New Jersey, the government respectfully preserves

the right to argue there that transfer is proper to the Western District of Louisiana.

## **CONCLUSION**

For the foregoing reasons, the Court should either dismiss this action or transfer the

petition.


Dated:    March 12, 2025

                                                Respectfully submitted,


YAAKOV M. ROTH                          MATTHEW PODOLSKY
Acting Assistant Attorney General       Acting United States Attorney
Civil Division                          Southern District of New York
                                        *Attorney for Respondents*

                              By:     */s/ Brandon M. Waterman*
                                      JEFFREY OESTERICHER
                                      BRANDON M. WATERMAN
                                      Assistant United States Attorneys
                                      86 Chambers Street, 3rd Floor
                                      New York, New York 10007
                                      Tel.: (212) 637-2695/2743
                                      jeffrey.oestericher@usdoj.gov
                                      brandon.waterman@usdoj.gov

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL,

                                    Petitioner,

          v.

WILLIAM P. JOYCE, *et al.*,

                                    Respondents.

No. 25 Civ. 1935 (JMF)

<u>DECLARATION OF ACTING FIELD OFFICE
DIRECTOR WILLIAM P. JOYCE</u>

## DECLARATION OF WILLIAM P. JOYCE

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.       I am aware that Mahmoud Khalil ("Khalil") has filed a Petition for a Writ for Habeas Corpus before this Court.

3.      As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.      On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.      On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. in front of 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  ICE also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.      Upon completion of initial processing, ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025.

9.      At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

10.     Elizabeth Detention Facility in Newark, New Jersey has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff whereas 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff.

11.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

12.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., and he has been detained at that detention facility since that time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of March 2025.

WILLIAM P JOYCE   Digitally signed by WILLIAM P JOYCE
Date: 2025.03.12 21:53:13 -04'00'
_____

William P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01935

**AMENDED
PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## INTRODUCTION

1.     This case concerns the government's targeted, retaliatory detention and
attempted removal of a student protestor because of his constitutionally protected speech.
Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United
States, and a recent graduate student at Columbia University. Over the last year and a
half, Mr. Khalil has been a mediator, an active participant in, and at times the public face
of, student protests on Columbia's campus related to Israel's military campaign in Gaza.
The Trump administration has made no secret of its opposition to those protests and has
repeatedly threatened to weaponize immigration law to punish noncitizens who have
participated.

2. On or before March 8, 2025, Respondents adopted a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3. Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4. Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5. Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6. During his arrest, the agents stated first that Mr. Khalil's "student visa"

was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7.     It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8.     The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

9.     Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be

father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months pregnant, live in Columbia's residential housing in New York City.

10.     Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.   Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.     Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

12.     Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop

5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the

Secretary of Homeland Security in the United States Department of Homeland Security.

In this capacity, she is responsible for the administration of the immigration laws

pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts

business in the Southern District of New York; is legally responsible for pursuing any

effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

Respondent Noem's address is U.S. Department of Homeland Security, Office of the

General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Marco Rubio is named in his official capacity as the United

States Secretary of State. In this capacity, among other things, he has the authority to

determine, based on "reasonable" grounds, that the "presence or activities" of a

noncitizen "would have serious adverse foreign policy consequences for the United

States." Following such a determination, DHS may initiate removal proceedings under 8

U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities

under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of

New York and as such is a custodian of the Petitioner. His address is United States

Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15.     Respondent Pamela Bondi is Attorney General of the United States. In

this capacity, she routinely transacts business in the Southern District of New York; is

responsible for the administration of the immigration laws pursuant to Section 103(a) of

the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner.

Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

## JURISDICTION & VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.     Venue is proper in the Southern District of New York Under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. Petitioner is detained at the direction of Mr. Joyce, and a substantial part of the events giving rise to the claims and relevant facts occurred within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Khalil was detained at 26 Federal Plaza at the time this habeas was initiated. The New York Field Office and Respondent Joyce directed Mr. Khalil's arrest and detention in New York, New York; told his counsel that he was being taken to 26 Federal Plaza in New York, New York; and entered his location on the ICE detainee locator as being in New York, New York. At the time of filing, the detainee locator stated that Mr. Khalil was held in New York, New York, information upon which his counsel reasonably relied to identify his location. To the extent the New York Field Office and Respondent

Joyce moved Mr. Khalil across state lines to New Jersey for a transitory period of time shortly before his habeas was filed, the New York Field Office prevented Mr. Khalil from communicating that information to his counsel in bad faith. Moreover, the New York Field Office then brought Mr. Khalil back across state lines to New York before then transferring him, after the filing of the instant petition, to Louisiana.

## **FACTS**

### *Mr. Khalil's Background*

19.     Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.     Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.     Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

### *Mr. Khalil's Student Activism and Speech on Matters of Public Concern*

22.     As a Palestinian, Mr. Khalil has felt compelled to be an outspoken

advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.     That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.     Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of 2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[1] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a

---

[1] See Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other." Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[2]

26.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

27.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful

---

[2] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html. Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

government officials disagreed with what he had to say.

***The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech***

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J. Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

30.     During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized Israel's actions.

31.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our

---

[3] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

college campuses, out of our cities, and get them the hell out of our country."[4]

32.     While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[5]

33.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[6]

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January

---

[4] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[5] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[6] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

29, 2025.

    **35.**    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

    36.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

    37.    In response to these Executive Orders and as part of an escalating attack

---

[7] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[8]

38.  For example, Betar USA—a self-described "Zionist activist organization"[9]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[10]

39.  Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[11]

40.  Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive

---

[8] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/
[9]  https://betarus.org/;  https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza
[10] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.
[11] https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

orders "already appear to be chilling political activism."[12]

41.    Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.    That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[13]

43.    On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[14]

44.    On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

### DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists

45.    On the evening of March 8, 2025, at approximately 8:30 p.m., Mr.

---

[12]    https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel
[13] https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/
[14] https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

Khalil and his wife were returning to their apartment from an Iftar[15] dinner at a friend's home.

46.     When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

47.     The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would have required a key or otherwise been given permission to enter the building.

48.     Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.     Mr. Khalil called his attorney, Amy Greer. Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated

---

[15] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him. Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50.    Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51.    Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process. Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge. Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52.    Mr. Khalil's wife presented the DHS agents with documents confirming Mr. Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53.    The agents then handcuffed Mr. Khalil and brought him outside where

there were multiple unmarked vehicles waiting.  Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her.  They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54.     The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[16] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.     The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the

---

[16] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.     At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[17] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York— authorities in the Louisiana ICE detention facility offered a date ten days away.

57.     Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil.

***Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana***

58.     While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr.

---

[17] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

59.     Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60.     The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61.     At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62.     While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be

processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63.     Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

64.     At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65.     Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

66.     Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

67.     Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

68.     Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and

forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69.     At no time throughout this process did any of the agents identify themselves.

70.     Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child.   In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.     Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.     It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to

attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

### *The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy*

73. On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[18]

74. The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[19]

75. Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[20]

76. The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was

---

[18] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782
[19] https://x.com/WhiteHouse/status/1899151926777749618
[20] https://x.com/marcorubio/status/1898858967532441945

carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[21]

77.     In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."[22]

78.     On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[23]

79.     At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[24]

80.     In a press conference regarding this case on March 12, 2025, Secretary of

---

[21] https://x.com/DHSgov/status/1898908955675357314;
https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/
[22] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student
[23] https://archive.ph/rD4sk#selection-1147.0-1159.428
[24]      https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022
(timestamp 10:16)

State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."[25]

81.    On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[26]

### DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution

82.    Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the

---

[25] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/
[26] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

United States would have potentially serious adverse foreign policy consequences for the United States."

83.     The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84.     The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)).  Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85.     Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners

from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.   Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.   In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

### **CLAIMS FOR RELIEF**

### **FIRST CLAIM**
**Violation of the First Amendment to the United States Constitution**

88.   Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

89.     The Rubio Determination and Policy Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

- retaliate against and punish Mr. Khalil for his past protected speech;

- prevent him from speaking now (through detention);

- attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

- deprive audiences of his present and future speech on matters of public concern; and

- chill other individuals from expressing views sympathetic to Palestinians.

90.     These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

91.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

92.     The Constitution establishes due process rights for "all 'persons'

within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

93.     The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released back to his family.

94.     Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

95.      The Policy and the Rubio Determination also violate Mr. Khalil's right to due process. The government's policy of Foreign Policy Ground making such

determinations concerning people like Mr. Khalil—lawful permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—is unconstitutionally vague.

## THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

96.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM

### Release on Bail Pending Adjudication

97.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

98.     This Court has the "inherent authority" to grant bail to habeas petitioners

like Mr. Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

99. This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly—instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights;

3)      Vacate and set aside the Rubio Determination;

4)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this

District pending these proceedings;

5)      Order the immediate release of Petitioner pending these proceedings;

6)      Order the release of Petitioner;

7)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)      Award reasonable attorneys' fees and costs for this action; and

9)      Grant such further relief as the Court deems just and proper.


Dated: March 13, 2025
New York, New York

                    /s/ *Amy Belsher*
                    Amy Belsher
                    Robert Hodgson
                    Veronica Salama
                    Molly Biklen
                    New York Civil Liberties Union
                    Foundation
                    125 Broad Street, 19th Floor

New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org

*Counsel for Petitioner*

Omar Jadwat
Noor Zafar
Sidra Mahfooz*
Brian Hauss
Brett Max Kaufman
Esha Bhandari
Vera Eidelman
Tyler Takemoto*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
ojadwat@aclu.org

*Application for admission* pro hac vice *forthcoming*

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.

Ramzi Kassem
Naz Ahmad
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu
CENTER FOR CONSTITUTIONAL RIGHTS

Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6436
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

DRATEL & LEWIS

Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Phone:(212)732-8805
Fax: (212) 571-3792
Email: agreer@dratellewis.com

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Mahmoud KHALIL, | |
| *Petitioner*, | |
| v. | Case No. 25-cv-01935 |
| Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | |
| *Respondents*. | |

## DECLARATION OF VERONICA R. SALAMA

I, Veronica R. Salama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Veronica R. Salama. I am a licensed attorney in good standing in the state of New York. I am an attorney of record in the above-captioned case.
2. I represent the petitioner, Mahmoud Khalil, in this action.
3. Mr. Khalil is currently detained by ICE at the LaSalle Detention Center in Jena, Louisiana, and I am unable to travel to him.
4. On March 13, 2025, I met with Mr. Khalil in a virtual attorney-client meeting. We reviewed the substance of the amended petition, and he confirmed the accuracy of the facts therein as they pertain to him.
5. I hereby verify that the factual statements in the amended petition in this action (ECF No. 38) as they pertain to Mr. Khalil are true and correct to the best of my knowledge.

Executed on March 14, 2025
New York, New York

Veronica R. Salama
Staff Attorney
New York Civil Liberties Union Foundation

**JA 456**

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting Field
Office Director of New York, Immigration and
Customs Enforcement; Caleb VITELLO, Acting
Director, U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official
capacity as Attorney General, U.S. Department of
Justice,

       *Respondents*.

Case No. 25-cv-1935 (JMF)

## <u>DECLARATION OF NOOR RAMEZ ABDALLA</u>

I, Noor Ramez Abdalla, under penalty of perjury, declare as follows:

1.      I am a United States citizen, and Mahmoud Khalil's wife.

2.      I was born in Flint, Michigan, and I was raised in Michigan until the sixth grade when my family and I moved to the United Arab Emirates because my father received an offer of employment there. After I graduated high school, my family and I moved back to Michigan. I completed my undergraduate degree at University of Michigan, Flint, where I earned a 4.0 grade point average and was my graduating class's commencement speaker. I continued on to complete dental school at Detroit Mercy Dental, graduating in May 2022 in the top ten percent of my class.

I started my career as a dentist the month after I graduated, and I have been working as a dentist in the tri-state area since December 2023.

3.      My husband, Mahmoud, is a Palestinian who grew up a refugee in Syria. He has devoted much of his life and career to helping and serving others. In fact, it was his work on education in Syrian refugee communities in Lebanon that brought us together. I met Mahmoud in the summer of 2016, when I was volunteering with a nongovernmental organization that runs educational programs for Syrian refugee communities in Lebanon. Mahmoud was employed with that organization at the time and managed the volunteer program. We fell in love. We continued a long-distance relationship after I returned to the United States and managed to visit with one another one to two times per year between 2016 and 2022.

4.      In December 2022, Mahmoud moved to the United States to begin a graduate program at Columbia University's School of International and Public Affairs the following month. We were finally able to reunite and be together after years of a long-distance relationship, and Mahmoud was working towards furthering his career in human rights.

5.      In November 16, 2023 we married, and in 2024 Mahmoud became a lawful permanent resident. We are expecting our first child together at the end of next month. When we found out we were pregnant, we were both so thrilled to welcome our first child into the world.

6.      When Israel began its genocide in Gaza in October 2023, Mahmoud felt compelled to speak out, based on his deep commitment and devotion to his Palestinian people and their rights and advocating for a swift end to their ongoing genocide. It is through this commitment to Palestinian rights that he came to be involved in the protests that erupted across college campuses in April 2024, and in Columbia University's encampments.

2

7.     Mahmoud is a natural bridge builder, and so he quickly rose to prominence as a lead negotiator on behalf of the students mounting the encampments and protesting the genocide in Gaza. As part of those duties, he spent weeks on end liaising between the administration and the students, in pursuit of a just resolution. Mahmoud was so committed to this goal that he barely slept for weeks, and I recall having to drag him home to sleep.

8.     His leadership in the protest movement was no surprise to me, because this is who he is: committed to his community, committed to serving others, and committed to justice. Mahmoud extended this care to his speech and organizing for Palestinians in Gaza and the West Bank, just as he did the people in his life—myself included.

9.     As a result of his involvement as a public-facing figure in the Columbia University encampments, Mahmoud fell victim to an aggressive and devastating doxing campaign over the course of the months that followed, one that continues to this day. He was receiving heinous messages every day and the subject of all kinds of public statements on social media and in news broadcasting, defaming him and maligning his speech and activities for Palestinian rights.

10.     Part of the doxing campaign included many public calls for the government to deport him. These targeted calls for his deportation became so frequent and aggressive that I recall Mahmoud asking me if I knew what to do if U.S. Immigration and Customs Enforcement (ICE) came to our home just last week. On March 7, 2025, the day before Department of Homeland Security (DHS) agents arrested Mahmoud, he even wrote an email to Columbia University Interim President Katrina Armstrong informing her of the targeted calls for his deportation, telling her he was so scared of adverse action by ICE that he was unable to sleep, and pleading for the university's support. I don't think anyone ever answered him, and we certainly did not receive any support.

3

**JA 460**

11.     On March 8, 2025, at approximately 8:25 PM, Mahmoud and I were returning from *iftar* (a meal breaking our daily fast, observed during the holy month of Ramadan) to our apartment in Columbia University housing. Around two agents in plain clothing approached us, following us from outside our building into the lobby. The agents asked if my husband was Mahmoud Khalil. He answered that he was, and they proceeded to state that they were going to detain him. A few other agents appeared with the original two agents at this point, apparently having entered through another entrance. One agent told me that I needed to leave and go up to my apartment, or else I would be arrested, too.

12.     Mahmoud then asked if I could go up and get his green card, and the agents said that I could and that they would wait for me downstairs. I quickly made my way up to our apartment to get Mahmoud's green card, believing that there must be some confusion about his immigration status. I observed one agent upstairs in our hallway as I was entering the apartment. When I came back downstairs and provided Mahmoud's green card to the agents, they seemed confused, and we heard one agent who was speaking with someone else over the phone inform them that Mahmoud was a green card holder.

13.     Despite seeing the green card, they insisted that they would be bringing him in anyway. The agents handcuffed him and forced him out of our apartment building. I called after him, asking how I would be able to reach him, and he directed me to call his attorney, Amy Greer, which I immediately did, keeping her on the line with me and asking for guidance on what to do.

14.     When they took my husband to the street, I followed them, begging for their names, contact information, or any way to get in touch with my husband. I was still on the phone with Amy and explained his lawyer was requesting their names. The officers refused to provide me with any of that information, and instead told me he was being taken to "26 Federal Plaza." I

4

**JA 461**

continued to approach the various cars of agents stationed outside, asking for the name of the agency they were from and trying to get someone to speak with Mahmoud's lawyer. The agents walked quickly away from me, some of them entered the cars, and drove off. I ultimately watched my husband driven off by the agents, having no idea why he was being arrested or how I could reach him.

15.     I was unable to sleep that night, first working with Amy to secure immigration counsel for Mahmoud and then trying to find a way to make contact with him. The lawyers relayed to me that he seemed to be in Manhattan throughout the night, according to an ICE locator. By the early morning, they had filed a lawsuit in federal court, with my consent.

16.     Within a few hours and still in the early morning on Sunday, the locator showed Mahmoud as being held at an immigration detention facility in Elizabeth, New Jersey. I immediately went there, desperate to see my husband. I attempted to see him twice and was told by employees at the facility that he was not there, and that I would not be able to see him. I waited outside of the facility for approximately two hours and was never able to see or be in contact with Mahmoud.

17.     Just hours later, his attorney told me that Mahmoud might be on his way to a detention center in Louisiana. I was desperate for information that no one seemed able to give me. I felt like Mahmoud had been kidnapped from our home, and no one could tell me where he was or what was happening to him. His transfer to Louisiana seemed more and more likely throughout the day, as we learned new information from various sources, but still no one had heard from him. His attorneys could not reach him, and neither could I.

18.     It wasn't until the following morning, on March 10, 2025, that I finally received a phone call from Mahmoud, confirming that he was at an ICE detention facility in Jena, Louisiana.

5

**JA 462**

19.     I cannot overstate how distressing this entire experience has been. The past week has been the worst of my life, and I find myself without my single greatest source of support, in my time of greatest need.

20.     I am currently in my thirty-third week of pregnancy, and I am due to give birth to Mahmoud and I's first child on April 28th, 2025. We are expecting a son. The thought that Mahmoud may miss the birth of our son is devastating.

21.     I am not exaggerating when I say that I would not have been able to get through my pregnancy without Mahmoud. At this stage of my pregnancy, I have biweekly appointments with my doctor scheduled. In just three weeks, those appointments will increase in frequency, becoming weekly appointments. Prior to his detention, Mahmoud attended almost every doctor's appointment with me. He cooks every meal for us, he cleans the house, he does our laundry and takes care of every need that we have as a household.

22.     Mahmoud has been invaluable to me in helping me cope with the physical and mental impact of my pregnancy. Early on in my pregnancy, my doctor found indication that I might require a regimen to preempt preeclampsia, a very serious condition that can cause major complications for a pregnant person and their baby. I was prescribed two baby aspirin per day, and I am still supposed to be taking that medication. I forget to take medication, and Mahmoud reminded me to take the medication every night, getting it for me before bed. Since the agents took him away, I haven't been able to sleep well or focus and am afraid that I have forgotten to take that medication.

23.     Just last month, on February 2, 2025, I had to be admitted to the hospital because I had not felt our baby in my stomach for a full day. I spent approximately four hours at the hospital, and Mahmoud supported me through the distress of being unable to feel our baby's movement in

6

my stomach and the experience of being hospitalized. Luckily, the doctors determined our baby to be in good health, and I was discharged home.

24.     I also generally struggle with feelings of anxiety, and pregnancy had posed an extra toll on my emotional state. I have frequently felt anxious about the daily experience of pregnancy, ensuring my baby is in good health, and the prospect of bringing life into this world. Mahmoud offers me every bit of reprieve I could hope for. He massages my feet and back every day, he makes sure that I eat and sleep well, and he offers me so much emotional support.

25.     Since his arrest, I have neither been able to sleep nor eat. I can feel my baby, and I hope that he is okay, but I know that this stress and all that comes with it is not good for him.

26.     My family is in Michigan, but Mahmoud and I decided to raise our baby here in New York. He received a wonderful job offer in human rights work here and was due to start in April 2025. We were counting on his income to support our family, as I am scheduled to stop working in March and will only receive approximately half of my usual pay throughout my period of maternity leave.

27.      I now face the prospect of delivering my baby without Mahmoud, and far from my family's home base in Michigan. As a result, I am left with only one source of income, my reduced maternity leave income—which is not enough for me and our baby to live off of. I am also without my husband, who is my sole and primary source of support here in New York.

28.     I also worry about Mahmoud braving this period of detention. I desperately want to see him but traveling by plane is not advised at this late stage of pregnancy. We are in the month of Ramadan, and typically throughout this month Mahmoud and I would fast and attend iftars with members of our community and prayers after sundown and on Fridays organized by Columbia University's Muslim Student Association. Instead, Mahmoud is being detained 1200 miles away

in another state. He has told me that he is unable to eat much because of the stress of detention, even at the end of his day of fast. Mahmoud also takes medicine every day for a stomach ulcer he lives with (and was diagnosed with following an endoscopy more than three years ago), and I worry about that condition worsening without proper treatment and sustenance during his detention. I know they did not provide his medication to him until Tuesday evening, despite his requesting it when he first arrived.

29. Life has been extraordinarily difficult throughout the past week, and it will not improve short of Mahmoud's release. My family is receiving contact and visits from reporters, and Mahmoud's family in Germany and Syria are experiencing harassment. To make matters worse, Mahmoud was supposed to travel to visit his parents in Germany later this month, particularly to pay a visit to his disabled and elderly father who lives with Alzheimer's Disease. Instead, we are all living with this new horrific reality. People have been attacking us online, and saying the most vitriolic things about Mahmoud and I.

30. This experience has flipped our lives upside down. Mahmoud and I planned to have our baby boy next month and move into a new home. Now, I can only hope that he will be with me when I give birth to our first child. I implore that the Court set his bail and permit him to return home to resume living with me and our soon-to-be-born child.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 14th day of March, 2025 in New York, New York.

_____

NOOR RAMEZ ABDALLA

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

      *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

      *Respondents*.

Case No. 25-cv-01935

## DECLARATION OF SAMAH SISAY

I, Samah Sisay, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following
is true and correct:

1. My name is Samah Sisay. I am a licensed attorney in good standing in the state of New
York. I am an attorney of record in the above-captioned case.
2. I represent the petitioner, Mahmoud Khalil, in this action.
3. I submit the following redacted documents in support of Mr. Khalil's motion for release
under *Mapp v. Reno:*

Exhibit B, MPA Confirmation for Mahmoud Khalil
Exhibit C, Identity Documents for Mahmoud Khail
Exhibit D, Notice to Appear for Mahmoud Khalil
Exhibit E, Certificate of Marriage for Mahmoud Khalil & Noor Abdalla
Exhibit F, Medical Letters for Noor Abdalla
Exhibit G, Letters of Support for Mahmoud Khalil
Exhibit H, *Castillo-Maradiaga v. Decker*, No. 21-CV-842 (KPF) (S.D.N.Y. Mar. 4, 2021)
(ECF 8-1)

Executed on March 15, 2025        /s/ Samah Sisay

New York, New York

Samah Sisay
Staff Attorney
Center for Constitutional Rights

# EXHIBIT B



## COLUMBIA | SIPA
School of International and Public Affairs

March 13, 2025

To Whom It May Concern:

This letter confirms that **Mahmoud Khalil** (████) is a student in the Master of Public Administration, Development Practice (MPA-DP) program at Columbia University's School of International and Public Affairs (SIPA).

**Mahmoud** began studies at SIPA in the Spring 2023 semester, has completed all requirements for his degree program, and is expected to confer his degree in May of 2025.

Thank you for your attention to this matter. Should you need further assistance, I can be reached at ████████ or ████████████.

Warm regards,



SIPA Office of Student Affairs

420 West 118th Street   New York, NY 10027   212-854-8690   sipa.columbia.edu



# EXHIBIT C



# EXHIBIT D

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: ▮▮▮▮ 1995

Event No: ▮▮▮▮▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮▮▮

FINS: ▮▮▮▮▮▮▮

File No: ▮▮▮▮▮▮▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮▮▮▮▮▮▮▮▮▮

(Number, street, city, state and ZIP code)      (Area code and phone number)

- [ ] You are an arriving alien.
- [ ] You are an alien present in the United States who has not been admitted or paroled.
- [x] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

- [ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

- [ ] Section 235(b)(1) order was vacated pursuant to:   [ ] 8CFR 208.30   [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY
_____
(Complete Address of Immigration Court, including Room Number, if any)

on   March 27, 2025   at   8:30 AM   to show why you should not be removed from the United States based on the

   (Date)          (Time)

charge(s) set forth above.      TIMOTHY MORAN - Supervisory Special Agent   TIMOTHY M MORAN JR *Digitally signed by TIMOTHY M MORAN JR Date 2025.03.09 09:41:11 -05'00'*
_____
(Signature and Title of Issuing Officer)

Date:   March 9, 2025        26 Federal Plaza, New York, NY
_____
(City and State)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations able to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____          _____
                                                                                *(Signature of Respondent)*

_____                                    Date: _____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on  March 9, 2025  , in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) Refused to sign  (B)          TIMOTHY M MORAN JR  Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.09 06:41:28 -05'00'
*(Signature of Respondent if Personally Served)*          TIMOTHY MORAN - Supervisory Special Agent
                                                                           *(Signature and Title of officer)*

DHS Form I-862 (6/22)                                                          Page 2 of 3

JA 474

# Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# EXHIBIT E

THE CITY OF NEW YORK
OFFICE OF THE CITY CLERK
MARRIAGE LICENSE BUREAU

X-2023-2

License Number

X-2023-9671

# Certificate of Marriage Registration

This Is To Certify That    MAHMOUD KHALIL

residing at    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

born on    ▮▮▮▮▮    at    Sasa  Syria

and    NOOR R ABDALLA

residing at    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

born on    ▮▮▮▮▮    at    Saginaw Michigan  United States

## Were Married

on    11/16/2023    at    The Office of the City Clerk
By SHIRLEY SAUNDERS          851 Grand Concourse
                             BRONX, NY 10451
                             United States

as shown by the duly registered license and certificate of marriage of said persons on file in this office.

CERTIFIED THIS DATE AT THE CITY CLERK'S OFFICE

Bronx
N.Y.

November 16,  23
20

PLEASE NOTE: Facsimile Signature
and seal are printed pursuant
to Section 11-A, Domestic
Relations Law of New York.



Michael McSweeney
City Clerk of the City of New York

CET-F

X 143094                    JA 477

# EXHIBIT F





Name: NOOR ABDALLA
DOB:
Encounter Date: 03/07/2025

**March 14, 2025**

Dear Ms. Abdalla,

This letter confirms that you are a patient under my care for the management of your pregnancy and postpartum course. Your first prenatal appointment was on 9/27/2024 and your due date is 4/28/2025. Your pregnancy course is significant for increased risk of 1/106 for pre-eclampsia before 37 weeks. You have had monthly prenatal visits with me from September through February as well as ultrasound monitoring. As of the third trimester your visits are now scheduled every 2 weeks and will increase to weekly after 36 weeks gestation.

**Sincerely,**

Electronically signed by :                                MD; Mar 14 2025 12:33PM Eastern Standard Time
(Author)



March 13, 2025

To Whom It May Concern:

I am Dr. ▉▉▉▉▉▉▉. My opinions and conclusions are based on my professional experience as a Board-Certified Family Medicine Physician with expertise in Obstetrics. I am not diagnosing or providing treatment for Ms. Noor Abdalla, but rather providing my professional medical assessment – based on my training and experience – of her condition and the risk posed by the incarceration of her husband. This letter is for legal purpose related to Mr. Khalil's incarceration, and I verify, under penalty of perjury, that it is based on my personal knowledge, and in accordance with CPLR R. § 2106 and 28 U.S.C. 1746, that the following is true and correct.

I earned a Bachelor of Arts from Pomona College in Claremont, CA and a Doctor of Medicine from the Icahn School of Medicine at Mount Sinai in New York, NY. I completed Family Medicine Residency at the Swedish Cherry Hill Family Medicine Residency in Seattle, WA. I am currently a core faculty physician at a residency program in New York State, where I oversee the Obstetrics curriculum, provide clinical care, as well as work on labor and delivery.

As a physician, I am very concerned about the health and safety of Ms. Abdalla, who is currently 33 weeks pregnant and experiencing the acute stress of witnessing the arrest and ongoing incarceration of her husband.

Psychological stress during pregnancy is known to increase the risk of adverse maternal and birth outcomes. These poor outcomes, such as preterm birth, low birth weight, and preeclampsia (hypertensive disorders of pregnancy), can be life-threatening for the mother and/or infant or have lasting repercussions on the child's health and cognition. A study demonstrated this association between maternal stress and poor outcomes by comparing neonatal outcomes in a town before and after a federal immigration raid. Sadly, low birth weight rates increased even among US-born pregnant women of the same ethnicity as those affected by deportation, showing how severe stressors impact pregnancy outcomes.[1] Pregnant women who experience these stressors can develop a hormonal imbalance, which negatively impacts the child in utero. I am alarmed that Ms. Abdalla, who was already determined to be at an increased risk for preeclampsia and prescribed medication for this earlier in her pregnancy, now faces an even greater likelihood of a poor birth outcome due to the stress of the incarceration of her husband.

Moreover, if a woman does have a poor birth outcome, she requires even more support during her recovery and while caring for a newborn who may have high medical needs. Having her spouse and the father of the child present for physical, psychological, financial, and logistical support is crucial. Without that support, she is at great risk for perinatal mood disorders such as depression.

Mitigating severe stress is urgent and important for the health of the pregnant woman and her child. Paternal involvement in pregnancy and labor has been shown to do just that - significantly improve maternal well-being and reduce rates of preterm birth, low birth weight, and even infant mortality.

In summary, given the high risk of poor outcomes due to maternal psychological stress and the benefits of paternal presence, I strongly recommend that Mr. Khalil be released to support Ms. Abdalla's health and that of their unborn child at this critical time.

Thank you for your consideration.

Please do not hesitate to contact me if I can provide additional evaluation or answer questions.

Sincerely,



---

[i] Novak NL, Geronimus AT, Martinez-Cardoso AM. Change in birth outcomes among infants born to Latina mothers after a major immigration raid. Int J Epidemiol. 2017 Jun 1;46(3):839-849. doi: 10.1093/ije/dyw346. PMID: 28115577; PMCID: PMC5837605.

# EXHIBIT G

███████████████████████████████

March 14, 2025

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY

RE: Letter in Support of Mahmoud Khalil's Bail Hearing

PURSUANT TO 28 USC 1746, I HEREBY DECLARE AS FOLLOWS:

I am writing this letter in support of Mahmoud Khalil, a dear friend, respected colleague, and an outstanding student whose character and integrity I can personally attest to. My name is ████████████ ████████████, and I am currently pursuing an Executive Master of Public Administration at Columbia University. I have lived in New York City since 2013, and over the past decade, I have built strong ties to this community.

Mahmoud, like me, loves New York City—especially my neighborhood, Astoria, where we often get falafel and shawarma sandwiches at his favorite restaurant, Zyara. But his deep connection to his community is especially evident in his love for Harlem. Since he was always visiting Astoria, I once tried to convince him to move closer to my neighborhood. He smiled and told me he loved Harlem too much and wanted to stay close to his community and friends. Sometimes he would joke that Astoria was too far away! I remember him once saying, *"Everyone I know is here."* That moment encapsulates who Mahmoud is—someone deeply rooted in his surroundings, dedicated to the relationships he has built, and committed to staying where he belongs.

Mahmoud is not just a friend; he is an essential part of my life and our wider community. Before he was detained, he and I had been planning a surprise baby shower for his wife, Noor. Just a week or so before, we had been chatting about the cost of strollers and tossing around baby name ideas—something that speaks to the kind of thoughtful and engaged husband he is. Mahmoud cannot be away from Noor, and he often talks about how much she means to him. With Ramadan coming to an end at the end of March, we had also planned to celebrate Eid together as we anticipate the arrival of the newest member of the Khalil family.

Mahmoud has spent holidays with my family and me. He came over to my house for Thanksgiving in 2023, and we also had a Friendsgiving at his place that year. My husband and Mahmoud play FIFA together, and when Mahmoud loses, he always blames it on the controller, insisting that one is much better than the other. On some Thursdays after my class, we would hang out—sometimes splitting a plate of nachos at our neighborhood hangout by SIPA, Arts and Crafts. These aren't just casual interactions—Mahmoud is part of the fabric of my everyday life, and he is deeply intertwined with our community. He was even planning to attend a music showcase at Columbia where my husband was set to perform—just another example of how involved he is in the lives of those around him.

One thing that has always stood out about Mahmoud is his passion for civic engagement. We have had long conversations about politics, including discussions about the upcoming New York City mayoral

election and who we thought would win. Our conversation naturally turned to voting and civic engagement, and we talked about how he would be able to vote once he became a U.S. citizen. I showed him pictures of the American flag decorations I bought for my husband's citizenship ceremony and the pictures we took in front of USCIS. I told Mahmoud I was excited to use the decorations for his own citizenship celebration one day.

Beyond our friendship, Mahmoud and I have shared major life milestones. We started our job search together, had our interviews on the same day, and received offers within a week of each other. I remember telling him how happy I was that he would be staying in the state indefinitely, and he laughed and said, *"Where else would I go?"* His words capture what I have always known—Mahmoud has built a life here, and there is nowhere else he would rather be.

Mahmoud is also actively engaged in fostering meaningful dialogue on international issues. He helped me organize a community event at the School of International and Public Affairs (SIPA), a joint conversation featuring Rashid Khalidi, a renowned Palestinian historian, and Daniel Levy, an Israeli peace negotiator. His role in bringing together respected voices from different perspectives demonstrates his deep commitment to diplomacy, intellectual rigor, and constructive engagement.

We had planned to walk in our graduation ceremony together in May (fall grads walk with spring grads in a May ceremony), and I had the idea of having a big dinner where our parents—visiting from out of town—could meet each other. I can't imagine attending graduation without Mahmoud.

Mahmoud is not a flight risk. His life, his wife, his friendships, his career, and his aspirations are all here. He has never given any indication that he would abandon them. There is no question in my mind that Mahmoud would comply with any court orders or restrictions. He is someone who deeply values responsibility and integrity, and I have no doubt that he will continue to engage with this process with the utmost respect for the law.

His absence is not only felt by his friends and family, but by the entire academic and professional community that he is a part of. Mahmoud's contributions to our shared spaces—both intellectual and social—cannot be overstated, and his detention is a loss to all of us.

For these reasons, I respectfully urge the Court to grant Mahmoud Khalil bail. He is an invaluable part of our community, and his absence is felt deeply by those who know and care about him.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON MARCH 14, 2025



Thank you for your time and consideration. I sincerely appreciate the Court's attention to this matter. If the Court requires any further information, I can be reached at the contact information above.

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman,

My name is ████████, and I am writing in support of my dear friend Mahmoud Khalil. I am a U.S. citizen, a human rights advocate, and a student at Columbia University's Graduate School of Arts and Sciences.

It is difficult to compose a letter that fully captures Mahmoud's character—the qualities that make him an exceptional friend, brother, spouse, and soon-to-be parent. I first met Mahmoud at the crowded home of a mutual friend. He had the demeanor of someone who was not intimidated by new social situations, and he spoke only when he had something meaningful to say. Though that characteristic has remained the same, I got to know Mahmoud better in the upcoming months.

Mahmoud is sociable, caring, and gentle. I have seen how firmly he holds his wife Noor's hand, how attentively he listens to her concerns, and how deeply he cares for her well-being. I am someone who tends to be anxious, and as you may know from recent news, Columbia University is not a calm place. Yet, I could always rely on Mahmoud to ground me. No matter how difficult a situation seemed, he could always see a way forward.

Mahmoud is always seeking the best course of action and expressing his opinions politely yet firmly. Younger students look up to him with admiration, and he has guided them with patience and kindness. He has a rare ability to build rapport with people who are drastically different—politically, personally, or otherwise. His clarity, focus, and strategic thinking made his opinions widely respected.

Mahmoud has always carried an immense sense of responsibility toward his friends and his people. He loves bringing people together, regardless of personal differences. He often hosted breakfasts at his home and dinners that stretched late into the night—always fostering a sense of community.

Mahmoud is quiet about his passions and hopes, but that does not mean he lacks them. I have seen his enthusiasm as he debated baby names, his careful balancing of school and family, and his determination to provide for his growing family despite financial difficulties. He never burdened others with his concerns—he simply focused on what he could do to improve his circumstances.

Just before his arrest, things were looking up for him. He had recently secured an amazing job with a prestigious organization, and had even signed an offer letter. I remember him nervously (yet quietly) preparing for his interview, asking me to pray for his success. He was on the verge of building the future he had worked so hard for.

I know that Mahmoud's principal concern right now is the well-being of his wife. I had been joking about babysitting their child after Noor gave birth. I never imagined that I would actually be doing so in Mahmoud's absence. I did not anticipate having to support a woman through the ordeal of childbirth without her husband by her side. I do not want to hold Mahmoud's child before he does. I do not want to know more about his baby boy before he has the chance to discover the delicate work of parenthood himself.

I urge this court to release Mahmoud and prevent the unconstitutional seizure of his rights.

I can be reached at ███████████ or at ████████████ . My current home address is ████████████████ .

Sincerely,

████████████

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

March 13, 2025

Dear Judge Furman,

My name is ████████████ . I am a part-time adjunct professor at Columbia University's School of International and Public Affairs (SIPA).

I am compelled to write this letter in support of Mahmoud Khalil.

I have known Mahmoud for 18 months in my capacity as adjunct professor at SIPA, both as a student and as my teacher's assistant. Mahmoud was my student in the fall of 2023 in my class that focuses on organizational strategy and design, called ████████████████ a core management class taught to all graduates of the Master of Development Practice degree program.

Mahmoud was, without a doubt, one of the best students I've ever had. He excelled in class, thoughtfully contributed to class discussion, and received an A on his final, semester-long assignment, an incisive critique of and set of recommendations for the strategy of a US501(c)3 organization, ██████, whom he had worked for for five years supporting the development of Syrian youth through educational programming. We shared his final assignment with subsequent classes as a model and case study for what an exceptional analysis should look like.

My co-teacher, ████████████ , and I were so impressed with Mahmoud's poise, intellect, and thoughtful leadership that we personally invited him to be our teacher's assistant the subsequent fall (2024). He was a stand-out teacher's assistant: professional, responsive, thorough, good humored, and a strong support to our ~50 graduate students from dozens of countries to help them understand the material during a rather eventful semester.

In one of our last classes in the fall of 2024, my co-teacher at SIPA and I invited him to give a guest lecture during our class on leadership to speak about his experience with the student movement on campus and leading during times of crisis. He talked about his successes and struggles in his campus activism, candidly acknowledged some mistakes made and lessons learned, and was proud to share an email the Columbia

administration had sent to the entire campus community that the conversations that Mahmoud was engaging in on behalf of the student groups "constructive dialogue."

Mahmoud has been a tremendous benefit to my classroom. Upon the completion of his studies in December, I had been looking forward to seeing Mahmoud's development as a leader, and hearing much more of his unique and nuanced voice in these extraordinarily complicated and contentious times.



Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman,

I am writing in support of Mahmoud Khalil.  My name is ████████████ and I am an American Jewish woman who believes in the importance of Israel as a Jewish homeland. I have known Mahmoud Khalil for over two years, since January 2023 as his professor, colleague, and friend.  I have always known Mahmoud as someone working to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel.  He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice (MPA-DP)– trains students on.

I have known Mahmoud in my capacity as his Professor at Columbia University for two semesters ████████████████████████████, and then as his supervisor in his role as a Teaching Assistant for the course ████████████ ████████████. In between semesters I also interacted with Mahmoud, due to his role as a Program Assistant for the MPA-DP program which I am affiliated with as a Professor and alumna.

I have worked with Mahmoud and directly seen and graded his work. This work has demonstrated a deep and persistent commitment to humanitarian principals and doing work that contributes to peace and stability.  Both semesters when he was my student, he focused his semester long project assignments on a non-profit organization (████, where he also previously worked) providing education services to refugees.  I had many conversations with him about how to deepen educational impact and ensure that refugees would have real economic opportunities to escape cycles of violence and poverty.

When it came time to choose a Teaching Assistant for the Fall 2024 iteration of the course, I sought out Mahmoud to apply to the position. His deep expertise with organizational management with international development organizations, his high standards for quality work, as well as his integrity were all reasons I thought he would make a great TA. He effectively served the class and students throughout the semester even as he navigated both global and campus events that were directly impacting him and his family.

I can state with full confidence that Mahmoud has never expressed support for Hamas, nor has he ever endorsed any form of extremism. Over the course of our extensive interactions, I have had numerous conversations with him about human rights, justice, and the student protests and I can personally attest to his commitment to nonviolence.

In terms of the campus protests, Mahmoud was my student as these events unfolded and was in the process of being hired as our Teaching Assistant as the encampment was being established. I directly spoke to him about the encampment and Mahmoud

**JA 489**

emphasised the protesters commitment to peace and non-violence. Mahmoud explained how the student movement was ensuring that Jewish voices were part of conversations and space. He was committed to dialogue and partnership with Jewish voices throughout his time on campus, one example of this was sharing a Jewish Sukkot event with me that he was attending put on by Jewish and Palestinian students on October 16th, 2024.

As our TA in Fall 2024 for a course for which Leadership was a key theme, he clearly spoke about the challenges of being seen as a leader of leaderless student movement. Many things have been incorrectly attributed to him in the media.

Mahmoud has always worked to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel. He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice – trains students on. Choosing to do this program, which trains students for public sector and public interest work also demonstrates his commitment to these issues. Everything he has ever worked on professionally and academically demonstrates his commitment to humanitarian principals including justice, peace, and development.



, March 14th, 2025

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square, New York, NY 10007

**RE: Unwavering, Unconditional Letter of Support for Mahmoud Khalil**

To the Honorable Judge Furman,

I write this unconditional, unqualified letter of support for Mahmoud Khalil in the strongest of terms. My name is ▮▮▮▮▮ and I am an alum of Columbia Law School '24 and Harvard College '18. I am currently admitted to practice law in the great State of California and am a Deputy Public Defender in Los Angeles County. I have had the distinct pleasure and honor of knowing Mahmoud Khalil since 2023, and I am confident in saying that he is one of the most genuinely caring, responsible, and upstanding individuals I have ever met. I have been able to observe his character and actions both in personal and professional contexts.

From the very first moment I met Mahmoud Khalil, I could see his strong commitment to justice and doing the right thing. Whether in his personal life, professional endeavors, or within the community, he consistently demonstrates unwavering integrity and kindness. He is always willing to lend a helping hand and put others first. But do not just take it from me. Mahmoud is universally regarded across the Columbia campus community as a trustworthy and caring individual. I still remember how in a moment of disagreement between several individuals, Mahmoud invited everyone to his home to break bread. He generously opened his home, his kitchen, and his heart and lent his strong mediation skills to foster trust and repair bonds. He is a great cook on top of everything!

Mahmoud is a bridge builder. He dreams of one day working as a diplomat for the United Nations. He dreams of a peaceful world where every person, regardless of who they are, can live with full citizenship and grow up with dignity, health, and love. What a gift he is to the world!

What a blessing it is to be in relationship with him! I am honored to be his colleague, and most importantly, his friend. While I am now over 3000 miles away on the opposite coast, I will never forget Mahmoud's smile. While he is serious in work contexts, his warmth and laughter reminds me that I will always have a safe refuge in him.

I urge you to release Mahmoud from his unjust incarceration. What is at stake is not just the liberty of a soon-to-be father, beloved community member, and cherished friend. It is the very integrity of the U.S. Constitution itself and the promise it holds.

DATED: March 13, 2025

Respectfully submitted,

▮▮▮▮▮▮▮▮▮▮▮▮

*Admitted to the State Bar of California

▮▮▮▮▮▮▮▮▮▮▮▮

**JA 491**

March 13, 2025

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman:

It is my privilege to write to you to attest to the sterling character of Mahmoud Khalil.

My name is ████████████. I am a U.S. citizen, 39 years old, and residing in Washington, D.C. where I am on a domestic tour with the ██████████████—I am a commissioned member of ████████████. I was previously posted to the U.S. embassy in Gaborone, Botswana as Deputy Public Affairs Officer and to the Embassy Branch Office in Tel Aviv as a vice consul adjudicating non-immigrant visa applications. I chose government service because of a belief in the founding ideals of the United States and their power to inspire.

In the summer of 2016, I met Mahmoud Khalil in Beirut, Lebanon when he organized and led a three-week volunteer trip to the Beqaa Valley as part of his work with ████ a U.S.-registered nonprofit providing education to Syrian children. I chose to volunteer with ████ because of its association with the Institution of International Education, my former employer and U.S. State Department partner.

Mahmoud capably led a religiously diverse international cohort of volunteers including Americans (among whom was his future wife Noor), Europeans, Syrians, and Lebanese to support victims of the Syrian war, including those harmed by Assad regime and groups aligned with the Islamic State of Iraq and Syria (ISIS). He was affable and unfailingly kind, which served him as he deftly navigated sectarian identities among not only the refugee community we worked with, but among our own volunteers. While each of the ████ organizers led with professionalism and integrity, driven by a commitment to peace and countering the harm done by war, Mahmoud stood out especially for his charm and sense of humor. In tasks big and small—working with refugee children whose parents had been killed or were missing due to violence by the Assad regime or ISIS, matching skills to tasks at the school, seeing to volunteer housing arrangements—he was always, simply put, genuinely *nice*; an unruffled problem solver. I believe that Mahmoud has a deep respect for children and human rights because of his dedication to helping refugees.

After three weeks of spending everyday together, our group became tightly knit, and Mahmoud is one of several people I have maintained a friendship with over the years from that time. We are scattered around the world, but meet in various countries, sending photos to the group when any combination of us meets up.

During a difficult stretch of my tour at the U.S. embassy in Botswana following the loss of my stepfather, my conversations with Mahmoud were a comfort. He drew on one such chat to thoughtfully send a book of poetry. Just one of many examples of his profound kindness and sense of compassion.

I was thrilled when I heard he would be coming to New York to further his studies, which allowed me to finally catch up with him in person in late 2023, when he was interning for United Nations Relief and Works Agency (UNRWA) while I was up to staff the UN General Assembly. He was as upbeat and positive as ever. Having him a train ride away instead of oceans, has meant getting to see him more easily, most recently in January of this year, when I also got to catch up with his wife, Noor, for the first time since they had gotten married. Despite the difficult context of the escalation in violence precipitated by the events of October 7, 2023, Mahmoud's passion for serving others, advocating for peace, compassion for children who have lost their parents, refugees, and his positivity remained intact.

My ongoing employment with the U.S. government and posting in Israel never impeded our friendship or diminished the warmth between us. Knowing Mahmoud's commitment to peace, I never doubted for a second his concern for my safety when I was repeatedly taking shelter during the Hamas attacks on Tel Aviv in May 2021.

 In our conversations about his principled opposition to the actions of the Israeli government in Gaza, not once did he express anything remotely like antisemitism. Mahmoud never said anything to make me believe that he supports Hamas or any other terrorist organization, and I have no doubt he wants to see the hostages taken on October 7th released to their families. I have never heard Mahmoud advocate for violence against anyone.

I eagerly look forward to getting to meet my dear friend's firstborn when time and geography allow. That child will be lucky to be raised by two fundamentally decent, kind, and deeply moral people who I am proud to have called friends for almost a decade.

I, ████████████, under penalty of perjury, do hereby affirm that the foregoing information is true and correct to the best of my knowledge.

**Honorable Jesse M. Furman**
**United States District Judge**
**Southern District of New York**
**Thurgood Marshall Courthouse**
**40 Centre Street, New York, NY**

**Dear Judge Furman,**

  My name is ███████ and I am writing this letter in support of Mahmoud Khalil. I am currently a junior at Columbia University. I grew up in Forest Hills, Queens, raised by my Jewish mother and my American father. From a young age, I was taught the importance of higher education in shaping a well-rounded individual. My father, ███████, exemplified this belief—he graduated from Harvard in 1993, becoming the first in our family to attend an Ivy League institution.

  Judaism has always been central to my identity. I attended Jewish preschool, went to Hebrew school multiple times a week until my Bar Mitzvah in 2017, celebrated Shabbat every Friday, and was raised with strong Jewish values. I emphasize this not to exaggerate or embellish, but to paint a clear picture of who I am. My Jewish identity is deeply meaningful to me, and in these past 16 months—an incredibly difficult time for the Jewish people—having a strong support system of kind, understanding, and respectful individuals has been more important than ever. Mahmoud is exactly that.

  From the moment I met Mahmoud 16 months ago, he has been nothing short of a selfless friend and an inspiring mentor. I clearly remember one of our first encounters at a peaceful rally on October 12, 2023. Despite how such events are often misrepresented in the media, this rally was a calm and peaceful demonstration in support of Palestinian rights. Mahmoud took on a protective security role that day, ensuring students were safe from any physical or verbal threats. When people hurled insults and profanities at me and my classmates, Mahmoud was the first to step in and de-escalate the situation. He never raised his voice, never used harsh language, never resorted to aggression—he spoke calmly and respectfully, shielding students, including me, a Jewish student, from harm. He put himself between me and an aggressor, prioritizing my safety over his own. That is not the behavior of an antisemite—that is the behavior of an ally and a friend.

  In the weeks that followed, I spent many late nights with Mahmoud at friends' apartments, getting to know him and hearing his incredible story—one that led him to work at the U.N. During this time, he also began attending Shabbat dinners I hosted with my friends. He would often bring a dish or a bottle of kosher wine to contribute, embracing the tradition with genuine curiosity and respect. He actively listened to the prayers, enthusiastically engaged with Jewish culture, and always approached our traditions with kindness.

At a later protest in November, I witnessed firsthand Mahmoud's unwavering commitment to protecting Jewish students. When an unaffiliated individual began shouting antisemitic slogans, Mahmoud was the first to intervene, immediately de-escalating the situation and ensuring the safety of those present. This came as no surprise—I already knew that Mahmoud was someone I could trust to stand up for me and my community.

Over the months, our friendship deepened. We shared meals, laughs, and countless memories. Mahmoud was not just a source of strength and support in my life but in the lives of so many others. He was always there—a shoulder to cry on, a friend to lean on, and a wise and compassionate presence in our community.

Mahmoud has done nothing that I have not done. He has committed no crime, nor has he ever advocated for anything that I have not also stood for. For that reason, I urge you to support his release.

Sincerely,

**Friday, March 14th**

With greatest respect,





Honorable Jesse M. Furman

United States District Judge

Southern District of New York

Thurgood Marshall Courthouse

40 Centre Street New York

Dear Judge Furman,

My name is ████████████, I am a Jewish student at Columbia University writing in support of my friend, Mahmoud Khalil. I am writing this letter because I know that if I ever needed him to do it for me, he would, and so much more, because that's the kind of person Mahmoud is. We know each other through sharing space more times than I can count, at protests and at community events and at concerts and Shabbats. He is someone who I trust implicitly. He is someone who always puts himself between those around him and danger, and he does it without thinking and without flinching. He does it even with people who he doesn't know well. We're not best friends but I know that if I was in danger, Mahmoud would do everything in his power to protect and help me—as lead negotiator during the encampment this is exactly what he did, protecting me and so many other student protestors who were being punished for speaking up against genocide. This letter is the least I can do for someone who has always selflessly and courageously put others before himself. I can't believe that it's precisely because of these incredible qualities he is being punished in this way. Mahmoud has protected Jewish students at Columbia like myself more than the university ever has. He has even protected us from the university itself. To punish him under the pretence that this kind, brave, gentle person somehow endangered us is the most egregious lie I've ever heard. His strength is only matched by his calmness even in the most stressful circumstances. I've never heard him raise his voice except at protests. I can't describe the sense of immediate comfort that one felt in his presence, and every minute I think of him detained, it hurts.

Please help Mahmoud.

**EXECUTED ON Friday March 14th**





Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

To the Honorable Judge Furman,

My name is [REDACTED], and for the past two years I have known and worked with Mahmoud Khalil on a number of occasions since meeting him as a graduate student at Columbia University. For over a year, Mahmoud and I served on the leadership board of the Columbia SIPA Palestine Working Group, a student-led organization promoting policy-related dialogue about Palestine. During this time, *he clearly and unequivocally, on multiple occasions, refused to endorse extremism in any form*. In the many, many hours spent discussing politics and Palestinian human rights issues, he never once suggested any sympathies for Hamas. I firmly stand behind this statement, to which I affix all credibility as a political science educator, a former United States Army officer, and combat veteran.

Since October 7, 2023, I have watched Mahmoud and other Arab colleagues at Columbia be subjected to the same refrain countless times: "do you condemn Hamas?". Myself and other classmates, however, were asked this to a far lesser degree. There was, and continues to be, an outsized onerous on Arab and Muslim students to repeatedly verbalize their condemnation of Hamas, as if their identity and dedication to basic human rights can only exist within the framework of violent extremism. Despite this unfair treatment, at every turn Mahmoud always answered by condemning extremism in all its forms. In the many times I have observed Mahmoud in incredibly contentious situations, he unwaveringly exuded calm, kindness, and an earnest desire for civil dialogue. In fact, many of us began lovingly calling him "Abu Khalil," or "father Khalil", reflective of his discerning, introspective leadership.

His erstwhile commitment to cross-party dialogue is so widely regarded among the student body, he was chosen from among his peers to represent Columbia's Gaza solidarity encampment (a peaceful, interfaith protest camp) as our lead negotiator. In this capacity, I

personally witnessed him serve as the epitome of leveled, good-faith dialogue for weeks. These are not the qualifiers of someone posing a threat to our national security. I would have been incredibly lucky to have someone as discerning as Mahmoud in my platoon during Operation Inherent Resolve, and I urge you to agree that that the United States will only be a more dangerous place if we forcibly remove young political voices committed to peace.

I certify that the foregoing is true and correct. Executed on (3/14/2025).



# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

        *Respondents*.

Case No. 25-cv-01935

## DECLARATION OF VERONICA R. SALAMA

I, Veronica R. Salama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the
following is true and correct:

1. My name is Veronica R. Salama. I am a licensed attorney in good standing in the state of
   New York. I am an attorney of record in the above-captioned case.

2. I represent the petitioner, Mahmoud Khalil, in this action.

3. I submit the following documents in support of Mr. Khalil's motion for preliminary
   injunctive relief in this action:

   a. Attached hereto as **Exhibit A** is a true and correct copy of the Politico article by
      Amanda Friedman, titled "Rubio Defends Detainment of Columbia Activist, Says
      More Arrests Will Come," published on March 16, 2025. I downloaded and saved
      this article in PDF format; it is also available at https://perma.cc/U3DR-KCPL.

   b. Attached hereto as **Exhibit B** is a true and correct copy of the NYTimes article by
      Luis Ferré-Sadurní and Hamed Aleaziz, titled "How a Columbia Student Fled to
      Canada After ICE Came Looking for Her," published on March 15, 2025. I
      downloaded and saved this article in PDF format; it is also available at
      https://perma.cc/3YH3-5U5K.

c. Attached hereto as **Exhibit C** is a true and correct copy of the full transcript of an interview with Troy Edgar, the Deputy Secretary of the Department of Homeland Security, on NPR's *Morning Edition* on March 13, 2025. I downloaded and saved this transcript in PDF format; it is also available at https://perma.cc/N6QY-4PWF.

d. Attached hereto as **Exhibit D** is a true and correct copy of the Associated Press article by Jake Offenhartz, titled "Immigration Agents Arrest Palestinian Activist Who Helped Lead Columbia University Protests," published on March 9, 2025. I downloaded and saved this article in PDF format; it is also available at https://perma.cc/HPH9-T2SV.

Executed on March 17, 2025
New York, New York

_____
Veronica R. Salama
Staff Attorney
New York Civil Liberties Union Foundation

**JA 501**

# EXHIBIT A





# Rubio defends detainment of Columbia activist, says more arrests will come

"I don't know where we have gotten it in our head that a visa is some sort of birthright," Rubio said.

3/17/25, 2:10 PM    Rubio defends detainment of Columbia activist as he says State Dept. could revoke hundreds more visas

Police guard the entrance to Columbia University as protesters rally in support of detained activist
Mahmoud Khalil on March 14, 2025, in New York. | Jason DeCrow/AP

By **AMANDA FRIEDMAN**
03/16/2025 04:18 PM EDT

   

Secretary of State Marco Rubio defended the decision to detain a green card
holder over his involvement in last year's pro-Palestinian protests at Columbia
University on Sunday, saying that "pro-Hamas" protesters who hold student
visas will be forced to leave the U.S.

"If you tell us when you apply for a visa, 'I'm coming to the U.S. to participate
in pro-Hamas events,' that runs counter to the foreign policy interest of the
United States … If you had told us you were going to do that, we never would
have given you the visa," Rubio said on CBS' "Face the Nation."

Top Stories from POLITICO

Read More

00:00                                                              02:00

Mahmoud Khalil, a Palestinian originally from Syria, was arrested by
immigration officials on March 8 for his involvement as a key negotiator
during Columbia's protests over the Israel-Hamas war last year. While he
entered the country on a student visa, he had eventually obtained legal
permanent U.S. residency, commonly referred to as a green card.

**JA 504**

President Donald Trump touted Khalil's detainment on social media last week as part of his effort to combat antisemitism on college campuses, saying the arrest was "the first of many to come." However, a federal judge blocked Khalil's deportation last week.

The legal battle has since spurred a debate about the First Amendment rights of foreign nationals and immigrants. Over 100 House Democrats signed a letter to the Department of Homeland Security on Friday, condemning the arrest as a violation of free speech rights and demanding the Trump administration provide evidence to justify Khalil's detainment.

But legal issues and criticism haven't deterred the Trump administration. Immigration officials arrested a second protester of Palestinian descent from Columbia on Friday for allegedly overstaying a student visa that was terminated in 2022.

"Every day we are approving visa revocations," Rubio said.

When asked by CBS moderator Margaret Brennan if there was any evidence of Khalil's link to terrorism or if the arrest was based merely on ideology, Rubio couldn't point to a specific example that backed the administration's claims that Khalil has shown material support for a terrorist organization.

"You should watch the news. These guys take over buildings. They vandalize colleges," Rubio said. "We don't need these people in our country. We never should have allowed him in … He is going to leave."

Also asked if it is only pro-Palestinian protesters who will have their visas revoked, Rubio said others' whose actions threaten the country's foreign policy interests will be subject to deportation.

"We don't want terrorists in America," Rubio said. "I don't know where we have gotten it in our head that a visa is some sort of birthright. It's not… If you violate the terms of your visitation, you're going to leave."

**FILED UNDER:** EMPLOYMENT & IMMIGRATION, IMMIGRATION, MARCO RUBIO, (⋯)

**JA 505**

# EXHIBIT B

# How a Columbia Student Fled to Canada After ICE Came Looking for Her

Ranjani Srinivasan's student visa was revoked by U.S. immigration authorities. That was just the start of her odyssey.

▶ **Listen to this article · 11:35 min**   Learn more

 

**By Luis Ferré-Sadurní and Hamed Aleaziz**

March 15, 2025

The first knock at the door came eight days ago, on a Friday morning.

Three federal immigration agents showed up at a Columbia University apartment searching for Ranjani Srinivasan, who had recently learned her student visa had been revoked. Ms. Srinivasan, an international student from India, did not open the door.

She was not home when the agents showed up again the next night, just hours before a former Columbia student living in campus housing, Mahmoud Khalil, was detained, roiling the university. Ms. Srinivasan packed a few belongings, left her cat behind with a friend and jumped on a flight to Canada at LaGuardia Airport.

When the agents returned a third time, this past Thursday night, and entered her apartment with a judicial warrant, she was gone.

"The atmosphere seemed so volatile and dangerous," Ms. Srinivasan, 37, said on Friday in an interview with The New York Times, her first public remarks since leaving. "So I just made a quick decision."

Case 2:25-cv-02357-EEF-DMD Document 19-2 Page 123 Date Filed 08/20/2025 PageID: 473

Ms. Srinivasan, a Fulbright recipient who was pursuing a doctoral degree in urban planning, was caught in the dragnet of President Trump's crackdown on pro-Palestinian demonstrators through the use of federal immigration powers. She is one of a handful of noncitizens that the Immigration and Customs Enforcement agency has targeted at Columbia in recent days.

In the week since that first knock at the door, Ms. Srinivasan says she has struggled to understand why the State Department abruptly revoked her student visa without explanation, leading Columbia to withdraw her enrollment from the university because her legal status had been terminated.



Ranjani Srinivasan was pursuing a Ph.D. in urban planning at Columbia. Ranjani Srinivasan

On Friday, while considering her future in Canada, she received some answers.

The Department of Homeland Security issued a statement that characterized Ms. Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas, a terrorist organization." The department did not provide any evidence for its allegations.

Kristi Noem, the homeland security secretary, posted surveillance footage on social media that showed Ms. Srinivasan lugging a suitcase at LaGuardia as she fled to Canada. Secretary Noem celebrated Ms. Srinivasan's departure as a "self-deportation."

"It is a privilege to be granted a visa to live & study in the United States of America," Secretary Noem wrote on X. "When you advocate for violence and terrorism that privilege should be revoked and you should not be in this country."

Ms. Srinivasan's lawyers have vehemently denied those allegations and have accused the Trump administration of revoking her visa for engaging in "protected political speech," saying she was denied "any meaningful form of due process" to challenge the visa revocation.

"Secretary Noem's tweet is not only factually wrong but fundamentally un-American," Naz Ahmad, one of Ms. Srinivasan's lawyers, said in a statement, adding: "For at least a week, D.H.S. has made clear its intent to punish her for her speech, and they have failed in their efforts."

In response to questions, officials with the Homeland Security Department said that when Ms. Srinivasan renewed her visa last year, she failed to disclose two court summonses related to protests on Columbia's campus. The department did not say how the summonses made her a terrorist sympathizer.

"I'm fearful that even the most low-level political speech or just doing what we all do — like shout into the abyss that is social media — can turn into this dystopian nightmare where somebody is calling you a terrorist sympathizer and making you, literally, fear for your life and your safety," Ms. Srinivasan said in the interview on Friday.

Ms. Srinivasan's current situation can be traced back to last year, when she was arrested at an entrance to Columbia's campus the same day that pro-Palestinian protesters occupied Hamilton Hall, a university building. She said she had not been a part of the break-in but was returning to her apartment that evening after a picnic with friends, wading through a churning crowd of protesters and barricades on West 116th Street, when the police pushed her and arrested her.

She was briefly detained and received two summonses, one for obstructing vehicular or pedestrian traffic and another for refusing to disperse. Her case was quickly dismissed and did not result in a criminal record, according to her lawyers and court documents. Ms. Srinivasan said that she never faced disciplinary action from the university and was in good academic standing.

"She was taken in with roughly 100 other people after being blocked from returning to her apartment and getting stuck in the street," said Nathan Yaffe, one of her lawyers. "The court recognized this when it dismissed her case as having no merit. Ranjani was just trying to walk home."

Ms. Srinivasan said she did not disclose the summonses in the visa renewal form later in the year because her case had been dismissed in May and she did not have a conviction.

"Because I had not and the charges were dismissed, I sort of marked it as 'no,'" she said. "But maybe that was my mistake. I would have been happy to disclose that, but just the way they had questioned us was sort of assuming that you had a conviction."

The State Department has broad discretion to revoke student visas, which it typically does if someone overstays or the government discovers fraud; convictions and arrests can also lead to revocations. Immigration lawyers said it was highly unusual for ICE to descend on college campuses searching for students with recently revoked visas as the agency has the past few days at Columbia, rattling many students.

"It is more rare for the government to act the way it has, such as in the cases in Columbia University, where they're going on campus and conducting an operation to apprehend somebody," said Greg Chen, a lawyer at the American Immigration Lawyers Association.

The Trump administration's targeting of students with visas at a university enveloped in a cultural firestorm opened a new front in the president's attempts to ramp up deportations and tamp down pro-Palestinian views. The president canceled $400 million in grants to the university after accusing it of failing to protect Jewish students. The arrests and attempted detentions of the Columbia students has led to an uproar among Democrats and civil rights groups.

Jason Houser, a senior ICE official during the Biden administration, said that "criminalizing free speech through radicalized immigration enforcement is a direct attack on our democracy."

Last week, ICE arrested Mr. Khalil, a green card holder who had become a leading face of the pro-Palestinian protests at Columbia. Mr. Trump hailed the arrest as "the first of many to come." On Friday, the Department of Homeland Security announced that it had arrested Leqaa Kordia, who had been involved in the protests at Columbia. Federal officials said she had overstayed her visa and had previously been arrested at a Columbia protest in April.

Unlike Mr. Khalil, Ms. Srinivasan said she was not an activist or a member of any group that organized demonstrations on campus.

Ms. Srinivasan said she was an architect who came to the United States from India as part of the Fulbright program in 2016 and that she enrolled at Columbia in 2020. She said she was in the fifth year of an urban planning doctoral program at the Graduate School of Architecture, Planning and Preservation, and was supposed to graduate in May.

She said that her activity on social media had been mostly limited to liking or sharing posts that highlighted "human rights violations" in the war in Gaza. And she said that she had signed several open letters related to the war, including one

JA 511

by architecture scholars that called for "Palestinian liberation."

"I'm just surprised that I'm a person of interest," she said. "I'm kind of a rando, like, absolute rando," she said, using slang for random.

It was March 5 when she received an email from the U.S. Consulate in Chennai, India, indicating that her visa had been revoked. The notice did not provide a reason, saying only that "information has come to light" that may make her ineligible for a visa.

Confused, she emailed Columbia's office for international students the following day seeking guidance. An official informed her that the revocation would take effect only if she left the country and that she could remain in the United States to pursue her studies for the time being, according to emails reviewed by The Times.

The next morning, on March 7, Ms. Srinivasan was on a call with an official from the international student office when the federal agents first knocked on the door of her apartment, which is off campus but operated by Columbia. The official told Ms. Srinivasan to call campus security, while her roommate engaged with the agents from behind the closed apartment door.

In an interview, her roommate said that the agents had initially identified themselves as "police," declined to provide their badge numbers, saying they feared they would be doxxed, and stood to the side of the door so that they were not visible through the peep hole. The roommate, a fellow Columbia student who spoke on the condition of anonymity out of fear for her safety, said that the building's doorman, who is an immigrant, later told her that he had let the three agents into the building because he was frightened.

Ms. Srinivasan abandoned the apartment that night, so she was not there when officials returned the following evening. Her roommate once again refused to open the door to let them in and recorded audio of the interaction, which she shared with The Times.

"We were here yesterday," one of the officials says, believing he was talking to Ms. Srinivasan because the roommate had not identified herself. "We're here today. We're here tonight. Tomorrow. You're probably scared. If you are, I get it. The reality is, your visa was revoked. You are now amenable to removal proceedings."

The official stressed that he and his colleagues were not trying to break the law, that she would have the right to go before an immigration judge and left a phone number for the Homeland Security Department that she could call if she had "a change of heart."

"That's the easiest and fastest way to do this, as opposed to you being in your apartment and us knocking on your door every day, which is just silly," he said. "You're a very smart person. It's just not — it's not worth it."

The next day, Ms. Srinivasan received an email from Columbia saying that homeland security had alerted the university that her visa had been revoked and her legal status in the country had been terminated. Because she had to immediately leave the United States, the email said, her enrollment at Columbia had been withdrawn and she had to vacate student housing.

The email, signed by the university's international student office, said that, in compliance with its legal obligations, Columbia was asking her to meet with the homeland security agents. The university declined to comment on Ms. Srinivasan's case.

On Thursday night, three federal agents returned to Ms. Srinivasan's apartment with a search warrant signed by a judge and went inside to search for her, according to her roommate and lawyers.

By then, Ms. Srinivasan was already in Canada.

Edward Wong contributed reporting. Alain Delaquérière contributed research.

*A correction was made on March 15, 2025: An earlier version of this article, relying on information provided by a spokesperson, misstated the surname of one of Ranjani Srinivasan's lawyers. She is Naz Ahmad, not Ahmed.*

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.  Learn more

**Luis Ferré-Sadurní** is a Times reporter covering immigration, focused on the influx of migrants arriving in the New York region. More about Luis Ferré-Sadurní

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy. More about Hamed Aleaziz

A version of this article appears in print on , Section A, Page 13 of the New York edition with the headline: A Fleeing Student's 'Dystopian Nightmare'

# EXHIBIT C

Case 2:25-cv-02357-EF Document 19-2 Page 131 Date Filed 08/20/2025 PageID: 481

**< DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened**

MARCH 13, 2025 4:18 AM ET

5-Minute Listen          **PLAYLIST**    TRANSCRIPT

MICHEL MARTIN, HOST:

President Trump has ramped up efforts to deliver on a campaign promise to carry out the largest ever deportation of migrants without legal status in U.S. history. Parallel to that effort is a crackdown on what the administration terms antisemitism on college campuses. Last weekend, a former student protest leader was arrested in New York City. Mahmoud Khalil, who has lawful permanent residency, a so-called green card, is being held in the Louisiana detention center. U.S. Immigration and Customs Enforcement, or ICE, says his green card was revoked. A judge ordered that he may not be deported, though, while the court weighs a legal challenge brought by his lawyers. Troy Edgar was just sworn in as Deputy Secretary of the Department of Homeland Security, and he is with us now to talk more about this. Good morning. Congratulations on your confirmation and also your return to the department. You served in the First Trump administration, as well.

TROY EDGAR: Yeah. Good morning, Michel. Very nice to be here.

MARTIN: Thanks so much...

EDGAR: Thank you.

MARTIN: ...For joining us. So Mahmoud Khalil says he acted as a spokesperson for pro-Palestinian demonstrators and as a mediator with Columbia University where he was a graduate student. As you know, Mr. Edgar, any conduct that can be legally sanctioned must be described. So what is the specific conduct the government alleges that Mr. Khalil engaged in that merits removal from the United States?

EDGAR: Yeah. Well, I think what you saw there is you've got somebody that has come into the country on a visa. And as he's going through the process of that visa process, he's come in to

**JA 516**

basically be a student that is not going to be supporting terrorism. So, you know, the issue is, you know, he was let in the country on this visa. He has been promoting this antisemitism activity at the university. And, you know, at this point, the State Department has revoked his visa for supporting that terrorist-type organization, and we're the enforcing agency, so we've come in to basically arrest him.

MARTIN: OK. So a White House official told the free press that there's no allegation that he broke any laws. So again, I have to ask, what specifically constitute terrorist activity that he was supporting? What exactly do you say he did?

EDGAR: Well, like I said, you know, when you apply for a visa, you go through the process to be able to say that, you know, you're here on a student visa. It doesn't afford you all the rights of coming in and basically going through this process, agitating and supporting Hamas. So at this point, you know, the Secretary of State and the State Department maintains the right to revoke the visa and that's what they've done.

MARTIN: So what - how did he support Hamas? Exactly what did he do?

EDGAR: Well, I think you can see it on TV, right? It's - this is somebody that, you know, we've invited and allowed the student to come into the country, and he put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it...

MARTIN: Forgive me - he's a...

EDGAR: ...And that's what we've done.

MARTIN: ...Permanent resident. He's not a visa holder. He's a legal permanent resident. He has the green card, at least he did until it's alleged that it was revoked. So, look, if the allegation is that Mr. Khalil organized protests and made speeches, after which other people engaged in prohibited activity or say, violent activity, well, Mr. Trump gave a political speech on January 6, 2021, after which some individuals engaged in violent and illegal acts. How is this any different?

EDGAR: Yeah. Well, like I said, I mean, President Trump's a citizen and president of the United States. This is a person that came in under a visa. And again, the Secretary of State,

**JA 517**

at any point, can take a look and evaluate that visa and decide if they want to revoke it and...

MARTIN: He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?

EDGAR: Like I said, I think that at this point, when he was - entered into the country on a student visa, at any point, we can go through and evaluate what his status is and the Secretary of State is basically...

MARTIN: Is any criticism of the United States government a deportable offense?

EDGAR: Like I said, you know, if you go through the process and you're a student and you're here on a visa and you go through at any point, you...

MARTIN: Is any criticism of the government a deportable offense?

EDGAR: Like I said, you know, as a student, he comes to the United States on a student visa, applies - let me put it this way, Michel - imagine if he came in and filled out the form and said I want a student visa. They ask him, what are you going to do here? I he said I'm going...

MARTIN: He was a student.

EDGAR: ...To go and protest. And...

MARTIN: So is protest...

EDGAR: ...Join an antisemitic activity...

MARTIN: ...A deportable event?

EDGAR: ...We would never have let him in the country.

MARTIN: Is protesting a deportable offense?

EDGAR: Like I said, you're focused on protesting. I'm focused on it's a visa process. He went through a legal process, came into the country...

MARTIN: Are you saying that he lied on his application? He's a lawful...

EDGAR: Well, I think...

MARTIN: ...Permanent resident, married to an American citizen.

## JA 518

EDGAR: Well, I think if he would have declared he's a terrorist, we would have never let him in.

MARTIN: And what did he engage in that constitutes terrorist activity?

EDGAR: I mean, Michel, have you watched it on TV? It's pretty clear.

MARTIN: No, it isn't. Well, explain it to those of us who have not or perhaps others have not. What exactly did he do?

EDGAR: Well, I think it's clear or we wouldn't be talking about it. I mean, the reality is that if you watch and see what he's done on the university...

MARTIN: Do you not know?

EDGAR: ...And he came in. If he would have declared that he...

MARTIN: Are you telling us that you're not aware? You don't know what he did that is a deportable offence.

EDGAR: No, I find it interesting that you're not aware.

MARTIN: Oh, I think you could explain it to us. I think others would like to know exactly what the offenses are, what the propaganda was that you allege, what the activity was that you allege. Well, perhaps we can talk again and you can give us more details about this. That's Department of Homeland Security Deputy Secretary Troy Edgar, Mr. Edgar, we really appreciate you coming to join us, and we do hope we'll talk again.

EDGAR: Thank you.

*Copyright © 2025 NPR. All rights reserved. Visit our website* terms of use *and* permissions *pages at* www.npr.org *for further information.*

*NPR transcripts are created on a rush deadline by an NPR contractor. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

**JA 519**

# EXHIBIT D



AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

**DONATE**

U.S. NEWS

## Immigration agents arrest Palestinian activist who helped lead Columbia University protests



 BY **JAKE OFFENHARTZ**
Updated 11:37 PM EDT, March 9, 2025

---

**UPDATE**: A judge has ordered the Trump administration not to deport Palestinian activist pending legal fight over his detention.

---

NEW YORK (AP) — Federal immigration authorities arrested a Palestinian activist Saturday who played a prominent role in Columbia University's protests against Israel, a significant escalation in the Trump administration's pledge to detain and deport student activists.

Mahmoud Khalil, a graduate student at Columbia until this past December, was inside his university-owned apartment Saturday night when several Immigration and Customs Enforcement agents entered and took him into custody, his attorney, Amy Greer, told The Associated Press.

Greer said she spoke by phone with one of the ICE agents during the arrest, who said they were acting on State Department orders to revoke Khalil's student visa. Informed by the attorney that Khalil was in the United States as a permanent resident with a green card, the agent said they were revoking that instead, according to the lawyer.

ADVERTISEMENT



Add to cart

A spokesperson for the Department of Homeland Security, Tricia McLaughlin, confirmed Khalil's arrest in a statement Sunday, describing it as being "in support of President Trump's executive orders prohibiting anti-Semitism."



0:00 / 48

**AP AUDIO: ICE arrests Palestinian activist who helped lead Columbia University protests, his lawyer says**
AP correspondent Julie Walker reports ICE arrests a Palestinian activist who helped lead Columbia University protests.

**RELATED STORIES**



JA 522

**Arrest of Palestinian activist stirs questions about protections for students and green card holders**



**Leader of student protests at Columbia facing deportation**



**Who is Mahmoud Khalil, the Columbia student activist arrested by ICE?**

Khalil's arrest is the first publicly known deportation effort under Trump's promised crackdown on students who joined protests against the war in Gaza that swept college campuses last spring. The administration has claimed participants forfeited their rights to remain in the country by supporting Hamas.

McLaughlin signaled the arrest was directly connected to Khalil's role in the protests, alleging he "led activities aligned to Hamas, a designated terrorist organization."

As ICE agents arrived at Khalil's Manhattan residence Saturday night, they also threatened to arrest Khalil's wife, an American citizen who is eight months pregnant, Greer said.

**JA 523**

Khalil's attorney said they were initially informed that he was being held at an immigration detention facility in Elizabeth, New Jersey. But when his wife tried to visit Sunday, she learned he was not there. Greer said she still did not know Khalil's whereabouts as of Sunday night.

ADVERTISEMENT



Add to cart

"We have not been able to get any more details about why he is being detained," Greer told the AP. "This is a clear escalation. The administration is following through on its threats."

A Columbia University spokesperson said law enforcement agents must produce a warrant before entering university property, but declined to say if the school had received one ahead of Khalil's arrest. The spokesperson declined to comment on Khalil's detention.

In a message shared on X Sunday evening, Secretary of State Marco Rubio said the administration "will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

▶ Follow live updates on President Donald Trump and his administration

The Department of Homeland Security can initiate deportation proceedings against green card holders for a broad range of alleged criminal activity, including supporting a terror group. But the detention of a legal permanent resident who has not been charged with a crime marked an extraordinary move with an uncertain legal foundation, according to immigration experts.

"This has the appearance of a retaliatory action against someone who expressed an opinion the Trump administration didn't like," said Camille Mackler, founder of Immigrant ARC, a coalition of legal service providers in New York.

Khalil, who received his master's degree from Columbia's school of international affairs last semester, served as a negotiator for students as they bargained with university officials over an end to the tent encampment erected on campus last spring.

The role made him one of the most visible activists in support of the movement, [prompting calls](#) from pro-Israel activists in recent weeks for the Trump administration to begin deportation proceedings against him.

Khalil was also among those [under investigation by a new Columbia University office](#) that has brought disciplinary charges against dozens of students for their pro-Palestinian activism, according to records shared with the AP.

The investigations come as the Trump administration has [followed through on its threat](#) to cut hundreds of millions of dollars in funding to Columbia because of what the government describes as the Ivy League school's failure to squelch antisemitism on campus.

The university's allegations against Khalil focused on his involvement in the Columbia University Apartheid Divest group. He faced sanctions for potentially helping to organize an "unauthorized marching event" in which participants glorified Hamas' Oct. 7, 2023, attack and playing a "substantial role" in the circulation of social media posts criticizing Zionism, among other acts of alleged discrimination.

"I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," Khalil told the AP last week.

"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," he added. "It's mainly an office to chill pro-Palestine speech."



**JAKE OFFENHARTZ**
Offenhartz is a general assignment reporter in the New York City bureau of The Associated Press.

X ✉



ADVERTISEMENT

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

MAHMOUD KHALIL,

                Petitioner,

       v.

WILLIAM P. JOYCE, *et al.*,

                Respondents.

No. 25 Civ. 1935 (JMF)

SECOND SUPPLEMENTAL DECLARATION
OF ACTING FIELD OFFICE DIRECTOR
WILLIAM P. JOYCE

---

## SECOND SUPPLEMENTAL DECLARATION OF WILLIAM P. JOYCE

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      I am aware that Mahmoud Khalil ("Khalil") has filed an Amended Petition for a Writ for Habeas Corpus before this Court.

3.      As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.      On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.      On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. at 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m. and arrived at 9:20 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States ("Exhibit A"). HSI also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.      Due to the lack of available detention space available to ERO New York, aliens arrested by ICE in that AOR are often detained at facilities in other AORs. This is an operational necessity to prevent overcrowding in ICE facilities.

9.      Orange County Jail in Goshen, New York did not have available detention space to accommodate Khalil and many ICE detention facilities throughout the Northeastern United States

are near or at capacity and engaged in efforts to relocate detained aliens to regions with available bedspace.

10.     Between March 8, 2025, and March 9, 2025, ERO New York transported sixteen detained aliens, including Khalil, from ERO New York's AOR to New Orleans Field Office of Enforcement and Removal Operations ("ERO New Orleans") AOR. Most of these transfers were for ongoing detention, while a small number were being staged for removal.  ERO New Orleans has administrative control of eight different detention facilities, meaning that AOR is often able to accommodate transfers when other AORs are not.

11.     Newark Field Office of Enforcement and Removal Operations ("ERO Newark") indicated that Elizabeth Detention Facility in Newark, New Jersey was experiencing and continues to experience a bedbug issue that prevented them from accepting detainees as full transfers. ERO New York did not request bed space from Philadelphia Field Office of Enforcement and Removal Operations ("ERO Philadelphia") or Buffalo Field Office of Enforcement and Removal Operations ("ERO Buffalo") based on awareness of general paucity of bedspace in those AORs compared to the known availability of bedspace in ERO New Orleans' AOR, as well as the need for those AORs to accommodate their own ongoing operations.

12.     While Khalil was at 26 Federal Plaza, ERO sought and obtained bedspace for Khalil from the ERO New Orleans Field Office.  The bedspace request for Khalil was made at 10:49 p.m. on March 8, 2025.  The travel packet for Khalil and his escorting officers was finalized at 3:57 a.m. on March 9, 2025, with a flight scheduled for 2:35 p.m. on March 9, 2025.

13.     ERO New York was responsible for locating bed space to detain Khalil and made its decisions on where to detain him based solely on operational considerations.

14.     ERO New York did not receive any directives or instructions pertaining to Khalil's detention.

15.     ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff. ICE ERO policy number 11087.2 dictates that absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours.

16.     In compliance with this policy, upon completion of initial processing, Khalil departed 26 Federal Plaza at 1:40 a.m. and ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025.  Elizabeth Detention Facility has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff. As stated above, Khalil could not be housed at Elizabeth Detention Facility long-term due to the bedbug issue, so he remained there only until his flight to New Orleans.

17.     At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

18.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

19.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., Central Time and he has been detained at that detention facility since that time. ICE has no current plans or intentions to transfer Khalil from ERO New Orleans' AOR during the pendency of removal proceedings.

20.     Except for this ongoing lawsuit, ERO New York is not involved in Khalil's immigration removal proceedings which are pending before the LaSalle Immigration Court in Jena, Louisiana.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of March 2025.



WILLIAM P. JOYCE
Digitally signed by WILLIAM P JOYCE
DN: cn=WILLIAM P JOYCE, o=U.S.
Government, ou=People,
email=William.P.Joyce@ice.dhs.gov,
c=US
Date: 2025-03-17T15:18:35-0400

William P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exhibit A

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB: ▮

Event No: ▮

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: ▮          FINS: ▮          File No: ▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮

(Number, street, city, state and ZIP code)          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:          ☐ 8CFR 208.30          ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY

(Complete Address of Immigration Court, including Room Number, if any)

on ___March 27, 2025___ at ___8:30 AM___ to show why you should not be removed from the United States based on the
         (Date)                    (Time)

charge(s) set forth above.          TIMOTHY MORAN - Supervisory Special Agent   TIMOTHY M MORAN JR   *Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.09 09:41:11 -05'00'*

(Signature and Title of Issuing Officer)

Date: ___March 9, 2025___          26 Federal Plaza, New York, NY

(City and State)

DHS Form I-862 (6/22)          Page 1 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_(Signature of Respondent)_

_____
_(Signature and Title of Immigration Officer)_

Date: _____

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 9, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) *Refused to sign* (TB)
_(Signature of Respondent if Personally Served)_

TIMOTHY M MORAN JR _Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.09 16:41:26 -05'00'_
TIMOTHY MORAN - Supervisory Special Agent
_(Signature and Title of officer)_

DHS Form I-862 (6/22)

**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR – 3 of 3

**JA 534**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                       :

MAHMOUD KHALIL,                      :

                Petitioner,      :

                              :            25-CV-1935 (JMF)

        -v-                :

                              :            <u>OPINION AND ORDER</u>

WILLIAM P. JOYCE et al.,        :

                              :

              Respondents.     :

--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      At the heart of this case is the important question of whether and under what circumstances the Government may rescind a person's lawful permanent resident status and remove him from the United States.  It is raised by way of a petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2241, that was filed on behalf of Mahmoud Khalil, a graduate student at Columbia University.  On March 8, 2025, immigration authorities arrested and detained Khalil, a green card holder and the husband of a United States citizen, based on a determination by the Secretary of State of the United States that his "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States."  8 U.S.C. § 1227(a)(4)(C)(i).  In his Petition, Khalil alleges that the Secretary of State made this determination to "retaliate against and punish" him for his "participation in protests" on and around Columbia's campus "concerning Israel's military campaign in Gaza."  ECF No. 38 ("Petition"), ¶¶ 2-3.  He argues that his arrest, detention, and prospective removal violate his First Amendment right to freedom of speech, his Fifth Amendment right to due process of law, as well as the Administrative Procedure Act, 5 U.S.C. § 706(2).  Petition ¶¶ 88-

99.  He seeks an order directing his release from detention and setting aside the Secretary of State's determination.  *See id.* at Prayer for Relief ¶¶ 2-3, 5-6.

These are serious allegations and arguments that, no doubt, warrant careful review by a court of law; the fundamental constitutional principle that all persons in the United States are entitled to due process of law demands no less.[1]  But before the Court may review Khalil's allegations and arguments, it must confront a threshold question: whether it is the proper tribunal to even consider Khalil's Petition.  Generally, a person challenging his detention through a habeas petition is required to file that petition in the federal district where he is detained at the time of filing and to name as the respondent the custodian detaining him there.  The Supreme Court articulated and applied these "longstanding" rules — known as the "district of confinement" and "immediate custodian" rules — in a case that could be described as even more extraordinary than this one: a habeas petition filed on behalf of Jose Padilla, a United States citizen who was designated an "enemy combatant" and detained by the military.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 449 (2004).  Lower courts, including this Court, have since held that these rules apply to habeas petitions filed by people held in immigration detention, such as Khalil, at least to the extent that they seek release.  Relying on the district-of-confinement and immediate-custodian rules, the Government moves to dismiss Khalil's Petition or to transfer it to the Western District of Louisiana, where he was taken by the Government on March 10, 2025, and has since been detained.  By contrast, Khalil argues that this Court should hear his Petition; in

---

[1]      In many instances, a person who argues that the Government's efforts to remove him from the United States are unlawful must await entry of a final order of removal and then file in the appropriate court of appeals a petition for review of that order.  *See, e.g., Michalski v. Decker*, 279 F. Supp. 3d 487, 492-95 (S.D.N.Y. 2018); *Yearwood v. Barr*, 391 F. Supp. 3d 255, 262-63 (S.D.N.Y. 2019).  The Court need not and does not address whether that is the route that Khalil must take to raise the claims that he brings in his petition here.

the alternative, he argues that it should be transferred to the District of New Jersey, where he was detained at the time that his lawyer filed the Petition, not to the Western District of Louisiana.

For the reasons set forth below, the Court agrees with the Government that Khalil's Petition cannot be heard in this District and agrees with Khalil that it should be transferred to the District of New Jersey, not dismissed or transferred to the Western District of Louisiana. These conclusions flow from the undisputed fact that, at 4:40 a.m. on March 9, 2025, when Khalil's lawyer filed the Petition on his behalf, he was detained in New Jersey. A straightforward application of the district-of-confinement and immediate-custodian rules therefore dictates that Khalil's Petition should have been filed in the United States District Court for the District of New Jersey, not in this Court. Khalil makes various arguments in an effort to avoid that conclusion, most notably seizing on a concurring opinion in *Padilla*, in which Justice Anthony M. Kennedy, joined by Justice Sandra Day O'Connor, observed that he "would acknowledge an exception" to the district-of-confinement and immediate-custodian rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." 542 U.S. at 454 (Kennedy, J., concurring). But it is not clear that Justice Kennedy's opinion is the law of the land; nor has any court ever found that his exceptions applied. In any event, even if Justice Kennedy's exceptions were the law (or the Court were to adopt them), they would not aid Khalil. That is because he has not alleged facts indicating that his transfer from this District to the District of New Jersey — the only transfer relevant to the jurisdictional analysis — was done for an improper purpose or that the Government was not forthcoming about his whereabouts in a way that meaningfully affected his ability to seek, let alone obtain, judicial review of his detention.

For these reasons, elaborated upon below, the Court concludes that it may not entertain Khalil's Petition.  But the Court rejects the Government's requests to dismiss the case or to transfer it to the Western District of Louisiana.  As to the former, transfer, rather than dismissal, is the path that courts usually take in these circumstances.  That path is all the more appropriate in this case, as dismissal would mean vacatur of this Court's order barring Khalil's removal from the United States until his claims can be addressed, *see* ECF No. 9, and thus might allow the Government to frustrate Khalil's effort to obtain judicial review of his claims by removing him from the country before a court could rule.  Moreover, Khalil filed in the wrong district through no fault of his own; his lawyer reasonably relied on the information made available to her by the Government at the time of filing.  As to the latter, the Court concludes that a straightforward application of well-established federal law mandates transfer of the case to the District of New Jersey because, under the immediate-custodian and district-of-confinement rules, it is the one and only district in which Khalil could have filed his Petition at the time this action commenced. Congress has prescribed the district to which this case must be transferred, and it is New Jersey. The Court is no less bound by these laws to transfer to the District of New Jersey than it is bound by the immediate-custodian and district-of-confinement rules to decline jurisdiction.

In many ways, this is indeed an exceptional case, and there is a need for careful judicial review.  Such judicial review is especially critical when, as here, there are colorable claims that the Executive Branch has violated the law or exercised its otherwise lawful authority in an arbitrary and discriminatory manner.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  But the Supreme Court has made clear that the "longstanding" immediate-custodian and district-of-confinement rules apply without regard for whether a case is "'exceptional,' 'special,' or 'unusual.'"  *Padilla*, 542 U.S. at 449-50.  And in an exceptional case, it is all the more important

for a court to apply well-established principles to the facts, lest emotions or passions interfere with reasoned analysis; that is the essence of the rule of law.  For the reasons that follow, the Court concludes that well-established principles call for this Court to transfer Khalil's Petition to the United States District Court for the District of New Jersey, and the Court orders that the case be so transferred forthwith.  To preserve the status quo and ensure that Khalil gets an opportunity to have his claims heard in due course, the Court's Order barring the Government from removing Khalil, *see* ECF No. 9, shall remain in effect unless and until the transferee court orders otherwise.  It will be up to that court to consider Khalil's claims as well as the motions that he has filed to date in connection with his claims, namely a motion to transfer him from his present place of confinement to a detention facility in this District, ECF No. 11; a motion for release on bail, ECF No. 53; and a motion for preliminary injunctive relief, ECF No. 66.

## RELEVANT FACTS

Many of the facts in this case are hotly contested.  For instance, the Petition depicts Khalil — who entered the United States in December 2022 on a student visa to attend Columbia University's School of International and Public Affairs, is married to a United States citizen, and has been a lawful permanent resident since 2024 — as an outspoken but peaceful leader of student protests held at Columbia University against Israel's actions in Gaza since the atrocities of October 7, 2023.  Petition ¶¶ 20-29.  By contrast, the Government has issued statements describing Khalil as leading "activities aligned to Hamas," "siding with terrorists," and a "threat to the foreign policy and national interests of the United States."  *Id.* ¶¶ 74, 76-77, 79.  More significant for present purposes, the Secretary of State has made a formal finding that Khalil's "presence or activities in the United States would have serious adverse foreign policy consequences for the United States," *id.* ¶ 82; *see also* ECF No. 48, at 7 (Notice to Appear), and,

on that basis, the Government apparently canceled Khalil's green card and now seeks his removal from the United States, *see* 8 U.S.C. § 1227(a)(4)(C)(i).

Significantly, however, the facts relevant to the threshold question of where this case should be heard — all of which relate to events between March 8 and 10, 2025 — are not really in dispute. On March 8, 2025, at approximately 8:30 p.m., agents from the United States Department of Homeland Security ("DHS") arrested Khalil outside his Columbia University apartment in New York City. Petition ¶¶ 45-48; ECF No. 48 ("Mar. 14, 2025 Joyce Decl."), ¶ 7. The agents approached Khalil and his wife and asked him to confirm his identity. Petition ¶ 47. When he did, the agents identified themselves as DHS agents and declared that they were taking him into custody. *Id.* Khalil asked why the agents were there, to which they replied that Khalil's visa had been revoked. *Id.* ¶ 48. Khalil then called his attorney, Amy Greer, who spoke with one of the agents present — Special Agent Elvin Hernandez — and explained that Khalil is a lawful permanent resident. *Id.* ¶¶ 49-51. Hernandez responded that the State Department had also revoked Khalil's green card and that he would be brought before an immigration judge. *Id.* ¶ 51.[2] The agents handcuffed Khalil, then informed his wife and lawyer that they were taking him to 26 Federal Plaza, the Immigration and Customs Enforcement ("ICE") Field Office in Manhattan. *Id.* ¶¶ 51-53. They proceeded to take him there, arriving at 9:20 p.m. *Id.* ¶ 58; Mar. 14, 2025 Joyce Decl. ¶ 7.

Once Khalil arrived at 26 Federal Plaza, ICE agents took his biometrics. Petition ¶ 58. While there, Khalil overheard an agent say to Agent Hernandez that "the White House is

---

[2]      The Petition alleges that when Khalil's wife presented to one of the DHS agents documents "confirming Mr. Khalil's status as a lawful permanent resident," the agent "looked confused" and said to someone on the telephone: "'He has a green card.'" Petition ¶ 52. Khalil's wife then "heard the agent repeat that they were being ordered to bring Mr. Khalil anyway." *Id.*

requesting an update." *Id.* Khalil was then asked to sign a Notice to Appear ("NTA") for removal proceedings, a document that provides notice of the grounds for a noncitizen's removal from the country, and a Notice of Custody Determination, a document that provides notice of the grounds for a noncitizen's detention during removal proceedings. *Id.* ¶ 59; Mar. 14, 2025 Joyce Decl. ¶ 7. The Notice to Appear ordered Khalil to appear before an immigration judge at "830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM." Petition ¶ 60; *see* ECF No. 48, at 7. The document was dated March 9, 2025, and the issuing officer's signature was timestamped at 12:40 a.m. Petition ¶ 60; *see* ECF No. 48, at 7-8. An ICE agent denied Khalil's request to speak with his lawyer about the Notice to Appear and the Notice of Custody Determination, and Khalil refused to sign the documents. Petition ¶ 59.

In the meantime, Greer began checking ICE's online Detainee Locator in an effort to locate Khalil. She first did so at 10:00 p.m. on March 8, 2025, but Khalil was not yet listed in the system. *Id.* ¶ 54. She checked the Detainee Locator again at 1:35 a.m. on Sunday, March 9, 2025, at which time Khalil was listed as being in custody in New York. *Id.* At 4:29 a.m., Greer checked the Detainee Locator again and observed that Khalil was still listed as being in New York. *Id.*[3] Eleven minutes later, at 4:40 a.m., Greer filed the Petition on Khalil's behalf; she filed it in this District "based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza" (which is located in this District). *Id.*; *see also* ECF No. 2. The Petition named as Respondents William P. Joyce, the Acting Field Office Director of the New York Field Office for ICE; Caleb Vitello, the Acting Director of ICE; Kristi Noem, the Secretary of DHS; and Pamela Bondi, the Attorney General of the United States. *See* ECF No. 2, ¶¶ 2-5. (The Petition has since been amended to name two additional Respondents, Donald J. Trump, the

---

[3]    Although it is immaterial for present purposes, the Court notes that, on March 9, 2025, at 2:00 a.m. (Eastern Standard Time), the time changed to 3:00 a.m. (Eastern Daylight Time).

President of the United States; and Marco Rubio; the Secretary of State, and is now styled "Amended Petition for Writ of Habeas Corpus and Complaint."  *See* Petition ¶¶ 10, 14.)

Significantly, it turns out that Khalil was no longer in the Southern District of New York when Greer filed the Petition.  Declarations filed by the Government — and not disputed by Khalil — reveal that, on March 9, 2025, at 1:40 a.m. (Eastern Standard Time), ICE agents transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility in Newark, New Jersey, into which he was booked at 3:20 a.m. (Eastern Daylight Time — i.e., forty minutes after leaving 26 Federal Plaza).  *See e.g.*, Mar. 14, 2025 Joyce Decl. ¶ 14; *see* ECF No. 32 ("Mar. 12, 2025 Joyce Decl."), ¶ 8.  According to the Government, 26 Federal Plaza is a "Hold Room facility" used only for temporary detention and "does not have beds or overnight medical staff." Mar. 14, 2025 Joyce Decl. ¶ 13.  Further, ICE policy provides that, "absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* (discussing ICE ERO policy number 11087.2).  "In compliance with this policy," ICE transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility.  *Id.* ¶ 14.  The Government explains this move on the ground that, "[d]ue to a lack of detention space available" to ICE's New York Field Office, noncitizens arrested by ICE in the New York City area are frequently detained at facilities located elsewhere.  *Id.* ¶ 8.  It further explains that the Orange County Jail, which is located in this District, "did not have available detention space."  *Id.* ¶ 9.

Although Khalil had left New York by 3:20 a.m. on March 9, 2025, the ICE Detainee Locator was not updated until later that morning.  *See* Petition ¶ 55 ("The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York.").  "Sometime after 9 a.m." that day, the Detainee Locator changed to say — accurately — that he was detained at the Elizabeth Detention Facility in New Jersey.  *Id.*  At 9:29 a.m., Khalil's immigration attorney twice attempted to call the Elizabeth Detention Facility, but no one

answered.  *Id.*  At around 11:20 a.m. the same day, Khalil's wife went to the Elizabeth Detention Facility to see him, but she was informed that Khalil was not showing up in the system.  *Id.*

At 11:30 a.m., agents removed Khalil from the Elizabeth Detention Facility to take him to the Central Louisiana ICE Processing Facility (also known as the LaSalle Detention Facility) located in Jena, Louisiana, where his removal hearing was noticed to occur on March 27, 2025.  Mar. 14, 2025 Joyce Decl. ¶¶ 16-17; *see* Petition ¶ 60; ECF No. 48, at 7.  The Government explains that the Elizabeth Detention Facility "was experiencing and continues to experience a bedbug issue that prevented [the facility] from accepting detainees as full transfers."  Mar. 14, 2025 Joyce Decl. ¶ 11.  Therefore, even before Khalil was moved from 26 Federal Plaza to the Elizabeth Detention Facility, the New York ICE office had requested and secured bedspace for Khalil from the New Orleans ICE Field Office and began arranging a flight to transport him there at 2:35 p.m. on March 9, 2025.  *Id.* ¶ 12; ECF No. 72 ("Mar. 17, 2025 Joyce Decl."), ¶ 12.[4] The Government maintains that the New York Field Office "was responsible for locating bed space to detain Khalil," that it "did not receive any directives or instructions pertaining to Khalil's detention," and that it "made its decisions on where to detain him based solely on operational considerations."  Mar. 17, 2025 Joyce Decl. ¶¶ 13-14.

Around noon on March 9, 2025, agents took Khalil to John F. Kennedy Airport in the Eastern District of New York (presumably passing back through the Southern District of New York en route).  Mar. 14, 2025 Joyce Decl. ¶ 16; *see* Petition ¶ 63.  At 1:22 p.m., Khalil's counsel emailed ICE in an effort to reach him; at 1:47 p.m., ICE responded — truthfully — by

---

[4]     The Government represents that Khalil was one of sixteen detained noncitizens transported from the New York Field Office's area of responsibility to the New Orleans Field Office's area of responsibility between March 8, 2025, and March 9, 2025.  Mar. 14, 2025 Joyce Decl. ¶ 10.  Most of these transfers were for ongoing detention, as with Khalil, while a "small number" were moved there in preparation for removal from the country.  *Id.*

email that Khalil was in the process of being transferred to a detention facility within the New Orleans ICE Field Office's area of responsibility. Petition ¶ 56. Khalil's counsel then contacted the U.S. Attorney's Office for the Southern District of New York, which confirmed that Khalil was en route to Louisiana. *Id.* Meanwhile, at John F. Kennedy Airport, Khalil boarded a flight at around 2:45 p.m. that brought him to Dallas, Texas, in the Northern District of Texas. *See id.* ¶ 65. From there, Khalil was placed on another flight at around 9:30 p.m., which landed in Alexandria, Louisiana, in the Western District of Louisiana, at around 1:00 a.m. on March 10, 2025. *Id.* ¶¶ 66-67. From there, agents drove Khalil to the Louisiana Detention Facility in Jena, Louisiana, in the Western District of Louisiana, into which he was booked at 1:33 a.m. on March 10, 2025. *Id.* ¶¶ 67, 70; Mar. 14, 2025 Joyce Decl. ¶ 17. He remains there today. Mar. 17, 2025 Joyce Decl. ¶ 19. The Government represents that "ICE has no current plans or intentions to transfer Khalil from [that facility] during the pendency of removal proceedings." *Id.*

## DISCUSSION

The "merits of this case" — involving, among other things, the rights of a person lawfully present in the United States to the protections of the First and Fifth Amendments to the United States Constitution — are "indisputably of profound importance." *Padilla,* 542 U.S. at 450 (internal quotation marks omitted). As the Supreme Court has admonished, however, "it is surely just as necessary in important cases as in unimportant ones that courts take care not to exceed their respective jurisdictions established by Congress." *Id.* at 450-51 (internal quotation marks omitted). Thus, before the Court may address the merits of Khalil's important claims, it must address the Government's contention — made in a motion to dismiss or transfer Khalil's Petition — that it is not the proper tribunal to hear those claims. For reasons that follow, the Court agrees with the Government that it may not entertain the merits of Khalil's Petition, and it agrees with Khalil that the proper course is to transfer the Petition to the District of New Jersey.

## A. This Court Lacks Jurisdiction to Consider Khalil's Petition

The Court begins with the central question of whether it may entertain Khalil's Petition given the undisputed fact that he was not in this District when his lawyer filed the Petition.

### 1. Applicable Law

The starting point for analysis is *Rumsfeld v. Padilla*, the Supreme Court's most recent and most relevant decision on the question of where a habeas petition can be heard. *Padilla* involved a United States citizen who was initially detained in the Southern District of New York on a material witness warrant (in connection with a grand jury investigation into the September 11th terrorist attacks), but then transferred into military custody in Charleston, South Carolina upon being designated by President George W. Bush as an "enemy combatant." 542 U.S. at 430. Two days after his transfer to South Carolina, Padilla's lawyer filed a habeas petition, pursuant to 28 U.S.C. § 2241, in the Southern District of New York, naming as respondents the President, the Secretary of Defense, and the Commander of the Consolidated Naval Brig in Charleston, where Padilla was then detained. *Id.* at 432. The Supreme Court granted certiorari to consider, among other things, whether Padilla properly filed his habeas petition in this District. *Id.* at 434. That question, the Court concluded, "br[oke] down into two related subquestions": first, who the proper respondent was for Padilla's petition, and second, where his petition seeking relief against that respondent should have been filed. *Id.*

As to the former, the Supreme Court concluded that both the statutory language of the federal habeas statute and its previous decision in *Wales v. Whitney*, 114 U.S. 564 (1885), confirmed the "longstanding practice" that in a "core" habeas petition challenging "present physical confinement," the proper respondent is the "the warden of the facility where the petitioner is being held," not a "remote supervisory official." *Padilla*, 542 U.S. at 435. The Court called this the "immediate custodian rule." *Id.* In reaching that conclusion, the Supreme

Court rejected the petitioner's argument that its decision in *Ex parte Endo*, 323 U.S. 283 (1944), called for a contrary result. In *Endo*, the Supreme Court had allowed a habeas petition by a Japanese-American citizen originally interned in California to proceed against the official responsible for her custody in California, even after she was transferred to Utah. *Padilla*, 542 U.S. at 440. According to the *Padilla* Court, *Endo* stood only "for the important but limited proposition" that a petitioner's relocation after a "properly file[d]" habeas petition does not deprive a district court of jurisdiction. *Id*. at 441.

As to the latter subquestion, the Court looked again to the "plain language" of the federal habeas statute — which limits district courts to granting relief "within their respective jurisdictions," 28 U.S.C. § 2241 — to conclude that a habeas petition naming a prisoner's custodian can be filed in only one district: "the district of confinement." 542 U.S. at 442 (internal quotation marks omitted). "The proviso that district courts may issue the writ only 'within their respective jurisdictions,'" the Court reasoned, "forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241. Together they compose a simple rule that has been consistently applied in the lower courts . . . : Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Id.* at 447-48. This "simple rule," the Court continued, "serves the important purpose of preventing forum shopping by habeas petitioners" as well as "district courts with overlapping jurisdiction." *Id.* at 447.

Applying the immediate-custodian and district-of-confinement rules, the Supreme Court concluded that Padilla's petition could not be heard in the Southern District of New York. Notably, the Court rejected Padilla's "request for a new exception" to these rules "based upon the 'unique facts' of [the] case." *Id.* at 441. The Court rightly acknowledged that Padilla's

detention was "undeniably unique in many respects" but declared that, "at bottom," it was "a simple challenge to physical custody imposed by the Executive — the traditional core of the Great Writ. There is no indication that there was any attempt to manipulate behind Padilla's transfer . . . , and the Government did not attempt to hide from Padilla's lawyer where it had taken him." *Id.* Later in its opinion, the majority explicitly rejected the dissent's view that the Court had previously "made various exceptions to the immediate custodian and district of confinement rules whenever 'exceptional,' 'special,' or 'unusual' cases have arisen." *Id.* at 448. If the dissent's "view were accepted," the majority explained, "district courts would be consigned to making ad hoc determinations as to whether the circumstances of a given case are 'exceptional,' 'special,' or 'unusual' enough to require departure from the jurisdictional rules this Court has consistently applied. We do not think Congress intended such a result." *Id.* at 450.

The majority opinion in *Padilla* was joined by five Justices. But one of those Justices, Justice Kennedy, filed a concurring opinion, joined by Justice O'Connor, to make two points. First, he noted that the rules governing habeas jurisdiction "are not jurisdictional in the sense of a limitation on subject-matter jurisdiction" and instead implicate questions of "personal jurisdiction or venue." *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring). That means both that objections to petitions on those grounds "can be waived by the Government" and that the rules themselves are "subject to exceptions." *Id.* at 452. Second, Justice Kennedy wrote that he "would acknowledge an exception" to the immediate-custodian and district-of-confinement rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* at 454. If, for example, "the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken," Justice Kennedy

would have concluded that the Southern District of New York "had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in [his] view, habeas jurisdiction would lie in the district or districts from which he had been removed." *Id.*

The *Padilla* Court explicitly reserved judgment on whether the immediate-custodian rule applies in the immigration context, *see id.* at 435 n.8, and the Second Circuit has not decided the issue either, *see Henderson v. I.N.S.*, 157 F.3d 106, 128 (2d Cir. 1998). In the years since, however, "a clear majority of courts in this circuit" — including *this* Court, on at least five separate occasions — "have held that the 'immediate custodian' rule applies" to "core" immigration habeas cases in which a petitioner challenges his or her detention pending removal "and that jurisdiction [in such cases] lies only in the district of confinement." *Singh v. Holder*, No. 12-CV-4731 (JMF), 2012 WL 5878677, at *2 (S.D.N.Y. Nov. 21, 2012) (internal quotation marks omitted) (collecting cases); *see Suraiya v. Cioppa*, No. 18-CV-6628 (JMF), ECF No. 18 (S.D.N.Y. Aug. 6, 2018); *Thomas v. Decker*, No. 19-CV-8690 (JMF), ECF No. 26 (S.D.N.Y. Oct. 17, 2019); *Tazu v. Barr*, No. 19-CV-1716 (JMF), ECF No. 16 (S.D.N.Y. Mar. 1, 2019); *Traore v. Decker*, No. 18-CV-7909 (JMF), ECF No. 9 (S.D.N.Y. Sept. 13, 2018); *see also Andoh v. Barr*, No. 19-CV-8016 (PAE), 2019 WL 4511623, at *2 (S.D.N.Y. Sept. 18, 2019) ("The substantial majority of judges in this District to consider this question have reached the same conclusion, holding that a defendant detained in New Jersey who seeks to challenge his detention, even if under the supervision of ICE personnel in this District, must bring a habeas action in the District of New Jersey." (citing *Almazo v. Decker*, No. 18-CV-9941 (PAE), 2018 WL 5919523, at *1 (S.D.N.Y. Nov. 13, 2018) (collecting cases))). By contrast, courts have generally held that for "non-core" habeas proceedings — for example, proceedings in which a

petitioner seeks "a stay of deportation or an adjustment of status" — jurisdiction can be proper outside the district of confinement.  *Singh*, 2012 WL 5878677, at *2 (citing cases).

### 2.  Analysis

As Khalil was in New Jersey when his lawyer filed the Petition here, this Court would plainly lack jurisdiction if the immediate-custodian and district-of-confinement rules apply in the normal course.  Khalil presses three arguments to avoid that conclusion, but none of his arguments are persuasive.  The first two can be swiftly rejected.  First, citing the fact that the Supreme Court and the Second Circuit have not addressed whether the immediate-custodian rule applies in the immigration habeas context, Khalil contends that Joyce, the Acting Field Director of the ICE New York Field Office, was his "immediate custodian" at the time of filing because Joyce "took and never relinquished custody over Mr. Khalil" until he arrived in Louisiana.  ECF No. 50 ("Pet.'s Opp'n"), at 12.  But this Court does not write on a clean slate.  As noted above, joining "a substantial majority" of judges in this District, *Andoh,* 2019 WL 4511623, at *2, it has rejected this exact legal argument no fewer than five times.  It is a fundamental rule-of-law principle that like cases must be treated alike.  *See Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("A just legal system seeks not only to treat different cases differently but also to treat like cases alike.").  That principle requires that the Court adhere to its prior conclusion here, even if the underlying circumstances of this case may be more unusual and more troubling than those in its prior cases.  Put simply, those underlying circumstances are not relevant to the purely legal question of whether, as a general matter, the immediate-custodian rule applies to immigration habeas petitions.

Second, Khalil argues that application of the immediate-custodian and district-of-confinement rules is inappropriate because his Petition asserts both "core" and "non-core" habeas claims.  *See* Pet.'s Opp'n 16-17.  True, in addition to seeking release from detention, he

seeks injunctive and declaratory relief with respect to the Secretary of State's determinations that led to his detention and removal proceedings.  *See, e.g.*, *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 406-07 (S.D.N.Y. 2018) (stating that "challenges to immigration-based detention" are "'core' immigration-based habeas challenges" but "challenges to forms of custody other than physical confinement, such as orders of removal" are not).  In support of this argument, Khalil relies on *Calderon v. Sessions*, 330 F. Supp. 3d 944 (S.D.N.Y. 2018), in which a judge of this Court held that a district court may adjudicate "core" habeas claims even where the immediate-custodian and district-of-confinement rules point elsewhere if the petition's accompanying "non-core" claims "predominate," *id.* at 952.  As Khalil all but acknowledges, however, *Calderon* is an outlier.  *See* Pet.'s Opp'n 17 n.5.  Most courts have correctly concluded that its approach "run[s] afoul of *Padilla*'s . . . rule: that 'core' claims must be brought in the district that has territorial jurisdiction over the custodian of the petitioner's present physical detention."  *S.N.C.*, 325 F. Supp. 3d at 409; *see, e.g.*, *Sow v. Whitaker*, 18-CV-11394 (GBD) (RWL), 2019 WL 2023752, at *4 (S.D.N.Y. May 8, 2019) (citing cases).  "When faced with a 'mixed' petition," these courts have held, "the approach most faithful to *Padilla*" is to order transfer "to the district that has *both* (a) territorial jurisdiction over the immediate custodian and (b) venue and personal jurisdiction over the legal custodian."  *S.N.C.*, 325 F. Supp. 3d at 409 (emphasis added).

In any event, Khalil's "mixed petition" argument would almost certainly fail for either of two other reasons as well.  First, all of his claims, at bottom, present a challenge to his detention. That is, Khalil seeks to vacate and set aside the Secretary of State's determination that his "presence or activities in the United States" would have "potentially serious foreign policy consequences for the United States" and seeks to enjoin Respondents' allegedly "unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech."  Petition ¶ 2; *id.* at Prayer for Relief, ¶¶ 2-3.  But if the Court were to grant this relief, it would necessarily

require Khalil's release because without the Secretary of State's determination, Khalil would still be a lawful permanent resident and, as the Government concedes, he could not then "be detained."  ECF No. 71 ("Gov't Reply"), at 9 n.6 (citing 8 U.S.C. § 1226(a), which only authorizes "detention pending removal proceedings").  Thus, Khalil's challenges to the revocation of his lawful permanent residence status are "unavoidably a challenge to [his] detention" and, in the circumstances here, likely "core" claims themselves.  *Andoh*, 2019 WL 4511623, at *3.  And second, even if Khalil's Petition is construed to bring "non-core" claims, it does not follow that they should be heard here.  Instead, as discussed below, the Court would, in that instance, exercise its discretion to ensure that such claims are heard by a court that, unlike this Court, has the authority to consider Khalil's entire Petition.

Khalil's final argument — which relies on Justice Kennedy's concurrence in *Padilla* — is perhaps his most compelling, but it too falls short.  *See* Pet.'s Opp'n 7-12.  For one thing, it is far from clear that Justice Kennedy's opinion is the law of the land.  The majority opinion in *Padilla* "enjoy[ed] the assent of five Justices" — including Justices Kennedy and O'Connor — which means that Justice Kennedy's concurrence cannot be construed as "the holding of the Court."  *Marks v. United States*, 430 U.S. 188, 193 (1977).  And the majority opinion itself referred to Justice Kennedy's proffered "exceptions" to the immediate-custodian rule as only "proposed," not "recognized."  542 U.S. at 435-36 ("No exceptions to this rule, either recognized or proposed, *see post* at 454 (KENNEDY, J., concurring), apply here." (footnote omitted)).  Since *Padilla*, a smattering of district courts have cited Justice Kennedy's opinion, some as if it were binding law.  *See, e.g.*, *Salcedo v. Decker*, No. 18-CV-8801 (RA), 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 18, 2019); *Sow*, 2019 WL 2023752, at *5; *Redding v. Thompson*, No. 17-CV-2740, 2018 WL 850147, at *6 (D. Minn. Jan. 23, 2018); *Xia v. King*, No. 24-cv-2000, 2025 WL 240792, at *2 (D. Minn. Jan 17, 2025); *Russell v. Bureau of Prisons*, No. 20-CV-1082, 2021 WL

7208910, at *4 n.5 (E.D. Ark. Sept. 27, 2021); *Vidal-Martinez v. Prim*, No. 20-CV-5099, 2020 WL 6441341, at *5 n.6 (N.D. Ill. Nov. 3, 2020); *see also Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *8 (D. Colo. June 13, 2024) (describing Justice Kennedy as having "proposed" exceptions to the immediate-custodian rule).  But Khalil does not cite, and the Court has not found, a single example of Justice Kennedy's opinion being applied to award relief.  From the get-go, then, Khalil's final argument rests on a shaky foundation.

Ultimately, however, the Court need not and does not decide whether Justice Kennedy's exceptions are good law because, even if they are, Khalil's attempts to invoke them fall short. Critically, in determining whether Justice Kennedy's exceptions would apply, the proper focus of the analysis is on the one and only transfer of Khalil with jurisdictional relevance: his transfer from 26 Federal Plaza in this District to the Elizabeth Detention Facility in the District of New Jersey.  After all, it was the Government's transfer and detention of Khalil there in the hours before Khalil's lawyer filed the Petition that, under the "longstanding" rules reaffirmed in *Padilla*, would make this Court an improper forum to adjudicate his claims.  542 U.S. at 449.  In other words, in considering the applicability of Justice Kennedy's proposed exceptions, the central questions are whether (1) "there is an indication that the Government's purpose in removing" Khalil from this District to the District of New Jersey was "to make it difficult for his lawyer to know where the habeas petition should be filed" and (2) whether, at the time of filing, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention."  *Id.* at 454 (Kennedy, J., concurring).  The circumstances surrounding Khalil's later transfer to Louisiana, which post-dated the filing of his Petition, may shed some light on these questions, but they are ultimately secondary to the relevant legal analysis.

First, Khalil does not allege any facts giving rise to the plausible inference that the Government's "purpose" in moving him to New Jersey was "to make it difficult for his lawyer to

know where the habeas petition should be filed." *Id.* At the outset, this Court can attest from its own experience that noncitizens arrested and detained by immigration authorities in New York City are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention. *See, e.g.*, *see Suraiya*, No. 18-CV-6628 (JMF), ECF No. 17; *Thomas*, No. 19-CV-8690 (JMF), ECF No. 26; *Tazu*, No. 19-CV-1716 (JMF), ECF No. 14; *Traore*, No. 18-CV-7909 (JMF), ECF No. 9. That experience is far from anomalous. *See e.g., Abraham v. Decker*, 18-CV-3481 (CBA), 2018 WL 3387695, at *1 (E.D.N.Y. July 12, 2018) (petitioner arrested in Brooklyn, charged as removable at 26 Federal Plaza, then transferred to a New Jersey detention facility); *Xiu Qing You v. Nielsen*, No. 18-CV-5392 (GBD) (SN), 2020 WL 2837022, at *2 (S.D.N.Y. June 1, 2020) (petitioner arrested in Manhattan, held initially at 26 Federal Plaza, then transferred "[a]fter hours of waiting" to a New Jersey detention facility); *Montrevil v. Decker*, 20-CV-264 (WFK) (LB), 2021 WL 11690690, at *1 (E.D.N.Y. July 19, 2021) (petitioner arrested in Queens, held at 26 Federal Plaza "for several hours," then transferred to a New Jersey detention facility); *Sow*, 2019 WL 2023752, at *1 (petitioner arrested at his home, brought to 26 Federal Plaza, then moved "[l]ater that same day or evening" to New Jersey detention facility).

Against this backdrop, the Court cannot conclude that the Government's transfer of Khalil from New York to New Jersey was done to prevent his lawyer from promptly challenging his detention in federal court. Khalil's lawyers do not allege that they were prepared to file the Petition any earlier than 4:40 a.m. And, within a matter of hours, the Government did truthfully disclose Khalil's whereabouts, first via the online Detainee Locator "[s]ometime after 9 a.m.," Petition ¶ 55, and later that afternoon in communications with Khalil's counsel, *see id.* ¶ 56. What is more, all of this took place on a Sunday between 1:40 a.m. (Eastern Standard Time) and "[s]ometime after 9 a.m." (Eastern Daylight Time) — that is, at a time when the federal courts were closed. It would have been one thing if the Government had covertly transferred Khalil at a

time when federal courts were able and ready to consider a habeas petition. But in this case,
Khalil's lawyer could not have obtained immediate relief even if she had known where he was
detained at the moment she filed the Petition. Put differently, the Government disclosed Khalil's
whereabouts to his lawyer well before any federal court could or would have entertained his
Petition. Given these circumstances, there is no basis to conclude that the Government's purpose
in transferring Khalil from New York to New Jersey was to frustrate the Great Writ.

That conclusion is compelling even if the Court were not to consider the Government's
explanations for Khalil's transfer to New Jersey, but it is nearly inescapable if the Court does. In
sworn declarations, the Government attests that the transfer was a function of its standard
operating procedures and "operational considerations." Mar. 17, 2025 Joyce Decl. ¶ 13. The
declarations affirm that noncitizens arrested by immigration authorities in New York are "often
detained at facilities in other [areas of responsibility]" due to the "lack of available detention
space" in New York. *Id.* ¶¶ 8-9. They further explain that "ICE's facility at 26 Federal Plaza is
a Hold Room facility used for detention of individuals awaiting removal, transfer, . . . intra-
facility movement, or other processing into or out of a facility" and that, pursuant to ICE policy,
"no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* ¶ 15. For
these reasons, the Government explains, Khalil was moved to the Elizabeth Detention Facility,
which was equipped with "overnight accommodations for detainees such as beds and 24-hour
medical staff." *Id.* ¶ 16. Khalil does not controvert these explanations, which are consistent with
the Court's experience and the case law cited above.[5]

---

[5] The Government invokes the "presumption of regularity" that attaches to many official
acts of public officials. Gov't Reply 6-7 & n.2 (citing *Nat'l Archives and Records Admin. v.
Favish*, 541 U.S. 157, 174 (2004)). It is not clear, however, that the presumption is appropriate
here. *See Proctor v. LeClaire*, 846 F.3d 597, 608 n.4 (2d Cir. 2017) n.4 ("While we afford
prison officials wide-ranging deference in the adoption and execution of policies designed to
promote institutional safety, Defendants cite no case, and we cannot find one, that applies such a

Khalil cites the Government's "movement of him across four states" to suggest ICE treated him anomalously. Pet.'s Opp'n 10-11. But as discussed above, the only transfer that occurred prior to the filing of the Petition — that is, the only jurisdictionally relevant transfer — was the transfer from the short-term holding facility in New York to the Elizabeth Detention Facility in New Jersey, and Khalil fails to cast doubt on the Government's explanation that this specific transfer was a function of its standard operating procedures.

In any event, considering Khalil's later transfers — on the theory that they shed light on the Government's purpose in transferring him to New Jersey in the first instance — would not warrant a different conclusion. The practical, and unfortunate, reality is that "the Government regularly transfers detained noncitizens between facilities, often multiple times." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 570 (2022) (Sotomayor, J., concurring in the judgment in part and dissenting in part); *see also Demore v. Kim*, 538 U.S. 510, 554 (2003) (Souter, J., concurring in part and dissenting in part) (explaining that immigration officials "detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence"); *see also Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 448 (3d Cir. 2021) (noting that "continuous transfer" can "permeate[] the reality of ICE detention"). And transfers to remote locations are routinely made without any prior notice to counsel. *See Anariba*, 17 F.4th at 448 (discussing how "the Government often repeatedly moves ICE detainees to remote locations far from counsel or their community without informing counsel of the transfer" (internal quotation marks omitted)); *Bell v. Ashcroft*, No. 03-CV-766 (HB), 2003 WL 22358800, at *3 (S.D.N.Y. Oct. 15, 2003)

---

presumption in a constitutional challenge to state prison officials' periodic review of [Administrative Segregation]. We decline to do so today." (cleaned up)). Moreover, "the presumption of regularity — to the extent it is not rebutted — requires a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove." *Latif v. Obama*, 677 F.3d 1175, 1180-81 (D.C. Cir. 2011). In any event, the Court need not and does not decide the issue.

(observing that "aliens in federal custody are routinely transferred . . . to other, often far-away, facilities"); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1500 (C.D. Cal. 1988) ("INS follows a general practice of transferring detained class members from the place of arrest to detention centers located in remote and isolated areas."), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990). However unusual or disturbing the circumstances leading to Khalil's arrest and detention may have been, his transfers from facility to facility — and, most critically, from 26 Federal Plaza to the Elizabeth Detention Facility on March 9, 2025 — do not appear to be that unusual. They are certainly not unusual enough for the Court to disregard the "longstanding" district-of-confinement and immediate-custodian rules.

Khalil also contends that the fact that his transfers took place "rapidly" — that is, in under twenty-four hours — "means [the Government's] conduct goes even more to the core of Justice Kennedy's concerns." Pet.'s Opp'n 12. But the swift nature of Khalil's transfer does not help his argument. For one thing, rapid transfers from one immigration detention facility to another also appear to be common, *see, e.g.*, *Xiu Qing You*, 2020 WL 2837022, at *2; *Montrevil*, 2021 WL 11690690, at *1; *Sow*, 2019 WL 2023752, at *1, and Khalil cites nothing to suggest otherwise. For another, to the extent that the core purpose of Justice Kennedy's exceptions is to "prevent the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum," *Eisel v. Sec. of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973), that purpose is not served where, as here, the Government truthfully disclosed the petitioner's whereabouts within hours (on a Sunday no less) and the transfers concluded in short order. The absence of the gamesmanship with which Justice Kennedy was concerned is only underscored by the fact that, "[a]ccording to the copy of the [Notice to Appear] that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours

after his arrest." Petition ¶ 56 n.17. In short, the full record does not support the idea that "the government played forum games or kept moving [Khalil] so that his filing could not catch up." *Griffin v. Ebbert*, 751 F.3d 288, 290 & n.2 (5th Cir. 2014) (citing *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring)).

Khalil is arguably on firmer ground in seeking to avail himself of Justice Kennedy's second proposed exception — for when "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) — if only because the exception does not appear to require any showing of improper purpose. But here too, his arguments fall short. Once again, the relevant question is whether the Government was insufficiently forthcoming as to Khalil's detention *in New Jersey*. It was not. At the moment of arrest, the Government truthfully informed Khalil's wife and his attorney that he was being taken to 26 Federal Plaza. *See* Petition ¶¶ 51, 53. Between then and the moment the Petition was filed, Khalil's attorney never asked a Government official for additional information about Khalil's whereabouts. Instead, she relied on ICE's online Detainee Locator, which did not reflect Khalil's transfer from New York to New Jersey for a period of approximately six hours. *See* Petition ¶ 55; *see also* Mar. 17, 2025 Joyce Decl., ¶ 16. But those hours were in the middle of the night on a weekend when, as noted, Khalil's lawyer could not even have obtained the relief that he later sought. Thus, assuming for the sake of argument that the Government was in some way not "forthcoming," as Justice Kennedy used that term, it did nothing to materially frustrate Khalil's access to the Great Writ.

Moreover, the one-time overnight delay in updating the online Detainee Locator, without more, is not enough to support an "inference of Government secrecy." *Padilla*, 542 U.S. at 450 n.17. Although not cited by either party here, ICE's own policies require only that it notify a detainee's lawyer "as soon as practicable on the day of transfer" and "in no circumstances later

than twenty-four (24) hours after the transfer occurs."  U.S. ICE, Policy No. 11022.1(5.3)(2)(a) (2012); *see also Sow*, 2019 WL 2023752, at \*5 (holding that Justice Kennedy's exception did not apply even where ICE failed to provide notice within twenty-four hours because "there is no allegation that the Government refused to tell [the petitioner's] lawyer where he had been taken" (cleaned up)).  And the reality is that "the Government often repeatedly moves ICE detainees to remote locations . . . without informing counsel of the transfer or updating the ICE detainee locator."  *Anariba*, 17 F.4th at 448 (internal quotation marks omitted).  Plainly, therefore, this is not the exceptional scenario Justice Kennedy imagined, in which "the Government had removed [its detainee] from the Southern District of New York but refused to tell his lawyer where he had been taken."  *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).  To the contrary, when Khalil's attorneys next requested information from the Government about his whereabouts on the afternoon of March 9, 2025, they received prompt and accurate replies.  *See* Petition ¶ 56.

In short, even if Justice Kennedy's proposed exceptions were good law (or the Court were inclined to adopt them by itself), they would not support Khalil's argument that this Court may entertain his claims.  It follows that the district-of-confinement and the immediate-custodian rules apply and that Khalil's Petition is not properly before this Court.[6]

---

[6]     Khalil argues that the Court should allow him "to conduct limited and expedited jurisdictional discovery" in the event that it is "not persuaded to deny the government's motion" to dismiss or transfer. Pet.'s Opp'n 17. But "a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). And discovery here is not warranted because, as noted above, the facts relevant to the limited questions currently facing the Court — most notably, that Khalil was detained in the District of New Jersey when his lawyer filed the Petition — are not in dispute. If the Court were inclined to accept the Government's argument for transfer to the Western District of Louisiana, perhaps the case for jurisdictional discovery would be stronger given Khalil's insinuation that the White House was directly involved in the plan to move him there, *see* Petition ¶ 58; *see also* Pet.'s Opp'n 11, and the fact that, in the space of less than twenty-four hours, the Government hauled Khalil through at least six different districts (one likely twice): the Southern District of New York, the District of New Jersey, the Eastern District of New York, the Northern District of Texas, the Central District of Louisiana, and the Western District of

## B. The Case Must Be Transferred to the District of New Jersey

That is not the end of the analysis. Instead, the lack of habeas jurisdiction in this District raises the questions of whether the Court should dismiss the case or transfer it to another district and, if the latter, to which district the case should be transferred. The Government argues that the Court should dismiss the case or, in the alternative, transfer it to the Western District of Louisiana on the theory that the Western District of Louisiana is the district in which Khalil is presently confined and, thus, the only district in which he could now bring his claims (at least to the extent they are "core" claims). ECF No. 31 ("Gov't Mem."), at 9. Khalil, on the other hand, opposes dismissal and argues that transfer to the District of New Jersey is appropriate. Pet.'s Opp'n 19. The Court agrees with Khalil.

For starters, it is important to note that the district-of-confinement and immediate-custodian rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," *Skaftouros v. United States*, 667 F.3d 144, 146 n.1 (2d Cir. 2011) (internal quotation marks omitted), but rather akin to "personal jurisdiction or venue rules," *Gooden v. Gonzales*, 162 Fed. App'x 28, 29 (2d Cir. 2005) (summary order); *see also Rivera-Perez v. Stover*, — F. Supp. 3d —, No. 23-CV-1348 (SRU), 2024 WL 4819250, at *5 (D. Conn. Nov. 18, 2024) (noting that courts have construed the immediate-custodian rule to raise questions of venue or personal jurisdiction, not subject-matter jurisdiction); *see generally Padilla*, 542 U.S. at 434 n.7 ("The word 'jurisdiction,' of course, is capable of different interpretations. We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court."). That is significant because, if the Court lacked subject-matter jurisdiction, dismissal (albeit without prejudice) would likely be the proper result. *See, e.g.*,

---

Louisiana. But because, for the reasons discussed below, the Court rejects the Government's argument for transfer to Louisiana, it need not and does not address that question.

*Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62-63 (2d Cir. 2009); *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017).[7]  But because the issue is one of either personal jurisdiction or venue, it is well established — and undisputed by the Government — that the Court has the discretion to transfer the case to another district rather than dismiss.  *See, e.g.*, *SongByrd*, 206 F.3d at 179 n.9; *see also* Gov't Reply 12.

In the circumstances presented here, there are at least three reasons to exercise that discretion.  First and foremost, as the Government acknowledges, a "prompt resolution" of this important case is "imperative."  Gov't Reply 14-15.  Requiring Khalil to refile his Petition (and his additional requests for relief, *see* ECF Nos. 11, 53, 66) would result in unnecessary delay.  Second, dismissal would prejudice Khalil in several important ways.  *See, e.g.*, *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001) (considering "whether the failure to transfer would prejudice the litigant" in deciding between dismissal and transfer); *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996) ("In determining whether a transfer is in the interest of justice, the equities of dismissing a claim when it could be transferred should be carefully weighed.").  Dismissal would mean vacatur of the temporary relief this Court granted to Khalil, *see* ECF No. 9, and would allow for Khalil's expedited removal from the country before his claims could even be adjudicated.  Requiring Khalil to refile his petition in the Western District of Louisiana (the only district in which a *new* petition could be filed) would also mean litigating far from his lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place.  *See* ECF No. 11, at 1-3.  Finally, the record makes

---

[7]      That said, 28 U.S.C. § 1631 — which provides that, when a "court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed" — would arguably provide a basis for the Court to transfer Khalil's petition even if the defect were one of subject-matter jurisdiction.  *See, e.g.*, *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000).

plain that Khalil's lawyers filed the Petition in this District based on a good-faith and reasonable

belief that he was then detained here.  Transfer is thus appropriate to ensure that Khalil is not

"penalized by . . . 'time-consuming and justice-defeating technicalities.'"  *Goldlawr, Inc. v.*

*Heiman*, 369 U.S. 463, 467 (1962); *see, e.g.*, *Liriano*, 95 F.3d at 122 (observing that the "good

faith" filing of an action in an improper forum is a "[f]actor[] militating for a transfer" rather

than dismissal).[8]

      To which district, then, should the case be transferred?  To answer that question, the

Court must look, in the first instance, to the statute — enacted by Congress in 1948 — that

governs the transfer of a civil case from "a district in which is filed a case laying venue in the

wrong . . . district."  28 U.S.C. § 1406(a); *see SongByrd, Inc.*, 206 F.3d at 179 n.9 (observing that

"a district court lacking both personal jurisdiction and proper venue" may transfer a case

pursuant to Section 1406(a) "to a district where both defects [are] avoided").  Curiously, the

parties failed to cite, let alone discuss, Section 1406(a) in their initial briefs addressing whether

and to where this case should be transferred.  In response to an Order from the Court directing

them to do so, however, the parties both acknowledge (or, at least, do not dispute) the

applicability of the statute.  *See* ECF No. 70, at 5; Gov't Reply 14; *see also* ECF No. 63.[9]  And in

any event, cases in which district courts have relied on Section 1406(a) to transfer immigration

habeas cases filed in the wrong district are legion.  *See, e.g.*, *Conlin v. United States*, No. 23-CV-

3272 (LTS), 2024 WL 458285, at *2-3 (S.D.N.Y. Jan. 11, 2024); *Casiano v. N.Y. State Niagara*

---

[8]     Additionally, to the extent that this Court has jurisdiction to adjudicate any "non-core" claims raised in Khalil's petition, dismissal of the Petition in its entirety is plainly unwarranted.

[9]     It follows that the parties have forfeited any argument against application of Section 1406(a).  *See, e.g.*, *Whitehurst v. Staten Island Univ. Hosp.*, No. 18-CV-1090 (ARR), 2018 WL 11218905, at *2 (E.D.N.Y. July 24, 2018) ("An argument is waived or abandoned if a party fails to make it." (internal quotation marks omitted)).

*Cnty.*, No. 24-CV-3850 (LTS), 2024 WL 3318225, at *1 (S.D.N.Y. June 17, 2024); *Bynum v. N.J.*, No. 24-CV-618 (LTS), 2024 WL 1023210, at *1 (S.D.N.Y. Feb. 26, 2024); *Moussaoui v. Biden*, No. 25-CV-691 (JGK), 2025 WL 457804, at *2 (S.D.N.Y. Jan. 28, 2025); *Darboe v. Ahrendt*, 442 F. Supp. 3d 592, 596 (S.D.N.Y. 2020); *see also, e.g.*, *United States v. Posey*, No. 16-CR-87 (RJA), 2023 WL 7124522, at *2 (W.D.N.Y. Oct. 30, 2023) (noting a court's "broad discretion" under Section 1406(a) "to transfer a habeas case to the proper judicial district").

Section 1406(a) provides for transfer "to any district . . . in which [the case] *could have been brought*." *Id.* (emphasis added). By its plain terms, therefore, the statute calls for transfer of Khalil's Petition to the District of New Jersey, the only district in which — due to the immediate-custodian and district-of-confinement rules — his "core" claims "could have been brought" at 4:40 a.m. on March 9, 2025. *See, e.g.*, *Alvarado v. Gillis*, No. 22-CV-10082 (JLR) (KHP), 2023 WL 5417157 (S.D.N.Y. Aug. 3, 2023), *report and recommendation adopted,* 2023 WL 5396499 (S.D.N.Y. Aug. 22, 2023) (ordering transfer of an immigration habeas petition to the district where the petitioner was detained at the time of filing); *Ali v. DHS/ICE/Dep't of Justice*, No. 19-CV-8645 (LGS), 2020 WL 3057383, at *2 (S.D.N.Y. June 9, 2020) (same); *Persaud v. ICE*, No. 04-CV-282 (FB), 2004 WL 1936213, at *1 (E.D.N.Y. Aug. 31, 2004) ("Although petitioner is currently confined in Alabama, at the time that he filed this petition he was confined in the Western District of Louisiana. Accordingly, the Court orders the petition to be transferred to the United States District Court for the Western District of Louisiana."); *cf. Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *10-11 (D. Colo. June 13, 2024) (observing that when transfer is necessary due to improper venue under *Padilla*, "many courts choose to transfer habeas cases" to the district where the action "could have been brought at the time it was filed or noticed"). Indeed, the Court cannot do otherwise because where, as here, "a federal statute covers the point in dispute," "that is the end of the matter; federal courts

are bound to apply rules enacted by Congress with respect to matters over which it has legislative power." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988) (cleaned up).

Relying on *Padilla*, the Government argues instead for transfer to the Western District of Louisiana, Khalil's present district of confinement. The "proper course," it insists, is "to transfer this case to the Western District of Louisiana — *i.e.*, the only district where Khalil could refile a petition today . . . . Put simply, 'jurisdiction lies in only one district: the district of confinement.'" Gov't Mem. 10 (quoting *Padilla*, 542 U.S. at 443). In *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960), however, the Supreme Court rejected a nearly identical argument with respect to 28 U.S.C. § 1404(a), which provides — in nearly identical language — for transfer of a civil case to another "district . . . where it might have been brought." There, the petitioners argued that "the phrase 'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer." *Id.* at 342. "We do not think," the Court declared, "the . . . phrase 'where it might have been brought' can be interpreted to mean . . . 'where it may now be *rebrought*, with defendants' consent.'" *Id.* (emphasis added). Section 1404(a) "is unambiguous, direct and clear, and . . . the unequivocal words of § 1404(a) and the legislative history establish that Congress indeed meant what it said." *Id.* (cleaned up). The same can be said for Section 1406(a).

*Padilla* does not affect that conclusion. To the contrary, it is fatal to the Government's argument because it dictates that, at "the time of the bringing of the action," *id.* at 342, habeas "jurisdiction lies in only one district: the district of confinement," *Padilla*, 542 U.S. at 443. At that time, of course, Khalil was confined in the District of New Jersey, not in the Western District of Louisiana. Moreover, to the extent that *Padilla* discusses the jurisdictional effect of prisoner relocation at all, it says that a prisoner's transfer after a petition is filed does not deprive a court that would otherwise have jurisdiction of the ability to adjudicate his petition. *See id.* at

441.  Finally, *Padilla* does not address the effect of Section 1406(a), the plain language of which is just as binding on courts as the plain language of the statute that the Supreme Court there applied.  The *Padilla* decision thus offers guidance about where a habeas petition is properly filed in the first instance, but it leaves open where a case should be transferred when, as here, a petition is filed in the wrong venue and the petitioner's present district of confinement differs from his district of confinement at the time of filing.

The Government's related argument that "the transfer statutes," including Sections 1404(a) and 1406(a), "do not independently vest courts with jurisdiction they would otherwise lack," Gov't Reply 14, suffers from a similar misunderstanding of *Padilla*.  No statute is required to "vest" the District of New Jersey with otherwise-absent jurisdiction because habeas jurisdiction is "not jurisdictional in the sense of a limitation on subject-matter jurisdiction." *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring); *see also Skaftouros*, 667 F.3d at 146 n.1 (same).  And as the *Padilla* Court's discussion of *Endo* makes clear, the fact that a detainee has been transferred away from a district that otherwise has jurisdiction to hear his or her claims does not necessarily deprive that district of habeas jurisdiction.  *See Padilla*, 542 U.S. at 441.

In short, applying the plain language of Section 1406(a), the Court concludes that Khalil's "core" habeas claims — those seeking his release from detention — must be transferred to the District of New Jersey, the one and only district in which he could have filed them when he did.  As discussed above, that arguably includes all of Khalil's claims.  But to the extent that Khalil's Petition also includes "non-core" claims over which this Court would have jurisdiction, transfer of those claims to the District of New Jersey is also appropriate, albeit under Section 1404(a).  That statute authorizes transfer of a case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any [] district or division where it might have been brought."  28 U.S.C. § 1404(a).  In deciding whether transfer is warranted under Section 1404(a),

courts consider various factors, including "the convenience to parties," "the convenience to witnesses," "where the case can be tried more expeditiously and inexpensively," and "the interests of justice." *Pierce v. Coughlin*, 806 F. Supp. 426, 428 (S.D.N.Y. 1992) (internal quotation marks omitted). Applying those factors, courts have transferred cases when an "action raising identical issues is pending" in another district, *Williams v. City of New York*, No. 03-CV-5342 (RWS), 2006 WL 399456, at *1 (S.D.N.Y. Feb. 21, 2006), or when transfer is otherwise required of "some, but not all, of the . . . claims in a given case," *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, No. 19-CV-7233 (CM), 2020 WL 4605241, at *9 (S.D.N.Y. Aug. 11, 2020); *see also Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 415 (E.D.N.Y. 2017) ("Rather than continue the case piecemeal, I also transfer the remaining claims . . . pursuant to 28 U.S.C. § 1404(a).").

Here, the relevant factors counsel in favor of transferring any remaining claims over which this Court might have jurisdiction to the District of New Jersey. As the Court discussed above, Khalil's claims challenging the Secretary of State's determination that he is removable are inextricably intertwined with his "core" habeas claims. Given that Khalil must litigate his "core" claims in New Jersey, it would be both more "convenient" for all involved and "in the interests of justice" for the New Jersey court to resolve any "non-core" claims that he may bring as well. *See, e.g.*, *Convergence Technologies (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 642 (E.D. Va. 2010) ("It is well-settled that transfer under § 1404(a) is generally in the interest of justice if a decision not to transfer would lead to courts rendering inconsistent judgments on the same issue."); *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent"). Accordingly, the Court concludes that — pursuant to Section 1406(a) or a combination of that statute and Section 1404(a) — transfer of

Khalil's entire Petition to the District of New Jersey is necessary and appropriate.

**CONCLUSION**

In sum, the Court DENIES the Government's motion to dismiss Khalil's Petition but GRANTS its motion to transfer, albeit to the District of New Jersey, not to the Western District of Louisiana.[10]  That conclusion is compelled by well-established rules and principles that this Court is bound to follow.  First, given the undisputed fact that Khalil was detained in the District of New Jersey at the time his lawyer filed the Petition, this Court lacks jurisdiction over most, if not all, of Khalil's claims.  Second, given that the District of New Jersey is the one and only district in which Khalil could have filed his Petition when he did, the statutes that govern transfer of civil cases from one federal district court to another dictate that the case be sent there, not to the Western District of Louisiana.  Put simply, the law precludes this Court from reaching the merits of Khalil's claims, as serious and important as they may be, and it mandates that the Court allow a tribunal with jurisdiction to take the matter up from here.

To be clear, "when an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done." *Magnetic Eng'g & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866, 868 (2d Cir. 1950).  This transfer is no different.  It will be up to the transferee court in New Jersey to consider not only Khalil's Petition, over which it alone has jurisdiction, but also the various motions that Khalil has filed to

---

[10]    Khalil's pro forma request for leave to amend his Petition in the event the Court concludes that it cannot be heard in this District, *see* Pet.'s Mem. 19-20, is denied.  First, the defect in most, if not all, of Khalil's claims is substantive, so amendment would be futile.  *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).  Second, Khalil does not suggest that he possesses any facts that could cure the jurisdictional problems with his Petition.  *See, e.g., Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint."), *aff'd*, 619 F. App'x 34 (2d Cir. 2015) (summary order); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

date in connection with his Petition, namely his motion to move him from the Western District of Louisiana to a detention facility in this District (or perhaps now New Jersey), ECF No. 11; his motion for immediate release on bail, ECF No. 53; and his motion for preliminary injunctive relief, ECF No. 66.  To avoid any unnecessary delay, the briefing schedules in effect for those motions, *see* ECF Nos. 29, 43, shall remain in effect unless and until the transferee court orders otherwise.  And to ensure that Khalil gets an opportunity to have his Petition and these motions considered by a court in the normal course — and to preserve the status quo — the Court's March 10, 2025 Order barring the Government from removing him (to which the Government has never raised an objection and which the Government has not asked the Court to lift in the event of transfer) shall similarly remain in effect unless and until the transferee court orders otherwise.  *See, e.g.*, *Burke v. People*, No. CIV.A. 04-4404, 2004 WL 2381198, at *2 (E.D. Pa. Oct. 25, 2004) ("The court also ordered that the stay of removal remain in place until further order of the transferee court.").

The Clerk of Court is directed to terminate ECF No. 30 and to transfer this case to the United States District Court for the District of New Jersey.  Further, consistent with the Government's own request, the Clerk of Court is directed to do so immediately, without regard for Local Civil Rule 83.1, which provides that "the Clerk [of Court], unless otherwise ordered, shall upon the expiration of seven (7) days effectuate the transfer of the case to the transferee court."  *See* Gov't Mem. 9 n.3 ("Should the Court transfer the case, to minimize any delay in having the case heard in the proper forum, the government respectfully requests that the Court waive the seven-day waiting period contained in Local Civil Rule 83.1.").

SO ORDERED.

Dated: March 19, 2025
      New York, New York

                                     JESSE M. FURMAN
                                United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MAHMOUD KHALIL, | No. 25-cv-01963 (MEF) |
| *Petitioner,* | |
| v. | **ORDER** |
| WILLIAM P. JOYCE et al., | |
| *Respondents.* | |

This case had been pending in the United States District Court for the Southern District of New York. There, on March 10, the Court ordered that the Petitioner may not be removed from the United States, pending a ruling on the Petition. See ECF 9.

Today, the case was transferred to this Court. See ECF 79.

The Court orders: the Petitioner shall not be removed from the United States, unless and until the Court issues a contrary Order.

The purpose of this Order is to preserve the Court's jurisdiction, so that the Petition can be reviewed and ruled on.

The authority for this is the All Writs Act, at Title 28, United States Code, Section 1651, as it has been interpreted by the Court of Appeals for the Third Circuit. See, e.g., Dabone v. Karn, 763 F.2d 593, 597 n.2 (3d Cir. 1985) (citing FTC v. Dean Foods Co., 384 U.S. 597, 603 (1966)).

IT IS on this 19th day of March, 2025, so ORDERED.

_____
Michael E. Farbiarz, U.S.D.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

*Petitioner,*

v.

WILLIAM P. JOYCE, *et al.*,

*Respondents.*

*Civ. Act. No.* 25-cv-1963 (MEF)

**RESPONDENTS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO
DISMISS OR TO TRANSFER THE CASE**

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

SARAH S. WILSON
Assistant Director

ALANNA T. DUONG
Senior Litigation Counsel

DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

      A.     Khalil's immigration detention................................................................ 2

      B.     Khalil's habeas petition........................................................................... 4

      C.     Procedural History and Transfer to this Court........................................ 4

ARGUMENT .......................................................................................................... 6

CONCLUSION ..................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ali v. Sec'y, Dep't of Homeland Sec.,*
   Civ. Act. No. 11-2072, 2012 WL 15750 (D.N.J. Jan. 4, 2012)..................................7

*Allen v. Chertoff,*
   Civ. Act. No. 10-1003 (FLW), 2010 WL 743916 (D.N.J. Mar. 4, 2010)..................7

*Argueta Anariba v. Dir. Hudson Cty. Corr. Ctr.,*
   17 F.4th 434 (3d Cir. 2021) ............................................................................7, 11

*Arizona v. California,*
   460 U.S. 605 (1983) ........................................................................................11

*Azize v. Bur. of Citizenship & Imm. Serv.,*
   No. 04Civ.9684 (SHS)(JCF), 2005 WL 3488333, at *1 (S.D.N.Y. Oct. 7, 2005) ....8

*Barden v. Keohane,*
   921 F.2d 476 (3d Cir.1990)...............................................................................8

*Burkey v. Marberry,*
   556 F.3d 142 (3d Cir. 2009) .............................................................................8

*Cortez v. Baskin,*
   Civ. Act. No. 19-12261-NLH-AMD, 2019 WL 2142902 n.1 (D.N.J. May 16, 2019) ..........9

*Eddine v. Chertoff,*
   Civ. Act. No. 07-6117 FSH, 2008 WL 630043 (D.N.J. Mar. 5, 2008) ....................7

*Ex Parte Endo,*
   323 U.S. 283 (1944) ........................................................................................7

*Furnari v. U.S. Parole Comm'n,*
   531 F.3d 241 (3d Cir. 2008) .............................................................................8

*Guzman v. Moshannon Valley Processing Ctr.,*
   Civ. Act. No. 24-1054 (JKS), 2024 WL 1251170 .................................................6

*In re: Howmedica Osteonics Corp.,*
   867 F.3d 390 (3d Cir. 2017) .............................................................................9

*Leybinsky v. U.S. Dep't of Homeland Sec.,*
   Civ. Act. No. 09-1965 (GEB), 2009 WL 1228586 (D.N.J. May 1, 2009)..................7

*Magee v. Clinton*,
   No. 04-5247, 2005 WL 613248 (D.C. Cir. 2005) ................................................8

*McCoy v. United States Board of Parole*,
   537 F.2d 962 (8th Cir. 1976) ................................................................10

*Parker v. Hazelwood*,
   Civ. No. 17-484-LM, 2019 WL 4261832 (D.N.H. 2019) ................................10

*Pittman v. Pullen*,
   No. 22-cv-1651 (JAM), 2023 WL 6379371 (D. Conn. 2023) ..........................10

*Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997) ................................................................11

*Rumsfeld v. Padilla*,
   542 U.S. 426 (2004) ........................................................................passim

*Sinochem International Co. v. Malaysia International Shipping Corp.*,
   549 U.S. 422 (2007) ..........................................................................9

*Spiniello Companies v. Moynier*,
   2014 WL 7205349 (D.N.J. 2014) ..............................................................9

*United States v. Little*,
   392 F.3d 671 (4th Cir. 2004) ................................................................8

*United States v. Means*,
   572 F. App'x. 793 (11th Cir. 2014) ..........................................................8

*United States v. Vidal*,
   647 F. App'x 59 (3d Cir. 2016) ..............................................................8

*Verissimo v. I.N.S.*,
   204 F. Supp. 2d 818 (D.N.J. 2002) ..........................................................10

*Wooten v. Zickefoose*,
   No. CIV. 10-4599 NLH, 2011 WL 794393 (D.N.J. Feb. 28, 2011) ....................8

*Yi v. Maugans*,
   24 F.3d 500 (3d Cir. 1994) ..................................................................8

Statutes

8 U.S.C. § 1226(a) ..............................................................................2
8 U.S.C. § 1252(g) ..............................................................................2

28 U.S.C. § 1404(a) ...................................................................................................................... 10

28 U.S.C. § 1406(a) ...................................................................................................................... 5, 9

28 U.S.C. § 2241 ...................................................................................................................... passim

Regulations

8 C.F.R. § 1003.14(a) ...................................................................................................................... 4, 10

## PRELIMINARY STATEMENT

Petitioner Mahmoud Khalil brings this habeas action under 28 U.S.C. § 2241 to challenge his detention by U.S. Immigration and Customs Enforcement ("ICE") during the pendency of his removal proceedings. Although the United States District Court for the Southern District of New York transferred the action, this Court is still not the proper forum. Federal district courts possess limited authority to grant writs of habeas corpus within their respective jurisdictions. As the Supreme Court has explained, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). And for challenges to detention, "jurisdiction lies in only one district: the district of confinement." *Id.* at 443.

At the time that this action was filed in the Southern District of New York, Khalil was physically present and detained at the Elizabeth Detention Facility in Newark, New Jersey. That petition was thus improper, because Khalil was not being held in the Southern District of New York—as Judge Furman correctly recognized. But Judge Furman erred in transferring this case to this Court. This Court has never had habeas jurisdiction over this matter, because no proper petition has ever been filed in this Court. And it does not have habeas jurisdiction over this matter now, because it neither has jurisdiction over the proper respondent in this action, nor is this district the district of confinement. Judge Furman concluded that the general transfer statutes could cure this jurisdictional defect, but that was in error: Those statutes do not independently vest courts with jurisdiction and cannot supply a court with habeas jurisdiction that it never had and presently lacks. Thus, while the parties have already litigated the issue of venue and jurisdiction before Judge Furman, this Court still has an independent responsibility to consider these issues and either dismiss this action without prejudice—so that Khalil can refile his petition in the Western District of Louisiana—or transfer it there—provided Khalil also consents.

None of this is to say that habeas relief is available in the first place at this time. Under a straightforward application of binding precedent and the federal immigration laws, a court should deny or dismiss the petition, and that court sits in the Western District of Louisiana. *See*, *e.g.*, 8 U.S.C. § 1252(g).

## BACKGROUND

### A.    Khalil's immigration detention

Mahmoud Khalil ("Khalil"), a native of Syria and citizen of Algeria, entered the United States on a student visa in December 2022. *See* Declaration of Acting Field Office Director William Joyce ("Joyce Decl.") ¶ 5 (ECF No. 32). He adjusted to lawful permanent resident status in November 2024. *Id.* ¶ 6. On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility detained Khalil at 8:35 p.m. at 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings. *Id.* ¶ 7; Second Supplemental Declaration of Acting Field Office Director William Joyce ("2d Supp. Joyce Decl."), ¶ 7. HSI transported him to 26 Federal Plaza at 8:44 p.m. for processing. *Id* While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), the charging document used to commence removal proceedings, which charged him as being removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. *Id*; *see also* 2d Supp. Joyce Decl., Ex. A – NTA, Mar. 9, 2025 (ECF No. 72). The NTA ordered that Khalil appear for a removal hearing at 8:30 a.m. on March 27, 2025, at the Immigration Court located at 830 Pinehill Road, Jena, Louisiana. *See* NTA. ICE also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings). Joyce Decl. ¶ 7.

Upon completion of processing, ICE transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility in Newark, New Jersey,[1] where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025. *Id.* ¶ 8. The 26 Federal Plaza location serves a processing center, which is effectively a short-term hold room for individuals. 2d Supp. Joyce Decl. ¶ 15. The facility does not have any beds or overnight medical staff. *Id.* ICE's own policy "dictates that absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* The Elizabeth Detention Center was also a brief stop because the facility was dealing with bedbug issues, and the facility could not accept anyone as a full transfer. *Id.* ¶ 11. ICE made an operational decision to not inquire into bedspace of surrounding areas of responsibility given the "awareness of general paucity of bedspace." *Id.* The request to ERO New Orleans was made on March 8, 2025, and a flight was scheduled for 2:35pm on March 9, 2025. *Id.* Therefore, shortly before noon on March 9, Khalil departed the Elizabeth Detention Facility and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana. Joyce Decl. ¶ 11. ICE, specifically Enforcement and Removal Operations New York, "did not receive any directives or instructions pertaining to Khalil's detention." 2d Supp. Joyce Decl. ¶ 14. Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m. on March 10, 2025, and he remains detained at that facility. Joyce Decl. ¶ 12.

---

[1] Elizabeth Detention Facility has comprehensive overnight accommodations for detainees, such as bends and 24-hour medical staff, whereas 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of a facility, and it does not have beds or overnight medical staff. Joyce Decl. ¶ 10.

On March 9, 2025, Khalil's NTA was filed with the Immigration Court at the LaSalle Detention Facility, vesting that court with jurisdiction over his removal proceedings. *See* 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court."); Ex. A, NTA; 2d Supp. Joyce Decl. ¶ 20 ("Except for this ongoing lawsuit, ERO New York is not involved in Khalil's immigration removal proceedings which are pending before the LaSalle Immigration Court in Jena, Louisiana."). ICE has no current plans or intentions to transfer Khalil during the pendency of his removal proceedings. 2d Supp. Joyce Decl. ¶ 19.

**B.      Khalil's habeas petition**

At 4:41 a.m. on March 9, 2025, Khalil's attorney filed the instant habeas petition under 28 U.S.C. § 2241, while Khalil was physically present and detained in New Jersey. Joyce Decl. ¶¶ 8-9; *see also* ECF No. 11 at 6 ("Counsel filed the instant habeas corpus petition on Mr. Khalil's behalf on March 9, 2025, at 4:41 a.m."). By her account, Khalil's attorney filed the instant habeas petition in this District, because (i) DHS agents had previously told Khalil's wife that he was being sent to 26 Federal Plaza (as he was), and (ii) the public "ICE Online Detainee Locator System" had not yet been updated at that hour to show he had been transferred to New Jersey. Declaration of Amy Greer ("Greer Decl.") (ECF No. 11-1) ¶¶ 7, 9. Khalil's operative petition challenges his current immigration detention as unlawful, and he seeks an order from this Court requiring ICE to release him immediately. Am. Pet. (ECF No. 38). Khalil seeks other relief in addition to release from custody. Am. Pet. at 31, Prayer for Relief.

**C.      Procedural History and Transfer to this Court**

After Khalil had filed his habeas petition, the parties briefed whether venue in the Southern District of New York was proper. On March 19, 2025, the court ("SDNY court") transferred the action to the District of New Jersey. *See* Order Transferring Petition (ECF No. 78). The SDNY court

found that it lacked jurisdiction over Khalil's habeas petition because he was in New Jersey at the time that the petition was filed. *Id.* at 15. Relying on decisions that rejected Khalil's arguments in other cases, Judge Furman applied the immediate-custodian rule to this habeas petition, concluding that the "core" and any potential "non-core" claims should be heard by a court that "has the authority to consider Khalil's entire Petition." *Id.* at 17. The SDNY court refused to find that Khalil's allegations "plausibl[y] infer[red] that the Government's 'purpose' in moving him to New Jersey" constituted some sort of gamesmanship. *Id.* at 18. Indeed, it went on to note instances in which detainees had been processed through 26 Federal Plaza and then were transferred to New Jersey. *Id.* at 19. Recounting the events that transpired when detaining Khalil, the SDNY court stated that there would be various reasons for moving Khalil to New Jersey and found that the instant petition was not properly before it. *Id.* at 20.

The SDNY court declined to transfer the action to the Western District of Louisiana and instead sent to the District of New Jersey. *Id.* at 25. Doing so, it noted that the district-of-confinement and immediate-custodian rules are not matters of subject-matter jurisdiction. *Id.* The SDNY court looked to 28 U.S.C. § 1406(a) and held that New Jersey was the appropriate jurisdiction because Khalil could have brought his action there at the time of filing. *Id.* at 28. It did not apply *Padilla* in this context, concluding that the statute permits transfer to a court that could have heard the case at the time it was brought. *Id.* at 29-30. The SDNY court rejected arguments that the transfer statutes would not independently vest jurisdiction where there was none to begin with because the Supreme Court previously noted that a transfer would not affect a district court's habeas jurisdiction. *Id.* at 30. Finally, the SDNY weighed the relevant facts and determined that it would be in the interest of justice for this Court to hear the habeas action. *Id.* at 30-31.

# ARGUMENT

This Court should either dismiss this petition without prejudice, or transfer this action to a proper forum, because the proper venue is exclusively the Western District of Louisiana.

**1.** A habeas petition brought under 28 U.S.C. § 2241 challenging detention must be brought against the immediate custodian and filed in the district in which the petitioner is detained. The Supreme Court has made clear that in "core" habeas petitions—that is, petitions like the instant one that challenges the petitioner's present physical confinement—the petitioner must file the petition in the district in which he is confined (that is, the district of confinement) and name his warden as the respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004).

In *Padilla*, the Supreme Court described habeas petitions challenging a petitioner's present physical confinement (*i.e.*, detention) as "core" habeas petitions. *Id.* at 445. For review of such "core" petitions, "jurisdiction lies in only one district: the district of confinement." *Id.* at 443. Accordingly, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."[2] *Id.* at 447; *see id.* at 443 (explaining that "[t]he plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement").

Courts within this Circuit have regularly applied *Padilla* in the immigration context, with respect to habeas petitions just like this one. *See, e.g., Guzman v. Moshannon Valley Processing Ctr.*, Civ. Act. No. 24-1054 (JKS), 2024 WL 1251170, at *1 ("District courts are limited to granting habeas relief

---

[2] In adopting the "immediate custodian" rule, the Supreme Court rejected the "legal reality of control" standard and held that legal control does not determine the proper respondent in a habeas petition that challenges present physical confinement. *See Padilla*, 542 U.S. at 437-39; *see also id.* at 439 ("In challenges to present physical confinement, we reaffirm that the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent.").

within their respective jurisdictions, so that the court issuing the writ has jurisdiction over the custodian.") (cleaned up); *Eddine v. Chertoff*, Civ. Act. No. 07-6117 FSH, 2008 WL 630043, at \*2 (D.N.J. Mar. 5, 2008) (noting that a petition should file in the district of confinement because "the court issuing the writ must be able to exercise personal jurisdiction over the custodian of the petitioner."); *Allen v. Chertoff*, Civ. Act. No. 10-1003 (FLW), 2010 WL 743916, at \*2 (D.N.J. Mar. 4, 2010) (same); *Leybinsky v. U.S. Dep't of Homeland Sec.*, Civ. Act. No. 09-1965 (GEB), 2009 WL 1228586, at \*2 (D.N.J. May 1, 2009) (same); *Ali v. Sec'y, Dep't of Homeland Sec.*, Civ. Act. No. 11-2072, 2012 WL 15750, at \*2 (D.N.J. Jan. 4, 2012) (same).

**2.** Nobody disputes that if Khalil filed his petition today, it would have to be in the Western District of Louisiana. The only question before this Court is whether that principle no longer holds, because Khalil was temporarily in New Jersey when he improperly filed his original habeas petition in New York. The answer is no.

As relevant, the Supreme Court has recognized a "limited" exception to the district-of-confinement rule, namely, only "when the Government moves a habeas petitioner after she *properly files* a petition naming her immediate custodian." *Id.* at 441 (emphasis added) (discussing *Ex Parte Endo*, 323 U.S. 283 (1944)); *see Argueta Anariba v. Dir. Hudson Cty. Corr. Ctr.*, 17 F.4th 434, 446 (3d Cir. 2021) ("Our precedent likewise reflects an adherence to the general rule articulated in *Endo*, that the government's post-filing transfer of a § 2241 petitioner out of the court's territorial jurisdiction does not strip the court of jurisdiction over the petition."). Under those circumstances, the court where jurisdiction originally vested may retain the case. *See Argueta Anariba*, 14 F.4th at 446 (collecting cases).

That limited exception does not apply here. Khalil has never filed a habeas petition in this Court. Importantly, that means that habeas jurisdiction has never vested in this Court. And as a corollary to that, it means the limited exception just described is not implicated. That exception applies only where the original court is able to "retain[] jurisdiction," even after someone is removed from its

territorial reach. *Padilla*, 542 U.S. at 441.  But where a court never *had* habeas jurisdiction in the first place, there is nothing to retain. *See Azize v. Bur. of Citizenship & Imm. Serv.*, No. 04 Civ. 9684 (SHS)(JCF), 2005 WL 3488333, at *1 (S.D.N.Y. Oct. 7, 2005); *see, e.g., Barden v. Keohane*, 921 F.2d 476, 477 n.1 (3d Cir. 1990) (noting that jurisdiction over a habeas petition is determined at the time it is filed and retaining jurisdiction because the original petition had properly named respondent); *United States v. Vidal*, 647 F. App'x 59, 60 (3d Cir. 2016) ("A § 2241 petition is properly filed in the jurisdiction in which the prisoner is confined. At the time Vidal filed his motion, he was confined in a facility outside the territory of the District of New Jersey. Accordingly, the District Court lacked jurisdiction to consider his motion.") (citations omitted).

The "default rule" articulated in *Padilla* thus controls here.  542 U.S. at 435. Because Khalil's original petition was improper, no court has yet had proper habeas jurisdiction over this matter.  And the only place where habeas jurisdiction would be proper today is the Western District of Louisiana. *See Wooten v. Zickefoose*, No. CIV. 10-4599 NLH, 2011 WL 794393, at *3 (D.N.J. Feb. 28, 2011). This because, , "jurisdiction lies in only one district: the district of confinement," *Padilla*, 542 U.S. at 443, and in this case, it is the Western District of Louisiana. *See, e.g., Burkey v. Marberry*, 556 F.3d 142, 146 (3d Cir. 2009) (noting that the petitioner, who challenged the BOP's determination that he was ineligible for early release, had "appropriately filed his habeas corpus petition in the district of confinement"); *Furnari v. U.S. Parole Comm'n*, 531 F.3d 241, 255 (3d Cir. 2008) ("28 U.S.C. § 2241 allows habeas corpus petitions to be brought . . . in the district in which the petitioner is confined."); *Yi v. Maugans*, 24 F.3d 500, 503 (3d Cir. 1994) ("A district court's habeas corpus jurisdiction is territorially limited and extends only to persons detained and custodial officials acting within the boundaries of that district.") (citations omitted); *see also United States v. Means*, 572 F. App'x. 793, 794 (11th Cir. 2014) (refiled petition should be filed in district where petitioner "currently incarcerated");

*Magee v. Clinton*, No. 04-5247, 2005 WL 613248, at *1 (D.C. Cir. 2005) (similar); *United States v. Little*, 392 F.3d 671, 680 (4th Cir. 2004) (similar).

**3.** The transfer statutes do not alter this analysis. In sending this case to this Court, Judge Furman relied on 28 U.S.C. § 1406(a), which provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

It is true that at the time Khalil's original petition was filed, it could have been properly filed in this district. But the SDNY court erred in treating that fact as dispositive. *See* Op. at 28-29. While Khalil's case "could have been brought" here at the time of filing, that does not mean it can be heard here and now. And it cannot, under *Padilla*—or the specific statutory text it interpreted. Section 2241(a) states that writs of habeas corpus "may be granted by … the district courts … within their respective jurisdictions." *Padilla* interpreted that text—namely, "jurisdiction[]"—to require that a habeas petitioner satisfy both the immediate custodian and district-of-confinement rules in order for a federal court to be able to issue a writ of habeas corpus. Section 1406(a) can permit transfer but only if the transferee court would also have subject matter jurisdiction over the matter. *See Cortez v. Baskin*, Civ. Act. No. 19-12261-NLH-AMD, 2019 WL 2142902, at *1 n.1 (D.N.J. May 16, 2019); *see also Spiniello Companies v. Moynier*, 2014 WL 7205349, at *5–6 (D.N.J. 2014) (explaining that if a court determines that venue has been improperly laid within its district, § 1406(a) confers discretion to transfer the case or dismiss it); *id.* ("To effectuate a § 1406(a) transfer to a proper venue, a court must possess subject matter jurisdiction over the case."); C. Wright, A. Miller, et al., 14D Fed. Prac. & Proc: Juris. § 3827 (4th ed.) ("A district judge may not order transfer under Section 1406(a) unless the court has jurisdiction of the subject matter of the action...."); *cf. Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007) (convenience-based venue issues may be addressed

before the threshold issue of subject-matter jurisdiction); *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 404 (3d Cir. 2017)(same). This is where the SDNY court erred. *See* Op. at 30.

Nothing in § 1406(a)'s general authorization for transfer displaces those specific conditions for habeas relief or purports to vest this Court with jurisdiction that would not otherwise exist. This Court has never had jurisdiction over this matter, and it cannot exercise jurisdiction over it now. *See Padilla*, 542 U.S. at 441-42. Even if that transfer statute technically permitted transfer to this Court as a matter of civil procedure, that does not somehow vest this Court with the statutory authority to issue a specific remedy—and do so notwithstanding the specific preconditions for such relief. Put otherwise, in order for this Court to award habeas relief under 2241(a), it must have "jurisdiction" to do so—as construed by *Padilla*. Nothing in the transfer statutes alters that limitation.

**4.** The transfer statutes all contemplate transfer to a district where an action "could have been brought in the first instance." *Parker v. Hazelwood*, Civ. No. 17-484-LM, 2019 WL 4261832, at *6 (D.N.H. 2019). Because that is only this district—and because this district is unavailable—those laws are broadly unavailable. That is why, as noted, the typical course on this posture is dismissal without prejudice, so that Khalil may properly refile in the right district. That said, 28 U.S.C. § 1404(a) allows transfer where the parties consent. And the United States would consent to transfer to the Western District of Louisiana, so that this petition can promptly be resolved. *See Pittman v. Pullen*, No. 22-cv-1651 (JAM), 2023 WL 6379371, at *3 (D. Conn. 2023).

The United States would consent to such transfer, because transfer of this action to the Western District of Louisiana serves the interest of justice. An immediate transfer to the proper forum is the best way to promptly resolve this habeas petition. *See Verissimo v. I.N.S.*, 204 F. Supp. 2d 818, 820 (D.N.J. 2002) (recognizing that the place of detainment may often be the most convenient forum to the parties) (citing *McCoy v. United States Board of Parole*, 537 F.2d 962, 966 (8th Cir. 1976)). Transferring also serves the interest of justice because the LaSalle Immigration Court has jurisdiction

over Khalil's removal proceedings and ICE has no plans to transfer him during the pendency of those proceedings. *See* 8 C.F.R. § 1003.14(a); Ex. A – as-filed-NTA; 2d Supp. Joyce Decl. ¶ 20.

Should he do so, Khalil's reliance on the law-of-the-case doctrine would be misplaced in this case. Order Transferring Petition at 29-30 (ECF No. 78). The doctrine "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). But this discretionary doctrine in no way limits this Court's power to decide its own jurisdiction. *Id.* (citing *Arizona v. California*, 460 U.S. 605, 619 (1983)). Given the substantial jurisdictional concerns with the original petition and the lack of filing in the proper district at the outset, the Court's exercise of discretion would not be warranted. *See id.* at 117 (declining to apply doctrine when it would affect jurisdictional issues).

*        *        *

## <u>CONCLUSION</u>

There is no doubt that this case has garnered much attention and involves important issues. "But it is surely just as necessary in important cases as unimportant ones that courts take care not to exceed their 'respective jurisdictions' established by Congress." *Padilla*, 542 U.S. at 450-51. The well-settled "jurisdictional rules" that govern habeas proceedings compel that this case must be heard in one forum, and one forum only: The Western District of Louisiana, where Khalil is now being held. For the foregoing reasons, the Court should dismiss this petition without prejudice, or transfer it to that district.

Dated: March 20, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

SARAH S. WILSON
Assistant Director

ALANNA T. DUONG
Senior Litigation Counsel

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was served on counsel of record via this Court's CM/ECF system on March 20, 2025.

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB:

Event No:

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID:                    FINS:                    File No:

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

_____

| (Number, street, city, state and ZIP code) | (Area code and phone number) |
|---|---|

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:     ☐ 8CFR 208.30     ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY
(Complete Address of Immigration Court, including Room Number, if any)

on _March 27, 2025_ at _8:30 AM_ to show why you should not be removed from the United States based on the
    (Date)         (Time)

charge(s) set forth above.

TIMOTHY MORAN - Supervisory Special Agent   TIMOTHY M MORAN JR _(Digitally signed)_
(Signature and Title of Issuing Officer)

Date: _March 9, 2025_          26 Federal Plaza, New York, NY
                                    (City and State)

DHS Form I-862 (6/22)                                          Page 1 of 3

**JA 588**

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
*(Signature of Respondent)*

_____                                          Date: _____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 9, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

TIMOTHY M MORAN JR *(Digitally signed by TIMOTHY M MORAN JR, Date: 2025.03.09 16:41:28 -05'00')*

(X) *Refused to sign* (B)                    TIMOTHY MORAN - Supervisory Special Agent
*(Signature of Respondent if Personally Served)*          *(Signature and Title of officer)*

DHS Form I-862 (6/22)                                                                 Page 2 of 3

**JA 589**

**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

Page 3 of 3

**JA 590**

U.S. Department of Homeland Security
Immigration and Customs Enforcement | **Additional Charges of Inadmissibility / Deportability**

**In:**   [ x ]  **Removal proceedings under section 240 of the Immigration and Nationality Act**

[   ]  **Deportation proceedings commenced prior to April 1, 1997, under former section 242 of the Immigration and Nationality Act**

**In the Matter of:**
Alien/Respondent: _____ Mahmoud Khalil _____

File No: _ _____  Address: 830 Pinehill Road, Jena, Louisiana 71342

[ ] - 1.  You are an arriving alien.
[ ] 2.  You are an alien present in the United States who has not been admitted or paroled.
[X] 3.  You have been admitted to the United States, but are removable for the reasons stated below.

There is/are hereby lodged against you the following allegation(s), [   ] in addition to or [X] in lieu of, those set forth in the original charging document:

1. You are not a citizen or national of the United States;
2. You are a native of Syria and a citizen of Algeria;
3. You were admitted to the United States at John F. Kennedy International Airport, Queens, New York, on or about December 20, 2022, as an F-1 nonimmigrant student to attend Columbia University in New York, New York;
4. Your status was adjusted to that of a conditional lawful permanent resident on November 16, 2024, based on marriage to a U.S. Citizen spouse, under section 245(a) of the Immigration and Nationality Act;
5. The Secretary of State has determined that your activities and presence in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest;
6. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer;
7. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 3, page 6, you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022.
8. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question part 8, page 9, you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD).

There is/are hereby lodged against you the following charge(s), [X] in addition to or [ ] in lieu of, those set forth in the original charging document:

Section 237(a)(1)(A) of the Immigration and Nationality Act, as amended, in that at the time of entry or of adjustment of status, you were within one or more of the classes of aliens inadmissible by the law existing at such time, to wit: aliens who seek to procure, or have sought to procure, or who have procured a visa, other documentation, or admission into the United States, or other benefit provided under the Act, by fraud or by willfully misrepresenting a material fact, under Section 212(a)(6)(C)(i) of the Act.

Dated:  3/17/2025

(Signature of Deportation Officer)

EOIR – 1 of 2

FORM I-261

Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in the charging document and that you are inadmissible or deportable on the charges contained in the charging document. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change you address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

**Certificate of Service**

This charging document was served on the respondent on _3/17/25_, in the following manner in compliance with section 239(a)(1)(F) of the Act.

☒ in person ☐ by certified mail, return receipt requested ☐ by regular mail

to: _830 Pinehill Rd Jena LA 71342_
(Alien's address)

☒ The alien was provided oral notice in the _English_ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in Section 240(b)(7) of the Act.

_Refuse to sign_ _____DO_____
(Signature of respondent if personally served)     (Signature and title of officer)

---

JA 592

# EXHIBIT I

March 19, 2025

████████████

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street
Newark, NJ 07101

PURSUANT TO 28 USC 1746, I HEREBY DECLARE THE FOLLOWING:

Dear Judge Farbiarz,

I am writing this letter to you in support of Mahmoud Khalil. My name is ████████████ and I am a U.S. citizen and identify as Jewish. I graduated from Columbia University's School of International and Public Affairs (SIPA) in May 2024 and have known Mahmoud Khalil for about two years since he started his studies at SIPA in January 2023.

I consider Mahmoud a colleague, fellow advocate and profound human being. I regard Mahmoud as a thoughtful, committed, highly intelligent, curious and pacifistic person. I developed this understanding of his character through my many interactions with him at Columbia in classrooms, social outings, and advocacy circles. I have had countless discussions with him about international affairs, politics and the Israeli-Palestinian conflict. I can point to several specific examples that highlight Mahmoud commitment to non-violent, respectful language and building an inclusive pro-Palestinian movement on campus.

My first interaction with Mahmoud was in March 2023. Over the prior winter break, I participated in a trip to the Occupied Palestinian Territories organized by PalTrek National. As a follow-up to the trip, a discussion was convened with participants of the trip to highlight our experience. I offered to speak about my experience as a Jewish person who has traveled to Israel on multiple occasions before this trip. I was honest about my participation in Birthright International, a fully-funded trip for American Jewish youth to experience Israel. Birthright has received criticism from anti-Israel groups for its support of resettling American Jews to Israel, often at the expense of Palestinian families. While some students at SIPA expressed valid concerns about including my experience over others from the trip, Mahmoud personally welcomed my inclusion in the panel. Mahmoud saw the importance of including my voice in this discussion and highlighting the complicated pressures on American Jews. Mahmoud, starting at SIPA in January, did not participate in the trip and did not know me beyond my identity as

Jewish and previous participant in Birthright. Instead of leaning into stereotypes or succumbing to the pressures of others, Mahmoud saw me as a human being with a long and complicated relationship to my religious identity and its connection to the state of Israel.

The next incident I'd like to highlight occurred in October 2023. Following the Hamas-led terrorist attacks on October 7th and subsequent military response by Israel, the Dean of SIPA, Keren Yarhi-Milo, asked to meet with some SIPA students to understand the impact of the war on Palestinian students. Mahmoud was in attendance. Mahmoud began the meeting by asking Dean Yarhi-Milo, an Israeli citizen, how she, her family and community were doing in light of the terrorist attack. In asking the question, Mahmoud condemned the violent, hateful act by Hamas terrorists and expressed grief for the immediate loss of life and continued impact on the communities. Even Dean Yarhi-Milo appeared touched by the question and expressed gratitude for his consideration of her experience of this violence as an Israeli woman.

From October 2023, tensions on campus elevated. I've watched Mahmoud on several occasions de-escalate tense situations on campus, leading with peace to usher a constructive dialogue rather than inciting aggression that leads to hate speech. I saw Mahmoud, as well as other Arab classmates, confronted and, at times, harassed by other students, asking him if he supported Hamas. Mahmoud would not raise his voice or respond with aggression, but instead simply answer the question by condemning Hamas and all forms of violent extremism. Mahmoud recognized this was a tactic to coerce him to promote hateful or extremist language, but he never wavered in his denouncement of all forms of violent extremism, including the actions of Hamas on October 7th.

On October 25th 2023, over 20 students, including myself, were targeted in a doxing campaign by the right-wing media organization, Accuracy in Media. The organization launched an online petition, personal website for each student, and paraded a billboard truck around campus displaying my name and photo under the banner, "Columbia's Leading Antisemite." The false statement was attributed to my position as the President of SIPA's Human Rights Working Group. Mahmoud, not targeted at that time by this doxing campaign, reached out to me personally to check in on my well-being. He recognized that my identity and work experience with Jewish organizations contradicted the claim of antisemitism, and offered his support. He expressed his support not in justification of antisemitism, but as defamatory action to distract from legitimate antisemitism happening on campus, saying to me, "by targeting the Jewish student and ignoring the very real antisemitism happening on campus, [Accuracy in Media] has made it clear their motives are not to protect Jewish people."

I can point to additional incidents that occurred in April 2024 during the Solidarity Encampment at Columbia University. During the Encampment, Mahmoud led community-wide discussions on how to ensure the space was free from hate and discrimination. Through this, he helped develop

community guidelines for the encampment that indicated any expression of hate speech will not be tolerated. On one occasion, some individuals made remarks that I personally found offensive as a Jewish person. I saw Mahmoud visibly uncomfortable, and instead of berating or verbally attacking the individuals, he approached them calmly to deescalate the situation by saying, "that's not a productive approach. We need to focus on law, not emotion." His priority has always been advocacy through nonviolent means, centering facts, legal arguments, and mutual respect.

ICE may attempt to use his participation in the Encampment protest against him, but that would be a complete distortion of reality. Mahmoud has actively included Jewish voices in conversations about Israel-Palestine. In fact, during the first day of Jewish Holy Days of Passover, I asked Mahmoud for his help in hosting a Passover Seder at the Encampment specifically for a non-Jewish audience. Mahmoud was very helpful in connecting me with the leadership of the Encampment and ensuring I had a large, safe space to host the Seder. Not only did he attend the Seder, Mahmoud invited his non-Jewish friends, understanding the importance of including non-Jews in the celebration of this Holy Day. Following the Seder, he commented to me directly, "thank you for hosting and inviting me to this Seder. It was my first time being invited to a Passover Seder and I am very thankful to have learned more about Judaism." His gratitude and support of this initiative further highlights his understanding of the value of including Jewish voices in typically non-Jewish spaces. In that moment, Mahmoud saw me, not just as a Jew but as a fellow human being equally committed to his message of nonviolence and peace.

Additionally, ICE and Federal officials may penalize Mahmoud for his visibility during Columbia's protests because he was selected as a press representative from the student negotiating team. Only specific students were selected for these roles to ensure the peaceful purpose of the protests were expressed calmly and without hatred. I watched him on several occasions be tested by the press with leading questions that sought to charge the conversation with antisemitic or extremist messaging, and Mahmoud maintained his calmness, commitment to promoting peace on campus and sensitivity to hateful or extremist rhetoric. His role as a student negotiator underscores his commitment to finding a peaceful end to the Encampment through dialogue with Columbia's administration.

I trust these examples provide insight into Mahmoud's character and context to his participation in nonviolent protests that may be weaponized against him. His commitment to peaceful dialogue, particularly the creation of interfaith spaces, exemplifies what I have personally witnessed: Mahmoud has never engaged in or expressed support for antisemitic nor extremist ideology. He is an incredible advocate, good-faith member of the Columbia Alumni community, and a kind human being. I urge you to support his immediate release.

I DECLARE UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 3/19/2025

Phone number: ███████████
Mailing Address: ███████████████████████

Thank you for your time and consideration. I sincerely appreciate the Court's attention to this matter. If the Court requires any further information, I can be reached at the contact information above.

Honorable Jesse M. Furman,
United States District Judge, Southern District of New York,
Thurgood Marshall Courthouse, 40 Centre Street, New York, NY

18 March 2025

**Statement in support of Mahmoud Khalil**

Dear Judge Furman,

My name is ███████████████, I am a friend and former colleague of Mahmoud Khalil. I write to express my support for him, and to vouch for his conduct and character.

I know Mahmoud in both a professional and personal capacity. Professionally, we spent two years working for the same team in the ████████████████████████████. Mahmoud worked for the ████████████████████████████████████████. I joined ██████████████████████████.

At work, Mahmoud was thoughtful and hard-working, consistently receiving the highest grade in his yearly appraisal. It is notable that Mahmoud was security cleared to work at the British Embassy in Beirut, one of the most politically sensitive posts in the diplomatic network. He was a trusted member of the team, showing discretion and personal integrity in all that he did. This is abundantly clear when examining the nature of Mahmoud's day-to-day work. Mahmoud was responsible for overseeing the Chevening Scholarship fund that brings some of the brightest students from Syria to study at British universities. In this role, he was privy to the sensitive personal information of hundreds of young Syrians who had grown up in Bashar al-Assad's brutal dictatorship - information which he handled with total discretion.

After I left the █████████████████████████, I moved to Beirut to study Arabic and start a new career in journalism. It is at this time that I really became friends with Mahmoud. Outside of work he is tremendously fun to be with, especially when there is music involved. He is a loyal friend and is always generous with his time. He has spent hours answering my questions about the vagaries of regional politics, and would always insist on giving me a lift home across town after a disappointing evening of watching England play football (soccer).

President Trump's characterization of Mahmoud could not be further from the truth. His activism is a reflection of the very best of his character, not some radical impulse or subversive agenda. Mahmoud is motivated by the desire to see justice for Palestinians, but one does not need to agree with his politics to admire his courage in pursuing that aim. As an immigrant of Palestinian-Syrian heritage, Mahmoud has been dealt one of the weakest geo-political hands imaginable, and yet he stood up to one of the most powerful educational institutions in the world, despite the personal risk that this involved. His integrity and moral conviction is an example to all of us.

I hope you will take this testimony into consideration, and I would be happy to provide any further information that might help with your judgement.

Yours sincerely,

████████████

**Contact:** ███████████████████

**JA 598**

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman,
I am writing in support of my friend and neighbor Mahmoud Khalil. My name is ▮▮▮▮▮▮▮ and I am
an Associate Professor at Columbia University. Over the past year, I have joined with a
diverse group of other Jewish colleagues to speak out in defense of our students' right to protest the
ongoing violence in Gaza. Through this advocacy, I have had the good fortune to get to know Mahmoud
well. He is an upstanding, principled, and well-respected member of our community.

I wish to convey to you in the strongest possible terms that the slander, insinuations, and guilt-by-
association leveled against Mahmoud by everyone from anonymous trolls on social media to the White
House could not be further from the truth known by those of us who know Mahmoud firsthand. I first got
to know Mahmoud when he invited me to a film screening and panel discussion organized by himself and
other Palestinian students in an interest of dialogue and understanding about the roots of disagreement on
our campus. After the Gaza Solidarity Encampment arose on our campus and he stepped in as a mediator
and spokesman, I only grew more impressed by his character, his kindness, and his commitment to a
vision of liberation and justice both here and in Israel-Palestine that includes everyone, of all creeds and
backgrounds.

Mahmoud's commitments to peace and collective liberation are a matter of public record. I myself have
heard him openly express his opposition to antisemitism and all other forms of prejudice. I have given
him my personal phone number and we have spoken often, whether just to catch up or whenever either
one of us had a concern or question about something happening on campus. I have given him my trust on
sensitive subjects and he has extended his in return. I have heard personally from Jewish students and
others about how welcome and safe they feel around Mahmoud. I have heard firsthand how he has
rebuked people who have said hurtful or prejudicial things in the context of the protest movement. I have
stood beside him on live television to defend our students' right to protest and I would not have done this
if I believed any of the things being said about him by the government or by his doxers and harassers on
social media were true.

My understanding is that even unkind people have rights. However, since Mahmoud's character and
beliefs are, I understand, at issue in this case, let it be said Mahmoud is among the kindest, gentlest, and
most principled people I have had the chance to meet over the last year and a half of turmoil on our
campus. There are not many people whose phone calls I will take at any hour without hesitation.
Mahmoud has always listened to my concerns in private and always spoken for inclusive visions of peace
and collective liberation in public. His role in the campus protests has always been that of mediator,
spokesman, of peacemaker, as one who seeks resolution, not inflammation, to conflict. He represents the
best of what this student body has to offer.

I am happy to provide more information if it can be helpful to the court. I can be reached by phone at
▮▮▮▮▮▮▮ or by mail at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Thank you for your
consideration of my experience and perspective.

Sincerely,



Honorable Jesse M. Furman
United States District Judge
District of New Jersey
50 Walnut St., #4015
Newark, New Jersey 07102

Dear Judge Farbiarz,

I am writing this letter in support of Mahmoud Khalil.

My name is ███████, and I bring more than decade of award-winning journalism and entrepreneurism to my role as ███████—a research action center at Temple University in Philadelphia, dedicated to education equity.  Based in the Middle East for almost a decade, I was one of the first women columnists at ███████ and co-founded ███████, an initiative dedicated to amplifying female voices in international affairs. I'm the co-founder of ███████, a ███████ campaign in Malawi and Guatemala that provides bicycles for adolescent girls to get to school. I am also the founding deputy editor of the ███████ in Egypt, where I was a U.S. Fulbright fellow and Pulitzer Center grantee.

I met Mahmoud almost 12 years ago, when I spent a summer in Beirut reporting on the Syrian refugee crisis. Mahmoud was 18 and had just recently fled Syria by himself. He was painstakingly teaching himself English and volunteering his time to help fellow Syrians build new lives from the rubble of a brutal dictatorship and civil war. He often referred to himself as a "double refugee"—a Palestinian in Syria, who grew up in a refugee camp in Damascus, and a Syrian refugee in Lebanon. He was one of the most courageous, gentle, and kind souls I ever met. And he remains one of the most courageous, gentle, and kind humans I know. Mahmoud shouldn't have to be extraordinary to deserve our empathy—or to ignite our rage over the injustice of it all. But he is.

When we crossed paths in Istanbul a few years ago during Ramadan, we celebrated over a huge iftar—the breaking of the fast. Mahmoud was admitted to Columbia SIPA as a graduate student. He was deeply humbled and full of hope. Against all odds, he not only built a new life for himself, but was now going to further his development studies so to better serve marginalized communities around this world.  "This will help me serve all the others—so many others—who didn't and won't get a chance," he told me. That's the thing about Mahmoud: his north star is creating opportunities for others, even when he barely had any himself as an 18-year-old refugee fleeing Bashar Al-Assad's murderous dictatorship.

Columbia should be honored to call Mahmoud, a humanitarian in the truest sense of the word, an alumnus.

Mahmoud has dedicated his life to protecting the dignity of others. And we now must protect his.

You can reach me at ██████████ and ██████████████████

Thank you,

██████████

March 20, 2025

# COLUMBIA UNIVERSITY

### IN THE CITY OF NEW YORK

#### DEPARTMENT OF HISTORY

March 19, 2025

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street
Newark, NJ 07101

Dear Judge Farbiarz,

I am writing this letter in support of Mr. Mahmoud Khalil, whom I have known since he took the graduate section of my course, "History of the Modern Middle East," HIST 6998, in the fall semester of 2023.

I am the ██████████████████████████████████ in the Department of History at Columbia University, where I taught for a total of 23 years until my retirement in July 2024. Before that I taught for sixteen years in the Department of History at the University of Chicago. I have also taught at Georgetown University, the American University of Beirut, and the Lebanese University. I have served as the President of the Middle East Studies Association, and as an adviser to the Palestinian delegation during the 1991-1993 Madrid-Washington Palestinian-Israel peace negotiations. I am the author of eight books on Middle Eastern history that have been translated into dozens of languages, and the co-editor of three others.

Mr. Khalil was an outstanding student in my course, taking an active part in the discussion sessions and in class, producing excellent take-home essays in the midterm and final exams, and obtaining the grade of A. Although he had far broader experience than they did of the history and politics of the Middle East, having grown up there and having worked for the British Embassy in Beirut, he was always respectful of other less knowledgeable students, and never dominated the discussions. His contributions were thoughtful and always to the point.

I got to know Mr. Khalil further during the subsequent months, when he became a negotiator for the students protesting Israel's war on Gaza with the Columbia administration, trying to bring the protests to a peaceful, mutually satisfactory end. This was a difficult task, as the administration was under intense external pressure. As far as I could tell, he performed this task in good faith, although his efforts, and those of faculty colleagues of mine to achieve the same end, were ultimately unsuccessful.

I also got to know Mahmoud through my wife, a former ███████████ at the School of International and Public Affairs (SIPA), where he was a student, as he and other SIPA students often consulted her for career advice and sometimes personal advice. We got to know him and his wife Noor socially, and I found him to be a dedicated family man, caring of her, and deeply considerate. He was also a source of solace and support for younger Palestinian students who had been doxed, harassed and callously treated by the University, which provided them with little or no support.

Mr. Khalil is a straight-forward, honest and soft-spoken individual, whom I have always found to be clear headed and mature beyond his years. In stark contrast with the entirely false picture of him portrayed by some, he is neither an extremist nor a hot-head, but rather someone deeply concerned about the fate of his people, the Palestinians. This is perfectly understandable, coming from someone whose family were forced to take refuge in Syria in 1948 after being driven from their homeland, and then had to leave Damascus due to the civil war there of the past fourteen years, which destroyed their home, and made them refugees once again.

I hope this background on Mr. Khalil is helpful to you in deciding on his case.

Sincerely yours,



History Department, Columbia University

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

RE: Letter in Support of Mahmoud Khalil's Bail Hearing

Dear Judge Furman,

I am writing this letter in support of my dear friend Mahmoud Khalil. My name is ███████████,
and I am a recent graduate of Columbia University, Mailman School of Public Health, Class of
2024. As a proud U.S. citizen, I deeply value free speech and am committed to protecting our
First Amendment and constitutional rights. What has happened to Mahmoud Khalil greatly
troubles me and raises serious concerns about the future of our country.

Mahmoud is more than just a friend; he is a dear brother whom I was fortunate to meet during
my time at Columbia and in New York. The first time I met Mahmoud was at a refugee advocacy
and human rights event organized by SIPA. I was sitting in the front row, listening to a top
diplomat's testimony when Mahmoud raised his hand and shared his personal refugee story,
leaving us all in awe. Mahmoud's journey of displacement and resilience should be taught in
every classroom across the world. I have yet to meet anyone who humanizes people, situations,
and stories like Mahmoud does. It didn't take long for me to understand the essence of who
Mahmoud is. He is affable, generous, intelligent, articulate, funny, caring, and humble. After the
event, I approached him, we chatted, walked across campus together, and, as expected, he
invited me over for tea. He convinced me to drink it by promising to make the best mujaddara
(lentil rice dish from the Levant)—and he delivered; it was delicious. Beyond his culinary talents,
Mahmoud's taste in music is worldly. His playlists reflect every experience and place he's
visited, and, of course, every song has a story behind it—spanning from his time in Syria to the
vibrant nights in Beirut.

On a professional level, I had the privilege of working with Mahmoud during our internships at
the United Nations while pursuing our graduate studies. I witnessed firsthand Mahmoud's
dedication to social justice, global issues, and his political acumen. Mahmoud is pragmatic,
diplomatic, and sensible—traits that are evident in his successful relationships with colleagues,
classmates, and professors.

Mahmoud has a unique ability to make people feel seen and heard. Above all, he is a loving husband, married to a kind-hearted woman, and I have no doubt that he will be an amazing father. His wife deserves to have him by her side during the birth of their first child, and we owe it to their child to be born in a country that values free speech and upholds the fundamental freedoms of its residents.

The absence of Mahmoud is profoundly felt by his loved ones, as well as by the broader academic and professional circles he is part of. His influence on both our intellectual and social spheres is immeasurable, and his detention marks a significant loss for all who know him.

Therefore, I respectfully urge the court to release Mahmoud from his unjust detention and bring him back home to his wife. I ask the court not to rob Mahmoud of one of the most significant moments of his life as he prepares to welcome his firstborn.

Sincerely,

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON MARCH 19, 2025



Mobile: ▮▮▮▮▮ or
Email: ▮▮▮▮▮

**Thank you for your time and consideration. I sincerely appreciate the Court's attention to this matter. If the Court requires any further information, I can be reached at the contact information above.**

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street
Newark, NJ 07101

March 19th, 2025

Dear Judge Farbiarz,

I am writing this letter in full support of Mahmoud Khalil. I am a Lecturer at Columbia University's School of International and Public Affairs (SIPA), where I have been teaching courses in quantitative methods and data analysis for ten years. Mahmoud was not a student of mine; rather, I had the pleasure of meeting him through his advocacy on campus to raise awareness of the humanitarian crisis in Gaza and help support affected students.

I understand that Mahmoud has been an invaluable contributor to the Development Practice program at SIPA, organizing events and programming in his role as Program Assistant. He also served as the Teaching Assistant for a core Development Practice Lab course. He did all of this as a full-time student, while advocating for an end to the war and human suffering in Gaza, and supporting affecting students. On top of this, I know Mahmoud to be a kind and devoted husband and friend to so many at SIPA.

I remember chatting with Mahmoud at several events he participated in. One was a panel that included Palestinian SIPA students who shared their stories of trying to exist as students while their family and friends were under constant bombardment in Gaza. Another event was a discussion with two Columbia faculty members about the charged geopolitical situation in the Middle East. Mahmoud's participation in these events offer just two examples of Mahmoud working to bring people together to foster dialogue and a greater understanding of unfolding events and their impact on the SIPA community. I also remember talking to Mahmoud in my office about designing a survey to gauge the views of students about the school's handling of the situation and allocation of resources. He wanted the school and university leadership to understand the views of their students. The Mahmoud I came to know worked tirelessly to foster understanding, raise awareness, and bring people together.

Mahmoud is interested in building bridges. I know him to be a warm and kind advocate for those whose voices are marginalized, here at SIPA and the world beyond. He came to SIPA to pursue a career in public service, and is deeply committed to fighting oppression through advocacy, public policy, and diplomacy. I understand that his professional goals are to work with

international organizations to influence United Nations member states to uphold international humanitarian law and protect human rights.

Personally, I have had a hard time knowing that there are those at Columbia who are not interested in understanding the different ways that many people in the community are suffering. It gives me hope that there are people like Mahmoud who are deeply committed to fostering mutual understanding. In Mahmoud I found community. I am so incredibly grateful for all that he has done to raise awareness and bring people together. Without him here on campus, I believe that the path forward to a safe and inclusive Columbia is a little less hopeful.

Should you have any additional questions about Mahmoud, please do not hesitate to reach out to me by phone ███████ or email ███████████████.

Sincerely,

███████████████

███████████████

Columbia University | SIPA

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman,

I am writing this letter in support of Mahmoud Khalil. My name is ███████████, and I am a second-year Ph.D. student at Columbia University. Prior to this, I was a Fellow at Harvard Divinity School. As an older student with significant experience in both governmental and non-governmental sectors, I have encountered a wide range of people and personalities. Today, however, I write to you not only as a friend, colleague, and sister like the figure of Mahmoud's, I write to you in my capacity as a mother.

In Fall of 2023, when I moved to New York last year to pursue my passion and obtain a Ph.D., I found myself navigating this vast city alone with two young children. My days were filled with the challenges of juggling motherhood and attending classes, while my nights were long, spent reading and writing to my carpal tunnel's delight. During these challenging times, I came to realize how crucial community really is. Mahmoud, seeing the struggles I faced, stepped in without hesitation. He took on the role of an older brother, inviting us over for dinners and engaging my children in games. Soon enough, my 4-year-old son began asking, "Are we going to see your funny friends?" whenever he wanted to see Mahmoud.

Never hesitating to help, Mahmoud has a natural and effortless way of stepping in and making everyone feel at ease. I remember, one day last Summer, while attending a street festival, my son had stopped in the middle of the bustling sidewalk to protest what he deemed to be an unfair allocation of ice cream between him and his older sister. Desperate to avoid being swept by the crowd, I pleaded for him to keep walking. Defiant, he swung his arms around his little body, picked up his foot and kicked the ground not knowing my toes had shuffled into that very same spot. In the midst of my silent discomfort, Mahmoud stepped in, offering a water bottle and giving my son a ride on his shoulders. While I recovered from the pain and muttered under my breath, Mahmoud had successfully and effortlessly fended off one of many future encounters I hope he has with his son.

That's who Mahmoud is: a caretaker. He empathizes with everyone, quickly identifies what's needed, and fills the gap without hesitation. He's never flustered, always calm, and a steady presence in times of stress. Mahmoud is grounded in logic, adept at resolving conflict, and always ready to serve as a mediator. In fact, he was the *father figure* the university neglected to be.

Mahmoud cares about injustice in any form, whether it's watching a mom get her toe stepped on by a screaming toddler or watching the children of Gaza be torn to shreds. Therefore, although

Mahmoud is a friend, and a big brother, I write to you as a mother: Mahmoud deserves to be a father. It is who he is and all he has ever been.

Kind Regards,



3/18/2025



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement;[1] Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

*Respondents*.

No. 25-cv-1963-MEF-MAH

## PETITIONER'S MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENTS' RENEWED MOTION TO DISMISS OR TRANSFER & IN SUPPORT OF HIS CROSS-MOTION FOR RE-TRANSFER

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Natasha Hajo, *Law Student*\*
CUNY School of Law

---

[1] Respondent Yolanda Pittman, in her official capacity as Warden of Elizabeth Contact Detention Facility, will be added.

125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Pro hac vice application pending or
forthcoming

Counsel for Petitioner

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................... 1

FACTUAL BACKGROUND .................................................................... 2

ARGUMENT ........................................................................................... 7

    I.  Venue is proper in the District of New Jersey ............................ 7

        A.  This Court has venue under the law of the case ............................. 7

        B.  Venue is proper in the District of New Jersey because Mr.
            Khalil could have filed his petition here at the time he filed
            it in the Southern District of New York ......................................... 12

        C.  Even if the law of the case and ordinary habeas principles
            did not venue the petition in this Court, the government's
            transfer of Mr. Khalil from New Jersey to Louisiana
            demands the application of an exception because the
            government frustrated the proper filing of his petition ................. 22

    II.  Purely for the purpose of preserving the argument for future
        appellate review, Petitioner maintains that venue was proper in the
        Southern District of New York ..................................................... 30

CONCLUSION ......................................................................................... 31

CERTIFICATE OF SERVICE ................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Anariba v. v. Dir. Hudson Cnty. Corr. Ctr.*,
    17 F.4th 434 (3d Cir. 2021) ...................................................... *passim*

*Arizona v. California*,
    460 U.S. 605 (1984) ..................................................................... 10

*Barden v. Keohane*,
    921 F.2d 476 (3d Cir. 1990) ...................................................... 13

*Better Packages, Inc. v. Zheng*,
    No. CIV.A 05-4477-SRC, 2006 WL 1373055 (D.N.J. May 17, 2006) ............. 29

*Blair–Bey v. Quick*,
    151 F.3d 1036 (D.C. Cir. 1998) .................................................. 13

*Bobian v. CSA Czech Airlines*,
    222 F. Supp. 2d 598 (D.N.J. 2002) ............................................ 7

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ......................................................... 19, 21, 22

*Chapman v. Mairoanna*,
    No. 12–4116, 2013 WL 1491550 (3d Cir. Apr. 12, 2013) ................ 13

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) ........................................................... 11, 12

*Corneil-Rodriguez v. INS*,
    532 F.2d 301 (2d Cir. 1976) ..................................................... 20

*Cruz v. Decker*,
    No. 18 Civ. 9948, 2019 WL 4038555 (S.D.N.Y. Aug. 27, 2019) .................... 11

*Cruz-Aguilera v. INS*,
    245 F.3d 1070 (9th Cir. 2001) .................................................. 15

*Doe v. Barr*,
    No. 20-cv-02263, 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020) .................... 19

ii

*Durel B. v. Decker,*
No. 20-3430-KM (D.N.J. Apr. 1, 2020) (ECF 18) ........................................... 15

*Eisel v. Sec'y of the Army,*
477 F.2d 1251 (D.C. Cir. 1973)........................................................................ 21

*Ex parte Catanzaro,*
138 F.2d 100 (3d Cir. 1943) ............................................................................. 14

*Ex Parte Endo,*
323 U.S. 283 (1944) ........................................................................... 13, 18, 24

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.,*
482 F.3d 247 (3d Cir. 2007) ............................................................................. 15

*Gallego v. Decker,*
No. 19 Civ. 8263, 2020 WL 5370448 (S.D.N.Y. Sept. 8, 2020)...................... 19

*Golding v. Sessions,*
No. 18-CV-3036, 2018 WL 6444400 (S.D.N.Y. Dec. 6, 2018)....................... 17

*Grayson v. Mayview State Hosp.,*
293 F.3d 103 (3d Cir. 2002) ............................................................................. 15

*Griffin v. Ebbert,*
751 F.3d 288 (5th Cir. 2014) ............................................................................ 25

*Grigorian v. Morton,*
No. CIV.A 10-3441, 2010 WL 2902537 (E.D. Pa. July 23, 2010) .................. 10

*Hayman Cash Reg. Co. v. Sarokin,*
669 F.2d 162 (3d Cir. 1982) ....................................................................7, 8, 11

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,*
467 U.S. 51 (1984) ........................................................................................... 21

*Hinds v. Hufford,*
No. 17-CV-488, 2017 WL 6346413 (M.D. Pa. Dec. 12, 2017) ....................... 15

*Hoffenberg v. United States,*
No. 12-cv-4833-JBS, 2013 WL 135134 (D.N.J. Jan. 8, 2013)........................... 7

*Hoffman v. Blaski*,
   363 U.S. 335 (1960) ...................................................................... 9, 11

*Holiday v. Johnston*,
   313 U.S. 342 (1941) ...................................................................... 23

*Joseph v. Sniezek*,
   No. CV-13-1889, 2013 WL 5351078 (M.D. Pa. Sept. 23, 2013)............... 13, 17

*Kaufman v. Trammell*,
   No. 08-CV-276, 2012 WL 380351 (N.D. Okla. Feb. 6, 2012)......................... 15

*Latif v. Obama*,
   677 F.3d 1175 (D.C. Cir. 2011)......................................................... 27

*Lee You Fee v. Dulles*,
   236 F.2d 885 (7th Cir. 1956) ............................................................ 20

*Mahmood v. Nielsen*,
   312 F. Supp. 3d 417 (S.D.N.Y. 2018) ................................................. 11

*Nascone v. Spudnuts, Inc.*,
   735 F.2d 763 (3d Cir. 1984) ............................................................. 30

*Nottingham v. U.S. Dist. Ct. for Middle Dist. of Penn.*,
   No. 21-CV-396, 2021 WL 1313526 (M.D. Pa. Apr. 8, 2021).......................... 15

*Pittman v. Pullen*,
   No. 22-cv-01651, 2023 WL 6379371 (D. Conn. Sept. 29, 2023) .................... 17

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997) ........................................................ 8, 10

*Rivera-Perez v. Stover*,
   No. 23-CV-1348, 2024 WL 4819250 (D. Conn. Nov. 18, 2024)..................... 11

*Rumsfeld v. Padilla*,
   542 U.S. 426 (2004) ................................................................. passim

*Schmitz v Zilveti*, 20 F.3d 1043 (9th Cir. 1994)..................................................... 23

*Smith v. Gaetz*,
   No. CIV 10-616, 2010 WL 3926868 (S.D. Ill. Oct. 5, 2010)........................... 15

*SongByrd, Inc. v. Est. of Grossman*,
  206 F.3d 172 (2d Cir. 2000) ............................................................. 30

*Soto v. Pugh*,
  No. CV 306-092, 2007 WL 113945 (S.D. Ga. Jan. 10, 2007) ......................... 15

*Sow v. Whitaker*,
  No. 18 Civ. 11394, 2019 WL 2023752 (S.D.N.Y. May 8, 2019) .................... 25

*Steele v. Beasley*,
  No. 19-CV-23, 2019 WL 1270932 (E.D. Ark. Mar. 19, 2019) ........................ 15

*United States v. Asmar*,
  827 F.2d 907 (3d Cir. 1987) ............................................................. 20

*Vasquez v. Reno*,
  233 F.3d 688 (1st Cir. 2000) ............................................................. 25

## Statutes

28 U.S.C. § 1406 ...................................................................... 9, 13

28 U.S.C. § 1631 ........................................................................ 11

28 U.S.C. § 2242 ........................................................................ 15

## Other Authorities

Br. for the Commonwealth Lawyers Association as Amicus Curiae,
  *Boumediene v. Bush*, Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S.
  Aug. 24, 2007) ....................................................................... 22

John Morton, ICE Director, *Policy 11022.1: Detainee Transfers* (Jan. 4,
  2012) ................................................................................. 28

Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941
  (2011) ................................................................................ 23

## INTRODUCTION

This unprecedented case involves government efforts to detain, under cover of night, Mahmoud Khalil, a lawful permanent resident, and then, "in the space of less than twenty-four hours, . . . haul[]" him "through at least six different districts (one likely twice)." Op. at 24 n.6 (ECF 78). Within hours of his arrest and detention, Petitioner Mahmoud Khalil filed a habeas petition to challenge the government's efforts to punish and silence him for his speech. All of the information his lawyers had that night pointed to New York as the location of his detention, and that is where they filed. But as the world now knows, Mr. Khalil was not in New York when his lawyers filed his petition. Instead, he was here, in New Jersey—though nobody but the government would know that until he was already gone.

The government renews a motion it has already lost to send Mr. Khalil's case on to its orchestrated venue, the Western District of Louisiana. Just five days ago, Judge Furman ruled that because Mr. Khalil was in New Jersey at the time of his habeas filing, Petitioner's case should be transferred here in the interests of justice. In his opinion, Judge Furman rejected all of the arguments the government makes here in its "renewed" motion to transfer the case to Louisiana, and his decision is the law of the case. Even if it were not, the government's arguments are contrary to binding precedent that holds that the proper venue for a habeas petition

is where the petitioner was being held at the time the petition was filed. Those arguments are also intolerably inconsistent with the fundamental purposes underlying habeas corpus.

As Judge Furman held, this Court is a proper venue for Mr. Khalil's petition, which challenges his unconstitutional and illegal detention and threatened deportation. While Mr. Khalil preserves his prior arguments that the Southern District of New York was a proper venue at the time he filed his petition, he is ready to proceed on his emergency motions and claims before this Court. The Court should deny the government's motion.[2]

## FACTUAL BACKGROUND

At approximately 8:30 p.m. on the night of March 8, 2025, Mr. Khalil and his wife, who is eight months pregnant, were returning to their home on the Upper West Side of Manhattan after attending an Iftar dinner, which is a meal eaten at sunset to break the daylong fast Muslims observe during the holy month of Ramadan. Am. Pet. ¶ 45 (ECF 38).[3] Plainclothes officers followed them into the lobby of their apartment building, asked to confirm Mr. Khalil's identity, and

---

[2] As explained below, Petitioner has filed a cross-motion for re-transfer to the S.D.N.Y. purely to preserve for any future appellate review the argument that venue over his petition was proper there. *See infra* Part II. He waives his reply on that cross-motion.

[3] Petitioner has verified the facts in the Amended Petition. *See* Salama Decl. (ECF 50-1).

announced that they were Department of Homeland Security ("DHS") agents there to take him into custody. *Id.* ¶¶ 46–47. Two other agents were already waiting inside. *Id.* ¶ 47. After Mr. Khalil asked, one of the agents represented that they had a warrant on a mobile phone and they would show it to him. *Id.* ¶ 48. (Neither Mr. Khalil nor his lawyers have yet to see any warrant.) As Mr. Khalil explained that he was a permanent resident with a green card, the agents began to create a physical barrier between him and his wife, and then threatened his wife that she would be arrested if she did not comply with their orders. *Id.*

Mr. Khalil called one of his lawyers, Amy Greer, who spoke with Special Agent Elvin Hernandez. *Id.* ¶ 49. Agent Hernandez represented that he and his colleagues had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. State Department. *Id.* When Ms. Greer informed Agent Hernandez that Mr. Khalil was a permanent resident, Agent Hernandez responded that the State Department had revoked that, too. *Id.* ¶ 51. He told Ms. Greer that he would be bringing Mr. Khalil to 26 Federal Plaza, the location of the ICE New York Field Office. *Id.* After Ms. Greer attempted to ask further questions, Agent Hernandez hung up the phone. *Id.*

After the DHS agents took Mr. Khalil outside, they told his wife that he would be brought to 26 Federal Plaza but otherwise refused to answer any

questions. *Id.* ¶ 53. They did not identify themselves, the grounds for her husband's arrest, or who she could contact to inquire about his location or condition. *Id.*

Believing that Mr. Khalil's arrest, detention, and threatened deportation were unlawful, Mr. Khalil's lawyers raced to draft a habeas petition on Mr. Khalil's behalf. That night, Ms. Greer checked the ICE online detainee locator multiple times to confirm the location of her client. *Id.* ¶ 54. At 10:00 p.m., Mr. Khalil was not yet entered in the system. *Id.* Hours later, at 1:35 a.m. the next morning, the system informed her that Mr. Khalil was in custody in New York City and instructed her to call the ICE New York Field Office for information. *Id.* Several hours after that, the locator revealed the same information. *Id.* ¶¶ 54–55.

While Mr. Khalil was being held at 26 Federal Plaza, as ICE agents took his biometrics, an agent approached Agent Hernandez and said, "the White House is requesting an update." *Id.* ¶ 58. As Mr. Khalil waited, agents prepared a Notice to Appear ("NTA"), a document that contains details about the grounds for a noncitizen's removal from the country. *Id.* ¶ 59. They presented the NTA to him for signature, but after they refused his request to speak with his lawyer, he declined to sign it. *Id.* The NTA indicated he had been assigned an immigration court date, several weeks out, in Louisiana. *Id.* ¶ 60.

At some point overnight, agents from the New York Field Office transported Mr. Khalil in handcuffs and shackles to Elizabeth Detention Center ("EDC") in

New Jersey. *Id.* ¶ 61. Upon arrival at EDC, Mr. Khalil requested yet again to speak with his lawyer and was again refused. *Id.* ¶ 62; Khalil Decl. ¶ 9 (ECF 73-1). He asked once more the next morning, and was again refused. Khalil Decl. ¶ 12.

Meanwhile, Mr. Khalil's attorneys continued to work on Mr. Khalil's habeas petition. At 4:40 a.m. on March 9, after confirming that the locator showed that Mr. Khalil remained in New York City, Ms. Greer filed the petition in the U.S. District Court for the Southern District of New York. Am. Pet. ¶ 54; *see* Pet. (ECF 2). The petition sought, among other things, to enjoin transfer outside the district. *See* Pet. at 10–11. Almost four hours later after filing the petition, Ms. Greer checked the ICE locator again, and it still showed Mr. Khalil as being in New York City. Am. Pet. ¶ 55. Some time after that, she checked once more, and found that the system had updated to show that Mr. Khalil was being held in Elizabeth, New Jersey, at the EDC, a detention center privately operated by the corporation CoreCivic. *Id.* Alarmed and scared, Ms. Greer and a colleague made two attempts to contact her client by phone, but no one at the facility answered. *Id.* And around 11:20 a.m., Mr. Khalil's wife arrived at the facility to look for him, but she was told he was not in their system, and she was turned away. *Id.*

Mr. Khalil had spent the night in EDC and was there, according to the government, at the time that Ms. Greer filed his habeas petition. Second Suppl. Joyce Decl. ¶ 17 (ECF 72). Around noon, ICE officers—including one Mr. Khalil

believes he recognized from the night before at 26 Federal Plaza—arrived at the EDC and handcuffed and shackled him and placed him in a van, where he also found two plastic bags containing the clothing and items the ICE agents had taken from him the night before. Am. Pet. ¶ 63; Khalil Decl. ¶¶ 20–21. Mr. Khalil was told he was then going to JFK without further clarification. Am. Pet. ¶ 63; Khalil Decl. ¶ 20.

That afternoon, ICE informed Mr. Khalil's counsel that the government was in the process of transferring Mr. Khalil to its New Orleans Field Office, almost 1500 miles away. Am. Pet. ¶ 56. Mr. Khalil's counsel emailed attorneys in the U.S. Attorney's Office for the Southern District of New York, who confirmed that Mr. Khalil was on the way to Louisiana. *Id.* She requested Mr. Khalil's immediate return to New York, but was told that ICE would not consent to his return absent a court order. *Id.* And when Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that, for detained immigrants in New York, typically occurs the same or next day—authorities in the Louisiana ICE detention facility offered a date ten days away. *Id.*

In the early hours of the morning on March 10, almost 40 hours after his arrest, Mr. Khalil arrived at the Louisiana Detention Facility in Jena, Louisiana, where he remains today. *Id.* ¶¶ 67, 70, 99.

## ARGUMENT

As Judge Furman has already held, venue is proper in this District. That is the law of the case, and regardless, it is correct.

## I.     Venue is proper in the District of New Jersey.

### A.     This Court has venue under the law of the case.

That the government has "renew[ed]" its motion to transfer gives the game away. ECF 89 at 1. Judge Furman rejected the government's argument that dismissal or transfer to Louisiana was appropriate in a reasoned opinion that was fully litigated by the government. *See* Op. at 25–32 (ECF 78).[4] In this Circuit, venue transfer decisions made by the transferor court are the law of the case. *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 166 (3d Cir. 1982); *Bobian v. CSA Czech Airlines*, 222 F. Supp. 2d 598, 602 (D.N.J. 2002). The "only" circumstances in which the transferee court—this Court—may make "a determination of venue and jurisdiction" is when that "determination has not previously been made by the transferor court." *Sarokin*, 669 F.2d at 166; *see Hoffenberg v. United States*, No. 12-cv-4833-JBS, 2013 WL 135134, at *1 (D.N.J. Jan. 8, 2013) (Where "the transferor court . . . expressly ma[kes] a reasoned determination that venue is proper in this District" and the Court "has personal

---

[4] *Available at Khalil v. Joyce*, No. 25 Civ. 1935 (JMF), 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

jurisdiction" over the defendant, "the law of the case doctrine prohibits reconsideration of venue transfer . . . ."). The matter is closed.[5]

The government says that the "law of the case doctrine" does not apply here, or at least that it is "discretion[ary]." Renewed Transfer Mem. at 11 (ECF 90). But the government's own case makes clear that even where the Court maintains the *power* to reconsider an earlier decision, it should be "loathe" to exercise that power, and it may do so only in cases of manifest injustice to the party seeking reconsideration. *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc. (PIRG of N.J.)*, 123 F.3d 111, 117 (3d Cir. 1997). The government suggests that "the substantial jurisdictional concerns with the original petition and the lack of filing in the proper district at the outset" amount to such circumstances, Renewed Transfer Mem. at 11, but they are not even close. Nothing about Judge Furman's decision suggests reevaluation based on "new evidence," "supervening new law," or "clear[] erro[r]" that would "create manifest injustice." *PIRG of N.J.*, 123 F.3d at 117. Judge Furman ruled five days ago. And in his opinion, he articulated why transfer to this Court *served* the interest of justice, instead of working the opposite. Op. at 26–27 (explaining that even the government agreed that "prompt resolution"

_____

[5] The Third Circuit has suggested that a party challenging a transfer could "seek reconsideration in the transferor court." *Sarokin*, 669 F.2d at 168. The government did not seek reconsideration of Judge Furman's order here.

is "imperative," and concluding that dismissal and delay "would prejudice Mr. Khalil in several important ways").

There is also no argument that Judge Furman's decision to transfer Mr. Khalil's petition to this District was clear error. Judge Furman firmly grounded his decision in the clear language of one of the federal transfer statutes, 28 U.S.C. § 1406(a), which permits transfer of a case filed in the wrong district "to any district . . . in which [the case] could have been brought." Op. at 28. As he explained, the transfer statute does not permit transfer to a district (like the Western District of Louisiana) where a case "may now be *rebrought*," but only where it "could have been brought" in the first place. *Id.* at 29 (quoting *Hoffman v. Blaski*, 363 U.S. 335, 342 (1960)). As Judge Furman explained, the D.N.J. was "the one and only district in which [Mr. Khalil] could have filed" his petition at just past 4 o'clock in the morning on March 9, when the petition was filed in the S.D.N.Y. *Id.* at 30. And, he found, justice would be served by transfer here in lieu of dismissal, because the latter would have meant "litigating far from [Mr. Khalil's] lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place," and his "lawyers filed the Petition in [the S.D.N.Y.] based on a good-faith and reasonable belief that he was then detained [t]here." *Id.* at 26–27.

The government does not specifically take issue with that analysis so much as suggest that this Court must undertake it all anew and somehow arrive at a new result. The government appears to rely on *PIRG of N.J.* for the proposition that this Court can and should send the case to Louisiana because it must re-evaluate its own "jurisdiction[]," and because Judge Furman got that question wrong.[6] But *PIRG of N.J.* was about a court's non-negotiable Article III jurisdiction over a matter; there, a prior decision on standing had been "undermine[d]" by later-in-time factual findings. 123 F.3d at 117. That is a *real* question of jurisdiction.[7]

Judge Furman, addressing the government's "jurisdictional" argument, made clear that it "suffers from a . . . misunderstanding of" the Supreme Court's decision in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004). Op. at 30. "[H]abeas jurisdiction is 'not jurisdictional in the sense of a limitation on subject-matter jurisdiction.'" *Id.* (quoting *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring)); *see Grigorian v. Morton*, No. CIV.A 10-3441, 2010 WL 2902537, at *2 n.4 (E.D. Pa. July 23,

---

[6] Actually, all the government can muster is "concern[]" with Judge Furman's ruling. Renewed Transfer Mem. at 11. That is far from a clarion call for clear error.

[7] The government also cites *Arizona v. California*, 460 U.S. 605 (1984), but the law-of-the-case issue there concerned the unique scenario of the Supreme Court's original jurisdiction, and even without directly applying the doctrine, the Court invoked "the principles upon which" it is based to decide against reconsideration of the previously litigated jurisdictional question before it. *Id.* at 619. The Court also reiterated that the doctrine applied absent a showing of clear error or manifest injustice. *Id.* at 619 n.8.

2010) ("the term 'jurisdiction,' as used in [the habeas] context, does not refer to a limitation on the power of the Court to hear the case" (citing *Padilla*, 542 U.S. at 451–52)). Instead, it is a venue rule. *Padilla*, 542 U.S. at 452 ("Because the immediate-custodian and territorial-jurisdiction rules are like personal-jurisdiction or venue rules, objections to the filing of petitions based on those grounds can be waived by the Government.").[8] As a result, "[n]o statute is required to 'vest' the District of New Jersey with otherwise-absent jurisdiction." Op. at 30 (rejecting the government's argument found in Transfer Reply Mem. at 14 (ECF 71)).[9]

Even if the question of *subject-matter* jurisdiction were both actually at issue and a close call here, the law of the case doctrine would still apply. The Supreme Court has explained that, in cases transferred under the federal statutes, courts "should encourage, not discourage, quick settlement of questions of transfer." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 819 (1988) (quoting *Hoffman*, 363 U.S. at 349 (Frankfurter, J., dissenting)); *accord Sarokin*, 669 F.2d at 167–68. As important as jurisdiction is in any given case, courts should work to

---

[8] *See also Cruz v. Decker*, No. 18 Civ. 9948, 2019 WL 4038555, at *2 (S.D.N.Y. Aug. 27, 2019) ("*Padilla*'s 'immediate custodian rule is a venue rule.'" (quoting *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 423 (S.D.N.Y. 2018)), *aff'd*, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019))); *Rivera-Perez v. Stover*, No. 23-CV-1348, 2024 WL 4819250, at *5 (D. Conn. Nov. 18, 2024) (same).

[9] Judge Furman pointed out that, "even if the defect were one of subject-matter jurisdiction," the Court "would arguably" have had a basis to transfer Mr. Khalil's petition under 28 U.S.C. § 1631. Op. at 26. n.7.

avoid engaging "in a perpetual game of jurisdictional ping-pong . . . until one of the parties surrenders to futility." *Id.* at 818. That would "undermine public confidence in our judiciary" and "squander private and public resources" in ways Congress's transfer statutes never intended. *Id.* at 818–19. That rationale applies with even more force in a case like this, involving an unprecedented exercise of executive power that, for two weeks, a detained Petitioner has been challenging as blatantly unconstitutional. As a result, and because "the doctrine of the law of the case is . . . a heavy deterrent to vacillation on arguable issues," "reversals" of a transferor court's decisions "should necessarily be exceptional," and "if the transferee court can find the transfer decision *plausible*, its jurisdictional inquiry is at an end." *Id.* at 819 (cleaned up). Judge Furman's transfer decision easily clears that low bar.

> **B.** **Venue is proper in the District of New Jersey because Mr. Khalil could have filed his petition here at the time he filed it in the Southern District of New York.**

Judge Furman's analysis is all more than sound, and there is no reason for this Court to even revisit it, let alone overrule it as clearly wrong. It is consistent with the "default" rule in habeas cases—at least outside of the immigration context, *Padilla*, 542 U.S. at 435 n.8 (majority op.), and in this Circuit within it as well, *Anariba v. v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 444 (3d Cir. 2021)—that the proper respondent is the warden of the facility where the prisoner

is being held" at the time the petition was filed. *Padilla*, 542 U.S. at 435–36. It is also consistent with this Circuit's law regarding the transfers of habeas petitioners. "When a prisoner is transferred while the litigation is pending, habeas jurisdiction as a general matter continues to be in the district where the prisoner was incarcerated at the time the habeas petition was filed." *Chapman v. Mairoanna*, No. 12–4116, 2013 WL 1491550, at *1 n.1 (3d Cir. Apr. 12, 2013) (cleaned up) (quoting *Blair–Bey v. Quick*, 151 F.3d 1036, 1039 n. 1 (D.C. Cir. 1998)); *Anariba*, 17 F.4th at 445–46; *Barden v. Keohane*, 921 F.2d 476, 477 n.1 (3d Cir. 1990). And where a habeas petitioner is "transferred multiple times" after his petition was filed, "[p]roper jurisdiction over the action thus remains in the District Petitioner was incarcerated at the time of filing." *Joseph v. Sniezek*, No. CV-13-1889, 2013 WL 5351078, at *3–4 (M.D. Pa. Sept. 23, 2013).

This caselaw synthesizes both the longstanding federal transfer statutes and the rule of *Ex Parte Endo*, 323 U.S. 283 (1944), which no court has seriously questioned in more than eighty years. The federal transfer statutes, including (as in this case) 28 U.S.C. § 1406(a), permit courts, "in the interest of justice," to "transfer" cases "laying venue in the wrong . . . district" to "any district . . . in which it could have been brought." And, under *Endo*, "[t]he fact that a detainee has been transferred far away from a district that otherwise has jurisdiction to hear his or her claims does not necessarily deprive that district of habeas jurisdiction." Op.

at 30 (citing *Padilla*, 542 U.S. at 441 (majority op.), itself discussing *Endo*).

Indeed, even before *Endo*, the Third Circuit had "adhere[d] to the general rule . . . that the government's post-filing transfer of a § 2241 petitioner out of the court's territorial jurisdiction does not strip the court of jurisdiction over the petition." *Anariba*, 17 F.4th at 445–46 (discussing *Ex parte Catanzaro*, 138 F.2d 100 (3d Cir. 1943)).

All of that compels the same conclusion that Judge Furman already reached. Despite this, the government argues that because Mr. Khalil "has never filed a habeas petition in this Court, . . . habeas jurisdiction has never vested in this Court." Renewed Transfer Mem. at 7; *see id.* (suggesting that *Endo* does not apply because Mr. Khalil's petition was never "*properly*" filed in the District of New Jersey); Transfer Reply Mem. at 13–14 (same). But the government's position makes no sense.

First, as Judge Furman found, because the government did not even mention section 1406(a) in its brief supporting its first motion to transfer (ECF 31), the government has "forfeited any argument against application of" the transfer statute in this case. Op. at 27 n.9.

Second, Judge Furman already dealt with the government's objection, explaining that because habeas jurisdiction is not the same as subject-matter jurisdiction, the government's "vesting" argument goes nowhere. Op. at 30.

Third, to the extent that the government might be arguing that the problem here is that Mr. Khalil named the wrong respondent in his initial petition, *see* Renewed Transfer Mem. at 8 (implying, in a somewhat inaccurate case parenthetical, that its argument might be that Mr. Khalil's petition lacks a "properly named respondent"), that issue is easily and routinely cured.[10] And notably, the habeas pleading statute only requires the

---

[10] Petitioner maintains that Respondent Joyce is was and is a proper Respondent, *see infra* Part II; *see* Opp'n to Transfer Mem. at 12–16 (ECF 50), and that substitute of the EDC warden here is a pro forma matter. Courts frequently (and *sua sponte*) direct the Clerk of Court to substitute the name of the proper warden upon the transfer of habeas cases. *See, e.g.*, Order, *Durel B. v. Decker*, No. 20-3430-KM (D.N.J. Apr. 1, 2020) (ECF 18) (after transfer from S.D.N.Y. to D.N.J., reviewing a habeas petition for COVID-19 relief and directly adding the "proper respondent"); *see also, e.g.*, *Hinds v. Hufford*, No. 17-CV-488, 2017 WL 6346413, at *3 n.1 (M.D. Pa. Dec. 12, 2017); *Smith v. Gaetz*, No. CIV 10-616, 2010 WL 3926868, at *2 (S.D. Ill. Oct. 5, 2010); *Kaufman v. Trammell*, No. 08-CV-276, 2012 WL 380351, at *6 n.1 (N.D. Okla. Feb. 6, 2012); *Soto v. Pugh*, No. CV 306-092, 2007 WL 113945, at *3 n.1 (S.D. Ga. Jan. 10, 2007); *Steele v. Beasley*, No. 19-CV-23, 2019 WL 1270932, at *3 n.1 (E.D. Ark. Mar. 19, 2019), *report and recommendation adopted*, No. 19-CV-23, 2019 WL 1461909 (E.D. Ark. Apr. 2, 2019), *aff'd sub nom. Steele v. Doe*, No. 19-1830, 2019 WL 5390950 (8th Cir. Aug. 6, 2019).

However, should the Court believe a motion to amend the caption is required, Petitioner respectfully requests leave to promptly file such a motion. *See, e.g.*, *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1073 n.2 (9th Cir. 2001) ("Necessary amendments to perfect the form of the habeas petition can be made in the district court upon transfer."); *see also, e.g.*, *Nottingham v. U.S. Dist. Ct. for Middle Dist. of Penn.*, No. 21-CV-396, 2021 WL 1313526, at *4 (M.D. Pa. Apr. 8, 2021) ("The Third Circuit Court of Appeals requires district courts to grant leave to amend before dismissing a civil rights complaint when curative amendment is conceivable." (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,

naming of the petitioner's warden "if known." 28 U.S.C. § 2242. Mr.

Khalil's lawyers did not and could not have known to name the EDC warden

when they filed the initial petition. Am. Pet. ¶ 54.

Fourth, the government's reading of the transfer statute is circular, and

it would thwart Congress' explicit purpose in enacting the statute. The

government argues that Judge Furman's transfer of the case to this District is

inoperative because "no court has yet had proper habeas jurisdiction over

this matter." Renewed Transfer Mem. at 8. But the whole point of the

congressionally granted transfer authority is to move a case from a place a

case was filed (but cannot be litigated) to a place where it "could have been

brought" (but, in fact, was not). And the government's argument renders the

statute completely useless. Under its view, jurisdiction never vested in the

original court (under the immediate custodian rule), so the case cannot be

heard there. And, it continues, jurisdiction never vested in the transferee

court (because it was not brought there originally), so the case cannot be

heard there, either. If that were somehow correct, no court could *ever*

transfer an action under section 1406(a), even "in the interest of justice," and

---

482 F.3d 247, 251 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103,
108 (3d Cir. 2002))).

courts would simply dismiss all improperly filed petitions as a matter of course.

As Judge Furman pointed out, that view is belied the "legion" of "cases in which district courts have relied on Section 1406(a) to transfer immigration habeas cases filed in the wrong district." Op. at 27 (citing, as examples, multiple cases). As those cases make clear, detainees file habeas petitions in the wrong place all the time, and courts routinely, and very often at the government's urging, send those petitions to the districts where the petitioners were detained at the time of filing.[11] No habeas case that is transferred after a habeas petitioner "erred at the outset by filing" in the wrong district, *Joseph*, 2013 WL 5351078, at *4, had already "vested" in the transferee court prior to the transfer. And that is likely why, despite four opportunities, the government has been unable to cite a single case where a court agreed with the argument it is making here[12]—or, even more telling, a

---

[11] *See, e.g.*, *Golding v. Sessions*, No. 18-CV-3036, 2018 WL 6444400, at *1, *3 (S.D.N.Y. Dec. 6, 2018) (granting government's requested transfer of habeas petition to the D.N.J. upon government's argument that the immediate custodian rule, under which a petitioner should "file that action in the district in which he is physically present at the time of filing," required it—despite the fact that the petitioner had named the Attorney General instead of "the person with day-to-day control over Petitioner (at the time of filing)," namely "the warden of the Bergen County Jail").

[12] The government has cited *Pittman v. Pullen*, No. 22-cv-01651, 2023 WL 6379371 (D. Conn. Sept. 29, 2023), which it claims supports the notion that "where a petitioner improperly filed a petition, but has since been moved to a

single case in which the government even *made* the argument it is making

here.[13]

Fifth, the government's argument would profoundly undermine the *Endo*

rule. According to the government, *Endo* means that the government cannot move

a petitioner who has "properly filed" a petition in order to unilaterally choose a

different venue—but *Endo* has nothing to say about the government moving a

petitioner in a way that prevents any "proper" filing in the first place. That is a

bafflingly dim view of *Endo*, which is bedrock habeas law. *See Anariba*, 17 F. 4th

at 445–46. "The objective of habeas relief," the Supreme Court held in *Endo*, "may

be *in no way* impaired or defeated by the removal of the prisoner from the

territorial jurisdiction of the District Court." 323 U.S. at 307 (cleaned up and

emphasis added). And the Third Circuit has been explicit, when addressing an

*Endo* issue in a related context that speaks directly to this case, that the

---

different location[,] courts typically dismiss without prejudice." Transfer Reply
Mem. at 14 (citing no other cases). But *Pittman* is irrelevant. In that case, a
petitioner sought injunctive relief regarding conditions claims he brought against
the warden of a facility, and was then transferred to another facility, mooting his
claims. 2023 WL 6379371, at *2. Under those circumstances, dismissal was
appropriate because, under the federal transfer statutes, the petition could *not* have
been brought in the district of confinement (N.D. Ga.) at the time it was filed. *Id.*

[13] *See* Transfer Mem. at 10 n.4 (ECF 31) (arguing that cases going against its
position are irrelevant because, in them, the government did not make the
argument it makes here).

consequences of undermining the rule would be intolerable. In applying *Endo*,

courts cannot allow the government to:

> willingly transfer an ICE detainee seeking habeas relief from
> continued detention to a jurisdiction that is more amenable to the
> Government's position, or . . . transfer an ICE detainee for the purpose
> of intentionally introducing complicated jurisdictional defects to delay
> the merits review of already lengthy § 2241 claims. Taken to an
> extreme, the Government could transfer a petitioner with such
> consistency as to evade a district court ever even obtaining
> jurisdiction over a petitioner's § 2241 claims.

*Anariba*, 17 F.4th at 447; *see id.* at 448 (casting doubt upon the legitimacy of

"[t]he frequency and circumstances surrounding" the government's frequent

transfers of ICE detainees, including the government's apparent practice of

"often repeatedly mov[ing] ICE detainees to remote locations far from

counsel or their community without informing counsel of the transfer or

updating the ICE detainee locator" (quoting a declaration)).

Last, but surely not least, the government's argument is wholly

inconsistent with the fundamental purpose of habeas. As the Supreme Court

has instructed, habeas corpus "must not be subject to manipulation by those

whose power it is designed to restrain." *Boumediene v. Bush*, 553 U.S. 723,

765–66 (2008). And while *Padilla* was premised in part on concerns that

habeas petitioners might engage in forum-shopping, "it is equally true that

the government should also be dissuaded from forum shopping" under

*Padilla*, "particularly considering that ICE unilaterally directs where

immigrants are detained, there would be almost no check on the government's ability to forum shop." *Gallego v. Decker*, No. 19 Civ. 8263, 2020 WL 5370448, at *4 (S.D.N.Y. Sept. 8, 2020) (cleaned up), *vacated as moot* (Sept. 22, 2020); *see Doe v. Barr*, No. 20-cv-02263, 2020 WL 1984266, at *5 (N.D. Cal. Apr. 27, 2020) ("[I]t should not go without mention that by detaining immigration prisoners in remote jail facilities . . . it at least appears that Respondents may be attempting to take advantage of the immediate custodian rule to frustrate Petitioner's effective access to habeas corpus litigation.").

The government's argument here is radical. It maintains that the longstanding, protective rule of *Endo*, based in the equitable nature of habeas corpus, and a protective transfer statute explicitly aimed at achieving "justice," do not protect Mr. Khalil because the government never told Mr. Khalil's lawyers that he was being detained in New Jersey, after it had consistently told them that he was being detained in New York, until he was already on the way to being detained in Louisiana—even though his lawyers, who he was not permitted to contact despite multiple requests, filed a petition for his release in the middle of the night.

Under either law or equity, that does not hold up.[14] The purpose of habeas, including its most rigorous rules, is not to err on the side of executive authority, but to ensure the legitimacy of the judicial check upon it. *Cf. Boumediene*, 553 U.S. at 779. The government's renewed motion to transfer this case is nothing but an invitation to the Court to abide "the Kafkaesque specter" of Mr. Khalil "wandering endlessly from one jurisdiction to another in search of a proper forum, only to find that it lies elsewhere." *Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1257–58 (D.C. Cir. 1973); *see* Op. at 33 (emphasizing the need to "avoid any unnecessary delay," Mr. Khalil's multiple pending motions, and waiving the ordinary seven-day waiting period after transfer under local rules).

Enough is enough: Mr. Khalil's petition should stay with this Court.

---

[14] Notably, the Second Circuit has applied equitable estoppel in an immigration case where the withholding of critical information caused a noncitizen grave harm. *See Corneil-Rodriguez v. INS*, 532 F.2d 301, 306 (2d Cir. 1976) (the "failure to provide the warning mandated by [a regulation] was fully as misleading as the misinformation given to" an individual in a persuasive Seventh Circuit case, "and certainly as unjust and as seriously prejudicial to her interests" (citing *Lee You Fee v. Dulles*, 236 F.2d 885 (7th Cir. 1956), *rev'd on other grounds*, 355 U.S. 61 (1957) (per curium))); *see United States v. Asmar*, 827 F.2d 907, 911–13 (3d Cir. 1987) (discussing availability of equitable estoppel against the government where it engages in "affirmative misconduct"); *see also Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984) ("[W]e are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government.").

**C.     Even if the law of the case and ordinary habeas principles did not venue the petition in this Court, the government's transfer of Mr. Khalil from New Jersey to Louisiana demands the application of an exception because the government frustrated the proper filing of his petition.**

The above more than justifies rejection of the government's renewed motion, and there is no need for the Court to address anything more. But if the Court disagrees, it should still keep the case in this District, relying on the exceptions to the immediate custodian rule described in *Padilla*. Habeas is the most "adaptable" remedy in American law. *Boumediene*, 553 U.S. at 779. And as the *Padilla* exceptions suggest, it simply cannot be that the government may detain a person, keep their counsel and family from knowing where they are being held, look on as that counsel timely files a habeas petition challenging the unlawful detention in the only place the detainee was known to be for more than 12 hours after his arrest, move the detainee 1000 miles away, and end up in the venue the government intended to manufacture all along.

Historically, the writ of habeas has been about principles, not rules. The Framers who codified habeas corpus in essentially the form in which it exists today modeled it on England's Habeas Corpus Act of 1679. *See id.* at 742. That Act, in turn, was specifically meant to counter practices that de facto threatened access to the writ, in ways that reverberate today through this case: "Prisoners were moved from gaol to gaol so that it was impossible to serve the proper gaoler with the writ

and some prisoners were removed overseas so giving rise to practical difficulties in terms of communication (between the detained person and those acting on his behalf), service (on the relevant gaoler), and enforcement of the writ (by production of the detained person) if the writ was issued." Br. for the Commonwealth Lawyers Ass'n as Amicus Curiae at *6, *Boumediene v. Bush*, Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S. Aug. 24, 2007) (quoting the Act). And it is clear that the writ was never intended to depend on technicalities that could easily be abused by the executive to restrict relief. *See* Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 948 (2011); *see also Holiday v. Johnston*, 313 U.S. 342, 350 (1941).

Of course, rules still matter, and this Court must apply them. *See supra* Part I.A–B. But the Supreme Court in *Padilla* also accepted that, in rare but important cases, the default rule would not apply. In a widely recognized concurring opinion, Justice Kennedy, joined by Justice O'Connor, explained that the immediate custodian rule is "subject to exceptions." 542 U.S. at 452 (Kennedy, J., concurring). And he emphasized that the five-vote majority opinion—of which the two concurring Justices were a pivotal part—"acknowledged" the same thing. *Id.* (citing *id.* at 435–36, 437–42, 444–47 (majority op.)).[15] The exceptions allow

---

[15] Judge Furman was uncertain whether these exceptions were "the law of the land," Op. at 3, but where the vote of a Supreme Court Justice (let alone two of them) is "necessary to the formation of a majority," that Justice's concurrence is at

courts to fashion flexible outcomes in unique, outlier cases that are tailored to the particular situation. They do not open the door to a free-for-all, permitting the filing of a petition in "any one of the federal district courts," but only in "the one with the most immediate connection to the named custodian." *Id.* at 453 (Kennedy, J., concurring).

Justice Kennedy listed various examples of past exceptions the Supreme Court had made to the immediate custodian rule. *See id.* at 454 (citing, e.g., *Endo*, 323 U.S. 283). And, of particular relevance here, he explained that, as a matter of fairness and in the interests of justice, he would acknowledge exceptions "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* "In cases of that sort," he continued:

> habeas jurisdiction would be in the district court from whose territory the petitioner had been removed. In this case, if the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken, the District Court would have had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in my view, habeas jurisdiction would lie in the district or districts from which he had been removed.

*Id.*

---

least "given particular weight." *Schmitz v Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994).

In *Padilla*, the majority and concurrence took pains to ensure that future courts—courts just like this one—would exercise their habeas authority to address extraordinary circumstances, in extraordinary moments, and prevent the grave injustice they imagined, but did not see directly before them, from ever coming to pass.[16] It is true, as Judge Furman observed, that while courts have left open the possibility that the *Padilla* exceptions remained available in a shocking case,[17] that apparently no court to date has invoked them to "award relief" to a habeas

---

[16] The *Padilla* majority—again, of which both Justice Kennedy and Justice O'Connor formed a crucial part—twice emphasized that Justice Kennedy's proposed exception had not been met in the case before the Court. *See* 542 U.S. at 435–36 (majority op.) ("No exceptions to this rule, either recognized or proposed, apply here." (cleaned up)); *id.* at 441–42 ("There is no indication that there was any attempt to manipulate behind Padilla's transfer—he was taken to the same facility where other al Qaeda members were already being held, and the Government did not attempt to hide from Padilla's lawyer where it had taken him.").

[17] *See, e.g.*, *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000) ("[W]e can envision that there may be extraordinary circumstances in which the Attorney General appropriately might be named as the respondent to an alien habeas petition. . . . An[] example of an extraordinary circumstance might be a case in which the INS spirited an alien from one site to another in an attempt to manipulate jurisdiction."); *Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014) (warning against the potential that the government would "play[] forum games or ke[ep] moving" a detainee "so that his filing could not catch up"); *Sow v. Whitaker*, No. 18 Civ. 11394, 2019 WL 2023752, at *6 (S.D.N.Y. May 8, 2019) ("This Court agrees that *Padilla* should not be interpreted so as to condone or encourage misbehavior or deceptive conduct by the Government in transferring immigrant detainees.").

petitioner. Op. at 18. But of course, *some* court, *some* day, would have to become the first, if the circumstances demanded it.

In asking Judge Furman to keep his case, Petitioner made a similar argument, and despite acknowledging that it was "compelling," the court rejected it. Op. at 17.[18] But critically, Judge Furman was careful to spell out that his conclusion only applied to Mr. Khalil's "transfer from [the S.D.N.Y.] to the District of New Jersey," as that was "the only transfer relevant to the jurisdictional analysis" before him. Op. at 3; *see id.* at 18. Judge Furman concluded that the evidence "f[e]ll short" when it came to the first transfer. *Id.* at 18. To get there, he called on his "own experience that noncitizens arrested and detained by immigration authorities in New York City are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention" to call Mr. Khalil's transfer from New York to New Jersey "far from anomalous." *Id.* at 19. But even as he did, he acknowledged that Mr. Khalil's second transfer, from New Jersey to Louisiana, was something else entirely—particularly given the White House's apparent

---

[18] Judge Furman remarked that *Padilla* "could be described as even more extraordinary than this one." Op. at 2. In at least one way—the military detention of a U.S. citizen on U.S. soil—that is true. But in the way that is critical to the application of the exceptions, it is not. The *Padilla* petition was incorrectly filed in the S.D.N.Y. two days after the petitioner was transferred to South Carolina. 542 U.S. at 431–32. But here, even according to the government's account, Mr. Khalil's petition was incorrectly filed in the S.D.N.Y. a mere 80 minutes after he arrived in New Jersey. *See* Second Suppl. Joyce Decl. ¶ 16; Am. Pet. ¶ 54.

"direct[] involve[ment] in the plan to move him there, . . . and the fact that, in the space of less than twenty-four hours, the Government hauled Khalil through at least six different districts (one likely twice)." Op. at 24 n.6.

The government's given justifications for transferring Mr. Khalil, after a brief stay in New Jersey, to Louisiana—again, without ever telling his lawyers that he was in this District, or permitting him an opportunity to call them—are not credible.[19]

- Sometime between the night of March 8 and early hours of March 9, the government decided, apparently in coordination with the White House, that it intended to send Mr. Khalil to Louisiana. Am. Pet. ¶¶ 58–60. By setting that plan in place, but then moving Mr. Khalil to a location that was never disclosed to his lawyers or family until he was sent down South, the government ensured that it would be able to argue—as it did from the start of this case—that "jurisdiction never vested" in this District. Tr. at 9:8–9 (ECF 44).

- The government did not, in fact, ever inquire into whether ICE facilities had a single bed for Mr. Khalil in any of its many detention centers in the tri-state area. It says that "[t]he decision for the petitioner to be ultimately detained in Louisiana was made pursuant to neutral operational considerations," Transfer Reply Mem. at 5–6, including "an awareness of general paucity of bedspace" in detention facilities around the tri-state area "compared to the known availability of bedspace" in Louisiana, Second Suppl. Joyce Decl. ¶ 11. But had the government actually

---

[19] As Judge Furman pointed out, to whatever extent the government is generally relying on any presumption of regularity (and it does not raise the point in its brief supporting its renewed motion), all that presumption does—"to the extent it is not rebutted"—is "require[] a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove.'" Op. at 20–21 n.5 (quoting *Latif v. Obama*, 677 F.3d 1175, 1180-81 (D.C. Cir. 2011)).

inquired, rather than relying on a general "awareness," it would have learned that Orange County Jail in Goshen, New York, was accepting new detainees during the same time period that Respondent Joyce contends it could not accommodate Mr. Khalil. Kim Decl. ¶¶ 9–10 (ECF 73-2).[20]

- The government says that Mr. Khalil could not remain at EDC for long-term detention because the facility was "experienc[ing] a bedbug issue that prevented them from accepting detainees as full transfers"—full stop. Second Suppl. Joyce Decl. ¶ 11. But the facility processed at least four individuals for detention at Elizabeth between March 6 and March 13, 2025, Major Decl. ¶¶ 6 (ECF 73-3), and Mr. Khalil himself saw at least three men being processed for detention, to be kept at Elizabeth, during his time in that facility, Khalil Decl. ¶¶ 13–14.

- Upon arrival at EDC, Mr. Khalil requested to speak with his lawyer, and he was refused. Am. Pet. ¶ 62; Khalil Decl. ¶ 9. He asked once more the next morning, and he was again refused. Khalil Decl. ¶ 12.

- The government appears to have violated its own policy to avoid transfers of detainees where there is immediate family or an attorney of record in the area.[21]

The truth is that the *Padilla* exceptions speak directly to this case. There is far more than "an indication" that "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," *Padilla*, 542

---

[20] Importantly, in part because Judge Furman narrowed the question before him to the propriety of Mr. Khalil's transfer from New York to New Jersey, and not his second transfer from New Jersey to Louisiana, Judge Furman's opinion did address the evidence submitted by Petitioner that is cited in this and the next paragraph. That evidence was submitted in connection with Petitioner's reply brief in support of his motion for a temporary restraining order. ECF 73.

[21] *See* John Morton, ICE Director, *Policy 11022.1: Detainee Transfers* (Jan. 4, 2012), https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf.

U.S. at 454—it simply was not. This alone is sufficient for this Court to invoke that exception. And, separately, there is far more than "an indication" that the government sent Mr. Khalil to Louisiana before ever telling his lawyers that he even set foot in this District "to make it difficult . . . to know where the habeas petition should be filed." *Id.* There is no way to read *Padilla* and conclude that not only Justices Kennedy and O'Connor, but anyone in the majority, would have approved of the government's attempt here to "manipulate" and "hide" critical facts from Mr. Khalil's lawyers, *id.* at 441 (majority op.), then—over weeks of litigation that has delayed the prompt resolution of Mr. Khalil's urgent claims (and motions for return to the area and release)—argue that, as a result, the lawyers had missed their chance at a "proper" habeas filing. *See Anariba*, 17 F.4th at 448 ("When continuous transfer permeates the reality of ICE detention, it suggests that the Government has the machinery already in place to permit extensive forum shopping.").

This Court should therefore hold that it has venue over Mr. Khalil's detention claims based on the exceptions to *Padilla*'s default rule. If those exceptions do not apply to this case, it becomes difficult to imagine what kinds of scenarios the majority and concurrence were contemplating at all.[22]

---

[22] All of the above, and the existing factual record, make it crystal clear that Mr. Khalil's petition should remain before this Court. But if the Court is still not persuaded to deny the government's motion, it should allow Petitioner to conduct

## II.     Purely for the purpose of preserving the argument for future appellate review, Petitioner maintains that venue was proper in the Southern District of New York.

Petitioner has already argued the merits of his position that the Southern

District of New York was a proper venue for his petition. *See* Opp'n to Transfer

Mem. at 7–17 (arguing that the *Padilla* exceptions, the facts regarding Mr. Khalil's

"immediate custodian," and the inclusion of both core and non-core habeas claims

in his petition yielded venue in the S.D.N.Y.).[23] He lost that argument, accepts that

he did, and has no desire to waste the Court's time re-arguing a closed issue. *See*

*supra* Part I.A (explaining why Judge Furman's transfer order is the law of the

case). But in order to preserve any potential future appellate review of that

question, should it become necessary, Petitioner has also filed a cross-motion for

---

limited and expedited jurisdictional discovery before deciding that dismissal or
transfer to Louisiana is appropriate. At the very least, the circumstances of this
case raise serious questions about the government's conduct in handling Mr.
Khalil's detention. And given the stakes, those questions would demand a fulsome
examination before an irreversible resolution on the government's motion sends
Mr. Khalil out of the District—possibly forever. Op. at 24 n.6 (explaining why "the
case for jurisdictional discovery would be stronger" in the context of the New
Jersey-to-Louisiana transfer than in the context of the New-York-to-New-Jersey
one). Because the interest in swift proceedings is Mr. Khalil's, and not the
government's, the government will not be prejudiced by a short delay for
discovery, and the interests of justice will be served. *See, e.g.*, *Better Packages,
Inc. v. Zheng*, No. CIV.A 05-4477-SRC, 2006 WL 1373055, at *4 (D.N.J. May 17,
2006) (applying a "reasonableness standard" to a request for expedited discovery,
and citing cases); *see also* Opp'n to Transfer Mem. at 17–19.

[23] Petitioner incorporates those arguments, made in opposition to the government's
first motion to transfer in this litigation, into this brief.

re-transfer to the S.D.N.Y. *See SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 177 (2d Cir. 2000) ("Most Circuits," including the Third, "have held that in order to preserve the opportunity for review of a transfer order in the transferee Circuit, a party must move for retransfer in the transferee district court."); *see Nascone v. Spudnuts, Inc.*, 735 F.2d 763, 765–66 (3d Cir. 1984).[24]

**CONCLUSION**

Respectfully, the Court should deny the government's renewed motion to dismiss or transfer venue and proceed to deciding the important and urgent issues raised by Mr. Khalil's petition and pending motions before the Court.

Dated: March 24, 2025                     /s/*Baher Azmy*

AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square

---

[24] Petitioner waives reply on his cross-motion.

125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL
SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Pro hac vice application pending or
forthcoming

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was

served on counsel of record via this Court's CM/ECF system on March 24, 2025.


/s/ *Baher Azmy*
Baher Azmy
*Counsel for Petitioner*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**SECOND AMENDED PETITION[1] FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

## **INTRODUCTION**

1.    This case concerns the government's targeted, retaliatory detention and attempted removal of a student protestor because of his constitutionally protected speech. Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent graduate student at Columbia University. Over the last year and a half, Mr. Khalil has been a mediator, an active participant in, and at times the public face of, student protests on Columbia's campus related to Israel's military campaign in Gaza. The Trump administration has made no secret of its opposition to those protests and has repeatedly threatened to weaponize immigration

---

[1] Petitioner files this Second Amended Petition pursuant to the Court's instruction in its Opinion and Order dated April 1, 2025. *See* ECF 153, n. 32.

law to punish noncitizens who have participated.

2.      On or before March 8, 2025, Respondents adopted a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa" was being

"revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7. It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8. The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

9. Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public

administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months pregnant, live in Columbia's residential housing in New York City.

10.    Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.  Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.    Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

11a. Respondent Yolanda Pittman is named in her official capacity as the Warden of Elizabeth Contract Detention Facility, also referred to as Elizabeth Detention Center. As Warden, she is responsible for the operations of Elizabeth Detention Center, including overseeing the people in the facility's custody, and as such she is a custodian of the Petitioner. Respondent Pittman's office address is Elizabeth Detention Center, 625 Evans St, Elizabeth, New Jersey, 07201.

12.    Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the

Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15.     Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

## JURISDICTION & VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.     Venue is proper in the Southern District of New York Under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. Petitioner is detained at the direction of Mr. Joyce, and a substantial part of the events giving rise to the claims and relevant facts occurred within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Khalil was detained at 26 Federal Plaza at the time this habeas was initiated. The New York Field Office and Respondent Joyce directed Mr. Khalil's arrest and detention in New York, New York; told his counsel that he was being taken to 26 Federal Plaza in New York, New York; and entered his location on the ICE detainee locator as being in New York, New York. At the time of filing, the detainee locator stated that Mr. Khalil was held in New York, New York, information upon which his counsel reasonably relied to identify his location. To the extent the New York Field Office and Respondent Joyce moved Mr. Khalil across state lines to New Jersey for a transitory period of time shortly before his habeas was filed, the New York Field Office prevented Mr. Khalil from communicating that information to his counsel in bad faith. Moreover, the New York Field Office then brought Mr. Khalil back across state lines to New York before then transferring him, after the filing of the instant petition, to Louisiana.

## FACTS

*Mr. Khalil's Background*

19.     Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.     Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.     Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

*Mr. Khalil's Student Activism and Speech on Matters of Public Concern*

22.     As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.     That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.     Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of 2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[2] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."   Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[3]

26.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

---

[2] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

[3] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.
Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

27.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with what he had to say.

***The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech***

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J.  Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently  supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[4]

---

[4] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-

30.    During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized Israel's actions.

31.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[5]

32.    While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[6]

33.    Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[7]

---

schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

[5] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[6] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[7] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34. Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

35. Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

36. Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[8] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you... and deport you."

---

interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

[8] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

*The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy*

37.     In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[9]

38.     For example, Betar USA—a self-described "Zionist activist organization"[10]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[11]

39.     Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[12]

40.     Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive orders "already appear to be chilling political activism."[13]

---

[9] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/
[10]     https://betarus.org/;     https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza
[11] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.
[12] https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice
[13]     https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel

41.     Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.     That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[14]

43.     On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[15]

44.     On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

**DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists**

45.     On the evening of March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and his wife were returning to their apartment from an Iftar[16] dinner at a friend's home.

46.     When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

---

[14] https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/

[15] https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

[16] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

47.     The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would have required a key or otherwise been given permission to enter the building.

48.     Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.     Mr. Khalil called his attorney, Amy Greer. Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him. Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50.     Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51.     Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process. Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration

judge. Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52. Mr. Khalil's wife presented the DHS agents with documents confirming Mr. Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53. The agents then handcuffed Mr. Khalil and brought him outside where there were multiple unmarked vehicles waiting. Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her. They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54. The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[17] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th,

---

[17] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.      The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.      At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[18] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

57.      Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see

---

[18] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

Mr. Khalil.

***Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana***

58.     While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr. Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

59.     Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60.     The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61.     At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62.     While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied.

The next morning, as Mr. Khalil reached the front of the line to be processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63.     Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

64.     At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65.     Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

66.     Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

67.     Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

68.     Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69.     At no time throughout this process did any of the agents identify themselves.

70.     Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child.   In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.     Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.     It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

***The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy***

73.     On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and

19

**JA 668**

other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[19]

74.    The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[20]

75.    Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[21]

76.    The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[22]

77.    In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint

---

[19] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782
[20] https://x.com/WhiteHouse/status/1899151926777749618
[21] https://x.com/marcorubio/status/1898858967532441945
[22]https://x.com/DHSgov/status/1898908955675357314;
https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/

for investigations against other students."[23]

78.     On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[24]

79.     At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[25]

80.     In a press conference regarding this case on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."[26]

81.     On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a

---

[23] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student
[24] https://archive.ph/rD4sk#selection-1147.0-1159.428
[25] https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16)
[26] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/

deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[27]

**DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution**

82.     Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

83.     The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84.     The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)).  Upon information and belief, Secretary Marco Rubio has not provided any

---

[27] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85.    Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.    In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment

protected speech.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

88.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

89.    The Rubio Determination and Policy Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

•    retaliate against and punish Mr. Khalil for his past protected speech;

•    prevent him from speaking now (through detention);

•    attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

•    deprive audiences of his present and future speech on matters of public concern; and

•    chill other individuals from expressing views sympathetic to Palestinians.

90.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

91.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

92.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

93.     The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released back to his family.

94.     Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538

U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

95.     The Policy and the Rubio Determination also violate Mr. Khalil's right to due process. The government's policy of Foreign Policy Ground making such determinations concerning people like Mr. Khalil—lawful permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—is unconstitutionally vague.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

96.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

### FOURTH CLAIM
### Release on Bail Pending Adjudication

97.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

98.     This Court has the "inherent authority" to grant bail to habeas petitioners like Mr.

Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

99. This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly— instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights;

3) Vacate and set aside the Rubio Determination;

4) Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5) Order the immediate release of Petitioner pending these proceedings;

6) Order the release of Petitioner;

7) Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8) Award reasonable attorneys' fees and costs for this action; and

9) Grant such further relief as the Court deems just and proper.


Dated: April 3, 2025                     Respectfully submitted,
Newark, NJ                                  /s/Jeanne LoCicero
                                           AMERICAN CIVIL LIBERTIES UNION
NEW YORK CIVIL LIBERTIES UNION             OF NEW JERSEY FOUNDATION
FOUNDATION                                 Jeanne LoCicero
Amy Belsher*                               Farrin R. Anello
Robert Hodgson*                            Molly K.C. Linhorst
Veronica Salama*                           570 Broad Street, 11th Floor
Molly Biklen *                             Newark, NJ 07102
125 Broad Street, 19th Floor               Tel: (973) 854-1715
New York, NY 10004
Tel: (212) 607-3300                        AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION
CLEAR PROJECT                              Omar Jadwat*
MAIN STREET LEGAL SERVICES, INC.           Noor Zafar*
Ramzi Kassem*                              Sidra Mahfooz*
Naz Ahmad                                  Brian Hauss*
Shezza Abboushi Dallal*                    Brett Max Kaufman*
CUNY School of Law                         Esha Bhandari*
2 Court Square                             Vera Eidelman*

28

**JA 677**

Long Island City, NY 11101
Tel: (718) 340-4558

VAN DER HOUT LLP
Marc Van Der Hout**
Johnny Sinodis**
Oona Cahill**
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

WASHINGTON SQUARE LEGAL
SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das*
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6430

*Counsels for Petitioner*
*Admitted Pro Hac Vice*
**PHV application pending or forthcoming*

Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805