**Nos. 25-2162 & 25-2357**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

MAHMOUD KHALIL,

Petitioner-Appellee,

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

Respondents-Appellants.

_____

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

_____

### APPENDIX: VOLUME III (679-1091)

_____

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
   General

DREW C. ENSIGN
Deputy Assistant Attorney General

BENJAMIN HAYES
Special Counsel to the Assistant
Attorney General

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

JOHN F. STANTON
RACHEL L. BROWNING
Trial Attorneys

# TABLE OF CONTENTS

Appendix – Volume III

Declaration of Ira J. Kurzban, April 6, 2025

    ECF No. 175-1 ........................................................................................679

Declaration of Molly K.C. Linhorst with Exhibits A–S, April 6, 2025

    ECF No. 175-2 – 175-21 .......................................................................685

Exhibit 1, Tab A: Memorandum from Marco Rubio, Secretary of State, to Kristi

Noem, Secretary of Homeland Security ("Determination"), April 12, 2025

    ECF No. 198-1 ................................................................................... 1019

Petitioner's Notice for Urgent Bail Relief, April 20, 2025

    ECF No. 203 ...................................................................................... 1025

Third Amended Petition for Writ of Habeas Corpus and Complaint, May 8, 2025

    ECF No. 236 ...................................................................................... 1027

Government's Response to Court's Order (ECF No. 234), May 9, 2025

    ECF No. 241 ...................................................................................... 1057

Government's Second Response to Court's Order (ECF No. 234), May 9, 2025

    ECF No. 246 ...................................................................................... 1060

Petitioner's Letter Seeking Leave to File Khalifa Secretary of State Determination,

May 12, 2025

    ECF No. 252 ...................................................................................... 1063

Petitioner's Letter Regarding Family Contact Visit, May 21, 2025

    ECF No. 258 ........................................................................................ 1070

Exhibit A, Correspondence with Facility, May 21, 2025

    ECF No. 258-1..................................................................................... 1074

Exhibit B, Elizabeth Detention Center FAQ, May 21, 2025

    ECF No. 258-2..................................................................................... 1083

Petitioner's Letter Regarding Structural Barriers to Access to Counsel and Witnesses, May 27, 2025

    ECF No. 271 ....................................................................................... 1089

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity
as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official
capacity as Attorney General, U.S.
Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

## DECLARATION OF IRA J. KURZBAN

    1.    My name is Ira J. Kurzban. I submit this declaration to explain how removal proceedings under 8 U.S.C. § 1229a and subsequent judicial review under 8 U.S.C. § 1252 function in practice, as well as the limitations on record development, timely adjudication, and review of constitutional claims in such proceedings.

## Qualifications

2.      I am an immigration practitioner and have been a partner in the law firm of Kurzban, Kurzban, Tetzeli, & Pratt P.A. of Coral Gables, Florida for over four decades, and serve as chair of the firm's immigration department.

3.      Since 1977, I have been active in all aspects of immigration law. I and the attorneys I supervise regularly practice in immigration courts across the country, as well as in federal courts in immigration-related matters.

4.      I am the author of *Kurzban's Immigration Law Sourcebook*, one of the most widely used immigration-law secondary sources in the United States. The book is in its Nineteenth Edition (2024) and is regularly cited by federal courts. *See, e.g.*, *Al Otro Lado v. EOIR*, 120 F.4th 606, 627 n.16 (9th Cir. 2024); *Gonzalez Hernandez v. Garland*, 9 F.4th 278, 289 (5th Cir. 2021) (Costa, J., dissenting); *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015); *Gonzalez v. Holder*, 771 F.3d 238, 243 (5th Cir. 2014); *United States v. Juarez*, 672 F.3d 381, 389 (5th Cir. 2012); *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000); *Viveiros v. Holder*, 692 F.3d 1, 3 (1st Cir. 2012); *Patel v. Ashcroft*, 378 F.3d 610, 612 (7th Cir. 2004); *Socop-Gonzalez v. INS*, 208 F.3d 838, 842 n.3 (9th Cir. 2000).

5.      As a practicing attorney, I am actively involved in the immigration bar. I am the Past President of the South Florida Chapter of the American Immigration Lawyers Association. I was the national president of the American Immigration Lawyers Association in 1987-88, and I thereafter served as its General Counsel. The American Immigration Lawyers Association is an affiliate organization of the American Bar Association. It has over 14,000 members in 35 chapters in the United States and four international chapters. I am also certified by the Florida Bar as a specialist in immigration law and served on the first committee to draft and grade the certification exam for Florida lawyers.

6.      Since 1977, I have litigated a variety of immigration-related cases and over 75 published decisions in the federal courts. Among other cases, I have been counsel of record in the United States Supreme Court in *Patel v. Garland*, 596 U.S. 328 (2022); *McNary v. Haitian Refugee Center, Inc*., 495 U.S. 479 (1991); *Commissioner v. Jean*, 496 U.S. 154 (1990); and *Jean v. Nelson,* 472 U.S. 846 (1985).

7.      Through my over four decades of experience as a practitioner in both the federal courts and immigration courts, I am well qualified to opine on how the

immigration-court system differs from the federal courts and the other matters addressed below.

## Background on Removal Proceedings and Judicial Review of Final Orders of Removal

8.      A person charged as deportable under 8 U.S.C. § 1227 is generally placed in removal proceedings before an immigration judge. Such proceedings are governed by the provisions of 8 U.S.C. § 1229a, and implementing regulations at 8 C.F.R. §§ 1239, *et seq.*, and 1240, *et seq.* Immigration judges are employees of the Department of Justice, housed under the Executive Office for Immigration Review.

9.      After an immigration judge renders a final decision on removability (and any applicable relief from removal), the losing party may appeal the decision to the Board of Immigration Appeals ("Board") within 30 days of the immigration judge's order.

10.      After the appeal is taken, the Board will prepare a transcript of the proceedings before the immigration judge, and issue a briefing schedule.

11.      In cases where an individual is detained, both parties must generally file their briefs with the Board within 21 days of the issuance of the briefing schedule.

12.      On review of decisions by immigration judges, the Board of Immigration Appeals reviews legal issues de novo, and factual issues for clear error.

13.      Judicial review of final administrative orders of removal occurs through a petition for review filed with the court of appeals with jurisdiction over the place where the immigration judge completed the removal proceedings. *See* 8 U.S.C. § 1252(a)(1), (b)(1)-(2).

## Timing of Removal Proceedings and the Petition for Review Process

14.      Complex cases like Mr. Khalil's can take upwards of a year to resolve. Given that Mr. Khalil is detained and has only recently had his first immigration hearing, it will most likely be at least several months before he receives a decision from the immigration judge, another several months for any appeal to the Board, and at least six months for any circuit court review—and could be significantly longer if there is a need for continuances in the case or if a decision is reversed by the Board.

15.  Further contributing to such delays is the fact that when there are serious issues related to a noncitizen's threshold removability, the issues of removability and any relief from removal are frequently bifurcated into separate hearings before the immigration judge.

16.  When a case involves contested issues of fact, the Board of Immigration Appeals will frequently remand cases to the immigration judge for further proceedings. Such remands are necessary because the Board lacks authority under governing regulations to conduct fact-finding in the first instance. Thus, anytime the Board finds a need for further fact-finding to decide an issue in the case, the Board will remand the matter back to the immigration judge for further proceedings.

17.  It is thus not uncommon for a case to "ping pong" back-and-forth from the immigration judge and the Board of Immigration Appeals several times before a final administrative order on removability is entered. This is particularly apt to occur in cases raising difficult or novel legal issues, as the Board may clarify legal standards and remand to the immigration judge for further fact-finding to apply the legal standards in the first instance.

18.  Until any such ping-ponging ends, and the Board of Immigration Appeals issues a final order of removal, a noncitizen cannot obtain judicial review via the petition-for-review process; such review is available only after the issuance of an administratively final order of removal.

## Limitations on Record Development in Removal Proceedings

19.  A noncitizen's ability to develop a factual record in removal proceedings is far more limited than in proceedings in federal district court.

20.  Except where claims to U.S.-citizenship are at issue, the federal courts of appeals review a final order of removal based exclusively on the administrative record developed before the immigration judge.

21.  The Immigration and Nationality Act gives immigration judges limited authority to allow the parties discovery in removal proceedings. Immigration judges, for example, "may" issue "subpoenas for the attendance of witnesses and presentation of evidence." 8 U.S.C. § 1229a(b)(1). But, as a matter of practice, immigration judges use this authority rarely, if at all. Depositions, moreover, are permitted only if the immigration judge "is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence

is essential" to the case. 8 C.F.R. § 1003.35. As a result, depositions are infrequently permitted.

22.  In the context of petitions for review of final removal orders, therefore, federal courts lack any capacity to engage in fact-finding. If a circuit court on petition for review determines that further fact-finding is required, the only available remedy is to remand proceedings back to the Board of Immigration Appeals, which must in turn further remand the matter back to the immigration judge for further proceedings.

23.  While these procedures afford noncitizens some ability to develop a factual record on individualized issues that arise in removal proceedings (for example, affording a noncitizen the ability to confront government witnesses who allege marriage fraud), they are wholly inadequate to develop a factual record when claims involve questions of government policy and practice.

24.  Based on these limitations, therefore, it is unlikely that an immigration judge would facilitate meaningful factual development on key questions at issue in Mr. Khalil's case, including whether the government maintains a policy of targeting noncitizens who engage in expressive activity in support of Palestinian rights, or critical of Israeli policies.

### Limitations on the Review of Constitutional Claims

25.  The Board of Immigration Appeals has disavowed authority to rule on core constitutional claims. *See Matter of Valdovinos*, 18 I. & N. Dec. 343, 345 (BIA 1982) ("claims as to the unconstitutionality of the statutes and regulations administered by this Board are outside the scope of our jurisdiction"); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006) (noting that the Board of Immigration Appeals has held itself "powerless to address . . . fundamental constitutional claims") (cleaned up). The Board has invoked this limitation to avoid ruling on claims arising under the First Amendment. *See, e.g.*, *In re Mehndy*, 2006 WL 2427850, at *2 (BIA July 17, 2006) (unpub.).

26.  Because the immigration judge and Board may be unable to review constitutional claims arising under the First Amendment, it is unlikely that an immigration judge would permit a noncitizen in removal proceedings to seek subpoenas or depositions for factual material related to such a claim.

27.     If a final order of removal is ultimately entered, it is therefore unlikely that the court of appeals reviewing the order of removal on petition for review would have before it a factual record sufficient to enable meaningful judicial review.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Dated: April 5, 2025                    _____

Ira J. Kurzban

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
MOLLY K.C. LINHORST**

I, Molly K.C. Linhorst, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1.  I am an attorney at the American Civil Liberties Union of New Jersey Foundation,
    and co-counsel for Petitioner.

2.  Attached hereto, at the exhibits listed below, are true and correct copies of the
    following materials:

    A.  Attached as **Exhibit A** is The Complaint and Petition for Writ of Habeas
        Corpus, filed as ECF 1 in *Yunseo Chung v. Trump et al.*, No. 1:25-cv-02412-NRB,
        before the Southern District of New York.

    B.  Attached as **Exhibit B** is the Declaration of attorney Nayantara Bhushan,

dated March 23, 2025, filed as ECF 9-13 in *Yunseo Chung v. Trump et al.*, No. 1:25-cv-02412-NRB, before the Southern District of New York.

C. Attached as **Exhibit C** is the First Amended Petition for Writ of Habeas Corpus and Complaint, dated March 28, 2025, filed as ECF 12 in *Rümeysa Öztürk v. Trump et al.*, No. 1:25-cv-10695-DJC, before the District of Massachusetts.

D. Attached as **Exhibit D** is a transcript of Secretary of State Marco Rubio's remarks during a joint news conference with Guyanese President Irfaan Ali on March 27, 2025. The transcript is also available at https://perma.cc/EDN2-RYFP. The transcript at pages 6–8, which reflects a back-and-forth exchange between a reporter and the Secretary of State, where he is asked about the arrest of Rümeysa Öztürk as well as the administration's recent revocation of visas, is excerpted below:

- QUESTION: Hello, Mr. President. Thank you for taking questions from us. We appreciate it. Humeyra Pamuk from Reuters. Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents. A year ago she wrote an opinion piece about the Gaza war. Could you help us understand what the specific action she took led to her visa being revoked? And what was your State Department's role in that process?

- SECRETARY RUBIO: We revoked her visa. It's an F1 visa, I believe. We revoked it, and here's why – and I'll say it again; I've said it everywhere. Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world – let me just send this message out – if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa. Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple. …

- QUESTION: Could you confirm – there's new reporting that 300 visas

– State Department has revoked 300 (inaudible).

- SECRETARY RUBIO: Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa.

- QUESTION: It could – you're saying it could be more than 300 visas?

- SECRETARY RUBIO: Sure. I hope – I mean, at some point I hope we run out because we've gotten rid of all of them. But we're looking every day for these lunatics that are tearing things up. And by the way, we want to get rid of gang members, too….

E. Attached as **Exhibit E** is the Petition for Writ of Habeas Corpus and Complaint, dated March 18, 2025, filed as ECF 1 in *Badar Khan Suri v. Trump et al.*, No. 1:25-cv-480, before the Eastern District of Virginia, Alexandria Division.

F. Attached as **Exhibit F** is the Complaint, dated March 15, 2025, filed as ECF 1 in *Momodou Taal et al., v. Trump et al.*, No. 3:25-cv-00335-ECC-ML, before the Northern District of New York.

G. Attached as **Exhibit G** is the Complaint, dated March 25, 2025, filed as ECF 1 in *American Association of University Professors, et al., v. Rubio et al.*, No. 1:25-cv-10685-WGY, before the District of Massachusetts.

H. Attached as **Exhibit H** is an article by Marc Caputo published by *Axios* on March 6, 2025, entitled "Scoop: State Dept. to use AI to revoke visas of foreign students who appear 'pro-Hamas.'" The article is also available at https://perma.cc/N5XX-3UVD. Citing an unnamed Senior State Department official, the article reports, "if officials find a social media post from a foreign national that appears to endorse the attack on Israel and looks 'pro-Hamas,' the official said, that could be grounds for visa revocation."

I. Attached as **Exhibit I** is an article by Marc Caputo published by *Axios* on March 27, 2025, entitled "Trump's 'pro-Hamas' purge could block foreign students from colleges." The article is available at https://perma.cc/Q687-6GC4. The article quotes a Senior Justice Department official as saying:

- What you're going to see in the not-too-distant future is the universities that we can show that were not doing anything to stop these demonstrations in support of Hamas — or encouraged enrollment by

activists — ... we can stop approving student visas for them, and they can no longer admit foreign students.

- The way that this looks ... is a grand jury subpoena goes to a university, a very broad subpoena" which would include "any information that they know about students who have actively participated in violent protests.

J. Attached as **Exhibit J** is an article by Prem Thakker published by *Zeteo* on March 29, 2025, entitled "SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge." The article is available at https://perma.cc/WCR3-BB7J. Excerpts from the article are provided below:

- According to documentation seen by Zeteo and interviews with university officials, the administration is deploying the rarely-used risk-to-foreign-policy immigration provision they used to detain Mahmoud Khalil to now target students across the country.

- University officials say that targeted students hail from the Middle East and Muslim-majority countries. They've also reported inconsistent notification patterns: some students have been informed about the revocations by the government, some have not; some only found out after officials manually checked internal visa status databases – while universities and officials themselves have mostly seemed to not be informed by the government.

- Three university officials, who were given anonymity so they could speak freely, across the country report that, in recent days, student residency statuses in the Student and Exchange Visitor Information System – SEVIS, a database where residency statuses of foreign students are managed – are being changed without their knowledge.

K. Attached as **Exhibit K** is an article by Sanya Mansoor published by *The Cut* on March 26, 2025, entitled "Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza Grapple with Trump's crackdown." The article is also available at https://perma.cc/7SB2-LALD. The reporter interviewed noncitizens who are "wrestling with how to criticize the U.S.'s continued military support of Israel without jeopardizing their visa status." Some reported they are "pull[ing] back from sharing personal political opinions on social media," while others reported that they no longer attend demonstrations in person.

4

**JA 688**

L.  Attached as **Exhibit L** is an article Alina Das published by the Knight First Amendment Institute at Columbia University on February 12, 2025, titled "Protecting Immigrant Activists From U.S. Government Retaliation: Lessons From First Amendment Litigation." The article is also available at https://perma.cc/WB7S-QL6B.

M.  Attached as **Exhibit M** is a transcript of Secretary of State Marco Rubio's remarks to the press while en route to Miami, Florida, on March 28, 2025. This transcript is also available at https://perma.cc/JUU8-GDQK.

N.  Attached as **Exhibit N** is a transcript of Secretary of State Marco Rubio's remarks to the press on March 12, 2025, from Shannon, Ireland. This transcript is also available at https://perma.cc/3Q5E-WB6C.

O.  Attached as **Exhibit O** is a tweet by Secretary of State Marco Rubio on X (formerly Twitter) dated March 15, 2025, 11:02 a.m. The tweet is also available at https://perma.cc/84SC-S387. Secretary Rubio states: "Very simple. President Trump isn't Biden. If you are coming to U.S. to join pro-terror riots we will deny you a visa. And if you do that after lying your way into our country we will cancel your visa & send you home."

P.  Attached as **Exhibit P** is a transcript of an interview of Secretary of State Marco Rubio on "Face the Nation with Margaret Brennan" dated March 16, 2025. This transcript is also available at https://perma.cc/2DY7-SRC4.

Q.  Attached as **Exhibit Q** is a transcript of an interview of Secretary of State Marco Rubio by Hugh Hewitt conducted via teleconference and dated March 19, 2025. This transcript is also available at https://perma.cc/D52U-8K9K.

R.  Attached as **Exhibit R** is a transcript of Secretary of State Marco Rubio's remarks during a joint press availability with Jamaican Prime Minister Andrew Holness on March 26, 2025. The transcript is also available at https://perma.cc/5X4E-JX3U. At page 16 of this transcript, Secretary Rubio is quoted saying:

- If you had told us that was – if you told us, I'm going to America not just to study at your university but to tear up your campus, we would have never let you in. And if you do that once you come into the United States, we're going to kick you out. We're going to do that. And I don't care – I don't care what terrorist organization you're supporting, we're going to kick you out. If you're a gang member, we're going to kick you out, okay? If you're one of these violent gang members that's coming to the United

States, then we're going to kick you out. That we're going to do. There's no doubt about it. But that, the President's very committed to that. And – but if you're a green card holder and you're not any of these things, you're going to be fine.

S. Attached as **Exhibit S** is a transcript of Secretary of State Marco Rubio's remarks during a joint press availability with Surinamese President Chandrikapersad Santokhi on March 27, 2025. The transcript is also available at https://perma.cc/FRK6-9ZAE.

3. In addition to the above-referenced exhibits, I am providing links to the following recordings, which do not have readily available transcripts that can be attached as physical exhibits, but are provided herein for ease of reference:

A. A recording of an interview with Leo Terrell – Senior Counsel to the Assistant Attorney General for Civil Rights and head of the "Task Force to Combat Anti-Semitism" – appearing on Fox News on March 10, 2025. The full recording is available at https://perma.cc/9UNS-CVVP. In this interview, responding to a question about Mahmoud Khalil's arrest and other related questions, Terrell states:

- It's the beginning of a series of big victories.

- This arrest of this individual is an indication and should serve as a deterrent. The Trump Administration is not going to allow individuals on a student visa, with a green card, to commit antisemitic behavior on our college campuses.

- I want these individuals who are practicing antisemitic behavior, if you are an individual on a student visa, you're not an American citizen, you're a foreign national, and you can expect deportation proceedings or revocation of your right to attend a prestigious university…

B. A recording dated March 13, 2025, of Vice President J.D. Vance interviewed by Laura Ingraham in The Ingraham Angle on Fox News. The recording is available at https://perma.cc/8F7H-V6BR.https://perma.cc/8F7H-V6BRhttps://perma.cc/8F7H-V6BR. Between 2:50 and 4:10 timestamp in this video, the following exchange takes place:

- Vice President JD Vance: Well, if it was an American citizen, it would be a different conversation …but Laura, a green card holder, even if I might like that green card holder, doesn't have an indefinite right to be in the

6

**JA 690**

United States of America . . . . my attitude on this is, this is not fundamentally about free speech, and to me, yes it's about national security, but it's also more importantly about who do we, as an American public, decide gets to join our national community, and if the Secretary of State and the President decide that this person shouldn't be in America and they have no legal right to stay here,  it's as simple as that.

- Laura Ingraham:  Do you see more such deportations happening?

- JD Vance: I think we'll certainly see some people who get deported on student visas if we determine that they don't–it's not in the best interests of the United States to have them in our country so yeah, I don't know how high that number's gonna be, but you're gonna see more people.

Dated: April 6, 2025                              Respectfully submitted,
New York, NY

                                                        /s/ Molly K.C. Linhorst
                                                        Molly K.C. Linhorst
                                                        AMERICAN CIVIL LIBERTIES UNION
                                                        OF NEW JERSEY FOUNDATION
                                                        570 Broad Street, 11th Floor
                                                        Newark, NJ 07102
                                                        Tel: (973) 854-1731
                                                        mlinhorst@aclu-nj.org

7

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Yunseo CHUNG,<br><br>                    *Plaintiff-Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States of America; Marco RUBIO, in his official capacity as Secretary of State, U.S. Department of State; Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice; Kristi NOEM, in her official capacity as Secretary of Homeland Security, U.S. Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; and William P. JOYCE, in his official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office,<br><br>                    *Defendants-Respondents*. | Case No. 25-cv-_____<br><br><br>**COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

1.      This action challenges the government's shocking overreach in seeking to deport a college student, Plaintiff-Petitioner Yunseo Chung, who is a lawful permanent resident of this country, because of her protected speech. The government's actions are an unprecedented and unjustifiable assault on First Amendment and other rights, one that cannot stand basic legal scrutiny. Simply put, immigration enforcement—here, immigration detention and threatened deportation—may not be used as a tool to punish noncitizen speakers who express political views disfavored by the current administration.

2.      Yunseo Chung is a twenty-one-year-old permanent resident of the United States— the only home she has known since coming here at the age of seven with her family from South

Korea—and a promising junior at Columbia University. She was the valedictorian of her high school class and has since thrived at college, academically and otherwise, participating in a campus literary magazine, an undergraduate law journal, and other student activities.

3.      Since 2023, along with hundreds of her peers, Ms. Chung has also participated in some student protests and demonstrations on Columbia University's campus related to Israel's military campaign in Gaza and the devastating toll it has taken on Palestinian civilians. Ms. Chung has not made public statements to the press or otherwise assumed a high-profile role in these protests. She was, rather, one of a large group of college students raising, expressing, and discussing shared concerns.

4.      On March 5, 2025, a student sit-in and protest was held at Columbia which garnered significant public attention.[1] Media reports identified Ms. Chung, along with other students, as among the protesters arrested outside of an academic building on campus. Ms. Chung was outside the building on that day to protest what she believed to be the excessive punishments meted out by the Columbia administration to student protesters facing campus disciplinary proceedings. She herself had previously faced a university disciplinary process (which resulted in a finding that Ms. Chung was not in violation of any university policy) and wanted to support her fellow students by attending the protest. Ms. Chung was arrested and given a Desk Appearance Ticket by the New York City Police Department for "obstruction of governmental administration," a common citation issued by the police at protests. That ticket will be adjudicated by the New York City court system in the normal course.

---

[1] Spencer Davis & Tulasi Cherukuri, *Columbia suspends four students who were arrested following Milstein sit-in*, Colum. Spectator (Mar. 7, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/07/columbia-suspends-four-students-who-were-arrested-following-milstein-sit-in/.

5.      Mere days later, however, the federal government began a series of unlawful efforts to arrest, detain, and remove Ms. Chung from the country because of her protected speech. It now appears that an ICE official signed an administrative arrest warrant for Ms. Chung on March 8, 2025. On March 9, 2025, Immigration and Customs Enforcement (ICE) showed up at Ms. Chung's parents' residence seeking her. On March 10, 2025, a federal law enforcement official advised Ms. Chung's counsel that her lawful permanent resident status is being "revoked." On Thursday, March 13, 2025, federal law enforcement agents executed a judicial search warrant at two Columbia-owned residences, including Ms. Chung's dormitory, seeking documents, including any occupancy or lease agreements, travel records, and immigration records—even though the warrant ostensibly targeted Columbia itself, not Ms. Chung.

6.      ICE's shocking actions against Ms. Chung form part of a larger pattern of attempted U.S. government repression of constitutionally protected protest activity and other forms of speech. The government's repression has focused specifically on university students who speak out in solidarity with Palestinians and who are critical of the Israeli government's ongoing military campaign in Gaza or the pro-Israeli policies of the U.S. government and other U.S. institutions.[2]

7.      Now, officials at the highest echelons of government are attempting to use immigration enforcement as a bludgeon to suppress speech that they dislike, including Ms. Chung's speech. To this end, Defendants-Respondents have adopted a policy ("the Policy") to retaliate against and punish noncitizens like Ms. Chung for their participation in protests. Under

---

[2] *See, e.g.*, Bianca Quilantan, Madine Touré, *'They need to see the institutions experiencing pain': The Trump administration wants Columbia University to change its admissions and disciplinary rules before research money gets turned back on.*, Politico (Mar. 15, 2025), *available at* https://www.politico.com/news/2025/03/15/colleges-federal-funding-shock-trump-antisemitism-00231160; Kate Bellows, *Can Trump Force Columbia U. to Expel Student Protesters?*, Chronicle of Higher Education (Mar. 14, 2025), *available at* https://www.chronicle.com/article/can-trump-force-columbia-u-to-expel-student-protesters; Kanishka Singh, Jonathan Allen, *Trump Threatens Funding Cut to Colleges Allowing 'Illegal Protests'*, Reuters (Mar. 4, 2025), *available at* https://www.reuters.com/world/us/trump-says-federal-funding-will-stop-colleges-schools-allowing-illegal-protests-2025-03-04/.

3

the Policy, if Defendant-Respondent Marco Rubio, the Secretary of State, claims reasonable ground to believe that a noncitizen protester's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, or personally determines that their protected views, speech, or associations would compromise a compelling U.S. foreign policy interest, then such determinations—according to the government—permit the U.S. Department of Homeland Security (DHS) to seek to detain and deport the noncitizen protester.

8.       Pursuant to the Policy, and consistent with remarks made by Secretary Rubio and by law enforcement agents who recently arrested another student at Columbia University,[3] Secretary Rubio purportedly made such a determination as to Ms. Chung ("the Rubio Determination"). This determination was based on Ms. Chung's actual and perceived lawful activity protected by the First Amendment: participation in protests and statements regarding Palestine, Israel, and discipline of student protestors on campus. Pursuant to the Rubio Determination, ICE, a component of DHS, seeks to arrest Ms. Chung, detain her, and place her in removal proceedings, presumably to South Korea. Ms. Chung is now at active risk of being put in immigration detention and deported from the only country she has ever known.

9.       Defendants-Respondents' actions violate Plaintiff-Petitioner's rights under the First Amendment and Fifth Amendment of the U.S. Constitution, the Administrative Procedure Act, the Immigration and Nationality Act, and its own policies. This Court should vacate and set aside Defendants-Respondents' Policy and the Rubio Determination, declare Defendants-

---

[3] Armando Garcia, Mariama Jalloh, Aaron Katersky, and Meredith Deliso, *Judge blocks removal of Palestinian activist who was detained at Columbia University*, ABC News (Mar. 10, 2025), *available at* https://abcnews.go.com/US/ice-arrests-palestinian-activist-green-card-columbia-university/story?utm_source=facebook&utm_medium=social&utm_campaign=dhfacebook&utm_content=null&id=119616144 (quoting tweet by Secretary Rubio stating: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported.").

Respondents' actions unlawful, and enjoin Defendants-Respondents from detaining, transferring, or deporting Ms. Chung unless Defendants-Respondents establish that their actions are untainted by impermissible First Amendment retaliation and discrimination, and are otherwise lawful.

## PARTIES

10.     Plaintiff-Petitioner Yunseo CHUNG is a longtime resident of the United States. Since 2022, she has been a student at Columbia University, residing in New York, New York. Ms. Chung became a lawful permanent resident of the United States in 2021. Upon information and belief, Ms. Chung has always resided pursuant to lawful immigration status in the United States since her arrival, with her family, as a seven-year-old child from South Korea.

11.     Defendant-Respondent Donald J. TRUMP is named in his official capacity as the President of the United States of America. In this capacity, he is responsible for the policies and actions of the executive branch, including the U.S. Department of State and U.S. Department of Homeland Security. Defendant-Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

12.     Defendant-Respondent Marco RUBIO is named in his official capacity as the Secretary of State of the United States. In this capacity, he is responsible for determinations made pursuant to certain provisions of the immigration laws. Among other things, he has the authority to determine, as he purportedly did here, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have potentially serious adverse foreign policy consequences for the United States," or to "personally" determine that a noncitizen's protected expressive activity "would compromise a compelling United States foreign policy interest." Following such a determination, the government may initiate removal proceedings under 8 U.S.C. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii) (the "Foreign Policy Ground"). In addition to his legal

responsibilities, he routinely transacts business in the Southern District of New York. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

13.     Defendant-Respondent Pamela BONDI is named in her official capacity as the Attorney General of the United States. In this capacity, she routinely transacts business in this District and is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g). Defendant-Respondent BONDI's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

14.     Defendant-Respondent Kristi NOEM is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a), and routinely transacts business in this District. Defendant-Respondent NOEM's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

15.     Defendant-Respondent Todd M. LYONS is named in his official capacity as the Acting Director of Immigration and Customs Enforcement. As the Acting Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and routinely transacts business in this District. He supervises Defendant-Respondent William P. JOYCE. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

16.     Defendant-Respondent William P. JOYCE is named in his official capacity as the Acting Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security. In this capacity, he is responsible for the enforcement of the immigration laws in New York City and surrounding counties within New York, including against

Ms. Chung. Defendant-Respondent JOYCE's address is New York ICE Field Office Director, 26 Federal Plaza, New York, New York 10278.

## JURISDICTION

17. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 2241; and U.S. Constitution, Article I, § 9, cl. 2 (the Suspension Clause).

18. An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has authority under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, and additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

19. Ms. Chung does not challenge an underlying order of removal or actions committed to unreviewable agency discretion. Ms. Chung is challenging Defendants-Respondents' pattern and practice of targeting individuals associated with protests for Palestinian rights for immigration enforcement in retaliation for their core protected political speech. This includes Defendants-Respondents' actions targeting Ms. Chung. No other forum exists to address these claims. Applying any statutory provision to curb jurisdiction in this case therefore would deprive Ms. Chung of any effective judicial review of her claims and a "serious constitutional question . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe,* 486 U.S. 592, 603 (1988).

## VENUE

20. Venue is proper in this Court under 28 U.S.C. §§ 2241(a), 1391(b)(2), and 1391(e)(1) because a substantial part of the events giving rise to Plaintiff-Petitioner's claims occurred in this district; Plaintiff-Petitioner resides in this District; Respondent Joyce resides in

this District; and the New York ICE Field Office, located in this District, is the office seeking Plaintiff-Petitioner's detention.

## **BACKGROUND**

### **Ms. Chung's History in the United States and at Columbia**

21.     Ms. Chung is twenty-one years old and a junior at Columbia University.

22.     Ms. Chung moved to the United States from South Korea with her parents and sibling at the age of seven. At the time, her father was pursuing graduate education in the United States.

23.     In 2021, Ms. Chung adjusted her status to that of a lawful permanent resident.

24.     The United States is Ms. Chung's one and only home. Her immediate family lives here, her friends are here, and her plans for the future all include living in the United States.

25.     In fall 2022, Ms. Chung began her studies at Columbia University. Ms. Chung was ecstatic when she arrived on Columbia's campus. Her freshman fall semester went beyond her wildest expectations for her college experience.

26.     Since arriving at Columbia, Ms. Chung has joined various student activities and organizations, including social organizations and student-run publications, such as the Columbia Undergraduate Law Review and Quarto, a literary magazine.

27.     Ms. Chung has also pursued internships in the legal field, at The Urban Justice Center, The Innocence Project, and the Federal Defenders of New York.

28.     Ms. Chung has excelled academically as well, maintaining a 3.99 GPA and making it onto the Dean's List every semester since she enrolled at Columbia.

**Ms. Chung's Exercise of Free Speech Rights in Support of Palestinians**

29.     In addition to these other activities, over the past year and a half, Ms. Chung has felt moved to join efforts to advocate for Palestinian human rights.

30.     Ms. Chung has also felt compelled to criticize Columbia for its handling of student protests supporting Palestinian human rights, including the punitive measures imposed on certain students.

31.     In April 2024, like hundreds of her peers at Columbia, Ms. Chung visited the Gaza Solidarity Encampment on numerous occasions for discussions, events, community, and protest.[4] She did not make public statements to the press, liaise between student protesters and Columbia, or otherwise assume a high-profile role in any of the aforementioned activities. She was, rather, one of a large group of college students raising, expressing, and discussing shared concerns. Ms. Chung was not arrested or disciplined in relation to any events that took place during the Gaza Solidarity Encampment at Columbia.

32.     In May 2024, Columbia commenced disciplinary proceedings against Ms. Chung in relation to an incident involving posting flyers on campus. The university accused Ms. Chung and other students of vandalism for attaching posters to Columbia buildings. The posters included photos of members of the Board of Trustees with the words: "Wanted for Complicity in Genocide."

33.     Ms. Chung appeared at a disciplinary hearing to ask for an adjournment so she could obtain legal counsel. Columbia agreed to postpone the hearing that day but then did not reschedule. Columbia reviewed these allegations, and did not find Ms. Chung had violated any

---

[4] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Colum. Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

applicable policies. By all appearances, her tenure at Columbia continued normally, and she had enjoyed her junior year of college up until the recent events detailed here.

34.     Because of her experience with the disciplinary process, Ms. Chung had an interest in monitoring and speaking out about the university's response to pro-Palestine protests on campus, particularly insofar as the response was at times arbitrary and lacking in transparency.

35.     In early 2025, Barnard College, which is affiliated with Columbia University, instituted disciplinary measures against multiple students for their involvement in events associated with advocacy for Palestinian rights.

36.     First, on or before February 23, 2025, Barnard College expelled two students for their alleged participation in the disruption of a class on January 21, 2025.[5]

37.     Then, on or before March 3, 2025, Barnard College expelled a third student, allegedly over the student's involvement in the student occupation of Hamilton Hall in April 2024.[6]

### Ms. Chung Protests Columbia's Disciplinary Measures

38.     By virtue of her experience with the disciplinary process and her discussions with other students, Ms. Chung was concerned about how Columbia was expelling and otherwise disciplining students, particularly for speech-related activities regarding Palestinian human rights, the very topic which had moved Ms. Chung to engage in speech-related activities, along with hundreds of other Columbia students.

39.     To Ms. Chung, the university's actions towards her fellow students were unnecessarily punitive. Given this and Ms. Chung's prior experience facing disciplinary

---

[5] Isha Banerjee & Apurva Chakravarty, *Barnard student expelled for occupation of Hamilton Hall, CUAD says*, Colum. Spectator (Mar. 3, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/03/barnard-student-expelled-for-occupation-of-hamilton-hall-cuad-says/.

[6] *Id.*

proceedings, she felt it was important to speak up publicly about the issue of discipline. Ms. Chung knew one of the students who had been expelled and felt personally invested in attending the protest.

40. Students and other protesters staged a sit-in inside and a demonstration outside an academic building (Milstein) at Barnard College on March 5, 2025, to demand that Barnard reverse the expulsions of the three students.[7] Ms. Chung did not organize the protest, speak to the media about it, or otherwise play a leading role. Rather, she was one participant among many protesting the university's handling of student discipline over Palestine-related speech.

41. At some point during the protest, in response to an apparent white supremacist bomb threat called in specifically to Milstein, New York City Police Department (NYPD) officers entered the Barnard campus.[8] The NYPD instructed protesters to exit the building and the courtyard. Ms. Chung happened to be at the front of the group of protesters outside of the Milstein building. Because she was at the front of the group while the NYPD was directing protesters to exit, she was pushed from both sides and was unable to follow police directives to move. The bomb threat was later determined to be fake.[9]

---

[7] Sarah Huddleston, *Pro-Palestinian protesters stage sit in in Milstein lobby*, Colum. Spectator (Mar. 5, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/05/pro-palestinian-protesters-stage-sit-in-in-milstein-lobby/.

[8] Jack Morphet, Amanda Woods, & Chris Nesi, *Anti-Israel protesters arrested at Barnard were mostly privileged youths, including woman whose family started Hamptons Jitney*, N.Y. Post (Mar. 6, 2025), *available at* https://nypost.com/2025/03/06/us-news/arrested-anti-israel-protesters-at-barnard-include-repeat-offender-woman-whose-family-started-hampton-jitney-bus-service/ (reporting that unknown individual emailed Barnard through anonymous dark web messaging service claiming to have placed pipe bomb inside college library targeting what sender referred to as "anti-white f——t terrorist communist (sic)").

[9] Philip Marcelo, *Police responding to bomb threat clear pro-Palestinian protesters occupying Barnard College library*, Associated Press (Mar. 5, 2025), *available at* https://apnews.com/article/palestinian-protest-barnard-college-e16286f14d1265470c862b9f8b41c471.

42.     Ms. Chung and others like her who were caught between the crowd behind them and the police in front of them were arrested and charged with obstruction of governmental administration.

43.     During protests in New York City, it is common for police to arrest many protesters against whom charges are eventually dropped or dismissed.

44.     The NYPD frequently uses the charge of obstructing governmental administration, a misdemeanor, during large protests.[10]

45.     Ms. Chung had never been arrested before this event and has not been arrested since then. She did not participate in any unlawful activity on the day of her arrest or on any other day. The NYPD issued her a desk appearance ticket and released her that day.

46.     On Friday, March 7, 2025, Columbia University placed Ms. Chung on interim suspension due to the arrest and restricted her campus access.

47.     Ms. Chung's speech regarding the obligations that Columbia has under international law, the human rights of the Palestinian people, and university restrictions on speech is all protected by the First Amendment, including because it relates to matters of public concern. It is political speech at the core of the protection of the First Amendment.

**The Government's Adverse Actions Against Ms. Chung**

48.     On Sunday, March 9, 2025, in the early evening, law enforcement officers describing themselves as Department of Homeland Security agents visited Ms. Chung's parents'

---

[10] *See* Department of Investigation, Investigation into NYPD's Response to George Floyd Protests (Dec. 2020), 9, 10, *available* *at* https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

home outside of this District. These agents told Ms. Chung's parents that they were looking for her.

49.    Nearly simultaneously, at approximately 7:02 p.m., Ms. Chung received a text message from a number previously unknown to her, saying: "Hi, Yunseo. This is Audrey from the police. My job is to reach out to you and see if you have any questions about your recent arrest and the process going forward. When are [sic] available for a phone call?"

50.    Shortly thereafter, before 8:00 p.m., an attorney, Nayantara Bhushan, called the number from which the text had been sent and spoke with an individual who identified herself as "Audrey," an agent with Homeland Security Investigations (HSI), a sub-component of ICE. She advised Attorney Bhushan that, "due to the situation with the protesting, the State Department was at liberty to revoke [Ms. Chung's] LPR status." The agent stated that there was an administrative warrant for Ms. Chung's arrest.

51.    At approximately 9:15 p.m. the same evening, Columbia Public Safety sent Ms. Chung an anonymous, unsigned email:

> "Dear [Ms. Chung], The U.S. Attorney's Office for the Southern District of New York has asked us to inform you that Homeland Security Investigations agents are seeking to make contact with you in connection with an administrative warrant for your arrest. Consistent with the University's practice, we wanted to share this information and their request with you. If you are represented by counsel, it may make sense for your lawyer to speak directly with DHS."

52.    After 9:30 p.m., Attorney Bhushan received a call and a text message from Perry Carbone, who identified himself as an Assistant United States Attorney (AUSA) in the U.S. Attorney's Office for the Southern District of New York.

53.    A different attorney for Ms. Chung, Naz Ahmad, then called AUSA Carbone at approximately 10:00 p.m. that evening, and left a voicemail, referencing Ms. Chung.

54.     The next day, Monday, March 10, 2025, between 11:00 a.m. and 12:00 p.m., Attorney Ahmad spoke with AUSA Carbone concerning Ms. Chung.

55.     AUSA Carbone explained that his office had been asked to assist HSI in "these matters." When asked, AUSA Carbone explained that his outreach was primarily in service of HSI's efforts rather than because of any contemplated prosecution against Ms. Chung. AUSA Carbone did not mention the existence of any judicial arrest warrant.

56.     AUSA Carbone stated that the Secretary of State had revoked Ms. Chung's visa. Attorney Ahmad explained that Ms. Chung is a U.S. permanent resident, and that she is not present in the United States on a visa.

57.     AUSA Carbone then stated that "the Secretary of State has revoked that," too.[11] Counsel for Ms. Chung offered that the Secretary of State does not have the unilateral authority to revoke permanent resident status. When Attorney Ahmad inquired further, AUSA Carbone could not explain the justification for the government's purported action.

58.     Later that same day, AUSA Carbone texted Attorney Ahmad a copy of an administrative arrest warrant naming Ms. Chung. The administrative arrest warrant did not specify under which provision of the immigration law Ms. Chung would be subject to deportation.

59.     The administrative warrant indicated that it was issued based upon a records check of databases and possibly other information.

60.     On Thursday, March 13, 2025, between 9:00 p.m. and 10:00 p.m., law enforcement agents executed search warrants at two residences on Columbia University's campus, including Ms. Chung's dormitory.

---

[11] This set of facts resembles what HSI agents told Mahmoud Khalil, a lawful permanent resident and student at Columbia University's School of International and Public Affairs. HSI agents arrested him on March 8, 2025. *See* Am. Pet. ¶¶ 47-52, ECF No. 38, *M.K. v. Joyce*, No. 25-1935 (S.D.N.Y. Mar. 13, 2025).

61.     The search warrants sought documents relating to Ms. Chung's affiliation with Columbia University, including any occupancy or lease agreements, travel records, and immigration records.[12]

62.     The search warrant cited 8 U.S.C. § 1324, commonly known as the "harboring" statute. Based on its citation to this statute and the records sought, the warrant ostensibly stemmed from an investigation targeting Columbia University for "harboring" two noncitizen students that ICE was looking to arrest. Public statements by a Department of Justice official confirmed as much.[13]

63.     Upon information and belief, these warrants were sought and obtained on false pretenses. The agents did not recover any documents from either search. The manner of execution suggests that the agents were searching for the two named students, including Ms. Chung, and needed a lawful basis to enter the residences in the hope of arresting the students on encounter.

**The Government's Bid to Silence Advocacy in Support of Palestinian Rights**

64.     The government's retaliation against Ms. Chung comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights. Officials at the highest levels of the federal government have made clear that they intend to use immigration enforcement to punish noncitizens who speak out in support of Palestinians and Palestinian rights, or who are perceived to have engaged in such speech.

---

[12] Another apartment was also searched that evening by law enforcement agents. A copy of the warrant left at this other apartment named Ms. Chung.

[13] Joseph Zuloaga, Daksha Pillai & Elliot Heath, *Department of Homeland Security agents search two University-owned residences, no arrests made*, Colum. Spectator (Mar. 14, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/14/department-of-homeland-security-agents-search-two-university-owned-residences-no-arrests-made/ (reporting Deputy Attorney General Todd Blanche's statement "that the warrants were executed as part of a separate probe into whether the University was 'harboring and concealing illegal aliens' on campus").

65.    Since fall 2023, communities across the United States began to mobilize in support of Palestinian human rights, including students on college campuses. Student demands have reflected criticism of U.S. government support for Israel's policies and military campaign in Gaza, and concern about the civilian death toll among Palestinians, particularly children and women. Many students also criticized their universities' involvement in the same, pushing for divestment from financial products or other investments associated with Israel.

66.    Some opponents of these protest activities, including President Donald J. Trump, frequently mischaracterize peaceful protest and any speech in favor of Palestinian rights as inherently supportive of Hamas or terrorism and anti-Semitic.

67.    When running for president in 2023 and 2024, then-candidate Trump repeatedly told his supporters that he would use immigration enforcement measures against noncitizen students engaged in protests supportive of Palestinians or critical of Israel's actions.

68.    For example, at a rally in Las Vegas on October 28, 2023, then-candidate Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[14]

69.    After the student movement to bring attention to atrocities in Gaza ramped up in spring 2024, then-candidate Trump promised campaign donors that he would deport student demonstrators supportive of Palestinian human rights. In response to the Gaza Solidarity Encampments, Trump spoke at an event in New York, stating: "One thing I do is, any student that

---

[14] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro- Palestinian protesters*, Reuters (Jan. 29, 2025), *available at* https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.

protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[15]

70.     Candidate Trump made clear that he intended to stifle advocacy for Palestinian rights, stating: "If you get me reelected, we're going to set that movement back 25 or 30 years."[16]

71.     At least one cabinet level official currently in the Trump Administration expressed similar views during this time. On October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. government should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[17]

72.     President Trump made clear his intent to deliver on these campaign promises within days of assuming office on January 20, 2025.

73.     On the day he assumed office, President Trump signed Executive Order 14161, titled, "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats."

74.     The Executive Order declares the Trump Administration's intent to target noncitizens who hold "hateful" views and noncitizens who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The Executive Order does not define "hateful." Moreover, the broad term "hostile attitudes" towards the U.S. government could encompass any form of political dissent, including opposing the U.S.

---

[15] Josh Dawsey, Karen DeYoung & Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, (May 27, 2024), *available at* https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[16] *Id.*

[17] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), *available at* https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

government's diplomatic, financial, military, and other forms of support for Israel's actions in Gaza, the West Bank, and beyond.

75.    On January 29, 2025, President Trump signed Executive Order 14188. This Executive Order signaled clearly that the Administration would prioritize investigating "post-October 7, 2023 campus anti-Semitism." The order adopted a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[18] In a separate release accompanying Executive Order 14188, the White House described the measures it would undertake as specifically targeting "leftist, anti-American colleges and universities."[19] The White House stated that this Executive Order was a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you . . . and deport you."

76.    Relying on these executive orders, groups and organizations opposed to Palestinian rights protests began publicizing names of individuals they wanted the U.S. government to deport. The groups compiled lists of students who were publicly identifiable as having organized Palestine-related protests, engaged in Palestine-related advocacy, or otherwise appeared to voice opinions supportive of Palestinians, and upon information and belief, submitted these tips to ICE's tip line.[20]

---

[18] This Executive Order reaffirms the definition of antisemitism adopted by Executive Order 13899, signed by President Trump on December 11, 2019. *See* 84. Fed. Reg. 68779 (Dec. 11, 2019) (including as example of antisemitism "claiming that the existence of a State of Israel is a racist endeavor").

[19] *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[20] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protestors*, The Intercept (Feb. 15, 2025), *available at* https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/.

77.     For example, Betar USA,[21] an extremist group that has openly embraced Islamophobia and indicated a desire to work with the far-right extremist group the Proud Boys, has published lists of individuals, including Columbia students and faculty, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump Administration."[22] Betar USA's Executive Director has met with prominent lawmakers and claims credit for providing information that led to the arrest of another Columbia student who also held lawful permanent resident status.[23]

78.     Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at Columbia University that it would like to see deported.[24]

79.     Other organizations, such as the Middle East Forum, have indicated they are proactively sharing information with the U.S. government about noncitizens, without publicly identifying the specific individuals.[25]

---

[21] Betar is a self-described "Zionist" movement. *See* https://betarus.org/. The Anti-Defamation League has labeled Betar USA an extremist group.

[22] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[23] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (March 14, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[24] *Id.*

[25] Zolan Kanno-Youngs, Tyler Pager & Hamed Aleaziz, *As Trump Broadens Crackdown, Focus Expands to Legal Immigrants and Tourists*, N.Y. Times (Mar. 21, 2025), *available at* https://www.nytimes.com/2025/03/21/us/politics/trump-immigration-visa-crackdown.html.

80. Predictably, this resulted in widespread fear of retaliation for pro-Palestine speech among noncitizen students. Reporting has shown that the executive orders "already appear to be chilling political activism."[26]

81. On or before Wednesday March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens, including Ms. Chung, for their actual or perceived advocacy for Palestinian rights.

82. Under the Policy, Respondent Rubio, the Secretary of State, and the Department of Homeland Security would seek to identify any noncitizen associated with protests supportive of Palestinian human rights. One way to target individuals would be to identify any noncitizen who had been arrested during protests associated with Palestinian rights advocacy on campuses, regardless of whether they had participated in the protest, their actual activity during any protest, the nature of any of the conduct charged, or the ultimate outcome or disposition of any of these arrests.[27]

83. Under the Policy, the Secretary of State would also identify noncitizen students or faculty generally associated with pro-Palestine protests on campuses, or who espoused views supportive of Palestinian human rights.

84. Under the Policy, Respondent Rubio is empowered to determine that a noncitizen's presence or activities in the United States would have potentially serious foreign policy

---

[26] Tovia Smith, *Foreign students say the threat of Trump's executive orders is getting real*, NPR (Mar. 3, 2025), *available at* https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel.

[27] *See, e.g.,* Esther Wang, *A New Yorker and His Dog Were Swept Up in the Violent Arrests at the City College Protest*, Hell Gate (May 9, 2024), *available at* https://hellgatenyc.com/omar-neptune-dog-swept-up-city-college-arrests/ (describing how individual who resides near City College campus was arrested while walking dog near City College on same night NYPD entered City College campus in response to encampment, and reporting that a friend from neighborhood dog walking group was also arrested that evening).

consequences for the United States or to "personally" determine that a noncitizen's protected expressive activity would compromise a compelling U.S. foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protester.

85.     On March 6, 2025, the Department of State confirmed the commencement of this Policy to the press.

86.     Specifically, on March 6, 2025, the Department of State informed Fox News that it had revoked the student visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-supporting disruptions. This individual was a university student. ICE will proceed with removing this person from the country."[28]

87.     The Department of State confirmed it was planning to review internal databases to see whether any visa holders were arrested and had not been subjected to immigration enforcement.[29]

88.     Additionally, on March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[30]

89.     Government officials confirmed that they would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged

---

[28] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), *available at* https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[29] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), *available at* https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[30] *Id.*

terrorist sympathies."[31] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

90. Government officials also said they would be reviewing civil lawsuits brought against organizations and individuals engaged in or perceived to be engaged in advocacy for Palestinian human rights that purport to "highlight foreign nationals allegedly engaged in antisemitic activity without consequence."[32]

### History of the Foreign Policy Ground

91. Under the immigration laws, the Secretary of State has been granted wide latitude to refuse entry or deport noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." *See* 8 U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i)).

92. The statute expressly forbids the Secretary of State from issuing a policy or decision to deny entry or initiate deportation based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that admitting the individual or allowing them to remain in the United States would compromise a compelling U.S. foreign policy interest, 8 U.S.C. § 1182(a)(3)(C)(iii), and then notifies certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1182(a)(3)(C)(iv).

93. Legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. A Senate Committee report provides that for years "the United States has embarrassed itself by excluding prominent foreigners

---

[31] *Id.*

[32] *Id.*

from visiting the United States solely because of their political beliefs." The amendments which resulted in the current version of the law were intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States."[33]

94. In a separate House Conference report, Congress made clear that the authority to use this provision should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that "the 'compelling foreign policy interest' standard [should] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'"[34]

95. As an example, the same House Report on the amendment shared the case of the Shah of Iran as an example where his "mere entry into the United States could [have resulted] in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad."[35]

**Existing DHS Guidance Concerning First Amendment Activity**

96. In 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees specifically concerning First Amendment protected activities.[36] Per that memorandum, the prior Trump Administration directed that "DHS

---

[33] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

[34] H.R. Conf. Rep. 101-955, at 6793-94, 101st Cong., 2nd Sess. (1990) (reprinted in 1990 U.S.C.C.A.N. 6784).

[35] *Id.* at 6793.

[36] See Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."[37]

97.     In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."[38]

98.     As of the date of filing, DHS has yet to rescind the Mayorkas 2021 Guidance, or issue new guidance that addresses consideration of First Amendment rights as a factor in enforcement actions.

### The Pattern of Government Retaliation Against Other Noncitizens

99.     Since March 6, 2025, the Trump Administration has engaged in retaliatory immigration enforcement against individuals who, like Ms. Chung, engaged in protected First Amendment activity—more specifically, those engaged or perceived to have engaged in Palestinian rights advocacy or any criticism of Israel or of U.S. support for Israel's military campaign in Gaza.

### *Mahmoud Khalil*

100.    On March 8, 2025, HSI agents arrested Mahmoud Khalil in the vestibule of his apartment building near Columbia University, at approximately 8:30 p.m.[39] Mr. Khalil is a U.S.

---

[37] *Id.*

[38] *See* Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

[39] McKinnon de Kuyper, *Mahmoud Khalil's Lawyers Release Video of His Arrest*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html.

lawful permanent resident and master's student at Columbia's School of International and Public Affairs.[40]

101.    During the arrest, HSI agents told Mr. Khalil's attorney that his student visa had been revoked.[41] His attorney informed the agents that he held a permanent resident card, and his wife showed the agents his permanent resident card.[42] The agents arrested Mr. Khalil anyway.

102.    Mahmoud Khalil has been an outspoken advocate for Palestinian human rights.[43]

103.    Mr. Khalil served as an advocate and negotiator on behalf of his fellow students at Columbia. Specifically, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment and the Columbia University administration.[44] Mr. Khalil's role as a student negotiator was widely reported.[45]

104.    After his arrest, multiple government officials made statements confirming that Mr. Khalil had been targeted for arrest for his speech and protest activity.

105.    On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President emphasized that Mr. Khalil's arrest was "the first of many to come," declaring that his Administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-

---

[40] *See* Am. Pet. ¶¶ 9, 20-21, ECF No. 38, *Khalil v. Joyce*, No. 25-cv-1935 (S.D.N.Y. Mar. 13, 2025).

[41] *Id.* ¶¶ 49, 51.

[42] *Id.* ¶¶ 22-28.

[43] *Id.*

[44] *Id.*

[45] Isa Irfan, *International students risk immigration status to engage in in Gaza protests*, Al Jazeera (May 17, 2024), *available at* https://www.aljazeera.com/news/2024/5/17/international-students-risk-immigration-status-to-engage-in-gaza-protests.

American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[46]

106.    The White House reposted President Trump's statement on the social media platform X, accompanied by a mugshot-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS."[47] The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.

107.    Defendant-Respondent Rubio stated: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[48]

108.    The same day, DHS issued a statement through its social media account on X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to [sic] Hamas, a designated terrorist organization," and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[49]

109.    On March 11, 2025, in response to an inquiry from The New York Times regarding Mr. Khalil's arrest, a spokesperson for the Administration reportedly stated that "United States'

---

[46]    Donald   J.   Trump,   Truth   Social   (Mar.   10,   2025,   1:05   p.m.),   *available   at* https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

[47]    The   White   House,   *X*   (Mar.   10,   2025,   1:34   p.m.),   *available   at* https://x.com/WhiteHouse/status/1899151926777749618.

[48] Marco Rubio, *X* (Mar. 9, 2025, 6:10 p.m.), *available at* https://x.com/marcorubio/status/1898858967532441945.

[49]    Dep't   of   Homeland   Sec.,   *X*   (Mar.   9,   2025,   9:29   p.m.),   *available   at* https://x.com/DHSgov/status/1898908955675357314; *see* Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, Colum. Spectator (Mar. 10, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.

foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[50]

110. At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[51]

111. In a press conference regarding Mr. Khalil on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities," and "if you end up having a green card . . . we're gonna kick you out."[52]

112. On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not claim Mr. Khalil had broken any laws and instead asserted that Mr. Khalil was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," or if "protesting [is] a deportable offense," Edgar did not dispute those statements.[53] Edgar stated that had Mr. Khalil

---

[50] Minho Kim, *The U.S. Is Trying to Deport Mahmoud Khalil, a Legal Resident. Here's What to Know.*, N.Y. Times (Mar. 11, 2025, updated 11:09 a.m.), *available at* https://archive.ph/rD4sk#selection-1147.0-1159.428.

[51] *White House Daily Briefing*, C-SPAN (Mar. 11, 2025), *available at* https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16).

[52] *Secretary of State Marco Rubio Remarks to Press*, U.S. Dep't of State (Mar. 12, 2025), *available at* http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

[53] Michel Martin & Destinee Adams, *DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened*, NPR (Mar. 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

reported during his visa application process that he was "going to protest" after entering the United States, "We would never have let him in the country."[54]

113.     Defendants-Respondents, including Secretary Rubio and ICE, are using the Foreign Policy Ground for removability against Mr. Khalil because of his beliefs, speech, or associations.[55]

114.     Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally protected past, current, or expected beliefs, statements, or associations.

115.     Within hours of Mr. Khalil's arrest, ICE was arranging to move him to Jena, Louisiana, more than a thousand miles away from his home, his eight-months-pregnant U.S. citizen wife, his community, his lawyers, and the federal district court where he had promptly filed a habeas corpus petition challenging the constitutionality of his detention.

116.     Federal government officials also made clear that Mr. Khalil was not the only noncitizen they had acted against.

### *Ranjani Srinivasan*

117.     On March 5, 2025, the Department of State informed a graduate student at Columbia University, Ranjani Srinivasan, that her F-1 student visa had been cancelled. The U.S. Consulate in Chennai did not explain why her visa had been cancelled.[56]

---

[54] *Id.*

[55] *See* Ex. A, Renewed Motion to Dismiss or Transfer the Case, *Khalil v. Joyce*, No. 25-cv- 01963 (D.N.J.), ECF No. 90.

[56] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

118.    As noted above, on March 6, 2025, the Department of State confirmed to a news outlet that it had revoked the student visa of an individual who had been criminally cited in connection with a campus protest.[57]   Upon information and belief, Ms. Srinivasan is that individual.

119.    ICE agents visited Ms. Srinivasan's apartment the morning of March 7, 2025 and the evening of March 8, 2025.[58] Both times, Ms. Srinivasan's roommate refused the agents entry, as they did not have a valid judicial search warrant.[59] During the second visit, the agents emphasized that they would be back and that Ms. Srinivasan was "amenable to deportation."[60]

120.    On March 9, 2025, Columbia informed Ms. Srinivasan that DHS had terminated her student status.[61]

121.    On March 14, 2025, Secretary of Homeland Security Kristi Noem issued a post on X, accompanied by a video of Ranjani Srinivasan: "I'm glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self deport."[62]

122.    That same day, the Department of Homeland Security issued a press release, discussing Ms. Srinivasan and another individual ICE had arrested.

---

[57] *See supra* n.28.

[58] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Kristi Noem, *X* (Mar. 14, 2025, 11:01 a.m.), *available at* https://x.com/Sec_Noem/status/1900562928849326488.

123. The DHS press release described Ms. Srinivasan as having "advocat[ed] for violence and terrorism" and as being "involved in activities supporting Hamas, a terrorist organization," without providing any description or information to support such a claim.[63]

124. Later reporting confirmed that DHS's primary motivation for identifying and targeting Ms. Srinivasan was the agency's perception of her involvement in student protests at Columbia University, and critically that this perception was due to her arrest in April 2024, the same day that protesters who had taken over Hamilton Hall at Columbia were arrested, notwithstanding that she was not involved in the protest.[64] Ms. Srinivasan has since stated repeatedly that she was trying to return home after a departmental picnic that day, when she was caught between protesters and the police barricades.[65]

### Leqaa Kordea

125. The March 14, 2025 DHS press release noted that the Newark ICE Field Office had detained another noncitizen, Leqaa Kordea. According to the press release, Ms. Kordea is from the West Bank, her student visa was terminated for lack of attendance at a university, and she had overstayed her expired visa.[66]

---

[63] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), *available at* https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

[64] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html ("The department did not state how the two summonses made her a terrorist sympathizer.").

[65] *Id.*

[66] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), *available at* https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

126.    DHS made clear in its statement that they had detained Ms. Kordea because of her presence at protests at Columbia University in April 2024.[67]

127.    While alluding to Ms. Kordea's arrest during the April 2024 protests, DHS did not address which criminal charges Ms. Kordea faced, the outcome of any charges, or whether she was meaningfully involved in the protest at all.

128.    The press release notes that Ms. Kordea was detained by the ICE Newark Field Office. Upon information and belief, like Mr. Khalil, Ms. Kordea was also sent far away from any family residing on the East Coast—to Prairieland, Texas.

129.    No government official has explained why Ms. Kordea, who presumably overstayed a student visa, must be detained and held hundreds of miles away from any family in the New Jersey area.

### Dr. Badar Khan Suri

130.    On March 17, 2025, ICE arrested a third individual, Dr. Badar Khan Suri, a post-doctoral fellow at Georgetown University. Agents arrested him outside his home in Arlington, Virginia, where he lives with his U.S. citizen wife and their three children.[68]

131.    Later, DHS Spokesperson Tricia McLaughlin claimed, without substantiation, that Dr. Suri, an Indian national, "was spreading Hamas propaganda and promoting antisemitism on social media."[69]

---

[67] Id.

[68] Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), *available at* https://www.politico.com/news/2025/03/19/trump-deportation-georgetown-graduate-student-00239754.

[69] Id.

132.    ICE has also reportedly invoked the Foreign Policy Ground for removal against Dr. Suri. However, no U.S. government official has explained how the presence or activities in the United States of a researcher on peacebuilding activities, who is married to a U.S. citizen with three children, and who has not engaged in any illegal activity, would have potentially serious adverse foreign policy consequences.

133.    Within twenty-four hours of his arrest, ICE moved Dr. Suri to a "staging" center at the Alexandria, Louisiana airport.[70] Reporting suggests that Dr. Suri will be sent to Prairieland, Texas. No government official has explained why Dr. Suri must be held in detention, nor why he should be detained hundreds of miles away from his wife and their young children.

### *Momodou Taal*

134.    The government's retaliatory campaign has impelled noncitizen students who may otherwise be exposed to the Policy to seek protection from the courts. These defensive efforts have themselves only given rise to further government retaliation.

135.    Momodou Taal, a doctoral student in Africana Studies at Cornell University came to the United States as an F-1 student visa holder. Beyond his academic work and other service at Cornell, Mr. Taal was active in student protests of U.S. foreign policy, particularly its military and financial support for Israel.[71]

136.    As Mr. Taal became more prominent in his advocacy, groups and organizations opposed to Palestinian rights began calling on ICE to target, arrest, and deport Mr. Taal for his

---

[70] *Id.*

[71] *See* Pet. ¶ 32, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025).

participation in protest. On March 13, 2025, for example, Betar USA posted on X a "Deport Alert" that specifically named Mr. Taal as a target.[72]

137.     In response to these impending threats, on March 15, Mr. Taal and two others filed a Complaint and Motion for Temporary Restraining Order in the Northern District of New York seeking an injunction against implementation of Executive Order 14188 and Executive Order 14188, and the application of the aforementioned Policy with respect to himself.[73] The court issued an order setting an in-person hearing on March 25, 2025 to address the merits of the Complaint and Motion.[74]

138.     On the morning of March 19, as part of Defendants-Respondents' ongoing effort to enforce the Policy, and in response to Mr. Taal's efforts to seek the court's protection, two undercover law enforcement officers appeared in the parking lot of Mr. Taal's residence.[75] The same day, Mr. Taal filed an emergency motion, again seeking the court's protection via injunction.[76]

139.     In response to Mr. Taal's effort at self-protection against retaliation, the government doubled down. In the early hours of March 21, attorneys from the U.S. Department of

---

[72]     Betar    USA    (@Betar_USA),    *X*    (March    13,    2025,    10:38    a.m.),    *available    at* https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom"); *see also* Pet. ¶¶ 36-38, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025) (describing concerted campaign targeting Mr. Taal for deportation under the Policy).

[73] *See* Pet., ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025).

[74] *See* ECF No. 19, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

[75] Malcolm Ferguson, *The Sinister Way Trump's DOJ Tried to Deport Cornell Student Protester*, New Republic (Mar. 21, 2025), *available at* https://newrepublic.com/post/193038/justice-department-deport-cornell-palestine-student-protester-momodou-taal.

[76] *Id.*

Justice emailed counsel for Mr. Taal, informing counsel that ICE intended to arrest and detain Mr. Taal, and inviting Mr. Taal to surrender to HSI.[77]

140.    Later, government officials conceded in filings to the Northern District of New York that DHS agents had identified Mr. Taal by conducting a review of publicly available information in line with the directives of Executive Order 14188 on antisemitism. An HSI official confirmed to the Court that it had referenced this Executive Order when communicating with the State Department concerning Mr. Taal.[78]

**University Response to Protests in Support of Palestinian Human Rights**

141.    Since 2023, communities across the country have mobilized in response to events in Gaza. Students have formed an important part of that movement, as they have in other social movements in U.S. history.

142.    In April and May 2024, several Gaza Solidarity Encampments went up on dozens of campuses around the world. The encampments, and the students demands, often tied to divestment from financial products or other instruments connected to Israeli military actions in Gaza, received widespread news coverage.

143.    Additionally, campus responses to the encampments, including any discipline imposed on students, also received widespread news coverage.

144.    Federal government officials have made clear that they intend to punish colleges and universities for their handling of student protests.

145.    As noted above, Executive Order 14188, issued on January 29, 2025, signaled very clearly that the Trump Administration would prioritize investigating "post-October 7, 2023

---

[77] *See* Letter Br., ECF No. 25, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

[78] *See* Dec. of Roy Stanley, Defendants' Opp'n to Motion for Preliminary Injunction and Temporary Restraining Order, ECF No. 30-2, *Taal et al. v. Trump et al.*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

campus anti-Semitism." A specific target would be "leftist, anti-American colleges and universities."

146.     On March 7, 2025, hours after ICE agents attempted to arrest Ms. Srinivasan, the Trump Administration announced it was cutting $400 million in grants to Columbia University, primarily in response to its handling of student protests.[79]

147.     On March 13, 2025, high level Trump Administration officials sent a letter to Columbia University, issuing a list of demands in order for Columbia to continue to receive federal funding. The demands primarily concern discipline of students, and student activities on campus.[80]

148.     On March 13, 2025, Columbia announced it had taken a wide range of disciplinary actions against students who had taken over Hamilton Hall in spring 2024.

149.     On March 21, 2025, Columbia announced it was acquiescing to the Trump Administration's demands.[81]

**Unlawful Use of the Foreign Policy Ground Against Ms. Chung**

150.     Upon information and belief, DHS and Respondent Rubio have invoked the Foreign Policy Ground for deportation against Ms. Chung.

---

[79] This specific amount, $400 million, may carry special significance to President Trump regarding a prior real estate transaction in that amount that Columbia University declined to pursue with him. *See* Matthew Haag & Katherine Rosman, *Decades Ago, Columbia Refused to Pay Trump $400 Million*, N.Y. Times (Mar. 21, 2025), *available at* https://www.nytimes.com/2025/03/21/nyregion/trump-columbia-university-400-million.html.

[80] Letter from Josh Gruenbaum, Comm'r of Fed. Acquisition Serv. for the Gen. Servs. Admin., Sean R. Keveney, Acting General Counsel for the U.S. Dep't of Health & Hum. Servs., & Thomas E. Wheeler, Acting General Counsel for the U.S. Dep't of Education, to Dr. Katrina Armstrong, Interim President of Columbia University (Mar. 13, 2025), *available at* https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[81] Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia, Colum. Univ. (Mar. 21, 2025), *available at* https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

151. HSI Agent "Audrey" told Ms. Bhushan that the Secretary of State had revoked Ms. Chung's LPR status.

152. AUSA Carbone also told counsel that the Secretary of State had revoked Ms. Chung's LPR status.

153. Additionally, other reporting indicates that the Secretary of State identified a second lawful permanent resident (aside from Mahmoud Khalil) to be deported pursuant to the same Foreign Policy Ground.[82]

154. Upon information and belief, Ms. Chung is the second lawful permanent resident identified in this reporting.

155. The Notice to Appear (NTA) initially issued to Mr. Khalil states that "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States," citing to 8 U.S.C. § 1227(a)(4)(C)(i) of the Immigration and Nationality Act (part of the Foreign Policy Ground). The NTA further states that "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States." And the I-261 form, which supplements the NTA, states that the Secretary of State "has determined that your activities and presence . . . would compromise a compelling US foreign policy interest."[83]

156. As applied to Ms. Chung, the Rubio Determination is motivated by Ms. Chung's constitutionally protected past, current, or expected beliefs, statements, or associations. Public

---

[82] Nick Miroff, *There Was a Second Name on Rubio's Target List*, The Atlantic (Mar. 13, 2025), *available at* https://www.theatlantic.com/politics/archive/2025/03/trump-deportation-green-card-holder-mahmoud-khalil/682037/.

[83] *See* Ex. A, Renewed Motion to Dismiss or Transfer the Case, *Khalil v. Joyce*, ECF No. 90, No. 25-cv- 01963 (D.N.J.).

statements by government officials, up to and including the Secretary of State, establish that Respondents-Defendants seek to punish, detain, and silence Ms. Chung because of her constitutionally protected past, current, or expected beliefs, statements, or associations.

157. The applicable statutes expressly prohibit removal based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that not removing the noncitizen would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating 8 U.S.C. § 1182(a)(3)(C)(iii)). Upon information and belief, Secretary Mario Rubio has not provided any notification regarding a determination under the Foreign Policy Ground concerning Ms. Chung, or anyone else, to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

158. The issuance of the administrative arrest warrant, pursuant to the Rubio Determination, is motivated by Ms. Chung's constitutionally protected past, current, or expected beliefs, statements, or associations.

### Injury to Ms. Chung

159. Defendants-Respondents' actions have inflicted harm on Ms. Chung. The prospect of imminent detention, to be followed by deportation proceedings, has chilled her speech. Ms. Chung is now concerned about speaking up about the ongoing ordeal of Palestinians in Gaza as well as what is happening on her own campus: the targeting of her fellow students by the federal

government, the arbitrary disciplinary process she and others are undergoing, and the failure of the university to protect noncitizen students.[84]

160.    Ms. Chung's immediate family resides in the United States. Ms. Chung has not lived in her birth country, South Korea, since the age of seven.

161.    If Ms. Chung is detained and deported, she will be indefinitely separated from her family and community. Ms. Chung's parents reside in the continental United States, and her sister is set to start college in the United States in the fall.

162.    Ms. Chung's life is centered in the United States. She is engaged on campus in various social and academic endeavors. She associates directly with other students who speak out on campus on a variety of topics of public import. If Ms. Chung is further detained, transferred far from family or friends, or deported, her ability to advocate for other students, or support Palestinian rights advocacy, will be greatly harmed.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
**Retaliation, Discrimination, and Prior Restraint**
**(U.S. Constitution, First Amendment)**

163.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

164.    The Foreign Policy Ground laid out in 8 U.S.C. §§ 1227(a)(4)(C) and 1182(a)(3)(C)(iii) is unconstitutional as a facial matter, and also unconstitutional as applied to Yunseo Chung under the First Amendment.

---

[84] Murtaza Hussain, *Columbia University's Secret Disciplinary Process for Students Critical of Israel*, Drop Site News (Mar. 4, 2025), *available at* https://www.dropsitenews.com/p/columbia-university-gaza-student-disclinary-office.

165.     The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

166.     The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, No. 06 Civ. 1007(SHS), 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). The First Amendment applies to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted*), cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

167.     It is well-settled that the First Amendment protects against retaliation even where the government "mistakenly *thought* that the [individual] had engaged in protected speech" because "the government's reason . . . is what counts[.]" *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). This rule applies where the government's factual mistake pertains to participation in protest activity, *Hughes v. City of New York*, 680 F. App'x 8, 9–10 (2d Cir. 2017) (applying *Heffernan* to protected association claim arising from protest); *see also Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 30 (2d Cir. 2016) (applying *Heffernan* to associational activity), and even where that individual did not actually engage in protected conduct. *See McNichol v. Falco*, No. 16-cv-2119, 2020 WL 5802492, at *11 (S.D.N.Y. Sept. 28, 2020) ("[A] perceived

protected activity, in the absence of an actual protected activity, can nevertheless give rise to an actionable First Amendment [] claim."); *Burgess v. Banasike*, 636 F. Supp. 3d 351, 359 (W.D.N.Y. 2022) ("[A] plaintiff need not actually engage in protected conduct[.]").

168.    Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

169.    "To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir*, 923 F.3d at 66 (internal citations omitted).

170.    In addition, "the Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment . . . . Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley*, 578 F.3d at 525. To establish a claim of an unconstitutional "prior restraint" on future testimony, a plaintiff must show (1) that defendants presented "threats of punishment that are designed to discourage" the future testimony, (2) "that [plaintiff's] potential testimony . . . caused the . . .threats," and (3) that the defendants actions caused some injury. *Id.*

171.    Ms. Chung's speech is protected by the First Amendment. Ms. Chung's past speech pertains to matters of prominent public concern, including the ongoing Israeli military campaign

in Gaza, U.S. government support therefor, U.S. academic institutions' financial investments associated with Israel, and campus responses to advocacy for the rights of Palestinians.

172.    Defendants-Respondents are aware of Ms. Chung's speech and viewpoints. Defendants-Respondents are aware that Ms. Chung was arrested at a protest outside of a building at Barnard College relating to disciplinary proceedings for students involved in pro-Palestine protests. The arrests were covered in the press, and Ms. Chung was fingerprinted after the arrest, which would have alerted ICE to the arrest. Defendants-Respondents' actions come days after this protest and arrest.

173.    There is a substantial causal connection between Ms. Chung's protected speech and Defendants-Respondents' adverse actions and threats. Defendants-Respondents have taken adverse actions against Ms. Chung that are motivated by her past and future exercise, and perceived exercise, of First Amendment-protected speech, and have taken action to silence and discourage Ms. Chung from speaking out in the future.

174.    The Rubio Determination, the Policy, and the targeting of Ms. Chung violate the First Amendment because they:

   a.   Retaliate against and punish Ms. Chung for her past protected actual and perceived speech;

   b.   Prevent her from speaking now (through threat of detention and deportation);

   c.   Attempt to chill (through ongoing threat) or prevent (through eventual removal) her future speech in the United States;

   d.   Chill others from expressing views sympathetic to Palestinians or advocate for Palestinian rights.

175.    These speech-related consequences are the point of the Policy, the Rubio Determination, and the government's subsequent actions against Ms. Chung, and are, in their own telling, the result of their disagreement with her protected speech and the viewpoint it expresses.

176.    Defendants-Respondents' actions against Ms. Chung on the basis of Ms. Chung's protected speech do not serve a compelling state interest, and are not narrowly tailored to any legitimate government interest. Defendants-Respondents' actions operate as a prior restraint that will prevent Ms. Chung from engaging in protected speech.

**SECOND CLAIM FOR RELIEF**
**Violation of the Due Process Clause**
**(U.S. Constitution, Fifth Amendment)**

177.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

178.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

179.    The Foreign Policy Ground and its implementation through the Policy, the Rubio Determination, and Defendants-Respondents' attempts to detain Ms. Chung violate her due process rights under the Fifth Amendment as unconstitutionally vague and violative of Ms. Chung's substantive and procedural due process rights.

180.    The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

181.    The Foreign Policy Ground in the INA is unconstitutionally vague, both as a facial

matter and as applied specifically to Ms. Chung—a lawful permanent resident, living peacefully in the country, who has engaged and may engage in speech advocating for Palestinian rights, and speech relating to university discipline of protesters advocating for Palestinian rights.

182. The arbitrary and wrongful Policy and Rubio Determination also violate Ms. Chung's substantive due process rights because they are so egregious and outrageous that they may be fairly said to shock the contemporary conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998). Ms. Chung has no national or international profile; has not published material advancing her views; has not made public speeches; has not given interviews to the press; and has not taken actions that attracted national much less international attention. She has engaged alongside hundreds of her peers in local activism perceptible only to those in her immediate physical surroundings. There is no conceivable foreign policy impact from her speech acts whatsoever, unless the Policy and Rubio Determination are predicated on a theory of collective punishment under which noncitizen members of campus-based protests are punished for the Secretary's view of the aggregate adverse effect of the entire Palestine solidarity campus protest movement. Such a collective punishment theory cannot comport with due process.

183. The Fifth Amendment also requires fair, pre-deprivation process when a person's liberty hangs in the balance, another right Respondents-Defendants have so far denied Ms. Chung by attempting to detain her unlawfully.

184. The government's attempts to detain Ms. Chung are wholly unjustified. The government has not demonstrated that Ms. Chung—a long-term permanent resident of the United States, with no criminal convictions, and with parents and a sibling who also are permanent residents—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further twin goals of (1) ensuring noncitizen's appearance during removal proceedings and

43
JA 735

(2) preventing danger to the community). There is no credible argument for Ms. Chung's immigration detention, away from her friends and family.

### THIRD CLAIM FOR RELIEF
**Violation of the Immigration and Nationality Act, Administrative Procedure Act, and
*Accardi* Doctrine
(5 U.S.C. § 706; 8 U.S.C. §§ 1227, 1182)**

185.     Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

186.     The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Ms. Chung's "presence or activities" would carry "potentially serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C). The Secretary of State's personal determination that Ms. Chung's protected past, current, or expected speech, beliefs, statements, or associations may form a basis to deport her because her presence "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

### FOURTH CLAIM FOR RELIEF
**Violation of the Non-Delegation Doctrine**

187.     Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

188.     Congress has not provided the Executive Branch with intelligible principles from

which the Executive can implement 8 U.S.C. § 1227(a)(4)(C)(i)-(ii) or § 1182(a)(3)(C)(iii).

189. Congress has delegated discretionary authority that is standardless and unreviewable.

190. Congress has failed to provide standards or procedures to allow for judicial review of an agency's discretionary deprivation of a noncitizen's liberty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Vacate and set aside Defendants-Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech and advocacy for Palestinian rights;

3) Vacate and set aside the Rubio Determination as applied to Ms. Chung;

4) Enjoin Defendants-Respondents from taking any enforcement action against Ms. Chung arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

5) Enjoin Defendants-Respondents from detaining Ms. Chung pending these proceedings;

6) Enjoin Defendants-Respondents from transferring Ms. Chung away from the jurisdiction of this District pending these proceedings;

7) Enjoin Defendants-Respondents from removing Ms. Chung from the United States pending these proceedings;

8)    Declare that Defendants-Respondents' actions to arrest, detain, or transfer Ms. Chung violate the First Amendment, the Due Process Clause of the Fifth Amendment, the INA, the APA, the *Accardi* doctrine, and the non-delegation doctrine.

9)    Award reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or other statute; and

10)    Grant such further relief as the Court deems just and proper.

Dated: March 24, 2025              Respectfully submitted,
      New York, NY

**EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP**
_____/s/_____
Jonathan S. Abady
Katherine Rosenfeld
Sonya Levitova
One Rockefeller Plaza, 8th Floor
New York, NY 10020
(212) 763-5000

**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**
_____/s/_____
Naz Ahmad
Ramzi Kassem
Tarek Z. Ismail*
Mudassar Hayat Toppa
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4558

*Admitted to practice in the Eastern District of New York; application to waive into the Southern District of New York pending.*

**HUMAN RIGHTS FIRST**
_____/s/_____
Joshua Colangelo-Bryan

121 West 36th Street, PMB 520
New York, NY 10018
(212) 845-5243

**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA**
_____/s/_____
Jordan Wells
131 Steuart Street # 400
San Francisco, CA 94105
(415) 543-9444

**LAW OFFICE OF MATTHEW BRAY**
_____/s/_____
Nathan Yaffe
119 West 23rd Street, Suite 900
New York, NY 10011
(646) 253-0580

**JONATHAN HAFETZ, ESQ.**
_____/s/_____
Jonathan Hafetz
1109 Raymond Blvd.
Newark, NJ 07102
(917) 355-6896

*Attorneys for Plaintiff-Petitioner*

## VERIFICATION PURSUANT TO 28 U.S.C. § 2242

I submit this verification on behalf of Plaintiff-Petitioner Yunseo Chung because I am one of her attorneys at the CLEAR Project and have communicated with the other attorneys on her case. On information and belief, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: March 24, 2025

*/s Naz Ahmad*
Naz Ahmad
CLEAR Project, Main Street Legal
Services, Inc.
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101

# Exhibit B

# Exhibit M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Yunseo CHUNG,

*Plaintiff-Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States of America; Marco
RUBIO, in his official capacity as Secretary of
State, U.S. Department of State; Pamela BONDI, in
her official capacity as Attorney General, U.S.
Department of Justice; Kristi NOEM, in her official
capacity as Secretary of Homeland Security, U.S.
Department of Homeland Security; Todd M.
LYONS, in his official capacity as Acting Director,
U.S. Immigration and Customs Enforcement; and
William P. JOYCE, in his official capacity as
Acting Field Office Director of the New York
Immigration and Customs Enforcement Office,

*Defendants-Respondents*.

Case No. _____

## DECLARATION OF NAYANTARA BHUSHAN

I, Nayantara Bhushan, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1. My name is Nayantara Bhushan. I am a licensed attorney in good standing in the state of
   New York. I work at the Legal Aid Society.

2. I was connected to Yunseo Chung after her arrest on March 5, 2025.

3. On March 9, 2025, Ms. Chung received a text message from someone purporting to be
   from the police, asking to speak to her about her arrest. I have personally reviewed a
   screenshot of the text message.

4. I learned that simultaneously, Ms. Chung's parents had been visited by law enforcement agents at their home outside of New York City.

5. I called the number that had texted Ms. Chung in the evening on March 9, 2025.

6. This individual identified herself as Audrey, and as working with Homeland Security Investigations. I do not recall her last name.

7. She stated that HSI was looking for Ms. Chung and that they had an administrative warrant for her arrest.

8. When asked why there was an administrative warrant, the agent stated: "Due to the situation with the protesting, the State Department is at liberty to revoke her LPR status."

9. Later that same evening, I received a call and voicemail from someone identifying himself as an Assistant United States Attorney, Perry Carbone.

10. I passed his information along to Naz Ahmad, another attorney advising Ms. Chung.

Executed on:   March 23, 2025

Respectfully submitted,

_____
Nayantara Bhushan

JA 744

# Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL KROL, in his official capacity as HSI New England Special Agent in Charge, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State,

*Respondents*.

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

## <u>INTRODUCTION</u>

1.      Rümeysa Öztürk is an international PhD student who was arrested on March 25, 2025 when six plain-clothes federal officers surrounded her on the street just outside her home in Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her friends, family and legal counsel could not locate or contact her. After an exhaustive search, they learned that she had ultimately been removed from Massachusetts and sent more than 1,300 miles away to an ICE detention facility in Louisiana.

1

2.     Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.     Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.     The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.

[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

on the loss of status. In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.    Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## **JURISDICTION**

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.    Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel, or Department of Justice counsel on this case. Meanwhile, Respondents withheld information about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice attorneys on this case) until nearly 24 hours after she had been detained. On information and belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern and practice of moving people detained for their speech to distant locations incommunicado and in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## **PARTIES**

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.

10.     Respondent Patricia Hyde is named in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement.

11.     Respondent Michael Krol is named in his official capacity as the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## FACTS

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

meaningful engagement by the University administration with the Senate resolutions.

17.    In February 2025, the website Canary Mission published a profile on Rümeysa, including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ." The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism" was a link and screenshots of the March 2024 opinion piece.

18.    Canary Mission's publication caused Rümeysa to fear for her safety.

***Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana***

19.    On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer approached Rümeysa near her Somerville apartment.[4]

20.    The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in handcuffs and took her away in an unmarked vehicle.

21.    Rümeysa's friends frantically tried to find out more information about what had happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of habeas corpus in this Court.

22.    At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved outside the District of Massachusetts without 48 hours' notice.

23.    For more than 24 hours after her arrest, Rümeysa's friends, family and legal counsel did not hear from her and could not speak to her.

24.    Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

could become ill without access to her medication.

25.    On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.    These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.    A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.    Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.    At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.    Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.    Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

7

*Rümeysa's Visa Revocation and Removal Proceedings*

32.     ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.     A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.     A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.     On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.     On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.     The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

_____

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

8

**JA 753**

***Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights***

38.     Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.     In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

9

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

***The Trump Administration Announces its Policy to Target Speech of Noncitizens***

44.      Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.      Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.      Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

10

**JA 755**

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

47. In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48. On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49. Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50. As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

11

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51. Legislative history makes clear that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

52. Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

### *The Government Begins to Implement its Policy of Intimidation and Retaliation*

53.     On March 5, 2025, the State Department revoked the student visa of Ranjani

Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy

Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days

later, federal immigration agents showed up at her apartment looking for her, but she did not

open the door. They showed up again the following night, but she was not home. On March 13,

2025, agents returned to her home with a judicial warrant. DHS released a statement

characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and

being "involved in activities supporting Hamas," but the agency has not provided any evidence

for its allegations, and Srinivasan disputes them.

54.     On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal

permanent resident and recent Columbia University graduate, at his Columbia University student

housing. Khalil had previously expressed support for the rights of Palestinians. The agents

initially told Khalil that they were detaining him because his student visa had been revoked by

the State Department, but when Khalil's attorney informed the agents that he was a green card

holder, the agents responded that the State Department had revoked Khalil's green card, too. The

Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the

basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked

vehicle. Over the course of that evening and into the early hours of the following morning, Khalil

would first be taken to an ICE field office in Manhattan and then to a detention facility in New

Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil

remains detained in Louisiana.

55. On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo Chung, a legal permanent resident and Columbia University student who has lived in the United States since she was seven. Chung had previously expressed support for the rights of Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition for habeas corpus in the United States District Court for the Southern District of New York, and sought, among other things, a temporary restraining order preventing immigration enforcement officials from taking her into custody or transferring her out of the district. On March 25, 2025, the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19 (S.D.N.Y.).

56. On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas. To date, Suri remains in immigration detention.

57.    On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal,
a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to
serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody.
Taal had previously expressed support for the rights of Palestinians. The Justice Department
wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from
attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response
to that application, the government informed the court that the State Department had revoked
Taal's student visa.

### *High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech*

58.    Multiple government officials, including Secretary of State Marco Rubio, have
confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or
perceived First Amendment activity.

59.    On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA,
Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose
presence or activities have potentially serious adverse foreign policy consequences for our
country . . . And we will continue to use every legal means available to remove alien enemies."

60.    After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations
found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that
relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting
terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense
security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by
federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-
university-graduate-student-somerville-ice/.

61.     In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.     Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### *DHS Did Not Follow Ordinary Procedure*

63.     DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.     According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the

States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025),

https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that

purpose is "to study." *Id.*

65.     The Study in the States website lists consequences that can occur "[w]hen an F-

1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus

employment authorization," the student "cannot re-enter the United States on the terminated

SEVIS record," and ICE agents "may investigate to confirm the departure of the student."

*Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27,

2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately

depart the United States. *Id.*

66.     DHS does not indicate on its Study in the States website that loss of student status

may result in immediate arrest and detention. DHS departed from these expected procedures in

arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

68.     The First Amendment to the United States Constitution provides in part that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people .

. . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

Amendment protects past, present, and future speech, including speech by noncitizens.

69.     The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

  a. retaliate against and punish Rümeysa's past protected speech;

  b. prevent her from speaking now (through detention);

  c. attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

  d. deprive those with whom she would speak of her present and future speech on matters of public concern; and

  e. chill other individuals who express support for Palestinian rights.

70.     These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

## SECOND CLAIM
### Violation of Fifth Amendment Right to Due Process

71.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72.     The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73.     The government's detention of Rümeysa is unjustified. The government has not

18

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.     Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.     Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.     The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

**THIRD CLAIM**
**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**

77.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

78.     The government has adopted a policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

79.     In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy Ground.

80.     In order to be invoked in an instance involving a noncitizen's past statements, the Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest."

81.     Here, there is no indication that the Secretary of State ever made such a determination.

82.     To the extent the Secretary of State failed to make such a determination, the invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

20

83.     To the extent the Secretary of State purported to make such a determination, it is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

84.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

85.     Federal courts sitting in habeas possess the "inherent power to release the petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D. Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in the criminal habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned up).

86.     This petition raises substantial constitutional and statutory claims challenging Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has asthma and has already suffered an asthma attack while in ICE custody, raising concerns about future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

21

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

## **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

1)     Assume jurisdiction over this matter;

1)     Require Respondents to return Petitioner to this District pending these proceedings;

2)     Order the immediate release of Petitioner pending these proceedings;

3)     Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4)     Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5)     Restore Petitioner's SEVIS record;

6)     Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7)     Award reasonable attorneys' fees and costs for this action; and

8)     Grant such further relief as the Court deems just and proper.

Respectfully submitted,

[signature block on next page]

22

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

**Pro hac vice application forthcoming*

Dated: March 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

March 28, 2025                              */s/ Jessie J.Rossman*
                                           Jessie J.Rossman

# Exhibit D

An official website of the United States Government  <u>Here's how you know</u>

**Home** > ... > Secretary of State Marco Rubio and Guyanese Pre...

# Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**

**STATE HOUSE**

**GEORGETOWN, GUYANA**

MARCH 27, 2025



**MODERATOR:**  Please remain standing.  You may be seated.  You will be witnessing the signing of the MOU between Guyana and the United States this morning.  I now invite Foreign Affairs representative, Mrs. Peggy McLennan, to give an overview.

Cookie Settings

**MS MCLENNAN:** Thank you, Marcia. Your Excellency Mr. President, members of cabinet, ladies and gentlemen, today, Minister of Foreign Affairs and International Cooperation Hugh Hilton Todd and Secretary of State Marco Rubio are signing a Memorandum of Understanding between our two countries to deepen security cooperation and address regional challenges, including countering narcotics trafficking and transnational organized crime. Under this mechanism, Guyana and the United States will strengthen information sharing, synthetic drug detection, transnational organized crime investigations and prosecutions, and military-to-military cooperation.

**MODERATOR:** Thank you very much. We now have the signing between the two nations.

(The Memorandum of Understanding was signed.)

(Applause.)

**MODERATOR:** Thank you very much, and now I invite his excellency to address us.

**PRESIDENT ALI:** Good afternoon, all. Secretary Rubio, you are no stranger to Guyana. Secretary Rubio has been and continues to be a strong advocate for Guyana's development, democracy, and peace. He has consistently demonstrated his personal commitment to the national rule of law, democracy, and security.

Guyana and the United States share a long bond of friendship and partnership. Indeed, the best of partnerships are those built on shared values, neutral trust, and a commitment to the rule of law and international order. This is what underpins our bilateral relationship and friendship. The United States is our trusted partner as we continue to build a stable, secure, and democratic society here.

This visit has allowed us to consolidate our bilateral agenda – defining policies and outlining clear intentions in areas of security, trade, energy, investments, infrastructure, democracy, regional peace and stability, human capital deployment, and development. I am very pleased at the reassurance of the U.S. in ensuring the safeguard of our territorial integrity and sovereignty. Our partnership and joint commitment to the safeguard of this region from every disruptive force is key to the maintenance of democracy and adherence to the rule of law.

The threats from Venezuela were specifically discussed.  Their blatant violation of the ICJ order and Argyle Declaration were noted.  Our joint commitment in enhanced partnership in combating transnational crime – inclusive of narcotrafficking, human trafficking, money laundering, and all forms of smuggling – is reflected in an enhanced MOU signed today.

We have reassured our partner that we'll continue to ensure all international and local labor laws are adhered to in the hiring of regional and international labor.  Further, with our expanding healthcare system and critical shortage of human capital, we'll explore areas of collaboration, filling existing gaps.

We were able to identify key infrastructure that are also critical to regional development as possible areas for investment and development.  We have committed to working closely together on the deployment of our energy potential, ensuring greater integration, value creation, and regional energy security, food security, and enhanced trade through joint initiatives to remove hurdles and expand existing areas of interest is key for both countries.  I am confident that the outcome of this visit has further aligned our policy agendas, shared commitment, and partnership that will see enormous benefits for our two countries and the region.

Let me once again thank Secretary Rubio for his personal commitment and that of the U.S. government to Guyana and this region in general.  I thank you.

(Applause.)

**SECRETARY RUBIO:**  Thank you.  Thank you, Mr. President.  And we have been working together and interacting for some time during my time in the Senate, but I told him I wanted to wait until I was Secretary of State to visit, and so here I am.  And I didn't know that was going to happen, but I'm grateful for your – for this visit and for the warm welcome we've received, and it's an exciting time to be here.

I think – and to the people of Guyana, thank you for welcoming us.  I hope you fully appreciate and understand this is one of the most exciting places in the world to be right now, because you have the opportunity, at this moment, to transform this country for generations, and we want to be your partner.  We want to be your partner in making that possible.  We think it's of mutual benefit to see that happen.

I get to visit in this job – already have – a number of countries in the nine weeks.  I've only been on the job for nine weeks, so let the record reflect after nine weeks this was one of my first visits here that I've taken abroad.  But we get to visit a lot of counties and when you visit you have some countries, unfortunately, are facing tremendous challenges and they're just looking to stabilize.  Other countries are looking to improve and make progress.  This country has an opportunity to transform.  And that's rare in the history of nations, to have an opportunity for transformative change.  And what I mean by transformative change is not simply oil and gas fields.  And that's very important – natural resources are critical – but that is just the basic ingredient that allows prosperity to happen.

One of the topics that's talked about all over the world today is data centers and the digitization of the economies, artificial intelligence.  Do you know what you need in order to do that?  You need to have really good scientists, and engineers, and technicians that know how to run it.  But the most important thing you need to be a dominant presence in the world in data centers and artificial intelligence is reliable and affordable energy.  That's just one example, among many others.

You have an opportunity to expand, in a responsible way, agriculture production, not just for the needs of your population but for the region, and to do it in a way that safeguards the beauty and the natural environment, that's pristine.  You have an opportunity to expand in issues of ecotourism.  I'm not a big fan of ecotourism – not – I'm not against ecotourism; I'm not an ecotourist.  I like staying at hotels.  I'll do it; maybe I'll go somewhere.  But there are people that love this stuff.  They love it.  And you have an opportunity to do that in an incredibly responsible way.

I'm just touching on a few things, but – that are opportunities before you.  And that shared prosperity for your country that will come as a result of that is transformative.  The lives of your children, the lives of your grandchildren, your lives are going to look very different in five to ten years under this leadership and under this vision as it continues, and we just want to be a partner.

Why do we want to be a partner?  Let's – just to be frank, why does the United States care about it?  Number one, we care about it because we think it creates a level of stability in the region which we share – which we share.  Not just stability here, stability for your neighbors, because we believe prosperity can become contagious.  Just like instability can become contagious, stability

and prosperity can become contagious.  It won't just help you, it will help all of your neighboring partners in the Caribbean Basin and the region writ large, and we think that ultimately makes life in America safer and more prosperous as well.  And so we wanted to look for every opportunity possible to partner with you.

But the basic element of any of this, the basic element of progress and transformation and prosperity, is always security.  So number one, we want to make sure that some of the tragic regional problems that exist with crime, transnational crime – we have a huge problem in the world right now with organized gangs and narcotraffickers that destabilize societies – we want to make sure that never reaches here.  And that's why today's MOU and the work we'll do together will – is designed not to stop it, but to prevent it from ever taking root, from ever finding its way here.  Because unfortunately, sometimes crime is attracted by prosperity and targets prosperity.

And the other are regional threats – the regional threats based on illegitimate territorial claims by a narcotrafficking regime.  And I want to be frank, and I've said this during my time as a senator, and I have full confidence in saying now as the Secretary of State:  There will be consequences for adventurism.  There will be consequences for aggressive actions.  And that's why our partnership in that regard will be important.  That is not what we want to be a feature of our relationship, but it is a necessity of our relationship, because you have a very difficult challenge on your hands with a dictator that's making illegitimate territorial claims.

And so you have our full commitment and support – today we're demonstrating it – both in tangible ways, and we're going to look for ways to make it long-term and sustainable ways, to make abundantly clear that we are invested both as a nation and from our people in being your partner in transformation and in prosperity.  And we will not allow illegitimate territorial claims to be an impediment to your dreams and to your right to develop this country into a symbol that I hope will inspire others to follow the example you set, Mr. President.

So thank you.  Thank you for the chance to be with you.  (Applause.)

**MODERATOR:**  Thank you very much, Excellency, and Secretary Rubio.  Members of the media, in the interests of time, we will accommodate four questions.  We will feed two questions from the local media, and two from our visiting media.  I recognize Stabroek News from the local media, as well as Mr. Campbell from the local media.  From the visiting media – okay, you represent?  Good.  Great.  And – all right, we'll start with Marcelle from Stabroek News.

**SECRETARY RUBIO:**  Hi.

**QUESTION:**  Good afternoon, sir.

**SECRETARY RUBIO:**  Good afternoon.

**QUESTION:**  Marcelle Thomas from the Stabroek News.  You just spoke of consequences for aggressive actions, and that the U.S. is Guyana's partner.  Given Venezuela's unprovoked aggression towards Guyana, I want to know if your country would stand by Guyana militarily if Venezuela were to attack this country.  And what would be the U.S.'s response should Venezuela attack U.S. oil major ExxonMobil, which is operating in Guyana's waters?

**SECRETARY RUBIO:**  It will be a very bad day for the Venezuelan regime if they were to attack Guyana or attack ExxonMobil or anything like – it would be a very bad day, a very bad week for them.  And it would not end well for them.  (Applause.)  I'm not going to get into details of what we'll do; we're not big on those kinds of threats.  I think everybody understands, and I want it to be clear – we've made this clear repeatedly – I think the U.S. Navy today is making it clear and demonstrating our ability to – we have a big navy and it can get almost anywhere in the – it can get anywhere in the world.  And we have commitments that exist today with Guyana.  We want to build on those and expand on those.  And we'll leave it for the appropriate time, but suffice it to say that if that regime were to do something such as that, it would be a very bad move.  It would be a big mistake for them.

**MODERATOR:**  We now invite from our visiting media.  Please remember to identify yourself and the media house you represent.

**QUESTION:**  Hi, thank you.  Hello, Mr. Secretary.

**SECRETARY RUBIO:**  Hi.

**QUESTION:**  Hello, Mr. President.  Thank you for taking questions from us.  We appreciate it. Humeyra Pamuk from Reuters.  Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents.  A year ago she wrote an opinion piece about the Gaza war.  Could you help us understand what the specific action she took led to her visa being revoked?  And what was your State Department's role in that process?

**SECRETARY RUBIO:** We revoked her visa. It's an F1 visa, I believe. We revoked it, and here's why – and I'll say it again; I've said it everywhere. Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world – let me just send this message out – if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple.

I think it's crazy – I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors – they're visitors – and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people. I don't care what movement you're involved in. Why would any country in the world allow people to come and disrupt? We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that, we're going to take it away.

I encourage every country to do that, by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it. We're just not going to have it. So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave. Every country in the world has a right to decide who comes in as a visitor and who doesn't.

If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and spray-painting your kitchen, I bet you you're going to kick me out. Well, we're going to do the same thing if you come into the United States as a visitor and create a ruckus for us. We don't want it. We don't want it in our country. Go back and do it in your country, but you're not going to do it in our country.

**QUESTION:** A follow-up?

**SECRETARY RUBIO:** Sure. Just tell me your follow-up and I'll tell every – and depending on your question, I'll answer it or not.

**MODERATOR:** No follow-up questions. All right. I now invite our Guyanese –

**SECRETARY RUBIO:** No, no. She had – can I get her follow-up real quick? Go ahead.

**QUESTION:** Could you confirm – there's new reporting that 300 visas – State Department has revoked 300 (inaudible).

**SECRETARY RUBIO:** Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa.

**QUESTION:** It could – you're saying it could be more than 300 visas?

**SECRETARY RUBIO:** Sure. I hope – I mean, at some point I hope we run out because we've gotten rid of all of them. But we're looking every day for these lunatics that are tearing things up. And by the way, we want to get rid of gang members, too.

So Venezuela sent us a bunch of gang members. I'm sure you've heard of Tren de Aragua, Mr. President – a terrible gang, vicious gang. They flooded in our – yesterday – just so everybody knows, yesterday one of these gang members who was involved in New York City in attacking a police officer was deported back to Venezuela, because they're now taking flights again because of some strong measures we've taken. And this guy lands – this guy's a guy that attacked a police officer in New York City and laughed about it in court with a smirk on his face. When he gets off the plane in Venezuela, he's welcomed by this character named Diosdado Cabello. I don't know if you've heard of this guy. And he welcomes him, hugging the guy. So does anybody have any doubt that these people are pushing these people into the United States to destabilize us and the region?

So yeah, we're looking for people like this, and we want to get them out of the United States, absolutely.

**MODERATOR:** Thank you. We'll now field a question from Guyana.

**QUESTION:** Thank you. Kurt Campbell, Newsroom. President Ali, you've already spoken about how President Trump's plans – tariff plans for China's ships could affect regional trade. I just wanted to know if in your trade talks today if that issue was specifically discussed –

**SECRETARY RUBIO:** Yes.

**QUESTION:** – by Secretary of State Rubio.

**SECRETARY RUBIO:** And I can tell you – oh, you're asking him. I'm sorry. (Laughter.)

**QUESTION:** It's for both of you. What assurances can you give Guyana and this hemisphere in terms of stemming indirect consequences?

**SECRETARY RUBIO:** Yes. Well, that's – look, the goal the President has in doing so is we need to have an ability to build ships in this world that don't just come from China, okay. I think it's just dangerous to have one country in the world building all the ships. I assure you that – and we don't want a war, but I mean, they're not going to build ships for us if we get in trouble, right? So we need to have alternatives to Chinese ships, and we're trying to create a market and a demand for alternatives to Chinese shipping construction. And I'm the first one to admit that the United States made a terrible mistake when we deindustrialized and we allowed all these industries to leave our country and go to other places. Now we're paying the consequences, but we have to fix it.

So I do believe – I can't speak – I don't – the trade portfolio does not belong to the Department of State, but I do believe that we will take this back because we've heard this not just here, Mr. President. We've heard it throughout our visits here in the Caribbean. And we're going to take it back and explain to those who are in charge of trade policy that there are some implications to applying it to certain nations who are partners and who are seeking to develop their economies in ways that I think serve the national interest of the United States, not to mention the national interest of our partners nations, and seeing what can happen.

So I can't make a commitment to those exempt, because that's not something we handle in the Department of State. What I can commit to is that I will most certainly raise this issue as a recurring issue, in multiple places, that it would have a real detrimental effect on economic development. Maybe in 10 years it won't be an issue because there's been some diversification, maybe in five, but right now it would be problematic. That message I'll take back to Washington

JA 779

and to my colleagues that are handling the trade portfolio, and we'll see how the President decides to proceed. But rest assured we will take that message back.

**PRESIDENT ALI:** And just to echo the sentiments that, yes, we did discuss it and the region would have raised it also. But there Secretary Rubio is – as he said, will take this back and to see whether there can be any special initiative for the region, given our specific circumstances.

But let me say also that we have a responsibility to our friends. The U.S. is a great friend of ours. The U.S. would have made it very clear that they are ready to stand by us in our development, in our economic expansion, in our security, and in our defense. And I will say very boldly that such friends must have some different and preferential treatment, because a friend who will defend me when I need a friend to defend me, must be a friend that enjoys some special place in our hearts and in our country, and that will be the case. Thank you.

**QUESTION:** And just quickly, illegal migration was also listed as a topic of discussion. Could you say what are the expectations from Guyana in this regard and any discussions on third-country deportations?

**SECRETARY RUBIO:** Well, we want to work with you on that. I think that's a problem for you as well. I mean, obviously, because of the combination of your growing economy, labor needs, and your geography, you have been a place where a lot of people have come in, and I think you want it to be the right people, right? So I think if we have information that someone has entered your country who has bad intentions, we want to be able to share that with your government because you don't want that.

You don't want those – if we have information on a Tren de Aragua gang member from Venezuela, we want to make sure that we're – we have collaboration and we're sharing that information. If we have information that some narcotrafficker is taking up shop here and has decided to try to turn this into a base of operation, which could become – could lead to violence and warfare here, gang warfare, we want to be able to share that with you. We want to prevent these problems from happening.

So from the perspective of Guyana, which is not a source country of migration to the United States per se – illegal migration – but it is a country that receives, unfortunately, you're getting a lot of people. And not everybody that comes here – I mean, most people are probably here to

**JA 780**

work hard and so forth, but not everyone. So if we have information that someone is in your country that we know is a bad person, we want to be able to share it with you. We want to be able to share it with you very quickly. So that sort of information sharing has to be a cornerstone of this security agreement that we've signed today and want to continue to expand upon.

**MODERATOR:** We will now field our final question from our visiting media.

**QUESTION:** Thank you so much. Vera with the – Vera Bergengruen with Wall Street Journal.

**SECRETARY RUBIO:** They're very tough, this Wall Street – be careful. All right. (Laughter.)

**QUESTION:** Secretary Rubio, when you and President Bukele – you mentioned Tren de Aragua several times. When you and President Bukele negotiated the deal to transfer the U.S. deportees to his prison in CECOT, did you discuss any provisions to ensure that individuals mistakenly identified as gang members would have access to legal recourse and that they can secure their release if they are wrongly brought – wrongfully detained?

**SECRETARY RUBIO:** Yeah, we have – that list was carefully vetted, provided to us by Homeland Security. We have confidence in it. What we negotiated is the reality that they, in El Salvador, comply with all the international requirements for imprisonment. So we sent them people. It was a combination of people – gang members, people we knew were involved in activities that were not productive to the United States, all of them removable in terms of our laws, all of them; every single one of them was someone who was removable from the United States irrespective – and MS-13 members, some of – many of whom are Salvadoran that we had identified as MS-13 members, that they had helped us identify as well. And that – so it was a combination of people that we sent. And we may send more. We'll see. I mean, it's up to their willingness to accept, but we are grateful to them for the opportunity to do that.

And remember, one of the reasons why we had to send some of those people there was because at the time Venezuela wasn't taking their people back. The Maduro regime – I say Venezuela, but it's not – it's the Maduro regime – was not taking their people back. They refused to take people back, their own people. They have an obligation. If you are a country and someone is illegally in another country, you have an obligation to take those people back, whether they're criminals or not. Venezuela said they wouldn't take them back, so we had to find a place to send them,

especially the ones that had records and – or ones that we had strong suspicions and evidence that were involved in illicit activity.

And so we had to send some to El Salvador because of that.  Now they've taken them back.  And one of them yesterday gets off an airplane, and this narcotrafficker Cabello greets him and hugs him on the tarmac.  Now, what I heard ultimately, by the way, is that some of these gang members we sent back were so bad to Venezuela – they were so bad that after hugging them, maybe not this guy but I don't know, they had to put four or five of them back in jail.  Because that's how dangerous these people are, even though they hugged them on the tarmac and put on this show.

These are some really bad people.  Tren de Aragua is one of the most dangerous gangs the world has ever seen, okay?  When they were held temporarily in Guantanamo while being transferred to Honduras because that's when the Venezuelans picked some of them up, the Marines at Guantanamo said these are some of the roughest people we've ever interacted with.  They were worse than the al-Qaida guys that were in their jails.  Think about that.  So that's who we're getting rid of, and we want to get rid of more of them.

**MODERATOR:**  Ladies and gentlemen, members of the media, this brings the end to our media conference.  And I would like to invite his excellency and Secretary Rubio for a photo op right on the stage.  (Applause.)

---

TAGS

Bureau of Western Hemisphere Affairs    Combating Drugs and Crime

Economic Growth and Prosperity    Economic Prosperity and Trade Policy    Energy    Energy

Guyana    Office of the Spokesperson    Official International Travel    The Secretary of State

Venezuela

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

BADAR KHAN SURI,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States;

Russell HOTT, in his official capacity as Field
Office Director of Washington, Immigration and
Customs Enforcement;

Jeffrey CRAWFORD, in his official capacity as
Warden of Farmville Detention Center;

Todd LYONS, Acting Director,
U.S. Immigration and Customs Enforcement;

Kristi NOEM, in her official capacity as Secretary
of the United States Department of Homeland
Security;

Marco RUBIO, in his official capacity as Secretary
of State; and

Pamela BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents*.

Case No. 1:25-cv-480

**PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## INTRODUCTION

1.    This case concerns the government's targeted, retaliatory detention and attempted removal of a postdoctoral fellow at Georgetown University based on his family connections and constitutionally protected free speech. Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in lawful status as a visiting scholar pursuant to lawful admission. The Trump administration has openly expressed its intention to weaponize immigration law to punish noncitizens whose views are

**JA 785**

deemed critical of U.S. policy as it relates to Israel. In this case, the government appears to be targeting Mr. Suri, a noncitizen, due to his U.S. citizen wife's identity as a Palestinian and her constitutionally protected speech.

2.    On March 17, 2025, Badar Khan Suri, a J-1 visa holder, was arrested and charged with removability under 8 U.S.C. §1227(a)(4)(C) and detained. This was done pursuant to a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Suri solely for their family ties to those who may have either expressed criticism of U.S. foreign policy as it relates to Israel, or who are perceived to hold such critical views imputed to them due to familial relationship. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and remove such individuals from the United States.

3.    Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Suri (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Suri's lawful activity protected by the First Amendment, his wife's lawful activity protected by the First Amendment, and his wife's familial relationship. Neither Secretary Rubio nor any other government official has alleged that Mr. Suri has committed any crime or, indeed, broken any law whatsoever.

4.    Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Suri, detain him, and place him in removal proceedings. On the evening of March 17, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Suri with no prior notice at his home and initiated proceedings to remove him from

this country.

5.    Mr. Suri is, upon information and belief, detained at Farmville Detention Center in Farmville, VA, Prince Edward County. He is at imminent risk of being moved to a detention facility in Los Fresnos, Texas, on the Mexican border.

6.    Mr. Suri lives in Rosslyn, Virginia. On March 17, 2025, he was coming back home from iftar. Law enforcement agents surrounded him outside of his building.  Mr. Suri called his wife, Mapheze Saleh, immediately. The agents identified themselves as members of the Department of Homeland Security and stated that the government had revoked his visa.

7.    Mr. Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents and stood with Mr. Suri and multiple agents outside for about 10 minutes. The agents had face coverings, and Ms. Saleh could only see their eyes. The officers took Mr. Suri's passport and DS-2019 form, but they did not permit his wife to hand over the passport or other documents directly to Petitioner. Approximately two hours later, Mr. Suri called Ms. Saleh to state he was being transferred to a detention center in Farmville, VA. Mr. Suri and Ms. Saleh have three children.

8.    Mr. Suri and his U.S. Citizen wife, Mapheze Saleh, have long been doxxed and smeared. Ms. Saleh is featured with her photograph and academic affiliation on the anonymously-run blacklisting site, The Canary Mission, which includes her former employment at Al Jazeera and her city of birth, Gaza City, as support for her alleged ties with Hamas. The Canary Mission website maintains a blacklist of individuals perceived to support Palestinian rights and is infamous for bullying, slandering, and defaming academics and students. In addition, Mr. Suri and Ms. Saleh have been smeared by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a

lobbying and media monitoring group that spreads misinformation and seeks to discredit American Muslims.

9.  The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Suri, and plans to whisk him 1,600 miles away in the same manner as the government did in the case of Mr. Mahmoud Khalil, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Mr. Suri's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Suri's lawful and protected speech. The Rubio Determination and Mr. Suri's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious, contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Suri's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

10. Petitioner Badar Khan Suri is a citizen and national of India. He is married to a U.S. citizen, and is in the United States in J-1 status as a visiting scholar after having been duly admitted. He is currently teaching a course on Majoritarianism & Minority Rights in South Asia and as a postdoctoral fellow.  He hopes to become a university professor and embark on a career in academia and teaching.  Petitioner has no criminal record and is not being charged with any crime.

11. Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

12. Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

13. Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner is detained. In this capacity, he is responsible for the immediate execution of detention over Petitioner and is the immediate custodian of Petitioner. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

14. Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

15. Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland

Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

16. Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

17. Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

JA 790

18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

19. An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

20. Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Suri was being held in Farmville, VA, when this habeas was initiated. At the time of filing, the detainee locator failed to update Mr. Suri's location. However, upon information and belief, Mr. Suri is, at the moment of this filing, physically within the Commonwealth of Virginia.

## FACTS

### *The Trump Administration's Hostile Campaign Against Palestinians and Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech*

21. In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. These campus protests resulted in opponents of these students' messages—including President Donald J. Trump—to characterize campus speech in favor of Palestinian rights as inherently supportive of

Hamas and antisemitic. For example, in several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

22. During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestine activities on university campuses.

23. For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

24. In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[1]

25. Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

---

[1] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump- schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis")

*President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors*

26.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

**27.**     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

**28.**     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [*sic*] who participated in pro-jihadist protests" that the federal government "will find you… and

deport you."

*The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy*

29.    In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

30.    Earlier this month, media reports described widespread fear of retaliation for pro-Palestine speech among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."

31.    On or before March 7, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Suri for his family relationship and constitutionally protected free speech. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport such individuals.

32.    In the days since Mr. Khalil's arrest, there have been reports of other instances of visa revocations of individuals purportedly based on their participation in Palestine-related speech. On March 13, Secretary of Homeland Security Kristi Noem announced that another Columbia student, Ranjani Srinivasan, who had participated in student protests on Columbia University's campus had her student visa revoked, and a third individual,

Leqaa Kordia, who had been arrested on Columbia's campus in April 2024, was arrested by ICE.

33. Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

34. The Rubio Determination was exclusively motivated by Mr. Suri's family relationship and constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing, detaining, and attempting to silence Mr. Suri.

35. The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

36. Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years,

the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

37. Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

38. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

39. The Rubio Determination and Policy Mr. Suri's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

- retaliate against and punish Mr. Suri for his or his wife's past protected speech, or speech imputed to him or his wife as a result of his family relationship;

- prevent him from speaking now (through detention);

- attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

- deprive audiences of his present and future speech on matters of public concern; and

- chill other individuals who express support for Palestinian rights.

40. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Suri and those similarly situated, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

### SECOND CLAIM
#### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

41. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

42. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

43. The government's detention of Mr. Suri is wholly unjustified. The government has

not demonstrated that Mr. Suri—a husband to a U.S. citizen, a father of three young

children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S.

at 690 (finding immigration detention must further the twin goals of (1) ensuring the

noncitizen's appearance during removal proceedings and (2) preventing danger to the

community). There is no credible argument that Mr. Suri cannot be safely released

back to his family.

44.    Moreover, Mr. Suri's detention is punitive as it bears no "reasonable relation" to any

legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration

detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole

basis of his detention—the Foreign Policy Ground and the Rubio Determination—are

unlawful for the reasons discussed *supra*. Here, there is every indication that his

"detention is not to facilitate deportation, or to protect against risk of flight or

dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510,

532-33 (2003) (Kennedy, J., concurring).

45.    The Policy and the Rubio Determination also violate Mr. Suri's right to due process.

The government's policy of Foreign Policy Ground making such determinations

concerning people like Mr. Suri—who is in valid J-1 status, living peacefully in the

country is unconstitutionally vague where it is due to perceived or actual

constitutionally protected free speech and familial relationships.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

46.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs

of this Complaint-Petition as if fully set forth herein. The government has adopted a

policy of targeting noncitizens for removal based on First Amendment-protected

speech advocating for Palestinian rights, including the speech of close family members. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM

### Release on Bail Pending Adjudication

47. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

48. Under 28 U.S.C.A. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C.A. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010)

49. This petition raises numerous substantial constitutional and statutory claims challenging Mr. Suri's retaliatory detention. Extraordinary circumstances exist that make Mr. Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment-protected speech advocating for Palestinian rights and/or their family relationships;

3)      Vacate and set aside the Rubio Determination;

4)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5)      Order the immediate release of Petitioner pending these proceedings;

6)      Order the release of Petitioner;

7)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)      Award reasonable attorneys' fees and costs for this action; and

9)      Grant such further relief as the Court deems just and proper.


Dated: March 18, 2025

Sterling, Virginia

/s/*Hassan Ahmad*
Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com
*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that on this date, I filed this Petition for Writ of Habeas Corpus and all attachments using the CM/ECF system. I will furthermore mail a copy by USPS Certified Priority Mail with Return Receipts to each of the following individuals:

Jeffrey Crawford, Warden
Farmville Detention Center
P.O. Drawer N
508 Waterworks Road
Farmville, VA 23901

Russell Hott, Field Office Director
U.S. Immigration and Customs Enforcement, Washington Field Office
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Kristi Noem, Secretary
U.S. Department of Homeland Security
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Todd Lyons, ICE Director
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Jessica D. Aber, U.S. Attorney
c/o Civil Process Clerk
Eastern District of Virginia, Alexandria Division
2100 Jamieson Avenue
Alexandria, VA 22314

Dated: March 18, 2025          /s/*Hassan Ahmad*
                               Hassan Ahmad (VSB #83428)
                               The HMA Law Firm, PLLC
                               6 Pidgeon Hill Dr, Suite 330
                               Sterling, VA 20165
                               T: 703.964.0245
                               hma@hmalegal.com
                               *Counsel for Petitioner*

**JA 801**

# Exhibit F

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Mar 15 - 2025**

John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOMODOU TAAL, MŨKOMA WA NGŨGĨ, and SRIRAM PARASURAMA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; <br><br> Defendants. | **COMPLAINT** <br><br> Civil Action No. 3:25-cv-335 (ECC/ML) <br><br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This action seeks to enjoin Defendants Donald J. Trump, the Department of Homeland Security ("DHS"), and DHS Secretary Kristi Noem from enforcing parts of two executive orders ("Orders") – Executive Order 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 30, 2025), ("EO 1"), and Executive Order 14188, "Additional Measures to Combat Anti-Semitism," 90 Fed. Reg. 8451 (Feb. 3, 2025), ("EO 2") – against Plaintiffs and similarly situated persons.

2.      The unprecedented and sweeping character of these Orders – coupled with the threat of imminent enforcement – has unconstitutionally silenced Plaintiffs and chilled protected expression, prohibiting them from speaking, hearing, or engaging with viewpoints critical of the U.S. government or the government of Israel, under threat of criminal prosecution or deportation.

1

These Orders violate the First and Fifth Amendments of the U.S. Constitution and must be enjoined, at least in part.

3.      EO 1 prohibits non-citizens lawfully living in the U.S. – such as Plaintiff Momodou Taal ("Mr. Taal") – from engaging in constitutionally protected speech that Defendants may subjectively interpret as expressing a "hostile attitude" toward U.S. "citizens, culture, government, institutions, or founding principles" on penalty of deportation.

4.      EO 2 declares that "[it] shall be the policy of the United States" to use "all available and appropriate tools" "to prosecute, remove or otherwise hold to account" citizens and non-citizens who engage in activity that Defendants label as "anti-Semitic." EO 2 further mandates the creation of mechanisms to monitor, surveil, and report the lawful expressive activities of non-citizen students, faculty, and staff on university campuses – explicitly linking such surveillance to immigration enforcement including deportation. While EO 2 claims to address harassment based on Jewish identity, public statements by Defendant Trump and other officials reveal that Defendants conflate criticism of the Israeli government and participation in pro-Palestinian advocacy – such as protests against the Israeli military's operations in Gaza – with antisemitism.

5.      Both Orders violate the constitutional rights of U.S. citizens and non-citizens alike by impermissibly restricting speech based on viewpoint, in violation of the First Amendment. They also raise serious due process concerns under the Fifth Amendment by threatening severe penalties – such as deportation or criminal prosecution – based on vague, subjective, and overbroad standards that grant unfettered discretion to government officials. The chilling effect is  lreadyy being felt by both citizens and noncitizens, including Plaintiffs Mūkoma Wa Ngũgĩ ("Prof. Wa Ngũgĩ") and Sriram Parasurama ("Mr. Parasurama"), who now fear government

2

**JA 804**

retaliation for engaging in constitutionally protected expression critical of U.S. foreign policy and supportive of Palestinian human rights.

6.      Defendants' own statements make clear that the Orders are intended to suppress dissenting viewpoints. A White House Fact Sheet released on January 30, 2025, accompanying EO 2 acknowledges that its language is "unprecedented."[1] The Fact Sheet claims that American universities are overrun by "pro-Hamas aliens and left-wing radicals," and that the Orders are designed to suppress speech occurring at "leftist, anti-American colleges and universities." In May 2024, Defendant Trump stated: "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[2]

7.      The threat of adverse immigration enforcement – including deportation – against Mr. Taal is imminent and real. The Fact Sheet "promises" that *every* non-citizen student visa holder residing in the U.S. will be deported by the end of the calendar year if they merely participate in a demonstration in support of Palestine. It quotes Defendant Trump: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

---

[1] *See* The White House, Fact sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[2] Josh Dawsey, Karen DeYoung, & Marianne LeVine, *Trump told donors he will crush Pro-Palestinian protests, deport demonstrators*, WASH. POST. (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

3

8.      At the end of February 2025, in an apparent reference to both citizen and non-citizen students, Defendant Trump's Senior Counsel to the Department of Justice's Civil Rights Division, Leo Terrell, stated: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years." Terrell added that "a lot is going to happen in the next four to five weeks," and that once protestors face a threat of jail time, "it will stop."[3]

9.      Indeed, enforcement began shortly thereafter. On March 9, 2025, Defendant DHS arrested and detained Mahmoud Khalil, a former Columbia University graduate student and prominent participant in pro-Palestinian campus demonstrations. On March 10, 2025, Defendant Trump stated: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."[4]

10.      As a non-citizen lawfully living in the U.S., Mr. Taal is entitled to First Amendment protection. The chilling effect imposed by the Orders violates his right to free speech. EO 2's encouragement of the criminal prosecution for engaging in constitutionally protected expression likewise violates his and the citizen-Plaintiffs' First Amendment rights. The Orders also violate Plaintiffs' First Amendment right to receive information, including the right to hear

---

[3] Jewish News Syndicate, DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years', NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/.
[4] Donald Trump (@realDonaldTrump), Truth Social (March 10, 2025, 1:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

4

and engage with each other's speech. Both Orders infringe on all Plaintiffs' right to free association, creating a reasonable fear that public association could be construed as "evidence" of antisemitism or a "hostile attitude" toward the U.S. government.

11.     Each Order is also unconstitutionally vague and overbroad. EO 1 imposes an amorphous and subjective standard for what constitutes a "hostile attitude" toward U.S. "government," "institutions," "culture," or "founding principles," depriving Plaintiffs of fair notice and sweeping up substantial amounts of protected speech. EO 2 does the same with regard to activity Defendants may interpret as "anti-Semitic." Vagueness in the First Amendment context demands the highest degree of judicial scrutiny – especially where, as here, the penalties include deportation, criminal prosecution, and the permanent disruption of Plaintiffs' lives and academic careers.

12.     Even Defendants acknowledge the unprecedented breath and scope of these content-based speech restrictions. The chilling effect has already impacted millions across the country. As of November 2024, there were an estimated 1.1 million non-citizens holding valid student visas in the U.S.,[5] alongside millions of citizen peers, professors, and colleagues whose free speech, association, and due process rights are also impaired by the Orders. Not even during wartime has any branch of government attempted to prohibit such a large segment of the population from criticizing the U.S. government, the president, Congress, the Supreme Court, or a foreign government. As Defendant Trump said, the goal is to force people to "behave."

---

[5] Inst. of Int'l Edu., United States Hosts More Than 1.1 Million International Students at Higher Education Institutions, Reaching All-Time High, INST. OF INT'L EDU. (Nov. 18, 2024), https://www.iie.org/news/us-hosts-more-than-1-1-million-intl-students-at-higher-education-institutions-all-time-high/.

5

13.     Whatever broad authority the President may hold over non-citizens seeking initial entry into the United States, those "plenary powers" do not justify the sweeping domestic content-based speech restrictions imposed here. Defendants' attempt to bar non-citizens from criticizing the U.S. government, its institutions, American culture, or the government of Israel – and to prohibit citizens form hearing those views – serves no legitimate government interest in preventing terrorism or enforcing immigration laws. The justifications offered are pretextual and dangerous. Criticism of the U.S. government does not constitute terrorism, and criticism of the Israeli government is not anti-Semitism. Even if some governmental interest were implicated, the challenged provisions fail strict scrutiny and are not narrowly tailored to achieve any legitimate end.

14.     This Court should therefore:

A.  Vacate Section 1(b) of EO 1's prohibition on speech critical of the government, its institutions, and American culture as applied to non-citizens lawfully living in the U.S.;

B.  Vacate any provisions establishing vetting or enforcement mechanisms to implement Section 1(b), including Sections 2(a)(i), 2(a)(ii), and 2(a)(iv) of EO 1 and the "monitor and report" requirement  in Section 3€ of EO 2, as applied to citizens and non-citizens facing risk of criminal prosecution or deportation;

C.  Enjoin Defendants from enforcing any such provision of either EO against non-citizens; and

D.  Enjoin Defendants from enforcing Section 2 of EO 2's criminal prosecution provision against speech and activity by citizens and lawfully present non-citizens critical of the government of Israel.

6

## PARTIES

15.    Plaintiff MOMODOU TAAL is a citizen of the United Kingdom and the Republic of The Gambia and currently resides in Tompkins County, New York. He is a 31-year-old Ph.D. student in Africana Studies at Cornell University and holds a bachelor's degree in law from the University of East Anglia in the United Kingdom. In the course of his early academic career, he has participated in numerous scholarly panels and authored significant academic works. He has spoken at events hosted by Harvard University, Sheffield University, the Muslim Council of Britain, and the Tahara Collective in Lagos, Nigeria. His first book, *The Malcolm Effect: Revisited*, was published in February 2025.

16.    Plaintiff MŨKOMA WA NGŨGĨ is a U.S. citizen and Professor of Literatures in English at Cornell University. He is the author of *The Rise of the African Novel: Politics of Language, Identity and Ownership*, as well as the novels *Mrs. Shaw, Black Star Nairobi*, *Nairobi Heat* and *Unbury Our Dead With Song*. He has also published two books of poetry: *Logotherapy* and *Hurling Words at Consciousness*. He is the co-founder of the Mabati-Cornell Kiswahili Prize for African Literature. In 2013, *New African* magazine named him one of the 100 most Influential Africans. He is Mr. Taal's professor.

17.    Plaintiff SRIRAM PARASURAMA is a second-year Ph.D. student in the School of Integrative Plant Sciences. In 2023, he was awarded the prestigious NSF Graduate Research Fellowship to support his research on tree physiology and forest ecology. He has also served as a teaching assistant in Food Sciences and currently maintains a 4.3 cumulative GPA. Despite being early in his research career, he already has two scientific publications – one as first author and one as second author.

7

**JA 809**

18.     Defendant DONALD J. TRUMP is the President of the United States and is sued in his official capacity. He is responsible for the formulation, issuance, and implementation of the executive orders and policies that are the subject of this action.

19.     Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY is an independent agency within the executive branch of the United States government. 6 U.S.C. § 111.

20.     Defendant KRISTI NOEM is the Secretary of the United States Department of Homeland Security and is sued in her official capacity. As Secretary, she is the highest-ranking official within the Department and is responsible for seeing its policies, operations, and enforcement actions. She is charged by law with the supervision and direction of all activities of the Department pursuant to 6 U.S.C. § 112.

## JURISDICTION & VENUE

21.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1346(a)(2) in that the matter in controversy arises under the Constitution and laws of the United States, and the United States and its officers are named as Defendants.

22.      Venue is proper in this District under 28 U.S.C. § 1391€(1) because the United States and its officers are Defendants, and at least one Plaintiff resides in the district.

## FACTUAL ALLEGATIONS

### Mr. Taal, a Longtime Advocate for Palestinian Rights, Is Accepted into Cornell University's Graduate Studies Program in February 2022

23.      Mr. Taal is a citizen of both the United Kingdom and the Republic of The Gambia. He is a currently a graduate student at Cornell University ("Cornell") and lawfully resides in the United States on a F-1 student visa pursuant to 8 U.S.C. § 1101(a)(15)(F)(i).

8

**JA 810**

24.     Mr. Taal's academic journey and professional journey has been shaped by a deep commitment to understanding the historical, cultural, and geopolitical roots of social injustice and political oppression. He is a vocal advocate for Palestinian human rights and a consistent critic of state and institutional actors – including the governments of Israel and the United States – whom he believes are complicit in conducting a genocide against the people of Palestine. In February 2022, Mr. Taal was accepted into Cornell's graduate program at the Africana Studies and Research Center, which offers an interdisciplinary curriculum focused on the global experience of Black communities.

25.     On July 28, 2022, Cornell certified Mr. Taal's Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, with the United States Citizenship and Immigration Services ("USCIS"), thereby confirming his admission and registration in the Student and Exchange Visitor Information System ("SEVIS"). Cornell's Graduate Admissions Specialist, Katherine Muro, attested that she had reviewed Mr. Taal's application, academic transcript, and records, and that Cornell had determined he met all criteria for admission qualifications met all standards for admission, requiring him to pursue a full course of study as defined by 8 C.F.R. 214(f)(6).

26.     Following the issuance and certification of Form I-20, Mr. Taal became eligible to apply for an F-1 student visa under 8 U.S.C. § 1101(a)(15)(F)(i), which he did on June 14, 2022. Since enrolling at Cornell, Mr. Taal has consistently demonstrated academic excellence, maintaining a cumulative GPA of 3.82.

### Mr. Taal Was Approved for Admission by the Department of State and Inspected by Customs and Border Protection at a Port of Entry

27.     On or about August 5, 2022, the U.S. Department of State ("State Department") approved Mr. Taal's student visa application after determining that he was statutorily eligible and

9

posed no threat to national security. This decision reflected the State Department's conclusion that Mr. Taal satisfied all requirements for admission under the Immigration and Nationality Act ("INA") and that no grounds of inadmissibility applied to him.

28.     Pursuant to 22 C.F.R. § 40.6, "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." The regulation further clarifies that the "reason to believe" standard under INA § 221(g) requires a "determination based upon facts or circumstances which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa." The burden of proof rests with the applicant to establish eligibility under INA § 212 or any other applicable legal provision, and Mr. Taal met that burden.

29.     On August 12, 2022, Mr. Taal entered the United States at John F. Kennedy International Airport, where he was inspected and lawfully admitted by U.S. Customs and Border Protection ("CBP"). His admission further confirmed the federal government's prior determination that he met all legal requirements for entry and posed no national security threat.

**After Inspection and Admission to the U.S., Mr. Taal Engaged in Expressive Activity Online and on Campus**

30.     During his time at Cornell, Mr. Taal has established himself as a scholar and public intellectual. He has authored academic articles, been invited to lecture at institutions, and served as a panelist at conferences. Journalists frequently seek his expertise on history, culture, and geopolitics.

31.     As a graduate student, Mr. Taal taught undergraduate classes at Cornell, including *What is Blackness* in Fall 2024 and *Africa: Its Continent and Its People* in Fall 2023. Since 2020, he has hosted *The Malcolm Effect*, a widely followed podcast featuring interviews with American and international scholars on political and historical issues, spanning from post-World War II

10

anti-colonial movements to contemporary global events. In February 2025, his first book, *The Malcom Effect: Revisited*, was published.

32.    Beyond academia, Mr. Taal has been an outspoken critic of U.S. foreign policy, particularly regarding military and financial support for Israel. He has expressed his views in classroom discussions, on social media, and through his podcast. His critiques have extended to U.S. political figures – including former President Joseph R. Biden,[6] Defendant Trump,[7] and members of Congress[8] – as well as both major political parties,[9] the British government,[10] Israeli Prime Minister Benjamin Netanyahu,[11] the Israeli military,[12] and corporations profiting from military conflicts.[13] His commentary has also addressed broader issues such as wealth

---

[6] Momodou Taal (@momodoutaal), X (Oct. 11, 2023, 10:11 AM), https://x.com/momodoutaal/status/1712141636321390730 ("No one should be tear-gassed, brutalized or arrested for supporting Palestine. What's happening at American universities is disgusting and terrifying.")

[7] Momodou Taal (@momodoutaal), X (Jan. 7, 2021, 4:28 PM), https://x.com/momodoutaal/status/1347239899209068559 ("The silencing of Palestinian voices in this country is violent").

[8] Momodou Taal (@MomodouTaal), X (Oct. 18, 2023, 9:46 AM), https://x.com/MomodouTaal/status/1815871390899396826 ("The U.S. government's silence on the violence in Gaza speaks volumes about where their priorities lie").

[9] Momodou Taal (@momodoutaal), X (Sept. 22, 2021) https://x.com/momodoutaal/status/1440336610344640520 ("The lack of accountability for U.S. foreign policy perpetuates injustice and harm globally").

[10] Momodou Taal (@momodoutaal), X (Sept. 5, 2022, 9:14 AM) https://x.com/momodoutaal/status/1567182099634872321 ("The hypocrisy of U.S. foreign policy in the face of human rights violations is undeniable").

[11] Momodou Taal (@momodoutaal), X (Mar. 13, 2024, 7:42 PM), https://x.com/momodoutaal/status/1836948532621644172 ("World leaders continue to be silent while innocent lives are being lost in Gaza. This is a moral failure").

[12] *Id.*

[13] Momodou Taal (@MomodouTaal), X (Mar. 12, 2024, 8:29 PM), https://x.com/MomodouTaal/status/1851718089991237753 ("The U.S. administration's silence on the violence in Gaza is shameful and speaks volumes about their priorities").

11

inequality,[14] corporate influence in politics,[15] and U.S. military interventions[16] in Africa,[17] Latin America, and the Middle East.[18]

33.    Mr. Taal faced university disciplinary measures for his participation in student protests and was temporarily suspended on April 26, 2024, and September 23, 2024. However, Cornell did not impose any sanctions affecting his immigration status. An alternative resolution ("Agreement) finalized on January 29, 2025, contained no allegations of violence and allowed Mr. Taal to continue his studies remotely. Under the Agreement, Mr. Taal could return to campus for medical, religious, and research purposes and would regain full campus access at the end of the Spring 2025 semester.

34.    Since entering the United States on an F-1 visa, Mr. Taal has traveled internationally and been lawfully re-admitted upon inspection by Customs and Border Protection

---

[14] Momodou Taal (@MomodouTaal), X (Jan. 4, 2025), https://x.com/MomodouTaal/status/1875408898292904280 ("'American society despises equality. Extreme inequality is not only tolerated, it is taken as a symbol of the success that liberty promises. But liberty without equality is equal to barbarism.' - Samir Amin").
[15] Momodou Taal (@MomodouTaal), X (Dec. 27, 2022, 5:42 PM), https://x.com/MomodouTaal/status/1608488775566626816 ("The double standard in how global powers treat human rights violations is stark and unacceptable").
[16] Momodou Taal (@MomodouTaal), X (Jun. 30, 2023, 10:52 AM), ("Affirmative action killed, student loan forgiveness deaded and discrimination against sexual minorities legalised all in a matter of days. The fascists are winning. No such thing as being neutral now").
[17] Momodou Taal (@MomodouTaal), X (Mar. 31, 2024, 3:09 PM), https://x.com/momodoutaal/status/1774514352822845661?s=46 ("When I was a student in the United States I was so revolted by the ruthless colonial exploitation and political oppression of the people of Africa that I knew no peace. The matter exercised my mind to such a degree that I decided to put down my thoughts in writing and to dilate on the results of some of my research concerning the subject of colonialism and imperialism' - Nkrumah").
[18] Momodou Taal (@MomodouTaal), X (July 25, 2023, 10:12 AM) https://x.com/MomodouTaal/status/1674792989347155971 ("The international community's inaction in the face of ongoing humanitarian crises is a failure of global responsibility").

on March 19, 2023; May 7, 2023; August 16, 2023; October 14, 2023; January 20, 2024; August

21, 2024; and December 22, 2024.

**Defendant Trump Campaigns on Pledge to "Deport" Students for Protest Activity and
Officials Pledge Prosecution of Citizens While Pro-Israel Groups Target Mr. Taal**

35.    During the 2024 presidential campaign, Defendant Trump repeatedly vowed to

deport non-citizen students who participate in protest activity. On or about October 28, 2023, he

told the Republican Jewish Coalition, "All of the resident aliens who joined in the pro-jihadist

protest this month, nobody's ever seen anything like it. Come 2025, we will find you and we will

deport you." On May 14, 2024, he told reporters, "Any student that protests, I throw them out of

the country… As soon as they hear that, they're going to behave." He described campus protests

as a "radical revolution" and promised, "we're going to set that movement back 25 or 30 years."

At a rally in Wildwood, New Jersey, he declared, "If you come from another country and try to

bring Jihadism or anti-Americanism or anti-Semitism to our campuses, we will immediately

deport you."

36.    As Mr. Taal became a prominent voice within the student movement, he faced

escalating scrutiny. On March 21, 2024, Representative Jason Smith of the House Committee on

Ways and Means – a prominent supporter of Defendant Trump – sent a letter to Cornell President

Martha Pollack citing Mr. Taal's public comments as examples of speech that should be

curtailed.[19] This letter indicated the Committee had dedicated resources to monitoring protest

activity at Cornell, a focus that appears ongoing.

---

[19] Letter from U.S. Rep. Jason Smith to Martha E. Pollack 4 n.16 (March 21, 2024), https://gop-
waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf.

13

37.     Mr. Taal has also been directly targeted by Zionist groups advocating for his
removal from the U.S. In November 2024, Betar US ("Betar") compiled a list of pro-Palestinian
foreign students it sought to have deported, naming Mr. Taal as the sole individual identified. [20]
Betar's director, Ross Glick, delivered this list to Senator John Fetterman and aides from the
offices of Senators Ted Cruz and James Lankford, later telling the *New York Post,* "They all gave
me the thumbs up." And added that Betar was in communication with prospective Trump
administration appointees at the Department of Justice regarding enforcement actions against
individuals on the list.[21]

38.     On February 11, 2025, the *Washington Free Beacon* reported that Mr. Taal was
considered the most prominent "foreign student" who played a leading role in pro-Palestinian
protests – specifically referring to him as the first and most important target – who could face
investigation or deportation under a potential Trump executive order.[22] Since then, high-profile
social media accounts have called for Mr. Taal's removal, often tagging the official social media
account of Immigration and Customs Enforcement ("ICE").[23] On March 13, 2025, Betar posted

---

[20] Jon Levine, *Zionist org preps list of foreign pro-Hamas students, hoping Trump will deport them*, N.Y. POST (Nov. 23, 2024, 8:22 AM), https://nypost.com/2024/11/23/us-news/zionist-org-preps-list-of-foreign-pro-hamas-students-hoping-trump-will-deport-them/.
[21] *Id.*
[22] Alana Goodman, *Trump Pledged To Deport Pro-Hamas Student Visa Holders. Who Are They?*, WASH. FREE BEACON (Feb. 11, 2025), https://freebeacon.com/campus/trump-pledged-to-deport-pro-hamas-student-visa-holders-who-are-they/.
[23] See, e.g., Jews Fight Back (@JewsFightBack), X (Feb. 20, 2025, 1:08 PM), https://x.com/JewsFightBack/status/1892637461412540818 ("This terror supporter Momodou Taal is NOT an American citizen. Why hasn't he been deported yet? Hit like and repost this to get @ICEgov's attention! He's in blatant violation of his visa. DEPORT. NOW").

on X a "Deport Alert" that specifically named Mr. Taal.[24] Mr. Taal's growing fear that he will be the target of an ICE removal operation is grounded in a pattern of escalating attention, coordination among high-ranking political and influential private actors, and public threats by figures with the power to influence immigration enforcement decisions.

### Defendant Trump Issues Executive Orders

EO 1: "Protecting the United States from Terrorists and National Security and Public Safety Threats

39.    Section 1(a) of EO 1 states that it is the policy of the federal government "to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025).

40.    Section 1(b) further states that, in order "[t]o protect Americans . . . the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

41.    Section 2 of EO 1 implements enhanced vetting of the speech and political opinions of non-citizens. As relevant to the Plaintiffs:

a.    Section 2(a)(i) requires Defendant Noem, the Attorney General, and the Director of National Intelligence to "promptly . . . identify all resources that may be used

---

[24] Betar USA (@Betar_USA), X (March 13, 2025, 10:38 AM), https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom...").

15

to ensure that all aliens . . . who are already in the United States, are vetted and screened to the maximum degree possible." *Id.*

      b.    Section 2(a)(ii) mandates the same officials to "ascertain whether [an] individual seeking [an immigration] benefit is . . . not a security or public safety threat." *Id.*

      c.    Section 2(a)(iv) requires the officials to "vet and screen to the maximum degree possible all aliens who . . . are already inside the United States." *Id.*

42.    Section 3 requires the Secretary of State, in coordination with Defendant Noem, the Attorney General and the Director of National Intelligence, to "[r]ecommend *any actions necessary* to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or *replacement of the culture* on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists." (Emphasis added). *Id.* These recommendations were due no later than February 19, 2025, but as of the date of this filing, they have not been made public.

<u>EO 2: "Additional Measures to Combat Anti-Semitism"</u>

43.    Section 1 of EO 2 includes a preamble attacking "the prior administration" for failing to take steps to "protect American Jews," and declaring that "this failure is unacceptable and ends today." Exec. Order No. 14188, 90 Fed. Reg. 8451 (Feb. 3, 2025).

16

**JA 818**

44. Section 2 states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*

45. Section 3 requires Defendant Noem, in consultation with the Secretaries of State and Education, to issue a report within 60 days to "identify[] all civil and criminal authorities or actions within the jurisdiction of" each agency to "combat anti-Semitism." *Id.*

46. Section 3€ authorizes the Attorney General to make "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.*

47. High-ranking officials from the Department of Justice have recently indicated Defendants' intent to prosecute citizens like Plaintiff Prof. Wa Ngũgĩ and Mr. Parasurama and subject them to lengthy prison sentences pursuant to EO 2. This threat is imminent. At the end of February 2025, Senior Counsel to the Assistant U.S. Attorney for Civil Rights Leo Terrell told Israel's Channel 12 News: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years."[25] He added, "a lot is going to happen in the next four to five weeks" and that once protestors face a threat of jail time, "it will stop."[26]

---

[25] Jewish News Syndicate, *DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'*, NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/.
[26] *Id.*

48. On February 28, 2025, the U.S. Department of Justice's Task Force to Combat Anti-Semitism announced it would begin "meet[ing] with university leadership, impacted students and staff, local law enforcement, and community members as it gathers information" about protest activity and alleged "anti-Semitic" activity on campuses in preparation for possible prosecution.[27]

**Executive Orders Impose Chilling Effect on Plaintiffs**

49. As a result of the executive orders, Mr. Taal has been forced to profoundly alter his prior speech and association patterns. He has refrained from attending protests and public political meetings, has substantially reduced his activity on social media, and no longer discusses politics with associates from Cornell, fearing his words will be misinterpreted or reported to government authorities. He lives in constant fear that he may be arrested by immigration officials or police as a result of his speech.

50. Following the issuance of the Orders, Mr. Taal also began withdrawing from broader forms of public engagement, including canceling speaking engagements and declining invitations to participate in public events – opportunities that had previously been integral to his advocacy work and professional development. Critically, Mr. Taal has been forced to cancel travel to international academic events. For example, he was invited by Queens University in Toronto, Ontario to speak at a launch event for his book, *The Malcolm Effect: Revisited*. He was

---

[27] Press Release, U.S. Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced#:~:text=Created%20pursuant%20to%20President%20Trump's,schools%20and%20on%20college%20campuses.

unable to attend for fear of being unlawfully detained and deported upon arrival at a U.S. port of entry. He is also fearful of traveling to London to visit family and friends.

51.     As a result of the chilling effect the executive orders have had on Mr. Taal's speech, the citizen-plaintiffs have been unable to listen to his views in the types of public € where Mr. Taal used to be able to speak his mind freely. These € include academic conferences, public political meetings, off-campus protests, and even less formal political discussions in public places like cafés, sidewalks, restaurants, and other locations. Prof. Wa Ngũgĩ and Mr. Parasurama have been deprived of their rights to listen to Mr. Taal's ideas and suggestions about planning peaceful protests and organizing educational meetings about the rights of the Palestinian people, as well as his political insights into the historical, political, and sociological roots of what they understand to be a genocide against the people of Palestine. The loss of Mr. Taal's voice in these spaces has diminished the richness and diversity of political dialogue within the community and has deprived the citizen-Plaintiffs of an important source of intellectual and organizing leadership. The absence of such discussion has also made it harder for Plaintiffs to build momentum around their advocacy work, since they no longer feel safe meeting and brainstorming in public.

52.     As a result, all Plaintiffs have ceased interacting with one another in public locations, fearing that their associations may draw scrutiny. Mr. Parasurama – a U.S. citizen, student, and prominent participant in local campus protests in support of the Palestinian people – used to regularly meet Mr. Taal at political meetings and demonstrations. Since the promulgation of the Orders, they have not met in person for fear that mere association could be construed as "anti-government" or "anti-Semitic." The resulting isolation has eroded their ability to engage in collective action and has undermined their ability to freely express their views on contemporary political events.

19

**March 2025: Enforcement Begins**

53.     On March 9, 2025, Defendant DHS arrested a former Columbia University graduate student and lawful permanent resident at his apartment in New York City. Following the arrest, DHS spokesperson Tricia McLaughlin issued a public statement declaring that action was taken "in support of President Trump's executive orders prohibiting anti-Semitism" and affirming that Defendant DHS is "committed to enforcing President Trump's executive orders and to protecting U.S. national security."

54.     The individual arrested, Mahmoud Khalil, was a prominent activist on Columbia's campus and, like Mr. Taal, had previously been listed by Betar as a target for removal.[28]

55.     On March 10, 2025, Defendant Trump posted the following statement on the social media platform Truth Social:

> Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the trump Administration will not tolerate it. many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect

---

[28] Surina Venkat, *Department of Homeland Security Confirms Arrest of Palestinian Activist Mahmoud Khalil, SIPA '24*, COLUMBIA SPECTATOR (March 10, 2025), https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24; Azad Essa, *Who is Mahmoud Khalil, the Palestinian student activist facing deportation from the US?* MIDDLE EAST EYE (Mar. 12, 2025), https://www.middleeasteye.net/profile/mahmoud-khalil-who-is-palestinian-student-columbia-facing-deportation-us.

20

every one of America's Colleges and Universities to comply.
Thank you![29]

### CLAIMS FOR RELIEF

### Count 1: Violation of the First Amendment Right to Free Speech

56.    Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

57.    Each EO has imposed an unconstitutional chilling effect on Mr. Taal's right to free speech. The First Amendment protects "people" and not citizens alone. U.S. Const. Amend. I. This includes non-citizens living in the U.S. "Freedom of speech and of press is accorded [non-citizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

58.    The Orders have had an immediate chilling effect on Mr. Taal, and Defendant Trump's "promise" to deport each and every visa holder who "joined" a pro-Palestinian protest by the end of 2025 renders Mr. Taal's subjective fear of imminent enforcement eminently reasonable. Mr. Taal has been forced to substantially curtail his speech activity. He has cancelled speaking engagements at which he had planned to speak on his views about Defendant Trump, U.S. policy toward Israel and the Israeli invasion of Gaza, he has ceased speaking at local public events or attending peaceful protests on and off Cornell University's campus, as he had done before the executive orders were published, and he has substantially limited his social media posts.

59.    Prof. Wa Ngũgĩ and Mr. Parasurama are similarly chilled by the executive orders. While not threatened with deportation, EO 2 contemplates the criminal prosecution of speech

---

[29] Donald Trump (@realDonaldTrump), Truth Social (March 10, 2025, 1:05 PM),
https://truthsocial.com/@realDonaldTrump/posts/114139222625284782

21

deemed "anti-Semitic" by Defendants. The government may not criminalize speech unless that speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969). Lacking from either executive order is any language indicating that the speech restrictions are limited to specific imminent lawless action likely to incite such action.

60.     The executive orders plainly impose content-based restrictions on speech by targeting speech that is critical of the U.S. government, its institutions, American "culture" and the State of Israel. "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991); *see, e.g., Cohen v. California*, 403 U.S. 15, 18 (1971) (treating conviction for wearing a jacket with offensive message as based on speech). These rights are of particular importance on university campuses. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

61.     Content-based restrictions on speech are strictly scrutinized to ensure they pass constitutional muster. Defendants cannot satisfy this test. There is no compelling or legitimate state interest in preventing individuals from criticizing the government, its institutions, Defendant Trump, American government policy, American culture, or the State of Israel. Even if the orders did possess some nexus to an articulable national security concern, such concerns "do not warrant abdication of the judicial role" and courts "should not defer to the government's reading of the First Amendment, even when such interest are at stake." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Neither executive order contains language that is narrowly tailored to meet a legitimate state end.

62.     By threatening deportation of non-citizens and criminal prosecution of U.S. citizen who protest Israel and Israeli actions in Palestine, the language of executive orders combined with

22

statements made by Defendant Trump and high-ranking officials in the Department of Justice have had an immediate chilling effect on the speech and activity Plaintiffs, who despite a past pattern and practice of attending protests and criticizing the U.S. government and government of Israel have refrained from such activity in the weeks following the promulgation of the Orders for fear of being arrested, prosecuted, jailed, or deported.

## Count 2: Violation of the First Amendment Right to Listen

63.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

64.     The First Amendment protects the right of citizens like Prof. Wa Ngũgĩ and Mr. Parasurama to hear, receive, debate, and discuss views that are critical of the U.S. government with non-citizens. "The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know." *Kleindienst v. Mandel*, 408 U.S. 753, 771 (1972). "We have recognized a First Amendment right to receive information and ideas." *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024). *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Amer. Acad. Of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

65.     This includes the right to hear criticisms of the government by non-citizens, even when such criticisms come from outside the U.S. (unlike here). In *Lamont v. Postmaster General*, the U.S. Supreme Court struck down an act of Congress requiring citizens to affirmatively request in writing that the Postal Service deliver mail containing "subversive" publications sent by a foreign sender. The Court held that "[t]his amounts in our judgment to an unconstitutional abridgment of the addressee's First Amendment rights." 381 U.S. 301, 307 (1965). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Id*. At 308 (Brennan, J., concurring). "The First Amendment goes

23

beyond protection of . . . the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

66.     The orders have substantially disrupted Prof. Wa Ngũgĩ and Mr. Parasurama's rights to hear views critical of the U.S. government and government of Israel. The orders deprive the citizen-plaintiffs of their ability to listen to Mr. Taal's historical, political, and academic views on issues of contemporary relevance and therefore violate their First Amendment rights. Likewise, the chilling effect the threat of criminal prosecution has had on Prof. Wa Ngũgĩ and Mr. Parasurama has deprived Mr. Taal of his right to benefit from and discuss their views.

**Count 3: Violation of the First Amendment Right to Association**

67.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

68.     All plaintiffs have a First Amendment right to associate with individuals who possess views that are critical of the U.S. government, its institutions, policies, American "culture," or whose views are critical of the Israeli government. "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. For Prosperity Found. V. Bonta*, 594 U.S. 595, 609 (2021) (Quoting *NAACP v. Button*, 371 U. S. 415, 433 (1963)).

69.     By barring non-citizens from criticizing the U.S. government, its institutions, its policies, American culture, and the government of Israel, the orders have chilled Plaintiffs and their professor-colleagues and fellow students from interacting, meeting, holding discussions or

24

**JA 826**

otherwise publicly associating with one another. This implicates each Plaintiff's associational rights, regardless of alienage. Because of Mr. Taal's prominent role speaking against U.S. and Israeli government policy and because EO 1 announced that Defendant DHS is surveilling all non-citizens in the U.S. to monitor their political views, he possesses a reasonable fear that associating with local activists may constitute an "anti-American" act in itself, thereby subjecting him to possible negative immigration consequences. And because EO2's criminal prosecution provision applies to citizens as well as non-citizens, all Plaintiffs fear that Defendants might interpret their association with one another as proof of activity that falls under the ambit of that order. This has produced an unconstitutional chilling effect on all Plaintiffs' right to freely and publicly associate with one another.

### Count 4: Violation of the First Amendment – Vagueness and Overbreadth

70.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

71.     Both executive orders are unconstitutionally vague and overbroad. The sweeping and confusing language of the orders creates substantial uncertainty as to the type of speech that is barred. This uncertainty has chilled a broad range of protected speech on the part of Plaintiffs, which renders each order unconstitutionally vague for overbreadth.

72.     "Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 391 (1972) (quotations and citations omitted). A restriction on speech is unconstitutionally vague if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly

25

legitimate sweep." *Ams. For Prosperity Found. V. Bonta*, 594 U.S. at 615; *United States v. Hansen*, 599 U. S. 762, 770 (2023) (speech restriction is void for vagueness if it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep").

73. This test is met here. The language of the orders encompasses all speech critical of the government, its institutions, American culture, and the government of Israel. Its scope is unprecedented in the context of First Amendment restrictions. The vast majority of the orders' applications sweep-up clearly protected speech. In fact, the orders criminalize no type of activity or speech that isn't already barred by either the inadmissibility and deportability statutes (8 U.S.C. §§1182 and 1227, respectively) or the criminal "material support for terrorism" statute (18 U.S.C. §2339B). The ban on expressing a "hostile attitude" toward American "culture" is of particular concern as EO1 does not define the elements of American "culture" that are to be insulated from criticism.

74. The broad and sweeping character of the Orders will lead reasonable individuals to self-censor speech that is plainly protected for fear of transgressing the vague boundaries enumerated therein. The Orders are overbroad and vague in violation of the First Amendment.

**Count 5: Violation of the Fifth Amendment – Vagueness and Lack of Notice**

75. Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

76. Both executive orders are also unconstitutionally vague under the Fifth Amendment because they cause persons "of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). The degree of precision required increases with the gravity of the penalty and the

importance of the rights at stake. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (higher standard applicable when speech at stake).

77.     EO 2 subjects all Plaintiffs to the threat of prosecution for pro-Palestinian speech, and both EO 1 and EO 2 subject Mr. Taal to the threat of removal. Deportation/removal is a "particularly severe penalty," *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). Neither executive order provides individuals of common intelligence with an understanding as to the type of speech and association barred. EO 1 conflates any criticism of the U.S. government, its institutions and American "culture" with "terrorism," and EO 2 conflates criticism of the State of Israel with "anti-Semitism." According to Defendant Trump's January 30, 2025, fact sheet on the executive orders, the orders equate "joining protests" with support for "Hamas," a designated Foreign Terrorist Organization ("FTO"). In the fact sheet, Defendant Trump states that college campuses as a whole are "leftist" and "infested with radicalism like never before."

78.     As a result of the vague language of each executive order, the accompanying fact sheet and public statements by Defendant Trump, a person of average intelligence would understand that any criticism of a government "institution" might include a social media post questioning the actions of the office of the president, a decision to sign an open letter expressing concerns over a particular executive action, or that attending a peaceful demonstration in support of the people of Palestine might be construed as "terrorism" or support for "Hamas." In the academic context, this would apply to academic research, homework assignments or statements in class. Because each executive order fails to provide sufficient notice of the type of speech barred, it denies Plaintiffs' due process right to conform their speech to the orders.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

27

(a)  Assume jurisdiction over this matter;

(b)  Temporarily restrain and enjoin Defendants from implementing or enforcing Section 1(b) of EO 1 barring speech by non-citizens lawfully residing in the U.S. critical of American "culture, government, institutions, or founding principles," pending further orders from this Court;

(c)  Temporarily restrain and enjoin Defendants from implementing or enforcing other parts of EO 1 to the extent they facilitate the speech restrictions in Section 1(b), including Section 2(a)(i) of EO 1 (requiring extreme vetting and screening of speech by non-citizens "who are already in the United States" lawfully); and Sections 2(a)(ii) and (iv) of EO 1 (allowing speech to be used to deny immigration benefits under the INA);

(d)  Temporarily restrain and enjoin Defendants from implementing or enforcing Section 3€ of EO 2 preparing reports requiring, coercing, or otherwise pressuring universities to "monitor for and report" student and staff campus speech and activity to federal law enforcement and immigration authorities;

(e)  Temporarily restrain and enjoin Defendants from implementing or enforcing Section 2 of EO 2's criminal prosecution authority to arrest, charge, or otherwise prosecute citizens and non-citizens for protected speech criticizing of the government of Israel;

(f)  Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended;

(g)  Pursuant to 5 U.S.C. §702, vacate the specific provisions in both Executive Orders outlined in (b)-€ *supra*;

(h)  Preliminarily and permanently enjoin DHS from enforcing the specific provisions

28

of the Executive Orders outlined in (b)-€ *supra*;

     (i)     Issue a writ of mandamus compelling Defendants to immediately cease implementing the specific provisions of the Executive Orders outlined in (b)-€ *supra* without further delay;

     (j)     Award costs and attorney fees under the Equal Access to Justice Act (EAJA), 5 U. S. C. § 2412, and on any other basis justified under law; and

     (k)     Grant other such relief that the Court may deem proper.

Dated: March 15, 2025                        Respectfully submitted,

**s/ Eric Lee**
MI Bar No. P80058*
Attorney for Plaintiffs
24225 W 9 Mile Rd., Suite 140
Southfield, MI 48033
Telephone: (248) 602-0936
Fax: (202) 333-6470
Email: ca.ericlee@gmail.com

**s/ Mohammad Saleem**
NY Bar No. 4842753
Attorney for Plaintiffs
Davis Ndanusa Ikhlas & Saleem LLP
26 Court St., Suite 603
Brooklyn, NY 11242
Telephone: (718) 783-6819
Fax: (855) 852-4742
Email: msaleem@dnislaw.com

**s/ Jonathan Wallace**
NY Bar No. 1733757†
Attorney for Plaintiffs
P.O. Box 728
Amagansett, NY 11930
Telephone: (917) 359-6234
Fax: (202) 333-6470
Email: jonathan.wallace80@gmail.com

**s/ Chris Godshall-Bennett**
DC Bar No. 1780920*
Attorney for Plaintiffs
American-Arab Anti-Discrimination Committee
910 17th St. NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 465-4247
Fax: (202) 333-6470
Email: cgb@adc.org

**s/ Maria Kari**
TX Bar No. 24127161*
Attorney for Plaintiffs
Project TAHA
5300 N Braeswood Blvd., Suite 4-191
Houston, TX 77096
Telephone: (205) 862-8005
Fax: (202) 333-6470
Email: info@mariakari.org

*pro hac vice* forthcoming
†admission pending

29

# Exhibit G

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, <br><br> RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and <br><br> MIDDLE EAST STUDIES ASSOCIATION, <br><br>       Plaintiffs, <br><br>    v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and <br><br> UNITED STATES OF AMERICA, <br><br>       Defendants. | Civil Action No. 1:25-cv-10685 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Implementing executive orders issued by President Trump in January, the defendant agencies have announced that they intend to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association (the "ideological-deportation policy"). The defendant agencies arrested Mahmoud Khalil, a recent Columbia University graduate and a legal permanent resident, pursuant to this policy earlier this month; they revoked the visas of at least four others, one of whom fled to Canada in fear of arrest; they supplied universities with the names of other students they intend to target under the policy; and they launched new social media surveillance programs aimed at identifying still others. After federal agents seized Khalil in the lobby of his university-owned student housing, President Trump warned: "This is the first arrest of many to come."

2.      While President Trump and other administration officials have described pro-Palestinian campus protests as "pro-Hamas," they have stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza. They have left no doubt that their new policy entails the arrest, detention, and deportation of noncitizen students and faculty for constitutionally protected speech and association. In an interview twelve days ago on NPR's *Morning Edition*, Deputy Secretary of Homeland Security Troy Edgar responded this way to questions from journalist Michel Martin about the arrest of Mahmoud Khalil:

> **Edgar:** This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.

> **Martin:** He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar:** Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin:** Is any criticism of the United States government a deportable offense?

**Edgar:** Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point . . .

**Martin:** Is any criticism of the government a deportable offense?

**Edgar:** Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the country.

3.      By design, the agencies' policy has created a climate of repression and fear on university campuses. Out of fear that they might be arrested and deported for lawful expression and association, some noncitizen students and faculty have stopped attending public protests or resigned from campus groups that engage in political advocacy. Others have declined opportunities to publish commentary and scholarship, stopped contributing to classroom discussions, or deleted past work from online databases and websites. Many now hesitate to address political issues on social media, or even in private texts. The agencies' policy, in other words, is accomplishing its purpose: it is terrorizing students and faculty for their exercise of First Amendment rights in the past, intimidating them from exercising those rights now, and silencing political viewpoints that the government disfavors.

4.      Plaintiffs are associations whose members include thousands of faculty and students at universities across the country. They commence this action because the ideological-deportation policy, and the repressive climate it has engendered, has far-reaching implications for the expressive and associational rights of their U.S. citizen members, and for Plaintiffs themselves. The policy prevents or impedes Plaintiffs' U.S. citizen members from hearing from, and associating with, their noncitizen students and colleagues. It makes it practically impossible for

them to organize with those students and colleagues and to participate in political expression alongside them. It also makes it more difficult for them to benefit from those individuals' insights and scholarship and to collaborate with them on academic projects. Plaintiffs themselves have also been harmed because they are no longer able to learn from and engage with noncitizen members to the extent they once did, and because they have had to divert resources from other projects to address the all-too-real possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising rights that the Constitution guarantees.

5. The First Amendment protects the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, noncitizen students and faculty. Because the ideological-deportation policy abridges these rights without adequate justification, the policy is unconstitutional. Plaintiffs respectfully request that the Court declare that the policy violates the First and Fifth Amendments, as well as the Administrative Procedure Act, and enjoin Defendants from further implementation of it. They also seek a declaration that Defendants' campaign of coercive threats to arrest, detain, and deport noncitizen students and faculty based on their pro-Palestinian expression and association violates the First Amendment.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, the First and Fifth Amendments, and Article III of the U.S. Constitution.

7. The Court has authority to issue the requested relief pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## PLAINTIFFS

9.      Plaintiff American Association of University Professors ("AAUP") is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at colleges and universities throughout the country. The AAUP's mission is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to accomplish their goals; and to ensure higher education's contribution to the common good. Founded in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in the country's colleges and universities. The AAUP is headquartered in Washington, DC.

10.      Plaintiff AAUP-Harvard Faculty Chapter ("Harvard-AAUP") is a nonprofit membership association of faculty across Harvard University's many departments and schools, and it is a chapter of the AAUP. Harvard-AAUP advocates for meaningful and democratic shared university governance, for academic freedom, and for the economic security of those who perform the institution's core instructional work. Harvard-AAUP is headquartered in Cambridge, Massachusetts.

11.      Plaintiff AAUP at New York University ("NYU-AAUP") is a membership association of faculty across NYU's many schools and campuses, and it is a chapter of the AAUP. NYU-AAUP is focused on defending academic freedom, encouraging participation in university governance, and advancing the interests of NYU faculty, students, and staff. NYU-AAUP is headquartered in New York City, New York.

12.     Plaintiff Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT") is a membership association representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University, and it is a chapter of the AAUP. Rutgers AAUP-AFT is one of the oldest higher education unions in the country, negotiating collective bargaining agreements for full-time faculty since 1970 and graduate workers since 1972. Rutgers AAUP-AFT's mission includes promoting the well-being of its unit members; protecting and improving the university's teaching, research, and service activities as a public good; promoting the development of the intellectual capacities and economic interests of students, the public, and workers at the university; advancing academic freedom and shared governance within the university; and building community and labor coalitions to achieve educational and economic justice. Rutgers AAUP-AFT is headquartered in New Brunswick, New Jersey.

13.     Plaintiff Middle East Studies Association ("MESA") is a 501(c)(3) nonprofit membership association of scholars, educators, and those interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). MESA's mission is to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples through programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. MESA is incorporated in Arizona and its principal place of business is in Washington, DC.

### DEFENDANTS

14.     Defendant U.S. Department of State is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1).

15.     Defendant Marco Rubio is the Secretary of State and has ultimate authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Defendant Rubio and the department he leads have adopted and begun implementing the ideological-deportation policy. Defendant Rubio is sued in his official capacity.

16.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including U.S. Immigration Customs and Enforcement ("ICE").

17.     Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws. Defendant Noem and the department she leads have adopted and begun implementing the ideological-deportation policy. Defendant Noem is sued in her official capacity.

18.     Defendant Todd Lyons is the Acting Director of ICE and has authority over the operations of ICE. In that capacity and through his agents, Defendant Lyons has broad authority over the operation and enforcement of the immigration laws. Defendant Lyons and the agency he leads have adopted and begun implementing the ideological-deportation policy. Defendant Lyons is sued in his official capacity.

19.     Defendant Donald J. Trump is President of the United States. He issued Executive Order 14,161 and Executive Order 14,188 (together, the "Executive Orders"), which the defendant agencies have cited as the basis for the ideological-deportation policy. He is sued in his official capacity.

20.     Defendant United States of America includes all other government agencies and departments responsible for the promulgation and implementation of the ideological-deportation policy.

## FACTUAL BACKGROUND

### *The 2023 and 2024 Campus Protests*

21.     Following the Hamas-led attacks on Israel of October 7, 2023, and Israel's subsequent bombing and invasion of Gaza, students and faculty organized protests on campuses across the United States. Many of the pro-Palestinian protests included calls for a ceasefire and for humanitarian aid to displaced or wounded Palestinians. Others centered on calls for institutional divestment from Israel. Many included criticism or condemnation of Israel's campaign in Gaza; and some included denunciations of Zionism. Others featured calls for a "free Palestine" and included chants—such as "from the river to the sea, Palestine will be free" and "intifada revolution"—that protesters said were calls for liberation and justice but that some listeners interpreted as calls for discrimination or violence. A small minority of protesters and counter-protesters engaged in violence and property damage, but the protests were overwhelmingly peaceful, even when they violated universities' rules.

22.     The pro-Palestinian protests on campus took different forms. They included teach-ins, sit-ins, walk-outs, marches, exhibitions, vigils, encampments, and in some instances the occupation of buildings. On April 17, 2024, student protesters at Columbia University erected a "Gaza Solidarity Encampment" on the university's Morningside campus, and more than one hundred solidarity encampments were established at universities across the United States in the weeks thereafter. Some universities eventually persuaded student protesters to dismantle their encampments; others immediately called in the police. At Columbia University, police arrested more than a hundred students in an effort to clear the encampment on April 18, 2024, the day after

the encampment was established. Later, after a smaller group of protesters broke into and occupied Hamilton Hall—a building that students had also occupied in earlier protests relating to the Vietnam War and Apartheid South Africa—Columbia's administration called in the police again.

23. The students and faculty who participated in the pro-Palestinian protests on campus came from diverse backgrounds and held a wide range of political views. Some protesters viewed their participation as an extension of an American protest tradition, encompassing the anti-war and anti-apartheid protests of the 1960s, 70s, and 80s. Some protesters were Palestinians whose family members had been killed in or displaced by the war. Some protesters were Jewish, and many of them joined the protests to express their opposition to what they viewed as the displacement and even genocide of Palestinians in their name. While most of the protesters were likely U.S. citizens, many foreign citizens with visas or green cards joined the protests, and sometimes even led them.

24. Despite the diversity of the protesters and the wide range of views they expressed, President Trump repeatedly characterized the protests as "pro-Hamas," "pro-terrorist," "antisemitic," and "anti-American" during his 2024 campaign. He also promised that, if elected, he would deport the noncitizen students and faculty who had participated in the protests. At an event in May 2024, for example, he told donors to his campaign: "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

### The Executive Orders

25. The defendant agencies adopted the ideological-deportation policy challenged here to implement two executive orders that President Trump issued shortly after taking office. President Trump issued Executive Order No. 14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," on January 20, 2025.

He issued Executive Order No. 14,188, titled "Additional Measures to Combat Anti-Semitism," on January 29, 2025.

26.     Executive Order 14,161 states that it is the policy of the United States to protect its citizens from noncitizens who "espouse hateful ideology," and to ensure that noncitizens who are already present in the United States "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for, aid, or support designated foreign terrorists and other threats to [America's] national security." The order directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to promptly "vet and screen" all noncitizens who are already inside the United States "to the maximum degree possible."

27.     Executive Order 14,188 states that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." It reaffirms Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism that encompasses constitutionally protected criticism of Israel and Israeli policies. (The definition encompasses, for example, speech that claims that Israel "is a racist endeavor," speech that holds Israel to standards "not expected or demanded of any other democratic nation," and speech that compares contemporary Israeli policies to those of the Nazis.) The order directs the head of each executive department or agency, within 60 days, to submit a report to the President "identifying all civil and criminal authorities or actions within the jurisdiction of that agency" that might be used "to curb or combat anti-Semitism." It also directs the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security to include in their reports "recommendations for familiarizing institutions of higher education with

the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor

for and report activities by alien students and staff relevant to those grounds and for ensuring that

such reports about aliens lead, as appropriate and consistent with applicable law, to investigations

and, if warranted, actions to remove such aliens."

28.     The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and

related grounds of inadmissibility, including various terrorism- and foreign policy–related

provisions, 8 U.S.C. § 1882(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *see*

8 U.S.C. § 1227(a)(4)(B), (C). Under the terrorism-related provisions, noncitizens who have

engaged in or incited terrorist activity are inadmissible to the country, *id.* § 1182(a)(3)(B)(i)(I),

(III); the same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[]

others to endorse or espouse terrorist activity or support a terrorist organization," *id.*

§ 1182(a)(3)(B)(i)(VII), or who are representatives of "a political, social, or other group that

endorses or espouses terrorist activity," *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse or

espouse" provisions). The foreign policy provision renders inadmissible any noncitizen "whose

entry or proposed activities in the United States the Secretary of State has reasonable ground to

believe would have potentially serious adverse foreign policy consequences for the United States."

*Id.* § 1182(a)(3)(C)(i). This provision also states, however, that individuals may not be excluded

based on "past, current, or expected beliefs, statements, or associations [that] would be lawful

within the United States" unless "the Secretary of State personally determines that the

[noncitizen]'s admission would compromise a compelling United States foreign policy interest,"

*id.* § 1182(a)(3)(C)(iii), and provides timely notice of that determination to Congress, *id.*

§ 1182(a)(3)(C)(iv).

29.     After President Trump signed Executive Order 14,188, the White House released a
fact sheet about the order "promis[ing]" to "Deport Hamas Sympathizers and Revoke Student
Visas." The fact sheet included this warning from the President:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on
> notice: come 2025, we will find you, and we will deport you. I will also quickly
> cancel the student visas of all Hamas sympathizers on college campuses, which
> have been infested with radicalism like never before.

### The Ideological-Deportation Policy

30.     To implement the two executive orders described above, the defendant agencies
adopted the ideological-deportation policy challenged here, announcing that they intend to carry
out large-scale arrests, detentions, and deportations of noncitizen students and faculty who
participate in pro-Palestinian protests and other related expression and association. Pursuant to this
policy, they arrested Mahmoud Khalil, a recent Columbia University graduate and a legal
permanent resident, earlier this month; they revoked the visas of at least four others, one of whom
fled to Canada in fear of arrest; they supplied universities with the names of other students they
intend to target under the policy; and they launched new social media surveillance programs aimed
at identifying still others.

31.     On March 6, 2025, Secretary of State Rubio posted to X: "Those who support
designated terrorist organizations, including Hamas, threaten our national security. The United
States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—
including international students—face visa denial or revocation, and deportation." A news report
published that same day revealed that the State Department had already launched a new social
media surveillance program, called "Catch and Revoke," to identify noncitizen students for
deportation pursuant to the new policy of ideological deportation. According to senior State
Department officials cited by *Axios*, the program involves "AI-assisted reviews of tens of

thousands of student visa holders' social media accounts" to find "evidence of alleged terrorist sympathies expressed after Hamas' [October 7] attack on Israel." According to the report, "[i]f officials find a social media post from a foreign national that appears to endorse the [October 7] attack on Israel and looks 'pro-Hamas,' . . . that could be grounds for visa revocation."

32.     Two days later, on March 8, 2025, ICE agents arrested Mahmoud Khalil, a 30-year-old legal permanent resident and recent Columbia graduate, at his Columbia University student housing. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's lawyer informed the agents that Khalil was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The deportation notice later filed by the government cites the foreign policy provision and states: "The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States."

33.     Khalil has not been charged with any crime, and an administration official stated to *The Free Press* that "[t]he allegation here is not that he was breaking the law." Instead, the administration has made clear that it arrested Khalil because of his role in organizing protests that the administration characterizes as pro-Hamas. In a post made to X on March 9, 2025, DHS asserted that Khalil had led activities "aligned to" Hamas, and that ICE had arrested Khalil "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." At a news briefing on March 11, 2025, Press Secretary Karoline Leavitt stated that "Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists." She asserted that "pro-Hamas

propaganda" fliers had been distributed at a protest that Khalil had led, though she did not provide any evidence that Khalil had produced, distributed, or even known about them.

34.     When Deputy Secretary of Homeland Security Troy Edgar appeared on NPR's *Morning Edition* two days later, he indicated even more clearly that the government had targeted Khalil for deportation based on his political speech. Edgar initially stated that the State Department revoked Khalil's green card "for supporting a terrorist type organization," namely Hamas. But when asked to clarify how Khalil had supported Hamas, Edgar pointed to his involvement in pro-Palestinian protests generally: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." When asked if that meant any criticism of Israel or the United States is "a deportable offense," he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country."

35.     On March 17, 2025, after Khalil had challenged the State Department's decision to revoke his green card on the basis of his speech, ICE filed an additional (and transparently pretextual) justification for the State Department's decision. This additional charge alleged that Khalil had, at the time of his adjustment of status in March 2024, sought to procure an immigration benefit by fraud because he failed to disclose that he was "a member" of the United Nations Relief and Works Agency for Palestine Refugees ("UNWRA") and Columbia University Apartheid Divest ("CUAD"), and that he had continued working for the British government.

36.     The State Department has revoked the visas of at least four other students and faculty pursuant to the ideological-deportation policy.

14

37. On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national, doctoral student at Columbia University, and Adjunct Assistant Professor of Urban Planning at NYU's Robert F. Wagner Graduate School of Public Service, also under the foreign policy provision. Three federal immigration agents showed up at her apartment looking for her two days later, but she did not open the door. They showed up again the following night, just hours before Khalil was arrested, but she was not home because, fearing arrest, she had already fled the United States for Canada. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them. Srinivasan appears to be active, however, in protesting what she believes to be human rights violations in Gaza, and in December 2023 she signed an open letter published by the Society of Architectural Historians in support of "Palestinian liberation."

38. On March 8, 2025, ICE signed an arrest warrant for Yunseo Chung, a 21-year-old legal permanent resident and Columbia University student who has lived in the United States since she was seven. A few days earlier, Ms. Chung protested outside a Barnard College building where pro-Palestinian student demonstrators were holding a sit-in. She was arrested by police officers, given a desk ticket by the New York City Police Department for "obstruction of governmental administration," and released. On March 10, a federal law enforcement official advised Ms. Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Ms. Chung's dormitory. The warrant appears to have been issued in connection with an investigation of Columbia University for an alleged violation of the federal harboring statute.

39.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding, which is part of Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the foreign policy provision. In a statement given to *Fox News*, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas.

40.     On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate in Africana Studies at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily "surrender to ICE custody." Taal is a prominent and outspoken pro-Palestinian advocate. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him, and while that application remained pending. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

41.     Defendants and other administration officials have made clear that they intend to target other foreign students and faculty for arrest, detention, and deportation under the policy.

42.     On March 9, 2025, the Secretary of State shared a news story about Khalil's arrest on X and warned: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." The same day, DHS posted to X: "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."

43.     The next day, President Trump posted on Truth Social:

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

44.     The White House Press Secretary Karoline Leavitt reiterated this message at the news briefing she gave on March 11, 2025. When asked how many arrests the administration planned to make, she said that she did not have an estimate, but that DHS "is actively working on it." She stated that DHS had gathered "very good intel" "at the direction of the President's executive order, which made it very clear . . . that engaging . . . in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated." This intelligence was, she said, aimed at "identify[ing] individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity." She also added that "Columbia University has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus." She concluded: "We expect all America's colleges and universities to comply with this administration's policy."

45. On March 12, 2025, the *New York Times* reported that "[i]nvestigators from a branch of [ICE] that typically focuses on human traffickers and drug smugglers [had] scoured the internet for social media posts and videos that the administration could argue showed sympathy toward Hamas" and "handed over reports on multiple protesters to the State Department."

46. On March 13, 2025, Vice President J.D. Vance gave an interview on Fox News in which he commented on Khalil's arrest, stating: "This is not fundamentally about free speech. And to me, yes, it's about national security, but it's also more importantly about who do we as an American public decide gets to join our national community. And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that." Asked whether he saw "more such deportations happening," he said "I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interests of the United States to have them in our country, so yeah, I don't know how high that number is going to be, but you're going to see more people."

47. On March 16, 2025, Secretary of State Rubio gave an interview on CBS's *Face the Nation* in which he promised that the administration would continue enforcing its policy of ideological deportation: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well."

### A Climate of Fear and Repression for Noncitizen Students and Faculty

48. The ideological-deportation policy has created a climate of fear and repression on university campuses across the country and forced many noncitizen students and faculty into silence. Out of fear that pro-Palestinian expression might lead to arrest, detention, and deportation, many noncitizen students and faculty are no longer willing to participate in, or even attend, public political protests. Some have stepped back from leadership roles and participation in groups that engage in advocacy related to Israel and Palestine. Some are abstaining from public writing or

scholarship that they would otherwise have pursued. Others have attempted to purge their earlier public writings, including online articles, blog posts, and social media posts. Some students have stopped contributing to classroom discussions of Israel and Palestine; others are skipping class altogether. Some faculty have even fled their cities of residence, effectively forced to abandon their academic communities.

49.     The chill on university campuses flows directly from the policy challenged here, as well as from Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their lawful expressive and associational activities.

50.     Plaintiffs all have noncitizen faculty and student members who have been compelled to curtail their exercise of expressive and associational rights in the ways described above. Some of these members are described below. These individuals have been anonymized because they fear that their connection to this lawsuit could lead to them being targeted for arrest, detention, and deportation. Some noncitizen members interviewed by undersigned counsel were too fearful even to have their experiences described anonymously.

51.     **AAUP Member A.** AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

52.     Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

53.      They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

54.      **AAUP Member B.** AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

55.      Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

56.      AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

57.      AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

58. **AAUP Member C.** AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

59. Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

60. The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

61. AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

62. **AAUP Member D.** AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

63. AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

64. The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

65. The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

66. **AAUP member E.** AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

67. **MESA Member A.** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

68.     Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

69.     The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

70.     They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

71.    **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

72.    Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

73.    MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

74.    **Noncitizen Student A.** Noncitizen Student A is a student visa holder and a graduate student who studies history and has been involved in pro-Palestinian advocacy at a university in the Northeast. They have worked closely with members of their local AAUP chapter in academic and political settings.

75.    Before the administration adopted the ideological-deportation policy, Noncitizen Student A regularly posted on social media, including about their academic work related to Israel and Palestine. Following the policy, however, Noncitizen Student A deleted their account on the social media platform X out of concern that their posts related to Palestine would make them a target for ideological deportation. They used their X account primarily for academic purposes; X

had been an important forum for them to publicize their academic work, to learn about research findings and opportunities in their discipline, and to network with other scholars, including members of the AAUP, their local AAUP chapter, and MESA. They also removed information about the content of their work from university-hosted websites.

76.    Noncitizen Student A has also been chilled from associating publicly with their peers and colleagues, including members of the AAUP, their local AAUP chapter, and MESA. Because of the ideological-deportation policy, they have declined to give speeches at campus protests and stayed away from rallies where law enforcement could be present; decided to pull out of a film screening and panel discussion related to indigenous studies that they had previously agreed to moderate; and cancelled their plans to attend a conference at which they had planned to speak on a panel about pro-Palestinian student movements.

### *Expressive and Associational Harms to Plaintiffs and their U.S. Citizen Members*

77.    The chill resulting from the ideological-deportation policy has caused significant harm to Plaintiffs and their U.S. citizen members.

<u>Plaintiffs</u>

78.    **AAUP.** Founded in 1915, the AAUP is one of the nation's oldest and largest membership associations and is dedicated to the advancement of higher education and academic freedom. Today, the AAUP has over 44,000 members, including faculty, graduate students, and other academic professionals based at universities across the country. These members are the lifeblood of the organization. The AAUP's leadership operates through a democratic process of engaging with its members in developing its positions and priorities and carrying out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to facilitate discussions with its members about pressing topics in higher education and academic freedom. The gatherings

often draw hundreds of members. The leadership relies on these conversations in making virtually every decision of substance about the organization's work.

79.     The ideological-deportation policy has dramatically undermined the AAUP's ability to pursue its mission by deterring noncitizen members from participating in AAUP events. Many noncitizen members have also stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and to investigate universities for their handling of campus protests over the last eighteen months. The AAUP has heard directly from some of these noncitizen members, who explained that their decisions to disengage were based on fear. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally been silent. All of this has deprived the AAUP of the input of a significant segment of its membership, undermining the ability of the organization to learn from those members and represent their interests in the organization's policymaking, report writing, and public advocacy.

80.     For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their videos off and voices muted. The AAUP has had similar experiences with a range of other events, including conversations organized to allow discussion of academic freedom and Israel and Palestine, and an event last week at Columbia University directed at students and focused on the Trump administration's attacks on the university and how the AAUP should respond.

81.     The ideological-deportation policy has also required the AAUP to divert resources that it would otherwise devote to its mission. Its leadership has spent a significant percentage of its time counseling its noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. At the same time, the policy has caused many noncitizen leaders at AAUP chapters to step back from leadership positions and public appearances out of fear that they will be labeled as pro-Hamas or pro-terrorist and targeted for deportation on that basis.

82.     **Harvard-AAUP.** Harvard-AAUP is a membership association of Harvard faculty and researchers, with approximately 70 members, that advocates for meaningful and democratic shared university governance, academic freedom, and the economic security of those who perform the university's core instructional work. Harvard-AAUP seeks to advance that mission through organizing, advocacy, and coalition-building at Harvard, as well as by working with other AAUP chapters and the AAUP on issues of broad concern across the higher education sector.

83.     The ideological-deportation policy has impaired Harvard-AAUP's ability to pursue its mission by deterring noncitizen faculty and students from joining Harvard-AAUP. Harvard-AAUP has learned that some noncitizens who would have been eligible to become members of Harvard-AAUP have declined to join the organization out of fear that their membership and association with Harvard-AAUP could put them at risk of deportation. The participation of noncitizen members in Harvard-AAUP is uniquely important to the organization's mission. Given the large population of international faculty and students within the Harvard University community, noncitizen member participation contributes to Harvard-AAUP's strategic decision-making, event planning, recruiting, and engagement with the university. The ideological-deportation policy has deprived Harvard-AAUP of opportunities to hear from and associate with

an important segment of the community it serves, undermining the ability of the organization to learn from those prospective members and to represent their interests in pursuing the organization's goals.

84. The ideological-deportation policy has also diverted the resources and attention that the Harvard-AAUP would otherwise use to focus on its core mission. Prior to the policy, Harvard-AAUP focused primarily on promoting more robust shared governance at the university, advancing the economic justice and institutional security of academic workers, and preserving academic freedom. Now, Harvard-AAUP devotes significant attention to advising and engaging the concerns of noncitizens on Harvard's campus who fear immigration consequences stemming from the ideological-deportation policy. For instance, Harvard-AAUP has worked with other groups at Harvard to organize information security trainings to help members of the university community protect against potential surveillance of their expressive activities online.

85. **NYU-AAUP.** NYU-AAUP is a membership association made up of faculty across NYU's schools and campuses, with over 100 individual members. NYU-AAUP is dedicated to defending academic freedom at NYU and throughout the academy, encouraging participation in shared governance at NYU, and advancing the professional interests of NYU faculty and researchers. To fulfill its mission, NYU-AAUP holds two full membership meetings a semester, where members communicate and collaborate with one another on addressing important issues in higher education. Throughout the year, NYU-AAUP also hosts events open to the broader NYU community focused on advancing academic freedom. As a reflection of NYU's large population of international and noncitizen faculty and students, NYU-AAUP's membership includes many noncitizen members, who play a vital role in fulfilling NYU-AAUP's goals.

86.     The ideological-deportation policy has impaired NYU-AAUP's ability to advocate for its interests in concert with noncitizen faculty and students at NYU. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt the need to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation or visa revocation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

87.     The ideological-deportation policy has also required NYU-AAUP to divert resources that it would otherwise have used to pursue its core mission. NYU-AAUP's primary goals are to advance academic freedom and better facilitate faculty-university relations at NYU. But since the policy began, NYU-AAUP has been forced to devote increasing attention and resources to addressing the potential immigration consequences of the policy for noncitizen faculty and students. For example, NYU-AAUP is devoting resources to preparing "know your rights" materials related to immigration enforcement on NYU's campus. NYU-AAUP members and others in the NYU community have asked NYU-AAUP for immigration consultations, and it now often falls on NYU-AAUP to connect and guide members through NYU's immigration resources. Additionally, the policy has had an impact on the content of NYU-AAUP's events. For instance, NYU-AAUP recently hosted a faculty town hall to discuss the state of the university. The organizers of the event intended to spend much of the event discussing how federal funding freezes and executive orders targeting diversity, equity, and inclusion programs would impact life at NYU.

In the end, a significant part of the town hall focused on the threat of deportation noncitizen faculty and students face under the policy.

88.    **Rutgers AAUP-AFT.** Rutgers AAUP-AFT is a union representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University. Rutgers AAUP-AFT is one of the oldest higher education unions in the country. It is also a chapter of the AAUP.

89.    The ideological-deportation policy has undermined Rutgers AAUP-AFT's ability to represent all bargaining unit members. Rutgers AAUP-AFT's research, pedagogy, and outreach depend on creating academic and community spaces where all members of its community, whether citizen or noncitizen, can fully participate. Noncitizen members, however, have shared with leadership that they are concerned that engaging on some research topics, such as racism and Israel and Palestine, could expose them to deportation. Many have also refrained from speaking out publicly or taking political action on these topics within the union because of the threat of deportation. Some noncitizen bargaining unit members have also expressed fears about joining the union because they are concerned it could invite targeting. When noncitizens do not join or speak out in the union, it becomes more difficult for Rutgers AAUP-AFT to represent the needs and priorities of all bargaining unit members, including by involving all union members in union leadership and decision making.

90.    The ideological-deportation policy has also required Rutgers AAUP-AFT to divert resources it would otherwise dedicate to its mission. Rutgers AAUP-AFT has had to devote time and resources to support noncitizen members who fear deportation, including by spending time organizing trainings, finding legal support for individual members, and engaging with university management to ensure that the university is taking appropriate action.

91.    **MESA.** MESA is a 501(c)(3) non-profit membership association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples. Today, MESA has over 2,000 individual members, including faculty and students at universities across the country. MESA provides its members with programs, publications, and services that enhance research and education, recognize professional distinction, and defend academic freedom. MESA hosts an annual meeting that is the premiere conference for scholars who research the Middle East. The conference, which is the largest such gathering in the world, consists of four days of academic programming, professional development, job market interviews, networking, and special events. For MESA's members, the annual meeting is a critical forum for scholarship, intellectual exchange, and pedagogical innovation. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, the *MESA Review of Middle East Studies*, a biannual newsletter, and frequent advocacy letters.

92.    The ideological-deportation policy has substantially harmed MESA's ability to pursue its mission by deterring noncitizen scholars of the Middle East from joining MESA or participating in MESA's events. A substantial portion of MESA's members are interested in studying the Middle East because of their own personal or family background in the region, which makes them invaluable members of MESA's academic community. Due to their personal connections, heritage, and language skills, these members are often the most effective ethnographers and most skilled archival researchers working in the discipline. Many of these members are also noncitizens who, due to fears of being targeted for deportation based on the content of their scholarship, have scaled back their participation in MESA's events and projects. This chill has undermined MESA's core function as a scholarly association that facilitates the

exchange of pedagogical insights, academic expertise, and novel research between its members
and advocates for their academic freedom.

93.     For example, noncitizen members of MESA have expressed concern about
attending MESA's annual meeting, which is scheduled to take place in November 2025 in
Washington, DC, for fear that their attendance at the conference will expose them to the attention
of immigration authorities. As described above, MESA's annual meeting is a landmark conference
in the discipline and is MESA's marquee event. Each year, MESA solicits paper proposals for the
conference by mid-February. This year, after the administration's adoption of the ideological-
deportation policy, a number of scholars who would usually submit proposals informed MESA
that they were unable to meet the deadline, or afraid of attending the meeting, due to its location.
In particular, international members outside of the United States expressed fears that they would
be denied entry or harassed because of the policy of ideological deportation. Noncitizen members
also reported being overwhelmed and unable to focus on making medium-term plans because of
their fear that their scholarship and speech about the Middle East might become the basis for
targeting by the government. Because submissions at the initial deadline were almost 40 percent
below where they should have been, based on past meetings in Washington, DC, MESA granted
an across-the-board extension. After MESA extended the deadline, there was still a sharp drop in
the number of submissions compared to prior years. At present, participation in the 2025 annual
meeting is projected to fall 10 percent below the expected level. Due to its members' fears of
ideological deportation, including harassment by officials based on their scholarly activities,
MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly
field, and provide a less effective opportunity for intellectual exchange. Moreover, members'
reports of self-censorship in research and scholarship for fear of being targeted by the government

is expected to depress participation in the meeting and reduce submissions to MESA's publications, particularly concerning Israel and Palestine.

94.     The ideological-deportation policy has also required MESA to divert resources it would otherwise devote to its mission. The annual meeting is a key recruitment vehicle for MESA, and reduced attendance means fewer dues-paying MESA members. MESA's leadership, staff, and volunteer faculty now spend more time and energy responding to crises stemming from the policy than on scholarship. For example, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have both been inundated with requests for assistance from noncitizen members who fear ideological deportation. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. MESA leadership has worked to develop new and different programming, such as know your rights workshops and meetings with legal services groups, that would not typically fall under the purview of a scholarly association. Because so many MESA members are fearful of ideological deportation, MESA is beginning a new monthly message to provide members with resources and information about MESA's response to the policy. As a result, MESA has far fewer resources available for its regular academic programming.

<u>Plaintiffs' Members</u>

95.     **Aslı Bâli.** Aslı Bâli is a professor of law at Yale Law School. Bâli's scholarship and teaching focus on international human rights law and comparative constitutional law. She is a U.S. citizen, a member of the AAUP and MESA, and the president of MESA.

96.     The ideological-deportation policy has harmed Bâli's ability to hear from and engage with her noncitizen colleagues and students. As the president of MESA, Bâli is receiving a cascade of requests for advice and assistance from noncitizen students and colleagues who fear

that they will be targeted for deportation based on their speech. Many of these individuals have deleted their social media profiles, removed online references to their involvement in campus groups that have supported Palestinian rights, and taken down previously public writing about Palestine. One noncitizen colleague is considering declining an offer to chair their department out of concern that they might be limited in what they could say or do in the role without making themselves a target for deportation. Bâli has lost the benefit of these colleagues' and students' participation in events and programming and is no longer able to freely communicate with them about their views and opinions.

97. The policy has also limited Bâli's ability to associate with noncitizen members of the AAUP and MESA, and it has undermined her academic work. Because of her noncitizen colleagues' fears of ideological deportation, Bâli now hesitates to approach noncitizens to be co-authors, which harms her ability to produce scholarly work. Additionally, Bâli recently felt she had to propose moving the participation of some colleagues in a conference scheduled to take place in April at Yale Law School entirely online because of concerns for the safety of noncitizen participants. This change would mean that participants will no longer be together in the same space to mingle and discuss ideas, which significantly reduces the value of an academic conference.

98. **Beth Baron.** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

99. The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have historical sources critical to their research because they fear they will not be allowed back into the

country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

100.    The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

101.    **Patricia Dailey.** Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

102.    The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. The goal of this community was to share information about the university and facilitate collective organizing. Dailey relied on the

community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine could now jeopardize the immigration status of noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

103. **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

104. The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She is considering cancelling another upcoming CPS event for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

105. **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

106. The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

107. **Joseph Howley.** Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

108. The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation

and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

109.   The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was backed only by citizen members of faculty and staff. He understood that noncitizen members who previously would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

110.   **Maya Jasanoff.** Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

111.   The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they

will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

112. **Lauren Kaminsky.** Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

113. The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

114. **Rebecca Karl.** Rebecca Karl is a professor of History at NYU. Karl's research and teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the AAUP, and a former president and now member-at-large of NYU-AAUP.

115. The ideological-deportation policy has limited Karl's ability to hear and engage with perspectives and scholarship she values. As a student of and researcher on histories of repressive regimes, Karl is interested in the multiple ways in which marginalized people

understand their lives and worlds. As a Jew, she is particularly interested in the history of antisemitism and Zionism and has helped organize educational events at NYU on those topics. In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues. Following the adoption of the policy, however, some noncitizen colleagues have been forced to take down research and scholarly work that was previously available online, and have ceased speaking publicly about issues related to Israel and Palestine; others have declined public speaking opportunities.

116.    The policy has undermined Karl's ability to assemble with noncitizen faculty and students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy, however, Karl has noticed a significant decrease in the participation of noncitizen faculty and students in pro-Palestinian expression, including petition-signing and public letter signing.

117.    **Chenjerai Kumanyika.** Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

118.    The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because

of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

119.   **David Kurnick.** David Kurnick is a professor of English at Rutgers University. His research and teaching interests include the history and theory of the novel, narrative theory, and sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

120.   The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

121.   **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

122.     The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

123.     **Vasuki Nesiah.** Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

124.     The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These

measures reduced attendance and hindered the dialogue and sharing of research that is critical to

Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the

United States are now unwilling to attend academic events inside the country for fear that they will

be detained and deported. For instance, several colleagues who typically attend the Law and

Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that

they will not attend for this reason. Because her field of international law is particularly engaged

with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The

policy has also chilled student discussion on campus, with many noncitizen students now avoiding

the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss

it. Some noncitizen students have also expressed concern about even showing up to class, and

there have been conversations among her colleagues about conducting classes over Zoom, which

Nesiah considers to be a poor substitute for in-person teaching.

125.    The policy has also limited Nesiah's ability to associate with noncitizen colleagues.

For example, a noncitizen colleague who had signed an open letter related to academic freedom

that Nesiah and her colleagues had recently organized asked that their name be removed from the

letter, because they feared that signing the letter would make them a target for deportation under

the policy.

126.    **Sonya Posmentier.** Sonya Posmentier is an associate professor of English at NYU

and the director of graduate studies in the NYU English department. Her research and teaching

interests include African American and Black Diasporic literature and culture, poetry and poetics,

and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of

NYU-AAUP's executive committee.

127.   The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

128.   The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses the intersection of the incarceration of Black and Brown Americans, immigrant detention in the United States, the war in Gaza and the Israeli occupation, and the criminalization of pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

129. **Judith Surkis.** Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

130. The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

131. The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

132. **Kirsten Weld.** Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

133.    Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

## CAUSES OF ACTION

### COUNT I
### The ideological-deportation policy
### violates the First Amendment

134.    The ideological-deportation policy violates the First Amendment because it entails the arrest, detention, and deportation of noncitizen students and faculty on the basis of, or in retaliation for, their political viewpoints; because it burdens the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, those noncitizen students and faculty; and because the policy is not narrowly tailored to any compelling governmental interest.

135.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the First Amendment as applied for substantially the same reasons.

## COUNT II
### Defendants' threats to punish constitutionally protected speech violate the First Amendment

136.     Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment because the threats are coercive and would chill individuals of ordinary firmness from exercising their expressive and associational rights.

## COUNT III
### The ideological-deportation policy violates the Fifth Amendment

137.     The ideological-deportation policy violates the Fifth Amendment because it invites arbitrary and discriminatory enforcement.

138.     To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the Fifth Amendment as applied because they invite arbitrary and discriminatory enforcement; and because they fail to give noncitizen students and faculty fair warning as to what speech and association the government believes to be grounds for arrest, detention, and deportation.

## COUNT IV
### The ideological-deportation policy violates the APA

139.     The ideological-deportation policy violates the APA because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right, and because it exceeds Defendants' statutory authority. 5 U.S.C. § 706(2)(A)–(C).

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Declare that the ideological-deportation policy violates the First and Fifth Amendments and the APA, and set the policy aside.

B. Enjoin Defendants from implementing or enforcing the ideological-deportation policy—including, without limitation, through investigation, surveillance, arrest, detention, deportation, or any other adverse action.

C. Declare that Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment, and enjoin Defendants from continuing to make those threats.

D. To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, declare that those provisions violate the First and Fifth Amendments as applied, and enjoin Defendants from applying those provisions.

E. Award Plaintiffs reasonable costs and attorneys' fees incurred in this action.

F. Grant such other and further relief as the Court may deem just and proper.

March 25, 2025 Respectfully submitted,

/s/ Edwina Clarke
Edwina Clarke, BBO 699702
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

/s/ Ramya Krishnan
Ramya Krishnan*
Carrie DeCell*
Xiangnong Wang*
Talya Nevins**
Jackson Busch*
Alex Abdo*
Jameel Jaffer*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500

ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham* (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

*\*pro hac vice* application forthcoming
\*\*admission to the bar pending

# Exhibit H









A message from Instagram

Congress can help keep teens safe with app parental approval and age verification. Lea

Mar 6, 2025 - Politics & Policy

# Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas"

 Marc Caputo



## AXIOS

Secretary of State [Marco Rubio](#) is launching an AI-fueled "Catch and Revoke" effort to cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups, senior State Department officials tell Axios.

**Why it matters:** The effort — which includes AI-assisted reviews of tens of thousands of student visa holders' social media accounts — marks a dramatic escalation in the U.S. government's policing of foreign nationals' conduct and speech.

- The reviews of social media accounts are particularly looking for evidence of alleged terrorist sympathies expressed after Hamas' Oct. 7, 2023, attack on Israel, officials say.

**Officials plan to examine** internal databases to see whether any visa holders were arrested but allowed to stay in the country during the Biden administration.

- They say they're also checking news reports of anti-Israel demonstrations and Jewish students' lawsuits that highlight foreign nationals allegedly engaged in antisemitic activity without consequence.

- The State Department is working with the departments of Justice and Homeland Security in what one senior State official called a "whole of government and whole of authority approach."

**Zoom in:** To launch "Catch and Revoke," federal officials examined 100,000 people in the Student Exchange Visitor System since October 2023 to see if any visas had been revoked because the student been arrested or suspended from school.

- Usually, a consular official whose office issues the visa for a foreigner makes the revocation decision once they've been

**AXIOS**                                                                ⌕

- "We found literally zero visa revocations during the Biden administration," the official said, "... which suggests a blind eye attitude toward law enforcement."

**Zoom out:** The Immigration Nationality Act of 1952 gives the secretary of state the authority to revoke visas from foreigners deemed to be a threat —a point Rubio made as a senator eight days after Oct. 7.

- "We see people marching at our universities and in the streets of our country ... calling for Intifada, celebrating what Hamas has done ... Those people need to go," Rubio said.

- Trump echoed the same sentiments in a Jan. 30 White House fact sheet tied to an executive order aimed at antisemitism at "pro-Hamas" activity: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice. We will find you, and we will deport you."

- Another executive order, issued Jan. 20, targets visa holders and foreigners who "threaten our national security, espouse hateful ideology."

**The big picture:** The cumulative effect of Trump's executive orders is already having a chilling effect on student visa-holders. They're starting to shy away from protests critical of Israel.

- "This should concern all Americans. This is a First Amendment and freedom of speech issue and the administration will overplay its hand," said Abed Ayoub, head of the American-Arab Anti-Discrimination Committee.

- "Americans won't like this. They'll view this as capitulating free speech rights for a foreign nation."

JA 885

Case 2:25-cv-02357-MEF Document 19-3 Page 5 of 10   Filed 08/20/2025
PageID: 1289
Case 2:25-cv-02357-MEF Document 19-3 Page 211 of 416 Filed 08/20/2025

AXIOS



Congress can help keep teens safe with
app store parental approval an
verification.

Learn more ⟶

**The backstory:** Ayoub said "the blueprint" for the new program can
be found in Operation Boulder of 1972, when the Nixon
administration infiltrated and surveilled pro-Palestinian groups,
which he said infringed on the rights of U.S. citizens as well as
foreign nationals.

- "With the advent of AI, it's even scarier because they're policing
  speech and using faulty technology," Ayoub said.

**The senior State Department official**, however, said that "it would
be negligent for the department that takes national security
seriously to ignore publicly available information about [visa]
applicants in terms of AI tools. ... AI is one of the resources available
to the government that's very different from where we were
technologically decades ago."

- If officials find a social media post from a foreign national that
  appears to endorse the attack on Israel and looks "pro-Hamas," the
  official said, that could be grounds for visa revocation.

- "Under President Trump, the Immigration Nationality Act is great
  again," the official added.

**Between the lines:** The Trump administration's pro-Israel posture
reflects his and Rubio's longstanding commitment toward the Jewish
state, an issue of intense interest to white evangelicals.

- Opposition to Israel's bombing campaign in Gaza, meanwhile,
  has divided the Democratic base, polls show.

**AXIOS**

and support for the Palestinian people — despite the efforts of some organizers.

- "We're not doing this for the polling, but it never hurts to be on the right side of an issue," a White House adviser said.



Want more stories like this? Sign up for <u>Axios AM</u>

Enter your email address

Subscribe

# Go deeper



Marc Caputo
Mar 27, 2025 - Politics & Policy

## Exclusive: Trump's "pro-Hamas" purge could block foreign students from colleges



# AXIOS



Illustration: Brendan Lynch/Axios

The Trump administration is discussing plans to try to block certain colleges from having any foreign students if it decides too many are "pro-Hamas," senior Justice and State Department officials tell Axios.

**Why it matters:** The effort — which could include grand jury subpoenas —marks another escalation of Trump's aggressive crackdown on immigration and antisemitism that civil libertarians say stifles campus speech and has led to several lawsuits.

Go deeper (3 min. read) ⟶



Avery Lotz
Mar 27, 2025 - Politics & Policy

## Rubio says U.S. may have pulled more than 300 visas

# AXIOS



Secretary of State Marco Rubio listens to a question during a press conference with Guyanese President Irfaan Ali (not pictured) in Georgetown, Guyana, on March 27. Photo: Nathan Howard/POOL/AFP via Getty Images

Secretary of State Marco Rubio said Thursday that the State Department may have already revoked more than 300 visas as the Trump administration pushes a sweeping immigration crackdown.

**The big picture:** Federal immigration enforcement has turned to college campuses, where it is targeting those who have expressed pro-Palestinian views in a strategy First Amendment and immigration advocates say is stifling free speech.

Go deeper (1 min. read)  ⟶

   

 Russell Contreras, Steph Solis
Mar 27, 2025 - Politics & Policy

## Ambush arrest of Tufts student sparks new concerns about immigration crackdown

 



Signage and flowers are placed on a tree next to where ICE agents apprehended Tuft University graduate student Rumeysa Ozturk on March 27, 2025 in Somerville, Massachusetts. Photo: Scott Eisen/Getty Images

The arrest of a [Tufts University](#) student by hooded Homeland Security agents in plain clothes — caught on video on a suburban Boston street — is raising fresh questions about the Trump administration's [aggressive crackdown](#) on immigrants over the opinions they've expressed.

**Why it matters:** The administration's push to quickly scoop up, detain and deport college students with pro-Palestinian views has stunned civil libertarians, who say it violates American traditions of [free speech](#) and due process under the law.

Go deeper (2 min. read)  ⟶

   

Smarter, faster on what matters.

Case 2:25-cv-25857-MEB   Document 19-3   Page-216   Filed 06/25/2025   Page 50 of 10
PageID: 1294

# AXIOS

| | | |
|---|---|---|
| About Axios | Newsletters | Privacy policy |
| Advertise with us | Axios Live | Terms of use |
| Careers | Axios Entertainment | Your Privacy Choices |
| Contact us | Axios HQ | |

Copyright Axios Media, 2024

# Exhibit I






Mar 27, 2025 - Politics & Policy

# Exclusive: Trump's "pro-Hamas" purge could block foreign students from colleges

 Marc Caputo





Illustration: Brendan Lynch / Axios

The Trump administration is discussing plans to try to block certain colleges from having any foreign students if it decides too many are "pro-Hamas," senior Justice and State Department officials tell Axios.

**Why it matters:** The effort — which could include grand jury subpoenas —marks another escalation of Trump's aggressive crackdown on immigration and antisemitism that civil libertarians say stifles campus speech and has led to several lawsuits.

**Zoom in:** The idea of prohibiting colleges from enrolling any student visa-holders grew out of Secretary of State Marco Rubio's "Catch and Revoke" program, which now is focusing on students who protested against the war in Gaza.

- A senior State Department official called the demonstrators it's targeting "Hamasniks" — people the government claims have shown support for the terror group.

- More than 300 foreign students have had their student visas revoked in the three weeks "Catch and Revoke" has been in operation, the official said. There are 1.5 million student visa-holders nationwide.

- "Everyone is fair game," the official said.

**At the heart of the plan** is the Student and Exchange Visitor Program, which certifies schools to accept student visa-holders. Institutions have been decertified in the past if the government determines they have too many student-visa holders who are using the education system as a ruse to live and work in the U.S., officials say.

- Now, the Trump administration is threatening to apply that decertification framework to the post-Oct. 7 demonstrations on college campuses.

**JA 894**

- "Every institution that has foreign students ... will go through some sort of review," the official said. "You can have so many bad apples in one place that it leads to decertification of the school ... I don't think we're at that point yet. But it is not an empty threat."

**Columbia University and UCLA** — both of which had controversial, disruptive pro-Palestinian protests last year — are among the schools mentioned the most often by administration officials.

- Columbia officials couldn't be reached for comment.

- "UCLA is committed to eradicating hate," a spokesperson for that university said, pointing to UCLA's new Initiative to Combat Antisemitism.

**What they're saying:** Critics accuse the administration of trampling free speech and due process rights, and of unfairly conflating support for Palestinian rights with backing Hamas, the terror group that rules Gaza.

- The Foundation for Individual Rights and Expression (FIRE), a nonpartisan free-speech group, said the concept of decertifying entire universities based on who is "pro-Hamas" is "a worrying escalation."

- "Deemed 'pro-Hamas' by whom? This kind of explicitly viewpoint-driven decision-making is ripe for abuse and risks arbitrary enforcement," FIRE legal director Will Creeley told Axios in a statement.

**Zoom out:** The administration's zero-tolerance immigration enforcement has provoked a spate of lawsuits, some of which are likely headed to the U.S. Supreme Court.

- That's what the administration wants: to give the high court several opportunities to expand the executive branch's power to deport a noncitizen with little judicial review.

JA 895

- A judge Tuesday temporarily blocked federal agents from detaining Yunseo Chung, a Columbia student who participated in pro-Palestinian protests. Her lawsuit argues that immigration enforcement can't "be used as a tool to punish noncitizen speakers who express political views disfavored by the current administration."

- The first major case challenging Rubio's right to revoke a green card was brought this month by Mahmoud Khalil, an organizer of the pro-Palestinian protests at Columbia.


**The big picture:** As the political parties realign, the GOP increasingly appeals to non-college voters and has clashed with academics and higher-education experts on cultural issues, including the Gaza war.

- Student visa holders are a lucrative revenue stream for colleges that can be choked off by the executive branch.

- "That's one of their biggest cash cows, foreign students. That's a meaningful source of revenue for them," a senior Justice Department official said.

- "What you're going to see in the not-too-distant future is the universities that we can show that were not doing anything to stop these demonstrations in support of Hamas — or encouraged enrollment by activists — ... we can stop approving student visas for them, and they can no longer admit foreign students," the official said.

**Catch up quick:** The Trump administration's assault on colleges and that had significant pro-Palestine, anti-Israel or antisemitic activism spans both coasts.

- Last week, to escape losing $400 million in federal money, Columbia caved to administration demands to combat antisemitism and limit protests.

- On March 5, the DOJ's new antisemitism task force launched a civil rights investigation into the University of California system.

- On March 10, the Education Department sent letters to 60 universities warning them of possible civil rights enforcement actions concerning antisemitism.

- And on March 18, the Justice Department filed a statement of interest siding with Jewish students suing over antisemitic activity during protests at UCLA.

**What's next:** The DOJ also is monitoring a new federal lawsuit from Columbia students accusing protest organizers of acting as a "propaganda arm" of Hamas.

- Expect more enforcement actions, the DOJ official said.

- "The way that this looks ... is a grand jury subpoena goes to a university, a very broad subpoena," the official said, adding that it would include "any information that they know about students who have actively participated in violent protests."



Want more stories like this? Sign up for Axios AM

Enter your email address

Subscribe

# Go deeper

A  Marc Caputo
   Mar 6, 2025 - Politics & Policy

## Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas"



Secretary of State Marco Rubio speaks with Rep. Jim Jordan (R-Ohio) in Statuary Hall before President Trump's address to Congress on Tuesday. Photo: Alex Wroblewski / AFP via Getty Images

Secretary of State Marco Rubio is launching an AI-fueled "Catch and Revoke" effort to cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups, senior State Department officials tell Axios.

**Why it matters:** The effort — which includes AI-assisted reviews of tens of thousands of student visa holders' social media accounts — marks a dramatic escalation in the U.S. government's policing of foreign nationals' conduct and speech.

JA 898

Go deeper (3 min. read) ⟶





Nadia Lopez, Avery Lotz
Mar 12, 2025 -   Axios San Francisco

## UC Berkeley, Stanford among colleges targeted for alleged antisemitism

### Universities being investigated by the Education Department for alleged antisemitism

As of March 11, 2025



Data: U.S. Department of Education; Chart: Axios Visuals

UC Berkeley and Stanford are among the dozens of higher education institutions being investigated by the Trump administration for allegations of antisemitic harassment and discrimination on campus.

**Why it matters:** President Trump is threatening to pull federal funding from schools that he alleges are failing to protect Jewish students and allow "illegal protests" on campus.

Go deeper (2 min. read) $\longrightarrow$





Isaac Avilucea, Avery Lotz
Updated Mar 11, 2025  -  Axios Philadelphia

## Trump is targeting several Philly-area schools for alleged antisemitism



Pro-Palestinian students and faculty of Drexel, Temple and UPenn demonstrate last spring at a UPenn encampment. Photo: Matthew Hatcher / AFP

The Trump administration is threatening dozens of universities, including several in the Philly region, with possible sanctions over allegations of antisemitism on campus.

**The big picture:** The move comes after President Trump said last week that he'd strip federal funding from colleges that allow "illegal protests."

Go deeper (2 min. read) $\longrightarrow$

## Smarter, faster on what matters.

Explore Axios Newsletters

| | | |
|---|---|---|
| About Axios | Newsletters | Privacy policy |
| Advertise with us | Axios Live | Terms of use |
| Careers | Axios Entertainment | Your Privacy Choices |
| Contact us | Axios HQ | |

Copyright Axios Media, 2024

# Exhibit J

# SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge

"Never seen something like this," say university officials about the secret targeting of Middle Eastern students.

 PREM THAKKER
MAR 29, 2025

♥ 510      💬 44      🔁 178                    Share



*Hundreds rally in New York City against the detention of Columbia student protest leader Mahmoud Khalil on March 12, 2025. Photo by Lev Radin/Pacific Press/LightRocket via Getty Images*

In a developing story, it appears the Trump administration is quietly targeting *even more* students for deportation and doing so in a way that is taking universities and the students themselves completely by surprise.

According to documentation seen by **Zeteo** and interviews with university officials, the administration is deploying the rarely-used risk-to-foreign-policy immigration provision they used to detain Mahmoud Khalil to now target students across the country.

University officials say that targeted students hail from the Middle East and Muslim-majority countries. They've also reported inconsistent notification patterns: some students have been informed about the revocations by the government, some have

JA 903

not; some only found out after officials manually checked internal visa status databases – while universities and officials themselves have mostly seemed to not be informed by the government.



## Revocation by Pushing a Button

The Immigration and Customs Enforcement (ICE) appears to be *manually* revoking students' immigration status – an authority typically left to university staff. And some students and universities are not even being made aware of those revocations – setting students up to be taken by immigration agents without even knowing it was coming.

Three university officials, who were given anonymity so they could speak freely, across the country report that, in recent days, student residency statuses in the Student and Exchange Visitor Information System – SEVIS, a database where residency statuses of foreign students are managed – are being changed without their knowledge.

Samah Sisay of the Center for Constitutional Rights told **Zeteo** that one's visa being revoked does *not* mean that their status would be too. Unlike student visas – which are entry documents that allow someone to enter the country – student *statuses* are what allow people to stay in the US. To maintain one's status, a student has to fulfill certain requirements, like being properly enrolled in classes, keeping documents up to date, and following work restrictions.



A student's *visa* could expire or be revoked for any number of reasons, but that wouldn't necessarily mean their *status* to stay would be taken away, too. Some of these *statuses,* which are typically overseen by university officers, are now allegedly being unilaterally revoked by ICE instead. While university officers often oversee status in the SEVIS system, Sisay said that DHS can technically revoke status without a university actively disenrolling a student.

Still, the practice is alarming students and university staff across the country. As one official put it, "Someone at ICE pushed a button, and now [students] are 'illegal' through a process that absolutely should not be happening."

## "Never Seen Something Like This"

According to documentation seen by **Zeteo** and university officials across the country, the unusual termination of students' statuses has occurred just in recent days, as

Secretary of State Marco Rubio has announced that the State Department has revoked at least 300 visas.

The reason? The same little-used rationale the State Department used to detain and attempt to deport Mahmoud Khalil, and an increasing string of students since then: A provision of Section 237 of the Immigration and Nationality Act — targeting students on the basis that their presence would have "potentially serious adverse foreign policy consequences" for the US.

In one case, a student was reportedly notified by the US that their visa was revoked per Section 221(i) of the act – which enables the Secretary of State to revoke visas per their "discretion" – and then that their *status* was terminated by Section 237.

In multiple cases, the US cited both the foreign policy provision and another portion of Section 237 to assert that the student was "otherwise failing to maintain their status."

This appears to be what happened to Tufts University graduate student Rumeysa Ozturk, who was detained by masked immigration authorities on Tuesday.

Some university officials are discovering these by sheer accident, encountering the changes as they look through the SEVIS database.

| Type your email... | Subscribe |
| --- | --- |

A State Department spokesperson told **Zeteo** that the department "has broad authority to revoke visas under Section 221(i) of the Immigration and Nationality Act (INA)," and that they "exercise that authority when information comes to light indicating that a visa holder may be no longer be eligible for a visa."

"Generally, the Department is not required to notify an individual of a visa revocation but does so when the Department determines it is practicable," the spokesperson continued, adding that "the number of revocations is dynamic."

DHS and the White House did not respond to **Zeteo's** requests for comment.

"I don't think there is a justification for ICE to do this. Not meaningfully, anyway," said Hassan Ahmed, an immigration lawyer who is representing Georgetown scholar Badar Khan Suri, who was recently arrested by masked agents in Virginia.

"First, there's the issue of notice and opportunity to defend," Ahmed told **Zeteo.** "Second, what policy sense does it actually make to pull the plug on expensive education halfway through? Third, if done on 237a4C grounds (foreign policy a la Mahmoud Khalil), then this is absolutely an abuse of that section of law."

While much of the discourse surrounding college campuses has revolved around Ivy League colleges, virtually all the cases **Zeteo** reviewed occurred at state schools across the country.

As with several of the recent high-profile cases involving individuals whisked off the street, it's unclear what *actual* grounds have justified the revocation. One university official told **Zeteo** that a student from the Middle East whose status was revoked said they had not attended protests or had social media posts that might have triggered the move (recall, Rubio's State Department is reportedly using artificial intelligence to monitor social media and revoke student visas).

Share

As one university official described the dynamic between student visas and student statuses: "What we appear to be seeing now is that there's no difference, there's no daylight between the two; that there are cancellations happening in SEVIS by the government; we don't really know if all students are getting notified or if some are getting notified...the schools are not getting notified."

"We've really...never seen something like this, where it is so directly tied together," they added.

*If you are a student affected by this, or have relevant information about these developments, please contact me via email or Signal (premthakker.35).*

*And if you are already a paid subscriber to **Zeteo** but would like to increase your support for our accountability journalism, please consider a donation, too.*

*Editor's note: This story has been updated with a comment from Hassan Ahmed.*

# Exhibit K

4/3/25, 3:30 PM    Case 2:25-cv-02412-JLS-MAR    Document 19-3    Page 233    Filed 04/07/25    Page 233 of 416    PageID: 1311



POWER

MAR. 26, 2025

# Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.

By Sanya Mansoor, a freelance reporter who covers immigration and Gaza

Photo-Illustration: by The Cut; Photo: Michael Nigro/Sipa USA via AP

🔖 SAVE    |    💬 24 COMMENTS

Since ICE agents arrested Columbia graduate <u>Mahmoud Khalil</u> in early March, Maryam, a student at Cornell University, doesn't leave the house unless they need to. They started getting groceries delivered and rarely go out to the shops. While they still help support and organize local demonstrations against <u>Israel's war in Gaza</u>, they no longer attend in person. When they do go out to class or to work, they write an employment lawyer's phone number on their body and carry all their documentation. As a person of Arab descent who is in the U.S. on a student visa, Maryam worries that they could be swept up in the Trump administration's crackdown on pro-Palestine activists. Recently, they installed security cameras outside their off-campus apartment. "It felt like a way I could protect myself," they say, if immigration agents were to show up at the door.

On top of all this, Maryam's sister is pregnant and they are now unsure of when they will be able to visit family. If they leave the country, they fear they won't be allowed to return. They try their best to calm down their

parents, who are scared of ICE detaining their child. Maryam's mother texts that she loves them more frequently, while their father, who normally talks a lot, now trails off and becomes quiet on the phone. "He understands that it is not in me to be bullied or cowed," they say.

International students across the country like Maryam are spooked by the arrests of Khalil, a U.S. permanent resident, and Georgetown University researcher Badar Khan Suri, an Indian national. (Maryam's name and that of other students in this story have been changed, as they fear the federal government may target them for deportation.) Trump's campaign-trail rhetoric about throwing student protesters out of the country has since become a real threat. The administration rescinded a longstanding policy that protected universities and other vulnerable locations from immigration enforcement; the State Department is launching an AI-driven program to help deport foreign nationals perceived as supporting Hamas; sweeping executive orders threaten deportation or criminal prosecution over actions the administration views as antisemitic or expressing a "hostile attitude" toward the U.S.; and Trump is pressuring universities to impose stricter protest rules or else lose their federal funding.

This all leaves international students wrestling with how to criticize the U.S.'s continued military support of Israel without jeopardizing their visa status. Several students I spoke with worried that identifying their country of origin or which university they attend, let alone talking about their protest activity, would put a target on their backs. Some are doubling down by engaging more publicly, including by protesting without a mask, while others are paring back their social-media activity and taking more precautions at protests. James, who attends New York University on a student visa, has continued to go to demonstrations and wears a shiesty to obscure his face and cover his eyebrows — "all this stuff we know can stop facial recognition," he explains. Stopping his activism was not an option. "I don't see myself disengaging completely," he says. "It's just a matter of picking different ways of engagement and supporting people who can be more visible." Still, he's nervous that authorities seem to be casting a wide net in their pursuit of pro-Palestine activists. "It's not just lead organizers, it's people who were at protests or signed letters," he says. "That makes me afraid, because how much more can they expand it? How much leeway do they have that I don't know about? Where do I fall?"

Salman, an Arab graduate student at NYU, had briefly met Khalil at a friend's birthday party last year. They didn't speak much, but the interaction was enough to make the news of the Columbia graduate's detention feel less abstract. *If they're deporting someone with a green card, then what protection does my F-1 student visa offer me?* Salman thought. He also saw parallels between his situation and the argument the Trump administration made for detaining Khalil: While he is not an organizer, Salman has frequently posted on social media about protests and policy demands, like calling for a cease-fire and arms embargo. "I don't think I post more or less than your average pro-Palestinian advocate," he says, but he fears that "people can read into what you post in whatever way." He's started to pull back from sharing his personal political opinions on social media. He did go to a protest earlier this month to demand Khalil's release, however, and then to another demonstration to protest Israeli airstrikes on Gaza. He wore a mask after friends and family urged him to take steps to conceal his identity. "I'm not taking a step back on this," he says.

Salman says his parents want him to be safe and finish his degree. "They also understand that I'm at a point in my life right now where even if they were to tell me 'Don't do this' or 'Don't do that,' they know me too well to think that I'm going to become silent all of a sudden out of fear," he says. Salman currently plans to fly to attend his sibling's engagement outside of the U.S., which he knows involves risk, but he plans to have a lawyer or emergency contact on standby in case he runs into issues reentering the United States.

## If they're deporting someone with a green card, then what protection does my F-1 student visa offer me?

NYU is one of several universities, including Brown and UC Berkeley, that are urging international students to reconsider traveling out of the country. (Cornell had advised international students to return to campus before Trump took office in anticipation of changing immigration policies.) The U.S. government wields more power and discretion at the border than it does within its borders, and "severe consequences can emerge very quickly," says Golnaz Fakhimi, legal director of the civil-rights organization Muslim Advocates. In the span of a few hours, one interaction with a border agent could lead to a person's removal from the country and a ban on seeking reentry for years. Muslim Advocates is helping students prepare for all scenarios, including ICE detention; that means figuring out a care plan for any dependents and putting a process in place to notify emergency contacts.

Both Muslim Advocates and the advocacy group Palestine Legal tell me they've received an uptick in inquiries recently from non-citizen students who are trying to gauge the risks involved in traveling, living in on-campus housing, protesting, and posting pro-Palestine content on social media. Some students who've reached out to them have a more public profile, but many of them don't and are still worried they may be on the government's radar. Palestine Legal senior staff attorney Radhika Sainath says there has been a subtle shift in the group's approach to providing Know Your Rights training for students, given that "we have an administration in place that does not respect the law." "There's more of a focus on different scenarios and what people might expect given what they said, or who they are, and their citizenship status," she said. Still, she stresses, everybody in the U.S. — regardless of their immigration status — has a right to freedom of speech and expression, which includes criticizing the American and foreign governments.

At Columbia, which has become Trump's biggest campus target, the international student community is rallying together after ICE detained Khalil and attempted to arrest Fulbright student Ranjani Srinivasan, who subsequently left for Canada. Grant Miner, the president of Columbia's student workers union, said that typically about five people come to its international student working group meetings. Following Khalil's arrest, 80 showed up. "People I've never seen before are coming to union meetings," Miner says, "and that's not because we did a good job organizing them, it's because they feel angry." Ph.D. student Allie Wong has been referring these students to mutual-aid funds and friendly lawyers, helping provide walking escorts for those who feel unsafe, and connecting them to healing circles. She's also heard from international students who are considering moving off-campus or want a secondary place to stay should ICE agents show up at their residence. Some of her peers have expressed interest in helping out, but the Justice Department recently directed federal prosecutors to investigate local compliance with Trump's immigration crackdown. That can include cases where the government believes U.S. citizens are harboring people who are in the country illegally. "This is paralyzing people who do have good intentions, and who want to help their friends, who are not promoting terrorism; they're just trying to get a good education," Wong says.

Some international students are confronting the Trump administration head-on. At Cornell, Momodou Taal, a British Gambian Ph.D. student, filed a lawsuit this month alongside two U.S. citizens that alleged the executive orders Trump is using to crack down on pro-Palestine activists amount to an unconstitutional silencing of their political views. "It got to a point where international students are becoming sitting ducks," Taal says. "We shouldn't be penalized and punished with the threat of deportation because of expressing our views." Residents of Taal's building tipped him off last week that unidentified law-enforcement officers had arrived at his Ithaca

home, and in a statement on X he wrote, "Trump is attempting to detain me to prevent me from having my day in court." On Friday, the Justice Department asked Taal to surrender to ICE; his legal team filed an emergency petition seeking to prevent the government from detaining him before a Tuesday hearing on the merits of his case.

Columbia student Yunseo Chung also filed a lawsuit Monday after immigration officials unsuccessfully tried to deport her. Chung is a lawful permanent resident like Khalil, and the government is relying on the same obscure immigration law to argue that her conduct — she was arrested after a campus sit-in — negatively affects America's foreign policy. Chung, who does not appear to have a leadership role in the student protest movement, and her legal team filed a petition that would block her detention while her lawsuit is ongoing, which a judge granted Tuesday.

The crackdown has led several of the students I spoke with, including those from countries that routinely stifle free speech, to question their long-term plans. Even if they want to stay in America because of their strong community ties and a desire to fight for the cause they believe is right, they're grappling with whether it's worth living in a country that won't allow them to freely express their political beliefs. James says he planned to stay in New York after his program ends, "not for nationalistic reasons" but because of the city and the friendships he's built there. But now, he's not sure it'll be possible. "It's not a question of wanting" to remain in the States, he says. "How long will it be until they find something to use as a reason to not let me in?"

Maryam came to the U.S. to work with particular scholars at Cornell and had no plans to stay in the country longer. Then they got into a relationship with an American citizen. "I started to think, *Maybe I could settle down here. Maybe this is a place where we could have a family and be happy,*" they say. But in the wake of Khalil's arrest, the couple is talking about living "anywhere that is not here." The future they envisioned together no longer feels realistic when "international students are being hunted by the federal government," Maryam says. They're not surprised that Trump is making good on his campaign promise, but they are increasingly worried that the American public won't push back enough on the administration's crackdown. "That scares me more than anything else," they say. "That the entire world is finding a way to make this a personal failing rather than a structural issue of targeting students who engage in constitutionally protected speech."

TAGS: POLITICS POWER TRUMP 2.0 THE CLASH ON CAMPUS MORE

# Exhibit L



Dugan Meyer, El Paso, TX, 31.812083, -106.542667

**ESSAYS AND SCHOLARSHIP**

# Protecting Immigrant Activists From U.S. Government Retaliation: Lessons From First Amendment Litigation

Immigrant activists in the U.S. face legal and structural barriers when fighting First Amendment retaliation.

BY **ALINA DAS**
**FEBRUARY 12, 2025**

**REGARDLESS OF FRONTIERS: THE FIRST AMENDMENT AND THE EXCHANGE OF IDEAS ACROSS BORDERS**
A project about surveillance, censorship, and the changing role of the international border

Do federal immigration officials have the power to arrest, detain, and deport immigrants in retaliation for their criticism of U.S. immigration policy?[1] The answer to this question should be an emphatic no. The U.S.

Supreme Court has long held that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[2] Few would contest that federal immigration policy is a matter of pressing public concern—which is confirmed, if anything, by its prominent role in current political debate.[3] As such, speech about federal immigration policy is entitled to the highest First Amendment protection.[4] A straightforward application of First Amendment law would firmly establish that the government is prohibited from silencing its critics through imprisonment or exile.

But constitutional protections in the immigration context are, unfortunately, anything but straightforward. In this essay, I describe and critique the legal and structural barriers that immigrant activists in the U.S. have faced when fighting back against ongoing First Amendment retaliation by federal immigration officials.[5] Drawing from my past scholarship and experience litigating these matters under the two previous administrations,[6] I describe the problematic legal positions taken by the federal government in First Amendment litigation and propose a better reading of the relevant constitutional and immigration provisions to promote First Amendment principles. I then briefly describe additional strategies, beyond defensive litigation, that immigrant advocates have pursued in order to address First Amendment retaliation. Ultimately, I argue that immigrant activists should not face onerous barriers to protecting their First Amendment rights.

## The Context

The use of federal immigration powers to retaliate against immigrants for what might otherwise be protected speech is not a new phenomenon. In *Threat of Dissent: A History of Ideological Exclusion and Deportation in the United States,* Julia Rose Kraut traces the history of ideological exclusion and deportation from the late 18th century to the War on Terror.[7] The passage of the Alien and Sedition Acts of 1798, the Palmer Raids of 1919, and the repeated efforts to deport alleged communists and anarchists throughout long periods of the 20th century are all troubling examples.[8] Throughout this history, federal courts have been reluctant to intervene due to a judicially created "plenary power" doctrine that counsels against judicial intervention in immigration matters, particularly at the intersection of immigration and national security.[9] Congress has only increasingly constrained judicial review, and in 1999, the Supreme Court issued a decision in *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC* ")holding that immigrants have no constitutional right to raise a selective enforcement claim against federal immigration officials relating to their decisions to commence proceedings, adjudicate cases, or enforce deportation orders in the absence of outrageous discrimination.[10]

In the decades since *AADC*, the power of federal immigration officials—and their ability to abuse that power—has only grown. In 2003, Congress transferred and consolidated federal immigration enforcement power to the newly created U.S. Department of Homeland Security (DHS), which divided responsibilities among: U.S. Immigration and Customs Enforcement (ICE, responsible for interior enforcement); U.S. Customs and Border Protection (CBP, responsible for border enforcement); and U.S. Citizenship and Immigration Services (USCIS, responsible for processing applications for immigration and citizenship status).[11] Federal law gives each of these agencies vast power to determine whom to detain, deport, or grant status or citizenship to.[12] Since the creation of the DHS, Congress has allocated billions of dollars to federal immigration agencies—more funds than all other federal law enforcement agencies combined.[13]

In recent years, these agencies have been repeatedly accused of abusing their authority in order to retaliate against immigrants for political speech—including criticism of federal immigration policy.[14] During the first Trump administration, the New York University (NYU) Immigrant Rights Clinic and its partners documented more than 1,000 incidents of alleged First Amendment retaliation against immigrant rights activists by numerous federal agencies.[15] ICE targeted prominent immigrant rights leaders in New

York City and Seattle for deportation, detained immigrants after they criticized ICE at town halls and rallies, and even detained and deported a grandfather after the Sundance Film Festival showcased a documentary about his past activism.[16] At the urging of immigrant rights organizations, the DHS under the Biden administration issued guidance that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."[17] However, First Amendment retaliation continues to be reported, particularly against the most vulnerable immigrants.[18] With Donald Trump's return to the presidency, along with many of his first-term immigration advisors, many fear another surge of retaliation against immigrant activists and widespread suppression of speech in favor of immigrant rights.

The nature of this alleged retaliation and the harms that arise from it are severe. Immigrants who have spoken out against detention and deportation policies through protest, community organizing, the arts, the press, and the legal system have found themselves fined,[19] arbitrarily placed in deportation proceedings,[20] abruptly detained,[21] placed in solitary confinement or transferred to far-off detention facilities,[22] and/or rapidly deported because of their First Amendment activity.[23] The chilling effect of these efforts on immigrant organizing is significant, with immigrant communities being sent a clear message: Speak out against detention and deportation, and you will be detained and deported.[24] If the government can silence its critics, it has the power to control public debate and hide the inner workings of its most controversial immigration policies from public view.

With no right to government-appointed counsel and the full weight of the U.S. deportation apparatus against them, only a small number of immigrant activists have been able to raise First Amendment retaliation claims in court. As discussed in the next section, these cases have involved hotly contested issues regarding the power of the courts to review such claims and the scope of First Amendment protections afforded to immigrant activists. Potentially clear-cut cases of retaliation have been complicated by arguments that threaten to erode First Amendment principles. At the same time, these cases have given courts an opportunity to revive First Amendment principles in the wake of *AADC* and name the targeting of immigrant activists by immigration officials as a form of outrageous discrimination.

By upholding the right of immigrant activists to criticize federal immigration policy without fear of retaliation, courts can help resurface the anti-subordinating role of the First Amendment as a protection against majoritarian tyranny.[25] The next section discusses the core questions that have cropped up in immigrant activists' First Amendment litigation and proposes how courts should resolve these issues in line with First Amendment principles.

## The Core Legal Questions

The core legal questions presented in any case alleging First Amendment retaliation by the government should address whether the evidence demonstrates that First Amendment retaliation has occurred and, if so, what the remedy should be.[26] Unfortunately, in the context of retaliation against immigrants in the U.S., the federal government has raised three additional immigration-specific gatekeeping questions that courts have had to confront before applying core First Amendment law: (1) Does the First Amendment protect all noncitizens in the U.S.? (2) Do federal courts have the power to consider, and do noncitizens have the right to raise, First Amendment challenges to retaliatory immigration enforcement? (3) Does the existence of a legally valid basis to arrest, detain, or deport a noncitizen preclude a noncitizen from bringing a First Amendment challenge to that action? In this section, I address each of these core questions in turn, proposing answers that would align with First Amendment principles. I focus on cases in which immigrants in the U.S. have sought to stop the retaliatory use of interior immigration enforcement power through stays, declaratory and injunctive relief, and grants of writs of habeas corpus.

## Does the First Amendment protect all noncitizens in the U.S.?

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[27] In *Bridges v. Wixon*, a case challenging efforts to deport Australian-born union leader Harry Bridges based on his alleged communist affiliation and membership, the Supreme Court affirmed that "[f]reedom of speech and of press is accorded aliens residing in this country."[28] There are many good reasons why the First Amendment would apply to noncitizens and citizens alike. Unlike other provisions in the U.S. Constitution, the First Amendment makes no reference to "citizens" and instead, where it refers to rights, speaks of "the people."[29] The values of the First Amendment reach much more broadly than the speaker: The First Amendment protects democratic self-governance for society as a whole and ensures both the right to speak and the right to listen.[30] Moreover, the First Amendment restricts the federal government from abusing its power to suppress speech based on its content or viewpoint, an important value irrespective of the status of the person whose speech is being silenced.[31]

Despite this, in a narrow set of circumstances, the federal government has argued that some immigrants in the U.S. are not entitled to First Amendment protections at all. Specifically, it has taken the position, in at least one First Amendment retaliation case litigated a decade ago, that noncitizens who have arrived in the U.S. recently and without authorization fall outside the First Amendment's protection.[32] In *Pineda-Cruz v. Thompson*, a group of mothers detained with their children at Karnes County Detention Center in Texas while seeking asylum sued the federal government, alleging First Amendment retaliation.[33] Approximately 80 mothers engaged in a protest, circulating a petition demanding their release and initiating a five-day hunger strike.[34] The complaint alleged that the prison reacted by placing several of the protest leaders in solitary confinement, terminating their prison jobs, threatening to take the mothers' children away, and engaging in verbal abuse.[35] The federal government filed a motion to dismiss that argued, in part, that "[a]s non-resident aliens who have not gained admission or entry to the United States – and who have not established connections to the United States – Plaintiffs are not entitled to prevail in a lawsuit seeking relief for alleged violations of the First Amendment."[36] The plaintiffs voluntarily dismissed the case prior to a decision on the motion to dismiss, but the federal government's position—that it had limitless power to silence asylum seekers within the U.S.—was alarming.[37]

The federal government based this position on three Supreme Court cases arising in significantly different contexts: *Johnson v. Eisentrager*, *United States ex rel. Turner v. Williams*, and *United States v. Verdugo-Urquidez*.[38] None of these cases hold that a noncitizen living in the U.S. lacks First Amendment rights, but the federal government's brief in *Pineda Cruz* used each case to suggest that immigration status may be relevant to a First Amendment inquiry.

*Eisentrager* addressed whether nonresident "enemy alien" German citizens captured as prisoners of war outside the U.S. may seek habeas review in U.S. courts.[39] In denying them access to habeas review, the Supreme Court described the "ascending scale of rights" afforded to immigrants to the U.S.:

> The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere *lawful presence* in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.
> [40]

In *Pineda Cruz,* the federal government used this case to argue the inverse, that a person without "lawful presence" in the U.S. is therefore categorically unprotected by the U.S. Constitution. This is something that the Supreme Court has not held,[41] and it was not addressed by *Eisentrager* (which, even in the context of addressing the reach of habeas corpus in wartime, has been interpreted as a highly context-specific decision).[42] *Eisentrager* therefore does not stand for the proposition that people in the U.S. without lawful presence have no First Amendment rights.

In *Turner*, the Supreme Court upheld the federal government's power to exclude "alien anarchists" from the U.S., finding no First Amendment concern and stating that a person excluded or expelled from the U.S. "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law."[43] The federal government in *Pineda Cruz* cited *Turner* to suggest that "deportable aliens" are therefore unable to seek First Amendment protection from deportation, but the analysis in *Turner* was much more narrow. In *Turner*, the Court observed that Congress reasonably viewed anarchy as a threat to national self-preservation and that, while anyone barred from entering the U.S. "is in fact cut off from worshiping or speaking or publishing or petitioning in the country[,]. . . that is merely because of his exclusion therefrom" and is not in and of itself a First Amendment injury.[44] Moreover, *Turner* pre-dates developments in constitutional law generally, and First Amendment law specifically, that recognize that the government may not deprive an individual of a benefit in violation of that individual's constitutional rights, even if the individual has no right to the benefit itself.[45] *Turner* does not, therefore, stand for the proposition that immigrants lack First Amendment protections.

*United States v. Verdugo-Urquidez is* a Fourth Amendment case, holding that the Fourth Amendment does not apply to searches and seizures of noncitizens outside the U.S.[46] The Supreme Court contrasted the Fourth Amendment's reference to "the people" with the Fifth and Sixth Amendments' references to "persons" or the "accused" and refused to apply the Fourth Amendment extraterritorially.[47] In so doing, the Court mentioned the First Amendment, stating:

> While this textual exegesis [examining references to "the people" in various portions of the U.S. Constitution] is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.[48]

In *Pineda Cruz*, the federal government used this language to argue that the detained mothers at Karnes could not raise First Amendment claims because they had not proven that they had "developed sufficient connection with the country" to be considered part of the community.[49] But nothing in *Verdugo-Urquidez* addresses what would constitute "sufficient connection" or suggests that people physically within the United States would not be considered part of the "national community." *Verdugo-Urquidez* is not about the rights of people inside the United States at all. Nor does *Verdugo-Urquidez* address whether freedom of speech (as opposed to other freedoms specified in the First Amendment) is limited to "the people" in the collective sense. As Michael Kagan has emphasized, the portion of the First Amendment protecting freedom of speech does not reference the class of speakers at all—suggesting a broad interest in limiting governmental abuses of power.[50] This interest underscores why the First Amendment should protect the mothers in *Pineda Cruz* from retaliation. As I have written in my previous scholarship, the treatment of immigrants in immigration detention is a matter of pressing public concern and the voices of people who are directly impacted by detention in the U.S. are critical to the public's understanding of these issues.[51] If

the government can silence those whom it chooses to hold in custody without scrutiny, it undermines democratic debate.

The origins of the First Amendment also matter. Verdugo-Urquidez did not end its analysis with this "textual exegesis" and instead went on to examine the history of the drafting of the Fourth Amendment and its purposes.[52] Similar context-specific debates are occurring in the Second Amendment sphere.[53] Any limitations on the reach of the First Amendment must align with its origins and purposes, including its focus on the free exchange of ideas and the right of the public to listen to diverse perspectives on issues of public concern.Moreover, because freedom of speech is "the matrix, the indispensable condition, of nearly every other form of freedom,"[54] there are strong reasons to examine the First Amendment in conjunction with other constitutional provisions that undeniably protect all persons.[55] This suggests not only more fulsome speech protections for anyone present in the territorial U.S. but also a reexamination of the reach of these protections to speakers outside the U.S., as other scholars have suggested.[56]

Perhaps recognizing the folly of its argument in *Pineda Cruz*, the federal government has not actively pursued similar arguments in other First Amendment cases involving immigrant activists in the decade since. It would have been difficult for the federal government to apply such reasoning to the majority of cases in which immigrant activists have alleged retaliation in any event. Immigrant activists who have drawn the attention of federal immigration officials generally have long-standing and substantial ties that have driven their organizing—family, employment, and community, in addition to long residence in the U.S. Even immigrant activists who are more recent arrivals—such as those who are detained within the U.S. pending immigration proceedings—are part of our national community and have viewpoints salient to the public debate. The federal governments and the courts should resist further fragmentation of First Amendment law and apply First Amendment principles robustly to all immigrant activists in the U.S.

## Do federal courts have the power to consider, and do noncitizens have the right to raise, First Amendment challenges to retaliatory immigration enforcement?

The Supreme Court has long recognized that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."[57] The First Amendment prohibits retaliation because allowing retaliation would permit the government to punish speech indirectly, when the government has no right to punish speech at all.[58]

To effectuate this right, however, an individual facing First Amendment retaliation requires access to a judicial forum. Federal question jurisdiction provides a judicial forum for constitutional controversies.[59] Indeed, some degree of judicial review over First Amendment claims is guaranteed by Article III and the First Amendment of the U.S. Constitution. The Supreme Court has held that interpreting a statute to deprive federal courts of jurisdiction over constitutional claims would raise serious constitutional concerns.[60] As Akhil Amar has explained, to ensure the Constitution's status as the supreme law of the land, it "would have been insufficient simply to empower, but not oblige, Congress to give federal courts jurisdiction in these cases."[61] Moreover, where the alleged First Amendment retaliation involves a restraint on liberty, other jurisdictional provisions apply. Article I, § 9, cl. 2 (the Suspension Clause) of the U.S. Constitution and the civil habeas statute, 28 U.S.C. § 2241, ensure the review of unconstitutional restraints on liberty.

Despite these background principles, the federal government has argued that immigrant activists—even those whose speech is concededly protected under the First Amendment—have no right to bring a First Amendment retaliation claim and no forum for review.[62] This argument is based primarily on the Supreme

Court's 1999 decision in *Reno v. AADC*, which interpreted a jurisdiction-stripping provision in the Immigration and Nationality Act, 8 U.S.C. § 1252(g), and analyzed whether the plaintiffs—members of the Popular Front for the Liberation of Palestine—could bring a selective enforcement claim to stop the commencement of removal proceedings against them.[63] For the reasons explained below, however, neither 8 U.S.C. § 1252(g) nor the ruling on selective enforcement in *AADC* precludes the review of immigrant activists' First Amendment retaliation claims. Where an immigrant raises a cognizable First Amendment retaliation claim, the U.S. Constitution guarantees review.

As an initial matter, the federal government often reads 8 U.S.C. § 1252(g) more expansively than its text or history suggests. In the 1990s, Congress amended federal immigration law to streamline and, in some cases, eliminate judicial review over certain immigration decisions.[64] As part of this effort, it enacted 8 U.S.C. § 1252(g) to limit review of decisions or actions by federal immigration officials to "commence proceedings, adjudicate cases, or execute removal orders." As the Supreme Court observed in *AADC*, Congress enacted § 1252(g) in the wake of lawsuits challenging federal immigration officials' failure to exercise prosecutorial discretion during these three stages of proceedings.[65] Congress wanted federal immigration officials to maintain their discretion to decide whether or not to halt proceedings at these stages in the process "for humanitarian reasons or simply for its own convenience."[66]

*AADC* examined § 1252(g) within a particular context. The plaintiffs in *AADC* were placed into removal proceedings and charged with routine immigration law violations and, although later dropped, with charges related to advocacy for "world communism."[67] They brought a selective prosecution challenge to the commencement of their removal proceedings, claiming that federal immigration officials targeted them based on their membership in the Popular Front for the Liberation of Palestine, which the federal government considered to be a terrorist organization.[68] After determining that § 1252(g) prohibited judicial review of decisions to commence removal proceedings, the Supreme Court then considered the plaintiffs' claim that its reading of the statute raised constitutional concerns.[69] The Supreme Court concluded that the plaintiffs had not raised a colorable First Amendment claim, holding that "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity."[70]

The Court could have stopped there but instead announced a general rule against selective enforcement claims in the immigration context.[71] Examining the issue from the context of selective prosecution, the Court reasoned that recognizing such claims would allow unlawfully present noncitizens like the plaintiffs in *AADC* to "to prolong a continuing violation of United States law" and probe the mindset of prosecutors, thereby risking "the disclosure of foreign-policy objectives and . . . foreign-intelligence products and techniques" related to combatting terrorism and national security interests.[72] The Court did not, however, foreclose all selective enforcement claims, recognizing that there may be cases "in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome."[73]

Read in context, *AADC* stands for the proposition that § 1252(g) precludes judicial review of a challenge to federal immigration officials' discretionary decision to commence a proceeding, adjudicate a case, or execute a removal order in the absence of a colorable constitutional claim and that a selective enforcement claim is not colorable in the absence of outrageous discrimination.[74] Notably, *AADC* reached its result by emphasizing national security and terrorism concerns, which are not present in the vast majority of immigration cases. One can therefore distinguish *AADC* from cases that raise different concerns, challenge different actions, or present viable constitutional claims.

For example, only a limited set of actions fall within the purview of *AADC*. *AADC* recognizes that 8 U.S.C. § 1252(g) is tethered solely to the "three discrete actions" referenced in 8 U.S.C. § 1252(g). It therefore does

4/5/25, 11:55 AM · Case 25-1357, Document 10-3, Page 245 · Date Filed 08/20/2025 · ... Protecting Immigrant Activists from US Government Retaliation: Lessons from First Amendm…

Case 25-1357, Document 19-3, Page 245 of 416
PageID: 1323

not alter a court's jurisdiction to review "many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order."[75] Another action not described in § 1252(g) is the decision to detain. Appropriately, courts have readily found habeas jurisdiction over challenges to retaliatory detention.[76]

Nor does *AADC* address a scenario where a noncitizen is raising a colorable constitutional claim for which no other forum is available.[77] Justice Ginsburg raised concerns about this scenario in her concurrence: "[W]ere respondents to assert a colorable First Amendment claim as a now or never matter[—]were that claim not cognizable upon judicial review of a final order—again precedent and sense would counsel immediate resort to a judicial forum."[78] Selective prosecution is a challenge raised at the beginning of the removal process, which provides some avenue for judicial review (even if the scope of that review is subject to debate). In a "now or never" scenario—for example, a case where retaliation occurs after the removal process is completed, i.e., selective deportation—the interests of the immigrant in having some forum in which to challenge the unconstitutionality of their deportation outweigh the interests of the deporting officials.[79] This "now or never" scenario counsels in favor of a narrow reading of § 1252(g) that does not foreclose review where a colorable constitutional claim (related to the First Amendment or otherwise) is raised.

Specific to the selective enforcement context, *AADC* explicitly leaves open the review of selective enforcement claims based on "outrageous" discrimination. In *Ragbir v. Homan*, the U.S. Court of Appeals for the Second Circuit held that First Amendment retaliation against an immigrant rights activist for his political speech critical of federal immigration policy is a form of outrageous discrimination that fits within the exception in *AADC*.[80] The plaintiff in *Ragbir* was the director of a prominent immigrant rights organization in New York that organized faith communities.[81] He received a final order of removal in 2007 but was given permission to continue to live and work in the U.S. for several years prior to his abrupt detention and imminent deportation and was targeted along with the co-founder of his organization in 2018.[82] The ICE official who authorized the detention of Mr. Ragbir and his colleague expressed resentment towards their public remarks and advocacy.[83] Mr. Ragbir argued that ICE's efforts to deport him amounted to First Amendment retaliation for his protected political speech and to outrageous discrimination under *AADC*.

The Second Circuit agreed that Mr. Ragbir presented a viable First Amendment claim. In laying out the test for outrageous discrimination, the Second Circuit explained that courts should examine "the gravity of the constitutional right affected; the extent to which the plaintiff's conduct or status that forms the basis for the alleged discrimination is actually protected; the egregiousness of the Government's alleged conduct; and the plaintiff's interest in avoiding selective treatment, as balanced against the Government's discretionary prerogative."[84] Applying this test, the court explained that "advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents" and therefore "implicates the apex of protection under the First Amendment."[85] The Second Circuit concluded that he raised strong, plausible claims of retaliation for his viewpoint on immigrant rights and the public attention it received.[86] As the Second Circuit held, "[t]o allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others."[87]

The existence of a valid constitutional claim, which the Supreme Court found lacking in *AADC*, casts serious constitutional doubt on whether Congress could eliminate judicial review. The court in *Ragbir*

4/5/25, 11:55 AM    Case 2:25-cv-02137-MED Document 10-3 ... Protecting immigrant Activists from U.S. Government Retaliation Lessons from First Amendm...

Case 2:25-cv-02137-MED Document 10-3 Page 246 Filed 04/06/25/08/20/2025 23
PageID: 1324

could have construed 8 U.S.C. § 1252(g) narrowly to avoid the constitutional concerns by concluding that the statute was designed to constrain review of agency discretion and not of valid constitutional claims.[88] Instead, the court concluded that the statute's prohibition on the review of decisions "to execute removal orders" did not distinguish between constitutional and nonconstitutional claims and thus that there was no room to construe the statute to avoid the constitutional doubt.[89] It thus turned to the more complex issue of whether Congress' enactment of § 1252(g) violated the Suspension Clause of the U.S. Constitution, which ensures some degree of habeas jurisdiction.

The Second Circuit concluded that the Suspension Clause guaranteed review. Mr. Ragbir was "in custody" by virtue of his deportation order[90] and his claims fell within the "constitutionally required scope of the privilege of the writ of habeas corpus" at common law.[91] Because the Great Writ had not been formally suspended, and because the parties conceded that Congress had not provided an "adequate substitute" for habeas review, the Second Circuit concluded that stripping jurisdiction over Mr. Ragbir's First Amendment claim violated the Suspension Clause.[92] It ordered the case to be remanded for further consideration.

The focus on the Suspension Clause has led to another line of argument that the federal government has raised in cases of alleged retaliatory deportation: whether habeas relief is available to a person who challenges their deportation. The Office of the Solicitor General filed a petition for certiorari to the U.S. Supreme Court in *Ragbir*. While the certiorari petition for *Ragbir* was pending, the Supreme Court issued a Suspension Clause case, *U.S. Department of Homeland Security v. Thuraissigiam*,[93] and remanded *Ragbir* to consider what impact, if any, *Thuraissigiam* had on the Suspension Clause analysis.[94] The question was never resolved in *Ragbir* because the parties entered into a settlement prior to a further decision.[95]

In *Thuraissigiam*, the Supreme Court held that 8 U.S.C. § 1252(e)(2), a statutory provision that limits judicial review of expedited removal orders, does not violate the Suspension or Due Process Clauses as applied to a noncitizen "at the threshold of initial entry" who sought to overturn his expedited removal order and "obtain additional administrative review" beyond what the statute required.[96] As scholars have observed, *Thuraissigiam* is a troubling case.[97] But there are several reasons why *Thuraissigiam* does not ultimately undermine a conclusion that *Ragbir* reached the right result with respect to the Suspension Clause question.

First, *Thuraissigiam* is narrow in scope. *Thuraissigiam* was an "as applied" challenge to the expedited removal of an individual seeking initial entry and a more robust process of review at the border.[98] *Thuraissigiam* thus stands for the narrow proposition that a noncitizen with no ties to the U.S. cannot resort to habeas as a means of "gaining entry" and that due process is not offended by the expedited removal process of such an individual pursuant to statute.[99] Importantly, its Suspension Clause analysis focused solely on the scope of the writ of habeas corpus in 1789 and thus did not consider the ways in which the writ has evolved over time.[100]

Second, several aspects of *Thuraissigiam* help make the case for why judicial review of a colorable First Amendment retaliation claim challenging deportation *is* constitutionally required. In crafting a narrow rule tailored to the border entry context, *Thuraissigiam* carefully preserved long-standing Supreme Court precedent protecting habeas review over the claims of noncitizens "already in the country who were held in custody pending deportation."[101] It also preserved Supreme Court precedent recognizing that habeas jurisdiction empowers courts to consider a variety of remedies to unlawful restraints on liberty.[102] It further underscored the presumption of judicial review and other interpretive canons designed to prevent the elimination of judicial review over deportation.[103] Finally, it recognized, as it must, that there are various sources of jurisdiction over colorable constitutional claims.[104]

JA 921

4/5/25, 11:55 AM Case 2:25-cv-02937 Document 19-3 Page 247 Filed 04/06/25 Page 1 of 23 ... Protecting Immigrant Activists from US Government Retaliation: Lessons from First Amendm…

PageID: 1325

*INS v. St. Cyr,* which *Thuraissigiam* cites, helps to demonstrate why courts should exercise habeas jurisdiction over cases challenging retaliatory deportation. The noncitizen in *St. Cyr* sought a writ of habeas corpus challenging his deportation, arguing "that the restrictions on discretionary relief from deportation contained in the 1996 statutes do not apply to removal proceedings brought against an alien who pleaded guilty to a deportable crime before their enactment."[105] In interpreting the statute to preserve habeas review over such a claim, the Supreme Court emphasized that "at the absolute minimum" the Suspension Clause preserved the writ as of 1789 and recognized "there is historical evidence of the writ issuing to redress the improper exercise of official discretion" even in cases where detention is authorized by statute.[106] It further observed that during the finality era, habeas was "the sole means by which an alien could test the legality of his or her deportation order."[107] At its core, *St. Cyr* recognizes the importance of preserving habeas review of deportation challenges, and *Thuraissigiam* upholds this view.
[108]

Whether construing § 1252(g) narrowly,[109] upholding habeas jurisdiction in light of Suspension Clause concerns, or locating a different constitutional source for a jurisdictional guarantee, federal courts have the power to consider colorable claims of First Amendment retaliation. Courts should reject the federal government's attempts to stretch cases like *AADC* and *Thuraissigiam* beyond their narrow facts, lest even outrageous discrimination go unremedied.

## Does the existence of a legally valid basis to arrest, detain, or deport a noncitizen preclude a noncitizen from bringing a First Amendment challenge to that action?

A third emerging issue is whether the existence of otherwise valid authority to take an immigration enforcement action eviscerates any potential First Amendment retaliation claim. For example, does the fact that a person has a legally valid deportation order mean that it does not matter whether a federal immigration official engaged in outrageous discrimination by choosing to deport the person because of their protected speech? Does the fact that a person can be lawfully detained mean that it does not matter whether a federal immigration official chooses to detain the person because of their protected speech? The federal government has raised this argument in a number of recent First Amendment retaliation cases involving immigrant activists, urging courts to dismiss challenges based on the existence of valid authority to detain or deport.

Under a typical First Amendment analysis, the fact that a government entity has the authority and discretion to take a particular action does mean that they can take that action for an impermissible reason. For example, in *Perry v. Sindermann*, an untenured, contract professor at a state college sued public officials after his contract was not renewed, arguing that the nonrenewal was on the basis of his protected speech criticizing the college's Board of Regents and violated his due process rights.[110] The Supreme Court addressed whether the lack of a right (contractual or otherwise) to employment renewal necessarily defeats any claim of First Amendment retaliation.[111] The Supreme Court held that it did not:

> For at least a quarter-century, this Court has made clear that, even though a person has no "right" to a valuable governmental benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest, especially his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to

4/5/25, 11:55 AM    Case 2:25-cv-02595 Document 19-8    Protecting Immigrant Activists From US Government Retaliation: Lessons from First Amendm...    Filed 04/06/25    Page 248 of 416
Case 2:25-cv-02595    Document 19-8    Filed 04/06/25    Page 248 of 23
PageID: 1326

"produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.[112]

In other words, even if the government has the authority and discretion to take a particular action, it cannot take that action on a basis that infringes on a person's First Amendment rights. In *Sindermann*, it was sufficient that the professor alleged that the adverse action in dispute—the nonrenewal of his contract —occurred on the basis of his criticism of the Board of Regents, which he alleged was protected speech.[113]

In many cases, including cases relating to public employment, the question of retaliatory animus and causality can be complex when the government may have multiple reasons—some permissible, some impermissible—for taking an action. Courts ordinarily have addressed these complexities by applying the burden-shifting test in *Mt. Healthy City School District Board of Education v. Doyle*.[114] Under the *Mt. Healthy* test, a plaintiff must first show that their protected speech was a "motivating factor" in the contested government action.[115] If the plaintiff meets this burden, the government will be liable unless it demonstrates it would have taken the action "even in the absence of the protected conduct."[116]

In the context of retaliatory arrest, however, an even more complex set of questions has emerged. Courts have approached the issue of retaliatory arrests with more caution than employment decisions, given Fourth Amendment considerations and the difficulty of assessing when an arresting officer should be able to consider speech as part of the decision to arrest.[117] In some contexts, the existence of probable cause for arrest—i.e., a legally valid basis for arrest—can displace the *Mt. Healthy* test and defeat a claim for damages based on First Amendment retaliation entirely.

The Supreme Court addressed the issue most recently in two cases where individuals sought damages for retaliatory criminal arrest under 42 U.S.C. § 1983: *Lozman v. Riviera Beach*[118] and *Nieves v. Bartlett*.[119] In *Lozman*, an individual sought damages after he was arrested at a city council meeting, alleging that the arrest was in retaliation for a lawsuit he filed against the city over a local development project and for his vocal criticism of various council members.[120] The Supreme Court differentiated Lozman's claim from the "typical retaliatory arrest claim" involving "an ad hoc, on-the-spot decision by an individual officer."[121] Rather, Lozman alleged "[a]n official retaliatory policy" in which "the government itself orchestrate[d] the retaliation."[122] Under those circumstances, the existence of probable cause was not a categorical bar, since the inquiry focuses on the orchestration of the action rather than the officer's individual decision-making.[123] As such, the typical *Mt. Healthy* test could apply.

In *Nieves*, the Supreme Court returned to the issue of damages for retaliatory arrest but this time in the context of a more typical arrest decision.[124] The plaintiff in *Nieves* sought damages after the police arrested him at a sports festival, allegedly in retaliation for the plaintiff's refusal to speak to one of the officers and his intervention in another officer's discussion with a minor during the event.[125] The Court noted that protected speech can be a legitimate consideration when making split-second arrest decisions and that causality between any impermissible animus an officer might have and the injury would be difficult to prove.[126] The Court further noted that, in the Fourth Amendment context, courts are rarely permitted to probe the subjective intent of police officers and that "[t]o ensure that officers may go about their work without undue apprehension of being sued, we generally review their conduct under objective standards of reasonableness."[127] In light of these challenges, the Court held that the existence of probable cause defeated the individual's claim for damages based on a retaliatory criminal arrest.[128] Only if a plaintiff demonstrates a lack of probable cause would the case then proceed through the *Mt. Healthy* framework.[129]

Drawing from these principles, the federal government has argued that similar rules should apply to the immigration context. In *Bello-Reyes v. Gaynor*, for example, the federal government cited *Nieves* to argue

that a noncitizen could not challenge ICE's decision to revoke his release on bond in retaliation for his speech because he had violated the conditions of his release several months prior.[130] Similarly, in *Ragbir v. Homan*, the federal government argued that a noncitizen could not challenge ICE's decision to deport him in retaliation for his speech because he had received a valid order of deportation several years prior, drawing from case law in the criminal arrest context.[131]

There are several reasons why *Nieves* cannot be so easily repurposed. First, *Nieves* is a § 1983 damages case that addresses individual officer liability for past conduct. It does nothing to alter long-standing First Amendment jurisprudence prohibiting government officials from engaging in retaliation. Justice Gorsuch explained this distinction in his partial concurrence and dissent in *Nieves*:

Both sides accept that an officer violates the First Amendment when he arrests an individual in retaliation for his protected speech. They seem to agree, too, that the presence of probable cause does not undo that violation or erase its significance. . . . If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age. . . . So if probable cause can't erase a First Amendment violation, the question becomes whether its presence at least forecloses a civil claim for damages as a statutory matter under § 1983.[132]

Immigrant activists who challenge the constitutionality of their detention and deportation on First Amendment grounds are not raising questions about individual officer liability. As the U.S. Court of Appeals for the Ninth Circuit concluded when it declined to apply *Nieves* in *Bello-Reyes*, a "petitioner need not identify a particular violator, only that his confinement is unconstitutional."[133] Courts should consider constitutional questions by applying normal constitutional principles, rather than importing exceptions from the context of statutory damages.

Second, even if *Nieves* could apply outside the damages context, it has little applicability to retaliatory immigration enforcement. Federal immigration officers are engaging in civil law enforcement, typically through pre-planned decision-making regarding the targets of an operation or the initiation of removal proceedings. Unlike police officers enforcing criminal law, federal immigration officers are generally not relying on protected speech to decide whether to take action against someone in "split-second judgments" at the scene of a crime.[134] Moreover, many aspects of civil immigration enforcement are not governed by standards like probable cause. Given the struggle to apply Fourth Amendment concerns regarding officer intent to the civil immigration context, both the Ninth Circuit in *Bello-Reyes* and the Second Circuit in *Ragbir* refused to adopt a similar rule in the context of retaliatory detention or deportation.[135] To the extent that a retaliation claim would require a court to probe the reasoning of immigration prosecutors, the Supreme Court already addressed those concerns by limiting any selective prosecution claims to cases of "outrageous discrimination" as outlined in *AADC*.[136]

Third, even if *Nieves* could apply to some forms of retaliatory immigration enforcement, many of the claims raised by immigrant activists would fall into one of two exceptions. The first is the *Lozman* category of cases: retaliation on the basis of official government policy or the orchestration of retaliation. In cases where retaliation stems from a policy or plan, rather than "an ad hoc, on-the-spot decision by an individual officer," there is "a compelling need for adequate avenues of redress," and the normal test under *Mt. Healthy* should apply.[137] The second is a more narrow exception recognized within *Nieves*: retaliation alleged under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."[138] The Supreme Court recognized that, in contexts in which officers exercise prosecutorial discretion, "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech."[139] Prosecutorial discretion is a significant feature of immigration enforcement, with millions of

4/5/25, 11:55 AM   Case 2:25-cv-02837-MED Document 1-9 amendment Page 250 of 1... litigation and the First Amendm...

Case 2:25-cv-02837-MED Document 19-8 Page 250 Filed 04/06/25 08/20/2054 of 23
PageID: 1328

people being permitted to remain in the U.S. under some form of supervision rather than being detained or deported.[140] Given the relative underenforcement of civil immigration law, allegations of retaliation should not be defeated merely by pointing to federal immigration officials' power to detain or deport. Objective evidence that officers typically exercise discretion is sufficient to meet this exception.[141]

For these reasons, courts should reject the federal government's attempt to expand *Nieves* into the immigration context and, at a minimum, should apply its various exceptions vigorously. Otherwise, federal immigration officials will be given free rein to silence immigrants for their viewpoints on immigration policy, which federal immigration officials should be powerless to do under the First Amendment.

In summary, the First Amendment prohibits the federal government from retaliating against immigrant activists in the U.S. based on their immigrant rights advocacy. This includes a prohibition against retaliatory immigration enforcement in the form of detention and deportation. When such retaliation occurs, immigrants may raise, and federal courts must review, First Amendment claims challenging such actions. Courts should reject the federal government's attempts to limit their authority to review and redress such claims.

# Additional Strategies

In addition to defensive litigation, immigrant rights advocates have identified a number of strategies to address potential First Amendment retaliation. These strategies include proactive community trainings and preparedness to mitigate the risk of First Amendment retaliation; documentation, reporting, public education, and political advocacy when First Amendment retaliation occurs; and the pursuit of opportunities for structural reform. Each of these strategies may play a critical role in addressing the possibility of future retaliation and suppression of First Amendment rights.

First, advocates have emphasized the importance of preparing and training communities to address and mitigate the risks posed to immigrants who engage in activism. Any person who chooses to organize or engage in rallies, protests, and other forms of First Amendment activity should be informed about their rights and the risks of such participation. Immigrants who are vulnerable to deportation face a unique set of risks, with respect to both federal immigration enforcement and local policing policies. To help immigrants make informed choices about how to engage in activism, some organizations have prepared trainings and developed know-your-rights materials.[142] When retaliation has been a risk, organizers of events have sought the presence of legal observers and pre-arranged for legal support. The purpose of this preparedness is not to chill participation in speech but to ensure that people are informed and empowered to exercise their rights.

Second, when retaliation against immigrants has occurred, advocates have engaged in careful documentation, reporting, public education, and political advocacy, sometimes in concert with litigation. Organizations have prepared reports, teach-ins, and briefings to educate the public and elected officials about the need to protect immigrant communities from retaliation.[143] Advocates have filed Freedom of Information Act lawsuits to uncover indicia of retaliation for individuals and organizations.[144] Individuals and organizations have submitted complaints to the Department of Homeland Security's Office of the Inspector General and Office of Civil Rights and Civil Liberties to seek internal investigations.[145] Advocates have used these public records, complaints, and reports to demonstrate and map patterns of retaliation as part of litigation and policy advocacy, generating significant media coverage.[146] These efforts have encouraged community organizations, faith leaders, and government officials to condemn the retaliation and participate in lawsuits challenging First Amendment retaliation.[147]

Third, advocates and scholars have identified and proposed a number of structural solutions to address or prevent instances of retaliation against immigrant activists in the future. These include legislative, administrative, and regulatory fixes, including the issuance of prosecutorial discretion guidance; the settlement of pending First Amendment cases; the strengthening of administrative interventions (including giving more oversight and intervention powers to agency watchdogs); regulatory redress; and legislative amendments to restore judicial review.[148] Under the Biden administration, federal officials adopted a small number of these proposals. For example, the DHS issued guidance prohibiting First Amendment retaliation in immigration enforcement and the Department of Justice settled some First Amendment retaliation cases by agreeing to grant temporary forms of protection to immigrant activists.[149] Other promising proposals, such as the adoption of regulatory reforms and the strengthening of oversight agencies, could be adopted in the future.[150]

With the incoming Trump administration, the prospect for such structural reforms may seem unlikely. However, opportunities for change may nonetheless arise. Under the first Trump administration, ICE was willing to settle a lawsuit in *Migrant Justice v. Wolf* that raised several claims, including claims of First Amendment retaliation.[151] As part of the settlement, ICE agreed to provide immigration relief to several members of Migrant Justice and to circulate a 2019 policy memorandum prohibiting First Amendment retaliation by immigration officials.[152] Advocates may find opportunities, including through settlement, to push for policy changes. At a minimum, they can continue to lay the groundwork for more structural solutions for a future administration.

## Conclusion

The large number of alleged instances of retaliation against immigrant activists in recent years has shed light on a long-standing problem at the intersection of immigration and First Amendment law. First Amendment principles should not be diminished on the basis of a speaker's immigration status. Many of the legal barriers to protecting immigrant activists from First Amendment retaliation can be overcome if courts carefully cabin past precedent and exercise robust review over colorable claims. In addition, other forms of advocacy can help safeguard opportunities for immigrants to protect their First Amendment rights. At a time when immigration issues are so central to political debate in the United States, our institutions should be amplifying, rather than silencing, the voices of people directly impacted by U.S. immigration policies.

## Acknowledgments

Many thanks to Ahilan Arulanantham, Jameel Jaffer, George Wang, and Kayla Yoon for their helpful feedback on the essay and to my co-counsel, colleagues, and clients for their insights and advocacy.

© 2025, Alina Das

Cite as: Alina Das, *Protecting Immigrant Activists From U.S. Government Retaliation: Lessons From First Amendment Litigation*, 25-03 Knight First Amend. Inst. (Feb. 12, 2025), https://knightcolumbia.org/content/protecting-immigrant-activists-from-us-government-retaliation-lessons-from-first-amendment-litigation [https://perma.cc/3QEV-WXSC].

---

**1**  Throughout this paper, I use the terms "immigrants" and "noncitizens" interchangeably to refer to people in the U.S. who do not have U.S. citizenship status.

**2**  City of Houston, Tex. v. Hill, 482 U.S. 451, 462–63 (1987).

**JA 926**

4/5/25, 11:55 AM    Case 2:25-cv-02507-... Document 19-8 ... Page 252 ... Filed 04/06/25 ... Page 22 of 23 — ... Protecting Immigrant Activists from us government retaliation lessons from First Amendm…

Case 2:25-cv-02507-MED   Document 19-8   Page 252   Filed 04/06/25   Page 22 of 23
PageID: 1330

**3**   "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'" Snyder v. Phelps, 562 U.S. 443, 453 (2011) (internal citations omitted).

**4**   *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."). In particular, "speech critical of the exercise of the State's power lies at the very center of the First Amendment." Gentile v. State Bar of Nev., 501 U.S. 1030, 1034 (1991).

**5**   This paper focuses primarily on the use of interior immigration enforcement power—immigration arrests, detention, and deportation—as a form of retaliation against noncitizens in the U.S. and on efforts to stop the retaliation. This paper does not, therefore, address retaliation by federal immigration officials against U.S. citizens or noncitizens seeking entry from outside of the U.S. Nor does this paper address efforts by individuals to seek damages for past retaliation.

**6**   *See, e.g.*, Alina Das, *Immigration Detention and Dissent: The Role of the First Amendment on the Road to Abolition*, 56 GA. L. REV. 1433 (2022) [hereinafter "Immigration Detention and Dissent"]; Alina Das, *Deportation and Dissent: Protecting the Voices of the Immigrant Rights Movement*, 65 N.Y.L. SCH. L. REV. 225 (2020-2021) [hereinafter "*Deportation and Dissent*"]. I have served as counsel or co-counsel in several cases raising First Amendment retaliation claims on behalf of immigrant activists, including *Ragbir v. Homan*, *Rojas v. Moore*, *Avendano-Hernandez v. Decker*, *Montrevil v. Decker*, *Austin Sanctuary Network v. Mayorkas*, and *M.Q. v. Genalo*, and have filed amicus briefings in other cases raising similar issues.

**7**   JULIA ROSE KRAUT, THREAT OF DISSENT: A HISTORY OF IDEOLOGICAL EXCLUSION AND DEPORTATION IN THE UNITED STATES (2020).

**8**   *Id.*

**9**   Das, *Deportation and Dissent*, *supra* note 6, at 242-243 (describing the role of the plenary power doctrine in immigration law at the intersection of First Amendment rights).

**10**   Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999)(presenting a general rule against selective enforcement claims in the context of removal proceedings but stating "we need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome")

**11**   *See* Homeland Security Act of 2002, Pub.L. No. 107–296, § 471, 116 Stat. 2135.

**12**   *See* Immigration and Nationality Act, 8 U.S.C. 1101 et seq.

**13**   *See, e.g.*, Migration Policy Institute, *As #DefundThePolice Movement Gains Steam, Immigration Enforcement Spending and Practices Attract Scrutiny* (June 25, 2020), https://www.migrationpolicy.org/article/defundthepolice-movement-gains-steam-immigration-enforcement-spending-and-practices-attract; *see also* American Immigration Council, The Cost of Immigration Enforcement and Border Security (Aug. 14, 2024), https://www.americanimmigrationcouncil.org/research/the-cost-of-immigration-enforcement-and-border-security.

**14**   *See* Das, *Deportation and Dissent*, *supra* note 6, at 231-239 (describing examples of retaliation).

**15**   ImmigrantRightsVoices.org (mapping 1,015 incidents of retaliation against immigrant rights activists during the Trump Administration); Nick Pinto, *Across the U.S., Trump Used ICE to Crack Down on Immigration Activists*, THE INTERCEPT (Nov. 1, 2020), https://theintercept.com/2020/11/01/ice-immigration-activists-map/.

**16**   *See* Das, *Deportation and Dissent*, *supra* note 6, at 234-237 (describing retaliation against Ravi Ragbir, Jean Montrevil, Maru Mora-Villalpando, José Bello, and Claudio Rojas).

**17**   Memorandum From Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

**18**   *See* Das, *Immigration Detention and Dissent*, *supra* note 6, at 1452-1453 (describing examples of retaliation against immigrant activists reported under the Biden administration); Azadeh Shahshahani and Chiraayu Gosrani, *"Known Adversary": The Targeting of the Immigrants' Rights Movement in the Post-Trump Era*, 72 EMORY L.J. 1245, 1249 (2023) (arguing that "retaliation is part and parcel of the deportation and detention machine, such that retaliatory enforcement action remains a threat to immigrants, movement leaders, and organizers" in the Biden administration and beyond).

**19**   *See, e.g.*, Tina Vásquez, *ICE is Targeting Women in Sanctuary with Obscure Laws and Retaliatory Fines*, Truthout (Dec. 13, 2020), https://truthout.org/articles/ice-is-targeting-women-in-sanctuary-with-obscure-laws-and-retaliatory-fines/.

**20**   *See, e.g.*, Tania Unzueta, *ICE Serves Deportation Notice on Undocumented Leader for Organizing Detained Immigrants*, Mijente (Jan. 16, 2018), https://mijente.net/2018/01/maruversusice/.

**21**   *See, e.g.*, Yara Simón, A*ctivist José Bello Performed an Anti-ICE Poem at Public Forum. Two Days Later, ICE Detained Him.*, Remezcla (July 15, 2019), https://remezcla.com/culture/jose-bellow-anti-ice-poem-dear-america/.

4/5/25, 11:55 AM                Case 2:25-cv-02327... Document 19-3... Page 253... Filed 04/06/25... Page 10 of 22... Protecting Immigrant Activists from US Government Retaliation: Lessons from First Amendm…

Case 2:25-cv-02327-MEF-CLW    Document 19-3    Page 253    Filed 04/06/25    Page 10 of 22
PageID: 1331

22   *See, e.g.,* Daniel Parra, *Hunger-Striking ICE Detainees Sue Over Conditions at NY's Orange County Jail,* City Limits (Apr. 5, 2023), https://citylimits.org/2023/04/05/hunger-striking-ice-detainees-sue-over-conditions-at-nys-orange-county-jail/.

23   Matt Katz, *ICE Detainee Who Sued His Jailers Was Swiftly Deported. Now He's Missing.* The Gothamist (May 28, 2020), https://gothamist.com/news/ice-detainee-who-sued-his-jailers-was-swifty-deported-now-hes-missing.

24   Brief of 24 Immigrants' Rights Advocacy Organizations as Amici Curiae in Support of Plaintiffs-Appellants at 9–18, Ragbir v. Homan, 923 F.3d 53 (2d Cir. 2019) (No. 18-1597) (asserting that the government's focus on immigrant speech has "chilled and continues to chill speech about the immigration system").

25   *See, e.g.,* Gregory P. Magarian, *Centering Noncitizens' Free Speech,* 56 Ga. L. Rev. 1563, 1575 (2022) (arguing that, by ensuring nonciti-zens' First Amendment rights, courts can "recapture the essential mid-twentieth century focus on protecting the rights of disadvan-taged groups, political dissenters, and other speakers at society's margins" and correct "speech inequality" that favors the powerful); Genevieve Lakier, *Imagining an Antisubordinating First Amendment,* 118 Colum. L. Rev. 2117, 2118 (2018) (describing and critiquing a broad shift in First Amendment jurisprudence that results in protections for the privileged rather than the powerless).

26   The prongs of a First Amendment retaliation claim vary by jurisdiction but generally require (1) protected speech, (2) an adverse action, and (3) a causal connection between the protected speech and the adverse action. Remedies vary based on the context and type of claim and the nature of the injury.

27   U.S. Const. amend. I.

28   Bridges v. Wixon, 326 U.S. 135, 148 (1945) (citing Bridges v. California, 314 U.S. 252 (1941)).

29   U.S. Const. amend. I.

30   *See* Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."); Garrison v. Louisiana, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

31   *See Citizens United,* 558 U.S. at 340 ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.").

32   Complaint, *Pineda-Cruz v. Thompson,* No. SA-15-CV-326-XR (W.D. Tex. Apr. 23, 2015), 2015 WL 1868560; *see also* Michael Kagan, *Do Immigrants Have Freedom of Speech?,* 6 Calif. L. Rev. Circuit 84 (2015) (discussing the lawsuit).

33   Complaint, *Pineda-Cruz v. Thompson,* No. SA-15-CV-326-XR (W.D. Tex. Apr. 23, 2015), 2015 WL 1868560.

34   *Id.* at ¶5.

35   *Id.* at ¶6.

36   Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction *Pineda Cruz v. Thompson,* 2015 WL 3922298 (W.D.Tex. May 7, 2015).

37   *See* Michael Kagan, *When Immigrants Speak: The Precarious Status of Non-Citizen Speech Under the First Amendment,* 57 B.C. L. Rev. 1237, 1245 (2016) [hereinafter Kagan, *When Immigrants Speak*] (describing the outcome of *Pineda-Cruz* and critiquing the federal government's position that certain noncitizens' speech is not protected by the First Amendment).

38   Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction *Pineda Cruz v. Thompson,* 2015 WL 3922298 (W.D.Tex. May 7, 2015) (citing *Johnson v. Eisentrager,* 339 U.S. 763 (1950), *United States ex rel. Turner v. Williams,* 194 U.S. 279, 292 (1904), and *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990)).

39   *Johnson v. Eisentrager,* 339 U.S. 763, 768-69 & n. 2 (1950) (describing distinction between "alien friends" and "alien enemies").

40   *Id.* at 770.

41   To the contrary, the Supreme Court has applied equal protection principles to protect children with "undocumented status" from state discrimination. *See Plyler v. Doe,* 457 U.S. 202, 224-225 (1982).

42   *See Boumediene v. Bush,* 553 U.S. 723, 762-764, 766 (2008) (applying a context-specific reading of *Eisentrager* and holding that noncitizens held by the U.S. as enemy combatants at Guantanamo Bay had the right to habeas review protected by the Suspension Clause). Another case, *Kwong Hai Chew v. Colding,* touches upon a related issue of constitutional rights and the lawfulness of entry. 344 U.S. 590, 596 (1953). In a footnote, the Court in *Chew* observed that neither the First nor Fifth Amendment distinguishes between citi-zens and "resident aliens" and stated that "once an alien lawfully enters and resides in this country, he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Id.* at 596 n.5. While this footnote emphasizes the rights of those who have lawfully entered the U.S. and established their residence here, it does not directly address what protections apply to

people who did not lawfully enter the U.S. or are non–"residents/others." Notably, unlawful entry is not a categorical bar to various forms of lawful immigration statuses in the U.S., so it is unclear why it would hold weight in a First Amendment analysis.

43    *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).

44    *Id.* at 292-294.

45    *See* Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L. J. 329, 363 n. 122 (2024) (explaining that *Turner* was decided at a time when the traditional distinction between rights and privileges meant that "Congress could exclude immigrants on the basis of their speech or beliefs without violating the First Amendment—not because those immigrants were outside the protection of the First Amendment, but because they sought a privilege", and observing that this distinction has since eroded as a matter of constitutional law); *see also* Perry v. Sindermann, 408 U.S. 593, 597(1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest, especially, his interest in freedom of speech.").

46    *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).

47    *Id.* at 264-265.

48    *Id.* at 265.

49    The federal government used the term "substantial connection" instead of "sufficient connection" without explanation. *See* Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction *Pineda Cruz v. Thompson*, 2015 WL 3922298 (W.D.Tex. May 7, 2015).

50    *See* Kagan, *When Immigrants Speak*, *supra* note 37, at 1248.

51    *See* Das, *Immigration Detention and Dissent*, *supra* note 6.

52    *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).

53    *See* Kagan, *When Immigrants Speak*, *supra* note 37, at 1246-1249 (discussing the Second Amendment context).

54    Palko v. Connecticut, 302 U.S. 319, 327 (1937).

55    *See* Kagan, *When Immigrants Speak*, *supra* note 37, at 1251 (situating First Amendment rights in broader constitutional values of restraining government power); David Cole, *Are Foreign Nationals Entitled to the Same Constitutional Rights as Citizens?*, 25 T. JEFFERSON L. REV. 367, 370 (2002-2003) ("[B]oth the First Amendment's protections of political and religious freedoms and the Fourth Amendment's protection of privacy and liberty apply to 'the people.' The fact that the Framers chose to limit to citizens only the rights to vote and to run for federal office is one indication that they did not intend other constitutional rights to be so limited."); Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. Rev. 667, 681-712 (2003) (discussing and criticizing case law suggesting that the "the people" in the First Amendment does not necessarily cover noncitizens).

56    *See, e.g.*, Shalini Bhargava Ray, *The Contested "Bright Line" of Territorial Presence*, 56 GA. L. REV. 1511 (2022) (exploring territorial reach of First Amendment protections).

57    Hartman v. Moore, 547 U.S. 250, 256 (2006); Board of County Commissioners v. Umbehr, 518 U.S. 668, 671, 865(1996); Perry v. Sindermann, 408 U.S. 593, 594-595(1972).

58    *See Perry*, 408 U.S. at 597-98.

59    U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1331.

60    *See* Webster v. Doe, 486 U.S. 592, 603 (1988) (holding that, in absence from a clear statement of congressional intent, courts must construe statutes to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim") (internal citations omitted).

61    Akhil Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. REV. 205, 250 (1985); *see also* Daniel J. Meltzer, *Congress, Courts, and Constitutional Remedies*, 86 Geo. L.J. 2537, 2570 (1998) (explaining how Article III constrains Congress' power to restrict judicial review).

62    The government has raised this argument in numerous cases challenging retaliatory deportation over the past decade, including in *Ragbir v. Homan*, *Rojas v. Moore*, *Montrevil v. Decker*, and *M.Q. v. Garland*.

63    Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 473 (1999).

64    *See, e.g.*, Gerald L. Neuman, *Jurisdiction and the Rule of Law After the 1996 Immigration Act*, 113 HARV. L. REV. 1963 (2000).

65   *Am.-Arab Anti-Discrimination Comm.*, 525 U.S at 483-485 ("Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed.").

66   *Id.* at 484.

67   *Id.* at 473.

68   *Id.*

69   *Id.* at 488 ("[W]e must address respondents' contention that . . . the doctrine of constitutional doubt requires us to interpret § 1252(g) in such fashion as to permit immediate review of their selective-enforcement claims.").

70   *Id.* at 488, 491-492.

71   *Id.* at 488-491.

72   *Id.* at 490-91.

73   *Id.* at 491.

74   Scholars debate the scope and legitimacy of the underlying rationale of *AADC*. However, no reading of *AADC* suggests that courts are permitted to dismiss constitutional claims for lack of jurisdiction without reaching the merits.

75   *Id.* at 483.

76   *See, e.g.*, Bello-Reyes v. Gaynor, 985 F.3d 696, 698 (9th Cir. 2021) (addressing merits of First Amendment challenge to ICE detention); Gutierrez-Soto v. Sessions, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018) (addressing merits of First Amendment challenge to ICE detention).

77   The majority in *AADC* assumed, without deciding, that a forum for the plaintiff's claim might not be available through the course of removal proceedings or, if available, would come too late to address the chilling effect of a retaliatory prosecution. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S at 488. But because it did not find a colorable constitutional claim, it did not need to address whether the lack of any forum for a colorable constitutional claim would, in and of itself, raise constitutional concerns.

78   *Id.* at 498 (Ginsburg, J., concurring).

79   Selective deportation claims also differ from selective prosecution claims in terms of the burden on the officials involved. While the Supreme Court in *AADC* expressed concern regarding the intrusiveness of inquiries into prosecutorial motive during a prosecution, a selective deportation claim focuses solely on the motives of the deporting officials who are seeking to enforce removal orders that were prosecuted long ago.

80   Ragbir v. Homan, 923 F.3d 53, 78 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227 (2020).

81   *Id.* at 58.

82   *Id.* at 58-59.

83   *Id.* at 60.

84   *Id.* at 69.

85   *Id.* at 69. The court distinguished *AADC*, observing that "national-security and foreign-policy concerns about terrorism were primary in *AADC*" and that the government made no assertion in *Ragbir* that an inquiry into the motivations of the government officials "would compromise intelligence sources and foreign relations." *Id.* at 72. Nor would such an assertion make sense, as "the plaintiff's plausible allegation is that the Government undertook the deportation to silence criticism of the responsible agency." *Id.*

86   *Id.* at 70.

87   *Id.* at 71.

88   *Id.* at 65. The Second Circuit concluded that 1252(g) could not be fairly interpreted to exclude constitutional claims, because Congress amended the statute to state that it applied "notwithstanding any other provision of law (statutory or nonstatutory)". *Id.* The Second Circuit stated, "[W]e are aware of no 'nonstatutory' claim that a petitioner could bring in relation to a deportation proceeding other than one rooted in the Constitution." *Id.* However, the term "nonstatutory" is likely a reference to the variety of administrative claims that petitioners may raise to challenge their deportation, under agency precedent or regulations. Elsewhere in the same provision, where Congress intended to reach constitutional claims, it used the term "constitutional" explicitly. *See, e.g.*, 8 U.S.C. §§ 1252(a)(2)(D), (b)(9).

## JA 930

**89**  *Id.* at 65.

**90**  *Id.* at 74-76 (concluding that the fact "that Ragbir faces imminent deportation, which necessarily involves a period of detention— and that he must comply, absent judicial intervention, with the Government's orders 'at any time and without a moment's notice,'" demonstrates "a present, substantial curtailment of Ragbir's liberty.") (quoting *Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cnty., California*, 411 U.S. 345, 350 (1973)).

**91**  *Id.* at 76-78.

**92**  *Id.* at 78.

**93**  591 U.S. 103 (2020).

**94**  Pham v. Ragbir, 141 S. Ct. 227 (2020).

**95**  Nick Pinto, *ICE Settles With Immigrant Rights Leader Who Sued Over First Amendment Violations*, The Intercept (Feb. 24, 2022), https://theintercept.com/2022/02/24/ice-ravi-ragbir-deportation-first-amendment/.

**96**  U.S. Department of Homeland Security v. Thuraissigiam, 591 U.S. 103, 106-107 (2020).

**97**  *See generally* Jonathan Hafetz, *The Suspension Clause After* Department of Homeland Security v. Thuraissigiam, 95 St. John's L. Rev. 379, 388-407, 419-445 (2021) (criticizing the Supreme Court's analysis of the Suspension Clause in *Thuraissigiam* and describing how its impact may be limited in future cases); *see also* Brandon Hallett Thomas, *Separation of Powers and* Thuraissigiam: *The Entry Fiction as Judicial Aggrandizement*, 136 Harv. L. Rev. F. 226, 248 (2023); Daniel Kanstroom, *Deportation in the Shadows of Due Process: The Dangerous Implications of DHS v. Thuraissigiam*, 50 Sw. L. Rev. 342 (2021); Lee Kovarsky, *Habeas Privilege Origination and DHS v. Thuraissigiam*, 121 Colum. L. Rev. F. 23, 25 (2021); Gerald Neuman, *The Supreme Court's Attack on Habeas Corpus in DHS v. Thuraissigiam*, Just Security (Aug. 25, 2020) https://www.justsecurity.org/72104/the-supreme-courts-attack-on-habeas-corpus-in-dhs-v-thuraissigiam/; Ahilan Arulanantham & Adam Cox, *Immigration Maximalism at the Supreme Court*, Just Security (Aug. 11, 2020), https://www.justsecurity.org/71939/immigration-maximalism-at-the-supreme-court.

**98**  *Thuraissigiam*, 591 U.S. at 106-107, 140 (specifying the holding was "as applied" to the facts of the case); *see also id.* at 150 (Breyer, J, concurring in the judgment) ("The question presented is whether, *as applied to respondent*, Section 1252(e)(2) is unconstitutional under the Suspension Clause.") (emphasis in original, internal quotation marks and citations omitted).

**99**  *Id.* at 137; Hafetz, *supra* note 97, at 399, 419 (observing that *Thuraissigiam* presented the Supreme Court only with a narrow questions regarding the Suspension Clause and should have limited application outside that context).

**100**  *Thuraissigiam*, 591 U.S. at 118, 126 (explaining that its focus is on the scope of the habeas writ in 1789).

**101**  *Id.* at 137 (citing *INS v. St. Cyr*, 533 U.S. 289 (2001)).

**102**  The Supreme Court has held that "release [from physical confinement] need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008); *Hensley v. Mun. Court*, 411 U.S. 345, 350 (1973) (rejecting "interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness"); *see also Thuraissigiam*, 591 U.S. at 137 (stating "release is the habeas remedy though not the 'exclusive' result of every writ" and acknowledging "the practice . . .of allowing the executive to justify or cure a defect" or ordering release on "conditions").

**103**  *Thuraissigiam*, 591 U.S. at 134-135 (citing *Guerrero-Lasprilla v. Barr*, 140 S.Ct. 1062, 1069–1070 (2020); *Nasrallah v. Barr*, 140 S.Ct. 1683, 1690–1692 (2020); and *INS v. St. Cyr*, 533 U.S. 289, 299 (2001)).

**104**  *Id.* at 138-140 (examining and rejecting noncitizen's due process claims under the Due Process Clause); Hafetz, *supra* note 97, at 440-445 (considering various sources of constitutionally guaranteed judicial review).

**105**  *INS v. St. Cyr*, 533 U.S. 289, 293 (2001).

**106**  *Id.* at 301, 342.

**107**  *Id.* at 306; *see also* Hafetz, *supra* note 97,at 420-440 (explaining "why the Suspension Clause should be interpreted to include evolving uses and understandings of the writ").

**108**  *Thuraissigiam*, 591 U.S. at 137.

**109**  Occasionally, the federal government has also pointed to other provisions in 8 U.S.C. § 1252, § 1252(a)(5) and (b)(9), to try to defeat jurisdiction over First Amendment retaliation claims. But Sections 1252(a)(5) and (b)(9) by their own terms apply only to judicial review of questions tied to the validity of a final order of removal. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 311, 313 (2001) (§ 1252(a) applies to "[j]udicial review of a final order of removal" and § 1252(b) "applies only '[w]ith respect to review of an order of removal under subsection (a)(I)'"); *see also Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018)(explaining that "the applicability of § 1252(b)(9) turns on whether

4/5/25, 11:55 AM   Case 2:25-cv-02333-MEF-SDA   Document 19-3   Filed 04/06/25   Page 257 ... Protecting Immigrant Activists from US Government Retaliation: Lessons from First Amendm...

Case 2:25-cv-01935-AMF-SDA   Document 10-8   Page 25   Filed 04/08/26   Page 21 of 23
PageID: 1335

the legal questions that we must decide 'aris[e] from' the actions taken to remove these aliens", and rejecting as "extreme" a reading that would cover a challenge to prolonged detention). Thus these provisions are generally irrelevant to retaliation claims.

110   Perry v. Sindermann, 408 U.S. 593, 594-595(1972).

111   *Id.* at 596.

112   *Id.* at 597.

113   *Id.* at 598.

114   Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

115   *Id* at 275.

116   *Id.*

117   The Supreme Court has voiced similar concerns in the context of a damages action for retaliatory prosecution. *See Hartman v. Moore*, 547 U.S. 250, 262 (2006). In light of a prosecutor's immunity from liability for the decision to prosecute, malicious prosecution claims require a litigant to allege that a "nonprosecuting official acted in retaliation" and then "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* To avoid too intrusive an inquiry into the non-liable prosecutor's state of mind, the Court has required a plaintiff to first establish a lack of probable cause to bring a damages case for retaliatory prosecution. *Id.* at 263-266.

118   Lozman v. Riviera Beach, 585 U.S. 87 (2018).

119   Nieves v. Bartlett, 587 U.S. 391 (2019).

120   Lozman, 585 U.S. at 90-91.

121   *Id.* at 99-100.

122   *Id.* at 100.

123   *Id.* at 99-100.

124   Nieves v. Bartlett, 587 U.S. 391(2019).

125   *Id.* at 396-397.

126   *Id.* at 401.

127   *Id.* at 403.

128   *Id.* at 405.

129   *Id.* at 404.

130   *See* Bello-Reyes v. Gaynor, 985 F.3d 696, 698 (9th Cir. 2021) (addressing and rejecting the government's arguments based on *Nieves*).

131   *See* Ragbir v. Homan, 923 F.3d 53, 67 & n.17 (2d Cir. 2019) (addressing and rejecting the government's proposed probable cause test), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227 (2020) (remanding on other grounds). The U.S. Solicitor General's office sought certiorari of *Ragbir* in part on the basis of *Nieves*, which was issued after the Second Circuit's decision. The Supreme Court declined to grant on that basis.

132   *Nieves*, 587 U.S at 412-413(Gorsuch, J., concurring).

133   Bello-Reyes v. Gaynor, 985 F.3d 696, 701 (9th Cir. 2021).

134   *Nieves*, 139 S. Ct. at 401.

135   Ragbir v. Homan, 923 F.3d 53, 67 & n.17 (2d Cir. 2019) (noting that the probable cause requirement for the Fourth Amendment serves a specific purpose for securing an individual and evidence in the process of investigating a criminal offense, circumstances not readily translatable into the civil immigration context), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227 (2020) (remanding on other grounds); Bello-Reyes v. Gaynor, 985 F.3d 696, 701 (9th Cir. 2021) (refusing to apply *Nieves* in part because "no equivalent benchmark [to probable cause] exists where ICE is revoking bond" and thus "extending [*Nieves*] to this situation would effectively eliminate almost any prospect of obtaining release on habeas for actually retaliatory, unconstitutional immigration bond revocation"). Notably, when the federal government sought the Supreme Court's vacatur of the *Ragbir* decision based on *Nieves*, the

**JA 932**

Supreme Court left the merits of the case undisturbed while remaining solely for further consideration of a separate jurisdictional question.

**136** Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999). Notably, unlike the selective prosecution claim in *AADC*, claims that challenge retaliatory detention or deportation like in *Bello-Reyes* and *Ragbir* do not require any probing into the motives of immigration prosecutors.

**137** Lozman v. Riviera Beach, 585 U.S. 87, 99-100 (2018).

**138** Nieves v. Bartlett, 587 U.S. 391, 406 (2019).

**139** *Id.* (internal citations and quotations omitted).

**140** Michael E. Miller, *They Fear Being Deported. But 2.9 Million Immigrants Must Check In With ICE Anyway*, Wash. Post (Apr. 25, 2019), https://www.washingtonpost.com/local/they-fear-being-deported-but-29-million-immigrants-must-check-in-with-ice-anyway/2019/04/25/ac74efce-6309-11e9-9ff2-abc984dc9eec_story.html.

**141** Gonzalez v. Trevino, 602 U. S. 653, 144 S.Ct. 1663, 1667 (2024) (describing the objective evidence standard and rejecting a more heightened requirement).

**142** *See, e.g.*, Immigrant Legal Resource Center, 10 Things Noncitizen Protestors Need to Know (May 15, 2024), https://www.ilrc.org/resources/10-things-noncitizen-protestors-need-know; National Immigration Law Center, Know Your Rights: Immigrants' Participation in Protests (Nov. 2020), https://www.nilc.org/wp-content/uploads/2020/11/Protest-Know-Your-Rights-nilc-2020-1.pdf; Make the Road New York and NYU Immigrant Rights Clinic, Immigrant Protest: A Guide for Attorneys Advising Noncitizen Activists in NYC (Jun. 2020), https://maketheroadny.org/wp-content/uploads/2020/06/Immigrant-Protest_June-2020.pdf.

**143** *See, e.g.*, U. Wash. Immigration Clinic et al., Targeted But Not Silenced: A Report on Government Surveillance and Retaliation Against Immigration Organizers in the United States (2021); Virtual Briefing: Immigrant Rights Activists Under Attack (Jan. 13, 2021), https://www.youtube.com/watch?v=Nta4HfSFY48; Retaliation Against Immigrant Rights Defenders: A Proposal for the Biden-Harris Administration to Redress First Amendment Violations by Federal Agencies (Jan. 8, 2021), https://www.immigrantrightsvoices.org/#/action; I Stand With Ravi, *Watch: Two Important Talks From the First Amendment Teach-In* (Oct. 27, 2018), https://istandwithravi.org/2018/10/27/watch-two-important-talks-from-the-first-amendment-teach-in/.

**144** *See, e.g.*, Mora-Villalpando v. U.S. Immigration & Customs Enf't, No. C18-0655JLR (W.D. Wash. Ju;. 26, 2019); Austin Sanctuary Network v. ICE, No. 20-01686 (S.D.N.Y. Sept. 19, 2022).

**145** *See, e.g.*, Robert F. Kennedy Human Rights et al., Letter to Dep't of Homeland Sec. Office for Civil Rights & Civil Liberties Officer Shoba Sivaprasad Wadhia et al, Violation of First Amendment Rights of People Engaged in a Hunger Strike at the Buffalo Federal Detention Facility (July 9, 2024), https://rfkhumanrights.org/wp-content/uploads/2024/07/CRCL-Complaint-7.9.2024-FINAL-PDF-1.pdf; NYU Immigrant Rights Clinic & Cornell First Amendment Clinic, Letter to Dep't of Homeland Sec. Office for Civil Rights & Civil Liberties Officer Katherine Culliton-Gonzalez et al., Retaliatory Immigration Enforcement (July 19, 2021), https://www.law.nyu.edu/sites/default/files/NYU%20Cornell%20DHS%20OCRCL%20Complaint_First%20Amendment%20Retaliation_Final%20Letter%20and%20Index%207%2019%202021%20web%20version.pdf; Cal. Collaborative for Immigrant Just., et al., Letter to Dep't of Homeland Sec. Office for Civil Rights & Civil Liberties Officer Katherine Culliton-Gonzalez et al., First Amendment Retaliation Against Individuals in Immigration Detention in California (Aug. 26, 2021), https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf.

**146** *See* Immigrant Rights Voices, www.immigrantrightsvoices.org; *see also* Nick Pinto, *Across the U.S., Trump Used ICE to Crack Down on Immigration Activists*, The Intercept (Nov. 1, 2020), https://theintercept.com/2020/11/01/ice-immigration-activists-map/; Gaby Del Valle, I*CE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE News (Aug. 24, 2019), https://www.vice.com/en/article/ice-keeps-arresting-prominent-immigration-activists-they-think-theyre-being-targeted/ (pointing to recent arrests of immigrant activists to document a post-Obama shift in ICE's enforcement priorities); Jimmy Tobias, *Exclusive: ICE Has Kept Tabs on 'Anti-Trump' Protesters in New York City*, The Nation (Mar. 6, 2019), https://www.thenation.com/article/archive/ice-immigration-protest-spreadsheet-tracking/; Tom Jones et al., *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC San Diego (Mar. 6, 2019), https://www.nbcsandiego.com/news/local/source-leaked-documents-show-the-us-government-tracking-journalistsand-advocates-through-a-secret-database/3438/; John Burnett, *Immigration Advocates Warn ICE is Retaliating for Activism*, NPR (Mar. 16, 2018), https://www.npr.org/2018/03/16/593884181/immigration-advocates-warn-ice-is-retaliating-for-activism; Maria Sacchetti & David Weigel, *ICE Has Detained or Deported Prominent Immigration Activists*, Wash. Post (Jan. 19, 2018), https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html.

**147** In *Ragbir v. Homan*, for example, organizational plaintiffs joined Mr. Ragbir in his lawsuit against ICE, and elected officials, faith leaders, and other community organizations submitted amicus briefs in support of his case. *See* I Stand With Ravi, Legal Filings, https://istandwithravi.org/legal-filings/. Members of Congress also wrote to the Department of Homeland Security condemning First Amendment retaliation against immigrant activists. *See* Congressmember Nydia Velazquez et al., to Dep't of Homeland Security Sec. Kirstjen Nielsen, et al., Letter re: ICE's recent targeting of activists (Jan. 26, 2018) (on file with author).

**JA 933**

**148**   *See, e.g.,* Das, *Deportation and Dissent, supra* note 6, at 249, 256.

**149**   Memorandum From Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf (stating t "[a] noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action"); Das, *Immigration Detention and Dissent, supra* note 6, at 1472 & n. 190 (discussing the settlement and resolution of certain cases).

**150**   *See, e.g.,* Michael Kagan, *Regulatory Constitutional Law: Protecting Immigrant Free Speech Without Relying on the First Amendment,* 56 GA. L. REV. 1417, 1430 (2022) (proposing that "[t]he Department of Homeland Security should issue regulations providing that an immigration court must terminate removal proceedings if the respondent can show that the immigration officers either became aware of her or chose to take action against her because of activity that is protected by the First Amendment"); Das, *Deportation and Dissent, supra* note 6, at 249-250 (proposing that federal regulations be amended to clarify that a noncitizen may invoke the "departure bar" process to prevent their deportation if they can establish that a governmental body is investigating their allegations of retaliation or seeking their testimony on matters of public concern); *id.,* at 255 (proposing that the Department of Homeland Security's internal investigatory bodies should be expressly empowered to take corrective action in cases of First Amendment retaliation, including through the issuance of subpoenas, orders of release from detention, and stays of removal); *id.* at 255 (arguing that DHS "should direct ICE to amend detention standards, to prohibit disciplinary measures in response to First Amendment activities and to facilitate greater transparency").

**151**   *See* Stipulation, Migrant Justice v. Wolf, No. 5:18-cv-192 (D.Vt.), https://migrantjustice.net/sites/default/files/MJ-ICE-Settlement.pdf.

**152**   *Id.*

---

**ALINA DAS**   Alina Das is a professor of clinical law at the New York University School of Law.

---

**FILED UNDER**   **ESSAYS AND SCHOLARSHIP**
**TAGS**   **FREE SPEECH & IMMIGRATION**

     

**JA 934**

# Exhibit M

An official website of the United States Government  Here's how you know

Home  >   ...   > Secretary of State Marco Rubio Remarks to the Pr…

# Secretary of State Marco Rubio Remarks to the Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**EN ROUTE MIAMI, FLORIDA**

MARCH 28, 2025

**QUESTION:**  Can I ask a non-trip question, because I want to know what's happening with this Ukrainian children grant.

**SECRETARY RUBIO:**  Grant?

**QUESTION:**  The Ukrainian children who —

**SECRETARY RUBIO:**  Oh, the data.  The data is secured.  We secured the data.  We'll transfer it to the appropriate party.  We've ensured that.  And we'll be able to say that next week.  We already notified that.  If we haven't, we're about to notify Congress.  I think we've gotten some letters.

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  So there's no danger to the data that's been collected on that.

**QUESTION:**  But is the program back on?

Cookie Settings

JA 936

**SECRETARY RUBIO:** No, no, the program we're not – the program is not funded. It was part of the reductions that were made, but we secured the data and we've ensured that we have it and it can be transferred to any appropriate authorities, and we'll issue a congressional – I don't know if it's a notification or just responses to the letters they've written us.

**QUESTION:** This is the Conflict Observatory?

**SECRETARY RUBIO:** Yes.

**QUESTION:** How is the —

**SECRETARY RUBIO:** You're not going to hit me with that mike like the President got hit? (Laughter.) Okay.

**QUESTION:** And when you were answering the – Mr. Secretary, earlier, you said 300 visas? It's actually —

**SECRETARY RUBIO:** Well, the —

**QUESTION:** Are they all student visas or —

**SECRETARY RUBIO:** No, no, no, you guys – you asked – the question was, was there 300? I know that number's been cited. I said it might be more because we're doing them every day, primarily student visas, some visitors visas.

**QUESTION:** Okay, so just making sure. Just making sure.

**SECRETARY RUBIO:** I don't know actually if it's primarily student visas. It's a combination of visas. They're visitors to the country. If they're taking activities that are counter to our foreign – to our national interest, to our foreign policy, we'll revoke the visa.

**QUESTION:** Are all of those related to pro-Palestinian protests or (inaudible)?

**SECRETARY RUBIO:** I'm trying to remember – there's a lot of them now, because I've gone through every one of them. I think there might be a few that are not, that are related to other groups that are – of people – we've also identified – but this actually is – it should be automatically

**JA 937**

revoked.  We've also identified people that have criminal charges and even while in the country, and still have active visas.  Some are unrelated to any protests and are just having to do with potential criminal activity.

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Huh?

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Yeah, I have to sign every single one.

**QUESTION:**  And what is the **—**

**SECRETARY RUBIO:**  Or the autopen.  I'm kidding.  No autopen.  I'm just joking.

**QUESTION:**  And what does it mean when you say against the foreign policy of the United States?

**SECRETARY RUBIO:**  It runs counter to our foreign **–** that's how we issue visas coming in.  I think about it this way.  If we knew this information **–** my standard:  If we knew this information about them before we gave them a visa, would we have allowed them in?  And if the answer is no, then we revoke the visa.

**QUESTION:**  Can I ask you on a different topic, Türkiye?  You had the meeting with the foreign minister a few days ago.  I think yesterday they **–** yesterday or today they expelled the BBC correspondent.  They arrested an AP photographer.  How concerned are you with how things are going there?

**SECRETARY RUBIO:**  Well, ultimately **–** and look, we've expressed that we're concerned.  We don't like to see the direction that's going.  It's an ally.  It's a partner in NATO.  Anytime you have instability on the ground, you don't like to see it.  Obviously, they have internal domestic political considerations.  We're not necessarily going to always opine on every single one of them.  To the extent we have deeper concerns, we expect to express them at least privately at the outset, certainly in a new administration when we're trying to establish relations.  But we watch the same news reports everybody else sees about what's going on.  We're certainly concerned about these

**JA 938**

protests and some of the reports. But we raised that and – but I haven't seen what – what you referenced in the last day, yeah.

**QUESTION:** Just on Turkey, in your tweet —

**SECRETARY RUBIO:** Türkiye.

**QUESTION:** Yes, Türkiye. In your tweet —

**QUESTION:** Are you guys going to change that? Are you going to back to Turkey?

**SECRETARY RUBIO:** When we're in Türkiye we're going to say Türkiye.

**QUESTION:** In your tweet, the final sentence is basically about the arrest of Istanbul mayor. You're not saying that explicitly, but those are their (inaudible).

**SECRETARY RUBIO:** Well, I mean, and we talked about that. I mean, their argument is that the mayor is involved in corruption, that this has been a longstanding issue that it's finally got acted upon, and that he is seeking refuge behind his politics. I don't know all the facts about it. Obviously, that's not what the mayor is saying or what the political opposition is saying is that this is a leader that might have won the election had he been allowed to run.

So we're watching it. We've expressed concern. We don't like to see instability like that in the governance of any country that's such a close ally, especially, and it —

**QUESTION:** After your post, Turkish diplomatic sources actually denied that this had come up and you had expressed your concern. I just wanted to ask you about that.

**SECRETARY RUBIO:** Well, I did raise it with the foreign minister, and probably exactly in the words that I'm using now, and that is we're watching these reports and obviously it's disturbing to see, and we talked about it in those terms. But as I said, we don't like to see that kind of instability or these things happening inside countries that we hope to partner with on a bunch of things. And President Trump had a very good working relationship with President Erdogan in the first administration. I think they would like to restart that. But they're a NATO ally, and we would like to cooperate with them in Syria and in other places. So I think it's possible to raise concerns

**JA 939**

and at the same time understand we have a lot of other things to partner on as well. We have – that's the balance of conducting a mature foreign policy.

**QUESTION:** Can you speak about the European leaders who said today that they – they oppose lifting sanctions on Russia, they don't think it's time to do that? Are you all considering that? Can you talk about deliberations?

**SECRETARY RUBIO:** Well, no, so we met with the Russians. Our team was over there this week. They came back and they arrived last night, I think, or early some point yesterday. So we're going to reconvene. I had some calls about it today. We're sort of going to analyze what they're – what they're raising and sort of study what exactly it is. It's a host of sanctions, including sanctions that are not American. They've raised potentially a couple – my readout of it – they're not even American sanctions, so we couldn't lift them if we wanted to. We're going to sort of analyze what our team came back with. We'll present those options to the President. The President will make those decisions. We're not there yet.

**QUESTION:** Have you received Iran's response to the President's letter?

**SECRETARY RUBIO:** Have I what? I'm sorry.

**QUESTION:** Received it, Iran's response.

**SECRETARY RUBIO:** Yeah, I'm not going to comment on that yet other than to say the President's letter has been publicly reported. I expect there will be a response, and obviously, at that point, the President will decide what steps, if any, he wants to take next.

**QUESTION:** Can we go back to visa issue just for a second? I mean, a lot of people feel freedom of speech concerns about it. Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy – say you learn something in your course of study that makes you think that what the policy is wrong – and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

**SECRETARY RUBIO:** Well, I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling

and you start protesting or complaining about paper straws – I mean, we're obviously not going to yank a visa over that. I think it crosses a line – think about it this way. No one has a right to a visa. These are things that we decide. We deny visas every day for all kinds of reasons all over the world. We deny visas because we think people might overstay. We deny visas because the country they come from are people that historically overstay. We deny visas every day, and we can revoke visas. If you have the power to deny, you have the power to revoke.

I would argue that the – what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot – buildings are being taken over, activities going on – this is clearly an organized movement. And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa. I think it would make sense to deny your visa. We're going to err on the side of caution. We are not going to be importing activists into the United States. They're here to study. They're here to go to class. They're not here to lead activist movements that are disruptive and undermine the – our universities. I think it's lunacy to continue to allow that.

**QUESTION:** So expressing any kind of view —

**SECRETARY RUBIO:** And by the way, I've been saying that since I was in the Senate. Now I'm just in a position to do something about it.

**QUESTION:** Mr. Secretary —

**SECRETARY RUBIO:** Now that's a broad thing to say – any kind of views. But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.

**QUESTION:** Mr. Secretary, I don't —

**QUESTION:** Hamas?

**SECRETARY RUBIO:** Yeah, there may be others. I mean, if you come here and join Tren de Aragua, we're going to yank your visa too. If —

**QUESTION:** Mr. Secretary?

**JA 941**

**SECRETARY RUBIO:** And so there may be other movements, but that's partly the movement we've seen on college campuses. Let's be clear: It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with.

But beyond that, they are spray-painting buildings. They are taking over buildings. You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it. When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy. We're not going to keep doing that. We're not. Don't come here. If you're going to do that, go somewhere else. Don't come here.

**QUESTION:** And I brought up the protests in Hong Kong in 2019, which I covered, because there were also shutdowns of college campuses back then. There were foreign students that were involved. There was graffiti. They stopped traffic at intersections. They shut down subway stations. They were largely peaceful, but there were also these instances that disrupted public life and there were foreign students that were involved there. And so, like, under your rationale, the Hong Kong authorities or the —

**SECRETARY RUBIO:** Well, every country in the world can deny visas to whoever they want. It's that simple. That's a fact. Whether we like it or not, they can deny visas.

Number two, that movement was not a movement in favor of a group that slaughtered babies and innocents. That's not what that – that movement, they were people who were complaining because there was no democracy, but I mean and they were upset about the direction Hong Kong was headed and the Chinese law that was being imposed. But they have – every country in the world has a right to deny you a visa. I'm not entitled to a visa. You're not entitled to a visa. Nobody is entitled to a visa in any other country. They can determine it and they can revoke it at any time they want.

Now, let's – I think it's important is that there's a clear distinction between protesting against the democratic order and protesting in favor of groups that advocate the slaughter and murder of innocent people, which is what many of these groups are supportive of. Beyond that, these groups are not just taking over – these are not sit-ins we're talking about. We are talking about buildings that have been vandalized, defaced, that where they – for months on end in some

**JA 942**

cases.  We're just not going to continue to allow it.  I don't understand what people don't get.  A
visa is a gift.  It's a voluntary thing.  We decide to give you a visa.  We deny visas all over the world
every day for a variety of reasons, and that means we can also revoke those visas.  No one is
entitled to a visa.

**QUESTION:**  I guess some of the examples have come up like a student at Tufts University, like all
they did was write an op-ed for the student newspaper advocating for a certain point of view.
They're not – as far as we can tell, they haven't openly advocated for Hamas.

**SECRETARY RUBIO:**  Well, we will – those – as they go, or if they seek to self-deport they can do
that, because that's what we've done.  We're basically asking them to leave the country.  That's
why they've been detained.  They can do so tomorrow.  Buy an airplane ticket and leave.  No
problem.

**QUESTION:**  Mr. Secretary?

**SECRETARY RUBIO:**  But I would add to this that I would caution you against solely going off of
what the media has been able to identify, and those presentations, if necessary, will be made in
court.

**QUESTION:**  But for example, in that – the Turkish students, the Tufts student's case, I asked you
today did she have – has she committed, like, or has she carried out any of those things that you
just listed?

**SECRETARY RUBIO:**  The activities presented to me meet the standard of what I've just described
to you: people that are supportive of movements that run counter to the foreign policy of the
United States.  If necessary and a court compels us, we'll provide that information.  But
ultimately it's a visa.  Judges don't issue student visas.  There is no right to a student visa.  We can
cancel a student visa under the law just the same way that we can deny a student visa under the
law.  And we will do so in cases we find appropriate.

The overwhelming majority of student visas in this country will not be revoked, because the
overwhelming majority of people that are coming to this country to study are not involved and
associated or aligned with organizations that seek to do damage in this country, and that, frankly,
organizations that hate the United States Government and hate our way of life.  So I just think it's

crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.

**QUESTION:** Right, but are the schools raising these issues with you? Are these – are there out —

**SECRETARY RUBIO:** Oh, I'm sure they're —

**QUESTION:** Are these outside groups that they're raising —

**SECRETARY RUBIO:** Oh, I don't know. I mean, I'm sure they are. I mean —

**QUESTION:** Like, how does it come to – come to your desk? Yeah.

**SECRETARY RUBIO:** Oh, bringing it to us? Well, we're not – we're not going to talk about the process by which we're identifying it because obviously we're looking for more people.

**QUESTION:** Have you seen the video of her being detained?

**SECRETARY RUBIO:** I haven't. But look, detention is simple. Your visa is expired, your visa is revoked, you have to leave.

**QUESTION:** But it's six hooded figures with masks on their face who don't identify themselves until they already grabbed her wrist. It's quite horrifying.

**SECRETARY RUBIO:** Yeah, I mean, unfortunately our agents – I mean, I'm not – that's a DHS or ICE, so I don't know what their practices are. But our agents have had to protect their identity because they've found themselves targeted – targeted for violence, targeted for operations against them. I would say most of these protesters are wearing masks too, and they're not in law enforcement.

**QUESTION:** Can I ask you a different topic? U.S.-funded media. Radio Martí is something that I believe you've supported in the past. What do you think of the cut in funding for that entity?

**SECRETARY RUBIO:** Well, first of all, they're not part of the – they're not – we don't control that. That's a separate entity that does it. My understanding is that Martí has actually started rebroadcasting today, and a few others. I think the executive order called for them to be – all

these agencies to be reduced to the statutory minimum. And I think the goal ultimately over time, as I understand it, is to reform these entities so that they provide news that, frankly, favors and advances the national interest of the United States. We have plenty of independent media outlets, including all of you, and then we are interested in media outlets that present America's point of view from our foreign policy standpoint. And so that review will be ongoing, but obviously that's outside the State Department. I don't control those.

**QUESTION:** What about the cuts (inaudible) —

**SECRETARY RUBIO:** I wish I did, though, but I don't. Not yet, anyway. Maybe we'll see, but I don't know.

**QUESTION:** What about cuts to some of the other programs in Cuba that were supporting dissidents, that were supporting political prisoners?

**SECRETARY RUBIO:** Yeah, well, some of them were not. Some of them will be restudied over time. I think ultimately we're trying to find programs that are effective. No one's been —

**QUESTION:** But no, it – as you know, there's (inaudible) in general always in Cuba right now.

**SECRETARY RUBIO:** Yeah, but there's – I – there's a bunch that were – that we approved that are on the – not even got waivered, just got restarted and we're doing them. There's others that we have suspended because we didn't think we were getting the return on the investment. That money may be repurposed to a program that works better for the same cost.

**QUESTION:** You mentioned that Marines have said – Marines at Guantanamo Bay have said that the Tren de Aragua members there —

**SECRETARY RUBIO:** Oh, yeah.

**QUESTION:** — were more violent than al-Qaida members.

**SECRETARY RUBIO:** Not just more violent, very well organized. They were able to communicate with each other, the hand signals, all kinds of – I mean, this is a prison gang, so it doesn't surprise me. That's how the Tren de Aragua originates from, so it doesn't surprise me that they're very effective in that setting.

**JA 945**

They're also very dangerous to keep in our country.  When you keep prison gangs in your country, they grow, they metastasize.  MS-13 was actually a group that was started by Salvadoran – either Salvadoran refugees and/or actually people born in the U.S. of Salvadoran descent in prisons.  MS-13 did not originate in El Salvador; they originated in U.S. prisons and spread down and back to El Salvador.  Prison gangs are very dangerous because they recruit and then they – they almost create academies within the prisons that then metastasize and spill out to the general population.

**QUESTION:**  Have you spoken to the Marines down in Guantanamo, or did they (inaudible)?

**SECRETARY RUBIO:**  I spoke to one that was in Guantanamo because I know them through a family friend, but I've also spoken to both Pete Hegseth about this and, if I'm not mistaken, Secretary Noem as well.  And they both – when I asked them, "Is this true?" they both confirmed that's what their officers and people on the ground were telling them.  So actually I heard this from a personal acquaintance, and then I actually had it affirmed to me by two members of the cabinet.

**QUESTION:**  (Inaudible.)

**QUESTION:**  (Inaudible) some of the people sent down to El Salvador to the prison weren't actually gang members, but that, for example, there was a (inaudible) with a tattoo (inaudible) supporting autism, people with autism, but it looked like a gang tattoo to the immigration agent and then (inaudible) mistakes made.  How do you address that?

**SECRETARY RUBIO:**  Well, ultimately that – all of that was the work of the Department of Homeland Security.  They've identified them.  I have confidence in the assessments that they've made.  They're – but I can't speak to any one of the individual cases because we're not involved in compiling them.  But I have no reason – in fact, I have confidence that they compiled a good list.  And if we have an opportunity to send more, we will – gang members, MS-13, whatever we can send.

**QUESTION:**  (Inaudible) isn't it an issue of due process?  I mean, was that raised with President Bukele?  Do these people have a right to appeal in some way?

**SECRETARY RUBIO:**  Every single one of them was deportable for reasons even beyond the Alien Enemies Act.  The MS-13 as well.  They were all deportable.  Many of these people had orders of

deportation already and were either in custody or had been recently apprehended.  So every single person that was sent there was deportable.

Unfortunately, if they're of Venezuelan descent, up until this week the Venezuelans were not picking anybody up.  They were not allowing anybody to go back.  They're the only country in the hemisphere that was refusing to accept anyone.  They have restarted those suddenly, and hopefully they'll continue and then we won't have to use El Salvador.

**QUESTION:**  So why use the Alien Enemies Act if they were deportable anyway?  Because that just seems to be (inaudible) inviting a challenge to it.

**SECRETARY RUBIO:**  No, I think the expedited nature of it.  These gangs were organized.  They were – they were presenting very real and immediate risks in a number of communities in our country in an organized fashion.  We have reason to believe that they were actually being pushed towards the United States in large numbers by the regime in Venezuela.  You saw just yesterday one of them arrived in Venezuela and was greeted on the tarmac as a hero.  This is an individual that was arrested for – caught on video – attacking police officers in Times Square, (inaudible) to law enforcement after doing so.  So we believe that in many ways the Venezuelan regime has encouraged that flow of these groups towards the United States to create harm in our country.

**QUESTION:**  The reason I ask is that we know (inaudible) Thursday before we left on Friday (inaudible) spoken to President Bukele twice, and this was all arranged, and —

**SECRETARY RUBIO:**  I've spoken to him a number of times.

**QUESTION:**  I know, but this —

**SECRETARY RUBIO:**  Not just the only time you were around.

**QUESTION:**  Well, no, no, no, this was the (inaudible).

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  This was the Thursday – Thursday night.

**SECRETARY RUBIO:**  Yes.

**JA 947**

**QUESTION:**  So now we're into Friday, and it became clear with this transfer of diplomatic notes from El Salvador and the stuff that the State Department was doing to get the money ready – 20 grand per person per year for this initial tranche of (inaudible).  And it made clear that the President was going to go in and sign the AEA declaration, and yet it didn't come out until after, so Saturday.  Why?  Was that —

**SECRETARY RUBIO:**  Well, about the AEA declaration, that came from the White House.  My conversations with President Bukele were as a follow-up and to finalize in a verbal agreement we had reached in my visit to El Salvador on my first trip as the Secretary, so it was just sort of following up on that and how we were going to proceed with it.  We were ready now to execute at some point, and we were working through those arrangements with them.  And that's what those calls were about.  It was just sort of to finalize what we had agreed on.

**QUESTION:**  So you don't think that the White House delayed (inaudible)?  Because the President did sign the AEA declaration on Friday.

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  (Inaudible) it wasn't (inaudible)?

**SECRETARY RUBIO:**  I can't speak to the timing of why they released the one they did.  I can tell you – and I think you were on that trip – that the agreement to house criminal aliens was reached with President Bukele back in February.

**QUESTION:**  Yes.

**SECRETARY RUBIO:**  And so we spoke – I've spoken to him since then, but obviously this – those days that I was there we did because we had a couple of open questions that we wanted answers to and that he wanted answers to, and we were finalizing that.

**QUESTION:**  Mr. Secretary, on Russia, about a month ago when we were in Riyadh, you were first starting on speaking with them, and you said something.  You said soon enough we're going to find out whether they're acting in good faith or not, we just need to test it out.  So a month later where do you stand?  Are they (inaudible) —

**SECRETARY RUBIO:** Well, I'm not prepared to pass judgment on it. They're meeting with us. They're talking to us. They're making proposals. They're agreeing to ceasefires but with conditions that we need to analyze.

**QUESTION:** So is that dragging their feet, actually?

**SECRETARY RUBIO:** I wouldn't – I'm not prepared to characterize it as one or the other. What I've said almost from the very beginning is, I mean, this war is complex. As you can see, it's now going on three years. And I never said it was going to be simple. There's a lot of work to be done with both sides, in particular the Russian side, which we haven't talked to in years. So —

**QUESTION:** How long do you anticipate these negotiations to continue?

**SECRETARY RUBIO:** We're going to – we're trying to achieve peace. We're committed to trying to achieve peace as long as it takes. That doesn't mean that I can guarantee you that there's going to be an agreement in a week or a month. I just can't put a timeframe on it because it doesn't depend on us. It depends on the Russians and it depends on the Ukrainians. It also depends on our partners in Europe who have sanctions that will have to be taken into account, I believe, as part of any final deal.

But I always think it's progress when at least specifics are being agreed to even though they may not be agreeable to both sides, because we get to determine sort of the negotiating posture and what the impediments are to peace. So I think when you negotiate, when you sit down with people and they – and you talk about these things, they have to memorialize these things in documents, at least it begins to give definition to what the impediments to peace are.

As far as willingness, that'll be tested when the time comes to sign or if – if we've dealt with impediments and there's still resistance from one side or the other, then we'll know. But we're not at that stage yet.

**QUESTION:** Do you anticipate this moving soon beyond the technical level and back to higher-level talks?

**SECRETARY RUBIO:** Well, I think you have to make more progress on a technical level at this point, but we'll see. We're going to analyze it. As I said, when they arrive back from Saudi Arabia I want to sit and talk to our team that was on the ground and get a better sense how those

negotiations went, because a lot of it isn't just what was written and what was said over 12 hours. And by the way, we met with the Ukrainians twice as well, so we want to get that perspective, which we met with them on Sunday and again on Tuesday, and the Russians on Monday. So I need to hear from them directly a little bit more about how it went, and then we'll present that. We'll meet with the team and we'll present that to the President, and then decide on a path of what the next steps are.

QUESTION: Can I ask you a different topic? Sudan. We've seen certainly an upsurge in violence. The army says they have kicked out from the presidential palace. You've seen the strike on the market. Is there anything diplomatically that the U.S. can (inaudible)?

SECRETARY RUBIO: We're engaged in conversations with a number of countries, with Ethiopia, with Kenya, in just over the last 72 hours where we've been raising that. And we're very concerned that we're going to backslide to where we were a decade or less ago, and so we don't want to see that. And so we're trying to figure out and we've been engaging with our partners about soliciting their ideas about what can we do on this matter to – what contributions can the United States make to stabilize it now. There are a number of places we're doing that. We're doing that with DRC-Rwanda as well. So there are a couple of places like that that we find ourselves sort of asking our regional partners how do they believe we can be most helpful and engaging, and with our partners outside the region as well. We've spoken – I spoke to the foreign minister of the UK yesterday about this topic.

QUESTION: (Inaudible) Iran and the (inaudible) letter (inaudible)?

SECRETARY RUBIO: Oh, he just asked me that, but you couldn't hear.

QUESTION: Oh, sorry.

SECRETARY RUBIO: No, that's okay. I just have to – now I have to remember the answer, because it has to be identical. (Laughter.)

QUESTION: You have to (inaudible).

QUESTION: Give us the details.

**SECRETARY RUBIO:**  It's been publicly reported that the – that the President sent a message.  I anticipate a response on that, and – but we have nothing else to announce on that.  Is that pretty much what I told you?  All right.

**QUESTION:**  Can I ask —

**SECRETARY RUBIO:**  All right.  Well, the game is going to start.  That's why.  (Laughter.)

**QUESTION:**  What brought about your hatred for ecotourism?

**SECRETARY RUBIO:**  I don't hate ecotourism.  It's just —

**QUESTION:**  You said —

**SECRETARY RUBIO:**  No, no, no, no.  I said I'm not a fan of ecotourism, but I'm not against it.  People like to do that stuff.  But like, to me, a vacation does not involve snakes and spiders.  So that's my view.  Maybe that'll change.  I don't know.

**MS BRUCE:**  All right.

**SECRETARY RUBIO:**  All right.  Thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs      Bureau of Western Hemisphere Affairs      Cuba

El Salvador      Office of the Spokesperson      Russia      The Secretary of State      Turkey

Ukraine

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit N

An official website of the United States Government  <u>Here's how you know</u>

**Home** >  ...  > Secretary of State Marco Rubio Remarks to Press

# Secretary of State Marco Rubio Remarks to Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**SHANNON, IRELAND**

MARCH 12, 2025



**SECRETARY RUBIO:**  All right, who's got a question?

**QUESTION:**  I do.

**SECRETARY RUBIO:**  I knew you would have a question.

Cookie Settings

**QUESTION:** So – Michael Gordon, *Wall Street Journal*. Sir, the Russians are still making gains on the battlefield. There's been no public response to the developments in Jeddah. Are you concerned they're playing for time? Have you had any contact with them? What's been their response officially and are they willing to accept the ceasefire unconditionally?

**SECRETARY RUBIO:** Well, I mean, we don't know the answer to the last question. That's what we want to know, whether they're prepared to do it unconditionally. We'll have contact with them today. There's already been contacts at different levels with counterparts, different members of the administration, and that'll continue. But as far as the Russian reaction to it, that's really the question here, and that is – this is a few hours old. We're going to bring it to them directly. We're going to say that Ukraine is prepared to stop all battlefield activity and begin the immediate process of negotiating an enduring end to the war, and we'll see what their response is.

If their response is yes, then we know we've made real progress and there's a real chance of peace. If their response is no, it'll be highly unfortunate, and it'd make their intentions clear. So that's what we're hoping to hear from them, and obviously, as I said, this was not pre-arranged with them, so they're – they're probably processing the news the same as the rest of the world. And so we hope to have a positive answer from them. The ball is truly in their court.

**QUESTION:** Mr. Secretary —

**QUESTION:** Mr. Secretary, Nike Ching with Voice of America. What would be a good G7 joint statement on Russia and on China?

**SECRETARY RUBIO:** Well, I think the perfect statement would be that the United States has done a good thing for the world in bringing this process forward, and now we all eagerly await and – the Russian response and urge them strongly to consider ending all hostilities so people will stop dying, so bullets will stop flying, and so a process can begin to find a permanent peace. I think the first step in all this is the acceptance that there is no military solution to this conflict. Neither side can militarily achieve their maximalist gains – their maximalist goals. I mean, they're just not going to achieve them through the military side. The only way this conflict can end is through negotiation. That's the only way you're going to have peace is through negotiation.

And so we need to start that process. And it is hard to start a process when people are shooting at each other and people are dying. And so our hope is that we can stop that, all these hostilities,

and get to a negotiating table where both sides – over some period of time with a lot of hard work – can find a mutually acceptable outcome that, in the case of Ukraine, obviously secures their long-term prosperity and security.

**QUESTION:** Mr. Secretary, could you just update us on Mr. Witkoff's plans for Moscow and whether he'll be meeting with President Putin?

And then separately, if you wouldn't mind elaborating on something that Mr. Waltz said yesterday about the specifics that you discussed with Ukrainians about what the end of the war would look like, you had mentioned we're not going to get maps out and draw lines, but did you actually talk about territorial concessions?

**SECRETARY RUBIO:** Well, we – we had conversations. As far as Steve's trip, I'm not here to – I can't – I'm not going to make any announcements about specific dates, times, or even confirm such a trip. Suffice it to say there is going to be multiple points of contact with the Russians to gauge are they willing to do this or not. And as far as the conversations that were yesterday, yeah – when you sit down with a counterpart like Ukraine, we're not going to negotiate this publicly, we're not going to actually put out there sort of what we talked about, because in any negotiation there's certainly an element where you don't want one side to be giving away all of this leverage from a public perspective. We had a broad conversation about what it would – but I think the bulk of our conversation was what a negotiation process would look like in terms of not the specific conditions, but rather the timing of it, sort of the steps they would like to see taken.

The Ukrainians made very clear that this isn't just about ending a war. They need to get their prisoners of war back; they need to get the children back. They'd like to see an exchange of prisoners of war; they'd like to see their children back. So there's all sorts of things tied to the, humanitarian assistance is important as well. There are areas of Ukraine that have been badly damaged that require immediate assistance. So these are the sorts of things that we talked about as being inclusive in the negotiation process.

So really the bulk of our conversation, when we got to that stage of it, was discussing the kinds of items that need to be on a negotiation agenda if and when we hopefully get there.

**QUESTION:** He also mentioned security guarantees, which is something that there has been some reluctance for the administration to elaborate on. Have – are you committing to security —

**SECRETARY RUBIO:**  Well, I think the point – no – the point to understand is that we're looking at securing their long-term – what we want to see – like any country in the world, Ukraine wants their long-term security.  They want to make sure that this doesn't happen again.  We all do.  What is the point of spending all this time to get a ceasefire hopefully and then a negotiated end to the war only to see it re-spark up again in about six years, four years, three years?  No one's – we're not interested in that, and they certainly aren't, either.

So I think the question really is more about a deterrence.  Can Ukraine create a sufficient deterrent against future aggression, against future attack, against future invasion?  Because every country in the world has a right to defend themselves, and no one can dispute that.  So that will most certainly have to be part of the conversation.  But again, I don't think there's – there isn't a peace to secure until you have a peace.

**QUESTION:**  Not just – not —

**SECRETARY RUBIO:**  There's no way to have an enduring peace without the deterrence piece being a part of it.

**QUESTION:**  Can I just follow up on that particular point?

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  Because the joint statement talks about European partners being involved in the peace process, but that's only attributed to the Ukrainian delegation.  There doesn't appear to be U.S. support for that line —

**SECRETARY RUBIO:**  Well, I think what it says in the statement is that they raised the need for the Europeans.  But I have already said publicly the Europeans have issued a series of sanctions against the Russian Federation, and I would imagine that in any negotiation – if we get there, hopefully – with the Russians that they will raise these European – the European sanctions that have been imposed upon them.  So I think that the issue of European sanctions are going to be on the table —

**QUESTION:**  But it —

**SECRETARY RUBIO:** — not to mention what happens with the frozen assets and the like. And so I think it's self-evident that for there to be a peace in Ukraine, at the end of that process there is going to have to be some decision by the Europeans about what they are going to do with these sanctions and so forth. And so that's why I think they have to be necessarily involved in this regard. Now, whether they're involved at the front end of it or at the back end of it, it'll have to play itself out. And then obviously there is also all sorts of security promises that European countries have made to Ukraine, that that will also be, I imagine, a part of this conversation as we move forward.

**QUESTION:** But —

**SECRETARY RUBIO:** So we don't disagree with that statement. I think the statement just reflects that they raised it.

**QUESTION:** But do you back European peacekeepers in Ukraine, which is something Russia has categorically —

**SECRETARY RUBIO:** Well, we'll see. I mean, there's different ways to – there's different ways to construct a deterrent on the ground that prevents another war from starting in the future. We're not going to go in with any sort of preconceived notion. The bottom line is it needs to be something that makes Ukraine feel as if they can deter and prevent a future invasion. How that looks and how that's put together, that's what we're going to be talking about, if we can get to that stage.

Again, right now we're just trying to get to the stage where there's actual diplomacy happening. Here's what we'd like the world to look like in a few days: neither side is shooting at each other, not rockets, not missiles, not bullets, nothing, not artillery. The shooting stops, the fighting stops, and the talking starts. That's what we want to see. What happens during that talking and how that evolves, I think we're going to have to be flexible and nimble and creative and patient and work hard at it and hopefully turn it into something that's concrete.

You've covered – many of you have covered foreign policy for years. That's how these things happen, and they're not easy, and sometimes they're difficult to predict which way they're going to go in terms of the specifics of it. But we just want to get to that stage. That would be, for lack

of a better term, a good problem to have, to have to figure out how to negotiate a peace because we're actually negotiating a peace while the shooting has stopped.

**QUESTION:**  Is the mineral deal essentially the security guarantee that you guys envisioned?

And then a second question is:  President Trump appealed to a lot of Americans during his campaign on free speech arguments and not suppressing speech, especially from the government, but your revocation of the green card to many is seen as one of the most anti-speech actions a secretary can take with his powers.  How do you respond?

**SECRETARY RUBIO:**  Yeah, I mean, the first question was again the —

**QUESTION:**  Is the minerals deal a version of the security guarantee?

**SECRETARY RUBIO:**  The minerals deal, yeah.  Well, I think that a minerals deal is something that I think is beneficial for both countries.  Certainly one of the things that provides for Ukraine's long-term prosperity and security is vibrant economic growth and development.  If their GDP is – begins to grow and – that gives them a tremendous amount of leverage and power and the ability to fund their own defenses.  So I think certainly any economic development for Ukraine is positive for their own future.

Obviously if the United States has a vested economic interest somewhere, we're tied to them on an economic front, we're in partnership with them on something, we will have an interest in the future of Ukraine as well.  I wouldn't couch it as a security guarantee, but certainly if the United States has a vested economic interest that's generating revenue for our people as well as for the people of Ukraine, we'd have a vested interest in protecting it if it were to be challenged or threatened.

On your first point, when you enter the – this is an important point, and I'm glad you asked this question.  When you come to the United States as a visitor – which is what a visa is, which is how this individual entered this country, on a visitor's visa, okay – you are here as a visitor.  We can deny you that visa.  We can deny you that – if you tell us when you apply, "Hi, I'm trying to get into the United States on a student visa, I am a big supporter of Hamas, a murderous, barbaric group that kidnaps children, that rapes teenage girls, that takes hostages, that allows them to die in captivity, that returns more bodies than live hostages" – if you tell us that you are in favor of a group like this, and if you tell us when you apply for your visa, "And by the way, I intend to come

**JA 959**

to your country as a student and rile up all kinds of anti-Jewish student, anti-Semitic activities, I intend to shut down your universities" – if you told us all these things when you applied for a visa, we would deny your visa. I hope we would. If you actually end up doing that once you're in this country on such a visa, we will revoke it. And if you end up having a green card – not citizenship but a green card – as a result of that visa while you're here and those activities, we're going to kick you out. It's as simple as that.

This is not about free speech. This is about people that don't have a right to be in the United States to begin with. No one has a right to a student visa. No one has a right to a green card, by the way. So when you apply for a student visa or any visa to enter the United States, we have a right to deny you for virtually any reason, but I think being a supporter of Hamas and coming into our universities and turning them upside down and being complicit in what are clearly crimes of vandalization, complicit in shutting down learning institutions – there are kids at these schools that can't go to class. You pay all this money to these high-priced schools that are supposed to be of great esteem and you can't even go to class, you're afraid to go to class because these lunatics are running around with covers on their face, screaming terrifying things. If you told us that's what you intended to do when you came to America, we would have never let you in. And if you do it once you get in, we're going to revoke it and kick you out.

**QUESTION:** Can I ask you about the Canada trip coming up? The President has taunted, if you will, Canada, calling it the 51st state, calling Prime Minister Trudeau the governor —

**SECRETARY RUBIO:** Well, he said it should become the 51st state from an economic standpoint. He says if they became the 51st state, we wouldn't have to worry about the border and fentanyl coming across because now we would be able to manage that. He's made an argument that it's their interest to do so. Obviously the Canadians don't agree, apparently, but —

**QUESTION:** Do you agree with it? Should there be – are you going to discuss that, becoming the 51st —

**SECRETARY RUBIO:** Well, that's not what we're going to discuss at the G7, and that's not what we're going to be discussing in our trip here. So it – they are the host nation, and I – I mean, we have a lot of other things we work on together. We defend North America through NORAD and the airspace of our continent together, so – not to mention the issues of Ukraine and other

**JA 960**

commonalities. So we're going to be focused in the G7 on all of those things. That's what the meeting is about. It is not a meeting about how we're going to take over Canada.

**QUESTION:** But more broadly —

**QUESTION:** But are you concerned at all about the reception that you might be getting, particularly at the event?

**SECRETARY RUBIO:** I don't know, should I be? What do you know that I don't know?

**QUESTION:** They're unhappy.

**QUESTION:** I don't know, you've got the tariffs in the last 12 hours, you've just seen this escalating trade war – not just with Canada but, with the exception of Japan, all the other members of the G7.

**SECRETARY RUBIO:** Yeah, so what's your point?

**QUESTION:** Well —

**QUESTION:** Are you worried about alienating the Canadians, that they wouldn't work with the United States?

**SECRETARY RUBIO:** Yeah, I mean, they've invited us to come. We intend to go. The alternative is to not go. I think that would actually make things worse, not better. So – it's a G7 summit.

**QUESTION:** One alternative could be not to —

**SECRETARY RUBIO:** Huh?

**QUESTION:** The alternative could be not to have tariffs or not to have the language that the President —

**SECRETARY RUBIO:** No, those are policy decisions. And so at the end of the day, the President's made those decisions. He's explained why. It's not just against Canada, it's not just against Mexico, it's not just against G7 countries. He's imposed steel and aluminum tariffs now on

**JA 961**

virtually the entire world, and the reason why is not to punish those countries; it's because he has outlined the need to develop a domestic capability.  If you don't have steel and aluminum, you can't build warships, you can't build airplanes, and you are not an industrial economy.  There are things we have to be able to protect and there's a lot of unfair trade practices, a lot of countries out there who subsidize their industries so that they can gain global market share, so they subsidize the industries, they're operating at a loss.  Meanwhile, our industries are trying to compete fairly, and that's why you don't have steel plants and that's why you can't produce the aluminum.  And that really threatens our national security in the long term.

So these are national security concerns when it comes to steel and aluminum and some of these other products.  But ultimately the President feels strongly – and I personally agree – that we have made some decisions when it comes to trade policies that have led to the de-industrialization of America and have left us deeply vulnerable to any sort of interruptions in global supplies and/or it being used to extort us, not to mention our inability to produce things that we need for our own economy and for our own defense.

So that's what those policies are about.  Every country in the world we expect will act in their national interest.  The United States forgot that.  President Trump is reminding us of that and getting us back to that, and I think it is quite possible that we could do these things and at the same time deal in a constructive way with our allies and friends and partners on all the other issues that we work together on.  And that's what I expect out of the G7 and Canada.

**QUESTION:**  Can I just ask on Russia?  Did you have – or Waltz – have any contact with Zelenskyy while you were in Saudi Arabia?  And then —

**SECRETARY RUBIO:**  No, I didn't.  I don't believe Mr. Waltz did either, but I did not.  But that was the team he selected, and it was appropriate.  It was his closest advisor, it was their foreign minister, it was their head of security.  So we felt that that was the counterparts they sent and to deal with us, and that's obviously pretty common in these sorts of things.  Generally the heads of state meet heads of state and appropriate counterparts meet others.  He – I imagine he had to get back, and he's – he – the president of a wartime country, so he's – but we did not have any contact with him there.  But I wouldn't read – read anything into it other than he selected his team for these talks and the President selected his, so —

**QUESTION:**  And was there any discussion with the Ukrainians about how a ceasefire, if Russia agrees, would be enforced?  How would the U.S. ensure parties —

**SECRETARY RUBIO:**  Yeah, well, the interesting thing about modern warfare is there – it's easier than ever to monitor and – simply because there's so many eyes on the ground and there's also all sorts of overhead commercial satellite and the like.  It would be pretty hard to hide drone strikes, it would be hard to hide missile strikes, ballistic strikes, artillery.  So we feel like that is something that could be monitored.  Obviously, if in fact the Russians say yes – let's hope they say yes.  If they say yes, one of the things we'll have to determine is who do both sides trust to be on the ground to sort of monitor some of the small arms fires and exchanges that could happen.  But those are practices that have become common in these, and I don't think that would be difficult to set up.  We didn't get into specifics, but obviously the need to monitor a ceasefire is clear to everyone.

**QUESTION:**  Sir, just a quick follow-up on this question.

**QUESTION:**  Can I get a last question?  Last question?

**MS BRUCE:**  One more question.  One more.  This is it.

**QUESTION:**  The —

**SECRETARY RUBIO:**  Yeah, because we're fueling up and have to get back on the plane.

**MS BRUCE:**  Right.

**QUESTION:**  Last question, sir.

**SECRETARY RUBIO:**  Yeah, yeah.

**QUESTION:**  The – you haven't – this administration has not hesitated to put a lot of pressure on Ukraine.  You reduced their intelligence support in the middle of a shooting war, you temporarily cut off their arms, criticized them publicly – not you, but leadership in public.  Are you truly prepared to apply pressure on Russia should it be recalcitrant and not agree to the terms of the ceasefire?  There's no been no concrete action that this administration has taken to punish Russia since it's come to office.

**SECRETARY RUBIO:** Well, a couple points. To be clear, as far as I am aware, the United States has not provided armaments to Russia. The United States is not providing assistance to Russia. Every single sanction that has been imposed on Russia remains in place. Every single sanction the President inherited has – remains in place.

**QUESTION:** Trump inherited, previous administration.

**SECRETARY RUBIO:** Right, but – well, I mean, they're pretty sanctioned up. I mean, there's a lot of sanctions on already. So my point being is that we've – there's been no steps taken to relieve any of these things. These things continue to be in place. But we don't think it's constructive for me to stand here today and begin to issue threats about what we're going to do if Russia says no. Let's hope they say yes.

At the end, let's understand. I remind everybody and bring you back to the point: The President's desire here is to bring about a lasting and enduring peace in Ukraine. He wants the shooting and the fighting to stop – not just for 30 days, not just for 60 days, but permanently. To do that, both sides have to come to the table. We are happy – we are happy that the Ukrainians have agreed to do so. Now it is up to Russia to say yes. If Russia says yes, that's very good news, and we will begin that process and do everything we can to move that process forward. If they say no, then obviously we'll have to examine everything and sort of figure out where we stand in the world and what their true intentions are. I think it'll be – if they say no, it'll tell us a lot about what their goals are and what their mindset is.

But I don't want to go into that before they've even answered us by issuing statements that are abrasive in any way. Our hope is that – when we met with them last, they expressed a willingness under the right conditions, without elaborating on the right conditions, to bring an end to this conflict. That was our question when we met with them. I think I shared it with you that were on our trip. The point of meeting with them was to find out is this a war they wanted to end or is this a war they just wanted to continue in perpetuity until they achieved whatever goals they have in mind, and they expressed a willingness, under the right circumstances, which they did not define, to bring an end to this conflict.

So we have Ukraine ready to come to the table. Now we need to get Russia to come to the table. If they do and the shooting stops, I think that's a very good day in the world. Obviously no one here is pretending that that negotiation's going to be easy or fast or simple, but at least we've

**JA 964**

gotten to that point. If their answer is no, then obviously we'll have to deal with that and we'll have to at that point make decisions on that basis. We're not there yet. Hopefully the answer is yes.

**MS BRUCE:** Thank you, everyone.

**SECRETARY RUBIO:** Okay, thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs   G-7   Ireland   Office of the Spokesperson

Official International Travel   Peace   Russia   Russia-Ukraine War

The Secretary of State   Ukraine

---



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit O



**JA 968**

# Exhibit P

# Transcript: Secretary of State Marco Rubio on "Face the Nation with Margaret Brennan," March 16, 2025



Updated on: March 16, 2025 / 3:28 PM EDT / CBS News



*The following is the transcript of an interview with Secretary of State Marco Rubio that aired on "Face the Nation with Margaret Brennan" on March 16, 2025.*

**JA 970**

MARGARET BRENNAN: Let's get straight to it this morning with Secretary of State, Marco Rubio, who joins us from Miami, Florida. Mr. Secretary for our audience, just to explain, this Red Sea area is a really important transit point for global shipping. The Houthis out of Yemen have been disrupting transit there for some time. President Trump cited these concerns when he announced the strikes. I'm wondering, how long will this campaign last, and will it involve ground forces?

U.S. SECRETARY OF STATE MARCO RUBIO: Well, first of all, the problem here is that this is a very important shipping lane and in the last year-and-a-half, the last 18 months, the Houthis have struck or attacked 174 naval vessels of the United States. Attacking the U.S. Navy directly 174 times, and 145 times they've attacked commercial shipping. So we basically have a band of pirates, you know, with guided precision anti-ship weaponry and exact- exacting a toll system in one of the most important shipping lanes in the world. That's just not sustainable. We are not going to have these people controlling which ships can go through and which ones cannot and so your question is, how long will this go on? It will go on until they no longer have the capability to do that.

MARGARET BRENNAN: Well, what does U.S. intelligence tell us at this point? Because the U.S. had been construct- conducting strikes for some time, but has not stopped the Houthis–

SECRETARY RUBIO: No.

ⓒCBS

Read More

00:00                                    ●                                    02:00

MARGARET BRENNAN: –So what's going to be different right now? Do you have more fidelity in the intelligence that would make this more successful?

SECRETARY RUBIO: Well, those strikes were a retaliation strike. So they launched one missile, we hit the missile launcher, or we sent something to do it. This is not a message. This is not a one off. This is an effort to deny them the ability to continue to constrict and control shipping, and it's just not going to happen. We're not going to have these guys, these people with weapons, able to tell us where our ships can go, where the ships of all the world can go, by the way, it's not just the U.S. We're doing the world a favor. We're doing the entire world a favor by getting rid of these guys and their ability to strike global shipping. That's the mission here, and it will continue until that's

JA 971

carried out. That never happened before, the Biden Administration didn't do that. All the Biden Administration would do is they would respond to an attack. These guys would launch one rocket, we'd hit the rocket launcher. That's it. This is an effort to take away their ability to control global shipping in that part of the world. That's just not going to happen anymore–

MARGARET BRENNAN: and it could–

SECRETARY RUBIO: –So, this will continue until that's finished.

ⓘ

MARGARET BRENNAN: It could involve ground raids?

SECRETARY RUBIO: Well, those are military decisions to be made, but I've heard no talk of ground raids. I don't think there's a necessity for it right now. I can tell you that as of last night, some of the key people involved in those missile launches are no longer with us, and I can tell you that some of the facilities that they use are no longer existing, and that will continue. The- look, it's bottom line, easy way to understand it, okay, these guys are able to control what ships can go through there. They've attacked the U.S. Navy 174 times. They've attacked the United States Navy. We're not going to have people sitting around with the missiles attacking the U.S. Navy. It's not going to happen, not under President Trump.

MARGARET BRENNAN: The President also referenced Iran in his statement. Iran provides some support for the Houthis as you know. Put this in context for me, because U.S. intelligence has been suggesting for some time that Israel has the desire and intent to conduct an attack on Iran's developing nuclear program in the coming months. President Trump has extended an offer for negotiations. Have you heard anything back from Iran? Is this strike in Yemen a signal to Iran?

SECRETARY RUBIO: This strike in Yemen is about their ability, the ability, of the Houthis, to strike global shipping and attack the U.S. Navy, and their willingness to do it. 174 times against the U.S. Navy, 145 sometimes against global shipping. That's what the strike is about. What we can't ignore, and the reason why the President mentioned Iran is because the Iranians have supported the Houthis. They provided them intelligence, they provided them guidance, they provided them weaponry. I mean, there's no way the Houthis, okay, the Houthis would have the ability to do this kind of thing unless they had support from Iran. And so this was a message to Iran, don't keep supporting them, because then you will also be responsible for what they are doing in attacking Navy ships and attacking global shipping.

MARGARET BRENNAN: They also get support from Russia, potentially, which you leveraged sanctions in regard to, but I want to ask you about tariffs because you were just in Canada this past week. China is Canada's second biggest export market, Mexico's third. In this ongoing trade back-and-forth, the U.S. is having, isn't there a risk that China will ultimately be the winner? If it's too costly to deal with the United States, won't they benefit?

SECRETARY RUBIO: Well, actually, China and Canada are involved in a mini trade war right now. In fact, the Chinese have imposed a bunch of tariffs, reciprocal or retaliatory tariffs on Canada after Canada imposed tariffs on them. So here's the way everyone needs to understand this, okay? The president rightfully believes that the balance of global trade is completely off gilt- kilter. For 30 or 40 years, we have allowed countries to treat us unfairly in global trade, much of it during the Cold War because we wanted them to be rich and prosperous because they were our allies in the Cold War, but now that has to change. You look at the European Union. The European Union's economy is about the same size as ours. It's not a low wage economy. It's very comparable to ours in terms of its composition and so forth. Why do they have a trade surplus with us? So what the President is saying is two things.

Number one, there are critical industries like aluminum, like steel, like semiconductors, like automobile manufacturing, that he rightfully believes, President Trump rightfully believes, the U.S. needs to have a domestic capability and the way you protect those industries and build that capability is by ensuring that there's economic incentives to produce in the United States. The second is global, and that is, we are going to put tariffs on countries reciprocal to what they impose on us. And so this is a global, it's not against Canada, it's not against Mexico, it's not against the EU, it's everybody. And then from that new baseline of fairness and reciprocity, we will engage, potentially in bilateral negotiations with countries around the world on new trade arrangements that make sense for both sides. Fairness, but right now, it's not fair. We're going to reset the baseline, and then we can enter into these bilateral agreements, potentially, with countries so that our trade is fair. What's not going to continue is, of course, these countries are upset–

MARGARET BRENNAN: So this is all just about leverage to get bilateral, not free trade- not North American Free trade deals–

SECRETARY RUBIO: No, it's not leverage–

MARGARET BRENNAN: re- renegotiation–

SECRETARY RUBIO: – No, no, it's not leverage, it's fairness. It's resetting baseline fairness. And then from there, we can work on deals and- and so forth, because they'll have products we don't make, we have products they don't make. That's where trade works the best. It has to be free, but it has to be fair, and right now it's only free on one side, and it's not fair for the other side–

MARGARET BRENNAN: Well you know, sir, that–

SECRETARY RUBIO: –It's an unsustainable position.

MARGARET BRENNAN: –the ad hoc nature of these policy announcements and pull backs are causing concern in the marketplace, as we saw this past week. So I heard you describe what seemed like a strategy to get to negotiations on a bilateral front. You also seem to negotiate- say this was national security minded. But then we also see comments by the President of like, 200 percent tariffs on champagne. That's not a critical industry for the United States, that seems more emotional.

SECRETARY RUBIO: No, that means that's- that's called retaliation that's what happens in these trade exchanges. They're going to increase tariffs on- they already have high tariffs. They're going to add more to their tariffs? Fine, then we'll have to find something to- I mean, you tell me? I mean, Canada is going after whiskey and orange juice and you know I mean–

MARGARET BRENNAN: In retaliation.

SECRETARY RUBIO: Yeah, exactly. So that sounds pretty petty to me as well. So what's the difference? The point is, I get it. I understand why these countries don't like it, because the status quo of trade is good for them. It benefits them, they like the status quo. We don't like the status quo. We are going to set a new status quo, and then we can negotiate something, if they want to, that is fair for both sides. But what we have now cannot continue. We have de-industrialized this country. De-industrialized the United States of America. There are things we can no longer make and we have to be able to make in order to be safe as a country and in order to have jobs. That's why we had a rust belt, that's why we've suffered all these important jobs that once sustained entire communities wiped out by trade that basically sent these factories, these jobs, this industrial capability, to other places that cannot and will not continue. I don't- President Trump, this is no mystery, he's been talking about this since the 1980s actually, even before he was a political figure. This is going to happen, and it's going to happen now.

MARGARET BRENNAN: I want to ask you about Russia. You said envoy Steve Witkoff's meeting with Vladimir Putin that happened last week would answer the fundamental question of whether we're moving towards a ceasefire, or whether Putin is using a delay tactic? You spoke with Sergey Lavrov, the Foreign Minister, yesterday. Is this a delay tactic?

SECRETARY RUBIO: Well, I think that was a pro- promising meeting. As I've said repeatedly, we're not going to negotiate this in the public. Hopefully we'll have something to announce at some point fairly soon. I can't guarantee that, but I certainly think the meeting was promising, the exchange was promising. I don't take away from Steve's meeting, from Ambassador Witkoff's meeting, negativity. There are some challenges. This is a complex, three-year war that's been ongoing along a very long military front, with a lot of complexity to it. So no one's claiming that it's easy, but I want everyone to understand, here's the plan. Plan A is, get the shooting to stop so that we can move to Plan B, phase two, which is have everybody at a table, maybe not- maybe with some shuttle diplomacy, to figure out a way to permanently end this war in a way that's enduring and it respects everybody's needs and so forth. No one is saying that that second part is easy, but we can't get even to that second part until we get past the first part. It's hard to negotiate an enduring end of a war as long as they're shooting at each other, and so the president wants a ceasefire. That's what we're working on, assuming we can get that done. That won't be easy in and of itself. We move to the second phase, which is negotiating something more enduring and permanent. That will be hard. It will involve a lot of hard work, concessions from both sides, but it has to happen. This war cannot continue. The president has been clear about that, and he's doing everything he can to bring it to an end.

MARGARET BRENNAN: Okay, we'll talk about that later in the program as well with Envoy Witkoff. I want to ask you about a decision you made to revoke a student visa for someone at Columbia University this past week. The Wall Street Journal editorial board writes, "the administration needs to be careful, it's targeting real promoters of terrorism not breaking the great promise of a green card by deporting anyone with controversial political views." Can you substantiate any form of material support for terrorism–

SECRETARY RUBIO: Yes.

MARGARET BRENNAN: –specifically to Hamas, from this Columbia student–

SECRETARY RUBIO: Yes.

MARGARET BRENNAN: –or was it simply that he was espousing a controversial political point of view?

SECRETARY RUBIO: Well, not just the student, we're going to do more. In fact, we- every day now we're approving visa revocations, and if that visa led to a green card, the green card process as well and here's why, it's very simple. When you apply to enter the United States and you get a visa, you are a guest, and you're coming as a student, you're coming as a tourist, or what have you. And in it, you have to make certain assertations and if you tell us when you apply for a visa, I'm coming to the U.S. to participate in pro-Hamas events, that runs counter to the foreign policy interest of the United States of America. It's that simple. So, you lied. You came- if you had told us that you were going to do that, we never would have given you the visa. Now you're here. Now you do it. You lied to us. You're out. It's that simple. It's that straight forward.

MARGARET BRENNAN: But, is there any- but is there any evidence of a–

SECRETARY RUBIO: Yes. Sure.

MARGARET BRENNAN: –link to terrorism, or is it just his point of view?

SECRETARY RUBIO: Yeah, they take over. I mean, do you not- I mean, you should watch the news. These guys take over entire buildings–

[CROSSTALK]

MARGARET BRENNAN: We covered it intensely. I'm asking about the specific–

SECRETARY RUBIO: –They vandalized colleges. They shut down colleges–

SECRETARY RUBIO: –well then you should know that this is–

MARGARET BRENNAN: –justification for the revocation of his visa–

SECRETARY RUBIO: Well, this specific individual was the spokesperson–

MARGARET BRENNAN: –was there any evidence the materials support for terrorism?

SECRETARY RUBIO: –was the negotiator- on negotiating on behalf of people that took over a campus? That vandalized buildings? Negotiating over what? That's a crime in and of itself, that they're involved in the being the negotiator, the spokesperson, this that the other. We don't want- we don't need these people in our country that we never should have allowed them in in the first place. If he had told us, I'm going over there, and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down, people can't even go to school, library buildings being vandalized. We never would have let him in. We never would have let him in to begin with. And now that he's doing it and he's here, he's going to leave, and so are others, and we're going to keep doing it. We're here- and by the way, I find it ironic that a lot of these people out there defending the First Amendment speech, alleged free speech rights of these Hamas–

MARGARET BRENNAN: Yes.

SECRETARY RUBIO: –sympathizers, they had no problem, okay, pressuring social media to censor American political speech. So it's, I think it's ironic and hypocritical. But the bottom line is this, if you are in this country, to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate in acts of rebellion and riots on campus. We never would have let you in if we had known that and now that we know it, you're going to leave.

MARGARET BRENNAN: Is it only pro-Palestinian people who are going to have their visas remote- revoked, or other points of view as well?

SECRETARY RUBIO: No, I think anybody who's here in favor- look, we want to get rid of Tren de Aragua gang members. They're terrorists too. We, the president, designated them, asked me to designate and I did, as a terrorist organization. We want to get rid of them as well. You're- we don't want terrorists in America. I don't know how hard that is to understand. We want people- we don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple, especially people that are here as guests. That is what a visa is. I don't know what we've gotten it in our head that a visa is some sort of birthright. It is not. It is a visitor into our country, and if you violate the terms of your visitation, you are going to leave.

MARGARET BRENNAN: Okay. Secretary Rubio, like to have you back. Talk to you about a lot more on your plate another time, but we have to leave it there.

SECRETARY RUBIO: Thank you.

MARGARET BRENNAN: Face the Nation will be back in a minute.

# Exhibit Q

An official website of the United States Government Here's how you know

Home > ... > Secretary of State Marco Rubio with Hugh Hewitt

# Secretary of State Marco Rubio with Hugh Hewitt

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**
**VIA TELECONFERENCE**

MARCH 19, 2025

**QUESTION:** Joined now by Secretary of State Marco Rubio. Mr. Secretary, welcome back. It's good to have you. Congratulations on assuming the top – the seventh floor.

**SECRETARY RUBIO:** Thank you. It's – I think we're starting our tenth week or our ninth week. I've lost count at this point, but a lot has happened in that period of time. But it's a great honor to be able to do this and to work for a president that I think is making history every day.

**QUESTION:** Well, Mr. Secretary, you've been on this program since 2010, I think probably more than a hundred times, and you may remember my basic worldview is that America's biggest adversary is China, People's Republic of China; that General Secretary Xi is a tough, ruthless man. He's in an alliance with the fanatics in Iran and they present a real and present danger with us. Do you share that worldview? Can a diplomat say that?

**SECRETARY RUBIO:** Well, I think it's certainly the biggest challenge we face. Look, here's the way I characterize it, because you're right, I mean, we need to have relations with these countries. But I think the story of the 21st century is going to be about what happened between the U.S. and China. I think I said this during my confirmation hearing. I think the Chinese believe that they are on a path towards becoming the most powerful nation on Earth, that it's in

Cookie Settings

matter of time, and they seek to manage that rise in a way that – and avoid disruptions along the way if possible.

And look, if in fact they end up out-competing us, out-innovating us, outworking us, what have you, that's one thing. But for us to sort of unilaterally allow them to do that rise while not playing by the same rules, then that would be on us. I think that's what's happened for the better part of 20 years. There was this assumption that some made that if – that we should allow China to continue to cheat in rules of trade and commerce and intellectual property and that kind of thing, and if we let them do it, that eventually they'd become rich, and when they became rich they'd become just like us. Well, that's not what happened. They became rich, but they're not just like us.

So I would say they're a rich and powerful country. They're going to be a rich and powerful country. We need to engage with them because it's irresponsible not to, but we also don't want to live in a world where we depend on China for things that we need.

**QUESTION:** Yesterday, *The Wall Street Journal* reported that General Secretary Xi is upset about the deal you made in Panama about the canal, and today it was announced that Hong Kong Enterprise is going to delay opening a car plant in Mexico in retaliation for the attempt to get the canal back. Do you care? Are we going to get the canal control back in American hands?

**SECRETARY RUBIO:** Yeah, look, we didn't give the canal to China, as the President says. President Trump's been very clear: We built that canal, we turned it over to – he didn't agree with that decision, but we turned it over to Panama. We wake up one day and Chinese influence is all over the canal. They – Hong Kong-based companies, which obviously have to respond to Chinese law, control all the key ports on – the key ports on both sides, the infrastructure deeply ingrained there benefited the Chinese, and that's just not sustainable and it can't continue. We made our view very clear that we believe the treaty has been violated. We had a great visit. There's a lot of follow-up to be done, but the President has been abundantly clear about it, and that is that the Panama Canal cannot be an outpost for the Chinese, because we built it and we intend to have influence over it, and because we didn't turn it – like I said, we didn't turn it over to the Chinese. We turned it over to Panama, and that's not the way it's played out.

**QUESTION:** So it's obviously a flashpoint. Flashpoints are best discussed at a summit. Is there a summit in the offing between President Trump and General Secretary Xi, either here or there?

**SECRETARY RUBIO:** Well, I think that meeting is eventually going to happen. There isn't one scheduled. I think that time will come. Obviously, as you know – and you've followed these things for a long time – and there needs to be a reason behind it. It has to – we have to know what they're meeting about and what the result of the meeting is going to be. But there's no doubt that that will happen. The President has in his first term – he'll do it again now – I mean, he'll meet with any foreign leader, basically, if there's a good reason to do so. He's – and look, I think that meeting will happen. But there's none scheduled at this moment.

**QUESTION:** Now, when the President talked to me – it was President-elect last, in January – and we talked about Jimmy Lai, and he told me he would get Jimmy Lai out of jail. Have you had any conversations with your Chinese counterparts about getting Mr. Lai out of jail? Because he's going to die pretty soon unless we get him out of that Hong Kong prison.

**SECRETARY RUBIO:** Yeah, it's a priority. We've raised it in every possible form and they know that it's important to us, and I think there are other countries as well that are very involved in raising this issue. And that needs to happen, and we're going to continue to raise it. Obviously, with some of these things you want to be careful what we say in the media. We don't want to jeopardize any efforts. But I think it's important to know that it's not something we've forgotten about and that it remains a priority, and I think other countries around the world are making the same point as well to the Chinese.

**QUESTION:** Very good. Now, the Iranian fanatics sell a lot of oil to China. That's the connection. I want to move to the attack on the Houthis this weekend. First of all, have the Houthis attacked us, or are they just putting out press releases over the last three days? Because they put out a lot of press releases that they're shooting at the *Truman*, and I understood Trump to say if they did that, the bombs would fall on Iran. What is the situation, Mr. Rubio?

**SECRETARY RUBIO:** Well, they've – look, they've – they say they attack. I mean, they launch and then they get shot down 100 miles away before it even is a threat, so DOD's had no problem defending. They're certainly not doing right now what they were doing at the peak of this thing, when they were attacking our Navy 150 times and global shipping 170 times. Maybe I got those numbers inverted, but nonetheless unacceptable.

And the one thing about President Trump is when he says things, he means it. And his – this effort is not a one-day thing. It's been going on now every night. It's been sustained, and it'll

continue until they no longer have the capability to threaten not just the U.S. Navy but global shipping. At the same time, the President's been clear. Iran is going to be held responsible for any assistance they continue to provide the Houthis. The President had a post earlier this morning where he outlined that Iran is still helping the Houthis – maybe not as openly, maybe not as much as they were in the past, but they're openly helping them. But they're still helping them, and that's unacceptable, and that needs to change.

So I won't get out ahead of the President other than to say I don't think I need to convince any of your listeners that when President Trump says something, he doesn't – he means it. Like, if he says something's going to happen, it'll happen.

QUESTION: (Inaudible) a couple of times. You deal with MBS and MBZ, and you deal with the Israelis. If it comes to blows, will we act in an alliance against Iran, do you think, or will we act alone?

SECRETARY RUBIO: Well, I think the President's been clear. He's prepared to do whatever it takes to prevent Iran from ever having a nuclear weapon. He's been abundantly clear. Now, he's a president that wants to promote peace. If you asked him, he would tell you he would much prefer to work this out diplomatically without a war. And that's his preference. That will always be his preference. But if you force him to choose between a nuclear Iran or taking action, the President's been clear: He will take action. Whether other countries seek to join us in that endeavor or simply cheer us on, sometimes quietly from the sidelines, that's another matter. But it certainly will not determine the steps we take, because we view a world with Iran having – and the ayatollahs, these religious fanatics, having nuclear weapons – that's just not acceptable.

QUESTION: I agree. Do we have the weaponry necessary to destroy their sites where they're conducting the illegal development programs, Mr. Secretary?

SECRETARY RUBIO: Well, let me just say on that – and that's probably a question better directed to DOD – but I'm confident enough to say that if the President makes the decision that we need to take action to prevent Iran from having a nuclear capability, we have the ability to do that, and to go further and perhaps even threaten the regime. But look, again, I'm at the State Department, right? We promote peace, not war. But obviously, the President's been clear that's what he prefers as well. So I always tell everybody I'd love to handle it through the State Department, but if we can't, then I have to turn these things over to Pete Hegseth over at the

**JA 981**

Department of Defense.  And – but we'd prefer to deal with it at the State Department, but you need a willing partner to do that.

QUESTION:  Now, Mr. Secretary, I want to turn to the deportation flights.  I'm on record as saying this is a case of first impression to my constitutional lawyer eyes.  It's a non-justiciable political question.  This judge should dismiss this case.  And if they want to appeal to the D.C. Circuit, by all means let them try, but he should punt because he shouldn't be telling – that's my political opinion.  Did you discuss with the President before the flights took off that we would have trouble with the courts as a result of this?

SECRETARY RUBIO:  Well, we shouldn't have trouble with the courts.  I mean, that developed in the middle of all this Yemen stuff going on at the same time on Saturday.  So let me just back up for a second and say this.  This is, to me, a conduct of foreign policy.  We have a regime in Venezuela that refuses, absolutely refuses, to take its nationals, and they have an obligation to take their nationals.  So we had to make an arrangement with another country, El Salvador and President Bukele, an arrangement that I made personally and followed up on again last week in conversations.  And once those commitments were made – and they included, by the way, MS-13 criminals that he wanted to put on trial in his country for crimes committed in El Salvador – we had made a foreign policy commitment that we were going to keep.

It is my view that judges do not have the right to conduct the foreign policy of the United States.  Go beyond the immigration issues that people focus on.  These are alien enemies in our country.  They're an organized group undermining the national security of the United States, and that needed to be dealt with.  We made an arrangement with an international partner.

QUESTION:  Let me pause here and give a signal to the stations down the road that I'm going to continue talking with Secretary Rubio and come back right away, so don't go anywhere.  I'm talking with Secretary Rubio about the deportation.

Now, Mr. Secretary, when you talked to President Bukele, did you make an agreement —

STAFF:  We're going to break.  We're going to break.

QUESTION:  I'm going to talk to him during the break (inaudible).  When we had those conversations, did you receive any assurance from him that he would segregate the Venezuelan terrorists from the MS-13 gangs in the other prisons?

**JA 982**

**SECRETARY RUBIO:** Well, we didn't have to make that agreement. We told them who we were going to send because the agreement is this: There's two different groups here. There are people that he wants because they committed crimes in El Salvador, and they're in the United States, and we agreed to return them so he can put them on trial for and deal with their justice system on the crimes they committed. And then we have Tren de Aragua, organized gang members and alien enemies inside the United States who are being housed by him in an excellent prison system that he has at a fraction of the cost of what it would cost to house them here in the United States. It is a matter that we've made, it's a foreign policy matter, and it's one that we weren't going to go back on because we make arrangements with foreign leaders – that's the conduct of foreign policy, and we can't have judges running the foreign policy.

**QUESTION:** I agree. I think you're going to win that case going away. Here's my political concern, because I used to cover gangs and the prisons of L.A. quite a lot. If you mix them up, they kill each other. I don't want to deport terrorists to a place where they'll be killed by other terrorists. Are you confident that they will be protected from other terrorists or other gang members who are their rivals in the cartel business?

**SECRETARY RUBIO:** Well, ultimately I can tell you that I have confidence that El Salvador runs an excellent prison system. That's why we engaged them on this process. They had capacity to assume them. They've done this before. They wiped out the MS-13 gang in El Salvador —

**QUESTION:** Yeah.

**SECRETARY RUBIO:** — in the way that they did it. So I think that my understanding is how they're going to handle it is he needs to handle them separately anyways, because the MS-13 guys that he's getting back are people that need to stand for justice for the crimes they committed in El Salvador. So that's a different process from the people we sent them, some of whom, frankly, are just alien enemies. So I don't know exactly how he's going to house them, but ultimately I – these are two separate tracks. They just happen to be as part of the same flights.

**QUESTION:** All right. Now, Mr. Secretary, I want to go back to Israel for a moment. It is clear to me that some of our foreign adversaries are using the internet to try and drive a wedge between Israel and the United States, and that antisemitic tropes are everywhere and they're trying —

**SECRETARY RUBIO:** Yeah.

**JA 983**

**QUESTION:** — to split the indivisible alliance, the one – I think they're the equal of any ally that we have.  Have you seen that?  Does it concern you?  Do you think there's any danger to our alliance?

**SECRETARY RUBIO:**  Well, I don't think there's any danger to our alliance.  I think there's most certainly people out there that are pursuing these.  Some are because they – they want the clicks, they want the followers, whatever it is may be that's driving it.  And I don't know who in specific, but I mean, they're out there doing that.  And there are those, frankly, that hate Israel and hate the United States.  And we've seen that engage itself and embed itself, for example, in what supposedly are supposed to be our elite universities in this country.  And instead we have people on faculty and in the student body that are actively out there every single day not just protesting against Israel, but committing acts of vandalism and violence and rioting and all kinds of disruptive behavior on this matter.

So I think it's very disturbing to see that play out because, at its core, I believe, is antisemitism.

**STAFF:**  One minute.

**QUESTION:**  So they also – it brings us to the deportation proceeding against Mr. Nahil, which, again, is a non-justiciable political question that you have the authority under 8 1227 to do.  Do you expect to win that case and do (inaudible) —

**SECRETARY RUBIO:**  I do.

**QUESTION:**  — other people like him?

**SECRETARY RUBIO:**  Well, I do and we are.  And we're going to continue to do it.  Bottom line is if you told us that these are the things you were going to do when you came to the United States, we never would have given you – we should never give you a visa.  If this is what you do once you get into the United States on a visa, we're going to revoke your visa, whatever status you have, and we're going to kick you out of the country.  We don't want that – those elements in our country.  So not only have we done it, we're going to continue to do it.  And we're going to – and we're going to improve the way we screen people for their visas, by the way.  It's amazing some of these people ever got in here to begin with.

**QUESTION:**  I – I've got one more question for you, Mr. Secretary —

**STAFF:**  Ten seconds.

**QUESTION:**  — and it's got to do with China.  I want to finish where we began.  In his book – I'm talking with Secretary of State Marco Rubio if you're joining us.  In his book on China, Henry Kissinger said Mao did not believe in deterrence.  Do you think General Secretary Xi Jinping believes in deterrence, and can we deter him from attacking Taiwan?

**SECRETARY RUBIO:**  I think that's a tough question because it's so fundamental to his identity and to what he wants to be part of his legacy.  I do think you can delay and deter by making the price of taking Taiwan higher than what he perceives to be the benefit, but let's be clear.  They believe the benefits are definitional for his – he wants that to be the defining crown jewel of his time in power.  So it's a very delicate situation there.  Our policy remains the same.  We do not believe that there should be any violent and/or extortion-based change to the status.

**QUESTION:**  Yeah, the Shanghai Communique said 100 years before anything would happen, and it's been only 50 years.  The TSCM president meeting with President Trump in the Roosevelt Room was a big deal.  I mean, that was a very big deal.  Is that a signal of our resolve to stand by Taiwan?

**SECRETARY RUBIO:**  Our policy is the same as it's been; it's been consistent.  We believe that they status of Taiwan should not be changed by force or by extortion or compelled in any way.  That's the policy of the United States; that remains the policy of the United States.  That's been the policy of President Trump, and that will continue to be his policy.  And when he makes policy decisions, he means them.

**QUESTION:**  I will let you go with that.  Secretary Rubio, keep coming back.  Always a pleasure to talk with you.  I appreciate your clarity and candor.  Good luck in this very important mission that you're on.

**SECRETARY RUBIO:**  Thank you.

TAGS

China     El Salvador     Immigration     Iran     Office of the Spokesperson

**Organized Crime and Gangs**     **Panama**     **The Secretary of State**     **Taiwan**

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit R

An official website of the United States Government <u>Here's how you know</u>

Home  >  ...  >  Secretary of State Marco Rubio and Jamaican Prim...

# Secretary of State Marco Rubio and Jamaican Prime Minister Andrew Holness at a Joint Press Availability

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**OFFICE OF THE PRIME MINISTER**

**KINGSTON, JAMAICA**

MARCH 26, 2025



JA 988

Cookie Settings

**PRIME MINISTER HOLNESS:**  Good afternoon.  It is my great pleasure to welcome United States Secretary of State, the Honorable Marco Rubio, to Jamaica.  Now, I have known Secretary of State Rubio for some time, and I've always been very impressed by his deep knowledge of the region.  Jamaica is deeply honored that you have chosen to visit us first on your official visit to the English-speaking Caribbean.  This visit so early in your term confirms the strength of historic friendship and strategic partnership between Jamaica and the United States, one built on shared values, democratic ideals, and people-to-people ties.  Our nations have long been united by a common commitment to freedom, prosperity, and security, and your visit today reaffirms this bond.

Today, we engaged in productive and constructive discussions focused on strengthening this partnership and expanding opportunities for collaboration.  During our meeting, we addressed several critical areas of cooperation.  Security, one major area, we reaffirmed our commitment to enhancing cooperation in combating transnational crime, ensuring the collective safety of our citizens, and mutually secured borders.  We discussed a global war on gangs, and there is already significant policy alignment with both countries in this regard.  The United States has been instrumental in supporting Jamaica's efforts to bolster its marine domain awareness and intelligence surveillance capabilities, which are crucial in our fight against organized criminal networks.

We discussed expanded and repurposing development assistance towards our shared goals, including security.  This will exponentially expand our cooperation in fighting lottery scammers, transnational organized crime, trafficking in guns, and building safer communities.  We are committed in ensuring our partnership delivers results in driving down criminality and trafficking in this hemisphere.

On Haiti, we look forward to continued partnership with the United States as we seek to work with the Haitian leadership and stakeholders to address the ongoing crises in Haiti.  The extraordinary humanitarian, civil, and national security challenges in Haiti pose an acute threat to Haitians, to regional stability, and indeed to its close neighbors, including Jamaica.  We agreed that we must do everything we can to stabilize the security situation in Haiti so that they are better able to build capacity and address their political and humanitarian challenges.

On trade, recognizing the United States as Jamaica's largest trading partner, with bilateral trade surpassing $3 billion in 2023, we explored avenues to further expand trade relations between

our two countries.  The renewal of the Caribbean Basin Economic Recovery Act was raised as a matter of critical importance to trade for ourselves and for all CARICOM member-states.

We also explored means to attract increased U.S. investment into Jamaica's emerging sectors. With our stable macroeconomic framework and positive growth trajectory, Jamaica is open for enhanced U.S. investment across multiple sectors, including energy and nearshoring.  In terms of logistics, the discussion touched on working with U.S. companies to leverage Jamaica's location as a premier transshipment hub in the Americas, and this will further bolster Jamaica's work as a major logistics hub for global trade.

On labor issues, the United States and Jamaica have enjoyed an 80-year-old history, relationship in terms of bilateral labor agreements, where we provide short-term skilled and semi-skilled labor in sectors such as agriculture and hospitality.  We discussed ways to expand and enhance these agreements, including skills development partnerships to upskill and reskill Jamaican workers.

On our Travel Advisory, we discussed significant progress that we are making in bringing down all major crimes, and that Jamaica today is safer than at any time in the last two decades.  In fact, crimes against visitors represent less than 0.01 percent of the more than 3 million visitors to Jamaica annually.  We are committed to working collaboratively to ensure that travel advisories reflect the current realities and promote travel to Jamaica.  I am confident that the dialogue initiated today will lead to tangible outcomes benefiting both our peoples and contributing to mutual stability and prosperity.

Indeed, our concern for enhanced regional and hemispheric security and prosperity was recognized as a shared one.  I wish my CARICOM colleagues who are now in Kingston productive meetings as well with the Secretary this afternoon.  Jamaica remains committed to fostering a partnership with the United States, one grounded in mutual respect, shared values, and a collective ambition for a stronger and a more resilient future.

I extend my sincere gratitude to Secretary Rubio and his delegation for their visit and for the productive and forward-looking discussions we have had.  We look forward to building upon this foundation, deepening our collaboration, and taking our partnership to new and greater heights for the lasting benefit of both our nations.

Ladies and gentlemen, I thank you very much for joining us, and I now give the floor to —

**SECRETARY RUBIO:**  Thank you.

**PRIME MINISTER HOLNESS:**  — Secretary Rubio for his press statement.

**SECRETARY RUBIO:**  Well, Mr. Prime Minister, first of all, thank you for the very warm welcome. On Tuesday was – I completed my ninth week on the job.  So I told you I'd be here early; I think that's pretty early.  And I'm glad to be here so soon.  Thank you to the foreign minister as well for welcoming me, and all the work we do together, and to the people of Jamaica.

The ties, I would say, between the United States and Jamaica don't need to be explained.  They're incredibly strong.  And in particular, my home state of Florida, we were commenting close to – 800,000 to a million Jamaican expatriates who call the United States home.  And I asked, was that just in Florida?  (Laughter.)  Because a very vibrant community that's contributed so much to the place that I've called home for so long.

And so we have a shared history that's tied together by people.  I also would say that some substantial percentage of Americans have traveled here at some point in their lives.  And that also binds countries together.  Nothing binds countries and cultures more closely together than people.  And we certainly have that in common, and we want to continue to make sure that we build on that.

We did touch on a couple of topics.  The first is trade.  The world, as has been closely followed, the President is in the midst of realigning American global trade policy, primarily to reset global trade in a way that's fair to the U.S. after 20 or 30 years of what we believe is unfairness – not when it comes to Jamaica, but broader.  And from that will come real opportunities to create new alignments and new trade arrangements and new trade opportunities, and I believe Jamaica is one of those places that together we both stand to benefit.

In particular, we discussed supply chains.  And we ask ourselves:  Why, if so many of these products are destined for the North American market, why are so many of the productive capacities located halfway around the world?  And there's a lot of different reasons why that's happened.  But it makes all the sense in the world to see more productive capacity, more manufacturing, more industry, relocated into our hemisphere.  We certainly have the labor and the population and the desire to do so in our hemisphere.  It's closer to the end markets.

And so we want to pursue opportunities to make that possible, and clearly I think Jamaica is one of those places that could benefit; and the prime minister has that vision for the country, and

the creation of not just jobs, but jobs that pay even better than the jobs that maybe some could find now.  So it's an opportunity, I think, would be mutually beneficial, and we're going to actively seek and look for ways to make that possible.

I also think there's extraordinary opportunities for investment.  And we talked about it, whether it's – particularly in energy.  The United States is going to be producing a lot of liquefied natural gas, which is a very clean fuel that we have in abundance and that we seek to export.  And it's also critical, by the way.  You cannot have manufacturing without reliable and affordable energy.  And so it's one of those things that I think potentially we could continue to partner on along with other things, whether it's mining opportunities off the seabed – in essence, to utilize all of the resources of the country in a responsible way that protects your environment, that protects your natural beauty, but at the same time is generating income and opportunity of employment for the people.  Ultimately, that's – governments have two prime responsibilities: the safety and prosperity of their people.  And your prime minister and his government is very focused on those two priorities.

We did talk about tourism because obviously it's a significant part of your economy.  And we pledged we were going to go back and re-evaluate the travel advisories as they currently stand to ensure that they do reflect the reality of the new numbers, what the numbers show.  Because you've made very impressive progress in your general numbers overall when it comes to the murder rate and so forth, but in particular with those travel advisories are designed to American travelers.  And I think we need to analyze that and just ensure that the status we're currently in accurately reflects the status quo and takes into account the progress you've already made this year and made last year, year over year, which I think is one of the highest numbers in terms of reductions that we've seen of any country in the region.

We have to talk about security, and I think that the prime minister has phrased it in a way that I think is very beneficial, and that is – he used the term "global war on gangs."  Maybe we'll find some other phraseology in the United States to describe it, but we're talking about the same problem.  It's amazing, if you look across the region – and really, many parts of the world – how many of the threats we face in the world now that once came from a ideological terrorist organization or from a nation state, are now coming from non-governmental criminal organizations, who in some cases are more powerful than the governments in some of these countries.  And we've confronted this issue.  It's a challenge in Mexico.  It's a challenge on the border between Venezuela and Colombia.  It is the challenge in Haiti, and it's been a challenge

**JA 992**

here.  And it's a multifaceted challenge.  They are transnational for a number of reasons.  One, as an example, is – and we've acknowledged this in our conversations that lead back to my time in the United States Senate – how many of the guns and the weapons that are being used by gangs to commit acts of violence here in Jamaica are purchased in the United States and then shipped here.  And we want to commit to doing more to stopping that flow at the same time as we do more to commit to increasing your capacity.  That's the other thing I underlined.

What we're talking about here when we talk about American assistance is America helping Jamaica build its own capacity, its own ability to confront these challenges and solve these problems because security is a baseline for everything.  And to that end, we have some good things to announce today here.

We've – the JOLT Fusion Center that is starting up again, and that's been even further strengthened.  That's going to help address lottery scamming.  We can announce this synthetics detection equipment for Jamaica's forensic labs; another counter-gang recruitment program that we seek to launch as a result of our visit here today; and announce something that I think is really important, and that is software, intelligent software, for the law enforcement here in Jamaica to combat gangs – things like night vision goggles as well, technology.  And we look to do more.  And on that end, let me touch on a topic that we talked about just a little bit.  Well, I'll touch on what the topic – then I'll get to this final one.

On – you mentioned upskilling and helping, how can we – it's a topic we hadn't touched on directly extensively before.  We talked about it today.  We seek to go back and find ways that we can partner to create opportunities for skills training so that if those companies – and we can attract those companies if we can attract – whether it's a logistics center or manufacturing – to come to Jamaica.  There's a workforce that's been equipped with the skills needed.

Now, we face this challenge domestically as well.  We need to do that ourselves.  But there may be things that we can do in collaboration with one another.  And this touches on the issue of aid – very controversial in the United States, but it's one of the reasons why I wanted to come here today because it in many ways highlights exactly what our vision for aid moving forward is.

The United States is not getting out of the aid business.  We are going to be providing foreign aid.  The difference is we want to provide foreign aid in a way that is strategically aligned with our foreign policy priorities and the priorities of our host countries and our nation states that we're partners with.  In essence, how that would work, how it has worked in the past, is USAID or

JA 993

some other entity would come into a country and say, this is what we think you need. And then they go out and hire an NGO that maybe are the ones that convinced them that that's what you need, and they give them a bunch of money and they come into the country and they do things. Some of these programs are fine. They're nice things. Other times, not so much. Nonetheless, that's how it used to be.

How we want it to be in the future is that our embassies are involved with the host government, our hosts, the – our partners. And we ask them, what are your needs? And we provide assistance geared towards the needs of the nation states that are hosting us and that we're partnering with. At the end, our partner in Jamaica, our partner all over the world, is the government. It's the host government, who have a clear vision for the future. And to the extent that our foreign aid can be helpful, it is in furtherance of what the people of your country have elected you to carry out.

Here there are a lot of things. We've just described some of them. What should our foreign aid be geared towards? It should be geared towards looking for opportunities to increase skills training, looking for opportunities to attract investment and business and trade, and looking, obviously, for opportunities to expand on your own domestic intelligence capabilities. We are going to have foreign aid that is aligned to our foreign policy, and our foreign policy is going to be aligned to our mutual shared interests with the partners that we have all over the world.

And I can tell you, Jamaica's an incredible partner to the United States. It's very cooperative on a number of fronts. And we will continue to work together, and we're going to work closer than we've ever worked before because we are now going to have U.S. programs for foreign aid that are going to be aligned with the vision that you've elected your leaders to carry out for your country. And that benefits us both.

And so I thank you for the opportunity to visit with you here today and talk about these things. I'm excited that we're going to be able to follow up on a lot of them and show real progress. The message that I've wanted to send in my travels – I've had to travel a couple of other places, but I've been to the hemisphere now twice – is very simple, and that is that the United States wants to ensure that when countries are cooperative and work with us and partner with us and constantly seek ways to engage us, that that leads to positive results and outcomes.

We – it's not – you can call it rewarding, but what it really means is it has to be a mutually beneficial relationship. And we want countries in the world, and we want countries in the region,

**JA 994**

to identify being close to the United States as something that is beneficial and helpful – helpful to develop, helpful to grow, and frankly helpful so that one day many countries can serve – and I think – and Jamaica is already doing this – as a model of what other countries would seek to emulate, whether it's on security, on trade, on investment, on skills acquisition and improvement.  These are the things that we want America – relationship with our partners to look like.  And I can think of no better friend in the Caribbean and frankly in the Western Hemisphere than Jamaica and your government, Mr. Prime Minister.

And so we thank you for this chance to visit with you so early.  And as I joked a couple times, but I'll say it again – I think I told it to the cameras already – I wanted to come here early so when I come for the second and third time, they don't accuse me of only wanting to go to Jamaica.  (Laughter.)  And – but in many ways, it really truly feels like home and – where I am in South Florida, and I thank you for your hospitality and this opportunity.  (Applause.)

**MINISTER DIXON:**  Good afternoon, Prime Minister Holness and Secretary Rubio.  Thank you both for your remarks just now.  We have several members of the media from Jamaica and the United States in the room with us this afternoon, but we'll only be taking four questions.  And I ask that those who have been selected, that you please stand as you ask your question.  And our first question is going to be from John Hudson of *The Washington Post*.

**QUESTION:**  Thank you.  Thank you very much.  Mr. Secretary, a Republican congressman —

**SECRETARY RUBIO:**  He came with me.  Don't say I don't take you to nice places, all right?  (Laughter.)

**QUESTION:**  But thank you for the hospitality.  Beautiful weather, beautiful country.  Much appreciated.

**SECRETARY RUBIO:**  I'm sorry.  Yeah.

**QUESTION:**  Mr. Secretary, Republican Congressman Don Bacon weighed in on the Signal chat breach saying the White House is, quote "in denial that this was not classified or sensitive data.  They should just own up to it and preserve credibility."  Do you think that's true?  Also, here in Jamaica, there are USAID employees at our embassy, like so many others around the world, on administrative leave, not carrying out the work of the American people.  Do you worry that the DOGE effort won't ultimately end up benefiting U.S. taxpayers?

And Prime Minister, violence and instability remains in Haiti.  What would you like to see from the United States in terms of being a productive force.  And a State Department envoy yesterday called the presence of Cuban doctors in Jamaica and elsewhere human trafficking.  Do you agree with that?

Thank you.

**SECRETARY RUBIO:**  Let me take the first – I've already – I mean, I've already addressed the aid one, but let me address it again.  This is not about getting rid of aid; this is about restructuring how we're going to do aid.  And when you restructure, there's some disruption and – but it has to happen.  By the way, this is not an idea – this is an idea Condoleezza Rice wanted.  This is an idea multiple secretaries of state throughout time have tried to achieve, and we intend to achieve it, because we think it makes all the sense in the world.  So I recognize it; there's disruption involved when you make reform and you make change.  But it's necessary, because our foreign policy and our foreign aid have to be aligned.

Foreign aid is an instrument of foreign policy, okay.  It is not a global charity.  Jamaica is not asking for charity; they're asking for development assistance so they can become stronger at their security needs and the other things of this nature.  That's what they're asking for.  They're not asking for a handout.  They're asking for a hand up, help to build their capabilities so that they become a self-reliant partner and frankly could end up – and already are helping other countries.  Jamaica now is contributing to the effort in Haiti, as an example.  So these are the kinds of things we want to see in our foreign aid.  So look, our goal was not to disrupt anyone's life.  Our goal was to restructure the way we deliver foreign aid so that it is aligned with our foreign policy and with what we're trying to carry out at our respective missions around the world.

On the first question, let me just say on the Signal thing, this thing was set up for purposes of coordinating how everyone was going to call – when these things happen, I need to call foreign ministers, especially of our close allies.  We need to notify members of Congress.  Other members of the team have different people they need to notify as well, and that was the purpose of why it was set up.  Obviously, someone made a mistake.  Someone made a big mistake and added a journalist.  Nothing against journalists, but you ain't supposed to be on that thing.  So they got on there, and this happened.  I've been – so I can speak to myself and my presence on it.  I think my role – I – on it was – just speaking for my role, I contributed to it twice.  I identified my point of contact, which is my chief of staff, and then later on – I think three hours

after the White House's official announcements had been made, I congratulated the members of the team.

I have been assured by the Pentagon and everyone involved that none of the information that was on there, though not intended to be divulged – obviously that was a mistake and that shouldn't have happened and the White House is looking at it – but that none of the information on there at any point threatened the operation or the lives of our servicemen.  And in fact, it was a very successful operation, and it's an ongoing operation.  But that was the intent behind it, and again, I think the Pentagon has made it clear that nothing on there would have endangered the lives or the mission.  And the mission has been very successful.

**QUESTION:**  Was it classified, the information?

**SECRETARY RUBIO:**  Well, the Pentagon says it was not.  And not only did it say it was not – they make very clear that it didn't put in danger anyone's life or the mission.  The – there was no intelligence information.  And understand – when this story first broke, they were sort of alluding to were there war maps, were there this – there was no war plans on there.  This was a sort of description of what we could inform our counterparts around the world when the time came to do so.

Again, look, I think the White House is looking at this entire thing.  How did that journalist get on there?  Was this the appropriate – and I think they'll be reforms and changes made so this never – this – well, it's not going to happen again; it can't.  But I want everybody to understand why this thing was even set up in the first place and also understand very clearly the mission was successful, and at no point was it in endangered.  And that's coming from the highest-ranking officials at the agency that was in charge of the actual operation, which is the Pentagon.

**PRIME MINISTER HOLNESS:**  In terms of Haiti, the United States has been an incredible partner – in fact the lead partner – in ensuring that resources and organization is brought to the crisis in Haiti.  In terms of what more could be done, I think we are at a phase in Haiti where there has to be a rapid expansion of the Haitian National Police, the HNP, in terms of the manpower and resources, because ultimately the HNP has to take on the gangs.  The present holding situation that we have is not necessarily moving the situation forward as we would all like, so there will have to be a significant expansion in resources in support of the HNP to enable them to take on the gangs.

In terms of Cuban doctors in Jamaica, let us be clear:  The Cuban doctors in Jamaica have been incredibly helpful to us.  Jamaica has a deficit in health personnel, primarily because many of our health personnel have migrated to other countries.  We are, however, very careful not to exploit the Cuban doctors who are here.  We ensure that they are treated within our labor laws and benefit like any other worker.  So any characterization of the program by others certainly would not be applicable to Jamaica.  We are ensuring that our program complies with all the international laws and standards to which we are a party to.

**MINISTER DIXON:**  All right, our next question will come from Tauna Thomas from Nationwide News Network.  Please stand.

**QUESTION:**  Secretary Rubio, my question is – or questions in relation to the matter of the Cuba medical cooperation program as well.  So the medical mission has been a cornerstone of health care in Jamaica and the Caribbean for over 50 years according to our foreign minister.  How does the U.S. reconcile its stance on this program with the region's reliance on Cuban medical professionals, and what alternatives does it propose to ensure health care stability?

**SECRETARY RUBIO:**  Yeah, well – yeah, I think the first thing is to separate the medical from the labor issues that we are pointing to, okay?  This is not about doctors.  This is not about the provision of medical assistance.  We have no problem with medical assistance and we don't have a problem with doctors.  We have a problem – and I'm not speaking about Jamaica; they've – they're – we discussed this today about following international labor standards and the like.  But I'm just talking about this program in general, how it's operated around the world.

And how it's operated around the world is that basically the doctors are not paid.  In many other parts of the world, the doctors are not paid.  The doctor – you pay the Cuban Government; the Cuban Government decides how much, if anything, to give them; they take away their passports; they basically operate as forced labor in many places.  Now, there are places that have better labor standards.  Perhaps Jamaica is one of those, and that's fine.  But I'm describing generally what the program has been.  It has operated in that way in many parts of the world and placed these people in tremendous danger.

And so we – I think we can all agree that the trafficking in labor, be they doctors or farm workers, is not something that we would want to be supportive of, and we find that to be an egregious practice on the part of the Cuban regime.  Now, every country operates their program differently, and obviously, because of our relationship with Jamaica we're going to – we're going

**JA 998**

to engage with them on that and talk about it further and have a better understanding. Perhaps none of this applies in the way it's handled here. But generally that's the problem with the program. It's not that they're Cuban doctors, it's that the regime does not pay these doctors, takes away their passports, and basically it is in many ways forced labor. And that we cannot be in support of. Again, not speaking, about here in particular, but in general about the program.

**MINISTER DIXON:** Okay, our next question's going to come from Will Lowry from The National News.

**QUESTION:** Thank you so much for taking my question, Mr. Secretary. I just want to circle back to John's question re: the Signal chat. Are —

**SECRETARY RUBIO:** Ah, the Signal chat, yes. (Laughter.)

**QUESTION:** But of course. Are you planning on making the Europeans pay for U.S. operations against the Houthis given that their businesses seem to benefit more from opening of these shipping lanes as discussed in that chat?

And then moving to Russia-Ukraine, I was wondering if you could elaborate on the Black Sea ceasefire deal and whether – how it's progressing. President Zelenskyy has already questioned Russia's seriousness, saying, quote, "They are… trying to distort agreements and, in fact, deceive both our intermediaries and the entire world."

**SECRETARY RUBIO:** Okay. So on the first question about – look, here's the problem, okay? These guys, these Houthis, these are pirates, okay? This is a band of – it's a gang, in essence, that's gotten control of a certain part, but these are a religious fanatic gang. And these guys have missiles and they've launched 174 attacks against U.S. Navy ships, 150-something attacks on commercial vessels. They are literally saying they control – they've set up a toll system in the Red Sea. These ships can go, these ships cannot; they don't blow up the Chinese ships, they don't blow up somebody, but they blow up all the other ships. This is not sustainable.

And so I think the point that I've made publicly is we are doing a great favor to the world, the United States is doing a great favor to the world, going after these guys' capability of doing this. How can we live in a world where a group like this has advanced weapons, okay, and can shut down a shipping lane and increase the cost of shipping that we're all paying for? Everything we buy, all the stuff is embedded in the cost and in the price of these things is how much it costs to ship it. And so that's just not a sustainable thing. We can't allow it.

So I think the point I would make is not we're going to make anybody pay – it's everybody should recognize we are doing the world a great favor going after these guys, because this can't continue. This is unsustainable. What's next? Some gang's going to show up somewhere else and shut off another shipping strait, a shipping lane? That's not practical. It cannot happen.

So what was your first question? I was so fired up about that one that I forgot the other one.

**QUESTION:** The Black Sea ceasefire —

**SECRETARY RUBIO:** Oh, yes, that one – easy ones. Well, look, I think yesterday – our negotiators are en route or perhaps they've already arrived, after spending – I think they met with the Ukrainians twice, the Russians once. What we have here is an agreement in principle on a Black Sea ceasefire. We got two things from that. The first is we have more detailed definition of what the energy ceasefire entails, and the second is the principle, concept of a Black Sea ceasefire. Obviously, after our meeting, as part of their release, the Russians detailed a number of conditions that they want to see met in order to do that. So we're going to evaluate that. Some of those conditions include sanctions that are not ours; they belong to the European Union.

So we're going to be gathering and sort of when our folks get back, sitting down, going through the proposals, getting their impressions of the conversations so we can more fully understand what the Russian position is or what their ask is in exchange, and then we'll present that to the President who will ultimately make a decision about what – the next step here. I think it's a good thing that we have both the Ukrainians and the Russians talking about ceasefires, be they energy or be they potentially in the Black Sea, but obviously this is hard and difficult work. This is a protracted three and a – almost three-and-a-half-year war now, or three-year war. It has a lot of framework of sanctions that have been built globally now that that would – that have to be looked at as part of an ultimate end to a conflict. There's a lot of things that have to be worked through, and I certainly think the only way you're going to make progress on these things is by engaging with both sides, understanding their asks, their demands, and seeing what's possible.

So we're going to have a chance now to sort of sit down as a team and evaluate, when they arrive, in detail how the meetings went with the Ukrainians, how the meetings went with Russia, what are the Russians asking for, what are the Ukrainians asking for, compare all that, and then make a decision on that basis about what comes next in this process. In the end, the goal here

is peace.  The goal is to end a war where people are dying.  And I think everyone should be happy that the United States is engaged in a process of ending a war and bringing about peace.

It's not going to be easy.  It won't be simple.  It'll take some time.  But at least we're on that road and we're talking about these things, and we're going to test it and see what's possible.  We think we owe that to the world, and the President, I continue to say, is the only leader in the world right now – President Trump – who's in a position to even get these two nations to a city to talk about these things, albeit in rooms far apart from one another when these talks were going on.  But nonetheless they're talking; it's the first time in a while that we've seen any conversation about this.  But we have a lot of work yet to be done, and we'll know more after we get the readout from our teams.

**MINISTER DIXON:**  Okay, our last question will come from Andrea Chisholm from Television Jamaica.

**QUESTION:**  Thank you.  Secretary Rubio, given changes to U.S. immigration policies, there are some Jamaicans who are afraid to travel back to Jamaica even though they are legitimate green card holders.  What assurances can you give to those individuals that they would have no difficulty returning to the United States?

**SECRETARY RUBIO:**  Well, yeah, green card —

**QUESTION:**  And very quickly, sir.

**SECRETARY RUBIO:**  Green card or residency?  I mean permanent residents you're asking me about?

**QUESTION:**  Permanent, yes.

**SECRETARY RUBIO:**  Yes, okay.  Okay.

**QUESTION:**  And secondly, what problems, if any, does America have with China's investment in Jamaica?

**SECRETARY RUBIO:**  Well, look, I mean, China's a rich and powerful country.  Our problem is not investment, okay?  Our problem is predatory practices.  That's what we're concerned about.  What we have seen all over the world is that China comes in and says, here's a bunch of money

**JA 1001**

for a project they never build. They've been – they bring their own workers to do the work; they don't hire the locals, they bring their own workers. And oftentimes it comes attached with a huge loan that can never be repaid, and now they hold it over your head forever. That's our concern. Our concern is unfair practices, too, where they come in, their government-subsidized companies underbid everybody because they're subsidized, but then they come back and charge whatever they want because now they've got the contract.

So these are the things that we remain very concerned about. Again, not specifically about Jamaica but in general. And so that's what we'll continue to highlight.

On the first point, I would say – let me talk about if you're a green card holder, you're not illegally in the United States. You're a green card holder, you are legally in the United States. What the President has said – and I don't know how anybody can disagree with this – every country in the world has immigration laws. And immigration laws, if you don't enforce them, you don't have immigration laws. Over the last few years we've had what, 13, 14, 15 million people enter the United States unlawfully and irregularly. No country in the world can assume that. By the way, that's not unique to us, right? Even here in Jamaica you've faced challenges of migration. And it's not that we don't sympathize with people that are leaving difficult circumstances, it's that no society can absorb mass migration from anywhere in the world. You just can't do it. And we're facing that challenge. That's not specific to Jamaica; I'm just speaking in general.

And so the President is doing something that, frankly, hasn't been done in a long time. He's enforcing our immigration laws, and that's what we're doing. So if you're a green card holder, you're not illegally in the United States. I think the challenge is for those who are illegally in the United States, we have to have immigration laws, they have to be followed. I mean, that – I don't know why that's an unreasonable demand. And frankly, I mean, Jamaica is not a major source of illegal migration, to be frank. It's not even in the top 10 or top 20 for that matter, I don't think.

So – but that said, we are enforcing our immigration laws. Because here's what happens if you don't: You'll get another 12 million people. And if tomorrow Jamaica announced anybody who wants to come can come in, you're going to get a lot of people too and it's going to be very disruptive. So we need to have immigration laws and we need to enforce them, and that's what we are – that's what the President is doing. That's what he promised voters he would do, and that's what we're going to continue to do. But if you're a green card holder, you're legally in the United States unless – unless – and I say this because a lot of these people come – unless you're some student visa holder who is a sympathizer of some terrorist organization and is running

around in our streets like a lunatic, burning down buildings and attacking students at universities, if you're one of these lunatics that's going to put on a mask over your face and break into a student union center and harass students and – we wouldn't have let you in in the first place.

If you had told us that was – if you told us, I'm going to America not just to study at your university but to tear up your campus, we would have never let you in.  And if you do that once you come into the United States, we're going to kick you out.  We're going to do that.  And I don't care – I don't care what terrorist organization you're supporting, we're going to kick you out.  If you're a gang member, we're going to kick you out, okay?  If you're one of these violent gang members that's coming to the United States, then we're going to kick you out.  That we're going to do.  There's no doubt about it.  But that, the President's very committed to that.  And – but if you're a green card holder and you're not any of these things, you're going to be fine.

**MINISTER DIXON:**  Prime Minister Holness and Secretary Rubio, as we close today's press conference, we want to thank you for your engagement here today.  We thank all of the members of the media and all of the other guests who are here and we wish you safe travels and a happy rest of the day.  Thank you.

**SECRETARY RUBIO:**  Thank you.

---

TAGS

Bilateral Relations and Engagement      Bureau of Western Hemisphere Affairs      Jamaica

Office of the Spokesperson      The Secretary of State

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit S

Home > ... > Secretary of State Marco Rubio and Surinamese P...

# Secretary of State Marco Rubio and Surinamese President Chandrikapersad Santokhi at a Joint Press Availability

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**JOHAN ADOLF PENGEL INTERNATIONAL AIRPORT**
**PARAMARIBO, SURINAME**

MARCH 27, 2025



Cookie Settings

**MODERATOR:** Good afternoon, President of the Republic of Suriname, His Excellency Chandrikapersad Santokhi; His Excellency Minister of Foreign Affairs of the United States of America, Mr. Marco Rubio. Welcome, everybody, dignitaries, ladies and gentlemen of the press. A warm welcome to this press moment in the context of the visit of the Secretary of State of America.

President Santokhi, I give you the floor.

**PRESIDENT SANTOKHI:** Thank you, Madam. Good afternoon to all of you. May I once again extend my warm welcome to the Secretary of State, His Excellency Marco Rubio, and his delegation. And I wish to acknowledge the accompanying media from the USA and also the Surinamese and other international media, and I thank you for being here for this opportunity.

Ladies and gentlemen, I have warmly welcomed the Secretary of State of the United States of America Marco Rubio and his delegation to the Republic of Suriname. And I may add that this is his first visit to the Caribbean, specifically Jamaica, Guyana, Suriname, and within a very short time after taking office.

Secretary of State Rubio, your visit provides a good momentum and opportunity on the way forward for our bilateral relationship. Suriname has a longstanding and strategic partnership with the United States of America. During our meeting, we have discussed opportunities for strengthening and expanding our bilateral relation and cooperation and furtherance of our partnership regionally. In the interest of further expanding the relationship, mainly in the field of trade and investment, we will work together to attract American investors to Suriname.

After all, cooperation with America and American business leads back to the beginning of the 19th century, and we currently have significant investment from the American companies, particularly in the oil and gas industry but also in the gold sector. And I look forward to the participation of the U.S. delegation in the upcoming edition of the Surinamese Energy, Oil, and Gas Summit and Exhibition, SEOGS, which will be held in Paramaribo in June of this year.

The importance of energy security in the Caribbean region was also addressed and discussed with Suriname, but also with Guyana, which are playing a crucial role. Both countries will become important partners for the Caribbean and the Western Hemisphere.

My thanks to Minister Rubio for including my country, Suriname, in his first visit to the Caribbean and for the support he has promised Suriname regarding the energy security and further intensifying the relationship, which will be in benefit of both our countries and both our people. Thank you.

**SECRETARY RUBIO:** Thank you, Mr. President. We first of all thank you for the very warm greeting. And I just began my 10th week as the Secretary of State, so I am happy to be able to make this visit so quickly. I want to extend my gratitude for the invitation, for the hospitality, and for the chance to interact with you – such a closer partner the country is, and you in particular have been, for the United States, and that's a partnership we want to build on.

Let me begin by extending my congratulations to your minister of foreign affairs, who will also be secretary general at the Organization of American States. It's an important organization that we want to see take on new vibrancy and new energy, and we look forward to working with you. It's something that the country should be very proud of. I think it signals the growing importance, relevance, the growing presence that as a nation you have on the regional stage and beyond. And so I wanted to extend that congratulations.

I also want to acknowledge the foreign policy of the United States, I think, over the last 20 years needs revision. It has largely ignored opportunities. When we have found close partners, we have often in our foreign policy neglected those opportunities, and we spent a lot of time on problems instead and on countries and leaders that give us a hard time. We're going to change that. We want to change that. President Trump wants to change that.

President Trump wants to make it clear that if you are a friend and ally, a partner of the United States, there are benefits for your country and for your people in doing so, and we want to enter it in terms of partnership. That's the way we view it. And so we wanted to take a particular interest in visiting and reaffirming our ties to both leaders and countries who have been strong partners, and you have been a very strong partner of the United States.

We recognize the difficulties you faced not so long ago when you came into office and had to take on a large debt, an economy that was underperforming. And these things take a little bit of time, but now you've reached and are reaching a point of stability, and now the exciting moment is ahead. Now is the opportunity to build upon that, build upon the pillars of successful nation-states, which is security and stability, so then you can reach prosperity.

And that's the path you're on, and I know it's a difficult path.  I know it's a path that requires a little bit of patience, but it's an important path and the path you've put your country on and that we want to help you sustain and be on for the years to come, because you have an opportunity to do something very special here.  You really do.

You have – most countries, when they experience growth in a mineral sector or in the energy sector, they often don't plan for it.  They plan for generating the revenue, but they don't plan how that revenue is going to benefit the people.  And you have taken the time, and your government has taken the time and put in the time, to construct a plan so that these things aren't just going to generate revenue; they're going to generate prosperity; they're going to generate opportunity.

That is the role of government.  That is the role of forward thinking.  That is the role of planning for the future.  And you're doing that, and you're doing it in a way that, if done correctly and sustained, you stay on this path, you're going to have a country that's going to transform in this generation, and it's going to mean something extraordinary for future generations.  And we just want to be a partner.  We discussed in our private meeting that, unfortunately, we are witnessing in the region how oftentimes insecurity, instability, and poverty becomes contagious; it spreads and it impacts other countries.

But the reverse is true as well:  Stability, security, and prosperity can also become contagious, and you have an opportunity not simply to change the destiny of the people of your country but in other ways and in direct ways really help impact the security, stability, and prosperity of the region.  And we just want to be helpful.  We believe it is in our national interest to have a Caribbean region that is safe and stable and prosperous, and you're at the vanguard of that in what you are doing.

And so we are just here to encourage you to continue to do that because we are going to do everything we can to ensure that American companies and American firms and investors who are looking for opportunities understand there's real opportunities here with the work you've put in to take on corruption, to take on – to establish strong rule of law and stability, so companies know if we invest in a sector it's going to generate revenue, jobs, and opportunity for the people of Suriname, but we also know that 5, 10, 15 years from now we're going to be safe in our investment because we have a country that has a strong democracy, has a stable rule of law, and has welcoming leaders who understand its importance for the people and for the future.

**JA 1009**

And that's what we commit to doing, for looking to opportunities to build on all of this. We've spoken about such – some of the mechanics of preventing drug trafficking organizations from ever getting a foothold here, of preventing these transnational crime gangs from ever getting a foothold here. We want to be your partner in stopping that from ever happening so you never, ever – now or in the future – face the problems that some other countries are facing.

And we've also talked about responsible ways, because you don't just want to – and you have the right vision for this. You don't simply just want to access the natural resources of a country. You want to do it in a way that's responsible, that protects the natural beauty of the land and preserves it so that future generations can enjoy it as well, and you have a unique and golden opportunity to do it. We're excited by your vision for it. We encourage the people of the country to sustain that vision, and we look forward to being your partner. We thank you for everything we've done together already and what hopefully we'll be able to continue to do in the years to come, certainly as long as I'm in this role.

So I thank you for this very warm welcome and I'm excited about the opportunity. And my understanding, Mr. Ambassador, I am only the fourth Secretary of State to visit?

**AMBASSADOR FAUCHER:** That's correct. Yeah.

**SECRETARY RUBIO:** But how many have visited twice? (Laughter.)

**PRESIDENT SANTOKHI:** That's up to you.

**SECRETARY RUBIO:** All right, so we have a new – we've just set a new goal. We've set a new goal, and hopefully we can come back again and reaffirm that. It – I am – I look forward to doing that.

**PRESIDENT SANTOKHI:** Thank you.

**MODERATOR:** Thank you very much, Your Excellencies. I give now the floor to Ivan Cairo from *De Ware Tijd*.

**QUESTION:** Good afternoon.

**SECRETARY RUBIO:** Good afternoon.

**QUESTION:**  Thank you for this opportunity.

Mr. Rubio, you just brushed on the topic of security.  What can Suriname expect in regards to drug trafficking and combatting drug trafficking?  Because for years there has been discussions that DEA will put up their office again in Suriname.  Is this discussed?

And also in regard to security, there was an agreement between Suriname and the United States, the Shiprider Agreement.  Will that – will that be revitalized – the police cooperation with the police of Las Vegas?  How is that in your policies?  And the cooperation between the National Army of Suriname and the South Dakota military enforcements, how will that be or will that come into play the next coming years?  Maybe the president could also chime in to that.  Thank you.

**SECRETARY RUBIO:**  Thank you.  Well, on the first, I can't speak for the South Dakota National Guard, but I can tell you it's very cold in South Dakota, and so I think they'd probably like coming here and being helpful.  How much does it snow here?

**PRESIDENT SANTOKHI:**  Well, we can import it.  (Laughter.)

**SECRETARY RUBIO:**  Well, they're trying to get away from the snow.  (Laughter.)

But you mentioned the DEA office.  That's something we're going to take back as well.  But here's what we want to do.  Let me explain.  The goal – we're having this debate in the United States about foreign aid, and this is one of the reasons why I wanted to come to the Caribbean because – and meet with all these countries.

For too long, our foreign aid has been driven by what we think you need.  We tell you, okay, these are the five things we're going to do for you.  Well, those aren't the five things you want.  We're changing that.  We want to make sure that we're providing the assistance that the countries need, and we want this power back over to our embassies under the State Department so we're providing the assistance you need.

Let me tell you the second.  The best foreign aid programs are the ones that come to an end because they have achieved their purpose.  The purpose of foreign aid is not for the United States to be here for 25 providing law enforcement.  The purpose of the United States is to help you build the capacity so you will be able to do it sustainably forever.  Our job is to help you become self-sustained in this regard; and not only self-sustaining, but the goal is ultimately to

**JA 1011**

help you be able to do this so well that you're now teaching other countries how to do it. You now become the country that helps others do it as well, and we think we can help with technology, with personnel, with best practices. We've talked about some of this already. We want to continue to build on that, because what we don't – what you don't want to see for a country is a place where drug trafficking organizations and gangs say that's a place where we can run guns, that's a place where we can move drugs, because they don't have the resources available to stop us.

Then you become a magnet for that sort of activity, and nothing will set you back on economic growth and prosperity faster than that. When these vicious gangs get into a country, they start shooting each other and anyone who's standing in between, and it destabilizes society. You never want to reach that point, and we want to help you prevent that. We want – when these drug dealers look at the world, we want them to say I don't want to go through Suriname because their police departments and their law enforcement is so strong they'll catch us; let's go somewhere else, or let's go into another line of work. And that's what we want to see.

So we are open to any programs we can do to build the capacity – which is already extensive; this partnership's very close. I mean, we cooperate on all of this already. We just want to keep building on it so that you can build a capacity where not only do you do it for yourself, but you're maybe helping other countries in the future do it because you've become so good at it. That's what we want to focus on; that's what we want to do.

**PRESIDENT SANTOKHI:** Yes, thank you, Secretary. Just to add some more information, yes, the topic of having the DEA office in Suriname again was discussed, and that will be further considered by the U.S. Government. The topic on the security agreement, as you mentioned, the Shiprider Agreement – we do have a new agreement, which has been approved already by the government, and that agreement has been submitted to the parliament, and we are waiting for the approval. But after the approval, that agreement will be a very strong mechanism to get more support from the U.S. Government in terms of technical support but also material support in the interdiction program, particularly those criminal organizations who are making use of our territory by illicit dropping of illicit (inaudible) but also illicit landing. With the new mechanism and with the technical assistance of the U.S. agencies, we'll bring an end to this threat, which is very dangerous for our nation but also the neighboring countries.

**MODERATOR:**  Thank you very much, Your Excellencies.  And now it's time for Ed Wong from *The New York Times*.

**QUESTION:**  Hi, thank you, Mr. President, Mr. Secretary, for taking questions from us.  Mr. Secretary, first to you.  You've traveled throughout the region.  As you know, China has a growing presence throughout the Caribbean and Latin America.  You carried out an effort to limit a Hong Kong company's presence in the Panama Canal, and you talked with some reservations about Chinese projects yesterday in Jamaica.  I was wondering, is it the aim of the Trump Administration to try and have the two superpowers reach an accommodation or an understanding where each power limits their military, diplomatic, and economic presence in the backyards of the other powers, meaning spheres of influence for each power?

And then related to China, in 2019 you supported legislation to support – to have the U.S. Government support the protesters in Hong Kong, the pro-democracy protesters.  And mostly the protests were peaceful, but also occasionally they disrupted public life.  And so based on your rationale for deporting campus protesters in the U.S., would you now support the Chinese Communist Party or Hong Kong authorities deporting foreigners who took part in those protests in 2019?

**SECRETARY RUBIO:**  Yeah, the first question is silly, because the people that we're getting rid of in our country are vandalizing – they're not protesters; they're taking over college campuses, they're harassing fellow students.  We let them in our country to study.  We gave them a visa because they said, I want to go to your university, I want to get a degree.  They didn't say, I want to go to university and I want to vandalize your library, and I want to chase Jewish students down the street, and I want to wear a mask over my face like if it's Halloween and terrorize people.  We didn't give them a visa to do any of that.

So we don't want those people in our country.  They're not – they're not demonstrating for – they're going beyond demonstration.  They are going and they are creating a ruckus.  They are creating riots, basically, on campus.  And it's making – it's unfair for students.  Some of these schools are some of the most expensive schools we have in America.  People pay a lot of money to go to these schools.  They borrow money to go to these schools, and you can't even go to class because some lunatic who's covering their face is running through campus, spraypainting things, harassing people.  And they're in my country as a guest.  We want them out.  Every one of them I find, we're going to kick them out.

**JA 1013**

On your second – on your first question, I don't – we don't talk about spheres of influence. The United States in an Indo-Pacific nation. We have relationships with Japan, South Korea, the Philippines. We're going to continue those relationships. My problem with China is twofold. The first is we haven't – in many cases, we don't have American companies that have shown an interest in investing in a country, so they don't show up. You leave them with no option. My second problem is in a lot of these countries, the Chinese companies go and they do a terrible job. Not a bad job, a terrible job. I just came from Guyana, where we had to drive on a road the Chinese built that – you're on the trip with us.

**QUESTION:** Yes.

**SECRETARY RUBIO:** Did you have to go on this road?

**QUESTION:** Yeah, it was bumpy.

**SECRETARY RUBIO:** We almost all had concussions, because the plane – the road was so bad – it was terrible – they paid these people to build this road, and then they bring their workers. They bring their workers; they don't hire you, they bring their workers in to do all the work. And then – or they want you to borrow a bunch of money and then they hold it over your head.

So what I want is for countries to have an alternative to that. What we want is for countries to have an alternative to that. We – if you're going to build a road, I want you to, like, have a real road. They were better off with a dirt road then the road we were just on. And it's not the fault of the current administration in Guyana; that was a road that was built before. But they did a terrible job. If you did that job in America, someone would sue you for a lot of money, okay? It was a bad road. So we want to be able to ensure that we are providing alternatives to what we think is bad work by the Chinese that never finishes on time, is always overbudget, and brings their own workers, don't even hire the locals.

And one more point I would make in this regard. There are certain sectors, okay, when it comes to telecommunications and so forth, where I'm just honest with people. If you're going to have a telecommunications system that is controlled by Chinese companies, you're going to have trouble having American investors come in. Because they don't want all their stuff stolen. They don't want all their stuff yanked out by some back door that the Chinese have installed in their telecommunications system. Again, we've had to face that too in America, because Huawei was

**JA 1014**

deploying in America as well. Again, we have to have an alternative, though. There has to be somebody else that comes along and says, we can do it too, and we won't spy on you when we do it.

So our goal is twofold: create these options; but not just options that don't – that – to China; options to work that involves bad workmanship, overbudget, with debt attached, and using their own workers instead of yours. That's the alternative we want to provide in any endeavor we can.

**QUESTION:** Mr. President, do you have any comments on cooperation with China in this hemisphere?

**PRESIDENT SANTOKHI:** Well, I think the position which has been addressed by Secretary of State Rubio is quite clear what the position of United States of America is. Our position as a country is that we are developing our countries with international cooperation with a lot of countries – more than 170 countries we are cooperating. All these cooperations are based on pragmatism, based on the needs and the national interest of the countries.

So in relation to China, what we are doing as a country is that we do have several areas of development. We are looking for investors. We are inviting investors. And just what the minister has said, not all the countries are showing up. There are sometime more countries which are showing up for their interests and their projects. So we need to keep that aspect also into consideration.

My invitation to the minister was we need the private sector of the United States. A lot of those projects which are implemented in Suriname by Chinese companies – those projects were granted through international procedures, and through international bidding procedures our local companies, our local content (inaudible), are excluded. And most of these projects were financed by the Inter-American Development Bank, the World Bank, and our view is that soon you will have more opportunities for the Surinamese companies, more and more Surinamese companies will evolve.

And on the other side, we hope that more United States company will offer themselves and come to Suriname. We'll offer them all the incentives, and I think Suriname is a very close country to the United States of America. They don't have to look for opportunities in the Far East or in Africa. Here we are. Here we have the oil and gas, and we are very happy to welcome the

**JA 1015**

opportunity.  We are very happy to welcome Halliburton, we are very happy to welcome Schlumberger, and we see more and more U.S. companies coming to Suriname to invest, and they are very welcome.

**MODERATOR:**  Thank you very much, Your Excellencies.  We have come to an end to this press moment.  We thank you for being here.  Thank you very much, and this is the end.  See you next time.  Bye.

---

TAGS

Bilateral Relations and Engagement        Bureau of Western Hemisphere Affairs

Economic Growth and Prosperity        Energy        Energy        Office of the Spokesperson

Official International Travel        The Secretary of State        Security and Defense        Suriname

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 1

Alice Miller
Chief Counsel
Numa Metoyer
Deputy Chief Counsel
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
830 Pinehill Road
Jena, Louisiana 71342
TEL:   (318) 992-1850

☒ DETAINED

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
JENA, LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | In Removal Proceedings |
| MAHMOUD KHALIL | ) | |
| | ) | A█████████ |
| | ) | |
| Respondent | ) | |

Immigration Judge: Comans

Next Hearing 4/11/2025

The U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("Department") submits the following documents in the above referenced case in support of allegation five and the charge under INA section 237(a)(4)(C)(i).

| Tabs | Documents |
|------|-----------|
| A | Letter<br><br>The Secretary of State<br>Washington<br><br>From: Marco Rubio<br><br>Subject: Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA) |

Respectfully submitted on April 9, 2025,

NUMA V
METOYER III

Digitally signed by
NUMA V METOYER III
Date: 2025.04.09
13:47:41 -05'00'

Numa Metoyer
Deputy Chief Counsel
Department of Homeland Security
U.S. Immigration and Customs
Enforcement 830 Pinehill Road
Jena, Louisiana 71342

# CERTIFICATE OF SERVICE

On the date below, I have provided a copy of the Department of Homeland Security Document Submission to the respondent and/or the respondent's counsel via:

☐ Central Louisiana ICE Processing Center
830 Pinehill Rd,
Jena, Louisiana 71342

☑ the Executive Office for Immigration Review (EOIR) Court & Appeals System (ECAS), in accordance with 8 C.F.R. 1003.31. The electronic case record in ECAS includes a Form EOIR-28 Notice of Entry of Appearance, which indicates the respondent is represented by counsel for this proceeding. Pursuant to 8 C.F.R. 1003.32, filing the foregoing via ECAS will effectuate service of the motion upon the respondent.

☐ River Correctional Center
26362 Highway 15
Ferriday, LA 71334

☐ OTHER:

NUMA V METOYER III
Digitally signed by NUMA V METOYER III
Date: 2025.04.09 13:48:24 -05'00'

Numa Metoyer
Deputy Chief Counsel Department of Homeland Security Immigration and Customs Enforcement 830 Pinehill Road Jena, Louisiana 71342

4/9/25

Date

TAB A

EOIR — 4 of 6

Uploaded on 19/08/2025 ...

**THE SECRETARY OF STATE**
**WASHINGTON**

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:     Marco Rubio

SUBJECT:   (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that ███████████████████ ██████████████ and Mahmoud Khalil (DOB: ██████████; POB: Algeria), both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C).  I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by:  Secretary of State Marco Rubio
E.O. 13526, Reason(s):  1.4 (justification sections)
Declassify on:  Month DD, YYYY
JA 1023

information provided by the DHS/ICE/HSI regarding the participation and roles of ███ and Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for ███ is also based on ███ citations for unlawful activity during these protests. The public actions and continued presence of ███ and Khalil in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**
Tab 1 – DHS Letter on ███
Tab 2 – HSI Subject Profile of ███
Tab 3 – DHS Letter on Mahmoud Khalil
Tab 5 – HSI Subject Profile of Mahmoud Khalil
Tab 5 – 8 USC 1227(a)(4)(C)

April 20, 2025

**<u>VIA ECF – FILED UNDER SEAL</u>**

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
U.S. Post Office & Courthouse
Newark, New Jersey 07101

      **Re: Khalil v. Trump, et al., No. 2:25-cv-1963 (MEF) (MAH)**

Dear Judge Farbiarz:

      Petitioner respectfully writes to provide urgent information to the Court regarding Petitioner and his family which is relevant to this Court's consideration of Petitioner's pending Motion for Release ("Bail Motion"), ECF 93.[1] At approximately 8 a.m. ET, Petitioner's wife went into labor and she has been admitted to a hospital in New York City to give birth to their family's first child. As this Court is aware, the impending birth of their child – which had been anticipated to occur on April 28 – was a central ground upon which Petitioner sought bail from this Court, so he can be present to emotionally and physically support his wife and their newborn child during this pivotal moment for their family. As the birth is happening eight days earlier than expected, Petitioner's request has become obviously urgent.

      Petitioner's counsel emailed the New Orleans Field Office Director for ICE Enforcement and Removal Operations at approximately 11:35 a.m. ET today, to request a two-week long furlough for Petitioner so he can be with his wife and his newborn child. Still, given the uncertainty of that request, and the meritorious and now even more urgent nature of his Bail Motion, Petitioner respectfully reiterates his request that the Court grant that motion as soon as possible.

                          Respectfully submitted,

                          /s/ Baher Azmy

AMERICAN CIVIL LIBERTIES UNION OF NEW      CENTER FOR CONSTITUTIONAL RIGHTS
JERSEY FOUNDATION                Baher Azmy
Jeanne LoCicero                   Samah Sisay*
Farrin R. Anello                   Diala Shamas*
Molly K.C. Linhorst             666 Broadway, 7th Floor
570 Broad Street, 11th Floor       New York, NY 10012
Newark, New Jersey 07102        Tel: (212) 614-6464
973-854-1715

---

[1]      Petitioner has filed this request under seal given the need for the family's privacy and security and will file the appropriate motion seeking leave of court pursuant to D.N.J. Local Rule 5.3.

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

* *Appearing Pro hac vice*

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Mahmoud KHALIL, <br><br> *Petitioner*, <br><br> v. <br><br> Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, <br><br> *Respondents*. | Case No. 25-cv-01963 (MEF-MAH) <br><br> **THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |

## INTRODUCTION

1.      This case concerns the government's targeted, retaliatory detention and attempted removal of a student protestor because of his constitutionally protected speech. Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent graduate student at Columbia University. Over the last year and a half, Mr. Khalil has been a mediator, an active participant in, and at times the public face of, student protests on Columbia's campus related to Israel's military campaign in Gaza. The Trump administration has made no secret of its opposition to those protests and has repeatedly threatened to weaponize immigration law to punish noncitizens who have participated.

2.      On or before March 8, 2025, Respondents adopted a policy ("the Policy") to

1

retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa" was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

2

**JA 1028**

7.     It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8.     The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

**PARTIES**

9.     Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months

3

pregnant, live in Columbia's residential housing in New York City.

10.     Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.  Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.     Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

11a. Respondent Yolanda Pittman is named in her official capacity as the Warden of Elizabeth Contract Detention Facility, also referred to as Elizabeth Detention Center. As Warden, she is responsible for the operations of Elizabeth Detention Center, including overseeing the people in the facility's custody, and as such she is a custodian of the Petitioner. Respondent Pittman's office address is Elizabeth Detention Center, 625 Evans St, Elizabeth, New Jersey, 07201.

12.     Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15.     Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

## JURISDICTION & VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.     Venue is proper in the District of New Jersey under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. At the time Mr. Khalil filed his original petition, he was physically detained in this judicial district at the direction and under the authority of the Respondents at the Elizabeth Contract Detention Facility, in Elizabeth New Jersey. Respondent Yolanda Pittman is the director of Elizabeth Contract Detention Facility, where Mr. Khalil was physically held at the time of the time of filing, and resides in the District of New Jersey. Respondent William P. Joyce is the Acting Field Office Director of the New York Field Office, whose officers under his authority initially arrested Mr. Khalil, communicated that he was being taken to 26 Federal Plaza in New York, arranged for Mr. Khalil's detention in this District, transported Mr. Khalil to and from this District, and directed the ICE Online Detainee Locator to show Mr. Khalil's location as 26 Federal Plaza in New York, which was the location specified for Mr. Khalil at the time of filing. Respondents Pittman and Joyce also denied Petitioner's requests to call his attorney or family members during the period immediate preceding, during, and following the filing of this petition, including during Mr. Khalil's transport to, detention in, and transport from this District.

## FACTS

*Mr. Khalil's Background*

19.     Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in

Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.    Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.    Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

***Mr. Khalil's Student Activism and Speech on Matters of Public Concern***

22.    As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.    That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.    Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of

2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[1] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."   Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[2]

26.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

27.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

---

[1] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

[2] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html. Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with what he had to say.

### The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J.  Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently  supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

30.     During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized

---

[3] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

Israel's actions.

31.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[4]

32.     While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[5]

33.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[6]

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

---

[4] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[5] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[6] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

36. 35. Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

36. Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

37. In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically,

---

[7] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[8]

38.     For example, Betar USA—a self-described "Zionist activist organization"[9]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[10]

39.     Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[11]

40.     Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive orders "already appear to be chilling political activism."[12]

41.     Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.     That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[13]

---

[8] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/

[9]     https://betarus.org/;     https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza

[10] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[11] https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

[12]     https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel

[13] https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/

43. On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[14]

44. On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

### DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists

45. On the evening of March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and his wife were returning to their apartment from an Iftar[15] dinner at a friend's home.

46. When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

47. The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would

---

[14] https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice
[15] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

13

have required a key or otherwise been given permission to enter the building.

48.    Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.    Mr. Khalil called his attorney, Amy Greer.  Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him.  Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50.    Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51.    Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process.  Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge.  Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52.    Mr. Khalil's wife presented the DHS agents with documents confirming Mr.

Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53.     The agents then handcuffed Mr. Khalil and brought him outside where there were multiple unmarked vehicles waiting.  Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her.  They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54.     The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[16] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.     The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated

---

[16] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.     At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[17] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

57.     Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil.

**Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana**

58.     While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr. Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

---

[17] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

59. Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60. The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61. At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62. While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63. Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in

a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

64. At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65. Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

66. Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

67. Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

68. Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69. At no time throughout this process did any of the agents identify themselves.

70. Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues

to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child.   In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.     Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.     It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

***The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy***

73.     On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[18]

---

[18] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782

74.     The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[19]

75.     Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[20]

76.     The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[21]

77.     In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."[22]

78.     On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy

---

[19] https://x.com/WhiteHouse/status/1899151926777749618
[20] https://x.com/marcorubio/status/1898858967532441945
[21]https://x.com/DHSgov/status/1898908955675357314;
https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/
[22] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student

includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[23]

79.     At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[24]

80.     In a press conference regarding this case on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."[25]

81.     On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[26]

***DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution***

82.     Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and

---

[23] https://archive.ph/rD4sk#selection-1147.0-1159.428

[24] https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16)

[25] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/

[26] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

83.    The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84.    The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)).   Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85.    Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan

Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.     In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

***The government adds new allegations and a charge of removability pursuant to the Policy and in further retaliation for Mr. Khalil's speech and initiation of this lawsuit***

88.     One week after Mr. Khalil filed the present action, the government engaged in further retaliatory action. On March 17, 2025, the government amended Mr. Khalil's NTA to include new—false—allegations that Mr. Khalil engaged in "fraud" and "willfully misrepresent[ed]

a material fact" on his application for adjustment of status process (the "Post-hoc Charge"). *See* ECF 90-1 (basing these allegations on purported employment and associations not reported or reported incorrectly on an application which were, and still are, immaterial as to his eligibility for lawful permanent residency).

89.     The Post-hoc Charge is meritless, pretextual, and further evidence of the government's unlawful Policy of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel. Like the Rubio Determination, the government added the Post-hoc Charge pursuant to this Policy as applied to Mr. Khalil. The Post-hoc Charge is retaliation for Mr. Khalil's speech and initiation of this lawsuit.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

90.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

91.     The Rubio Determination, Policy, and Post-hoc Charge, Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

•       retaliate against and punish Mr. Khalil for his past protected speech;

•       prevent him from speaking now (through detention);

•       attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

- deprive audiences of his present and future speech on matters of public concern; and

- chill other individuals from expressing views sympathetic to Palestinians.

92. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

93. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

94. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

95. The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released

back to his family.

96.     Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

97.     The Policy and the Rubio Determination also violate Mr. Khalil's right to due process. The government's policy of targeting people like Mr. Khalil—lawful permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—is unconstitutionally vague.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

98.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest"

is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

99.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

100.     This Court has the "inherent authority" to grant bail to habeas petitioners like Mr. Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

101.     This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly— instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents

him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights, including as applied to Mr. Khalil through the Rubio Determination and the Post-Hoc Charge;

3) Vacate and set aside the Rubio Determination;

4) Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5) Order the immediate release of Petitioner pending these proceedings;

6) Order the release of Petitioner;

7) Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8) Award reasonable attorneys' fees and costs for this action; and

9) Grant such further relief as the Court deems just and proper.

Dated: May 1, 2025            Respectfully submitted,
Newark, NJ                  /s/ Jeanne LoCicero
                            AMERICAN CIVIL LIBERTIES UNION
NEW YORK CIVIL LIBERTIES UNION       OF NEW JERSEY FOUNDATION

FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen *
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Mudassar Toppa*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

VAN DER HOUT LLP
Marc Van Der Hout**
Johnny Sinodis**
Oona Cahill**
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

WASHINGTON SQUARE LEGAL
SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das*
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6430

Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, NJ 07102
Tel: (973) 854-1715

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat*
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Brett Max Kaufman*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805

*Counsels for Petitioner*
*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing filing was

served on counsel of record via this Court's CM/ECF system on May 8, 2025

pursuant to the Court's verbal ruling of May 2, 2025 granting Petitioner's motion

to amend the petition.

*/s/Jeanne LoCicero*
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

*Counsel for Petitioner*



**U.S. Department of Justice**
Civil Division

May 9, 2025

**By ECF**
Honorable Michael E. Farbiarz
United States District Judge
U.S. Post Office & Courthouse
Federal Square
Newark, New Jersey 07101

Re:   *Khalil v. Joyce, et al.*, **Civ. Act. No. 25-1963 (MEF) (MAH)**
      **Government's Response to Court's Order (ECF No. 234)**

Dear Judge Farbiarz:

Respondents ("the Government") submit this response to this Court's order (ECF No. 234). The Government refers to three instances below in which federal officials have invoked 8 U.S.C. § 1227(a)(4)(C) to initiate the removal of individuals from the United States. To protect privacy considerations and avoid inadvertent disclosures, the Government has anonymized the information.

1.  On April 24, 2004, Secretary of State Colin Powell recommended to Secretary of the Department of Homeland ("DHS") Security Tom Ridge that the presence of an African national in the United States would have potentially adverse foreign policy consequences. Government authorities discovered evidence that the individual participated in and/or contributed to violent political activity while in Somalia. Based on this information, and in keeping with United States' interests in promoting democracy, the rule of law, an effective governing institution in Somalia, Secretary Powell concluded that allowing this alien to reside freely in the United States would undermine the country's foreign policy interests. Secretary Powell thus recommended that removal under 8 U.S.C. § 1227(a)(4)(C), and detained in the government's custody until his removal could be effectuated to Somalia or, alternatively, a third country.

2.  On March 14, 2025, Secretary of State Marco Rubio determined that the presence and activities of another alien would have potentially serious adverse foreign policy consequences for the United States, because of (among other things) his "active support" for Hamas, his efforts to spread Hamas "propaganda," and his conduct in creating a "hostile environment" for Jewish students on campus. Secretary Rubio's memorandum stated that the individual's continued presence or activities in the United States would have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest. DHS initiated removal proceedings, charging the alien with removability under 8 U.S.C. § 1227(a)(4)(C) based on the determination by Secretary Rubio.

**JA 1057**

3. On March 15, 2025, Secretary of State Rubio determined that the presence and activities of another alien present in the United States would have potentially serious adverse foreign policy consequences for the United States. The alien has a documented history of antisemitism and encounters with law enforcement, including incidents involving the possession of illicit drugs, a domestic dispute with his former spouse, and a 2015 episode in which he visited a gun store and bragged about "kill[ing] Jews while he was in Palestine." Secretary Rubio determined that the individual's continued presence and activities would have potentially serious foreign policy consequences and compromise a compelling U.S. foreign policy interest. Thus, DHS initiated removal proceedings, charging the alien with removability pursuant to 8 U.S.C. § 1227(a)(4)(C)(i) based on Secretary Rubio's determination.

These three examples are what the Government has been able to assemble in the time allotted by the Court. The Government is also reviewing the accompanying documentation for privilege and other sensitive information with all deliberate speed. The Government must ensure that it does not disclose information inadvertently and hopes to provide an update later today.

The Government also continues to review its databases and files for any other invocations of 8 U.S.C. § 1227(a)(4)(C)(i) to initiate removal proceedings. If other instances of the statute's invocation become known, the Government will inform the Court as appropriate. The Government cannot provide a firm deadline for its complete review at this time because it has not yet been able to confirm the full universe of materials that need to be reviewed in the short period of time afforded to respond to the Court's order.

\*     \*     \*

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

SARAH S. WILSON
Assistant Director

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov



**U.S. Department of Justice**
Civil Division

May 9, 2025

**By ECF**
Honorable Michael E. Farbiarz
United States District Judge
U.S. Post Office & Courthouse
Federal Square
Newark, New Jersey 07101

Re:  *Khalil v. Joyce, et al.*, **Civ. Act. No. 25-1963 (MEF) (MAH)**
 **Government's Second Response to Court's Order (ECF No. 234)**

Dear Judge Farbiarz:

Respondents ("the Government") submit this letter in response to the second part of this Court's order (ECF No. 234).

The undersigned is aware of only one predecessor statute to Immigration and Nationality Act ("INA") § 237(a)(4)(C)(i), 8 U.S.C. § 1227(a)(4)(C)(i). That predecessor statute was INA § 241(a)(4)(C)(i), 8 U.S.C. § 1251(a)(4)(C)(i). It was adopted as part of Section 602 of the Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat. 4978. The text of the enacted provision is as follows:

> An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

8 U.S.C. § 1251(a)(4)(C)(i) (1996). In 1996, Congress transferred the provision to its current location. *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, Div. C, § 305(a)(2), 110 Stat. 3009 (1996).

The Government refers to four instances below in which federal officials invoked 8 U.S.C. § 1251(a)(4)(C)(i) to initiate the removal of individuals from the United States. To protect privacy considerations and avoid inadvertent disclosures, the Government has anonymized the information as to the two cases that did not result in public court decisions.

1. On January 5, 1995, Secretary of State Warren Christopher determined that the presence in this country of Mohammad J.A. Khalifah, a Saudi national, would have potentially serious adverse foreign policy consequences for the United States under INA § 241(a)(4)(C), because he was convicted for terrorist activities in Jordan, among other things. *See In re Mohammad J.A. Khalifah*, 21 I. & N. Dec. 107 (BIA 1995). The Government has so far been unable to locate the relevant letter from Secretary of State Christopher to the Attorney General.

2. On March 29, 1995, Secretary of State Warren Christopher recommended to Attorney General Janet Reno that the presence in this country of a Haitian national would have potentially serious adverse foreign policy consequences for the United States under INA § 241 (a)(4)(C), because he was a co-founder and leader of an illegitimate paramilitary organization responsible for numerous human rights violations in Haiti. His presence and activities in the United States created the impression in Haiti that the United States was permitting this individual to use the United States as a base of operations and fueled rumors that the United States secretly supported him. Therefore, the Secretary concluded that his presence and activities in the United States would seriously undermine the compelling foreign policy objectives of supporting Haiti's democracy and of seeking respect for human rights in Haiti and throughout the world.

3. On October 2, 1995, Secretary of State Warren Christopher recommended to Attorney General Janet Reno that the presence in this country of Mario Ruiz Massieu, a Mexican national, would have potentially serious adverse foreign policy consequences for the United States under INA § 241 (a)(4)(C) because of existing allegations of Ruiz Massieu's engagement in political corruption in Mexico, among other things. *See Matter of Ruiz-Massieu,* 22 I. & N. Dec. 833 (BIA 1999); *see also Massieu v. Reno,* 915 F. Supp. 681, 711–12 (D.N.J. 1996). This individual was the former second-ranking law enforcement official in Mexico and had been charged criminally in Mexico. Therefore, the Secretary concluded that his presence in the United States would harm the foreign policy objectives of working with Mexico to confront criminality on both sides of the border and to support the reform of Mexico's justice system.

4. On April 4, 1997, Secretary of State Madeleine Albright recommended to Attorney General Janet Reno that the presence of a Palestinian national in the United States would have potentially serious adverse foreign policy consequences and compromise a compelling United States foreign policy interest. This person was a top leader of a designated foreign terrorist organization and had been declared a Specially Designated Terrorist. In addition, two U.S. courts had found probable cause that this person was criminally responsible for ten incidents of terrorism. Therefore, the Secretary concluded that his presence and activities in the United States would seriously undermine the compelling foreign policy objectives in the fight against international terrorism and the promotion of a peaceful resolution of the issues between Israel and Palestinians. The Secretary made this determination pursuant to INA § 241 (a)(4)(C), as it was designated prior to April 1, 1997, and INA § 237(a)(4)(C), as in effect after April 1, 1997.

These four instances are what the Government has been able to assemble in the time allotted by the Court. The Government is also reviewing the accompanying documentation for privilege and other sensitive information with all deliberate speed. The Government must ensure that it does not disclose information inadvertently.

The Government also continues to review its databases and files for any other invocations of 8 U.S.C. § 1251(a)(4)(C)(i) to initiate removal proceedings. If other instances of the statute's invocation become known, the Government will inform the Court. The Government cannot provide a firm deadline for its complete review at this time because it has not yet been able to confirm the full universe of materials that need to be reviewed in the short period of time afforded to respond to the

Court's order. The Department of State is continuing its search and inquiring about files that may not be in the agency's immediate custody. The Executive Office for Immigration Review is currently reviewing its databases and files.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

SARAH S. WILSON
Assistant Director

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov

May 12, 2025

<u>VIA ECF</u>
Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Newark, New Jersey 07101

  **Re:**  *Khalil v. Trump, et al.*, **No. 2:25-cv-1963 (MEF) (MAH)**

Dear Judge Farbiarz:

  Petitioner writes to seek leave to provide the Court with a copy of the Secretary of State's 8 U.S.C. § 1227(a)(4)(C) determination in the case of Mohammad J.A. Khalifah (1995), which the government referenced in its May 9, 2025 letter, but stated it has been "unable to locate." (ECF No. 246 at 1). Petitioner's counsel, Marc Van Der Hout, obtained a true and correct copy of that determination during his representation of Mr. Khalifah in removal proceedings, which is attached for the court's consideration.

           Respectfully submitted,

           /s/ Baher Azmy

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Mudassar Hayat Toppa*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

* *Appearing Pro hac vice*

*Counsel for Petitioner*

**JA 1064**

# United States of America

## DEPARTMENT OF JUSTICE
### IMMIGRATION AND NATURALIZATION SERVICE

.................................................. January 20, ................, 19 95

## CERTIFICATION

BY VIRTUE OF the authority vested in me by Title 8, Code of Federal Regulations, Part 103 a regulation issued by the Attorney General pursuant to Section 103 of the Immigration and Nationality Act,

I HEREBY CERTIFY that the annexed documents are originals, or copies thereof, from the records of the said Immigration and Naturalization Service, Department of Justice, relating to

Mohammad J.A. KHALIFAH

File No. _____ A29-457-661 _____, of which the Attorney General is the legal custodian by virtue of Section 103 of the Immigration and Nationality Act.

Thomas G. Schiltgen
District Director

Immigration and Naturalization Service

Form
(Rev. 1-73) N

JA 1065

THE SECRETARY OF STATE

WASHINGTON, D.C. 20520

The Honorable
Janet Reno,
Attorney General.

**THE SECRETARY OF STATE**

**WASHINGTON**

January, 1995

Dear Madam Attorney General:

I am writing to inform you that, pursuant to Section 241(a)(4)(C) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(4)(C), I have concluded that the presence or activities of Mohammad Khalifah in the United States would have potentially serious adverse foreign policy consequences for the United States. I request that you seek his deportation on foreign policy grounds, and that you take all steps possible, consistent with the Immigration and Nationality Act and other relevant law, to effect his deportation to Jordan.

My decision to invoke Section 241(a)(4)(C) with respect to Mr. Khalifah is based on the following considerations. Most significantly, global counterterrorism is among the top foreign policy priorities of this Administration. The United States is taking a leading role in international efforts, both bilateral and multilateral, to combat terrorism. The Department of State continually seeks to foster cooperation between foreign governments and international organizations in antiterrorist efforts.

Central to this policy is the effort to identify terrorists and ensure that they are brought to justice. Terrorist acts frequently occur outside the United States or are committed by persons beyond the reach of the United States; in such cases, we seek through intense diplomatic efforts to have countries with jurisdiction over the perpetrators bring the perpetrators to justice or, in appropriate cases, make them available to the United States for prosecution.

The Honorable
        Janet Reno,
                Attorney General.

We also work closely with foreign governments to ensure that international terrorists do not find sanctuary in countries that will not or cannot bring them to justice. Where possible, we share evidence and other information that can help curb terrorist activities.

Permitting Mr. Khalifah to remain in the United States would be at odds with these important foreign policy initiatives and would have potentially serious adverse foreign policy consequences for the United States. Mr. Khalifah has been identified to us by the Government of Jordan as a terrorist. He is accused of involvement in terrorist attacks against cinemas in Jordan, and has been convicted _in absentia_. The Government of Jordan has notified the Department of State that it seeks Mr. Khalifah's rendition and that, in accordance with usual Jordanian practice, he will be tried again if he is returned to Jordan, after which the previous verdict will be null and void.

I believe that the Jordanian request is made in good faith. To permit Mr. Khalifah to remain at large in the United States in light of his alleged activities and criminal conviction in Jordan, and Jordan's request for his deportation, would have potentially serious adverse foreign policy consequences in several respects. It would cast doubt upon the seriousness of our resolve to combat terrorism, and thereby undermine our ability to play a leadership role in this arena. It would also damage our credibility in making requests to other governments that they refuse to permit terrorists to travel freely in their own countries.

In the particular context of Middle East terrorism, it could damage U.S. relations with Jordan (a key player in the Middle East peace process) and other friendly foreign governments whose interests Mr. Khalifah threatens.

Jordan is aware of Mr. Khalifah's presence in the United States, and has asked for our assistance in sending him to Jordan so that he may be brought to justice. To permit Mr. Khalifah to remain in the United States in these circumstances would potentially be seen as an affront to Jordan and at odds with many of the basic elements of our cooperative bilateral relationship.

-3-

Ultimately, permitting Mr. Khalifah's presence in the United States would potentially undermine our longstanding and successful policy of international legal cooperation to bring about the prosecution of terrorists.  If other countries concluded that we were not serious about combatting terrorists, or that we were not prepared to take the aggressive steps to bar terrorists from the United States, this would threaten the ability of the United States to obtain the assistance of foreign authorities in the combatting of terrorism, including U.S. efforts to bring suspects residing abroad to trial in the United States.

Accordingly, I have made the finding provided for in Section 241(a)(4)(C) and request that you take all reasonable efforts to ensure Mr. Khalifah's deportation from the United States.  In addition, in light of the Government of Jordan's good faith request that Mr. Khalifah be rendered to Jordan, I request that you do everything possible, consistent with the Immigration and Nationality Act, to ensure his deportation to Jordan.

Sincerely,

Warren Christopher

May 21, 2025

<u>VIA ECF</u>
Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Newark, New Jersey 07101

**Re:** *Khalil v. Trump, et al.*, No. 2:25-cv-1963 (MEF) (MAH)

Dear Judge Farbiarz:

Petitioner respectfully writes with an urgent request for this Court's intervention regarding his ongoing detention. Specifically, and for the reasons set forth below and to aid in his habeas proceedings, Petitioner requests that this Court issue an order: (1) requiring the LaSalle Detention Facility to permit Mr. Khalil to have a private contact visit with his wife, Dr. Abdalla, and newborn child today, May 21, 2025, for two hours[1] and/or (2) at a minimum, permit Dr. Abdalla to join a contact visit currently scheduled with immigration counsel at LaSalle so the legal team can discuss legal strategy and facts known collectively between Dr. Abdalla and Mr. Khalil and which is relevant to his pending habeas case and for pending motions in his immigration proceedings. One of the first orders issued in this case was to direct the U.S. Attorney's office to ensure that DHS would provide regular access to counsel, *Khalil v. Joyce*, 1:25-cv-01935, ECF 29 (S.D.N.Y.), which is an equitable power this Court retains and authorizes the relief requested—modest as it is as compared to the painful costs of denial.

As the Court is aware, the Khalil family welcomed their first child one month ago, on April 21, 2025. In order to provide the most indispensable human connection and to help Mr. Khalil prepare for his ongoing habeas proceeding and for the upcoming immigration hearing, Petitioner's wife and his newborn baby have traveled over 6 hours and 1500 miles to visit Mr. Khalil in detention, which will be the first time he will be able to see or hold his family since his arrest and transfer to Louisiana, over 10 weeks ago. As this Court well knows, Mr. Khalil is purportedly in civil immigration detention, where he cannot be subject to punishment or retaliation; yet currently, routine legal or family visits only occur in a confined space permitting muffled communication through a full plexiglass window that permits no human touch.

Petitioner's counsel have made repeated requests for a contact visit to occur between Mr. Khalil and his wife and baby to the relevant ICE and GeoGroup administrators at the LaSalle Detention Facility in Jena. Such a visit is necessary for the most elementary human reasons and given the ongoing strain of his pending habeas petition, this visit is critical to ensure Mr. Khalil, who is an active participant his legal case, can continue to meaningfully contribute to the proceedings before this Court.

---

[1] Currently, Dr. Abdalla and Mr. Khalil have a visit approved for 6PM CT, however that visit would be a no-contact visit.

The relevant administrators have responded that they are unable to accommodate this request, including a confirmation of this refusal this morning. (Email correspondence attached as Exhibit A). ICE policy authorizes contact visits between detained individuals and family members, subject to the reasonable discretion of DHS officials.[2] The refusal to permit a contact visit is not reasonable and is further evidence of the retaliatory motive behind Mr. Khalil's arrest and far-away detention as well as the ongoing punitive nature of his detention. Petitioner, his wife and infant son are, as all the evidence in this case demonstrates, the farthest thing from a security risk. It is the government who chose to detain Mr. Khalil and send him 1500 miles from his family rather than detain him, as they could have (and as we have requested in seeking a transfer there), in Elizabeth, New Jersey, where counsel confirmed with an EDC official that family contact visits are ordinarily provided on a daily basis and where a parent is permitted to hold their child.[3]

In addition, a legal contact visit has been authorized for today between Mr. Khalil and his counsel, from 11-3pm CT. It thus appears the facility can accommodate contact visits absent a plexiglass barrier. Thus, the facility should make accommodations during or after this time for a private in-person visit where the family can be alone together for the first time. In addition, and at a minimum, counsel needs to meet with Petitioner and his wife together to discuss the factual circumstances surrounding his arrest on March 8, 2025. This discussion is relevant both to his habeas proceedings and his immigration proceedings. For the former, this conversation is relevant to his claims of retaliatory arrest and detention and the unusual circumstances surrounding both events that reflect the government's retaliatory motive. For the latter, Petitioner has an outstanding motion to terminate his removal proceedings on the grounds of his warrantless arrest and to rebut DHS's misrepresentation to the immigration court that Mr. Khalil attempted to evade his arrest.

Undersigned counsel emailed the government to seek assistance with this request and their position on this motion, and agreed to give the government until 12:30 PM ET to communicate a response. The government finally responded that they would not facilitate a contact visit as "doing so would pose security concerns, such as requiring the visit to occur in an unsecure part of the facility or requiring Mr. Khalil's wife and newborn inside a secured part of the facility." Petitioner has responded asking for clarification regarding these responses in the hope of reaching an accommodation, but is filing this motion nevertheless in the interest of expediency.

---

[2]     See ICE Directive 11064.3 (Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults), which states that: "It is the policy of ICE to ensure that the agency's civil immigration enforcement activities do not unnecessarily disrupt or infringe upon the parental or guardianship rights of noncitizen parents or legal guardians of minor children or incapacitated adults, consistent with all legal obligations and applicable court orders." ICE Directive 11064.3 Section 2.

[3]     See also Core Civic FAQ (attached as Exhibit B) (Q: "Who can visit?" A: "Detainees are allowed to receive visits from their families, associates, legal representatives, consular officials, and others in the community. All visitors must provide proper government issued photo identification.") (Q: "How do I get approval for a visit?" A: "No approval needed.") (A: "detainees may hold their small children").

2

Respectfully submitted,

/s/ Baher Azmy

AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Appearing Pro hac vice

Counsel for Petitioner

3

# EXHIBIT A



Diala Shamas <dshamas@ccrjustice.org>

---

## Fw: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL ███████████ (readnow - for Marc's filter)

Nora Ahmed <Nahmed@laaclu.org>
To: "Khalil v. Trump (All-Counsel)" <khalilvTrump_All-Counsel@nyclu.org>

Wed, May 21, 2025 at 10:46 AM

---

Nora Ahmed | Legal Director
Pronouns: she, her, hers
American Civil Liberties Union of Louisiana
P.O. Box 56157, New Orleans, LA 70156
Tel: 917.842.3902| nahmed@laaclu.org
*Admitted to the New York Bar, not admitted to the Louisiana Bar

---

**From:** ███████  ███████████ >
**Sent:** Wednesday, May 21, 2025 9:30:07 AM
**To:** Nora Ahmed <Nahmed@laaclu.org>; ███████  ███████████ >
**Cc:** Marc Van Der Hout <JodyMarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <Jsin@vblaw.com>; Oona Cahil <Ocah@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL ███████████ (readnow - for Marc's filter)

Good Morning,

The visit will remain as non-contact as previously arranged. Thank you.

███████████

**FACILITY ADMINISTRATOR, GEO SECURE SERVICES**
**The GEO Group, Inc.®**
**Central Louisiana ICE Processing Center**
**Alexandria Staging Facility**
830 Pinehill Road
Jena, Louisiana 71342



www.geogroup.com

**Learn more about the GEO story: www.wearegeo.com**
This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended

recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

---

**From:** Nora Ahmed <Nahmed@laaclu.org>
**Sent:** Wednesday, May 21, 2025 9:08 AM
**To:** ███████ < ███████████████ >; ███████ < ████████████████ >
**Cc:** Marc Van Der Hout <JodyMarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <Jsin@vblaw.com>; Oona Cahil <Ocah@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL ███████████ (readnow - for Marc's filter)

Good morning Facility Administrator ████ and DFOD █████ ,

As time is of the essence and mom and child are here after traveling 1500 miles, I am checking in on the below request.

Best,
Nora Ahmed | Legal Director
Pronouns: she, her, hers
American Civil Liberties Union of Louisiana
P.O. Box 56157, New Orleans, LA 70156
Tel: 917.842.3902| nahmed@laaclu.org
*Admitted to the New York Bar, not admitted to the Louisiana Bar

---

**From:** Nora Ahmed <Nahmed@laaclu.org>
**Sent:** Tuesday, May 20, 2025 4:46:52 PM
**To:** ███████ < ███████████████ >; ███████ < ████████████████ >
**Cc:** Marc Van Der Hout <JodyMarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <Jsin@vblaw.com>; Oona Cahil <Ocah@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL ███████████ (readnow - for Marc's filter)

Thank you, Facility Administrator Rice, for keeping the previously scheduled visits on the calendar.

**I am writing again to ask you both—Facility Administrator ████ and DFOD ██████—for an exception to CLIPC's standing no-contact social visitation policy.** We come to you requesting your assistance in uniting a new father with his less than one-month old first-born child, who, as you know, was born while his father was detained.

We understand that provision 5.7.V.B. in the PBNDS provides that facility administrators determine whether to permit social contact visits. We also understand that it authorizes exceptions to be made to the visitation standards on a "case-by-case basis when warranted by compelling circumstances." Those same standards indicate that a facility should "try to facilitate contact visitation when possible" between an individual detainee and his minor child.

So, while we understand the facility's standing policy for no-contact social visitation, we believe that the circumstances here are beyond compelling. Therefore, we are appealing to both of you to work with us to

JA 1075

find a way for CLIPC to make an exception for Mr. Khalil—so that he can hold his newborn child for the first time.

We are simply trying to unite father and child. Please let us know if it is at all possible to facilitate at least one contact visitation between the two.

**Nora Ahmed** | Legal Director

Pronouns: she, her, hers

**American Civil Liberties Union of Louisiana**

P.O. Box 56157, New Orleans, LA 70156

Tel: 917.842.3902 | nahmed@laaclu.org

*Admitted to the New York Bar, not admitted to the Louisiana Bar*

**Confidentiality Notice**: *The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.*

---

**From:** ▇▇▇▇▇▇ <▇▇▇▇▇▇▇▇▇▇▇▇▇>
**Date:** Tuesday, May 20, 2025 at 3:02 PM
**To:** Nora Ahmed <Nahmed@laaclu.org>, ▇▇▇▇▇▇▇ <▇▇▇▇▇▇▇▇▇▇▇▇▇▇>
**Cc:** Marc Van Der Hout <JodyMarc@mindspring.com>, Marc Van Der Hout <MV@vblaw.com>, Johnny Sinodis <Jsin@vblaw.com>, Oona Cahil <Ocah@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL A▇▇▇▇▇▇▇▇ (readnow - for Marc's filter)

Good Afternoon Ms. Nora,

I understand your request for contact visitation; however, our facility procedures are for non-contact visitation only. The visit will remain on the schedule for non-contact as previously approved. Thank you.

▇▇▇▇▇▇▇▇▇

FACILITY ADMINISTRATOR, GEO SECURE SERVICES



**The GEO Group, Inc.®**

**Central Louisiana ICE Processing Center**

**Alexandria Staging Facility**

830 Pinehill Road
Jena, Louisiana 71342

www.geogroup.com

**Learn more about the GEO story: www.wearegeo.com**

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

---

**From:** Nora Ahmed <Nahmed@laaclu.org>
**Sent:** Tuesday, May 20, 2025 2:05 PM
**To:** ▮▮▮▮▮▮ <▮▮▮▮▮▮▮▮▮▮▮▮>; ▮▮▮▮ <▮▮▮▮▮▮▮▮▮▮>
**Cc:** Marc Van Der Hout <JodyMarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <Jsin@vblaw.com>; Oona Cahil <Ocah@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Social Contact Visit with U.S. citizen wife and newborn child traveling from New York // Mahmoud KHALIL A▮▮▮▮▮▮▮ (readnow - for Marc's filter)

Good afternoon DFOD ▮▮▮ and Facility Administrator ▮,

I understand per below that CLIPC **has** denied a contact visit—between Mr. Khalil, his **wife, and** his newborn child—because the facility does not provide for social contact visits. While I understand the information set forth in the email below, I am trying to square that with what I read as a policy directive that "[c]ontact visits may be facilitated at *all* ICE detention facilities." *See* https://www.ice.gov/doclib/detention-reform/pdf/facilitatingVisitationParents.pdf (accessed May 20, 2025) (emphasis added).

Taking into consideration CLIPC's standing policy denying all social contact visits, I am writing to ask that an exception be made pursuant to the above-mentioned policy, and/or to understand how a limited contact family visit can be provided for considering the age of Mr. Khalil's son—he is 29 days old today. ICE Directive 11064.3 (Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults) states that: "It is the policy of ICE to ensure that the agency's civil immigration enforcement activities do not unnecessarily

disrupt or infringe upon the parental or guardianship rights of noncitizen parents or legal guardians of minor children or incapacitated adults, consistent with all legal obligations and applicable court orders." ICE Directive 11064.3 Section 2.

We fully understand that the PBNDS states that facilities should make decisions and policies for visits within the "constraints of the safety, security and good order of the facility."(5.7.I, *Purpose and* Scope). But we also understand that facilities are encouraged to provide opportunities for *both* contact and non-contact visitation with approved visitors during both day and evening hours. (5.7.II, *Expected Outcomes*) (emphasis added). Moreover, the PBNDS clearly encourage consideration of the particular circumstances at issue for the person detained. 5.7.II.6 ("Generally visits should be for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances.").

Here, contact visitation for Mr. Khalil with his wife and newborn son poses no risk of violating the facilities' conditions on safety, security, and good order. Indeed, based on public-facing CLIPC policy, it is only family or "social" visits that are non-contact; thus, contact visits are feasible broadly and can be reasonably accommodated. A simple contact visit for Mr. Khalil's wife and newborn child poses no risk of violating the orderly operation of the facility; indeed, as you are aware, the facility is highly secure, with multiple security checkpoints prior to entry. Existing policies already protect against such disruptions, and the minor exception to allow a contact family visit here would leave those in place. Further, such a meeting can be facilitated with minimal staffing requirements, greatly mitigating the impact to the operations of the facility.

Thank you both for considering this request. We are happy to continue working with ICE and CLIPC to identify any limited exception that may provide Mr. Khalil with the opportunity to see his wife, and his newborn son for the first time.

Best,

**Nora Ahmed** | Legal Director

Pronouns: she, her, hers

**American Civil Liberties Union of Louisiana**

P.O. Box 56157, New Orleans, LA 70156

Tel: 917.842.3902 | nahmed@laaclu.org

*Admitted to the New York Bar, not admitted to the Louisiana Bar*

**Confidentiality Notice**: *The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.*

**From:** ▮▮▮▮▮ < ▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Tuesday, May 20, 2025 7:33 AM
**To:** Oona Cahill <ocah@vblaw.com>
**Cc:** Marc @ Home <jodymarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <jsin@vblaw.com>
**Subject:** Re: [EXTERNAL] Request for Extended Contact Visits with U.S. citizen wife traveling from New York // Mahmoud KHALIL A▮▮▮▮▮▮ (readnow - for Marc's filter)

Good Morning,

The dates and times below are good for visitation. Please note that CLIPC does not offer contact visitation. The visitation extension is approved but it will be non-contact. Thank you.

Wednesday, May 21 (6pm-8pm)

Thursday May 22 (6pm-8pm)

Friday May 23 (9am-11am, and 6pm-8pm).

█████████

**FACILITY ADMINISTRATOR, GEO SECURE SERVICES**

**The GEO Group, Inc.®**

**Central Louisiana ICE Processing Center**

**Alexandria Staging Facility**

830 Pinehill Road
Jena, Louisiana 71342

███████████

█████████

www.geogroup.com

**Learn more about the GEO story: www.wearegeo.com**

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

From: Oona Cahill <ocah@vblaw.com>
Sent: Monday, May 19, 2025 9:14 PM
To: ███████ <███████>
Cc: Marc @ Home <jodymarc@mindspring.com>; Marc Van Der Hout <MV@vblaw.com>; Johnny Sinodis <jsin@vblaw.com>
Subject: [EXTERNAL] Request for Extended Contact Visits with U.S. citizen wife traveling from New York // Mahmoud KHALIL A███████ (readnow - for Marc's filter)


Hi Warden,


Thanks again for your assistance coordinating the legal visit for this week. We also wanted to reach out to request that your facility provide extended contact visitation during family visiting hours with Mr. Khalil's U.S. citizen wife, Noor Abdalla, who will be traveling from New York to Louisiana this week to attend Mr. Khalil's hearing and visit her husband. Mr. Khalil's wife would like to visit her husband for as long as possible during the visitation periods on Wednesday, May 21 (6pm-8pm), Thursday May 22 (6pm-8pm), and Friday May 23 (9am-11am, and 6pm-8pm).


Because Ms. Abdalla is traveling from such a great distance after having just given birth to the couple's first child to visit her husband for the first time since he was detained ten weeks ago, we hope and assume that under the circumstances, the facility would be willing to arrange extended contact visitation. This request is in line with ICE's Performance-Based National Detention Standards (PBNDS), which encourage facilitating contact visits and allowing generous visitation policies for family members traveling far distances. *See, e.g.*, PBNDS 5.7, V.I.1 ("ICE/ERO encourages more generous limits when possible, especially for family members traveling significant distances."); PBNDS 5.7, II.4 ("Facilities are encouraged to provide opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours"); II.6 ("Generally visits should be for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances.").


Please let us know if there is any additional information that would be helpful in processing this request. We would be happy to discuss further on the phone to work out any logistics. Thank you very much for your assistance.


Best,

Oona


Oona Cahill

Litigation & Research Fellow


Van Der Hout LLP

360 Post Street, Suite 800

San Francisco, CA 94108

JA 1080

Main Line: 415-981-3000

Fax: 415-981-3003 | www.vblaw.com



*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

# EXHIBIT B



**Elizabeth Detention Center**

**Elizabeth, New Jersey**

## Inmate Mail Information

➢ **Addressing correspondence properly**

❖ All incoming and outgoing mail must be properly addressed and include the detainee's full name, Immigration A# and dorm/bed number. If all information is not included, mail will be returned. *Example:*

- John Doe
- A# 123456789
- 625 Evans Street
- Elizabeth, NJ 07201

➢ **General Correspondence**

❖ Detainees may send or receive general mail from anyone they know. All general correspondence must be received in a standard legal or letter-size envelope.

➢ **Special Correspondence**

❖ Detainees may also send or receive special correspondence from private attorneys and other legal representatives, government attorneys, judges, courts, embassies and consulates, ICE and the Office of the Inspector General, IHSC, and grievance officers.

NOTE: When the sender is an approved special correspondent, as outlined above, the envelope should also be marked "Confidential" or "Legal".

➢ **Packages**

❖ Detainees are not allowed to receive or send packages without advance arrangements and prior approval from facility officials.
❖ Inspection and Rejection of Correspondence
❖ All incoming and outgoing correspondence and packages will be opened in the detainee's presence (unless otherwise authorized by the Warden) and inspected for contraband.
❖ Contraband includes, but is not limited to the following: materials that depict, describe or encourage activities that could lead to physical violence such as materials dealing with the subjects of self-defense or survival, weaponry, armaments, explosives, or incendiary devices; information regarding escape plots, plans to commit illegal activities or to violate ICE rules or facility guidelines; information regarding the production of drugs or alcohol; sexually explicit

The information provided in this document is believed to be accurate, though it remains subject to change without notice.
This document was published January 2025.

1

JA 1083

material; threats, extortion, obscenity, or gratuitous profanity; a code; stamps, envelopes and blank paper; phone cards; photos larger than 5x7; books and magazines. (If magazines are approved, they must be received directly from the publisher). A package received without prior approval is considered contraband.

❖ Correspondence and packages containing contraband will be rejected.

# Procedures for Sending Money

➤ Detainees will be allowed to have funds sent to them while in detention. Funds may be sent to detainees through one of the following methods:

❖ To the company's bank lockbox at

CORECIVIC
**Inmate Last Name, First Name, Commissary Number**
Facility: **EDC**
P. O. Box 16545
Atlanta, GA 30321-0545

➤ Western Union transfer services

➤ ConnectNetwork App (google play, app store)

**Bank Lockbox**

➤ Funds received must be in the form of a money order or cashier check made payable to the inmate/resident. There is no limit to the amount of funds that the inmate/resident may receive on any given day, unless contractual requirements mandate otherwise.

❖ Cash will not be accepted.

❖ Personal checks will not be accepted.

❖ Checks made out to multiple parties will not be accepted.

❖ Foreign currency will not be accepted.

➤ With the exception of personal checks received at the company's lockbox, unaccepted funds received will be sent back to the sender with a 16-1B Unaccepted Funds Notification. Personal checks received at the company's lockbox will be destroyed.

❖ In the event cash is received, it will be deposited and a check will be written to the sender for the amount of cash received with a 16-1B Unaccepted Funds Notification.

➤ Incoming Funds

All incoming funds must clearly indicate the inmate/resident's name and identification number.

❖ Funds received at the company's bank lockbox may not have any other documents included in the envelope. Other documents or personal items received at the company's lockbox will be destroyed.

**Western Union**

➤ You can send money via Western Union by using the Internet, by phone or by a Walk-in Cash

The information provided in this document is believed to be accurate, though it remains subject to change without notice. This document was published January 2025.

2

JA 1084

Payment. The website for internet is www.westernunion.com/corrections. The phone number for phone quick collect is 1-800-634-3422.

➤ To send money via a Western Union Walk-In Cash Payment Location the following is a sample of a quick collect form.

 

# Emergency Notifications

➤ Emergency notifications may be made to the Shift Supervisor 24 hours a day.

# Visitation Frequently Asked Questions

## Who can visit?

➤ Detainees are allowed to receive visits from their families, associates, legal representatives, consular officials, and others in the community. All visitors must provide proper government issued photo identification.
➤ Safety, security and good order are always primary considerations in a detention facility, and visitors must be properly identified and attired.

## How do I get approved for visitation?

➤ No approval needed.

## How do minors get approved to visit?

➤ No approval needed. Minors who are visiting the facility must be accompanied by an adult guardian

The information provided in this document is believed to be accurate, though it remains subject to change without notice. This document was published January 2025.

3

(18 years or older).  Minors must not be left unaccompanied in the waiting room, visiting room or any other area.

## How long does the application process take?

➢   There is no application process.

## How will I know if I've been approved?

➢   No approval needed.

## What are the days and times of visitation?

**Visitation Schedule**

**Males**
| | | |
|---|---|---|
| Monday, Wednesday and Friday | (1700Hrs - 2045Hrs) | 5:00PM - 8:45PM |
| Tuesday and Thursday | (1830Hrs - 2200Hrs) | 6:30PM - 10:00PM |
| Saturday | (0900Hrs - 1745Hrs) | 9:00AM - 5:45PM |
| Sunday | (0900Hrs - 1745Hrs) | 9:00AM - 5:45PM |

**Females**
| | | |
|---|---|---|
| Monday, Wednesday and Friday | (2100Hrs - 2200Hrs) | 9:00PM - 10:00PM |
| Tuesday and Thursday | (1700Hrs - 1800Hrs) | 5:00PM - 6:00PM |
| Saturday | (1800Hrs - 1900Hrs) | 6:00PM - 7:00PM |
| Sunday | (1800Hrs - 1900Hrs) | 6:00PM - 7:00PM |

**Holiday Schedule**
| | | |
|---|---|---|
| Males | (0900Hrs - 1745Hrs) | 9:00AM - 5:45PM |
| Females | (1800Hrs - 1900Hrs) | 6:00PM - 7:00PM |

**Attorney Visits**
| | | |
|---|---|---|
| Sunday to Saturday | (0600Hrs - 2200Hrs) | 6:00AM - 10:00PM |

## How long can I visit?

➢   Elizabeth Detention Center provides an opportunity for you to have up to one (1) hour of visitation with family and friends according to the Visitation Schedule.  If there are more visitors than the visitation room can accommodate, it may be necessary to limit visits or its duration.

## Where do I park when I arrive at the facility?

➢   Parking Lot across the street from facility is for Staff and Visitors

The information provided in this document is believed to be accurate, though it remains subject to change without notice. This document was published January 2025.

4

JA 1086

## Will I be searched?

➢ Yes.

❖ All visitors are subject to a personal search. This may include a pat-down search as well as a visual search of purses, briefcases, packages, and other documents. Any visitor refusing to be searched shall not be permitted to visit.

## What is the dress code for visitation?

**Visitor Dress Code**

All visitors must be properly dressed and adhere to the following dress code:

➢ Shorts shall cover customarily covered areas of the anatomy, including the buttocks and crotch area, both when standing and sitting. Shorts no higher than mid-thigh are acceptable. Short-shorts, jogging shorts, cut-offs, and other obviously inappropriate short garments are prohibited.
➢ Shirts and dresses shall extend to mid-thigh, seated.
➢ Slits in skirts and dresses shall rise no higher than mid-thigh, seated.
➢ Sheer (see-through) or extremely tight clothing is prohibited.
➢ Tops that expose the shoulders and midriffs are not permitted. Examples of prohibited clothing items include, but are not limited to; bare midriffs, tube tops, strapless tops, and swimsuits.
➢ Coats, jackets, hooded sweatshirts, zip up/button sweatshirts and hats are not permitted. Space will be provided for coats and hats as they are NOT permitted in the visitation area.
➢ Shirts shall be worn at all times. Muscle shirts, bare mid-riff shirts and sleeveless shirts are prohibited.
➢ Shoes shall be worn at all times.
➢ Gang "colors" and other gang displays are prohibited.



Picture source from Le Folauga-The Journey

The information provided in this document is believed to be accurate, though it remains subject to change without notice. This document was published January 2025.

5

## What type of identification do I need to be allowed into the facility?

➢ Valid government issued photo ID such as driver's license or passport.

## What items am I allowed to bring to visitation?

➢ None

## Can my visitation be shortened, suspended, or terminated?

*CoreCivic has the right to shorten, suspend, or terminate visitation. Some examples which can affect your visit are listed below, but are not limited to:*

➢ Visitors are expected to conduct visits in a quiet and orderly manner at all times.  Disruptive conduct by minors, accompanying adults, or detainees may cause termination of visit.
➢ Under no circumstances shall visitors pass any item directly to a detainee, nor a detainee pass any item to a visitor.
➢ Visitors are NOT allowed to bring money to visitation.
➢ Cases of contraband introduction or criminal violations may lead to criminal prosecution of the visitor, detainee, or both.
➢ Visitors shall remain seated at their assigned table during the duration of the visit
➢ Detainees may briefly embrace and kiss each visitor once at the beginning and end of each visit
➢ Detainees may hold their small children or the children of their visitor.
➢ Detainees and their visitors may hold hands only if it can be observed by visitation staff. The holding of hands placed on one's lap is strictly prohibited.
➢ No other forms of affection or physical contact between detainees and visitors are permitted nor shall they be tolerated.
➢ No firearms or weapons of any kind are permitted in the facility.
➢ If visitors are or appear to be intoxicated, visitation will not be allowed.
➢ All visitors are subject to search while in the facility.
➢ Visitors are not allowed to carry any items into the visitation area.
➢ ***Please refer to Dress Code for further information***.

**<u>Note:</u>**
**Minors must remain under the direct supervision of an adult visitor, so not to disturb other visitors. Disruptive conduct by minors, accompanying adults, or detainees may cause termination of visit.**

The information provided in this document is believed to be accurate, though it remains subject to change without notice. This document was published January 2025.

6

JA 1088

May 27, 2025

VIA ECF
Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Newark, New Jersey 07101

    **Re:**    *Khalil v. Trump, et al.*, No. 2:25-cv-1963 (MEF) (MAH)

Dear Judge Farbiarz,

    Petitioner Mahmoud Khalil thanks the Court for its May 21 order, ECF 262, and writes to update the Court about various structural barriers to his access to counsel and witnesses, as those relate to his fully-briefed motions for release pending adjudication of his habeas corpus petition, *see, e.g.,* ECF 91 at 22, and to compel his return to New Jersey, ECF 11 and 96. To be clear, Petitioner respectfully submits this update, but seeks no new relief by way of this letter.

    Petitioner's need to request a federal court's intervention last week illustrates how Mr. Khalil's continued detention at the Central Louisiana ICE Processing Center in Jena during the pendency of this matter in this Court in New Jersey impedes his meaningful access to his habeas counsel and to witnesses—including his own spouse—who would assist in his prosecution of his habeas case.

    To begin with, it has been enormously difficult for counsel to arrange in-person legal visitation or to communicate remotely with Mr. Khalil fully and effectively. Louisiana's great distance from New Jersey and Mr. Khalil's attorneys itself poses significant problems, along with the limitation of virtual meetings, which complicates even the simplest lawyering act of reviewing legal documents with an incarcerated client. But the specific location of the Jena facility itself has compounded those significant hurdles, even when counsel attempts to arrange out-of-town visits there. The nearest airport, hotels, and rental car facilities are in Alexandria, approximately one hour away, and the nearest large cities (New Orleans, Dallas, and Houston) are more than a four-hour drive away. Moreover, the small size of the Alexandria airport means that travel from the greater New Jersey region is complicated and costly to rearrange at the last minute.

    When in-person visitation in Jena does occur, that access is insufficient to allow habeas counsel to properly consult with and advise Mr. Khalil. It also pales in comparison to the access that Mr. Khalil would maintain to habeas counsel if he were detained in New Jersey. The government confirmed in its May 21 declaration that there is no regular space for counsel to have contact legal visitation with Mr. Khalil at the facility in Jena. *See* ECF No. 263-1 ¶ 10 (noting that all visitation spaces at Central Louisiana ICE Processing Center have plexiglass dividers). Visitation typically occurs in a cramped, closet-sized space with only a single chair for counsel. That the Jena facility made a one-time exception to those rules for a contact legal visit with several immigration counsel last week, *see* ECF 258 at 1, stands in stark contrast to how visits would take place at a detention facility closer to this Court. In fact, throughout May, several attorneys from CLEAR, one of the legal organizations representing Mr. Khalil in this case, met with a client held at the Elizabeth Detention Center (EDC) since April. Those meetings occurred under normal EDC

**JA 1089**

rules, in a legal visitation space where contact and document-sharing were permitted. Because regular, in-person, contact visitation, with the ability to share and review legal documents with a client, is essential both to maintaining a meaningful attorney-client relationship and to effective communication, even frequent, regularly scheduled video teleconferences are not an adequate substitute.

Finally, last week's events underscore that the human costs of Mr. Khalil's detention in Louisiana, now in its third month, continue to mount. After the government denied him the opportunity to be present for his son's birth and his wife's recovery, Mr. Khalil seeks at minimum the chance to form his own physical bond with his son—an opportunity that release or even detention at EDC provides, but continued detention at CLIPC in Jena does not.

In sum, release or detention at EDC in New Jersey would allow regular legal (and social) contact visits, which would significantly aid Mr. Khalil and his lawyers in continuing to litigate his habeas case. *See* ECF 96 at 5.

Respectfully submitted,

/s/ Naz Ahmad

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Michael K.T. Tan*

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Mudassar Toppa*
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

2

Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Counsel for Petitioner*

\* *Appearing Pro hac vice*

3