# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

MAHMOUD KHALIL,

Petitioner-Appellee,

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

Respondents-Appellants.

---

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

---

## APPENDIX: VOLUME IV (1092-1430)

---

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
    General

DREW C. ENSIGN
Deputy Assistant Attorney General

BENJAMIN HAYES
Special Counsel to the Assistant
Attorney General

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

JOHN F. STANTON
RACHEL L. BROWNING
Trial Attorneys

# TABLE OF CONTENTS

<u>Appendix – Volume IV</u>

Declaration of Veronica Salama, June 4, 2025

    ECF No. 284 ................................................................................................... 1092

Exhibit A, Declaration of Mahmoud Khalil, June 4, 2025

    ECF No. 284-1 ................................................................................................ 1099

Exhibit B, Declaration of Dr. Noor Ramez Abdalla, June 4 2025

    ECF No. 284-2 ................................................................................................ 1112

Exhibit C, Declaration of Johnny Sinodis, June 4, 2025

    ECF No. 284-3 ................................................................................................ 1119

Exhibit D, Declarations of Veena Dubal and Aslı Ü Bâli, June 4, 2025

    ECF No. 284-4 ................................................................................................ 1194

Exhibit E, Declarations of Mūkoma Ngũgĩ and Sriram Parasurama, June 4, 2025

    ECF No. 284-5 ................................................................................................ 1241

Exhibit F, Declarations of Victoria Porell, Golnaz Fakhimi, and Joshua Dratel, June 4, 2025

    ECF No. 284-6 ................................................................................................ 1247

Exhibit G, Declarations of Columbia University Professors, June 4, 2025

    ECF No. 284-7 ................................................................................................ 1269

Exhibit H, Declarations of Columbia University Students, June 4, 2025

    ECF No. 284-8 ................................................................................................ 1310

Exhibit I, Declarations of John Raphling, June 4, 2025

    ECF No. 284-9 ........................................................................................ 1374

Exhibit J, Declarations of Stephanie Fox, June 4, 2025

    ECF No. 284-10 ...................................................................................... 1382

Exhibit K, Declaration of Ira J. Kurzban, June 4, 2025

    ECF No. 284-11 ...................................................................................... 1386

Exhibit L, Declaration of Stacy Tolchin, June 4, 2025

    ECF No. 284-12 ...................................................................................... 1391

Exhibit M, Declaration of Josh Paul, June 4, 2025

    ECF No. 284-13 ...................................................................................... 1397

Exhibit N, Declaration of Christopher K. Le Mon, June 4, 2025

    ECF No. 284-14 ...................................................................................... 1401

Exhibit P, Declaration of Kerry E. Doyle, June 4, 2025

    ECF No. 284-16 ...................................................................................... 1414

Exhibit Q, Declaration of [Redacted Individual], June 4, 2025

    ECF No. 284-17 ...................................................................................... 1420

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| Mahmoud KHALIL,<br>            *Petitioner*,<br>v.<br>Donald J. TRUMP, in his official capacity as<br>President of the United States; William P. JOYCE,<br>in his official capacity as Acting Field Office<br>Director of New York, Immigration and Customs<br>Enforcement; Yolanda PITTMAN, in her official<br>capacity as Warden of Elizabeth Contract<br>Detention Facility; Caleb VITELLO, Acting<br>Director, U.S. Immigration and Customs<br>Enforcement; Kristi NOEM, in her official capacity<br>as Secretary of the United States Department of<br>Homeland Security; Marco RUBIO, in his official<br>capacity as Secretary of State; and Pamela BONDI,<br>in her official capacity as Attorney General, U.S.<br>Department of Justice,<br><br>            *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF<br>VERONICA R. SALAMA** |

I, Veronica R. Salama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Veronica R. Salama. I am a licensed attorney in good standing in the state of New York. I am an attorney of record in the above-captioned case. I represent the Petitioner-Plaintiff, Mahmoud Khalil, in this action.

2. Attached hereto, at the exhibits listed below, are true and correct copies of the following declarations:

   A. Attached as **Exhibit A** is the Declaration of Petitioner-Plaintiff Mahmoud Khalil, dated June 4, 2025.

   B. Attached as **Exhibit B** is the Declaration of Dr. Noor Ramez Abdalla, dated June 3, 2025, speaking to the harms that she and Mr. Khalil are experiencing to date as a direct result of the Determination and Petitioner's arrest and detention, including: chilling effects, family separation, and the trauma of detention.

   C. Attached as **Exhibit C** is the June 4, 2025, Declaration of Johnny Sinodis, partner at Van Der Hout LLP and representing Mr. Khalil's in this matter and in his immigration proceedings, summarizing Mr. Khalil's immigration proceedings and related evidence—including the dismissal of post-hoc charge #7 by the immigration judge on April 22,

1

2025, DHS's decision not to cross-examine Mr. Khalil at this same hearing, and its failure to argue in support of the remaining charges in its June 2, 2025, closing arguments submission.

D. Attached as **Exhibit D** are declarations from the American Association of Urban Professors ("AAUP") about the broader chilling effect in colleges and universities and the uncertainty of how to conform conduct because of the Trump Administration's ideological exclusion Policy:

1. **Exhibit D-1:** Declaration of Veena Dubal, general counsel of the AAUP, a plaintiff in *American Association of University Professors v. Rubio*, No. 25-cv-10685, (D. Mass. filed Mar. 25, 2025), dated April 1, 2025, speaking on the principal ways in which the ideological-deportation policy has impeded and continues to impeded the AAUP, from carrying out its mission and the harm to AAUP campus chapters and members.

2. **Exhibit D-2:** Declaration of Aslı Ü Bâli, the Howard M. Holtzmann Professor of Law at Yale Law School, member of the AAUP, and the current President of the Middle East Studies Association of North America ("MESA"), a plaintiff in *American Association of University Professors v. Rubio*, No. 25-cv-10685, (D. Mass. filed Mar. 25, 2025), dated April 1, 2025, speaking on the effect of the ideological-deportation policy on MESA's members.

E. Attached as **Exhibit E** are declarations by a professor and a student at Cornell University, speaking to the chilling effects they experienced from government's targeting of Momodou Taal, a non-U.S. citizen who, like Mr. Khalil, was targeted for removal based on his pro-Palestine expression.

1. Declaration of Mūkoma Ngũgĩ, Professor at Cornell University, dated March 14, 2025, filed as ECF 2-3 in *Taal v. Trump*, No. 3:25-cv-00335, (N.D.N.Y. filed Mar. 15, 2025).

2. Declaration of Sriram Parasurama, graduate student at Cornell University, filed as ECF 2-4 in *Taal v. Trump*, No. 3:25-cv-00335, (N.D.N.Y. filed Mar. 15, 2025).

F. Attached as **Exhibit F** are declarations from legal service providers speaking to a significant uptick in individuals seeking legal advice following Mr. Khalil's arrest, particularly those on university campuses, or those who had been previously been outspoken in support of Palestinian rights or simply because of their non-citizen status:

1. **Exhibit F-1:** Declaration of Victoria Porell, Senior Staff Attorney at Palestine Legal, dated June 3, 2025, reporting a 30% spike in legal support requests since Mr. Khalil's arrest and providing individual anonymized examples;

2. **Exhibit F-2**: Declaration of Golnaz Fakhimi, legal director of Muslim Advocates, dated June 4, 2025, reporting a sharp increase in non-citizens seeking legal support since Mr. Khalil's arrest, driven by fear that expressing views supportive

of Palestinian rights or critical of U.S. and Israel policies could trigger immigration enforcement;

3. **Exhibit F-3:** Declaration of Joshua Dratel, founding partner of Dratel & Lewis,[1] dated June 3, 2025, stating that since Mr. Khalil's arrest, his law firm has been contacted by dozens of individuals from diverse backgrounds seeking legal advice out of fear of government retaliation for their pro-Palestine advocacy.

G. Attached as **Exhibit G** are declarations from Columbia University professors, speaking on the climate of fear and uncertainty, chilling effect on speech and political participation, and providing examples of faculty and students changing their behavior in response to Mr. Khalil's arrest and detention:

1. **Exhibit G-1:** Declaration of Rashid Khalidi, Edward Said Professor Emeritus of Modern Arab Studies at Columbia University, dated June 4, 2025;

2. **Exhibit G-2:** Declaration of James Schamus, Professor of Professional Practice in the School of the Arts at Columbia University, dated May 31, 2025;

3. **Exhibit G-3:** Declaration of Nadia Abu El-Haj, Professor of Anthropology at Barnard College and Columbia University, dated June 1, 2025;

4. **Exhibit G-4:** Declaration of ████████, ███████████████████████████████ at Columbia University, dated June 2, 2025;

5. **Exhibit G-5:** Declaration of Yannik Thiem, associate professor in the Department of Religion at Columbia University, dated June 1, 2025;

6. **Exhibit G-6:** Declaration of Harold Stolper, Lecturer at Columbia University's School of Internal and Public Affairs ("SIPA"), dated June 2, 2025;

7. **Exhibit G-7:** Declaration of ███████, ███████████████, dated June 2, 2025;

8. **Exhibit G-8:** Declaration of ██████████, ███████████, and ████████, ██████████, dated June 2, 2025;

9. **Exhibit G-9:** Declaration of ██████████, ██████, ███ ████, ██████████████████ dated June 2, 2025;

---

[1] Dratel & Lewis is one of the law firms representing Mr. Khalil in the above-captioned case.



10. **Exhibit G-10:** Declaration of ████████, ██████ ███████████████, dated June 2, 2025;

11. **Exhibit G-11:** Declaration of ██████████, Lecturer in the Department of ██████████████ and postdoctoral scholar in ████████████ at Columbia University, dated June 2, 2025.

H.  Attached as **Exhibit H** are declarations of students at Columbia University speaking to their own experiences and of their observations of chilled speech since Mr. Khalil's arrest and detention and the Rubio Determination:

1.  **Exhibit H-1:** Declaration of ███████, graduate student at Columbia University pursuing an ██████████████, dated June 1, 2025;

2.  **Exhibit H-2:** Declaration of ████████████, recent graduate of Columbia University, dated June 1, 2025;

3.  **Exhibit H-3:** Declaration of ██████████, Jewish graduate ████████ ████, dated May 31, 2025.

4.  **Exhibit H-4:** Declaration of ██████████████, recent Jewish graduate of Barnard College, dated May 31, 2025;

5.  **Exhibit H-5:** Declaration of Shay Orentlicher, student at Columbia University and organizer with Columbia-Barnard Jewish Voice for Peace (JVP), dated May 31, 2025;

6.  **Exhibit H-6:** Declaration of ███████, rising third-year PhD student and instructor at Columbia University, dated June 2, 2025;

7.  **Exhibit H-7:** Declaration of ██████████████, ████████████, dated June 3, 2025;

8.  **Exhibit H-8:** Declaration of ████████, recent graduate of ███, dated June 2, 2025;

9.  **Exhibit H-9:** Declaration of ████████, recent Jewish graduate of Columbia University with continued active involvement in the Columbia community, dated June 1, 2025, speaking to their experience and attaching a letter by Jewish Columbia alumni denouncing the arrest and detention of Mr. Khalil;

10. **Exhibit H-10:** Declaration of ██████████, ████████████████, dated June 2, 2025;

11. **Exhibit H-11:** Declaration of ██████████, recent Jewish graduate of Columbia University, dated June 2, 2025; and

4

**JA 1095**

12. **Exhibit H-12:** Declaration of ████████, recent graduate of Columbia University, dated June 2, 2025.

I. Attached as **Exhibit I** is the Declaration of Human Rights Watch ("HRW") researcher John Raphling, dated June 4, 2025, describing the chilling effect on speech among international students and non-U.S. citizens in response to the Trump administration's punitive actions against 'dissenters,' drawing comparisons to patterns of repression observed by HRW in authoritarian regimes.

J. **Exhibit J -** is the Declaration from Stephanie Fox, Executive Director of Jewish Voice for Peace ("JVP"), dated June 2, 2025, on the chilled speech of both U.S. citizen and noncitizen JVP members.

K. Attached as **Exhibit K** is the Declaration of immigration attorney Ira Kurzban**,** dated June 4, 2025, on the unusualness of detaining a lawful permanent resident, especially one with strong ties to the U.S., on fraud or misrepresentation grounds.

L. **Exhibit L** Declaration of immigration attorney Stacy Tolchin, dated May 30, 2025, regarding how fraud and misrepresentation and Mr. Khalil's likelihood of success obtaining a waiver even if the post-hoc charges were sustained.

M. Attached as **Exhibit M** is the declaration from Josh Paul, former Director of Congressional and Public Affairs for the Bureau of Political-Military Affairs, U.S. Department of State, in his personal capacity, dated May 12, 2025 on immigration cases regarding international chill and harm and impact on public interest.

N. Attached as **Exhibit N** is the declaration from Christopher J. Le Mon, former Deputy Assistant Secretary in the Bureau of Democracy, Human Rights, and Labor at the U.S. Department of State, in his personal capacity, dated June 4, 2025, on arbitrary detention being utilized to suppress speech in the U.S. under the Rubio Determination similar to practices in undemocratic countries.

O. Attached as **Exhibit O** is the Expert Declaration of Andrew Rasmussen, PhD., a licensed psychologist in New York, documenting the clinical psychological harm Mr. Khalil is suffering from the shock of unjust arrest and continued detention and family separation, which will inevitably severely worsen absent release.

P. Attached as **Exhibit P** is the declaration from Kerry Doyle, former Principal Legal Advisor for U.S. Immigration and Customs Enforcement ("ICE") and former Immigration Judge, in her personal capacity, dated June 4, 2024, on the transfer of Mr. Khalil to Louisiana, his detention based on the Foreign Policy Ground, and the post-hoc charges as highly unusual.

Q.  Attached as **Exhibit Q** is the declaration from ████████████████, a licensed psychologist and ████████████████████████, dated June 3, 2025, on the irreparable social and stigmatic harm that Mr. Khalil is and will likely continue to suffer in this country as a Palestinian Muslim subject to the Rubio Determination and other disparaging comments by high level government officials.

Executed on June 4, 2025
New York, New York

_Veronica Salama_

Veronica R. Salama
Staff Attorney
New York Civil Liberties Union Foundation

6

**JA 1097**

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>       *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>       *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF MAHMOUD KHALIL** |

I, Mahmoud Khalil, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am the Petitioner-Plaintiff in this action. As my attorney previously stated in her declaration (ECF 50-1), we reviewed the amended habeas petition (ECF 38) together during a virtual attorney-client meeting on March 13, 2025, and I confirmed the accuracy of the factual statements in that petition as they pertain to me. I have also reviewed the second and third amended habeas petitions filed in this matter (ECF 162 and 236, respectively), including the new allegations regarding the post-hoc charge of inadmissibility, and I verify that the facts contained therein, as they relate to me, are true and correct to the best of my knowledge.

2. Some of the facts in this declaration are stated in my habeas petition. I include them here again for clarity and to assist the Court in reviewing my account directly and in my own words. I also welcome the opportunity to testify in person, at the courthouse, as to any of my experiences described here.

3. I understand that the Court has requested additional information about the irreparable harms I have suffered—and continue to suffer—as a result of the government's actions against me. These harms are wide-ranging: they include dignitary and reputational harm, personal and

familial hardship, including constant fear for personal safety, continued detention, restrictions on my freedom of expression, and severe damage to my professional future.

4. I submitted a declaration in my immigration proceedings describing the events of the night of my arrest on March 8. I understand my attorneys in this matter have also filed these documents (ECF 212-1). For the Court's ease, I am attaching a copy of that declaration as **Exhibit 1.**

5. I am 30 years old. I am a Palestinian Lawful Permanent Resident of the United States of America. I hold an Algerian passport. I was born in a Palestinian refugee camp in Syria named Khan Eshieh. I have dedicated my life to advocating for human rights, informed by my own life experiences. I am a husband to Dr. Noor Abdalla, a U.S. Citizen, and as of April 21, 2025, I am a father to our son, Deen, who is also a U.S. Citizen. As of May 22, 2025, I hold a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"). I have never been accused or convicted of any crime.

6. I offer this declaration from inside LaSalle Detention center, where I have been confined since March 9, 2025, because of the government's determination that my protected speech in support of Palestinian rights somehow impacts U.S. foreign policy interests.

7. The most immediate and visceral harms I have experienced directly relate to the birth of my son, Deen. Instead of holding my wife's hand in the delivery room, I was crouched on a detention center floor, whispering through a crackling phone line as she labored alone. I listened to her pain, trying to comfort her while 70 other men slept around me. When I heard my son's first cries, I buried my face in my arms so no one would see me weep. The first time I saw my son in person was through a plate-glass window. The first time I held him was in an immigration courtroom, only after Noor traveled over ten hours with our newborn. I speak to her as often as possible, but these conversations are not private, everything is monitored by the government. Knowing that we are being recorded means we can't speak freely out of fear for further retaliation—not about how all of this is affecting us, not even about the private intimate things between a husband and wife. We leave so much unsaid, and that silence weighs heavily on both of us.

8. Noor and Deen mean everything to me. To not be able to see them, hold them, speak with them freely, enjoy everything I imagined our first days as a family would be like, is devastating. Worst still is knowing that they must face all the fear and notoriety of this case without me. The Rubio Determination is casting a shadow of suspicion across our entire family. I could never have imagined this would happen, and it is horrifying to experience this as a husband and father.

9. In speaking with Noor, I have been deeply disturbed by the harassment she has endured as a result of my arrest and detention. That harassment has been directed at both her and our family—not only because the government labeled me a U.S. foreign policy concern, but also because of this administration's public, deeply racist, and false accusations that I support Hamas or have engaged in antisemitic activity. None of this is true. I am a Palestinian who cares deeply about the Palestinian people and their inalienable rights. But the U.S. government believe that anyone who calls for Palestinian rights must support Hamas or be antisemitic. That is itself a form of anti-Palestinian racism and it is wrong.

10. I remember seeing the public statements issued by the White House and President Trump on social media, both after my arrest and again after the Immigration Judge upheld the Rubio Determination. It is hard to describe the humiliation and pain of seeing mugshot-style images of myself circulated from the highest levels of the U.S. government—accompanied by inflammatory language, grotesque and false accusations, and open celebration of my deportation. These were not just attacks on my character; they were efforts to erase my humanity. Below are true and correct copies of just four of the social media posts I have seen, as shown to me by my attorneys:









3

11. As someone who fled prosecution in Syria for my political beliefs, for who I am, I never imagined myself to be in immigration detention, here in the United States—a country that proclaims democracy and rule of law, freedom of expression—defending myself against baseless and retaliatory immigration charges, after being targeted for who I am, for who I advocated for.

12. Like the thousands of students that I've protested with across the United States and in my university—including Muslim, Jewish and Christian friends—I advocate for human rights, for international law, for the end of the killing of innocent people. I believe in the innate equality of all human beings. I believe in human dignity. I believe in the right of my people to look at the blue sky and not fear an impending missile. Why should protesting this Israel government's indiscriminate killing of thousands of innocent Palestinians result in the erosion of my constitutional rights?

13. As I remain detained because of the Rubio Determination, and because of the government's stated intent to punish me for my speech, I am unable to protest the ongoing genocide of the Palestinian people—my own people— a fundamental aspect of my freedom of expression that is deeply important to me.

14. Beyond my immediate detention, as the Rubio Determination continues to hang over me, I know that any expressive activity I undertake carries the risk of further punishment or surveillance. I still believe it is important to speak out against the ongoing genocide of the Palestinian people and broader systemic injustices. But even as I try to do so now from a distant prison, I do so under the weight of extreme fear—that my words will be mischaracterized, used against me, or taken as further evidence of wrongdoing. It is impossible for me to understand what words the U.S. government believes are the basis for arrest and exile, and what words are not.

15. Before the Rubio Determination and my consequent arrest and detention, my career projection was to work in diplomacy and international affairs, whether at the United Nations (UN) or at a diplomatic mission. In fact, just days before my arrest and detention, I had accepted a position at Oxfam International as a Palestine and Middle East/North Africa Policy Advisor. In this role, I was set to work towards helping to uphold international law and human rights at the UN, including by achieving a permanent ceasefire in Gaza that would end the genocide that this Israeli government is committing in Palestine. I was scheduled to start this job in April 2025.

16. On April 3rd, Oxfam International formally revoked my employment offer. I strongly believe that the Rubio Determination, my arrest and detention—and the public stigma that followed—played a significant role in this decision. I was not surprised; roles like this depend on your reputation. How could someone who has been labeled a risk to U.S. foreign policy credibly represent an international organization in diplomatic spaces—let alone serve as an advisor on human rights and regional policy in the Middle East and North Africa? Beyond credibility, how could I effectively perform the essential duties of a position like this—which requires traveling internationally—where visa denial or intense scrutiny would be nearly inevitable?

17. I have devoted my academic and professional life to international development, public service

and diplomacy. And I've long aspired to serve in international organizations or diplomatic missions—perhaps as a U.S. citizen someday. But if the Rubio Determination stands, that is not possible—the harm to my professional career would be career-ending.

18. In addition to the professional aspirations I've spent over a decade pursuing, I now face immediate relational and safety harms because of the Rubio Determination.

19. This label is now embedded in government systems and records—including DHS databases, consular files, and likely even diplomatic cables. I face the risk of being flagged, delayed, or denied when traveling, applying for visas, or engaging with consular authorities anywhere in the world. The suspicion has real implications for my family and my safety. Because of my arrest and the government's publicized and false determination that my protected speech in support of Palestinian rights is antisemitic and compromises "a compelling U.S. foreign policy interest," I—and by extension, my wife and newborn son—have become targets for attack and surveillance by government agencies, as well as by private actors. If this determination remains in place, I will continue to live in constant fear for our safety—from formal institutions and informal, but very real, threats of harm.

20. In addition to the ongoing risks to our physical safety because of the Rubio determination, other harms to my family are already accruing: my mother had applied for a U.S. visa so she could be with us for the birth of my son, listing me as her host. Her visa was approved in March 2025, and the U.S. embassy ask her to send in her passport to get the visa stamped. However, after she submitted her passport, the embassy returned it without stamping, saying that her case was under administrative processing. The timing of this change is directly correlated with the Rubio Determination and my arrest and detention. As of today, my mother's visa has not been approved.

21. And while my family is unlikely to be able to visit me, to bond with my newborn son or assist me and Noor as we navigate parenthood for the first time, I also fear I will no longer be admitted into Germany to see my father, who is 70 years old and severely disabled. This is deeply devastating for me. Before the Rubio Determination, I prioritized seeing him at least three times a year. Even during the travel-restricted period after applying for adjustment of status, I applied for, and was granted, USCIS emergency parole so I could visit him due to his disability. Will Germany, or any U.S. ally, allow entry to someone the U.S. government has determined to be a foreign policy concern? I worry I will never be able to see him again if the Rubio Determination is allowed to remain in place.

22. There are similar relational harms that have already begun to accrue because of the Rubio Determination, as many people in my life seek to distance themselves from me and from Noor, out of fear for their own reputation, safety, and potential targeting of the next Rubio Determination.

23. I believe that undoing the Rubio Determination will allow me to be with my son and my wife beyond the walls of this detention center, to speak, write, and protest freely, to continue my career trajectory in diplomacy, to see my family and return to the community in New York that I have worked so intentionally to build since I moved to the United States.

5

**JA 1103**

24. I also want to provide this Court with more information regarding DHS's baseless post-hoc charges against me:

25. On March 17, 2025—after one week in detention at LaSalle and just days after filing my habeas petition—I was approached by LaSalle staff and handed a Form I-261, "Additional Charges of Inadmissibility/Deportability." I have reviewed ECF 90-1 and confirm it is a copy of the form I received. The I-261 stated that these new charges were "in lieu of those set forth in the original charging document," which I understand refers to the NTA I was given on March 9 at 26 Federal Plaza. While the original NTA alleged that the Secretary of State had determined my "presence or activities would have serious adverse foreign policy consequences," the I-261 claimed they would *also* "compromise a compelling U.S. foreign policy interest." It also added three new allegations, claiming I "failed to disclose" certain information in my Form I-485, Application to Register Permanent Residence or Adjust Status. Specifically, the I-261 alleged:

   A. "you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer" (Allegation 6); "you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022" (Allegation 7); and "you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD)" (Allegation 8).

26. I answered all questions in my green card application truthfully and to the best of my knowledge. As to Allegation 6: I was never employed by UNRWA, nor was I ever an "officer" of the organization. Rather, I completed an unpaid internship at UNRWA in 2023 as part of my graduate program at Columbia University. Columbia approved me for the internship, paid me a stipend directly, and remained my employer throughout. As part of that internship, I was required to submit reports and blog posts to Columbia about my experience, and my supervisor at UNRWA was required to submit a report to the university, after which I received a passing grade from the university. I understood that the U.S. Department of State was notified of my internship because UN agencies must notify the U.S. Mission to the United Nations. My LinkedIn profile accurately reflected this internship, and I disclosed my employment with Columbia—which included this internship—on my green card application. Indeed, I am proud of my internship experience. I had simply understood that reflecting my employment with Columbia was sufficient to fully and truthfully disclose my employment history, including the internship at UNRWA, on my green card application.

27. As to Allegation 7: I stopped working at the British Embassy in December 2022, when I moved to the United States. The reference in my green card application was therefore accurate. At my Immigration Court hearing on May 22nd, the immigration judge dismissed this allegation.

28. As to Allegation 8: I have always been clear about my role as a negotiator and facilitator between student protestors, groups, coalitions, including CUAD, and the university administration. To the best of my knowledge, CUAD is a coalition made up of over 120 different student groups. It is not a standalone organization with individual membership. As far as I am aware, it has always operated horizontally, without formal leadership or hierarchy.

6

**JA 1104**

Importantly, when the April 2024 student encampment protests began at Columbia—I had already submitted my green card application (in March 2024). Faculty members reached out to me and asked me to help as a mediator between the students and the administration. They specifically sought someone who was not affiliated with the student groups organizing the encampment and who was trusted by the administration, students, and faculty alike. I believe they approached me because of my background in diplomacy and negotiation, and because of the relationships I had established with the university administration. At the same time, students in the encampment—which included many who were not affiliated with CUAD—also chose me to serve in this role. I agreed, and I began going back and forth, sharing messages and stated positions between the two sides.

29. I testified about these facts at my immigration court hearing on May 22, 2025. The government attorneys did not ask me any questions regarding these issues.

30. While all of the allegations against me in my immigration court case are false, I know that the Rubio Determination is the one that carries the heaviest consequences. It is the only allegation that, if it stands, will have the greatest impact on the future of my family—particularly my wife and son, who are U.S. citizens. I understand that the Rubio Determination is not only a ground for deportation, but it is also a bar to entry and is not subject to routine waiver like the post-hoc charges. In other words, no matter what happens to the other charge against me, it is the Rubio Determination that will make this country—the country of my wife and child—a country I cannot return to in the future. This harms all of us.

31. I have read every decision issued by the Court in this matter. I ask my lawyers to walk me through the decisions in detail during my virtual legal visits and I wait for the decision to be uploaded to LexisNexis so I can access it from the detention center for myself. I remember reading the Court's finding that, when it comes to here-and-now harms on First Amendment freedoms, and political speech in particular, the law requires "no unnecessary delay."

32. I have authorized my attorney to sign this declaration on my behalf, given the difficulty in arranging in-person visits to the LaSalle Detention Center in Jena, Louisiana where I am presently detained. If required to do so, I will provide a signature when I am able to do so.

Executed on June 4, 2025
New York, New York

   _/s/ Mahmoud Khalil_____
   Mahmoud Khalil

   *Signed on his behalf by counsel*
   *Veronica R. Salama*

## DECLARATION OF VERONICA R. SALAMA

I, Veronica R. Salama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Veronica R. Salama. I am a licensed attorney in good standing in the state of New York. I am an attorney of record in the above-captioned case.

2. I represent the petitioner, Mahmoud Khalil, in this action.

3. Mr. Khalil is currently detained by ICE at the LaSalle Detention Center in Jena, Louisiana, and I am unable to travel to him.

4. On June 4, 2025, I met with Mr. Khalil in a virtual attorney-client meeting. I signed Mr. Khalil's declaration on his behalf with his express consent, after reviewing it with him and confirming its accuracy, as reflected in his declaration.

Executed on June 4, 2025
New York, New York

_____
Veronica R. Salama
Staff Attorney
New York Civil Liberties Union Foundation

EXHIBIT A-1

Uploaded on 04/24/2025 at 06:30:43 AM (Central Daylight Time) Base City: JNA

### <u>Declaration of Mahmoud Khalil</u>

I, Mahmoud Khalil, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. On Saturday, March 8, 2025, at approximately 8:25 PM, my wife and I were returning from dinner at a friend's apartment next door to our Columbia-owned apartment building when two agents in plain clothing followed us from outside our building into the foyer. The agents asked me if I was Mahmoud Khalil, and I confirmed that I was. The agents claimed to be from the police and I asked them which police. They said the Department of Homeland Security ("DHS") and that I had to go with them. At that point, I handed them my driver's license and asked them why I should go with them. They told me that my visa has been revoked. I explained that I am not a visa holder, but in fact have a green card. They were visibly confused when they heard that I have a green card. I requested to see an arrest warrant.

2. They asked my wife to leave me and said otherwise she would be detained. I asked my wife to go upstairs to our apartment to get my green card. I waited in the foyer with the agents as my wife went up to our apartment to find my green card.

3. At 8:26 PM, I called my attorney, Amy Greer, as I was surrounded by people claiming to be from the DHS inside my Columbia-owned apartment and who wanted me to go with them. My attorney asked me if they had shown me an arrest warrant. I asked the agent again to see the arrest warrant, to which he replied that he had the warrant on his phone. The same agent told me to hand over my phone to him and identified himself as special agent ▮▮▮▮▮▮▮▮ to Amy Greer. During the call between my attorney and Agent ▮▮▮▮▮, he reiterated that he had an administrative warrant. But despite repeated

**JA 1108**

requests, he did not show the warrant. After a brief phone call with my attorney regarding

my status as a green card holder and if a warrant existed, the agent abruptly ended the

phone call. The other agents asked me to move to the other side of the foyer, and I

complied. I sat in the foyer while waiting for my wife.

4. Once my wife returned and showed the agents my green card, Agent █████, on the

phone with an unknown individual, informed them that I was a green card holder. I tried

to call my lawyer again on my phone.

5. Then, a DHS agent told me I was under arrest and directed me to turn around. I asked

again about the warrant, but complied with the request. As I turned, I attempted to hand

my wife my phone to talk to the lawyer. The agent said "stop resisting" to which my wife

and I both responded that I was not resisting but attempting to hand my phone to my

wife. I placed my hands behind my back as they arrested me and stated to them, "I am

coming with you, don't worry," as clearly shown in the video my wife was recording.

Once I was handcuffed, the agents escorted me out of the building and on to █████

███. The agents placed me in a car and drove me to 26 Federal Plaza.

6. At no point in my interactions with these agents did I attempt to resist, flee, or otherwise

not comply with the agents' orders. Throughout this interaction, I insisted on seeing the

warrant that the agent stated he had on his phone and that he would show me, but he did

not at any point show me a warrant.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23rd day of April, 2025.


&#95;/s/ Mahmoud Khalil

Mahmoud Khalil

I, Oona Cahill, declare as follows:

1. My name is Oona Cahill. I am a licensed attorney in good standing in the state of California. I am an attorney of record in the above-referenced case.
2. I represent the Petitioner, Mahmoud Khalil.
3. I signed Mr. Khalil's declaration on his behalf with his express consent, after reviewing it with him, as reflected in his declaration. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on the 23rd day of April, 2025.

/s/ Oona Cahill

Oona Cahill

# Exhibit B

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
NOOR RAMEZ
ABDALLA**

     I, Noor Ramez Abdalla, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am a United States citizen, and Mahmoud Khalil's wife.

2. I previously submitted a declaration in support of Mahmoud's motion for release (ECF No. 55) about our relationship and the impact of his arrest and detention on my pregnancy. I also submitted a declaration in Mahmoud's immigration proceedings, in support of his motion to terminate, which I understand was subsequently submitted to this Court as part of ECF 212-1.

3. On April 21, 2025, I gave birth to my and Mahmoud's first child, our son Deen.

**JA 1112**

4. The end of my pregnancy and labor was extremely stressful because I was separated from Mahmoud due to his ongoing detention.

5. After Mahmoud was arrested and before I gave birth, many people posted awful statements online, including death threats, about Mahmoud, myself, and our baby. I saw these whenever I would read an article or social media post about our situation, and became afraid for our safety. The posts often focused on the false accusations of Mahmoud being antisemitic, the fact that I wear a hijab, and the fact that we are Muslim. Because of the baseless allegations against Mahmoud, we have become an easy target for hateful people who want to harm my family, wished I would miscarry, or that someone should take our baby away from us. There were so many comments like this that I was honestly shocked – both at the amount and at the hatred and bigotry included in them.

6. Those comments impacted me negatively, even though I made efforts to not read them. I was constantly stressed, which is not good for a baby. I did not leave the house as much as I would before Mahmoud's arrest and detention because I was scared someone would try to hurt me because I am Mahmoud's wife. I did not want to be recognized.

7. When I first went into labor, I had no family with me. I felt alone and I was scared. My mother thankfully was able to come to New York a few hours after I went into labor.

8. When I first got to hospital, I was told my water broke and they admitted me. I was overwhelmed and started having a panic attack. I couldn't stop crying. I was devastated that Mahmoud was still detained instead of being by my side, as he and I wished. I was also extremely afraid for my safety at the hospital because so many people had threatened me and threatened to take our baby. The hospital admitted me under an alias and the hospital's security had to be instructed to only allow a pre-approved list of people into my room.

9. Despite my fear and panic, at that moment, I was still hopeful that Mahmoud would be released in time to join me at the hospital. I spent the first hours of my labor coordinating with Mahmoud's lawyers – something I never would have imagined having to do before all of this – to see if there was any possibility of him being released for our baby's birth. It was not how I imagined giving birth; I thought Mahmoud and I would be welcoming our new baby boy into the world together.

10. After being in labor for nearly ten hours, I learned from one of Mahmoud's attorneys that ICE had denied Mahmoud's request for furlough or temporary release, and that he would not be with me during the birth. I was utterly heartbroken.

I could not believe that I would have to give birth to our child without Mahmoud by my side.

11. I was in labor for 24 hours. It was extremely difficult. After Deen arrived, though I was exhausted, I could not sleep.

12. I didn't sleep during the two nights I spent at the hospital after giving birth to my son because I was too worried that if my baby left my side, someone might take him away from me. I made my mother, who had flown in from out of state to be with me, accompany Deen to all of his newborn medical tests and declined the nurses' offers to look after him so that I could get some rest because I didn't want my baby to leave the room. I didn't want to take my eyes off of him.

13. Mahmoud had to meet his newborn son, Deen, over a video call the morning after he was born. He could not call on video when Deen was first born in the middle of the night because the immigration jail does not allow video calls at night. It did not feel like a real meeting because it was only through a screen. This was not how he wanted to see his son for the first time. He should have been holding Deen, touching him, and kissing him.

14. When I returned home from the hospital, it finally hit me that I would have to do everything – caring for a newborn, navigating the legal system, figuring out housing, work, finances – without Mahmoud's presence at my side. I was completely overwhelmed and crying a lot. My mother was extremely concerned about me.

15. Though I had immense support from family and friends in those early days, nothing could replace Mahmoud's presence. Those are days our little family will never get back. Mahmoud will never be part of bringing our first baby home from the hospital, awkwardly carrying the baby carrier, and figuring out how to hold such a tiny baby, and all of the other fun, hard, and challenging parts of adjusting to having a newborn. This reality of all we have missed and will never get back is a weight that constantly sits on me.

16. I am constantly aware of Mahmoud's absence, not just because I miss him so deeply, but because taking care of a newborn alone is a lot of work. At first, I was in a lot of physical pain as I healed from giving birth, and I was distressed that Mahmoud was not there. Now, though I feel physically improved, the distress remains.

17. Because of the immense stress I am under, it has been difficult to feed Deen without supplementing with formula. This has been a source of great sadness and disappointment for me.

3

**JA 1114**

18. On May 20th, Deen and I traveled more than ten hours to Louisiana to attend Mahmoud's immigration hearing with hopes that he could hold his son for the first time.

19. However, I was told on the phone, before we arrived at the facility in Louisiana, that we could not have a contact visit. Numerous lawyers and this Court had to get involved as we sought an opportunity for Mahmoud, Deen, and I to be together in person, even if only for a legal meeting to be able to discuss his habeas corpus case in federal court. At one point, I didn't think it was going to happen because we were constantly being told no. But, eventually, I was told that we had been granted a contact visit for the following morning.

20. However, I did not want to wait to see my husband in person for the first time in 2 ½ months. We had already been apart for too long. We had come all that way, Mahmoud was expecting us, and so Deen and I traveled nearly an hour to get to the detention facility. Mahmoud met Deen for the first time through a plate glass window. In order for Mahmoud to better see Deen and play with him, I had to lay Deen on the ledge in front of the plate glass window separating us from each other. It was an awful feeling for all of us. Mahmoud was right there, but he could not touch his son.

21. Thankfully, the following day, we were able to meet in person, though we only had less than one hour. One of Mahmoud's lawyers was with us. Certainly, it was not how I imagined Mahmoud would first meet his son.

22. I was so happy that Mahmoud was able to see and hold Deen without a plate glass window separating them. However, even that moment was bittersweet because I had to teach Mahmoud how to hold and feed Deen – something Mahmoud would have already known how to do after 4 weeks of parenting an infant had he been home with us. It highlighted how much Mahmoud had missed over the past month because he has been detained and has not been allowed to get to know or take care of his child – the child both of us love so much, and who we both were so excited to bring into this world *together*.

23. Attending the immigration hearing and listening to the expert witnesses and Mahmoud talk about all the ways he could be targeted or killed if he were to be deported as a result of the U.S. government's public and highly visible smearing of him was incredibly scary.

24. Mahmoud's case has impacted every aspect of our life. I have experienced Islamophobia my whole life as a Muslim woman who wears a hijab, but it has been amplified by Mahmoud's detention and ongoing case. Mahmoud's and my careers,

**JA 1115**

our desire for a stable life, and Deen's future will forever be impacted by these false allegations against him.

25. The government has said that Mahmoud's speech harms U.S. foreign policy. This false statement hangs over his head and ours. It is unimaginable to have to live our lives without knowing whether our words will make us a target for the U.S. government to harm us.

26. I don't want Deen to have to grow up with the knowledge that the U.S. government views his father's advocacy for his people's rights as something that requires punishment, that is not welcome in his country, or that would subject him to hostility. I don't want him to grow up thinking that a part of his identity is somehow not worthy of protection or that advocating for his people's human rights can land him in trouble like it did his father.

27. Mahmoud's case is also impacting our networks of support. Friends and family members are worried about traveling because of their connection with Mahmoud. People we are close with, especially noncitizens, have stopped coming to my apartment, declined to write letters of support for Mahmoud, or even talk on the phone with him because they fear retaliation by the U.S. government due to their support of Mahmoud.

28. Post-partum continues to be difficult. I am getting little to no sleep. I'm supposed to go back to work in September but everything in our life is uncertain because of Mahmoud's detention and immigration case. Without Mahmoud's financial, physical, and emotional support, without his *presence*, and because of his detention, it is very hard to plan for any kind of future.

29. Having Mahmoud present would take so much off my plate. Right now, everything falls on me alone because I am doing so much on behalf of Mahmoud that he cannot while he is detained. When he is home, I can focus fully on raising Deen, which is what I want to do, and I will have a partner with whom to share the heavy lift of everyday life with an infant.

30. The uncertainty is hard. I don't want to be separated from Mahmoud any longer. I want us to be together. I want Deen to grow up with both of his parents in the way Mahmoud and I dreamed, planned, hoped, and wanted.

31. Despite the uncertainty, my main priority is for Mahmoud to return home to us – to make our family whole again.

5

Dated: June 4, 2025                              Signed:

_____
NOOR RAMEZ ABDALLA

# Exhibit C

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF JOHNNY SINODIS**

## DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, CA 94108. I have personal knowledge of the matters stated herein. I am one of Mr. Khalil's attorneys who is representing him in the above captioned-matter before this Court and also the Immigration Court. I have been practicing immigration law since December 2011.

2. I write to provide the Court additional relevant information and updates on Mr. Khalil's removal proceedings in Immigration Court.

3. As the Court is aware, on March 17, 2025, nine days after the U.S. Department of Homeland Security (DHS) arrested and detained Mr. Khalil pursuant to the Rubio Determination, DHS asserted for the first time that he is removable from the United States pursuant to 8 U.S.C. § 1227(a)(1)(A) because, per DHS, he was inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i) when he adjusted his status to that of a lawful permanent resident (i.e., a green card holder) for

allegedly failing to disclose: (1) he was "a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer" (Allegation 6); (2) his alleged "continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022" (Allegation 7); and (3) he was "a member of the Columbia University Apartheid Divest (CUAD)" (Allegation 8).

4.  The alleged "failure to disclose" occurred in March 2024 when Mr. Khalil completed and filed his Form I-485, Application to Register Permanent Residence or Adjust Status, with the U.S. Citizenship and Immigration Services (USCIS). The Form I-485 is also commonly referred to as a "green card application." Mr. Khalil signed his Form I-485 on March 26, 2024, and mailed it to USCIS on March 29, 2024.

5.  DHS asserted these additional allegations and the additional § 1227(a)(1)(A) charge of removal via a Form I-261, Additional Charges of Inadmissibility/Deportability. *See* Form I-261 dated Mar. 17, 2025 (Allegations 6 through 8).

6.  Under longstanding precedent from the Board of Immigration Appeals (BIA), DHS must prove by clear and convincing evidence that an alleged misrepresentation was willful, material, and made with the intent to deceive to establish inadmissibility under § 1182(a)(6)(C)(i) and removability under § 1227(a)(1)(A).[1]

7.  DHS's Form I-261 does not assert that any of Mr. Khalil's alleged "failure[s] to disclose" at the time he applied for his green card were willful, material, or done with the intent to deceive. As discussed below, at the outset of the May 22 hearing in Immigration Court, the Immigration Judge dismissed Allegation 7. During the hearing, Mr. Khalil testified, as relevant here, in response to allegations 6 and 8, and DHS did not cross-examine him on this testimony. In the parties' closing arguments submitted to the Immigration Court on June 2, DHS did not reference or address Allegations 6 and 8.

**Removal Proceedings as to the § 1227(a)(1)(A) Charge:**

8.  On April 8, 2025, the Immigration Judge (IJ) ordered DHS to submit all evidence in support of its allegations against Mr. Khalil by April 9, 2025.

9.  On April 9, 2025, DHS submitted documents in Immigration Court in support of their

---

[1] I am providing the following BIA decisions as a reference for the Court: *Matter of G-G-*, 7 I&N Dec. 161, 164 (BIA 1956) (for immigration purposes, the term fraud "is used in the commonly accepted legal sense, that is, as consisting of false representation of a material fact made with knowledge of its falsity and with intent to deceive the other party."); *Matter of Y-G-, 20 I&N Dec. 794, 796 (BIA 1994)* (material misrepresentation requires: (1) the person procured, or sought to procure a benefit under U.S. immigration laws; (2) the person made a false representation and the false representation was willfully made; (3) the false representation was material; and (4) the false representation was made to a U.S. government official); *Matter of D-R-, 27 I&N Dec. 105, 107 (BIA 2017)* (a finding of a willful, material misrepresentation must be based on "clear, unequivocal, and convincing evidence.").

allegations that Mr. Khalil failed to disclose information on his March 26, 2024, Form I-485. The following documents correspond to these allegations:

(a) a screenshot of a website showing Mr. Khalil as a speaker at a conference for the Society for International Development (SID) in 2025 and erroneously stating he works at the Syria Office in the British Embassy in Beirut;

(b) tabloid articles and blog posts dating between April 26, 2024, and March 11, 2025, which (a) erroneously state that Mr. Khalil's LinkedIn profile reflected that he was employed as a political affairs officer with UNRWA from June to November 2023 and (b) falsely claim Mr. Khalil was the leader of CUAD, while also providing no supporting evidence;

(c) several articles describing Mr. Khalil as the negotiator on behalf of all student protestors involved in Columbia University's encampment; and

(d) the "About Us" page from UNRWA's website, describing its work assisting Palestinian refugees.

10. On April 11, 2025, Mr. Khalil submitted evidence to the Immigration Court refuting DHS's allegations and evidence. *See* **Exhibit 1** (Mr. Khalil's submission of documents on April 11, 2025).[2]

11. On April 11, 2025, as relevant here, the IJ issued an order giving both parties until April 23, 2025, to file any additional evidence on the § 1227(a)(1)(A) charge of removal.

12. DHS did not file additional evidence on or before April 23, 2025.

13. On April 23, 2025, Mr. Khalil filed additional documents with the Immigration Court further refuting the charge that he willfully failed to disclose material information on his Form I-485 or made a false representation with an intent to deceive the U.S. government. *See* **Exhibit 2** (Mr. Khalil's submission of documents on April 23, 2025).[3]

14. Mr. Khalil's evidentiary submissions on April 11, 2025, and April 23, 2025, included the following documents:

(a) In Opposition to Allegation 6 regarding UNRWA: (1) a letter from UNRWA to Columbia University, confirming that Mr. Khalil was an unpaid intern at UNRWA and that the internship was approved by Columbia University; (2) a letter from the Associate Director of Mr. Khalil's master's program at Columbia University, dated April 10, 2025, confirming that Mr. Khalil completed his internship with UNRWA for

---

[2] On April 13, 2025, Mr. Khalil submitted the full record of immigration proceedings, to date, to the Court. *See* ECF 199. He reattaches his submission from April 11, 2025, discussed herein for ease of the Court's review as **Exhibit 1**.

[3] The April 23, 2025, immigration court evidence was previously filed with the Court as ECF 210-1 and is reattached here for ease of the Court's review as **Exhibit 2**.

course credit at Columbia; (3) a printout of Mr. Khalil's LinkedIn profile, demonstrating that his role at UNRWA was publicly disclosed and was listed as an internship (not employment, as the tabloid article filed by DHS alleged); and (4) a letter from the Director of the UNRWA Representative Office confirming that Mr. Khalil served as an unpaid, voluntary intern at UNRWA between June 2023 and November 2023.

(b) In Opposition to Allegation 7 regarding the British Embassy: (1) Evidence Regarding Mr. Khalil's participation in the SID conference in 2020—not 2025, as inaccurately portrayed in a screenshot submitted by DHS; (2) Mr. Khalil's contract with the British Embassy showing an end date in November 2022; (3) a letter from Mr. Khalil's colleague and the head of the office at the British Embassy, confirming he left the British Embassy in December 2022; and (4) a Letter from SID confirming Mr. Khalil is not a speaker in 2025.

(c) In Opposition to Allegation 8 regarding CUAD: (1) a letter from a professor at Columbia University confirming Mr. Khalil was not a member of CUAD but in fact a negotiator on behalf of all students involved in the encampment, who liaised between the students and the administration; (2) a letter from a University Senator at Columbia confirming Mr. Khalil was not a member of CUAD; and (3) letters of support from Columbia students explaining Mr. Khalil's role as a negotiator on behalf of all students.

15. On April 25, 2025, the IJ scheduled an Individual Calendar Hearing (the equivalent of a trial in Immigration Court) for May 22, 2025, at 8:30 a.m.

16. On May 12, 2025, DHS filed a motion to pretermit Mr. Khalil's applications for asylum and for withholding of removal, arguing that there are reasonable grounds to believe that he is a danger to the security of the United States. *See* 8 U.S.C. §§ 1158(b)(2)(A)(iv), 1231(b)(3)(B)(iv). As support for this argument, DHS alleged that, because Secretary of State Marco Rubio had determined Mr. Khalil's presence in the United States to be adverse to a compelling foreign policy interest, he is also a danger to the security of the United States.

17. On May 19, 2025, Mr. Khalil filed an opposition to DHS's motion to pretermit.

18. At the outset of the hearing on May 22, 2025, the IJ orally stated that, based on the evidence in the record, DHS could not sustain the allegation that Mr. Khalil had failed to disclose that he worked at the British Embassy after December 2022. *See* Form I-261 at Allegation 7. The IJ did not provide a ruling on the other two allegations—Allegation 6 and 8.

19. The IJ also orally stated that she denied DHS's motion to pretermit Mr. Khalil's applications for asylum and for withholding of removal, rejecting DHS' argument that she should find him a danger to the security of the United States.

20. During his testimony at the May 22 hearing, as relevant here, Mr. Khalil provided further explanation for why the Form I-261's allegations regarding UNRWA and CUAD lacked

merit.[4]

21. As to UNRWA, Mr. Khalil testified that: (1) he received a stipend from Columbia University for his internship at UNRWA; (2) that he was paid directly by Columbia University; and (3) that he was never employed by UNRWA. He testified that, as part of his internship at UNRWA, he was required to submit reports to Columbia and author blog posts about his experience for the school. He testified that his supervisor at UNRWA was also required to submit a report to Columbia. Mr. Khalil disclosed his employment with Columbia University on his Form I-485, which necessarily included his internship at UNRWA. Because Columbia was his employer during his internship with UNRWA, Mr. Khalil understood that disclosing his employment at Columbia included that internship role. Mr. Khalil further testified that it is his understanding that, in June 2023, the U.S. Department of State was notified of his internship with UNRWA. Mr. Khalil explained that he relied on the guidance in the Form I-485 instructions, which do not mention internships, to complete the application. He further testified that individuals cannot be members of UNRWA, as membership of UNRWA is reserved for nation-states.

22. When DHS had the opportunity to cross-examine Mr. Khalil about his internship at UNRWA and the documentary and testimonial evidence he provided about the information on his Form I-485, DHS did not ask him a single question.

23. As to CUAD, Mr. Khalil testified that all of the purported evidence DHS filed in support of its allegation—that he willfully failed to disclose "membership" in CUAD on his March 2024 green card application—concerns alleged activity that took place in April 2024, nearly a full month *after* he submitted his Form I-485.

24. He further testified that he was never a member or a leader of CUAD. He testified that, to the best of his knowledge, CUAD is not an individual member organization and did not have a formal leadership. CUAD was comprised of over 120 different groups that ranged from those focusing on Palestine, to a climate club and a dance club. Mr. Khalil testified that, CUAD is just that—a coalition of existing groups, not a free-standing individual membership group—and that, as far as he is aware, CUAD operated without any hierarchy, leadership, or structure. Mr. Khalil further explained that, when protests began at Columbia—nearly three weeks after he submitted his Form I-485—faculty at Columbia reached out to him to act as a negotiator. Mr. Khalil explained how faculty approached him specifically because they wanted someone who was NOT part of the student groups leading the protests, as well as someone like Mr. Khalil who was trusted by the administration, students, and faculty, and who had experience with diplomacy and negotiation. Contemporaneously, students in Columbia's encampment—which encompassed many students other than those affiliated with CUAD—also asked him to act as a negotiator. Mr. Khalil agreed to do so, and he began to go back and forth between the administration and the students. He relayed the positions of the administration to the hundreds of students in assembly-style meetings. The students then voted on their collective position by

---

[4] In addition to testifying as to the meritless of the second charge of removal, Mr. Khalil also presented his own testimony and the testimony of four expert witnesses in support of his applications for asylum, withholding of removal, and protection under the Convention Against Torture.

raising their hands to vote. Mr. Khalil would then take their collective decision back to the administration.

25. DHS had the opportunity to cross-examine Mr. Khalil about his alleged membership in CUAD and the documentary and testimonial evidence he provided about the information on his Form I-485 but again did not ask him a single question about this allegation or his testimony contradicting it.

26. At the close of the May 22 hearing, the IJ ordered both parties to submit written closing arguments by June 2, 2025, at 5:00 p.m. Central Time.

27. The parties filed their respective closing arguments on June 2, as the IJ ordered. DHS's written closing argument did not dispute any of Mr. Khalil's testimony nor the evidence submitted by him as to the second charge of removal, all of which showed that the § 1227(a)(1)(A) could not stand.  In fact, DHS did not discuss in any way or even mention the § 1227(a)(1)(A) charge of removal, conceding, for all intents and purposes, that the § 1227(a)(1)(A) charge cannot be sustained.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 4th day of June 2025 at San Francisco, California.

Johnny Sinodis
Declarant



Marc Van Der Hout
Johnny Sinodis
Oona Cahill
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco, California 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003

Attorneys for Respondent
Mahmoud KHALIL

**<u>DETAINED</u>**

UNITED STATES DEPARTMENT OF JUSTICE

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

OFFICE OF THE IMMIGRATION JUDGE

JENA, LOUISIANA

| | |
|---|---|
| In the Matter of: | ████████ |
| Mahmoud KHALIL, | Hearing Date: April 11, 2025 |
| Respondent, | Hearing Time: 1:00 p.m. |
| | Before: Hon. Judge Jamee E. Comans |
| In Removal Proceedings. | |

**DOCUMENT LIST FOR MR. KHALIL'S HEARING ON APRIL 11, 2025**

Respondent, Mr. Mahmoud KHALIL, ██████████, through counsel, hereby submits

attached Exhibits A through L. He reserves the right to amend and supplement this documentation

prior to and at his Hearing scheduled for April 11, 2025, at 1:00 p.m.

Dated: April 11, 2025                    Respectfully submitted:

Marc Van Der Hout
Johnny Sinodis
Oona Cahill
Van Der Hout, LLP

Attorneys for Mr. Khalil

Uploaded on 04/11/2025 at 1:05:53 PM (Central Daylight Time) Bates City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 11 of 74
PageID: 3262

Tab                                                                                                           Page

**EVIDENCE REFUTING ALLEGATIONS OF ANTISEMITISM IN THE RUBIO MEMORANDUM**

**A.** "Columbia has pushed an anti-Palestinian narrative, lead student negotiator tells CNN," CNN (Apr. 29, 2024), available at https://www.cnn.com/business/live-news/university-protests-palestine-04-29-24/index.html ...............................................................................................1

*Khalil was also asked what he would say to Jewish students who feel unsafe on campus. "I would say that the liberation of Palestine and the Palestinians and the Jewish people are intertwined. They go hand in hand. Anti-Semitism and any form of racism has no place on campus and in this movement," Khalil said, noting that some members of Columbia's encampment are Jewish and held Passover seders earlier this week, led by Jewish Voices for Peace. "They are an integral part of this movement," Khalil said of the organization.*

**EVIDENCE DEMONSTRATING MR. KHALIL'S PUBLICLY DISCLOSED POSITION AT UNRWA WAS AN INTERNSHIP FOR COURSE CREDIT THROUGH HIS COLUMBIA MASTER'S PROGRAM**

**B.** Letter from UNRWA New York to the Assistant Director, Master of Public Administration in Development Practice (MPA-DP), the School of International and Public Affairs, Columbia University, dated May 17, 2023 ...............................................................................................3

*I am pleased to inform you that SIPA student, Mahmoud Khalil, has been selected for an internship at the Representative Office of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) in New York. We are looking forward to welcome Mahmoud to our team. The internship is unpaid and will have a duration of three months. It is expected to commence on 1 June to 31 August on a full-time basis; Mahmoud will transition to a part-time schedule from 1 September until 30 November to allow for the continuation of his studies.*

**C.** Letter from Associate Director and Adjunct Associate Professor, Master of Public Administration in Development Practice, School of International and Public Affairs, Columbia University, dated April 10, 2025 ...........................................................................5

*I certify that, as part of the MPA-DP [Master of Public Administration in Development Practice] core curriculum, Mahmoud Khalil concluded his 3.0 credit 12-week summer placement, in 2023, at the United Nations Relief and Works Agency (UNRWA). The MPA-DP program trains aspiring practitioners to understand, develop, and implement integrated approaches to sustainable development, emphasizing practical knowledge and skills. The core curriculum, in combination with internships such as this, provide students with a solid background in the theories and methods of development. As a supplement to coursework, skills training through internships equip students with the management, communication, quantitative, and analytical skills needed to work fluidly across disciplines and regions.*

2
Document List

Mahmoud KHALIL, ▓▓▓▓

Uploaded on 04/11/2025 at 10:50:53 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 12 of 74
PageID: 3263

**D.** Printout of Mr. Khalil's LinkedIn profile, demonstrating that his role at UNRWA was publicly disclosed and was listed as an internship ..............................................................7

**E.** Evidence of UNRWA USA's 501(c)(3) status ....................................................12

### EVIDENCE DEMONSTRATING THE SOCIETY FOR INTERNATIONAL DEVELOPMENT WEBSITE SUBMITTED BY DHS IS OUTDATED, ERRONEOUS, AND DOES NOT ESTABLISH THAT HE WORKED FOR THE UK'S SYRIA OFFICE IN BEIRUT BEYOND 2022

**F.** 2020 Annual Conference Social Media Toolkit, Society for International Development, October 7-8, 2020, listing Mr. Khalil as a speaker................................................15

**G.** 2020 Annual Conference Schedule, Society for International Development, listing Mr. Khalil as a speaker on October 7, 2020..............................................................20

### EVIDENCE DEMONSTRATING MR. KHALIL LEFT HIS EMPLOYMENT IN THE BRITISH EMBASSY IN DECEMBER 2022, AS STATED ON HIS FORM I-485

**H.** Mr. Khalil's signed Independent Contractor Agreement with the British Embassy in Beirut, showing his contract with the Embassy ended in December 2022 ......................................25

**I.** Email from ⬛⬛⬛⬛⬛⬛, British Embassy Beirut confirming that Mr. Khalil left his position at the Embassy in December 2022 ......................................................27

### EVIDENCE DEMONSTRATING MR. KHALIL WAS NOT A MEMBER OF COLUMBIA UNIVERSITY APARTHEID DIVEST (CUAD)

**J.** Letter from ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ Professor at Barnard College and Columbia University ..............................................................................................29

*I am a Professor of ⬛⬛⬛⬛ at Barnard College and Columbia University. I spent a lot of time at the encampment in the spring of 2024: I was there to observe and de-escalate the situation. I had many conversations with Mahmoud Khalil, as well as one conversation with members of the Columbia administration involved in the negotiations. I want to emphasize that Mahmoud Khalil's involvement was not as a member of CUAD. As I understood it— and also as is my understanding from the Columbia administrators with whom I spoke—Mr. Khalil served as a negotiator between CUAD and other student protesters, on the one hand, and the Columbia administration, on the other. He was not a member of CUAD, but rather he was nominated as a person who could serve as a go-between between students and the university administration. Mahmoud Khalil's role was to negotiate a peaceful solution between the encampment participants and the Columbia administration, in the hopes of avoiding inviting the New York City police department onto campus a second time.*

**K.** Letter from ████████████ University Senator, representing the ████████ at Columbia University, 2023-2024 academic year, ████████████████████ and member of the Senate Executive Committee ...............................................................31

*The main point of this letter is to define what Mahmoud's role was as it relates to CUAD. Everything in this letter is from my personal experience and perspective of the 2023-2024 academic year. While I cannot speak for anyone else, any group, or any institution, I believe that my understandings of the situations and relationships that I discuss in this letter are opinions that are shared widely by most who know Mahmoud and anyone who interacted with him in the context of the student movement for Palestine at Columbia.*

*Mahmoud Khalil was not a member or a leader of CUAD. He was known by many, including myself, as a compassionate, diplomatic, intelligent, and passionate Palestinian student who advocated for his people and for the basic right to freedom of speech and protest. That is why protestors in the Columbia Encampment (also known as the Gaza Solidarity Encampment) asked Mahmoud to negotiate with the University on their behalf, and why he agreed to represent them at the negotiating table. I know this from my role as part of the University Senate delegation that mediated and observed the negotiations. Any allegation that Mahmoud was a member of CUAD is unequivocally false and has no basis in fact.*

**EVIDENCE THAT MR. KHALIL'S LOBBY, WHERE HE WAS ARRESTED BY ICE OFFICERS ON MARCH 8, 2025, WAS CLOSED TO THE PUBLIC AND THEREFORE OFFICERS COULD NOT ENTER WITHOUT A JUDICIAL WARRANT, WHICH THEY DID NOT HAVE**

**A. Photos of signs at the entrance to Mr. Khalil's lobby** ......................................................36

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JFA
Case 2:25-cv-01963-MEF-MAH     Document 284-3     Filed 06/05/25     Page 14 of 74
PageID: 3265

**CERTIFICATE OF SERVICE**

On April 10, 2025, I, Johnny Sinodis, caused the enclosed document to be served on the U.S. Department of Homeland Security via the EOIR Courts and Appeals System (ECAS). This document was electronically filed through ECAS and both parties are participating in ECAS. Therefore, there is no separate service completed.

Executed this 10th day of April 2025.

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JAN
Case 2:25-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 15 of 74
PageID: 3266

# TAB A

EOIR — 7 of 44

# Columbia has pushed an anti-Palestinian narrative, lead student negotiator tells CNN

From CNN's Samantha Delouya



Mahmoud Khalil speaks with CNN on Monday, April 29.   CNN

In a conversation with CNN's Wolf Blitzer, Columbia student lead negotiator Mahmoud Khalil, discussed what he called an "anti-Palestinian narrative" at the school amid pro-Palestinian protests.

> "Over the past six months, these students, they have witnessed the killing of over 34,000 Palestinians in Gaza and despite all of this, the institution, Columbia at least, has only pushed one narrative — an anti-Palestinian narrative on campus," Khalil said. "They feel that they are alienated. They feel that the university is very biased against them," he said of the protesters.

Khalil was also asked what he would say to Jewish students who feel unsafe on campus.

> "I would say that the liberation of Palestine and the Palestinians and the Jewish people are intertwined. They go hand in hand. Anti-Semitism and any form of racism has no place on campus and in this movement," Khalil said, noting that some members of Columbia's encampment are Jewish and held Passover seders earlier this week, led by Jewish Voices for Peace.
> "They are an integral part of this movement," Khalil said of the organization.



Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEF-MAH   Document 284-3: J#A   Filed 06/05/25   Page 17 of 74
PageID: 3268

# TAB B

Uploaded on 06/04/2025 at 10:50:53 PM (Central Daylight Time) By: JN



representative office
new york

one un plaza
room 1265
united nations
new york, n.y. 10017
usa

t +1 212 963 2255

www.unrwa.org

New York, 17 May 2023

Dear Ms. █████

I am pleased to inform you that SIPA student, Mahmoud Khalil, has been selected for an internship position at the Representative Office of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) in New York. We are looking forward to welcome Mahmoud to our team.

The internship position is unpaid and will have a duration of three months. It is expected to commence on 1 June to 31 August on a full-time basis; Mahmoud will transition to a part-time schedule from 1 September until 30 November to allow for the continuation of his studies.

The internship at the UNRWA Representative Office in New York provides a valuable opportunity to familiarize interns with the UN system and with substantive humanitarian, development and political issues. Mahmoud will be responsible for assisting with the smooth functioning of the Office, including:

- Attend meetings, briefings and other events at the UN related to the situation of Palestine refugees, including the monthly Security Council briefings on the Question of Palestine;
- Write reports of meetings; prepare a variety of documents, including letters, concept notes and talking points;
- Prepare monthly newsletters;
- Track international media and social media coverage of issues related to Palestine refugees and UNRWA;
- Assist in the preparation of UNRWA events and visits to New York by senior UNRWA officials;
- Assist with the effective administrative management of UNRWA's Representative Office in New York.

Should you require any further information please do not hesitate to contact us.



Director

████████████

Assistant Director, Master's of Public Administration in Development Practice (MPA-DP)
The School of International and Public Affairs, Columbia University

**JA 1135**

**4**

# TAB C

Uploaded on 04/11/2025 at 12:50:53 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 20 of 74
PageID: 3271

COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK

SCHOOL OF INTERNATIONAL AND PUBLIC AFFAIRS

New York City, April 10, 2025

TO WHOM IT MAY CONCERN

This is to certify that Mahmoud Khalil successfully concluded an internship for 1.5 credit as part of his Master of Public Administration in Development Practice (MPA-DP) degree, at The Permanent Mission of the State of Palestine to the United Nations, during the spring semester of 2024.

Furthermore, I certify that, as part of the MPA-DP core curriculum, Mahmoud Khalil concluded his 3.0 credit 12-week summer placement, in 2023, at the United Nations Relief and Works Agency (UNRWA).

The MPA-DP program trains aspiring practitioners to understand, develop, and implement integrated approaches to sustainable development, emphasizing practical knowledge and skills.

The core curriculum, in combination with internships such as this, provide students with a solid background in the theories and methods of development. As a supplement to coursework, skills training through internships equip students with the management, communication, quantitative, and analytical skills needed to work fluidly across disciplines and regions.

Yours sincerely,

██████████████

Associate Director and Adjunct Associate Professor
Master of Public Administration in Development Practice
School of International and Public Affairs
*Columbia University*

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEL-MAH   Document 284-3:   Filed 06/05/25   Page 21 of 74
PageID: 3272

# TAB D

Uploaded on 04/11/2025 at 12:50:53 PM (Central Daylight Time) Base City: JFN
Case 2:23-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 22 of 74
PageID: 3273
(41) Mahmoud K. | LinkedIn                                                                4/10/25, 9:59 AM

 

      

Home    My Network    Jobs    Messaging    Notifications    Me    For Business    Retry Premium



## Mahmoud K. · 3rd

**MPA Candidate at SIPA | Columbia**

 Columbia | SIPA

New York, New York, United States · **Contact info**

500+ connections

[ Message ]    [ **+ Follow** ]    [ More ]

## Activity
887 followers

**Mahmoud hasn't posted yet**
Recent posts Mahmoud shares will be displayed here.

Show all activity →

## Experience


**Political Affairs Officer**
UNRWA · Internship
Jun 2023 - Nov 2023 · 6 mos
New York, United States

Main tasks included covering issues related to UNRWA at the Security
Council and General Assembly.


**Foreign, Commonwealth and Development Office**
Full-time · 4 yrs 7 mos

**Programme Manager - Conflict, Stability & Security Fund**
Sep 2022 - Dec 2022 · 4 mos

Managed UK-funded projects with a focus on accountability, justice, and
gender equality in Syria.

**Programme Manager - Political Officer**
Jun 2018 - Aug 2022 · 4 yrs 3 mos
Beirut District, Lebanon · On-site

Managed the prestigious Chevening Scholarship Program and reported
on the situation in Syria.

Uploaded on 04/11/2025 at 12:50:53 PM (Central Daylight Time) Base City: JFK
Case 2:23-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 23 of 74
PageID: 3274
(41) Mahmoud K. | LinkedIn
4/10/25, 9:59 AM



**Finance and Operations Manager / Lebanon Scholarship Program Lead**
Jusoor
Jun 2013 - Jun 2018 · 5 yrs 1 mo
Lebanon

Oversaw the finance and operations of a growing program, which expanded to serve 4,000 students across 3 centers and employ 45 staff



**Field Officer**
Najda Now International
Jan 2013 - May 2013 · 5 mos
Lebanon

## Education



**Columbia | SIPA**
Master of Public Administration - MPA
Jan 2023 - Dec 2024

**Lebanese American University**
Bachelor's Degree, Computer Science
2015 - 2018

Show all 3 educations →

## Volunteering



**Social Media Coordinator**
Jusoor
Jan 2014 - Jul 2016 · 2 yrs 7 mos
Education



**Youth Advisory Group Member**
Global Partnership for Education
Jun 2017 - Jan 2019 · 1 yr 8 mos
Education

Part of GPE's Youth Advisory Group advocating for access to quality education for out of school children.

## Skills

### NGOs

 12 endorsements

### Teamwork

Endorsed by ▊▊▊▊ who is highly skilled at this

Endorsed by 2 colleagues at Jusoor

9 endorsements

Show all 30 skills →

## Courses

**Project Management**

 Associated with Jusoor

**Relief Rapid Assessment Methodology**

 Associated with Najda Now International

Show all 4 courses →

## Languages

**Arabic**
Native or bilingual proficiency

**English**
Full professional proficiency

## Interests

**Companies**   Groups   Newsletters   Schools

**United Nations**
5,839,262 followers
✓ Following

**Columbia Business School**
231,844 followers
+ Follow

Show all companies →

## Causes

Disaster and Humanitarian Relief · Economic Empowerment · Education · Human Rights · Politics · Poverty Alleviation · Science and Technology

**More profiles for you**

 Badar Khan Suri · 3rd
Ph.D. in Peace & Conflict Studies
Message

Uploaded on 04/11/2025 at 12:50:53 PM (Central Daylight Time) Base City: JFK    Page 25 of 74
(41) Mahmoud K. | LinkedIn
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 25 of 74
PageID: 3276
4/10/25, 9:59 AM



**Laya Mosto** · 3rd
Advocacy and Policy Officer, MPA in Development Practice

Message



**Asmaa AbuMezied** · 3rd
Gender and Economic Justice Advisor | Development Consulting |
Program Design and Management | LSE | Columbia University SIPA MPA-

+ Follow



**Paras Abbasi** · 3rd
MPA | Climate finance and climate justice | Gender justice | Sustainable
development and financial inclusion | Human rights and advocacy

Message



**Amy Greer** · 3rd
Partner K&L Gates White Collar Defense and Investigations | Securities &
Financial Regulatory Enforcement | Corporate Governance & ESG |

Message

Show all

**People you may know**
From Mahmoud's school

**Nishat "Bella" T.**
Assistant Commissioner, DYFJ | CUP NY Fellow 2023

Connect



**Stephanie McGregor**
Retired Assistant Director Career Planning at City University of New York
School of Law

Connect



**Darren Rosenblum**
Professor, McGill Law Faculty

Connect



**Scott Roehm**
Director of Global Policy and Advocacy at The Center for Victims of
Torture

Connect



**Zainab Tahir**
Master's Candidate - Columbia University School of International and
Public Affairs

Connect

Show all

Case 2:25-cv-01963-MEF-MAH    Document 284-5    Filed 06/05/25    Page 26 of 74
PageID: 3277

# TAB E

Uploaded on 04/11/2025 at 12:57:63 PM (Central Daylight Time), Base City, UN.
4/11/25, 10:33 AM · Tax Exempt Organization Search Details | Internal Revenue Service · Page 27 of 74
Case 2:23-cv-61963-MEF-MAH Document 25-3 Filed 06/05/25 Page 27 of 74
PageID: 3278

# Unrwa USA National Committee Inc.

EIN: 20-2714426 | Washington, District of Columbia, United States

## Other Names

UNRWA USA NATIONAL COMMITTEE INC

## Publication 78 Data

Organizations eligible to receive tax-deductible charitable contributions. Users may rely on this list in determining deductibility of their contributions.

**On Publication 78 Data List:** Yes

**Deductibility Code:** PC ⓘ

## Copies of Returns (990, 990-EZ, 990-PF, 990-T)

Electronic copies (images) of Forms 990, 990-EZ, 990-PF or 990-T returns filed with the IRS by charities and non-profits.

⌄ **Tax Year 2021 Form 990**

⌄ **Tax Year 2020 Form 990**

⌄ **Tax Year 2019 Form 990**

⌄ **Tax Year 2018 Form 990**

⌄ **Tax Year 2017 Form 990**

⌄ **Tax Year 2016 Form 990**

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JFN
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 29 of 74
PageID: 3280

# TAB F

# Society for International Development
## Washington Chapter

## 2020 Annual Conference Social Media Toolkit

**Date:** October 7-8, 2020

**About:** Join us on October 7 and 8 for **SID-Washington's first-ever virtual conference**! While we will miss gathering in person, we are super excited about moving our annual conference online. Join hundreds of other international development professionals to discuss and debate ideas, trends, and challenges facing our sector today.  Focusing on our theme of **The Decade to Deliver**, we will examine what we need to do as a community to meet the Sustainable Development Goals by 2030.

Just like our in-person conference, we will have keynote addresses, plenaries, breakout sessions, and more. We will also have workshops, networking opportunities, and, of course, our ever-popular exhibit hall. And, unconstrained by physical space, we expect speakers and attendees from all over the globe. With our focus on networking, we will have innovative ways for you to interact with your peers from all sectors of development, including NGOs, contractors, the private sector, consulting firms, government agencies, universities, small businesses, large corporations, donors, and anyone else engaged in the important work of international development.

## Join the Conversation

Twitter: @sidwashington

Hashtags:
- #SIDWConference
- #SIDWOnline
- #globaldev
- #VirtualConference
- #HappeningNow

Website: https://www.sidwconference.org

LinkedIn: Society for International Development, Washington Chapter

Facebook: Society for International Development, Washington Chapter

Instagram: @sidwash

**Please use these social media platforms to spread the word to everyone in the development community about the Annual Conference!**

## Sample Tweets

Conference-Related

- Looking forward to speaking at the first-ever @SIDWashington #VirtualConference this week! Join me at the #SIDWConference for a full day of discussion about #globaldev issues, achieving SDG goals by 2030, and more! Register now: https://www.sidwconference.org

- Join me tomorrow at [time] to discuss [topic] at the 2020 #SIDWConference. Thank you for having me @SIDWashington https://www.sidwconference.org/

- #HappeningNow: The 2020 #SIDWConference is underway. I'll be speaking about [topic] and look forward to an engaging #SIDWOnline experience full of discussion, debate & networking with people engaged in #globaldev! https://www.sidwconference.org

## Sample LinkedIn Posts

- It is almost time for 2020 #SIDWConference! On October 7-8, I am excited to join other #GlobalDev professionals at the first-ever Virtual Society for International Development, Washington Chapter (SID-W) Conference! I'll be speaking about [topic] and I hope to see you there: https://www.sidwconference.org/

## Sample Facebook Posts

- Delighted to be able to talk about [topic] at the first ever virtual #SIDWConference. Registration is still open and you can be part of the conversation: www.sidwconference.org

## Annual Conference Speaker Twitter Handles and/or Organization:

**Day 1**

Opening Plenary

- Fireside Chat with USAID Deputy Administrator Bonnie Glick
    - Keynote Speaker: Bonnie Glick - @USAIDBGlick, @USAID
    - Moderator: Wade Warren - @Deloitte, @DeloitteGov

AM Panels

- Panel 1 (People) - Building our Talent Pipeline for Diversity, Equity, and Inclusion
    - Moderator: Yvette Burton - @ycburtonphd, @NYUniversity
    - Tonija Hope - @HowardU
    - Carmen Mezzera - @apsiainfo
    - Uzra Zeya - @UzraZeya, @AfPeacebuilding
- Panel 2 (Planet) - Realizing the Circular Economy Advantage
    - Moderator: Wesley Spindler - @wesleyspindler, @AccentureStrat
    - Jon Angin - @TetraTechIntDev
    - Elissa Foster - @Pantagonia
    - David Stover - @BureoInc
- Panel 3 (Prosperity) - Delivering Economic Growth and Trade Support in the "New Normal"
    - Moderator: Masood Ahmed - @MasoodCGD, @CGDev
    - Jennifer Adams - @USAIDMozambique
    - Anabel Gonzalez - @_AnabelG, @PIIE
    - Vasken Khabayan - @VKhabayan, @GAC_Corporate
    - Gail Warrander - @GWarrander, @FCDOGovUK
- Panel 4 (Learning Lab) - How Effective Partnerships are Addressing the SDGs
    - Facilitator: Joeanne Sonenshine - @jsonenshine, @conn_impact

Lunch Plenary

- Next Generation of Leaders and SDGs: Linking Local and Global for Systemic Change
    - Moderator: Jeffrey Caesar
    - Mahmoud Khalil - @FCDOGovUK
    - Claire Sullivan - @univofdayton
    - Soazic Elise Wang Sonne - @WorldBank

PM Panels

- Panel 1 (People) - Focusing on Women and Girls in COVID Response and Recovery
    - Moderator: Caren Grown - @CarenGrown, @WorldBank
    - Gary Barker – @Promundo_US
    - Patricia Greene
    - Dr. Valerie Hudson - @BushSchool
- Panel 2 (Planet) - Environmental Implication of Infectious Diseases
    - Moderator: John Parker - @TetraTechIntDev
    - Hellen Amuguni - @tuftsvet
    - Patricia Bright - @USAID
    - Sabri Zain - @TRAFFIC_WLTrade
- Panel 3 (Prosperity) - Local Leadership for Sustainable Urban Development
    - Moderator: Tony Pipa - @anthonypipa, @BrookingsGlobal
    - Yvonne Aki-Sawyerr - @yakisawyerr
    - Mauricio Rodas - @MauricioRodasEC

- Panel 4 (Learning) - Disrupting Racism through Communications
    - Facilitator: Jelena Hasbrouck - @Jelenyo
    - Chizi Igwe - @DalbergTweet

**Day 2**

Opening Plenary

- Sean Cairncross - @MCC_CEO, @MCCGov
- Gloria Steele - @USAID

AM Panels

- Panel 1 (People) - Strategies and Tools for Addressing Inequalities
    - Moderator: Carla Koppell - @CarlaKoppell, @GeorgetownU
    - Lucie Amadou - @counterpartint
    - Maitreyi Bordia Das – @DasMaitreyi, @WorldBank
    - Rosarie Tucci - @USIP
- Panel 2 (Reimagining Development) - Reimagining Development
    - Moderator: Roger Ford - @FRogerFord, @Accenture
    - Nicole Barnes - @RTI_INTL_DEV
    - Julie Becker - @Chemonics
    - Jeremy Kanthor - @DAIGlobal
    - Thomas Reilly - @TetraTechIntDev
    - Erin Uggen - @Nathan_Inc
- Panel 3 (Innovation Showcase Q&A)

- o   Moderator: Nick Martin - @ncmart
- Panel 4 (Learning Lab)
  - o   Bobby Jefferson - @DAIGlobal
  - o   Jon Walton

PM Panels

- Panel 1 (USAID's Digital Strategy and the Decade to Deliver)
  - o   Moderator: Manisha Aryal - @Chemonics
  - o   Krista Baptista - @DAIGlobal
  - o   Craig Jolley - @JolleyWithAnE, @USAID
  - o   Michelle Parker - @USAID
- Panel 2 (Reimagining Development)
  - o   Moderator: Wade Warren, @Deloitte
  - o   Graham Couturier - @EqualAccessIntl
  - o   Bob Fries - @acdivoca
  - o   Olivier Girard - @1977Creative
  - o   Michele Laird - @Michele_Laird, @abtassociates
- Panel 3 (Food Security)
  - o   Moderator: Sylvia Megret - @SylviaMegret, @acdivoca
  - o   Mark Castellino – @CastellinoMark, @OpportunityIntl
  - o   Jocelyn Brown Hall - @ JocelynB_FAO, @FAO
  - o   Tracy Mitchell - @RTI_INTL_DEV (Doesn't have her own account)
  - o   Lori Groves Rowley - @LGRowley1
- Panel 4 (Learning Lab)
  - o   Tosca Bruno-van Vijfeijken - @Tosca5Oaks

Closing Plenary

- Moderator: George Ingram - @BrookingsInst
- Sarah Mendelson - @SarahMendelson, @CarnegieMellon
- Shaun Mickus - @JNJGlobalHealth
- Eric Reading - @eric_reading, @AbtAssociates
- Tessie San Martin - @Tessie_Plan, @PlanUSA

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 34 of 74
PageID: 3285

# TAB G

Uploaded on 04/11/2025 at 1:05:03 PM (Central Daylight Time). Base City: JFA.

# Day 1

**Wednesday, October 7, 2020**
**10:00 AM - 3:00 PM (Eastern Time)**

Please note that the schedule is subject to change.

**10:00 - 10:55 AM (ET)**

**Fireside Chat with USAID Deputy Administrator Bonnie Glick**

To kick off our first ever Virtual Annual Conference, USAID Deputy Administrator Bonnie Glick will join us for a fireside chat with SID-Washington incoming Board Chair Wade Warren to talk about priorities and challenges in international development during a pandemic and looking ahead to a post-COVID world. Following up on their

discussion at our 2019 Annual Conference, Bonnie and Wade will talk about how things have changed more than any of us could have imagined just a year ago and provide their thoughts on the way forward in unprecedented and challenging times.

**Keynote:**
**Bonnie Glick** - Deputy Administrator, USAID

**Moderator:**
**Wade Warren** - Board Chair, Society for International Development - Washington Chapter, Chief Strategy Officer for International Development, Deloitte Consulting and former Acting Administrator, USAID

**11:00 - 11:55 AM (ET)**

- Track 1: People

- Track 2: Planet

- Track 3: Prosperity

- Track 4: Learning Lab

- Other Features

<

>

**Building our Talent Pipeline for Diversity, Equity and Inclusion**

A diverse workforce and an inclusive climate are essential for ensuring organizations that thrive and deliver globally. This panel will discuss how to enable a diverse, healthy workforce for our field and within our organizations – why it's essential and how to cultivate and nurture talent.

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time). Base City: JFK.

Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 36 of 74
PageID: 3287

**Moderator:**
**Yvette Burton** - Lead Faculty and Architect, Inclusion By Design Business Certification Program, New York University

**Speakers:**
**Tonija Hope** - Director, Ralph J. Bunche International Affairs Center, Howard University
**Carmen Mezzera** - Executive Director, Association of Professional Schools of International Affairs (APSIA)
**Uzra Zeya** - CEO and President, Alliance for Peacebuilding

**12:00 - 12:25 PM (ET)**

**Networking Lounges**
Want to meet others working on specific topic or issue? Stop by our networking lounge to meet SID-Washington Co-chairs and other attendees. Join a table on a topic that is of interest to you. Feel free to move around to multiple tables during this 25-minute session or stay at one the entire time. It's up to you!

The networking lounge will be open all day for you to informally mingle with others, but will only be facilitated by SID-W Co-Chairs during this 25-minute session.

**Other Ways to Network**

1. Visit the virtual exhibit hall.
2. Participate in the discussion boards and create your own topics for discussion.
3. Chat one-on-one with other attendees.
4. Stop by the networking lounge throughout the day to meet others.

**12:30 - 1:25 PM (ET)**

**Next Generation of Leaders and SDGs: Linking Local and Global for Systemic Change**

To deliver on the SDGs we need leadership at the local and global level. And we need to identify strategies and approaches for community engagement that build lasting results. Our panel of leaders working both globally and locally will explore how we can tap into the potential of new and innovative digital sources of data to track progress towards the SDGs. What are examples of effective strategies for community engagement? And how can artificial intelligence be deployed as a force for good to achieve the SDGs?

**Moderator:**
**Jeffery Caesar** - Campaign Director, 360 Campaign Consulting

**Speakers:**
**Mahmoud Khalil** - Program Manager, UK's Syria Office in Beirut

**Claire Sullivan** - Student Sustainability Leader, University of Dayton
**Soazic Elise Wang Sonne** - Young Professional (Economist), Social Development Global Practice, The World Bank Group

**1:30 - 2:25 PM (ET)**

Uploaded on 04/11/2025 at 12:50:53 PM (Central Daylight Time). Base City: JNA

- Track 1: People

- Track 2: Planet

- Track 3: Prosperity

- Track 4: Learning Lab

- Other Features

<

>

## Focusing on Women and Girls in COVID Response and Recovery

Women and girls are being disproportionately affected economically and socially by COVID-19, and they risk losing ground in the recovery. They are the majority of frontline workers in the response and  they are losing jobs and income disproportionately, even as they assume the larger share of paid and unpaid care responsibilities, and face skyrocketing rate of gender-based violence. This panel will discuss the impact of COVID on efforts to foster gender equality and strategies for preventing long-term backsliding of efforts for equality.

**Moderator:**
**Caren Grown** - Global Director, Gender, The World Bank

**Speakers:**
**Gary Barker** - CEO and Founder, Promundo
**Patricia Greene** - Former Director, Women's Bureau, U.S. Department of Labor
**Valerie Hudson** - University Distinguished Professor, Bush School of Government and Public Service, Texas A&M University

**2:30 - 3:30 PM (ET)**

**Fireside Chat with Andrew Herscowitz, Chief Development Officer, DFC**

**Keynote:**
**Andrew Herscowitz** - Chief Development Officer, U.S. International Development Finance Corporation

**Moderator:**
**Robert Mosbacher, Jr.** - Board Chair, Mosbacher Energy Company and Former President and CEO, Overseas Private Investment Corporation

**Keynote Address: David Miliband, International Rescue Committee**

We will end our first day with a keynote address by International Rescue Committee (IRC) President and CEO David Miliband. David is leading IRC through extraordinarily difficult times and will comment on the challenges facing all of us and how he and IRC are navigating them.

Exh. 13 - Adm.                                                    JA 1154                                          **23**

EOIR — 29 of 44

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time). Base City: JFK

Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 38 of 74
PageID: 3289

**Keynote:**
**David Miliband** - President and CEO, International Rescue Committee (IRC)

EOIR — 30 of 44

Exh. 13 – Adm.

**JA 1155**

**24**

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 39 of 74
PageID: 3290

# TAB H

Uploaded on 04/11/2025 at 10:55:53 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 40 of 74
PageID: 3291

British Embassy
Beirut

01 November 2022

<u>Private and Confidential</u>

**Mahmoud Khalil
British Embassy Beirut**

Dear Mahmoud,

**Re: Extension of Fixed Term Contract**

As you are aware your Independent Contractor Agreement as CSSF Syria Projects Manager at the British Embassy Beirut will end on 20 November 2022.

I am writing to confirm the extension of your Independent Contractor Agreement until 20th December 2022.

The terms and conditions of your employment will remain the same as per your original agreement.

Please confirm your acceptance by signing the acknowledgement receipt below and return it to the Human Resource Department, Corporate Services.

May I take this opportunity to thank you for your valued contribution to British Embassy Beirut.

Yours sincerely,

**Head of Corporate Service**

I hereby acknowledge receipt of the letter of appointment setting out the conditions for locally engaged staff at the British Embassy in Beirut. Having read and fully understood them, I agree to accept them as the conditions governing my employment at the British Embassy, Beirut.

Signed _Mahmoud Khalil_

Name in full _Mahmoud Khalil_

Date _12/11/2022_

# TAB I

OFFICIAL

To whom it may concern

I can confirm that Mahmoud Khalil ended his contract at the British Embassy Beirut in December 2022 in order to take up a scholarship at Columbia University. Mahmoud has not worked for the Embassy since, albeit he was an excellent and respected member of staff during his time here and also a worthy recipient of a scholarship.

Regards

█████████

British Embassy Beirut
+961 81 512 80

Follow us online: www.gov.uk/fcdo

This email is intended for the addressee(s) only: All messages sent and received by the Foreign, Commonwealth & Development Office may be monitored in line with relevant UK legislation

OFFICIAL

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JFK
Case 2:23-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 43 of 74
PageID: 3294

# TAB J

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 44 of 74
PageID: 3295

April 10, 2025

Executive Office for Immigration Review
Immigration Court
830 Pinehill Road
Jena, LA 71342

Dear Sir/Madam,

I am a Professor of ███████████ at Barnard College and Columbia University. I spent a lot of time at the encampment in the spring of 2024: I was there to observe and de-escalate the situation. I had many conversations with Mahmoud Khalil, as well as one conversation with members of the Columbia administration involved in the negotiations. I want to emphasize that Mahmoud Khalil's involvement *was not as a member of CUAD*. As I understood it—and also as is my understanding from the Columbia administrators with whom I spoke—Mr. Khalil served as a negotiator between CUAD and other student protesters, on the one hand, and the Columbia administration, on the other. He was not a member of CUAD, but rather he was nominated as a person who could serve as a go-between between students and the university administration. Mahmoud Khalil's role was to negotiate a peaceful solution between the encampment participants and the Columbia administration, in the hopes of avoiding inviting the New York City police department onto campus a second time.

Best,



Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 45 of 74
PageID: 3296

# TAB K

April 10, 2025
TO: Executive Office for Immigration Review
Immigration Court
830 Pinehill Rd
Jena, LA 71342

To the Executive Office for Immigration Review,

I am writing to you today in defense of Mahmoud Khalil. My name is ████████████, and I am a graduate of Columbia ████████████, 2024). Before graduating in May 2024, I served as a University Senator, representing the ████████████ at Columbia University. In the 2023-2024 academic year, I was serving as a ████████████, and by virtue of that role I was a member of the Senate Executive Committee. It is through my work as a student leader within the University Senate (particularly in the context of the pro-Palestine protests and the ensuing injustices and controversies at Columbia) that I met, befriended, and interacted with Mahmoud. It is through that same work that I have firsthand knowledge of his relationship to Columbia University Apartheid Divest (CUAD).

The main point of this letter is to define what Mahmoud's role was as it relates to CUAD. Everything in this letter is from my personal experience and perspective of the 2023-2024 academic year. While I cannot speak for anyone else, any group, or any institution, I believe that my understandings of the situations and relationships that I discuss in this letter are opinions that are shared widely by most who know Mahmoud and anyone who interacted with him in the context of the student movement for Palestine at Columbia.

Mahmoud Khalil was not a member or a leader of CUAD. He was known by many, including myself, as a compassionate, diplomatic, intelligent, and passionate Palestinian student who advocated for his people and for the basic right to freedom of speech and protest. That is why protestors in the Columbia Encampment (also known as the Gaza Solidarity Encampment) asked Mahmoud to negotiate with the University on their behalf, and why he agreed to represent them at the negotiating table. I know this from my role as part of the University Senate delegation that mediated and observed the negotiations. Any allegation that Mahmoud was a member of CUAD is unequivocally false and has no basis in fact.

There were many parties involved with the Encampments on all sides, so here is a breakdown of the relevant groups:
1. Columbia Encampment (or the Encampment) - a non monolithic group of protestors who set up camp on the Columbia University lawn to demand, among other things, disclosure and divestment from companies involved in the oppression and killing of Palestinians. This included both members of CUAD and allies who were Columbia students not affiliated with CUAD.
2. Encampment Negotiators - There were two students who represented the Encampment in negotiations with the University. One of them was Mahmoud Khalil, and the other was ████████████.

3. University Senate delegation - a group of University Senators, some witnessing the negotiations as neutral observers, and others serving as neutral mediators to help both sides come to an agreement. We were asked to take on this role by the Encampment Negotiators, who wanted a trusted, neutral body to ensure that the University administration dealt with them in good faith. This format for the negotiations was agreed to by the University.
4. University Negotiators - members of the University administration who represented the University in the negotiations and reported to senior University leadership
5. University (or University Administration) - the senior University leadership who made the ultimate decisions when it came to the negotiations. This included the President of the Columbia, the Board of Trustees, and whoever else they decided to include in their decision-making process

During this time, I spent many hours, sometimes almost the entire day, in the negotiating room with Mahmoud and the others. Not a single negotiating session would pass without Mahmoud stating that he is not a member of CUAD and that he does not have the power to tell the Encampment what to do. This was not some negotiating tactic. When I was not in the negotiating room, I observed what happened in the Encampment and how they made decisions. The Encampment Negotiators, including Mahmoud, would come down and provide the latest update to a committee of members in the Encampment, which included some CUAD members. This committee would then discuss the updates and then share them with the entire Encampment during an "assembly" meeting. There were times when they just had Mahmoud and/or ████ share the updates directly at assembly. If there was a decision to be made (for example, to accept or decline a given deal), that would be voted on at assembly by everyone in the Encampment, which included both CUAD and non-CUAD members. There would be individuals who spoke up in favor of or against particular actions or decisions, meaning there was an opportunity to discuss or debate at assembly as well. The Encampment Negotiators would then take this decision back into the negotiating room during the next session to continue in trying to reach an agreement. So, in the entire process, Mahmoud was fully faithful in representing the demands of the Encampment in the negotiations, and held no position to make decisions. He was, in a sense, a messenger and an ambassador, and he would constantly ensure that everyone in the negotiating room understood the limitations of his influence in the process as a non-CUAD member, particularly because he respected the democratic decision-making of the Encampment.

This should be enough to explain that Mahmoud was not a member of CUAD, and was simply negotiating on behalf of the Encampment (which included CUAD and non-CUAD protestors); he would constantly repeat this fact, and all of his interactions with CUAD and the Encampment were aligned with this reality. But, I want to also back up a bit and share another interaction with Mahmoud that gives more context and evidence for him not being a member of CUAD.

My first real interaction with Mahmoud was in February 2024, when he and a handful of other Palestinian students at Columbia, across different schools, came to my apartment to meet with me and some other University Senators. The University administration had just announced an

Interim University Policy for Safe Demonstrations, which the Senate Executive Committee had consulted on in an attempt to ensure that the admin did not repeat their past transgressions of limiting the free speech rights of protesting students. While the University Senate did not agree with this new policy (it was never voted on by the full University Senate), it was a fairer and less restrictive framework for managing demonstrations when compared to how the University was previously operating. Because of this, a few of us University Senators wanted to meet with CUAD leadership to explain the new policy, come to an agreement on abiding by it, and hopefully open an ongoing dialogue that would help inform further reforms to University policies. (It is important to note that CUAD does not have a formal leadership structure, though we did not know about how they operated when initiating the meeting). Instead of meeting with us, the CUAD members who we were in contact with suggested that we meet with a delegation of Palestinian students and hear directly from them about their personal experiences trying to advocate for their people. We believed that taking that meeting was important to ensure that our constituents were heard (Palestinians students and their allies were rarely ever afforded the common courtesy of being able to share their stories with University leadership), to inform our decision-making with the needs of some of our most vulnerable community members, to build trust, and to eventually get around to meeting with CUAD and opening that dialogue. The Palestinian students did not feel comfortable or safe meeting with us without masks on campus, and this was of course understandable given the persecution and doxxing that they and their allies had already faced thus far. So, I offered my apartment as a more neutral meeting space.

Mahmoud introduced himself to me and my colleagues as folks started trickling into the apartment, and I recognized him from other events around campus. I did not know he was Palestinian until then. I kicked off our meeting and Mahmoud acted as a sort of facilitator for their side. When introducing everyone, he made a few things clear: 1) they were not here representing CUAD, 2) some of them may be involved with CUAD in various capacities, but not all of them are, and 3) he was not affiliated with CUAD. As the meeting went on, it became clear to me that Mahmoud was a trusted member of the Palestinian student community, and it became clear why - he was empathetic, knowledgeable, wise, diplomatic, and steadfast. He did not need to be a member of CUAD or the leader of a student org to advocate for his people; he just needed to be who he is and stay engaged where he can make the most impact.

From that first interaction, I knew that Mahmoud was neither a leader nor a member of CUAD. But, because of that same first meeting, I knew that he would always do what he could, in his personal capacity, to support his community and stand up for what is right. So when, a few months later, I walked into a room where negotiations between the University and the Encampment were to take place, I was not surprised to see him sitting there, representing the protestors in the Encampment. They could not have asked a better person to speak on their behalf, and indeed, the University could not have asked for a better negotiating partner; not because he would agree to their unserious demands, but because Mahmoud was composed and honorable. He would (and did) deal with the University with equitability and honesty. It is a shame that the rest of that chapter ended so disgracefully.

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA

To sum up this letter for support, I, in my capacity as a student leader within the University Senate, met with and worked directly with Mahmoud Khalil to help better represent and meet the needs of the University student body and various other stakeholders. Through all of my interactions with Mahmoud in that capacity, it was clear to me that Mahmoud was not a member of CUAD. Any allegation to the contrary is baseless.

I hope you will consider these facts as you make this decision. Thank you.

Sincerely,

Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time) Base City: JNA
Case 2:23-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 50 of 74
PageID: 3301

# TAB L





Uploaded on 04/11/2025 at 12:57:53 PM (Central Daylight Time), Base City: JFK

Case 2:25-cv-03053-MEF-MAH    Document 284-3    Filed 06/05/25    Page 52 of 74    PageID: 3303

CONTACT PUBLIC SAFETY AT (212) 854-5555

♔ COLUMBIA RESIDENTIAL

**For Safety's Sake,**
<span style="color:red">**Don't hold the door for anyone you don't know.**</span>

**This may seem impolite, but your fellow residents will understand.**

**This is a matter of Safety— Yours and Your Neighbors'.**



# EXHIBIT 2

**JA 1170**

Uploaded on 04/23/2025 at 10:19:18 RM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 54 of 74
PageID: 3305

Marc Van Der Hout                                          **<u>DETAINED</u>**
Johnny Sinodis
Oona Cahill
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco, California 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003

Attorneys for Respondent
Mahmoud KHALIL

UNITED STATES DEPARTMENT OF JUSTICE

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

OFFICE OF THE IMMIGRATION JUDGE

JENA, LOUISIANA

In the Matter of:

Mahmoud KHALIL,                         Hearing Date: N/A
                                        Hearing Time: N/A
Respondent,                             Before: Hon. Judge Jamee E. Comans

In Removal Proceedings.

**ADDITIONAL EVIDENCE AND DOCUMENT LIST FOR MR. KHALIL REFUTING
THE CHARGES AGAINST HIM IN THE NOTICE TO APPEAR AND FORM I-261**

On April 23, 2025, I, Johnny Sinodis, caused the enclosed document to be served on the U.S. Department of Homeland Security via the EOIR Courts and Appeals System (ECAS). This document was electronically filed through ECAS and both parties are participating in ECAS. Therefore, there is no separate service completed.

Executed this 23rd day of April 2025.

We include a separate certificate of service on the final page, as requirements vary by Immigration Courts

Uploaded on 04/23/2025 at 10:19:18 RM (Central Daylight Time) Base City: JFK
Case 2:25-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 55 of 74
PageID: 3306

Respondent, Mr. Mahmoud KHALIL, ███████, through counsel, hereby submits

attached Exhibits A through F in further rebuttal to the charges in the Notice to Appear and the

Form I-261, Additional Charge of Inadmissibility/Deportability.

Dated: April 23, 2025                    Respectfully submitted:

                                         Marc Van Der Hout
                                         Johnny Sinodis
                                         Oona Cahill
                                         Van Der Hout, LLP

                                         Attorneys for Mr. Khalil

Tab                                                                                                    Page

**ADDITIONAL EVIDENCE REFUTING ALLEGATIONS OF ANTISEMITISM IN THE
RUBIO MEMORANDUM AND CLARIFYING MR. KHALIL'S ROLE AS A
NEGOTIATOR ON BEHALF OF ALL STUDENTS**

**A.** Letter from ▮▮▮▮▮ ▮▮▮▮, dated March 19, 2025...............................................................1

*I am writing this letter to you in support of Mahmoud Khalil. My name is ▮▮▮▮▮▮▮ and
I am a U.S. citizen and identify as Jewish. I graduated from Columbia University's School of
International and Public Affairs (SIPA) in May 2024 and have known Mahmoud Khalil for
about two years since he started his studies at SIPA in January 2023.*

*I consider Mahmoud a colleague, fellow advocate and profound human being. I regard
Mahmoud as a thoughtful, committed, highly intelligent, curious and pacifistic person. I
developed this understanding of his character through my many interactions with him at
Columbia in classrooms, social outings, and advocacy circles. I have had countless
discussions with him about international affairs, politics and the Israeli-Palestinian conflict.
I can point to several specific examples that highlight Mahmoud commitment to non-violent,
respectful language and building an inclusive pro-Palestinian movement on campus.*

*My first interaction with Mahmoud was in March 2023. Over the prior winter break, I
participated in a trip to the Occupied Palestinian Territories organized by PalTrek National.
As a follow-up to the trip, a discussion was convened with participants of the trip to highlight
our experience. I offered to speak about my experience as a Jewish person who has traveled
to Israel on multiple occasions before this trip. I was honest about my participation in
Birthright International, a fully-funded trip for American Jewish youth to experience Israel.
Birthright has received criticism from anti-Israel groups for its support of resettling American
Jews to Israel, often at the expense of Palestinian families. While some students at SIPA
expressed valid concerns about including my experience over others from the trip, Mahmoud
personally welcomed my inclusion in the panel. Mahmoud saw the importance of including
my voice in this discussion and highlighting the complicated pressures on American Jews.
Mahmoud, starting at SIPA in January, did not participate in the trip and did not know me
beyond my identity as Jewish and previous participant in Birthright. Instead of leaning into
stereotypes or succumbing to the pressures of others, Mahmoud saw me as a human being
with a long and complicated relationship to my religious identity and its connection to the
state of Israel.*

*The next incident I'd like to highlight occurred in October 2023. Following the Hamas-led
terrorist attacks on October 7th and subsequent military response by Israel, the Dean of SIPA,
Keren Yarhi-Milo, asked to meet with some SIPA students to understand the impact of the war
on Palestinian students. Mahmoud was in attendance. Mahmoud began the meeting by asking
Dean Yarhi-Milo, an Israeli citizen, how she, her family and community were doing in light
of the terrorist attack. In asking the question, Mahmoud condemned the violent, hateful act
by Hamas terrorists and expressed grief for the immediate loss of life and continued impact
on the communities. Even Dean Yarhi-Milo appeared touched by the question and expressed*

Uploaded on 04/23/2025 at 10:19:18 RM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 57 of 74
PageID: 3308

*gratitude for his consideration of her experience of this violence as an Israeli woman.*

*From October 2023, tensions on campus elevated. I've watched Mahmoud on several occasions de-escalate tense situations on campus, leading with peace to usher a constructive dialogue rather than inciting aggression that leads to hate speech. I saw Mahmoud, as well as other Arab classmates, confronted and, at times, harassed by other students, asking him if he supported Hamas. Mahmoud would not raise his voice or respond with aggression, but instead simply answer the question by condemning Hamas and all forms of violent extremism. Mahmoud recognized this was a tactic to coerce him to promote hateful or extremist language, but he never wavered in his denouncement of all forms of violent extremism, including the actions of Hamas on October 7th.*

*On October 25th 2023, over 20 students, including myself, were targeted in a doxing campaign by the right-wing media organization, Accuracy in Media. The organization launched an online petition, personal website for each student, and paraded a billboard truck around campus displaying my name and photo under the banner, "Columbia's Leading Antisemite." The false statement was attributed to my position as the President of SIPA's Human Rights Working Group. Mahmoud, not targeted at that time by this doxing campaign, reached out to me personally to check in on my well-being. He recognized that my identity and work experience with Jewish organizations contradicted the claim of antisemitism, and offered his support. He expressed his support not in justification of antisemitism, but as defamatory action to distract from legitimate antisemitism happening on campus, saying to me, "by targeting the Jewish student and ignoring the very real antisemitism happening on campus, [Accuracy in Media] has made it clear their motives are not to protect Jewish people."*

*I can point to additional incidents that occurred in April 2024 during the Solidarity Encampment at Columbia University. During the Encampment, Mahmoud led community-wide discussions on how to ensure the space was free from hate and discrimination. Through this, he helped develop community guidelines for the encampment that indicated any expression of hate speech will not be tolerated. On one occasion, some individuals made remarks that I personally found offensive as a Jewish person. I saw Mahmoud visibly uncomfortable, and instead of berating or verbally attacking the individuals, he approached them calmly to deescalate the situation by saying, "that's not a productive approach. We need to focus on law, not emotion." His priority has always been advocacy through nonviolent means, centering facts, legal arguments, and mutual respect.*

*ICE may attempt to use his participation in the Encampment protest against him, but that would be a complete distortion of reality. Mahmoud has actively included Jewish voices in conversations about Israel-Palestine. In fact, during the first day of Jewish Holy Days of Passover, I asked Mahmoud for his help in hosting a Passover Seder at the Encampment specifically for a non-Jewish audience. Mahmoud was very helpful in connecting me with the leadership of the Encampment and ensuring I had a large, safe space to host the Seder. Not only did he attend the Seder, Mahmoud invited his non-Jewish friends, understanding the importance of including non-Jews in the celebration of this Holy Day. Following the Seder, he commented to me directly, "thank you for hosting and inviting me to this Seder. It was my*

3

Uploaded on 04/23/2025 at 10:19:13 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 58 of 74
PageID: 3309

*first time being invited to a Passover Seder and I am very thankful to have learned more about Judaism." His gratitude and support of this initiative further highlights his understanding of the value of including Jewish voices in typically non-Jewish spaces. In that moment, Mahmoud saw me, not just as a Jew but as a fellow human being equally committed to his message of nonviolence and peace.*

*Additionally, ICE and Federal officials may penalize Mahmoud for his visibility during Columbia's protests because he was selected as a press representative from the student negotiating team. Only specific students were selected for these roles to ensure the peaceful purpose of the protests were expressed calmly and without hatred. I watched him on several occasions be tested by the press with leading questions that sought to charge the conversation with antisemitic or extremist messaging, and Mahmoud maintained his calmness, commitment to promoting peace on campus and sensitivity to hateful or extremist rhetoric. His role as a student negotiator underscores his commitment to finding a peaceful end to the Encampment through dialogue with Columbia's administration.*

*I trust these examples provide insight into Mahmoud's character and context to his participation in nonviolent protests that may be weaponized against him. His commitment to peaceful dialogue, particularly the creation of interfaith spaces, exemplifies what I have personally witnessed: Mahmoud has never engaged in or expressed support for antisemitic nor extremist ideology. He is an incredible advocate, good-faith member of the Columbia Alumni community, and a kind human being.*

**B.** Letter from ▮▮▮▮▮▮▮▮ , dated March 14, 2025 ........................................................5

*I am writing in support of Mahmoud Khalil. My name is ▮▮▮▮▮▮▮▮ and I am an American Jewish woman who believes in the importance of Israel as a Jewish homeland. I have known Mahmoud Khalil for over two years, since January 2023 as his professor, colleague, and friend. I have always known Mahmoud as someone working to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel. He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice (MPA-DP)– trains students on.*

*I have known Mahmoud in my capacity as his Professor at Columbia University for two semesters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and then as his supervisor in his role as a Teaching Assistant for the course ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. In between semesters I also interacted with Mahmoud, due to his role as a Program Assistant for the MPA-DP program which I am affiliated with as a Professor and alumna.*

*I have worked with Mahmoud and directly seen and graded his work. This work has demonstrated a deep and persistent commitment to humanitarian principals and doing work that contributes to peace and stability. Both semesters when he was my student, he focused his semester long project assignments on a non-profit organization (Jusoor, where he also previously worked) providing education services to refugees. I had many conversations with him about how to deepen educational impact and ensure that refugees would have real*

4

Additional Evidence Refutting Charges in NTA and Form I-261
Mahmoud KHALIL, ▮▮▮▮▮▮▮

Uploaded on 04/23/2025 at 10:19:48 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-RME-MAH Document 284-3 Filed 06/05/25 Page 59 of 74
PageID: 3310

*economic opportunities to escape cycles of violence and poverty.*

*When it came time to choose a Teaching Assistant for the Fall 2024 iteration of the course, I sought out Mahmoud to apply to the position. His deep expertise with organizational management with international development organizations, his high standards for quality work, as well as his integrity were all reasons I thought he would make a great TA. He effectively served the class and students throughout the semester even as he navigated both global and campus events that were directly impacting him and his family.*

*I can state with full confidence that Mahmoud has never expressed support for Hamas, nor has he ever endorsed any form of extremism. Over the course of our extensive interactions, I have had numerous conversations with him about human rights, justice, and the student protests and I can personally attest to his commitment to nonviolence.*

*In terms of the campus protests, Mahmoud was my student as these events unfolded and was in the process of being hired as our Teaching Assistant as the encampment was being established. I directly spoke to him about the encampment and Mahmoud emphasised the protesters commitment to peace and non-violence. Mahmoud explained how the student movement was ensuring that Jewish voices were part of conversations and space. He was committed to dialogue and partnership with Jewish voices throughout his time on campus, one example of this was sharing a Jewish Sukkot event with me that he was attending put on by Jewish and Palestinian students on October 16th, 2024.*

*As our TA in Fall 2024 for a course for which Leadership was a key theme, he clearly spoke about the challenges of being seen as a leader of leaderless student movement. Many things have been incorrectly attributed to him in the media.*

*Mahmoud has always worked to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel. He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice – trains students on. Choosing to do this program, which trains students for public sector and public interest work also demonstrates his commitment to these issues. Everything he has ever worked on professionally and academically demonstrates his commitment to humanitarian principals including justice, peace, and development.*

**C.** Letter from ███████████s, dated March 14, 2025 ..................................................................7



*My name is ████████████ and I am writing this letter in support of Mahmoud Khalil. I am currently a junior at Columbia University. I grew up in Forest Hills, Queens, raised by my Jewish mother and my American father. From a young age, I was taught the importance of higher education in shaping a well-rounded individual. My father, ████████████ exemplified this belief—he graduated from Harvard in 1993, becoming the first in our family to attend an Ivy League institution.*

*Judaism has always been central to my identity. I attended Jewish preschool, went to Hebrew school multiple times a week until my Bar Mitzvah in 2017, celebrated Shabbat every Friday,*

Uploaded on 04/23/2025 at 10:19:19 RM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 60 of 74
PageID: 3311

*and was raised with strong Jewish values. I emphasize this not to exaggerate or embellish, but to paint a clear picture of who I am. My Jewish identity is deeply meaningful to me, and in these past 16 months—an incredibly difficult time for the Jewish people—having a strong support system of kind, understanding, and respectful individuals has been more important than ever. Mahmoud is exactly that.*

*From the moment I met Mahmoud 16 months ago, he has been nothing short of a selfless friend and an inspiring mentor. I clearly remember one of our first encounters at a peaceful rally on October 12, 2023. Despite how such events are often misrepresented in the media, this rally was a calm and peaceful demonstration in support of Palestinian rights. Mahmoud took on a protective security role that day, ensuring students were safe from any physical or verbal threats. When people hurled insults and profanities at me and my classmates, Mahmoud was the first to step in and de-escalate the situation. He never raised his voice, never used harsh language, never resorted to aggression—he spoke calmly and respectfully, shielding students, including me, a Jewish student, from harm. He put himself between me and an aggressor, prioritizing my safety over his own. That is not the behavior of an antisemite—that is the behavior of an ally and a friend.*

*In the weeks that followed, I spent many late nights with Mahmoud at friends' apartments, getting to know him and hearing his incredible story—one that led him to work at the U.N. During this time, he also began attending Shabbat dinners I hosted with my friends. He would often bring a dish or a bottle of kosher wine to contribute, embracing the tradition with genuine curiosity and respect. He actively listened to the prayers, enthusiastically engaged with Jewish culture, and always approached our traditions with kindness.*

*At a later protest in November, I witnessed firsthand Mahmoud's unwavering commitment to protecting Jewish students. When an unaffiliated individual began shouting antisemitic slogans, Mahmoud was the first to intervene, immediately de-escalating the situation and ensuring the safety of those present. This came as no surprise—I already knew that Mahmoud was someone I could trust to stand up for me and my community.*

*Over the months, our friendship deepened. We shared meals, laughs, and countless memories. Mahmoud was not just a source of strength and support in my life but in the lives of so many others. He was always there—a shoulder to cry on, a friend to lean on, and a wise and compassionate presence in our community.*

**D.** Letter from ████████████████████ dated March 14, 2025 .............................................9

*My name is ████████████████ I am a Jewish student at Columbia University writing in support of my friend, Mahmoud Khalil. I am writing this letter because I know that if I ever needed him to do it for me, he would, and so much more, because that's the kind of person Mahmoud is. We know each other through sharing space more times than I can count, at protests and at community events and at concerts and Shabbats. He is someone who I trust implicitly. He is someone who always puts himself between those around him and danger, and he does it without thinking and without flinching. He does it even with people who he doesn't know well. We're not best friends but I know that if I was in danger, Mahmoud would do*

Uploaded on 04/23/2025 at 10:19:18 RM (Central Daylight Time) Base City: JAX
Case 2:25-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 61 of 74
PageID: 3312

*everything in his power to protect and help me—as lead negotiator during the encampment this is exactly what he did, protecting me and so many other student protestors who were being punished for speaking up against genocide. This letter is the least I can do for someone who has always selflessly and courageously put others before himself. I can't believe that it's precisely because of these incredible qualities he is being punished in this way. Mahmoud has protected Jewish students at Columbia like myself more than the university ever has. He has even protected us from the university itself. To punish him under the pretence that this kind, brave, gentle person somehow endangered us is the most egregious lie I've ever heard. His strength is only matched by his calmness even in the most stressful circumstances. I've never heard him raise his voice except at protests. I can't describe the sense of immediate comfort that one felt in his presence, and every minute I think of him detained, it hurts.*

### ADDITIONAL EVIDENCE DEMONSTRATING THE SOCIETY FOR INTERNATIONAL DEVELOPMENT WEBSITE SUBMITTED BY DHS IS OUTDATED, ERRONEOUS, AND DOES NOT ESTABLISH THAT MR. KHALIL WORKED FOR THE UK'S SYRIA OFFICE IN BEIRUT BEYOND 2022

E. Letter from ███████████, President, Society for International Development, dated April 20, 2025, confirming that Mr. Khalil was a speaker at the Society's conference in 2020 and is not a speaker for the 2025 conference ........................................................................10

*The Society for International Development, United States Chapter (SID-US) is a nonpartisan, non-lobbying, nonprofit corporation incorporated in the District of Columbia dedicated to the advancement of sustainable, effective development worldwide since 1957. SID-US serves as a global town square to convene practitioners, thought leaders, and public and private institutions.*

*In response to your request for information regarding Mr. Mahmoud Khalil's participation in SID-US events, I write to advise you that Mr. Khalil spoke at our 2020 Annual Conference in his capacity of Program Manager at the Syria Office in the British Embassy in Beirut, where, according to the bio we were provided, he lead the Syria Chevening Program. Mr. Khalil has not been invited by SID-US to speak or participate at any SID-US event in any capacity before or since our 2020 Annual Conference.*

### ADDITIONAL EVIDENCE DEMONSTRATING MR. KHALIL'S PUBLICLY DISCLOSED POSITION AT UNRWA WAS AN INTERNSHIP FOR COURSE CREDIT THROUGH HIS COLUMBIA MASTER'S PROGRAM

F. Letter from ███████████████, Director, UNRWA Representative Office, dated April 22, 2025 ...........................................................................................................................11

*Mr. Mahmoud Khalil served as an intern at the UNRWA Representative Office in New York, on a full-time basis from 7 June to 31 August 2023 and on a part-time basis from 1 September to 30 November 2023 to allow for the continuation of his studies at Columbia University.*

*The internship was an unpaid voluntary position in accordance with the practice of the Agency.*

Additional Evidence Refutting Charges in NTA and Form I-261
Mahmoud KHALIL, ▮▮▮▮▮

**JA 1179**

Uploaded on 04/23/2025 at 10:18:03 RM (Central Daylight Time) Base City: JFK
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 63 of 74
PageID: 3314

March 19, 2025

███████████

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street
Newark, NJ 07101

PURSUANT TO 28 USC 1746, I HEREBY DECLARE THE FOLLOWING:

Dear Judge Farbiarz,

I am writing this letter to you in support of Mahmoud Khalil. My name is ███████████ and I am a U.S. citizen and identify as Jewish. I graduated from Columbia University's School of International and Public Affairs (SIPA) in May 2024 and have known Mahmoud Khalil for about two years since he started his studies at SIPA in January 2023.

I consider Mahmoud a colleague, fellow advocate and profound human being. I regard Mahmoud as a thoughtful, committed, highly intelligent, curious and pacifistic person. I developed this understanding of his character through my many interactions with him at Columbia in classrooms, social outings, and advocacy circles. I have had countless discussions with him about international affairs, politics and the Israeli-Palestinian conflict. I can point to several specific examples that highlight Mahmoud commitment to non-violent, respectful language and building an inclusive pro-Palestinian movement on campus.

My first interaction with Mahmoud was in March 2023. Over the prior winter break, I participated in a trip to the Occupied Palestinian Territories organized by PalTrek National. As a follow-up to the trip, a discussion was convened with participants of the trip to highlight our experience. I offered to speak about my experience as a Jewish person who has traveled to Israel on multiple occasions before this trip. I was honest about my participation in Birthright International, a fully-funded trip for American Jewish youth to experience Israel. Birthright has received criticism from anti-Israel groups for its support of resettling American Jews to Israel, often at the expense of Palestinian families. While some students at SIPA expressed valid concerns about including my experience over others from the trip, Mahmoud personally welcomed my inclusion in the panel. Mahmoud saw the importance of including my voice in this discussion and highlighting the complicated pressures on American Jews. Mahmoud, starting at SIPA in January, did not participate in the trip and did not know me beyond my identity as

Jewish and previous participant in Birthright. Instead of leaning into stereotypes or succumbing to the pressures of others, Mahmoud saw me as a human being with a long and complicated relationship to my religious identity and its connection to the state of Israel.

The next incident I'd like to highlight occurred in October 2023. Following the Hamas-led terrorist attacks on October 7th and subsequent military response by Israel, the Dean of SIPA, Keren Yarhi-Milo, asked to meet with some SIPA students to understand the impact of the war on Palestinian students. Mahmoud was in attendance. Mahmoud began the meeting by asking Dean Yarhi-Milo, an Israeli citizen, how she, her family and community were doing in light of the terrorist attack. In asking the question, Mahmoud condemned the violent, hateful act by Hamas terrorists and expressed grief for the immediate loss of life and continued impact on the communities. Even Dean Yarhi-Milo appeared touched by the question and expressed gratitude for his consideration of her experience of this violence as an Israeli woman.

From October 2023, tensions on campus elevated. I've watched Mahmoud on several occasions de-escalate tense situations on campus, leading with peace to usher a constructive dialogue rather than inciting aggression that leads to hate speech. I saw Mahmoud, as well as other Arab classmates, confronted and, at times, harassed by other students, asking him if he supported Hamas. Mahmoud would not raise his voice or respond with aggression, but instead simply answer the question by condemning Hamas and all forms of violent extremism. Mahmoud recognized this was a tactic to coerce him to promote hateful or extremist language, but he never wavered in his denouncement of all forms of violent extremism, including the actions of Hamas on October 7th.

On October 25th 2023, over 20 students, including myself, were targeted in a doxing campaign by the right-wing media organization, Accuracy in Media. The organization launched an online petition, personal website for each student, and paraded a billboard truck around campus displaying my name and photo under the banner, "Columbia's Leading Antisemite." The false statement was attributed to my position as the President of SIPA's Human Rights Working Group. Mahmoud, not targeted at that time by this doxing campaign, reached out to me personally to check in on my well-being. He recognized that my identity and work experience with Jewish organizations contradicted the claim of antisemitism, and offered his support. He expressed his support not in justification of antisemitism, but as defamatory action to distract from legitimate antisemitism happening on campus, saying to me, "by targeting the Jewish student and ignoring the very real antisemitism happening on campus, [Accuracy in Media] has made it clear their motives are not to protect Jewish people."

I can point to additional incidents that occurred in April 2024 during the Solidarity Encampment at Columbia University. During the Encampment, Mahmoud led community-wide discussions on how to ensure the space was free from hate and discrimination. Through this, he helped develop

community guidelines for the encampment that indicated any expression of hate speech will not be tolerated. On one occasion, some individuals made remarks that I personally found offensive as a Jewish person. I saw Mahmoud visibly uncomfortable, and instead of berating or verbally attacking the individuals, he approached them calmly to deescalate the situation by saying, "that's not a productive approach. We need to focus on law, not emotion." His priority has always been advocacy through nonviolent means, centering facts, legal arguments, and mutual respect.

ICE may attempt to use his participation in the Encampment protest against him, but that would be a complete distortion of reality. Mahmoud has actively included Jewish voices in conversations about Israel-Palestine. In fact, during the first day of Jewish Holy Days of Passover, I asked Mahmoud for his help in hosting a Passover Seder at the Encampment specifically for a non-Jewish audience. Mahmoud was very helpful in connecting me with the leadership of the Encampment and ensuring I had a large, safe space to host the Seder. Not only did he attend the Seder, Mahmoud invited his non-Jewish friends, understanding the importance of including non-Jews in the celebration of this Holy Day. Following the Seder, he commented to me directly, "thank you for hosting and inviting me to this Seder. It was my first time being invited to a Passover Seder and I am very thankful to have learned more about Judaism." His gratitude and support of this initiative further highlights his understanding of the value of including Jewish voices in typically non-Jewish spaces. In that moment, Mahmoud saw me, not just as a Jew but as a fellow human being equally committed to his message of nonviolence and peace.

Additionally, ICE and Federal officials may penalize Mahmoud for his visibility during Columbia's protests because he was selected as a press representative from the student negotiating team. Only specific students were selected for these roles to ensure the peaceful purpose of the protests were expressed calmly and without hatred. I watched him on several occasions be tested by the press with leading questions that sought to charge the conversation with antisemitic or extremist messaging, and Mahmoud maintained his calmness, commitment to promoting peace on campus and sensitivity to hateful or extremist rhetoric. His role as a student negotiator underscores his commitment to finding a peaceful end to the Encampment through dialogue with Columbia's administration.

I trust these examples provide insight into Mahmoud's character and context to his participation in nonviolent protests that may be weaponized against him. His commitment to peaceful dialogue, particularly the creation of interfaith spaces, exemplifies what I have personally witnessed: Mahmoud has never engaged in or expressed support for antisemitic nor extremist ideology. He is an incredible advocate, good-faith member of the Columbia Alumni community, and a kind human being. I urge you to support his immediate release.

Uploaded on 04/23/2025 at 10:19:18 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3   Filed 06/05/25    Page 66 of 74
PageID: 3317

I DECLARE UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON 3/19/2025



Thank you for your time and consideration. I sincerely appreciate the Court's attention to this matter. If the Court requires any further information, I can be reached at the contact information above.

Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street, New York, NY

Dear Judge Furman,

I am writing in support of Mahmoud Khalil.  My name is ███████████ and I am an American Jewish woman who believes in the importance of Israel as a Jewish homeland. I have known Mahmoud Khalil for over two years, since January 2023 as his professor, colleague, and friend.  I have always known Mahmoud as someone working to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel.  He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice (MPA-DP)– trains students on.

I have known Mahmoud in my capacity as his Professor at Columbia University for two semesters ███████████████████████████████████, and then as his supervisor in his role as a Teaching Assistant for the course ████████████████ ████████████████. In between semesters I also interacted with Mahmoud, due to his role as a Program Assistant for the MPA-DP program which I am affiliated with as a Professor and alumna.

I have worked with Mahmoud and directly seen and graded his work. This work has demonstrated a deep and persistent commitment to humanitarian principals and doing work that contributes to peace and stability.  Both semesters when he was my student, he focused his semester long project assignments on a non-profit organization (Jusoor, where he also previously worked) providing education services to refugees.  I had many conversations with him about how to deepen educational impact and ensure that refugees would have real economic opportunities to escape cycles of violence and poverty.

When it came time to choose a Teaching Assistant for the Fall 2024 iteration of the course, I sought out Mahmoud to apply to the position. His deep expertise with organizational management with international development organizations, his high standards for quality work, as well as his integrity were all reasons I thought he would make a great TA. He effectively served the class and students throughout the semester even as he navigated both global and campus events that were directly impacting him and his family.

I can state with full confidence that Mahmoud has never expressed support for Hamas, nor has he ever endorsed any form of extremism. Over the course of our extensive interactions, I have had numerous conversations with him about human rights, justice, and the student protests and I can personally attest to his commitment to nonviolence.

In terms of the campus protests, Mahmoud was my student as these events unfolded and was in the process of being hired as our Teaching Assistant as the encampment was being established. I directly spoke to him about the encampment and Mahmoud

EOIR — 14 of 21

**5**

Uploaded on 04/23/2025 at 00:63:18 PM (Central Daylight Time) Base City: FINA
Case 2:25-cv-01963-MEF-MAH Document 284-3 Filed 06/05/25 Page 68 of 74
PageID: 3319

emphasised the protesters commitment to peace and non-violence. Mahmoud explained how the student movement was ensuring that Jewish voices were part of conversations and space. He was committed to dialogue and partnership with Jewish voices throughout his time on campus, one example of this was sharing a Jewish Sukkot event with me that he was attending put on by Jewish and Palestinian students on October 16th, 2024.

As our TA in Fall 2024 for a course for which Leadership was a key theme, he clearly spoke about the challenges of being seen as a leader of leaderless student movement. Many things have been incorrectly attributed to him in the media.

Mahmoud has always worked to be part of the solution towards a peaceful resolution to the conflict in Palestine and Israel. He is committed to peaceful development which is also what our graduate program – the Master of Public Administration in Development Practice – trains students on. Choosing to do this program, which trains students for public sector and public interest work also demonstrates his commitment to these issues. Everything he has ever worked on professionally and academically demonstrates his commitment to humanitarian principals including justice, peace, and development.



, March 14th, 2025

*Lecturer at Columbia University's School of International and Public Affairs in the Master of Public Administration in Development Practice*

7

**Honorable Jesse M. Furman**
**United States District Judge**
**Southern District of New York**
**Thurgood Marshall Courthouse**
**40 Centre Street, New York, NY**


**Dear Judge Furman,**

     My name is ███████████ and I am writing this letter in support of Mahmoud Khalil. I am currently a junior at Columbia University. I grew up in Forest Hills, Queens, raised by my Jewish mother and my American father. From a young age, I was taught the importance of higher education in shaping a well-rounded individual. My father, ████████, exemplified this belief—he graduated from Harvard in 1993, becoming the first in our family to attend an Ivy League institution.

     Judaism has always been central to my identity. I attended Jewish preschool, went to Hebrew school multiple times a week until my Bar Mitzvah in 2017, celebrated Shabbat every Friday, and was raised with strong Jewish values. I emphasize this not to exaggerate or embellish, but to paint a clear picture of who I am. My Jewish identity is deeply meaningful to me, and in these past 16 months—an incredibly difficult time for the Jewish people—having a strong support system of kind, understanding, and respectful individuals has been more important than ever. Mahmoud is exactly that.

     From the moment I met Mahmoud 16 months ago, he has been nothing short of a selfless friend and an inspiring mentor. I clearly remember one of our first encounters at a peaceful rally on October 12, 2023. Despite how such events are often misrepresented in the media, this rally was a calm and peaceful demonstration in support of Palestinian rights. Mahmoud took on a protective security role that day, ensuring students were safe from any physical or verbal threats. When people hurled insults and profanities at me and my classmates, Mahmoud was the first to step in and de-escalate the situation. He never raised his voice, never used harsh language, never resorted to aggression—he spoke calmly and respectfully, shielding students, including me, a Jewish student, from harm. He put himself between me and an aggressor, prioritizing my safety over his own. That is not the behavior of an antisemite—that is the behavior of an ally and a friend.

     In the weeks that followed, I spent many late nights with Mahmoud at friends' apartments, getting to know him and hearing his incredible story—one that led him to work at the U.N. During this time, he also began attending Shabbat dinners I hosted with my friends. He would often bring a dish or a bottle of kosher wine to contribute, embracing the tradition with genuine curiosity and respect. He actively listened to the prayers, enthusiastically engaged with Jewish culture, and always approached our traditions with kindness.

At a later protest in November, I witnessed firsthand Mahmoud's unwavering commitment to protecting Jewish students. When an unaffiliated individual began shouting antisemitic slogans, Mahmoud was the first to intervene, immediately de-escalating the situation and ensuring the safety of those present. This came as no surprise—I already knew that Mahmoud was someone I could trust to stand up for me and my community.

Over the months, our friendship deepened. We shared meals, laughs, and countless memories. Mahmoud was not just a source of strength and support in my life but in the lives of so many others. He was always there—a shoulder to cry on, a friend to lean on, and a wise and compassionate presence in our community.

Mahmoud has done nothing that I have not done. He has committed no crime, nor has he ever advocated for anything that I have not also stood for. For that reason, I urge you to support his release.

Sincerely,

**Friday, March 14th**

Uploaded on 04/23/2025 at 10:19:18 PM (Central Daylight Time), Base City: JFA

Honorable Jesse M. Furman

United States District Judge

Southern District of New York

Thurgood Marshall Courthouse

40 Centre Street New York


Dear Judge Furman,

My name is _____, I am a Jewish student at Columbia University writing in support of my friend, Mahmoud Khalil. I am writing this letter because I know that if I ever needed him to do it for me, he would, and so much more, because that's the kind of person Mahmoud is. We know each other through sharing space more times than I can count, at protests and at community events and at concerts and Shabbats. He is someone who I trust implicitly. He is someone who always puts himself between those around him and danger, and he does it without thinking and without flinching. He does it even with people who he doesn't know well. We're not best friends but I know that if I was in danger, Mahmoud would do everything in his power to protect and help me—as lead negotiator during the encampment this is exactly what he did, protecting me and so many other student protestors who were being punished for speaking up against genocide. This letter is the least I can do for someone who has always selflessly and courageously put others before himself. I can't believe that it's precisely because of these incredible qualities he is being punished in this way. Mahmoud has protected Jewish students at Columbia like myself more than the university ever has. He has even protected us from the university itself. To punish him under the pretence that this kind, brave, gentle person somehow endangered us is the most egregious lie I've ever heard. His strength is only matched by his calmness even in the most stressful circumstances. I've never heard him raise his voice except at protests. I can't describe the sense of immediate comfort that one felt in his presence, and every minute I think of him detained, it hurts.

Please help Mahmoud.

**EXECUTED ON Friday March 14th**



Uploaded on 04/23/2025 at 10:19:03 PM (Central Daylight Time) Page City: JFH
Case 2:25-cv-01963-MEF-MAH   Document 284-3   Filed 06/05/25   Page 72 of 74
PageID: 3323



Ms. Shezza Abboushi Dallal
Staff Attorney
CLEAR
2 Court Square
Long Island City, NY
11101
Email: ███████████████████

April 20, 2025

**SUBJECT: Participation of Mahmoud Khalil in Society for International Development, United States Chapter 2020 Conference**

Dear Ms. Abboushi Dallal,

The Society for International Development, United States Chapter (SID-US) is a nonpartisan, non-lobbying, nonprofit corporation incorporated in the District of Columbia dedicated to the advancement of sustainable, effective development worldwide since 1957. SID-US serves as a global town square to convene practitioners, thought leaders, and public and private institutions.

In response to your request for information regarding Mr. Mahmoud Khalil's participation in SID-US events, I write to advise you that Mr. Khalil spoke at our 2020 Annual Conference in his capacity of Program Manager at the Syria Office in the British Embassy in Beirut, where, according to the bio we were provided, he lead the Syria Chevening Program.  Mr. Khalil has not been invited by SID-US to speak or participate at any SID-US event in any capacity before or since our 2020 Annual Conference.

Sincerely,



███████████████
President
Society for International Development, United States Chapter

**10**

Uploaded on 04/23/2025 at 10:19:18 RM (Central Daylight Time) Base City: JFK
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 73 of 74
PageID: 3324



representative office
new york

two united nations plaza,
room 0205
new york, n.y. 10017
usa

t: +1 212 963 2255

www.unrwa.org

New York, 22 April 2025

To Whom it May Concern:

Mr. Mahmoud Khalil served as an intern at the UNRWA Representative Office in New York, on a full-time basis from 7 June to 31 August 2023 and on a part-time basis from 1 September to 30 November 2023 to allow for the continuation of his studies at Columbia University.
The internship was an unpaid voluntary position in accordance with the practice of the Agency.



Director
UNRWA Representative Office

المكتب التمثيلي
نيويورك

مبنى الأمم المتحدة ٢
(بلازا ٢)
غرفة رقم ٢٠٥،
نيويورك، نيويورك ١٠٠١٧
الولايات المتحدة الأمريكية

ف ٢٢٥٥ ٩٦٣ ٢١٢ +1

Uploaded on 04/23/2025 at 10:19:18 PM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 284-3    Filed 06/05/25    Page 74 of 74
PageID: 3325

## CERTIFICATE OF SERVICE

On April 23, 2025, I, Johnny Sinodis, caused the enclosed document to be served on the U.S. Department of Homeland Security via the EOIR Courts and Appeals System (ECAS). This document was electronically filed through ECAS and both parties are participating in ECAS. Therefore, there is no separate service completed.

Executed this 23rd day of April 2025.

Exhibit D

D-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, <br><br> Petitioner, <br><br> v. <br><br> Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, <br><br> Respondents. | Case No. 25-cv-01963 (MEF-MAH) <br><br><br><br> **DECLARATION OF VEENA DUBAL** |

I, Veena Dubal, declare:

1.      I am the general counsel of the American Association of University Professors ("AAUP"), a nonprofit membership association and labor union of faculty, graduate students, and other academic. The AAUP is a plaintiff in *American Association of University Professors v. Rubio*, No. 25-cv-10685, (D. Mass. filed Mar. 25, 2025), a case challenging the Trump administration's policy of targeting noncitizen faculty and students for arrest, detention, and deportation on the basis of their participation in pro-Palestinian protests and related expression and association (the "ideological-deportation policy").

2.      Attached hereto as **Exhibit A** is a true and correct copy of a sworn declaration I submitted in the above-referenced case detailing some of the ways that the AAUP and its members have been harmed by the Trump administration's ideological-deportation policy.

3.      I declare under penalty of perjury that the forgoing is true and correct, and that the attached declaration is true and correct.

Respectfully submitted,

_____
Veena Dubal

June 2, 2025

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, <br><br> RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and <br><br> MIDDLE EAST STUDIES ASSOCIATION, <br><br>       Plaintiffs, <br><br>    v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and <br><br> UNITED STATES OF AMERICA, <br><br>       Defendants. | Civil Action No. 1:25-cv-10685 (WGY) |

## DECLARATION OF VEENA DUBAL

I, Veena Dubal, declare and state as follows:

1.     I am a professor of law at the University of California, Irvine School of Law and the general counsel of the American Association of University Professors ("AAUP"). I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

**Background**

2.     The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals. Founded in 1915, the AAUP seeks to promote academic freedom and shared governance at the nation's colleges and universities.

3.     The AAUP has campus chapters at colleges and universities around the country. Among those chapters are the AAUP-Harvard Faculty Chapter ("Harvard-AAUP"), AAUP at New York University ("NYU-AAUP"), and Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT").

4.     I have served as the AAUP's general counsel since October 2024. In that role, I provide legal advice to the organization and monitor legal developments that are relevant to the AAUP and its members. I am also a member of the AAUP.

5.     In the past few weeks, I have closely followed the Trump administration's policy of arresting, detaining, and deporting students for their pro-Palestinian expression and association (the "ideological-deportation policy"). Because of the policy's effects on the AAUP and its members—described in more detail below—I regularly discuss it with my colleagues in the AAUP's national leadership, leaders of AAUP campus chapters, and AAUP members around the country.

## Harm to the AAUP

6.      In my role as the general counsel of the AAUP, I have observed firsthand two principal ways in which the ideological-deportation policy has impeded and continues to impede the AAUP from carrying out its mission.

7.      *Reducing participation in AAUP events*. The ideological-deportation policy has deterred noncitizen members from participating in AAUP events. Many noncitizen members have stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and faculty or to investigate universities for their handling of campus protests relating to Israel and Palestine. I have heard directly from noncitizen members, who explained that they were interested in attending AAUP events addressing these topics but decided not to for fear of being associated with advocacy related to the topics and targeted for deportation on that basis. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally refrained from speaking.

8.      For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their voices muted. Similarly, the AAUP attempted to organize a virtual event about the threats its noncitizen members face of being targeted under the ideological-deportation policy. But I heard directly from multiple noncitizen members that they would not attend unless the virtual meeting software could anonymize their identities. Because anonymity directly undermined the purpose of the event—

3

**JA 1199**

which was to hear the experiences of noncitizen members—the AAUP dropped the idea of member participation and conversation in this event.

9.      My colleagues in the AAUP's national leadership and I have had similar experiences with a range of other events, including member discussions about academic freedom and Palestine and a recent event at Columbia University focused on the Trump administration's attacks on the university and how the AAUP should respond. For example, I had hoped to have an open conversation with the membership about the repression of pro-Palestinian speech on campuses, but I heard from many chapter leaders that too many of their citizen and noncitizen chapter members would be afraid to attend, leading to a one-sided conversation.

10.     Reduced participation in AAUP events directly frustrates the AAUP's mission. The AAUP's over 44,000 members are the lifeblood of the organization. AAUP leadership engages with members through a democratic process to develop its positions and priorities and carry out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to discuss academic freedom and other pressing topics in higher education. The gatherings often draw hundreds of members. My colleagues in the AAUP's national leadership and I rely on these conversations to make virtually every decision of substance about the organization's work. When members are afraid to participate in AAUP events, it prevents us from representing their interests in the organization's policymaking, report writing, and public advocacy.

11.     *Diverting resources*. The ideological-deportation policy has also forced the AAUP to divert resources that it would otherwise devote to its core mission. AAUP leadership has spent a significant percentage of its time counseling noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. I, for example, now devote at least 50 percent of the time that I allot to my AAUP

leadership position to these activities, regularly fielding calls and emails from AAUP members and chapters related to the policy. These activities are not ones that the AAUP or its leadership typically engage in, and they leave me and my colleagues in the AAUP's national leadership with less time to focus on the organization's core mission. For example, I have almost no time to discuss or advise on broader issues of shared governance at the university level or on state legislative attacks on tenure. Many of our members have lost their federal grant funding, and my attention to this critical problem and its implications for academic freedom has been limited.

**Harm to AAUP Campus Chapters**

12.       As the AAUP's general counsel, I routinely speak with leaders of AAUP campus chapters, including leaders of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, chapter leaders have relayed three principal ways in which the ideological-deportation policy has impeded and continues to impede their chapters from carrying out the AAUP's mission.

13.       *Diverting resources*. Much like the AAUP's national organization, all three of the above-mentioned chapters have diverted resources away from their core missions and towards advising noncitizens who fear that they will be punished under the ideological-deportation policy. For example, Harvard-AAUP has redirected resources from its work promoting shared governance and economic justice to respond to the ideological-deportation policy. Because noncitizen members expressed concern that they could be flagged for deportation based on their social media activity or other online communications, the chapter expended significant effort organizing trainings for faculty seeking to avoid government surveillance of their expressive activities online. NYU-AAUP and Rutgers AAUP-AFT have similarly diverted chapter resources to organize trainings or prepare training materials related to the ideological-deportation policy. NYU-AAUP, for instance, is preparing "know your rights" materials related to immigration enforcement on

NYU's campus. NYU-AAUP and Rutgers AAUP-AFT are also spending time guiding noncitizen members through university immigration resources and connecting them with individual legal support.

14.     *Suppressing membership and participation*. The ideological-deportation policy has also chilled noncitizens from joining and participating fully in all three of the above-mentioned chapters, preventing these chapters from advocating for the interests of their full constituencies. This harm is particularly acute for Harvard-AAUP, a relatively new chapter that is attempting to recruit members and build its presence on campus. Its leaders recently learned that some noncitizens who would have been eligible to become members have declined to join the organization out of fear that their membership could put them at risk of deportation. Many Harvard faculty, staff, and graduate students are noncitizens, so losing their participation deprives Harvard-AAUP of opportunities to hear from and associate with an important segment of the community it serves.

15.     In a similar vein, I have learned that the ideological-deportation policy has caused noncitizen leaders at AAUP chapters around the country to step back from leadership positions and public appearances out of fear that they will be falsely labeled as "pro-Hamas" and targeted for deportation on that basis. As an organization, the AAUP has been heavily involved in advocacy relating to academic freedom, the suppression of student and faculty discussion of Israel and Palestine on campus, the Trump administration's efforts to punish universities for not suppressing these discussions even more aggressively than they have, and the Trump administration's recent efforts to arrest, detain, and deport noncitizen students and faculty who have participated in pro-Palestinian protests. The leaders at our many chapters around the country participate in this advocacy, but noncitizen leaders are now terrified of being publicly associated with it because of

the risk that the Trump administration will identify them and target them for deportation. I have heard directly from one noncitizen member who has withdrawn from a chapter leadership position, and several additional members who have refrained from making public statements on behalf of their chapter. Chapter leaders have also told me that noncitizen members have declined to attend in-person meetings and events. This has deprived AAUP chapters of experienced leaders and prevented them from engaging in effective advocacy on their campuses.

16. *Impeding campus advocacy*. The ideological-deportation policy has likewise prevented some of the above-mentioned chapters from advocating for their interests on campus in concert with noncitizen faculty and students. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt compelled to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

## Harm to the AAUP's Members

17. As AAUP's general counsel, I also routinely speak with individual members of AAUP chapters around the country, including members of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, members have explained how the ideological-deportation policy has harmed and continues to harm them. I have also received reports of additional AAUP members who have been and continue to be harmed by the ideological-deportation policy.

*U.S. Citizen Members*

18.     I have heard from U.S. citizen members that the ideological-deportation policy prevents them from hearing their noncitizen students' and colleagues' perspectives. Members have told me about noncitizen colleagues and students who have ceased speaking or writing publicly about Palestine, withdrawn from academic events, or altered their research or teaching plans out of fear that their expression will lead to deportation.

19.     In our conversations, U.S. citizen members have underscored how valuable to their scholarship, teaching, and public engagement they find the speech that the ideological-deportation policy suppresses. Some AAUP members I have spoken with study the world outside the United States and rely on noncitizens' perspectives to add texture to their academic work. Others collaborate closely with noncitizen colleagues and students in their teaching or research. U.S. citizen members have had to cancel events—including talks and conferences—and postpone or stop their plans to write grants, conduct research, and produce scholarship with noncitizen members who fear immigration consequences because of the ideological-deportation policy.

20.     I have also heard from U.S. citizen members that the ideological-deportation policy prevents them from associating with noncitizen members. U.S. citizen members have conveyed that their noncitizen colleagues and students have stopped attending protests and other public gatherings related in any way to Israel and Palestine, including AAUP events, because they fear that attending these gatherings could mark them for deportation.

21.     By way of example, I have spoken directly with some of the U.S. citizen members named in the complaint who have been injured by the ideological-deportation policy. I describe their circumstances below.

22.     *Joseph Howley.* Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and

teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

23.　　The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant literary works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year related to Israel and Palestine. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

24.　　The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was joined only by citizen members. He understood that noncitizen members who previously

would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

25.     *Chenjerai Kumanyika.* Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

26.     The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

27.     *Vasuki Nesiah.* Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

28.     The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These measures reduced attendance and hindered the dialogue and sharing of research that is critical to Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the United States are now unwilling to attend academic events inside the country for fear that they will be detained and deported. For instance, several colleagues who typically attend the Law and Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that they will not attend for this reason. Because her field of international law is particularly engaged with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The policy has also chilled student discussion on campus, with many noncitizen students now avoiding the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss it. Some noncitizen students have also expressed concern about even showing up to class, and there have been conversations among her colleagues about conducting classes over Zoom, which Nesiah considers to be a poor substitute for in-person teaching.

29.     The policy has also limited Nesiah's ability to associate with noncitizen colleagues. For example, a noncitizen colleague who had signed an open letter related to academic freedom that Nesiah and her colleagues had recently organized asked that their name be removed from the

letter, because they feared that signing the letter would make them a target for deportation under the policy.

30.     *Sonya Posmentier.* Sonya Posmentier is an associate professor of English at NYU and the director of graduate studies in the NYU English department. Her research and teaching interests include African American and Black Diasporic literature and culture, poetry and poetics, and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of NYU-AAUP's executive committee.

31.     The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

32.     The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses, among other topics, the criminalization of

pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

33.     In addition to the U.S. citizen members I've spoken with directly, I have received reports about several other U.S. citizen AAUP members who have been injured by the ideological-deportation policy. I describe their circumstances below.

34.     *Patricia Dailey.* Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

35.     The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. Dailey relied on the community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine would jeopardize the immigration status of its noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

36.     *Maya Jasanoff.* Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

37.     The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

38.     *Lauren Kaminsky.* Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

39.     The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

40.    *Rebecca Karl.* Rebecca Karl is a professor of History at NYU. Karl's research and teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the AAUP, and a former president and now member-at-large of NYU-AAUP.

41.    The ideological-deportation policy has limited Karl's ability to hear and engage with perspectives and scholarship she values. As a student of and researcher on histories of repressive regimes, Karl is interested in the multiple ways in which marginalized people understand their lives and worlds. As a Jewish person, she is particularly interested in the history of antisemitism and Zionism and has helped organize educational events at NYU on those topics. In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues. Following the adoption of the policy, however, some noncitizen colleagues have felt compelled to take down research and scholarly work that was previously available online, and have ceased speaking publicly about issues related to Israel and Palestine; others have declined public speaking opportunities.

42.    The policy has undermined Karl's ability to assemble with noncitizen faculty and students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy, however, Karl has noticed a significant decrease in the participation of noncitizen faculty and students in pro-Palestinian expression, including petition-signing and public letter signing.

43.    *David Kurnick.* David Kurnick is a professor of English at Rutgers University. His research and teaching interests include the history and theory of the novel, narrative theory, and sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

44. The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

45. *Judith Surkis.* Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

46. The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

47.     The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

48.     *Kirsten Weld.* Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

49.     Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

### Noncitizen Members

50.     These accounts conform with those I have heard directly from the AAUP's noncitizen members. Many noncitizen members I have spoken to are deeply fearful that they will be targeted for arrest, detention, and deportation based on their expression and association relating

to Israel and Palestine. I have heard directly from noncitizen members who have withdrawn from academic conferences and pulled scholarly articles relating to Israel and Palestine because of these fears. I have also heard from one noncitizen member who has left the United States and plans to fulfill their academic responsibilities remotely for the rest of the semester. Some noncitizen members expressed concern to me that being named or even described in this lawsuit could put them at risk of retaliation under the policy.

51.     By way of example, I have spoken directly with noncitizen members—referred to in the complaint as AAUP Member C and D—who have been injured by the ideological-deportation policy. I describe their circumstances below.

52.     *AAUP Member C.* AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

53.     Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

54.     The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

55.    AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

56.    *AAUP Member D.* AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

57.    AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

58.    The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

59.    The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

60.    In addition to the noncitizen members I've spoken with directly, I have received reports about several other noncitizen AAUP members—referred to in the complaint as AAUP Member A, B, and E—who have been injured by the ideological-deportation policy. I describe their circumstances below.

61.  *AAUP Member A.* AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

62.  Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

63.  They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

64.  *AAUP Member B.* AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

65.  Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

66. AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

67. AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

68. *AAUP member E.* AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 1, 2025          _____
                                    Veena Dubal

D-2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Mahmoud KHALIL, | |
| Petitioner, | |
| v. | Case No. 25-cv-01963 (MEF-MAH) |
| Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | **DECLARATION OF ASLI Ü BÂLI** |
| Respondents. | |

I, Aslı Ü Bâli, declare:

1.      I am the current President of the Middle East Studies Association of North America ("MESA"), a 501(c)(3) nonprofit membership association of faculty, students, and researchers interested in the study of the Middle East. MESA is a plaintiff in *American Association of University Professors v. Rubio*, No. 25-cv-10685, (D. Mass. filed Mar. 25, 2025), a case challenging the Trump administration's policy of targeting noncitizen faculty and students for arrest, detention, and deportation on the basis of their participation in pro-Palestinian protests and related expression and association (the "ideological-deportation policy").

2.     Attached hereto as **Exhibit A** is a true and correct copy of a sworn declaration I submitted in the above-referenced case detailing some of the ways that MESA and its members have been harmed by the Trump administration's ideological-deportation policy.

3.     I declare under penalty of perjury that the forgoing is true and correct, and that the attached declaration is true and correct.

Respectfully submitted,

_____
Aslı Ü Bâli

May 30, 2025

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS,

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS-HARVARD
FACULTY CHAPTER,

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS AT NEW
YORK UNIVERSITY,

RUTGERS AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS-AMERICAN
FEDERATION OF TEACHERS, and

MIDDLE EAST STUDIES ASSOCIATION,

        Plaintiffs,

     v.

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT
OF STATE,

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, and the
DEPARTMENT OF HOMELAND
SECURITY,

TODD LYONS, in his official capacity as
Acting Director of U.S. Immigration and
Customs Enforcement,

DONALD J. TRUMP, in his official capacity
as President of the United States, and

UNITED STATES OF AMERICA,

        Defendants.

Civil Action No. 1:25-cv-10685

1

## DECLARATION OF ASLI Ü. BÂLİ

I, Aslı Ü Bâli, declare:

1.        I am the current President of the Middle East Studies Association of North America ("MESA"), a plaintiff in the above-captioned case. I have held that position since November 6, 2023. In my capacity as President, I regularly communicate with and respond to the interests and concerns of MESA members. I have spoken to and heard reports from many MESA members who have been directly and seriously harmed by the Trump administration's policy of targeting noncitizen faculty and students for arrest, detention, and deportation on the basis of their participation in pro-Palestinian protests and related expression and association (the "ideological-deportation policy").

2.        I am a U.S. citizen, and am myself a member of MESA. I am also a member of the American Association of University Professors, another plaintiff in this case.

3.        In addition to my role within MESA, I am the Howard M. Holtzmann Professor of Law at Yale Law School. My research and teaching interests include public international law, particularly human rights law and the law of the international security order, and comparative constitutional law, with a focus on the Middle East. As a scholar, I have written on the nuclear non-proliferation regime, humanitarian intervention, the roles of race and empire in the interpretation and enforcement of international law, the role of judicial independence in constitutional transitions, federalism and decentralization in the Middle East, and constitutional design in religiously divided societies.

4.        My declaration is based on my experience leading MESA, one of the premier academic and advocacy-oriented organizations that focuses on the study of the Middle East; my conversations with and reports I have received about members of MESA; and my own experience as a scholar who engages in research and teaching about the Middle East. I have personal

knowledge of the facts stated in this declaration, and, if called to testify, I could competently do so under oath.

## MESA

5.       MESA is a 501(c)(3) nonprofit membership association of faculty, students, and researchers interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). Founded in 1966, MESA's mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples.

6.       MESA accomplishes these goals by organizing programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. For instance, MESA hosts for its members an annual meeting, which is the premiere conference for scholars who research the Middle East. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, and the *MESA Review of Middle East Studies*. In addition to its academic programming, MESA advocates on behalf of its members through its Committee on Academic Freedom and its Task Force on Civil and Human Rights, which work on issues that are central to MESA's mission of promoting high standards of scholarship and teaching, defending academic freedom, and supporting civil and human rights.

7.       MESA has over 2,000 individual members, including faculty and students at universities across the country who work in the field of Middle East studies, as well as more than 50 institutional members and 36 affiliated institutions. MESA's membership is made up of U.S. citizens as well as many noncitizens, and includes members who live outside of the U.S. or who

frequently travel abroad as part of their academic work—all of whom contribute invaluably to the scholarly community MESA seeks to foster.

**The Effect of the Ideological-Deportation Policy on MESA's Members**

8.      I and other members of MESA have been directly and seriously harmed by the Trump administration's ideological-deportation policy. The policy, along with the Trump administration's attendant threats, has created a climate of fear and repression that has caused significant and lasting damage to the community of scholars—both U.S. citizens and noncitizens alike—that MESA represents.

9.      Since the ideological-deportation policy began, I have heard from many MESA members who feel the need to self-censor out of fear that their speech and expression could put them at risk of arrest, detention, or deportation. For instance, I know that some noncitizen MESA members have deleted their social media profiles or decided to take down posts that could be interpreted as advocating for pro-Palestinian positions. Some have removed public indicia of their involvement with pro-Palestinian groups on campus. Noncitizen MESA members have told me that they are afraid to organize even ordinary academic programming and events that touch on the issue of Palestine. Similarly, I have spoken to noncitizen members who are concerned that simply teaching about Israel and Palestine in class might put them at risk for arrest, detention, or deportation. As a result of the policy, many noncitizen members of MESA are now terrified of engaging in critical aspects of their research, teaching, and public advocacy, especially when those activities touch on Israel or Palestine.

10.      For example, I have spoken with two noncitizen MESA members—whom the complaint refers to as MESA Member A and MESA Member B—who have drastically limited

their scholarly and public engagement because of the ideological-deportation policy. I describe their circumstances below.

11.    **MESA Member A.** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

12.    Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

13.    The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

14.     They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

15.     **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

16.     Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

17.     MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

18.     The experiences of MESA Member A and B are just two examples. I have heard from and know of many more noncitizen MESA members who have sharply limited their speech and expression on issues relating to Israel and Palestine, out of fear that they may be targeted for arrest, detention, or deportation based on those activities. Indeed, some noncitizen members

expressed concern that even being named or described in connection with this lawsuit could put them at risk under the ideological-deportation policy. Others informed me that they were deeply concerned about having their specific experiences described at all in the lawsuit, even anonymously.

19.     The climate of fear and repression created by the ideological-deportation policy has not only harmed noncitizen MESA members, it has also had a direct and significant impact on MESA members who are U.S. citizens by preventing them from engaging with and hearing from their noncitizen colleagues and students.

20.     I rely greatly on the insights of my noncitizen colleagues in MESA. As President of MESA, it is important for me to understand the breadth of interests represented in the organization to ensure that I am able to address the most pressing priorities for MESA's membership. Being able to freely communicate with noncitizen members of MESA about their views and opinions is vital to achieving that goal. Because of the ideological-deportation policy, however, many noncitizen members of MESA are concerned about communicating with me about topics relating to Israel and Palestine, especially in writing or over email, even though those topics are salient to their scholarship or to MESA's work defending the academic freedom of its members. Many noncitizen members have also retreated from public engagement on issues relating to Israel and Palestine, which is a crucial area of Middle East study, making it harder for me to stay on top of scholarly and other developments in the field that are important to my role as President of MESA.

21.     The policy has also seriously undermined my academic work. I am a legal scholar whose research and teaching focuses on the Middle East. My work has often placed special attention on Palestine. For instance, I have written about and discussed publicly the United

Nations' unique role in the Israeli-Palestinian conflict and the application of international law to Israel and Palestine. I have organized conferences and events on human rights in Israel and Palestine and engaged with colleagues and students about their views on the topic. Because many noncitizen MESA members have restricted their expressive and academic activities out of fear that they may be targeted for arrest, detention, or deportation, I have lost the benefit of many of my colleagues' research and expert views on the issues I am interested in studying, particularly where they relate to Israel and Palestine. Because I understand that my noncitizen colleagues now fear deportation based on their scholarly work, I hesitate to approach them to collaborate on public projects that might put them at risk. For instance, I am reluctant to coauthor blog posts, essays, or articles with noncitizen graduate students or untenured colleagues that touch on issues related to Israel and Palestine for fear of putting these potential coauthors at risk of ideological deportation. These are partnerships I would have enthusiastically pursued prior to the ideological-deportation policy.

22.     Additionally, I have become increasingly concerned about the participation of some of my noncitizen colleagues in a conference scheduled to take place in April at Yale Law School. Although I and others have spent over a year organizing this conference and expected the event to take place in-person, I recently proposed moving the conference entirely or partially online due to concerns that noncitizens would not participate in light of the ideological-deportation policy. Some participants have decided to limit their participation by joining virtually rather than risk potential deportation if they traveled to attend in person. This change has already diminished the value I and the other organizers hoped to gain from the conference. Should more participants decide to join exclusively online it would be devastating to the conference, which was intended to bring the participants together in the same space to network and exchange ideas in-person.

23.     I also know of, or have heard from colleagues about, noncitizen students who have been significantly harmed by the ideological-deportation policy. Noncitizen students have removed posts from their social media, taken down previously published writing, and removed references to published writing from their own profiles, particularly if the content of the posts or writings touch on Palestine. This is especially damaging for any students who wish to become academics, as it prevents them from developing a public profile of scholarly work in the field. Noncitizen students have also withdrawn from student organizations on campus in order to distance themselves from events relating to Israel and Palestine, because of the fear that being associated with the events could have consequences for their immigration status. The chill that the ideological-deportation policy has produced on student speech directly and adversely affects my own work because my research agenda is ordinarily informed and enriched by ideas and novel issue areas that I develop or learn about in conversation with my students.

24.     My experiences are not unique. I have spoken with at least four of my MESA colleagues, whom I describe in more detail below. These members, and many more, have been seriously harmed by the ideological-deportation policy and the broad chilling effect it has had on the expressive and associational activities of noncitizen faculty and students who do work or advocacy related to the Middle East.

25.     **Beth Baron.** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

26.     The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have

historical sources critical to their research because they fear they will not be allowed back into the country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

27.     The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

28.     **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

29.     The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language

news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She has since felt compelled to cancel two more upcoming CPS events in April for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

30.    **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

31.    The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

32.    **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs

the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

33.     The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

34.     In addition to these four MESA members, I have heard from many more U.S. citizen members of MESA who have lost the benefit of hearing from and engaging with their noncitizen colleagues and students due to the ideological-deportation policy. Some members have reported that they are now required to take on more public-facing work in their departments or other groups due to their noncitizen colleagues' decisions to step back from this work out of fear that they may be targeted under the policy. Some have expressed increasing concern about approaching noncitizen colleagues to collaborate on or co-author any kind of public writing. Others have described canceling or altering planned events out of fear that they might place noncitizen colleagues or students at risk. The result of the ideological-deportation policy has been

to significantly limit the ability of citizen members of MESA to work with and learn from their noncitizen colleagues and students.

### The Effect of the Ideological-Deportation Policy on MESA

35.     The Trump administration's ideological-deportation policy has also seriously harmed MESA itself.

36.     In line with the experiences described above, many noncitizen members of MESA have scaled back their participation in MESA's events and projects due to their fears of being targeted for arrest, detention, or deportation based on their political and scholarly engagement related to Israel and Palestine.

37.     Noncitizen members play an especially critical role in the academic community MESA seeks to foster. They often possess unique insights, personal connections, and skills—including heritage language skills—that allow them to become among the most effective ethnographers and researchers working in the discipline. This also gives many noncitizen members special insight into how an academic and advocacy organization like MESA can best serve its community of scholars. Noncitizen members of MESA make invaluable contributions to the organization. That the ideological-deportation policy has compelled many noncitizen members of MESA to step back their engagement with MESA undermines MESA's goal of facilitating the exchange of pedagogical insights, academic expertise, and novel research among its members.

38.     The policy has also had a significant negative impact on participation in MESA's annual meeting. As part of its mission to grow and support the academic community that studies the Middle East, MESA hosts an annual meeting, which is the premier academic conference for those who study the Middle East. The meeting consists of four days of academic programming, professional development, networking, and special events. Participants in the annual meeting

attend research workshops, participate in joint projects that help advance the study of the Middle

East, form research collaborations, and discuss the issues most pertinent to their work. The meeting

is a critical forum for scholarship, intellectual exchange, and pedagogical innovation, and for many

MESA members, the annual meeting is the highlight event of the year.

39.     Unfortunately, there will be a decline in participation this year as a result of the

policy. I have heard from noncitizen members of MESA who are concerned about attending

MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC.

Members have told me that they fear that their attendance at the conference could put them at risk

for arrest, detention, deportation, or other immigration consequences. Each year, in preparation for

the annual meeting, MESA solicits paper proposals for the conference in mid-February. After the

administration's adoption of the ideological-deportation policy, I have noticed a meaningful

decline in submissions. This year, the initial deadline for submitting paper proposals was on

February 13, 2025. However, a number of scholars who ordinarily submit paper proposals

informed me that they were unable to meet the deadline for submissions. Some expressed concerns

about attending the meeting, due to its location. In particular, members outside of the U.S.

expressed fears that they would be denied entry or harassed because of the administration's

ideological-deportation policy. Noncitizen members also reported feeling overwhelmed and

unable to focus on making plans for the annual meeting because of their fear that scholarship and

speech about the Middle East, the entire focus of their academic careers, might become the basis

for being targeted by the government.

40.     Submissions at the initial deadline this year were almost 40 percent below where

they should have been, based on my estimates from past MESA annual meetings in Washington,

DC. Given that sharp decline in submissions by that deadline, MESA's leadership decided to grant

an across-the-board extension to February 20, 2025, something that the organization has rarely done in its history. After we extended the deadline for submissions, there was still a marked decrease in the total number of submissions compared to prior years. Based on the number of submissions, participation in the 2025 annual meeting is projected to fall 10 percent below the level we expected.

41.     Due to our members' fears of ideological deportation, MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly field, and provide a less effective opportunity for intellectual exchange. Additionally, noncitizen members' reports of self-censorship in their research, scholarship, and advocacy based on their fear of being targeted by the government is expected to reduce overall engagement in the annual meeting and reduce submissions to MESA's scholarly publications, particularly on issues concerning Israel and Palestine.

42.     The absence of these noncitizen members' voices will have a substantial impact on the annual meeting, depriving MESA and its other members of the important insights, information, and views these scholars would have contributed. Academic conferences, especially ones like MESA's annual meeting, are most effective when a wide-range of backgrounds and viewpoints are represented. Reduced attendance or engagement at the annual meeting will limit the information and ideas shared at the meeting and the opportunities for networking and intellectual exchange that would otherwise be available in the absence of the policy. It will take away from the vibrancy of the conversation and community MESA seeks to foster at its annual meeting, and it will greatly impair MESA's ability to pursue its mission of fostering the study and public understanding of the Middle East.

43.     Reduced attendance at the annual meeting will also impose serious financial burdens on MESA. A significant portion of MESA's budget is funded through the registration fees connected to attendance at the annual meeting. Based on the sizable reduction in the number of academic papers submitted for the meeting, which has previously been a reliable predictor of attendance, I anticipate that registrations for the next annual meeting will be seriously reduced, meaning MESA will collect substantially fewer registration fees. Additionally, because the annual meeting is the premier event of the year for MESA members, I anticipate that some individuals who cannot or will not attend the meeting due to concerns relating to the ideological-deportation policy will allow their memberships to lapse, and others who might have joined MESA to attend the annual meeting will not do so due to fears of the potential immigration consequences stemming from the ideological-deportation policy. This would impose an even greater financial cost on MESA given its reliance on dues-paying members for its annual operation budget.

44.     The ideological-deportation policy has also required MESA to divert resources to managing and addressing the consequences of the policy for its members, that it would otherwise devote to its core mission. I and other members of MESA's leadership, staff, and volunteer faculty are now required to spend substantial time and attention responding to crises stemming from the ideological-deportation policy, which takes away from MESA's ability to develop and foster scholarship.

45.     For instance, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have recently been inundated with requests for assistance from noncitizen MESA members who fear arrest, detention, and deportation under the policy. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. The

16

committees have also needed to shift their focus from addressing threats to MESA's members from foreign governments to addressing threats stemming from the U.S. government's ideological-deportation policy. For example, in past years, a significant portion of the Committee on Academic Freedom's work involved advocacy outside the United States. Now, the committee is forced to devote most of its attention to addressing the concerns of noncitizen MESA members who fear potential immigration consequences stemming from the ideological-deportation policy. Between November 2018 and November 2024, the committee produced 211 letters, of which 85 (or 40 percent) concerned North America. In the first few months of 2025, 80 percent of the letters produced by the committee have concerned North America.

46.     MESA leadership has also been required to develop new and different programming aimed at addressing members' concerns related to the ideological-deportation policy. For example, MESA developed and held a know your rights workshop on March 27, which addressed details about the legal options available to noncitizen students and colleagues should they be affected by the ideological-deportation policy, as well as best practices to address risks to our members during travel. MESA has another similar workshop planned for April 1. These are events that MESA leadership believed were necessary to help protect its members from the ideological-deportation policy. MESA leadership is also facilitating meetings between its members and legal services groups on April 9 to respond to member concerns relating to travel and digital security. This is programming that MESA would not typically arrange for its members, and is not the kind of service that a scholarly association regularly provides for its members.

47.     Additionally, because so many MESA members are fearful of the immigration consequences stemming from the ideological-deportation policy, MESA has begun to distribute a new monthly message to members to provide them with resources and information about MESA's

response to the ideological-deportation policy. For instance, on February 10 and March 21, MESA's leadership sent members information about threats to academic freedom and MESA's mission arising from the ideological-deportation policy. As a result of this significant shift in focus and attention, MESA has had fewer resources to dedicate to its regular academic programming. This includes supporting the program committee's work in selecting proposals to include in our annual meeting in November 2025, with our usual timeline having had to be pushed back to accommodate new demands on our resources. In addition, more staff time is now dedicated to messaging and communications around the threats to academic freedom and freedom of association in the U.S. due to the ideological-deportation policy.

48.     I declare under penalty of perjury that the forgoing is true and correct.


Respectfully submitted,


_____
Aslı Ü Bâli

April 1, 2025

# Exhibit E

## AFFIDAVIT OF MŪKOMA NGŨGĨ

I swear under penalty of perjury that the following is true and correct:

1. My name is Mūkoma Ngũgĩ, I am a Professor at Cornell University in the Department of Literatures in English and I reside in Tompkins County, New York.

2. I am the author of numerous non-fiction works, novels and volumes of poetry focusing on the struggle of the people of the African continent for liberation from the centuries-long impact of colonial exploitation. My work is recognized and taught world wide.

3. I have been a close associate and friend of Momodou Taal on campus. I have mentored him, I have helped him as he navigates his academic career, and I've also been someone to whom he has often come for personal advice about the best way to maintain his political and personal integrity while also teaching his courses in an objective way. I have great respect for the way he has stood up for himself and expressed his views about what Israel has done to the population of Palestine. His principled stance against all oppressions (including racial, class, gender, sexuality), is something I admire about him. Momodou Taal is a brilliant student that any professor would be happy to have in class.

4. Since the issuance of the executive orders by Trump, I have been deprived of my right to listen to my colleague's views and opinions. I want to help him develop his scholarship, but this is very hard to do under conditions where I am worried about whether the university or outside forces will monitor and report the things that we say to each other, either in class or otherwise.

5. As a result of the executive orders, Momodou and I have stopped engaging with each other in public in the way we used to. It has been hard for me, as someone who always values what he has to say, to reconcile my desire to keep teaching others with my desire to speak up against his being silenced.  I truly wish I could call a public meeting—or even invite professors to dinner to

meet with Momodou and hear his perspective on things—but I can't. I'm too worried about putting him at risk of deportation, since I'm also associated with criticism of U.S. foreign policy and the policies of the government of Israel. I do also worry about whether my own association in public with Momodou would be seen as "anti-Semitic." Neither of us has any ill feelings toward our Jewish colleagues and friends who have struggled with us against oppression and state violence.

6. I will say that I am particularly upset that Momodou was forced to miss his book launch. I know that for an author, a book launch is a critical moment in one's academic and intellectual life. There is something about shaking hands with one's readers, hearing their thoughts, talking to them in person, signing their copies—Momodou missed out on all of this because he has a legitimate fear of being turned away at the border for no good reason, given that the things he said while residing in the U.S. should be protected by the Constitution.

7. I am afraid of being subjected to criminal prosecution as a result of the second executive order that mentions "anti-Semitism" without a clear definition. I have been critical of multiple governments (African governments, the Israeli government, the US government) and I don't believe we should conflate criticism of the State with criticism of a State's citizenry.

8. I believe the legal term is "irreparable harm." I certainly feel that I've been harmed in a way that I can't repair unless and until I'm able to speak freely and openly with Momodou Taal again.

Signed,

_____                    Date:   14th March 2025

## AFFIDAVIT OF SRIRAM PARASURAMA

I swear under penalty of perjury that the following is true and correct:

1. My name is Sriram Parasurama, I am a graduate student at Cornell University and I reside in Tompkins County, New York.

2. I am a second-year Ph.D. student in the School of Integrative Plant Sciences. In 2023, I was awarded the NSF Graduate Research Fellowship to support my research on tree physiology and forest ecology. I have also served as a teaching assistant for the University and I currently maintain a 4.3 cumulative GPA.

3. I was a close associate of Momodou Taal during the demonstrations that protested the Israeli government's actions against the people of Palestine. Since the issuance of the executive orders in question, I have been deprived of my right to listen to my friend's views and insights on what Israel is doing to the people of Palestine. Momodou always brings such a rich historical and cultural analysis to our discussions of the political situation in the US and internationally, but he's been forced to stay quiet since the executive orders came out. We used to meet up all the time, go out for coffee, plan demonstrations, and discuss political issues but, despite our friendship remaining strong, the looming threat of disciplinary action has made our open association infinitely more tenuous.

4. I am not able to interact with Momodou as much as before out of fear of being falsely labeled "anti-Semitic." Additionally, given my own prior prominent involvement in protest activity and subsequent discipline, Momodou is not able to freely associate with me as it might lead officials, either at the university or the government, to believe that he

is engaging in "anti-American" activity. We have been forced to stop seeing each other in public.

5. Having already dealt with criminal allegations, I fear being subjected to further criminal prosecution myself because of the second executive order here. It is unclear what type of speech, such as criticism of the state of Israel, might constitute "anti-Semitism," as I do not harbor any ill will toward Jewish people at all. In fact, many of those who have been involved in protest activity with me are Jewish, and I consider our unity in opposition to American and Israeli government policy regarding Palestine to be a great strength of our movement. Nevertheless, I worry about interacting with my friends and fellow activists for fear of putting all of us at risk of deportation or criminal prosecution.

6. As a scientist researching the impacts of climate change on our great North American forests, I additionally fear that pressure from these executive orders and my open association with Momodou and the Palestinian cause will negatively impact my ability to carry out my critical research. In order to maintain compliance with these directives, I worry that many of my grant and fellowship sources will revoke current funding or refuse to provide future funding for this vital research I conduct. I wholeheartedly believe in the mission of scientists, the pursuit and defense of knowledge and truth, but am restricted by the demonization of my and Momodou's political thought.

Signed,

Date:

# Exhibit F

F-1

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Mahmoud KHALIL,<br><br>     *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>     *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF VICTORIA PORELL** |

I, Victoria Porell, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I submit this declaration in support of Petitioner Mahmoud's Khalil motion for a preliminary injunction in his above-captioned habeas corpus petition and in particular to address the ways in which the United States government's targeting of Mr. Khalil for his Palestinian rights advocacy is causing him irreparable harm and is contrary to the public interest.

2. Specifically, I write to explain the ways in which, even in the context of a long term campaign to target and silence students advocating for Palestinian human rights, Palestine Legal has observed and documented a substantial increase in concerns expressed by students – and corollary chill to their activism – in direct reaction to the arrest and detention of Mahmoud Khalil on March 8, 2025.  I

conclude that the arrest, detention and attempted removal of Mr. Khalil for what the federal government has explicitly attributed to his campus activism on behalf of Palestine has had a considerable chilling effect on activism and particularly student campus activism.

## Background on Palestine Legal

3. Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization specifically dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks and responds to efforts to suppress expression supporting Palestinian rights, particularly those aiming to chill, or wholly eliminate, campus-based organizing. Palestine Legal has advised thousands of students, campus groups, and other advocates whose rights have been violated for expressive conduct supporting Palestinian rights and faced false accusations of support for terrorism, doxing, and other repressive efforts.

4. We have successfully defended the civil and constitutional rights of students advocating for Palestinian human rights through strategic litigation, amicus curiae filings, complaints alleging violations of Title VI of the Civil Rights Act of 1964 based on Palestinian national origin and related associational discrimination, along with other legal advocacy. See., e.g., *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist LEXIS 178359 (D. Md. Oct. 1, 2024).

## Qualifications

5. I am a Senior Staff Attorney at Palestine Legal and have worked at the organization since January 2024, primarily representing students and faculty members facing retaliation for their speech in support of Palestine. Prior to my employment at Palestine Legal, from 2018-2023, I was a member of Palestine Legal's attorney network and volunteered on cases referred to me. I also worked as a Legal Intern for Palestine Legal in 2016-2017.

6. At Palestine Legal, I have been serving at the head of our Intake Committee, overseeing all incoming requests for legal support, monitoring trends in requests for support, and ensuring requests are addressed either by a Palestine Legal attorney or a referral from our attorney network.

**Requests for Legal Support Following Mr. Khalil's Arrest—By the Numbers**

7.  The movement for Palestinian rights and freedom has long been hotly contested in the United States. On college campuses, where there is a concentration of advocacy for Palestinian rights, student advocates have consistently faced pervasive threats to their political expression and associational rights via doxing by anti-Palestinian groups, differential treatment and disciplinary processes.

8.  Since the onset of Israel's latest military offensive against Palestinians in the Gaza Strip, more and more students have used common protest tactics to express their dissent against the United States' and their own institutions' support for Israel's prolonged military offensive that has killed over 54,000 Palestinians, including over 16,000 children. (*See*, Jay Ulfelder, *Crowd Counting Consortium: An Empirical Interview of Pro-Palestine Protests at U.S. Schools*, Harvard Kennedy School, Ash Center for Democratic Governance and Innovation, (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.) With students' protests against the onslaught on Gaza has come unprecedented retaliation: in the 17 months since October 2023, Palestine Legal has received over 3,500 requests for legal support, the majority related to campus-based suppression.

9.  Since the onset of the Trump administration in late January 2025, student organizers face a new, dire threat to their political expression: the leveraging of the federal government's vast immigration powers to punish and thereby deter constitutionally protected advocacy for Palestinian rights. These efforts at state-directed political suppression have been deemed "the greatest threat to free speech since the Red Scare." (*See*, Michelle Goldberg, *This Is the Greatest Threat to Free Speech Since the Red Scare*, THE NEW YORK TIMES (Mar. 10, 2025), https://www.nytimes.com/2025/03/10/opinion/mahmoud-khalil-free-speech.html.)

10. Since March 8, 2025[1], the date of Mr. Khalil's arrest and detention by ICE, Palestine Legal has received 409 requests for legal support. In the same amount of time (82 days) immediately preceding March 8, 2025, we received 322 requests for legal support. This amounts to a nearly 30% increase, at a time (since October 2023) when we have been receiving an already heightened volume of requests. As a point of comparison, in all of 2022, we received 290 requests for legal support.

11. I personally responded to 39 of the 409 requests for legal support that we received.

---

[1] As of May 29, 2025, 9:08pm PST.

12. Of the 409 requests that Palestine Legal received since March 8, 2025, 167 requests were related to educational institutions, the majority coming from students or faculty members from colleges and universities.

13. Many non-citizen students and faculty reaching out for legal support have been targeted and doxed by the same or similar pro-Israel organizations that targeted Mr. Khalil prior to his detention, including Betar, Canary Mission, and Documenting Jew Hatred on Campus. (*See*, Tsehai Alfred, *Mahmoud Khalil, SIPA '24, asked Columbia for protection a day before detainment, lawyers confirm*, COLUMBIA SPECTATOR (Mar. 12, 2025), https://www.columbiaspectator.com/news/2025/03/12/mahmoud-khalil-sipa-24-asked-columbia-for-protection-a-day-before-detainment-lawyers-confirm/.)

14. Palestine Legal does not inquire about the citizenship status of those seeking legal support, so precise numbers are not available, but anecdotally, requests for immigration consultation and representation from students and faculty increased dramatically after March 8, 2025, with many individuals directly referencing the high-profile detention of non-citizen students such as Mahmoud Khalil.

15. After March 8, 2025, Palestine Legal also received a significant increase in the number of requests for "Know Your Rights" presentations and materials, particularly for non-citizens resulting from escalating fear from pro-Palestinian activists about possible retribution by ICE and/or universities.

16. Since March 8, 2025, Palestine Legal staff have participated in at least 13 "Know Your Rights" trainings or other public presentations that reached an estimated audience of over 2,700 people.

**Increasing Requests for Legal Support—Individual Examples**

17. In the days and weeks following Mr. Khalil's arrest, as we saw an increase in the numbers of requests for legal support, I also saw an intensification of the emotional state of those reaching out for support. Students I spoke to expressed anxiety, panic, and terror at the possibility that they may be disappeared off the street and detained without warning. Multiple student clients, and even one member of Palestine Legal's attorney network, broke down in tears while we were on the phone.

18. A law student organization asked me if they shouldn't have meetings anymore so as to protect their members, especially non-citizens on campus.

4

**JA 1250**

19. Multiple graduate students and faculty members (citizens and non-citizens) asked if it was safe to travel abroad or if they should reschedule international conferences and field work. An international graduate student from a US university who was abroad conducting research reached out because he was concerned about his ability to re-enter the US because his name appeared in a news article about a Palestinian rights demonstration.

20. Multiple non-citizen students who were in leadership positions of student organizations or officers in student government asked if they could or should request that their institutions remove their names from internal and external websites. One chapter of Students for Justice in Palestine (SJP) contacted Palestine Legal after their university refused to make private a spreadsheet listing the leadership of student clubs. They expressed that they were especially worried one of their board members, a non-citizen, would be retaliated against by the federal government if this information remained public.

21. Student journalists, from at least two universities, asked if they should remove by-lines from articles having anything to do with the Middle East or campus protests. These questions followed reporting that professors, including Dean of the Columbia Journalism School Jelani Cobb, had publicly told students who were not U.S. citizens to avoid publishing work on Gaza, Ukraine and their former classmate's arrest, and that "nobody can protect you. These are dangerous times." (*See*, Liam Stack and Katherine Rosman, *At Columbia, Tension Over Gaza Protests Hits Breaking Point Under Trump*, THE NEW YORK TIMES (Mar. 12, 2025), https://www.nytimes.com/2025/03/12/nyregion/columbia-university-trump-protests.html.)

22. A non-citizen student expressed that they had not left their apartments out of fear that they would be arrested by ICE.

23. A student who was President of SJP at her University and a United States citizen asked if her non-citizen roommates were at risk because of her position of leadership.

24. A faculty member reported to Palestine Legal that they were supposed to give a lecture in March. However, the event was cancelled at the last minute and the reason provided to the faculty member was that the organizers had concerns about retaliation against non-citizen academics.

25. A member of a graduate student government reached out because they had

5

**JA 1251**

received a number of questions from doctoral students about whether they would be able to remain enrolled and/or finish their degrees from oversees if they are deported for their Palestine organizing or have their F-1 student visas cancelled.

26. At least three non-citizen students who had written op-eds about campus protests reached out seeking legal representation because they believed that they may be targeted as a result.

27. Multiple students who had been interviewed or photographed for campus newspaper articles concerning demonstrations asked if they could or should request their names or pictures be removed from previously published articles.

28. Many students asked if it was safe for them to be members of student organizations or attend campus events having to do with Palestine. A first-year doctoral student and legal permanent resident asked whether he was at risk of having his green card revoked for having been a member of SJP and whether he should stop associating with the group.

29. A non-citizen Palestine Legal client who was a lawful permanent resident expressed intense fear of retaliation for being involved in campus activities concerning Palestine and decided to put her application for citizenship on hold.

30. I am attaching as **Exhibit A** an article that Palestine Legal attorneys and clients were consulted on that includes some additional examples that illustrate the climate of fear that has set in on campuses, particularly amongst non-citizen students and scholars.

31. Attached hereto, at the exhibits listed below, are true and correct copies of the following materials:

    A. Attached as **Exhibit A**: Sanya Mansoor, *Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.*, THE CUT (Mar. 26, 2025), https://www.thecut.com/article/pro-palestine-student-protesters-worry-will-ice-come-for-me.html.

Dated: June 3, 2025                     Signed:
Oakland, CA

*/s/* Victoria Porell

6

**JA 1252**

F-1
Exhibit A

# Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.

By Sanya Mansoor, a freelance reporter who covers immigration and Gaza

MAR. 26, 2025

🔖 SAVE   |   💬 22

Photo-Illustration: by The Cut; Photo: Michael Nigro/Sipa USA via AP

Since ICE agents arrested Columbia graduate <u>Mahmoud Khalil</u> in early March, Maryam, a student at Cornell University, doesn't leave the house unless they need to. They started getting groceries delivered and rarely go out to the shops. While they still help support and organize local demonstrations against <u>Israel's war in Gaza,</u> they no longer attend in person. When they do go out to class or to work, they write an employment lawyer's phone number on their body and carry all their documentation. As a person of Arab descent who is in the U.S. on a student visa, Maryam worries that they could be swept up in the Trump administration's crackdown on pro-Palestine activists. Recently, they installed security cameras outside their off-campus apartment. "It felt like a way I could protect myself," they say, if immigration agents were to show up at the door.

On top of all this, Maryam's sister is pregnant and they are now unsure of when they will be able to visit family. If they leave the country, they fear they won't be allowed to return. They try their best to calm down their parents, who are scared of ICE detaining their child. Maryam's mother texts that she loves them more frequently, while their father, who normally talks a lot, now trails off and becomes quiet on the phone. "He understands that it is not in me to be bullied or cowed," they say.

International students across the country like Maryam are spooked by the arrests of Khalil, a U.S. permanent resident, and Georgetown University researcher <u>Badar Khan Suri,</u> an Indian national. (Maryam's name and that of other students in this story have been changed, as they fear the federal government may target them for deportation.) Trump's campaign-trail rhetoric about <u>throwing student protesters out of the country</u> has since become a real threat. The administration <u>rescinded a longstanding</u> policy that protected universities and other vulnerable locations from immigration enforcement; the State Department is launching an <u>AI-driven program</u> to help deport foreign nationals perceived as supporting Hamas; sweeping executive orders threaten deportation or criminal prosecution over actions the administration

JA 1254

views as <u>antisemitic</u> or expressing a "<u>hostile attitude</u>" toward the U.S.; and <u>Trump is pressuring</u> universities to impose stricter protest rules or else lose their federal funding.

This all leaves international students wrestling with how to criticize the U.S.'s continued military support of Israel without jeopardizing their visa status. Several students I spoke with worried that identifying their country of origin or which university they attend, let alone talking about their protest activity, would put a target on their backs. Some are doubling down by engaging more publicly, including by protesting without a mask, while others are paring back their social-media activity and taking more precautions at protests. James, who attends New York University on a student visa, has continued to go to demonstrations and wears a shiesty to obscure his face and cover his eyebrows — "all this stuff we know can stop facial recognition," he explains. Stopping his activism was not an option. "I don't see myself disengaging completely," he says. "It's just a matter of picking different ways of engagement and supporting people who can be more visible." Still, he's nervous that authorities seem to be casting a wide net in their pursuit of pro-Palestine activists. "It's not just lead organizers, it's people who were at protests or signed letters," he says. "That makes me afraid, because how much more can they expand it? How much leeway do they have that I don't know about? Where do I fall?"

Salman, an Arab graduate student at NYU, had briefly met Khalil at a friend's birthday party last year. They didn't speak much, but the interaction was enough to make the news of the Columbia graduate's detention feel less abstract. *If they're deporting someone with a green card, then what protection does my F-1 student visa offer me?* Salman thought. He also saw parallels between his situation and the argument the Trump administration made for detaining Khalil: While he is not an organizer, Salman has frequently posted on social media about protests and policy demands, like calling for a cease-fire and arms embargo. "I don't think I post more or less than your average pro-Palestinian advocate," he says, but he fears that "people can read into what you post in whatever way." He's started to pull back from sharing his personal political opinions on social media. He did go to a protest earlier this month to demand Khalil's release, however, and then to another demonstration to protest Israeli airstrikes on Gaza. He wore a mask after friends and family urged him to take steps to conceal his identity. "I'm not taking a step back on this," he says.

Salman says his parents want him to be safe and finish his degree. "They also understand that I'm at a point in my life right now where even if they were to tell me 'Don't do this' or 'Don't do that,' they know me too well to think that I'm going to become silent all of a sudden out of fear," he says. Salman currently plans to fly to attend his sibling's engagement outside of the

U.S., which he knows involves risk, but he plans to have a lawyer or emergency contact on standby in case he runs into issues reentering the United States.

NYU is one of several universities, including Brown and UC Berkeley, that are urging international students to reconsider traveling out of the country. (Cornell had advised international students to return to campus before Trump took office in anticipation of changing immigration policies.) The U.S. government wields more power and discretion at the border than it does within its borders, and "severe consequences can emerge very quickly," says Golnaz Fakhimi, legal director of the civil-rights organization Muslim Advocates. In the span of a few hours, one interaction with a border agent could lead to a person's removal from the country and a ban on seeking reentry for years. Muslim Advocates is helping students prepare for all scenarios, including ICE detention; that means figuring out a care plan for any dependents and putting a process in place to notify emergency contacts.

Both Muslim Advocates and the advocacy group Palestine Legal tell me they've received an uptick in inquiries recently from non-citizen students who are trying to gauge the risks involved in traveling, living in on-campus housing, protesting, and posting pro-Palestine content on social media. Some students who've reached out to them have a more public profile, but many of them don't and are still worried they may be on the government's radar. Palestine Legal senior staff attorney Radhika Sainath says there has been a subtle shift in the group's approach to providing Know Your Rights training for students, given that "we have an administration in place that does not respect the law." "There's more of a focus on different scenarios and what people might expect given what they said, or who they are, and their citizenship status," she said. Still, she stresses, everybody in the U.S. — regardless of their immigration status — has a right to freedom of speech and expression, which includes criticizing the American and foreign governments.

At Columbia, which has become Trump's biggest campus target, the international student community is rallying together after ICE detained Khalil and attempted to arrest Fulbright student Ranjani Srinivasan, who subsequently left for Canada. Grant Miner, the president of Columbia's student workers union, said that typically about five people come to its international student working group meetings. Following Khalil's arrest, 80 showed up. "People I've never seen before are coming to union meetings," Miner says, "and that's not because we did a good job organizing them, it's because they feel angry." Ph.D. student Allie Wong has been referring these students to mutual-aid funds and friendly lawyers, helping provide walking escorts for those who feel unsafe, and connecting them to healing circles. She's also heard from international students who are considering moving off-campus or want a

secondary place to stay should ICE agents show up at their residence. Some of her peers have expressed interest in helping out, but the Justice Department recently directed federal prosecutors to investigate local compliance with Trump's immigration crackdown. That can include cases where the government believes U.S. citizens are harboring people who are in the country illegally. "This is paralyzing people who do have good intentions, and who want to help their friends, who are not promoting terrorism; they're just trying to get a good education," Wong says.

Some international students are confronting the Trump administration head-on. At Cornell, Momodou Taal, a British Gambian Ph.D. student, filed a lawsuit this month alongside two U.S. citizens that alleged the executive orders Trump is using to crack down on pro-Palestine activists amount to an unconstitutional silencing of their political views. "It got to a point where international students are becoming sitting ducks," Taal says. "We shouldn't be penalized and punished with the threat of deportation because of expressing our views." Residents of Taal's building tipped him off last week that unidentified law-enforcement officers had arrived at his Ithaca home, and in a statement on X he wrote, "Trump is attempting to detain me to prevent me from having my day in court." On Friday, the Justice Department asked Taal to surrender to ICE; his legal team filed an emergency petition seeking to prevent the government from detaining him before a Tuesday hearing on the merits of his case.

Columbia student Yunseo Chung also filed a lawsuit Monday after immigration officials unsuccessfully tried to deport her. Chung is a lawful permanent resident like Khalil, and the government is relying on the same obscure immigration law to argue that her conduct — she was arrested after a campus sit-in — negatively affects America's foreign policy. Chung, who does not appear to have a leadership role in the student protest movement, and her legal team filed a petition that would block her detention while her lawsuit is ongoing, which a judge granted Tuesday.

The crackdown has led several of the students I spoke with, including those from countries that routinely stifle free speech, to question their long-term plans. Even if they want to stay in America because of their strong community ties and a desire to fight for the cause they believe is right, they're grappling with whether it's worth living in a country that won't allow them to freely express their political beliefs. James says he planned to stay in New York after his program ends, "not for nationalistic reasons" but because of the city and the friendships he's built there. But now, he's not sure it'll be possible. "It's not a question of wanting" to remain in

the States, he says. "How long will it be until they find something to use as a reason to not let me in?"

Maryam came to the U.S. to work with particular scholars at Cornell and had no plans to stay in the country longer. Then they got into a relationship with an American citizen. "I started to think, *Maybe I could settle down here. Maybe this is a place where we could have a family and be happy,*" they say. But in the wake of Khalil's arrest, the couple is talking about living "anywhere that is not here." The future they envisioned together no longer feels realistic when "international students are being hunted by the federal government," Maryam says. They're not surprised that Trump is making good on his campaign promise, but they are increasingly worried that the American public won't push back enough on the administration's crackdown. "That scares me more than anything else," they say. "That the entire world is finding a way to make this a personal failing rather than a structural issue of targeting students who engage in constitutionally protected speech."

TAGS:   POLITICS    POWER    TRUMP 2.0    THE CLASH ON CAMPUS    MORE

■ **SHOW 22 COMMENTS**

**JA 1258**

F-2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

*Petitioner*,

v.

DONALD J. TRUMP, *et al*.,

*Respondents*.

Civ. No. 25-1963 (MEF) (MAH)

**DECLARATION OF
GOLNAZ FAKHIMI**

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.  My name is Golnaz Fakhimi.  I am over the age of eighteen and have personal knowledge of the facts stated in this declaration.

2.  I am a civil and human rights attorney, and, since October 2, 2023, I have been the legal director of Muslim Advocates ("MA"), a national legal advocacy and social justice organization.

3.  MA's work includes providing education, counsel, and defense to non-citizens at risk of or facing wrongful immigration-related surveillance or scrutiny, denial of immigration benefits or visas, interior immigration enforcement, and/or border enforcement by the U.S. government—on the basis of any protected ground, including viewpoint, race, national origin, and/or religion.

4.  MA's work also addresses the interests of U.S. citizens who are harmed by these, and other, wrongful U.S. governmental practices against non-citizens.

5.  MA's work on these issues includes conducting related Know Your Rights trainings ("KYRs"); providing legal consults to impacted individuals; providing direct representation to clients in litigation and non-litigation matters; and coordinating and supporting other attorneys in their provision of education, counsel, and defense to impacted people.

1

6.  In the time that has passed since the March 8, 2025, immigration arrest of Mr. Khalil and many others like him—such as Mohsen Mahdawi, Rümeysa Öztürk, Dr. Badar Khan Suri, and Leqaa Kordia (an MA client)—MA has experienced a sharp uptick in contact from non-citizen community members from across the nation who are alarmed by the administration's policy and practice of weaponizing its carceral power under the Immigration and Nationality Act for the purpose of chilling and punishing speech and conduct supportive of Palestinian lives and freedom, critical of U.S. and Israeli governmental conduct that harms Palestinians, or otherwise expressive of viewpoints that the administration does not like.

7.  Since March 8, 2025:

a)  Community members have asked MA to conduct approximately eleven (11) KYRs addressing viewpoint-related immigration risks and consequences for non-citizens. Between January 20, 2025, and March 8, 2025, MA had only received one (1) such request.

b)  MA has provided approximately fifty (50) individual consults to non-citizens personally concerned by viewpoint-related immigration risks and consequences. Between January 20, 2025, and March 8, 2025, MA had received few to no such requests.

c)  MA has provided support for the consideration or preparation of anticipatory habeas corpus actions for approximately thirteen (13) non-citizens acutely worried that viewpoint-based immigration custody could precipitate against them, as it has for Mr. Khalil and others. These individuals have included students, professors, and journalists. By contrast, between January 20, 2025, and March 8, 2025, MA had never been asked to support the consideration or

preparation of an anticipatory habeas action concerning viewpoint-based confinement.

d)   In the course of the support and coordination that I have provided nationally to other attorneys supporting and defending non-citizens concerned by viewpoint-related immigration risks and consequences in the aftermath of Mr. Khalil's immigration arrest—many such attorneys have expressed to me that non-citizens are now routinely asking them to prepare anticipatory habeas corpus actions for them.

8.   Across the aforementioned categories, many non-citizens have directly expressed to me that, in hopes of mitigating or navigating risks of viewpoint-based immigration consequences to them, they have: deleted social media accounts, deleted social media content, reduced social media usage, changed social media settings to "private," decided against protest attendance, decided against domestic air travel, and/or decided against international travel.

9.   U.S. citizens have also directly expressed to me having changed their usage of and/or behaviors on social media along the lines described above, in hopes of reducing immigration-related risks to non-citizens with whom they associate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 4, 2025

Respectfully submitted,

Golnaz Fakhimi
Muslim Advocates
1032 15th Street N.W. #362
Washington, D.C. 20005
Tel: (202) 655-2969
golnaz@muslimadvocates.org

3

**JA 1262**

F-3

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>     *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>     *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF JOSHUA DRATEL, PARTNER AT DRATEL & LEWIS** |

I, Joshua Dratel, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.     I am the founding partner of Dratel & Lewis, one of the law firms representing Petitioner Mahmoud Khalil in the above captioned case. After graduating law school in June 1981, I was admitted to the New York State Bar in March 1982, and have practiced law continuously since, primarily as a criminal defense lawyer. I have handled matters at all stages (investigations, trials, and appeals) in the U.S. state and federal courts – principally in New York – across the U.S., as well as some internationally. Throughout my career, my practice has included a wide range of matters, including "white collar," "organized crime," drugs, sex offenses, cybercrime, terrorism and national security, and capital cases.

2.     Currently, I am co-chair (since 2018) of the Defense Function Committee of

the American Bar Association ("ABA"), and co-chair of the *Amicus Curiae* Committee
of the National Association of Criminal Defense Lawyers ("NACDL") (since 1994),
as well as NACDL's National Security Committee (since 2011).  From 2011-2022 I
was NACDL's representative on ABA's Criminal Justice Section Council.  I am also a
member of the New York City Bar's Capital Punishment Committee (since 2002).  I
am a past President (2005) of the New York State Association of Criminal Defense
Lawyers.  I am a member of the Criminal Justice Act panel in the Southern District of
New York since 1988, and a member of that District's capital representation panel
since its inception.

3.      I have testified as an expert multiple times in the courts of the United Kingdom
and Canada as an expert on various aspects of U.S. law and its criminal legal system,
and also in a U.S. arbitration.

4.      Dratel & Lewis associate attorney Amy E. Greer, Esq., has been involved in
the above-captioned case since Mr. Khalil's arrest March 8, 2025.

5.      Since March 9, 2025, Dratel & Lewis has been contacted by more than three
dozen individuals and entities representing an extraordinarily diverse group of
vocations and professions, including students (undergraduate and graduate),
academics, lawyers, journalists, artists (in various disciplines), personnel working for
non-governmental organizations ("NGO's"), and activists.  Also, spouses and other
family members of the above-listed individuals have contacted us as well.

6.      The individuals described above also possess all ranges of immigration status in
the U.S. – from visa holders to Legal Permanent Residents to naturalized citizens to
native-born citizens.  Nearly all are without any criminal history, and none have been
convicted of a crime (or are currently charged with or accused of any criminal
conduct).  They also have expressed concern about family members whose status
could be used as leverage against them.

7.      Notwithstanding this diversity, all of these people and entities who have
consulted and/or retained our firm have one factor in common:  they each have
sought advice and/or representation as a prophylactic measure because they have
genuine fear of retaliation by the United States government for exercising their
protected speech, expressive activities, and associations related to advocacy for
Palestinian human rights and/or against the genocide being perpetrated in Gaza,
and/or relating to their particular areas of scholarship and/or work related to
Palestine.

8.      In addition, some of the lawyers described above have defended others

exercising their First Amendment rights, or engaged in proactive litigation to vindicate the First Amendment rights of others.

9.     Mr. Khalil's arrest and nearly three-month-long detention has caused the individuals described in ¶¶ 4-5 above to possess a credible fear – notwithstanding their citizenship or immigration status – of U.S. government retaliation for past and future First Amendment expression that could have an adverse impact their liberty, their ability to continue living, working, and/or studying or teaching in the U.S., their ability to re-enter the U.S., and their ability to retain their current employment, housing, and/or parental rights.

10.     The individuals who have sought counsel and a formal relationship with an attorney have done so in large part because the vagueness and lack of standards in the Secretary of States "foreign policy ground" leaves them without sufficient guidance as to what expression would be the subject of an enforcement action of some sort.

10.  This reaction across such a broad spectrum – transcending age, economic position, social or professional status, race, gender, religion, and nationality – is unprecedented in my nearly half-century career.  It does not have even a remote analog, even among the several cycles of political upheaval that have occurred in the U.S. through the past five decades.  The fear and intimidation spread rapidly and widely after Mr. Khalil's arrest and detention, and persists, as we have continued to field such inquiries on a regular basis.  Indeed, the steady volume has compelled us to refer some of them to other lawyers.

Dated: June 3, 2025                         Signed:
New York, NY

3

**JA 1266**

# Exhibit G

G-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF RASHID KHALIDI**

I, Rashid Khalidi, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Rashid Khalidi, and I am the Edward Said Professor Emeritus of Modern Arab Studies at Columbia University, where I taught for 23 years.

2. I declare under penalty of perjury that the foregoing is true and correct.

3. I have personally observed multiple instances of the Trump administration's targeting of Mahmoud Khalil causing many of my colleagues and students to change their behavior. I feel obliged to avoid all identifying details regarding these individuals, out of fear that they might also become targets of the Trump administration and other harassing private actors.

4. These instances include many foreign students, whether they have been involved in student activism or not, who are fearful of detention or deportation on the basis of their real or supposed past, current, or future speech or activity. These students are avoiding travel back to their homes, or travel that is necessary for their studies, out of concern they may be detained or deported upon their return. Foreign students of my acquaintance are all fearful for their future as students in the United States. Some of the students and faculty of my acquaintance at a variety of universities (Columbia, City University of New York, Princeton University) who are permanent residents or have student or work visas have been advised by their institutions not to leave the United States for fear of detention or deportation on their return.

5. These are not imaginary fears. A relative of mine who is an MA student at a Washington area university and was returning recently from a university-sponsored event abroad was detained at a United States airport for 7 hours, had his phone confiscated, and was threatened with deportation, while one of his fellow students, a United Kingdom citizen, was denied re-entry.

6. Two of my PhD students and several MA students and undergraduates who studied with me have been restricting their engagement in political speech on social media, and fear participation in class, or writing about subjects that might be considered objectionable by the Trump administration. This has thrown a chill over both teaching and studying a broad range of topics of this nature, out of fear that one might be deported for saying something in class that might be reported to the Trump administration by fellow students, as has apparently happened in the past.

7. As a result of the climate of fear created by the Trump administration's targeting of Mahmoud Khalil (and others), some of my colleagues at Columbia and other universities have been censoring the content of their instruction and scholarship, have avoided any political activity, and have limited their engagement on social media. Others have chosen to continue their advocacy, but have felt obliged to mask themselves while doing so out of fear that they might also become targets of the Trump administration and other harassing private actors, who appear to be acting in coordination with the administration.

Signed:

Rashid Khalidi

2

G-2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>        *Petitioner,*<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>        *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF JAMES SCHAMUS** |

       I, James Schamus, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is James Schamus, and I am a Professor of Professional Practice in the School of the Arts at Columbia University. I have been a professor at Columbia for 36 years.

2. The removal and detention of former Columbia student Mahmoud Khalil has had and continues to have a profound and overwhelmingly chilling effect on campus. Students and colleagues of all backgrounds and political orientations are keenly aware that a Columbia student, accused of no crime, has been disappeared from their midst, and they have perhaps rightfully concluded that thoughts and expressions of thoughts may someday retroactively be declared, regardless of citizenship or legal status, cause for their own detention or other punishment. As

we are a community devoted to the sharing and expression of often difficult and challenging thoughts, Mr. Khalil's removal and continued detention cut to the very core of the community.

3.  Among the specific examples I can share of the impact of Mr. Khalil's removal are: Students opting not to attend academic talks and other events out of fear that the topics discussed at the talk would draw operatives who would seek to photograph and identify attendees; students telling me they are now hesitant to participate in classroom discussions that might be construed as "political," even about ancient texts and on topics far removed from current debates and protests; students and colleagues, permanent residents and on various visas, cancelling academic research and conference trips abroad out of fear they will be detained and deported should they seek to cross the border. Of course many of these examples (and I can count many more) are informed by subsequent actions taken by the current administration, but all of them are concretized and experienced with the very intimate knowledge that Mr. Khalil served as an inaugural embodiment of and instrument for the administration's instauration of fear among our students; and his continued detention only strengthens the potency of that fear.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 31 , 2025                     Signed:
New York, NY

James Schamus

2

**JA 1273**

G-3

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF NADIA ABU EL-HAJ**

       I, Nadia Abu El-Haj, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Nadia Abu El-Haj, and I am a Professor of Anthropology at Barnard College and Columbia University.

2. Mahmoud Khalil's arrest and continued detention has had a noticeable impact on both students and faculty at Columbia. A green card holder who was arrested under the purview of the Secretary of State for, allegedly, harming US foreign policy has sent a chill through campus life. No one had previously feared arrest on the basis of political speech. Once Mahmoud Khalil, a green card holder at that, was abducted without a judicial warrant and whisked off to a detention center 1000 miles away virtually everyone became fearful. The consequences are clear and the fear palpable. I list but a few of the direct consequences below. I have direct knowledge of the

examples I enumerate either because I was involved in the decision making or because I discussed and/or offered advice to individuals regarding their situations and decisions.

3. A green card holding Palestinian student hid in his apartment for 3 weeks for fear that he would be detained by ICE agents if he was seen walking around.

4. A naturalized U.S. citizen of Palestinian descent was too frightened to come to campus. As a consequence, he moved his class off campus, with the consent of his department.

5. Two Palestinian PhD students who hold Israeli citizenship had planned to return home for the summer in order to do research for their dissertations. Fearing they were more likely to end up on the Department of Homeland Security's radar if they traveled, they decided to stay in New York. This decision was made despite the fact that staying in the city for the summer poses a substantial financial burden on each of them, and they may need to go into debt. (Columbia PhD fellowships provide 9, not 12-month stipends).

6. As Co-Director of the Center for Palestine Studies at Columbia, I canceled our two final events of the semester, one of which was to host a Palestinian lawyer together with a Middle East Studies scholar, and the second writers and translators of literature and poetry. Given that three of the participants are Palestinians in the US on either work or student visas, we did not go forward with the events. After discussions with each participant, we collectively decided that these events, while they certainly would have enriched discussions on campus, put the participants at too high a risk of being targeted by DHS.

7. More generally, Mahmoud Khalil's detention has had a chilling effect on colleagues who are foreigners, U.S. green-card holders, as well as naturalized citizens. Those of Arab and/or Muslim origin are feeling vulnerable and withdrawing from public speech; several are reassessing whether or not to leave the US for academic conferences or vacations out of fear that they will not be allowed to re-enter. What is more, at least one Lebanese-born naturalized citizen is considering not returning to Columbia next year, because she is fearful for her own safety. A naturalized citizen of Israeli (Jewish) origin was told she was on the federal government's radar and was at risk of detention when she returned from traveling abroad; she delayed her return until a law school colleague accompanied her back and through the border. A British professor on a green card cut-off all contact with a student pursued by ICE out of fear that he too would be swept up in the frenzy.

8. In general, there is nothing "normal" about Columbia University's campus today.

Foreign students live in fear of their visas being revoked: many students of myriad national origins took part in pro-Palestinian demonstrations last year, before it became, in effect if not formally, a crime. Likewise, faculty of many national origins stood outside the encampment in an effort to deescalate the situation and, potentially, protect students from a likely police raid. They too live in fear that they will be picked up and detained for merely acting like the adults in the room.

9. The effects of such fear are permeating well beyond the "mood" of campus life. Academic workshops and conferences on a wide range of topics have seen participants withdraw, or have been canceled or moved off campus because many non-Columbia speakers—foreigners, green-card holders and US citizens—are too frightened to participate in events on Columbia's campus. For my part, I canceled a recent talk at Harvard University's Middle East Studies Center after delivering the talk at Princeton. Even though I am unsure what the federal government could do to me for my academic speech, I too felt I needed to withdraw and rethink how I am going to go forward in this increasingly repressive political environment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 1, 2025          Signed:
NEW YORK, NY

Nadia Abu El-Haj

3

**JA 1277**

G-4

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>    *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>    *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF** ██████████ |

   I, ██████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ██████████. I am the ██████████ ██████████ at Columbia University.

2. The effect of Mahmood Khalil's arrest has been profound on myself, my colleagues, and my students. It has created a climate of fear and uncertainty that has chilled speech and political participation, as well as circumscribed our personal and professional activities.

3. One factor in the creation of this climate of fear and uncertainty is the government's invocation of a particular provision of the Immigration and Nationality Act in justifying Mahmood Khalil's arrest. This is due to the way that the government has

classified Khalil's activities as a threat to foreign policy. This classification calls into question that which we understand as protected speech and basic rights. This is frightening to many due to two factors: one, Khalil has engaged in peaceful anti-war speech and protests against Israeli military actions and US support for those actions, and two, the way the certain political groups and the current administration identify a broad array of political speech that is counter their own views as "pro-Hamas." This conflation makes anti-war or protests of government policy the same as support for Hamas. Given that this is a political group classified by the government as a terrorist group, many fear that such an equivalence opens the door to many further forms of government persecution and retaliation.

4. The government's invocation of the INA provision as justification for Khalil's arrest and detention has led us to conclude that any past activities in which we have participated or speech that we have engaged in that espouses views disfavored by the current administration will be used against us, whether we are green card or international student visa holders. For example, after the government announcement that it was using AI to scan social media accounts, many students and colleagues have scrubbed their social media of all mentions of anti-war sentiments, or even just any mention of factual statements about Palestinians or Israel.

5. Many have been told by legal counsel specializing in immigration issues that either their place of origin or their political participation and/or speech—especially if they have been doxed by private organizations—could result in visa revocations, arrests, or, the inability to return to the US if they leave.

6. One colleague who holds a green card fears he will not be allowed back into the US if he goes to visit his family in Lebanon. Other colleagues fear traveling abroad to conduct research necessary to their profession. Many students have been told that they should not leave the country if they have student visas. The inability to leave the country causes psychological hardship, since many students cannot see their families, some of them going on a year with no end in sight. This has resulted in financial hardship because the summer stipend they receive is not sufficient to live in New York.

7. This has also resulted in disruption of progress towards their degrees because they are unable to conduct research or engage in necessary language training. One student has had to change his dissertation topic entirely, since it is not clear when or if he will be able to travel to conduct research. Another student has needed to request an extension in submitting a dissertation proposal because she cannot travel to conduct necessary research for the topic she was accepted into a doctoral program to study.

2

8. Given that certain groups, who are responsible for carrying out sustained doxing campaigns since October 7, have reported names (such as Khalil's) to the government, many students and colleagues are worried that any current or future activities will invite government scrutiny and retaliation. As a result many censor their social media posts of any mention of Israel or Palestine, or of any disagreement with Israeli or US government policy. Many students and colleagues do not attend any protests, political rallies, or events at which they can be photographed or identified for fear that their names will be given to the government by persons and groups hostile to their political views.

9. This is self-censorship is further reinforced as apparently necessary given the fact that such targeting seems to have been how Mahmood Khalil was identified. That this has resulted in his arrest and prolonged detention has created a deep sense of fear and danger that extends to fear of coming to campus or even answering their doors.

10. One student, who lives in Mahmood Khalil's building and witnessed his arrest from the window was afraid to leave his apartment for a week. Many students and colleagues were afraid to come to campus or walk on streets around campus for the fear of immigration agents, severely inhibiting their ability to participate in their daily personal and professional lives.

11. As a naturalized citizen I am also afraid to speak about politics on social media or attend any kind of public or political event that the current administration views with disfavor for fear of being further doxed. I fear that the way certain partisan groups are giving names to the government, as well as the way the government is using AI to scan social media will result in government retaliation against me at the border.

12. This is also why I wished to submit this declaration under seal. I need to travel for professional reasons and I fear that this will inhibit my ability to do so and result in other amorphous repercussions for my daily life. Part of the fear is also due to the unprecedented nature of government actions against people like Mahmood Khalil and to the vague nature of the justification, which makes it unclear how far the administration will go even against its own citizens.

I declare under penalty of perjury that the foregoing is true and correct.

3

**JA 1281**

Dated: June 2, 2025          Signed:
New York, NY

4

**JA 1282**

G-5

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>        *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>        *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF YANNIK THIEM** |

I, Yannik Thiem, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Yannik Thiem, and I am an associate professor in the Department of Religion at Columbia University.

2. I joined the Religion Department at Columbia University as a tenured faculty member at the rank of associate professor in the summer of 2019. Prior to that I was a full-time tenured faculty member in the Philosophy Department at Villanova University in Villanova, Pennsylvania. My teaching and research fall into the area of social and political philosophy and more specifically I work on the relationship of politics and religion as well as on questions of gender and sexuality.

3. I received my first doctorate in Catholic Theology from the University of

Tübingen in Germany and my second doctorate in Rhetoric from the University of California in Berkeley, after having spent a year as a visiting scholar at Harvard University in Cambridge on a Fulbright Scholarship.

4.  During the 1980s and 1990s I grew up and went to school in Germany, in an area in former West Germany about 30 minutes from the former German-German border. I mention this circumstance because it points to two aspects that have affected—and continue to impact—my understanding of what it means to be a citizen in a democracy protected by the rule of law. This background also is why I am so gravely concerned by the kinds of alterations in approaching political speech and political activity that I have observed in students and colleagues, but also in myself since Mahmoud Khalil was arrested by ICE on the evening of March 8, 2025.

5.  Firstly, for me, what is commonly referred to as "the fall of the Berlin Wall" in November 1989 was and is — as for any of us who lived in proximity to the German-German border — neither mainly about Berlin nor far away nor an abstract concept. Within hours of the opening of the border, the local volunteer fire brigade was driving through our town, using the only vehicles with sound systems able to make announcements, asking everyone who could spare a couch or a cot to take in some of the people who had newly arrived from the East. Nobody knew how long the border would stay open, so people from the East had packed what they could and just left. We in our little town had spent weeks glued to the television watching people come out every Monday in East Germany for demonstrations. It was extraordinary to see the demonstrators assert week after week "WE are the people." But what would happen next was far from certain. I viscerally remember how tense everyone was, both the reporters as well as we, who were watching from our home an hour or so southwest from the closest demonstrations. School was in session at the time, but the tried and tested worksheets and lesson plans were suspended. The world outside on our own doorstep had become the textbook for the time being. The Tiananmen Square massacre had just happened that June. As much as everyone was exhilarated to see people protesting, our teachers' and parents' fear was palpable. (I recall my parents buying inordinate amounts of canned food — which we never ate and would later give away. My father was a child during World War II and my mother had been born during the so-called "hunger years" just after the war. Our parents, as were all the adults around us, were preparing for war.) The haste with which East Germans were coming to our town in November 1989, having left their entire lives behind, and my parents' fear about imminent war have taught me that the power of "we, the people" remains always vulnerable to the might of weapons — physical and psychological. What remains seared into my own memory is how tenuous,

2

precious, and extraordinary that foundation of all democratic self-governance is —
"We, the people" coming together and laying claim to the right to government of
the people by the people for the people. But most of all, I carry with me from that
childhood experience that if we wish to live in a democracy, the depth of our
commitment to the freedom of expression must be matched by an equal depth of
a commitment to the freedom to assembly.

6. The other formative aspect of growing up and going to school in Germany was
the German high school curriculum and its emphasis on Germany's recent fascist
past. During the time when I was in school, the curriculum emphasized not only a
detailed reckoning with the unfolding of the atrocities of Nazi Germany, but also
confronted us as youth on a yearly basis from seventh grade on with questions
such as "How could the authoritarian fascist Nazi regime entrench itself?", "How
did which institutions give way to their own Nazification?", "When and how could
the Nazis have been stopped by our grandparents and great-grandparents?", "Why
did they not do more to resist in the early days?" and "How can we ensure that
should anti-democratic forces rear their ugly heads again that we stand up and
defend democracy in ways that our ancestors failed?" When I grew up, the phrase
"never again" was a given, but the far more vexing ethical and political imperative
issued from its corollary: "Fight against the beginnings *(Wehret den Anfängen)*!" The
lesson we learned was that authoritarians and those working with them seek to
make dissent costly. As I absorbed growing up, when a democracy functions well,
it might be uncomfortable to speak out or show up to participate in political
speech and activity. But it should not be costly. It should not carry a penalty when
we engage in political speech and political activity. In a democracy, nobody should
need to be a hero or a saint to participate.

7. The news of Mahmoud Khalil's arrest on the evening of March 8, 2025 was jarring
and deeply disconcerting. Since the inauguration in January 2025, many of us had
shared a general sense of apprehension about what the Trump administration
would mean for a variety of issues and populations, such as immigrants and
transgender individuals but also academic freedom and freedom of speech and
assembly more generally. But up until Mahmoud Khalil was taken by ICE agents
on March 8 that general atmosphere of apprehension had more of a "wait and see"
character to it. However, when Khalil was arrested, detained, and labeled as a
"threat to foreign policy interests" of the United States, and then subsequently
other students and scholars were detained as well, the threat became very real. And
since then there has been a noticeable shift in the sense of how risky political
speech and activity are but also in how confident we are that academic freedom
protections will in fact protect us.

8. Perhaps among the most shocking realizations is that it seems that even Columbia University as represented by its leadership is quite intentionally censoring itself. In the days immediately following Khalil's arrest by ICE we received email communications from Interim President Dr. Katriana Armstrong, Provost Dr. Angela Olinto, and Executive Vice President of the Arts and Sciences Dr. Amy Hungerford. Email correspondence from high-level administrators in the aftermath of events that deeply shake the community are nothing unusual. What was unusual in this instance was that such emails usually name the specifics of the circumstances of what has occurred, but in this case the emails were notable in their vagueness, especially in neither mentioning Khalil's name nor reporting that a student had suddenly been taken from Columbia-owned housing into ICE custody.

9. The first mention of his name in official correspondence from University leadership came in an email on April 28, 2025, with the subject line "Supporting Our International Community." By this time Interim President Armstrong had resigned and the Board of Trustees had appointed the then Co-Chair of the Board Claire Shipman as Acting President. Initially it was not clear to us as University community members why exactly our University leadership would not mention Khalil's name. But it now appears that this too was an instance of the government chilling speech. At Columbia's commencement two weeks ago, Acting President Shipman publicly mentioned Mahmoud Khalil's name and acknowledged that many students were missing his presence. The Education Secretary Linda McMahon immediately commented on how "disappointing" and unnecessary it was to mention Khalil's name in public.[1] It suddenly became apparent that our University's administrators have been adjusting their communications with us, the Columbia University community, to avoid "disappointing" the Trump administration.

10. Immediately following Khalil's arrest many international students were absolutely terrified of leaving their apartments. Provost Olinto's email correspondence March 10, 2025 acknowledged that "this last week has been a stressful time for many on campus" and reminded us "Students may always reach out to their teachers to request accommodation if they are unable to attend class, and we hope that faculty will be as helpful as possible with these requests." My undergraduate class during

---

[1] "President Shipman is trying to balance different factions, but I was disappointed," McMahon said. Naming Khalil wasn't "necessary for her to say, considering all of the campus unrest that had happened," McMahon said. https://www.wsj.com/us-news/education/trump-college-university-federal-funding-fight-91c2a274?gaa_at=eafs&gaa_n=ASWzDAhSd_NNKxd_AdL0_pHNSlyZ3vfM4Hq39cjA2QCo1b8_XwSTxL5mXH Fe79Y-rjQ%3D&gaa_ts=683d60b7&gaa_sig=WrH_tWSqLaq4VzqFkZgJnXjYwLoUYSTPo39Zfw92z42_Eu5m_39KsFE_w3mpRHGgJUODG5X4-igNQwUmztmqvg%3D%3D

the Spring term 2025 met in a building outside of the gates of the Morningside campus. Many students who lived in the dorms had indicated that they were worried about leaving campus since some had been active in campus demonstrations while others had simply shared their political views on social media over the past year. Since there were students who were among those terrified to leave campus, I met my undergraduate class on the Morningside campus during the week immediately following Khalil's arrest. Even then, several students were wrecked with anxiety that there might be an ICE official suddenly appearing to arrest them.

11. Holding normal classes was next to impossible during that week. Even students who were U.S. citizens were concerned not only for Khalil and their peers on visas, but also expressed their own fears of arrest and asked for advice for themselves. Should they get a lawyer, just as a precaution? Is it true that everyone has First Amendment rights or only citizens? But what if the government doesn't respect those rights? Would it be best to delete all political social media content? Students also worried about being in touch with family, friends, classmates, or instructors over Columbia University email, fearing that the University might turn over their emails to the Trump administration.

12. International students and a few native-born but minority students in that undergraduate class became quiet from the time of Khalil's arrest onwards, carrying a palpable sense of fear with them, and several mentioned to me that they remained anxious and worried because they feel that they should be more courageous and participate in political speech and action despite the obvious risks. Several have mentioned that they consider being politically engaged to be what Columbia had taught them it meant to be a citizen of the world.

13. My other course this past Spring semester was a graduate seminar on the work of the German-Jewish thinker Walter Benjamin who died in 1940 while fleeing from the Nazis. On March 11, 2025, a few days after the arrest of Khalil, I sent out an email to my graduate seminar, similar to the email that I had sent earlier to my undergraduate class. The only difference in content was that I planned on meeting the graduate seminar in the usual off-campus building since most students in that seminar did not live on campus already. With the exception of one student on a visa who was concerned about leaving their home, all the students were present in person for this seminar session and expressed their appreciation not only for being able to meet in person but also for the explicitness of the email that I had sent. Among the nearly 20 different instructors which the students had during that semester, apparently I was the only one who mentioned Khalil by name in the email sent to the class.

14. The conversation during that first seminar session after Khalil's arrest focused mostly on why there was such an anxious silence among everyone, as if even stating what had happened or mentioning Khalil's name in writing was dangerous. One student asked whether I had hesitated to send the email that I had sent them. I admitted that of course I had considered that we know that there have already been subpoenas for the correspondence of some Columbia administrators and faculty colleagues. In a large course, I would quite possible not have written the email. I wish I could say with certainty that I would have written this email no matter what, but I am not sure.

15. One student observed that even though many of us do not know Mahmoud Khalil personally, his arrest and continued detention by ICE have catapulted us into a different moment in time. "It hits home differently when they come for a student at your own university, someone in your neighborhood," the student commented. Another student agreed and added that we <u>all</u> have already changed so much in how we act, because we all are now constantly evaluating and assessing the risks of what used to not even cross our minds as a potentially risky political statement. We all already self-censor in ways that we never used to. Even if we overcome our initial fears and say something, that hesitation and the need to wrestle up courage changes things. The students understood this. But still, why, they wanted to know, was there not even one other faculty member who would mention Khalil's name in their email to their class? What does it say about us and who we have become when we are too scared to accord a fellow human the dignity of calling them by their name?

16. Since the end of March, I have had several discussions with graduate students and colleagues about what we should expect in terms of being targeted for working on questions regarding queer and especially transgender communities and individuals and how we should proceed in our academic research. I mention this concern here, because Khalil's detention is also in the background of these conversations. A colleague commented that "They start with non-citizens first and it won't be long until they move on to citizens who they don't like." For a junior colleague with whom I spoke about Khalil's detention, that Khalil appears to remain imprisoned solely for his political activity, prompts the question "Would I be willing to lose my job and possibly even go to jail for this research?" One graduate student explicitly wanted help with thinking about how they could reorient their research because they are concerned about being unable to find academic employment in the United States with a research project focused on the interplay of politics and religion in recent debates on transgender youth.

6

**JA 1289**

17. Since Khalil's arrest on March 8 and the other students and scholars who have subsequently been detained or who have fled the country, three non-citizen graduate students have since consulted me about summer travel plans and how they should approach their fears that upon returning to the country they might be denied entry. One is concerned because of the countries in which they will be conducting their research. The other two worry because of the political content that they have posted on social media. Both these students have since deleted the social media content in question and were considering deleting their social media accounts altogether (while understanding of course that "the Internet forgets nothing"). All three of the students were planning to consult with an immigration lawyer before making a final decision on whether they would travel abroad this summer. In the nearly 25 years of having been in the United States first as an F1-visa holder myself and for several decades now working regularly with international graduate students, this is the first time that I am encountering such considerations and worries about being denied reentry to the United States because of a research project topic, the location where such research is undertaken, or public political speech.

18. For myself, I have decided against traveling abroad to see my family in Germany this summer. I am a dual citizen, I am transgender, I am affiliated with Columbia University, and I have not hidden my political views. I made this decision primarily because it remains extraordinarily alarming to me that even though Khalil is a green-card holder and has deep local community ties, including a native-born wife and newborn son, he has been in detention for nearly three months for what looks like nothing more than his political activity in support of freedom and justice for the Palestinian people.

19. It has also been noticeable that at Palestine-related academic events since Khalil's arrest, there are far more people in the audience who now wear face masks than even just a few months ago at the end of the Fall semester 2024. Similarly, several undergraduate students with whom I have spoken have commented on how they felt comfortable last year to attend pro-Palestinian demonstrations without concealing their identities, but now they fear that the risk of being doxed is too high. International students have largely opted not to attend political demonstrations at all, but even students who are U.S. citizens feel the need to conceal their identities.

20. If there is a vagueness to my accounts here, it is because I have omitted the names of students and colleagues because they do not wish to be identified. I omitted one particularly striking instance of academic self-censorship because I was not able to come up with a satisfactorily concrete way of describing the event while at the

same time protecting the identity of the student to the extent that they and I would feel comfortable with.

21. It is very sobering to observe just how deeply Khalil's arrest in early March 2025 and his continuing detention have impacted how we approach political speech and activity, academic work, and the particulars of our lives where we have good reason to assume that they run counter to the agenda of the Trump administration. Writing these sentences here feels risky. But it is necessary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 1, 2025                    Signed:
New York, NY

Yannik Thiem

G-6

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

      *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

      *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
HAROLD STOLPER**

    I, Harold Stolper, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Harold Stolper, and I am a Lecturer at Columbia University's School of International and Public Affairs (SIPA), where I have taught quantitative methods and data analysis for the past ten years. I submit this declaration in support of Mahmoud Khalil and based on my direct experience as a faculty member working with SIPA students, both in and outside the classroom.

2. In my capacity as a faculty member, I have observed a profound chilling effect on students' sense of safety and willingness to engage in political speech, organizing, and even routine academic activities following the detention of Mahmoud Khalil by federal immigration officers.

3. A noncitizen student from Gaza shared with me that they "would have loved to book an office hour appointment with me but I am avoiding campus for the past few weeks." This student, whose family and friends in Gaza have been killed by Israeli airstrikes, told me they no longer feel safe at Columbia or SIPA and have effectively abandoned the professional goal of working in the United States. Instead, they expressed an urgent desire to leave the country after graduation so they could live and work freely and without fear. They cited Mahmoud's detention as a central reason for avoiding campus and staying largely confined to their home.

4. In the days immediately following Mahmoud's detention, another Muslim student from Saudi Arabia, who to my knowledge has not engaged in public political speech, asked to attend class remotely. They told me that SIPA "is no longer being a proper place to knowledge share and spread education with all this hostility," and expressed fear about being physically present on campus.

5. While I cannot speak to the internal deliberations of my faculty colleagues, I am aware that some have declined to write publicly in support of Mahmoud because they feared doing so could negatively impact their own immigration status or green card applications. This suggests that Mahmoud's detention has caused even faculty members to self-censor and fear professional or legal consequences for acts of solidarity or speech.

6. After Mahmoud's detention in March 2025, several second-year students in my class—students who typically travel abroad for their capstone projects during Spring Break—expressed concern about leaving the U.S. One Muslim student from Indonesia cancelled their planned travel with their capstone group and stayed in New York, telling me they were afraid they would not be allowed back into the country to complete their degree. I recall that they cited Mahmoud's detention as one of the sources of their fear.

7. Based on these and other experiences, I believe Mahmoud's detention has had a substantial chilling effect across SIPA's academic community. The atmosphere on campus has shifted from frustration and exasperation to one of real fear: fear that students, particularly those who are Muslim, Arab, or otherwise visibly associated with advocacy for Palestinian safety and freedom, may be detained, surveilled, or otherwise penalized for their political views or identity.

8. I, too, feel this shift. Even as a U.S. citizen and full-time faculty member, I have found myself more hesitant to speak openly or advocate on behalf of students. I know others share this fear. Many students—citizens and non-citizens alike—worry that even peaceful, non-disruptive expressions of political opinion could lead to federal or institutional repercussions.

9.  SIPA's website proudly states that its "graduates and faculty strive to improve social services, advocate for human rights, strengthen markets, protect the environment, and secure peace, in their home communities and around the world." And yet, since the humanitarian catastrophe in Gaza escalated, to my knowledge SIPA has not held any public academic events addressing the crisis, despite its undeniable relevance to global public policy, human rights, and peace and security. I believe that this institutional silence is not accidental. Rather, it reflects the profound chilling effect of Mahmoud's detention and broader governmental and institutional actions that have caused faculty and administrators alike to avoid public discourse on this topic.

10. The fear on campus is not theoretical. It is lived, felt, and daily expressed by students and faculty alike. I am submitting this declaration because I believe the detention of Mahmoud Khalil—without criminal charge and seemingly in response to political advocacy—has cast a shadow over our academic community. It undermines the mission of SIPA and the values we claim to uphold.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 2, 2025                          Signed:
London, United Kingdom

Harold Stolper, PhD
Lecturer in the Discipline of International &
Public Affairs
Columbia University | SIPA

G-7

Document Fully Redacted

G-8

Document Fully Redacted

G-9

Document Fully Redacted

G-10

Document Fully Redacted

G-11

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Mahmoud KHALIL, | |
| *Petitioner,* | |
| v. | Case No. 25-cv-01963 (MEF-MAH) |
| Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | **DECLARATION OF** ▮▮▮▮▮▮▮▮ |
| *Respondents.* | |

I, ▮▮▮▮▮▮▮▮, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ▮▮▮▮▮▮▮▮, and I am a lecturer in the Department of ▮▮▮▮▮▮▮▮ and a postdoctoral scholar in ▮▮▮▮▮▮▮▮ at Columbia University. I also completed my PhD at Columbia University in 2021.

2. I came to study and later research and teach at Columbia University because I was under the impression that it was safe space for Palestinians and Palestine research and discourse. It hosts a dedicated Center for Palestine Studies, has an Edward Said reading library, and has many faculty and librarians with deep interests and commitments to Palestine. Regrettably, this was not my experience.

3.  When Trump took office, the stage for further anti-Palestinian hostility on and by campus was already set by the prior actions of the Columbia University administration.[1] As government officials openly spoke about deporting students, doxxers began feeding them names of people to deport, one of whom was of course Mahmoud Khalil. Immediately I noticed students, faculty, and staff take measures to protect themselves – such as putting their social media on private or deleting it all together, or removing themselves from organizations advocating for Palestinian rights for fear of targeting and reprisal.

4.  The abduction of Mahmoud Khalil in my building lobby (we are neighbors) brought a very chilling climate of fear, especially among Palestinian students, faculty, and staff. We were warned by lawyers of the risks of ICE abductions on campus that may target anyone, especially those doxxed.

5.  As a result of student fears as I had several international students in my seminar, I moved my entire seminar off campus to a nearby venue that offered us sanctuary. Those of us with relatives in Gaza (myself included) have also taken measures to be careful of our own public facing work for the safety of our relatives – as Israel has

---

[1] Columbia's clear commitment to Israel and its desire to snuff out any presence of Palestine became most evident after October 7, 2023. Palestinians were increasingly made unwelcome and unsafe on Columbia's campus. I myself took leave for the remainder of the semester after my uncle's family was killed by an Israeli missile in November of 2023 in Gaza. There was no open acknowledgement of any of the losses Palestinian staff, faculty, and students faced by Columbia University. Instead, we were punished by the university for trying to even have open discussions about it.

Many Palestinians colleagues began to withdraw their presences for fear of the reprisals and the witch-hunting that came from doxxers—both campus community members and off-campus private parties. This doxxing was not new – Canary Mission has been around a long time, and they have long targeted Palestinian faculty at Columbia University specifically. However, this time it took new heights.

The targeting and harassment were also enabled and enacted by Columbia University's then president, Minouche Shafik, and by Columbia's board of trustees when questioned during the Congressional hearings. Rather than defend their students and faculty, they promised to do more to discipline them. I myself was subject to a "disciplinary hearing," as I was targeted by faculty and staff in my department for speaking out for Palestine on a department listserv. My own complaints to the university for being doxxed and targeted were ignored. As a result of all this, I took mental health leave (FMLA) in the fall of 2024, as the university increasingly became a hostile environment.

2

**JA 1306**

been known to target people for public advocacy (such as the late Refaat Al-Areer). As one example: one international student I know but will not name for these reasons, has been laying very low, careful to even walk around alone, and is actively trying to figure out their future as funding has been withdrawn and their visa status is in question.

6.  Several non-citizen students or scholars, including legal permanent residents, that I know personally have decided against traveling abroad to visit their families for fear of being barred re-entry.

7.  I also know of many, many faculty who have stayed silent on the military assault on Gaza – even if they are opposed to it – for fear of the effects on their careers and livelihoods. Many continue to be doxxed, harassed, and ignored when addressing these matters with the administration (I myself have been ignored). At least 3 librarians have been fired (Barnard and Columbia) for advocating for Palestinian rights. And of course students who protest against the genocide in Gaza continue to be beaten, arrested, suspended, and/or expelled by the university and law enforcement. Columbia University has essentially become a police state in service of the Trump administration's demands, but as explained earlier, it had laid the groundwork itself to ensure the silencing and erasure of Palestine and Palestinians and the criminalization of anyone who protests this.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                           Signed:
New York, NY

3

**JA 1307**

# Exhibit H

H-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>     *Petitioner,*<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>     *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF**<br>██████████ |

I, ██████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ██████████, and I am a student at Columbia University pursuing an ██████████████████████. Much of my community at Columbia are outspoken young advocates and activists who have been chilled by the recent crackdown on free speech, notably in Mahmoud Khalil's case.

2. Mahmoud Khalil's detention in March has had a visible effect on the ability and willingness of students to exercise their fundamental freedoms, particularly as it relates to political speech and behavior. Everybody knows that the United States government, via Secretary of State Marco Rubio, has determined that participating in campus protest and speech in support of Palestinians is contrary to "U.S. foreign policy" and could render a person deportable. As a result, students are less willing

now to attend protests, post on their social media accounts, express support for Palestine, or associate with anyone who does.

3. At least one undergraduate international student has consulted my opinion on transferring to an institution outside of the United States to complete their degree. This student had previously been incredibly vocal about their support for Palestine following the beginning of the Israeli assault on Gaza in 2023. However, they now feel that they can no longer voice their opinions freely in the United States, especially as all students at Columbia University face heightened surveillance by the federal government.

4. Graduate international students have also voiced similar fears. Many feel uncomfortable in their own homes and fear being abducted by Department of Homeland Security agents. For this reason, they have started staying with friends instead of in their own homes or have taken other measures to protect themselves.

5. Students who are American citizens or legal residents have expressed that they are unwilling to publicly voice their support for Palestine for fear that they will be surveilled in public or that their speech on social media will be documented and reported. These students are also wary of potential criminal charges as a repercussion of exercising free speech in support of Palestine, now that Mahmoud has faced three months of detention for his speech alone.

6. One particular student who had written a thesis paper on the First Amendment as it relates to the Free Palestine movement in the US expressed that she wanted to have her writing published in an academic journal, but was reticent about using her real name as this might cause legal problems in the future or cause her to be otherwise targeted. I know of at least one other student who has published a paper online using a pseudonym for this reason.

7. Many students in my community have also expressed hesitation about traveling abroad to visit family or for career opportunities over the summer. They fear being interrogated or their devices being searched at the border since interactions with law enforcement could lead to their arbitrary arrest, even if a crime has not been committed.

8. This chilling effect is due to the circumstances of Mahmoud's detention. As far as the community understands, Mahmoud is being detained for his speech alone. As such, not only are students afraid to speak politically about Palestine, but they are also afraid to publicly associate with others who do exercise their speech in support of Palestine.

2

I declare under penalty of perjury that the foregoing is true and correct.

.

Dated: June 1, 2025          Signed:
New York, NY



3

H-2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

      *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

      *Respondents.*

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF** 



I, ███████████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ███████████████, and I am a recent graduate from Columbia University.

2. The targeting and unjust detention of Mahmoud Khalil has had ripple effects across communities. As we know, Mahmoud was targeted for speaking up against the ongoing genocide in Gaza and for the liberation of his own people, for Palestine. Much of his activism was based at the school we attended, Columbia University. Mahmoud also lived in Columbia housing.

3. In my capacity as a Columbia student at the time of his detention, I have seen a lot of fear for Gaza, for Mahmoud, and for peoples' freedoms in their advocacy for

Palestine. The way Mahmoud is being targeted for deportation and deemed a "threat to U.S. foreign policy," simply because of his speech in support of the Palestinian people, has had direct implications, especially on people who do not have American citizenship.

4. For example, after the government abducted Mahmoud, many students (my classmates) stopped going to their classes. Having noted Columbia's collaboration with DHS, there were students who were afraid to step onto Columbia-owned property. Some students who lived in Columbia buildings moved, out of fear for their safety and freedom. Students who have not been able to move out of their Columbia housing have lived in a perpetual fear and anxiety at the potentially violent outcomes they could face from the school and DHS. Since Mahmoud was detained, some people have barely left their homes out of fear of being detained as he was.

5. I have seen how students and faculty who have publicly spoken up, written, published, and taught in support for a free Palestine and end to the ongoing genocide in Gaza are facing targeting. Some students are afraid to leave the country and be detained upon return and some students have been pushed to leave the U.S. as living here in fear became unsustainable for them. Since Mahmoud's detentions, international students who are Palestinian, and/or advocates for Palestine, have confided in me their fears about articles they've written, or social media posts, interviews, or photos depicting their participation in protests. Many international students are now afraid to attend protests and marches for Palestine, out of the fear of political detention as is being done to Mahmoud. They have lived in a perpetual anxiety at the very real threat of DHS targeting and indefinite detention, as is happening to Mahmoud.

6. Since the targeting of Mahmoud, and the subsequent rampage targeting of Palestinians, pro-Palestine activists, and immigrants by DHS and the Trump administration broadly, many people are always on the lookout, are in constant panic and hypervigilance, many people have not been able to sleep from this fear. This is especially true with students at Columbia because of the way that Mahmoud's activism as a Palestinian student at Columbia has been explicitly used against him to justify his indefinite detention. Many students fear that they are next, and there are many students who have been explicitly threatened by the same inhumane treatment.

I declare under penalty of perjury that the foregoing is true and correct.

2

Dated: June 1, 2025
New York, NY

Signed:



_____

3

H-3

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

     *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

     *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
████████████
████████

I, ████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ████████, and I was a Jewish graduate student ████████ █ ████████. Attached hereto, are the exhibits listed below, are true and correct copies of the following materials:

    A. After Mahmoud was detained, a chilling effect swept through the Columbia ███ student body. As a Jewish American, I felt deeply afraid. The fact that such horrifying actions were being carried out in the name of protecting Jewish students made me fear an increase in antisemitism—not only because of the injustice itself, but because it risked fueling backlash and resentment. Mahmoud's detainment didn't make me feel safer as a Jew—it made me feel more vulnerable.

    B. I served as a board member for a Columbia ███ student group at Columbia during the 2024–2025 academic year, alongside several international students. After Mahmoud was detained, one of our board members—an international student—asked to resign out of fear

that their involvement with the group could lead to their own detainment. The atmosphere of fear and repression was palpable.

C.  That same international student even asked to leave a group chat simply because Mahmoud was in it—fearing that any association with him could put them at risk of detainment. Out of that same fear, they archived all of their previous anti-war advocacy posts on social media, despite having been outspoken on those issues before. The repression wasn't just chilling—it forced students to erase parts of their identity and activism to feel safe.

D.  As a Jewish student, the night I saw President Trump post 'Shalom Columbia,' I texted my mom that I felt like I was having a panic attack. That phrase—meant to suggest Jewish support for his targeting of pro-Palestinian students—was terrifying. It felt like our identities were being weaponized to justify the crackdown on freedom of speech at our tight-knit community of Columbia ▆▆. That night I worried it would lead to a potential detention of one of my peers that I cared about fueling my anxiety. This fear later came to be true when my peer, that I care about Mahmoud Khalil was detained. Please see my text messages with my mother from March 7, 2025, which document my immediate panic and fear in real time. I went to the hospital later this evening.



E.

F.  Immediately after Mahmoud was detained, I helped organize a ▆▆-wide letter-writing campaign so members of our community could send him messages of support. I also did public press to raise awareness about the campaign. Shortly after, a professor pulled me aside and warned me that I could be charged with terrorism simply for publicly advocating for Mahmoud. I was terrified—I broke down in tears and began shaking uncontrollably. It was hard for me to comprehend that advocacy for a peer I know and trust could lead to my own criminalization, but because of everything that had happened to Mahmoud, I was terrified that what this professor warned of could mean I was next.

G.  Since Mahmoud's detainment, I've experienced persistent nightmares, insomnia, and an overwhelming sense of fear that I, or another peer that I care about could be taken next—despite being a Jewish American citizen. At one point, I was alone in my Columbia campus

housing when maintenance began banging on my door for a repair. I panicked, broke down crying, and called my mom, terrified that law enforcement had come to find me, or even worse, someone who had wished harm upon me as a Jewish student on one of these doxxing pages had come to hurt me. The constant state of fear has become part of my daily life.

H.  On another occasion, I came home from class to find an NYPD car parked outside my Columbia housing. I was so overcome with fear that I couldn't bring myself to enter the building—instead, I walked aimlessly around the neighborhood until the car eventually left. Ever since Mahmoud's detention, I've been living with a constant, irrational fear that I, too, could be targeted or detained at any moment. That's what it felt like happened to him.

I.  Columbia ███'s student body is made up of over 50% international students. Since Mahmoud's detainment, many of those students have shared that they no longer feel safe attending class. I've witnessed this firsthand—class attendance has noticeably declined, particularly among international students. Those who do continue to attend are often too afraid to speak up, whether in the classroom or even in informal spaces like our cohort's WhatsApp group. The fear and silence are unmistakable.

Dated: May 31, 2025          Signed: ███████████
New York, NY

3

**JA 1320**

H-4

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

      *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity
as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary
of State; and Pamela BONDI, in her official
capacity as Attorney General, U.S.
Department of Justice,

      *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████

    I, ███████████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.  My name is ███████████████, and I was a Jewish undergraduate student at Barnard College at Columbia University, ███████████.

2. Mahmoud's abduction has created a chilling effect and caused mass fear and distress to Columbia students. As a Jewish student, the fact that his detainment was done in the name of Jewish safety was incredibly scary. I fear that tying such a blatant, fascist attack on free speech to the religion I love will only fuel antisemitism and I am heartbroken to see my religion weaponized in the abduction of my peers.

3. Moreover, I am deeply scared for my friends and community. For the month after Mahmoud was taken, I woke up every morning and checked my phone to make sure none of my other friends were taken by ICE. I had trouble sleeping and would wake up in the middle of the night with feelings of dread. I cried almost every day for a month and a half, and had a really hard time keeping up with schoolwork.

4. I recall on one occasion experiencing a bout of panic and distress in anticipation of an ███████████ midterm, and writing to my mother that I feared for my classmates and community members that there would be an ICE raid



5. A few days after my peer, Mohsen Madawi, was also detained by ICE, I broke down sobbing in the middle of my senior thesis seminar, in front of the whole class, because I was so scared. I felt as if no one on campus was safe, and like I was witnessing the rise of fascism and powerless to stop it.

6. Growing up in a Jewish community, I have been taught from a young age to look for the warning signs of fascism. Seeing people I care about deported for their political beliefs and identity filled me with dread. I couldn't comprehend how everyone was continuing to go to class and go about their daily life.

7. I know many of my friends have experienced the same. My boyfriend has been having flare ups of OCD and anxiety attacks due to the culture of fear and apprehension we experienced knowing our community members were at risk of deportation. On one occasion, he experienced a panic attack and walked himself to the hospital because he was having trouble breathing.

8. I know multiple international students who fear for their safety and have been too scared to speak out in support of Mahmoud, or to engage in pro-Palestinian speech. A few days after Mahmoud was taken, I sat next to my international friend at a Purim party as she cried for fear she would be deported too, having attended a few rallies and reposted some posts. She has not felt safe attending protests or engaging in pro Palestinian content on Instagram.

9. Another international classmate told me multiple times how much he wished he could stand with us at rallies, or contribute to our divestment efforts, but he is too scared he will be targeted and lose his visa. As a result of his very real fear, our whole community lost out on the benefit of his voice, opinions, and contributions.

10. Fellow Jewish organizers and I were terrified that any public response to our friend Mahmoud Khalil's abduction, or any type of protest or exercise of free speech that got the Trump administration's attention would trigger

another ICE raid and put our friends at risk. For this reason, we discouraged international students from attending our demonstration and felt it was only safe for demonstrations to be led by Jewish students. Again, this meant that our entire community lost out on the incredible contributions of our international peers because they rightly fear retaliation and potential deportation.

Dated: June 3, 2025                    Signed: █████████████████
New York, NY

H-5

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>        *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>        *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF SHAY LEV ORENTLICHER** |

I, Shay Lev Orentlicher, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am Shay Lev Orentlicher.  I am a Jewish student at Columbia University and an organizer with Columbia-Barnard Jewish Voice for Peace.

2. Since Mahmoud has been detained, I have found myself second guessing everything I do. I am afraid that I or people I love will be targeted if I am politically active. Though I have tried to continue to exercise my free speech rights since Mahmoud was taken, I second-guess everything in a way I never did before because the potential consequences feel so much greater not just for me but for my community.

3.  I have told my international friends that they do not have to spend time with me in public in case association with me jeopardizes their safety. Out of fear, some of my friends and I now only meet in private spaces to ensure their safety.

4.  One of the classes I took last spring was a large political theory lecture about justice. Mahmoud was detained shortly before our midterm examination, and as a result, the professor sent out an email informing us that if any student in the class had real reason to think they were at risk of being targeted by immigration and were afraid to come on campus, they did not have to come in for the midterm and could take it at a later date. A couple weeks later, my Teaching Assistant sent out an email providing information about accommodations for those who had been unable to come in person to take the midterm — indication that students in the class did indeed have to miss the examination out of fear.

5.  Later in the semester, the same class included a lecture on Palestine and Israel. Though it is a large class, the professor likes to open it up for discussion and debate, especially when the lectures are on specific issues. We had lively debates about surrogacy, abortion, and hate speech, among other controversial topics without issue. Not a single student raised their hand to voice an opinion when the topic was Palestine. When I went to ask the professor a question after the lecture, he told me he has been teaching this course for over twenty years, and every single time he taught it, the same lively debate ensued for the Palestine-Israel lecture. This was the first time he had taught the course that nobody had been willing to share an opinion. He told me he thought Mahmoud's detention was a huge factor in creating this atmosphere of fear.

6.  The scariest moment for me after Mahmoud was taken, when I saw the true depth of this chill, came with Passover. I was inviting all of my Jewish friends to the seder I was organizing for anti-Zionist Jews, and I invited one Jewish friend who was an international student. She said she would love to, especially since she didn't have another seder to attend, but she asked me, "Is this seder the kind of thing that could make me lose my visa?" I did not know how to answer. I clarified that it was a community space for religious ritual, not a political action or protest, but that given Mahmoud's circumstances, I didn't know if that made it safe for her to attend. She did not come to the seder.

7.  The atmosphere of fear at Columbia is palpable. What happened to Mahmoud is impossible to ignore, and it has shaped how we interact with one another and our academic environment. When students are afraid to go to class, take exams, raise their hand in lecture, attend religious events, and spend time with their friends,

that constitutes a terrifying chill. It is a chill that undoubtedly has affected international students most, but the rest of us feel it, too.

8. I am afraid of how anything and everything I say will reflect upon international students at Columbia. Before I say anything related to Palestine, I question if my words will be maligned in tabloids that are later submitted as evidence against another international student.

9. I cannot speak freely if my words – for which I and only I should be responsible – will be weaponized by the federal government against my peers in immigration courts.

Dated: May 31, 2025                              Signed:
Indianapolis, IN

                                                 */s/ Shay Lev Orentlicher*

3

**JA 1329**

H-6

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

      *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and
Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

      *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████

I, ███████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,
that the following is true and correct to the best of my knowledge.

1. My name is ████████, and I am a rising third year PhD student and instructor
   at Columbia University.

2. Prior to Mahmoud's detention, Columbia University was already hostile to pro-
   Palestinian speech. Students were frequently doxxed, harassed, and harshly
   disciplined by university faculty and administration.

3. The Trump Administration's abduction of Mahmoud Khalil has had a very chilling
   effect throughout the campus. His warrantless detention set off a new wave of
   trauma throughout the campus. Students felt extremely unsafe knowing that the

University administration that was meant to protect them was actively putting them at risk, colluding with the Government to detain our peers for being associated with protest activity.  As a result, many students stopped attending classes, missed vital health appointments (which were located on campus), were absent at mandatory meetings, and stepped down from leadership roles at the University, all due to fear of being targeted.

4. The examples I describe in this declaration are the testaments of my classmates, professors, staff, and friends – stories I have been trusted with, and stressors I've first-hand observed in my immediate community.

5. His arrest and detention on university property demonstrated how easily the Department of Homeland Security (DHS) accessed private campus property without a warrant. Several students, including US citizens, sought refuge outside of University housing out of fear of being targeted by the federal government.

6. And for those who had nowhere to go, the loss of housing was a looming concern for many (including some that had minor children), further compounding the stress and fear.

7. Some events hosted by various Departments (including events broadly related to the Middle East) were canceled during this time, fearing DHS would use them as a venue for surveillance and targeting.

8. Several instructors attempted to cancel or relocate their classes to Zoom in order to protect students, but Columbia's Provost expressly prohibited them from doing so. This forced students to choose between pursuing their education and navigating a hostile and repressive campus environment.

9. As a result of this environment, many students also did not travel to academic conferences, refrained from publishing their scholarship, chose not to speak on panels, and ceased their duties as teaching assistants, fearing that those activities might make them vulnerable to the same targeting and detention Mahmoud experienced for their political speech and activity. Graduate student workers found themselves unable to fulfill their academic and professional responsibilities under the same extreme stress.

10. Numerous Palestinian students sought psychological support through Columbia Psychological Services (CPS) during this period. At least half a dozen students expressed experiencing debilitating symptoms including vomiting, diarrhea, paranoia, nightmares, depression, suicidal ideation, anxiety, emotional distress, and

2

**JA 1332**

panic attacks. Some were so severely impacted that they had to register with the Office of Disability Services, which is documented in the University's official records.

11. This ongoing crisis interfered with students' ability to meet graduation and academic program requirements. In the case of PhD students like myself, many of whom are required to teach as a condition of their fellowships, the environment constituted a hostile work environment. These students were expected to perform their teaching responsibilities under unreasonably distressing conditions, fearing their classrooms and their students would be targeted by ICE raids. Some attempted to relocate their classes off-campus but were admonished by University administrators for doing so.

12. The fear instilled by doxxing campaigns by University affiliates (student and faculty), who in turn reported individuals to the government, and the abduction of Mahmoud caused some students to hesitate in reaching out to University support systems. This hesitation was intensified by reports of FERPA violations by the University, alleged to have shared protected student information with members of Congress. This breakdown of trust deterred students from seeking institutional assistance during an already perilous time.

13. Staff members also expressed intense fear, both from the University administration and the federal government under the Trump Administration. Many were deeply concerned about the University's documented history of cooperation with law enforcement agencies including the NYPD, FBI, and DHS. As a result, staff were afraid to assist Palestinian and Pro-Palestinian students, to even mention Mahmoud's name in meetings or communications, or to provide meaningful services beyond basic referrals to CPS, fearing legal reprimand from the University and the federal government.

14. Staff were immediately afraid to organize, speak publicly, hold meetings with impacted students, or make any on-the-record statements, once again in fear of legal or professional reprimand, by the University or the federal government. The widespread fear and unwillingness to act reflected the gravity of the repression witnessed at Columbia University during the past 20 months and under the Trump Administration.

15. Similar to the staff, faculty were terrified to speak out, fearing it would make them targets of the Trump Administration—especially those on visas or temporary immigration statuses. Even among U.S. citizens, the vast majority experienced a chilling effect on their First Amendment rights. Many were too afraid to publicly

3

**JA 1333**

advocate for their students or address the repression they were witnessing.

16. Students, Faculty and Staff began seeking refuge elsewhere, applying to programs, jobs and positions at other universities, some even outside of the United States.

17. Similar to students and staff, faculty also were either hesitant about or stopped international travel, conferences, panels, publishing, interviews, research, and so on.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                         Signed:
New York, NY



**JA 1334**

H-7

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████████

I, ████████████████, declare under penalty of perjury, pursuant to 28
U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ████████████████. I am a U.S. citizen currently residing in
   Astoria, New York. I was a graduate student at Columbia University's School of
   International and Public Affairs, also known as SIPA, ████████████████.

2. Mahmoud Khalil was also a student at SIPA and graduated in December 2024.

3. SIPA is a professional school of global public policy and international affairs,
   where approximately 30 to 40 percent of students hold international visas.

4. I submit this declaration to explain how Rubio provision has not only created fear
   and confusion but also caused concrete harm to students and professionals like

me, particularly in a setting like SIPA, where international perspectives are central to our learning environment.

5. SIPA is intended to prepare future policymakers, diplomats, and global leaders, and its value depends on the open exchange of diverse international perspectives.

6. When students are too afraid to speak, particularly those from regions directly affected by U.S. foreign policy, the entire academic environment suffers.

7. The chilling effect caused by the Rubio provision has undermined the quality of my education because students who should be central to these discussions are silencing themselves out of fear.

8. As a result, classroom discussions, campus events, and peer engagement have all become more constrained, limiting my ability to learn from the very voices SIPA was built to elevate.

9. One of the clearest examples of this was our cohort WhatsApp chat, in which students used to share event invitations and discuss international policy issues.

10. After Mahmoud's detention, several international students expressed fear that even registering for a Palestine-related event or expressing an opinion in the chat could be interpreted as threatening or grounds for surveillance.

11. Some stopped participating altogether because they were unsure what was safe.

12. International students also raised concerns about the very existence of the student group I organize with, which focuses on Palestine, saying they feared being associated with it. Several people said that the group's visibility and outward speech in support of Mahmoud might put a target on their backs and suggested we hold fewer events or speak about Mahmoud less to avoid antagonizing the administration.

13. One alarming incident involved SIPASA, our student government.

14. In the weeks after Mahmoud's detention, SIPASA planned to release a statement acknowledging student concerns about ICE and international students.

15. ████████████████████████████████████████

16. She told her classmates she feared being targeted by the Trump administration and that even a modest show of solidarity could endanger her immigration status.

17. These were not theoretical fears. ██████████████████████████
████████████████████████████████████████████████████████
████████████ All she was trying to do was avoid scrutiny, risk, and spotlight, and the very act of describing her efforts to stay safe may now violate that intent. That is the irony of this moment.

18. One of our classmates was born and raised in ████ and holds a J-1 visa. She told us she feared that her mere presence in the United States could be misinterpreted and used against her.

19. She was here to study public policy and international affairs, yet even speaking in class felt dangerous to her.

20. She was rarely alone in the days and weeks after Mahmoud's arrest. We checked in on her regularly and asked her to sit out of protests and events, even though she wanted to attend.

21. We made these decisions not because she had done anything wrong but because we feared for her safety under this broad and unpredictable law.

22. In my case, I accepted a job offer in February 2025 for the role of Manager, Immigration, with a confirmed start date of April 29.

23. My vacation dates were approved in writing as part of the offer.

24. On April 28, just one day before my scheduled start, I received a message rescinding the offer.

25. I had already completed the onboarding steps and received welcome emails from the team.

26. I believe this decision was not based on performance or communication but rather influenced by my Palestinian identity, my affiliation with student organizing, and my visible support for Mahmoud Khalil.

3

**JA 1338**

27. The government's targeting of Mahmoud has created an atmosphere where constitutionally protected speech and association, especially when connected to Palestine, are treated as potential threats. I believe this environment emboldened my employer to view me as a liability, leading to the sudden rescission of my offer with no valid justification.

28. I was also interviewed by a journalist from The Washington Post about Mahmoud's case due to my background in immigration and our friendship.

29. I ultimately declined to go on the record because I feared how it might affect my job prospects and my family.

30. My mother is a 72-year-old noncitizen and my father is a 78-year-old disabled American citizen.

31. They often travel together, and I was afraid that my visibility might create complications for them at the airport. I asked them not to travel to the United States or come visit me for my upcoming May graduation, despite how excited I was to see them.

32. When I visited Mahmoud at the ICE detention facility, I brought my U.S. passport with me instead of my New York State ID.

33. I made that decision because I was afraid I might be misidentified and detained despite being a citizen.

34. These moment crystallized what this law has done to our sense of safety and citizenship.

35. In Louisiana, I was hosted by members of the Palestinian community who supported me but were terrified to be seen entering the prison facility.

36. One elderly man who drove me said, "You believe in this freedom of speech stuff? This is for them, not for people like us."

37. Some community members refused to even speak with me at all because they were all immigrants and feared retaliation.

38. I was born and raised in Saudi Arabia. I came to the United States in part because I believed in this country's commitment to freedom of speech and democratic

4

**JA 1339**

values.

39. This experience has profoundly shaken that belief and made me question whether I truly belong in this country.

40. If Mahmoud can be deported under this law, the government is sending a message that Americans like me are not truly welcome here.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2025                                    Signed:
New York, NY



H-8

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, | |
| *Petitioner,* | |
| v. | |
| Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | Case No. 25-cv-01963 (MEF-MAH) <br><br> **DECLARATION OF** ▮▮▮▮▮▮▮▮ |
| *Respondents.* | |

I, ▮▮▮▮▮▮▮▮, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ▮▮▮▮▮▮▮▮, and I attended ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

2. Following October 7th 2024 and the onslaught of Israel's war on Gaza, surveillance and repression by the Columbia University administration and private actors against anyone calling for the liberation of the Palestinian people had escalated to new levels I had never seen before. Classmates and peers of mine, particularly students of color, became hyper aware of the ways they expressed beliefs that went against the school or government administrations. However, with the horrifying illegal abduction of Mahmoud Khalil and the targeting that led to it, the resulting damages go far beyond just a suspicion of being surveilled. Now, people have actively changed their

behaviors due to fear resulting from Mahmoud's targeting.

3. Not even a week after Mahmoud's detention, an international student had taken the difficult decision to step down from a position of leadership in a student organization at the School of International Public Affairs (SIPA) that held events and focused on political education on the unfolding genocide in Palestine. They expressed a deep concern of being detained after seeing what the state had done to Mahmoud. They expressed to me and our peers that they are afraid to even post anything advertising the student group's events out of fear that their mere association might have repercussions.

4. Similarly, many students at SIPA, where they had hoped to learn and apply policies in the name of justice, have instead found themselves having to alter their lifestyles and silence themselves in order to continue their education and careers, and out of fear that they might be targeted next and, as Mahmoud was, labeled a "threat" to foreign policy interests in the United States. SIPA is majority international students and, in learning about Columbia's cooperating with DHS, they feared for not just themselves but also for their family members. For instance, a peer at the School of International Affairs felt the need to self-censor a public statement they were preparing to make at an event. They confided in me by explaining how they wished they could give more of a platform to speaking about the unjust detention of Mahmoud Khalil, but since they are not an American citizen and have to care for their family members who also are not citizens, they feel more than just their life is at risk.

5. For many students, the fear of DHS and Columbia targeting our loved ones has kept us up at night and has had irreparable effects on our mental health and, consequently, our ability to engage in the community or academic aspects of university life. After finding out what happened to Mahmoud, a friend of mine had suffered an episode of debilitating depression and anxiety that prevented them from attending classes or leaving their home. They feared walking on campus with the unprecedented amount of targeted surveillance on students speaking out for Palestinians.

6. Just like this peer and friend of mine, I shared these debilitating experiences as a result of Mahmoud's detention that prevented me from focusing on my school work or functioning in a healthy way. We would console each other in the harsh reality that we don't feel comfortable speaking to our professors either.

7. The professors at SIPA have their own fears about losing their jobs for speaking out about what happened to Mahmoud, including the Monday after he was taken. Classes resumed with little to no mention of Mahmoud which made me much more

2

frightful in asking for support.

8. One of the most devastating instances I have encountered of censorship as a result of Mahmoud's targeting and detention is that of a friend whose family members have been directly impacted by the genocide in Palestine, and who has felt too afraid to speak out about the genocide of their own family and Palestinian community. They are afraid of being targeted and detained the same way Mahmoud was, and fully consumed by this understandable fear instead of spending the necessary time and energy focusing on their own wellbeing and healing with their community.

9. The kidnapping of Mahmoud has undoubtedly impacted and instilled immense fear in many students, community members, and people around the world. Students at Columbia know the consequences looming ahead and the threats being made to their futures and lives. Having to choose between putting your life and future at risk or giving up your morals by staying silent while a human is detained for speaking out against genocide should never be the reality.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 2, 2025                    Signed:
New York, NY

3

**JA 1344**

H-9

March 12, 2025

We, Jewish alumni of Columbia University across a spectrum of political views, schools, and years of graduation, join together to unequivocally denounce the illegal detention of green-card holder and recent Columbia School of International and Public Affairs (SIPA) graduate Mahmoud Khalil by agents of the U.S. Immigration and Customs Enforcement (ICE) merely for exercising his constitutionally-protected rights to free expression.

The Trump administration cynically exploits Jewish feelings of vulnerability and fear to justify its egregious assault on higher education and academic freedom, including on our alma mater. The Republican assault upon the First Amendment and principles of free expression and inquiry which underpin American universities do not make Jews safe. It endangers all of us.

We speak out now to denounce the Trump Administration's assault on higher education, science and the rule of law—and its cruel efforts to divide the Jewish community from our neighbors, colleagues and classmates. We say now, clearly and unequivocally, as Jewish graduates of Columbia, that the Trump Administration's brazen assault on our democracy, including on freedoms protected by the Constitution harms the Jewish community, our neighbors and our loved ones.

We therefore reject in absolute terms the Trump Administration's attempt to characterize its conduct as an act taken in our interests—the interests of our Jewish communities. Seizing, detaining, and threatening with deportation a member of Columbia's broader community for the act of peaceful protest of the acts of a foreign government and of U.S. foreign policy constitutes an assault upon the fabric of our democracy—a democratic society where American Jews have found refuge from absolutist and authoritarian regimes they fled. We refuse to be used to dismantle American democracy, and we accuse the Trump Administration for its cynical exploitation of our people's aspirations for safety and inclusion for its own purposes as itself an act of anti-Semitism.

The Trump administration's actions, first and foremost, endanger Mahmoud Khalil and his family. We hope that they are reunited safely and soon. But these dangerous and unconstitutional acts threaten the foundations of democratic life and free expression which lies at the heart of it.

Signed,

| Name | School | Class |
| --- | --- | --- |
| Aaron Gans | Medical School | 2022 |
| Abby H Lublin | Columbia College | 1998 |
| Abby Kamen | Social Work | 2021 |
| Abby Shuster | GS, Jewish Theological Seminary | 2014 |
| Abby White | Columbia College or Barnard | 2019 |
| Abraham Greene | Columbia College or Barnard | 1999 |
| Adam Conner-Sax | Columbia College or Barnard | |
| Adam Jacobs | GS, Jewish Theological Seminary, Teachers College | 2001, 2006 |
| Adam S. Levine | Arts and Sciences (Graduate) | 2010 |
| Albert Kohn | GS, Jewish Theological Seminary | 2018 |
| Alena Graedon | School of the Arts | 2007 |
| Alex Fendrich | Columbia College or Barnard | 2017 |
| Alexander K Ames | Columbia College or Barnard | 1999 |
| Alisa Baer | Columbia College | 2002 |
| Alisa Gross Parker | Columbia College or Barnard | 2007 |
| Alison (Keimowitz) Spodek | Department of Earth and Environmental Sciences | 2006 (PhD) |
| Aliza Lifshitz | Columbia College or Barnard | 2020 |
| Amanda Gersh | School of the Arts | 1997 |
| Amara Jaeger | Columbia College or Barnard | 2020 |
| Amy Phillips | Columbia College or Barnard | 2003 |
| Andrea Floersheimer | Columbia College | 2019 |
| Andrew Irving | Columbia Law School | 1976 |
| Anna Jesseman | School of Social Work | 2011 |
| Anna Kalm | Columbia College or Barnard | 2019 |
| Anne Levy | Columbia College or Barnard, Teachers College | 2001, 2016 |
| Anya Bernstein | Columbia College or Barnard | 1996 |
| Arinn Amer | Columbia College or Barnard | 2011 |
| Austen Leah Rose | Arts and Sciences (Graduate) | 2013 |
| Avi Allison | Columbia College or Barnard | 2011 |

| Name | School | Class |
|---|---|---|
| Avi Alpert | Columbia College or Barnard | 2006 |
| Avi Hoffman | Engineering and Applied Science | 2009 |
| Avidan Halivni | Columbia College or Barnard | 2019 |
| Avinoam Joseph Stillman | Columbia College | 2017 |
| Avner Gvaryahu | Arts and Sciences (Graduate) | |
| B. Levitt | GS | 2010 |
| Becca Stussman | Engineering and Applied Science | 206 |
| Ben Feder | Columbia College or Barnard | 1986 |
| Beth Zikronah Rosen | School of International and Public Affairs | 2010 |
| Carl Biers | Columbia College | 1990 |
| Carlyn Kolker | Columbia College | 1998 |
| Chase Henry Mechanick | Columbia Law School | 2015 |
| Claire (Chaim) Spaulding | Columbia College or Barnard | 2019 |
| Corinne Greenblatt | Columbia College or Barnard College | 2020 |
| Daniela Lapidous | Columbia College or Barnard | 2016 |
| David Klion | | 2006 |
| David N. Myers | Arts and Sciences (Graduate) | 1991 |
| David Schlitt | Columbia College or Barnard | 2004 |
| Debbie Wecksell | Columbia College or Barnard | 2014 |
| Deborah Appel | GS | 2006 |
| Dina Blanc | Barnard College | 1983 |
| Dr. Jennifer A Lupu | Columbia College or Barnard | 2012 |
| Edo Roth | Engineering and Applied Science | 2017 |
| Elena Ross | School of Social Work | 2023 |
| Eleni Malka Zimiles | Social Work | 2014 |
| Eli Pinker | Columbia College or Barnard | 2021 |
| Eliana Fishman | | 2018 |
| Emma Kessler | GSAS | 2012 |

| Name | School | Class |
|---|---|---|
| Emma Sarachan | Columbia College or Barnard | 2015 |
| Eric Alterman | Columbia College or Barnard College | 1984 |
| Eric Schuman | School of the Arts | 2012 |
| Frances Miriam Kreimer | Columbia College or Barnard | 2006 |
| Fred Block | Columbia College or Barnard | 1968 |
| Gabe Pont | GS, Jewish Theological Seminary | 2020 |
| Gabriella Spitzer | Columbia College or Barnard | 2013 |
| Gary A. Cohen | Columbia Law School | 1986 |
| Gavi Strauss | GS, Jewish Theological Seminary | 2019 |
| Hali Weiss | Columbia College or Barnard, Architecture, Planning, & Preservation (Graduate) | 1984, 1987 |
| Hannah Christianson | Columbia College or Barnard | 2022 |
| Hannah Rose Gorman | Columbia College or Barnard | 2016 |
| Hannah Selinger | Columbia College or Barnard | 2002 |
| Harry Reis | Columbia Law School | 2024 |
| Hollis Architzel | Columbia College or Barnard | 2005 |
| Ira Temple | Columbia College or Barnard | 2007 |
| Isaac Brooks Fishman | Columbia Law School | 2018 |
| Isabel Nelson | Barnard College, Columbia School of Public Health | 2016, 2021 |
| Isadora Nogueira | Columbia College or Barnard | 2020 |
| Jacqueline Karp | Barnard College, JTS | 2017 |
| James Rutherford | School of the Arts | 2011 |
| Jamie Klein | Columbia College or Barnard | 2011 |
| Jan de Bakker | Columbia College or Barnard, Engineering and Applied Science | 2003, 2005 |
| Jeff Alexander | Columbia Law School | 2008 |
| Jen Rice | Columbia College or Barnard | 2008 |
| Jenn Wyse | Columbia College or Barnard, Social Work | 2014, 2007 |

| Name | School | Class |
|------|--------|-------|
| Jenna Barzelay | SIPA | 2015 |
| Jenna Zucker | Barnard College | 2021 |
| Jennifer Gottlieb | Columbia College or Barnard | 1993 |
| Jennifer Rosenstein | Teachers College | 2002 |
| Jenny Dubnau | Columbia College or Barnard | 1985 |
| Jenny Labendz | Columbia College or Barnard | 2002 |
| Jessica Becker | Columbia College or Barnard, Business School | 2010, 2014 |
| Jessica Ullian | Barnard College, Journalism | 2002 |
| Julie Abbruscato | Columbia College or Barnard | 1986 |
| Julie Keefe | Columbia College or Barnard | 2005 |
| Juliet Herzberg | Social Work | 2013 |
| Justin Singer (JD/MBA '09) | Business School, Columbia Law School | 2009 |
| Kalila Jaeger | Columbia College or Barnard | 2017 |
| Kalman Victor | Columbia College or Barnard College | 2016 |
| Karen Abrams | Teachers College | 2001, 2009 |
| Karl Klare | Columbia College or Barnard | 1967 |
| Kate Axelrod | School of Social Work | 2013 |
| Kate Steiker-Ginzberg | Columbia College or Barnard | 2012 |
| Katherine Herman | Columbia College or Barnard | 2005 |
| Kayla Ablin | Columbia College or Barnard | |
| Kyle Lukoff | Columbia College or Barnard | 2006 |
| Kyra Bloom | Columbia College or Barnard, Teachers College | 2015, 2022 |
| L. Berger | Social Work | 2012 |
| Laura Pisoni | Columbia College or Barnard | 2006 |
| Laura Shmishkiss | School of International and Public Affairs | 2003 |
| Laura Wernick | School of International and Public Affairs, Social Work | 1998 |
| Lauren Deitz | Arts and Sciences (Graduate) | 2023 |

| Name | School | Class |
|------|--------|-------|
| Lauren Kesner O'Brien | SIPA | 2008 |
| Leah Bellow-Handelman | Public Health | 2012 |
| Lee Pinkas | Teachers College | 2006 |
| Leeza Gavronsky | Columbia College or Barnard | 2017 |
| Lena Rudnick | School of the Arts | 2014 |
| Leo Goldberg | Columbia College or Barnard | |
| Linda Slodki | Banard, Arts and Sciences (Graduate) | 1972 |
| Lisa Namdar Kaufman | School of the Arts | |
| Louise Yelin | Department of English and Comparative Literature | 1977 (PhD) |
| Maddie Molot | Columbia College or Barnard | 2018 |
| Madelyn Baker | Columbia College or Barnard | 2019 |
| Mara D. Kravitz | GS | 2013 |
| Matthew Weisberg | Public Health | 2022 |
| Max Cohen | General Studies, Jewish Theological Seminary | 2007 |
| Max David Finkel | GS/JTS | 2016 |
| Maya Porath | | 2014 |
| Megan Millenky | Columbia College or Barnard | 2001 |
| Melanie Pflaum | Teachers College | 1995 |
| Micah Nelson | School of International and Public Affairs | 2024 |
| Michael Altman-Lupu | Columbia Law School | 2020 |
| Michal Richardson | Columbia College or Barnard | 2006 |
| Michelle Caswell, CC'97 | Columbia College or Barnard | 1997 |
| Michelle Kamens | School of Social Work | 2004 |
| Miriam Krent M.S.ed, M.S. CCC-SLP | Teachers College | 2017 |

| Name | School | Class |
|------|--------|-------|
| Mollie Krent | Columbia College or Barnard | 2015 |
| Molly Chilingerian | Teachers College | |
| Naeta Rohr | Teachers College | 2014 |
| Naida Tushnet | Arts and Sciences (Graduate) | 1962 (MA) |
| Naomi Sharlin | Teachers College | 2011 |
| Naomi Shatz | Columbia College or Barnard | 2004 |
| Naomi Sobel | Arts and Sciences (Graduate) | 2009 |
| Nathan Levine | Columbia College or Barnard | 2017 |
| Nina Paroff | Public Health | 2017 |
| Noa Appleton | Public Health | 2016 |
| Noa Kattler Kupetz | Columbia College or Barnard | 2018 |
| Noa Myers | Columbia College or Barnard | |
| Noa Tann | School of International and Public Affairs | 2023 |
| Noa Urbach | | 2025 |
| Noah Schoen | Columbia College | 2016 |
| Noam A Lindenbaum | GS, Jewish Theological Seminary | 2021 |
| Nora Rodriguez | Columbia College or Barnard | 2011 |
| Orli M | | 2015 |
| Orli M | GS, Jewish Theological Seminary | 2015 |
| Phoebe Spanier | Columbia College or Barnard | |
| Pippi Kessler | Teachers College | 2017 |
| Rabbi Aaron Rotenberg | GS, Jewish Theological Seminary | 2009 |
| Rabbi Allen Lipson | GS, Jewish Theological Seminary | 2015 |
| Rabbi Aryeh Bernstein | GS, Jewish Theological Seminary | 1998 |
| Rabbi David Jaffe | Social Work | 1994 |
| Rabbi Jennie Rosenn | Columbia College or Barnard College | 1991 |
| Rabbi Rachel Goldenberg | Columbia College | 1997 |
| Rabbi Rachel Kahn-Troster | Columbia College or Barnard, Jewish Theological Seminary | 2001 |

| Name | School | Class |
|---|---|---|
| Rabbi Rebecca T. Alpert | Barnard College | 1971 |
| Rabbi Solomon Hoffman | Columbia College or Barnard | 2014 |
| Rachel Aviv | School of the Arts | 2009 |
| Rachel Blau DuPlessis | Columbia College or Barnard, Arts and Sciences (Graduate) | 1963, 1970 |
| Rachel Mazor | Columbia College | 1998 |
| Rachel Mewes | Teachers College | 2020 |
| Rachel Rosenbloom | Columbia College or Barnard | 1990 |
| Rachel Tsuna | Columbia College or Barnard | 2018 |
| Rae Abileah, Kohenet | Columbia College or Barnard | 2004 |
| Raye Farber | | 2011 |
| Rebecca Grabiner | Social Work | 2003 |
| Rebecca Green | Teachers College | 2014 |
| Rebecca Rosen | School of International and Public Affairs | 2020 |
| Rebecca Schiff | School of the Arts | 2009 |
| Rebecca Subar | Barnard | 1981 |
| Rebekah Dempsey | Columbia College or Barnard | 2017 |
| Rebekeh Packer | Columbia College or Barnard | 2017 |
| Robert Newton | | 2001 |
| Robyn Uri | Columbia College or Barnard | 2011 |
| Romi Messer | Columbia College or Barnard | 2016 |
| Samuel Gross | Columbia College or Barnard | 1968 |
| Samuel Norich | Columbia College or Barnard | 1968 |
| Samuel Reider | Columbia College or Barnard | 2011 |
| Samuel Sontag | Columbia Law School | 2024 |
| Sarah B. Johnson | Social Work | 2014 |
| Sarah Chandler | School of International and Public Affairs, Jewish Theological Seminary | 2005, 2008 |
| Sarah Deutsch | Columbia College or Barnard | 2011 |

| Name | School | Class |
|------|--------|-------|
| Sarah Dorman Sveen | School of the Arts | 2014 |
| Sarah Katz | Columbia College or Barnard | 1997 |
| Sarah Leonard | Columbia College or Barnard | Yes |
| Sarah Rosenblatt | Architecture, Planning, & Preservation (Graduate) | 2012 |
| Sarah Saadoun | Columbia Law School | 2014 |
| Sarah Stone | GS, SIPA | 2016, 2019 |
| Sarah Weinstein | Columbia College or Barnard | 2016 |
| Senator Julia Salazar | Columbia College or Barnard | 2014 |
| Shachar Cohen-Hodos | GS | 2019 |
| Shahar Colt | Columbia College or Barnard | 2006 |
| Shana Leshko | Columbia College or Barnard | 2017 |
| Shana Parker | Columbia College or Barnard | 2004 |
| Shara Morris | Columbia College or Barnard | 2011 |
| Shari Turitz | School of International and Public Affairs | 1995 |
| Shira Botzum | GS, Jewish Theological Seminary | 2019 |
| Shira Danan | Columbia College or Barnard | 2007 |
| Shoshana Levy | Columbia College or Barnard | 2018 |
| Shoshana Williams | Barnard College | 2020 |
| Sofia Rubenstein | Social Work | 2017 |
| Sophie Ellman-Golan | Columbia College or Barnard | 2014 |
| Sophie Finkelstein | Arts and Sciences (Graduate), School of the Arts | 2016 |
| Stephanie Krent | Columbia College or Barnard | 2011 |
| Steve Quester | Columbia College or Barnard | 1985 |
| Steve Weinberg | Columbia College or Barnard, Architecture, Planning, & Preservation (Graduate) | 1966, 1968 |
| Suzanne Blanc | Columbia College or Barnard | 1974 |
| Suzanne Herman | Columbia College or Barnard | 2015 |

| Name | School | Class |
|---|---|---|
| Sylvie Rosen | Columbia College or Barnard, Jewish Theological Seminary | 2019 |
| Tali Myers | Columbia College or Barnard | 2014 |
| Talya Wintman | Columbia College or Barnard | 2020 |
| Tess Solomon | Columbia College or Barnard, Public Health | 2015, 2019 |
| Tony Kushner | Columbia College or Barnard | 1978, 2010 (Honorary Doctorate of Letters) |
| Valerie Schenkman | School of the Arts | 2010 |
| Vanessa Thill | Columbia College or Barnard College | 2013 |
| Wesley (Yehudah) Webster | GS, Jewish Theological Seminary | |
| Yaffa Fogel | Columbia College or Barnard | 2017 |

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>   *Petitioner,*<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>   *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF** ▮▮▮▮▮▮▮ |

I, ▮▮▮▮▮▮, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ▮▮▮▮▮▮, and I am a Jewish alumnus of Columbia University. I graduated recently and remain actively involved in the Columbia community.

2. I, along with more than 250 other Jewish Columbia University alumni, signed a letter (see attached exhibit) expressing our unequivocal condemnation of Mahmoud's Khalil's detention by U.S. Immigrations and Customs Enforcement (ICE). I am particularly disgusted and horrified by the federal government's cooptation and abuse of Jewish identity to justify the wrongful detention of a fellow Columbia

graduate. Like many Jewish Americans, my family came to this country fleeing religious persecution, and several members of my family who stayed behind were killed during the Holocaust. I object in the strongest possible sense to the notion that the federal government's targeting of individuals like Mahmoud for detention and deportation based on their political beliefs and constitutionally-protected free speech will ensure the safety of Jewish members of the Columbia University community or Jewish Americans at large. On the contrary, Mahmoud's detention is a violation of many of the essential freedoms that ensure the safety of Jewish Americans from the exact same kinds of persecution our families have faced in the past.

3. In the months since Mahmoud was detained, several international students attending Columbia University have expressed to me their fears that what happened to Mahmoud might happen to them. Some of them deleted their social media accounts, avoided attending class in-person, or stopped leaving the house altogether out of fear. About a week after Mahmoud was detained, I offered to escort an international student to the grocery store so they could buy food. The student confided that they had not left their apartment in a week out of fear.

4. Palestinian Columbia students who are U.S. citizens have also expressed to me their fear of being targeted by the federal government in a similar fashion to Mahmoud. Palestinian students have told me they are afraid to interface directly with members of University leadership, including the Columbia University President, Claire Shipman, because they know Mahmoud was targeted due to his role as a negotiator with the Columbia administration. As a result, these students have been prevented from advocating for themselves and their needs as Palestinian students during this time due to fear.

5. The chilling effect of Mahmoud's detention on members of the Columbia community has not been limited to international and Palestinian students. Although I am a U.S. citizen and no longer a Columbia student, I too have felt afraid to speak out against Mahmoud's detention and participate in peaceful protests as a member of the Columbia community out of fear that any dissent against the federal government by Columbia students, faculty, staff, or alumni could trigger the detention of more Columbia students by ICE, in retribution. In the week after Mahmoud's detention, there were widespread rumors among members of the Columbia community that the federal government would respond to any act of peaceful protest at Columbia with a raid of campus by ICE and mass detentions of non-citizen students. As a result, many Columbia students chose not to speak out publicly against the detention of Mahmoud or the demands of the federal government imposed upon Columbia University at that time out of fear that their

actions could cause their friends and peers to be detained and deported.

6. Since Mahmoud was detained, I have felt profoundly worried for my friends and community. For at least a week after Mahmoud's detention, I regularly refused to go to sleep until the early hours of the morning because I was afraid that I would wake up to the news that another one of my friends or community members had been detained by ICE during the night.

7. Attached hereto, at the exhibits listed below, are true and correct copies of the following materials:

   A. Attached as **Exhibit A**, a letter drafted and signed by Jewish Columbia alumni denouncing the detention of Mahmoud Khalil.

Dated: June 1, 2025                    Signed:

H-10

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

        *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

        *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████████████

I, ███████████████, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1. My name is ███████████████, and I am ███████████████
███████████████████████████████████████
███████████████

2. I was a student organizer, and a member of a student organization focused on
educating the community on Palestine.

3. For the SIPA student community, of which the majority are international students,
Mahmoud's sudden abduction has had tangible and irrevocable consequences and
has drastically impacted daily life.

4. Mahmoud's abduction and continued detention has been exceptionally impactful for a classmate who I have organized with previously, whose father was a political prisoner, abducted in similar manner, and severely tortured by their government, and who later passed away due to health complications caused by this torture.

5. This friend came to study in the United States to find safety and reprieve from the constant fear of political imprisonment they are accustomed to. Yet they have found themselves in an alarmingly similar position; instead of staying in the United States after graduation as they had hoped, they are planning to immediately flee to a country where they are truly safe from this sort of targeting and violence. They told me that this is the same sentiment many of their friends have expressed following Mahmoud's abduction.

6. This person also was unable to attend their sibling's wedding—the first person in their family to get married—because they feared being denied entry if they left the country and subsequently sought return. I was with them that night, as they had to stay up until 4 in the morning to watch over Zoom as their entire family gathered to celebrate this momentous occasion. They expressed to me their conflicting feelings and guilt for missing this milestone in their sibling's life, contrasting their very real fear of being detained upon return to the U.S. because they have occasionally expressed support for Palestinian life.

7. Another international friend of mine who I have organized with had a terminally ill father whose health began to deteriorate dramatically in April 2025. They had to return home to be with their family and their father in his last moments. Yet, the moment was marred and burdened by planning around visa concerns, by carrying this immense tragedy alongside the very real threat of being rejected or detained at the border.

8. They told me how this anxiety weighed on them throughout the trip, and in their final moments with their father. They expressed grief and frustration at their desire to stay with their family longer after their father's death, but their inability to because of increasing repression and anxiety around their visa status as a graduating student.

9. They told me how this fear affected what they said, what they did, and the way they expressed themselves publicly. They distanced themselves from a student organization they care about deeply because the organization engaged in political activity, they scrubbed their Instagram of any political discourse, and they stopped posting about politics completely.

10. They feel isolated and unable to make new friends because they are unsure of who will take offense to something they say and report them, either to the school (which

2

**JA 1361**

would lead to their name possibly being handed over to DHS/ICE), or to the federal government directly. They worried about public deportation campaigns—similar to the campaign Mahmoud suffered—being started against them by bad actors, resulting in federal immigration agents knocking at their door.

11. They are a fantastic political writer who chose to stop writing before their trip, concerned about the scrutiny that comes with publicly engaging in topics like Palestine, and beyond that, politics and current affairs as a whole.

12. Despite having returned to the United States, they have remained silent—fearful of jeopardizing their visa status and of being held in detention, hundreds or even thousands of miles from their community, like Mahmoud.

13. Yet another international friend of mine and fellow organizer told me how they arrived to the U.S. as an international student full of hope, eager to work hard, and with a deep belief in this country's strongly held value of free speech as foundational to our democracy. Yet, they expressed that this belief was shattered on March 8 upon Mahmoud's arrest—and continues eroding with his ongoing detention. They voiced that something inside them broke when they saw him targeted for nothing more than exercising this very right.

14. And they have expressed that this fear is no longer theoretical following the announcement that the U.S. Embassy would pause student visa applications alongside U.S. Secretary of State Marco Rubio's call for mass revocations of Chinese student visas.

15. They told me that after Mahmoud's abduction, they could not eat, they could not sleep, they could not focus. They were admitted to the ER days after his abduction with stress-induced acid reflux that mimicked heart problems. They said that they were so overwhelmed they thought they were dying.

16. They told me that Mahmoud's abduction and ongoing detention feels like a targeted message to all U.S. visa holders—a warning that they are only welcome here as long as they stay silent. His case, they said, serves a broader signal to international students of what this country is both willing and capable of doing. Even someone with far more legal protections than this friend was taken without a warrant.

17. This friend had an internship abroad this summer that they have now had to cancel because they are terrified of the consequences of leaving the country, both because they are a U.S. visa holder and because of their beliefs and expressions in support of Palestinian human rights.

18. I have a friend from Latin America who completed their undergraduate degree at

3

**JA 1362**

one of the top 5 universities in the world, and who was accepted into a dual degree graduate program at Columbia for the fall semester. We have spoken at length about his excitement of attending his dream program, of exploring his passions in an environment as challenging as Columbia, of moving to New York and traveling to the United States for the first time in his entire life.

19. In fact, part of this excitement stemmed from the belief that he would have a voice in the conversation on Palestine—a voice that would be respected and heard, given Columbia's visibility and its students' influence in shaping a national discourse that affirms the humanity of Palestinians in the face of their erasure. At the same time, he struggled with the prospect of becoming a passive observer—of being sidelined from both the work and the ongoing discourse on campus.

20. I spoke with him recently about his plans for the fall, and he shared the heartbreak of having to reject his offer—not because he wanted to, but because he feared being detained like Mahmoud. That fear stemmed from his nationality, his political beliefs, his support for Palestinian human rights, and the fact that his program and his own moral compass would require him to speak openly about all these things. Now, he won't be attending any graduate program this fall. He hasn't found an alternative that comes close to what Columbia offers.

21. The culture of fear at SIPA is real. Among students who represent the future of diplomacy, global policymaking, development, and humanitarian action, this fear hinders their learning and engagement in and out of the classroom. This is not only because they fear reprisal for discussing ongoing crises and conflicts, but also because the atmosphere of uncertainty—fueled by the government's seemingly arbitrary abductions—has taken a profound emotional and mental toll.

22. After Mahmoud's abduction, I observed that my classrooms became nearly empty. I spoke with students who were too scared to stay in their campus housing and left to stay with friends or acquaintances off-campus, despite having nothing to do with on-campus organizing. There were students afraid to leave their apartments or even rooms, some students began attending class online, greatly impacting the quality of their education.

23. During a letter-writing campaign to Mahmoud and his family, many international students expressed to me fear at signing their name on a letter to him or even sending a letter at all, scared that they would become ICE/DHS' next targets for merely showing support for a beloved classmate stolen from our community. Some of those letters and the signatures on a petition that went alongside the campaign were signed "From a terrified international student," or similar.

4

**JA 1363**

24. Endless op-eds written by our peers smearing Mahmoud's name added to this level of fear because for us he is the shining example of good and moral behavior. Multiple international students have expressed to me that if this could be done to Mahmoud, then anyone could be abducted and have their name dragged through the mud, because Mahmoud did everything right.

25. This also speaks to the level of fear and distrust sowed amongst the student body, which already existed after Trump took office, but which was exponentially amplified after Mahmoud's abduction. Students became fearful of each other, worried about who was listening to their conversations, who was watching, who was recording. Multiple people I know began to self-censor, they became careful who they engaged with or they avoided speaking about politics entirely, they scrubbed their social medias or deleted them altogether, fearful that any one of these things would cause a fellow student to report them to either the University administration, of which there is low trust and good cause to believe they have handed information to the federal government, or directly to ICE/DHS.

26. Mahmoud's detention has had massive implications for the student organization I am a part of. Prior to his abduction, our group was a popular and well-respected organization at our school and across campus, our events and talks were always well-attended, we engaged students across the political spectrum and differing levels of interest and knowledge.

27. However, after Mahmoud's kidnapping, our engagement and active membership dropped drastically. People became terrified to interact or become publicly associated with us. We lost a board member who was panicked at the idea of losing their visa for merely being on the board of this student organization.

28. Boards of other student organizations asked to withdraw their sponsorship from our campaign in support of Mahmoud—not because they didn't care or support the cause, but because international board members now feared that publicly supporting him, or any cause connected to Palestine, could jeopardize their visas—and, by extension, their degrees.

29. After Mahmoud's abduction, this student organization became completely occupied with protecting its international students from the same fate. Instead of organizing educational panels or conversations intended to build understanding amongst the diverse perspectives that make up this student body, our focus was forced to shift; our time and energy were consumed with organizing in support of Mahmoud and in providing services, such as Know Your Rights trainings, to a terrified student body.

5

**JA 1364**

30. The organization itself was consumed by fear and grief caused by Mahmoud's sudden and traumatic forced disappearance. Because of this now very real and immediate threat to the safety of our active members, our decision making changed, with protecting our international students being our top priority. We spent hours discussing the implications for U.S. visa holders of decisions we had already made— or ones that we would have otherwise reached consensus on with ease. Every choice we made felt weighty and totalizing; suddenly, our friend's material safety hung in the balance with every decision we made.

31. We did almost nothing after March 8, except organize around Mahmoud, field outside threats, and try to restructure so that our vulnerable members were safe. We could not fulfill the organization's mission: to educate our peers about Palestine and provide a safe space on campus for students to engage in open, critical discourse.

32. For myself, an American citizen, Mahmoud's abduction deeply impacted my wellbeing and my ability to organize and speak freely about Palestine. My circle got smaller as I saw the devastating impact of being too open and trusting. Every single person I did not know became a person I could not trust, became a person who could put me or someone I love in harm's way.

33. I stopped going to class in person—as someone who is very outspoken with my beliefs, and who chose Columbia partially because of its history of fierce protection of the First Amendment and academic discourse, I became afraid of being reported to university administration or the federal government for merely expressing those beliefs. I worried about federal agents showing up to class for either myself or one of my international peers.

34. For me, Mahmoud's abduction and ongoing detention points to a horrifying trend this country seems to be following. I am worried that post-graduation, my job may put me at risk because it will be political by nature. I worry for my brother's safety, who works with trans-youth in the Midwest.

35. Right now, the government is disappearing international students without regard for whether they are here legally, or whether the government itself is acting legally. They are sending people to super-max prisons in El-Salvador for having tattoos. They are detaining entire families in courtrooms—people who are following the law and trying to stay in the United States legally. I believe it's only a matter of time before they start doing the same to American citizens, and that weighs on me every time I speak out—or stay silent. I fear getting a job and being stuck here in the United States as things continue to deteriorate. Yet I also worry about leaving my loved ones behind, without protection or plan. I feel paralyzed, and this paralysis began on March 8 with Mahmoud's abduction.

6

36. None of the stories I have shared in this declaration are unique or unusual. I could share many more with the Court. Still, what I have observed—and what I experienced myself—is just a small glimpse into what is happening in communities across the country. I want to impress upon the Court the devastating impact Mahmoud's abduction and ongoing detention has had on countless communities — it is not only those who know and care for him who are affected. Far from it.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                    Signed:
New York, NY

7

**JA 1366**

H-11

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and
Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

       *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████████

I, ██████████, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1. I am ████████████, and I graduated from Columbia University in ████████
with a ████████████ degree. I am Jewish and consider it to be an important part
of my identity. I have family members who live in Israel and whose homes were
destroyed on October 7th.

2. Since Mr. Khalil was arrested, the chill in speech I have observed on campus and
experienced firsthand has been drastic and far-reaching. It has even influenced my
decision to have my name publicly redacted in this statement as I do not wish to receive
unwanted attention or become a target of the US government.

3.  My senior year roommate was an international student who did not give much thought to political issues such as the Israel-Palestine conflict. Since Mr. Khalil's arrest, they told me that they avoided going anywhere near campus protests, not because they felt threatened by the protestors, but because they feared being seen or associated with any campus protest would lead to them potentially being detained and deported.

4.  This past April, I took part in a protest in support of the release of Mr. Khalil on Columbia's campus. ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

5.  The combination of Mr. Khalil's arrest and detention, as well as ████████
████████████ has had the effect of making me hesitant about publicly expressing my beliefs about the Israel-Palestine conflict and engaging visibly in protests on university property.

Dated: June 2nd, 2025                     Signed: ████████████████
████████████

_/s/_

H-12

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, | |
| *Petitioner*, | |
| v. | Case No. 25-cv-01963 (MEF-MAH) |
| Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | **DECLARATION OF** ▬▬▬▬▬ |
| *Respondents*. | |

I, ▬▬▬▬▬, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am ▬▬▬▬▬, a graduate ▬▬▬▬▬ from Columbia University.

2. **Many of my friends who are international students have confided in me about their fears of being targeted for deportation if they exercise their right to freedom of speech.**

3. **I know the people I am speaking of are not even able to write in support of Mahmoud Khalil because of the danger they are in. They have told me they won't follow certain accounts on Instagram, or are deleting Instagram posts. Some of my friends have made their accounts private or deleted them altogether.**

4. **Many of my friends who were excited to start their lives post graduation in New York City are considering, or have ultimately decided to, move back to the country they came from. These are some of the smartest, most creative and kind people I know. Some of the reasons they've told me behind their decisions are that they don't like seeing their gay friends being harassed, they feel unsupported by the university, and most of all, the targeting of Mahmoud has made them afraid they'll be next.**

5. **It is obvious to me that the effect Mahmoud Khalil's detainment has had has been an increase in fear among my friends from other countries and a transformation of their view of the United States. No longer do my friends from around the world think of America as a free country that they can start their life in, but instead they view it as a dangerous place that is becoming more unstable every day. These are compassionate people, dedicated scholars, and principled human beings and I have seen them be transformed by fears of surveillance and governmental oppression.**

6. **Personally, as a Jewish student it is a cruel irony that I have spent the last months trying vainly to comfort my friends who are afraid that they will be taken by the government in the name of keeping me safe.**

Dated: June 2nd, 2025 ▮▮▮

Signed:



2

JA 1372

# Exhibit I

Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street
Newark, NJ 07101

## DECLARATION OF JOHN RAPHLING

I, John Raphling, declare as follows:

1. I am an associate director and researcher for Human Rights Watch's US Program. I submit this declaration to inform the court about the likely impacts of the US government's efforts to deport Mahmoud Khalil on the right to free expression throughout the United States, especially on university campuses.

2. Human Rights Watch has serious concerns that the Secretary of State's invocation of "foreign policy grounds" as a basis to deport Mahmoud Khalil serves as a pretext for violating his right to free expression under international human rights law and is intended by the Secretary to punish and deter protected speech, particularly among international and non-US citizen students.[1] This is creating a climate of fear on campuses across the country.

3. Human Rights Watch (HRW) is an international research and advocacy organization that investigates alleged violations of international human rights law throughout the world and advocates for accountability for perpetrators, reparations for victims, and changes of policy to prevent ongoing and future abuses.[2] HRW has conducted investigations in over 90 countries, advocating before international bodies, like the United Nations, before local and national governments, including on many occasions U.S. Congressional committees, and to the public. The United States Program at HRW investigates human rights issues in the US, including violations by immigration enforcement agencies and within criminal legal systems.[3] The US Program also investigates government actions that may undermine democratic processes and institutions.

4. I have conducted research for the US Program at HRW for over eight years.[4] My primary area of expertise is the criminal legal system and systems of government coercion. I have researched free expression issues, particularly on US university campuses in the context of protests related to the Israeli assault on Gaza. Prior to working for HRW, I was a lawyer for over twenty years who represented protesters, political activists, and organizers in civil and criminal courts in cases related to their rights to free expression.

---

[1] Human Rights Watch, "US: End Campaign of Draconian Campus Arrests," *HRW*, April 3, 2025, US: End Campaign of Draconian Campus Arrests | Human Rights Watch.
[2] Human Rights Watch, "About Us," *HRW*, 2025, https://www.hrw.org/about-us.
[3] Human Rights Watch, "United States," *HRW*, 2025, https://www.hrw.org/united-states.
[4] Human Rights Watch, "John Raphling," *HRW*, 2025, https://www.hrw.org/about/people/john-raphling.

5. Officials for the Department of Homeland Security arrested Mahmoud Khalil on March 8, 2025, have detained him since, and seek to deport him, despite his status as a lawful permanent resident.[5] The US government has supplied an undated memorandum from Secretary of State Marco Rubio invoking the 1952 Immigration and Nationality Act (INA) Section 237(a)(4)(C) as a basis for these actions.[6] In the memorandum, the Secretary acknowledges that Khalil's actions, statements and beliefs are lawful, but he "determines" that his presence in the US would have "potentially serious adverse foreign policy consequences and would compromise a compelling US foreign policy interest." The Secretary cites no specific actions or beliefs, but he refers to Khalil's participation in protests which he claims are "anti-Semitic." He provides no evidence for this claim, although that INA provision requires "reasonable ground" for such a determination.[7]

6. Khalil, along with tens of thousands of other students, faculty and staff, participated in protests on US university campuses in the months following the Hamas-led attack on Israel on October 7, 2023[8], and during Israel's ongoing military operations in Gaza. As the death toll in Gaza has soared amid allegations of grave human rights violations carried out by Israeli forces[9], campus protests proliferated and over 3,000 students were arrested nationwide in the spring of 2024, though Khalil was not one of them.[10]

7. Opposition to Israel's actions, to US support for those actions, and to university policies including their investments in companies that profit from abuses in Israel, are legitimate

---

[5] Tsehai Alford, et al., "Palestinian activist Mahmoud Khalil, SIPA '24, detained by Immigration and Customs Enforcement, lawyer says," *Columbia Spectator*, March 10, 2025, Palestinian activist Mahmoud Khalil, SIPA '24, detained by Immigration and Customs Enforcement, lawyer says.

[6] In the matter of Mahmoud Khalil, "U.S. Department of Homeland Security's Submission of Documents," Case No. REDACTED, April 9, 2025, https://www.documentcloud.org/documents/25894412-newly-released-memo-from-rubio-details-governments-only-evidence-in-effort-to-deport-mahmoud-khalil/.

[7] 8 U.S.C. section 1227, https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1227&num=0&edition=prelim.

[8] Human Rights Watch, "I Can't Erase All the Blood from my Mind," *HRW*, July 17, 2024, https://www.hrw.org/report/2024/07/17/i-cant-erase-all-blood-my-mind/palestinian-armed-groups-october-7-assault-israel.

[9] Human Rights Watch, "Israel: Starvation Used as Weapon of War in Gaza," *HRW*, December 18, 2023, Israel: Starvation Used as Weapon of War in Gaza | Human Rights Watch; Human Rights Watch, "Gaza: Israeli Military War Crimes While Occupying Hospitals," HRW, March 20, 2025, Gaza: Israeli Military War Crimes While Occupying Hospitals | Human Rights Watch; AJLabs, "Israel-Hamas war in maps and charts: live tracker," Al Jazeera, April 17, 2025, https://www.aljazeera.com/news/longform/2023/10/9/israel-hamas-war-in-maps-and-charts-live-tracker; Tinshui Yeung and Neha Gohil, "Palestinian health ministry says 60 killed, 284 injured in past 24 hours," *BBC*, May 31, 2025 https://www.bbc.com/news/live/c628n68zpj6t; Human Rights Watch, "'Hopeless, Starving, and Besieged': Israel's Forced Displacement of Palestinians in Gaza," *HRW*, November 14, 2024, "Hopeless, Starving, and Besieged": Israel's Forced Displacement of Palestinians in Gaza | HRW; Human Rights Watch, "Israel's Crime of Extermination, Acts of Genocide in Gaza," *HRW*, December 19, 2024, Israel's Crime of Extermination, Acts of Genocide in Gaza | Human Rights Watch.

[10] The New York Times, "Where College Protesters have been Arrested or Detained," *New York Times*, July 22, 2024, Where College Protesters Have Been Arrested or Detained - The New York Times.

political viewpoints, the expression of which is protected by US and international human rights law.[11] Such free expression is at the core of a democratic society.

8.  As the protest movement grew on college campuses, it emerged as a flashpoint during the 2024 presidential election. As a candidate, Donald Trump falsely equated protests against the Israeli military's extensive bombardment of Gaza with antisemitism and support for terrorism. He threatened "any student that protests, I throw them out of the country."[12] The Republican Party platform included a commitment to "[d]eport pro-Hamas radicals and make our college campuses safe and patriotic again."[13]

9.  Upon taking office, President Trump said: "To all the resident aliens who joined in the pro-jihadist protests ... we will find you, and we will deport you."[14] Following Khalil's arrest, the official White House X account declared "Shalom, Mahmoud" and announced a campaign against "terrorist sympathizers."[15] Trump personally posted that "[t]his is the first arrest of many to come."[16]

10. The Trump administration has claimed generally, as in Khalil's case specifically, that their right to revoke immigrants' legal status is based on that same provision of the INA that allows the secretary of state to determine that a person's presence in the country "would compromise a compelling United States foreign policy interest."[17]

---

[11] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, UN Doc. A/6316 (1966), 999 UNTS 171, entered into force March 23, 1976, ratified by the US in 1992, arts. 9, 19 and 21, International Covenant on Civil and Political Rights | OHCHR; Human Rights Watch, "US: States use anti-boycott laws to punish responsible businesses," *HRW*, April 23, 2019, https://www.hrw.org/news/2019/04/23/us-states-use-anti-boycott-laws-punish-responsible-businesses.

[12] TOI Staff, "Trump says he'll deport anti-Israel student protesters if elected—report," *Times of Israel*, May 28, 2024, Trump says he'll deport anti-Israel student protesters if elected — report | The Times of Israel.

[13] Donald J. Trump, "2024 GOP Platform: Make America Great Again," 2024, rncplatform.donaldjtrump.com.

[14] President Donald J. Trump, "Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism," *The White House*, January 30, 2025, Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism – The White House.

[15] The White House, X posting, March 10, 2025, The White House on X: ""We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again." –President Donald J. Trump us https://t.co/M3vDyAdDHE" / X.

[16] House Foreign Affairs Committee Majority, X posting, March 10, 2025, House Foreign Affairs Committee Majority on X: "Shalom Mahmoud https://t.co/xgS2wnOUYo" / X

[17] Gaby Del Valle, "Trump is bringing back McCarthyism to go after Mahmoud Khalil," *The Verge*, March 12, 2025, Trump is bringing back McCarthyism to go after Mahmoud Khalil | The Verge; Steve Vladeck, "Five Questions About the Khalil Case," *One First*, March 10, 2025, 131. Five Questions About the Khalil Case

11. DHS Deputy Secretary Troy Edgar cited to "pro-Palestinian activity" as the reason for Khalil's impending deportation and refused to answer whether protesting itself was grounds for deportation.[18]

12. There are other recent examples of this arbitrary targeting of people for their viewpoint on Palestinian rights. On March 25, 2025, masked and camouflaged federal agents wearing black hooded sweatshirts seized Rümeysa Öztürk, a Tufts University doctoral student from Türkiye and Fulbright scholar on a student visa, from a public sidewalk near her home in a Boston suburb, and took her into custody.[19] The federal government transported her over a thousand miles away to a detention center in Louisiana and said it intends to deport her. DHS officials alleged that Öztürk "engaged in activities in support of Hamas," apparently because she co-authored an opinion piece[20] in a student newspaper calling on Tufts University to "acknowledge the Palestinian genocide"[21] and divest from investments connected to Israel. DHS has also sought to arrest and deport Yunseo Chung, a Columbia University undergraduate and lawful permanent resident from South Korea who has lived in the US since childhood following her arrest during a campus protest.[22]

13. The administration's justifications for the arrest and planned deportations of Khalil and several other students are illegitimate and false and violate international human rights law.[23]

14. These actions reflect the administration's larger pattern of exerting pressure on universities to silence protests related to the ongoing hostilities in Gaza.[24] The administration has terminated government funding[25] and initiated Department of Justice

---

[18] Michel Martin and Destinee Adams, "DHS Official Defends Mahmoud Khalil Arrest, But Offers Few Details on Why It Happened," *NPR*, March 13, 2025, DHS Deputy Secretary Troy Edgar defends Mahmoud Khalil arrest : NPR.

[19] Niha Masi, et al., "Tufts student detained by masked officers, video shows," *The Washington Post*, March 27, 2025, Tufts student Rumeysa Ozturk detained by federal officers, video shows - The Washington Post.

[20] Rumeysa Ozturk, et al., "Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions," *The Tufts Daily*, March 26, 2024, Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions - The Tufts Daily.

[21] Human Rights Watch, "Israel's Crime of Extermination, Acts of Genocide in Gaza," *HRW*, December 19, 2024, Israel's Crime of Extermination, Acts of Genocide in Gaza | Human Rights Watch.

[22] Jonah E. Bromwich and Hamed Aleaziz, "Columbia Student Hunted by ICE Sues to Prevent Deportation," *New York Times*, March 24, 2025, Columbia Student Hunted by ICE Sues to Prevent Deportation - The New York Times.

[23] Human Rights Watch, "US: End Campaign of Draconian Campus Arrests," *HRW*, April 3, 2025, US: End Campaign of Draconian Campus Arrests | Human Rights Watch

[24] Isaac Arnsdorf and Susan Svrluga, "Trump says pressure on Columbia is only the beginning for college campuses," *The Washington Post*, March 15, 2025, Trump says pressure on Columbia is only the beginning for college campuses - The Washington Post.

[25] Alan Blinder, "Trump has targeted these universities. Why?" *New York Times*, May 27, 2025, https://www.nytimes.com/article/trump-university-college.html; Stephanie Saul, "Trump pulled $400 million from

investigations[26] against universities it alleges promote antisemitism based on claims that they have not suppressed pro-Palestine activism on campus sufficiently. Officials have demanded that universities provide the names and nationalities of protesters and activists to law enforcement officials.[27]

15. The arrest, detention, and efforts to deport Mahmoud Khalil and others have created a climate of fear among international students and US citizens who understand that the Trump administration seeks to punish people for speaking out in a way the administration disagrees with on this important public issue. That threat of punishment has suppressed people's free speech and expression as they seek to avoid drawing attention to themselves.

16. I am aware of numerous reports from campuses across the US of students, researchers and faculty members experiencing pervasive fear in response to the threat of punitive actions exemplified by the detention and possible deportation of Mahmoud Khalil.[28] Actions taken

---

Columbia. Other schools could be next." *New York Times*, March 8, 2025, https://www.nytimes.com/2025/03/08/us/columbia-trump-colleges-antisemitism.html; Michael Casey, "Trump administration freezes $2.2 billion in grants to Harvard over campus activism," *AP News*, April 15, 2025, https://apnews.com/article/harvard-trump-administration-federal-cuts-antisemitism-0a1fb70a2c1055bda7c4c5a5c476e18d

[26] Ty Roush, "Trump administration investigates these 60 colleges over antisemitism allegations," *Forbes*, March 11, 2025, https://www.forbes.com/sites/tylerroush/2025/03/11/trump-administration-investigates-these-60-colleges-over-antisemitism-allegations/.

[27] Laura Meckler, "New Trump demand to colleges: name protesters—and their nationalities," *The Washington Post*, March 25, 2025, Trump demands colleges name protesters and their nationalities - The Washington Post

[28] Lubna Kably, "Hundreds of international students wake up to an email asking them to self deport for campus activism," *The Times of India*, March 29, 2025, https://timesofindia.indiatimes.com/world/us/hundreds-of-international-students-are-waking-up-to-an-email-asking-them-to-self-deport-for-campus-activism-or-even-sharing-posts-on-social-media/articleshow/119679695.cms; Brandon Drenon and Robin Levinson-King, "Anxiety at US colleges as foreign students are detained and visas revoked," *BBC*, April 18, 2025, https://www.bbc.com/news/articles/c20xq5nd8jeo; Adrian Florido, "These students protested the Gaza war. Trump's deportation threat didn't silence them," *NPR*, May 21, 2025, https://www.npr.org/2025/05/21/nx-s1-5400644/these-students-protested-the-gaza-war-trumps-deportation-threat-didnt-silence-them; Daniella Silva, et al., "Trump takes aim at foreign-born college students, with 300 visas revoked," *NBC News*, March 27, 2025, https://www.nbcnews.com/news/us-news/trump-administration-takes-aim-immigrant-students-rcna198346; Vimal Patel, Miriam Jordan, and Halina Bennet, "Nearly 300 students have had visas revoked and could face deportation," *New York Times*, April 7, 2024, https://www.nytimes.com/2025/04/07/us/student-visas-revoked-trump-administration.html; Faiza Patel, "U.S. AI-driven "Catch and Revoke" Initiative Threatens First Amendment Rights," Brennan Center for Justice, March 20, 2025, https://www.brennancenter.org/our-work/analysis-opinion/us-ai-driven-catch-and-revoke-initiative-threatens-first-amendment-rights; Dawn White, "Trump administration revokes almost 80 North Texas student visas," *CBS News Texas*, April 10, 2025, https://www.cbsnews.com/texas/news/trump-administration-revokes-almost-80-north-texas-student-visas/; Killian Baarlaer, "Amid free speech concerns, pro-Palestinian students take caution on Kentucky campuses," *Courier-Journal*, May 9, 2025, https://www.courier-journal.com/story/news/education/2025/05/09/pro-palestinian-students-concerned-about-free-speech-at-kentucky-colleges/83049198007/; Trevor Hughes, "19 State AGs ask federal judge to block Trump's student visa cancellations," *Courier-Journal*, April 11, 2025, https://www.courier-journal.com/story/news/nation/2025/04/11/attorneys-general-lawsuit-trump-student-visa-cancellations/83048386007/; American Association of University Professors, et al. v. Marco

in response to the threat include, among others, making preparations for arrest every time they leave their homes, hiding their identities in public, not attending classes, changing career plans, cancelling travel or opting to return to their home countries. International students have stopped engaging in classroom discussions about controversial topics, particularly Israel and Palestine, declined to attend protest or educational events that they otherwise would attend, stopped posting on social media about these topics and removed previous posts that might attract attention from the government, stop publishing papers, speaking on panels, conducting research, teaching classes, decline job offers, and otherwise retreat from speaking out publicly, and even privately.

17. My colleagues at HRW who speak on campuses about Israel and Palestine conflict report hearing repeatedly from students raising these same fears and describing similar actions, including from students who are US citizens. The silencing of students, researchers, and faculty not only harms those individuals, it deprives everyone on campus of the benefit of their viewpoints and scholarship, diminishing academic freedom and the quality of education for all. It discourages foreigners from coming to the US to study, conduct research and teach, depriving the country of their contributions.[29]

18. Punishing people for exercising their rights to free speech and assembly is a violation not only of the First Amendment of the US Constitution, but also of the International Covenant on Civil and Political Rights (ICCPR), which the US ratified in 1992, including Article 9, which forbids arbitrary arrest and detention, Article 19, which protects free expression, and Article 21, which protects freedom of assembly.[30] Under the ICCPR, noncitizens have these rights as well.[31] HRW has documented how authoritarian regimes throughout the world detain, deport and otherwise punish critics of government policy in order to silence them.[32]

---

Rubio, et al., Civil Action No. 1:25-cv-10685, "Complaint for Declaratory and Injunctive Relief," filed March 25, 2025, https://clearinghouse.net/doc/157588/.

[29] Vimal Patel, Miriam Jordan, and Halina Bennet, "Nearly 300 students have had visas revoked and could face deportation," *New York Times*, April 7, 2024, https://www.nytimes.com/2025/04/07/us/student-visas-revoked-trump-administration.html.

[30] ICCPR, Arts. 9, 19, and 21.

[31] UN Human Rights Committee, CCPR General Comment No. 15: The Position of Aliens Under the Covenant (Art 11 (1) of the Covenant), April 11, 1986, CCPR General Comment No. 15: The Position of Aliens Under the Covenant | Refworld

[32] Human Rights Watch, "'All conspirators': How Tunisia Uses Arbitrary Detention to Crush Dissent," *HRW*, April 16, 2025, https://www.hrw.org/report/2025/04/16/all-conspirators/how-tunisia-uses-arbitrary-detention-crush-dissent; Human Rights Watch, "India: Arrests, Raids Target Critics of Government," *HRW*, October 13, 2023, https://www.hrw.org/news/2023/10/13/india-arrests-raids-target-critics-government; Human Rights Watch, "Two Authorities, One Way, Zero Dissent," *HRW*, October 23, 2018, https://www.hrw.org/report/2018/10/23/two-authorities-one-way-zero-dissent/arbitrary-arrest-and-torture-under; Human Rights Watch, "We Try to Stay Invisible," *HRW*, October 8, 2024, https://www.hrw.org/report/2024/10/08/we-try-stay-invisible/azerbaijans-escalating-crackdown-critics-and-civil-society; Human Rights Watch, World Report 2024: Egypt, events of 2023, *HRW*, January

19. The Trump administration is claiming the authority to punish and remove noncitizen dissenters at will, without providing any meaningful justification. These actions not only violate the rights of those being targeted, but by intimidating others into silence, they represent a much larger threat to the right of free expression for all people in the US, citizens and non-citizens alike.

20. If the US government succeeds in deporting Mahmoud Khalil, it sends a direct message to everyone residing in this country that, if they speak out in a way the administration disagrees with on this major public issue, they risk severe consequences.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Dated: June 4, 2025

.

_____

John Raphling
Declarant

---

2024, https://www.hrw.org/world-report/2024/country-chapters/egypt; Human Rights Watch, "Turkiye: Free Turkmen Activist; Halt Deportation," *HRW*, June 3, 2025 https://www.hrw.org/news/2025/06/03/turkiye-free-turkmen-activist-halt-deportation.

# Exhibit J

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF STEFANIE FOX, EXECUTIVE DIRECTOR OF A JEWISH VOICE FOR PEACE**

I, Stefanie Fox, declare under penalty of perjury that the following is true and correct to the best of my knowledge.

1. I am Executive Director of A Jewish Voice for Peace ("JVP"), a U.S.-based, grassroots membership organization mobilizing Jewish communities to advocate for a just society in Palestine/Israel. I have been Executive Director of JVP for 5 years, and a staff member prior to that for 16 years.

2. With 720,000 members and supporters, JVP is one of the largest progressive Jewish organizations in the world.

3. JVP partners with other U.S.-based organizations who advocate for civil rights and

justice in the United States and Palestine/Israel.

4. JVP and its members are impacted by and concerned about (a) the brazen public arrest and detention of Mahmoud Khalil, a lawful permanent resident of the United States, and (b) the government's insistence that Mr. Khalil's protected, lawful speech is an appropriate basis for the revocation of his green card and grounds for deportation.

5. This position and the current administration's corresponding policies and orders have chilled the speech of JVP and its members. Non-citizen members of JVP, including students, are afraid they will be targeted for exercising their First Amendment rights in advocating for Palestinian human rights. U.S. citizen members of JVP are similarly afraid of being targeted by the government.

6. JVP members across citizenship and visa statuses have curtailed their speech and silenced themselves for fear of reprisal, retaliation, and targeting by the government. Several JVP members who are not U.S. citizens have entirely stopped exercising their First Amendment rights because they fear they will be unlawfully arrested and detained by the government, just like Mr. Khalil was. They worry about the possibility of deportation, something lawful permanent residents and visa holders did not worry about before Mr. Khalil's arrest. Deportation would fundamentally alter their lives.

7. With respect to students and student chapters, specifically, members are afraid that unlawful arrest, detention, or deportation will prevent them from completing their studies and will derail their education and future careers. They face a decision no Jewish lawful permanent resident or U.S. citizen should have to face: choosing between speaking out against a genocide that the state of Israel claims to carry out in the name of Jews and completing an education that is necessary to secure their future. Many students have stopped speaking about Palestine/Israel entirely.

8. Dozens of JVP members, including students, who are being, or feel they may be,

2

**JA 1383**

targeted for their protected speech have requested help, support, advice, and assistance securing legal representation from JVP. The number of requests has increased significantly since Mr. Khalil's arrest. JVP has had to expend significant time and resources responding to these requests and assisting its members and partners.

9. The most recent example relates to JVP's National Member Meeting ("NMM"), which occurred in May 2025. In the weeks and days before the NMM, several presenters informed JVP they would not attend because they were concerned about government retaliation. Presenters who live outside the United States were afraid of unlawful arrest and detention while inside the United States. They cited the administration's arrest and detention of Mr. Khalil as an example of what could happen to them and the reason they could not safely attend the NMM.

10. The chilling effect JVP, its members, and its partners are experiencing will increase if the government continues to unlawfully detain Mr. Khalil and deports him for exercising his First Amendment rights.

Dated: June 2, 2025

STEFANIE FOX, EXECUTIVE DIRECTOR OF A JEWISH VOICE FOR PEACE

3

# Exhibit K

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, et al.,

       *Respondents*

Case No. 25-cv-01963
(MEF-MAH)

## DECLARATION OF IRA J. KURZBAN

1.     My name is Ira J. Kurzban. I submit this declaration to provide context on the decision by the Department of Homeland Security to detain lawful permanent resident respondents in removal proceedings pursuant to allegations that the respondent committed prior immigration-related fraud or misrepresentations.

### Qualifications

2.     I am an immigration practitioner and have been a partner in the law firm of Kurzban, Kurzban, Tetzeli, & Pratt P.A. of Coral Gables, Florida for over four decades, and serve as chair of the firm's immigration department.

3.     Since 1977, I have been active in all aspects of immigration law. I and the attorneys I supervise regularly practice in immigration courts across the country, as well as in federal courts in immigration-related matters.

4.     I am the author of *Kurzban's Immigration Law Sourcebook*, one of the most widely used immigration-law secondary sources in the United States. The book is in its Nineteenth Edition (2024) and is regularly cited by federal courts. *See, e.g.*, *Al Otro Lado v. EOIR*, 120 F.4th 606, 627 n.16 (9th Cir. 2024); *Gonzalez Hernandez v. Garland*, 9 F.4th 278, 289 (5th Cir. 2021) (Costa, J., dissenting); *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015); *Gonzalez v. Holder*, 771 F.3d 238, 243 (5th Cir. 2014); *United States v. Juarez*, 672 F.3d 381, 389 (5th Cir. 2012); *Gonzalez v.*

*Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000); *Viveiros v. Holder*, 692 F.3d 1, 3 (1st Cir. 2012); *Patel v. Ashcroft*, 378 F.3d 610, 612 (7th Cir. 2004); *Socop-Gonzalez v. INS*, 208 F.3d 838, 842 n.3 (9th Cir. 2000).

5.　　As a practicing attorney, I am actively involved in the immigration bar. I am the Past President of the South Florida Chapter of the American Immigration Lawyers Association. I was the national president of the American Immigration Lawyers Association in 1987-88, and I thereafter served as its General Counsel. The American Immigration Lawyers Association is an affiliate organization of the American Bar Association. It has over 14,000 members in 35 chapters in the United States and four international chapters. I am also certified by the Florida Bar as a specialist in immigration law and served on the first committee to draft and grade the certification exam for Florida lawyers.

6.　　Since 1977, I have litigated a variety of immigration-related cases and over 75 published decisions in the federal courts. Among other cases, I have been counsel of record in the United States Supreme Court in *Patel v. Garland*, 596 U.S. 328 (2022); *McNary v. Haitian Refugee Center, Inc*., 495 U.S. 479 (1991); *Commissioner v. Jean*, 496 U.S. 154 (1990); and *Jean v. Nelson,* 472 U.S. 846 (1985).

7.　　Through my over four decades of experience as a practitioner in both the federal courts and immigration courts, I am well qualified to opine on how the immigration-court system differs from the federal courts and the other matters addressed below.

## Framework for Detention Pending Removal Proceedings

8.　　The Immigration and Nationality Act ("INA") authorizes the detention of noncitizens who are placed in removal proceedings. *See* 8 U.S.C. 1226(a).

9.　　In some cases, the INA makes detention mandatory—as in the case of certain "criminal aliens" 8 U.S.C. § 1226(c) or certain suspected terrorists, *id.* § 1226a.

10.　　If a noncitizen placed in removal proceedings is not subject to any of the  mandatory detention grounds, the Department of Homeland Security need not detain the noncitizen pending removal proceedings. *Id.* § 1226(a).

11.     Noncitizens who are arrested by ICE, issued a Notice to Appear, and placed into removal proceedings are routinely released on their own recognizance by ICE after consideration as to whether they pose a flight risk or danger to property or persons. *See, e.g.*, 8 C.F.R. § 236.1(c)(3). Such noncitizens appear at their removal proceedings in a non-detained setting before immigration judges who handle the so-called "non-detained docket."

12.     If ICE declines to release a noncitizen on their own recognizance, a noncitizen who is not subject to mandatory detention may seek a bond from the immigration judge.

13.     An immigration judge should grant bond unless the noncitizen poses a flight risk or a danger to the community.

14.     In practice, lawful permanent residents charged with removability grounds that do not subject them to mandatory detention are in most cases not detained pending their removal proceedings—particularly when the allegations and removability charges leveled against them do not suggest a danger to the community.

15.     In my experience, it is extremely unusual for a lawful permanent resident charged with removability under INA § 237(a)(1)(A) for being inadmissible at the time of admission for committing immigration fraud or making material misrepresentations to be detained pending removal proceedings absent aggravating circumstances such as a criminal record.

16.     Such detention would be even more unusual if the lawful permanent resident has strong ties to the United States, such as a U.S. citizen spouse or child.

17.     Additionally, in my experience it is rare for ICE to amend a Notice to Appear in a case involving a lawful permanent resident to add additional factual allegations and charges of removability particularly given the nature of the allegations added in this case.

18.     Based on the above, the Government's decision to amend the Petitioner's Notice to Appear to add an allegation that he obtained residency by committing fraud or misrepresentation through failure to disclose organizations is extraordinarily unusual.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Dated: June 4, 2025

_____

Ira J. Kurzban

# Exhibit L

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF STACY TOLCHIN**

I, Stacy Tolchin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am an attorney licensed to practice law before the State of California. I have been practicing immigration law since 2002.

2. I am admitted to practice before the United States Supreme Court; the United States Court of Appeals for the Ninth, Tenth, and Second Circuits; the United States District Courts for the Northern District of California, Eastern District of California, Central District of California, and Southern District of California; the United States District Court for New Mexico; and the U.S. Court of Federal Claims.

3. I received my Juris Doctorate from the University of California at Los Angeles

in 2001 and have been practicing law for over 23 years.

4. I am a recipient of the American Immigration Lawyers' Association of Southern California Chapter's 2019 Pro Bono Champion Award, University of California at Los Angeles Law School's 2018 Alumni Public Service Award, the National Lawyers Guild of Southern California 2017 annual award, the American Immigration Lawyers Association's 2009 Jack Wasserman Award for Excellence in Immigration Litigation, the 2009 American Civil Liberties Union of Southern California Equal Justice Advocacy Award, the 2008 National Immigration Law Center Annual Award, the 2007 "Unsung Hero" Award for the National Lawyers Guild of the Bay Area, and was recognized in 2003 by the Arab-American Anti-Discrimination Committee of San Francisco. I have also been named to "Super Lawyers" from 2012-2024.

5. I have represented noncitizens in applications for adjustment of status (i.e., green card applications) and naturalization for more than 20 years, and have represented noncitizens in removal proceedings during that time as well.

6. Both the applications for adjustment of status and naturalization have historically had a question on them requesting information on whether the applicant has ever, at any time, been associated with or a member of any organization in the United States or anywhere in the world.

7. This question is vague and ambiguous and has always been problematic in that applicants do not understand how to answer. It is unclear if the question requires a response about the applicant's place of worship, book club, sports team, university, fraternity/sorority, place of employment, video or computer game circles, or political party.

8. I have been at many interviews where the applicant has volunteered the name of an organization, such as a professional organization, and we have been told by the adjudicating official that the question does not really pertain to such organizations and not to provide details of association with the organization on the application.

9. The vast majority of my clients answer "NO" to the question in its entirety. In the few occasions when it turned out that an adjudicating officer asked more direct questions about memberships and affiliations that my clients answered and the officer deemed relevant, the officer sometimes simply made a note and moved on, and sometimes stated that the question was not asking about that type of membership/association and never even noted the response in the

2

**JA 1392**

application.

10. It is difficult to advise clients what to put on the application regarding this question because people are not able to remember their "associations" at "any time" "anywhere in the world." Even I would not know what to put on the application if I were completing it for myself.

11. The naturalization application was in fact changed on April 1, 2024 to eliminate this question. Now the question in the naturalization application asks only about membership or association directly in terrorist or totalitarian organizations.

12. The adjustment of status application continues to contain the vague and ambiguous question regarding membership and association. However, I have been in many interviews where the adjudicators skip the question altogether.

13. In the rare instances where the membership/association question has been at issue, courts have held that the government must still prove that the missing information is material and the individual had an intent to deceive or made a willful misrepresentation. In some of the cases I have litigated, courts have held that the government has failed to prove those critical components. For example, I have seen denials of naturalization, for instance, where the applicant failed to list their donation to a Palestinian rights organization. This was litigated after a naturalization denial before the U.S. District Court for the Central District of California in Hamdi v. United States Citizenship & Immigr. Serv., No. EDCV1000894VAPDTBX, 2012 WL 13135302, at *10 (C.D. Cal. Aug. 29, 2012), and the district court found that the failure to disclose the association was not done with the subjective intent to defraud.

14. I also was involved with a case where the government attempted to denaturalize an individual from Iran due to his failure to disclose his Iranian military service under the membership/association question on the naturalization application. This case was litigated before the Ninth Circuit in United States v. Mousavi, 378 F. App'x 667, 669 (9th Cir. 2010), and the court held that the failure to disclose the military membership was not material to the naturalization application.

15. I have never seen things like the omission of a student internship or student club membership being the basis for a material misrepresentation charge.

16. As relevant to Mr. Khalil's case, it is incredibly rare to see a lawful permanent resident detained and placed into removal proceedings for having failed to disclose a past membership or association on the application for adjustment of

status. In order to do so, the Department of Homeland Security would have to show the applicant made a false representation and, in doing so, intended to deceive, or willfully failed to disclose a fact that was material, which is very difficult because most associations/memberships are not material. Further, the question on the Form I-485 and Form N-400 is so open-ended and ambiguous that it is hard to show that there was an intent to hide such information, or that it was willfully done. In the vast majority of cases, the question is just usually irrelevant, and without further instruction or prompting, applicants are left without sufficient information to know how to answer the question.

17. I have represented at least ten permanent residents who have been placed into removal proceedings after they were denied naturalization. The only ones who were detained were those who had criminal convictions that DHS believed made them removable, in addition to being ineligible for naturalization.

18. Lawful permanent residents who are charged with removal for fraud or willful misrepresentation at the time of admission (i.e., when they adjusted their status to that of a lawful permanent resident) are eligible for a waiver under 8 U.S.C. § 1227(a)(1)(H). In order to qualify for the waiver, the applicant must have a spouse, parent, or child who is a permanent resident or a U.S. Citizen. I have handled roughly five to seven of these waivers before immigration judges, and these are straightforward waivers that do not require a showing of hardship at all. Once the applicant is deemed eligible (in that they adjusted status and have a qualifying family member), the only inquiry for the immigration judge is the consideration of discretionary factors. These waivers are even available in cases where the applicant has been found to have purposefully committed marriage fraud for purposes of an immigration benefit. I have never had one of these waivers denied by an immigration judge.

19. If the sole charge of removal against Mr. Khalil were 8 U.S.C. § 1227(a)(1)(A), due to what is perceived to be fraud or a material misrepresentation committed by him at the time he adjusted his status to that of a lawful permanent resident, and an immigration judge were to sustain that charge, then he would qualify for a waiver under 8 U.S.C. § 1227(a)(1)(H). Under those circumstances, I believe that he would be granted the waiver in the exercise of discretion given his relationship to his U.S. citizen wife and child, and the lack of any criminal history in his case.

////

4

JA 1394

Dated: June 4, 2025
Pasadena, CA

Signed:

_____
STACY TOLCHIN

# Exhibit M

## DECLARATION OF JOSH PAUL

I, Josh Paul, declare as follows, pursuant to 28 U.S.C. §1746:

1. 8 U.S.C. §1227(a)(4)(C) requires that the Secretary of State "has reasonable ground to believe" that the presence or activities of an alien in the United States would have potentially serious adverse foreign policy consequences. I write as former State Department official to address the "reasonable ground" standard in this statute.

2. I am familiar with statutes affording the President and/or the Secretary of State with discretion in matters of foreign policy based on my employment for over a decade as a Director in the Bureau of Political-Military Affairs. For instance, I was a part of the policy process to make determinations under 22 U.S.C. §2753 and 22 U.S.C. §2776 which relate to the transfer of arms to foreign countries. Such transfers require a formal notification to Congress, triggering a 'notify and wait' period to allow for Congressional action, unless, to quote typical language that is reflected in four places in the above statutes, "the President states in his certification that an emergency exists which requires the proposed export in the national security interests of the United States" (22 U.S.C. §2776(c)), in which case the notification to Congress is waived, and the sale proceeds immediately. In this most weighty matter of arms transfers, which could involve the transfer of a major weapons system such as a fleet of fighter jets, with lasting global defense and foreign policy consequences, there is no modifying language to the President's authority to certify that an "emergency exists." Indeed, as we were advised by the Department's Attorney Advisors when making a series of such emergency certifications in 2019 for deeply controversial arms sales to the Middle East, and in the absence of what any of us believed to be any compelling reason to bypass the Congressional notification process beyond the then-Secretary of State's desire to do so, under this statute an "emergency" is whatever the President, or the Secretary of State acting under his delegated authority, says it is.

3. The same does not apply to the statute at question in this case, because it not only includes a significant caveat to the determination process – "reasonable ground to believe" – but applies this caveat in a circumstance which is far less likely to have the broad and lasting national security impact of a major weapons export.  As a foreign policy practitioner who is experienced in the application of statutes to circumstances, it is my view that the inclusion of this qualifying language is significant. Unlike the example cited above that relates to weapons transfers, it is clear that the intent of 8 U.S.C. §1227(a)(4)(C) is not to provide absolute discretion to, in this case, the Secretary of State, as is the case for the emergency certification authority for arms sales, but rather to circumscribe their authority only to cases in which there is "reasonable ground to believe" that the circumstances otherwise meet the requirements of the statute.

4. This caveat having been established, we come to the consideration of whether there is, indeed, "reasonable ground to believe" that the "presence or activities" in the United

States of the Respondent, Mahmoud Khalil, would "have potentially serious adverse consequences." In my view as a former State Department official, there is not.

5. Khalil is a graduate student of international affairs at Columbia University and is not charged with any crime. The Secretary of State's determination pursuant to 8 U.S.C. §1227(a)(4)(C) only argues that the basis for the Secretary's assessment regards "the participation and roles of... Khalil in antisemitic protests and disruptive activities, which foster[s] a hostile environment for Jewish students in the United States."

6. I note first of all that there is no prima facie evidence for any antisemitic activity on the part of Khalil; indeed, Khalil has been joined in his first amendment activity by many Jewish students, and has publicly made clear that his protest activity concerns the actions of a political entity (i.e. the State of Israel) and not any specific religion or ethnicity.

7. But even were Khalil's actions somehow antisemitic (I aver, again, that they are not) or disruptive, I am not aware of any circumstances in which the conduct of such activities by a graduate student would in any way mean that their presence in the U.S. would have "potentially serious adverse foreign policy consequences." Having both been at one point a graduate student of international affairs, and having worked in academia after that service to teach U.S. and international students about the conduct of foreign policy, I can rather attest to the contrary – that in my experience the words and actions of international affairs students are most often of no consequence whatsoever!

8. Indeed, if there is anything that sets apart the American educational system, particularly at the graduate studies level, it is the freedoms that accompany it – the freedoms to express unpopular ideas and to probe and tackle common assumptions. At no time in American academic history am I aware of a circumstance in which the voice of a student posed "serious adverse foreign policy consequences." Rather, it would be the silencing of such voices, or the deportation of said students, that would pose "serious adverse foreign policy consequences" to the United States.

9. This is because, as the U.S. Government itself has long recognized, the presence of foreign students strengthens American national security. For instance, the State Department itself funds a program, International Military Education and Training (IMET) which the official Security Assistance Management Manual (SAMM) describes as "one of the most important security cooperation (SC) engagements the U.S. has with another country," because "[l]ong after a country purchases, utilizes, and disposes of U.S. military equipment, what remains are the experiences the international military student (IMS) had during training. Through exposure to the American way of life and direct observation of U.S. commitment to universal human rights, the IMS comes to understand and appreciate American democratic ideals." It is my view that not only is there no "reasonable ground" for the Secretary to believe that the presence of Respondent Khalil poses any potentially serious adverse consequences to U.S. foreign policy, but that it is the Secretary's determination itself, by undercutting the basic appeal of American

academic freedom, and disincentivizing the next generation of global leadership in their respective fields from coming to America and building the lasting cultural familiarity and friendships with our nation and its people, which poses the only "serious adverse foreign policy consequences" to the United States emanating from this case.

10. In sum, unlike the broad discretion that is often available in law to foreign policy decisionmakers such as the President or Secretary of State, the statute at hand in this case imposes a limitation in the form of a standard, and that standard has not been met. I urge the court to reject the Secretary's determination, and to permit Khalil to remain.

I declare under penalty of perjury that the foregoing statement is true to the best of my knowledge,

information, and belief. Executed on this 12th day of May 2025 at Washington, D.C.

Josh Paul
Declarant

Exhibit N

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

    *Petitioner,*

  v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE, in
his official capacity as Acting Field Office Director of
New York, Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention Facility;
Caleb VITELLO, Acting Director, U.S. Immigration
and Customs Enforcement; Kristi NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; Marco RUBIO,
in his official capacity as Secretary of State; and
Pamela BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

    *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

## <u>DECLARATION OF CHRISTOPHER J. LE MON</u>

I, CHRISTOPHER J. LE MON, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I submit this declaration in connection with Petitioner Mahmoud Khalil's motion for a preliminary injunction in his above-captioned habeas corpus case. In particular, I address an issue before the Court of whether it is in the "public interest" for noncitizens to be subject to the determination of the Secretary of State that the individual's continued presence or activities in the United States would "compromise a compelling foreign policy interest" (*See* Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Rubio Determination") (ECF 198-1), at 1, where the activities in question amount to constitutionally protected expression.

2. As a former senior White House, National Security Council, and State Department official with significant international relations and foreign policy experience, including analyzing, assessing, promoting, and protecting internationally-recognized human rights, I believe Secretary Rubio's use of the Determination to punish nonviolent student speech and activism is contrary to internationally-recognized human rights, contrary to longstanding

1

**JA 1401**

bipartisan U.S. foreign policy and national interests, and contrary to fundamental American values as set forth in the U.S. Constitution and as expressed vocally by Presidents of both parties and by America's founders. The longstanding and bipartisan American tradition and foreign policy objective of promoting and respecting the fundamental human right to freedom of expression and opinion, particularly speech that expresses dissent from U.S. foreign policy, overwhelmingly demonstrates that the Rubio Determination and the arrest, detention, and attempted deportation of Petitioner is in fact *contrary* to the public interest of the United States.

3.      The arrest, detention, and attempted deportation of Petitioner, and his deprivation of liberty solely as a response to his protected speech, beliefs, and/or opinions, is antidemocratic activity that is commonplace in any number of autocratic countries whose abuses I monitored and sought to prevent when I served at the White House and Department of State, including countries like Egypt, Saudi Arabia, or the United Arab Emirates.  For decades, the U.S. Government has condemned the similar autocratic tactic of silencing critics through arrest, detention, or deportation, as being contrary to internationally-recognized human rights and as contrary to longstanding, bipartisan U.S. foreign policy interests in promoting and protecting these universal rights worldwide, regardless of the citizenship status of the individual exercising those rights.

## Background and Qualifications

4.      I have over 20 years' experience in international law and policy, including as a senior U.S. Government official.  I served as Deputy Assistant Secretary in the Bureau of Democracy, Human Rights, and Labor at the U.S. Department of State between January 2021 and January 2025, where I oversaw the offices of Near Eastern Affairs and Security and Human Rights.  Previously, from 2017 to 2021 I was the Washington Director at Crisis Action, an international human rights advocacy NGO.  I served on the National Security Council staff at the White House from 2016 to 2017 as Special Assistant to the President and Senior Advisor for Multilateral Affairs and Human Rights, and from 2013 to 2014 as Director for Multilateral Affairs.  From 2014 to 2017, I served at the White House as Special Assistant to the President for Presidential Personnel (National Security), and from 2009 to 2013 I served as Senior Advisor in the Bureau of International Organization Affairs at the Department of State.  Prior to my public service, I was an international lawyer in private practice from 2004 to 2009, and from 2003 to 2004 I clerked for Judge Thomas Buergenthal at the UN International Court of Justice.  I received my law degree from New York University School of Law, and received my B.A. from the University of California, Santa Cruz, and am a member of the Council on Foreign Relations.

## The Public Interest in Safeguarding Free Expression Rights of Dissenters and Preventing Arbitrary Detention

5.      I understand the basic facts surrounding Mr. Khalil's case from the publicity that his case has generated, and from the widely-publicized news media reporting about other similarly situated noncitizen students who have been detained by ICE and been subject to

deportation pursuant to the Rubio Determination.  In preparing this declaration, I further reviewed the publicly-accessible Rubio Determination, which comprises only three paragraphs.[1]

6.      As I understand the facts of this case, Mr. Khalil is a Syrian national of Palestinian ancestry and a Legal Permanent Resident of the United States who was a student pursuing a graduate degree in Public Administration at Columbia University's School of International and Public Affairs.  On campus, he became a prominent advocate and spokesperson for Palestinian human rights, and a strong critic of Israel's military campaign in Gaza following the Hamas terrorist attacks of October 7, 2023, as well as a critic of the support the United States government – and he believed, Columbia University itself – has provided to Israel's military campaign.  In other words, Mr. Khalil, as a Palestinian student enrolled at Columbia University, vociferously disagreed with, dissented from, and strongly and vocally spoke out against U.S. foreign policy toward Israeli-Palestinian issues, and against what he perceived as his university's support for that policy.  I am unaware of any credible evidence that Mr. Khalil personally engaged in any activities involving violence, or that he personally engaged in any antisemitic conduct or speech.  I am of course aware that antisemitic speech and conduct has occurred at some student protests against Israel's military campaign, which I strongly and unreservedly condemn.[2]

7.      In reviewing the Rubio Determination, I understand Secretary Rubio has determined that "the activities and presence" of Mr. Khalil in the United States "would have potentially serious adverse policy consequences," which the Secretary based on a conclusion that the protests Mr. Khalil was alleged to be engaged in were "antisemitic" and "disruptive," such that Mr. Khalil's continued presence in the United States would "undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States."  However, nowhere does the Rubio Determination accuse Mr. Khalil of committing any crime, of engaging in any acts of violence, of posing any physical danger or harm to anyone, or of personally engaging himself in any antisemitic speech or conduct.  Nor does the Rubio Declaration accuse Mr. Khalil of any specific or concrete actions that would undermine a foreign policy interest of the United States.  I am unaware of any accusation or suggestion that Mr. Khalil's speech sought to or did incite violence or other unlawful conduct.  Instead, the basis of the Rubio Determination, and of the United States' arrest, detention, and attempted deportation of Mr. Khalil (and other students), appears exclusively to stem from Mr. Khalil's exercise of his constitutionally-protected rights to dissenting speech, nonviolent protest activity, and nonviolent advocacy that criticized U.S. and Israeli policy, and it appears that it is in fact this exercise of rights that the Trump administration finds objectionable.

---

[1]      However, I am unaware of and thus have not reviewed any publicly available substantive legal or policy analysis by the U.S. Government that would support the Rubio Determination's sweeping conclusions.

[2]      As detailed in this Declaration, alongside my strong condemnation of any and all antisemitic speech or conduct (and of all hate speech, no matter the target), I do not believe nonviolent expression is legitimate grounds for legal punishment (including deportation), given First Amendment protections.  Nor do I believe that the existence of such condemnable speech or conduct on U.S. soil produces adverse foreign policy consequences for the United States that are not far outweighed by the adverse foreign policy consequences to accrue were the U.S. Government to punish such nonviolent free expression through detentions, deportations, or other deprivations.

3

**JA 1403**

8.      It is important to highlight that the weaponization by the Trump administration and others of the term "antisemitism" to target individuals nonviolently criticizing policies of the Israeli government not only violates the right to freedom of expression and undermines democratic debate, but also recklessly erodes the moral clarity needed to confront the sincerely worrying rise in actual antisemitism worldwide, making the fight against that scourge even more difficult by diluting and politicizing the underlying principle.

### The Historical Importance of Human Rights
### as an Element of U.S. Foreign Policy and as a Public Interest

9.      From the early words of the Declaration of Independence to the first sentence of the Bill of Rights, certain fundamental rights rest indisputably at the heart of American history and America's identity as a nation.  Reflecting on the centrality of human rights to America's founding, President Carter observed that "America did not invent human rights.  In a very real sense, it is the other way round.  Human rights invented America."[3]

10.      Nearly two centuries after the founding of the United States, the robust American constitutional tradition of protecting free expression and free assembly drove the United States to lead in crafting and promoting the now universally-recognized international human rights norms around these and other fundamental freedoms following the Second World War, including the adoption of the Universal Declaration of Human Rights ("UDHR") in 1948 and the International Covenant on Civil and Political Rights ("ICCPR") in 1966.  Over nearly eight decades since the concept of human rights became an international legal reality, Presidents of both parties – despite at times wide differences in foreign policy priorities across administrations – nonetheless consistently have asserted that the promotion and protection of human rights is not just an essential U.S. foreign policy interest,[4] but is central to American identity.[5]  Democratic and

---

[3]      Remarks by President Carter, Jan. 14, 1981.

[4]      See, e.g., Remarks by President Carter, Dec. 6, 1978 ("human rights are not peripheral to the foreign policy of the United States… Human rights is the soul of our foreign policy. And I say this with assurance, because human rights is the soul of our sense of nationhood."); Remarks by President Reagan, Dec, 10, 1985 ("The United States will never cease to be in the forefront of the noble battle for human rights."); Remarks by President Clinton, Dec. 9, 1997 ("advancing human rights must always be a central pillar of America's foreign policy"); Remarks by President Obama, May 19, 2011 ("The United States supports a set of universal rights.  And these rights include free speech, the freedom of peaceful assembly, the freedom of religion, equality for men and women under the rule of law, and the right to choose your own leaders… Our support for these principles is not a secondary interest.  Today I want to make clear that it is a top priority that must be translated into concrete actions, and supported by all of the diplomatic, economic and strategic tools at our disposal"); Remarks by President Biden, Aug. 16, 2021 ("I have been clear that human rights must be at the center of our foreign policy, not the periphery.").

[5]      See, e.g., Remarks by President Eisenhower, Jun. 4, 1958 ("Basic to our democratic civilization are the principles and convictions that have bound us together as a nation.  Among these are personal liberty, human rights, and the dignity of man."); Remarks by President Carter, Jan. 19., 1978 ("The very heart of our identity as a nation is our firm commitment to human rights… The world must know that in support of human rights, the United States will stand firm."); Remarks by President Reagan, Dec. 3, 1987 ("The United States declared its independence with a document that proclaimed rights to be inalienable gifts from God, not just those who could make it to our shores but to all people, everywhere."); Remarks by President Bush, Jan. 29, 2002 ("America will always stand firm for the non-negotiable demands of human dignity: the rule of law; limits on the power of the state; respect for women; private property; free speech; equal justice; and religious tolerance.  America will take the side of brave men and

4

**JA 1404**

Republican Presidents alike also have insisted that, aside from the inalienability and intrinsic value of human rights, improving respect for human rights at home and abroad advances other U.S. national interests and buoys U.S. credibility and global standing,[6] and have warned that diminished respect for human rights poses serious national security risks for the United States and the world.[7]  Of course, every Presidential administration without exception has taken foreign policy decisions that deviated at times from its publicly-stated commitment to prioritize human rights.  But the Trump administration stands all but alone in recent American history in suggesting that the exercise or defense of human rights, whether domestically or internationally, is *contrary* rather than *fundamental* to U.S. foreign policy or to U.S. national interests; indeed, every other President in recent memory has asserted the exact opposite.  Among America's chief diplomats, the same is true: a survey of public remarks by Secretary Rubio's predecessors over the past several decades demonstrates remarkably consistent public commitment[8] to the importance of human rights in U.S. foreign policy by previous Secretaries of State across administrations of both parties, making the Trump administration's public and transparent abandonment of this principle even more ahistorical and appalling.[9]

_____

women who advocate these values around the world, including the Islamic world, because we have a greater objective than eliminating threats and containing resentment.  We seek a just and peaceful world.")

[6]        See, e.g., Remarks by President Reagan, Dec. 10, 1985 ("Respect for human rights is essential to true peace on Earth.  Governments that must answer to their peoples do not launch wars of aggression.  That's why the American people cannot close their eyes to abuses of human rights and injustice, whether they occur among friend or adversary or even on our own shores."); Remarks by President Clinton, Dec. 9, 1997 ("As long as America is determined to stand for human rights, then free people all around the world will choose to stand with America."); Remarks by President Obama, Dec. 10, 2009 ("peace is unstable where citizens are denied the right to speak freely or worship as they please; choose their own leaders or assemble without fear... No matter how callously defined, neither America's interests – nor the world's – are served by the denial of human aspirations."); Remarks by President Biden, Oct. 15, 2021 ("Demonstrating that our commitment to human rights begins at home is among the most powerful and persuasive tools in our foreign policy kit.").

[7]        See, e.g., Remarks by President Reagan, Dec. 10, 1984 ("The American people recognize that it is the denial of human rights, not their advocacy, that is a source of world tension."); Remarks by President Reagan, Nov. 21, 1985 ("We Americans believe that history teaches no clearer lesson than this: Those countries which respect the rights of their own people tend, inevitably, to respect the rights of their neighbors. Human rights, therefore, is not an abstract moral issue; it is a peace issue."); Remarks by President Obama, May 28, 2014 ("America's support for democracy and human rights goes beyond idealism – it is a matter of national security... Respect for human rights is an antidote to instability and the grievances that fuel violence and terror.").

[8]        Again, the foreign policy *conduct* of many administrations has fallen far short of public commitments on human rights, including through highly selective criticism of violations and a willingness to turn a blind eye toward human rights abuses by U.S. partners.  But rhetorical commitment by Presidents and Secretaries of State throughout modern history demonstrates the continuing importance of the principle to U.S. national and foreign policy interests.

[9]        See, e.g., Remarks by Secretary Blinken, Mar. 30, 2021 ("We will bring to bear all the tools of our diplomacy to defend human rights and hold accountable perpetrators of abuse... Standing up for human rights everywhere is in America's interests... Standing for people's freedom and dignity honors America's most sacred values."); Remarks by Secretary Pompeo, Mar. 13, 2019 ("our committed defense of human rights stems from America's founding principles."); Written Statement by Secretary Tillerson, Mar. 6, 2017 ("Promoting human rights and democratic governance is a core element of U.S. foreign policy... Our values are our interests when it comes to human rights."); Remarks by Secretary Kerry, Apr. 19, 2013 ("promoting human rights isn't a foreign policy priority simply because it's the right thing to do. It's tied to our own security.  It's tied to the possibilities of prosperity and of nations living by rule of law and of nations living in peace...  Because part of the American spirit is the fierce belief in the dignity and potential of every single person, part of American leadership is speaking out for

5

**JA 1405**

**Targeting Dissent as a Tool of Autocracies and Other Undemocratic Governments**

11.    Among my duties as Deputy Assistant Secretary of State for Democracy, Human Rights, and Labor, I daily monitored and assessed human rights conditions across the Middle East and North Africa, as well as human rights issues relating to the provision of U.S. security assistance worldwide.  This included reviewing diplomatic, intelligence, media, and NGO reporting; meeting and speaking directly with human rights defenders, journalists, civil society

---

people who can't speak for themselves. It's also standing up for those who fight for their own rights – as I said, sometimes in the most desolate places, without support. It is our effort to stand up for the universal rights of all people."); Remarks by Secretary Clinton, Apr. 8, 2011 ("Here at the State Department, human rights is a priority 365 days a year… because it actually is in line with our values, our interests, and our security."); Remarks by Secretary Rice, Mar. 8, 2006 ("Our promotion of human rights and democracy is in keeping with America's most cherished principles and it helps to lay the foundation for lasting peace in the world."); Remarks by Secretary Powell, Mar. 4, 2002 ("the American people are united in the conviction that active support for human rights must be an integral part of American foreign policy. The United States will be a steadfast friend to men and women around the world who bravely seek to improve the observance of international human rights standards within their own countries and worldwide."); Remarks by Secretary Albright, Dec. 6, 2000 ("Respect for human rights belongs within the heart of American foreign policy… That is where it ought to stay for many years to come."); Remarks by Secretary Christopher, Dec. 10, 1996 ("We have to be vigilant in defending human rights and political freedom"); Remarks by former Secretary Baker, Apr. 10, 2011 ("I think we need to be clear that we're going to always support our principles and values, that is the promotion of democracy and the protection of human rights, politically, diplomatically and economically"); Remarks by Secretary Schultz, Feb. 22, 1984 ("moral values and a commitment to human dignity have been not an appendage to our foreign policy but an essential part of it, and a powerful impulse driving it. These values are the very bonds that unite us with our closest allies, and they are the very issues that divide us from our adversaries… It is the difference between tyranny and freedom – an age-old struggle in which the United States never could, and cannot today, remain neutral."); Remarks by Secretary Haig, May 15, 1981 ("Let me deal first with the question of whether a concern for human rights is compatible with the pursuit of America's national interest.  My answer to this is a resounding 'yes.'  The supreme American national interest is simple and compelling: we want a world hospitable to our society and our common ideals. As a practical matter, our national interest requires us to resist those who would extinguish those ideals and are hostile to our common aspirations… Human rights are not only compatible with our national interest, they are an integral element of the American approach – at home and abroad."); Remarks by Secretary Muskie, Aug. 7, 1980 ("There are those who suggest that the freedom of other people is none of our business, that with enough military hardware our freedom can be secure while the freedom of others is stifled, that our purpose in the world is to preserve the status quo. I say, and I believe you say, that is an invitation to trouble. It is a narrow vision of ourselves and of the world… If we do not promote freedom in the world, there will be less freedom in the future for Americans."); Remarks by Secretary Vance, Apr. 30, 1977 ("Our concern for human rights is built upon ancient values.  It looks with hope to a world in which liberty is not just a great cause, but the common condition. In the past, it may have seemed sufficient to put our name to international documents that spoke loftily of human rights. That is not enough.  We will go to work, alongside other people and governments, to protect and enhance the dignity of the individual."); Remarks by former Secretary Rusk, ca. 1985 ("I know that there are countries in which human rights are in a better position because of the continuous and steady influence of the United States… a number of places where human rights matters were taken more seriously because of us.  I would hope that we would continue to work at it that way."); Remarks by Secretary Marshall, Sep. 23, 1948 ("Not only is it appropriate that we should here reaffirm our respect for the human rights and fundamental freedoms, but that we should renew our determination to develop and protect those rights and freedoms… Systematic and deliberate denials of basic human rights lie at the root of most of our troubles… It is not only fundamentally wrong that millions of men and women live in daily terror of secret police, subject to seizure, imprisonment or forced labor without just cause and without fair trial, but these wrongs have repercussions in the community of nations.  Governments which systematically disregard the rights of their own people are not likely to respect the rights of other nations and other people, and are likely to seek their objectives by coercion and force in the international field."); cf. Statement by then-Senator Rubio, Mar. 31, 2021 ("As Americans who are blessed to live in this great country, we have a moral obligation and a strong national security interest to defend and promote the fundamental rights of all people.").

6

**JA 1406**

activists, and foreign government officials; and collaborating with experts across the State Department, the broader U.S. Government, and nongovernmental organizations in the United States. Beyond this daily human rights diplomacy and analysis, I also supervised the compilation of the Department of State's annual Human Rights Reports for countries across the Middle East and North Africa covering calendar years 2020 through 2023.

12.     Under international human rights law, all persons are entitled to the right to freedom of expression[10] and the right to freedom of peaceful assembly,[11] and are entitled to be free from arbitrary detention.[12] For detention to be considered "arbitrary" under international law, it must not be unlawful under domestic law, and also must not be unjust, unpredictable, or disproportionate to a legitimate state interest pursued by the government.[13] Over the decades since the UDHR and ICCPR were adopted, judicial and scholarly interpretations of the interplay between these rights has established that when an individual is deprived of liberty in response to their exercise of fundamental rights like freedom of expression, that detention is by definition "arbitrary."[14] International jurists have clarified further that any government restrictions on the fundamental rights to freedom of expression or freedom of peaceful assembly not only must be in pursuit of a legitimate state interest (vice designed merely to quash the exercise of those

---

[10]     See UDHR, art. 19 ("Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."); ICCPR, art. 19(1)-(2) ("Everyone shall have the right to hold opinions without interference. Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.").

[11]     See UDHR, art. 20(1) ("Everyone has the right to freedom of peaceful assembly and association."); ICCPR, art. 21 ("The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others.").

[12]     See UDHR, art. 9 ("No one shall be subjected to arbitrary arrest, detention or exile."); ICCPR, art. 9(1) ("Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention.").

[13]     See UN Human Rights Committee, General Comment 35, Dec. 16, 2014, para. 12 ("An arrest or detention may be authorized by domestic law and nonetheless be arbitrary. The notion of 'arbitrariness' is not to be equated with 'against the law,' but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability and due process of law, as well as elements of reasonableness, necessity and proportionality.").

[14]     See, e.g., UN Human Rights Committee, General Comment 35, para. 17 ("Arrest or detention as punishment for the legitimate exercise of the rights as guaranteed by the [ICCPR] is arbitrary, including freedom of opinion and expression, freedom of assembly, freedom of association, freedom of religion and the right to privacy.") (internal citations omitted); UN Working Group on Arbitrary Detention, Op. No. 2022/24 (Belarus), May 25, 2022 (finding the politically-motivated detention of an opposition lawyer was "arbitrary" as it was "quite clear to the Working Group that the basis for the arrest and subsequent detention of Mr. Znak was in fact his exercise of freedom of expression and freedom of assembly as well as the right to take part in public affairs of Belarus. There is no evidence whatsoever that any of his actions have been violent, that he incited violence or that his actions have indeed led to violence perpetrated by others."); UN Working Group on Arbitrary Detention, Op. No. 2020/86 (Saudi Arabia) (finding the detention of a Shi'a cleric in response to his criticism of sectarian violence and sectarian discrimination to be "arbitrary" given his detention "resulted from the active exercise of civil and political rights").

rights), but also must be undertaken in the manner that is least intrusive to the exercise of those fundamental rights.[15]

13.    Arbitrary detention is a silent weapon of modern autocracy.  Undemocratic governments the world over employ arbitrary detention to suppress dissent, entrench power, and stifle protest movements, attempting to stem public outcry and prevent the legitimate public criticism, protest, and debate that is essential to functional democracy.  By targeting dissent and other critical speech through arbitrary detention, undemocratic regimes seek to sever the lifeblood of protest movements, including the ability of individuals and groups to communicate, organize, and express political will, aiming to incapacitate political critics and to infect society with fear and intimidation.  Particularly when employed against individuals criticizing government policy, arbitrary detention seeks to punish the very acts (e.g., protests or speech aimed at raising public awareness) that otherwise could enable legal or political accountability for the disfavored policy.  Frequently used selectively to publicly target high-profile protestors, arbitrary detention is a tool of repression calculated to inspire fear in individuals, communities, and movements who disagree with government policies, sending the chilling message that the mere exercise of fundamental freedoms of expression or assembly could lead to detention, imprisonment, deportation, or disappearance.

14.    Within the region on which I worked most closely during my most recent service at the Department of State, such abuses are sadly commonplace.  In Egypt, the el-Sisi government has arrested and detained many thousands of human rights defenders, journalists, activists, opposition politicians, and even ordinary citizens, abusing vaguely-worded laws to detain or imprison for years individuals whose only "offense" was criticism of government policies. The Iranian regime has arrested and tortured thousands of protesters and dissenters, especially during and after the 2022 protests sparked by Mahsa Zhina Amini's death in custody, citing vague national security charges and consistently depriving defendants of due process as punishment for protests demanding simply respect for basic human rights.  In Saudi Arabia, women who have demanded equal treatment under law and ordinary citizens who have criticized the autocratic behavior of Crown Prince Mohammed bin Salman have found themselves sentenced to lengthy prison sentences after closed trials by state security courts; some were convicted after being pressured to repatriate or extradited from other countries on charges related to critical speech, while others like Washington Post columnist (and U.S. Legal Permanent Resident) Jamal Khashoggi have faced fates far worse than arbitrary detention, including torture and extrajudicial execution at the hands of the government.  In the United Arab Emirates, authorities have imprisoned activists, lawyers, and students, holding many of them incommunicado for long periods of time simply for forming an independent advocacy group that publicly recommended changes to government policy, even going so far as to re-convict and re-sentence many of them on the same charges years later to ensure their continued detention.

---

[15]    See, e.g., UN Human Rights Committee, General Comment 34, Jul. 29, 2011, para. 23 (government restrictions on the exercise of freedom of expression "may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights. Nor, under any circumstance, can an attack on a person, because of the exercise of his or her freedom of opinion or expression, including such forms of attack as arbitrary arrest, torture, threats to life and killing, be compatible with [ICCPR] article 19.").

**JA 1408**

15.     There are myriad further examples of governments in other parts of the world as well that utilize arbitrary detention to target the expression of critical or dissenting speech. The Chinese government has institutionalized arbitrary detention as a tool of ideological control and political repression, systematically targeting lawyers, journalists, and civil society activists under vague statutes that criminalize "picking quarrels and provoking trouble," and detaining or disappearing rights advocates and government critics; its massive incarceration of more than a million Uyghurs and other ethnic minorities in "re-education camps" in Xinjiang aims to silence not only individual critics, but entire communities.  Russia under Putin has aggressively used arbitrary detention to extinguish political opposition, control public narratives, and prevent widespread protest; beyond the poisoning and imprisonment of iconic human rights defender Alexei Navalny (who later died in a Siberian gulag), the Russian government has preemptively detained thousands of demonstrators nationwide ahead of planned protests using broad laws banning "unauthorized" gatherings and legislation criminalizing public statements that "discredit" the Russian military.  The Lukashenko regime in Belarus used mass arbitrary arrests to quash 2020 pro-democracy protests, sentencing and imprisoning opposition leaders through closed-door trials that came nowhere near international standards for fairness.  In Maduro's Venezuela, authorities routinely have detained activists, opposition politicians, and even government employees and health workers, for criticizing government maladministration, relying on a controversial and vague law criminalizing acts that "incite hatred." Cuba's one-party state has long used speech-related detention to maintain political control, including in response to protests demanding adequate food and medicine, relying on vague criminal laws covering contempt and public disorder to punish and suppress criticism of government policies and government shortcomings.

16.     Details of the practice of arbitrary detention have been well documented historically in the annual Human Rights Report by the Department of State; sadly, even more examples abound in countries beyond those noted above.[16]

17.     The use of arbitrary detention by governments to suppress criticism and speech is particularly potent in extinguishing fundamental human rights when a country's judiciary lacks independence, or where the judiciary is overly influenced by the executive.  In these instances, judges perform little to no independent fact-finding to test the government's assertions that an individual has committed a criminal act, or they fail to appropriately tailor the government's overbroad interpretations of laws and thus allow the criminalization of speech or conduct constituting the exercise of universal human rights.  In each of the countries noted above as well as numerous others, judges effectively operate as arms or subsidiaries of the executive, lacking the independence from the government needed for them to preserve the rule of law and respect for fundamental freedoms.  Some, like Saudi Arabia's Specialized Criminal Court or Egypt's terrorism courts and state security emergency courts, have been reported to all-but-explicitly take direction from government officials.  Others, like courts in Egypt, the UAE, or Iran, regularly have convicted protestors and dissidents on vague charges like "spreading false news" or "inciting hatred" in response to critical speech.  Still others, like Qatar, have deported immigrants who held legal status after they peacefully protested mistreatment, in a clear effort to

---

[16]     For recent examples, see generally Department of State, 2023 Country Reports on Human Rights Practices; Department of State, 2022 Country Reports on Human Rights Practices; Department of State, 2021 Country Reports on Human Rights Practices; Department of State, 2020 Country Reports on Human Rights Practices.

**JA 1409**

silence criticism by demonstrating protestors' vulnerability as noncitizens. In these and other countries, courts have based convictions of government critics on unreliable evidence, including coerced confessions and biased media or other sources. The lack of judicial independence and the inability or unwillingness by judges to stand up against governments targeting critics and dissidents potently multiplies the harm and risk of arbitrary detention.

18.    Both globally and in the United States, the protection of speech and especially of the expression of dissent or criticism of government policy remains essential for the health of a country's democracy. From its founding through to the present, the United States has uniquely emphasized the paramount value that free expression has for the very concept of America, and has infused that commitment and principle into U.S. foreign policy. In my service at the Department of State, this primacy of free expression regularly invited tensions with counterparts from undemocratic governments, who argued it was better to emphasize societal cohesion or the preferences of the government or a popular majority (actual or simply imagined by a leader unbound by fair elections) over the rights of an individual to express criticism or dissent toward government policy. Even some of America's closest allies and partners in Europe, themselves robust democracies with admirable human rights records, advanced slightly more restrictive definitions of the right to free expression than the United States, in part given their histories with inciteful hate speech leading to catastrophic violence. No matter the interlocutor, I communicated to foreign counterparts, just as countless U.S. diplomats for decades have done, that not only does protecting critical or dissenting speech reinforce universal human rights; doing so also *enhanced* societal stability, by permitting grievances to be aired peacefully, and promoted more effective governance and policy by allowing feedback from civil society as well as legal and political accountability where government policies or programs fall short of their goals or of public desires, or where government policies or programs were marred by corruption or mismanagement.

19.    The dangers of abandoning protections for dissenting or critical speech can be seen in the present and the past in societies across the Middle East and North Africa and elsewhere around the world. When a government is allowed to decide which speech it will tolerate and which speech it will not, the result throughout history has been a broadening crackdown that puts any government critic – citizen and noncitizen alike – squarely in the crosshairs of state repression. As noted above, critics or dissidents in countries with undemocratic governments unchecked by the rule of law or by independent judicial bulwarks regularly face grim fates, ranging from arbitrary detention to torture to disappearance and extrajudicial execution. Their societies suffer similar decay. The instability inherent in a system where dissent is met with detention or violence regularly leads to increased criticism and protest of that intolerance and abuse, which the government usually meets with further suppression of freedoms. Historically, this downward spiral that begins with government intolerance of critical or dissenting expression typically continues toward one of two outcomes: either a population crumbles under government repression, accepting official censorship and even self-censoring to avoid punishment, or a society decides it is unwilling to live without the ability of individuals to freely express themselves without fear of reprisal, and seeks to replace wholesale a repressive government with one that better respects their human rights.

20.     During my service as Deputy Assistant Secretary in the Bureau of Democracy, Human Rights, and Labor at the Department of State, I observed firsthand how one of the most important tools of American diplomatic influence and power was the resilience and strength of our democratic values, including the importance of protecting human rights both at home and abroad, especially for individuals expressing criticism or dissent from government actions.  In my official travels to the Middle East and North Africa, I met with numerous human rights defenders, journalists, activists, opposition politicians, academics, and business leaders, each keen to highlight threats to human rights or rule of law they and others faced in their country, and each eager to learn about and recommend avenues that the United States could follow to support progress and greater respect for human rights.  I never approached these conversations, or those with foreign government officials with whom I raised concerns over their human rights practices, by presenting the United States as having achieved perfection or anything approaching it when it came to our own human rights record.  Rather, I reflected with pride upon the constitutional and statutory guarantees the United States had enacted to protect human rights at home; reflected with humility on the yawning gaps between the promises of those guarantees and their actual implementation over American history, especially for Americans from marginalized populations; and reflected with commitment on the ongoing efforts by the U.S. Government to work to further close that gap.

21.     My interlocutors in civil society, each of them fighting for progress on human rights issues in their own country, understood as I do that the struggle to protect human rights is not just generational, but likely unending.  Yet the brave human rights defenders with whom I met (sometimes amid visible surveillance by their government) also recognized the deep contribution to global progress on human rights that came not only from concrete improvements on these issues in the United States (halting and uneven as those have been), but also from America's consistent and continued rhetorical and philosophical commitment to human rights as a core element of our foreign policy and of our approach to governments around the world.  I was repeatedly told that the continued attention of the U.S. Government to human rights conditions in their countries was a powerful tool to prevent or mitigate abuses, and that the bathing of America's historical founding in the language of human rights gave the United States unique standing on the issue.  When asked on a trip to Egypt in mid-November 2024 whether that fundamental American commitment and precept would disappear with the re-election of President Trump, I urged Egyptian human rights advocates to recall the strength of American institutions – including the judiciary, legislature, and rule of law – as checks against an executive that might try to abandon the bipartisan history of U.S. commitment to human rights.

22.     Just a few short months after that confident exhortation about the strength of American institutions, Mr. Khalil's case has obtained world-wide notoriety, as have the cases of other student protestors in the United States whom the government has arrested and detained pursuant to Determinations by Secretary Rubio that their free expression and other speech activities supposedly undermine the foreign policy interests of the United States.  Amid a yearslong trend of democratic backsliding worldwide, the clear commitment of the United States to universal human rights – especially the right to free expression and the ability to peacefully dissent and criticize government policy without reprisal – is needed more than ever.  Should the U.S. Government be permitted to claim that suppressing the ability of individuals in the United States to exercise universal human rights enshrined in the U.S. Constitution, that precedent will

11

**JA 1411**

diminish the capability of the United States to execute the longstanding bipartisan foreign policy objective of standing up for human rights and democracy worldwide, an objective that has been pursued (unevenly, admittedly) across administrations of both parties for decades.  Moreover, allowing the Federal government to carry out reprisals against individuals as a response to dissent, protest, or critical speech that the current administration dislikes would strike a serious blow against the health and stability of American democracy; would deal serious damage to U.S. credibility worldwide on human rights issues; and would make every person in the United States – noncitizens and citizens alike – far less safe and far less free.[17]

_____

Christopher J. Le Mon

Sworn on this 4th day of
    June, 2025

_____

[17]    See, e.g., Letter from George Washington to Officers of the Army, Mar. 15, 1783 ("For if Men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of Mankind; reason is of no use to us – the freedom of Speech may be taken away – and, dumb & silent we may be led, like sheep, to the Slaughter.").

**JA 1412**

# Exhibit P

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Yolanda PITTMAN, in her official
capacity as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director, U.S.
Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary
of State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
KERRY E. DOYLE**

## <u>DECLARATION OF KERRY E. DOYLE</u>

I, KERRY E. DOYLE, hereby declare and state:

    1.     The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

    2.     I am currently Of Counsel with Green and Spiegel, LLC, which is an immigration firm based in Philadelphia, Pennsylvania. I graduated *cum laude* from American University, Washington College of Law with a J.D. and The George Washington University with a B.A. in Political Science. I am a member of the Commonwealth of Massachusetts Bar, the Supreme Court Bar and the bars of Several Federal Courts of Appeals and U.S. District Courts.

    3.     I served as Principal Legal Advisor (PLA), for Immigration Customs Enforcement

**JA 1414**

(ICE) from September 2021 through September 2024. In that role, I oversaw the more than 1,500 attorneys and staff who work for the Office of the Principal Legal Advisor (OPLA) across the country. As PLA, I was responsible for establishing the direction and priorities of our office in alignment with the Office of General Counsel (OGC), ICE, and DHS leadership. During that time, I also served on detail as Acting Deputy General Counsel, Office of General Counsel (OGC), Department of Homeland Security (DHS) from February 2024 through May 2024 and as Deputy General Counsel from October 2024 through December 2024. I was appointed as an Immigration Judge and served in that position from December 2024 through mid-February 2025.

4.      In private practice, I have represented many hundreds of noncitizens in removal proceedings. I am a recognized expert in complex immigration issues, including immigration court removal proceedings. I have been a frequent speaker at immigration conferences and national lawyer trainings, including recurring trainings co-hosted by the Boston Immigration Court (part of the Executive Office for Immigration Review (EOIR)) and the New England chapter of AILA, with a specific focus on training pro-bono attorneys volunteering to represent noncitizens in immigration bond hearings. I have been recognized as an expert witness on immigration law topics before both state and federal courts. In light of my expertise, while in private practice, I was selected by the Immigration Court to represent detained individuals who have been deemed incompetent through the National Qualified Representative Program. In the past, I worked closely with the Massachusetts Immigrant and Refugee Advocacy Coalition and the Massachusetts Law Reform Institute providing technical assistance and public testimony on various immigration-related policy issues before the state legislature and the Boston City Council. More recently, I have testified before the Federal Law Enforcement subcommittee of the Government Oversight Committee in the U.S. House of Representatives.

5.      I am providing this declaration in my personal capacity. The opinions herein should

not be construed to represent the position of DHS or any components therein, the Department of Justice, or Green and Spiegel, LLC. Moreover, while the views I express herein are generally based on my over twenty-five years of immigration law practice, including extensive experience in both private practice and government service, no part of this declaration includes, references, reflects, draws upon, confirms, or denies privileged, confidential, deliberative, sensitive, or classified information.

6.      I have reviewed Mahmoud Khalil's Third Amended Petition for Writ of Habeas Corpus and Complaint, ECF 236 ("Petition"). While I do not represent Mr. Khalil and I have no first-hand knowledge of the facts from this case, I understand from the Petition that Mr. Khalil is confined at the Central Louisiana ICE Detention Facility in Jena, Louisiana. I also understand from the Petition that Mr. Khalil has never been convicted of a crime nor arrested (prior to his apprehension by ICE on March 8, 2025).

7.      Mr. Khalil's overnight transfer to Louisiana is highly unusual.

8.      Indeed, it is extraordinarily rare for DHS to transfer someone, overnight, from one part of the country, such as New York or New England, all the way to Louisiana. This is particularly true where that person's family and attorneys are in the greater New Jersey area. Historically, a noncitizen is most likely to remain in the general geographic area where they are living before being detained, barring an extremely unusual situation. I cannot recall a situation in which something similar happened to one of my clients in my twenty-five plus years of private practice.

9.      I cannot recall the U.S. government detaining a lawful permanent resident of the United States with no prior criminal involvement or arrests and then placing that person in removal proceedings charging primarily 8 U.S.C. 1227(a)(4)(C), based even in part on that person's constitutionally protected political speech in the United States. This case is the first such instance

of which I have become aware of this occurring.

10.    In fact, I do not recall the U.S. government ever citing 8 U.S.C. 1227(a)(4)(C) as a ground of removability in any removal case not involving a current or former foreign government official. This case is the first such instance of which I have become aware.

11.    I understand from the Petition that senior U.S. government officials made statements after Mr. Khalil's apprehension, explicitly referencing his detention to send a message to others that they, too, should fear arrest. If that allegation in the Petition is accurate, it would also be extraordinary in my view.

12.    I believe that there is a strong governmental and public interest in protecting noncitizens from retaliation through immigration enforcement because freedom of speech is a bedrock of democratic governance and the rule of law.

13.    This holds particularly true in the immigration context, where the U.S. government has limited enforcement resources and must exercise wide prosecutorial discretion in a fair and legitimate manner. Even the appearance of retaliation as the main motive for an enforcement action risks undermining the rule of law.

14.    DHS guidance has publicly reiterated the agency's commitment to honoring noncitizens' First Amendment rights and avoiding enforcement against a noncitizen solely based on First Amendment protected activity. This includes then-Acting Secretary of Homeland Security Kevin K. McAleenan's May 17, 2019 guidance titled "Information Regarding First Amendment Protected Activities" and then-Secretary of Homeland Security Alejandro N. Mayorkas's September 30, 2021 guidance titled "Guidelines for the Enforcement of Civil Immigration Law."

15.    Targeting a noncitizen for apprehension, detention, and removal based solely on that noncitizen's speech would be contrary to these principles and I believe would risk undermining the perceived legitimacy of immigration enforcement.

16.    It is also unusual that DHS added a second charge of removability alleging misrepresentations in Mr. Khalil's immigration applications in the absence of any pending immigration application triggering review, and only after he was apprehended and filed a habeas corpus petition.

17.    Moreover, in light of the fact that the new charges appear challenging for the government to prove, this development highlights the government's concern that the original charge for removal may not be proven and that they are eager to have Mr. Khalil removed at any cost. The arrest, detention and aggressive posture of the government in this case, evidenced by the amended charges, will, in my view, chill the free speech rights of citizens and noncitizens.

18.    Lawful permanent residents of the United States are not typically placed in removal proceedings, and certainly not detained, based solely on the types of allegedly missing information described in the second charge (as detailed in the Petition). That such a charge was added creates an even broader fear among noncitizens. While not all noncitizens who have engaged in political speech may have Mr. Khalil's public profile, most have submitted various immigration applications to DHS and probably now fear that their applications will become a pretext for targeting.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED:    June 4, 2025                          _/s/ Kerry E. Doyle_

                                               KERRY E. DOYLE

# Exhibit Q

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, *Petitioner,* v. Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, *Respondents.* | Case No. 25-cv-01963 (MEF-MAH) **DECLARATION OF** ████████ |

I, ███████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am a licensed psychologist with expertise in cultural psychology, trauma and minority mental health. I submit this declaration in support of Mahmoud Khalil's motion for a preliminary injunction. In particular, I seek to offer evidence regarding a question I understand is under the Court's review: whether the invocation of the determination of Secretary of State Rubio that Mr. Khalil should be arrested, detained and removed from this country because of allegations that his advocacy for Palestinian human rights would cause Mr. Khalil "irreparable harm." Based on my experience and a review of relevant clinical literature, I conclude that it would be reasonable to presume Mr. Khalil would likely experience "irreparable harm."

2. As I detail below, even within a broader context of rising Islamophobia and anti-Arab and anti-Palestinian sentiment and discrimination in this country, the recent and dramatic escalation of charges that activism for Palestinian human rights is somehow (and falsely) the equivalent of antisemitism is itself a reflection of Islamophobia and anti-Palestinian bias. Particularly when lodged against already marginalized Arabs and Palestinians in this country, such a conflation ultimately depends on the problematic stereotyping of Palestinians and Arabs, who are deemed incapable of invoking universalist calls for justice and the vocabulary of international human rights without also coming from a place of violence or hatred.

3. Mr. Khalil, a prominent and well-respected leader in the Palestinian human rights movement in this country has been derided – at the highest levels of the United States government – and without evidence or substantiation as a dangerous "anti-semite" and someone who is a supporter of Hamas. Essentializing his activism as a form of antisemitic hatred or terrorism suggests that Islamophobia and anti-Palestinian animus is operating at the highest levels of government and accordingly being disseminated via his high-profile case, across the country and the world.

4. The social science literature predicts – and amply supports – that such forms of Islamophobia and anti-Palestinian bias, could result in stigmatic harms, injury to identity and other forms of psychological pain that are not, the literature suggests, easily remediated.

## BACKGROUND AND QUALIFICATIONS

5. As an ███████████████████████████████████████████████████, and with the majority of my research over the last decade has focused on the experiences of Arab, Middle Eastern, and North African (MENA) Americans with special attention to discrimination, racial trauma, psychological well-being, and ethnic identity development, I am qualified to offer my expert opinion on the way in which Mr. Khalil has been targeted by the administration would produce distinctive harms to a Muslim, Palestinian like Mr. Khalil.

6. I received my Ph.D. ███████████████████████████████████████████
███████████████████████████████████████████████████████

7. Additionally, I have published numerous first-author manuscripts in high-impact peer-reviewed psychology journals, ████████████████████████████████
████████████████████████████ including studies focused on resilience among trauma-exposed Syrian refugees, perceived discrimination among

2

**JA 1421**

Arab Americans, and more recently, the intergenerational transmission of trauma among Arab/MENA families in the U.S.

## CHARGES OF ANTI SEMITISM

8.  Given the prominence of Mr. Khalil's case in the media, as well as wide reporting about other similarly situated students who have been apprehended and detained by ICE and subject to deportation pursuant to the Secretary of State's Determination, I have an understanding of the basic facts surrounding Mr. Khalil's case.  As I understand the facts of this case, Mr. Khalil, a Syrian national of Palestinian ancestry, was a graduate student pursuing a degree at Columbia University. On campus, he became a prominent advocate and spokesperson for Palestinian human rights, and a strong critic of Israel's military campaign in Gaza and the support he believed the United States government and Columbia University itself provided to Israel's military campaign, which international courts of law and international human rights organizations have determined is an ongoing genocide.

9.  I understand that the legal authority claimed to arrest and detain and deport Mr. Khalil is Secretary of State Rubio's Determination, that "the activities and presence" of Mr. Khalil in the United States "would have potentially serious adverse policy consequences," which the Secretary based on a conclusion that the protests Mr. Khalil were engaged in were "antisemitic" and "disruptive" such that his continued presence would "undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States."  Mr. Khalil is not accused of committing any crime, causing any acts of violence or posing any physical danger or harm to anyone. Instead, the entirety of his detention and attempted deportation rests on a claim that his Palestinian human rights activism is "anti-semitic."

10. Even more, he has been smeared as a supporter of terrorism at the highest levels of the United States government.  President Trump described Mr. Mahmoud Khalil as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University" (Second Amended Complaint, ¶73), the official page of the administration accused Mr. Khalil of "[leading] activities aligned to Hamas" (SAC ¶74), and Press Secretary Karoline Leavitt accused Mr. Khalil of "siding with terrorists"( SAC ¶79) when responding to questions about his arrest. Additionally, on March 9, 2025, the White House posted on X/Twitter a mocking and threatening post that centered Mr. Khalil's photograph with "Shalom Mahmoud" and the White House logo just below Mr. Khalil's face.  The text of the tweet

stated, "We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."[1] (SAC ¶8).

11. Additionally, the current administration has accused Mr. Khalil of espousing antisemitic views, with Secretary of State Marco Rubio noting during a press conference "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out" (SAC ¶80).

12. News outlets have engaged in similar negative portrayals, with one FOX news segment describing Mr. Khalil as a head of an organization that harasses, attempts to intimidate, and doxes Jewish and non-Jewish staff & students - describing Mr. Khalil specifically as a "wolf that is trying to dress up as a sheep"[2], and other news segments portraying Mr. Khalil as a pro-Hamas sympathizer and a violent actor.[3]

13. Accordingly, Mr. Khalil's activism and his cries for justice and safety of his people, as well as his invocation of international human rights laws to support his position that the gravest human rights violations are occurring in Gaza and throughout Palestine have been erased, in favor of a flattened, caricatured assertion that such views have no merit on their own terms, but are rather anti-Semitic and aligned with terrorism.

14. This erasure of Mr. Khalil's actual arguments – rooted as they appear to be in claims of justice and law – in favor of these well-worn tropes themselves reflect Islamophobia and anti-Palestinian bias insofar as they lean on a presumption that Arab-initiated calls for justice can only come from a place of hatred or sympathy for violence and terrorism.

15. Mr. Khalil, thus, has been broadly publicly pilloried and silenced – indeed arrested, detained and possibly deported – through these well-worn anti-Palestinian and

---

[1] The White House [@WhiteHouse]. (2025, March 9). X. https://x.com/WhiteHouse/status/1899155922842161597.

[2] Fox and Friends (April, 2025). *Columbia professor rips activist Mahmoud Khalil for 'lying to American public'* [Video]. Fox News. https://www.foxnews.com/video/6371173098112.

[3] Azerrad, E. (2025, March 13). *Deporting Hamas Supporters Like Mahmoud Khalil Is Perfectly Legal.* City Journal. https://www.city-journal.org/article/columbia-student-mahmoud-khalil-hamas-deport-legal; I24 News (April, 2025). *U.S. immigration judge rules pro-Hamas Columbia activist Mahmoud Khalil can be deported* [Video]. https://www.i24news.tv/en/news/international/americas/artc-u-s-immigration-judge-rules-pro-hamas-columbia-activist-mahmoud-khalil-can-be-deported.

Islamophobic tropes.

## CLINICAL LITERATURE DOCUMENTING HARMS OF
## ANTI-ARAB/ANTI-PALESTINIAN BIAS AND ISLAMOPHOBIA

16. My review of the clinical literature on the effects of Islamophobia and anti-Arab/Palestinian bias and targeting suggests a consistent correlation with targeting of these populations and serious social and psychological harm. That literature would suggest that Mr. Khalil – arguably the biggest and most severely criticized Palestinian individual targeted in this country, is feeling the predictive negative consequences from his targeting.

### *Methodology*

17. A systematic search was conducted using databases such as PsyINFO, PubMed, and Google Scholar to identify relevant literature on the topics of anti-Arab prejudice, anti-Palestinian racism, and Islamophobia. Keywords included "Arab American," "discrimination," "anti-Palestinian racism," "Islamophobia," "trauma," "mental health", and "psychological distress". Only peer-reviewed articles, published books, and official reports were included.

18. A cursory search examining the impact of public misrepresentation and humiliation was also conducted, with focus on relevant empirical literature on the mental health consequences of these experiences.

### *Summary of Findings*

19. The negative image of Arabs has been manipulated in various political contexts, historically speaking, and is being used and amplified today in the rhetoric surrounding figures like Mr. Mahmoud Khalil. In his activism for Palestine on the campus of Columbia University, rather than being recognized as a peace maker and diplomat, Mr. Khalil has been repeatedly branded in the media and by the highest-level officials of the U.S. government as antisemitic and in support of terrorists, reinforcing the patterns identified in the literature. This harmful stereotyping has built upon by authoritarian ideologies – a social science term detailed **post** – that are awakened in times around incidents perceived as terrorist attacks, and during the 2016 U.S. Presidential Election where Donald Trump's rhetoric echoed these authoritarian sentiments,[4] particularly when considering his policies targeting Arab

---

[4] Choma, B. L., & Hanoch, Y. (2017). Cognitive ability and authoritarianism: Understanding support

5

**JA 1424**

and Muslim populations.

20. Researchers have identified right-wing authoritarianism[5] ("RWA")[6] and social dominance orientation[7] ("SDO")[8] as reasons for the rise in anti-Arab prejudice, upon which the administration's latest actions rest. Increases in prejudice towards Arabs has been observed in individuals who were more conservative and reactionary following news of Islamic terrorist attacks[9] and greater implicit and explicit anti-Arab sentiments were also observed in those with higher RWA, particularly authoritarian aggression.[10] In one investigation, the authors urge that "it is important for political leaders to avoid aggressive language when referring to Arab countries or persons. By utilizing such aggressive language, political leaders could unintentionally increase aggressive ideologies held specifically toward Arabs, including Arab Americans".[11]

21. The anti-Arab and anti-Muslim discrimination that Mr. Khalil is currently facing by both political figures and the media could reasonably impact his mental health and wellbeing, based on evidence showing a relationship between experiences of discrimination and depression and anxiety. Additionally, the misrepresentation of Mr. Khalil's character in the media could reasonably contribute to perceived public humiliation, which has been associated with emotional distress, anxiety, depression,

---

for Trump and Clinton. Personality and Individual Differences, 106, 287–291. https://doi.org/10.1016/j.paid.2016.10.054.

[5] RWA includes three core concepts: submission to authority, adherence to traditional norms, and aggression toward those seen as nonconforming.

[6] Altemeyer, B. 1981. *Right-wing authoritarianism.* Winnipeg, Canada: University of Manitoba Press.

[7] SDO refers to the tendency of individuals to organize their experience of the world into ingroups and outgroups, where they believe their own ingroup is superior to outgroups.

[8] Pratto, F., Sidanius, J., Stallworth, L.M., &Malle, B. F. (1994). Social dominance orientation: A personality variable predicting social and political attitudes. *Journal of Personality and Social Psychology, 67*, 741–763.

[9] Echebarria-Echabe, Agustin and Emilia Fernandez-Guede. 2006. Effects of terrorism on attitudes and ideological orientation. *European Journal of Social Psychology,* 36(2):259–65.

[10] Awad, G. H., & Hall-Clark, B. N. (2009). Impact of religiosity and right wing authoritarianism on prejudice towards Middle Easterners. *Beliefs and Values: Understanding the Global Implications of Human Nature, 1,* 183–192; Johnson, M. K., Labouff, J. P., Rowatt, W. C., Patock-Peckham, J. A., & Carlisle, R. D. (2012). Facets of right-wing authoritarianism mediate the relationship between religious fundamentalism and attitudes toward Arabs and African Americans. *Journal for the Scientific Study of Religion, 51,* 128 –142. http://dx.doi.org/10.1111/j.1468-5906.2011.01622.x.

[11] Johnson, M. K., Labouff, J. P., Rowatt, W. C., Patock-Peckham, J. A., & Carlisle, R. D. (2012). Facets of right-wing authoritarianism mediate the relationship between religious fundamentalism and attitudes toward Arabs and African Americans. Journal for the Scientific Study of Religion, 51, 128 – 142. http://dx.doi.org/10.1111/j.1468-5906.2011.01622.x

posttraumatic stress symptoms, and suicidal thoughts.[12]

22. Accusations of terrorism and alignment with terrorist groups is also common, and has a long history, in anti-Palestinian rhetoric specifically.[13] Suleiman conducted a longitudinal study of American news coverage of the Arab Israeli conflicts across several years (1956, 1967, and 1973) and observed how the negatively stereotyped Arab was weaponized to increase public support for Israel.[14] Stockton found that these negative images of Arabs only worsened after the Arab Israeli war in 1967 and continued in the early 1990's to promote American involvement in the first Persian Gulf War.[15]

23. Unique to anti-Palestinian prejudice, accusations of antisemitism when advocating for Palestinian human rights have been categorized as a form of racial gaslighting experienced by Palestinians.[16] The Arab Canadian Lawyers Association has defined anti-Palestinian racism as a form of racism that "silences, excludes, erases, stereotypes, defames, or dehumanizes Palestinians or their narratives".[17] The Institute for the Understanding of Anti-Palestinian Racism (IUAPR), in consultation with the Arab Canadian Lawyers Association released a report on November 19, 2024, that summarized findings from their national survey investigating anti-Palestinian racism in the U.S. from March through April, 2024 and its impact on both Palestinians and non-Palestinians.[18] The major findings from the report were as follows:

   A. 63.4% of participants reported experiencing "silencing, exclusion, harassment, physical threat of harm, or defamation while advocating for Gaza and/or Palestinian human rights"[19]

---

[12] Li, W. W., Heward, C., Merrick, A., Astridge, B., & Leow, T. (2024). Prevalence of experiencing public humiliation and its effects on victims' mental health: A systematic review and meta-analysis. Journal of Pacific Rim Psychology, 18.

[13] Schotten, C. H. (2024). Zionism and the war (s) on terror: extinction phobias, anti-Muslim racism, and critical scholarship. *Critical Studies on Terrorism, 17*(4), 996-1018.

[14] Suleiman, Michael. (1988). *The Arabs in the mind of America*. Brattleboro, Vt.: Amana Books.

[15] Stockton, Ronald. (1994). Ethnic archetypes and the Arab image. In E. McCarus (Ed.), *The development of Arab-American identity* (pp. 119-153). Michigan: The University of Michigan Press.

[16] Abu-Laban, Y., & Bakan, A. B. (2022). Anti-Palestinian racism and racial gaslighting. *The Political Quarterly, 93*(3), 508-516.

[17] Majid D. *"Anti-Palestinian Racism: Naming, Framing, and Manifestations."* Arab Canadian Lawyers Association, April 2022.

[18] Zuberi, A., Zuberi, Z., Saud, L., Rimawi, L., Biskup, T., McMagon, E.L., Valdez, P., & Ghannam, J. (2024). *Anti-Palestinian racism survey additional findings report 2024: Student and educator data.* The Institute for the Understanding of Anti-Palestinian Racism.

[19] Ibid at 4.

B. 82.4% of participants reported "experiencing harm to mental or physical health at least once or twice due to experiencing or witnessing anti-Palestinians racism"[20]

C. When sampling schools and academic institutions, "74% of students and 75% of educators experienced silencing, exclusion, harassment, physical threat or harm, and defamation while advocating for Gaza and/or Palestinian human rights"[21]

D. 60% of students and 61% of educators "were afraid to speak out about what is happening to Palestinians in Gaza or for Palestinian human rights in general"[22]

24. The survey highlights a significant pattern of fear, silencing, and psychological and physical harm among individuals advocating for Palestinian rights, particularly within educational settings,[23] with some arguing that self-censorship is likely related to fears of being accused of antisemitism.[24] Given these consequences and other material consequences (e.g., loss of job opportunities, etc.), avoidance in engaging in discussion about Palestine may lead to feelings of alienation, particularly for those who identify as Palestinian, Arab, or Muslim American. If this is the baseline fear of any Palestinian activist, it is reasonable to assume that Mr. Khalil – a primary target of high-level officials in this administration – feels this particularly acutely.

25. With regards to the consequences of experienced anti-Arab prejudice, there has been a growing body of psychological literature that has examined how anti-Arab discrimination and Islamophobia have impacted the health and well-being of this population. In one study with a predominantly Muslim sample of youth, findings showed that greater exposure to negative media portrayals of Muslims was associated with lower psychological well-being, leading to heightened feelings of exclusion and alienation.[25] In a sample of 279 Arab Americans, experiences of discrimination were related to greater levels of depression and anxiety, after

---

[20] Ibid.

[21] Ibid.

[22] Ibid at 8.

[23] Telhami, S., Lynch, M., & Langlois, K. (2023, November). *Critical Issues Poll: Middle East Scholar Barometer*. https://criticalissues.umd.edu/.

[24] Fassin, D. (2024). The rhetoric of denial: Contribution to an archive of the debate about mass violence in Gaza. *Journal of Genocide Research*, 1–7.

[25] Dari, T., Saleem, M., Nassar, S., & Abou-Dahech, H. (2024). Ethnic identity, negative media portrayal, and psychological well-being in Arab-American youth: Mediation analysis. *Journal of Multicultural Counseling and Development, 52*(4), 273-284.

accounting for differences related to age, biological sex, and residency status. In this same sample, greater levels of discrimination were also associated with higher likelihood of regarding one's own physical health as fair or poor (instead of good or excellent).[26] In another study exploring the effects of discrimination following September 9/11 attacks in 1016 Arab Americans, findings showed that experiences of overt discrimination towards self or family members (e.g., verbal insults, threatening words, physical attacks related to ethnic identity) and feeling not respected in broader American society were related to greater psychological distress.[27] And finally, in yet another sample of Middle Eastern/Arab American adults, ethnic discrimination was significantly related to greater psychological distress.[28] While a burgeoning area of research, findings provide support for the notion that exposure to anti-Arab and anti-Muslim discrimination is associated with psychological distress.

26. Unique ramifications of experiencing anti-Palestinian racism specifically have seldom been investigated in empirical work. That said, the impact of public misrepresentation and humiliation on mental health has been investigated. Given public accusations against Mr. Khalil of supporting terrorism and espousing antisemitic views, I feel this area of literature is relevant to the case. With regards to public humiliation, in a recent systematic review and meta-analysis of 33 different studies (with a total sample size of over 40,000 individuals), the authors found a significant negative impact of public humiliation on mental health, with studies noting symptoms of anxiety, depression, emotional distress, posttraumatic stress symptoms, and suicidal thoughts.[29] One study in particular found that the negative effects of humiliation on participants were particularly pronounced when individuals felt that values that were more central to their self-concept were attacked and denigrated.[30]

---

[26] Kader, F., Bazzi, L., Khoja, L., Hassan, F., & de Leon, C. M. (2020). Perceived discrimination and mental well-being in Arab Americans from southeast Michigan: A cross-sectional study. *Journal of racial and ethnic health disparities, 7*, 436-445.

[27] Padela, A. I., & Heisler, M. (2010). The association of perceived abuse and discrimination after September 11, 2001, with psychological distress, level of happiness, and health status among Arab Americans. *American journal of public health, 100*(2), 284-291.

[28] Ikizler, A. S., & Szymanski, D. M. (2018). Discrimination, religious and cultural factors, and Middle Eastern/Arab Americans' psychological distress. *Journal of Clinical Psychology, 74*(7), 1219-1233.

[29] Li, W. W., Heward, C., Merrick, A., Astridge, B., & Leow, T. (2024). Prevalence of experiencing public humiliation and its effects on victims' mental health: A systematic review and meta-analysis. *Journal of Pacific Rim Psychology,* 18.

[30] Mann, L., Feddes, A. R., Leiser, A., Doosje, B., & Fischer, A. H. (2017). When is humiliation more intense? The role of audience laughter and threats to the self. *Frontiers in Psychology, 8*, 495.

27. There is a distinct harm here also of a distortion of Mr. Khalil's avowed identity. While Mr. Khalil is being accused by public officials of supporting terrorism and espousing antisemitic views, he has described himself in the following way in a 2024 CNN interview: "As a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other".[31] As such, the current administration's misrepresentation of a presumably central component of Mr. Khalil's character could be psychologically damaging. While the majority of these studies have focused on public humiliation in "offline" spaces (e.g., a school setting), it is presumed that the impact of humiliation in the digital age is even more far reaching – as victims of public humiliation and misrepresentation can never truly escape the witnessed and humiliating experience as a result of the permanency of online content. In a published dissertation focused specifically on the lived experience impact of humiliation and misrepresentation in the media (MHM) in the digital age, research showed that MHM was associated with heightened traumatic symptoms and suicidal thoughts and with participants noting that their respective experiences with MHM were uniquely traumatic and were life-changing in many negative ways, including materially and psychologically.[32]

28. The findings presented from the literature in this report demonstrate a troubling picture of how negative stereotypes and prejudicial attitudes towards Arab Americans, Palestinians, and Muslims contribute to a climate of silencing and psychological harm. The stereotypes about Arabs, especially men, as violent, radical, and terrorist-supporting have been ongoing for decades and as such, have been ingrained in American media and political rhetoric, further fueling discriminatory attitudes. The negative image of Arabs has been manipulated in various political contexts, historically speaking, and is being used and amplified today in the rhetoric surrounding figures like Mr. Mahmoud Khalil.

29. The perpetuation of negative stereotypes, coupled with the deployment of antisemitism allegations in response to Palestinian advocacy, creates a climate where

---

[31] Bailey, C. (2025, March 11). *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests.* CNN. https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

[32] Marie, C. (2020). The Traumatic Impact of Media Humiliation, Misrepresentation and Victim-Shaming on Narrative Identity and Well-Being. (Publication No. 27961901). [Doctoral Dissertation, Fielding Graduate University]. ProQuest Dissertations & Theses. *See also* Marie, C. (2013-2022). *The Traumatic Impact of Media Misrepresentation & Public Shaming.* The Amplifier Magazine: Society for Media Psychology and Technology. Division 46 of the American Psychological Association. https://div46amplifier.com/2021/12/13/the-traumatic-impact-of-media-misrepresentation-public-shaming/.

individuals are often silenced, harassed, or targeted when speaking up for Palestine. Data from recent surveys and reports highlight the pervasive fear among Palestinians and their allies, particularly in educational and professional settings, to speak out on these issues, resulting in a tendency to engage in self-censorship. Such experiences of marginalization are related to heightened psychological distress, with evidence linking experiences of discrimination and racism to increased rates of anxiety, depression, and poor self-reported physical health among Arab Americans.

30. Mr. Khalil, as one of the most prominent Palestinian activists, has been subjected to the full weight of these politically driven and media disseminated stereotypes and tropes. I have not had the opportunity to conduct an assessment of Mr. Khalil, however based on the literature documenting the harms of such identity-distortions, and based on my professional experience, they have the potential to significantly harm him psychologically.

Dated: June 3, 2025                                          Signed:

███████████████                                        /s/ ████████████████