**Nos. 25-2162 & 25-2357**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

MAHMOUD KHALIL,

Petitioner-Appellee,

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

Respondents-Appellants.

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

### BRIEF OF NATIONAL JEWISH ADVOCACY CENTER AS AMICUS
### CURIAE IN SUPPORT OF RESPONDENTS-APPELLANTS

Mark Goldfeder (*PHV pending*)
Arielle F. Klepach (*PHV pending*)
Erielle Azerrad (*PHV pending)*
NATIONAL JEWISH
ADVOCACY CENTER
3 Times Square
New York, NY 10036
mark@njaclaw.org
Arielle@njaclaw.org
ErielleA@njaclaw.org

Jason B. Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, D.C. 20037
jtorchinsky@holtzmanvogel.com

**United States Court of Appeals for the Third Circuit**

### Corporate Disclosure Statement and
### Statement of Financial Interest

No. _____
25-2162 & 25-2357

MAHMOUD KHALIL,

v.

PRESIDENT UNITED STATES OF AMERICA, et al.

<u>Instructions</u>

      Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

      Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

      The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

      The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

      If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

__National Jewish Advocacy Center__
(Name of Party)

1) For non-governmental corporate parties please list all parent corporations:

N/A

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

*Mark Goldfeder*
(Signature of Counsel or Party)

Dated: __August 29, 2025__

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................ii

IDENTITY AND INTERESTS OF AMICUS CURIAE ...........................1

INTRODUCTION & ..............................................................................2

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT ........................................................................................5

  I.  Appellee's Engaged in Conduct Adverse to U.S. Foreign Policy......5

  A.  As a Leader in CUAD, Appellee Engaged in a Host of Activity
    Adverse to U.S. Foreign Policy. .........................................................5

    *i.*  Since His Release From Immigration Custody, Appellee has
    Only Doubled Down on His Activities, Which Threaten U.S.
    Foreign Policy Interests. ..............................................................17

  II. Appellee Lied on His Lawful Permanent Residence Application by
  Omitting his Affiliation with the United Nations Relief and Work
  Agency ("UNRWA"), Which Knowingly Employs Hamas Terrorists,
  Including Several Who Participated in the October 7th Massacre. ......25

  III.   CONCLUSION ..................................................................30

CERTIFICATE OF COMPLIANCE .......................................................32

ELECTRONIC DOCUMENT CERTIFICATE.........................................33

CERTIFICATE OF SERVICE ...............................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Bojnoordi v. Holder,*
  757 F.3d 1075 (9th Cir. 2014) ...............................................................3

*Hosseini v. Nielsen,*
  911 F.3d 366 (6th Cir. 2018) ................................................................3

*Khalil v. Trump,*
  2025 WL 1514713 (D.N.J. May 28, 2025) ................ 6, 20, 21, 25-26, 30

**Statutes**

8 U.S.C. § 1182 ....................................................................................3, 26

8 U.S.C. § 1227 ..........................................................................2, 3, 5, 26

**Rules**

Federal Rule of Appellate Procedure 32 .................................................33

Federal Rules of Appellate Procedure 27 ..............................................33

## IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

Since its founding in 2020, the National Jewish Advocacy Center ("NJAC") has become recognized as a leader in combatting antisemitism by developing and supporting innovative legal solutions that drive change. Antisemitic hate crimes, discriminatory rhetoric, and biased policies have become increasingly common since Hamas's October 7, 2023 terrorist attack on Israel. The promotion of violent, pro-terror rhetoric has led to the marked rise in antisemitism. The failure to adequately address and condemn this normalizes the catastrophic rise of institutionalized antisemitism around the world.

The proper resolution of this matter is of critical importance to NJAC because it involves one of the United States' first post-October 7th attempts to hold individuals who pose a danger to Jews around the world based on domestic acts and who seek to interfere with the United States' foreign policy goals, especially as they relate to Israel and antisemitism. There is a direct relationship between the normalization of terrorism and violence and the rise of antisemitism. To combat antisemitism and support national security, it is vital that the government be able to revoke

---

[1] No counsel for a party authored this brief in whole or in part. No person or entity other than *Amicus*, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

legal status from individuals who undermine the safety and stability of society, both within the United States and beyond its borders.

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

Appellee Mahmoud Khalil was the lead negotiator and spokesperson for Columbia University-based student groups with ties to Foreign Terrorist Organizations ("FTO"), one such group being Columbia University Apartheid Divest ("CUAD"). Appellee facilitated the violent takeover of buildings and other violent acts, including destruction of property, criminal possession of a weapon, false imprisonment, and others. He also advocated on behalf of those who engaged in such acts. Appellee has called for "resistance by any means necessary," a euphemism for engaging in violence against innocent civilians to achieve a political objective—namely, the destruction of the State of Israel, a strategic partner of the United States and a country with which we have an enduring alliance.

For Appellee's conduct, the Secretary of State determined that he poses "potentially serious adverse foreign policy consequences. . . ." 8 U.S.C. § 1227(a)(4)(C)(i) (the "foreign policy basis"), and has therefore

ordered his removal. Appellee also failed to disclose his employment at the United Nations Relief and Works Agency ("UNRWA") in his lawful permanent residence ("LPR") application, forming a second basis for removal under 8 U.S.C. § 1182(a)(6)(C)(i) (the "fraud basis"). The district court erred in granting Appellee's motion for a preliminary injunction because Appellee is unlikely to succeed on the merits of his claims challenging the bases for removal.[2]

*First,* the district court concluded that Appellee is likely to succeed on the merits of the foreign policy basis because Appellee's conduct, detailed in the Secretary of State's determination, pertains only to domestic policy. Not so. Although the Secretary of State's determination

---

[2] Amicus notes that, even if the district court were to find those two bases impermissible, Appellee led a group that was distributing materials produced by an FTO to American college students, behavior that satisfies the basis of removal outlined in 8 U.S.C. § 1227(a)(4)(B), insofar as he is "endors[ing] or espous[ing] terrorist activity or persuad[ing] others to endorse or espouse terrorist activity or support a terrorist organization." *See* 8 U.S.C. § 1227(a)(4)(B) (citing 8 U.S.C. § 1182(a)(3)) (addressing classes of deportable aliens). Federal bodies have routinely applied the standard found in section 1227 to denial of entry analyses, finding that distribution of an FTO's literature forms a permissible basis for denial of entry, decisions which have been affirmed by various U.S. Courts of Appeal. *See, e.g.,* *Hosseini v. Nielsen,* 911 F.3d 366, 373 (6th Cir. 2018) (affirming determination by USCIS that Iranian alien is inadmissible for providing material support to two Iranian terrorist organizations after copying and distributing literature produced by the terrorist organizations); *Bojnoordi v. Holder,* 757 F.3d 1075, 1078 (9th Cir. 2014) (affirming decision by Board of Immigration Appeals that Iranian alien who "passed out flyers, wrote articles, and trained [terrorist] members on the use of guns" is inadmissible for providing material support to an FTO). As described in more detail below, Appellee has also characterized the October 7th terrorist attacks as "inevitable" and has refused to condemn Hamas for its conduct on that day or any other in its violent history.

describes Appellee's conduct as antisemitic, which is certainly is, the crux of Appellee and CUAD's activities relate to U.S. relations with the State of Israel. By seeking to extort Columbia University and, by extension,[3] other entities into divesting from Israel, Appellee's conduct is directly related to foreign policy.

***Second,*** the district court erred by granting Appellee a preliminary injunction even though it failed to hold that Appellee was likely to succeed on the merits of his claim surrounding the fraud basis for removal. Indeed, Appellee is *not* likely to succeed on the merits of that claim. Appellee worked at UNRWA for several months, including during the October 7th terrorist attack. Appellee has described October 7th as "inevitable," which is unsurprising given his employment at an agency known for employing Hamas terrorists, including many who engaged acts of terror on October 7th. The United States has withdrawn aid from UNRWA given its longstanding and well-documented affiliation with Hamas. Appellee failed to disclose his employment with UNRWA in his LPR application, which he submitted to the Department of Homeland Security ("DHS") less than six months after he stopped working at

---

[3] Upon information and belief, Appellee repeatedly lauded his and CUAD's efforts as a model for other movements across the country, demonstrating his intention to spread BDS and the extortionate nature of his group's activities throughout the country.

UNRWA. Appellee also notably failed to disclose two other pertinent affiliations in the application. He is therefore unlikely to succeed on the merits of challenging the fraud basis for removal.

## ARGUMENT

### I. Appellee's Engaged in Conduct Adverse to U.S. Foreign Policy

Appellee is a Syrian native and Algerian citizen who came to the United States on a student visa. Through his leadership role in Columbia University Apartheid Divest ("CUAD"), Appellee has engaged in a litany of activity that is harmful to U.S. foreign policy interests and could therefore have "potentially serious adverse foreign policy consequences." 8 U.S.C. § 1227(a)(4)(C)(i). The United States maintains a strong foreign policy interest in its relationship with, and the very existence of, the State of Israel. As described in more detail below, Appellee's activities endangered that relationship. Appellee's deportable conduct falls into two categories: 1) his activities as a leader in CUAD and 2) his activities since his release from immigration detention. Each of these categories is addressed below.

### A. As a Leader in CUAD, Appellee Engaged in a Host of Activity Adverse to U.S. Foreign Policy.

Until his arrest in March 2025, Appellee was the public face and de facto president of CUAD. *Haggai et al. v. Kiswani et al.*, 25-CV-2400 (S.D.N.Y. 2025) (DE 66 at ¶ 35) (hereinafter "Haggai SAC"). CUAD was originally founded as a collection of Columbia student organizations that supported the Boycott, Divest, and Sanction ("BDS") movement. *Id.* CUAD remained largely dormant for years until November 2023 after Columbia Students for Justice in Palestine ("SJP") and Columbia Jewish Voices for Peace ("JVP") were suspended and then reorganized and reemerged as CUAD. *Id.* Since the suspension, Appellee served as one of the primary spokespeople for the so-called Gaza Solidarity Encampment ("Encampment") at Columbia, a prolonged pro-Hamas propaganda effort; (ii) threatened "escalation" on behalf of CUAD if its demands were not met; and (iii) organized and led the actions of CUAD and Columbia SJP and JVP, which operated through CUAD. Notably, while Appellee was at its helm, CUAD called for the "total eradication of Western civilization. . . ." *Id.* at ¶ 166. The promotion of Western, democratic values is vital to U.S. foreign policy interest. In fact, President Trump issued a Policy Directive to the Secretary of State providing that the foreign policy of the United States "shall champion core American interests and always put

America and Americans first." Opinion & Order at App. B, *Khalil v. Trump*, No. 2:25-cv-1963 (D.N.J., May 28, 2025), ECF No. 272.

On October 7, 2023, Hamas committed the worst massacre of Jews since the Holocaust. Immediately after the attack, Hamas called on its supporters to join in a "Day of Rage" scheduled for the following week. Haggai SAC at ¶ 110. Several organizations, including Columbia SJP, heeded Hamas' call and engaged in a Day of Resistance filled with the hateful and violent rhetoric Hamas demanded. Appellee led Columbia SJP's Day of Resistance, acting in direct response to calls for "resistance" by an FTO. *Id.*

Shortly thereafter, Columbia University suspended its SJP and JVP chapters, and CUAD, with Khalil at the helm, emerged as the entity through which SJP and JVP continued their activities uninterrupted. *Id.* at ¶ 23.

CUAD hosted a series of events where its leaders and members espoused support for Hamas and its violent activities. For example, on March 7, 2024, CUAD hosted an event titled "Palestine 101." During that event, Appellee attempted to indoctrinate impressionable young minds into supporting terrorism by alleging that "Israel and their propaganda always find something to attack. . .they – we – have tried armed

7

resistance, which is, again, legitimate under international law, but Israel calls it terrorism."[4] Armed resistance against civilians is, in fact, illegitimate under international law. *See, e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 3, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I) art. 51, June 8, 1977, 1125 U.N.T.S. 3. In the same session, a co-panelist explained that their movement's end goal is "the end to the Zionist project, the full liberation of Palestine"—that is, the destruction of the State of Israel, one of the strongest and most enduring alliances that the United States has.[5]

By April 2024, CUAD and its affiliates had erected the Encampment, sowing chaos and espousing support for terrorism in the middle of Columbia's campus. The Encampment was designed to disrupt campus activities, terrorize Jewish students, and prevent them from fully accessing campus, unless they disavowed any allegiance to Israel. Haggai SAC at ¶ 139. The Encampment was marred by justification for violent

---

[4] Michael Wilson, Michael Rothfeld and Ana Ley, "How a Columbia Student Activist Landed in Federal Detention," N.Y. TIMES (Mar. 16, 2025) https://www.nytimes.com/2025/03/16/nyregion/mahmoud-khalil-columbia-university.html

[5] David Lederer (@Davidlederer6), X (Mar. 11, 2025, 1:21 PM), https://x.com/Davidlederer6/status/1899511077198590024

attacks against Jews. For example, Encampment organizers, including CUAD, invited representatives from Within Our Lifetime ("WOL") to participate in the encampment. Within Our Lifetime is an offshoot of SJP that refers to Israel as the "Zionist settler-colonial project" and advocates for the liberation of Palestine "by any means necessary," a known euphemism for violent uprising.[6]

The purpose of the Encampment was to force Columbia to capitulate to the students' demands of divestment from Israel. Appellee was the Encampment's lead negotiator. Haggai SAC at ¶ 143. Although Appellee and others have subsequently attempted to minimize his leadership role in CUAD and the Encampment, Appellee is depicted in multiple videos and photographs acting as a spokesperson for the Encampment and acknowledging his role in strongarming Columbia to adhere to its demands. For example, on April 19, 2024, Appellee held a microphone in the center of the Encampment to introduce a speaker to those present at the Encampment. Appellee stated that the speaker, "joined **us** today to show support for **this** movement. . .please come closer as [speaker] gives his remarks to everyone here in support of the

---

[6] Jonathan Dienst, Courtney Copenhagen, and Tom Winter, "Man who allegedly attacked Jewish Columbia students faces federal hate crime charges," NBC NEW YORK (May 7, 2025), https://www.nbcnewyork.com/news/local/crime-and-courts/man-allegedly-attacked-jewish-columbia-students-federal-hate-crime-charges/6255556/.

Columbia University Apartheid Divest movement on campus **that has now inspired a big movement across U.S. universities**."[7] Appellee also spoke with the media on behalf of the Encampment. When asked by a CNN news anchor how far the Encampment participants were willing to go, Appellee replied that they would go as far as they needed to go to "pressure the university to divest from occupation."[8]

On April 29, 2024, CUAD and its affiliated groups seized Hamilton Hall, an academic building at Columbia University. They barricaded the doors, blocked entrances, smashed windows, zip-tied the doors shut, and even took janitorial staff hostage.[9] Columbia then dismantled the Encampment, causing CUAD and its affiliated groups to receive heaps of praise from FTOs and nation-state proxies, including the Islamic Republic of Iran, the Popular Front for the Liberation of Palestine ("PFLP"), Al-Qaeda, and Hezbollah. Haggai SAC at ¶ 154. Despite recognition and praise by FTOs, Appellee and his cohorts continued in their pursuit of extorting Columbia to divest from and boycott Israel.

---

[7] "LIVE From Columbia University Palestine Encampment," YouTube, uploaded by BreaThrough News, Apr. 19, 2024, https://www.youtube.com/watch?v=pT-Qy4mpEg0 (at 4:58).
[8] Eitan Fischberger (@EFischberger), X (Mar. 10, 2025, 12:25 AM) https://x.com/EFischberger/status/1898953421048193345
[9] Aviva Klompas (@AvivaKlompas), X (Apr. 30, 2024, 7:15 AM), https://twitter.com/AvivaKlompas/status/1785266759366226128.

Ever persistent, Appellee, CUAD, and their affiliates erected yet another encampment on campus during alumni weekend, between May 31 and June 1, 2024. Appellee again served as the spokesperson for that encampment.[10]

In June 2024, CUAD publicly called on its followers to replicate October 7 on American soil, specifically guiding CUAD members to "look to the tactics" of the "Palestinian resistance for inspired actions," and instructed them to "rise" "like a flood," as Hamas wanted. Haggai SAC at ¶ 164.

On multiple occasions, Appellee reaffirmed his commitment to leading CUAD and advocating for its objectives. Between the Spring 2024 and Fall 2024 semesters, Appellee explained, in public interviews, that he and CUAD had been "working all summer on our plans, on what's next to pressure Columbia to listen to the students and to decide to be on the right side of history."[11] Appellee reiterated that CUAD and its affiliates were considering engaging in ". . .not only protests, not only

---

[10] Documenting Jew Hatred on Campus Database, 2024-05-31 Encampment #3, Day 1 (May 31- June 1), available at https://drive.google.com/drive/folders/10si7NIykySofwbDOkcSUiNM6x-L5NfuZ (last accessed Aug. 25, 2025).

[11] Lexi Lonas Cochran, "Students gearing up for round 2 of pro-Palestinian protests: 'We've been working all this summer,' THE HILL (Aug. 4, 2024), https://thehill.com/homenews/education/4803740-pro-palestinian-student-protests-college-campus-new-semester-israel-gaza-hamas/

encampments, [but] kind of any — **any available means necessary** to push Columbia to divest from Israel."[12] (emphasis added). Indeed, the following semesters saw more vandalism, building takeovers, and destructive actions that turned Columbia upside down and stoked chaos—as intended. Some examples include the cementing of university toilets,[13] the vandalism of the Columbia COO's home with red paint, crickets, and mealworms,[14] the takeover of multiple libraries; and the disruption of an Israeli professor's class, which was littered with antisemitic flyers.[15]

By October 2024, CUAD was doubling down on its affiliations with students who actively supported and called for violence against Jews. On October 8, 2024, CUAD posted "A Letter from CUAD Leadership to Khymani James and Our Comrades in Solidarity" on a CUAD Instagram account that, on information and belief, is operated by Appellee. James,

---

[12] *Id.*

[13] Isha Banerjee, Rebecca Massel, and Wiann Wilson, "Protestors vandalize University buildings on anniversary of Hind Rajab killing," COLUMBIA SPECTATOR (Jan. 30, 2025), https://www.columbiaspectator.com/news/2025/01/30/protesters-vandalize-university-buildings-on-anniversary-of-hind-rajab-killing/

[14] Minyvonne Burke, "Columbia University exec's New York apartment building vandalized with red paint and crickets," NBC NEWS (Aug. 10, 2024), https://www.nbcnews.com/news/us-news/columbia-university-coo-cas-holloway-red-paint-apartment-rcna166079

[15] Isabel Vincent and Rikki Schlott, "Masked students disrupt Columbia classes, distribute antisemitic leaflets as college named 'national model' for anti-Israel protest," N.Y. POST (Jan. 22, 2025), https://nypost.com/2025/01/22/us-news/masked-students-disrupt-columbia-classes-distribute-antisemitic-leaflets/

a former CUAD spokesperson, had recorded a video starting that "Zionists don't deserve to live" and that others should "Be grateful that I'm not just going out and murdering Zionists" during a meeting with school disciplinary officials. Haggai SAC at ¶ 173. CUAD first attempted to distance itself from James' statement, issuing what it describes as an apology on his behalf. But on October 8, 2024, CUAD retracted its apology, stating: "We support liberation by any means necessary, including armed resistance . . .violence is the only path forward . . . Long live Palestine, long live the Intifada, and long live the Resistance." *Id*. Supporting armed resistance is a clear declaration of support for terrorism against Israel, the United States' greatest ally in the Middle East. CUAD's explicit calls for acts of international terrorism and violence to "liberate[]" Palestine are directly adverse to U.S. foreign policy.

Appellee also held a leadership role at CUAD's November 2024 Veteran's Day demonstration. Rather than honor U.S. veterans who served to protect this nation, protest participants venerated Hamas and Hezbollah terrorists instead. One speaker at this protest stated, "We honor all our Martyrs, those who resisted whether violently or non-

violently. If this makes you uneasy ask yourself why."[16] Pamphlets distributed at this protest contained images of Palestinian militants who engaged in terrorism and quoted Hassan Nasrallah, the former leader of U.S. designated Foreign Terrorist Organization, Hezbollah.[17] CUAD published flyers advertising this event, which read "Veterans Day is an American Holiday to honor the patriotism, love of country, and sacrifice, of Veterans. This won't stand! We reject this holiday."[18] It is a Hezbollah tradition to celebrate "Martyr's Day" on November 11 each year to commemorate a 1982 suicide bombing in Lebanon.[19] CUAD, with Appellee at its helm, imported Hezbollah's tradition of celebrating a suicide bombing to the United States.

In March 2025, Appellee continued to sow chaos and support terrorism on Columbia's campus—this time by leading a building takeover where Hamas propaganda was distributed. On March 5, CUAD organized a mob that stormed and occupied Barnard's Milstein Library. Haggai SAC at ¶ 189. Appellee was the primary spokesperson and

---

[16]    David    Lederer    (@davidlederer6),    X    (Mar.    13,    2025,    7:18    AM), https://x.com/davidlederer6/status/1900144372856840699?s=46.

[17] Documenting Jew Hatred on Campus Archive, Martys Day Commemoration, available                                                                                          at https://drive.google.com/drive/folders/1SxGg6BKN_ACBfG14oGWX78u8D7V7gfS2 (last accessed Aug. 25, 2025).

[18]    David    Lederer    (@davidlederer6),    X    (Mar.    13,    2025,    7:18    AM), https://x.com/davidlederer6/status/1900144372856840699?s=46.

[19] https://www.tehrantimes.com/news/429363/Hezbollah-s-Culture-of-martyrdom

negotiator on behalf of the mob, despite the fact that he had already completed his coursework and was therefore no longer studying at Columbia. *Id.* Appellee and the mob he represented demanded the immediate reinstatement of expelled students, amnesty for individuals disciplined for their pro-terror activities, and the abolition of all of Barnard's disciplinary procedures. *Id.* at ¶ 190. During the illegal occupation of Milstein library, CUAD affiliates disseminated a pamphlet titled "Our Narrative," which was branded with the "Hamas Media Office" logo. *Id.* at ¶ 191. Appellee promoted these activities by acting as the face of this building takeover where these materials were distributed. Distributing terrorist propaganda on U.S. soil Appellee engaged in activity adverse to U.S. foreign policy interests, which includes the unequivocal denouncement of terrorism and violence against civilians.

The content of these pamphlets was even more troubling. The pamphlets justified October 7 and contained iconography of Yahya Sinwar, the late military leader of Hamas and October 7 mastermind. The pamphlet also contained images of Nasrallah. Stickers reading "Death to America," "Two, Three, many Al-Aqsa Floods,"[20] and

---

[20] "Towfan Al-Aqsa" ("Al-Aqsa Flood") was the codename for Hamas' October 7 attack.

"Sometimes History Needs a Push" with an image of Sinwar and a rifle, were all plastered throughout Milstein Library.






Shortly thereafter, Immigration and Customs Enforcement arrested Appellee and initiated deportation proceedings. Appellee was detained in immigration custody until June 20, 2025. Since then, he has continued to engage in conduct adverse to U.S. foreign policy interests.

  *i.* Since His Release From Immigration Custody, Appellee has Only Doubled Down on His Activities, Which Threaten U.S. Foreign Policy Interests.

On June 11, 2025, the district court granted Appellee's habeas petition and ordered his release from immigration custody. ECF No. 299. This legal victory has only emboldened Appellee.

On August 5, 2025, Appellee appeared on a podcast where he made a series of disturbing statements that demonstrate why his activities have serious adverse foreign policy consequences. Specifically, Appellee, who was working at UNRWA at the time, stated that October 7 came against the backdrop of a deal between Saudi Arabia and Israel, which was "very imminent," and which would have supposedly prevented "any path to statehood and self-determination" by Palestinians.[21] Appellee alleged that this normalization of diplomatic relations between Israel and Saudi Arabia meant that Hamas "had to do [October 7th]."[22] Appellee characterized October 7th as unavoidable because it was a "desperate attempt to tell the world that Palestinians are here. . .Palestinians don't have to be perfect victims."[23]

Notably, Hamas acknowledged that it launched the October 7 attack with the purpose of torpedoing peace negotiations between Israel and Saudi Arabia.[24] Minutes from a high-level meeting in Gaza reveal

---

[21] Ezra Klein, "Mahmoud Khalil Tells His Story," N.Y. TIMES (Aug. 5, 2025), https://www.nytimes.com/2025/08/05/opinion/ezra-klein-podcast-mahmoud-khalil.html

[22] *Id.*

[23] *Id.*

[24] Marcus Walker and Summer Said, "Hamas Wanted to Torpedo Israel-Saudi Deal With Oct. 7 Attacks, Documents Reveal," WALL ST. JNL., (May 18, 2025), https://www.wsj.com/world/middle-east/hamas-wanted-to-torpedo-israel-saudi-deal-with-oct-7-attacks-documents-reveala70ec560?gaa_at=eafs&gaa_n=ASWzDAjOLhwndkozxmkdlghj8xit7IhcKdPjB XZKW6838aqb_8VwGjADtk9wCLfGAXI%3D&gaa_ts=68a7c854&gaa_sig=LAHNo

that, days before October 7th, Yahya Sinwar, Hamas's Gaza chief, told fellow militants that an "extraordinary act" would be required in order to derail the normalization talks that were "marginalizing the Palestinian cause."[25] The meeting minutes cited Sinwar as saying that "the Saudi-Zionist normalization agreement is progressing significantly" and that a deal would "open the door for the majority of Arab and Islamic countries to follow the same path."[26]

It is no question, then, that Appellee's activities threaten U.S. foreign policy interests. Upon his release from immigration custody, Appellee went on a publicity tour where he parroted the exact justification for October 7th that was contemplated by Hamas leaders just days before the attack. Appellee went on to hold a series of meetings with U.S. lawmakers during his tour across Capitol Hill.[27]  Prior to his flurry of meetings, Appellee publicly refused to denounce Hamas during an interview with CNN.[28]

---

MdNfe3ZfLx1_aW7edWSSD7xLdsncsZj-DuPDizpmPhrcJQYGS-KDXZVa9q2eZE8tpGD9M8lDyD7MaBaWA%3D%3D

[25] *Id.*

[26] *Id.*

[27] Corey Walker, "Mahmoud Khalil Refuses to Condemn Hamas, Visits High-Profile Democrats in DC," ALGEMEINER (July 22, 2025), https://www.algemeiner.com/2025/07/22/mahmoud-khalil-refuses-condemn-hamas-visits-high-profile-democrats-dc/

[28] *Id.*

On August 16, 2025, Appellee led the "Mass March for Humanity" in New York City, during which he quoted a Hamas terrorist, Anas al-Sharif.[29] Al-Sharif was killed during an Israeli missile strike because he was the leader of a terror cell, yet Appellee lionized him. Appellee led a group of about 2,000 protestors and recalled al-Sharif's final words: "The time is now, the bridges towards liberation start with us."[30]

Appellee's activities have a serious, adverse effect on U.S. foreign policy interests because the activities implicate foreign policy vis-à-vis Israel. The district court erred in concluding that Appellee's activities bear only on U.S. domestic policy. *Khalil v. Trump*, 2025 WL 1514713, at *18 (D.N.J. May 28, 2025).

The district court concluded that the Secretary of State's determination pertained only to domestic activities. *Id.* But all of Appellee's activities, from his advocacy on Capitol Hill, to his leadership role in CUAD and their litany of disruptive activities, were aimed at promoting the Boycott, Divestment, and Sanctions ("BDS") movement. *See, e.g.*, Haggai SAC at ¶ 72 ("CUAD was initially founded by Columbia

---

[29] Marie Pohl and Caitlin McCormack, "Mahmoud Khalil quotes slain Al Jazeera correspondent allegedly aligned with Hamas at 'March for Humanity' protest, N.Y. POST (Aug. 16, 2025), https://nypost.com/2025/08/16/us-news/mahmoud-khalil-quotes-slain-al-jazeera-correspondent-allegedly-aligned-with-hamas-at-march-for-humanity-protest/.
[30] *Id.*

SJP and Columbia JVP to create a partnership of numerous on-campus student organizations to support the BDS movement against Israel."). The BDS movement seeks the destruction of the State of Israel.[31] Pressuring institutions to divest from the United States' greatest ally in the Middle East directly implicates foreign policy. *Khalil v. Trump*, 2025 WL 1514713, at *12 (D.N.J. May 28, 2025) ("Bottom line: a country's 'foreign policy' is the course of action it takes as to other countries.").

The district court read the Secretary of State's determination too narrowly, unduly constraining the Secretary from guiding and executing U.S. foreign policy. The determination described Appellee's activities as antisemitic and threatening to Jewish students. *Id.* at App'x. A. Importantly, global antisemitism falls directly under the purview of the U.S. State Department. In fact, the Global Anti-Semitism Review Act of 2004 **required** the Department of State to establish an office for "monitoring and combating acts of anti-Semitism and anti-Semitic incitement" abroad. In result, the U.S. State Department now has a Special Envoy to Monitor and Combat Antisemitism. Every time conflict

---

[31] "The Boycott, Divestment and Sanctions Campaign (BDS)," ANTI-DEFAMATION LEAGUE (May 24, 2022), https://www.adl.org/resources/backgrounder/boycott-divestment-and-sanctions-campaign-bds ("The Boycott, Divestment and Sanctions movement (BDS) is an international campaign aimed at delegitimizing and pressuring Israel. . .").

erupts in the Middle East, antisemitic incidents in the U.S. surge by roughly 400%. It is an undeniable pattern. The State Department, through the Special Envoy is tasked to push back immediately and forcefully against targeted campaigns - often done in coordination with foreign state actors- that turn Jewish communities and institutions into targets.

Appellee's distribution of FTO materials from an organization that seeks the eradication of global Jewry—Hamas including material that explicitly states it is being done in coordination with designated terrorist organizations-



-represents perfectly the behaviors that the U.S. State Department, whose mandate includes combating global antisemitism, should and *must address*.[32] Indeed, Hamas repeatedly has called for Palestinians to kill Jews across the globe.[33] Therefore, the U.S. State Department's

---

[32] The flyers specifically state that: "This booklet is part of a coordinated and intentional effort to uphold the principles of the Thawabit and the Palestinian Resistance movement overall. By transmitting the words of the Resistance [Hamas] directly, this material aims to build popular support for the Palestinian war of national liberation, a war which is waged through armed struggle." Lest there be any confusion, the booklet included messages from Hamas and PFLP leaders, including a quote from Hamas' Al-Aqsa Martyrs' Brigades, stating that "We will emerge upon you from where you least expect it."

[33] https://www.voanews.com/a/middle-east_hamas-official-condemned-after-calling-palestinians-kill-jews/6171870.html; Hamas official, Hamad Al-Regeb in an April 2023 sermon prayed for "annihilation" and "paralysis" of the Jews whom he described

response to Appellee's pro-Hamas activity is appropriately designed to limit the reach of Hamas's calls for violence against Jewish people globally.

Furthermore, these activities were not just antisemitic in nature—they were aimed at promoting BDS and extorting Columbia to capitulate to demands to divest from Israel.  To be sure, take Appellee's word for it.  The Anti-Boycott Act (part of the Export Administration Act and the Export-Import Bank Act)—which prohibits U.S. persons and companies from participating in foreign boycotts that are not sanctioned by the U.S. government, including certain BDS actions—is premised on the notion that such boycotts run contrary to U.S. foreign policy interests.  Appellee denies that his activities were antisemitic in nature, claiming that concerns about antisemitism at Columbia reflect a "manufactured hysteria."[34] Instead, Appellee acknowledged, as a spokesperson for the

---

as filthy animals: "[Allah] transformed them into filthy, ugly animals like apes and pigs because of the injustice and evil they had brought about." Al-Regeb also prayed for the ability to "get to the necks of the Jews." https://www.adl.org/resources/article/hamas-its-own-words. In its founding charter, Hamas cites calls upon Muslims to "fight" and "kill" all Jews:

The hour of judgment shall not come until the Muslims fight the Jews and kill them, so that the Jews hide behind trees and stones, and each tree and stone will say: 'Oh Muslim, oh servant of Allah, there is a Jew behind me, come and kill him,' except for the Gharqad tree, for it is the tree of the Jews. (Hamas Charter, Article 7).

[34] JTA and TOI Staff, "Mahmoud Khalil justifies Oct. 7, downplays antisemitism at Columbia, in NYT interview," TIMES OF ISRAEL (Aug. 7, 2025),

Encampment, that the activities were aimed at forcing Columbia to

**divest from Israel**.[35] Appellee cannot deny the antisemitism

undergirding his activities by hiding behind the façade that calls for the

destruction of Israel (i.e., "from the River to the Sea, Palestine will be

free") constitute only pro-Palestinian activism, while still also

maintaining that this advocacy implicates only domestic policy. The

Congress has passed laws specifically aimed at discouraging such

behaviors on the basis that they do, in fact, touch upon foreign policy

considerations. Appellee cannot have it both ways.

But even if this evidence were insufficient to establish that Appellee

acted in such a manner, he is also deportable because of his fraudulent

visa application.

## II. Appellee Lied on His Lawful Permanent Residence Application by Omitting his Affiliation with the United Nations Relief and Work Agency ("UNRWA"), Which Knowingly Employs Hamas Terrorists, Including Several Who Participated in the October 7th Massacre.

To begin, the district court has held that Appellee is unlikely to

succeed on the merits of his claim related to his alleged failure to

accurately complete his lawful permanent resident application. *Khalil v.*

---

https://www.timesofisrael.com/mahmoud-khalil-justifies-oct-7-downplays-antisemitism-at-columbia-in-nyt-interview/.

[35] Eitan Fischberger (@EFischberger), X (Mar. 10, 2025 12:25 AM), https://x.com/EFischberger/status/1898953421048193345.

*Trump*, 2025 WL 1514713, at *56 (D.N.J. May 28, 2025) ("The Petitioner is not likely to succeed on the merits of his claim related to his alleged failure to accurately complete his lawful-permanent-resident application."). Although the district court later ruled that Appellee was entitled to a preliminary injunction because he was likely to succeed on the merits of his section 1227 claim, the district court's subsequent decision did not again address the merits of Appellee's likelihood of success on the fraud basis for removal under 8 U.S.C. § 1182(a)(6)(C)(i).

What Appellee failed to disclose is that he was interning for UNRWA, an organization that has long supported and employed Hamas members. An overview of UNRWA's history demonstrates the significance of Appellee's failure to disclose this information in his LPR application.

First, UNRWA is known to employee several Hamas members. Of the 12,521 UNRWA employees in Gaza, 1,462 or 12% are members of Hamas, Palestinian Islamic Jihad, or another terrorist group operating in Gaza.[36] James Lindsay, who served as UNRWA's general counsel from

---

[36] GOV'T OF ISRAEL, THE CONNECTION BETWEEN UNRWA AND HAMAS IN GAZA 4 (Apr. 23, 2025), https://govextra.gov.il/media/qbep4ejj/the-connection-between-unrwa-and-hamas-280425.pdf.

2002 to 2007 and prior to that, spent two decades in the Criminal Division of the U.S. Department of Justice, told The New York Times:

> The U.N. has been unable and or unwilling to eliminate Hamas militants and their supporters, as well as those from other terrorist groups, from their ranks. UNRWA hiring practices and the makeup of the labor pool from which UNRWA draws its employees suggests to me that the numbers the Israelis are talking about are probably pretty close to the truth.[37]

A July 2025 report released by the U.S. State Department detailed that "UNRWA is irredeemably compromised." As a result of its findings, which included UNRWA's participation in the October 7 terror attacks, the U.S. State Department "is maintaining a policy of minimal contact with" the organization.[38] Indeed, as a consequence of UNRWA's role in the October 7 Terror Attacks, the Biden Administration halted all funding to UNRWA in January 2024, and the Trump Administration has maintained that posture.

As one senior State Department official stated "UNRWA exists to provide cover for Hamas. They are completely corrupt and should be

---

[37] Jo Becker & Adam Rasgon, Records Seized by Israel Show Hamas Presence in U.N. Schools, N.Y. TIMES (Dec. 8, 2024), https://www.nytimes.com/2024/12/08/world/middleeast/hamas-unrwa-schools.html.
[38] Adam Kredo, 'Irredeemably Compromised': Trump Admin Tells Congress Hamas-Linked UNRWA Must Be Dismantled, WASH. FREE BEACON (July 31, 2025), https://freebeacon.com/trump-administration/trump-admin-tellscongress-hamas-linked-unrwa-is-irredeemably-compromised-and-must-be-dismantled/.

disbanded."[39] The United States' position reflects that UNRWA's involvement in the October 7 Terror Attacks was not a function of a "few bad apples" but representative of a systemic infiltration and takeover of an organization by Gaza-based terrorist organizations, as Mr. Lindsay, former UNRWA general counsel, observed.

UNRWA also serves to indoctrinate children in Gaza. UNRWA employs Hamas terrorists as teachers and spreads terrorist propaganda against Jewish people and Israel. Of the 546 principals and deputy-principals in UNRWA's education facilities in Gaza, at least 80 or 15% are members of a terrorist organization.[40] As succinctly reported by The New York Times in December 2024 when investigating Hamas's takeover of UNRWA schools, "Residents of Gaza said in interviews that the idea that Hamas had operatives in UNRWA schools was an open secret. One educator … was regularly seen after hours in Hamas fatigues carrying a Kalashnikov."[41] Additional reporting from The New York Times focused on 24 UNRWA school employees at 24 different schools—the majority as principals and deputy principals—who were revealed to be members of

---

[39] *Id.*

[40] GOV'T OF ISRAEL, The Connection Between UNRWA and Hamas in Gaza, at 4 (Apr. 23, 2025), https://govextra.gov.il/media/qbep4ejj/the-connection-between-unrwa-and-hamas-280425.pdf.

[41] Becker and Rashon, *supra* note 26.

Hamas or Palestinian Islamic Jihad, another terrorist organization operating in Gaza. Almost all the Hamas members-cum-teachers were fighters in Hamas's military brigade.[42]

Appellee was interning at UNRWA on October 7th, which he acknowledged during a podcast interview earlier this month.[43] Yet, he failed to disclose this information in his LPR application Form I-485, which he filled out less than 6 months after he left his role at UNRWA. As detailed in the Department of Homeland Security's Additional Charges of Inadmissibility/Deportability, ECF. 90 Ex. A at 5, Appellee failed to disclose his affiliation with UNRWA in response to the portion of the form that reads, in relevant part, "Provide **ALL** of your employment and educational history for the last 5 years as indicated in the Instructions." (emphasis in original). Given the scrutiny surrounding UNRWA in the wake of October 7th and its employees documented involvement in that attack, it is unsurprising that Appellee omitted this information from his LPR application. Notably, Appellee also failed to disclose his affiliation with CUAD and his continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut.

---

[42] *Id.*

[43] Washington Free Beacon (@FreeBeacon), X (Aug. 6, 2025 1:17 PM), https://x.com/FreeBeacon/status/1953143360098541600.

*Id.* The district court correctly noted that Appellee put forward no evidence and developed no meaningful legal arguments to demonstrate his likelihood of success in challenging this basis for removal. *Khalil v. Trump*, 2025 WL 1514713, at *52-54 (D.N.J. May 28, 2025). Nor can he. Appellee's failure to disclose his affiliation with UNRWA, particularly in light of its entrenched affiliations with a designated FTO (and Appellee's subsequent refusal to denounce Hamas) should certainly form a basis for his removal from the United States.

## III.    CONCLUSION

For the reasons stated herein, the district court erred in granting Appellee's motion for a preliminary injunction. His activities as a leader of CUAD and since his release from custody demonstrate an adverse impact on U.S. foreign policy interests because they advocated for divestment from Israel and violence towards Jews. Appellee is similarly unlikely to succeed on the second basis for removal because he failed to disclose his affiliation with UNRWA, an organization that employed Hamas terrorists who participated in October 7th.

Dated: August 29, 2025              Respectfully submitted,

                                    */s/ Jason B. Torchinsky*
                                    Jason B. Torchinsky

Holtzman Vogel Baran
 Torchinsky & Josefiak, PLLC
2300 N. Street, NW
Suite 643
Washington, DC 20037
Phone: (202) 737-8808
jtorchinsky@holtzmanvogel.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

I, Jason B. Torchinsky, counsel for *amicus curiae* National Jewish Advocacy Center and a member of the bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 27(d)(2) and 32(g), that the foregoing motion is proportionately spaced, has a typeface of 12 points, and contains 4,711 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

Dated: August 29, 2025                    */s/ Jason B. Torchinsky*
                                          Jason B. Torchinsky

# ELECTRONIC DOCUMENT CERTIFICATE

In accordance with Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic brief is identical to the text of the paper copies being filed. I further certify that the electronic submission was subjected to a virus scan by Crowdstrike Falcon Sandbox Malware Analysis.

Dated: August 29, 2025        */s/ Jason B. Torchinsky*
                                  Jason B. Torchinsky
                                  Holtzman Vogel Baran
                                   Torchinsky & Josefiak, PLLC
                                  2300 N. Street, NW
                                  Suite 643
                                  Washington, DC 20037
                                  Phone: (202) 737-8808
                                  jtorchinsky@holtzmanvogel.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Jason B. Torchinsky, counsel for *amicus curiae* National Jewish Advocacy Center and a member of the bar of this Court, certify that on August 29, 2025, the foregoing motion was filed using the Court's electronic filing system. I further certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

Dated: August 29, 2025                    */s/ Jason B. Torchinsky*
                                          Jason B. Torchinsky