## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Mahmoud KHALIL,

*Petitioner–Appellee,*

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Todd LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General of the Department of Justice,

*Respondents–Appellants.*

---

## APPELLEE'S RESPONSE BRIEF

---

AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
Tel: (973) 854-1715

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisas
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar
Michael K.T. Tan
Sidra Mahfooz
Brian Hauss
Esha Bhandari
Vera Eidelman
Tyler Takemoto
Brett Max Kaufman
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Mudassar Hayat Toppa
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES,
INC.
Alina Das
Kyle Barron
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805

VAN DER HOUT LLP
Marc Van Der Hout
Johnny Sinodis
Oona Cahill
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

*Counsel for Petitioner–Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................iii

INTRODUCTION......................................................................1

JURISDICTIONAL STATEMENT ...................................................2

STATEMENT OF THE ISSUES ......................................................2

STATEMENT OF THE CASE ........................................................3

SUMMARY OF THE ARGUMENT ...............................................12

STANDARD OF REVIEW ...........................................................16

ARGUMENT...........................................................................16

    I. The district court properly exercised its habeas authority.............16

        A. The district court has habeas jurisdiction ...........................16

        B. The district court had authority to order the relief in its
           preliminary injunction orders .............................................26

    II. The INA does not strip the district court of jurisdiction over
       Petitioner's claims .......................................................27

        A. 8 U.S.C. § 1252(g) does not bar review..............................28

        B. 8 U.S.C. § 1252(b)(9) does not bar review..........................34

        C. Reading 1252 to bar review would raise serious
           concerns under the First Amendment and Suspension
           Clause..............................................................43

    III.The district court did not err in granting a preliminary
       injunction .................................................................46

        A. Petitioner is likely to succeed on his as-applied
           vagueness claim....................................................46

       1. The Rubio Determination's application of the
          Foreign Policy Ground to punish Petitioner for his
          protected expression warrants the most stringent
          vagueness scrutiny ...................................................... 46

       2. The Foreign Policy Ground, as applied to
          Petitioner through the Rubio Determination, is
          unconstitutionally vague ........................................... 50

  B. Alternatively, Petitioner is likely to succeed on his other
     claims ................................................................................. 56

       1. The Rubio Determination was retaliatory in
          violation of the First Amendment ............................... 56

       2. Petitioner's detention violated his right to
          substantive due process ............................................... 65

  C. The district court did not err in finding irreparable
     harm ................................................................................... 67

IV. The district court did not err in granting Petitioner's release
   on bail .................................................................................... 70

  A. 8 U.S.C. § 1226(e) does not strip jurisdiction to order
     Petitioner's release on bail .................................................. 70

  B. The district court properly granted Petitioner bail ............... 71

CONCLUSION ............................................................................. 76

# TABLE OF AUTHORITIES

## Cases

*Aditya W. H. v. Trump,*
    782 F. Supp. 3d 691 (D. Minn. 2025) .............................................58, 75

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007) .................................................................39, 42

*Alli v. Decker,*
    650 F.3d 1007 (3d Cir. 2011) .................................................................27

*Al-Siddiqi v. Achim,*
    531 F.3d 490 (7th Cir. 2008).................................................................70

*Am. Beef Packers, Inc. v. Interstate Com. Comm'n,*
    711 F.2d 388 (D.C. Cir. 1983) ..............................................................19

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
    70 F.3d 1045 (9th Cir. 1995)................................................................65

*Anariba v. Dir. Hudson Cnty. Corr. Ctr.,*
    17 F.4th 434 (3d Cir. 2021)............................................................20, 26

*Anderson v. Davila,*
    125 F.3d 148 (3d Cir. 1997)...........................................................61, 63

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
    598 U.S. 175 (2023) ...............................................................................44

*Barahona-Gomez v. Reno,*
    236 F.3d 1115 (9th Cir. 2001)..............................................................31

*Barna v. Bd. of Sch. Dirs.,*
    877 F.3d 136 (3d Cir. 2017)...........................................................19, 47

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ...............................................................................66

*Bello-Reyes v. Gaynor,*
    985 F.3d 696 (9th Cir. 2021).....................................................34, 58, 64

*Black v. Decker,*
103 F.4th 133 (2d Cir. 2024) .................................................. 42

*Borbot v. Warden Hudson Cnty. Corr. Facility,*
906 F.3d 274 (3d Cir. 2018) ................................................... 70

*Bouie v. City of Columbia,*
378 U.S. 347 (1964) .............................................................. 52

*Boumediene v. Bush,*
553 U.S. 723 (2008) ......................................... 25, 40, 45, 46

*Bridges v. Wixon,*
326 U.S. 135 (1945) .............................................................. 58

*Cabeda v. Att'y Gen. of U.S.,*
971 F.3d 165 (3d Cir. 2020) .................................................. 35

*Cahill v. Insider Inc.,*
131 F.4th 933 (9th Cir. 2025) ............................................... 30

*Calderon-Rosas v. Att'y Gen. U.S.,*
957 F.3d 378 (3d Cir. 2020) .................................................. 65

*Cardoso v. Reno,*
216 F.3d 512 (5th Cir. 2000) ................................................ 32

*Carlson v. Landon,*
342 U.S. 524 (1952) .............................................................. 66

*Castillo v. Att'y Gen. of the United States,*
109 F.4th 127 (3d Cir. 2024) ................................................ 19

*Chehazeh v. Att'y Gen. of the U.S.,*
666 F.3d 118 (3d Cir. 2012) .......................................... 31, 35

*Christian v. Hawk,*
923 F.2d 200 (D.C. Cir. 1990) ............................................. 19

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ................................................................ 46

*Clark v. Martinez,*
543 U.S. 371 (2005) ....................................................................44, 54

*Conard v. Penn. State Police,*
902 F.3d 178 (3d Cir. 2018) ........................................................57, 59

*Cruz-Aguilera v. INS,*
245 F.3d 1070 (9th Cir. 2001) .............................................................19

*Demjanjuk v. Meese,*
784 F.2d 1114 (D.C. Cir. 1986) ..........................................................22

*Demore v. Kim,*
538 U.S. 510 (2003) .......................................................66, 67, 70, 76

*Dennis v. United States,*
341 U.S. 494 (1954) ............................................................................64

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) .........................................................................29, 42

*DHS v. Thuraissigiam,*
591 U.S. 103 (2020) ..............................................................26, 28, 45

*Dombrowski v. Pfister,*
380 U.S. 479 (1965) ............................................................................44

*Dragenice v. Ridge,*
389 F.3d 92 (4th Cir. 2004) .................................................................19

*Duarte v. Mayorkas,*
27 F.4th 1044 (5th Cir. 2022) .............................................................32

*E.F.L. v. Prim,*
986 F.3d 959 (7th Cir. 2021) ..............................................................32

*E.O.H.C. v. v. Sec'y U.S. DHS.,*
950 F.3d 177 (3d Cir. 2020) .....................................................28, 39, 42

*Elkimya v. DHS,*
484 F.3d 151 (2d Cir. 2007) ...............................................................71

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................. 39

*Ercelik v. Hyde,*
    2025 WL 1361543 (D. Mass. May 8, 2025) ......................... 58

*Ex parte Catanzaro,*
    138 F.2d 100 (3d Cir. 1943) ............................................... 20

*Ex parte Endo,*
    323 U.S. 283 (1944) ........................................................... 20

*Falco v. Zimmer,*
    767 F. App'x 288 (3d Cir. 2019) ........................................ 59

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................... 47

*Garcia v. Att'y Gen. of U.S.,*
    553 F.3d 724 (3d Cir. 2009) ......................................... 29, 31

*German Santos v. Warden Pike Cnty. Corr. Facility,*
    965 F.3d 203 (3d Cir. 2020) ................................... 42, 65, 67

*Gobeille v. Liberty Mut. Ins. Co.,*
    577 U.S. 312 (2016) ........................................................... 36

*Grayned v. City of Rockford,*
    408 U.S.104 (1972) ............................................................ 46

*Greater Philadelphia Chamber of Com. v. City of Philadelphia,*
    949 F.3d 116 (3d Cir. 2020) .............................................. 68

*Griffin v. Ebbert,*
    751 F.3d 288 (5th Cir. 2014) ............................................. 26

*Guerrero-Lasprilla v. Barr,*
    589 U.S. 221 (2020) ........................................................... 28

*Gutierrez-Soto v. Sessions,*
    317 F. Supp. 3d 917 (W.D. Tex. 2018) ......................... 58, 60

*Harisiades v. Shaughnessy,*
　　342 U.S. 580 (1952) ............................................................. 64

*Harris v. Nelson,*
　　394 U.S. 286 (1969) ............................................................. 20

*Hartman v. Moore,*
　　547 U.S. 250 (2006) ............................................................. 68

*Hill v. City of Scranton,*
　　411 F.3d 118 (3d Cir. 2005) ................................................. 62

*Humphries v. Various Fed. USINS Emps.,*
　　164 F.3d 936 (5th Cir. 1999) ........................................... 36, 38

*In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts,*
　　913 F.2d 89 (3d Cir. 1990) ..................................................... 5

*In re Kaine,*
　　55 U.S. 103 (1852) ............................................................... 73

*In re Phar-Mor, Inc. Sec. Litig.,*
　　172 F.3d 270 (3d Cir. 1999) ................................................. 16

*In re Ruiz-Massieu,*
　　22 I. & N. Dec. 833 (BIA 1999) ........................................... 41

*INS v. St. Cyr,*
　　533 U.S. 289 (2001) ....................................................... 28, 35

*Jennings v. Rodriguez,*
　　583 U.S. 281 (2018) ....................................................... *passim*

*Johnson v. Guzman Chavez,*
　　594 U.S. 523 (2021) ............................................................. 42

*Johnston v. Marsh,*
　　227 F.2d 528 (3d Cir. 1955) ....................................... 71, 72, 74

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013) ...................................................... 16

*Kabakjian v. United States*,
   267 F.3d 208 (3d Cir. 2001) ................................................... 56

*Kansas v. Crane*,
   534 U.S. 407 (2002) .............................................................. 66

*Kellici v. Gonzales*,
   472 F.3d 416 (6th Cir. 2006) ................................................ 34

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .............................................................. 65

*Kong v. United States*,
   62 F. 4th 608 (1st Cir. 2023) ........................................... 34, 42

*Kumarasamy v. Att'y Gen. of U.S.*,
   453 F.3d 169 .......................................................................... 35

*Lafferty v. St. Riel*,
   495 F3d 72 (3d Cir. 2007) ..................................................... 18

*Lee v. United States*,
   582 U.S. 357 (2017) .............................................................. 47

*Leslie v. Holder*,
   865 F. Supp. 2d 627 (M.D. Pa. 2012) .................................. 75

*Liriano v. United States*,
   95 F.3d 119 (2d Cir. 1996) ................................................... 19

*Lozman v. City of Riviera Beach*,
   585 U.S. 87 (2018) ................................................................ 64

*Lucas v. Hadden*,
   790 F.2d 365 (3d Cir. 1986) ........................................ 71, 73, 74

*Madu v. U.S. Att'y Gen.*,
   470 F.3d 1362 (11th Cir. 2006)................................... 31, 34, 35

*Mahdawi v. Trump,*
   136 F.4th 443 (2d Cir. 2025).................................................27, 39, 43, 75

*Mahdawi v. Trump,*
   781 F. Supp. 3d 214 (D. Vt. 2025) ................................................66, 75

*Mapp v. Reno,*
   241 F.3d 221 (2d Cir. 2001) ..................................................................71

*Marbury v Madison,*
   5 U.S. (1 Cranch) 137 (1803) ..............................................................25

*Massieu v. Reno,*
   91 F.3d 416 (3d Cir. 1996) ....................................................................40

*Massieu v. Reno,*
   915 F. Supp. 681 (D.N.J.)......................................................................48

*McNary v. Haitian Refugee Ctr., Inc,*
   498 U.S. 479 (1991) ...............................................................................41

*Media Matters v. Bailey,*
   2024 WL 3924573 (D.D.C. Aug. 23, 2024) ...........................................63

*Miller v. Mitchell,*
   598 F.3d 139 (3d Cir. 2010) ..................................................................60

*Miranda v. Garland,*
   34 F.4th 338 (4th Cir. 2022)..................................................................42

*Mohammed H. v. Trump,*
   2025 WL 1692739 (D. Minn. June 17, 2025) ........................................61

*Mohammed H. v. Trump,*
   781 F. Supp. 3d 886 (D. Minn. 2025)........................................58, 66, 75

*Moss v. Miniard,*
   2024 WL 4326813 (E.D. Mich. Sept. 27, 2024) ....................................75

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
   429 U.S. 274 (1977) ...................................................................57, 59, 62

*Munaf v. Geren,*
533 U.S. 674 (2008) ............................................................. 72

*Munoz-Saucedo v. Pittman,*
2025 WL 1750346 (D.N.J. June 24, 2025) ........................... 23

*Nadarajah v. Gonzales,*
443 F.3d 1069 (9th Cir. 2006) .............................................. 42

*Neb. Press Ass'n v. Stuart,*
427 U.S. 539 (1976) ............................................................. 40

*Nielsen v. Preap,*
586 U.S. 392 (2019) ............................................................. 41

*Nieves v. Bartlett,*
587 U.S. 391 (2019) ....................................................... 63, 64

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................... 27, 31

*O'Connor v. City of Newark,*
440 F.3d 125 (3d Cir. 2006) ................................................. 58

*Öztürk v. Hyde,*
136 F.4th 382 (2d Cir. 2025) ....................................... *passim*

*Öztürk v. Trump,*
2025 WL 1420540 (D. Vt. May 16, 2025) ............................ 75

*Öztürk v. Trump,*
777 F. Supp. 3d 26 (D. Mass. 2025) .................................... 17

*Öztürk v. Trump,*
779 F. Supp. 3d 462 (D. Vt. 2025) ...................................... 17

*Parra v. Perryman,*
172 F.3d 954 (7th Cir. 1999) ............................................... 34

*Rabe v. Washington,*
405 U.S. 313 (1972) ............................................................. 52

*Ragbir v. Homan,*
  923 F.3d 53 (2d Cir. 2019) ............................................................. *passim*

*Reno v. ACLU,*
  521 U.S. 844 (1997) ............................................................................ 47

*Reno v. Am.-Arab Anti-Discrimination Comm,*
  525 U.S. 471 (1999) ..................................................................... *passim*

*Reno v. Flores,*
  507 U.S. 292 (1993) ............................................................................ 65

*Robinson v. Johnson,*
  313 F.3d 128 (3d Cir. 2002) .............................................................. 19

*Roman v. Ashcroft,*
  340 F.3d 314 (6th Cir. 2003) ............................................................. 19

*Royal Canin U.S.A., Inc. v. Wullschleger,*
  604 U.S. 22 (2025) .............................................................................. 21

*Rueda Vidal v. U.S. DHS,*
  536 F. Supp. 3d 604 (C.D. Cal. 2021) .............................................. 58

*Rumsfeld v. Padilla,*
  542 U.S. 426 (2004) ..................................................................... *passim*

*Schlanger v. Seamans,*
  401 U.S. 487 (1971) ............................................................................ 19

*Sessions v. Dimaya,*
  584 U.S. 148 (2018) ..................................................................... 47, 49

*Shalala v. Illinois Council on Long Term Care, Inc.,*
  529 U.S. 1 (2000) ................................................................................ 40

*Singh v. Gonzales,*
  499 F.3d 969 (9th Cir. 2007) ............................................................. 35

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ............................................................................ 57

*Stilp v. Contino,*
   613 F.3d 405 (3d Cir. 2010) .................................................. 68

*Storey v. Lumpkin,*
   8 F.4th 382 (5th Cir. 2021) ................................................. 19

*Suppan v. Dadonna,*
   203 F.3d 228 (3d Cir. 2000) ................................................. 57

*Suri v. Trump,*
   2025 WL 1310745 (E.D. Va. May 6, 2025) ........................... 17

*Suri v. Trump,*
   2025 WL 1806692 (4th Cir. July 1, 2025) ..................... *passim*

*Sylvain v. Att'y Gen. of U.S.,*
   714 F.3d 150 (3d Cir. 2013) ................................................. 70

*Tazu v. Att'y Gen. U.S.,*
   975 F.3d 292 (3d Cir. 2020) ......................................... *passim*

*Tourscher v. McCullough,*
   184 F.3d 236 (3d Cir. 1999) ................................................. 56

*Trump v. J.G.G.,*
   145 S. Ct. 1003 (2025) ........................................................ 26

*United States v. Hovsepian,*
   359 F.3d 1144 (9th Cir. 2004) ............................................. 31

*United States v. L. Cohen Grocery Co.,*
   255 U.S. 81 (1921) .............................................................. 53

*United States v. Loy,*
   237 F.3d 251 (3d Cir. 2001) ................................................. 53

*United States v. Matchett,*
   837 F.3d 1118 (11th Cir. 2016) ........................................... 48

*United States v. Moussaoui,*
   382 F.3d 453 (4th Cir. 2004) ............................................... 22

*United States v. Tann,*
 577 F.3d 533 (3d Cir. 2009) ...........................................................35, 74

*Vasquez v. Reno,*
 233 F.3d 688 (1st Cir. 2000) .................................................................26

*Velasco Lopez v. Decker,*
 978 F.3d 842 (2d Cir. 2020) ..................................................................70

*Watson v. Rozum,*
 834 F.3d 417 (3d Cir. 2016) ...........................................................59, 61

*Winter v. NRDC,*
 555 U.S. 7 (2008) ....................................................................................72

*Wong v. United States,*
 373 F.3d 952 (9th Cir. 2004) .................................................................38

*Zadvydas v. Davis,*
 533 U.S. 678 (2001) ....................................................................65, 66, 76

## Statutes

28 U.S.C. § 1292(a) ......................................................................................2

28 U.S.C. § 1331 ...........................................................................................2

28 U.S.C. § 1631 .............................................................................12, 17, 18

28 U.S.C. § 2201 ...........................................................................................2

28 U.S.C. § 2241 ...........................................................................................2

28 U.S.C. § 2242 .........................................................................................22

28 U.S.C. § 2243 .........................................................................................73

5 U.S.C. § 701 ...............................................................................................2

6 U.S.C. § 202(3) ........................................................................................29

8 U.S.C. § 1103(a) ......................................................................................29

8 U.S.C. § 1182(a) ....................................................................... 3

8 U.S.C. § 1226(a) ................................................................... 8, 66

8 U.S.C. § 1227 ........................................................................... 7

8 U.S.C. § 1252(a) ................................................................. 31, 35

8 U.S.C. § 1252(b) ................................................................ 10, 35

8 U.S.C. § 1252(e) ..................................................................... 31

8 U.S.C. § 1252(f) ..................................................................... 31

8 U.S.C. § 1252(g) ........................................................... 13, 28, 29

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 2 ...................................................... 2, 45

## Other Authorities

1 Smolla & Nimmer on Freedom of Speech ................................... 65

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) ....................... 60

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025) ....................... 60

Gov't Letter, *Chung v. Trump*, No. 25-cv-2412 (June 4, 2025),
    ECF No. 56 ............................................................................ 38

H.R. Rep. No. 109-72, *reprinted in* 2005 U.S.C.C.A.N. at 300 ................... 42

## INTRODUCTION

The United States government arrested Petitioner, Mahmoud Khalil, a lawful permanent resident with a U.S. citizen spouse (and, now, child) and detained him more than a thousand miles from counsel and family for over one hundred days by invoking an unprecedented application of an obscure provision of the Immigration and Nationality Act ("INA") to punish him for his constitutionally protected advocacy for Palestinian human rights. The full force of the government's retaliation manifested more broadly as a nationwide policy to target and punish students for their pro-Palestine speech—executive conduct numerous courts have elsewhere enjoined.

Following the district court's thorough adjudication of the issues in this case, which included an undisputed factual record authorizing Petitioner's release on bail, the government comes to this Court seeking to re-detain and deport him—primarily by challenging the habeas court's very authority to adjudicate fundamental constitutional questions regarding the government's unprecedented campaign to target him for his speech.

As the district court held in multiple lengthy opinions and as explained below, the federal courts have the jurisdiction—and duty—to check executive conduct when it violates constitutional rights by seeking to censor speech

through the abuse of immigration enforcement authority. The Court should affirm the district court's carefully considered judgments.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 2241; 28 U.S.C. § 1331; U.S. Const. art. I, § 9, cl. 2 (the Suspension Clause), and Article III of the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 701; and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court properly assumed habeas jurisdiction over this petition.

2.     Whether the INA strips district courts of subject-matter jurisdiction over Petitioner's habeas claims.

3.     Whether the district court abused its discretion in granting a preliminary injunction against Respondents' use of a determination by Secretary of State Marco Rubio ("Rubio Determination"), invoking 8 U.S.C.

§ 1182(a)(3)(C)(iii) (the "Foreign Policy Ground" or "FPG"), to detain and remove Petitioner.

4.      Whether the district court abused its discretion in releasing Petitioner on bail.

STATEMENT OF THE CASE

Petitioner's Background

Petitioner was born in a Palestinian refugee camp in Syria. JA1100 ¶ 5. While volunteering with Syrian refugees in Lebanon, he met Dr. Noor Abdalla, a U.S. citizen who was working in the same program. JA459 ¶ 3. Petitioner came to the United States in 2022 on a lawful visa to study human rights and diplomacy at Columbia. JA1033 ¶ 20; JA1099 ¶ 1. In 2023, he and Dr. Abdalla married, and in 2024 Petitioner became a lawful permanent resident. JA459 ¶ 5. On April 21, 2025 (during his detention in Louisiana), he became the proud father of his U.S. citizen son, Deen. JA1100 ¶ 5. In May 2025, Petitioner earned a master's degree in public administration from the Columbia University's School of International and Public Affairs. *Id.*

Petitioner's Speech

Petitioner cares deeply about the Palestinian people and has dedicated his life to peaceful protest and advocacy. JA1100 ¶¶ 5, 9; JA459 ¶ 3; JA492-

3

93; JA600-01; JA598. Since arriving in the United States, Petitioner has been a consistent advocate for Palestinian human rights and justice. JA1033 ¶¶ 20-23. Beginning in October 2023, Petitioner took a more public role in pro-Palestinian advocacy, including through speaking at protests, engaging with media, and serving as a mediator and negotiator between student groups and the Columbia administration.

Petitioner has consistently denounced antisemitism and all forms of extremism, insisted on nonviolence, and welcomed students of all faiths and identities into a student movement "for social justice and freedom and equality for everyone." JA1034 ¶ 25; JA599; JA489-99. He has emphasized that Jewish students are "an integral part" of the movement for Palestine, and that "the liberation of Palestinians and Jewish people are intertwined." JA1133; *see* JA368-71 (district court repeatedly crediting unchallenged declarations from declarants—several of whom are Jewish—demonstrating Petitioner's nonviolence and lack of danger to the community).

Importantly, at no point in these proceedings has the government ever contested these and other voluminous facts put forward by Petitioner, nor has it put forward any evidence of its own justifications for the actions it has taken against him. As the district court found, Petitioner has submitted a "thick

record" of sworn evidence, which remains entirely unrebutted, despite Respondents having "many opportunities" to respond. JA370.

Characteristically, in their presentation, Respondents assert that Petitioner "engage[d] in disruptive and antisemitic activities," Dkt. 46 at 5 (No. 25-2357) ("Br.")[1], but in support cite a tabloid source that was not submitted to the district court and is therefore not part of the record, *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89, 96 (3d Cir. 1990). They also mischaracterize another article, the full text of which *is* in the record and clearly reflects that Petitioner denies the allegations repeated in Respondents' brief. JA521-25; *see* ECF 156 at 32 n. 10.[2] Indeed, the only record material supporting Respondents' claim is the conclusory language in the very executive action challenged in this case (the "Rubio Determination"). ECF 198-1.

### Government Retaliation

Shortly after assuming office, Respondent Trump signed two executive orders aimed at fulfilling campaign promises to "throw" pro-Palestine student

---

[1] All "Dkt." citations are to filings in this Court.

[2] "ECF" numbers reference entries on the district court docket, 25-cv-1963 (D.N.J.), that are not included in the JA.

protestors "out of the country." JA1035-37 ¶¶ 32, 29-36. Respondents adopted a policy ("the Policy") of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel. JA1050 ¶ 89; *see* ECF 124 at 4-10. Under the Policy, Respondent Rubio would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences and compromise a compelling United States foreign policy interest. JA1039 ¶ 44. A determination (like the "Rubio Determination" issued in this case as to Petitioner) would permit the Department of Homeland Security ("DHS") to try to detain and deport the protestors. JA1027 ¶ 2.

On March 8, without notice or a warrant, plainclothes federal officers entered the vestibule of Petitioner's private residence in New York City and arrested him. The next day, they whisked him first to New Jersey and eventually to a remote detention facility in Louisiana. JA1039-42 ¶¶ 46-56. The same day, Respondent Trump issued a statement applauding Petitioner's arrest, warning that it was "the first of many to come," and promising to "find, apprehend, and deport" students engaged in "pro-terrorist, anti-Semitic, anti-American activity." JA1045 ¶¶73. Respondent Rubio affirmed that he would

be "revoking the visas and/or green cards of Hamas supporters in America so they can be deported." JA1046 ¶¶ 75. The next day, DHS confirmed that Petitioner's arrest was carried out in support of Respondent Trump's executive orders and "in coordination with the Department of State," and (without providing evidence) accused Petitioner of leading "activities aligned to Hamas." JA1046-47 ¶¶ 76, 81.

For nearly 48 hours, Petitioner was held incommunicado as his attorneys and family frantically tried to determine his location and contact him. JA1041-42 ¶¶ 54-56. While detained at 26 Federal Plaza on the night of March 8, Petitioner was presented with a Notice to Appear ("NTA") for removal proceedings in Jena, Louisiana; his requests to speak with his lawyer were repeatedly denied. JA1043 ¶¶ 59, 62. Respondents charged Petitioner as removable under the FPG, JA1047-48 ¶ 82, submitting a determination by Secretary Rubio that Petitioner's expressive activity—which was "otherwise lawful"—would "compromise a compelling foreign policy interest." ECF 198-1 (citing 8 U.S.C. § 1227(a)(4)(C)). Such use of the FPG against a lawful permanent resident for lawful speech was unprecedented. JA1416-17 ¶¶ 9-10.

Within hours of his March 8 arrest, Petitioner's lawyers filed a habeas petition on his behalf in the Southern District of New York challenging his detention and deportation on constitutional grounds. JA1041 ¶ 54. A week later, in the midst of nationwide criticism of the grounds for his arrest, Respondents levied a second immigration charge ("Post-Hoc Charge") alleging misrepresentations on Petitioner's green card application. JA1049-50 ¶ 88. Experts have noted the extremely rare use of this charge against someone with Petitioner's background. JA1388 ¶ 15, JA1392-94, JA1418 ¶ 16-18, JA1546-47.

For the next 104 days, Immigration and Customs Enforcement ("ICE") exercised its discretion, based on shifting justifications, to keep Petitioner detained pursuant to 8 U.S.C. § 1226(a). JA527 ¶ 7; JA1387-38; JA1439; JA1462. It also refused his furlough request to witness the birth of his first child and denied him relocation so that he could be detained closer to his family. JA1113 ¶ 10, 1446.

## Proceedings Below

On March 9, based on all the information available to and "affirmatively" provided by the government, Petitioner's lawyers filed his

initial habeas petition in the Southern District of New York. JA1041 ¶ 54.[3] On March 25, after the petition was transferred to the District of New Jersey, JA537, Petitioner amended his pleadings, including as most relevant here an amended preliminary injunction motion challenging his detention, the Rubio Determination, and the Policy on First and Fifth Amendment grounds. ECF 124. Over the next several months, the district court methodically determined, in lengthy opinions, that it has habeas and subject-matter jurisdiction. JA34-100 (habeas jurisdiction); JA101-208 (subject-matter jurisdiction).

On June 11, the court issued a preliminary injunction prohibiting Respondents "from seeking to remove the Petitioner from the United States based on the [Rubio Determination]" and detaining him on that basis. JA19-20. On the merits, in an earlier opinion, the court had concluded that the FPG, as applied to Petitioner through the Rubio Determination, is likely unconstitutionally vague. JA209-309.[4] And on the equities, the court

---

[3] Petitioner later filed several amended habeas petitions, with the operative one found at JA1027.

[4] The court did not reach Petitioner's other claims raised in support of his preliminary-injunction motion, including his First Amendment retaliation claim (which was his primary claim, ECF 124) and his substantive due process claim.

concluded on a voluminous and undisputed factual record that, if Respondents were permitted to rely on the Rubio Determination in removal proceedings, Petitioner would suffer reputational, occupational, and speech-related irreparable harms. JA11-17.

On June 12, Petitioner asked Respondents to inform the immigration judge ("IJ") that they were no longer relying on the Rubio Determination, pursuant to the district court's injunction, JA1437, and made his own filing with the IJ, ECF 341-1 at 5. Respondents ignored Petitioner's request, and on June 20, the IJ issued a written order for Petitioner's removal and refused to consider bond or a removability waiver. JA25. Because, through these actions and inactions, Respondents were continuing to seek Petitioner's removal based on the enjoined Rubio Determination, Petitioner sought to clarify the injunction. ECF 332. In particular, Petitioner was concerned that the IJ's order would trigger a requirement to notice an appeal with the Board of Immigration Appeals ("BIA") that would divest the IJ of jurisdiction over Petitioner's case and make further efforts to compel Respondents' compliance more difficult. *See id.* at 1 n.1.

On July 17, the district court clarified the requirements of its injunction, (1) explaining that the IJ's June 20 decision "was directly inconsistent with

the" injunction, JA25; and (2) finding "as a factual matter that the Respondents' efforts to remove the Petitioner from the United States on the [Post-Hoc Charge] 'meaningfully rely on the [Rubio Determination].'" JA28 (quoting JA1540). It then ordered Respondents to take certain steps to comply with its June 11 order. JA28-32.

On July 18, in partial compliance with the July 17 order, the IJ reopened Petitioner's immigration case, ensuring she retained jurisdiction. ECF 360-1 at 1 n.1. Later that day, Respondents filed a motion to stay the court's July 17 order, ECF 360-1, and on July 25, the court denied the motion. JA1708-17. In rejecting Respondents' arguments on the stay factors, the court emphasized that "the critical fact[] here" is that the IJ's June 20 action violated the June 11 injunction. JA1716.

On July 30, this Court denied Respondents' request to stay the preliminary injunction except as to the district court's direction to "cause the [IJ] to consider Appellee's request for [a] waiver of removability." Dkt. 41 (No. 25-2357).

## Bail Proceedings

Meanwhile, on June 20, the district court held a bail hearing during which it ordered Petitioner's release pending the habeas proceedings. JA22-

23; *see* JA315-89. The court cited to extensive evidence of extraordinary circumstances to which Respondents had "opted to say nothing in response." JA369; *see* JA336, JA351, JA370, JA386. The court explained at length why its justifications for release satisfied the applicable standards. JA337-76. It denied Respondents' request for a stay of the release order. JA382-85. Respondents appealed and, waiting almost one week, sought a stay of Petitioner's release in this Court. Dkt. 16 (No. 25-2162).

On July 30, this Court denied Respondents' request for a stay of the bail order, explaining that they had "not demonstrated irreparable harm." Dkt. 41 (No. 25-2162).

<u>SUMMARY OF THE ARGUMENT</u>

I.    The district court properly exercised habeas jurisdiction. The petition was properly transferred from S.D.N.Y. under 28 U.S.C. § 1631, which requires, when in the interests of justice, that it be treated as if it were filed in the D.N.J.—where Petitioner was in fact located at the moment it was filed. On that basis, the petition satisfies the district of confinement rule. The petition also satisfies the immediate-custodian rule because, after relation-back amendment, it names the New Jersey custodian. In addition, the initial absence of the custodian from the first petition would be excused by the

"unknown custodian" exception recognized by both the Supreme Court and Congress. As multiple courts have found in recent months, all of Respondents' other counterarguments violate foundational holdings from the Supreme Court and this Court, and would undermine the bedrock promise of the Great Writ: to permit flexibility in addressing executive misconduct.

II. None of the INA's jurisdictional provisions bar review of Petitioner's claims. 8 U.S.C. § 1252(g) is a narrow provision that applies only to three discrete actions taken by "the Attorney General" ("AG"). It does not apply here because Petitioner challenges a determination by the *Secretary of State*, and because courts have permitted challenges to the legal authority underpinning the AG's actions. Respondents' focus on the relief that necessarily flows from the injunction runs headlong into the plain text of 1252(g), which only bars review of "claims" impinging on prosecutorial discretion and says nothing about remedies.

8 U.S.C. § 1252(b)(9) likewise does not apply because no final order of removal has been issued. Even if it applied to pre-final order cases, the text must be construed to exempt actions, such as the Rubio Determination, predicate to removal, and "now-or-never" claims like Petitioner's because a lengthy petition-for-review process would not remedy the immediate and

ongoing chilling of his and others' speech.

In any event, neither provision can be read to bar unlawful detention claims under well-established case law. And construing them to apply to Petitioner's claims would raise serious constitutional concerns; if they did apply, the First Amendment and Suspension Clause would independently require review.

III. The Court should affirm the preliminary injunction. As the district court concluded, the FPG, as applied to Petitioner through the Rubio Determination, is unconstitutionally vague. First, Respondents are applying the FPG to render Petitioner removable on account of his protected speech—that is a classic speech restriction, backed by the severe penalty of removal, and it is subject to the most stringent vagueness scrutiny. Second, the FPG is unconstitutionally vague as applied because there is a complete mismatch between the statute's text, legislative history, and enforcement history—which contemplate activities abroad that affect America's international relations—and the Rubio Determination, which focuses exclusively on Petitioner's protected expression in the United States and does not identify any impact on U.S. foreign relations. Respondents try to sidestep this glaring discrepancy by reinterpreting the FPG to cover speech that, in their view,

disagrees with U.S. policy on any global issue, but that novel and open-ended construction would only exacerbate vagueness.

Alternatively, this Court should affirm the preliminary injunction on the grounds that the Rubio Determination was applied to punish Petitioner in retaliation for his constitutionally protected expression, as reflected by the Determination itself and voluminous record evidence, and that Petitioner's detention violated substantive due process. The undisputed record also shows that Petitioner's detention was similarly punitive and served no legitimate purpose, because Petitioner poses no flight risk or danger.

The Rubio Determination presumptively imposes irreparable harm through its infringement of Petitioner's First Amendment rights. These harms include the threat of renewed efforts to detain or remove him pursuant to the Rubio Determination, and the attendant chilling effect such actions would have on Petitioner's expression and the speech of countless other noncitizens. They also include the irreparable harm to Petitioner's reputation and career prospects stemming from these unconstitutional enforcement actions.

IV.    The district court properly exercised its authority to grant Petitioner's release. Under this Court's precedent, habeas courts have inherent authority to grant bail based on extraordinary circumstances. The district

court exercised that authority in light of extensive and uncontroverted evidence regarding the highly unusual and punitive nature of Petitioner's detention. Respondents do not contest the district court's findings, and their attempt to ratchet up the bail standard conflicts with this Court's case law and the flexibility habeas courts possess to remit petitioners to bail.

## STANDARD OF REVIEW

A grant of a preliminary injunction is reviewed for abuse of discretion; findings of fact for clear error; and legal conclusions de novo. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013); *In re Phar-Mor, Inc. Sec. Litig.*, 172 F.3d 270, 273 (3d Cir. 1999). "The grant of bail is discretionary with the district judge" and is reviewed for abuse of discretion. *Landano v. Rafferty*, 970 F.2d 1230, 1238 (3d Cir. 1992).

## ARGUMENT

I. **The district court properly exercised its habeas authority.**

A. **The district court has habeas jurisdiction.**

The district court correctly concluded that it has habeas jurisdiction over the petition, and as six courts have concluded since March, none of Respondents' counterarguments work. *See Öztürk v. Hyde*, 136 F.4th 382, 392-93 (2d Cir. 2025) (denying stay pending appeal); *Suri v. Trump*, 2025

WL 1806692, at *4-6 (4th Cir. July 1, 2025) (same); *Suri v. Trump*, 2025 WL 1310745, at *7-14 (E.D. Va. May 6, 2025); *Öztürk v. Trump*, 779 F. Supp. 3d 462, 474-80 (D. Vt. 2025); *Öztürk v. Trump*, 777 F. Supp. 3d 26, 33-44 (D. Mass. 2025); JA57-100, *motion to certify appeal denied*, Order, No. 25-8019 (3d Cir. May 6, 2025).

The "default rule" in habeas cases is "that the proper respondent is the warden of the facility where the prisoner is being held" at the time the petition was filed. *Rumsfeld v. Padilla*, 542 U.S. 426, 435-36 (2004); *Öztürk*, 136 F.4th at 390. Respondents' central argument is that Petitioner "fail[ed]" to comply with these "district of confinement" and "immediate custodian" rules. Br. 19. Notably, "[a]ny confusion about where habeas jurisdiction resides arises from the government's conduct" in the hours after Petitioner's arrest, *Öztürk*, 136 F.4th at 390. In any event, as the district court found, this confusion was properly addressed through 28 U.S.C. § 1631 and Fed. R. Civ. P. 15.

First, the petition satisfies the district-of-confinement rule. Respondents contend that because the petition was initially filed in the S.D.N.Y., the D.N.J. (the conceded district of confinement at the time of filing) is an improper habeas venue. But section 1631 fixes that issue. That statute *requires*, when

in the "interest of justice," that a district court transfer a "civil action" for which there is "want of jurisdiction" to a court where the case "could have been brought at the time it was filed," and specifies that the case shall then "proceed as if it had been filed" in the transferee court (D.N.J.) at the original time of filing ("March 9 at 4:40 a.m.," JA68) in the transferor court (S.D.N.Y.) that lacked jurisdiction. JA62. Because Petitioner was physically in New Jersey when his lawyers filed the petition, it could have been brought there under *Padilla*'s default rules. JA94; *Öztürk*, 136 F.4th at 390-92 (endorsing same section 1631 analysis). Accordingly, the petition "shall proceed as if it had been filed in or noticed for [the D.N.J.] on the date upon which it was actually filed in or noticed for [the S.D.N.Y.]." 28 U.S.C. § 1631; *see Lafferty v. St. Riel*, 495 F3d 72, 82 (3d Cir. 2007) (similar conclusion under "parallel" transfer statute, discussing section 1631).

Respondents argue that the transfer statute can only "correct [a] threshold technical or procedural defect," rather than grant or "vest" the court below with "substantive authority that it otherwise lacked," Br. 22-23. But that is all the statute did. *Öztürk*, 136 F.4th at 391. And "rescu[ing] cases mistakenly filed in the wrong court, and . . . allow[ing] transfer to reach a just result," *Castillo v. Att'y Gen. of the United States*, 109 F.4th 127, 135 (3d

Cir. 2024) (cited at Br. 22), is precisely what Congress intended section 1631 to do. *See Am. Beef Packers, Inc. v. Interstate Com. Comm'n*, 711 F.2d 388, 390 (D.C. Cir. 1983) (per curium) (citing legislative history)).[5]

Further, in an argument never raised below and thus forfeited,[6] Respondents assert that section 1631 does not apply to habeas cases at all, because they are not "civil actions." Br. 23. Whether or not the phrase includes habeas actions in *other* statutory contexts, *id.* at 24,[7] it clearly does in this one. This Court has "repeatedly recognized that Section 1631 applies to habeas petitions," JA61 (citing, *inter alia*, *Robinson v. Johnson*, 313 F.3d 128, 139 (3d Cir. 2002))—as has every other circuit to touch on the question.[8] And

---

[5] Respondents assert that Petitioner's case is "different in kind" from cases that they acknowledge *could* benefit from a section 1631 transfer—for example, where courts can use the statute "to excuse what would otherwise be a violation of a statute of limitations (in the event the case needed to be refiled)," Br. 22—but they make no effort to explain *how*.

[6] *Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 147 (3d Cir. 2017).

[7] Respondents also rely on *Schlanger v. Seamans*, but all the Court held there was that a federal statute providing for nationwide service of process in "civil actions" had not silently "extended" habeas jurisdiction beyond the traditional default rules. 401 U.S. 487, 490 n.4 (1971).

[8] *See, e.g.*, *Liriano v. United States*, 95 F.3d 119, 123 (2d Cir. 1996); *Dragenice v. Ridge*, 389 F.3d 92, 97 (4th Cir. 2004); *Storey v. Lumpkin*, 8 F.4th 382, 390 (5th Cir. 2021); *Roman v. Ashcroft*, 340 F.3d 314, 328 (6th Cir. 2003); *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1074 (9th Cir. 2001); *Christian v. Hawk*, 923 F.2d 200 (D.C. Cir. 1990).

given Congress's purpose in enacting section 1631—ensuring that well-meaning litigants do not lose the ability to pursue cases because they filed them in the wrong court—it would make no sense to exempt habeas, our law's most flexible remedy, *Harris v. Nelson*, 394 U.S. 286, 291 (1969), from its ambit.

Next, Respondents argue that by moving Petitioner to Louisiana, they stripped the New Jersey court of habeas jurisdiction. Br. 19-20. But that outcome runs headlong into the long-standing rule of *Ex parte Endo*, 323 U.S. 283 (1944). *See* JA69-75; *Öztürk*, 136 F.4th at 392. The *Endo* rule—"done and settled" in this Circuit, JA74, since a year before *Endo* itself, *see Ex parte Catanzaro*, 138 F.2d 100, 101 (3d Cir. 1943)—is "that a habeas court that otherwise has jurisdiction over a case does not lose that jurisdiction just because the habeas petitioner has been moved out of the district." JA69; *Öztürk*, 136 F.4th at 392 (citing *Padilla*, 542 U.S. at 441, itself discussing *Endo*). The district court correctly understood *Endo* to prevent Respondents' movement of Petitioner from New Jersey to Louisiana from depriving it of jurisdiction it acquired pursuant to section 1631. JA69, JA75; *Öztürk*, 136 F.4th at 392; *see Endo*, 323 U.S. at 307; *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 447 (3d Cir. 2021). Respondents argue that *Endo* protects

habeas petitioners only where habeas jurisdiction originally "vested" in a particular court. Br. 20. But "[u]nder § 1631," jurisdiction *did* vest in the D.N.J., because "the transferee court inherits the filing time of the transferor court." *Öztürk*, 136 F.4th at 392; *see* JA67; JA75.

Second, the petition meets the immediate-custodian rule. Petitioner amended his petition to name the EDC warden, ECF 162, and that amendment "relates back" to the original date of filing, Fed. R. Civ. P. 15(c)(1)(C)(1)-(2). Respondents acknowledge the amendment, but ignore its relation back—and for the purposes of the immediate-custodian rule, the amendment is the ballgame. JA89 n.32.[9]

Even without the amendment, the district court properly applied the "unknown custodian" exception to excuse any failure to comply with the default immediate-custodian rule. As multiple courts have found since March, Respondents' argument to the contrary is not only wrong and Kafkaesque, but threatens to undermine the fundamental purpose of the Great Writ.

---

[9] Respondents summarily suggest that the amendment actually *defeated* habeas jurisdiction in the D.N.J. Br. 25. But their argument relies on a "plainly inapposite" case. *Öztürk*, 136 F.4th at 394 (discussing *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025)). In any event, the murky argument appears to simply repackage Respondents' losing position that the transfer statute did not properly confer jurisdiction on the D.N.J.

When Petitioner's lawyers filed his petition, they "had been affirmatively and persistently led to believe he was in Manhattan"; they had "relied on that information"; and "in spite of [their] best efforts there was no realistic way for [them] to know that the Petitioner was, in fact, in New Jersey when [they] filed the Petition." JA82-83. Those undisputed factual findings establish that Petitioner's filing falls squarely within the "unknown custodian" exception to the default habeas rules. Under this exception—more accurately understood as both an "unknown custodian" and an "unknown location" exception—when the government holds someone "in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450 n.18 (citing *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C. Cir. 1986)); *Öztürk*, 136 F.4th at 392-93; *Suri*, 2025 WL 1806692, at *4-6; *United States v. Moussaoui*, 382 F.3d 453, 464-65 (4th Cir. 2004); JA83-99; *see* 28 U.S.C. § 2242 (habeas petitioner must include "the name of the person who has custody over him . . . , *if known*" (emphasis added)). The exception fits this case to a tee, and Respondents' arguments to the contrary all fail.[10]

---

[10] At the outset of this litigation, Petitioner argued that habeas jurisdiction was proper in the S.D.N.Y., and moved in the D.N.J. for re-transfer on that

While it is true the Supreme Court has never *applied* the exception, Respondents' attempt to reduce it to a mere "possibility," Br. 20 n.3 (emphasis removed), fails. *See* Dkt. 1 at 17-18 (No. 25-8019) (Respondents acknowledging the exception when seeking to certify interlocutory appeal). Indeed, the *Padilla* Court plainly embraced it as the "law of the land." JA84-86 (recognizing the exception is treated as "a basic part of our law," and noting the government's failure to ever argue otherwise before March); *see Padilla*, 542 U.S. at 450 n.18 (presenting exception as rule and citing *Demjanuk*); *Padilla*, 542 U.S. at 458 (Stevens, J., dissenting) (noting the Court's unanimous agreement on this exception).[11]

---

basis in order to preserve the issue for eventual appellate review of a final judgment. JA646-47; *see Suri*, 2025 WL 1806692, at *6 (concluding that unknown-custodian exception likely excused *both* the immediate-custodian and district-of-confinement rules and permitted "fil[ing] a habeas petition in [a] detainee's *last-known location against their ultimate custodian*" where "the government moves a detainee from a district and their attorney cannot discover their location with reasonable inquiry" (emphasis added)); *Munoz-Saucedo v. Pittman*, 2025 WL 1750346, at *4 (D.N.J. June 24, 2025) (similar); *cf. Padilla*, 542 U.S. at 454 (Kennedy, J., concurring). That argument is not before this Court.

[11] Respondents point to dicta from *Demjanuk* that was not adopted or even discussed in *Padilla* to suggest that the exception requires a court to transfer a habeas petition to another district once the petitioner's location becomes known—in other words, when the government reveals it. Br. 21. But that kind of rule would directly undermine *Endo*.

Respondents argue that the exception applies only to *prolonged* secret detention—that there is incommunicado detention, and then there is "brief" incommunicado detention. Br. 21; *see* Dkt. 1 at 17 (No. 25-8019); *Öztürk*, 136 F.3d at 393. But rejecting that "extraordinary proposition," *Öztürk*, 136 F.4th at 393, and properly applying the exception, the district court held that Petitioner's custodian was "*unknowable*," Br. 20, at the time of filing, JA82-83.[12]

In the end, Respondents' position means that at the time of filing, Petitioner "would not have been able to call on any habeas court. Not in Louisiana, New York, or New Jersey. And not anywhere else, either." JA98;

---

[12] Suggesting that Petitioner's incommunicado detention was merely "brief" and not "prolonged," Respondents represent that "the Government told Petitioner's counsel *within hours* exactly where he was *being held*." Br. 20 (emphasis added) (citing JA543-44). That is false. JA543-44 (finding that *29 hours* after his arrest, Respondents informed Petitioner's counsel that he "was in the process of *being transferred* to a detention facility within the New Orleans ICE Field Office's area of responsibility"). And Respondents never allowed him, despite multiple requests, to contact his lawyer throughout his forcible move, whether to tell them where he was or where he was apparently going. JA80-83.

Regardless, knowing that Petitioner was on his way to Louisiana, while he remained in New York or New Jersey, would not have helped Petitioner's counsel at all. Under *Padilla*'s default rules, Petitioner could not have filed a habeas petition in a place he was yet to arrive. *Suri*, 2025 WL 1806692, at *4 n.4.

*see Öztürk*, 136 F.4th at 393. "The only authority [the government] cites for [this argument] is *Demjanjuk*, which says no such thing. Neither does *Padilla*." *Suri*, 2025 WL 1806692, at \*6 (cleaned up); *Öztürk*, 136 F.4th at 393. The argument is particularly galling because it "is contrary to longstanding tradition." *Öztürk*, 136 F.4th at 393. The unknown-custodian exception is based in equity, fairness, and the necessary availability of the Great Writ—the most "adaptable" remedy in American law. *Boumediene v. Bush*, 553 U.S. 723, 779 (2008). And "[o]ur tradition is that there is no gap in the fabric of habeas—no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." JA99. "Otherwise, [a] detainee would lack the ability to seek habeas relief as long as the government kept their location and custodian a secret, thus granting 'the political branches . . . the power to switch the Constitution on or off at will,' 'leading to a regime in which . . . the President, not the Supreme Court, says "what the law is."'" *Suri*, 2025 WL 1806692, at \*6 (cleaned up) (quoting *Boumediene*, 553 U.S. at 765 (quoting *Marbury v Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))).[13]

---

[13] The *Padilla* rules also serve "the important purpose of preventing forum shopping by habeas petitioners." 542 U.S. at 447. But forum-shopping

**B.** **The district court had authority to order the relief in its preliminary injunction orders.**

Respondents adopt the extreme position that "relief other than 'simple release' is not available in a habeas action." Br. 26 (quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 119 (2020)); *see* Br. 27 (quoting *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 300 (3d Cir. 2020)). But as the Supreme Court recently held, "claims for relief [that] necessarily imply the invalidity of [petitioners'] confinement and removal . . . fall within the core of the writ of habeas corpus." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (cleaned up). And *Thuraissigiam*—which addressed the historical common-law understandings of habeas, not the statute—affirmed that "the writ could be invoked by aliens," like Petitioner, "already in the country who were held in custody pending deportation." *Thuraissigiam*, 591 U.S. at 137; *see Tazu*, 975 F.3d at 300 (addressing "constitutional right to habeas"). In addition, Petitioner brought this case as both a habeas petition and a complaint under 28 U.S.C. § 1331. JA1027, JA1031-32. The court, sitting in equity, has the inherent authority to enjoin presumptively unconstitutional government

concerns apply to the government, too. *See, e.g., Anariba*, 17 F.4th at 447; *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000); *Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014).

conduct, and hybrid pleadings are routinely filed in this Circuit seeking various forms of relief. *See, e.g.*, *Alli v. Decker*, 650 F.3d 1007, 1009-10, 1016 (3d Cir. 2011) (considering "combined habeas petition and civil complaint" that sought declaratory relief regarding immigration bond hearings); *see also* JA 31 (invoking broad equitable "power to ensure that its injunctive decrees are effective as a practical matter") (citing, *inter alia*, *Nken v. Holder*, 556 U.S. 418, 428 (2009)).

## II.    The INA does not strip the district court of jurisdiction over Petitioner's claims.

Respondents argue that 8 U.S.C. § 1252(b)(9) and (g) deprived the district court of jurisdiction to review Petitioner's claims that his detention and removal based on the Rubio Determination are unconstitutional. Br. 27. Motions panels in sister circuits have considered and rejected this argument with respect to illegal detention claims, *see Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025); *Öztürk*, 136 F.4th 382; *Suri*, 2025 WL 1806692, at *7-9, and Respondents' argument also fails with respect to Petitioner's challenge to removal based on the Rubio Determination.

The "touchstones" of the Court's jurisdictional analysis are "two presumptions": "the usual strong presumption in favor of judicial review of

administrative action" and "the narrower construction of a jurisdiction-stripping provision is favored." *E.O.H.C. v. v. Sec'y U.S. DHS.*, 950 F.3d 177, 184 (3d Cir. 2020) (citing *INS v. St. Cyr*, 533 U.S. 289, 298 (2001)). These presumptions are bolstered by the interpretative canon requiring a "clear statement of congressional intent to repeal habeas jurisdiction" and "clear indication of congressional intent" when a proposed interpretation would "push the outer limits of Congress' power." *Thuraissigiam*, 591 U.S. at 137 (cleaned up). The presumptions can "only be overcome by clear and convincing evidence of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (cleaned up). This burden is not met here.

### A.     8 U.S.C. § 1252(g) does not bar review.

"Section 1252(g) does not sweep broadly," *Tazu*, 975 F.3d at 296; JA201 (collecting cases), but is "narrow[ly]" tethered to exercises of discretion by the Attorney General and "applies only to three discrete actions": "to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). Other "decisions or actions that may be part of the deportation process" do not fall within 1252(g)'s limited scope because

they do not interfere with the Attorney General's, or DHS Secretary's,[14] prosecutorial discretion—the "particular evil" that 1252(g) was directed against. *Id.* at 482, 485 n.9; *accord Öztürk*, 136 F.4th at 396-97. Since *AADC*, the Supreme Court has continued to emphasize 1252(g)'s "narrow" ambit. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020); *see Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018).

Respondents argue that 1252(g) strips jurisdiction over Petitioner's challenge to the Rubio Determination because it "is necessary to, and inextricably intertwined with, removal and detention." Br. 29. But this ignores the plain text of the provision and this Court's instruction that 1252(g) does not apply to challenges to the absence of legal authority. *Garcia v. Att'y Gen. of U.S.*, 553 F.3d 724, 729 (3d Cir. 2009). In any case, unlawful *detention* claims are beyond 1252(g)'s reach.

First, 1252(g) applies only to the three discrete actions listed in the statute as undertaken "*by the Attorney General.*" 8 U.S.C. § 1252(g) (emphasis added). Here, Petitioner challenges the *Secretary of State's* determination, and the preliminary injunction bars Respondents only from

---

[14] In 2002, Congress transferred immigration enforcement authority to the DHS Secretary. 8 U.S.C. § 1103(a); 6 U.S.C. § 202(3).

"seeking to remove" him on *that* basis. JA19. The Rubio Determination is a non-prosecutorial, *prior* action taken by a *different* Executive Branch official, and 1252(g) does not reach claims "challen[ging] Government actions taken *before* the Attorney General tried to pursue removal." *Tazu*, 975 F.3d at 298 (emphasis added)); JA201. Even if the Rubio Determination is "necessary to . . . removal and detention," Br. 29, it is a prior decision that regulates criteria for a noncitizen's lawful status that does not *require* the Attorney General to take any action at all. In other words, the Rubio Determination could stand alone without the Attorney General exercising discretion to seek Petitioner's removal, and a challenge to the Rubio Determination thus does not interfere with the "discretion-protection" function of 1252(g). *AADC*, 525 U.S. at 487; JA202.

Respondents argue that 1252(g) applies because the *relief* the district court ordered covers actions by the DHS Secretary and the IJ. Br. 29, 31-32. But 1252(g) bars review only of a "cause or claim" arising from the Attorney General's decisions to undertake the three specified acts, and courts retain inherent jurisdiction to enforce their orders with respect to other claims. *Cahill v. Insider Inc.*, 131 F.4th 933, 938 (9th Cir. 2025). Petitioner's underlying *claim* does not challenge a covered action. Had Congress wished

to prohibit certain *remedies* in 1252(g), it would have done so explicitly, as it did in neighboring provisions of 1252. *See, e.g.*, 8 U.S.C. § 1252(e)(1), (f); *see also Nken*, 556 U.S. at 430-31 (applying expressio unis canon where provisions at issue "were enacted as part of a unified overhaul of judicial review procedures").[15]

Second, section 1252(g) is "not implicated" where, as here, Petitioner challenges the "very authority" to seek removal on an unlawful basis. *Garcia*, 553 F.3d at 729. "[U]nless the Attorney General first has authority under the [INA] to remove an alien, § 1252(g) cannot shield the Attorney General's discretionary use of that authority." *Tazu*, 975 F.3d at 297; *see United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc) ("The district court may consider a purely legal question" that "forms the backdrop against which the Attorney General later will exercise discretionary authority . . ."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (similar). Here,

---

[15] Even if 1252(g) applied to remedies, this Court has held that its prohibition on review of the Attorney General's discretion to "adjudicate cases" encompasses only "prosecutorial" actions—such as the decision "to indict a criminal and bring him to trial"—but does not encompass "quasi-judicial decisions" by the immigration courts like the one addressed by the district court's orders here. *Chehazeh v. Att'y Gen. of the U.S.*, 666 F.3d 118, 135 (3d Cir. 2012); *see Barahona-Gomez v. Reno*, 236 F.3d 1115, 1121 (9th Cir. 2001) (collecting cases).

the district court found that the Constitution likely "took away the Attorney General's authority," *Tazu*, 975 F.3d at 298, to detain and remove Petitioner based on the Rubio Determination, because that Determination was unlawful. Respondents' cases are inapplicable because they do not involve challenges to the validity of removal orders the Attorney General sought to execute. Br. 30 (citing *Tazu*, 975 F.3d at 298 (petitioner identified "no flaw" in Attorney General's "authority to remove him"); *E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021) (challenging "DHS's execution of her admittedly valid removal order"); *Cardoso v. Reno*, 216 F.3d 512, 517 (5th Cir. 2000) (similar)); *cf. Duarte v. Mayorkas*, 27 F.4th 1044, 1055 (5th Cir. 2022) (1252(g) did not bar challenge to USCIS's legal authority to adjudicate petitioners' cases).

*AADC* does not control here, Br. 30-31, because Petitioner is not an "alien unlawfully in this country" whom the government has selectively targeted for an otherwise valid removal on additional terrorism-related grounds. 525 U.S. at 491-92; JA195. He is a lawful permanent resident whom the government has attempted to *render* removable via the Rubio Determination, which purports to set speech-related criteria to maintain lawful status. JA1100; JA1045-52. It is that Determination that Petitioner challenges on constitutional grounds, not any selective enforcement against

someone who is already removable. Petitioner has "adduced plausible—indeed, strong" and uncontroverted—"evidence" that the government retaliated against him based on his constitutionally protected speech and in order to chill the speech of others. *Ragbir v. Homan*, 923 F.3d 53, 73 (2d Cir. 2019) (finding that petitioner had "alleged discrimination" that "qualifies as 'outrageous' under *AADC*"), *cert. granted, judgment vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020). "To allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to . . . deportation but also . . . citizens and other residents who would fear retaliation . . . ." *Id.* at 71.

Third, even if 1252(g) reaches Petitioner's challenge to *removal* based on the Rubio Determination, it does not bar his *detention* claim. Respondents argue that 1252(g) applies to that claim because detention is the "method by which the Secretary of Homeland Security chooses to commence proceedings." Br. 28. But this "dramatically overstates the reach of § 1252(g)." *Öztürk*, 136 F.4th at 396. The phrase "arising from" in section 1252(g) is not "infinitely elastic" and "does not reach claims that are independent of, or wholly collateral to, the removal process." *Id.* at 397-98 (cleaned up) (collecting cases). Petitioner's detention claim is collateral to the

removal process because it can "be resolved without affecting pending removal proceedings." *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999); *see Öztürk*, 136 F.4th at 398; *Madu*, 470 F.3d at 1368; *Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 698, 700 n.4 (9th Cir. 2021) (1252(g) did not bar First Amendment detention challenge).[16] This Court should not adopt a broad reading of section 1252(g) that would shield virtually all unlawful detention claims from review and allow the government to "detain noncitizens indefinitely without needing to provide a justification to anyone." *Kong v. United States*, 62 F. 4th 608, 614-16 (1st Cir. 2023) (reviewing legislative history).

### B.    8 U.S.C. § 1252(b)(9) does not bar review.

Respondents contend that section 1252(b)(9) bars review of Petitioner's claims even though he has not been issued a final order of removal, and because he can receive meaningful review on a petition for review ("PFR"). Br. 34-38. They are wrong.

First, this Court has held that section 1252(b)(9) applies only to review of a final order, which has not been issued in this case. *Chehazeh*, 666 F.3d at

---

[16] *Tazu* (cited at Br. 28), which involved a challenge to the execution of a removal order and the "brief door-to-plane detention" required to execute that order, 975 F.3d at 298, is inapposite here.

131-33; JA130-39; *see Öztürk*, 136 F.4th at 399.[17] Section 1252(b)(9) is subject to the limitations of section 1252(b), which "by its own terms," applies to "'review only of a final order of removal.'" *Chehazeh*, 666 F.3d at 131 (cleaned up) (citing 8 U.S.C. § 1252(b), (a)(1)); *see* JA131; *see also St. Cyr*, 533 U.S. at 313. Respondents' interpretation completely ignores the very first words of § 1252(b). But consistent with the plain text, this and other circuits have limited (b)(9) to final orders. *See, e.g., Öztürk*, 136 F.4th at 399; *Suri*, 2025 WL 1806692, at *9; *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007); *Madu,* 470 F.3d at 1367.

Respondents suggest that *Chehazeh* is "no longer good law" in light of *E.O.H.C.* Br. 35. But as the district court explained, *E.O.H.C.* is not inconsistent with *Chehazeh* and does not overrule it. JA134-35; *see* Third Circuit I.O.P. 9.1; *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009). Nor did *Jennings* implicitly overrule *Chehazeh*. JA135-39 *(contra* Br. 35); *see Cabeda v. Att'y Gen. of U.S.*, 971 F.3d 165, 171 (3d Cir. 2020). The plurality opinion by Justice Alito simply held that section 1252(b)(9) did not channel

---

[17] 8 U.S.C. § 1252(a)(5) likewise applies only to review of final orders of removal. *See St. Cyr*, 533 U.S. at 311, 313; *Kumarasamy v. Att'y Gen. of U.S.*, 453 F.3d 169, 172 (3d Cir. 2006).

unlawful detention claims because they did not "arise from" removal proceedings. *Jennings*, 583 U.S. at 292-95. It said *nothing* about whether (b)(9) would otherwise apply before a final order of removal. And three Justices in dissent suggested that it cannot apply pre-final order. *Id.* at 876 (Breyer, J., dissenting).

Second, even if 1252(b)(9) applied to pre-final-order claims, habeas review of Petitioner's retaliatory detention and removal claims is required to provide "meaningful" relief. *Jennings*, 583 U.S. at 293.

"[T]he applicability of 1252(b)(9) turns on whether the legal questions that [a court] must decide 'aris[e] from' the actions taken to remove" noncitizens, and the phrase must be construed narrowly to avoid "extreme" results. *Id.* Justice Alito explained that "arising from" is not self-defining, but a technical term when used in jurisdictional statutes and that courts must "eschew[] uncritical literalism" when interpreting such "capacious phrases," *id.* at 293-94 (cleaned up) (collecting cases), in favor of limiting constructions that give effect to "the broad scope Congress intended while avoiding . . . susceptibility to limitless application," *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016); *see Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 943 (5th Cir. 1999) ("'arising from' does seem to describe a nexus

somewhat more tight than the also frequently used phrase 'related to'"). Applying this principle to (b)(9), the *Jennings* plurality concluded that "arising from" does not encompass claims that would be "effectively unreviewable" by the time a final order of removal is entered. 583 U.S. at 293.

Consistent with this reasoning, and for the same reasons that 1252(g) does not cover actions preceding removal, *supra* Part II.A, "arising from" as used in 1252(b)(9) cannot sweep in claims challenging actions that took place *before* removal is sought. Otherwise, the government could elude judicial review of those actions entirely by simply declining to initiate a removal proceeding. Thus, for example, Respondents could issue an executive order stating that all noncitizens who engage in pro-Palestine expressive activity compromise a compelling foreign policy interest and are therefore subject to removal, but then decide not to serve anyone with an NTA. Were 1252(b)(9) read broadly to cover such an action, the government could rely on the executive order as a Sword of Damocles to censor protected speech by noncitizens yet indefinitely avoid judicial review of its First Amendment violation. The government could specify individuals in such an order to silence them in particular while declining to file NTAs against them. *See, e.g.,*

Gov't Letter, *Chung v. Trump*, No. 25-cv-2412 (June 4, 2025), ECF No. 56 (exercising "broad discretion" and declining to issue NTA pursuant to same Rubio Determination).

The mere fact that, here, DHS chose to file an NTA and initiate removal proceedings soon after Secretary Rubio issued his Determination does not change the statutory analysis. Petitioner's First Amendment claims and injuries "aris[e] from" the Rubio Determination, Br. 51, which was undertaken pursuant to a policy of punishing noncitizens for their pro-Palestine speech and silencing others. It is a predicate action that *renders* Petitioner subject to removal but it does not "aris[e] from" an "action taken to remove" him, as cases addressing 1252(g) have explained. *See, e.g., Wong v. United States*, 373 F.3d 952, 964 (9th Cir. 2004) (claims "aris[ing] from "discriminatory animus that motivated" prior actions that "*resulted in* the INS's decision to commence removal" were not barred); *Humphries*, 164 F.3d at 944 (it would "defy logic" to hold that claims challenging actions that took place before removal "somehow 'aris[e] from' decisions and actions accomplished only after the injury allegedly occurred").

In addition, from *Jennings* and "the usual presumptions favoring judicial review," this Court has derived a simple now-or-never principle that

informs how it construes the phrase "arising from": "When a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." *E.O.H.C.*, 950 F.3d at 180, 186; *see* JA140-50; *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) (similar).

Petitioner raises a quintessential "now-or-never" claim. His "core argument is that his free speech and due process rights are being violated, *now*," *Mahdawi*, 136 F.4th at 452; JA199-200, due to the application of the unconstitutionally vague Rubio Determination. By subjecting him to retaliatory detention and threatening him with removal, Respondents seek to censor his speech and that of others who similarly would speak out in support of Palestinian rights, JA13-18; JA1029 ¶ 8; JA1050 ¶ 91; JA 1102 ¶¶ 13-14, and intentionally further the unconstitutional objective of censoring "timel[y]" political speech when it could still influence public debate, *Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976). If Petitioner were forced to wait until the end of a lengthy PFR process to raise his challenge, "relief [would] come too late to redress these conditions of confinement," *E.O.H.C.*, 950 F.3d at 186, and First Amendment injuries, rendering his constitutional claims "effectively unreviewable" and accomplishing the unlawful object of his

detention, *Jennings*, 583 U.S. at 293; JA 184-89. Indeed, prior restraints on speech are the most disfavored type of speech regulation because government censorship "is immediate and irreversible." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); JA187-88. "Delayed review" here "may mean no review at all." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 47 (2000) (Thomas, J., dissenting).

Moreover, the constitutional claims at the heart of this case cannot be meaningfully adjudicated on a PFR because the IJ lacks authority to develop an adequate factual record, consider constitutional claims, and lacks special expertise. JA154-178; JA161-62; JA1650-53; *Öztürk*, 136 F.4th at 400-01. That IJs are "empowered to develop *a* [factual] record," Br. 36 (emphasis added), does not mean that it is an adequate one. *Boumediene*, 553 U.S. at 792 (noting concerns with limiting review "to a record that may not be accurate or complete"). Indeed, IJs are limited by statute, regulation, and binding BIA precedent from developing a record of the retaliatory purpose of Petitioner's detention or the Rubio Determination, ECF 183—a fact that is evident from the scant record on the constitutional issues created by the IJ in this case. JA161-62.

*Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996), does not control here and, if anything, further supports Petitioner's argument that meaningful review cannot be had on a PFR. *Massieu* did not involve the infringement of free expression interests, which requires "a faster-than-usual timeline" than the PFR process would provide. JA181-83. And back then, the immigration court "could realistically . . . push things forward" by gathering facts and bringing its expertise to bear. JA179. But after this Court's *Massieu* decision, the BIA concluded that an IJ cannot look behind the Secretary's determination, JA175 & n.55 (citing *In re Ruiz-Massieu*, 22 I. & N. Dec. 833 (BIA 1999)), precluding future IJs from peeking behind the Secretary's determination or adducing facts relevant to assessing its legality, such as retaliatory or viewpoint discriminatory purpose. Even after *McNary v. Haitian Refugee Ctr., Inc*, 498 U.S. 479 (1991), Br. 37-38, the Supreme Court and this Court have construed 1252(b)(9) to exempt now-or-never claims—such as Petitioner's—that cannot receive meaningful review on a PFR.

Third, at the very least, 1252(b)(9) does not channel Petitioner's unlawful detention claims. The Supreme Court has repeatedly affirmed that district courts retain jurisdiction over claims of illegal civil immigration detention. *Jennings*, 583 U.S. at 293 (rejecting expansive reading of (b)(9)

that would render claims of "excessive detention" "effectively unreviewable"); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019); *Johnson v. Guzman Chavez*, 594 U.S. 523, 533 n.4 (2021); *Regents*, 591 U.S. at 19. This Court and others have reviewed such claims in habeas. *See, e.g., German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 210 (3d Cir. 2020); *E.O.H.C.*, 950 F.3d at 187 (reviewing claim under 1997 *Flores* Settlement Agreement); *Black v. Decker*, 103 F.4th 133, 138-39 (2d Cir. 2024); *Kong*, 62 F.4th at 609; *Miranda v. Garland*, 34 F.4th 338, 352-53 (4th Cir. 2022); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1079 (9th Cir. 2006). And in enacting the REAL ID Act of 2005, Congress "stated unequivocally" that 1252(b)(9) "should not be read to preclude" "challenges to detention," because "detention claims are 'independent of challenges to removal orders.'" *Aguilar*, 510 F.3d at 11 (quoting H.R. Rep. No. 109-72 at 175, *reprinted in* 2005 U.S.C.C.A.N. at 300); *see E.O.H.C.*, 950 F.3d at 186. By the time a final order of removal is eventually entered—if one is entered at all—Petitioner's pre-order, "excessive detention would have already taken place" and he would be deprived of any "meaningful chance for judicial review." *Jennings*, 583 U.S.

at 293. Thus, "cramming judicial review" of his detention into a PFR would be "absurd." *Id.* [18]

Moreover, "[t]he question is not whether detention is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action." *Jennings*, 583 U.S. at 295 n.3; *accord Öztürk*, 136 F.4th at 399. And the legal questions with respect to Petitioner's claim of unlawful detention—whether "the government arrested [and detained him] to punish speech with which it disagrees"—arise from his detention, not his removal proceedings. *Mahdawi*, 136 F.4th at 452. To be sure, Petitioner's challenge to detention based on the Rubio Determination raises similar legal questions as his challenge to removal on that basis, but "overlap, even substantial substantive overlap, does not make one claim arise out of the other." *Öztürk*, 136 F.4th at 400 (explaining why Respondents' broad reading would lead to "staggering results").

C. **Reading 1252 to bar review would raise serious concerns under the First Amendment and Suspension Clause.**

---

[18] In fact, Respondents' position is that constitutional challenges to detention cannot even be heard on a PFR of a removal order, and that Petitioner cannot seek release through a bond hearing before an IJ. ECF 156 at 10; *see Öztürk*, 136 F.4th at 400-01 (discussing limitations on IJ and BIA review of detention claim).

If sections 1252(b)(9) or (g) were construed to bar Petitioner's challenge to detention and removal based on the Rubio Determination, the statutes would raise serious questions under the First Amendment and Suspension Clause. This is yet another reason to hold that those provisions do not apply. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (applying canon of constitutional avoidance). Alternatively, were the Court to read 1252 to apply, both the First Amendment and Suspension Clause would independently require review of Petitioner's claims.

Reading 1252 to bar review would raise serious First Amendment concerns. JA184-90. As Justice Ginsburg explained in her concurrence in *AADC*, when "here-and-now speech impacts" are involved, JA184, "the Constitution requires immediate judicial intervention," 525 U.S. at 492 (Ginsburg, J., concurring), in order to mitigate the broad "chilling effect" that retaliatory actions can have on the exercise of First Amendment rights, *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965); JA188-90; *see Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023) (requiring immediate judicial review of "here-and-now injury" of being subject to an "illegitimate

proceeding").[19] Applied here, "interlocutory intervention in [immigration] proceedings would be in order, notwithstanding a statutory bar, if the [agency] acts in bad faith, lawlessly, or in patent violation of constitutional rights." *AADC*, 525 U.S. at 493. Petitioner has readily made that showing here. *See, e.g.,* JA1035-37; JA1045-48; JA1669 ¶¶ 4-6; JA685-91. The factual record is replete with unrebutted evidence that he was targeted for his speech and to silence public debate expressing similar viewpoints, and the district court found that the Rubio Determination as to him is likely unconstitutional. *See* JA281 n.60 (noting that "Petitioner's case is a First Amendment case").

Reading 1252 to bar review of Petitioner's detention would also raise serious concerns under the Suspension Clause, U.S. Const. art. I, § 9, cl. 2. *Cf. Jennings*, 583 U.S. at 323-326 (Thomas, J., concurring) (suggesting that barring review of unlawful detention claims if raised in habeas petition may violate Suspension Clause). Habeas is at "its core a remedy for unlawful executive detention." *Thuraissigiam*, 140 S. Ct. at 1970-71. As such, an adequate alternative to habeas must—at the absolute minimum—provide the

---

[19] The *AADC* majority did not disagree that immediate review is required to address First Amendment harms. 525 U.S. at 488 n.10; *see* JA192-94. Instead, it resolved the merits of the First Amendment question by determining that deportable noncitizens cannot raise a selective prosecution defense.

petitioner with "a meaningful opportunity to demonstrate that he is being held" unlawfully. *Boumediene*, 553 U.S. at 779. "And the habeas court must have the power to order the conditional release of an individual unlawfully detained." *Id*. A PFR that requires Petitioner to challenge his illegal detention *after* its retaliatory purpose (chilling of speech) has been effectuated, without an opportunity to *remedy* the illegal detention, is not an adequate alternative to habeas. *Cf. Boumediene*, 553 U.S. at 792 ("cumulative effect" of detainees' inability to challenge the executive's "legal authority to detain them," "contest the [administrative courts'] findings of fact," "supplement the record on review," and "request an order of release" was suspension of the writ).

III.    **The district court did not err in granting a preliminary injunction.**

    A.    **Petitioner is likely to succeed on his as-applied vagueness claim.**

        1.    <u>The Rubio Determination's application of the Foreign Policy Ground to punish Petitioner for his protected expression warrants the most stringent vagueness scrutiny.</u>

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S.104, 108 (1972). A law can be vague for two independent reasons: if the government fails to "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or if it would

"authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); JA 216-20. When regulations affecting speech are involved, particularly "rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012); *see Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (heightened scrutiny where regulation carries serious penalties). Because removal from the United States is "a particularly severe penalty," *Lee v. United States*, 582 U.S. 357, 370 (2017), Respondents' use of the Rubio Determination to render Petitioner removable in response to his expressive activities in the United States must satisfy the most stringent form of vagueness scrutiny. JA 285.

Respondents attempt to evade vagueness scrutiny here by arguing that the FPG (and its application to Petitioner through the Rubio Determination) is not susceptible to a vagueness challenge, because it does not regulate primary conduct. Br. 40-43. Respondents failed to press this argument below and have therefore forfeited it on appeal. *See Barna*, 877 F.3d at 147. The argument is also unavailing. The cases Respondents cite, Br. 40-42, held that vagueness analysis does not apply to statutes governing access to entitlements and privileges or to merely advisory guidelines. By contrast, removal is a

"severe penalty," *Lee*, 582 U.S. at 370, and "the most exacting vagueness standard" applies to laws rendering a noncitizen removable, "in view of the grave nature of deportation—a drastic measure, often amounting to lifelong banishment or exile." *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (plurality opinion); *see id.* at 183 (Gorsuch, J., concurring in the judgment). As then-District Judge Maryanne Trump Barry put it in her decision holding the FPG void-for-vagueness: "'Foreign policy' cannot serve as the talisman behind which Congress may abdicate its responsibility to pass only sufficiently clear and definite laws when those laws may be enforced against the individual." *Massieu v. Reno*, 915 F. Supp. 681, 702 (D.N.J.), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

Respondents argue that the FPG does not regulate primary conduct, because "the statute itself does not purport to control the alien's conduct or make it unlawful." Br. 41. Nonsense. Under the statute, a noncitizen may be rendered removable, a severe penalty, for "statements" that compromise a compelling foreign policy interest. That is a classic, direct, and intentional regulation of speech. *See United States v. Matchett*, 837 F.3d 1118, 1122 (11th Cir. 2016) (Pryor, J., respecting the denial of en banc rehearing) (recognizing that laws regulating speech are subject to vagueness review).

And it makes the penalized expression "unlawful"—i.e., it exposes noncitizens to legal penalties on account of their constitutionally protected expression. Respondents have also acknowledged that they are applying the FPG *here* to control speech: indeed, the Rubio Determination itself announces this fact. It states that Petitioner is rendered removable because "condoning*" his expression would "undermine a significant foreign policy objective." JA312; *accord* Br. 45. The Rubio Determination thus punishes Petitioner for his speech and serves to deter similar expression by other noncitizens.[20]

Respondents alternatively assert that the Rubio Determination is not subject to *heightened* vagueness scrutiny as a speech restriction, because *AADC* "expressly held that aliens are categorically prohibited from raising

---

[20] Respondents argue that the FPG cannot make speech unlawful because it applies only to speech that is "lawful within the United States." Br. 41. As the Rubio Determination itself acknowledges, however, the FPG authorizes the Secretary to penalize speech that is "*otherwise* lawful" in the United States when, in his view, it compromises a compelling foreign policy interest. JA311 (emphasis added). In other words, the FPG applies legal penalties to speech that does not violate any other law. Regardless, nomenclature cannot change the fact that the statute operates as a speech restriction, and is therefore subject to vagueness review, when applied to remove a noncitizen because of their expression. "[D]ue process protections against vague laws are not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute." *Dimaya*, 584 U.S. at 184 (Gorsuch, J., concurring in part) (cleaned up).

First Amendment retaliation claims to challenge their detention and removal." Br. 50. But this badly misrepresents *AADC*, which did not even involve a detention claim and merely held that "an alien *unlawfully in this country* has no constitutional right to assert *selective enforcement* as a defense against his deportation." 525 U.S. at 488 (emphases added). Petitioner is a lawful permanent resident who is not making a selective-enforcement defense to deportation, and *AADC* does not "bar[]," Br. 50-51, his vagueness claim.

### 2. The Foreign Policy Ground, as applied to Petitioner through the Rubio Determination, is unconstitutionally vague.

As the district court recognized, Petitioner is likely to succeed on his vagueness challenge to Respondent's application of the FPG to him through the Rubio Determination. JA223. The key statutory phrase—authorizing the Secretary of State to render a noncitizen subject to removal because their expression "undermines a compelling United States foreign policy interest"— refers to "the United States' relations with other countries," JA233, as confirmed by the court's thorough survey of dictionary definitions, *see* JA230-32. This reading of the statutory text was reinforced by the law's legislative history, which "generally suggests that Section 1227 removal was intended

---

50

for cases in which (a) the underlying conduct happened abroad or almost exclusively abroad, and (b) it was determined by the Secretary of State that the underlying conduct would have impacted U.S. relations with other countries," and its enforcement history, which "shows Section 1227 has generally been used over the years in keeping with the legislative-history blueprint." JA259; JA260-74.

Whereas the traditional sources of statutory meaning refer to activities abroad that affect the United States' relationship with foreign countries, the Rubio Determination "did not affirmatively determine that the Petitioner's alleged conduct has impacted U.S. relations with other countries. Indeed, the Secretary's determination says nothing about any country other than America." JA234. And it "described only activities undertaken by the Petitioner in the United States." JA240. The court concluded that the mismatch between the FPG's text, legislative history, and enforcement history on the one hand, and its application here through the Rubio Determination on the other, renders this novel application unconstitutionally vague. JA239-40. An ordinary person could not have anticipated that the FPG would apply to domestic expression that has not been found to affect America's relationships with foreign countries, and the Secretary's application of the

statute to such speech was totally ungrounded in the statutory text. JA239-40; JA300.[21]

Respondents contend that the district court's reading of the statute ignores the word "interest," which they maintain "encompasses *all* subjects in which the United States has a 'concern' that relates to its foreign policy," even if there is no impact on the United States' relationships with specific countries. Br. 44 (emphasis added). The district court called this the "external affairs" definition of "foreign policy interests." JA290. Respondents do not explain why the word "interest" compels that open-ended construction, rather than the district court's straightforward interpretation—i.e., the United States' interests in its relations with other countries. JA233. Nor do Respondents attempt to square their interpretation with the FPG's legislative or enforcement history. JA274.

And as the district court observed, Respondents' "external affairs" interpretation of the FPG would lead deeper into the vagueness thicket.

---

[21] Respondents complain that this is really an *ultra vires* claim that has no relation to the statute's vagueness. Br. 44. But the unforeseeable and retroactive enlargement of a punitive statute's scope is a well-established form of *as-applied* vagueness, regardless of whether the statute itself is vague. *See* JA238-39 (citing *Rabe v. Washington*, 405 U.S. 313, 315 (1972); *Bouie v. City of Columbia*, 378 U.S. 347, 351-56 (1964)).

JA291. Even a list of publicly identified "subjects in which the United States has a 'concern' that relates to foreign policy," Br. 41, encompasses everything from "preserving the trade of ethically sourced diamonds" to "promoting gender equality," JA292. The extent of these interests at any given time is unknowable. "There is no one-stop shop, no single place to see all of America's foreign policy interests put down on paper," JA295, and many of the interests themselves "are both enormously broad and fuzzy at their edges." JA296. "[I]f 'foreign policy' under section 1227 is taken to include interests in fostering world economic stability or in creating good will towards the United States," there is no way "to know where these begin and end." JA296-97.[22]

Respondents' construction of the FPG "leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *United*

---

[22] According to Respondents, the FPG's "requirements that the alien's activities 'compromise' a foreign policy interest that is 'compelling' mitigate" the vagueness inherent in their proposed construction. But these words do not refer to anything specific that could provide notice or cabin enforcement discretion. JA 249. And the FPG does not include a mens rea requirement, so that noncitizens can be punished even if they had no idea they had done anything to compromise a compelling foreign policy interest. *Id.* In any event, Respondents' proposed standard is so inherently vague that it cannot be cured by mitigating factors of any kind. *See United States v. Loy*, 237 F.3d 251, 265 (3d Cir. 2001).

*States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). Such an open-ended standard would be particularly problematic for a statute imposing severe penalties for speech. It would mean that noncitizens "have to go quiet" on just about any public issue that could draw this or any future administration's disapproval in order to avoid removal, "[b]ut having people go quiet because they cannot readily determine how to stay on the right side of the law—that is one of the things vagueness doctrine exists to guard against." JA283.

Respondents maintain that the problems the district court identified with their "external affairs" interpretation of the statute are *facial* concerns irrelevant to Petitioner's as-applied vagueness challenge. Br. 49. Respondents cannot fend off Petitioner's as-applied vagueness challenge by asking this Court to endorse an obviously unconstitutional interpretation of the statute. *Cf. Martinez*, 543 U.S. at 380-81 (if one of two plausible statutory constructions "would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court"). Nor would Respondents' interpretation obviate Petitioner's as-applied vagueness claim. As the district court asked, how could any reasonable person infer that the FPG encompasses *anything* that affects external affairs, when that interpretation is not supported by the

statute's text, legislative history, or enforcement history? JA290-91 n.69. And even if an ordinary person could figure out that combating antisemitism is a compelling "foreign policy interest" under the statute, there are no public criteria for assessing when or how that interest might be "compromised" by protected speech. JA283; JA290.

Respondents alternatively assert that Secretary Rubio "*did* determine that Petitioner's conduct affected 'the United States' relations with other countries,'" Br. 45, because it noted that "condoning anti-Semitic conduct and disruptive protests in the United States" would "undermine[] U.S. policy to combat anti-Semitism around the world and in the United States." JA1024. The use of the phrase "around the world" does not, however, imply that Petitioner's activities affected the United States' relationship with any foreign country. JA239. It simply describes the global scope of the government's policy.

Although Respondents baldly assert that "the United States' 'relations' with Israel would undoubtedly be affected if the United States tolerated or 'condoned' anti-Semitic activities in the United States," the Rubio Determination does not even mention Israel. Post-hoc pronouncement by counsel cannot cure the deficiencies on the Rubio Determination's face. And,

having successfully urged the district court not to peer behind the Rubio Determination in adjudicating Petitioner's as-applied vagueness claim, JA233-34 n.28, Respondents cannot now ask this Court to draw factual inferences or consider evidence beyond the four corners of the document to challenge the district court's finding.[23]

**B.   Alternatively, Petitioner is likely to succeed on his other claims.**

This Court "may affirm the district court on any ground supported by the record." *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999); *Kabakjian v. United States*, 267 F.3d 208, 213 (3d Cir. 2001) (same, "even if the district court did not reach it"). Here, where the extensive uncontested record demonstrates that the Rubio Determination was retaliatory in violation of the First Amendment and that Petitioner's detention was both retaliatory and served no legitimate purpose in violation of the Due Process Clause, the Court can and should affirm the preliminary injunction on these alternative grounds. The parties fully briefed these issues below. ECF 67, 124, 156, 175.

1.   The Rubio Determination was retaliatory in violation of the First Amendment.

---

[23] Even if Secretary Rubio *had* found that Petitioner's expression affected the United States' relationship with foreign countries, Petitioner still could not be punished for failing to forecast that his lawful domestic political expression could cause unspecified foreign policy harms. JA282–84.

First Amendment retaliation claims are analyzed under the two-step *Mt. Healthy* framework. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If Petitioner makes out a prima facie case that: "(1) [he engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights, and (3) [there was] a causal link between the constitutionally protected conduct and the retaliatory action," *Conard v. Penn. State Police*, 902 F.3d 178, 183 (3d Cir. 2018) (cleaned up), the burden shifts to Respondents to prove, by a preponderance of the evidence, they would have taken the same adverse action even absent the protected speech. *Mt. Healthy*, 429 U.S. at 287; *see Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000) (plaintiff prevails "if the protected conduct played any substantial role and the defendant is unable to carry its burden of showing" no adverse consequences). Petitioner plainly demonstrated each of the requisite elements here, and Respondents failed to meet their shifted burden.

First, the district court properly held there is "ample record evidence" that Petitioner has engaged in protected speech in support of Palestinian rights, JA13 n.5, n.6, political speech which "occupies the highest rung of the

hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Petitioner's status as a lawful permanent resident does not change this analysis, since "[f]reedom of speech and of press is accorded aliens residing in this country," *Bridges v. Wixon*, 326 U.S. 135, 148 (1945), and several courts have held specifically that the First Amendment protects noncitizens detained and threatened with deportation because of protected speech. *See, e.g.*, *Ragbir*, 923 F.3d at 71-72; *Bello-Reyes*, 985 F.3d at 698; *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018); *Rueda Vidal v. U.S. DHS*, 536 F. Supp. 3d 604, 619-23 (C.D. Cal. 2021).

Second, Respondents' attempts to remove Petitioner plainly constitute adverse action sufficient to deter a person of "ordinary firmness" from exercising their First Amendment rights. *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (explaining that the "deterrence threshold" for First Amendment retaliation claims is "very low"); *see Ragbir*, 923 F.3d at 71-72 (threat of removal constitutes adverse action). Separately, Petitioner's detention was also an adverse action sufficient to satisfy this prong of the analysis. *See Ercelik v. Hyde*, 2025 WL 1361543, at *11 (D. Mass. May 8, 2025); *see also Mohammed H. v. Trump*, 781 F. Supp. 3d 886, 892 (D. Minn. 2025); *Aditya W. H. v. Trump*, 782 F. Supp. 3d 691, 707 (D. Minn. 2025). In

addition, the record is replete with uncontested evidence that Petitioner's detention actively chilled his speech and that of others. JA13; JA1092-97; *Ragbir*, 923 F.3d at 71 (considering chill upon "citizens and other residents").

Third, again the undisputed record shows that Respondents' decision to target Petitioner was, and continues to be, substantially motivated by his protected activity. To prove causation, Petitioner need only show that his protected activity was "*a* substantial" or "*a* motivating factor" in Respondents' decision to take adverse action against him. *Mt. Healthy*, 429 U.S. at 287 (cleaned up and emphases added); *see Falco v. Zimmer*, 767 F. App'x 288, 311 (3d Cir. 2019). Evidence of a causal link may include government statements, timing and proximity of the adverse action, a pattern of antagonism, and other evidence "gleaned from the record as a whole." *Conard*, 902 F.3d at 184 (citation omitted); *see Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). All are present here.

Respondents first arrested and detained Petitioner *concededly* in direct response to his speech and for only that reason. JA1045-50 ¶¶ 73-91; JA1023-24 (Rubio Determination); JA588 (NTA). Thus, although retaliatory motive is "almost never subject to proof by direct evidence," *Watson*, 834 F.3d at 422, here there is such direct evidence, *see Miller v. Mitchell*, 598 F.3d 139,

152-55 (3d Cir. 2010) (threats to prosecute protected speech constituted direct evidence of retaliatory motive).

Moreover, the causal connection between Petitioner's protected speech and his targeting is evidenced by the government's own executive orders outlining plans to target pro-Palestinian advocacy and public statements reflecting hostility towards pro-Palestine speech and praising his arrest and detention as a "blueprint" for future immigration enforcement. JA1046 ¶ 77; *see* Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (instructing agencies to target noncitizens who "espouse hateful ideology"); Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025) (instructing agencies to investigate "campus anti-Semitism"); ECF 345-6 (Exec. Order No. 14188 "Fact Sheet" (Jan. 30, 2025) (describing the order as a "promise" to "deport Hamas sympathizers," sending a message to all "resident aliens who joined in the pro-jihadist protests" that the government "will find you . . . and deport you"); JA500-25, JA685-1018 (collecting interviews, public statements, and reporting where Respondents conflate any participation in pro-Palestinian advocacy or protest with being "pro-jihadist," "pro-Hamas," and antisemitic); *see also Ragbir*, 923 F.3d at 70-71 (citing remarks of immigration officials as indicia of retaliation); *Gutierrez-Soto,* 317 F. Supp. 3d at 934 (same);

*Mohammed H. v. Trump*, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025) (same in the context of "students who express support for Palestine or criticize Israel").

Respondents' addition of a second ground for removal and detention—the Post-Hoc Charge—reinforced the retaliatory nature of Petitioner's initial arrest and detention. *See Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir. 1997) ("Government compounded" retaliatory harm); *Ragbir*, 923 F.3d at 79 (near-in-time retaliation carries "taint of the unconstitutional conduct"); *Watson*, 834 F.3d at 424 (similar). Faced with a petition and a preliminary injunction motion challenging the constitutionality of the Rubio Determination, Respondents promptly made the "extraordinary decision," JA349, to add a highly unusual (let alone meritless and frivolous, JA1122-24, 1392-94) charge that, as the record indisputably confirms is rarely, if ever, brought against lawful permanent residents with no criminal history. JA1388, JA1392-94, JA1418, JA1546-47 (declarations regarding rarity of charge and frequency with which it is waived).

In addition to evidence regarding timing, the record is replete with evidence of a "pattern of antagonism" and retaliatory conduct. *Watson*, 834 F.3d at 422. The pattern began with Petitioner's warrantless arrest and

unusual detention more than a thousand miles away from his then-pregnant wife. JA1040-42 ¶¶ 48-57; JA1416. It continued with the taunting statements government officials made publicly celebrating his detention and promising the detention of others. *See, e.g.*, JA1045-47 ¶¶ 73-81. Petitioner sued, and since then Respondents have added an unusual removal charge, held him in detention on unusual grounds, and criticized his recent release by further suggesting he "self-deport." JA1769. Petitioner's case also falls within a broader pattern of antagonism involving other students and professors engaged in pro-Palestine speech where Respondents have engaged in similar conduct: unusual arrests, relocation, and detention. JA507, JA685-831, JA1241-46, JA1444-45.

In response to Petitioner's prima facie showing of retaliation, Respondents did not attempt to create any record showing they would have taken the same adverse actions absent his protected speech. *See Mt. Healthy*, 429 U.S. at 287. Instead, they argued only that they have a "facially valid" ground for removal, ECF 156 at 28, and that the Court need not inquire further. But "[d]iscriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid." *Hill v. City of Scranton*, 411 F.3d 118, 130 (3d Cir. 2005); *see Anderson*, 125 F.3d at 161

(same, with respect to "retaliation for his exercise of First Amendment speech.").

Indeed, Respondents' arguments below appear to concede that they would fail the *Mt. Healthy* analysis and suggest instead that *Nieves v. Bartlett*, 587 U.S. 391 (2019), should apply to Petitioner's retaliation claims. *See* ECF 156 at 28. But *Nieves*, which held that a litigant who seeks *damages* to redress a retaliatory criminal arrest by a police officer must prove the absence of probable cause for the arrest, does not apply to this case.

Tellingly, Respondents could point to "no case in which a court has applied *Nieves* in the civil context," since "courts have declined to extend *Nieves* beyond" criminal arrests, where officers "must make 'split-second' probable cause judgments and thus rely on protected speech to obtain 'vital information' about a suspect." *Media Matters v. Bailey*, 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024) (cleaned up) (quoting *Nieves*, 587 U.S. at 401). In the immigration context, courts have held that even an "undisputedly valid final order of removal" does not bar a noncitizen's habeas "claim that Government officials sought to deport him in retaliation for his speech," *Ragbir*, 923 F.3d at 67, and that probable cause to revoke an immigration bond does not defeat a noncitizen's habeas claim for retaliatory arrest and

detention, *Bello-Reyes*, 985 F.3d at 701. In these cases, courts "apply *the Mt. Healthy* standard, the default rule for First Amendment retaliation claims." *Id.* at 702; *see Ragbir*, 923 F.3d at 66-67.[24]

Finally, Respondents argued below that the First Amendment does not protect noncitizens from retaliatory arrest, detention, or removal based on their political beliefs and expression, ECF 156 at 30, relying principally on *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952). But, while *Harisiades* upheld the deportation of noncitizens based on their Communist Party membership, it did so on the ground that such membership was not protected under then-current First Amendment doctrine. 342 U.S. at 592 & n.18 (citing *Dennis v. United States*, 341 U.S. 494 (1954)). "[R]ead properly, *Harisiades* establishes that deportation grounds are to be judged by the same standard applied to other burdens on First Amendment rights." *Am.-Arab Anti-*

---

[24] *See also* JA913-34 (scholarly article discussing retaliation claims in the immigration context). Even if *Nieves* did apply to some claims involving civil arrests, this case would fall under an exception to the *Nieves* rule for "arrests that result from official policies of retaliation." 587 U.S. at 398 (citing *Lozman v. City of Riviera Beach*, 585 U.S. 87, 99-101 (2018) (in cases where retaliation stems from a policy, there is "a compelling need for adequate avenues of redress," and the *Mt. Healthy standard* applies)). There is just such a policy here. *See supra* Part III.A.1; JA1036-39; JA1045-50; JA685-1018.

*Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995).[25]

Likewise, *Kleindienst v. Mandel*, 408 U.S. 753 (1972), is inapposite, as it merely held that "*unadmitted* and *nonresident* alien[s] ha[ve] no constitutional right of *entry* to this country." *Id.* at 762 (emphases added).

> 2.  Petitioner's detention violated his right to substantive due process.

The record also demonstrates that Petitioner's immigration detention violated due process because it was retaliatory and served no constitutionally permissible purpose. *Calderon-Rosas v. Att'y Gen. U.S.*, 957 F.3d 378, 385 (3d Cir. 2020) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *German Santos*, 965 F.3d at 210. Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (cleaned up). Petitioner's detention failed that test for two reasons.[26]

---

[25] *Dennis* and *Harisiades* have also been cabined by subsequent Supreme Court precedents. *See, e.g.*, 1 Smolla & Nimmer on Freedom of Speech § 10:19.

[26] Several courts have recently released noncitizens from detention premised on the government's retaliatory policy on substantive due process grounds. *See, e.g.*, *Öztürk*, 79 F. Supp. 3d at 493 ("[C]ivil immigration detention is not

First, the government detained Petitioner not for any bona fide law enforcement purpose but to punish him for his speech. Civil detention cannot be a "mechanism for retribution," *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (cleaned up), because "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives," *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20 (1979) (cleaned up). Petitioner's detention violated the Fifth Amendment because it was retaliatory and intended to punish him for his speech.[27]

Second, even in the absence of the affirmative evidence of punitive intent, Petitioner's detention violated due process because the uncontroverted evidence demonstrates, as the district court found, he is neither (1) a flight risk or (2) danger to the community, JA370 at 56:5-11, and therefore, his detention served no legitimate purpose. *See Demore v. Kim*, 538 U.S. 510, 531-32 (2003) (Kennedy, J., concurring); *Zadvydas*, 533 U.S. at 690; *German*

---

permissible for a punitive purpose."); *Mohammed H.*, 781 F. Supp. 3d at 895; *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025); *Ercelik*, 2025 WL 1361543, at *14.

[27] *Carlson v. Landon*, 342 U.S. 524 (1952), does not counsel otherwise. *Contra* ECF 156 at 26-27. *Carlson* involved a statutory scheme specifically authorizing detention of Communists pending removal because Congress found they posed special dangers. 342 U.S. at 541-42. There is no special detention scheme applicable to the FPG. *Cf., e.g.,* 8 U.S.C. § 1226(a) (detention scheme for terrorism-related removal grounds).

*Santos*, 965 F.3d at 214.[28] Indeed, Petitioner—a lawful permanent resident with no criminal history—is married to a U.S. citizen living in New York City with an infant U.S. citizen child. JA1028 ¶¶ 4-5; JA483-99, 594-609; JA471; JA1112-16 ¶¶ 4, 28-30; JA1099-1105 ¶¶ 5, 12, 15, 17; *see* JA8-21.

Because the government cannot justify Petitioner's detention based on constitutionally permissible purposes, it has ignored them and instead claimed broadly that "Congress authorized detention of aliens and gave the Executive significant discretion in that regard." ECF 310 at 2. But Congress cannot authorize unconstitutional detention. *See German Santos*, 965 F.3d at 208. Nor does the government have "discretion" to detain someone for unconstitutional reasons. *See Demore*, 538 U.S. at 511; *id.* at 532-33 (Kennedy, J., concurring).

## C. The district court did not err in finding irreparable harm.

Reviewing Petitioner's unrebutted evidence, the district court correctly found three separate forms of irreparable harm flowing from the Rubio Determination: (1) the chilling effect on Petitioner's expression; (2) harm to

---

[28] Below, Respondents attempted to cabin these cases as relevant only to prolonged detention. ECF 156 at 27. But the cases all affirm civil detention may be carried out only for nonpunitive purposes and must be tethered to flight risk and danger.

Petitioner's reputation; and (3) harm to Petitioner's career prospects. JA1472-79.

First, irreparable harm is presumed because the Rubio Determination infringes Petitioner's First Amendment freedoms. *See, e.g., Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020). That alone is a sufficient basis for affirming the district court's irreparable harm finding. *See, e.g., Stilp v. Contino*, 613 F.3d 405, 409 n.4 (3d Cir. 2010). And beyond the presumption, the district court found that the Rubio Determination "deters [Petitioner] from engaging in speech-related activities." JA1474; JA1478. In addition to separating Petitioner from his wife and newborn son, detention prevented him from participating in expressive activities on matters of public concern, a well-established form of irreparable harm. JA1474 (collecting cases); *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Although Respondents also filed the Post-Hoc Charge against Petitioner, the court found that "Petitioner's detention almost surely flows from the charge that is based on the Secretary of State's determination." JA1478. Respondents do not dispute this finding. Br. 51-52.

Respondents argue that the preliminary injunction against Petitioner's *removal* pursuant to the Rubio Determination cannot be justified on the basis

of any purported chilling effect, because (according to them) the Post-Hoc Charge supplies an independent basis for Petitioner's removal. Br. 52. But Petitioner's removability on that charge has not been finally adjudicated and its merits are dubious. *See* JA1392-93, JA1120-24, JA1104-05. Moreover, unlike the FPG, the Post-Hoc Charge provides for a routinely granted waiver of removal in cases where a lawful permanent resident has a U.S. citizen spouse or child. JA29-31. And the district court found that the Rubio Determination "is the likely reason that the . . . waiver has not been ruled on." JA31. If Petitioner's request for a routine waiver is granted, or if the Post-Hoc Charge is ultimately dismissed or enjoined, then the Rubio Determination would be the sole remaining justification for Petitioner's removal. And the possibility that Petitioner could be removed pursuant to the Rubio Determination, absent an injunction, supports the district court's finding that its chilling effect extends beyond Petitioner's detention. JA17-18 n.11.

Second, the district court found that the Rubio Determination harmed Petitioner's reputation and damaged his career. JA1473. These are also both long-recognized forms of irreparable harm. JA1473 (collecting cases). Without disputing this finding, Respondents argue that these harms derive not from their efforts to remove or detain Petitioner on the FPG charge but

from the Rubio Determination. Br. 51. But both can be true at once. Indeed, Respondents publicly boasted of Petitioner's arrest and detention pursuant to the Rubio Determination, in a grotesque attack on Petitioner's character that included the circulation of mugshot-style images and false accusations, JA1101, which predictably inspired third parties to harass his wife and family. JA1100 ¶ 9.

## IV. The district court did not err in granting Petitioner's release on bail.

### A. 8 U.S.C. § 1226(e) does not strip jurisdiction to order Petitioner's release on bail.

Respondents argue that section 1226(e) bars jurisdiction over Petitioner's release. Br. 53-54. Not so. "[O]ver and over again" courts have "held that there [is] insufficient clarity in 1226(e) . . . to strip habeas jurisdiction." JA329-31 (collecting cases); *Öztürk* 136 F.4th at 401 (citing *Demore*, 538 U.S. at 517); *Sylvain v. Att'y Gen. of U.S.*, 714 F.3d 150, 155 (3d Cir. 2013). As *Jennings* made clear, 1226(e) does not preclude challenges to the "extent of the Government's detention authority." 583 U.S. at 296; *see also Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 279 (3d Cir. 2018) (similar); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020); *Al-Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir. 2008). And Respondents are

incorrect in arguing that these cases are inapplicable here because the district court did not base its order on review of a constitutional challenge. Br. 37. Indeed, the court found that Petitioner raised a "substantial" due process claim that Respondents were "unconstitutional[ly]" using the Post-Hoc Charge to "punish" him for his speech. JA374-76. Moreover, nothing in 1226(e) reaches the district court's inherent authority to grant bail pending a habeas adjudication. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Johnston v. Marsh*, 227 F.2d 528, 530-31 (3d Cir. 1955); *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. DHS*, 484 F.3d 151,154 (2d Cir. 2007) (discussing *Mapp* and affirming its validity after enactment of section 1226(e)).

## B.   The district court properly granted Petitioner bail.

The district court properly granted Petitioner release, applying the extraordinary circumstances test from *Lucas*, 790 F.2d at 367, based on the: (1) extensive, uncontested evidence of lack of flight risk and dangerousness, JA367-70 at 53:12-56:16, (2) "highly, highly, highly unusual" nature of his detention, given the uncontested evidence that it is "overwhelmingly unlikely that a person would be detained" on the Post-Hoc Charge, JA371-72 at 57:9-58:5, (3) chilling effect on Petitioner's exercise of his First Amendment rights,

JA372-73 at 58:11-59:2, (4) inability of the immigration judge to consider whether release is constitutionally proscribed, JA373 at 59:3-16, and (5) existence of a substantial due process claim that the government is punitively detaining Petitioner in violation of the Fifth Amendment, JA374-76 at 60:18-62:6.

Respondents point to no error in the district court's factual findings. Instead, they argue the district court erred in applying *Lucas,* suggesting its analysis conflicts with the standard for a preliminary injunction under *Winter v. NRDC*, 555 U.S. 7 (2008), and this Court's holding in *Landano*, 970 F.2d 1230. Neither argument is correct.

First, the power of a habeas court to grant bail is not limited to the standards for a preliminary injunction under F.R.C.P. 65.[29] The habeas court's inherent authority to grant bail at the discretion of the judge derives from common law. *Johnston*, 227 F.2d at 531. This common law habeas power allows a federal court to order release prior to a determination of the legality

---

[29] The government's citation, Br. 56, to *Munaf v. Geren*, 533 U.S. 674, 682 (2008) (addressing a request for a preliminary injunction and saying nothing about bail standards), to support the application of *Winter* is unavailing.

of detention. *See, e.g., In re Kaine*, 55 U.S. 103, 133 (1852).[30] Nothing in Rule 65 displaces the habeas bail standard or otherwise restricts the flexible remedies available in habeas. 28 U.S.C. § 2243 (granting broad authority to "dispose of the matter as law and justice require").

Nor does Third Circuit precedent require otherwise. While an initial merits assessment may be a factor in a habeas court's decision to grant bail, this Court has never required a particular merits assessment as a universal precondition to habeas bail. In *Lucas,* this Court described the potential standards as "requiring that a habeas petitioner (1) make out a clear case for habeas relief on the law and facts, *or* (2) establish that exceptional circumstances exist warranting special treatment, *or* both." 790 F.2d at 367 (citations omitted and emphasis added). This Court adopted "the narrower 'extraordinary circumstances' test" in *Lucas* to "reflect[] the recognition that a preliminary grant of bail is an exceptional form of relief in a habeas corpus

---

[30] That release is cognizable in habeas does not mean that the bail order "amounts effectively to merits relief as a preliminary matter." Br. 56 (citing *Thuraissigiam*, 591 U.S. at 119). Temporary and conditional release on bail, solely for the pendency of proceedings, is a far cry from an ultimate determination on the petition. Despite his release on bail, Petitioner remains in "custody" for habeas purposes. *Jones v. Cunningham*, 371 U.S. 236, 243 (1963).

proceeding." *Id.* The Court noted that this approach is consistent with *Johnston*, which affirmed the district court's authority to grant bail in a case that did not involve a merits analysis. *Id.* at 366-67 (citing *Johnston*, 227 F.2d at 528).

In *Landano*, this Court discussed other courts' stricter standards in various post-conviction criminal habeas contexts but did not displace *Lucas*'s extraordinary circumstances test. 970 F.2d at 1242 (distinguishing post-conviction bail standards based on comity concerns).[31] The heightened standards that may apply when a petitioner challenges his custody post-conviction (having already received "the full range of constitutional rights" in his criminal prosecution, JA347) have no application here, where Petitioner is challenging the constitutionality of his ongoing executive detention in the only forum empowered to consider his claims.[32]

The district court did not, therefore, apply the wrong standard when it applied *Lucas* to hold that Petitioner has demonstrated extraordinary

---

[31] To the extent there is some conflict between *Landano* and *Lucas*, the predecessor *Lucas* opinion would apply. Third Circuit I.O.P. 9.1; *Tann*, 577 F.3d at 541.

[32] Even if the *Landano* standard applied, Petitioner would satisfy it based on any of his constitutional claims under the First and Fifth Amendment—and this Court may affirm on any basis in the record. *See supra* Part III.B.

circumstances meriting bail. Nor did it adopt a "merits-agnostic" order, Br. 55, given its findings of a substantial due process claim where Respondents disapproved of Petitioner's past speech, were "detaining and seeking to keep detained the petitioner . . . in the face of thick evidence [of lack of flight risk or dangerousness]", and "that this is overwhelming[ly] unlikely in the ordinary course"—all of which amounts to "an effort to use the immigration charge here to punish the petitioner." JA375 at 61:12-25.

Multiple courts have held that noncitizens challenging detention because of pro-Palestine speech have substantial First and/or Fifth Amendment retaliation claims warranting release on bail. *See Mahdawi*, 136 F.4th at 455; *Mahdawi*, 781 F. Supp. 3d at 228-30, *Suri*, 2025 WL 1806692, at *3-*4; *Öztürk v. Trump*, 2025 WL 1420540, at *6 (D. Vt. May 16, 2025); *Mohammed H.*, 781 F. Supp. 3d at 891-95; *cf. Aditya W. H.,* 782 F. Supp. 3d at 706-12..[33] And contrary to Respondents' arguments, Br. 57, *AADC* does nothing to diminish the strength of this due process claim. The Supreme Court

---

[33] Even outside the context of punitive and retaliatory detention, numerous courts have held that lack of flight risk and dangerousness can demonstrate an extraordinary circumstance. *See, e.g., Leslie v. Holder*, 865 F. Supp. 2d 627, 638 (M.D. Pa. 2012); *Moss v. Miniard*, 2024 WL 4326813, at *5 (E.D. Mich. Sept. 27, 2024).

has long held that immigration detention must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 (cleaned up); *Demore*, 538 U.S. at 532-33 (Kennedy, J., concurring). In light of all of the district court's extensive findings of fact and law, JA367-77, the district court did not abuse its discretion to grant bail.

## CONCLUSION

The Court should affirm the rulings of the district court.

Dated: September 10, 2025

*/s/ Robert Hodgson*

AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
Tel: (973) 854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Mudassar Hayat Toppa
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar
Michael K.T. Tan
Sidra Mahfooz
Brian Hauss
Esha Bhandari
Vera Eidelman
Tyler Takemoto
Brett Max Kaufman
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

WASHINGTON SQUARE LEGAL SERVICES,
INC.
Alina Das
Kyle Barron
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805

VAN DER HOUT LLP
Marc Van Der Hout
Johnny Sinodis
Oona Cahill
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

*Counsel for Petitioner–Appellee*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Robert Hodgson, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

/s/ Robert Hodgson
Robert Hodgson
*Counsel for Petitioner–Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Third Circuit by using the CM/ECF system. All counsel of record in this case are registered CM/ECF users.

*/s/ Robert Hodgson*
Robert Hodgson
*Counsel for Petitioner–Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as modified by the Court's August 19, 2025 minute order, because it contains 15,996 words and complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Charter typeface. I also certify that the text of the electronic and hard copies of this brief are identical.

*/s/ Robert Hodgson*
Robert Hodgson
*Counsel for Petitioner–Appellee*

## ANTI-VIRUS CERTIFICATION

I certify that an electronic copy of this brief was scanned for viruses using Windows Security anti-virus (version 1.435.67.0) and no virus was detected.

*/s/ Robert Hodgson*
Robert Hodgson
*Counsel for Petitioner–Appellee*