**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

**MAHMOUD KHALIL,**

*Petitioner-Appellee*

**v.**

**DONALD J. TRUMP, ET AL.,**

*Respondents-Appellants*

---

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY, NO. 25-1963 (MEF) (MAH)

---

**BRIEF FOR *AMICI CURIAE* INTERNATIONAL LAW PROFESSORS,
SCHOLARS, AND PRACTITIONERS**

Sarah H. Paoletti*
   * *Counsel of Record*
Transnational Legal Clinic
University of Pennsylvania
Carey School of Law
3501 Sansom Street
Philadelphia, PA 19104
T: (215) 898-8427
paoletti@law.upenn.edu
(In her individual capacity)

Paul L. Hoffman
200 Pier Ave, Suite 226
Hermosa Beach, CA 90254
T: (424) 297-0114

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Amici certify that Amici Curiae are all individuals appearing in their individual capacity, and are not corporations with a parent corporation, or corporations owned by a publicly held corporation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF AMICI CURIAE ...................................................................... 1

SUMMARY OF ARGUMENT .......................................................................... 2

ARGUMENT ..................................................................................................... 6

    **I.   International law requires the United States to respect the human rights to freedom of opinion, expression, association, and assembly**............. 6

    **II.  The U.S. government violated international law by applying an overly vague law to impose severe penalties on Mr. Khalil for exercising his fundamental rights.**........................................................................................ 11

        A.    Section 1227 is overly vague and discretionary, in contravention of international law's legality requirement. ....................................... 13

        B.    Appellants have not shown that their restrictions on Mr. Khalil's rights are necessary and proportionate to a legitimate purpose, as required by international law .............................................................................. 15

        C.    Appellants appear to be retaliating against Mr. Khalil for exercising his fundamental rights, in violation of international law. .............. 22

    **III.  Appellants' use of Section 1227 to target noncitizens for their protected activities is discriminatory, in violation of international law.** ....... 25

    **IV.  Reversing the District Court's injunction risks chilling the exercise of fundamental rights in the United States and abroad.** ................. 27

CONCLUSION.................................................................................................. 29

APPENDIX I      *List of Amici Curiae* ………....……………………………..30

COMBINED CERTIFICATIONS …………………………………………….38

# TABLE OF AUTHORITIES

**Relevant Case Files**

Appellants' Opening Br. — 12

Appellee's Resp. Br. — 11, 18, 21

Pet'r's Am. Mem. of Law in Supp. of Prelim. Inj. 15, ECF. No. 124 — 23

**U.S. Cases**

*Am. Ass'n of Univ. Profs. v. Rubio,* 780 F. Supp. 3d 350
(D. Mass. Apr. 29, 2025) — 28

*Chung v. Trump,* No. 25-cv-02412, 2025 WL 917666 (S.D.N.Y. Mar. 25, 2025) — 24

*Hartford Fire Ins. Co. v. Cal*., 509 U.S. 764 (1993) — 8

*Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713 (D.N.J. May 28, 2025) — 15

*Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1649197
(D.N.J. June 11, 2025) — 11, 21, 22

*Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64 (1804) — 2, 8

*Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025) — 24

*Öztürk v. Hyde*, 136 F.4th 382 (2d Cir. 2025) — 24

*Roper v. Simmons*, 543 U.S. 551 (2005) — 2, 7

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) — 6

*Suri v. Trump*, No. 25-1560, 2025 WL 1806692 (4th Cir. 2025) — 24

*Thompson v. Oklahoma,* 487 U.S. 815 (1988) — 7

**U.S. Statutes**

Immigration and Nationality Act                                              2, 14

8 U.S.C. § 1182(a)(3)(C)(iii)                                                   14

8 U.S.C. § 1227(a)(4)(C)                                               2, 3, 14, 18

**Other U.S. Government Documents**

Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed Reg 8451 (Jan. 20, 2025)                                                               18

Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025)                                                          18

Memorandum from Secretary of State Marco Rubio to Secretary of Homeland Security Kristi Noem, ECF 198-1                                                    3

S. Comm. on Foreign Rel., Rep. on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 1 (102d Sess. 1992)                          6, 7

**International Cases**

*Adylova et al v. Kazakhstan*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/140/D/3044/2017-3045/2017 (Aug. 20, 2024)                             17

*Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. (July 17, 2018)          13

*Alekseev v. Russian Federation*, Hum. Rts. Comm., U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013)                                       26

*Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016)

(May 29, 2019)     26

*Djavit An v. Turkey*, App. No. 20652/92, Eur. Ct. H.R. (Feb. 20, 2003)     10

*Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct.

H.R. (ser. C) No. 79 (Feb. 6, 2001)     9

*Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm., U.N. Doc.

CCPR/C/122/D/2252/2013 (May 24, 2018)     22

*Kivenmaa v. Finland*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/50/D/412/1990

(June 9, 1994)     10

*Komarovsky v. Belarus*, U.N. Hum. Rts. Comm., U.N. Doc.

CCPR/C/109/D/1839/2008 (Feb. 4,  2014)     20

*Marques de Morais v. Angola*, U.N. Hum. Rts. Comm., U.N. Doc.

CCPR/C/83/D/1128/2002 (Apr. 18, 2005)     21

*Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/139/D/3056-

3134/2018 (Oct. 12, 2023)     12, 17

*Park v. Republic of Korea*, U.N. Hum. Rts Comm., U.N. Doc.

CCPR/C/64/D/628/1995 (Nov. 3, 1998)     16

*Rabbae v. The Netherlands*, U.N. Hum. Rts. Comm., U.N. Doc.

CCPR/C/117/D/2124/2011 (Nov. 18, 2016)     4, 9, 17

*Ross v. Canada*, U.N. Doc. CCPR/C/70/D/736/1997 (2000)     19

*Schumilin v. Belarus*, No. 1784/2008, U.N. Doc. CCPR/C/105/D/1784/2008

(2012)                                                                                    19

**International Treatises**

American Convention on Human Rights, *adopted on* Nov. 22, 1969, 1144 U.N.T.S.

123                                                                                    7, 10

International Convention on the Elimination of All Forms of Racial Discrimination,

Dec. 21, 1995, 660 U.N.T.S. 195                                                       25, 26

International Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. 92-908,

999 U.N.T.S. 3                                                                        passim

Organization of American States, American Convention on Human Rights art. 7(5),

Nov. 22, 1969, 1144 U.N.T.S.123                                                       7, 10

Organization of American States, *Multilateral Treaties*, Signatories and

Ratifications, https://perma.cc/RK2E-N4N7                                              7

**U.N. Documents**

Comm. on the Elimination of Racial Discrimination, General Recommendation 30:

Discrimination against non-citizens, U.N. Doc CERD/C/64/Msc.11/rev.3 (Feb. 23-

Mar. 12, 2004)                                                                         25

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to

Freedom of Opinion and Expression), *Report of the Special Rapporteur on the*

*Promotion and Protection of the Right to Freedom of Opinion and Expression*,
U.N. Doc. A/75/261 (July 28, 2020)                          3, 9, 14, 16

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to
Freedom of Opinion and Expression), *Report of the Special Rapporteur on the
Promotion and Protection of the Right to Freedom of Opinion and Expression*,
U.N. Doc. A/HRC/38/35 (Apr. 6, 2018)                          4, 17

Farida Shaheed (Special Rapporteur on the Right to Education), *Academic Freedom*,
U.N. Doc. A/HRC/56/58 (June 27, 2024)                          9

Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the
Special Rapporteur on the Right to Education, Ms. Farida Shaheed on Her Visit to
the United States of America* (May 10, 2024)                          9

G.A. Res. 217A, Universal Declaration of Human Rights (Dec. 10, 1948)     7, 25, 26

G.A. Res. 66/164, Promotion of the Declaration on the Right and Responsibility of
Individuals, Groups and Organs of Society to Promote and Protect Universally
Recognized Human Rights and Fundamental Freedoms, U.N. Doc. A/66/164 (Dec.
19, 2011)                          23

Gina Romero (Special Rapporteur on the Promotion and Protection of the Right to
Freedom of Opinion and Expression), *Protecting the Rights of Freedom of
Assembly and Association from Stigmatization*, U.N. Doc. A/79/263 (July 31,
2024)                          20, 24, 27, 29

Hum. Rts. Comm., General Comment No. 15: The Position of Aliens Under the

    Covenant, U.N. Doc HRI/GEN/1/Rev. 1 (Apr. 11, 1986)         26

Hum. Rts. Comm., General Comment No. 31: Nature of the General Legal

    Obligation on States Parties to the Covenant, U.N. Doc. CCPR/C/21/Rev.1/Add.13

    (May 26, 2004)         26

Hum. Rts. Comm., General Comment No. 34 on Article 19: Freedoms of Opinion

    and Expression, U.N. Doc. CCPR/C/GC/34 (Sep. 12, 2011)         passim

Hum. Rts. Comm., General Comment No. 35 on Article 9: Liberty and security of

    person, U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014)         22

Hum. Rts. Comm., General Comment No. 37 on Article 21: The right of peaceful

    assembly, U.N. Doc. CCPR/C/GC/37 (Sep. 17, 2020)         passim

Irene Khan (Special Rapporteur on the Promotion and Protection of the Right

    to Freedom of Opinion and Expression), *Report on Global Threats to Freedom*

    *of Expression Arising from the Conflict in Gaza*, U.N. Doc. A/79/319

    (Aug. 23, 2024)         passim

Letter to the United States from the Mandates of the U.N. Special Rapporteur on

    Human Rights Defenders et al., at 4, U.N. Doc. AL USA 12/2024 (May 10, 2024),

    https://perma.cc/F9TD-8W79         9

Maina Kiai (Special Rapporteur on the Rights to Freedom of Peaceful Assembly

    and of Association), *Report of the Special Rapporteur on the Rights to Freedom*

*of Peaceful Assembly and of Association*, U.N. Doc. A/HRC/26/29

(Apr. 14, 2014)                                                    10

Margaret Sekaggya (Special Rapporteur on the Situation of Human Rights

Defenders), *Commentary to the Declaration on the Right and Responsibility of*

*Individuals, Groups and Organs of Society to Promote and Protect Universally*

*Recognized Human Rights and Fundamental Freedoms*, 71–72 (July 2011)      10

Irene Khan (Special Rapporteur on the Right to Freedom of Opinion and

Expression) et al., *U.S. Must Immediately Release Palestinian Rights-Activist*

*Mahmoud Khalil and Stop Threats of Deportation Against Foreign Residents, Say*

*U.N. Experts*, U.N. OHCHR (Mar. 20, 2025), https://perma.cc/7ULQ-NPNY  6, 28

*Deporting International Students Involved in Pro-Palestinian Protests Will Escalate*

*Trauma and Polarisation on US Campuses: U.N. Experts*, U.N. OHCHR (Mar. 17,

2025), https://perma.cc/KQ9B-SPY9                                   27

*Ratification Status of United States of America*, U.N. Treaty Body Database,

https://perma.cc/FP6F-MDS3                                          2, 6

U.N. ESCOR, 160th mtg., U.N. Doc. E/CN.4/SR.160 (1950)              8

U.N. GAOR, 3d Sess., 183d plen. mtg, U.N. Doc. A/PV.183 (Dec. 10, 1948)      7

**Books**

Amal Clooney & David Neuberger, *Freedom of Speech in International*

*Law* (2024)                                                        passim

Stuart Casey-Maslen, *Assemblies, Demonstrations and Protests*, *in* The Right to
Life Under International Law 308, 310 (2021) .................................................. 2

**Articles**

Louis Henkin, *Constitutional Rights and Human Rights*, 13 Harv. C.R.-C.L. L.
Rev. 593 (1978) .................................................................................................. 7

**Other Authorities**

Daniella Silva et al., *Trump Takes Aim at Foreign-Born College Students, With 300
Visas Revoked*, NBC News (Mar. 27, 2025, at 20:58 ET), https://perma.cc/E3JS-
SMKY .............................................................................................................. 24

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 11:05 ET),
https://perma.cc/BML5-GR84 ......................................................................... 28

Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders*,
OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015) ............................................... 23

Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights
Defenders in the Americas*, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011) ........ 14

Jazzmin Jiwa, *'I Could Be Next': International Students at Columbia University Feel
'Targeted' After Mahmoud Khalil's Arrest*, The Guardian (Mar. 19, 2025, at 11:00
ET), https://perma.cc/MBF6-XPJ5 .................................................................. 28

Jocelyn Gecker, *After Columbia Arrests, International College Students Fall Silent*,
ABC News (Mar. 15, 2025, at 01:09 ET), https://perma.cc/ZC2G-86JB ....... 28

Josh Dawsey et al, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post, May 27, 2024, https://www.washington post.com/politics/2024/05/27/trump-israel-gaza-policy-donors .......... 24

Michel Martin & Destinee Adams, *DHS Official Defends Mahmoud Khalil Arrest, But Offers Few Details on Why it Happened*, NPR (Mar. 13, 2025, at 04:18 ET), https://perma.cc/2DWY-GZV9 .......... 18

Restatement (Third) of Foreign Rel. § 114 (A.L.I. 1987) .......... 2, 8

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are international law and human rights professors, scholars, and practitioners.[2] *Amici* are deeply concerned that the government's reliance on the vague "foreign policy interest" provision of the Immigration and Nationality Act ("INA") to arrest, detain, and seek to deport Mr. Mahmoud Khalil violates his fundamental human rights to freedom of opinion, expression, association, and assembly and places the United States at odds with its obligations under international law.

This case, along with similar cases now proceeding in U.S. courts, has global implications. *Amici* believe that restrictions on fundamental rights in the United States could set a dangerous precedent that undermines the enjoyment of human rights worldwide. Given these stakes, *amici* respectfully submit this brief to encourage the Court to uphold the District Court's order enjoining Appellants from detaining or deporting Mr. Khalil for exercising rights protected by international law.

---

[1] No counsel for any party has authored this brief in whole or in part, no party or party's counsel—other than *amici* or their counsel—contributed money that was intended to fund preparing or submitting this brief.

[2] A list of *amici* is set forth in Appendix I. The positions taken in this brief are those of *amici* individually and should not be attributed to any institution with which *amici* are or have been affiliated.

## SUMMARY OF ARGUMENT

Under international law, the United States must respect the human rights to freedom of opinion, expression, association, and assembly. These rights are protected by, *inter alia*, the U.S.-ratified International Covenant on Civil and Political Rights ("ICCPR") and customary international law. International Covenant on Civil and Political Rights arts. 19, 21, 22, Dec. 16, 1966, T.I.A.S. 92-908, 999 U.N.T.S. 3 [hereinafter ICCPR]; *Ratification Status of United States of America*, U.N. Treaty Body Database, https://perma.cc/FP6F-MDS3; Amal Clooney & David Neuberger, *Freedom of Speech in International Law* 41–43 (2024) ("article 19 of the ICCPR has achieved customary status"); Stuart Casey-Maslen, *Assemblies, Demonstrations and Protests*, *in* The Right to Life Under International Law 308, 310 (2021) (right of peaceful assembly has achieved customary status). In determining whether the foreign policy provision of the INA, 8 U.S.C. § 1227(a)(4)(C), was lawfully applied to restrict Mr. Khalil's expressive activity, this Court should favor constitutional and statutory interpretations consistent with international law. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 575–78 (2005) (using international law to interpret constitutional protections); *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 81 (1804) (statutes should not be construed to conflict with international law); Restatement (Third) of Foreign Rel. § 114 (A.L.I. 1987) (same).

Appellants' arrest, detention, and attempted deportation of Mr. Khalil for his expressive activities—on the basis of purported "potentially serious adverse foreign policy consequences for the United States," Memorandum from Secretary of State Marco Rubio to Secretary of Homeland Security Kristi Noem, ECF 198-1 [hereinafter Rubio Determination] (citing 8 U.S.C. § 1227(a)(4)(C))—is inconsistent with international law. Freedom of opinion may not be restricted under any circumstances. And restrictions to freedom of expression, association, and assembly are permissible only when clearly and predictably provided by law, necessary and proportionate to serve a legitimate purpose, and non-discriminatory. ICCPR, *supra*, arts. 19(3), 21, 22; *see also* Hum. Rts. Comm., General Comment No. 34 on Article 19: Freedoms of opinion and expression, ¶¶24-25, U.N. Doc. CCPR/C/GC/34 (Sep. 12, 2011) [hereinafter GC No. 34]; Hum. Rts. Comm., General Comment No. 37 on Article 21: The right of peaceful assembly, ¶¶36, 39, U.N. Doc. CCPR/C/GC/37 (Sep. 17, 2020) [hereinafter GC No. 37].

Appellants fail to meet this demanding standard. Section 1227 is impermissibly vague, falling short of the legality requirement that restrictions be "drafted with sufficient precision to enable an individual to regulate [their] conduct accordingly." David Kaye, *Report of the Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, ¶24, U.N. Doc. A/75/261 (July 28, 2020) [hereinafter Kaye Report]. The provision confers

"unfettered discretion," *id.*, on the Secretary of State to impose grave sanctions based on a nebulous foreign policy interest. The statute does not indicate which activities are restricted, making it impossible for an individual to "regulate [their] conduct accordingly." *Id.*; *see also* GC No. 34, *supra*, ¶¶24–25. The government's use of this obscure provision to restrict protected speech was both unprecedented and unforeseeable, in contravention of the ICCPR's legality requirement.

The government also cannot demonstrate that the extreme actions of arresting, detaining, and attempting to deport Mr. Khalil are necessary and proportionate to serve a legitimate aim. The record indicates Petitioner was targeted under a broader government policy to penalize speech and protests supporting Palestinian human rights. Baldly asserting that the government acted to combat antisemitism does not, in itself, establish a legitimate purpose. While a government may restrict the rights to freedom of expression, assembly, and association when necessary to safeguard one of the ICCPR's expressly enumerated aims, "it must demonstrate in specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken…by establishing a direct and immediate connection between the expression and the threat." GC No. 34, *supra*, ¶36. Proportionality and necessity are "strict tests," *Rabbae v. The Netherlands,* ¶10.4, U.N. Doc. CCPR/C/117/D/2124/2011, requiring that states use the least restrictive means to actually protect a legitimate aim. David Kaye, *Report of the Special*

*Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression,* 7, U.N. Doc. A/HRC/38/35 (Apr. 6, 2018) [hereinafter Kaye 2018 Report].

The government fails to clear this bar. It has not demonstrated a "direct and immediate connection," GC No. 34, *supra*, ¶36, between Mr. Khalil's expressive activities and a legitimate interest, nor that detention and deportation of a lawful permanent resident impose "the least burden on the exercise" of rights. *Id.* Indeed, detention rarely passes scrutiny under the necessity prong because the penalty far exceeds simply limiting the expressive activity. The government's inability to justify its actions further suggests that it is using administrative processes to retaliate against Mr. Khalil for his speech, assembly, and association—another violation of international law. Finally, the government's targeting of noncitizens based on their viewpoints contravenes international law's prohibition against discrimination.

This Court should uphold the District Court's injunction to ensure that U.S. laws are applied consistently with international law and to safeguard the exercise of fundamental rights in the United States. Many of the world's leading human rights experts—appointed by governments at the United Nations ("U.N.") to monitor human rights globally—have expressed alarm that "U.S. authorities are openly weaponising deportation as a tool to censor critical voices, seriously damaging the precious rights of free speech and assembly that the U.S. has long cherished and

promoted at home and abroad." Irene Khan et al., *U.S. Must Immediately Release Palestinian Rights-Activist Mahmoud Khalil and Stop Threats of Deportation Against Foreign Residents, Say U.N. Experts*, U.N. OHCHR (Mar. 20, 2025), https://perma.cc/7ULQ-NPNY.

Indeed, the government's actions have already imposed a chill. Noncitizens fear that if individuals like Mr. Khalil can be detained and deported for disfavored speech, then they too could be punished for voicing opinions on social or political issues. For example, *amici* are aware of other similarly-qualified individuals who wished to join this brief but were deterred due to possible retaliation, including arrest or deportation. For these many reasons, *amici* respectfully urge this Court to affirm the District Court's ruling.

## ARGUMENT

### I. International law requires the United States to respect the human rights to freedom of opinion, expression, association, and assembly.

International law protects the rights to freedom of opinion, expression, association, and assembly, including through the ICCPR, ICCPR arts. 19, 21, 22, *supra*, a binding treaty that the United States ratified in 1992. *Ratification Status of United States of America*, *supra*; S. Comm. on Foreign Rel., Rep. on the ICCPR, S. Exec. Rep. No. 23, 3 (102d Sess. 1992) [hereinafter Senate Report on ICCPR Ratification]; *see also Sosa*, 542 U.S. at 735 (ICCPR "bind[s] the United States as a matter of international law...."). These rights also are enshrined in the Universal

6

Declaration of Human Rights ("UDHR"), G.A. Res. 217A, Universal Declaration of Human Rights arts. 19–20 (Dec. 10, 1948), [hereinafter UDHR], which the United States helped to draft and voted for in 1948, *see* U.N. GAOR, 3d Sess., 183d plen. mtg. at 933–34, U.N. Doc. A/PV.183 (Dec. 10, 1948) (recorded vote: 48-0-8), and the American Convention on Human Rights ("ACHR"), which the United States signed in 1977. Organization of American States, American Convention on Human Rights art. 7(5), Nov. 22, 1969, 1144 U.N.T.S.123; Organization of American States, *Multilateral Treaties*, Signatories and Ratifications, https://perma.cc/RK2E-N4N7 [hereinafter ACHR].

International law's treatment of these fundamental rights echoes the robust domestic protections of the U.S. Constitution's First Amendment. Senate Report on ICCPR Ratification, at 1; *see also* Louis Henkin, *Constitutional Rights and Human Rights*, 13 Harv. C.R.-C.L. L. Rev. 593, 609, 620 (1978). These rights are "cornerstones of a democratic society," Senate Report on ICCPR Ratification at 3, and critical to realizing all other rights, *see* UDHR Preamble. The U.S. Supreme Court has cited the ICCPR in interpreting constitutional protections. *See, e.g.*, *Thompson v. Oklahoma,* 487 U.S. 815, 831 n.34 (1988); *Roper*, 543 U.S. at 575–78. In *Murray v. Schooner Charming Betsy*, the Supreme Court established: "[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." 6 U.S. (2 Cranch) 64, 81 (1804); *see also Hartford*

*Fire Ins. Co. v. Cal.*, 509 U.S. 764, 814–15 (1993) (Scalia, J., dissenting); Restatement (Third) of Foreign Rel. § 114 (A.L.I. 1987).

**The right to opinion** protects the holding of "opinions without interference." ICCPR art. 19(1), *supra*. The U.N. Human Rights Committee, tasked with interpreting the ICCPR and state compliance with the treaty, observed that the ICCPR permits "no exception or restriction" on this right. GC No. 34, *supra*, ¶5. Importantly, "[a]ll forms of opinion are protected," whether of a "political, scientific, historic, moral or religious nature." *Id*. ¶9. A state party violates the ICCPR if it "criminalize[s] the holding of an opinion," or engages in acts of "harassment, intimidation, or stigmatization of a person, including arrest, detention, trial or imprisonment for reasons of the opinions they may hold." *Id.*

The **right to expression** includes the right "to seek, receive and impart information and ideas of all kinds." ICCPR art. 19(2), *supra*. When drafting the ICCPR, the United States affirmed that it was "devoted" to freedom of speech, noting that it "was one of the first freedoms to be stamped out when undemocratic regimes seized power." U.N. ESCOR, 160th mtg., ¶33, U.N. Doc. E/CN.4/SR.160 (1950); *see also Korneeko v. Belarus*, U.N. Hum. Rts. Comm., ¶8.3, U.N. Doc. CCPR/C/95/D/1553/2007 (Apr. 24, 2009) (freedom of expression "is of paramount importance in any democratic society."). This right encompasses expression related to "political discourse," "public affairs," "discussion of human rights," and

"teaching." GC No. 34, *supra*, ¶11. Protected speech includes that which may be "deeply offensive" to some, *id.*; *Rabbae,* ¶10.4, U.N. Doc. CCPR/C/117/D/2124/2011, or disfavored or "unwelcome or shock the State." *Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct. H.R. (ser. C) No. 79, ¶152 (Feb. 6, 2001). International law provides that "[e]xpressing support for, or opposition to, a specific government, is fully guaranteed by the rights to freedom of expression, association, and peaceful assembly…." Farida Shaheed, *Statement by the Special Rapporteur on the Right to Education, Ms. Farida Shaheed on Her Visit to the United States of America* (May 10, 2024). Freedom of expression thus also protects speech supporting Palestine and criticizing Israel. *See* Irene Khan, *Report on Global Threats to Freedom of Expression Arising from the Conflict in Gaza*, ¶88, U.N. Doc. A/79/319 (Aug. 23, 2024) [hereinafter Khan Report].

In addition, the right to expression underpins academic freedom, which states are required to respect and protect. *See* Farida Shaheed, *Academic Freedom*, ¶21, U.N. Doc. A/HRC/56/58 (June 27, 2024); Kaye Report, *supra*, ¶8. At universities, "the right to express views on a campus inside or outside of class is at the heart of academic freedom." Letter to the United States from the Mandates of the U.N. Special Rapporteur on Human Rights Defenders et al., at 4, U.N. Doc. AL USA 12/2024 (May 10, 2024), https://perma.cc/F9TD-8W79.

The **right to association** enables people to join together "freely for ideological, religious, political…or other purposes," to advance shared views. ACHR art. 16(1), *supra*; *see also* ICCPR art. 22, *supra*. This right is "a key component in the empowerment of marginalized communities and individuals." Maina Kiai, *Report of the Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association*, ¶15, U.N. Doc. A/HRC/26/29 (Apr. 14, 2014).

The **right to assembly** protects peaceful activities in many forms, including private or public meetings, demonstrations, and sits-ins. *See* GC No. 37, *supra*, ¶6; *Kivenmaa v. Finland*, U.N. Hum. Rts. Comm., ¶9.3, U.N. Doc. CCPR/C/50/D/412/1990 (June 9, 1994); *Djavit An v. Turkey*, App. No. 20652/92, Eur. Ct. H.R. ¶56 (Feb. 20, 2003). It is fundamental to "a system of participatory governance based on democracy, human rights, the rule of law and pluralism." GC No. 37, *supra*, ¶1. Public demonstrations are "critical to the consolidation of democratic life in societies" as well as "engines" of political change. Margaret Sekaggya (Special Rapporteur on the Situation of Human Rights Defenders), *Commentary to the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms*, 71–72 (July 2011). As "political speech enjoys particular protection…assemblies with a political message should enjoy a heightened level of accommodation and protection." GC No. 37, *supra*, ¶32. States

must not restrict peaceful assemblies "without compelling justification" or "sanction participants or organizers without legitimate cause." *Id*. ¶23. "Peaceful protest" as a form of assembly can include advocating for "contentious ideas or goals;" causing "disruption, for example of a vehicular or pedestrian movement or economic activity,'' *id*. ¶7; and engaging in "[c]ollective civil disobedience or direct action campaigns." *Id.* ¶16. The "isolated acts of violence by some participants should not be attributed to others, to the organizers or to the assembly as such." *Id*. ¶19.

## II. The U.S. government violated international law by applying an overly vague law to impose severe penalties on Mr. Khalil for exercising his fundamental rights.

Prior to his arrest and revocation of status, Mr. Khalil was a lawful U.S. permanent resident, *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1649197, *1 (D.N.J. June 11, 2025), a recent graduate of Columbia University, and an "advocate for Palestinian human rights and justice" who "consistently denounced antisemitism and all forms of extremism, insisted on nonviolence, and welcomed students of all faiths and identities into a student [social justice] movement." Appellee's Resp. Br. 4. Mr. Khalil spoke at protests, engaged with the media, and served "as a mediator and negotiator between student groups and the Columbia administration." *Id.* Such speech and activism are at the core of international law protections for the rights to freedom of opinion, expression, association, and assembly.

On March 8, 2025, U.S. Immigration and Customs Enforcement agents arrested Mr. Khalil at his home in New York. *Id.* at 6. He was held incommunicado for nearly 48 hours as government agents moved him first to New Jersey and then Louisiana, more than 1,000 miles away from his community and then-pregnant wife. *Id.* at 6–7. Mr. Khalil was detained for 104 days, causing him to miss the birth of his child, and inflicting irreparable harm on his career, reputation, and fundamental rights. *Id.* at *8. The government does not dispute that Mr. Khalil was detained for his speech and other expressive activities. Rubio Determination, *supra*, at 2; Appellants' Opening Br. 5–6.

Under international law, governments may not restrict or penalize the holding of an opinion—no matter how contentious—in any way. GC No. 34, *supra*, ¶9 (noting "the Covenant permits no exception or restriction" of this right). International law allows only limited restrictions on the rights to expression, association, and assembly. To be lawful, a government must satisfy an established three-part test of (1) legality, (2) legitimacy, and (3) necessity and proportionality. ICCPR arts. 19(3), 21, *supra*; *see also* GC 34, *supra*, ¶¶21-36; GC 37, *supra*, ¶¶36-69. Restrictions cannot be discriminatory. GC 34, *supra*, ¶26. Moreover, restrictions must not "impair the essence of the right, or be aimed at…causing a chilling effect." *Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., ¶7.4, U.N. Doc. CCPR/C/139/D/3056-3134/2018 (Oct. 12, 2023).

International law places a particularly high value on political discourse, which "should be penalized only under very narrow circumstances, even when the 'rights of others'…are implicated." Clooney & Neuberger, *supra*, at 50. Accordingly, human rights bodies consistently "require very strong reasons for justifying restrictions on political debate, for broad restrictions imposed in individual cases would undoubtedly affect respect for the freedom of expression in general in the State concerned." *Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. ¶212 (July 17, 2018); *see also* GC No. 34, *supra*, ¶35; GC No. 37, *supra*, ¶32.

The government has not satisfied international law's three-part test. It has restricted Mr. Khalil's fundamental rights in order to chill his speech and similar political discourse more broadly. As such, this Court should uphold the District Court's decision enjoining Appellants' use of the INA's foreign policy grounds to restrict Mr. Khalil's rights.

### A. Section 1227 is overly vague and discretionary, in contravention of international law's legality requirement.

As under U.S. constitutional law, the international law principle of **legality** requires that restrictions on the rights to free expression, association, and assembly be "provided by law" and "formulated with sufficient precision to enable an individual to regulate his or his conduct accordingly." GC No. 34, *supra*, ¶¶24, 25; *see* GC No. 37, *supra*, ¶¶36, 39. "A restriction may not be unduly vague or overbroad such that it could confer unfettered discretion on officials." Kaye Report, *supra*, ¶24.

Laws relying on ambiguous terminology with an open-ended scope are inconsistent with this requirement. Clooney & Neuberger, *supra*, at 186. Human rights advocates have particular reasons to be concerned about vagueness, as it increases the risk that the law could be used in retaliation for their work or speech. *See* Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights Defenders in the Americas*, ¶92-93, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011); Khan Report, *supra*, ¶70.

Mr. Khalil's detention and threatened deportation run afoul of the legality principle. Appellants rely on a vague law that provides unfettered discretion to one official to restrict legally protected speech and activities. Appellants have not charged Mr. Khalil with any crime. Instead, they claim legal authority to deport him on "foreign policy" grounds, invoking Section 237(a)(4)(C)(iii) of the INA, 8 U.S.C. § 1227(a)(4)(C). Section 1227, in turn, incorporates by reference 8 U.S.C. § 1182(a)(3)(C)(iii), which provides that although a noncitizen generally may *not* be removed because of their lawful "beliefs, statements, or associations," they *can* be removed if the Secretary of State "personally determines" that their presence "would compromise a compelling United States foreign policy interest."

The law does not define "foreign policy" nor clarify which activities are restricted, making it virtually impossible for an individual to "regulate his or her conduct accordingly." GC No. 34, *supra*, ¶25. "Foreign policy" is a boundless and exceedingly vague category that can cover a wide range of issues concerning any

corner of the world. Governments' foreign policies frequently shift and are rarely fully articulated to the public. Consequently, individuals cannot know or predict whether their speech or conduct is contrary to the government's foreign policy goals at any given time.

The provision also confers unchecked discretion on the Secretary of State. As the District Court observed, "there is no public manual, or anything else of the kind, that sheds light on when the Secretary of State might opt to use his Section 1227 power." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *19 (D.N.J. May 28, 2025). The breadth and slipperiness of the foreign policy interest, combined with this unbridled discretion, heightens the risk of government mischief and forces noncitizens to self-censor on all political issues or else risk removal. Penalizing Mr. Khalil's exercise of fundamental rights on the grounds that his speech and activities compromise a foreign policy interest is impermissibly vague and does not meet international law's legality requirement.

**B. Appellants have not shown that their restrictions on Mr. Khalil's rights are necessary and proportionate to a legitimate purpose, as required by international law.**

To lawfully impose restrictions on the rights to free expression, association, and assembly, a government must demonstrate that those restrictions serve a **legitimate purpose** and are **necessary** and **proportionate** to that purpose. These

requirements are crucial to prevent governments from unduly curtailing fundamental freedoms based on politically-motivated interests.

For a restriction to be **legitimate**, it must be aimed at protecting one of four purposes expressly provided in the ICCPR: "the rights or reputations of others," "national security," "public order," or "public health or morals." ICCPR arts. 19(3), 21–22, *supra*. This list is "exhaustive, and cannot be used pretextually to curtail speech." Clooney & Neuberger, *supra*, at 47. Governments bear the burden of showing "that the restriction actually protects, or is likely to protect, the legitimate State interest at issue." Kaye Report, *supra*, ¶24. To clear this bar, governments must demonstrate in an "individualized fashion" the direct and immediate connection between the right they seek to restrain and the threat to a legitimate interest. GC No. 34, *supra*, ¶35. For example, when a government invokes a national security purpose to restrict speech, it must specifically indicate how the speech threatens the enumerated purpose. *See, e.g.*, *Park v. Republic of Korea*, ¶10.3, U.N. Hum. Rts Comm., U.N. Doc. CCPR/C/64/D/628/1995 (Nov. 3, 1998) (finding government violated university student's right to free expression when it imprisoned him under national security law for participating in youth movement critical of government because it failed to identify the precise nature of the threat to national security).

Even when a government can show that a restriction serves a legitimate purpose, the restriction must also be **necessary** and **proportionate** to achieve that

aim. Necessity and proportionality are "strict tests," *Rabbae,* ¶10.4, U.N. Doc. CCPR/C/117/D/2124/2011, requiring governments to "demonstrate that the restriction imposes the least burden on the exercise of the right and actually protects, or is likely to protect, the legitimate state interest at issue." Kaye 2018 Report, *supra*, ¶7; *see also Adylova et al v. Kazakhstan*, U.N. Hum. Rts. Comm., ¶8.4, U.N. Doc. CCPR/C/140/D/3044/2017-3045/2017 (Aug. 20, 2024) (violation where state did not demonstrate that considerable fine and 10–15 days detention were necessary and proportionate); *Nikolaichik*, U.N. Doc. CCPR/C/139/D/3056-3134/2018, ¶7.9 (violation where state did not show that "fines or administrative detention for participating in peaceful, albeit unauthorized, meetings" were "least intrusive in nature or proportionate to the interest that it sought to protect, particularly in the light of the[ir] chilling effect").

Appellants fail on all three fronts. First, Appellants have not shown that their restrictions of Mr. Khalil's rights serve a legitimate purpose. The record indicates that Appellants are targeting Petitioner pursuant to a new government policy of detaining and removing noncitizens who engage in protected expressive activity in support of Palestinian human rights. This policy was announced in two Executive Orders shortly after Respondent Trump took office. *See* Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025); Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other*

*National Security and Public Safety Threats*, 90 Fed Reg 8451 (Jan. 20, 2025); *see also* Appellee's Resp. Br. 6–7 (confirming that Mr. Khalil's arrest was carried out in support of the Executive Orders). Immediately after Mr. Khalil's arrest, the Deputy Secretary of the Department of Homeland Security justified the government's actions on the grounds that Mr. Khalil was "put[ting] himself in the middle of the process of basically pro-Palestinian activity." Michel Martin & Destinee Adams, *DHS Official Defends Mahmoud Khalil Arrest, But Offers Few Details on Why it Happened*, NPR (Mar. 13, 2025, at 04:18 ET), https://perma.cc/2DWY-GZV9. Respondent Trump warned that the arrest was "the first of many to come," and promised to "find, apprehend, and deport" students engaged in "pro-terrorist, anti-Semitic, anti-American activity." Appellee's Resp. Br. 6 (quoting JA1045 ¶¶73). While in detention, Mr. Khalil was charged as removable based on Respondent Rubio's determination that Petitioner's "otherwise lawful" expressive activity would "compromise a compelling foreign policy interest of combatting antisemitism worldwide." Rubio Determination, *supra* (citing 8 U.S.C. § 1227(a)(4)(C)).

Restrictions on antisemitic speech can serve a legitimate purpose under some circumstances, for example when designed to protect the "rights or reputations" of

others.[3] *See, e.g., Ross v. Canada*, U.N. Doc. CCPR/C/70/D/736/1997 (2000) (no violation where teacher was reassigned to non-teaching role after accusing Jews of undermining freedom, democracy, and Christian beliefs, because government used least restrictive means to serve legitimate aim of protecting Jewish children's right to education). However, the government bears the burden of establishing that its restriction actually serves a legitimate aim. It is not sufficient to merely assert that a restriction is intended to protect a valid purpose. *Schumilin v. Belarus*, No. 1784/2008, U.N. Doc. CCPR/C/105/D/1784/2008 (2012) (finding restriction on freedom of expression invalid because government failed to establish "how, in practice, in this particular case, the [petitioner's] actions affected the respect of the rights or reputations of others").

Appellants have not established with the required specificity a connection between Mr. Khalil's expressive actions and a legitimate aim. The record is void of any specific allegations or evidence that by curtailing Mr. Khalil's speech or activities, the government protected the rights of others, advanced national security,

---

[3] International law requires states to "protect individuals from violence and discrimination," including antisemitic violence and discrimination. Clooney & Neuberger, *supra,* at 153. But even where speech rises to the level of hate speech, governments must still establish that the restrictions satisfy the three-part test set out in ICCPR 19(3), and the restrictions must "not be based on ambiguous or overbroadly defined offences." *Id.* at 173, 175; GC No. 34, ¶¶50-52 (the acts that are addressed in article 20 are all subject to restriction pursuant to article 19, ¶3).

or secured public order. Appellants' inability to identify, with precision, how its extreme restrictions of Mr. Khalil's rights serve any legitimate aim is especially suspect in the context of a documented pattern of government stigmatization of advocates for Palestinian human rights. *See* Gina Romero, *Protecting the Rights of Freedom of Assembly and Association from Stigmatization*, ¶57, U.N. Doc. A/79/263 (July 31, 2024) (Governments "have used demonizing and vilifying rhetoric against global pro-Palestinian solidarity protests. This stigmatization has been framed as a fight against anti-Semitism and hate speech."). It is a mistake to "confuse and conflate criticism of the policies of Israel, which is a legitimate exercise of freedom of expression, with antisemitism." Khan Report, *supra*, ¶75. Here, Appellants have not shown that their restrictions on Mr. Khalil's rights serve any aim beyond penalizing and suppressing involvement in pro-Palestinian activity, much less a legitimate one.

Second, even if Appellants could show a legitimate purpose for restricting Mr. Khalil's rights, they fail to demonstrate that his detention and deportation are necessary and proportional to that aim. Deprivation of liberty is an extreme measure that must be strictly justified. *See, e.g., Komarovsky v. Belarus*, U.N. Hum. Rts. Comm., ¶9.4, U.N. Doc. CCPR/C/109/D/1839/2008 (Feb. 4, 2014) (weeklong administrative arrest violates freedom of expression where government has not demonstrated why, exactly, detention was necessary and proportional to achieve

legitimate aims). In the context of speech restrictions, detention is unlikely to meet the necessity and proportionality requirements, because of both the paramount importance of the right to free expression in a democratic society, and the severity of arrest and detention as sanctions for exercising that right. *See, e.g.*, *Marques de Morais v. Angola*, U.N. Hum. Rts. Comm., ¶6.8, U.N. Doc. CCPR/C/83/D/1128/2002 (Apr. 18, 2005) (arrest, detention, and travel constraints imposed for violating speech restrictions aimed to protect public order failed the proportionality test); *Ribeiro v. Mexico*, U.N. Hum. Rts. Comm., ¶10.9, U.N. Doc. CCPR/C/123/D/2767/2016 (Aug. 29, 2018) (detention for violating defamation legislation limiting speech, even if pursuant to a legitimate aim, failed the necessity and proportionality tests). Moreover, detention pending removal is "virtually never" used in the United States where a lawful permanent resident has not been charged with a crime, further indicating it is not necessary. *Khalil*, 2025 WL 1649197, at \*4– 5. Yet the government detained Mr. Khalil for over 100 days, releasing him only pursuant to a court order. *Id.* at \*8, 11–12. During the course of his detention, the government denied Mr. Khalil's requests to attend the birth of his first child and to be transferred to a facility closer to his family. Appellee's Resp. Br. 8. Such decisions belie any notion that the government adopted the "least restrictive means" to curtail Mr. Khalil's expressive activity, even if it had shown a legitimate purpose for such restriction.

Deportation, like detention, "is always 'a particularly severe penalty'," *Lee v. United States*, 582 U.S. 357, 370 (2017) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010)), because it impacts a plethora of other rights beyond the underlying expressive activity. Here, Mr. Khalil faces separation from his U.S. citizen family and irreparable harm to his career, both consequences that far exceed any conceivable construction of the "least restrictive means" for the government to achieve its aims. *See Khalil v. Trump*, 2025 WL 1649197, *5.

For the foregoing reasons, Appellants have failed to establish that arresting, detaining, and attempting to deport Mr. Khalil served a legitimate purpose, or was necessary and proportional to that goal.

## C. Appellants appear to be retaliating against Mr. Khalil for exercising his fundamental rights, in violation of international law.

The government's inability to show that it has lawfully restricted Mr. Khalil's rights suggests that its actions may be retaliatory. Under international law, states may not use "an arrest or detention as punishment for the legitimate exercise of the rights as guaranteed by the [ICCPR]...." Hum. Rts. Comm., General Comment No. 35 on Article 9: Liberty and security of person, ¶23, U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014); *Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm. ¶7.7, U.N. Doc. CCPR/C/122/D/2252/2013 (May 24, 2018). In particular, states may not impose "reprisals" on individuals "as a result of their presence at or affiliation with a peaceful assembly," GC No. 37, *supra*, ¶33, nor subject human rights defenders to

abusive criminal or civil proceedings merely for their role in peaceful assemblies. *See* G.A. Res. 66/164, Promotion of the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, ¶6, U.N. Doc. A/66/164 (Dec. 19, 2011); Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders*, 3, 7-8, 41-43, OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015). This principle applies equally to participation in assemblies advocating for Palestinian human rights. The U.N. Special Rapporteur for freedom of opinion and expression has observed that international law "creates an imperative for all States to change their laws, policies and practices restricting or prohibiting [such] advocacy." Khan Report, *supra*, ¶ 84.

Taken together, the evidence indicates that Appellants retaliated against Mr. Khalil because of his political speech and activism related to Palestine. Multiple U.S. government officials have indicated their disagreement with the viewpoint and content of Mr. Khalil's speech and activities. *See, e.g.,* Pet'r's Am. Mem. of Law in Supp. of Prelim. Inj. 16-17, 19, ECF No. 124. Moreover, the government's treatment of Mr. Khalil is part of a broader effort to penalize student protestors. *Id.* at 20–21. Even before Respondent Trump took office, he pledged that "any student that protests, I throw them out of the country." Josh Dawsey et al., *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post, May

27, 2024, https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors. Mr. Khalil is one of at least four students whom the government has arrested in recent months for their expressive activities supporting Palestine. *See, e.g., Öztürk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692 (4th Cir. 2025); *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025). Hundreds of international students' visas have been revoked for the same. *See, e.g., Chung v. Trump,* No. 25-cv-02412, 2025 WL 917666 (S.D.N.Y. Mar. 25, 2025) (lawful permanent residence revoked and arrest warrant issued); Daniella Silva et al., *Trump Takes Aim at Foreign-Born College Students, With 300 Visas Revoked*, NBC News (Mar. 27, 2025, at 20:58 ET), https://perma.cc/E3JS-SMKY (reporting on government's revocation of over 300 university students' visas, with multiple students detained and deported). This crackdown is occurring in the context of a broader pattern of stigmatization and criminalization of students advocating for Palestinian human rights. *See* Khan Report, *supra*, ¶36 (noting over 45 proposed state and federal measures "aimed at restricting street protests in support of Palestine, punishing student protestors and stigmatizing their Palestinian advocacy as 'terrorism'"); Romero Report, *supra*, ¶57 ("In various universities in the United States of America, such as Columbia University, authorities and law enforcement have responded disproportionately, with vilification, criminalization, sanctions, arrests, detentions, and the use of excessive force."). Detaining and seeking to deport

Mr. Khalil in retaliation for exercising his basic rights is illegal under international law.

Further, because Mr. Khalil's arrest and detention lack a legal basis, Appellants' actions also violate the right to liberty and security of the person, ICCPR art. 9, *supra*, and implicate other fundamental human rights, including the right to not be subjected to unlawful interference with privacy, family, or home, or unlawful attacks on reputation. *Id.* arts. 17, 23.

## III. Appellants' use of Section 1227 to target noncitizens for their protected activities is discriminatory, in violation of international law.

The government's invocation of Section 1227 to penalize noncitizens for pro-Palestine speech and assembly also contravenes international law's prohibition of discrimination. The rights at issue here must be guaranteed without discrimination. *See* ICCPR art. 2(1), *supra*; GC No. 34, *supra*, ¶26; International Convention on the Elimination of All Forms of Racial Discrimination, art. 5(d)(viii), (ix), Dec. 21, 1995, 660 U.N.T.S. 195 [hereinafter ICERD]; UDHR art. 2, *supra*; Comm. on the Elimination of Racial Discrimination, General Recommendation 30: Discrimination Against Non-citizens, ¶3, U.N. Doc CERD/C/64/Msc.11/rev.3 (Feb. 23-Mar. 12, 2004). In restricting these rights, governments may not discriminate between citizens and noncitizens, or on the basis of nationality or national or ethnic origin. *See* ICCPR art. 2(1), *supra*; UDHR art. 2, *supra*; ICERD art. 5(d), *supra*; Hum. Rts, Comm., General Comment No. 15: The Position of Aliens Under the Covenant, ¶7, U.N. Doc

HRI/GEN/1/Rev. 1 (Apr. 11, 1986) (noncitizens "have the right to freedom of thought, conscience…[and] to hold opinions and express them [as well as] receive the benefit of the right of peaceful assembly and of freedom association.…There shall be no discrimination between aliens and citizens in the application of these rights."); Hum. Rts. Comm., General Comment No. 31: Nature of the General Legal Obligation on States Parties to the Covenant, ¶10, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26, 2004) ("State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party"); GC No. 37, *supra*, ¶5. Invoking Section 1227 to remove noncitizens because of their expressive activity impermissibly discriminates by penalizing their speech when the same speech is protected for citizens.

International law also prohibits viewpoint discrimination; any restrictions on the rights to expression, assembly, and association must be content-neutral. GC No. 37, *supra*, ¶22; *see also Alekseev v. Russian Federation*, Hum. Rts. Comm., ¶9.6, U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013) (government's rejection of individual's right to organize a protest based on its subject is "one of the most serious interferences with the freedom of peaceful assembly"); *Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016) (May 29, 2019) (rejecting controversial ideas as valid basis for restricting freedom of expression and assembly). Restrictions specifically targeting expression in support of Palestinian

human rights or critical of Israel are thus impermissible. *See* Romero Report, *supra*, ¶58; *see generally* Khan Report, *supra*. In March 2025, U.N. human rights monitors concluded that "arbitrary detention of U.S. lawful permanent residents, and removal of international students who have participated in university protests in solidarity with Palestine" is "disproportionate, unnecessary, and discriminatory." *Deporting International Students Involved in Pro-Palestinian Protests Will Escalate Trauma and Polarisation on US Campuses: U.N. Experts*, U.N. OHCHR (Mar. 17, 2025), https://perma.cc/KQ9B-SPY9. Appellants' invocation of Section 1227 to target noncitizens for their pro-Palestine speech is inconsistent with the United States' duty to protect human rights on an equal basis regardless of citizenship and speech content.

## IV. Reversing the District Court's injunction risks chilling the exercise of fundamental rights in the United States and abroad.

The impacts of the government's restrictions on human rights reverberate far beyond this case. Following Mr. Khalil's arrest, Respondent Trump warned that "[t]his is the first arrest of many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 11:05 ET), https://perma.cc/BML5-GR84. Indeed, subsequent arrests have followed. As a result, noncitizens across the country are uncertain which speech or activities may result in retaliation or punishment, and fear that they could face detention and deportation for exercising their rights. *See, e.g.*, Jazzmin Jiwa, *'I Could Be Next': International Students at Columbia University Feel*

*'Targeted' After Mahmoud Khalil's Arrest*, The Guardian (Mar. 19, 2025, at 11:00 ET), https://perma.cc/MBF6-XPJ5; Jocelyn Gecker, *After Columbia Arrests, International College Students Fall Silent*, ABC News (Mar. 15, 2025, at 01:09 ET), https://perma.cc/ZC2G-86JB; *Am. Ass'n of Univ. Profs. v. Rubio,* 780 F. Supp. 3d 350, 377–78 (D. Mass. Apr. 29, 2025) (suit concerning chilling effect of U.S. government's actions on expressive activities of lawful permanent resident university professors).

This chilling effect risks extending beyond the Palestine issue. U.N. human rights experts have warned that the government's revocation of student visas or residency rights is "highly dangerous as it seeks to exert a chilling effect on free expression among immigrants going far beyond the Palestinian issue." Irene Khan et al., *supra.* These experts called on the United States to "immediately end retaliation against students supporting Palestinians' rights." *Id.* U.N. experts have also stressed that narratives that misrepresent legitimate exercises of rights as illegal activities, and characterize individuals involved as threats to national security, can have a "severe and lasting" chilling effect on "civic space broadly." Romero Report, *supra*, ¶14.

Indeed, fears of retaliation impacted the filing of this brief by deterring the participation of eminent potential *amici*, particularly those who are not U.S. citizens. Such constriction on the exercise of fundamental rights in the United States could

set a dangerous precedent that undermines the enjoyment of human rights worldwide.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court affirm the District Court's ruling granting Petitioner's motion for preliminary injunction.

DATED: September 17, 2025

/s/ Sarah H. Paoletti

Sarah H. Paoletti*
    * *Counsel of Record*
Transnational Legal Clinic
University of Pennsylvania
Carey Law School
3501 Sansom Street
Philadelphia, PA 19104
Tel: (215) 898-1097
paoletti@law.upenn.edu
(In her individual capacity)

Paul L. Hoffman
200 Pier Ave
Suite 226
Hermosa Beach, CA 90254
Tel: (424) 297-0114

*Counsel for Amici Curiae*

*Appendix I*

# LIST OF *AMICI CURIAE*[4]

**E. Tendayi Achiume**
Professor of Law, Stanford University
Former United Nations Special Rapporteur on Contemporary forms of Racism,
Racial Discrimination, Xenophobia and Related Intolerance

**Rabiat Akande**
Wilson H. Elkins Chair and Associate Professor
University of Maryland Carey School of Law

**Susan M. Akram**
Clinical Professor and Director
International Human Rights Clinic
Boston University School of Law

**Cori Alonso-Yoder**
Assistant Professor of Law
Director of the Immigration Clinic
University of Maryland Francis King Carey School of Law

**Philip Alston**
John Norton Pomeroy Professor of Law
New York University

**Sandra L. Babcock**
Clinical Professor, Cornell Law School
Director, International Human Rights Clinic

**Aslı Ü. Bâli**
Professor of Law
Yale Law School

---

[4] Institutional affiliation is provided for identification purposes only. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

**Thomas B. Becker, Jr.**
Legal & Policy Director, University Network for Human Rights
Lecturer in Law, Columbia Law School

**Joseph Berra**
Human Rights in the Americas Director
UCLA Promise Institute for Human Rights

**Blaine Bookey**
Visiting Assistant Professor
University of California College of the Law, San Francisco
Legal Director, Center for Gender & Refugee Studies

**Christine Bustany**
Senior Lecturer in International Law
The Fletcher School of Law and Diplomacy
Tufts University

**Toby Cadman**
Barrister and Joint Head of Chambers Counsel
Guernica 37 Chambers

**Sandra Coliver**
Board Member
Guernica 37 Centre for International Justice

**Brian Concannon, Jr.**
Executive Director
Institute for Justice & Democracy in Haiti

**Avidan Cover**
Professor
Case Western Reserve University School of Law

**Pablo de Greiff**
Senior Fellow, Center for Human Rights and Global Justice
School of Law, New York University

**Christian M. De Vos**
Visiting Assistant Professor of Law
City University of New York School of Law

**Lisa Dicker**
Lecturer on Law
Harvard Law School

**William S. Dodge**
Lobingier Professor of Comparative Law and Jurisprudence
George Washington University Law School

**Susan H. Farbstein**
Clinical Professor of Law
Harvard Law School

**Alexandra V. Filippova**
Senior Staff Attorney
Institute for Justice & Democracy

**Kristina Fried**
Institute for Justice and Democracy in Haiti

**Tyler R. Giannini**
Clinical Professor of Law
Harvard Law School

**Denise Gilman**
Clinical Professor
Co-Director, Immigration Clinic
University of Texas School of Law

**Rebecca Hamilton**
Professor of Law
American University, Washington College of Law

**Hurst Hannum**
Professor Emeritus of International Law
Fletcher School of Law and Diplomacy
Tufts University

**Ellie Happel**
Adjunct Professor of Clinical Law
New York University School of Law
**Adil Haque**
Distinguished Professor of Law and Judge Jon O. Newman Scholar
Rutgers Law School

**Todd Howland**
Interim Director, Environmental Justice Clinic
Vermont Law and Graduate School

**Deena R. Hurwitz**
International Human Rights Lawyer

**Dr Richard Joyce**
Senior Lecturer, Melbourne Law School
University of Melbourne

**Francisco Rivera Juaristi**
Clinical Professor of Law
Santa Clara Law

**Ioannis Kalpouzos**
Visiting Professor
Harvard Law School

**Ashlynn Kendzior**
International Human Rights Lawyer

**John H. Knox**
Henry C. Lauerman Professor of International Law
Wake Forest University School of Law

**Daniel Levine-Spound**
Lecturer on Law
Harvard Law School

**Beatrice Lindstrom**
Lecturer on Law
Harvard Law School

**Darryl Li**
Associate Professor of Anthropology and Associate Member of the Law School
University of Chicago

**Bert Lockwood**
Distinguished Service Professor and Director, Urban Morgan Institute for Human
Rights University of Cincinnati College of Law

**Rachel López**
James E. Beasley Professor of Law
Temple University Beasley School of Law

**Dr. Heidi Matthews**
Assistant Professor
Osgoode Hall Law School, York University

**Natasa Mavronicola**
Professor of Human Rights Law
University of Birmingham

**Wade McMullen**
Distinguished Fellow, Human Rights Institute
Georgetown University Law Center

**Grace Meng**
Executive Director, Epstein Program in Public Interest Law & Policy
UCLA School of Law

**Bonita Meyersfeld**
Professor
Wits University, School of Law, South Africa

**Chi Adanna Mgbako**
Clinical Professor of Law
Walter Leitner International Human Rights Clinic
Fordham Law School

**Saira Mohamed**
Agnes Roddy Robb Chair in Jurisprudence, Ethics, and Social Responsibility
Professor of Law
University of California, Berkeley School of Law

**Samuel Moyn**
Kent Professor of Law and History
Yale University

**Karen Musalo**
Bank of America Foundation Chair in International Law
Professor & Director, Center for Gender & Refugee Studies
U.C. Law, San Francisco

**Ruhan Nagra**
Associate Professor of Law
University of Utah S.J. Quinney College of Law

**Vasuki Nesiah**
Professor of Practice in Human Rights and International Law
The Gallatin School, NYU

**Fionnuala Ni Aolain**
Professor
The Queen's University of Belfast and the University of Minnesota Law School

**Chidi Anselm Odinkalu**
Professor of Practice, International Human Rights Law
Fletcher School of Law and Diplomacy
Tufts University

**Diane Orentlicher**
Professor Emerita
American University Washington College of Law

**Dinah R PoKempner**
Adjunct Professor, Columbia University
Former Consultant to the UN Special Rapporteur on Freedom of Expression
Former General Counsel, Human Rights Watch

**Emily A. Ray**
Clinical Fellow
Harvard Law School

**Dr Sophie Rigney**
Senior Lecturer, School of Law
The Royal Melbourne Institute of Technology (RMIT) University

**Naomi Roht-Arriaza**
Distinguished Professor of Law (emeritus)
University of California Law, San Francisco

**Cesare Romano**
Professor of Law
Loyola Law School

**Britton Schwartz**
Deputy Director, International Human Rights Clinic
Santa Clara University School of Law

**Carey Shenkman**
International Human Rights Lawyer

**Matiangai Sirleaf**
Nathan Patz Professor of Law
University of Maryland Francis King Carey School of Law

**Joseph R. Slaughter**
Director of the Institute for the Study of Human Rights
Columbia University

**David Sloss**
John A. and Elizabeth H. Sutro Professor of Law
Santa Clara University School of Law

**Stephan Sonnenberg**
Associate Professor of Practice
Wesleyan University

**Ralph G. Steinhardt**
Lobingier Professor of Comparative Law & Jurisprudence (emeritus)
The George Washington University Law School

**Maureen A. Sweeney**
Law School Professor
University of Maryland Carey School of Law

**Ryan Thoreson**
Associate Professor
University of Cincinnati College of Law

**Salma Waheedi**
International Human Rights Lawyer

**Deborah M. Weissman**
Reef C. Ivey II Distinguished Professor of Law
University of North Carolina at Chapel Hill

**Lynn Welchman**
Professor of Law
College of Law, SOAS University of London, UK

**Thomas Wilner**
International Human Rights Lawyer

# COMBINED CERTIFICATIONS

1.  Counsel Sarah H. Paoletti is a member in good standing of the Third Circuit. Counsel Paul L. Hoffman is a member in good standing of the California bar and will be seeking admission to this Court.

2.  This brief complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6476 words.

3.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

4.  On September 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the Clerk of the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I also certify that all participants are registered CM/ECF users and will be served via the CM/ECF system.

5. The text of the electronic version of this document is identical to the text of the paper copies that will be provided.

6. This document was scanned for viruses Windows Defender and no virus was detected.

DATED: September 17, 2025       /s/ Sarah H. Paoletti

Sarah H. Paoletti
Transnational Legal Clinic
University of Pennsylvania
Carey Law School
3501 Sansom Street
Philadelphia, PA 19104
Tel: (215) 898-1097
paoletti@law.upenn.edu
(In her individual capacity)

*Counsel of Record for Amici Curiae*