# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Mahmoud Khalil,

*Petitioner-Appellee,*

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Todd LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General of the Department of Justice,

*Respondents-Appellants.*

On Appeal from the United States District Court
for the District of New Jersey, No. 25-cv-1963
Hon. Michael E. Farbiarz

## BRIEF OF *AMICI CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, NATIONAL COALITION AGAINST CENSORSHIP, THE CATO INSTITUTE, THE RUTHERFORD INSTITUTE, PEN AMERICA, AND FIRST AMENDMENT LAWYERS ASSOCIATION IN SUPPORT OF PETITIONER–APPELLEE

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473

ronnie.london@thefire.org

Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that none of the *amici* has any parent corporation, and no publicly held corporation owns 10% or more of the stock of any of the *amici*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF AMICI CURIAE ................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 6

ARGUMENT ........................................................................ 9

I.   Mr. Khalil's Advocacy Is Core Protected Political Speech. .............. 9

    A.   Mr. Khalil has full First Amendment rights ........................... 9

    B.   The First Amendment protects all viewpoints ...................... 12

    C.   Detaining   Mr.   Khalil   for   his   advocacy   is unconstitutional viewpoint discrimination. .......................... 15

    D.   The administration's detention of Mr. Khalil amounts to unconstitutional retaliation. ................................................ 19

II.   The   Foreign   Policy   Deportation   Provision   Is Unconstitutionally Vague ................................................................ 20

III.   Arrests Targeting Protected Advocacy Contradict America's Free-Speech Rights and Values. ..................................................... 25

    A.   Allowing   arrest   and   detention   for   speech   the government disfavors will chill expression at America's universities and beyond. ....................................................... 25

    B.   Allowing the Secretary of State to order the arrest and detention of speakers deemed contrary to the national interest is an un-American approach to speech .................... 28

CONCLUSION ................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ............................................. 10, 11

*Boos v. Barry*,
  485 U.S. 312 (1988) .......................................................... 13

*Bridges v. California*,
  314 U.S. 252 (1941) ........................................................ 9, 10

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ......................................... 6, 10, 12, 30

*Brooks v. Auburn Univ.*,
  296 F. Supp. 188 (M.D. Ala. 1969) ................................. 16

*Connick v. Myers*,
  461 U.S. 138 (1983) .......................................................... 12

*Cox v. Louisiana*,
  379 U.S. 536 (1965) ............................................................ 6

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) ..................................................... 13, 19

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) .......................................................... 20

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ............................................................. 12

*Gay & Lesbian Students Ass'n v. Gohn*,
  850 F.2d 361 (8th Cir. 1988) ........................................... 16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .......................................................... 21

*Healy v. James*,
  408 U.S. 169 (1971) ..................................................... 16, 25

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ......................................................................14, 15, 18

*Hous. Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) .................................................................19

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) .................................................................17

*Int'l Soc'y for Krisha Consciousness, Inc. v. Barber,*
    650 F.2d 430 (2d Cir. 1981) .....................................................27

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) .......................................................13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) ...........................................................16, 25

*Kwong Hai Chew v. Colding,*
    344 U.S. 590 (1953) .................................................................10

*Lozman v. Riviera Beach,*
    585 U.S. 87 (2018) ...................................................................19

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
    594 U.S. 180 (2021) .................................................................26

*Massieu v. Reno,*
    915 F. Supp. 681 (D.N.J. 1996) .........................................21, 22, 23, 24

*Matal v. Tam,*
    582 U.S. 218 (2017) .................................................................17

*McCullen v. Coakley,*
    573 U.S. 464 (2014) .................................................................13

*Molpus v. Fortune,*
    432 F.2d 916 (5th Cir. 1970)....................................................16

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .................................................................12

*Pahls v. Thomas,*
    718 F.3d 1210 (10th Cir. 2013) ............................................. 10

*Rafeedie v. INS,*
    795 F. Supp. 13 (D.D.C. 1992) ......................................... 10, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .............................................. 15, 16, 25

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ..................................................... 9, 21

*Smith v. Goguen,*
    415 U.S. 566 (1974) ......................................................... 21

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ................................................. 8, 12, 15

*Starnes v. Butler Cnty. Ct. of Common Pleas,*
    971 F.3d 416 (3d Cir. 2020) ............................................. 19

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ........................................................... 8

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) ............................................................... 6

*Texas v. Johnson,*
    491 U.S. 397 (1989) ........................................................... 8

*United States v. Alvarez,*
    567 U.S. 709 (2012) ......................................................... 13

*United States v. Robel,*
    389 U.S. 258 (1967) ........................................................... 7

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ......................................................... 15

**Statutes**

18 U.S.C.
  § 2339A(b)(1) .......................................................................14

8 U.S.C.
  § 1182(a)(3)(B)(i)(VII) .......................................................18
  § 1182(a)(3)(C)(iii) ...............................................................7
  § 1227(a)(1) ...........................................................................18
  § 1227(a)(4)(B) .....................................................................18
  § 1227(a)(4)(C)(i) ............................................................7, 20
  § 1227(a)(4)(C)(ii) .................................................................7

An Act Concerning Aliens,
  ch. 58, § 2, 1 Stat. 570 (1798) ..............................................8

**Constitutional Provisions**

U.S. Const. amend. I .................................................................9

**Foreign Laws**

Federal Law of the Russian Federation on Information,
  Informational Technologies and the Protection of Information
  [Russian Federation Collection of Legislation] 2006, No. 31, Item
  3448 ......................................................................................28

Law of Printing and Publication (Royal Decree No. M/23, 3/9/1424
  H), art. 9 (2003) ..................................................................29

Xianfa art. 51 (1982) ..............................................................28

**Other Authorities**

*Enrollment Trends*, Open Doors..............................................25

James Madison,
  The Report of 1800 (Jan. 7, 1800) .......................................11

Josh Dawsey, Karen DeYoung, & Marianne LeVine,
  *Trump Told Donors He Will Crush Pro-Palestinian Protests,*
  *Deport Demonstrators*, Wash. Post (May 27, 2024).............26

Michel Martin & Destinee Adams,
*DHS Official Defends Mahmoud Khalil Arrest, but Offers Few
Details on Why It Happened*, NPR (Mar. 13, 2025).............................27

Secretary of State Marco Rubio Remarks to Press, U.S. Dep't of
State, Mar. 12, 2005..............................................................................27

Thomas Jefferson,
First Inaugural Address (Mar. 4, 1801)..............................................29

*White House Daily Briefing*, C-SPAN (Mar. 11, 2025)....................passim

**INTEREST OF AMICI CURIAE[1]**

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In June 2022, FIRE expanded its advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. In lawsuits across the United States, FIRE works to vindicate First Amendment rights without regard to the speakers' views. *See, e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, No. 23-356, 2025 WL 2177513 (2d Cir. Aug. 1, 2025); *Novoa v. Diaz*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeal docketed*, No. 22-13994 (11th Cir. argued June 14, 2024); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *appeal docketed*, No. 25-2366 (9th Cir.

---

[1] All parties consent to this filing. No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission.

Apr. 14, 2025); *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). As such, FIRE is deeply concerned by the government's claim of authority to subject resident aliens to adverse action for their expressed viewpoints.

The National Coalition Against Censorship (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision in *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote freedom of thought, inquiry, and expression, and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of students, teachers, librarians, artists, and others. NCAC has long opposed attempts to censor or limit youth free expression on college campuses and tracks efforts to suppress artistic and cultural expression related to political conflict in Israel and Palestine. *See, e.g.*, Art Censorship Index: Israel and Palestine 2023-Onwards, NAT'L COAL. AGAINST CENSORSHIP, https://ncac.org/art-censorship-index-israel-palestine-2023-onwards. It

therefore has a longstanding interest in assuring the continuance of robust First Amendment protections for all, including students and noncitizens. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato files *amicus* briefs, publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its president, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to

ensure that the government abides by the rule of law and is held accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

PEN American Center, Inc. ("PEN America") is a non-partisan, not-for-profit organization dedicated to creative expression and the liberties that make it possible. Founded in 1922, PEN America engages in advocacy, research, and public programming related to free expression in the United States and around the world. PEN America stands for the unhampered transmission of thought within each nation and between all nations, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, express their views, and access the views, ideas, and literature of others. PEN America has engaged in research and advocacy related to protest rights and the free speech rights of immigrants.

The First Amendment Lawyers Association (FALA) is a nonpartisan, nonprofit bar association comprised of attorneys throughout the United States and elsewhere whose practices emphasize defense of Freedom of Speech and of the Press, and which advocates against all forms of government censorship. Formed in the mid-1960s,

FALA's members practice throughout the U.S. in defense of the free speech. Since its founding, its members have been involved in many of the nation's landmark free expression cases, including cases before the Supreme Court. *See*, *e.g.*, *Ashcroft v. Free Speech Coalition, Inc.*, 535 U.S. 234 (2002) (successful challenge to Child Pornography Prevention Act argued by FALA member and former president H. Louis Sirkin); *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803 (2000) (successful challenge to "signal bleed" portion of Telecommunications Act argued by FALA member and former president Robert Corn-Revere). In addition, FALA has a tradition of submitting *amicus* briefs to the Supreme Court on issues pertaining to the First Amendment. *See*, *e.g.*, *City of Littleton v. Z.J. Gifts D-4, LLC,* 2004 WL 199239 (Jan. 26, 2004) (*amicus* brief submitted by FALA); *United States v. 12,200-ft Reels of Super 8mm Film*, 409 U.S. 909 (1972) (order granting FALA's motion to submit *amicus* brief).

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is unthinkable that a person in a free society could be snatched from his home, imprisoned, and threatened with deportation for expressing an opinion the government dislikes. Certainly not in the country envisioned by our nation's Framers. America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. That includes "the opportunity for free political discussion" as "a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). And "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). For these reasons, along with all citizens, "freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Secretary of State Marco Rubio, however, facilitated the arrest and detention of lawful permanent resident, Mahmoud Khalil, not because the government claims he committed a crime or other deportable offense, but for the seemingly sole reason that his expression stirred the Trump administration to anger. The Secretary claims he can trigger the arrest and detention of Mr. Khalil under a statute giving the secretary of state the power to initiate deportation proceedings against anyone he "personally determines" is contrary to America's "foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i)–(ii). And he argues this power extends even to deporting *permanent residents* for *protected* speech. It does not.

The First Amendment's protection for free speech trumps a federal statute. *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). Accepting Secretary Rubio's position would irreparably damage free expression in the United States, particularly on college campuses. Foreign students would (with good reason) fear criticizing the current American government during classroom debates, in term papers, and on social media, lest they risk arrest, detention, and, eventually, deportation. That result is utterly incompatible with the longstanding recognition that

"[t]he essentiality of freedom in the community of American universities is almost self-evident," and that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Secretary Rubio claims (as do all censors) that this time is different, that the supposed divisiveness of Mr. Khalil's pro-Palestinian (and, as administration officials allege, anti-Israel) views cannot be tolerated. But "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding the First Amendment protects burning the American flag in protest); *see also Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (holding the First Amendment protects displaying "God Hates Fags" and "Thank God for Dead Soldiers" posters outside a military funeral).

The government's actions against Mr. Khalil harken back to the infamous Alien Friends Act of 1798, which allowed President John Adams to deport any alien deemed a danger to "public safety." An Act Concerning Aliens, ch. 58, § 2, 1 Stat. 570, 571 (1798). It was "one of the

most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring). Yet today, Secretary Rubio allows this stain of history to repeat itself.

The "First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges v. California*, 314 U.S. 252, 263 (1941) (footnote omitted) (invalidating criminal convictions, including of a noncitizen, based on protected speech). Our "liberty-loving society" does not permit arrest, detention, and deportation as a punishment solely based on protected speech. Reversing the district court and allowing the government to detain Mr. Khalil would prolong the very same unconstitutional harms his lawsuit seeks to prevent. The Court should affirm.

## ARGUMENT

### I. Mr. Khalil's Advocacy Is Core Protected Political Speech.

#### A. Mr. Khalil has full First Amendment rights.

The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I.

And the Supreme Court has made clear the Constitution's "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148 (citing *Bridges*, 314 U.S. 252). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (citation omitted); *see also Wixon,* 326 U.S. at 161 (Murphy, J., concurring) ("Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders … including those protected by the First Amendment." (cleaned up)).

This has stood as established law for more than 70 years. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995); *Rafeedie v. INS*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment …."). That is because the First Amendment operates as a restraint on government subjecting those under its power to disfavored treatment based on their opinions. *See Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013).

Administration officials' statements about Mr. Khalil and his arrest have confused fundamental distinctions between government powers to permit or deny an individual's request to enter the United States versus the rights of an individual who has lawfully entered and became a lawful permanent resident. To be sure, Congress has broad powers to set rules for allowing or excluding aliens from entry. But "[t]he Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection." *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1065. As James Madison explained, because noncitizens "owe, on one hand, a temporary obedience" to American laws, "they are entitled in return, to their protection and advantage." James Madison, The Report of 1800 (Jan. 7, 1800), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/BF76-6LCD. And it is especially so when the government seeks to arrest, detain, and eventually deport a lawful permanent resident for engaging in protected speech.

There is no merit to a government argument that, because the political branches have broad authority over immigration matters, the government can cast aside the constitutional rights of legal residents like

Mr. Khalil. Because "resident aliens have constitutional rights it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Wixon*, 326 U.S. at 161 (Murphy, J., concurring). Like all noncitizens in the United States, Mr. Khalil "is entitled to the same First Amendment protections as United States citizens." *Rafeedie*, 795 F. Supp. at 22.

### B. The First Amendment protects all viewpoints.

America's First Amendment and commitment to freedom of speech reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). "Speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (cleaned up) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

Mr. Khalil's pro-Palestinian protest and advocacy are core protected political speech. "The Supreme Court has declared that the

First Amendment protects political demonstrations and protests—activities at the heart of what the Bill of Rights was designed to safeguard." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988)). Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

So too is handing out flyers, one of the specific justifications White House Press Secretary Katherine Leavitt offered for Mr. Khalil's deportation.[2] Distributing "leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up). None of the posters Ms. Leavitt cited contain or consist of unprotected speech, and the government does not assert otherwise.[3]

---

[2] *White House Daily Briefing*, C-SPAN, at 11:20 (Mar. 11, 2025), https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 [https://perma.cc/858N-F4WY] (alleging that Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus); *see also* Am. Pet. for Writ of Habeas Corpus & Compl. ("Am. Pet.") ¶ 79; Dkt. No. 38.

[3] *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (holding categories of speech unprotected by the First Amendment are carefully cabined and limited to: incitement, obscenity, defamation,

Nor can the administration justify its deportation by alleging Mr. Khalil's speech supported "terrorism." The Antiterrorism and Effective Death Penalty Act of 1996 criminalizes providing specified foreign terrorist organizations like Hamas, ISIS, and Al-Qaeda "material support or resources," defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court held that under this definition, even expressing support *for a terrorist organization* or its goals, without more, does not qualify as providing material support. As the Court explained, Congress had not "sought to suppress ideas or opinions," but rather prohibited "material support," which "most often does not take the form of speech at

_____

speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting a "grave and imminent threat the government has the power to prevent, although a restriction under [this] last category is most difficult to sustain") (citations omitted).

all." *Id.* at 26. Protests and independent advocacy are not "material support" for terrorism. They are protected speech.

Some nations react to disfavored speech by "punishing the speaker." *Snyder*, 562 U.S. at 461. But as a "Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* That is the path this Court should, and must, follow here.

### C. Detaining Mr. Khalil for his advocacy is unconstitutional viewpoint discrimination.

American free speech jurisprudence dictates that the government may not punish people based on their opinions. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion …." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That means "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Courts have rejected viewpoint discrimination for decades, particularly at universities. Courts at all levels have rebuffed efforts at public

universities to restrict ideas by limiting who may teach,[4] who may be invited to speak,[5] which publications to fund,[6] and what organizations to recognize or fund.[7]

The government's attempt to detain and deport Mr. Khalil on the bases proffered to date amounts to confessed viewpoint discrimination. The administration said Mr. Khalil would be deported for "siding with terrorists, Hamas terrorists."[8] President Trump has also declared that his administration's actions against students holding lawful visas are aimed to eliminate anyone involved in "pro-terrorist, anti-Semitic, anti-

---

[4] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 602–603 (1967) (loyalty oaths for university faculty).

[5] *Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970) (university speaker bans); *Brooks v. Auburn Univ.*, 296 F. Supp. 188, 196 (M.D. Ala. 1969) ("Alabama cannot … regulate the content of the ideas students may hear" because that is "unconstitutional censorship in its rawest form").

[6] *Rosenberger*, 515 U.S. at 825–29 (denial of funding to Christian student newspaper).

[7] *Healy v. James*, 408 U.S. 169 (1971) (denial of recognition to student political group); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 363–67 (8th Cir. 1988) (refusal of funding to student gay rights group following state legislature's resolution).

[8] *White House Daily Briefing*, *supra* note 2, at 11:01; *accord* Am. Pet. ¶ 79.

American activity."[9] This is the American government engaging in open and blatant viewpoint discrimination.

The administration claims Mr. Khalil's opinions were "anti-Semitic" and made Jewish students "feel unsafe."[10] But viewpoint discrimination remains unlawful even when others find the speaker's message offensive. The "proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (plurality opinion) (cleaned up); *see also Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (protecting speech "offensive to many Americans," including on the subject of "terrorism," because "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment" (citation omitted)).

The government has not claimed Mr. Khalil ever engaged in any terrorist activity. It does not allege he ever provided material support to a terrorist organization. The government has not purported to rely on any of the provisions of the Immigration and Nationality Act that concern

---

[9] Am. Pet. ¶ 73.

[10] Am. Pet. ¶ 73 (President Trump statement on social media); *White House Daily Briefing*, *supra* note 2, at 11:14 (Press Secretary Leavitt comments).

terrorist activity. *E.g.*, 8 U.S.C. §§ 1227(a)(1), (4)(B), 1182(a)(3)(B)(i)(VII). Instead, the government targeted Mr. Khalil because of his advocacy for Palestinians, called his advocacy "pro-terrorist," and has sought to deport him from the country. As the Supreme Court made clear in *Holder*, independent advocacy of views or causes remains fully within the First Amendment's protection. 561 U.S. at 39.

To be sure, vandalism and blockading students from attending class are not protected by the Constitution. But the government's justification for detaining and attempting to deport Mr. Khalil has not included allegations that he engaged in those unprotected acts. Instead, the government points to Mr. Khalil's protected expression, claiming it has a "zero-tolerance policy for siding with terrorists."[11] That is unacceptable under our Constitution and under bedrock American principles of free speech.

---

[11] *White House Daily Briefing*, *supra* note 2, at 11:57 (Press Secretary Leavitt comments); *accord* Am. Pet. ¶ 73 (President Trump statement on social media).

**D.    The administration's detention of Mr. Khalil amounts to unconstitutional retaliation.**

Arresting and detaining Mr. Khalil because of his political opinions is textbook unlawful retaliation. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018). Unlawful retaliation occurs when, after an individual engages in protected conduct, the government takes "retaliatory action" against them, and there is a "causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 429 (3d Cir. 2020) (cleaned up). Action is retaliatory when it is "sufficient to deter a person of ordinary firmness from exercising" their freedom of speech. *Id.* (citation omitted).

The administration's arrest and detention of Mr. Khalil tick each unconstitutional box. As explained above, protest and advocacy on a matter of public concern is quintessential protected speech. *Edwards*, 372 U.S. at 235.  There can be no doubt arrest and detention would deter a person of ordinary firmness. *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (categorizing "an arrest" as an "easy to identify" adverse action). And the Trump administration has repeatedly confirmed

its actions against Mr. Khalil are predicated on his protected speech.[12] The administration's arrest and detention of Mr. Khalil is quintessential retaliation and barred by the Constitution.

## II. The Foreign Policy Deportation Provision Is Unconstitutionally Vague.[13]

Especially insofar as it can apply, as here, based solely on protected speech, the Foreign Policy Deportation Provision, 8 U.S.C. § 1227(a)(4)(C)(i) ("FPDP"), which Secretary Rubio used to render Mr. Khalil deportable, is unconstitutionally vague. A vague regulation may violate due process for either of two reasons, both of which apply here: when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or when it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).

Here, the FPDP grants the secretary unfettered discretion to render a noncitizen deportable based on speech adversely affecting "foreign

---

[12] *See, e.g.*, *White House Daily Briefing*, *supra* note 2, at 10:24 (Press Secretary Leavitt comments).

[13] Though Mr. Khalil's brief does not raise this argument concerning the facial validity of the FPDP, *amici* wish to alert the Court to additional significant concerns regarding the constitutionality of the FPDP.

policy consequences" while giving permanent residents like Mr. Khalil no notice of what conduct can trigger expulsion from the United States. Vagueness concerns are heightened in the context of speech because, fearing government punishment, speakers will self-censor and "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up) (citations omitted). Consequently, a regulation affecting protected speech "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

And the FPDP faces a doubly stringent standard: Because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Dimaya*, 584 U.S. at 156–57 (plurality opinion) (cleaned up) (applying heightened vagueness test to invalidate an INA provision).

The only court to address the FPDP's facial constitutionality (so far as we can find) held it unconstitutionally vague—even outside the context of speech. *Massieu v. Reno*, 915 F. Supp. 681 (D.N.J.), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996) (reversing for failure to exhaust

administrative remedies).[14] The *Massieu* court noted the FPDP vests "virtually boundless" authority in granting the secretary of state powers to deport simply by declaring it related to "foreign policy" reasons the secretary "need neither explicate nor defend." *Id.* at 701–02. As the FPDP affords "unrestrained power" with "utterly no standards" guiding it, the provision is void for vagueness. *Id.* at 702–03.

The court also held the statute unconstitutionally vague because, as even the government did not dispute in that case, it gives "absolutely no notice to aliens as to what is required of them." *Id.* at 699. In contrast with other "clearly defined" grounds for deportation—such as entering the country illegally or committing a crime—a person has no meaningful notice of when his mere presence in the United States will cause "adverse foreign policy consequences." *Id.* at 699, 702. In this way, the FPDP

> represents a breathtaking departure both from well established legislative precedent which commands deportation based on adjudications of defined impermissible conduct by the alien in the United States, and from well established precedent with respect to extradition which commands extradition based on adjudications of probable cause to believe that the alien has engaged in defined impermissible conduct elsewhere.

---

[14] At that time, Section 237(a)(4)(C)(i) of the INA was Section 241(a)(4)(C)(i).

*Id.* at 686.

America's foreign policy is an "unpublished, ever-changing, and often highly confidential" "amalgamation of interests and alliances" known to few outside the State Department and the President himself at any given time. *Id.* at 700–01. But even *declared* government policies offer insurmountable challenges. For instance, if the government seeks warmer relations with China, must noncitizens curtail criticism of China's human rights abuses? Regardless of whether the policy is rolled out in the State of the Union Address or classified and known only to a select few, the FPDP leaves the regulated noncitizen no way of knowing how to avoid running afoul of it. *Id.* "'Foreign policy' cannot serve as the talisman behind which Congress may abdicate responsibility to pass only sufficiently clear and definite laws when those laws may be enforced against the individual." *Id.* at 701.

As the *Massieu* court explained, it may be such that "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions." *Id.* And it may consequently be that "Congress could not have statutorily dictated to the Secretary the seriousness of particular foreign policy consequences." *Id.* "The fact

remains, however, that Congress cannot hide behind this required deference as a justification for granting the Secretary carte blanche to declare an alien's deportability at will." *Id.* The fact "that Congress might not have been able to provide more definite standards *does not excuse it from its constitutional obligation to do so*." *Id.* at 701–02 (emphasis added).

For all these reasons, the FPDP is unconstitutionally vague because there is "no conceivable way" a person can know ahead of time how to "conform his or her activities to the requirements of the law." *Id.* at 700.[15] At bottom, the court held, our Constitution does not allow deportation action against noncitizens lawfully in our country "in the unfettered discretion of the Secretary of State and without any meaningful opportunity to be heard." *Id.* at 686. And these constitutional problems are only exacerbated when, as in Mr. Khalil's case, the government seeks to deploy the FPDP against protected speech.

---

[15] For these and related reasons, the court held the statute was not only unconstitutionally vague, but also an unconstitutional deprivation of the due process right to be heard and an unconstitutional delegation of legislative powers. *Massieu*, 915 F. Supp. at 703–11.

## III. Arrests Targeting Protected Advocacy Contradict America's Free-Speech Rights and Values.

### A. Allowing arrest and detention for speech the government disfavors will chill expression at America's universities and beyond.

Arresting and detaining Mr. Khalil for engaging in protected expression on a university campus is irreconcilable with the Supreme Court's admonition that colleges and their "surrounding environs" are "peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180–81 (quoting *Keyishian*, 385 U.S. at 603). We count on universities to act as the historic "center of our intellectual and philosophic tradition" of open debate and inquiry. *Rosenberger*, 515 U.S. at 835.

There are more than a million international students studying at America's universities.[16] None of them will feel safe criticizing the American government of the day—in class, in scholarship, or on their own time—if a current or future secretary of state may, whenever he chooses and at his unreviewable discretion, facilitate their arrest and detention based on their spoken or written advocacy.

---

[16] *Enrollment Trends*, Open Doors, https://opendoorsdata.org/data/international-students/enrollment-trends [https://perma.cc/RL4H-TEMZ] (last visited Sept. 17, 2025).

That is not the American free speech tradition. Our schools "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021). Secretary Rubio may disapprove of what Mr. Khalil has to say, but it is his constitutional duty to defend his right to say it, whether on or off campus.

The point of the administration's action against Mr. Khalil *is* the chill—to scare the Nation's million-plus foreign students and tens of millions of lawful resident noncitizens from engaging in pro-Palestinian advocacy (even though millions of citizens freely engage in the very same advocacy). That is what candidate Trump promised on the campaign trail. In 2024, he vowed, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[17] Then, after Mr. Khalil's arrest, Secretary Rubio warned foreign students that if

---

[17] Josh Dawsey, Karen DeYoung, & Marianne LeVine, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors [https://perma.cc/2EU2-GNG9].

they were a "supporter of Hamas" and engage in "anti-Jewish student, anti-Semitic activities" then "we're going to revoke [your lawful status] and kick you out."[18] The equation for foreign students is simple: Support the administration's view of the war in Gaza, or else.

This must not stand. "Our commitment to precious First Amendment freedoms is tested when unpopular" speakers and groups "seek refuge within its scope." *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 447 (2d Cir. 1981). In America, some advocate ideas that are "discomforting, unsettling, and obnoxious." *Id.* But they "are entitled to the First Amendment freedoms we all enjoy, and considerations of comfort or convenience cannot prevail." *Id.*

---

[18] *See* Secretary of State Marco Rubio Remarks to Press, U.S. Dep't of State, at 9:18, Mar. 12, 2005, http://state.gov/secretary-of-state-marco-rubio-remarks-to-press [https://perma.cc/LTK4-BLMW]; *see also* Michel Martin & Destinee Adams, *DHS Official Defends Mahmoud Khalil Arrest, but Offers Few Details on Why It Happened*, NPR (Mar. 13, 2025), https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump [https://perma.cc/2FFN-QUZT].

**B.** **Allowing the Secretary of State to order the arrest and detention of speakers deemed contrary to the national interest is an un-American approach to speech.**

Allowing the Secretary of State to retaliate against speakers if he deems it in the national interest would place the United States among strange bedfellows when it comes to freedom of speech. For example, Article 51 of China's Constitution provides that individual liberty gives way if the government decides the expression "undermine[s] the interests of the state." Xianfa art. 51 (1982).[19] Russia's laws, too, permit the "[r]estriction of access to information" in the name of protecting "morality," its system of government, and the "security of the state." Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448.[20] And Saudi Arabia prohibits expression that serves any "foreign interest" conflicting with the "national interest" or that "stir[s] up discord among citizens."

---

[19] Available at: https://english.www.gov.cn/archive/lawsregulations/201911/20/content_WS5ed8856ec6d0b3f0e9499913.html [https://perma.cc/D8DG-5RSH].

[20] Available at: https://www.wto.org/english/thewto_e/acc_e/rus_e/wtaccrus58_leg_369.pdf [https://perma.cc/GW9F-C78F].

Law of Printing and Publication (Royal Decree No. M/32, 3/9/1424 H), art. 9 (2003).[21]

As China's, Russia's, and Saudi Arabia's experiences show, giving the government the power to censor when it believes speech threatens the government's "interests" is a loophole with infinite diameter. It has no place in America's tradition of individual liberty.

America has charted a different course than the world's censorial kings and regimes. In 1801, President Thomas Jefferson used his first inaugural address to defend the free speech rights of those who called for dissolution of the Union. He proclaimed, "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of safety with which error of opinion may be tolerated and where reason is left free to combat it."[22] Little could be more dangerous to the interests of a fledgling nation than calling for its extinction, yet our commitment to free speech remained. So it should today, 224 years later.

---

[21] Available at: https://www.saudiembassy.net/law-printing-and-publication [https://perma.cc/PG92-U2F4].

[22] Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/647Z-7LP9.

## CONCLUSION

The freedom of foreign nationals lawfully residing in the United States is not "dependent upon their conformity to the popular notions of the moment," because the First Amendment "belongs to them as well as to all citizens." *Wixon,* 326 U.S. at 166 (Murphy, J., concurring). The arrest and detention of Mr. Khalil violate the First Amendment and betray more than two centuries of American commitment to free and open expression. The Court should affirm the district court's orders granting Mr. Khalil's preliminary injunction motion and releasing him from custody.

Dated: September 17, 2025

Respectfully Submitted,

/s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amici Curiae*

# CERTIFICATES OF COMPLIANCE

1.    Pursuant to 3d Cir. L.A.R. 28.3(d) and 3d Cir. L.A.R. 46.1(e), I certify that I am a member of the bar of this court.

2.    I certify that this document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,677 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

3.    I certify that on September 17, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

4.    The text of the electronic and paper copies of this brief is identical.

5.    The electronic copy of this brief was scanned for viruses using SentinelOne (version 24.1.2.7444), and no virus was detected.

Dated: September 17, 2025      /s/ *Ronald G. London*
                                    Ronald G. London
                                    FOUNDATION FOR INDIVIDUAL
                                      RIGHTS AND EXPRESSION

700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amici Curiae*