# Nos. 25-2162 & 25-2357

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

MAHMOUD KHALIL,

*Petitioner-Appellee,*

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; SECRETARY UNITED STATES DEPARTMENT OF STATE;
ATTORNEY GENERAL UNITED STATES OF AMERICA,

*Respondents-Appellants.*

On Appeal from the United States District Court for
the District of New Jersey, No. 25-1963 (MEF) (MAH)

## BRIEF OF *AMICI CURIAE* 73 FAITH ORGANIZATIONS, CONGREGATIONS, AND FAITH LEADERS IN SUPPORT OF PETITIONER-APPELLEE MAHMOUD KHALIL

Rutgers Law School – Newark
Center for Law & Justice
Constitutional Rights Clinic
123 Washington Street
Newark, New Jersey 07102
(973) 353-3239
*Counsel for Amici Curiae*
Jessica Rofé, Esq.

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* have no parent companies, and no publicly owned corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... ii

PRELIMINARY STATEMENT .................................................................3

I.   ARGUMENT ...................................................................................7

A.   THE GOVERNMENT'S TARGETING AND ONGOING DETENTION OF MR. KHALIL
VIOLATE HIS FIRST AND FIFTH AMENDMENT RIGHTS, AND THE DISTRICT COURT
PROPERLY GRANTED BAIL. .......................................................................7

B.   THE GOVERNMENT'S RETALIATORY POLICY AND ITS APPLICATION OF THE
FOREIGN POLICY GROUND STATUTE TO MR. KHALIL ARE VOID FOR VAGUENESS. ..13

CONCLUSION .......................................................................................17

APPENDIX A ........................................................................................19

CERTIFICATION OF COMPLIANCE ..................................................29

CERTIFICATION OF SERVICE...........................................................30

ANTI-VIRUS CERTIFICATION .........................................................31

## TABLE OF AUTHORITIES

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Amend. 1 ..................................................................................1

### UNITED STATES SUPREME COURT

*Bridges v. Wixon*, 326 U.S. 135 (1945) ........................................................7

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ................................13

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ...........................................16

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) .................................9

*Houston v. Hill*, 482 U.S. 451 (1987) ...........................................................11

*Jordan v. DeGeorge,* 341 U.S. 223 (1951)......................................................14

*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965)...................................9

*NAACP v. Button*, 371 U.S. 415 (1963)............................................... 13, 15

*Nieves v. Bartlett,* 587 U.S. 391 (2019)........................................................11

*Sessions v. Dimaya*, 584 U.S. 148 (2018)......................................................13

*Snyder v. Phelps,* 562 U.S. 443 (2011) .........................................................11

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................11

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......................................................8

### UNITED STATES COURT OF APPEALS

*Aref v. Lynch,* 833 F.3d 242 (D.C. Cir. 2016) ................................................9

*Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021) ......................................8

*Hannon v. Beard,* 645 F.3d 45 (1st Cir. 2011) ...............................................9

*Rafeedie v. I.N.S.*, 795 F. Supp. 13 (D.D.C. 1992)..........................................8

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *cert granted, judgement vacated on other grounds,* 141 S. Ct. 227 (2020);...............................................8

### UNITED STATES DISTRICT COURT

*Aditya W. H. v. Trump*, No. 25-cv-1976 (KMM/JFD), Dkt. 21 (D. Minn. May 14, 2025) ............................................................................................12

*Ercelik v. Hyde*, No. 25-cv-11007, Dkt. 30 (D. Mass. May 8, 2025).....................12

*Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917 (W.D. Tex. 2018) ......................8

*Khan Suri v. Trump*, 25-cv-0480, Dkt. 65 (E.D. Va. May 14, 2025) .....................12

*Mahdawi v. Trump*, No. 25-cv-00389-GWC, -- F.Supp.3d -- , 2025 WL 1243135 (D.Vt. Apr 30, 2025) .................................................................................12

*Massieu v. Reno,* 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996) .......................................................................16

*Mohammed H. v. Trump*, No. 25-1576, Dkt 29 (D. Minn. May 5, 2025) ..............12

*Öztürk v. Hyde*, No. 25-cv-0374, Tr. Bail Hrg. 105:9-115:5 (D. Vt. May 9, 2025)12

*Rafeedie v. I.N.S.*, 795 F. Supp. 13 (D.D.C. 1992). ............................................8, 16

*Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604 (C.D. Cal. 2021) ................................................................................................................8

## ARTICLES

David Cole, *The First Amendment's Borders,* 6 HARV. L. & POL'Y REV. 147 (2012) ...................................................................................................8, 9

Katie J.M. Baker, *The Group Behind Project 2025 Has a Plan to Crush the Pro-Palestinian Movement*, N.Y. TIMES (May 18, 2025), https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html.........................................................................................15

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are leaders, congregations, and organizations across faiths who revere the Constitution and cherish its guarantee of freedom of speech and due process of law. Without presuming to speak for all American faiths—a diverse community that hold a multitude of viewpoints—*amici* are compelled to file this brief because the arrest, detention and potential deportation of Petitioner-Appellee Mahmoud Khalil for his protected speech violate the most basic constitutional rights. We share with him a profound interest in the integrity and protection of the First Amendment and Fifth Amendment to the United States Constitution (U.S. Const., Amend. 1 and 5). *Amici* include the following organizations and individual faith leaders:

1. Bend The Arc: A Jewish Partnership for Justice
2. Boston Workers Circle
3. The Buddhist Coalition for Democracy
4. Congregation Ahavas Sholom
5. Congregation Beit Simchat Torah
6. The Episcopal Diocese of Long Island
7. The Episcopal Diocese Of New York
8. The Episcopal Peace Fellowship
9. Faithful America
10. First Spanish United Methodist Church (the People's Church), East Harlem
11. Hindus for Human Rights

---

[1] All parties have consented to this filing. No party's counsel authored this brief in whole or in part. No party nor any party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici, their members, and their counsel contributed money related to the preparation or submission of this brief.

12. Hinenu Baltimore
13. Immigration Law & Justice New York
14. Indiana Center for Middle East Peace
15. Interfaith Alliance
16. Interfaith Center Of New York (ICNY)
17. Interfaith Center on Corporate Responsibility
18. Ionia United Methodist Church
19. Jews for Racial & Economic Justice
20. Justice for All
21. Kadima Reconstructionist Community
22. The Kairos Center for Religions, Rights, and Social Justice
23. Kehilla Community Synagogue
24. Kol Tzedek Synagogue
25. Kolot Chayeinu/Voices of our Lives
26. L'Chaim! Jews Against the Death Penalty
27. Leo Baeck Temple
28. Mid-City Zen
29. Multifaith Voices for Peace & Justice
30. Muslim Advocates
31. New Jewish Narrative
32. New Sanctuary Coalition
33. New York Jewish Agenda
34. New York State Council of Churches
35. Palestine Justice Network
36. Partners for Progressive Israel
37. Pax Christi New York State
38. The Riverside Church, New York
39. The Shalom Center
40. St. Ann & the Holy Trinity Episcopal Church
41. St. Mary's Episcopal Church, Harlem
42. St. Peter's Episcopal Church, Chelsea
43. Shir Tikvah
44. T'ruah: The Rabbinic Call for Human Rights
45. Union Theological Seminary
46. The Village Zendo
47. The Workers Circle: Jewish Culture for a Just World

Individual Faith Leaders
    Rabbi Alana Alpert

Rabbi David Basior
The Rev. Zenki K. Batson
The Rev. Dr. Robin Blair
Rabbi Joshua Chasan
The Rev. Fred Davie
Rabbi Nate Degroot
The Rev. Canon John E. Denaro
Rabbi Amy Eilberg
Rabbi Dr. Barat Ellman
The Rev. Paul Fleck
Rabbi Ari Lev Fornari
The Rev. Mary Foulke
Rabbi Rebecca Hornstein
The Rev. Cece Jones-Davis
Rabbi Rachel Kahn-Troster
Rabbi Jason Klein
The Rev. W. Mark Koenig
Rabbi Bob Gluck
The Rev. Christine Lee
Rabbi Arielle Lekach-Rosenberg
The Rev. Liz Maxwell
The Rev. Seth Zuiho Segall, Zen Priest
Dr. Michael Spath
Rabbi Jessica Spencer
Robert Steinbaum

For descriptions of *amici*, please see Appendix A attached hereto.

## PRELIMINARY STATEMENT

*Amici curiae* are leaders, congregations, and organizations across faiths with diverse views and perspectives but a shared belief that the federal government's decision to punish and retaliate against Petitioner Mahmoud Khalil offends our most treasured constitutional rights—rights that are of particular importance to faith communities across the United States.

3

Mr. Khalil, a Palestinian husband and father, came to the U.S. to study international policy as a human rights defender, and is now a lawful permanent resident. Because of his background in diplomacy, Mr. Khalil was asked to serve as a negotiator for students of varying faiths, including many Jewish students, who were engaged in pro-Palestinian protests at Columbia University. While *amici* may hold different views on the substance of the various views expressed at the protests, *amici* all believe in the right to protest, and were shocked when Mr. Khalil became the first target of the Trump Administration's policy to arrest, detain, and attempt to deport students and scholars on "foreign policy" grounds.

On March 8, 2025, during the Holy Month of Ramadan, on his way home from an Iftar dinner, Mr. Khalil and his pregnant wife were surrounded in the lobby of his apartment by officers who handcuffed him, placed him in a vehicle, and moved him across several state lines over the course of several hours in order to detain him in a private immigration detention center in Louisiana. The video of his arrest was shocking, and President Trump and Secretary of State Marco Rubio made clear that he was to be the first of many.

Secretary Rubio later attempted to justify these extraordinary measures under a rarely invoked statute that permits the deportation of certain individuals on "foreign policy" grounds. The statute expressly prohibits the Secretary of State from detaining and removing a noncitizen because of the individual's "past, current, or

expected beliefs, statements, or associations" when lawful within the United States, unless the Secretary deems an individual's presence or activities to "compromise a compelling U.S. foreign policy interest." Secretary Rubio relies on this rare exception in efforts to deport Mr. Khalil for his lawful speech, and immigration officials have pursued this and other charges to try to keep Mr. Khalil detained.

Months into these efforts, the federal government has not shown how Mr. Khalil's continued presence in this country, or his freedom pending any immigration decision, would pose any threat--because they cannot make such a showing. The Administration claims its actions against Mr. Khalil support efforts to combat antisemitism. Antisemitism is a persistent scourge that has threatened the Jewish people for centuries, and *amici* are united in condemnation of antisemitism and all forms of religious discrimination. But arresting, detaining, and potentially deporting Mr. Khalil for his protected free speech does not assist in eradicating antisemitism. Nor was that the government's real purpose. Rather, in Mr. Khalil's case, the government is instead exploiting legitimate concerns about antisemitism as pretext for undermining core pillars of American democracy, the rule of law, and the fundamental rights of free speech and academic debate on which this nation was built. The government's actions jeopardizing the free exercise and expression of faith concern all *amici.*

Many religious minorities, including Jewish people, came to the United States to escape generations of similar predations. Many faith groups represented in this filing have members whose ancestors or who themselves battled prejudice, repression, danger and trauma to make a safe home here in the United States. The images of Mr. Khalil's arrest in twenty-first century New York City evoke the oppressive tactics employed by the authoritarian regimes that ancestors of many of *amici*'s members left behind in Odessa, Kishinev, and Warsaw, as well as other places around the globe that more recently have engaged in these tactics. Even some groups originating in this country found themselves, amid the struggle for civil rights, targeted for expressing views aligned with their faith. To watch state authorities undermine the same fundamental rights that empowered so many Jewish Americans and others fleeing dangerous homelands is chilling; to know it is being done in the name of the Jewish people and on behalf of faith is profoundly disturbing. It is especially troubling that this governmental action is undertaken in a country whose very founders fled religious oppression. If anything, *amici* believe such unjust treatment of lawful residents like Mr. Khalil will aggravate risks to American Jews and other people of faith, not ease them, because an intolerant government is never good for the free exercise of faith. That bedrock principle stands at the very foundation of our country.

Our Constitution secures to all students and scholars, including noncitizens, the right to peacefully express political beliefs without fear of government reprisal. Contrary to Secretary Rubio's claim, Khalil's constitutionally protected expression does not, and cannot, cause his continued presence in the U.S. to compromise a compelling U.S. foreign policy interest. Our foreign policy is not so fragile that a person's words in support of his homeland could so easily compromise it, and our constitutional guarantees are not so feeble that they may be so easily discarded.

Many of these issues continue to be litigated in the case below, but the district court has preliminary enjoined removal and detention based on the foreign policy ground and released Mr. Khalil on bail in light of the government's punitive actions and extraordinary circumstances. This Court should affirm the district court's orders. The First and Fifth Amendments demand no less.

## I.   ARGUMENT

### A.   THE GOVERNMENT'S TARGETING AND ONGOING DETENTION OF MR. KHALIL VIOLATE HIS FIRST AND FIFTH AMENDMENT RIGHTS, AND THE DISTRICT COURT PROPERLY GRANTED BAIL.

It is well-settled that "[f]reedom of speech and of press is accorded [noncitizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). While the government may have broad discretion to deny entry to noncitizens, "once a [noncitizen] lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Id.* at 161

(Murphy, J., concurring); *see also Rafeedie v. I.N.S.*, 795 F. Supp. 13, 22 (D.D.C. 1992). So too are noncitizens protected by the Fifth Amendment's guarantee of due process of law. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

Immigration laws permitting the government to deport a foreign resident who merely "advocates or teaches . . . proscribed political doctrines" are unconstitutionally overbroad. *Rafeedie,* 795 F. Supp. at 22-23 (invalidating former 8 U.S.C. §§ 1182(a)(27) and (a)(28)(f) as overbroad). Federal courts have likewise enjoined attempts to detain, deport, or otherwise punish lawful foreign residents because they expressed views the government opposed. *See, e.g.*, *Ragbir v. Homan*, 923 F.3d 53, 71-72 (2d Cir. 2019), *cert granted, judgement vacated on other grounds,* 141 S. Ct. 227 (2020); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (bond revocation); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921-22 (W.D. Tex. 2018) (parole revocation); *Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 619–623 (C.D. Cal. 2021) (denial of DACA Application).

The government's pretextual assertion of U.S. foreign policy interests cannot justify its censorship of noncitizen speakers. *See generally* David Cole, *The First Amendment's Borders,* 6 HARV. L. & POL'Y REV. 147 (2012). Foreign policy or national defense "cannot be invoked as a talismanic incantation" to support any

government action "which can be brought within its ambit." *United States v. Robel,* 389 U.S. 258, 263 (1967) "Implicit in the term 'national defense 'is the notion of defending those values and ideals which set this Nation apart," and the risks inherent in a free society have never licensed the government to trammel the foundational expressive liberties that "make[] defense of the Nation worthwhile." *Id.* at 264. Enforcing the First Amendment's protections for all speakers in the United States only "highlights the cherished values of our constitutional framework." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 310 (1965) (Brennan, J., concurring). Since the First Amendment applies to foreign students attending American universities, government action to remove such students or revoke their visas or terminate their lawful permanent resident status must comport with the First Amendment's protections.

The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted). A violation occurs when (1) a speaker engages in protected speech, (2) the government takes adverse action against her, and (3) the speaker's exercise of her speech rights is a reason for the government's action. *See Hannon v. Beard,* 645 F.3d 45, 48 (1st Cir. 2011); *Aref v. Lynch,* 833 F.3d 242, 258 (D.C. Cir. 2016).

The government acknowledged that Mr. Khalil's protected speech was the basis of his arrest. Secretary of State Rubio issued a memorandum, filed in Mr. Khalil's removal proceedings on April 9, 2025, with the conclusion that allowing Mr. Khalil to stay in the U.S. would create a "hostile environment" for Jewish students in the United States, asserting that because "the foreign policy of the United States champions core American interests and American citizens," "condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective."[2] Yet the sole offense the government identifies to date is his vocal and lawful role as a mediator in the Columbia University pro-Palestinian demonstrations of 2024. It is unclear what speech in particular the government attributes to Mr. Khalil, or if it is holding him responsible for everything that anyone involved in the demonstrations has said. Either way, Mr. Khalil cannot be detained and deported because of this speech. While some *amici* may not agree with the views expressed in the demonstrations, and some may even disagree strongly with them, *amici* are united in the belief that "the government may not prohibit the expression of an idea simply because society

---

[2] *See* Tab A, *Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)*, *Department of Homeland Security,* (Apr. 9, 2025) https://s3.documentcloud.org/documents/25894225/dhs-documents-mahmoud-khalil.pdf.

finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Mr. Khalil's speech addresses a subject of broad, complex public debate and constitutes core political speech at "the heart of . . . First Amendment [ ] protection." *Snyder v. Phelps,* 562 U.S. 443, 451-52 (2011). The freedom to express even unpopular ideas without risking arrest is "one of the principal characteristics by which we distinguish a free nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987). If the government could simply "silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age." *Nieves v. Bartlett,* 587 U.S. 391, 412 (2019) (Gorsuch, J., concurring). And when the voices in question overlap with the faith-driven missions of *amici* such as speaking out on behalf of the oppressed, the hungry, the endangered, the migrant and the voiceless, the result is a profound assault on the First Amendment. Arresting and detaining Mr. Khalil for his words is a betrayal of the constitutional values that attracted many *amici* and their families who immigrated to this great country's shores.

The government's punitive treatment of Mr. Khalil equally offends the Fifth Amendment's Due Process Clause. Even after the district court preliminarily enjoined the government from detaining and seeking to deport Mr. Khalil on the foreign policy ground, the federal government refused to release Mr. Khalil and

relied instead on a second charge that is rarely, if ever, used to detain and deport lawful permanent residents like Mr. Khalil. At no time did immigration officials allege or provide evidence that Mr. Khalil was a flight risk or danger, and yet not only kept him detained but also denied his requests to be temporarily present for the birth of his son and to at least be transferred to a detention center closer to his son after his birth. With mounting evidence that detention was being used to punish Mr. Khalil—something that the due process clause forbids in the civil detention context—the district court released Mr. Khalil. There is no reason that Mr. Khalil must be locked away and separated once again from his wife and son as this case continues to be litigated.

It is a testament to our justice system that our federal courts have appropriately acted promptly to protect the First and Fifth Amendment rights of many of the students and scholars who have been similarly detained in the weeks following Mr. Khalil's detention. *See Khan Suri v. Trump*, 25-cv-0480, Dkt. 65 (E.D. Va. May 14, 2025) (ordering release); *Aditya W. H. v. Trump*, No. 25-cv-1976 (KMM/JFD), Dkt. 21 (D. Minn. May 14, 2025) (ordering release); *Öztürk v. Hyde*, No. 25-cv-0374, Tr. Bail Hrg. 105:9-115:5 (D. Vt. May 9, 2025) (ordering release); *Ercelik v. Hyde*, No. 25-cv-11007, Dkt. 30 (D. Mass. May 8, 2025) (ordering release); *Mohammed H. v. Trump*, No. 25-1576, Dkt 29 (D. Minn. May 5, 2025); *Mahdawi v. Trump*, No. 25-cv-00389-GWC, -- F.Supp.3d -- , 2025 WL 1243135 (D.Vt. Apr 30, 2025).  These

decisions protect all our First and Fifth Amendment rights, and would support a decision by this Court affirming the district court's order releasing Mr. Khalil.

## B. THE GOVERNMENT'S RETALIATORY POLICY AND ITS APPLICATION OF THE FOREIGN POLICY GROUND STATUTE TO MR. KHALIL ARE VOID FOR VAGUENESS.

The government's actions raise serious constitutional concerns for an additional reason, which serves as the basis of the district court's preliminary injunction: the government's invocation of 8 U.S.C. § 1227(a)(4)(C)(i), the foreign policy ground, as applied to Mr. Khalil is unconstitutionally vague.

A policy or as-applied law is void for vagueness when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012). Extra care must be taken "[w]hen speech is involved": "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. Thus, laws regulating expression face an even more stringent test, as vague speech regulations invite arbitrary enforcement against less popular viewpoints and cause speakers to self-censor. *See NAACP v. Button*, 371 U.S. 415, 432, 435 (1963). Because extraordinary penalties such as removal amplify the risks of vague speech regulation, courts must apply the "most exacting vagueness standard" when assessing such statutes. *Sessions v. Dimaya*, 584 U.S. 148, 150 (2018) (holding portion of

Immigration and Nationality Act ["INA"] void for vagueness) (citing *Jordan v. DeGeorge,* 341 U.S. 223, 231 (1951)).

The government's policy and Secretary Rubio's determination under the foreign policy ground as pretexts to arrest Mr. Khalil fail that test. The policy and law purport to permit the deportation of noncitizen campus speakers like Mr. Khalil because the Secretary has deemed his presence or activities to pose "potentially serious adverse foreign policy consequences for the United States." And while the law expressly prohibits the Secretary from taking such action against a noncitizen based on the individual's protected "beliefs, statements, or associations," it nevertheless purports to permit the Secretary to deport a noncitizen if he determines that allowing the individual to remain "would compromise a compelling U.S. foreign policy interest." *See* 8 U.S.C. § 1227(a)(4)(C)(i)-(ii). Importantly, the legislative history states Congress's intention that the foreign policy ground be "used sparingly" and "only in unusual circumstances" and "not merely because there is a likelihood that a [noncitizen] will make critical remarks about the United States or its policies." 101 Cong. Rec. 35417 (1990) (enacted).[3] Despite this unambiguous

---

[3] To put a finer point on it, Congress cited two examples where the foreign policy ground might apply: (1) when a [noncitizen's] mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the

14

congressional intent, Secretary Rubio does not appear to recognize any material constraints on his discretion to invoke the foreign policy ground to target Mr. Khalil for removal based on his protected speech.

The vagueness doctrine prohibits precisely this kind of discriminatory enforcement against disfavored speakers. *See Button,* 371 U.S. at 432, 435. Without standards delineating what may "compromise[] a compelling U.S. foreign policy interest" (or even what the U.S.'s foreign policy is), noncitizens are left to guess what otherwise protected speech could lead to their detention and deportation. Does *all* speech expressing solidarity with or even sympathy for the Palestinian people compromise a compelling U.S. foreign policy interest?[4] Should the political winds shift, what is to stop a future Secretary of State from deciding certain pro-Israel speech compromises a compelling U.S. foreign policy interest? Do protests of Russian activities in Ukraine, or conversely of Ukrainian actions in response,

_____

former Shah of Iran)"; and (2) when a [noncitizen's] entry would violate a treaty or international agreement to which the United States is party." *Id*.

[4] Concern that the Trump Administration is using its purported fight against antisemitism as cover for targeting groups, including U.S. citizens, whom it sees as standing in disagreement with its political policies is not merely speculative. *See* Katie J.M. Baker, *The Group Behind Project 2025 Has a Plan to Crush the Pro-Palestinian Movement*, N.Y. Times (May 18, 2025), https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html. (reporting on Project Esther, the Heritage Foundation's proposal to rapidly dismantle the pro-Palestinian movement in the United States, along with its support at schools and universities, at progressive organizations and in Congress).

compromise a compelling U.S. foreign policy interest? No one can know—the statute's enforcement delegates plenary censorship authority "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972). "[U]ncertain meanings" lead individuals "to steer far wider of the unlawful zone" and self-censor. *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964).

It is this very uncertainty that led a federal court to hold the foreign policy ground unconstitutionally vague. *See Massieu v. Reno,* 915 F. Supp. 681, 699-701 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).[5] The two fatal defects Judge Maryanne Trump Barry identified in *Massieu* are cogent and persuasive here. First, and as discussed above, the law contains no "standards" for determining what a noncitizen must do to avoid adverse action since enforcement lies entirely within the Secretary's personal and undisclosed judgment. *Massieu*, 915

---

[5] *See also Rafeedie*, 795 F. Supp. 13 (D.D.C. 1992), where the court held a similar provision of the INA void for vagueness. That provision authorized the Attorney General to detain and deport any noncitizen whom he  knows or has reason to believe seek(s) to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States," (*id.* at 15), as an unconstitutionally vague abridgment of freedom of speech because  [t]he undefined terms of the statute—'activities,   prejudicial' 'endanger'—are so broad and vague as to deny plaintiff a reasonable opportunity to know what he may or may not say or do." *Id.* at 23.

F. Supp. at 699, n.16. Second, given that American foreign policy is "unpublished, ever-changing and often highly confidential," no noncitizen "could know, ex-ante, how to conform his or her activities to requirements of the law" or when "his or her mere presence here would cause adverse foreign policy consequence." *Id.* at 700.

These constitutional concerns are as apt today as they were in 1996. The government's shocking new policy and its application of the foreign policy ground to Mr. Khalil provides absolutely no notice to noncitizens like Mr. Khalil as to what speech it proscribes. Instead, the government's policy and application of the statute vest the Secretary of State with seemingly unfettered discretion to take action against any noncitizen lawfully in the U.S. based on whatever constitutionally suspect ground he chooses, including lawful speech the Secretary deems contrary to his nebulous and ever-changing view of "foreign policy." The First Amendment does not abide laws that invite such sweeping censorship.

## CONCLUSION

While *amici* may hold different views on the substance of Mr. Khalil's statements, they firmly stand behind his right to voice dissent and cannot support the government's invocation of antisemitism as a pretext for his arrest, detention, and deportation. In our Republic founded on the separation of powers, it is the duty of the federal judiciary to defend liberty and protect our most fundamental freedoms whenever the government attempts to undermine them. This Court should exercise

17

its authority to safeguard these freedoms in this case. *Amici* respectfully urge this Court to affirm the district court's preliminary injunction and decision to grant bail.

Date: September 17, 2025
New York, NY

Respectfully Submitted,


/s/ Jessica Rofé
_____

Jessica Rofé, Esq.
Rutgers Law School - Newark
Center for Law & Justice
Constitutional Rights Clinic
123 Washington Street
Newark, NJ 07102
(973) 353-3239
*Counsel for Amici Curiae*

Proposed *amici* consist of the following faith organizations, congregations, and individuals:

1.    **BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE** is the nation's leading progressive Jewish voice empowering Jewish Americans to fight for justice and equality for all and is the only national Jewish organization focused exclusively on social change in the United States. Bend the Arc mobilizes Jewish Americans beyond religious and institutional boundaries through bold leadership development, innovative civic engagement, and robust advocacy.

2.    **BOSTON WORKERS CIRCLE** is a community and spiritual home for secular Jewish life; a voice for progressive Jewish values and social change; and an arts and education center celebrating Yiddish, Jewish, and progressive culture.

3.    **THE BUDDHIST COALITION FOR DEMOCRACY** is a non-denominational Buddhist non-profit organization that supports democratic ideals, norms, and practices. We believe democratic governance is the best method for: 1) ensuring the dignity and fundamental rights of all persons, 2) enabling all members of society to lead meaningful and fulfilling lives, 3) and settling passionately held differences of opinion through peaceful means. We commit to supporting democracy with methods that are consistent with the Buddhist principles of wisdom, compassion, right speech, and nonviolence.

4.    **CONGREGATION AHAVAS SHALOM** is a Conservative, egalitarian Jewish congregation, the oldest operating synagogue in Newark, N.J. It is passionately committed to the pursuit of Tikkun Olam (repair of the world) and social justice.

5.    **CONGREGATION BEIT SIMCHAT TORAH** is a spiritual home for people of all sexual orientations and gender identities. Passionate, provocative, and deeply Jewish, our community engages in spirited debate and activism: rejoicing in diversity, denouncing social injustice wherever it exists, and striving for civil rights for all people.

6. **THE EPISCOPAL DIOCESE OF LONG ISLAND** is composed of 129 congregations in Brooklyn, Queens, and Nassau and Suffolk counties. It encompasses the largest and most populous island in the continental United States, covering 1,400 square miles of rural farmlands, urban cityscapes, and everything in between. The people of this diocese are among the most diverse in the world, yet are united in their mission to serve the people of God in their midst.

7. **THE EPISCOPAL DIOCESE OF NEW YORK** is comprised of nearly 190 parishes throughout the New York City and Hudson Valley regions. We proclaim a bold, bright, and clear Gospel of Jesus Christ—rooted in grace, driven by love, and embodied through service. We focus locally. Our systems, structures, and staff exist to support local communities, including our many immigrant parishioners.

8. **THE EPISCOPAL PEACE FELLOWSHIP** exists to end violence — in our hearts, in our Church, and in our world — through obeying Christ's call to justice, peace, and reconciliation.

9. **FAITHFUL AMERICA** is a network of progressive Christians demonstrating our faith through bold, prophetic action for a more equitable, free, and loving world. We're a community of Christians from all denominations and none, churched and unchurched, who integrate spiritual practice and organized action to love our neighbors and to resist those twisting our faith to cause harm.

10. **FIRST SPANISH UNITED METHODIST CHURCH (THE PEOPLE'S CHURCH)** is an historic Latino congregation (Puerto Rican in origin since 1922) that has been a community anchoring institution in East Harlem, known for the Young Lord's Takeover 50 years ago, when we were baptized with a nickname known in the community as "the People's Church." We still have close connections with the new generation of the Young Lords as a partner in community outreach and conscientization effort. FSUMC is committed to proclaiming and practicing the Gospel of Our Lord and Savior Jesus Christ for the transformation of the world to become a global village where peace and justice and shalom of God prevails. We are doing our part in our locality toward that vision and yearning of Jesus Christ. The Palestine liberation issue

has been dear to many of the church members and in our discussion and proclamation for some time, as we are a congregation that has been historically committed to the liberation of Puerto Rico.

11. **HINDUS FOR HUMAN RIGHTS** is a progressive Hindu organization rooted in liberatory Hindu values and devoted to Justice and Peace in the country and the world. We stand resolutely against caste and Hindu supremacy.

12. **HINENU BALTIMORE** is a community rooted in joy, pursuit of justice, and radical kinship. We offer a home for people of all backgrounds seeking Jewish life to land, feel safe, and be welcomed. We assert that our political and Jewish selves need not be in conflict with one another, and fearlessly declare our intention to live our Jewish values in the public sphere for the benefit our city.

13. **IMMIGRATION LAW & JUSTICE NEW YORK** welcomes immigrants with compassion, dignity, and love by providing free, high-quality legal services to low-income and vulnerable immigrants, education to communities of faith and the public about the immigration system, and advocacy for immigrant rights.

14. **INDIANA CENTER FOR MIDDLE EAST PEACE** is a voice of conscience supporting full civil, political, and human rights for Palestine.

15. **INTERFAITH ALLIANCE** is a national interfaith organization dedicated to protecting the integrity of both religion and democracy in America. Interfaith Alliance was founded in 1994 by a broad coalition of mainstream religious leaders who wanted to challenge the outsized impact of religious extremists in our country. For more than thirty years, Interfaith Alliance has advocated at all levels of government for an equitable and just America where the freedoms of belief and religious practice are protected, and where all persons are treated with dignity and have the opportunity to thrive.

16. **INTERFAITH CENTER OF NEW YORK (ICNY)** is a secular non-profit organization with a mission to overcome prejudice, violence, and misunderstanding by activating the power of the city's grassroots religious and civic leaders and their communities. Over the course of 25 years, ICNY

has built the most religiously-diverse and civically-engaged network of grassroots and immigrant religious leaders across the five boroughs of Manhattan, Queens, Brooklyn, Staten Island and The Bronx. These include Muslim, Sikh, Hindu, Buddhist, Christian, Jewish, Afro Caribbean, and Native American New Yorkers who have either attended one or more of our social justice retreats, participated in our religious diversity education programs for social workers, teachers, lawyers, and NYPD officers, or joined multi-faith advocacy work on immigration and religious freedom.

17. **INTERFAITH CENTER ON CORPORATE RESPONSIBILITY** is a coalition of faith- and values-based investors who view shareholder engagement with corporations as a powerful catalyst for change. Our statement, "inspired by faith, committed to action" sets forth our pledge to be active owners, and to engage meaningfully with the companies in our portfolios through the process of shareholder engagement that we pioneered more than 50 years ago.

18. **IONIA UNITED METHODIST CHURCH** is in Ontario County, New York, and a welcoming, inclusive and affirming congregation, allowing ALL people the opportunity to be involved in all aspects of the life of the community. We seek to love one another as we have been loved by Christ.

19. **JEWS FOR RACIAL & ECONOMIC JUSTICE** is New York's leading grassroots organization of progressive Jews organizing on issues that affect all New Yorkers. With 6000 dues-paying members, and a reach of tens of thousands more, JFREJ organizes with our neighbors and allies for a New York where all communities can thrive. We work in coalition with communities across all lines of difference on a range of issues including housing, healthcare, immigration, community safety, and hate violence prevention.

20. **JUSTICE FOR ALL** is a human rights organization accredited by the United Nations, focused on Muslim minority issues and anti-genocide advocacy.

21. **KADIMA RECONSTRUCTIONIST COMMUNITY** is building a progressive community of inclusion, social justice, and Jewish tradition for Jews and our allies. Committed to racial, economic and gender justice, we

bridge spirituality and social justice through Shabbat and holiday celebration, inter-generational learning, and solidarity work with #blacklivesmatter, immigration justice organizations, and movements to end the Israeli occupation.

22. **THE KAIROS CENTER FOR RELIGIONS, RIGHTS, AND SOCIAL JUSTICE** is a national organization committed to building a movement to end poverty, racism, ecological devastation, and religious nationalism, open to all, and led by the poor. Drawing on the power of religions and human rights, we are a center for movement strategy, coordination, grassroots organizing, and education among the poor across all lines of division. The Kairos Center for Religions, Rights, and Social Justice is fiscally sponsored by Tides Center, a 501(c)(3) nonprofit organization.

23. **KEHILLA COMMUNITY SYNAGOGUE** is a synagogue with over 500 member households serving Oakland, CA and the East Bay, and affiliated with Jewish Renewal.

24. **KOL TZEDEK SYNAGOGUE**, a Voice for Justice, is a Reconstructionist synagogue in West Philadelphia. We are a multiracial, intergenerational Jewish community where people are invited to study Torah, ask unanswerable questions, sing on and off key, teach our children, pursue justice, engage actively with our neighborhood, and care for one another. Together, we are building a spiritually rigorous, joyful refuge deeply grounded in Jewish tradition and practice. We welcome the questioning, the seeking, and the devoted. We dance together in celebration, pray with our whole selves, and support each other in grief. Our spiritual practices nourish and inspire us to make the world more whole.

25. **KOLOT CHAYEINU/VOICES OF OUR LIVES** is a vibrant, independent, progressive Jewish congregation in Brooklyn, NY. Launched in 1993 around Founding Rabbi Ellen Lippmann's dining table, Kolot is a congregation where doubt can be an act of faith and all hands are needed to build our community. We are creative, serious seekers who pray joyfully, wrestle with tradition, pursue justice, and refuse to be satisfied with the world as it is. We share a commitment to ending structural racism and becoming an antiracist congregation. And, as individuals of varying sexual orientations, gender

identities, races, family arrangements, and Jewish identities and backgrounds, we search for meaningful and just expressions of our Judaism in today's uncertain world.

26. **L'CHAIM! JEWS AGAINST THE DEATH PENALTY** is an international Jewish anti-death penalty group.

27. **LEO BAECK TEMPLE**, a Reform congregation, is a welcoming and inclusive community committed to searching for moral, spiritual and intellectual nourishment from one another and from the wellspring of our Jewish tradition and to sharing that nourishment with the world. We build our congregational community upon the three pillars that are said in our tradition to sustain the world -- on Torah, on worship, and on acts of lovingkindness.

28. **MID-CITY ZEN (**New Orleans, LA) is a Soto Zen temple in the lineage of Suzuki Roshi.

29. **MULTIFAITH VOICES FOR PEACE & JUSTICE** is a grassroots multifaith group that creates and coordinates peace and justice-oriented programming, actions, and projects in the Palo Alto area.

30. **MUSLIM ADVOCATES ("MA")** is a national legal advocacy organization that works with and for Muslims and other marginalized people across the United States who face discriminatory abuses of federal power. Its work includes providing education, counsel, and defense to noncitizens at risk of or facing wrongful immigration-related surveillance, scrutiny, or consequences—on the basis of any protected ground, including viewpoint, race, national origin, and/or religion. MA's work across these issues includes conducting related Know Your Rights trainings; providing legal consults to impacted individuals; providing direct representation to clients in litigation and non-litigation matters; and coordinating and supporting other attorneys in their provision of education, counsel, and defense to impacted people. In all of these regards, MA's work has spiked in the aftermath of Mr. Khalil's retaliatory immigration arrest during Ramadan this year. MA resoundingly supports affirmance of the district court's preliminary injunction and decision to order Mr. Khalil's release.

31.    **NEW JEWISH NARRATIVE** is a progressive American Jewish organization that works towards peace, justice, and a better future for Israelis and Palestinians alike.

32.    **NEW SANCTUARY COALITION** is a faith-based organization that works with migrants (or "Friends") to accompany them through the immigration process. At New Sanctuary Coalition, members empower Friends to take charge of their own case.

33.    **NEW YORK JEWISH AGENDA** advocates, organizes, and convenes liberal Jewish New Yorkers to impact policy, politics, and the communal discourse.

34.    **NEW YORK STATE COUNCIL ON CHURCHES** is a New York Statewide organization which is committed to the promotion of religious freedom and human rights not only in New York but throughout the United States and around the world. We fervently are committed to the rule of law, free speech and academic freedom.

35.    **PALESTINE JUSTICE NETWORK** works to educate and mobilize our denomination for Palestinian human rights, associating with ecumenical allies and financially supporting our goals.

36.    **PARTNERS FOR PROGRESSIVE ISRAEL** is a progressive American Zionist organization dedicated to the achievement of a durable and just peace between the State of Israel and its neighbors, which includes an end to Israel's occupation based on a two-state solution. We support Israelis working to ensure social justice, civil rights, and equality for all of Israel's inhabitants. Partners promotes a just Israeli society by cultivating Jewish-Arab partnerships and seeks to deepen American Jews' understanding of the complexities of both Israeli and Palestinian societies.

37.    **PAX CHRISTI NEW YORK STATE** is a state chapter of Pax Christi USA, a member of the international Catholic Peace Movement. Our guide is the nonviolent Jesus. We follow Catholic Social Teaching rooted in Gospel Nonviolence and our modus operandi are prayer, study, and action.

38. **THE RIVERSIDE CHURCH, NEW YORK CITY** is an interdenominational, interracial, international, open, welcoming, and affirming church and congregation. The mission of the Church is to serve God through word and witness; to treat all human beings as sisters and brothers; and to foster responsible stewardship of all God's creation.

39. **ST. ANN & THE HOLY TRINITY EPISCOPAL CHURCH** is a Christian house of worship and community center that partners with numerous service organizations and cultural groups. We are an inclusive and welcoming congregation committed to the pursuit of peace and justice for all God's people.

40. **ST. MARY'S EPISCOPAL CHURCH, HARLEM** is the "I am not afraid" church, standing up as a community of faith on the unceded land of the Munsee & Lenni Lenape people in West Harlem to pursue justice and peace for the poor and oppressed, to pray and care for the sick, lonely and at risk and to put into practice the message of the Gospel by the power of the Holy Spirit, "Be Not Afraid!"

41. **ST. PETER'S EPISCOPAL CHURCH, CHELSEA** abides by its mission is to cultivate space in New York City for seekers to authentically encounter God.

42. **THE SHALOM CENTER** works to steward and seed an emergent Jewish sacred justice.

43. **SHIR TIKVAH** is a 600-family Jewish Reform congregation in Minneapolis, Minnesota. Shir Tikvah is a k'hilah k'doshah (holy community), joyfully revealing the intersections of talmud torah (lifelong Torah study), t'filah (prayer), tzedakah (justice), and hachnasat orchim (radical hospitality). We creatively wrestle with tradition and innovation as we invigorate Jewish spiritual life and transform the world.

44. **T'RUAH: The Rabbinic Call for Human Rights,** a coalition of many hundreds of rabbis, brings the Torah's ideals of human dignity, equality, and justice to life by empowering rabbis and cantors to be moral voices and to lead

Jewish communities in advancing democracy and human rights for all people in the United States, Canada, Israel, and the occupied Palestinian territories.

45. **UNION THEOLOGICAL SEMINARY** is deeply rooted in a critical understanding of the breadth of Christian traditions yet significantly instructed by the insights of other faiths. It makes connections between these traditions and the most profoundly challenging issues of our contemporary experience: the realities of suffering and injustice, world religious pluralism, the fragility of our planet, and discoveries of modern science.

46. **VILLAGE ZENDO** was founded in 1986 and is committed to authentically continuing the Zen tradition while keeping it contemporary and relevant to today's world. We are located in lower Manhattan, offering a place of healing and sanctuary in the midst of one of the world's busiest and most vital cities. Through its commitment to "Action," Village Zendo participates in refugee resettlement, prison ministry, and advocacy in support of equal justice.

47. **THE WORKERS CIRCLE: JEWISH CULTURE FOR A JUST WORLD** is a national, secular, Jewish social justice organization with over 200,000 people in our activist community across the nation. We were founded by Eastern European Jewish immigrants fleeing programs and persecution and seeking democratic freedoms in the U.S. to build "a better and more beautiful world for all."

**INDIVIDUAL FAITH LEADERS:**

1. RABBI ALANA ALPERT

2. RABBI DAVID BASIOR

3. THE REV. ZENKI K. BATSON

4. THE REV DR ROBIN BLAIR

5. RABBI JOSHUA CHASAN

6. THE REV. FRED DAVIE

7.  RABBI NATE DEGROOT

8.  THE REV. CANON JOHN E. DENARO

9.  RABBI AMY EILBERG

10. RABBI DR. BARAT ELLMAN

11. THE REV. PAUL FLECK

12. RABBI ARI LEV FORNARI

13. THE REV. MARY FOULKE

14. RABBI REBECCA HORNSTEIN

15. THE REV. CECE JONES-DAVIS

16. RABBI RACHEL KAHN-TROSTER

17. RABBI JASON KLEIN

18. THE REV. W. MARK KOENIG

19. RABBI BOB GLUCK

20. THE REV. CHRISTINE LEE

21. RABBI ARIELLE LEKACH-ROSENBERG

22. THE REV. LIZ MAXWELL

23. THE REV. SETH ZUIHO SEGALL, ZEN PRIEST

24. DR. MICHAEL SPATH

25. RABBI JESSICA SPENCER

26. ROBERT STEINBAUM

## CERTIFICATION OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations stated in Fed. R. App. P. 32(a)(7)(B). Using the word count feature of Microsoft Word, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 3,945 words. The brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman typeface. I certify that the text of the electronic and hard copies of this brief are identical. I certify that Jessica Rofé is a member of the bar of this Court.

/s/ Jessica Rofé

Jessica Rofé, Esq.

Dated: September 17, 2025

## CERTIFICATION OF SERVICE

I hereby certify that on September 17, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Third Circuit by using the CM/ECF system. All counsel of record in this case are registered CM/ECF users.

/s/ Jessica Rofé
Jessica Rofé, Esq.

Dated: September 17, 2025

## ANTI-VIRUS CERTIFICATION

I hereby certify that the electronic copy of this brief was scanned using Cisco Secure Client and is virus-free.

/s/ Jessica Rofé
Jessica Rofé, Esq.

Dated: September 17, 2025