# No. 25-2162 & 25-2357

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

MAHMOUD KHALIL,

*Petitioner-Appellee,*

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW
YORK FIELD OFFICE IMMIGRATION AND CUSTOMS
ENFORCEMENT; WARDEN ELIZABETH CONTRACT
DETENTION FACILITY; DIRECTOR UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; SECRETARY UNITED STATES
DEPARTMENT OF STATE; ATTORNEY GENERAL UNITED
STATES OF AMERICA,

*Respondents-Appellants.*

On Appeal from the United States District Court
for the District of New Jersey

**BRIEF ON BEHALF OF 108 COLUMBIA UNIVERSITY AND
BARNARD COLLEGE FACULTY MEMBERS AS
AMICI CURIAE IN SUPPORT OF APPELLEE
URGING AFFIRMANCE**

*(**Counsel listed on next page**)*

Luna Droubi
Matthew Melewski
Jeremy Ravinsky
Keegan Stephan
BELDOCK LEVINE &
HOFFMAN LLP
99 Park Ave., PH/26th Floor
New York, NY 10016
(212) 490-0400
ldroubi@blhny.com
mmelewski@blhny.com
jravinsky@blhny.com
kstephan@blhny.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................ii

INTEREST OF AMICI CURIAE..............................................................1

INTRODUCTION.....................................................................................3

ARGUMENT .............................................................................................6

    I.    COLUMBIA UNIVERSITY HAS HISTORICALLY
          SERVED AS A BEACON OF ROBUST FIRST
          AMENDMENT DISCOURSE. .............................................. 6

    II.   THE PORTRAYALS OF COLUMBIA UNIVERSITY
          AND THE PALESTINIAN SOLIDARY PROTESTS
          AS DANGEROUS, VIOLENT, OR ANTI-SEMETIC
          ARE FALSE. ........................................................................ 11

    III.  LEVERAGING FALSE PROTRAYALS OF
          WIDESPREAD ANTI-SEMITISM TO SILENCE
          POLITICAL SPEECH THREATENS THE VERY
          MISSION OF THE UNIVERSITY.................................. 17

CONCLUSION .......................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) ............................... 8

*Healy v. James*, 408 U.S. 169 (1972) ......................................................... 8

*J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011) ..................... 8, 18

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ................................... 18

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) .............................. 8

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................... 8

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................... 8

## Statutes

8 U.S.C. 1227(a)(4)(C) ................................................................................ 4

## Other Authorities

Brief of National Jewish Advocacy Center, *Khalil v. President of the United States*, No 25-2162 (3d Cir. 2025), ECF No. 53 at 8–20. ......... 12

*Defending Columbia University from the Congressional Assault on Higher Education* (Apr. 2024), https://docs.google.com/document/u/2/d/e/2PACX-1vRIBsnP_PxwLRUrS3BBvyB1Zj4Y-BJM1AknpwF8J-HF0s6oPHULEBm433VHbNDwHDXmXH7lNf0ILtY8/pub ...................... 12

*Elissa Nadworny, All the Ways the Trump Administration Is Going After Colleges and Universities,* NPR (Jun. 10, 2025), https://www.npr.org/2025/06/10/nx-s1-5424450/ways-trump-administration-is-going-after-colleges ......................................................................... 10

Frank A. Guridy, *Why We Need to Remember 1968 Now*, Columbia Spectator (Apr. 26, 2018), https://www.columbiaspectator.com/opinion/2018/04/26/why-we-need-to-remember-1968-now. ............................... 6

ii

Glenn C. Altschuler et al., *The Myth of 'Woke' Indoctrination of Students*, The Hill (Apr. 9, 2023), https://thehill.com/opinion/education/3941143-the-myth-of-woke-indoctrination-of-students ......17

Graham Wright et al., *Antisemitism on Campus: Understanding Hostility to Jews and Israel*, Brandeis University Cohen Center for Modern Jewish Studies (Aug. 2024), https://www.brandeis.edu/cmjs/antisemitism/antisemitism-on-campus.html.....................................16

IAGS Resolution on the Situation in Gaza, International Association of Genocide Scholars (Aug. 2025), https://genocidescholars.org/wp-content/uploads/2025/08/IAGS-Resolution-on-Gaza-FINAL.pdf ........11

*Israel Has Committed Genocide in the Gaza Strip, UN Commission Finds*, United Nations (Sept. 16, 2025), https://www.ohchr.org/en/press-releases/2025/09/israel-has-committed-genocide-gaza-strip-un-commission-finds. ..................................................................................11

Johanna Lee, *Mandela Hall: A History of the 1985 Divest Protests*, Columbia Spectator (Apr. 12, 2016), https://www.columbiaspectator.com/eye/2016/04/12/mandela-hall. .................6

Letter from Jewish Faculty Responding to the Second Report of Columbia University's Anti-Semitism Taskforce (Sept. 5, 2024), https://docs.google.com/document/u/1/d/1ROJM_N9TWe909sAK1s PkIkFJzboe60e8PlMKqvKhdCg/pub (last visited Sept. 16, 2025).....12, 14, 19

Michael C. Bender et al., *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/politics/trump-pressure-universities.html

Provost Jonathan Cole, *The University Responds: 'On the Matter of Edward Said'*, Columbia Spectator (Oct. 20, 2000), https://www.columbiaspectator.com/2000/10/20/university-responds-matter-edward-said. ..........................................................................................9

*Statement by University President Lee Bollinger on the Invitation of Mahmoud Ahmadinejad*, Columbia Spectator (Sept. 19, 2007), https://

www.columbiaspectator.com/2007/09/19/statement-university-president-lee-bollinger-invitation-mahmoud-ahmadinejad/ ................7

*The David Project*, PowerBase, https://powerbase.info/index.php/The_David_Project (last updated May 2, 2013, 8:59 PM). ....................9

Zachary Folk, *Columbia Student Protesters Occupied The Same Building In 1968—Here's How The Two Protests Compare So Far*, Forbes (Apr. 30, 2024), https://www.forbes.com/sites/zacharyfolk/2024/04/30/columbia-student-protesters-occupied-the-same-building-in-1968-heres-how-the-two-protests-compare-so-far/?sh=768908561d5d .6

## INTEREST OF AMICI CURIAE[1]

Amici are a group of 108 current and former Columbia University and Barnard College (hereinafter "Columbia University" or "Columbia" or the "University") faculty members from across a broad range of academic departments and disciplines.[2] All Amici were present on campus and actively observant of the broad campus protest activities in support of Palestinian rights—and the Columbia administration's heavy-handed responses—in the months and years following Hamas's October 7 attacks in Israel. A number of Amici were among twenty-three Jewish faculty who published a public letter to then-President of Columbia University, Minouche Shafik, rejecting the "dangerous and false conflation" of pro-Palestinian speech and anti-Semitism, and asking the

---

[1] No party's counsel authored this brief in whole or in part. No person, other than Amici Curiae's counsel, funded the preparation or submission of this brief. All parties consented to the filing of this brief.

[2] A full list of Amici appears as an appendix to this brief. Amici present this brief solely in their personal, private capacities, and the views expressed herein are not those of the colleges or universities with which some Amici are affiliated.

University not to succumb to political pressure to silence criticism of Israeli, U.S., and Columbia University policy in Gaza.[3]

All Amici have had an intimate view and first-hand knowledge of the environment at Barnard and Columbia during the time Mahmoud Khalil was present on campus.

We write to urge this Court to reject the caricature of the far-reaching anti-Semitic climate on campus that has been propagated by tabloids, bad-faith actors on and off campus, and those at the highest levels of our government. It is this caricature that led to the targeting of Mr. Khalil and others to be punished for constitutionally protected advocacy—advocacy that sits at the heart of the historic University's mission to question, advocate, and, where possible, change people's minds.

Further, Amici who are familiar with the activities of Mahmoud Khalil while on campus categorically reject the persistent smearing of Mr. Khalil as anti-Semitic or as a supporter of terrorism. Instead, these

---

[3] Debbie Becher et al., *Jewish Faculty Reject the Weaponization of Antisemitism*, Columbia Spectator (April 10, 2024), https://www.columbiaspectator.com/opinion/2024/04/10/jewish-faculty-reject-the-weaponization-of-antisemitism.

Amici recognize his mature leadership role as a mediator between students and the University administration, and his belief in solidarity across faiths in pursuit of justice and peace.

Because efforts to silence peaceful student activism in support of Palestine—or other social justice causes—does grave danger to Columbia University's mission and to our constitutional order writ large, Amici urge the Court to affirm the judgment that Mr. Khalil's detention and attempted removal runs contrary to our fundamental constitutional commitments.

## INTRODUCTION

This case concerns the Government's detention and arrest of Mahmoud Khalil—a Palestinian student at Columbia University and a lawful permanent resident—because of his speech and expressive activity protesting Israel's military onslaught on Palestinians in Gaza. The Government claims the right to deport Mr. Khalil on the grounds that these constitutionally protected activities are allegedly "adverse" to the foreign policy interests of the United States.[4] JA340 (citing 8 U.S.C.

---

[4] The Government later added a second charge alleging misrepresentations on Mr. Khalil's green card application. Mr. Khalil has challenged this additional charge as pretextual and merely part and

1227(a)(4)(C)).[5] The proffered context for the Government's actions is the atmosphere and events at the University while Mr. Khalil was a student there, specifically the protests that began on campus in the aftermath of Hamas's October 7 attacks on Israel and Israel's military offensive in Gaza (hereinafter "Palestinian Solidarity Protests").[6]

Appellants' portrayal of Columbia's campus—and Mr. Khalil's role on it—is a gross and dangerous distortion of reality. Appellants' uncited claims about "repeated acts of violence" and "riots" by "pro-Hamas protestors" are not supported by the record. The government and its Amici dangerously exaggerate First Amendment protected activity and routine, widely attended, and time-honored campus protests. Appellants make only a half-hearted attempt to tie these exaggerations to Mr.

---

parcel of the government's desire to retaliate against him for his pro-Palestinian advocacy.

[5] "JA___" refers to the parties' joint appendix by page number. "Gov't Br. __" refers to the Government's opening brief by page number.

[6] Appellants' Opening Brief at 1 (relying on "his participation in the violent and anti-Semitic riots and protests that occurred at Columbia University during the spring and summer of 2024. During those protests, Jewish students were the victims of repeated acts of violence and blocked from access to classroom and other campus facilities by pro-Hamas protestors.").

Khalil, settling on a self-refuting reference to him "potentially helping to organize an 'unauthorized marching event.'"[7] Contemporaneous accounts of the Palestinian Solidarity Protests paint a very different picture of campus. *See* JA1180–1182.

As manufactured as Appellants claims are, their real-world consequences for Columbia University's reputation and integrity, and academia generally, are grave. The record is replete with evidence of the pall that Mr. Khalil's detention—and the false narrative the government has used to justify its actions—has cast over Columbia University's academic and intellectual life. Students and faculty alike have described the chilling effect that the government's attempt to punish Mr. Khalil for disfavored speech has had on their lives, careers, and education.

For this reason, and for the reasons provided in Appellee's brief, we urge the Court to affirm in the interest of preserving Columbia University as a forum for First Amendment activities. Judicial intervention in this matter is critical to the preservation of academic integrity on our campus and throughout the country, providing assurance for those whose speech would otherwise be chilled. If our students are

---

[7] *Id.* at 5–6.

arrested and deported for engaging in activities endemic to the critical mission of a university, the historic mission of Columbia University and other universities is irreversibly threatened.

## ARGUMENT

### I.     COLUMBIA UNIVERSITY HAS HISTORICALLY SERVED AS A BEACON OF ROBUST FIRST AMENDMENT DISCOURSE.

Columbia University has historically been a robust intellectual and political eco-system. It has famously been a place of dynamic and productive First Amendment dialogue and confrontations. In keeping with this essential tradition of academic freedom, the Palestinian Solidarity Protests were no different than other protests that have occurred on Columbia's campus. This includes protests to end the University's racist treatment of their Harlem neighbors,[8] for an end to

---

[8] Frank A. Guridy, *Why We Need to Remember 1968 Now*, Columbia Spectator (Apr. 26, 2018), https://www.columbiaspectator.com/opinion/2018/04/26/why-we-need-to-remember-1968-now.

the Vietnam War[9] and apartheid in South Africa,[10] as well as challenging

unpopular speakers such as Iranian president Mahmoud Ahmadinejad.[11]

The debates raised by these First Amendment activities can be

heated and uncomfortable, and protests can evoke strong feelings.

College campuses are filled with young students learning not just about

the world, but about themselves, their identity, and the principles that

will guide them into the future. Because of this, campuses, including

Columbia University, have and continue to be filled with impassioned

and energetic movements for change. This was no different with the

Palestinian Solidarity Protests, where many students on campus were

reacting to the horrors of the war in Gaza. *See* JA1375.

---

[9] Zachary Folk, Columbia Student Protesters Occupied The Same Building In 1968—Here's How The Two Protests Compare So Far, Forbes (Apr. 30, 2024), https://www.forbes.com/sites/zacharyfolk/2024/04/30/columbia-student-protesters-occupied-the-building-in-1968-heres-how-the-two-protests-compare-so-far/?sh=768908561d5d.

[10] Johanna Lee, *Mandela Hall: A History of the 1985 Divest Protests*, Columbia Spectator (Apr. 12, 2016), https:// www.columbiaspectator.com/ eye/2016/04/12/mandela-hall.

[11] *Statement by University President Lee Bollinger on the Invitation of Mahmoud Ahmadinejad*, Columbia Spectator (Sept. 19, 2007), https:// www.columbiaspectator.com/2007/09/19/statement-university-president-lee-bollinger-invitation-mahmoud-ahmadinejad.

Bold, impassioned, strident speech—even if painful or uncomfortable to hear—is at the core of the First Amendment's protections of free speech. As the Supreme Court has repeatedly underscored, "debate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes [unpleasant speech]." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (internal citations omitted)); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 774 (1994) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." (internal citations omitted)); *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008) ("As the Supreme Court in *Healy v. James* explained, 'the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of

8

constitutional freedoms is nowhere more vital than in the community of American schools.'" (quoting *Healy v. James*, 408 U.S. 169, 180 (1972))); *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 939 (3d Cir. 2011) ("There is no First Amendment exception for offensive speech . . . .").

Columbia University's historic commitment to free inquiry and robust disagreement is what gave it the reputation as a world-class institution, one previously known as welcoming of international students and perspectives. In the past, Columbia has historically stood up against attempts to suppress Palestinian scholarship[12] and to the reckless accusations from private actors like the David Project that aimed to chill speech in support for Palestinian rights.[13] That is no longer the case.[14]

---

[12] Provost Jonathan Cole, *The University Responds: 'On the Matter of Edward Said'*, Columbia Spectator (Oct. 20, 2000), https://www.columbiaspectator.com/2000/10/20/university-responds-matter-edward-said.

[13] *The David Project*, PowerBase, https://powerbase.info/index.php/The_David_Project (last updated May 2, 2013, 8:59 PM).

[14] Unfortunately, Columbia University's more recent failure to stand against smear attacks on University students, faculty, and scholars advocating on behalf of Palestinian rights—from the government, and from doxxing trucks broadcasting ours and our students' faces and anonymously-run websites smearing students and scholars as anti-Semitic—shows that it has yielded to the influence of the government and these private actors.

But where students and faculty can no longer rely on their university for support of free speech and inquiry, the safe harbor of the Constitution is all the more vital.

Limiting academic freedom when it comes to questions of Israel and Palestine paves the way for limitations on other contested topics, from climate science to the history of slavery as some high-level government officials have started to pursue.[15] What's more, students must have the freedom to dissent, to make mistakes, to offend without intent, and to learn to repair harm done if necessary. A college campus is an intentionally drawn space for challenge and learning; it should be faculty and students mediating this complicated process, not government officials policing content of which they disapprove.

---

[15] *See* Michael C. Bender et al., *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/politics/trump-pressure-universities.html; Elissa Nadworny, *All the Ways the Trump Administration Is Going After Colleges and Universities*, NPR (Jun. 10, 2025), https://www.npr.org/2025/06/10/nx-s1-5424450/ways-trump-administration-is-going-after-colleges.

## II. THE PORTRAYALS OF COLUMBIA UNIVERSITY AND THE PALESTINIAN SOLIDARY PROTESTS AS DANGEROUS, VIOLENT, OR ANTI-SEMETIC ARE FALSE.

After Hamas's horrific attacks on October 7, 2023, Israel began bombing and then invaded Gaza, a military assault that human rights organizations and scholars throughout the world are calling a genocide.[16] Students and faculty, outraged by the mass murder of civilians, engaged in the time-honored norm of campus protests, much as they protested the Vietnam War, South African apartheid, and racial violence. The Palestinian Solidarity Protests represented a continuation of Columbia University's historic role in fostering heated but necessary discourse on a matter of grave public importance. Indeed, it would have been a shocking departure from the University's historic function if the campus had been quiet during this morally and politically contentious time.

---

[16] "[T]he International Association of Genocide Scholars . . . [d]eclares that Israel's policies and actions in Gaza meet the legal definition of genocide in Article II of the United Nations Convention for the Prevention and Punishment of the Crime of Genocide (1948)." IAGS Resolution on the Situation in Gaza, International Association of Genocide Scholars (Aug. 2025), https://genocidescholars.org/wp-content/uploads/2025/08/IAGS-Resolution-on-Gaza-FINAL.pdf; *see also Israel Has Committed Genocide in the Gaza Strip, UN Commission Finds*, United Nations (Sept. 16, 2025), https://www.ohchr.org/en/press-releases/2025/09/israel-has-committed-genocide-gaza-strip-un-commission-finds.

However, the government and others have perpetuated a false narrative about Columbia University and the Palestinian Solidarity Protests. For example, Amici National Jewish Advocacy Center, relying almost exclusively on mere allegations in its own unverified Complaint in a separate litigation against Mr. Khalil, claims that Mr. Khalil and groups involved in the Palestinian Solidarity Protests were "sowing chaos and espousing support for terrorism." *See* Brief of National Jewish Advocacy Center, *Khalil v. President of the United States*, No. 25-2162 (3d Cir. 2025), ECF No. 53 at 8–20 (citing Second Amended Complaint, *Haggai v. Kiswani*, No. 25-CV-2400 (S.D.N.Y. 2025), ECF No. 66).[17]

Far from dangerous, violent, or anti-Semitic, the Palestinian Solidarity Protests at Columbia University were largely peaceful.[18] They

---

[17] Not only do Amici rely on their prior allegations to support their claims in this proceeding, completing their solipsistic logic, Amici rely on this proceeding as evidence of Amici's claims *in the separate proceeding as well*. *See* Second Amended Complaint, *Haggai v. Kiswani*, 25-CV-2400 (S.D.N.Y. 2025), ECF No. 66, ¶ 35.

[18] *Defending Columbia University from the Congressional Assault on Higher Education* (Apr. 2024), https:// docs.google.com/document/u/2/ d/e/2PACX-1vRIBsnP_PxwLRUrS3BBvyB1Zj4Y-BJM1AknpwF8J-HF0s6oPHULEBm433VHbNDwHDXmXH7lNf0ILtY8/pub ("[I]t is absurd to claim that antisemitism . . . is rampant on Columbia's campus.").

included student encampments, organized teach-ins for fellow students, press conferences, readings, prayers, cultural activities and performances, collective meals, and a Passover seder. *See, e.g.*, JA596. To the extent that there was any violent rhetoric, first-hand observers have publicly pointed out, "[i]t was the demonstrations outside the campus that contained much of the violent rhetoric."[19] Outside protesters were drawn to Columbia University "by former President Shafik's suspension of two pro-Palestine student groups," which "escalated the protests and made our campus a flashpoint."[20]

Seeking to justify its unlawful detention and removal proceedings of Mr. Khalil, the government dramatically distorts the Columbia University campus and cynically represents it as unique and harmful. Appellants and their Amici are attempting to wield the notoriety surrounding the Palestinian Solidarity Protests to falsely tar Columbia University as a hotbed of anti-Semitic rhetoric and violence. As in the

---

[19] Letter from Jewish Faculty Responding to the Second Report of Columbia University's Anti-Semitism Taskforce (Sept. 5, 2024), https://docs.google.com/document/u/1/d/1ROJM_N9TWe909sAK1sPkIkFJzboe60e8PlMKqvKhdCg/pub.

[20] *Id.*

case of other universities, the government seeks to use this fabricated narrative as pretext to further interfere with other academic activities that the government and these private actors oppose.

Contemporaneous accounts of the protests from students and faculty—individuals who were present on campus as the protests were ongoing—refute these fabricated descriptions of the campus climate at the time. Many of the instances of supposed anti-Semitism rest on misleading or distorted accounts of specific events.[21] For example, faculty members who spoke out against the weaponization of anti-Semitism were falsely accused of calling for the end of the state of Israel.[22] Incidents of alleged anti-Semitism used to justify the government's arrest and detention of Mr. Khalil have been shown to be falsely reported.[23]

What is notable from the government's submissions in this case and in the public at large is the absence of any factual basis for their claim

---

[21] *See* Letter from Jewish Faculty, *supra* note 19 ("[T]he report cherry-picks information to show the campus climate in the worst possible light.").

[22] *See id.*

[23] *See id.* (discussing the false allegations that an Israeli student's finger was fractured by a protester).

that there is a hostile climate on campus for Jewish students, or anything approximating student violence. The actual evidence in this case—which substantiates lived experiences on campus—overwhelming proves the opposite. The record in this case contains declarations from a dozen, majority Jewish, undergraduate and graduate students, attesting to Jewish students' distress that the false conflation of criticism of Israeli policy and anti-Semitism is being weaponized to silence and punish Palestinian voices,[24] as well as the climate of fear, repression, and anxiety that has befallen the campus after Mr. Khalil's arrest.[25]

The record also contains evidence substantiating Amici's own experiences, including Jewish faculty rejecting the government's caricature of the Columbia University's campus as a place of rampant

---

[24] *See* JA1318–1320, 1322-1325, 1327–1329.

[25] *See, e.g.*, JA1295 ("The fear on campus is not theoretical. It is lived, felt, and daily expressed by students and faculty alike"); JA1323 ("Mahmoud's abduction has created a chilling effect and caused mass fear and distress to Columbia students. As a Jewish student, the fact that his detainment was done in the name of Jewish safety was incredibly scary.").

anti-Semitism, and substantiating Mr. Khalil's leadership role in mediating between the administration and protesting students.[26]

Without question, "antisemitism is a grave concern that should be scrutinized alongside racism, sexism, Islamophobia, homophobia, and all other forms of hate."[27] As Columbia students and faculty opposed to the government's heavy-handed tactics have stated publicly, "when antisemitism rears its head, it should be swiftly denounced, and its perpetrators held to account."[28] However, "[t]o argue that taking a stand against Israel's war on Gaza is antisemitic is to pervert the meaning of the term."[29] Indeed, a noteworthy study from Brandeis University recently found barely any overlap between college students with hostility toward the state of Israel and those with hostility toward Jews.[30]

---

[26] *See* JA1161, 1163–1164.

[27] Defending Columbia University from the Congressional Assault on Higher Education, *supra* note 18.

[28] *Id.*

[29] *Id.*

[30] Graham Wright et al., *Antisemitism on Campus: Understanding Hostility to Jews and Israel*, Brandeis University Cohen Center for Modern Jewish Studies (Aug. 2024), https://www.brandeis.edu/cmjs/antisemitism/antisemitism-on-campus.html.

## III.   LEVERAGING FALSE PROTRAYALS OF WIDESPREAD ANTI-SEMITISM TO SILENCE POLITICAL SPEECH THREATENS THE VERY MISSION OF THE UNIVERSITY.

Appellants' false and misleading portrayal of Columbia University's campus has widespread consequences, not just for Columbia, but for higher education writ large. Indeed, permitting federal officials to arrest, detain, and deport students on such a false premise, when they are actually engaged in protected political expression, would do irreparable damage to the very function of a modern university. This Court should not permit higher education to suffer this irremediable wound.

A wide variety of students and professors have reported that non-citizen students have stopped attending classes, limited their engagement on social media, and have avoided traveling back home for fear of detention or deportation upon their return. *See* JA1270,1275–1277. Non-citizen students and professors have stopped attending events relating to the war on Gaza and academic conferences on its consequences. *See* JA1281, 1290. A wide variety of events have been cancelled, and research put on pause, at Columbia and other universities.

*See* JA868, 1251, 1332. Even University leadership began to self-censor its public statements. A broad chill has descended on campus life.

Rather than being concerned with the safety and well-being of Jewish students on campuses, Appellants and their supporting Amici are leveraging anti-Semitism in a wider effort to caricature and demonize universities, including Columbia University, as hotbeds of "woke indoctrination."[31] Its opportunistic use of anti-Semitism in a moment of crisis is expanding and strengthening longstanding efforts to undermine educational institutions.

Weaponizing charges of anti-Semitism to suppress political speech critical of the state of Israel has the serious risk of undermining the legitimacy and autonomy of democratic institutions, including universities. It is on subjects such as Israel and Palestine—subjects that inspire such intense emotions and conflicting points of view—where the First Amendment's protection of academic freedom is so crucial. *See Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust

---

[31] Glenn C. Altschuler et al., *The Myth of 'Woke' Indoctrination of Students*, The Hill (Apr. 9, 2023), https://thehill.com/opinion/education/3941143-the-myth-of-woke-indoctrination-of-students.

exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" (internal citations omitted)); *J.S.*, 650 F.3d at 944 ("In order to maintain a thriving democracy, students cannot be unreasonably encumbered in their freedom to express moral, political, and social ideals and beliefs.").

Criticism of Israel is not anti-Semitism. The relationship between Israel, Judaism, and Jewry is a hotly contested topic, including between and among Jews.[32] University campuses are one of the primary arenas in which this evolving and multi-faceted inquiry takes place.[33]

As Jewish scholars at Columbia University have noted, "the[] terms [Zionism and anti-Zionism] have been contested, notably among Jews, since the rise of the Zionist movement in the late 19th century and

---

[32] *See* Defending Columbia University from the Congressional Assault on Higher Education, *supra* note 18 (describing "more than a century of debates among Jews themselves about the nature of a Jewish homeland in the biblical Land of Israel, including Israel's status as a Jewish nation-state").

[33] *See* Letter from Jewish Faculty, *supra* note 19 (describing Columbia University as a place where "Jewish students and scholars . . . continue to interrogate, investigate, and express their own ideas and commitments as works-in-progress").

remain the subject of rigorous scholarly inquiry today."[34] Conflating anti-Zionism—or any criticism of the state of Israel—with anti-Semitism not only distracts attention from actual anti-Jewish hatred, but also threatens the integrity of Columbia University as a site for research, debate, and exploration.[35] Ironically, by labelling the Palestinian Solidarity Protests as anti-Semitic, the government condemns and erases the viewpoints of those Jewish faculty and students who supported the protests.[36]

Ultimately, falsely characterizing Columbia's campus and its historic tolerance of heated, dissenting political viewpoints in this way is damaging to the University because it will continue to produce its predictable effects: stifling dialogue, silencing voices and the corresponding search for truth, and undermining the valor and mission

---

[34] *See id.*

[35] *See id.* ("We can't have open dialogue across differences on this difficult topic if students, faculty, and others are not free to criticize a modern state and its actions or debate a political philosophy like Zionism.").

[36] *See id.* ("It dismisses the experiences of the post-Zionist, non-Zionist, and anti-Zionist Jews who work, study, and/or live on our campus.").

Columbia University as a premier educational institution. Columbia University exists in order to foster this dialogue; not in spite of it. Even more, punishing students for engaging in the kind of protected expression at the heart of the University's mission risks irreparably damaging the mission of higher education writ large.

The Court's intervention is critical for the protection of the constitutional right to speech and dissent and the corresponding health of a great University.

## CONCLUSION

For all of the foregoing reasons, Amici respectfully request that this Court affirm the district court's orders preliminary enjoining the application of the "foreign policy grounds" against Mr. Khalil and ordering his release from detention.

Respectfully submitted,

/s/ Luna Droubi
Luna Droubi
Matthew Melewski
Jeremy Ravinsky
Keegan Stephan
BELDOCK LEVINE & HOFFMAN LLP
99 Park Ave., PH/26th Floor
New York, NY 10016
(212)490-0400
ldroubi@blhny.com

mmelewski@blhny.com
jravinsky@blhny.com
kstephan@blhny.com

*Counsel for Amici Curiae*

# Appendix A: List of Amici Curiae

Nadia Abu El-Haj
      Ann Whitney Olin Professor, Department of Anthropology

Thea Abu El-Haj
      Professor of Education, Barnard College

Marcel Agüeros
      Professor of Astronomy, Columbia University

Daniel Alarcón
      Associate Professor, Journalism School

Heidi Allen
      Associate Professor

Riana Elyse Anderson
      Associate Professor, Columbia School of Social Work

Nico Baumbach
      Associate Professor of Film and Media Studies

Debbie Becher
      Associate Professor, Barnard College

Helen Benedict
      Professor of Journalism

Meredith Benjamin
      Lecturer, English, Barnard College

Nina Berman
      Professor of Journalism

Susan Bernofsky
      Professor of Writing, Columbia University

Elizabeth Bernstein
        Professor of Sociology and WGSS, Barnard College

Lutfur Bhuiya
        Senior Systems Manager, Columbia University

Caroline Bowman
        Assistant Professor of Philosophy, Barnard College

Melanie Brewster
        Professor of Counseling and Clinical Psychology, Teachers College
        at Columbia University

Taylor Carman
        Professor of Philosophy, Barnard College, Columbia University

Kristi Cassaro
        Term Assistant Professor, English, Barnard College

Amy Chazkel
        Associate Professor of History

Kaoukab Chebaro
        Head of Global Studies, Columbia University Libraries

Yinon Cohen
        Yerushalmi Professor of Israel and Jewish Studies

Patricia Dailey
        Associate Professor

Lila Davachi
        Professor of Psychology

Rosalyn Deutsche
        Term Professor, Barnard College (retired)

Ezekiel Dixon-Román

Professor of Critical Race, Media, & Educational Studies

Madeleine Dobie
    Professor of French

Thomas Dodman
    Associate Professor, French, Columbia University

Marwa Elshakry
    Associate Professor

Ansley Erickson
    Associate Professor, History and Education Policy, Teachers College, Columbia University, and Affiliated Faculty, Department of History, Columbia University

Gil Eyal
    Professor of Sociology

Jeffrey Fagan
    Isidor & Seville Sulzbacher Professor of Law

Katherine Franke
    James L. Dohr Professor of Law (retired)

Daniel Friedrich
    Professor of Curriculum, Teachers College

Victoria Frye
    Professor, Columbia School of Social Work

Ralph Ghoche
    Assistant Professor, Architecture, Barnard College

Mara Green
    Assistant Professor, Barnard College

Michelle R. Greene

Assistant Professor of Psychology, Barnard College

Nora Gross
   Assistant Professor of Education, Barnard College, Columbia University

Najam Haider
   Professor of Religion, Barnard College

Jack Halberstam
   David Feinson Professor of the Humanities

Kim F. Hall
   Lucyle Hook Professor of English & Professor of Africana Studies

Ross Hamilton
   Professor of English, Barnard College

Michael Harris
   Professor of Mathematics, Columbia University

Meghan Hartman
   Term Assistant Professor, Religion, Barnard College

Maricarmen Hernandez
   Assistant Professor of Sociology

Marianne Hirsch
   William Peterfield Trent Professor Emerita, English and Comparative Literature

Jennifer S. Hirsch
   Professor of Sociomedical Sciences, Mailman School of Public Health, Columbia University

Jean E Howard
   George Delacorte Professor Emerita in the Humanities

Joseph Howley
    Associate Professor of Classics

Lisa Jahn
    Assistant Professor of American Studies, Barnard College

Janet Jakobsen
    Professor, Women's, Gender, and Sexuality Studies, Barnard College

Kay James
    Associate Professor of Neuroscience & Education, Teachers College

Rebecca Jordan-Young
    Professor of Women's, Gender, and Sexuality Studies

David Scott Kastan
    Old Dominion Foundation Professor Emeritus of English, Columbia University

Matthew Keegan
    Assistant Professor, Barnard College

Gregory Khalil
    Adjunct Assistant Professor, Graduate School of Journalism

Salman S. Khan
    Assistant Professor of Medicine CUIMC

Stacy Kinirons
    Assistant Professor Rehabilitation & Regenerative Medicine (Physical Therapy) CUIMC

Jennifer C Lena
    Associate Professor of Arts Administration, Teachers College

David Lurie

Associate Professor, East Asian Languages and Cultures, Columbia University

Daniel Malinsky
Assistant Professor of Biostatistics, Columbia Mailman School of Public Health

Linn Cary Mehta
Adjunct Lecturer, English

Christia Mercer
Gustave M. Berne Professor of Philosophy

Nara Milanich
Professor of History, Barnard College

Kenneth Miller
Peter Taylor Professor of Neuroscience

Debra Minkoff
Professor of Sociology, Barnard College

Shayoni Mitra
Senior Lecturer, Department of Theatre, Barnard College

Manijeh Moradian
Assistant Professor of Women's, Gender and Sexuality Studies, Barnard College

John Morrison
Professor of Philosophy, Barnard College

Yves Moussallam
Associate Professor of Earth and Environmental Sciences. Columbia University

Bahia Munem
Full-Time Lecturer, Columbia University

Erica D. Musser
        Assistant Professor of Psychology, Barnard College

Celia E. Naylor
        Professor, Africana Studies, Barnard College

Frederick Neuhouser
        Professor of Philosophy, Barnard College

Robert Newton
        Senior Research Scientist (retired), Part-Time Lecturer

James Piacentini
        Adjunct Assistant Professor of Urban Planning

Pablo Piccato
        Professor of History

Sheldon Pollock
        Professor Emeritus, MESAAS

Ashwini Rao
        Professor of Rehabilitation and Regenerative Medicine (Physical
        Therapy) at CUIMC

Hussein Rashid
        Term Lecturer, Religion, Barnard College

Bruce Robbins
        Old Dominion Foundation Professor in the Humanities

Beth Rubin
        Professor, Teachers College

Prantik Saha
        Assistant Clinical Professor of Pediatrics

Joerg Schaefer
>    Lamont Professor, Lamont-Doherty Earth Observatory of Columbia University

James Schamus
>    Professor of Professional Practice, School of the Arts

Sharon Schwartz
>    Professor of Epidemiology

Randa Serhan
>    Term Associate Professor, Sociology, Barnard College

Mmi Shirasu-Hiza
>    Professor of Genetics and Development, Assistant Dean of Mentoring for VIBRE Ph.D. Program, Columbia University, Irving Medical Center

Anooradha Iyer Siddiqi
>    Associate Professor of Architecture, Barnard College

Amelia Simone Herbert
>    Assistant Professor of Education and Urban Studies

David Skeist
>    Adjunct Lecturer, Theatre, Barnard College

Jonathan Snow
>    Professor of Biology, Barnard College

Alisa Solomon
>    Professor

Julien Teitler
>    Professor, Columbia School of Social Work

Michael Thaddeus
>    Professor of Mathematics, Columbia University

Yannik Thiem
        Associate Professor of Religion

J. Blake Turner
        Associate Professor of Social Science (in Psychiatry) at CUIMC

Dominic T. Walker
        Term Associate Professor Sociology, Barnard College

Melanie Wall
        Professor of Biostatistics (in psychiatry), Vagelos College of
        Physicians and Surgeons, Columbia University Irving Medical
        Center

Alex Watson
        Senior Lecturer, English, Barnard College

Madisson Whitman
        Lecturer, Center for Science and Society and Anthropology

Gisela Winckler
        Professor of Climate, Climate School, Columbia University

Samantha C. Winter
        Associate Professor, Columbia School of Social Work

Susan S. Witte
        Professor

Peter Woit
        Senior Lecturer, Mathematics Department

Elwin Wu
        Professor, Columbia School of Social Work

Giulia Zanni
        Assistant Professor Department of Psychiatry

E.Y. Zipris
      Adjunct Professor, Teachers College

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 3,748 words, excluding the parts of the brief exempted by Rule 32(a)(7)(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (14-point Century Schoolbook), and is double-spaced.

3.    Counsel certifies that the text of this electronic brief is identical to the text of the paper copies that will be submitted to the Court.

4.    Counsel certifies that a virus detection program has been run on the .PDF being filed with the Court and that no virus was detected. Counsel used the virus detection program VirusTotal.

/s/ Luna Droubi
Luna Droubi

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Luna Droubi
Luna Droubi