# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

### Nos. 25-2162 & 25-2357

## MAHMOUD KHALIL,

### Petitioner-Appellee,

### v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Todd LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General of the Department of Justice,

### Respondents-Appellants.

On Appeal from the U.S. District Court for the District of New Jersey,
No. 25-cv-1963 (MEF)(MAH)

## BRIEF OF *AMICI CURIAE* SCHOLARS OF CONSTITUTIONAL LAW IN SUPPORT OF PETITIONER-APPELLEE AND AFFIRMANCE

LAWRENCE S. LUSTBERG
MADHULIKA MURALI
GIBBONS P.C.
JOHN J. GIBBONS FELLOWSHIP IN PUBLIC INTEREST AND CONSTITUTIONAL LAW
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for* Amici Curiae

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF AMICI ....................................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ......................................................................................5

I.      THE HISTORY OF EXECUTIVE BRANCH ACTION IN
        TARGETING NON-CITIZENS FOR DETENTION AND
        REMOVAL DURING TIMES OF PERCEIVED CRISIS,
        INCLUDING BASED UPON THEIR EXPRESSION OF
        POLITICAL VIEWPOINTS, HAS NOT SURVIVED LEGAL OR
        HISTORICAL SCRUTINY. ...........................................................5

        A.      The Executive has a pattern of responding to perceived political
                crisis by invoking supposed national security or foreign policy
                concerns to target certain non-citizens for detention and
                removal. ........................................................................5

        B.      Judicial review plays a crucial role in constraining such abuses
                of executive power, especially those which run afoul of the
                Constitution. ................................................................16

II.     THIS CASE TYPIFIES SUCH UNDESIRABLE EXECUTIVE
        ACTION, AND THE DISTRICT COURT WAS CORRECT NOT TO
        PERMIT IT HERE. ...................................................................20

        A.      This case typifies the undesirable executive action of the past. .........20

        B.      The district court properly held that the Foreign Policy Ground
                as applied to Petitioner likely violates the Constitution.....................22

CONCLUSION ..................................................................................26

ADDENDUM ...................................................................................1a

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boumediene v. Bush,*
    553 U.S. 723 (2008)..................................................................18, 19

*Boutilier v. INS,*
    387 U.S. 118 ...............................................................................19

*Bridges v. Wixon,*
    326 U.S. 135 (1945)........................................................................17

*Chae Chan Ping v. United States,*
    130 U.S. 581 (1889)......................................................................6, 7

*City of Chicago v. Morales,*
    527 U.S. 41 (1999).........................................................................24

*Colyer v. Skeffington,*
    265 F. 17 (D. Mass. 1920), *rev'd in part sub nom. Skeffington v.*
    *Katzeff,* 277 F. 129 (1st Cir. 1922) ....................................................17

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)........................................................................24

*Gastelum-Quinones v. Kennedy,*
    374 U.S. 469 (1963)........................................................................18

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)....................................................................24, 26

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006)........................................................................19

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)........................................................................26

*In re Hamide and Shehadeh,*
    Nos. A 19 262 560 & A 30 660 528 (IJ Dec. Jan. 29, 2007),
    *available at* http://www.adc.org/PDF/LA8.pdf..................................14

*Ex Parte Jackson*,
   263 Fed.110, 113 (D. Mont. 1920) ....................................................17

*Jordan v. De George*,
   341 U.S. 223 (1951)...........................................................................19

*Garcia v. Noem,*
   No. 25-1404, 2025 U.S. App. LEXIS 9237, (4th Cir. Apr. 17,
   2025) ..................................................................................................15

*Kolender v. Lawson*,
   461 U.S. 352 (1983)...........................................................................24

*Korematsu v. United States*,
   323 U.S. 214 (1944)...........................................................................16

*Korematsu v. United States*,
   584 F.Supp. 1406 (N.D. Cal. 1984) ...................................................16

*Lee v. United States*,
   582 U.S. 357 (2017)...........................................................................25

*Massieu v. Reno*,
   915 F.Supp. 681 (D.N.J. 1996), *rev'd on other grounds,* 91 F.3d
   416 (3d Cir. 1996).............................................................................23

*Rasul v. Bush*,
   542 U.S. 466 (2004)...........................................................................19

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997).....................................................................12, 25

*Rowoldt v. Perfetto*,
   355 U.S. 115 (1957).....................................................................17, 18

*Sessions v. Dimaya*,
   584 U.S. 148 (2018).............................................................19, 24, 25

*Stern v. Marshall*,
   564 U.S. 462 (2011)...........................................................................16

*United States v. Davis*,
   588 U.S. 445 (2019)...........................................................................24

**Statutes**

8 U.S.C. § 1182(a)(3)(C)(iii) .................................................................1, 2, 22, 25

8 U.S.C. § 1227(a)(4)(C) .................................................................................2

8 U.S.C. § 1227(a)(4)(C)(i).............................................................................22

**Other Authorities**

*200 Caught in New York,* N.Y. Times, Nov. 8, 1919 ................................8

Anthony J. DeMattee, Matthew J. Lindsay & Hallie Ludsin, *An Unreasonable Presumption: The National Security/Foreign Affairs Nexus in Immigration Law*, 88 Brook. L. Rev. 747 (2023)................................4

*Att'y Gen. A. Mitchell Palmer on Charges Made Against Dep't of Justice by Louis F. Post and Others: Hearings Before the H. Comm. on Rules*, 66th Congress, 2d Sess. (1920) ................................9

Attorney General A. Mitchell Palmer on Charges Made Against Department of Justice by Louis F. Post and Others, Hearing Before the House Comm. on Rules, 66th Cong. 157 (1920)...........................7

Brian Finucane, *Legal Fig Leaf: The US-El Salvador Detainee Diplomatic Notes,* Just Security, Jul. 17, 2025, https://www.justsecurity.org/117271/us-elsalvador-diplomatic-notes/ ..........................................................................................15

*Charges of Illegal Practices of the Dep't of Justice: Hearings Before a Subcomm. of the S. Comm. on the Judiciary*, 66th Cong., 3d Sess. (1921)............................................................................................9

Charles H. McCormick, *Seeing Reds: Federal Surveillance of Radicals in the Pittsburgh Mill District, 1917-1921* (Univ. of Pitt. Press 1997)...................................................................................8

David Cole, *Enemy Aliens,* 54 Stan. L. Rev. 953 (2002) .........................7, 8, 10, 11

David Cole, *Enemy Aliens: Double Standards and Constitutional Freedoms in the War on Terrorism* (The New Press 2003) ........................10, 16

David Cole, *The New McCarthyism: Repeating History in the War on Terrorism*, 38 Harv. C.R.-C.L. L. Rev. 1 (2003).........................................*passim*

David Cole, *No Reason to Believe: Radical Skepticism, Emergency Power, and Constitutional Constraint,* 75 U. Chi. L. Rev. 1329 (2008).................................................................................................8

David Cole, *Reflections on Immigration One Hundred Years After the Red Scare,* 65 N.Y.L. Sch. L. Rev. 178 (2020-2021).............................8

Erwin Chemerinsky, *The Assault on the Constitution: Executive Power and the War on Terrorism,* 40 U.C. L. Rev. 1 (2006)............................11

Erwin Chemerinsky, *Civil Liberties and the War on Terrorism,* 45 Washburn L.J. 1 (2005) ...............................................................................15

Exec. Order 14188 "Fact Sheet" (Jan. 30, 2025), available at https://perma.cc/9EGD-T9P7 ....................................................................21

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025)....................20

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025)....................20

Fed. Bureau of Investigation, Famous Cases and Criminals: Palmer Raids, https://www.fbi.gov/history/famous-cases/palmer-raids (last visited Sept. 16, 2025) ...................................................................................9

Geoffrey R. Stone, *Free Speech in the Age of McCarthy: A Cautionary Tale,* 93 Cal. L. Rev. 1387 (2005)....................................................11

Geoffrey R. Stone, *Perilous Times: Free Speech in Wartime From the Sedition Act of 1798 to the War on Terrorism* (W.W. Norton & Co. 2004) ...........................................................................................................4

George Santayana, *Reason in Common Sense,* in *The Life of Reason* (1st ed. 1905) ........................................................................................27

Harlan Grant Cohen, *Note: The (Un)Favorable Judgment of History: Deportation Hearings, the Palmer Raids, and the Meaning of History,* 78 N.Y.U. L. Rev. 1431 (2003).............................................7

Human Rights Watch, Report: *Presumption of Guilt: Human Rights Abuses of Post-September 11 Detainees* 10 (2002)............................................13

Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine,* 2016 Wis. L. Rev. 1127 (2016) ..........................................................24

Jonathan Hafetz, *Immigration and National Security Law: Converging Approaches to State Power, Individual Rights, and Judicial Review, 18* ILSA J. Int'l. & Comp. L. 625 (2012) ...............................................6

Mari J. Matsuda, *Foreword: McCarthyism, the Internment and the Contradictions of Power*, 19 B.C. Third World L.J. 9 (1998) ..........................10

Mark Tushnet, *Defending Korematsu?: Reflections on Civil Liberties in Wartime*, 2003 Wis. L. Rev. 273 (2003) ..........................................................4

The Nat'l Popular Gov't League, *To the American People: Report Upon the Illegal Practices of the United States Department of Justice* (1920)....................................................................................................9

René Reyes, *Free Speech as White Privilege: Racialization, Suppression, and the Palestine Exception,* 111 Va. L. Rev. Online 166 (2025), available at https://virginialawreview.org/articles/free-speech-as-white-privilege-racialization-suppression-and-the-palestine-exception/ ...........................................................................................21

Robert K. Murray, *Red Scare: A Study in National Hysteria* (1955)....................7, 8

Shirin Sinnar, *A Label Covering A "Multitude of Sins": The Harm of National Security Deference,* 136 Harv. L. Rev. F. 59.......................................4

Sudha Shetty, *The Rise of National Security Secrets Commentary: National Security: Response,* 44 Conn. L. Rev. 1563 (2012) ...........................18

Susan M. Akram & Maritza Karmely, *Immigration and Constitutional Consequences of Post-9/11 Policies Involving Arabs and Muslims in the United States: Is Alienage a Distinction without a Difference?*, 38 U.C. Davis L. Rev. 609, 620 (2005).........................................12

U.S. Dep't. of State, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability,* Mar. 27, 2025 https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability/ ..............................21

U.S. Dep't of Justice, *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks* 12 (2003), available at http://www.justice.gov/oig/special/0306/full.pdf.....................12, 13

# STATEMENT OF *AMICI*[1]

*Amici curiae*, whose names and affiliations are set forth in the attached Addendum, are distinguished scholars who teach, lecture, and write about constitutional law, national security, and civil liberties. *Amici* are nationally recognized experts who have published extensively on issues implicated here, including due process, the First Amendment, separation-of-powers, and the interplay between judicial review and executive action.

This case implicates fundamental questions about individuals' rights to speak; to be free from detention; to be on notice of the legal consequences of their own conduct; and to equal treatment under the law. Specifically, this case involves the historically familiar practice whereby the Executive Branch invokes national security or policy concerns during times of perceived crisis to target non-citizens for detention and removal, here through a novel application of a once-obscure statutory provision, 8 U.S.C. § 1182(a)(3)(C)(iii) (the "Foreign Policy Ground"). As scholars, *Amici* seek to assist the Court in deciding this case by providing an overview of this practice and of how it has been discredited by history and by judges, like the district court here, who vindicated the important role of the judiciary in checking executive

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, and no person or entity contributed money to fund the preparation or submission of this brief, other than *Amici* and their counsel. No disclosure statement is required by Fed. R. App. P. 26.1 or 3d Cir. L.A.R. 26.1.0.

power and protecting fundamental rights. For the reasons set forth below, *Amici* respectfully submit that this Court should affirm the decision of the district court.

## SUMMARY OF ARGUMENT

On March 8, 2025, Petitioner Mahmoud Khalil ("Petitioner"), a lawful permanent resident, was arrested by plainclothes federal officers. Over the next 48 hours, Petitioner was held incommunicado while federal officers transported him to New Jersey and then to a detention facility in Louisiana. The next day, the Department of Homeland Security issued a statement saying that Petitioner's arrest was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." JA1046 ¶ 76. The statement further asserted that "[Immigration and Customs Enforcement] and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security." *Id.*

Respondents charged Petitioner as removable under 8 U.S.C. § 1182(a)(3)(C)(iii) (the "Foreign Policy Ground"), which was applied to him via a determination by Secretary of State Marco Rubio ("Respondent Rubio") that Petitioner's "otherwise lawful" expressive activity would "compromise a compelling foreign policy interest." ECF 198-1[2] (citing 8 U.S.C. § 1227(a)(4)(C))

---

[2] "ECF" numbers reference entries on the district court docket, 25-cv-1963 (D.N.J.), that are not included in the JA.

(the "Rubio Determination"). Petitioner initially challenged his detention through a habeas petition on March 9 in the United States District Court for the Southern District of New York. JA1041¶ 54. After the petition was transferred to the District of New Jersey, Petitioner filed, among other pleadings, an amended motion for a preliminary injunction challenging his detention, the Rubio Determination, and the Respondents' policy "of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel," Dkt. 61 at 6,[3] on First and Fifth Amendment grounds. ECF 124.

After numerous rounds of briefing and oral argument, the district court concluded that the Foreign Policy Ground, as applied to Petitioner, was likely unconstitutionally vague. JA209-309.[4] Accordingly, the district court issued a preliminary injunction prohibiting Respondents "from seeking to remove the Petitioner from the United States" and detaining him on that basis. JA19-20. Respondents have appealed from that order and from the court's June 20 order of Petitioner's release on bail pending his habeas proceedings. JA22-23.

It is *Amici's* view that Petitioner's case is of a piece with actions that have been taken by the Executive during prior periods of perceived political crisis. Specifically, the Executive has demonstrated a pattern of invoking national security

---

[3] All "Dkt." citations are to filings in this Court.

[4] The court did not reach Petitioner's other claims, including a First Amendment retaliation claim and a substantive due process claim.

or foreign policy concerns to target certain non-citizens for detention and removal, often based upon their expression of political views.[5] But these concerns were ultimately revealed to have been overstated and unsubstantiated,[6] and these actions, which were eventually discredited by the courts and by history, now only serve as a terrible national embarrassment.

In this case, there is little question but that the executive action taken against Petitioner occurred as part of a pattern of repression of non-U.S. citizens—specifically, those who advocate for Palestinian rights. While the Executive is indisputably owed deference with regard to national security or foreign policy matters, no such deference is owed under these circumstances, which involve the targeting of certain non-U.S. citizens based upon the constitutionally protected expression of their viewpoints.[7]

*Amici* believe that the district court was correct not to permit such executive action to stand; that action not only violated fundamental rights of freedom of speech

---

[5] *See generally* Geoffrey R. Stone, *Perilous Times: Free Speech in Wartime From the Sedition Act of 1798 to the War on Terrorism* 5, 283-307, 528-29 (W.W. Norton & Co. 2004); David Cole, *The New McCarthyism: Repeating History in the War on Terrorism*, 38 Harv. C.R.-C.L. L. Rev. 1 (2003).

[6] *See, e.g.,* Anthony J. DeMattee, Matthew J. Lindsay & Hallie Ludsin, *An Unreasonable Presumption: The National Security/Foreign Affairs Nexus in Immigration Law*, 88 Brook. L. Rev. 747, 759-66 (2023); Mark Tushnet, *Defending Korematsu?: Reflections on Civil Liberties in Wartime*, 2003 Wis. L. Rev. 273, 273 (2003).

[7] *See* Shirin Sinnar, *A Label Covering A "Multitude of Sins": The Harm of National Security Deference,* 136 Harv. L. Rev. F. 59, 74 (2022).

and equal protection, but did so based upon a statute, the vagueness of which enabled such arbitrary and capricious action. Specifically, the district court, having thoroughly analyzed the executive action at issue, including its invocation of national security or foreign policy concerns, properly held that the Foreign Policy Ground was likely unconstitutionally vague as applied to Petitioner. In doing so, the court fulfilled its fundamental role in our system as a check on executive power, and this Court should accordingly affirm the correct judgments below.

## ARGUMENT

I.  **THE HISTORY OF EXECUTIVE BRANCH ACTION IN TARGETING NON-CITIZENS FOR DETENTION AND REMOVAL DURING TIMES OF PERCEIVED CRISIS, INCLUDING BASED UPON THEIR EXPRESSION OF POLITICAL VIEWPOINTS, HAS NOT SURVIVED LEGAL OR HISTORICAL SCRUTINY.**

   A.  **The Executive has a pattern of responding to perceived political crisis by invoking supposed national security or foreign policy concerns to target certain non-citizens for detention and removal.**

Throughout American history, the Executive Branch of government has, during periods of perceived national "crisis," repeatedly targeted certain non-citizens for detention and removal, often based upon their constitutionally protected expression of their political viewpoints. The Executive has typically invoked national security or foreign policy concerns as justifications for such action. In doing so, it has drawn upon a "presumed nexus between immigration, on the one hand, and

national security and foreign affairs, on the other."[8] This presumed nexus can be traced as far back as the 1889 *Chinese Exclusion Case, Chae Chan Ping v. United States,* 130 U.S. 581 (1889). There, the Court held that, in the context of an alleged "Oriental invasion," the Scott Act properly prohibited the reentry of Chae Chan Ping, a longtime resident of the United States, in order to "give security against foreign aggression and encroachment." *Id.* at 595, 606. However, Justice Field devoted much of his opinion not to security concerns but instead to the contentions that people of Chinese descent had allegedly failed to assimilate by "adhering to the customs and usages of their own country," and that they were "content with the simplest fare" and made labor market competition unfavorable towards "our people." *Id.* at 595. Despite Justice Field's "inter[weaving] then-familiar anti-Chinese tropes with [] foreign affairs and national security themes,"[9] scholars have, over time, challenged this presumed nexus between immigration and national security or foreign policy, observing that "most immigration cases do not touch on sensitive questions of national security or foreign policy.[10] Indeed, when the Executive has invoked such concerns to target certain non-citizens during perceived

---

[8] DeMattee, Lindsay & Ludsin, *supra* note 6, at 748.

[9] *Id.* at 757.

[10] *Id.* at 749; *see also* Jonathan Hafetz, *Immigration and National Security Law: Converging Approaches to State Power, Individual Rights, and Judicial Review,* 18 ILSA J. Int'l. & Comp. L. 625, 638-39 (2012).

crises over the past century, the concerns have often been overstated or unsubstantiated, contributing to the obloquy this executive practice has received.[11]

The first major iteration of such executive action occurred in 1919, a few decades after the *Chinese Exclusion Case*.[12] Responding to a series of bombings targeting several public figures, Attorney General Mitchell Palmer launched nationwide raids aimed at detaining and removing large numbers of non-citizens from the United States.[13] But the raids were not aimed at those suspected of conducting the attacks. Rather, motivated by suspicion about "Bolsheviks,"[14] the raids were aimed generally at so-called foreign "radicals,"[15] creating a period of repression now known as the first "Red Scare."[16] Thus, pursuant to the Alien Act of October 16, 1918, Pub. L. No. 65-221, 40 Stat. 1012, which permitted the deportation of any alien who believed in or advocated the violent overthrow of the

---

[11] *See* Tushnet, *supra* note 6, at 283-84, 298.

[12] *See generally* Robert K. Murray, *Red Scare: A Study in National Hysteria,* 1919-1920, at 69-71 (1955).

[13] David Cole, *Enemy Aliens,* 54 Stan. L. Rev. 953, 995 (2002).

[14] Harlan Grant Cohen, *Note: The (Un)Favorable Judgment of History: Deportation Hearings, the Palmer Raids, and the Meaning of History,* 78 N.Y.U. L. Rev. 1431, 1456 (2003).

[15] *See* Attorney General A. Mitchell Palmer on Charges Made Against Department of Justice by Louis F. Post and Others, Hearing Before the House Comm. on Rules, 66th Cong. 157, 166 (1920) ("The results of the investigations conducted by the Bureau of Investigation . . . showed that the predominating cause of the radical agitation . . . was the alien population in this country."); *id.* at 26 ("Most of the individuals involved in this movement are aliens or foreign-born citizens.").

[16] Cole, *Enemy Aliens, supra* note 13, at 995.

government, the government adopted a broad rule providing that mere association with certain left-wing organizations sufficed to qualify a non-citizen for removal,[17] regardless of whether the non-citizen had ever even attended any meetings.[18] Given the public's fears of "radicals, immigrants, and labor unrest,"[19] "[t]he main target of the raids and arrests were Russians and Eastern Europeans."[20] In total, across the raids, federal and local officials arrested between 4,000 and 10,000 individuals.[21] On December 21, 1919, 249 non-citizens were loaded onto a ship and deported to Russia.[22] Yet, none of those deported were shown to have been involved in planning the bombings. In fact, "[n]ot a single bomber was found,"[23] and not one of the thousands of immigrants detained was charged with involvement in the bombings.[24]

The Palmer raids now represent a historical "lesson in overreaction."[25] Almost immediately after the Palmer raids, leading scholars and lawyers, including Felix Frankfurter, Zachariah Chafee, and Roscoe Pound, vehemently condemned the raids

---

[17] Cohen, *supra* note 14, at 1458.

[18] Charles H. McCormick, *Seeing Reds: Federal Surveillance of Radicals in the Pittsburgh Mill District, 1917-1921* 155-58 (Univ. of Pitt. Press 1997).

[19] Cohen, *supra* note 14, at 1456.

[20] *Id.* at 1458.

[21] Cole, *Enemy Aliens, supra* note 13, at 996.

[22] *See 200 Caught in New York,* N.Y. Times, Nov. 8, 1919, at 1.

[23] David Cole, *Reflections on Immigration One Hundred Years After the Red Scare,* 65 N.Y.L. Sch. L. Rev. 178 (2020-2021).

[24] David Cole, *No Reason to Believe: Radical Skepticism, Emergency Power, and Constitutional Constraint,* 75 U. Chi. L. Rev. 1329, 1347-48 (2008).

[25] Cole, *Reflections on Immigration, supra* note 23, at 172.

in a report that concluded: "American institutions have not in fact been protected by the Attorney General's ruthless suppression. On the contrary, those institutions have been seriously undermined . . . . No organization of radicals acting through propaganda over the last six months could have created as much revolutionary sentiment in America as has been created by the Department of Justice itself."[26] Attorney General Palmer was called to defend his conduct before Congress.[27] Over a century later, the Federal Bureau of Investigation ("FBI") concedes that the Palmer raids "were certainly not a bright spot for the young Bureau,"[28] while scholars maintain that the raids represent a "concrete example of what happens to a democratic nation and its people when faith and reason are supplanted with fear."[29]

Unfortunately, these lessons had not been learned by the 1940s. A few decades after the first Red Scare, during World War II and the Cold War that followed, Congress and the Executive again exploited anti-communist sentiment, couched in the language of national security and foreign affairs, to suppress protected speech. In this next shameful episode, "[g]uilt by association was the watchword, as loyalty

---

[26] The Nat'l Popular Gov't League, *To the American People: Report Upon the Illegal Practices of the United States Department of Justice* 7 (1920).
[27] *See Att'y Gen. A. Mitchell Palmer on Charges Made Against Dep't of Justice by Louis F. Post and Others: Hearings Before the H. Comm. on Rules*, 66th Congress, 2d Sess. (1920); *Charges of Illegal Practices of the Dep't of Justice: Hearings Before a Subcomm. of the S. Comm. on the Judiciary*, 66th Cong., 3d Sess. (1921).
[28] Fed. Bureau of Investigation, Famous Cases and Criminals: Palmer Raids, https://www.fbi.gov/history/famous-cases/palmer-raids (last visited Sept. 16, 2025).
[29] Murray, *supra* note 12, at ix.

oaths, blacklists, registration requirements, and congressional inquiries sought to identify and penalize those who were sympathetic to or associated with the Communist Party, irrespective of their involvement in any otherwise illegal activity."[30]

Though citizens were also implicated in the scourge of the McCarthyism that is now viewed as such a "grave error" in American history,[31] non-citizens suffered particular consequences. In 1939, Congress considered more than 100-anti-immigrant proposals, eventually adopting statutory provisions that allowed for the deportation and exclusion of those associated with communist groups.[32] For example, the Internal Security Act of 1950 and the Immigration and Nationality Act of 1952 required communist organizations to register with the Attorney General, prohibited citizenship and allowed for the removal of members of communist groups.[33]

As noted, these McCarthy-era tactics have been consistently condemned by history. Scholars are unanimous that "the massive repression"[34] of McCarthyism

---

[30] Cole, *Enemy Aliens, supra* note 13, at 996-97.

[31] Cole, *The New McCarthyism, supra* note 5, at 7.

[32] David Cole, *Enemy Aliens: Double Standards and Constitutional Freedoms in the War on Terrorism* 130 (The New Press 2003) [hereinafter "Enemy Aliens book"].

[33] Internal Security Act of 1950 §§7, 22, Pub. L. No. 81-831, 64 Stat. 987 (1950); Immigration and Nationality Act of 1952 §§212, 241, 313, Pub. L. No. 82-414, 66 Stat. 163 (1952).

[34] Mari J. Matsuda, *Foreword: McCarthyism, the Internment and the Contradictions of Power*, 19 B.C. Third World L.J. 9 (1998).

"violated the most fundamental norms and the most essential values of the American constitutional systems."[35] And the courts, fulfilling their role in checking impermissible executive action, stepped up as well. Thus, "the McCarthy era tactics were not merely a mistake, but unconstitutional," with the Supreme Court eventually ruling that "both the First Amendment right of association and the Fifth Amendment's Due Process Clause preclude imposition of criminal or even civil liability for association absent specific intent to further a group's illegal ends."[36]

Unfortunately, the 21st century has seen a continuation of such executive practice. Although the "war on terrorism"[37] of the last two decades has involved new means of targeting of non-citizens,[38] the process is familiar: "Today's war on terrorism . . . demonstrate[s] our government's remarkable ability to evolve its tactics in ways that allow it simultaneously to repeat history and to insist that it is not repeating history."[39] Adopting an "unprecedented"[40] approach to broad

---

[35] Geoffrey R. Stone, *Free Speech in the Age of McCarthy: A Cautionary Tale,* 93 Cal. L. Rev. 1387, 1405 (2005).

[36] Cole, *Enemy Aliens, supra* note 13, at 997; *see also id.* at 968, n.62.

[37] *Id.* at 955.

[38] *See generally* Erwin Chemerinsky, *The Assault on the Constitution: Executive Power and the War on Terrorism,* 40 U.C. L. Rev. 1 (2006).

[39] Cole, *The New McCarthyism, supra* note 5, at 1-2 ("We have not . . . interned people solely for their race, but we have detained approximately two thousand people . . . largely because of their identity . . . . we have subjected Arab and Muslim noncitizens to discriminatory deportation, registration, fingerprinting, visa processing, and interviews . . .").

[40] Chemerinsky, *supra* note 38, at 4.

executive power after the attacks of September 11, 2001, the government began an operation that targeted between 2,000 and 5,000 individuals for mass arrests, detentions, interrogations, and removals.[41] Almost all of those targeted were Arab and Muslim,[42] but almost none of them were shown to have any connection to terrorist activity or ultimately charged with any terrorism-related crime.[43] For example, the FBI initiated an investigation designated "PENTTBOM" immediately following the attacks.[44] Through this investigation, the Executive detained more than 1,200 individuals for interrogations.[45] "Although many were questioned and released with no charges pressed against them, many were detained for immigration law violations,"[46] and some deemed "of interest" were administratively detained until the FBI cleared them of terrorist involvement.[47] But according to the

---

[41] Susan M. Akram & Maritza Karmely, *Immigration and Constitutional Consequences of Post-9/11 Policies Involving Arabs and Muslims in the United States: Is Alienage a Distinction without a Difference?*, 38 U.C. Davis L. Rev. 609, 620 (2005).

[42] *Id.*

[43] *Id.* at 621, 631-32.

[44] "Pentagon/Twin Towers Bombings." *See* Office of the Inspector Gen., U.S. Dep't of Justice, *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks* 12 (2003), available at http://www.justice.gov/oig/special/0306/full.pdf. [hereinafter OIG Report].

[45] *See* Muzaffar A. Chishti, et al., *America's Challenge: Domestic Security, Civil Liberties, and National Unity After September 11,* 7 (Migration Policy Institute 2003).

[46] Akram & Karmely, *supra* note 41, at 622.

[47] OIG Report, *supra* note 44, at 1.

Department of Justice's Inspector General, the "of interest" designation was applied in an "indiscriminate and haphazard manner,"[48] with detainees "arrested more by virtue of chance encounters . . . rather than by any genuine indications of a possible connection with or possession of information about terrorist activity."[49] At least 762 non-citizens, the vast majority of whom were Muslim men from South Asia, South West Asia, and North Africa, were detained.[50]

Congress also passed the "USA PATRIOT ACT,"[51] which authorized the Executive to remove, or deny entry to, foreign nationals who provided support to groups broadly designated as "terrorist organizations," including those that "seek[] to fund lawful ends, such as political and humanitarian activities."[52] Unsurprisingly, this Act, too, has been disproportionately applied to Arab and Muslim communities, even in the absence of a lawful basis for removal.[53] For this reason, at least one

---

[48] *Id.* at 70.

[49] *Id.* at 41-42, 70.

[50] *Id.* at 20-21; Human Rights Watch, Report: *Presumption of Guilt: Human Rights Abuses of Post-September 11 Detainees* 10 (2002).

[51] Uniting & Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001); USA Patriot Act §§ 411 & 412, 8 U.S.C. §§ 1182 & 1226.

[52] Akram & Karmely, *supra* note 41, at 633.

[53] *See, e.g.*, Hon. Paul Brickner & Meghan Hanson, *The American Dreamers: Racial Prejudices and Discrimination As Seen Through the History of American Immigration Law*, 26 T. Jefferson L. Rev. 203, 231 (2004).

immigration judge described the removal proceedings of two Palestinians under Section 411 of the Act as "an embarrassment to the rule of law."[54]

In combination with disproportionately targeting Arab and Muslim non-citizens, the "war on terrorism" has involved "adapted"[55] tactics of the McCarthy era—for example, "penalizing people under criminal and immigration laws for providing "material support" to politically selected "terrorist" groups, without regard to whether an individual's support was intended to further or in fact furthered any terrorist activity," another form of "guilt by association."[56] Even worse, part of the "new paradigm" of the war on terrorism has been the designation of certain non-citizens as "enemy combatants," enabling the Executive to detain and torture them at U.S.-run offshore detention centers, such as Guantánamo Bay, Bagram Air Base in Afghanistan, and secret CIA "black sites."[57] Yet, military and intelligence officers themselves recognized that many offshore detainees presented no threat to the U.S.[58]

Once again, scholars have condemned these actions, concluding that "[s]ince September 11, 2001, some of the worst aspects of American history have been

---

[54] *In re Hamide and Shehadeh*, Nos. A 19 262 560 & A 30 660 528 at 9-10, 11 (IJ Dec. Jan. 29, 2007), *available at* http://www.adc.org/PDF/LA8.pdf.
[55] Cole, *The New McCarthyism*, *supra* note 5, at 1.
[56] *Id.* at 2.
[57] Jonathan Hafetz, *Habeas Corpus After 9/11: Confronting America's New Global Detention System* 31-67 (2011).
[58] Joseph Margulies, *Guantánamo and the Abuse of Presidential Power* 70 (2006) ("[I]n many cases, we had simply gotten the slowest guys on the battlefield.") (quoting Lieutenant Colonel Thomas Berg).

repeating themselves."[59] "While it has altered slightly the tactics . . . to avoid literally repeating history, in its basic approach the government today is replaying the mistakes of the past."[60]

Today, the paradigm for the targeting of non-citizens includes different offshore detention sites,[61] newer formulations of national security or foreign policy concerns,[62] and greater claims of unreviewable executive authority.[63] Viewed in context, the Executive is again attempting to undertake those actions that have indelibly stained the nation's history. In these times, the need for meaningful checks on executive power—even (and particularly) when the Executive cites national security or foreign policy concerns, is more important than ever. The district court's exercise of judicial review in this case must be viewed, in historical context, as one such critical check.

---

[59] Erwin Chemerinsky, *Civil Liberties and the War on Terrorism,* 45 Washburn L.J. 1, 1 (2005).

[60] Cole, *The New McCarthyism, supra* note 5, at 3.

[61] *See* Brian Finucane, *The Legal Fig Leaf: The US-El Salvador Detainee Diplomatic Notes,* Just Security, Jul. 17, 2025, https://www.justsecurity.org/117271/us-elsalvador-diplomatic-notes/.

[62] *See* Amicus Br. of Immigration Lawyers, Law Professors, and Scholars (ECF 110-1) at 7-8 ("It may well be that [Petitioner's] case is unprecedented in the history of this provision and in the history of the United States.").

[63] *Garcia v. Noem,* No. 25-1404, 2025 U.S. App. LEXIS 9237, at *6 (4th Cir. Apr. 17, 2025) ("If today the Executive claims the right to deport without due process and in disregard of court orders, what assurance will there by tomorrow that it will not deport American citizens and then disclaim responsibility to bring them home?").

**B. Judicial review plays a crucial role in constraining such abuses of executive power, especially those which run afoul of the Constitution.**

In granting Fred Korematsu's *coram nobis* petition and vacating his conviction in an effort to redress one of the most regrettable chapters in American history, Judge Marilyn Hall Patel stated: "[the Supreme Court's decision in *Korematsu v. United States,* 323 U.S. 214 (1944)] stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability . . . . [I]n times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused." *Korematsu v. United States,* 584 F.Supp. 1406, 1420 (N.D. Cal. 1984). Indeed, "a system based on checks and balances" is a foundational principle of American democracy.[64] Thus, in times of perceived crisis, courts have historically played a crucial role in constraining abuses of executive power, even when that power purports to be based upon national security or foreign policy concerns.

For example, during the Palmer raids, discussed above, several courts carefully scrutinized the Executive's actions, ultimately undoing them.[65] Thus,

---

[64] Chemerinsky, *supra* note 38, at 3; *see also Stern v. Marshall,* 564 U.S. 462, 482-483 (2011).
[65] Cole, Enemy Aliens book*, supra* note 32, at 120.

Judge George Anderson in Massachusetts decried the Executive's "mob" tactics and granted the habeas petitions of numerous detainees.[66] Judge George Bourquin in Montana, granting a writ of habeas corpus, stated in no uncertain terms: "Assuming petitioner is of the so-called 'Reds[,]' he and his kind are less a danger to America than are those who indorse or use the methods that brought him to deportation." *Ex Parte Jackson,* 263 Fed.110, 113 (D. Mont. 1920).

Likewise, during the second Red Scare, the Supreme Court made clear that the Executive is not entitled to unlimited removal authority by mere citation to national security or foreign policy grounds. For example, in *Bridges v. Wixon,* 326 U.S. 135 (1945), an early Cold War case, the Court overturned the removal order for Harry Bridges because the Executive did not prove that he was meaningfully affiliated with the Communist Party or its violent aims. *Id* at 156-57. The Court held that an individual like Bridges, "who cooperates with such an organization only in its *wholly lawful activities* cannot by that fact be said as a matter of law to be 'affiliated' with it.". *Id.* at 143.

Similarly, in *Rowoldt v. Perfetto,* 355 U.S. 115 (1957), the Court held that the government did not meet its burden of proving that a non-citizen was deportable under the requirements of the Internal Security Act. *Id.* at 121. The non-citizen's

---

[66] *Colyer v. Skeffington*, 265 F. 17, 43, 79-80 (D. Mass. 1920), *rev'd in part sub nom. Skeffington v. Katzeff,* 277 F. 129, 133 (1st Cir. 1922).

own testimony that he joined the Communist party, paid dues, attended meetings, and worked in a Communist bookstore was not enough, *id.* at 116-21, in light of "the solidity of proof that is required for a judgment entailing the consequences of deportation." *Id.* at 120. The Court reached a similar conclusion in *Gastelum-Quinones v. Kennedy,* 374 U.S. 469 (1963), overturning a deportation order because the government's case rested on "a mere inference based upon the alien's silence," which was unacceptable given that "deportation is a drastic sanction, one which can destroy lives and disrupt families." *Id.* at 479.

Notably, even in the context of detentions of non-citizens designated as "enemy combatants" in the "war on terrorism," the Supreme Court has assumed a "robust judicial role vis-à-vis security decision-making."[67] The Court acknowledged in *Boumediene v. Bush,* 553 U.S. 723 (2008) that "[i]n considering both the procedure and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches." *Id.* at 796. But the *Boumediene* Court nevertheless went onto hold that "[l]iberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Id.* at 798. Thus, the Court held that the petitioners had a constitutional right to challenge their confinement through the writ of habeas corpus.

---

[67] Sudha Shetty, *The Rise of National Security Secrets Commentary: National Security: Response,* 44 Conn. L. Rev. 1563, 1572 n.40 (2012).

*Boumediene* followed a string of cases born out of the "war on terrorism" in which the Supreme Court reinforced the reviewing power of the judicial branch, even when the Executive claimed heightened deference pursuant to national security or foreign policy concerns. *See, e.g., Hamdan v. Rumsfeld,* 548 U.S. 557, 613 (2006) (holding that military commissions set up by the Executive lacked the power to proceed because they violated the Uniform Code of Military Justice and the Geneva Conventions); *Rasul v. Bush,* 542 U.S. 466, 484 (2004) (holding that federal courts have jurisdiction to hear non-citizens' habeas corpus and other statutory challenges to their detention at Guantanamo Bay).

In addition to rejecting the notion of absolute national security deference, the Supreme Court has specifically established that deportation statutes violate the Constitution if they are impermissibly vague. Indeed, the Court in *Sessions v. Dimaya,* 584 U.S. 148, 148 (2018) held that "the most exacting vagueness standard should apply in removal cases . . . . in view of the grave nature of deportation." *Id.* at 156-57 (cleaned up). *See also Jordan v. De George,* 341 U.S. 223, 231-32 (1951) (testing statute under the established criteria of the void-for-vagueness doctrine); *Boutilier v. INS,* 387 U.S. 118, 123 (reaffirming that the void-for-vagueness doctrine was applicable despite the civil nature of deportation proceedings).

Thus, the judiciary plays a critical role in checking executive action, as it did here, given the Executive's repeated breach of the Constitution during times of perceived crisis. This case speaks directly to this history.

## II.   THIS CASE TYPIFIES SUCH UNDESIRABLE EXECUTIVE ACTION, AND THE DISTRICT COURT WAS CORRECT NOT TO PERMIT IT HERE.

### A.   This case typifies the undesirable executive action of the past.

A common feature of the different periods of history described in Part I is a climate of repression in which non-citizens, or those espousing particular—even unpopular—beliefs were disproportionately targeted. For example, during the Red Scares, there was a climate of repression of communists or communist sympathizers, with certain non-citizens bearing the brunt of the repression; likewise, the war on terrorism involved repression of those perceived to be terrorists, many because they had certain religious affiliations or came from certain regions of the world.

This case connects this history to current times. Indeed, Petitioner argues that Respondents adopted a policy "of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel." Dkt. 61 at 6. Petitioner cites two executive orders, Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on

January 29, 2025. JA1036 ¶¶ 34-36. The White House described the measure as specifically targeting "leftist, anti-American colleges and universities" and sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you…and deport you."[68]

Thus, "[s]tudents have been arrested and subjected to institutional sanctions; faculty members have been censured and terminated; and universities have been threatened with the prospect of losing their federal funding and accreditation if they allow pro-Palestinian [expressive activity] on campus."[69] Respondent Rubio has indicated that more than 300 students have had their visas revoked for engaging in pro-Palestinian expressive activity.[70] Thus, we once again find ourselves in a period of repression of those engaging in certain (here, pro-Palestinian) advocacy in which non-citizens are being disproportionately targeted, harkening back to the most unfortunate episodes of American history. *See supra* Part I.A. Underscoring this repression, Petitioner was targeted despite the fact that he "has consistently

---

[68] Exec. Order 14188 "Fact Sheet" (Jan. 30, 2025), available at https://perma.cc/9EGD-T9P7.

[69] René Reyes, *Free Speech as White Privilege: Racialization, Suppression, and the Palestine Exception,* 111 Va. L. Rev. Online 166, 168 (2025), available at https://virginialawreview.org/articles/free-speech-as-white-privilege-racialization-suppression-and-the-palestine-exception/.

[70] U.S. Dep't. of State, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability,* Mar. 27, 2025 https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability/.

denounced antisemitism and all forms of extremism, insisted on nonviolence, and welcomed students of all faiths and identities into a student movement for social justice and freedom and equality for everyone," Dkt. 61 at 4 (cleaned up). That, as in times past, executive action is not only constitutionally problematic, but also wrong, is a fact pattern once again presented here. It is in this context that this Court is called upon to evaluate the district court's providing exactly the check on a sister branch of government that our Constitution intended.

**B.**    **The district court properly held that the Foreign Policy Ground as applied to Petitioner likely violates the Constitution.**

The Foreign Policy Ground states that a noncitizen "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). Where a person's lawful, past, current, or even "expected" beliefs, statements, or associations are cited as the basis for their deportation, removal is barred unless the Secretary of State personally determines that the non-citizen's continued presence or activities would compromise a "compelling" foreign policy interest. 8 U.S.C. § 1182(a)(3)(C)(iii). Here, the Rubio Determination alleges the "participation" of Petitioner in "antisemitic protests and disruptive activities," which it further alleges "undermine U.S. policy to combat anti-Semitism around the world." *See* ECF 198-1 at 7.

*Amici*'s concerns, based upon the history set forth above, are twofold. The text of the Foreign Policy Ground, and its lack of specificity as to what activities would make someone subject to it, enable the Executive to use precisely the generic and often unsubstantiated national security or foreign policy concerns it has historically invoked when targeting non-citizens in times of perceived crises. Indeed, the vagueness of this provision was specifically recognized by then-District Judge Maryanne Trump Barry holding the Foreign Policy Ground void-for-vagueness in 1996: "[T]he statute provides absolutely no notice to aliens as to what is required of them under the statute. *Massieu v. Reno,* 915 F.Supp. 681, 699 (D.N.J. 1996), *rev'd on other grounds,* 91 F.3d 416 (3d Cir. 1996). And the requirement that a non-citizen's presence or activities would compromise a "compelling" U.S. foreign policy interest lacks any standard for enforcement. Thus, the statute enables the Executive to disproportionately target certain non-citizens of particular communities, as it has during prior political crises. For example, during the first Red Scare, the Executive disproportionately targeted Russians and Eastern Europeans, and during the "war on terrorism," the Executive almost exclusively targeted Arabs and Muslims. This disproportionate targeting has the quality of an equal protection issue, but the point, here, is that the vagueness of the provision allows the Executive Branch's arbitrary and impermissible action, targeting particular groups of non-citizens, and those who express certain beliefs.

The void-for-vagueness doctrine addresses both of these concerns. The general constitutional framework for the void-for-vagueness doctrine is rooted in the due process clause. "The Due Process Clauses' prohibition on the deprivation of life, liberty, or property without due process of law serves as the principal source of the void for vagueness doctrine."[71] The doctrine's twin goals are that statutes "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," *City of Chicago v. Morales,* 527 U.S. 41, 56 (1999), and "[do] not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983). With respect to the second goal, the Court has long held that vague laws "impermissibly delegate[] basic policy matters to policeman, judges and juries for resolution in an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972). *See also United States v. Davis*, 588 U.S. 445, 452 (2019); *Sessions,* 584 U.S. at 156.

Moreover, as the district court noted, two aspects of Petitioner's case trigger a more exacting standard of vagueness review. First, when the statute affects speech, particularly "rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.,*

---

[71] Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine,* 2016 Wis. L. Rev. 1127, 1134 (2016).

567 U.S. 239, 253-54 (2012); *see also Reno v. American Civil Liberties Union,* 521 U.S. 844, 870-71 (1997). Second, "the grave nature of deportation—a drastic measure, often amounting to lifelong banishment or exile" provides further impetus for an exacting standard of review. *Sessions,* 584 U.S. at 157; *see also Lee v. United States,* 582 U.S. 357, 370 (2017).

After outlining these principles, the district court meticulously discerned the meaning of the key statutory phrase. That phrase provides that non-citizens are removable because their expressive activity "undermines a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii). The district court concluded that "foreign policy interest" refers to "the United States' relations with other countries." JA233. This conclusion was supported by the statute's legislative history, which "generally suggests that Section 1227 removal was intended for cases in which (a) the underlying conduct happened abroad or almost exclusively abroad, and (b) it was determined by the Secretary of State that the underlying conduct would have impacted U.S. relations with other countries." JA259.

Thus viewed, the district court held that the Foreign Policy Ground, as applied to Petitioner via the Rubio Determination, which alleged that Petitioner participated in anti-Semitic activities in the U.S., frustrates both goals of the void-for-vagueness doctrine. First, the statute, which describes conduct affecting U.S. relations with other countries, does not give an ordinary person notice that their purely domestic

expressive activity could lead to their being targeted under the statute. Second, if a person can be removed without the Secretary in fact determining that there was a "foreign policy" impact, then there is no "explicit standard" left behind in Section 1227, thus rendering the statute capable of arbitrary and discriminatory enforcement. *Grayned,* 408 U.S. at 108.

This arbitrary and discriminatory enforcement is precisely what echoes the history discussed above. That history reminds us that if statutes allows it, the Executive will act, as it has done here, to invoke national security or foreign policy to target non-citizens and those who participate in constitutionally protected expressive activity, even if they pose no actual national security or foreign policy threat, all as part of a broader strategy of repression. The district court correctly exercised its constitutional authority to prohibit the Executive from capitalizing on an obscure, vague immigration law to engage in this type of action yet again. Consistent with the law, with the significant role of the judiciary, and with the history discussed above, this Court should affirm its decision.

## CONCLUSION

"It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad." *Hamdi v. Rumsfeld,* 542 U.S. 507, 532 (2004). At stake in this case is not only

Petitioner's ability to speak and be free from detention and removal. Also at stake is our constitutional system of government in which the judicial branch of Government acts as the critical check and balance on the Executive Branch. Ultimately, it reminds us that those who ignore history are condemned to repeat it. George Santayana, *Reason in Common Sense,* in *The Life of Reason* 284 (1st ed. 1905). For these reasons, *Amici* respectfully urge that the Court affirm the judgment below.

Dated: September 17, 2025        Respectfully submitted,

<u>s/ Lawrence S. Lustberg</u>
Lawrence S. Lustberg
Madhulika Murali
Gibbons P.C.
John J. Gibbons Fellowship in Public
Interest and Constitutional Law
One Gateway Center
Newark, NJ 07102-5310
Phone: 973-596-4500
llustberg@gibbonslaw.com

*Counsel for* Amici Curiae

# ADDENDUM[72]

Muneer I. Ahmad
Sol Goldman Clinical Professor of Law
Yale Law School

Susan Bandes
Emeritus Centennial Distinguished Professor of Law
DePaul College of Law

Erwin Chemerinsky
Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley School of Law

David D. Cole
The Honorable George J. Mitchell Professor in Law and Public Policy
Georgetown University Law Center

Martin S. Flaherty
Charles and Marie Robertson Visiting Professor
School of Public and International Affairs
Princeton University

Tom Ginsburg
Leo Spitz Distinguished Service Professor of International Law
University of Chicago Law School

Lucas Guttentag
Martin F. Flug Lecturer in Law & Senior Research Scholar
Yale Law School

Thomas Healy
Board of Visitors Distinguished Professor of Law
Seton Hall Law School

---

[72] Institutional affiliations are listed for identification purposes only. All signatories are participating in their individual capacity.

Helen Hershkoff
Herbert M. and Svetlana Wachtell Professor of Constitutional Law and Civil Liberties
New York University School of Law

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Jules Lobel
Bessie McKee Walthour Endowed Chair
University of Pittsburgh School of Law

Hiroshi Motomura
Susan Westerberg Prager Distinguished Professor of Law
University of California, Los Angeles School of Law

Aziz Rana
J. Donald Monan, S.J., University Professor of Law and Government
Boston College Law School

Kermit Roosevelt
David Berger Professor for the Administration of Justice
University of Pennsylvania Carey Law School

Geoffrey R. Stone
Edward H. Levi Distinguished Service Professor of Law
University of Chicago Law School

## CERTIFICATE OF COMPLIANCE

I, Lawrence S. Lustberg, Esquire, hereby certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), because it contains 6,416 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Fed. R. App. P. 32(f) as well as the statement required by Fed. R. App. P. 29(a)(4)(e).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.    The text of the electronic brief is identical to the text of the paper copies being filed.

4.    The electronic brief has been prepared on a computer that is automatically protected with a virus detection program, namely a continuously updated version of Core Agent and Sophos Intercept X, and no virus was detected.

5.    I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: September 17, 2025          s/ Lawrence S. Lustberg
                                   Lawrence S. Lustberg

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2025, I caused a true copy of the foregoing to be filed through the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated: September 17, 2025

s/ Lawrence S. Lustberg
Lawrence S. Lustberg