Nos. 25-2162 & 25-2357

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Mahmoud KHALIL,

*Petitioner–Appellee,*

Donald J. TRUMP, in his official capacity as President of the United States;
William P. JOYCE, in his official capacity as Acting Field Office Director of
New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in
her official capacity as Warden of Elizabeth Contract Detention Facility;
Todd LYONS, in his official capacity as Acting Director of Immigration and
Customs Enforcement; Markwayne MULLIN, in his official capacity as
Secretary of the Department of Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela BONDI, in her official
capacity as Attorney General of the Department of Justice,

*Respondents–Appellants.*

## PETITIONER–APPELLEE'S PETITION FOR REHEARING EN BANC

AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
Tel: (973) 854-1715

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar
Michael K.T. Tan
Sidra Mahfooz
Brian Hauss
Esha Bhandari
Brett Max Kaufman
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Naz Ahmad
Mudassar Hayat Toppa
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES,
INC.
Alina Das
Kyle Barron
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805

VAN DER HOUT LLP
Marc Van Der Hout
Johnny Sinodis
Oona Cahill
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

*Counsel for Petitioner–Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

RULE 35.1 STATEMENT.............................................................................................. viii

INTRODUCTION............................................................................................................. 1

STATEMENT OF THE CASE ......................................................................................... 3

ARGUMENT ..................................................................................................................... 8

I.   The panel majority's interpretation of 8 U.S.C. § 1252(b)(9)
    conflicts with binding precedent and leaves Mr. Khalil with no
    meaningful or effective judicial review of his claims challenging
    unconstitutional executive detention............................................................... 8

    A.  Under binding precedent, section 1252(b)(9) does not
        apply to Mr. Khalil's detention claims ..................................................... 8

        1.  The panel decision conflicts with *Chehazeh*, which
            holds that section 1252(b)(9) is inapplicable when
            there is no final order of removal............................................... 8

        2.  The panel decision conflicts with *Regents*, *Jennings*,
            and *E.O.H.C.*, which hold that detention claims
            cannot be meaningfully reviewed on a PFR because
            they cannot be effectively remedied at that stage............ 10

        3.  Even if the panel majority's interpretation of (b)(9)
            is correct, it still erred under its own analysis
            because Mr. Khalil's constitutional detention claims
            do not raise legal questions that would be
            determinative of those addressed by a PFR court............ 24

    B.  The panel majority's fleeting analysis concluding that its
        interpretation of section 1252(b)(9) does not violate the
        Suspension Clause or the First and Fifth Amendments
        conflicts with authority from this Court, the Second
        Circuit opinion upon which the majority relied, and the
        Supreme Court....................................................................................... 26

II. The panel majority's interpretation of 8 U.S.C. § 1252(b)(9) to bar habeas review of Mr. Khalil's removal claims leaves him with no meaningful or effective judicial forum capable of redressing his First Amendment injuries ....................................................... 31

CONCLUSION ............................................................................................................. 37

# TABLE OF AUTHORITIES

__Cases__

*Am. Ass'n of Univ. Professors v. Rubio,*
    802 F. Supp. 3d 120 (D. Mass. 2025)................................................22

*Am. Ass'n of Univ. Professors v. Rubio,*
    No. 25-10685, 2026 WL 686418 (D. Mass. Mar. 11, 2026)..................33

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007) ................................................ 11, 13, 15, 33

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) .............................................................................32

*Bell v. Wolfish,*
    441 U.S. 520 (1979) .............................................................................24

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ..................................................................... *passim*

*Casa de Maryland v. DHS,*
    924 F.3d 684 (4th Cir. 2019)..................................................................9

*Castro v. DHS,*
    835 F.3d 422 (3d Cir. 2016) .........................................................26, 33

*Chehazeh v. U.S. Att'y Gen.,*
    666 F.3d 118 (3d Cir. 2012) ..................................................... viii, 7, 8

*Clark v. Martinez,*
    543 U.S. 371 (2005) .............................................................................26

*Demore v. Kim,*
    538 U.S. 510 (2003) ...................................................................... 12, 25

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020).................................................................... viii, 9, 14

*DHS v. Thuraissigiam,*
    591 U.S. 103 (2020).............................................................................26

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ...................................................................32

*Duenas v. Garland*,
78 F.4th 1069 (9th Cir. 2023).....................................................30

*E.O.H.C. v. Sec'y U.S. DHS*,
950 F.3d 177 (3d Cir. 2020) ...................................... *passim*

*Fort Wayne Books, Inc. v. Indiana*,
489 U.S. 46 (1989) .....................................................................32

*Heck v. Humphrey*,
512 U.S. 477 (1994) ...................................................................19

*INS v. St. Cyr*,
533 U.S. 289 (2001) ..................................................... 11, 30, 33

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ...................................................... *passim*

*Johnson v. Guzman Chavez*,
594 U.S. 523 (2021) ...................................................................13

*Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*,
538 F.3d 241 (3d Cir. 2008) .......................................................9

*Luna v. Holder*,
637 F.3d 85 (2d Cir. 2011) ......................................... *passim*

*Madu v. U.S. Att'y Gen.*,
470 F.3d 1362 (11th Cir. 2006) ..................................................8

*Marks v. United States*,
430 U.S. 188 (1977) .....................................................................9

*Massieu v. Reno*,
91 F.3d 416 (3d Cir. 1996) .......................................................15

*McCarthy v. Madigan*,
503 U.S. 140 (1992) ...................................................................21

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
  432 U.S. 43 (1977) ............................................................32

*Nielsen v. Preap*,
  586 U.S. 392 (2019) .........................................................13

*NRA v. Vullo*,
  602 U.S. 175 (2024) .........................................................23

*Oesterich v. Selective Serv. Sys. Local Bd. No. 11*,
  393 U.S. 233 (1968) .........................................................32

*Oliver v. City of Brandon*,
  607 U.S. —, 2026 WL 783725 (Mar. 20, 2026) ....................19

*Osorio-Martinez v. U.S. Att'y Gen.*,
  893 F.3d 153 (3d Cir. 2018) ..................................... *passim*

*Öztürk v. Hyde*,
  136 F.4th 382 (2d Cir. 2025) ................................... *passim*

*Öztürk v. Hyde*,
  155 F.4th 187 (2d Cir. 2025) ............................................20

*Öztürk v. Trump*,
  779 F. Supp. 3d 462 (D. Vt. 2025) ...................................30

*Paulo v. Holder*,
  669 F.3d 911 (9th Cir. 2011) ...........................................20

*Pham v. Ragbir*,
  141 S. Ct. 227 (2020) .......................................................34

*Ragbir v. Homan*,
  923 F.3d 53 (2d Cir. 2019) ...............................................34

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ...........................................23, 32, 34, 36

*Shuttlesworth v. City of Birmingham*,
  394 U.S. 147 (1969) .........................................................22

*Singh v. Gonzales,*
499 F.3d 969 (9th Cir. 2007) ................................................................8

*Suri v. Trump,*
No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) ...............8, 9, 20

*Swain v. Pressley,*
430 U.S. 372 (1977) ............................................................................27

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994) ............................................................................15

*Trump v. J.G.G.,*
604 U.S. 670 (2025) ............................................................................33

*United States v. Dohou,*
948 F.3d 621 (3d Cir. 2020) ...............................................................21

*Webster v. Doe,*
486 U.S. 592 (1988) ............................................................................37

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ............................................................................24

## Statutes

8 U.S.C § 1227 ...............................................................................4, 12

8 U.S.C. § 1182(a)(3)(C)(iii) ................................................................4

8 U.S.C. § 1226 ...................................................................................12

8 U.S.C. § 1252(b)(9) ................................................................. *passim*

8 U.S.C. § 1325 ...................................................................................21

8 U.S.C. § 1326 ...................................................................................21

18 U.S.C. § 611 ...................................................................................21

18 U.S.C. § 922(g)(5) ..........................................................................21

28 U.S.C. § 2243 .................................................................................30

## Regulations

8 C.F.R. § 1003.19(h)(2)(i)(C)..................................................................12

## Rules

Third Circuit I.O.P. 9.1 .........................................................................10

## Other Authorities

Akhil Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. Rev. 205 (1985) ......................37

Daniel J. Meltzer, *Congress, Courts, and Constitutional Remedies*, 86 Geo. L.J. 2537 (1998)....................................................................37

H.R. Rep. No. 109-72 ...........................................................................13

Oral Arg., *Suri v. Trump*, No. 25-1560 (4th Cir. Mar. 17, 2026) ................19

Restatement (Second) of Judgments(1982) .............................................21

Transactional Records Access Clearinghouse, *Latest Data on Custody Decisions in New Immigration Court Cases, July 2025* (2025) ..............12

## RULE 35.1 STATEMENT

I believe, based on reasoned and studied professional judgment, that the panel decision is contrary to decisions of the Supreme Court of the United States and this Court, *see Jennings v. Rodriguez*, 583 U.S. 281 (2018); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020); *Chehazeh v. U.S. Att'y Gen.*, 666 F.3d 118 (3d Cir. 2012); *E.O.H.C. v. Sec'y U.S. DHS*, 950 F.3d 177, 184 (3d Cir. 2020), and involves questions of exceptional importance because it has far-reaching implications for the law surrounding habeas corpus, executive detention, and the First and Fifth Amendments.

*/s/ Brett Max Kaufman*
Brett Max Kaufman
*Counsel for Petitioner–Appellee*

Petitioner–Appellee Mahmoud Khalil moves for rehearing en banc of the panel majority's decision determining that 8 U.S.C. § 1252(b)(9) of the Immigration and Nationality Act ("INA") strips federal courts of habeas jurisdiction over his independent constitutional challenges to detention and removal. By interpreting the statute, despite multiple presumptions favoring reviewability of claims, to foreclose any meaningful judicial review of the First and Fifth Amendment claims in this case, the panel decision conflicts with Supreme Court, Third Circuit, and other circuits' precedent and carries extraordinary consequences that require en banc review.

Most importantly, the panel held that section (b)(9) strips habeas jurisdiction over Mr. Khalil's claims that his detention is unconstitutional. If left to stand, that decision would permit the government to detain any noncitizen on retaliatory or punitive grounds, without lawful justification, while insulating this abuse of detention power from any federal court review, for what will likely be years, as it accomplished its unconstitutional end. And even if a targeted individual someday prevails on a challenge to removal, either before the agency or on a petition for review ("PFR"), no federal court will ever be able to review or remedy a claim that their detention violated the

Constitution. This would gut the Great Writ and allow the executive unfettered power to violate the Constitution—including by censoring, chilling, and punishing speech—through unreviewable imprisonment. That result is not only incompatible with the Supreme Court's and this Court's precedent regarding (b)(9) but runs afoul of the Suspension Clause and the First and Fifth Amendments.

Similarly, but separately, the decision's application of section (b)(9) to require Mr. Khalil's First and Fifth Amendment claims challenging his removal to await the PFR process deprives him of any meaningful review of those claims, both of which implicate his freedom of speech. These claims fall outside of (b)(9) because late review of First Amendment claims is no review at all.

This case is of extraordinary importance. It asks whether the government can openly target noncitizens for their speech and seek to censor the marketplace of ideas in the United States by reliance (even if spurious) on the immigration laws. It also asks whether the government can immunize itself from federal court review while it accomplishes the very kind of

unconstitutional purpose the courts, and habeas corpus, are meant to guard against.

The full Court should rehear this case en banc.

## STATEMENT OF THE CASE[1]

### Petitioner's Speech & Government Retaliation

Mr. Khalil was born in a Palestinian refugee camp. JA1100 ¶ 5. He lawfully came to the United States in 2022 on a student visa for a master's program in public and international affairs at Columbia University. JA1033 ¶ 20; JA1099 ¶ 1. In 2023, he married a U.S. citizen, and in 2024 he became a lawful permanent resident ("LPR"). JA459 ¶ 5.

Mr. Khalil has been a consistent advocate for Palestinian human rights and justice. JA1033 ¶¶ 20-23. Beginning in October 2023, he took a more public role in pro-Palestinian advocacy, including through speaking at protests, engaging with media, and (in April 2024) serving as a mediator and negotiator between student groups and the Columbia administration. JA1033-34 ¶¶ 22, 24-26. In March 2025, the government chose to target and detain him explicitly for his speech and advocacy, as demonstrated by

---

[1] A complete statement of the case is laid out in Petitioner's brief before the panel. Resp.Br.3-12.

unrebutted evidence, including the government's own public statements and submissions in immigration court. JA1045-50.

On March 8, without notice or a warrant, plainclothes federal officers entered the vestibule of Mr. Khalil's private residence in New York City and arrested him in front his eight-months-pregnant wife. JA1039 ¶¶ 46-47. In the middle of the night, Department of Homeland Security ("DHS") agents whisked him first to New Jersey and then, the next morning, to a remote detention facility in Louisiana. JA1039-42 ¶¶ 46-56. For 36 hours, Mr. Khalil was held incommunicado as his attorneys and family frantically tried to find and contact him. JA1041-42 ¶¶ 54-56. While detained in Manhattan on the night of March 8, Mr. Khalil was presented with a Notice to Appear ("NTA") for removal proceedings in Jena, Louisiana, and his requests to speak with his lawyer were repeatedly denied. JA1043 ¶¶ 59, 62. Respondents charged Mr. Khalil as removable under 8 U.S.C. § 1182(a)(3)(C)(iii) (the "Foreign Policy Ground" or "FPG"), JA1047-48 ¶ 82, based on a determination by Secretary of State Marco Rubio (the "Rubio Determination") that Mr. Khalil's expressive activity—which was "otherwise lawful"—would "compromise a compelling foreign policy interest," JA1023 (citing 8 U.S.C. § 1227(a)(4)(C)). Such use

of the FPG against an LPR for lawful speech inside the United States was unprecedented. JA1416-17 ¶¶ 9-10; JA266-74; JA1057-62.

<u>Proceedings Below</u>

Within hours of his March 8 arrest, Mr. Khalil's lawyers filed a habeas petition in the Southern District of New York challenging both his detention and deportation on various constitutional grounds. JA1041 ¶ 54; JA1050-53. A week later, after a public outcry, Respondents levied a second immigration charge, which Petitioner has maintained was a mere extension of the government's unconstitutional retaliation, alleging misrepresentations on Petitioner's green card application. JA1049-50 ¶ 88. Experts have noted the extremely rare use of this charge against someone with Mr. Khalil's background. JA1388 ¶ 15; JA1392-94; JA1418 ¶ 16-18; JA1546-47.

After a transfer of Mr. Khalil's petition to the District of New Jersey, JA34-100, the district court issued a thorough opinion confirming its subject matter jurisdiction, JA101-208, and, on June 11, granted a preliminary injunction prohibiting Respondents from detaining or seeking to remove Mr. Khalil based on the Rubio Determination, JA19-20; *see* JA209-309 (concluding that the FPG, as applied to Mr. Khalil through the Rubio

Determination, is likely unconstitutionally vague).[2] The court later determined that Respondents had taken actions in Mr. Khalil's immigration proceedings that were "directly inconsistent with" its injunction, JA25, and ordered Respondents to take certain steps to comply with its June 11 injunction, JA28-32.

Meanwhile, on June 20—at which point Mr. Khalil had spent 104 days in detention, missing the birth of his first child—the district court held a bail hearing and ordered Petitioner's release pending the habeas proceedings. JA22-23; JA315-89. The court cited to extensive evidence of extraordinary circumstances to which Respondents had "opted to say nothing in response," JA369; *see* JA336, JA351, JA370, JA386, and explained at length that the bail order satisfied the applicable standards, JA337-76.

Panel Decision

On appeal, a divided panel of this Court reversed the district court's preliminary injunction and bail order based on the majority's conclusion that 8 U.S.C. § 1252(b)(9) strips federal courts of subject-matter jurisdiction over

---

[2] The court did not reach Mr. Khalil's other claims raised in support of his preliminary-injunction motion, including his First Amendment retaliation claim and his substantive due process claim—both of which remain as alternative grounds for affirming the injunction on appeal. Resp.Br.56-70.

Mr. Khalil's First and Fifth Amendment challenges to not only his removal but also to his unlawful detention.[3]

The majority held that, under (b)(9), a claim "arises from" an action or proceeding to remove a noncitizen—and therefore is barred from habeas review—if it "raise[s] legal or factual questions that a court of appeals will . . . be able to review" on a PFR even if the court cannot provide a remedy. Op.23. Because the majority concluded that "[e]ach of the legal questions Khalil raises in his petition" challenging his removal "can be decided later, on a PFR," it determined that (b)(9) bars those constitutional claims from habeas review. Op.26. And because the panel concluded that Mr. Khalil's "arguments against" unconstitutional detention "are identical to his arguments against removal," it determined that the "legal questions" those arguments raised could be "review[ed]" on a PFR, too. Op.28.

In partial dissent, Judge Freeman countered that the majority's reading of section (b)(9) conflicts with this Court's prior decisions in *Chehazeh v. U.S. Att'y Gen.*, 666 F.3d 118, 131-34 (3d Cir. 2012), and *E.O.H.C. v. Sec'y U.S.*

---

[3] All three members of the panel agreed that the district court had habeas jurisdiction over Mr. Khalil's petition. Op.9-20; Dissent.1. No judge reached the merits of the district court's injunction.

*DHS*, 950 F.3d 177, 184 (3d Cir. 2020), and "renders meaningful review hollow" because Mr. Khalil's "First Amendment injuries during his detention may get *no* review, let alone meaningful review"—and only habeas can provide such review. Dissent.20-21.

ARGUMENT

I.    The panel majority's interpretation of 8 U.S.C. § 1252(b)(9) conflicts with binding precedent and leaves Mr. Khalil with no meaningful or effective judicial review of his claims challenging unconstitutional executive detention.

   A.    Under binding precedent, section 1252(b)(9) does not apply to Mr. Khalil's detention claims.

      1.    The panel decision conflicts with *Chehazeh*, which holds that section 1252(b)(9) is inapplicable when there is no final order of removal.

In *Chehazeh*, this Court explicitly held that (b)(9) applies *only* to review of a final order of removal, 666 F.3d at 131-33, which has not been issued in this case. Other circuits have agreed. *See, e.g., Öztürk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025) (denying stay pending appeal); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) (same); *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006); *see also* Dissent.4-5 & nn.2-3.

The panel majority concluded that the "Supreme Court has since abrogated that part of *Chehazeh*," in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), because Justice Alito's plurality opinion for three Justices—which concluded that (b)(9) *did not* bar a prolonged-detention claim—"strongly suggested" (in dicta) that (b)(9) might bar challenges to the government's initial decision to detain a noncitizen. Op.30. But as Judge Freeman explained, that is incorrect. Dissent.8-9. The majority's reading of the dicta "is incompatible with the views of the remaining five Justices who participated in *Jennings*," Dissent.9, and it is also incompatible with how the Supreme Court, two years later, characterized *Jennings*' holding. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (omitting the dicta in a re-formulation of the scope of (b)(9)); *see Casa de Maryland v. DHS*, 924 F.3d 684, 697 (4th Cir. 2019) (agreeing with *Chehazeh* after *Jennings*); *Suri*, 2025 WL 1806692, at *9 (reaffirming that holding). And even if the majority correctly reads the dicta, it fails to establish that this view constituted "the narrowest grounds necessary to secure a [*Jennings*] majority," *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, 538 F.3d 241, 248 (3d Cir. 2008) (cleaned up), as is required, under *Marks v. United States*, 430 U.S. 188 (1977), to constitute a holding of the Court. Dissent.9.

The majority also suggests that *E.O.H.C.* implicitly adopted the *Jennings* abrogation theory. Op.31. But the absence of any discussion of *Jennings* on that point strongly implies *E.O.H.C.* did not deliberately intend such a conflict. Dissent. 10 & n.5; JA134-35. And even if it did, two subsequent panels could not have overruled Circuit precedent any more than one. *See* Third Circuit I.O.P. 9.1.

> **2.    The panel decision conflicts with *Regents*, *Jennings*, and *E.O.H.C.*, which hold that detention claims cannot be meaningfully reviewed on a PFR because they cannot be effectively remedied at that stage.**

Even if (b)(9) can apply before issuance of a final order of removal, it cannot bar Mr. Khalil's unconstitutional detention claims, and the panel's contrary conclusion conflicts with Supreme Court and Third Circuit precedent.

First, various essential canons of statutory interpretation—(i) "the strong presumption in favor of judicial review of administrative action," (ii) "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," (iii) the rule that a "clear indication" of congressional intent is expected when a proposed interpretation would push "the outer limits of Congress' power," and (iv) the canon of constitutional avoidance—mandate a narrow reading of 1252(b)(9) to exclude detention

claims from any bar on habeas review. *INS v. St. Cyr*, 533 U.S. 289, 298-300 (2001); *see E.O.H.C.*, 950 F.3d at 184. Moreover, the protections of habeas are at their strongest—and therefore are the most difficult to displace through anything short of explicit and unambiguous congressional commands—when it comes to executive detention. *See Boumediene v. Bush*, 553 U.S. 723, 783 (2008); *St. Cyr*, 533 U.S. at 301, 314. In no small part due to those presumptions, this Court has explained that section (b)(9) does not apply to claims that fall outside the PFR process because "[t]he point" of the subsection "is to channel claims into a single petition for review, not to bar claims that do not fit within that process." *E.O.H.C.*, 950 F.3d at 186; *see Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) ("We thus read the words 'arising from' in section 1252(b)(9) to exclude claims that are independent of, or wholly collateral to, the removal process."); *see also St. Cyr*, 533 U.S. at 313-14.

Second, detention claims challenging the lawfulness or constitutionality of a noncitizen's present physical confinement by immigration authorities do not fit within the PFR process. Detention is not an essential part of removal; in fact, most people in removal proceedings are not detained. *See, e.g.,* Transactional Records Access Clearinghouse, *Latest Data on Custody*

*Decisions in New Immigration Court Cases, July 2025* (2025), https://perma.cc/Q7QF-EH5U.[4] And executive detention is a deprivation of liberty that is distinct from removal. Reflecting that difference, the INA treats detention and removability as separate legal inquiries, involving separate justifications and statutes (8 U.S.C. § 1226 for detention, versus 8 U.S.C § 1227 for removability) tied to separate administrative proceedings (custody redetermination hearings, if available, versus removal proceedings). Given this, it is little surprise that the one jurisdiction-stripping provision in the INA that does explicitly reference detention claims is situated in the detention statute. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003) (holding that even that statute, 8 U.S.C. § 1226(e), does not strip habeas review of constitutional and statutory detention claims).

The majority's interpretation of (b)(9) bypasses the detention statute entirely and interprets a provision within the INA's statutory removal scheme to bar habeas review of an unconstitutional detention claim. Moreover, it

---

[4] Although noncitizens charged with the FPG (like Mr. Khalil) are *not* subject to mandatory detention by statute, once DHS has decided to detain them, a DHS regulation prohibits an immigration judge ("IJ") from issuing bond, rendering DHS's decision effectively unreviewable in administrative proceedings. JA1530 (citing 8 C.F.R. § 1003.19(h)(2)(i)(C)). That is what happened here. *Id.* (denying Mr. Khalil a bond hearing).

does so contrary to the intent of Congress, which "stated unequivocally" when passing the REAL ID Act of 2005 that 1252(b)(9) "should not be read to preclude" "challenges to detention," because "detention claims are 'independent of challenges to removal orders.'" *Aguilar*, 510 F.3d at 11 (quoting H.R. Rep. No. 109-72, at 175, *reprinted in* 2005 U.S.C.C.A.N. at 300); *see also Öztürk*, 136 F.4th at 399; *E.O.H.C.*, 950 F.3d at 186.[5]

Second, the Supreme Court has repeatedly rejected an expansive reading of (b)(9) that would render claims outside the PFR process, specifically including detention claims, unreviewable. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 533 n.4 (2021); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019); *Jennings*, 583 U.S. at 293. While the panel majority misreads *Jennings* to support a harsher reading of section (b)(9), Dissent.8, the result in *Jennings* was based on the understanding that by the time a final order of removal is entered in an immigration case, setting up a PFR, the unconstitutional detention "would have already taken place" such that the petitioner would be deprived of any "meaningful chance for judicial review." 583 U.S. at 293. And notably, in *Regents*, the Supreme Court quoted and

---

[5] *E.O.H.C.* specifically cited this portion of the First Circuit's analysis in *Aguilar*, *see* 950 F.3d at 186, but the panel majority here did not address it.

applied *Jennings* but did not recite Justice Alito's dicta concerning the hypothetical reach of (b)(9) to channel claims challenging the initial decision to detain a noncitizen, instead holding only that "1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." 591 U.S. at 19 (cleaned up). A decision to challenge the constitutionality of one's detention is not asking for review of any of those determinations and thus falls outside the channeling process. *See Öztürk*, 136 F.4th at 400-01.

Third, in *E.O.H.C.*, this Court held, relying on *Jennings*, that (b)(9) "does not strip jurisdiction when aliens seek *relief that courts cannot meaningfully provide* alongside review of a final order of removal." 950 F.3d at 186 (emphasis added). As *E.O.H.C.* explained, these kinds of "now-or-never claims," *id.* at 185-86, do not, in the words of the statute, "arise from an[] action taken or proceeding brought to remove an alien from" the country. 8 U.S.C. § 1252(b)(9); *see Jennings*, 583 U.S. at 293 ((b)(9) should not be read to permit "absurd" results). In *E.O.H.C.*, this Court asked, "If not

14

now, when?," 950 F.3d at 180, and explained that "[i]f the answer is 'never,' then "§ 1252(b)(9) poses no jurisdictional bar," Dissent.12.[6]

The relief Mr. Khalil seeks through his challenge to unconstitutional detention cannot be remedied on a PFR because review of the legality of his removal at that point—even if it were determinative of his detention claim (and it is not)—would come "too late to redress" his injury. *E.O.H.C.*, 950 F.3d at 186. Where a habeas petitioner's "core argument is that [their] free speech and due process rights are being violated, *now,* . . . requir[ing] [them] to sit on [their] challenge until [they] receive[] a final order of removal would create the situation warned of in *Jennings*." *Öztürk*, 136 F.4th at 401.

Because the panel majority's opinion is clearly inconsistent with *E.O.H.C.,* the majority strains to rewrite it. The majority insists *E.O.H.C.* was not actually about "*injur[ies]* that cannot be *remedied* later through a PFR" but was instead about whether a claim "raise[s] *legal or factual questions* that

_____

[6] As the district court laid out, *E.O.H.C.*'s and *Jennings*'s "meaningful review" and "now or never" analysis is not a creature of immigration law but sits comfortably within general administrative law. JA145-47 (discussing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and other precedent); JA148-54 (discussing this Court's application of background administrative law principles regarding "meaningful review" to immigration law in *E.O.H.C.* and *Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996) (Alito, J.)); *see also Aguilar*, 510 F.3d at 14 (interpreting (b)(9) in light of *Thunder Basin*).

cannot later be *reviewed* via a PFR." Op.22. And it portrays *E.O.H.C.* as having "left open" a distinction between such arguments, by reasoning that the case "had no occasion to pass on that distinction." Op.22.

But the majority is wrong.[7] In explaining why (b)(9) did not bar the *E.O.H.C.* petitioners' due process challenge to alleged interference with counsel but did bar their statutory challenge on similar grounds, this Court plainly stated: while "the constitutional harm . . . could not be *remedied* after a final order of removal" (and thus was not subject to the PFR channeling process), the harm from the alleged violation of the "statutory right," which was "tied to the removal proceedings themselves," did not amount to "*irreparable harm*." 950 F.3d at 187-88 (emphases added); *see* Dissent.19-20 & n.12. And when the Court announced its holding at the top of the *E.O.H.C.* opinion, it did not even mention the relevance of "legal and factual questions" to now-or-never claims. *See* 950 F.3d at 180 ("When a detained alien *seeks relief* that a court of appeals cannot *meaningfully provide* on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." (emphases added)); Dissent.19-20 & n.12.

---

[7] Even if the majority correctly interpreted (b)(9), it applied that interpretation incorrectly to bar Mr. Khalil's claims. *See infra* I.A.3.

Consistent with its own prominent summation of the holding in *E.O.H.C.*, when the Court likened certain hypothetical conditions-of-confinement claims (like the denial of Kosher food to a religious detainee) to the prolonged-detention claim in *Jennings* as types of now-or-never claims that evade (b)(9)'s bar, it rejected the government's argument that such claims could await a PFR by resting its holding on the specter of irreparable harm: "For one, the final order of removal may never come," and "[e]ven if it does, review and relief may come too late to redress these conditions of confinement." Dissent.20 n.12 (cleaned up).[8] That emphasis makes sense, given *Jennings*'s identical concern. There, Justice Alito explained that the problem with an interpretation of (b)(9) that barred habeas review of a prolonged detention claim was that it would "depriv[e] [a] detainee of any meaningful chance for judicial review"; accordingly, he made explicit that such a deprivation resulted from the fact that "the allegedly excessive

---

[8] The majority rejected Judge Freeman's application of *E.O.H.C.*'s "may never come" language to Mr. Khalil because the Board of Immigration Appeals ("BIA") "has set an expedited briefing schedule for [his] appeal of the immigration judge's order of removal." Op.29. But in the world the panel decision has created, Mr. Khalil would be subject to detention without any federal review pending the entirety of the removal proceedings before the IJ and the BIA. And if he somehow prevails at the BIA, federal review will never come, and no court will have addressed any of his constitutional claims.

detention would have already taken place" "[b]y the time a final order of removal was eventually entered." 583 U.S. at 293. *Jennings*'s and *E.O.H.C.*'s focus—on the *irreparable harm* of such detention, rather than the inability of a PFR court to *address the factual and legal questions* raised by the claim—is unmistakable.

The majority does not and cannot distinguish Mr. Khalil's detention claims from the prolonged-detention and Kosher food claims that *Jennings* and *E.O.H.C.* (and now the panel majority) made clear were outside (b)(9)'s reach. When the majority concluded that Mr. Khalil's challenge to "the mere fact of detention" "has nothing to do with the conditions in which he was being held," Op.34, it was insisting upon a distinction without a difference. *E.O.H.C.*'s hypothetical detainee's claim was that he was being deprived of Kosher food *in detention*; Mr. Khalil's claim is that he is being unjustifiably deprived of freedom, and subjected to ongoing censorship, *through detention*.[9] And while the majority concedes that *at some point* a petitioner

---

[9] The majority brushes aside the harms of detention while awaiting a PFR as "routine[]" in "our legal system." Op.25. But its comparator detainee—"[a]n innocent defendant who was convicted of a serious crime and imprisoned because his trial lawyer was ineffective," *id.*—was already granted a criminal trial circumscribed with many strict due process protections, and was not someone subjected to *executive detention* absent any process, where the

might be able to bring a *prolonged detention claim* that is not barred by (b)(9), Op.29, it does nothing to explain why (b)(9) would bar a claim of unconstitutional detention several months into that detention but not a claim of unconstitutional detention on day one. No matter what legal questions a PFR court could ultimately address, that is not a harm that can be remedied later.[10]

In the end, the majority's unpersuasive rewriting of *E.O.H.C.* appears to hinge largely on the worry that Mr. Khalil's interpretation of the statute might allow a habeas petitioner, "[w]ith a final judgment in hand," to "use issue preclusion or law of the case in the later PFR, leaving that court nothing to decide," and "encourag[ing] . . . piecemeal litigation." Op.24-26 (cleaned up).

---

executive is seeking seeks to delay judicial review of its own unconstitutional conduct. *Cf. Boumediene*, 553 U.S. at 765 (executive lacks the power to "switch the Constitution on or off at will"); *see* Dissent.21 n.14; Oral Arg. at 1:04:35-1:06:08, *Suri v. Trump*, No. 25-1560 (4th Cir. Mar. 17, 2026), https://www.ca4.uscourts.gov/OAarchive/mp3/25-1560-20260317.mp3.

[10] The notion that, when considering whether an overlap in legal questions presented by claims in two different fora might bar one of the claims, the distinction between *relief* and *legal questions* can be critical, is not cabined to this context. Indeed, the Supreme Court just decided unanimously that a person's claim for prospective First Amendment relief against an unconstitutional statute is not barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), by the existence of their prior conviction under the same statute. *Oliver v. City of Brandon*, 607 U.S. —, 2026 WL 783725 (Mar. 20, 2026).

But preclusion is simply part of litigation, including under the INA. *See, e.g.,* *Paulo v. Holder*, 669 F.3d 911 (9th Cir. 2011). And policy concerns about the mere specter of potential future overlap or preclusion in a removal case is simply not what Congress had in mind when it wrote (b)(9). *See Öztürk*, 136 F.4th at 400 ("overlap, even substantial substantive overlap," between a challenge to detention and a later challenge to removal "does not make one claim arise out of the other" for the purposes of (b)(9)); *Suri*, 2025 WL 1806692, at *1 n.1 ("We cannot so easily consign an individual's liberty to the concerns of bureaucratic tidiness. The Constitution does not yield to administrative convenience, and due process is not suspended merely because two courts may be asked similar questions. Simply stated, human rights do not cower before the speculative perils of duplicative litigation."); *see also* *Öztürk v. Hyde*, 155 F.4th 187, 208 (2d Cir. 2025) (Nathan, J., concurring in denial of rehearing en banc) (explaining that the government's similarly broad reading of another INA subsection, 1252(g), would "eviscerate habeas corpus for noncitizens whenever the government detains them and also seeks

to remove them" for a similar reason—a conclusion that is inconsistent with the "*presumption* of judicial review, not of jurisdiction stripping").[11]

Moreover, while the panel majority appeared concerned about habeas petitioners short-circuiting removal proceedings, the ultimate issue of whether *detention* is unconstitutional is separate from the issue of whether *removal* is unconstitutional. Even in cases of overlap, habeas courts already have prudential rules to ensure that petitioners first exhaust claims that can and should be exhausted. *See, e.g., McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *United States v. Dohou*, 948 F.3d 621, 628-29 (3d Cir. 2020). And because preclusion requires a final judgment, Restatement (Second) of Judgments §§ 13(g), 17(c) (1982), whether a habeas case would outpace a removal case to final judgment is far from clear (as this case shows).

---

[11] The majority's holding that the hypothetical existence of common legal questions or facts bars a habeas claim would create absurd and troubling results. For example, the legal and factual question of whether a person is an "alien" is relevant to numerous legal provisions—detention, removability, voting, employment law, criminal law (charges and sentencing), and numerous other issues, some of which may be considered close in time. *See, e.g.,* 8 U.S.C. §§ 1325-1326; 18 U.S.C. §§ 611, 922(g)(5). But on the majority's view, section 1252(b)(9) would eliminate federal courts' review over any claims (habeas or not) challenging "alienage" in contexts outside of removal just because those same legal or factual questions might someday be heard on a PFR.

Finally, it is especially true that the PFR process cannot provide Mr. Khalil with meaningful review of his *First Amendment* challenge to detention. The urgency of federal court review is especially great when First Amendment harms are accomplished (as here) through retaliatory, pretextual detention— because such detention does double-duty, not only chilling speech, but effectively operating as a prior restraint. *See* JA187-88; Dissent.15-17 & nn.8-10; *see also Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 194 (D. Mass. 2025). The PFR process is simply unable to provide meaningful review of a First Amendment detention claim to someone like Mr. Khalil, who, on the panel majority's view, would be forced to sit in detention for months or years before accessing a federal court that could put a halt to unconstitutional government retaliation. If the majority opinion stands, the government could pretextually detain any noncitizen during a fierce public debate on any issue, and silence them and others during the very moment when their speech would have most salience and affect public discourse. Such censorship, once achieved, cannot be remedied later. *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("[T]iming is of the essence in politics. It is almost impossible to predict the

political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all.").[12]

In enacting (b)(9), Congress was thinking about the millions of cases that pass through the immigration system every year—not about an extreme and unprecedented government attempt to detain an LPR for free speech and silence him and others on that basis. As Justice Alito made clear in *Jennings*, courts should not read (b)(9) to sweep up extreme cases like this one, where the government is weaponizing law enforcement power for the impermissible purpose of punishing and censoring lawful speech. *Cf. NRA v. Vullo*, 602 U.S. 175, 194 (2024) ("[T]hreaten[ing] to wield [government] power … to punish [protected] advocacy … violates the First Amendment.").

---

[12] *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AADC*"), is not to the contrary. *Contra* Op.34. The *AADC* majority did not disagree that immediate review is generally required to address First Amendment harms. 525 U.S. at 488 n.10; *see* JA192-94. Instead, it resolved the merits of the First Amendment question in that case and found no constitutional concerns about or applicable exceptions to a general rule against selective enforcement claims. *AADC*, 525 U.S. at 490-91. Here, by contrast, there are serious constitutional concerns and reasons why Mr. Khalil is entitled to review of his First Amendment retaliation claim. Resp.Br.50; Oral.Arg.Tr. 32:18-33:24 (3d Cir. Oct. 21, 2025).

3. Even if the panel majority's interpretation of (b)(9) is correct, it still erred under its own analysis because Mr. Khalil's constitutional detention claims do not raise legal questions that would be determinative of those addressed by a PFR court.

Even assuming the panel majority's revised reading of *E.O.H.C.* were correct, and that (b)(9) applies to detention claims that overlap with a legal question that may be reviewed on a PFR, even if the PFR can provide no remedy, the majority still erred.

First, the majority incorrectly concluded that Mr. Khalil's substantive due process claim challenge to detention falls within (b)(9) because it "just repackages," Op.28, the same question raised by his First Amendment challenge to his removability. That cavalier treatment obscures that these are different constitutional questions entirely. *See* Resp.Br.67-69. Under *Bell v. Wolfish*, civil detention violates substantive due process if it is (1) punitive in intent, *or* (2) unrelated to any legitimate government interest in detention, *or* (3) excessive to such a legitimate government interest. 441 U.S. 520, 539 n.20 (1979); *see Zadvydas v. Davis*, 533 U.S. 678, 690-96 (2001) (applying those principles to immigration detention). In addition to his argument that the federal government intentionally detained him in order to punish and silence him for his protected speech, Mr. Khalil also argues that his detention

24

is simply unrelated and excessive to any legitimate government interest in detention—i.e., because "there is a very strong and uncontested record here as to lack of flight risk and lack of dangerousness." JA336; *see Demore*, 538 U.S. at 531-32 (Kennedy, J., concurring). This substantive due process claim that his detention was unjustified by flight risk or dangerousness can succeed on *Bell*'s second or third prong even if a court were to find no evidence of punitive or retaliatory intent. Even under the majority's new interpretation of (b)(9), the provision would not bar this substantive due process claim, as the legal question it presents would not be reviewed on a PFR at all.

Second, while Mr. Khalil's First Amendment detention claim does overlap with his First Amendment removal claim, the claims are distinct. In particular, if Mr. Khalil establishes a prima facie case of retaliatory conduct, the burden shifts to the government to show that it would have taken the complained-of action even in the absence of Mr. Khalil's protected conduct. *See* Resp.Br.57-63. The government has not yet even attempted to meet that burden. But because Mr. Khalil's detention was *not* mandatory under the immigration statutes, it was a separate and distinct choice by the government, and may have been motivated by purposes different from those that motivated the government's removal efforts—especially because the threat of

detention may effectuate a more significant chill of Mr. Khalil's and others' speech than the threat of removal proceedings.

> B. The panel majority's fleeting analysis concluding that its interpretation of section 1252(b)(9) does not violate the Suspension Clause or the First and Fifth Amendments conflicts with authority from this Court, the Second Circuit opinion upon which the majority relied, and the Supreme Court.

If the majority were correct that (b)(9) prevents Mr. Khalil from accessing a federal court to challenge his unconstitutional detention in habeas before the entire course of executive-controlled immigration proceedings is complete, that interpretation would be unconstitutional as applied. Resp.Br.43-46.[13]

Noncitizens with ties to the United States like Mr. Khalil "may not be denied the privilege of habeas corpus." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 177 (3d Cir. 2018); *see Castro v. DHS*, 835 F.3d 422, 446 (3d Cir. 2016). And, habeas, of course, "is at its core a remedy for unlawful executive detention." *DHS v. Thuraissigiam*, 591 U.S. 103, 119 (2020) (cleaned up). As such, Congress may not strip federal courts of habeas

---

[13] At the very least, the majority's interpretation of (b)(9) raises serious questions under the Suspension Clause and First Amendment, and where a statutory interpretation is not unambiguous, courts must apply the canon of constitutional avoidance. *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

jurisdiction unless it provides an adequate and effective alternative to habeas review. *Osorio-Martinez*, 893 F.3d at 177 (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)). Such an alternative to habeas must—at the absolute minimum—provide a petitioner with "a meaningful opportunity to demonstrate that he is being held" unlawfully. *Boumediene*, 553 U.S. at 779.

A PFR that only allows Mr. Khalil to challenge his illegal detention months or years *after* its retaliatory chilling of speech or punitive purpose has been effectuated, without an opportunity to actually remedy the illegal detention, is not an adequate or effective alternative to habeas. *See* Dissent.20; *Boumediene*, 553 U.S. at 792 ("cumulative effect" of detainees' inability to challenge the executive's "legal authority to detain them," "contest the [administrative courts'] findings of fact," "supplement the record on review," and "request an order of release" constituted unlawful suspension of the writ).

The panel majority dispatched the issue in a single sentence, concluding that "the availability of the PFR process satisfies the Suspension Clause." Op.34. For that point, it cited only the Second Circuit's decision in *Luna v. Holder*, 637 F.3d 85, 95 (2d Cir. 2011)—but that case does not remotely support the majority's sweeping conclusion, which conflicts with this Court's

and the Supreme Court's Suspension Clause precedent. *See Osorio-Martinez*, 893 F.3d at 177 n.22 (relying on the analysis in *Luna* to conclude that an INA provision violated Suspension Clause as applied to "Special Immigrant Juveniles" seeking judicial review of orders of expedited removal); *Boumediene*, 553 U.S. at 771 (rejecting adequacy and effectiveness of congressional substitute for habeas detention challenges).

First, *Luna* addressed the adequacy of the PFR process for a petitioner who sought to challenge *removability*, not detention. 637 F.3d at 85. Indeed, it was even narrower than that—addressing the adequacy and effectiveness of the "statutory motion to reopen process" that is a minor feature of the PFR process. *Id.* at 97. And, relying on *Luna*, *Osorio-Martinez* concluded that even in a removal context, the Suspension Clause prevents Congress from stripping habeas jurisdiction where it has not provided for an adequate or effective substitute. 893 F.3d at 177-78. By contrast, what is at issue here is the basic, fundamental right to challenge one's unlawful *detention* by the executive, where "the need for collateral review is most pressing" and "the need for habeas corpus is more urgent." *Boumediene*, 553 U.S. at 783. But under the panel majority's interpretation of (b)(9), Mr. Khalil has *no* court available to contest his unlawful detention during the pendency of his removal

proceedings—and his claim is that his detention is unlawful *irrespective* of whether his removal is unlawful. Resp.Br.41-43.

Second, as *Boumediene*, *Luna*, and this Court's opinion in *Osorio-Martinez* make clear, the ability of any habeas alternative to provide "*appropriate orders for relief, including, if necessary, an order directing the prisoner's release,*" is critical to the Suspension Clause analysis. *Boumediene*, 553 U.S. at 787 (emphasis added); *see Luna*, 637 F.3d at 97, 104 ("[W]hen Congress has replaced the writ of habeas with an adequate and effective substitute, 'it has granted to the courts broad remedial powers to secure the historic office of the writ.'" (quoting *Boumediene*, 553 U.S. at 776-77); *Osorio-Martinez*, 893 F.3d at 177 n.22. And even after an immigration detainee waits months or years for the chance to access a federal court of appeals on a PFR, while that court might issue orders that lead to their release (by determining that their removal is unlawful), that court will not and cannot address detention itself.

Third, *Luna* explained that "in the cases in which the Supreme Court has found a substitute to be adequate and effective, 'the purpose and effect of the substitute was to expedite consideration of the detainee's claims, not to delay or frustrate it.'" 637 F.3d at 97 (cleaned up) (quoting *St. Cyr.*, 533

U.S. at 775-76); *see* 28 U.S.C. § 2243 (mandating speed in effectuating the habeas remedy). Here, the majority's reading of (b)(9) delays federal court consideration of Mr. Khalil's claims for months or years, with "little or nothing to show for it." JA154-56.

Fourth, *Luna* emphasized that "because habeas is 'designed to restrain' the Government's power, the scope of the substitute procedure must not be 'subject to manipulation' by the Government." 637 F.3d at 97 (quoting *St. Cyr*, 533 U.S. at 765-66); *see Osorio-Martinez*, 893 F.3d at 177 n.22. But the majority's reading of (b)(9) would permit brazen abuse of the Great Writ, enabling the government to raise an even patently spurious immigration charge against a noncitizen, including in admitted retribution for speech, and forestall federal court review of its unlawful actions. Moreover, whatever its nominal independence, the immigration system remains entirely under the control of the executive branch. *Duenas v. Garland*, 78 F.4th 1069, 1073 (9th Cir. 2023); *see Öztürk v. Trump*, 779 F. Supp. 3d 462, 485-86 (D. Vt. 2025) (rejecting government's "practically limitless" argument "that no matter how egregious the type or quantity of First Amendment or due process violations committed by the government in detaining an individual, an Article III court cannot consider any alleged constitutional violations until after Article II

employees, with no power to consider or address those violations, have moved the case through their lengthy process").

Fifth, at a minimum, a PFR cannot be an adequate and effective substitute for a claim of retaliatory, pretextual detention in violation of the First Amendment because, as explained above and below, the First Amendment requires prompt and effective review of speech claims.

II.    **The panel majority's interpretation of 8 U.S.C. § 1252(b)(9) to bar habeas review of Mr. Khalil's removal claims leaves him with no meaningful or effective judicial forum capable of redressing his First Amendment injuries.**

While the panel majority's erroneous resolution of Mr. Khalil's detention claims alone justifies en banc review, the majority was also wrong to hold that section 1252(b)(9) bars his removal claims.

As explained above, under Supreme Court and Third Circuit precedent, (b)(9) requires meaningful review of claims that do not fit within the PFR process. And First Amendment claims do not fit. Across many areas of law, First Amendment harms are treated as unique, and their urgency demands upfront federal court review. Dissent.15-17 & nn.8-10. As Justice Ginsburg explained in her *AADC* concurrence, when "here-and-now speech impacts" are involved, JA184, "the Constitution requires immediate judicial intervention," in order to mitigate the broad chilling effect that retaliatory

actions can have on the exercise of First Amendment rights. *AADC*, 525 U.S. at 492 (Ginsburg, J., concurring). That principle is consistent with reams of cases. JA183-88 ("Our law's response to a here-and-now impact on political speech has been the same across the board: no unnecessary delay." (discussing cases)); *see, e.g., Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 55-56 (1989) (delayed review might "seriously erode federal policy" by "only further harm[ing] the operation of a free press" (cleaned up)); *Oesterich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233 (1968) (immediate review of withdrawal of draft exemption even though petitioner could get administrative review); *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 44 (1977) (denying review would "deprive [petitioner] of rights protected by the First Amendment during the period of appellate review"); *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) (First Amendment chill resulting from "the fact of the [state] prosecution" could not be "adequate[ly] vindicate[ed]" through a defense against state charges); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (requiring immediate judicial review of "here-and-now injury" of being subject to an "illegitimate proceeding").

Mr. Khalil's First and Fifth Amendment removal claims both seek redress of First Amendment harms that are, by their very nature, irreparable.

JA199; JA284-87; *see Am. Ass'n of Univ. Professors v. Rubio*, No. 25-10685, 2026 WL 686418, at *7 (D. Mass. Mar. 11, 2026) ("Proceeding through the administrative process—controlled by Article II administrative hearing officers—is exactly the injury that [the government] intend[s], and exacerbates the injury." (cleaned up) (quoting *Aguilar*, 510 F.3d at 14)).[14] The panel opinion forecloses review of these claims by requiring people like Mr. Khalil to wait until they are ordered removed and then file a PFR. As the dissent explains, this is not meaningful review. Dissent.20-21.

Moreover, the panel majority's analysis again raises serious Suspension Clause concerns. Under the Suspension Clause, some judicial review of deportation is required. *St. Cyr*, 533 U.S. at 304-08; *Osorio-Martinez*, 893 F.3d at 177-78; *Castro*, 835 F.3d at 446; *see Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) ("[C]laims for relief" that "necessarily imply the invalidity of

---

[14] As the district court explained, Mr. Khalil's Fifth Amendment challenge to removal (and detention) raises serious First Amendment issues. JA284-87.

[one's] confinement and removal . . . fall within the core of the writ of habeas corpus."(cleaned up)).

A PFR is not an adequate substitute for habeas review when it comes to First Amendment claims challenging removal.[15] Even without detention, a petitioner who has been unconstitutionally targeted for removal because of speech will remain chilled for the pendency of removal proceedings. That is not a harm that can be remedied even if, on a PFR, the individual is ultimately spared from the ultimate punishment of removal.[16]

---

[15] Even in the context of the general prohibition on raising selective enforcement claims in the immigration context (a claim that Mr. Khalil does not bring, Resp.Br.50), the Supreme Court recognizes an exception for "outrageous discrimination." *AADC*, 525 U.S. at 491; *see Ragbir v. Homan*, 923 F.3d 53, 73 (2d Cir. 2019) (petitioner "alleged discrimination" that "qualifies as 'outrageous' under" *AADC*), *cert. granted, judgment vacated sub nom.*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020). The panel majority referenced this exception without considering whether it would apply to Mr. Khalil's case—and it would.

[16] Any concern that a rule carving out First Amendment removal claims from (b)(9) would lead to strategic pleading and a flood of First Amendment habeas petitions is misplaced. Oral.Arg.Tr. 38:7-42:10. Frivolous claims will be quickly weeded out. And as the aftermath to *Ragbir* (which precipitated few First Amendment claims against removal) makes clear, most noncitizens will not seek the uncertain protection of a First Amendment claim against retaliation by engaging in speech that makes them a prominent government target.

Moreover, to be a constitutionally adequate substitute for habeas review, the administrative remedy and PFR process together must be adequate and effective. *See Osorio-Martinez*, 893 F.3d at 177. Part and parcel of that analysis are the procedural mechanisms provided. *See Luna*, 637 F.3d at 97-98. Those mechanisms include, here, the ability of the immigration courts and the PFR court to engage in the kind of factfinding that is necessary to deciding Mr. Khalil's claims and order the kind of relief to which he would be entitled in habeas. *See Boumediene*, 553 U.S. at 771, 787. And the immigration and PFR process does not permit the necessary fact-finding because it focuses solely on the question of the validity of a removal order and entitlement to relief from removal, not the constitutionality of government action. JA161-62.

In particular, the IJ cannot meaningfully review the constitutionality of the government's decision to retaliate against Mr. Khalil for his speech by removing him. The IJ lacks authority to develop an adequate factual record, consider constitutional claims, and lacks special expertise on constitutional claims. JA154-178; JA161-62; JA1650-53; *Öztürk*, 136 F.4th at 400-01. The majority agreed that "[i]f Khalil were truly unable to build a fulsome administrative record before the immigration courts, then his legal questions

could not be reviewed adequately on a PFR." Op.35. And it also agreed that there were serious "limits" on the immigration courts' ability to take evidence, in particular on the FPG charge, and that "structure of the immigration-court system is ill-suited" to addressing the kind of constitutional challenges brought by Mr. Khalil. *Id.*; *see* JA1650-53; JA157-58; JA162. But it concluded that a court of appeals might be able to invoke an unprecedented and uncertain potential failsafe provision of the Hobbs Act to allow it to "deal with the problem" of entirely deficient factfinding through a remand to a federal district court. Op.35-36.

As the dissent pointed out, nothing about the majority's interpretation of the INA and the Hobbs Act is guaranteed in the Fifth Circuit, where Mr. Khalil will litigate his PFR—perhaps after already being removed, since (unlike other circuits) the Fifth Circuit rarely grants temporary stays of removal. Dissent.25. And the Supreme Court, in *AADC*, cast serious doubt on the majority's interpretation. 525 U.S. at 488 n.10. While the majority washed its hands of that problem by concluding that *its* interpretation, rather than what would happen in the real world, is what matters, Op.37-38, its resolution blithely embraces the possibility that, through a cruel shell game, this Court closes the door to habeas relief on the premise that the door to

legitimate factfinding will be open on a PFR only for Mr. Khalil to find that the second door is also closed. Moreover, resort to this kind of last-ditch remedy would lead to even more delay, even further undermining the meaningfulness of judicial review as a substitute for the kind of prompt consideration of Mr. Khalil's First Amendment claim would receive in habeas. The majority all so briefly insists that all of this amounts to an "adequate and effective" substitute for habeas, but it is not. The Suspension Clause, and the First and Fifth Amendment themselves under Article III, ensure far more meaningful protections from executive detention.[17]

## CONCLUSION

The Court should grant the petition.

---

[17] *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (in absence of a clear statement of congressional intent, courts must interpret statutes to "avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (cleaned up)); *see also* Akhil Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. Rev. 205, 250 (1985); Daniel J. Meltzer, *Congress, Courts, and Constitutional Remedies*, 86 Geo. L.J. 2537, 2570 (1998).

Respectfully submitted,

Dated: March 31, 2026

/s/ Brett Max Kaufman

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
Tel: (973) 854-1715

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Omar Jadwat
Noor Zafar
Michael K.T. Tan
Sidra Mahfooz
Brian Hauss
Esha Bhandari
Brett Max Kaufman
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Naz Ahmad
Mudassar Hayat Toppa
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das
Kyle Barron
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805

|                                      | VAN DER HOUT LLP           |
|                                      | Marc Van Der Hout          |
|                                      | Johnny Sinodis             |
|                                      | Oona Cahill                |
|                                      | 360 Post St., Suite 800    |
|                                      | San Francisco, CA 94108    |
| *Counsel for Petitioner–Appellee*    | Tel: (415) 981-3000        |

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

/s/ Brett Max Kaufman
Brett Max Kaufman
*Counsel for Petitioner–Appellee*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2026, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Third Circuit by using the CM/ECF system. All counsel of record in this case are registered CM/ECF users.

*/s/ Brett Max Kaufman*
Brett Max Kaufman
*Counsel for Petitioner–Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A), as modified by the Court's February 9, 2026 order, because it contains 7,987 words, and it complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word's 14-point Charter typeface. I also certify that the text of the electronic and hard copies of this brief are identical.

/s/ Brett Max Kaufman
Brett Max Kaufman
*Counsel for Petitioner–Appellee*

## ANTI-VIRUS CERTIFICATION

I certify that an electronic copy of this brief was scanned for viruses using Windows Security anti-virus (version 1.435.67.0) and no virus was detected.

/s/ Brett Max Kaufman
Brett Max Kaufman
*Counsel for Petitioner–Appellee*